**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD HAEBERLEIN, <br><br> Defendants. | Civil Action No.: 1:21-cv-10479-IT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................4

I.    BIOGEN'S RESEARCH AND DEVELOPMENT OF ADUCANUMAB........................4

II.   THE PHASE 3 TRIALS OF ADUCANUMAB................................................................6

III.  THE PHASE 3 CLINICAL TRIAL DATA
      AND FDA APPROVAL OF ADUCANUMAB................................................................7

      A.    Biogen's Analysis of the Phase 3 Data and Its Discussions with the FDA .............7

      B.    Biogen Seeks Approval for Aducanumab................................................................9

      C.    The November 4, 2020 Publication of the FDA's Opinions on
            Aducanumab's Clinical Trial Data and Massie's Dissenting View.......................12

      D.    The Advisory Committee Meeting and Negative Votes........................................14

      E.    FDA Approval of Aducanumab..............................................................................15

ARGUMENT ...........................................................................................................................16

I.    BIOGEN'S SCIENTIFIC INTERPRETATIONS OF CLINICAL TRIAL
      DATA ARE EXPRESSIONS OF OPINION AND ARE NOT MATERIALLY
      FALSE OR MISLEADING STATEMENTS AS A MATTER OF LAW .........................16

      A.    Defendants' Statements Are Scientific Interpretations of Clinical Trial
            Data And Are Not Rendered "False or Misleading" by Alleged Dissenting
            Views ......................................................................................................................17

      B.    Statements Reflecting Biogen's Scientific Interpretations of
            Aducanumab's Clinical Trial Data and Efficacy Constitute Expressions of
            Scientific Opinion ..................................................................................................19

      C.    Plaintiffs Do Not Satisfy the *Omnicare* Standard for Pleading False or
            Misleading Expressions of Scientific Opinion .......................................................21

II.   THE COMPLAINT DOES NOT ALLEGE FACTS THAT SATISFY THE
      RIGOROUS STANDARDS FOR PLEADING SCIENTER ............................................24

III.  THE COMPLAINT DOES NOT ALLEGE FACTS TO ESTABLISH THAT
      DEFENDANTS' ALLEGED MISSTATEMENTS CAUSED ANY LOSSES ................29

IV.   PLAINTIFFS' SECTION 20(a) CLAIMS MUST BE DISMISSED ...............................32

CONCLUSION.........................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)........................................................................................................6

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ......................................................................................20

*In re Alkermes Sec. Litig.*,
No. 03 Civ 12091, 2005 WL 2848341 (D. Mass. Oct. 6, 2005)........................................29, 30

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
267 F.3d 30 (1st Cir. 2001)........................................................................................................4

*Angelos v. Tokai Pharmaceuticals, Inc.*,
494 F. Supp. 3d 39 (D. Mass. 2020) .............................................................................25, 26, 27

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)...................................................................................16, 23, 24, 28

*In re Biogen Secs. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016) .........................................................................................24

*In re Boston Sci. Corp. Sec. Litig.*,
686 F.3d 21 (1st Cir. 2012)...............................................................................................16, 26

*In re Boston Sci. Corp. Sec. Litig.*,
708 F. Supp. 2d 110 (D. Mass. 2010) ...............................................................................27, 31

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)..............................................................................................3, 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011)....................................................................................................28

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)....................................................................................................20

*Cody v. ConforMIS, Inc.*,
199 F. Supp. 3d 409 (D. Mass. 2016) .....................................................................................21

*Corban v. Sarepta Therapeutics, Inc.*,
No. 14 Civ. 10201, 2015 WL 1505693 (D. Mass. Mar. 31, 2015)................................. *passim*

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ...............................................................................29, 30

*Cozzarelli v. Inspire Pharms., Inc.*,
    549 F.3d 618 (4th Cir. 2008) ...............................................................................................3, 24

*Emerson v. Genocea Biosciences, Inc.*,
    353 F. Supp. 3d 28 (D. Mass. 2018) ........................................................................................23

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016)......................................................................................24

*Guerra v. Teradyne Inc.*,
    No. 01 Civ. 11789, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) ...........................................26

*Harrington v. Tetraphase Pharm. Inc.*,
    No. 16 Civ. 10133, 2017 WL 1946305 (D. Mass. May 9, 2017) ......................................19, 23

*Hill v. Gozani*,
    651 F.3d 151 (1st Cir. 2011)....................................................................................................22

*Kader v. Sarepta Therapeutics, Inc.*,
    No. 14 Civ. 14318, 2016 WL 1337256 (D. Mass. Apr. 5, 2016) ...............................................4

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020) ......................................................................................22

*Maldonado v. Dominguez*,
    137 F.3d 1 (1st Cir. 1998).................................................................................................16, 27

*Mehta v. Ocular Therapeutix, Inc.*,
    955 F.3d 194 (1st Cir. 2020)........................................................................................21, 27, 32

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019).....................................................................................................23

*Miller Inv. Tr. v. Morgan Stanley & Co., LLC*,
    308 F. Supp. 3d 411 (D. Mass. 2018) ......................................................................................29

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405, 415 (9th Cir. 2020) ...........................................................................................25

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
    No. 17 Civ. 12146, 2019 WL 1950399 (D. Mass. Apr. 30, 2019) ..........................................21

*Omnicare v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)..........................................................................................................3, 21, 22

iii

*In re Polaroid Corp. Sec. Litig.*,
134 F. Supp. 2d 176 (D. Mass. 2001) ...................................................................................29

*Ratner v. Ovascience, Inc.*,
134 F. Supp. 3d 621 (D. Mass. 2015) ...................................................................................29

*Sanders v. AVEO Pharm., Inc.*,
No. 13 Civ. 11157, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) ...................................26, 27

*In re Sanofi Secs. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015)......................................................................................19

*Simon v. Abiomed, Inc.*,
37 F. Supp. 3d 499 (D. Mass. 2014) .....................................................................................28

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
499 F. Supp. 3d 49 (D. Del. 2020).......................................................................................31

*Suna v. Bailey*,
107 F.3d 64 (1st Cir. 1997).................................................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................................................16

*Tongue v. Sanofi*,
816 F.3d 199, 214 (2d Cir. 2016)...............................................................................19, 20, 22

*In re Wayfair, Inc. Sec. Litig.*,
471 F. Supp. 3d 332 (D. Mass. 2020) .............................................................................31, 32

*Yan v. ReWalk Robotics Ltd.*,
973 F.3d 22 (1st Cir. 2020).................................................................................................22

**STATUTES**

15 U.S.C. § 78u-4 ....................................................................................................................16

Defendants Biogen Inc. ("Biogen" or "the Company"), and its officers Michel Vounatsos (Chief Executive Officer), Alfred W. Sandrock, Jr., M.D., Ph.D. (Head of Research and Development), and Samantha Budd Haeberlein, Ph.D. (Head of Neurodegeneration Development) (the "Individual Defendants" and, collectively with Biogen, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint (the "Complaint" or "AC"), ECF No. 42.

## PRELIMINARY STATEMENT

Biogen is a global biotechnology company that researches, develops and markets treatments for serious neurological diseases. For more than a decade, Biogen has pursued one of the most difficult challenges in modern medicine: a treatment for Alzheimer's disease, a neurodegenerative disease that progressively impairs memory, language and thinking, and affects more than 6 million Americans.

This securities case concerns aducanumab, Biogen's new Alzheimer's drug, branded as ADUHELM$^{TM}$—the first treatment approved by the U.S. Food and Drug Administration (the "FDA") directed at an underlying pathophysiology of Alzheimer's disease. Aducanumab was approved under the FDA's accelerated approval program on June 7, 2021, after which Biogen's per-share stock price increased to a closing price of $395.85—more than 30% higher than the prior day closing, and higher than the closing day stock price during the entirety of the Class Period.

The shareholder Plaintiffs in this case, however, rushed to file this lawsuit before the FDA had made its approval decision, focusing on stock price fluctuation during a short time period in November 2020. In an attempt to convert into securities fraud a scientific debate about data interpretation, Plaintiffs focus on statements and events during the FDA review process. In particular, on November 4, 2020, the FDA published a joint briefing book prepared by the FDA

and Biogen concerning the aducanumab data, in advance of an FDA advisory committee convening on November 6, 2020. The advisory committee provides non-binding views to the FDA. In the briefing book, the FDA stated that "the results of Study 302 [one of Biogen's two Phase 3 clinical trials, also known as the EMERGE trial] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab." (Declaration of William J. Trach ("Trach Decl.") Ex. A, at 57.) The FDA included in the appendix to the joint briefing book a dissent prepared by an FDA statistician. Following publication, Biogen's stock price increased. But then, on November 6, 2020, the members of the advisory committee publicly disagreed with several of the FDA's and Biogen's interpretations of the aducanumab data and seemingly agreed with some of the dissenting views in the appendix. The Company's stock price decreased following the meeting.

Seizing on this stock price drop, Plaintiffs—who purchased Biogen stock only after the FDA published the briefing book on November 4, 2020, and then sold on November 9, 2020, the first trading day after the advisory committee vote—contend that their losses were caused by purportedly misleading statements of Biogen about aducanumab's clinical trial data during the proposed one-year Class Period from October 22, 2019, until November 9, 2020. Plaintiffs' claim, however, is premised on the advisory committee votes and critiques of the clinical trial data contained in the dissenting appendix, which was made public at precisely the same time as the positive statements by the FDA in the joint briefing book that led Biogen's stock to rise.

The Complaint's allegations thus reflect nothing more than the existence of a genuine scientific debate about how to interpret complex data—and certainly do not plead facts showing that Defendants made materially false or misleading statements. Biogen never made any representations about advisory committee views or votes, or FDA approval; instead, the Company

2

warned investors that it would not speculate on the likelihood of approval and that regulatory authorities may ultimately delay or decline approval.  Plaintiffs essentially complain that Biogen should have drawn different scientific conclusions, but this theory is precluded by controlling Supreme Court and First Circuit authority holding that expressions of opinion, such as Biogen's scientific interpretations challenged here, are actionable only if Plaintiff satisfies the rigorous standards of *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  Those standards are not met here; indeed, Plaintiffs' fraud claim here fails based on the legal reasoning in *Corban v. Sarepta Therapeutics, Inc.*, No. 14 Civ. 10201, 2015 WL 1505693 (D. Mass. Mar. 31, 2015) (Talwani, J.), affirmed on appeal, 868 F.3d 31 (1st Cir. 2017), in which this Court rejected a similar attempt to convert expressions of scientific opinion made during an FDA process into securities fraud.  (See *infra* Argument, Part I.)

Plaintiffs also fail to plead factual allegations that establish a strong inference of scienter showing that each Defendant intended to deceive shareholders.  Plaintiffs' scienter theory here—that the Company was motivated to lie because it had "staked Biogen's future on an Alzheimer's treatment" (AC ¶ 5)—is not factually supported and has been squarely rejected by the First Circuit, which has held that alleged general motives to drive financial performance are ***not*** a sufficient basis to plead scienter.  *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 616 (1st Cir. 2017).  Nor do Plaintiffs offer any motive for Biogen (or any Individual Defendant) to pursue FDA approval if they did not believe their own scientific interpretations of the data: "It is improbable that [Defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure." *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 627 (4th Cir. 2008).  The Complaint therefore does not plead the requisite strong inference of scienter, which is an independent basis to dismiss this lawsuit.  (*See infra* Argument Part II.)

3

*Finally*, the Complaint does not plead loss causation—*i.e.* that the stock price drop after the advisory committee meeting was caused by Defendants' alleged misstatements. The only new information that was revealed after the FDA published the briefing book on November 4, 2020, was the publication of the advisory committee votes on November 6, 2020. Those votes were unknowable by Biogen until they happened, and Biogen did not offer ***any*** predictions at all about the outcome of those votes, much less misspeak on that topic. Further, investors already knew, including from the dissenting view in the appendix to the briefing book published by the FDA, that aducanumab's clinical trial data was the subject of scientific debate. Thus, Plaintiffs cannot plausibly contend that the November 9, 2020 stock drop was actually caused by revelation of any alleged fraudulent statement by Defendants. (*See infra* Argument Part III.)

For these reasons and others discussed below, the Complaint should be dismissed in its entirety and with prejudice.

## **BACKGROUND**[1]

### I.    **BIOGEN'S RESEARCH AND DEVELOPMENT OF ADUCANUMAB**

Alzheimer's disease is a neurodegenerative disorder in which the "brain cells that process, store and retrieve information degenerate and die." (AC ¶ 38.) According to the FDA, "more than 6 million Americans are living with Alzheimer's disease and this number is expected to grow as the population ages." (Trach Decl. Ex. N, at 3.) These "patients lose their memory and

---

[1]    In describing the relevant factual background here and in other places in this memorandum, Defendants rely on documents cited and quoted in the Complaint, which are incorporated by reference. *See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) ("When the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss.") (quotation marks omitted). In addition, the Court may take judicial notice of relevant documents published on the FDA's website, including the FDA's June 7, 2021, press release announcing the agency's approval of aducanumab. *See* Press Release, FDA, *FDA Grants Accelerated Approval for Alzheimer's Drug* (June 7, 2021), *available at* https://www.fda.gov/news-events/press-announcements/fda-grants-accelerated-approval-alzheimers-drug; *Kader v. Sarepta Therapeutics, Inc.*, No. 14 Civ. 14318, 2016 WL 1337256, at *11 (D. Mass. Apr. 5, 2016) (FDA official's response to petition was "an official statement of the FDA," and "constitute[d] a 'public record' of which the Court may take judicial notice").

cognitive functioning over time" and, in late stages, "can no longer hold a conversation or respond to their environment." (*Id*.) No novel therapies have been "approved for Alzheimer's disease since 2003," and as of the Class Period, no approved treatment has been "directed at the underlying pathophysiology of Alzheimer's disease." (*Id*. at 1; *see* AC ¶ 253 (alleging that as of the Class Period only "a few symptomatic treatments" were approved for Alzheimer's disease).)

As the Complaint alleges, the leading theory concerning Alzheimer's disease concerns an amyloid beta protein in the brain, which can take the form of easily metabolized single-molecule monomers, as well as larger forms, including oligomers and amyloid plaques. (AC ¶¶ 40–43.) "Genetic, neuropathological and cell biological evidence suggest that reducing or removing Aβ [amyloid beta] could be beneficial for patients with Alzheimer's disease." (Trach Decl. Ex. A, at 13; *see also* AC ¶ 42.) More than ten years ago, Biogen began studying aducanumab as a treatment for Alzheimer's. (AC ¶¶ 45–50; Trach Decl. Ex. A, at 13.) Biogen submitted an application for investigation of aducanumab to the FDA in 2011. (AC ¶ 50.)

In 2012, Biogen conducted a safety study of aducanumab referred to as Study 103 or the PRIME Phase 1b Study. (AC ¶¶ 52–53.) The primary purpose, referred to as an "endpoint" in clinical testing, of the study was to evaluate aducanumab's safety. (*Id*. ¶ 59.) In addition to establishing safety, "even though the study was not powered to detect changes in clinical measures of efficacy," the PRIME Phase 1b Study showed that, at a 10 mg/kg dosage, aducanumab resulted in a "statistically significant" reduction in amyloid beta aggregates in the brain as demonstrated using positron emission tomography analysis, or PET scans, and a corresponding "statistically significant" reduction in clinical decline on a number of indicative scales. (Trach Decl. Ex. A, at 26, 87–88; *see also* AC ¶ 60.) The FDA stated, on November 4, 2020, that "[d]espite the smaller

5

sample size [than in the Phase 3 trials], the 10 mg/kg dose arm was able to achieve statistical

significance according to the pre-specified analysis plan." (Trach Decl. Ex. A, at 90.)

## II.    THE PHASE 3 TRIALS OF ADUCANUMAB

Following discussion of the PRIME Phase 1b Study with the FDA, Biogen reached

agreement with the FDA on Phase 3 testing parameters for two "large, global, randomized, double-

blind, placebo-controlled, parallel-group studies designed to assess the efficacy, safety, PK and

pharmacodynamics of aducanumab." (Trach Decl. Ex. A, at 28; *see also* AC ¶ 63.) The "primary

objective of the studies was to evaluate the efficacy of aducanumab in reducing clinical decline"

using prespecified measures of clinical decline. (Trach Decl. Ex. A, at 28; *see also* AC ¶ 66.)

**Protocol Amendments**. During the course of the Phase 3 trials, two amendments

were made to the protocol that governed dosing of aducanumab:

- Under the original protocol, participants who showed signs of Amyloid Related Imaging Abnormalities ("ARIA"), a potential safety-adverse event, were to suspend dosing under certain circumstances, and then to resume dosing once ARIA was resolved at lower levels for the remainder of the trial. (AC ¶ 85; *see also* Trach Decl. Ex. A, at 63.) In July 2016, Protocol Version 3 was put in place, which provided that "participants who suspended dosing due to ARIA, after resolution of the findings, . . . could resume dosing at the same [prior] dose." (Trach Decl. Ex. A, at 33; *see also* AC ¶ 84–85.)

- Then, in March 2017, Protocol Version 4 was put in place following consultation with the independent monitoring committee and global regulators, which set the high-dose level for certain participants with greater risk of ARIA to 10 mg/kg, increased from 6 mg/kg. (Trach Decl. Ex. A, at 32; *see also* AC ¶¶ 88–89.)

Taken together, these amendments had "the effect of increasing exposure to" the 10 mg/kg dose

of aducanumab for participants, and, "[d]ue to differences in enrollment timing, the protocol

amendments influenced more patients in Study 302 [EMERGE] than Study 301 [ENGAGE]

because Study 302 [EMERGE] started later." (Trach Decl. Ex. A, at 63; *see also* AC ¶ 90.)

**Futility Analysis**. An interim analysis for futility was prespecified in the Phase 3

study protocols and statistical analysis plan. (Trach Decl. Ex. A, at 34; *see also* AC ¶ 91.) A

6

futility analysis is a common tool to provide early warning that a trial is unlikely to achieve its endpoints, which can be used to cease trials and avoid needless testing on humans. (Trach Decl. Ex. A, at 34.) The futility analysis on aducanumab was to be conducted based on data through the point at which approximately half of participants were enrolled through Week 78, which occurred on December 26, 2018. (AC ¶ 92; *see also* Trach Decl. Ex. A, at 34-35.) The futility analysis was conducted by an independent data monitoring committee, not Biogen. (AC ¶ 93.)

In March of 2019, the independent committee conducting the futility analysis recommended that Biogen terminate the Phase 3 trials based on the "probability calculated on the data at the interim date that the final data would" not "show statistical significance in favor of aducanumab." (AC ¶ 94; *see also* Trach Decl. Ex. A, at 35.) On March 21, 2019, Biogen publicly announced the discontinuation of the Study 301 (ENGAGE) and Study 302 (EMERGE) Phase 3 trials and related aducanumab trials based on the independent committee's futility analysis. (AC ¶ 98.) In the announcement, Biogen expressed its commitment to "advancing our pipeline of potential therapies in Alzheimer's disease," and committed to presenting data from the trials in the future "to inform ongoing research." (Trach Decl. Ex. C, at 1–2.)

### III. THE PHASE 3 CLINICAL TRIAL DATA AND FDA APPROVAL OF ADUCANUMAB

#### A. Biogen's Analysis of the Phase 3 Data and Its Discussions with the FDA

Further Phase 3 data was generated between the December 26, 2018 futility analysis cutoff date and the March 21, 2019 termination of the Phase 3 trials—meaning that months of blinded data was not available and had not been studied by either Biogen or the independent committee at the time that futility was declared. (AC ¶¶ 92, 98, 110; *see* Trach Decl. Ex. A, at 36-37.) Moreover, while the independent committee had reviewed the data from the two parallel

studies in pooled form (meaning that the data were combined), it was also possible to analyze the data from each study independently.  (Trach Decl. Ex. A, at 35–36.)

Biogen and its scientific team subsequently evaluated the data from each of the Phase 3 trials on its own, and that evaluation resulted in the significant scientific conclusions that: (i) "the results of [the] futility analysis w[ere] incorrect" (Trach Decl. Ex. D, at 2); (ii) the EMERGE (Study 302) Phase 3 trial had in fact "met its primary endpoint" (*id*. at 7); and (iii) although the ENGAGE (Study 301) Phase 3 trial had not met its primary or secondary endpoints, "the subset of patients who received sufficient exposure to 10 milligram per kilogram aducanumab . . . showed similar results to the comparable population from EMERGE, in terms of both amyloid plaque reduction and reduced clinical decline."  (AC ¶ 188.)

Biogen shared its preliminary findings and the underlying data with the FDA. (AC ¶ 119; *see also* Trach Decl. Ex. A, at 36–37.)  At a June 2019 meeting, the FDA's Office of Neuroscience told Biogen that the futility analysis may have been flawed and that "it would have been more appropriate if futility had not been declared."  (AC ¶ 119; *see* Trach Decl. Ex. A, at 37 (FDA minutes note that futility design may have been "flawed").)  Thus, "the FDA and Biogen agreed that further analyses of the Phase 3 data were needed to determine the next steps for the aducanumab development program."  (Trach Decl. Ex. A, at 37; *see also* AC ¶ 119.)

On October 21, 2019, the FDA informed Biogen that it had "concluded that early termination of Phase 3 program did not compromise the ability to interpret the results" and thus "the data were suitable for further analysis."  (Trach Decl. Ex. A, at 38; *see also* AC ¶ 121.)  In particular, the FDA and Biogen considered the discordant results of Studies 301 (ENGAGE) and 302 (EMERGE)—which led the FDA to inform Biogen that the data "suggest an understanding of the discordant results of Studies 301 and 302 sufficient to allow for independent consideration of

8

whether Study 302 might provide evidence adequate to establish the effectiveness of aducanumab for the treatment of Alzheimer's disease."  (AC ¶ 121 (citing FDA meeting minutes).)

### B.    Biogen Seeks Approval for Aducanumab

The next day—October 22, 2019, the start of the Class Period—Biogen announced that: (i) "the FDA indicated to [Biogen] that it is reasonable for [the Company] to file these two studies"; (ii) "following consultation with the FDA," Biogen believed "it is reasonable to submit a regulatory filing for aducanumab based on these data"; and (iii) "[b]ased on discussions with the FDA," the Company intended to file an application seeking approval of aducanumab.  (Trach Decl. Ex. D, at 2, 9, 21; *see also* AC ¶ 120 (alleging that Biogen had FDA's "blessing" to study and seek approval of aducanumab).)  There is no allegation that Biogen either misled the FDA or misinformed the public about its discussions with the FDA.  Following the announcement, Biogen's stock price jumped and analysts upgraded projections, emphasizing "Biogen's interactions with the FDA leading up to their announcement."  (Trach Decl. Ex. E, at 1.)

Over the following year, Defendants provided public updates on Biogen's ongoing analysis of the aducanumab data, explaining its interpretations of the clinical trial data, and, in particular, its explanations for the different results of the two Phase 3 trials.

With respect to the data from the Phase 3 trials, Defendants stated transparently the scientific interpretation that Study 302 (EMERGE) had met its primary endpoint of a reduction on the Clinical Dementia Rating Scale, but that Study 301 (ENGAGE) did not:

- Defendant Sandrock stated on October 22, 2019, that "reduction in clinical decline was statistically significant in EMERGE" but that only a portion of the patients' results from "ENGAGE support the findings of EMERGE."  (AC ¶ 186.)
- Defendant Budd Haeberlein stated on October 22, 2019, that a "statistically significant reduction on CSF phosphor-Tau levels [a measure of amyloid buildup in the brain] was observed in EMERGE" but "the primary and secondary endpoints were not met in ENGAGE."  (*Id*. ¶ 188.)

- Defendant Sandrock stated on January 30, 2020: "Final analysis of these data showed that EMERGE was a positive study. . . . On the other hand data from the ENGAGE study did not meet the primary endpoint." (*Id*. ¶ 203.)

- Defendant Sandrock stated on July 22, 2020: "EMERGE is the first study to show in effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. . . . [while] ENGAGE [was] a negative study." (*Id*. ¶ 207.)

- Defendant Sandrock stated on October 21, 2020, that "we have a robustly positive study in EMERGE, . . . then we have ENGAGE and we believe we understand why ENGAGE was a negative study." (*Id*. ¶ 215.)

Biogen also provided its scientific interpretation for why Study 301 (ENGAGE) was a negative study.  Biogen opined that the differences in enrollment timing in the two Phase 3 trials, combined with the effect of the mid-study protocol amendments, resulted in fewer Study 301 (ENGAGE) participants than Study 302 (EMERGE) participants receiving sufficient exposure to the 10 mg/kg dosage of aducanumab.  (Trach Decl. Ex. A, at 62–63.)  In particular, Biogen stated its scientific opinion that the "primary learning from the[] data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints," a finding that "was statistically significant in EMERGE" and supported by "the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE."  (AC ¶ 186.)  As explained by Defendant Sandrock at the outset of the Class Period: "Importantly, patients . . . who had enrolled early in the trials . . . had a lower average exposure to aducanumab in large part due to two protocol amendments that occurred sometime after the start of the trials." (AC ¶ 186.)  Defendant Sandrock further stated: "[T]here is a very sort of sharp dose response, . . . you have to get to high dose of aducanumab and intermediate dosing at least in an 18-month trial is not enough." (*Id*. ¶ 190.)  Defendant Budd Haeberlein similarly stated: the "individuals who were able to have the

10

opportunity for the intended dosing regimen, the so-called Protocol Version 4 group . . . did support the positive findings." (*Id*. ¶ 200.)[2]

Defendants also expressed the scientific opinion that, taken collectively, the Phase 3 studies, Study 301 (ENGAGE) and Study 302 (EMERGE), and the PRIME Phase 1b Study, supported the effectiveness of aducanumab. For example, as Defendant Sandrock summarized near the end of the Class Period: "our argument rests on the fact that we have a robustly positive study in EMERGE . . . . We have a supportive study in [the PRIME Phase 1b Study] . . . . And then we have ENGAGE and we believe we understand why ENGAGE was a negative study. And our belief is that it doesn't detract from the positive study." (AC ¶ 215.)

Finally, with respect to the risks, in the same earnings calls, presentations and other written statements that Plaintiffs allege are misleading, Defendants cautioned that while Biogen believed in the evidence of aducanumab's efficacy and was pursuing an application, aducanumab's fate rested, ultimately, with the FDA. In the October 22, 2019, announcement at the outset of the Class Period, Defendant Sandrock explained that while "there are circumstances where [] FDA can approve a drug based on a single study, ***it's up to them to determine what those circumstances are***." (Trach Decl. Ex. D, at 23 (emphasis added).) Throughout the Class Period, Defendants declined "to speculate on how the regulators would look at this kind of data." (*Id*., Ex. F, at 14; *see also id*., Ex. I, at 15 ("I don't want to comment on FDA's internal processes . . . And I can't comment on it.").) Biogen's public presentations likewise contained substantial warnings:

> These statements involve risks and uncertainties that could cause actual results to differ materially from those reflected in such statements, including actual timing and content of submissions to and decisions made by the regulatory authorities [about aducanumab];

---

2   Defendants also emphasized the importance of both enrollment timing and the protocol amendments by making comparisons between the population of Phase 3 participants who predated the protocol amendments and the population of participants who post-dated those amendments. (*See, e.g.*, AC ¶ 209 (comparing "pre PV4 [protocol version 4] population" and "post PV4 population"); *id*. ¶ 213 (same).)

11

regulatory submissions may take longer or be more difficult to complete than expected; ***regulatory authorities may require additional information or further studies, or may fail or refuse to approve or may delay approval of Biogen's drug candidates, including aducanumab***; . . . These statements are based on our current beliefs and expectations and speak only as of the date of this presentation.

(*E.g.*, Trach Decl. Ex. G, at 6 (emphasis added).)  The Company's risk disclosures in each public filing further cautioned that "even if later stage clinical trials are successful, regulatory authorities may delay or decline approval of our product candidates." (*Id.*, Ex. H, at 37.)

## C.    The November 4, 2020 Publication of the FDA's Opinions on Aducanumab's Clinical Trial Data and Massie's Dissenting View

Part of the review of aducanumab was a review of the clinical trial data by a committee of scientists tasked with providing independent input to the FDA (the "Advisory Committee").  (AC ¶ 217.)  In advance of that review, Biogen and the FDA jointly prepared a briefing document (the "Joint Report"), which the FDA published.  (AC ¶ 220; *see also* Trach Decl. Ex. A.)  The Joint Report reflected the scientific conclusions regarding aducanumab's efficacy that Biogen had previously disclosed.  As to the FDA, the Joint Report publicized for the first time the FDA's positive views, including: (i) "the results of Study 302 [EMERGE] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab" (Trach Decl. Ex. A, at 57 (quoted at AC ¶ 224)); (ii) the "results of Study 103 [PRIME Phase 1b] are appropriately viewed as supportive evidence of the effectiveness of aducanumab" (*id*. at 94 (alleged at AC ¶ 226)); and (iii) the "effect of aducanumab in Study 302 [EMERGE] is robust and exceptionally persuasive on several of the instruments used to evaluate efficacy." (*Id*. (quoted at AC  ¶ 227.)  As the same market analysts cited in the Complaint stated after publication, the Joint Report "corroborates [Biogen]'s prior assertions that FDA indicated it was reasonable to file" for approval of aducanumab.  (Trach Decl.

12

Ex. K, at 1; *see id.*, Ex. J ("There was clearly a highly collaborative process between [Biogen] and the FDA to maximally understand the dataset, indicating the Agency is on the same page.").)

Also published by the FDA with the Joint Report was an appendix prepared by Tristan Massie, an FDA statistician (the "Massie Appendix"), who dissented from the FDA's position on Biogen's scientific conclusions. Massie made his disagreement with Biogen's and the FDA's position clear: "In summary, the totality of the data does not seem to support the efficacy of the high dose." (AC, Ex. 1, at 255; *see also* AC ¶ 231.) Massie stated further: "Inconsistency on many levels summarizes the final clinical efficacy data" related to aducanumab. (AC, Ex. 1, at 253.) The Massie Appendix sets forth several statistical counterarguments to Biogen's and the FDA's scientific interpretations and opinions described in Joint Report. (*See id.*)

Massie's dissenting opinion and analyses were public and unmistakable. The Massie Appendix was published on the FDA's website on November 4, 2020—the same day as the entire Joint Report. (AC ¶¶ 220, 231 & Ex. 1.) The tenor of Massie's dissent also was recognized in the market, as demonstrated by the various analyst reports cited in the Complaint. A November 4, 2020, RBC report cited by Plaintiffs (AC ¶ 233(e)) noted that the "FDA's statistician reviewer was ***highly critical*** and notes he sees '***no compelling substantial evidence*** of treatment effect or disease slowing'"; the analyst also observed that "we expect the two panel statisticians to mirror that more skeptical view." (Trach Decl. Ex. J (emphasis added).) Similarly, a Raymond James report cited by Plaintiffs (AC ¶ 234(b)), observed that the Massie Appendix was "very negative" and reflects a view that "***the entire analysis is flawed*** and aducanumab doesn't work." (Trach Decl. Ex. K, at 1 (emphasis added).) A JPMorgan report cited by Plaintiffs (AC ¶ 234(a)), reported that there was a "conflict of opinions between the FDA reviewers and their statisticians, who are ***far more negative***." (Trach Decl. Ex. L, at 1 (emphasis added).)

13

Notwithstanding the dissenting views in the Massie Appendix, Biogen's stock price jumped on November 4, 2020. (AC ¶ 236.) As the Complaint concedes, this was a reaction to what the Plaintiffs describe as the FDA's "effusive" comments regarding the aducanumab trial data in the Joint Report. (*Id*. ¶ 222.) Analysts likewise suggested that the FDA's comments affected the Company's stock price: "FDA tea-leaves read much more positive than consensus." (*Id*. ¶ 233(d) (quoting Jeffries analyst); *id.* ¶ 234(a) (analyst report titled "To be Brief . . . the FDA Wants to Approve Adu"); *id*. ¶ 234(c) (analyst report titled "First pass of briefing docs suggest FDA has constructive view").)

### D.    The Advisory Committee Meeting and Negative Votes

On November 6, 2020, two days after publication of the Joint Report and the Massie Appendix, the Advisory Committee published its mixed votes on the following questions:

| QUESTION | YES | NO | UNCERTAIN |
|---|---|---|---|
| Does Study 302, viewed independently and without regard for Study 301, provide strong evidence that supports the effectiveness of aducanumab for the treatment of Alzheimer's Disease? | 1 | 8 | 2 |
| Does Study 103 provide supportive evidence of the effectiveness of aducanumab for the treatment of Alzheimer's Disease? | 0 | 7 | 4 |
| Has the Applicant presented strong evidence of a pharmacodynamics effect of aducanumab on Alzheimer's disease pathophysiology? | 5 | 0 | 6 |
| In light of the understanding provided by the exploratory analyses of Study 301 and 302, along with the results of Study 103 and evidence of a pharmacodynamics effect on Alzheimer's disease pathophysiology, is it reasonable to consider Study 302 as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease? | 0 | 10 | 1 |

(AC ¶ 239.) On November 9, 2020, the first trading day following the Advisory Committee votes, the Company's stock price dropped by approximately 28.2%. (*Id*. ¶ 252.)

14

### E.    FDA Approval of Aducanumab

On June 7, 2021, the FDA approved aducanumab, publishing a label authorizing aducanumab "for the treatment of Alzheimer's disease." (Trach Decl. Ex. O, at 2.)  The FDA approved aducanumab through its accelerated approval program, which is reserved for "a drug for a serious or life-threatening illness that may provide meaningful therapeutic benefit over existing treatments when the drug is shown to have an effect on a surrogate endpoint that is reasonably likely to predict a clinical benefit to patients." (*Id.*, Ex. N, at 1.)  According to the FDA: "In all studies in which it was evaluated, . . . Aduhelm consistently and very convincingly reduced the level of amyloid plaques in the brain in a dose- and time-dependent fashion.  It is expected that the reduction in amyloid plaque will result in a reduction in clinical decline" in patients with Alzheimer's. (*Id.* at 2.)  The FDA further stated: "The clinical trials for Aduhelm were the first to show that a reduction in these plaques—a hallmark finding in the brain of patients with Alzheimer's—is expected to lead to a reduction in the clinical decline of this devastating form of dementia." (*Id.* at 1.)  In addition, the FDA stated: "Although the Aduhelm data are complicated with respect to its clinical benefits, FDA has determined that there is substantial evidence that Aduhelm reduces amyloid beta plaques in the brain and that the reduction in these plaques is reasonably likely to predict important benefits to patients." (*Id.* at 3.)  Finally, the FDA stated that it "is requiring Biogen to conduct a post-approval clinical trial to verify the drug's clinical benefit." (*Id.*)  The day of the FDA's announcement, June 7, 2021, Biogen's stock price closed more than 30 percent higher over the previous close. (*See id.*, Ex. Q.)

Lead plaintiff Nadia Shash and representative Amjad Khan purchased Biogen securities on November 4 and 5, 2020, after the Joint Report was published, and—rather than waiting for the FDA approval decision—sold their shares on November 9, 2020, following the Advisory Committee vote. (ECF No. 10-3, at 2; ECF No. 42-2.)  Shareholders filed putative class

action lawsuits soon thereafter.  (Complaint, Nov. 13, 2020, ECF No. 1; Complaint, *Shapiro v. Biogen Inc.*, NO. 21 Civ. 10017, Jan. 5, 2021, ECF No. 1.)  The operative Complaint in this action was filed on April 26, 2021.  (Amended Complaint, ECF No. 42.)

## ARGUMENT

To state a claim, Plaintiffs must allege facts supporting six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  Such claims are subject to the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27, 30 (1st Cir. 2012); *Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998).  Specifically, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The Complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" *id*. § 78u-4(b)(2)(A)— namely, "intentional or willful conduct designed to deceive or defraud" or "a high degree of recklessness."  *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017) (quotation marks omitted).  This test is met "only if a reasonable person would deem the inference of scienter cogent ***and at least as compelling*** as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (emphasis added).

## I.    BIOGEN'S SCIENTIFIC INTERPRETATIONS OF CLINICAL TRIAL DATA ARE EXPRESSIONS OF OPINION AND ARE NOT MATERIALLY FALSE OR MISLEADING STATEMENTS AS A MATTER OF LAW

The purported misstatements identified in the Complaint are expressions of Biogen's scientific interpretations of data generated in various aducanumab clinical trials.  In

16

*Omnicare*, the Supreme Court held that expressions of opinion are not actionable unless: (i) the opinion was "both objectively and subjectively false"; (ii) the opinion includes untrue embedded facts; or (iii) the opinion holder omitted material facts about "the inquiry into or knowledge concerning a statement of opinion." *Corban*, 2015 WL 1505693 at *6. Thus, based on well-settled precedent holding that scientific opinions such as those expressed by Defendants are expressions of opinion that reflect a measure of subjective determination rather than known facts, the alleged misstatements are subject to *Omnicare*. As discussed below, the Complaint fails to allege facts satisfying any exception articulated by the Supreme Court, and thus fails to state a claim.

A.      **Defendants' Statements Are Scientific Interpretations of Clinical Trial Data And Are Not Rendered "False or Misleading" by Alleged Dissenting Views**

The theory of the Complaint apparently is that the Defendants' alleged statements about aducanumab were false or misleading because Massie disagreed with them in his dissenting report and because a majority of the Advisory Committee voted "no" on the questions put to the Committee by the FDA. In particular, the Complaint identifies four of Biogen's scientific opinions based on the Company's analysis of the aducanumab clinical trial data:

1.  The "reduction in clinical decline was statistically significant in EMERGE, and we believe . . . the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE." (AC ¶ 129.)

2.  The "Observed Reductions In Amyloid Plaque Were Correlated With Better Clinical Outcomes." (*Id.*, p. 40 (header).)

3.  "Regional Variation Was Not Important." (*Id.*, p. 49 (header).)

4.  The "Fact that All Endpoints In Study 302 Were Positive Supported Approval" of aducanumab. (*Id.*, p. 51 (header).)[3]

---

[3]  As to each of the four scientific conclusions expressed by Biogen, the FDA has expressed agreement. (*See* Trach Decl. Ex. A, at 83 ("A guiding principle of the hypothesis was that if aducanumab is effective and the effect is dose-related in Study 302, it follows that patients in Study 301 with adequate consistent dosing should also demonstrate an effect on clinical endpoints. . . . a variety of approaches . . . appears to show that consistent exposure to high doses of aducanumab does lead to similar treatment effects in the two studies."); *id.* at 57 ("Beneficial effects on clinical measures are supported by evidence suggesting a dose-response relationship on

17

The Complaint then identifies a series of statistical counterarguments to the above scientific conclusions, *all of which* derive directly from the Massie Appendix published on the FDA website on November 4, 2020 (*e.g.*, AC ¶ 141 ("As Massie noted, . . . .")), as shown below:

| **Plaintiffs' Allegation as to Why Biogen's Statements are False and Misleading** | **Massie Appendix** |
|---|---|
| "APOE4 carriers should experience better clinical outcomes on average after PV4 . . . [b]ut APOE4 carries did not experience better clinical outcomes in Study 302 after PV4." (AC ¶¶ 136 –37.) | "One can see in Figure 5 that . . . the [APOE4] treatment groups were more consistent from pre-PV4 to post-PV4." (AC Ex. 1, at 278.) |
| "[P]atients who receive more 10mg/kg doses should experience better clinical outcomes on average . . . [y]et, in Study 302, whether a patient received 6, 8, 10, 12 or 14 doses had no impact." (AC ¶¶ 139–40.) | "However, one can notice that study 302 shows no real difference between >=6, >=8, >=10, >=12 or =14, which would suggest that the number of 10 mg/kg doses doesn't matter." (AC Ex. 1, at 289.) |
| "Yet in both Studies 301 *and* 302, patients whose high-dose treatment was interrupted by ARIA and so received *fewer* high doses performed numerically better than those whose treatment was not interrupted and received more high doses." (AC ¶ 142.) | "[T]he subgroup requiring dose titration adjustments due to ARIA (requiring some unblinding) and so getting fewer 10 mg/kg doses is numerically better . . . ." (AC Ex. 1, at 283.) |
| "APOE4 non-carriers on average would be expected to experience more favorable clinical results . . . [However], in Study 302, APOE carriers experienced better clinical outcomes." (AC ¶¶ 146, 148.) | "For all of the four key endpoints the APOE-estimated effect is lower than APOE+ for both low and high doses . . . ." (AC Ex. 1, at 287.) |
| "Neither the correlation coefficient nor $R^2$ showed a meaningful relationship between amyloid beta levels and positive clinical outcomes.  In fact, the correlation coefficient in Study 302 – the successful study – showed a negative relationship." (AC ¶ 166.) | "In summary, for high dose patients the [clinical scores and] changes in Aβ . . . are uncorrelated." (AC Ex. 1, at 293–94.)  "The correlation with the biomarker for . . . study 302 is in the wrong direction, i.e., the wrong side of no correlation." (*Id*. at 293.) |

clinical outcomes and by evidence of a dose- and time-dependent relationship on biomarkers of fundamental Alzheimer's disease pathophysiology, including brain amyloid burden, the primary direct market of aducanumab's intended mechanistic effect."); Trach Decl. Ex. O, at 13 ("The estimate of the treatment effect favored ADUHELM across all prespecified subgroups of interest."); Trach Decl. Ex. A, at 51 ("Study 302 provides the primary evidence of effectiveness of aducanumab.  The effect of aducanumab in Study 302 is robust and exceptionally persuasive on several of the instruments used to evaluate efficacy.").)

| **Plaintiffs' Allegation as to Why Biogen's Statements are False and Misleading** | **Massie Appendix** |
|---|---|
| "There were statistically significant differences between countries in the effect of aducanumab."  (AC ¶ 174.) | "[T]here was statistically significant variation . . . in the treatment effect across countries." (AC Ex. 1, at 326.) |
| "That Study 302 was positive on all endpoints is not meaningful because . . . the endpoints are not independent of each other." (AC ¶ 182.) | "The correlations among the primary and secondary endpoints at Week 78 are substantial and all easily nominally significant."  (AC Ex. 1, at 337.) |

Finally, the Complaint alleges repeatedly that Defendants' public statements of belief concerning the clinical trial results are "misleading" because Defendants did not disclose or acknowledge the counterarguments presented in the Massie Appendix.  (*See* AC ¶¶ 186–226.)  For example, in paragraph 186, the Complaint quotes a statement that reiterates Biogen's scientific conclusion that a "reduction in clinical decline was statistically significant in EMERGE, and we believe" that "the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE." (AC ¶ 186.)  In the next paragraph, the Complaint alleges that the statement is misleading by reference to the counterarguments set out in the Massie Appendix.  (*Id*. ¶ 187.)  The Complaint repeats this pattern for ***each and every*** purported misstatement in the Complaint.  (*See id*. ¶¶ 186–216.)  (For ease of reference, the alleged misstatements identified in the Complaint are listed in their entirety in Trach Decl. Ex. R.)

**B.     Statements Reflecting Biogen's Scientific Interpretations of Aducanumab's Clinical Trial Data and Efficacy Constitute Expressions of Scientific Opinion**

"[C]ourts have been clear that scientific opinions are just that: opinions" and thus are actionable only if they are "without reasonable basis or objectively false."  *Harrington v. Tetraphase Pharm. Inc.*, No. 16 Civ. 10133, 2017 WL 1946305, at *5 (D. Mass. May 9, 2017).  Here, Biogen's scientific opinions resulted from analyses of clinical data—the hallmark of opinion, not objective fact.  *See In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 543–44 (S.D.N.Y.

19

2015) ("Courts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions.") (collecting cases; quotation marks omitted), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  That there were differing opinions about the clinical trial data between Biogen and Massie, Massie and the FDA, the FDA and the Advisory Committee, and members of the Advisory Committee themselves (the votes were not unanimous), merely reflects a robust scientific debate—as the FDA noted when it granted accelerated approval.  (*See* Trach Decl. Ex. N, at 1 ("As is often the case when it comes to interpreting scientific data, the expert community has . . . differing perspectives.").)

This Court's decision in *Corban* is instructive on this point.  There, the defendant pharmaceutical company was alleged to have misstated the efficacy of its developmental drug by relying on a subset of the tested population.  2015 WL 1505693, at *6.  This Court dismissed those claims, noting that investors were "aware of the company's use of the [subset] population" and holding that there was nothing improper about the company "defend[ing] use of the [subset] population and cast[ing] its trial results in a positive light."  *Id*.  This Court further concluded that "the challenged statements consist of interpretations of the company's data, which constitute non-actionable expressions of opinion" unless *Omnicare* is satisfied.  *Id*.; *see In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009) ("Medical researchers may well differ . . . as how best to interpret data garnered under various protocols.").  This Court's opinion was affirmed by the First Circuit, *see Corban*, 868 F.3d at 31, and also is consistent with opinions from other federal Circuit Courts expressly holding that scientific interpretations of clinical data are opinions that are subject to the standards set forth in *Omnicare*.  *See Tongue*, 816 F.3d at 214 (holding that statements about a drug's efficacy "are little more than a dispute about the proper interpretation of

20

data" which are protected expressions of opinion); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (affirming grant of a motion to dismiss on the basis that "[i]nterpretations of clinical trial data are considered opinions").

In short, Biogen was permitted to draw its own scientific conclusions from the data. Moreover, Defendants repeatedly said that the Company's scientific interpretations were statements of belief. (*See, e.g.*, AC ¶ 129 ("[W]e ***believe*** that the totality of these data support a regulatory filing"); *id.* ¶ 197 ("I do ***believe*** that we knew dose was important [in evaluating aducanumab's efficacy]."); *id.* ¶ 200 ("And overall, the data that we share, we ***believe***, supports the disease-modifying mechanism of action of aducanumab."); *id.* ¶ 207 ("We ***believe*** that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE."); *id.* ¶ 215 ("And then we have ENGAGE and we ***believe*** we understand why ENGAGE was a negative study. And *our belief* is that it doesn't detract from the positive study.") (emphasis added throughout).) These explicit identifications of opinion likewise requires application of rigorous *Omnicare* standards. *E.g.*, *Cody v. ConforMIS, Inc.*, 199 F. Supp. 3d 409, 419 (D. Mass. 2016) (statement that "we believe [specific facilities] are compliant with the FDA's [requirements] . . . appears to be an unvarnished opinion").

C.  **Plaintiffs Do Not Satisfy the *Omnicare* Standard for Pleading
False or Misleading Expressions of Scientific Opinion**

Application of *Omnicare* compels dismissal. *First*, with respect to subjective falsity, the Complaint does not even attempt to plead facts showing that Defendants did not believe the scientific conclusions regarding the aducanumab data when made, which is required to render an opinion actionable. *See Omnicare*, 575 U.S. at 186. This alone is fatal. *Corban*, 2015 WL 1505693, at *6; *see also In re Ocular Therapeutix, Inc. Sec. Litig.*, No. 17 Civ. 12146, 2019 WL 1950399, at *8 (D. Mass. Apr. 30, 2019) (claim dismissed where defendant offered opinions

21

prefaced with "we think" and the complaint did not plead facts showing subjective disbelief), *aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020).

*Second*, the Complaint does not plead objective falsity, as required by the Supreme Court's decision in *Omnicare*. 575 U.S. at 185–86. The Complaint at most alleges that the Advisory Committee and Massie disagreed with Biogen's and the FDA's scientific conclusions, and it is well settled that scientific disagreement among statistical experts is not a basis for pleading falsity. In *Leavitt v. Alnylam Pharmaceuticals, Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020), for example, the court dismissed claims premised on statements that a developmental drug "could support" a broad label, which the FDA subsequently declined to approve. 451 F. Supp. 3d 176, 184 (D. Mass. 2020). In doing so, the *Leavitt* Court emphasized that "[a]lthough the FDA interpreted trial results differently . . . those facts alone do not render the statements fraudulent or misleading." *Id.*; *see also id*. at 185 ("That [the company] presented its data in a positive light and made optimistic statements before FDA review . . . does not make those statements materially misleading.") (citing *Corban*, 2015 WL 1505693 at *6). And here, the FDA's subsequent approval decision further disposes of the notion that Defendants' scientific interpretations were objectively false. *See Tongue*, 816 F.3d at 214 (allegations that "Defendants' interpretations of the data was irrational or unreasonable . . . have little merit" following FDA acceptance).

*Finally*, under *Omnicare*, Plaintiffs cannot save their claims by couching them in terms of omissions. To start, Biogen was not required to disclose all competing arguments that might undercut its opinions. As the Supreme Court has held, an "opinion . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" since "investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189. Thus, liability attaches "only where an issuer's failure to include a material fact

22

has rendered a published statement misleading." *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 31 (1st Cir. 2020) (quotation marks omitted). This standard is not remotely met here.

Further, under *Omnicare*, Defendants' statements also must be considered "in the light of the circumstances under which they were made." *Hill v. Gozani*, 651 F.3d 151, 152 (1st Cir. 2011) (citation omitted). Here, Defendants stated throughout the Class Period that the study of aducanumab data remained in progress (*see, e.g.*, AC ¶ 157 ("we're still learning as we look at the data")), and Biogen "had no legal obligation to loop the public into each detail" of the ongoing work. *Corban*, 868 F.3d at 40. Similarly, Defendants cautioned that FDA approval was uncertain and not within Biogen's control. (*See supra* 10–11.) Such warnings defeat fraud claims premised on alleged misstatements of optimism about developmental drugs. *See, e.g.*, *Harrington*, 2017 WL 1946305 at *9 (warning about "possibility of the FDA not approving the drug" was "anything but boilerplate" and provided notice of possible scientific disagreement by the FDA).

In all events, the Complaint pleads no omissions case: It contains no allegation that Defendants omitted dissenting views of the clinical data with which they agreed or saw as valid criticisms (much less did so during the full year-long Class Period). Absent such allegations, no omissions theory can be supported. *See Suna v. Bailey*, 107 F.3d 64, 70 (1st Cir. 1997) (affirming dismissal absent allegations of "facts **known by [defendant]**, and **contemporaneous with the statements** [alleged to be misleading], that would show" defendant disbelieved the statements that defendant had made) (emphasis added); *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 38 (D. Mass. 2018) ("statement cannot be intentionally misleading" based on withheld data "if the defendant did not have sufficient information at the relevant time" to doubt the statement and "to form an intent not to disclose" the additional data) (quotation marks omitted).

23

## II.    THE COMPLAINT DOES NOT ALLEGE FACTS THAT SATISFY THE RIGOROUS STANDARDS FOR PLEADING SCIENTER

To state a securities fraud claim, the Complaint "must state with ***particularity*** facts giving rise to a ***strong inference*** that the defendant acted with" scienter.  *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019) (emphasis in original).  This "rigorous" test requires a showing of "intentional or willful conduct designed to deceive or defraud investors" or "a high degree of recklessness."  *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017) (quotation marks omitted).  The First Circuit's application of this rule "is noticeably strict and rigorous."  *In re Biogen Secs. Litig.*, 193 F. Supp. 3d 5, 12 n.1 (D. Mass. 2016) (citing *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008)).  Thus, Plaintiffs must show that "a reasonable person would . . . deem" their theory of scienter "cogent and ***at least as compelling*** as any opposing inference one could draw."  *In re Biogen Inc. Sec. Litig.*, 857 F.3d at 41 (emphasis added; citing *Tellabs*, 551 U.S. at 324).  The Complaint does not come close to doing so.

The only compelling inference to be drawn from the Complaint is that Defendants' statements reflected their honestly held interpretations of clinical trial data.  To hold otherwise, the Court would have to assume that Defendants pursued approval of a drug in which they lacked confidence, even after Biogen (i) responsibly discontinued clinical trials following an independent futility analysis in March 2019, (ii) analyzed clinical trial data that had been generated after the cutoff for data consideration in the futility analysis, (iii) concluded that the full set of data supported aducanumab's efficacy, and (iv) consulted with the FDA about pursuing an application for approval of aducanumab based on the full clinical trial data.  That, ultimately, the FDA approved aducanumab for treatment of Alzheimer's disease under its accelerated approval program based on that same clinical trial data only reinforces the compelling inference that Biogen reasonably believed in the strength of the clinical trial evidence.

24

Conversely, courts have repeatedly rejected the inference that a company such as Biogen would invest in a drug when it supposedly knows the drug does not work. *See Cozzarelli*, 549 F.3d at 627 (finding it "improbable that [Defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure"); *see also Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) (rejecting "implausible" allegations that defendant invested "substantial time and resources in clinical studies and NDA submissions that it knew were doomed to fail"). As the Ninth Circuit stated in *Nguyen v. Endologix, Inc.*: "[W]hy would defendants promise the market that the FDA would approve Nellix if defendants knew the FDA would eventually figure out that Nellix could not be approved . . . ? The theory does not make a whole lot of sense." 962 F.3d 405, 415 (9th Cir. 2020). And to give rise to a compelling inference, a scienter theory must make sense: "a viable scienter theory" requires "plausible allegations of concrete benefits that could be realized . . . and the likely prospect of achieving such benefits." *Angelos v. Tokai Pharmaceuticals, Inc.*, 494 F. Supp. 3d 39, 59 (D. Mass. 2020).

In an effort to plead scienter, Plaintiffs principally advance the argument that Defendants were motivated to knowingly misstate aducanumab's efficacy because aducanumab was critical to Biogen's business. (*See* AC ¶ 5 ("Defendants staked Biogen's future on an Alzheimer's treatment, aducanumab.").) This argument is factually infirm: Shortly after the outset of the Class Period, Biogen publicly reported more than $11 billion in annual product revenue and nearly $6 billion in annual net income for 2019. (Trach Decl. Ex. H, at F-2.)

Furthermore, First Circuit precedent expressly rejects Plaintiffs' scienter theory. In *Brennan*, the plaintiff had alleged that the "all of the company's hopes . . . hinged on [the developmental drug's] success," and thus that the defendants "had a motive to 'shade the truth'" about clinical study results. 853 F.3d at 616. The First Circuit held that such allegations were no

25

different from "the usual concern by executives to improve financial results" and thus "do not satisfy the PSLRA without something more." *Id*. (quotation marks omitted). Indeed, in *Brennan* the plaintiff also made allegations that the individual defendants' compensation structure and stock sales further showed scienter (the Complaint here makes no comparable allegations), yet the First Circuit affirmed the district court's finding that "the complaint as a whole fails to raise a strong inference of scienter." *Id*. at 615. Similarly, in *Angelos*, the district court held that scienter was not demonstrated merely through allegations regarding "the importance of the success of the development of [the developmental drug] to [the company]'s continued viability." 494 F. Supp. 3d at 59. Finding that the pleading lacked the requisite "something more" required by the First Circuit, the *Angelos* Court dismissed plaintiff's fraud claims because "there are no allegations of any internal reports or communications indicating that defendants knew of problems with the Phase 3 trial . . . or of any discussions in which defendants expressed an intent to mislead investors about the Phase 3 trial." *Id*. at 58; *see also Sanders v. AVEO Pharm., Inc.*, No. 13 Civ. 11157, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (allegations of potential financial benefits are insufficient for scienter "in the absence of personal benefit inuring to the Defendants").

The Complaint here also is devoid of factual allegations showing the "something more" the First Circuit requires. As to Biogen, the Complaint alleges no corporate transaction or other opportunity from which Biogen would benefit by artificially inflating its stock price. *Angelos*, 494 F. Supp. 3d at 59. Nor does the Complaint allege any specific, tangible benefit flowing to any Individual Defendant from the purported misstatements regarding aducanumab's efficacy. Indeed, Plaintiffs do not allege that any Individual Defendant engaged in suspicious sales of Biogen stock for personal gain, which also weighs against a finding of scienter. *See Guerra v.*

26

*Teradyne Inc.*, No. 01 Civ. 11789, 2004 WL 1467065, at \*28 (D. Mass. Jan. 16, 2004) (failure to allege stock sales weighs against a finding of a compelling inference of scienter).

The Complaint also does not identify any employee at Biogen who purportedly acted with an intent to deceive shareholders.  The Complaint does not make a single allegation as to (i) when the Individual Defendants had knowledge of a misstatement, (ii) how they had such knowledge, (iii) facts showing an intent to mislead, or (iv) any other basic fact that supports any inference of scienter.  Thus, the claims against the Individual Defendants necessarily fail, both because scienter as to them is not pleaded, *see In re Boston Sci. Corp.*, 686 F.3d at 31 (scienter requires allegations that "the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so"), and because the heightened pleading standards under Rule 9(b) and the PLSRA are not satisfied.  *See Maldonado v. Dominguez*, 137 F.3d 1, 9–10 (1st Cir. 1998) (the First Circuit "has been especially rigorous in applying Rule 9(b) in securities fraud actions" and has "held inadequate a complaint's general averment of the defendant's knowledge of falsity" without "specific facts" showing that the defendant "knew that a statement was false or misleading").  Nor does the Complaint identify any Biogen employee whose purported fraudulent intent can be attributed to Biogen.  *See In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 127 (D. Mass. 2010) (holding that the "most straightforward way" to infer scienter against an entity is "to plead it for an individual").

Tellingly, the Complaint contains no "allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements" that Defendants here were "aware that they were withholding vital information or at least were warned by others that this was so"—which the First Circuit has held are the hallmarks of well-pleaded facts showing scienter.  *Mehta*, 955 F.3d 194, 206–07 (1st Cir. 2020).  The Complaint cites no confidential

27

witness claiming an intent to mislead, no internal document contradicting the Company's scientific conclusions, and no insider trading. Courts in this circuit routinely dismiss securities claims in the absence of such allegations. *E.g.*, *Angelos*, 494 F. Supp. 3d at 57–58 ("[T]here are no allegations of any internal reports or communications indicating that defendants knew of problems with the Phase 3 trial when the allegedly misleading statements were made, or of any discussions in which defendants expressed an intent to mislead investors about the Phase 3 trial."); *Sanders*, 2015 WL 1276824 at *9–10 (dismissal based on "no allegation of insider trading; no divergence of internal reports and external statements on the same subject; [and] no personal gain to the Defendants"); *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 522 (D. Mass. 2014) (same).

In a last-ditch effort to buttress their scienter case, Plaintiffs allege a few "additional facts further probative of scienter." (AC, p. 81 (header).) They are nothing of the sort.

*First*, Plaintiffs quote an analyst exchange in which Defendants stated that Biogen published less data from aducanumab's Phase 3 trials than it had historically published for other Phase 3 trials. (AC ¶¶ 268–70.) That Biogen transparently disclosed that it was not publishing all of the available data does not support any inference of scienter—to the contrary, the transparency of that statement undercuts the claim of scienter. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir. 2011) ("[A]ttempts to provide investors with warnings of risks generally weaken the inference of scienter."); *see also In re Biogen Inc. Sec. Litig.*, 857 F.3d at 42–43 (cautious statements and warnings about a developmental drug and its potential limits "undercut[s]" any strong inference of scienter) (quotation marks omitted). Furthermore, Biogen's Phase 3 trials were unusual because they were cut short due to a futility analysis but revived following review of additional data—making any purported deviation from historical practice entirely unsurprising. Indeed, in the very same statement, Defendant Sandrock

28

noted that Biogen intended to present the data to the FDA for consideration, and thus the Company was "very sensitive about what we want to present [publicly] now." (AC ¶ 269.)

*Second*, the Complaint quotes Defendant Sandrock's statement that Biogen does not file applications "willy-nilly" and took the process seriously. (AC ¶ 272.) But this statement corroborates that Defendants were sufficiently persuaded by the clinical trial data to pursue FDA approval—a belief vindicated by the FDA's approval decision. That Massie and the Advisory Committee members disagreed with Biogen's and the FDA's interpretations does not suggest that Defendants thought the aducanumab application was a "willy-nilly" submission. *See Ratner v. Ovascience, Inc.*, 134 F. Supp. 3d 621, 631 (D. Mass. 2015) (holding that statement that the FDA was likely to approve, which ended up "incorrect ***ex-post*** does not, without more, support a 'strong inference' that ***ex-ante*** [the statement] was knowingly false") (emphasis in original).

## III.    THE COMPLAINT DOES NOT ALLEGE FACTS TO ESTABLISH THAT DEFENDANTS' ALLEGED MISSTATEMENTS CAUSED ANY LOSSES

Plaintiffs' claims should be dismissed for an independent reason: the Complaint does not allege facts connecting either the purported inflation of or subsequent drop in Biogen's stock price to any alleged misstatements by Defendants. To plead loss causation, Plaintiffs must allege a "causal link between the alleged misconduct and the economic harm ultimately suffered." *In re Alkermes Sec. Litig.*, No. 03 Civ 12091, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005) (citation omitted). Here, because Plaintiffs' claims are premised on alleged misstatements, the Complaint "must allege that the misstatements were the reason the transaction turned out to be a losing one." *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 188 (D. Mass. 2001). Loss causation should be pleaded with specificity under Rule 9(b), as most courts in this district have held, *e.g.*, *Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 444–45 (D. Mass. 2018), and certainly must satisfy the plausibility standard of Rule 8. *See Coyne v. Metabolix, Inc.*,

29

943 F. Supp. 2d 259, 274 (D. Mass. 2013) ("Although I find that Rule 9(b) governs loss causation pleading, it is ultimately not material because I find the allegations here do not even reach the Rule 8 plausibility level."). Here, the Complaint meets neither standard, as its allegations demonstrate that Biogen's stock price drop was caused by the public disclosure of the Advisory Committee's votes—not by any purported revelation of any alleged prior misstatement by any Defendant.[4]

The fundamental tenet of loss causation is a corrective disclosure that connects the "current, present, negative information to the earlier false or misleading statement"—in other words, it simply is "not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other." *Coyne*, 943 F. Supp. 2d at 273. Here, Biogen's stock price dropped on November 9, 2020, the first day of trading following the Advisory Committee's votes on November 6. (AC ¶¶ 23, 238.) But the ***only*** new information in the market alleged in the Complaint is the ***outcome*** of those votes. The Complaint alleges no misstatement that was corrected by this new information—nor could it, as Defendants never predicted (and certainly never promised) a particular outcome. The Complaint thus fails entirely to establish a ***connection*** between the new information on November 6 (the Advisory Committee votes) and any prior alleged misstatement. This failure is fatal to the pleading of loss causation. *See Coyne*, 943 F. Supp. 2d at 273 ("If Plaintiff's loss resulted from the disclosure of negative information other than a prior false or misleading statement by the Defendants, then she . . . has not pled an adequate claim for securities fraud."); *see also In re Alkermes*, 2005 WL 2848341 at *11 (dismissal where there was "no allegation" that alleged misstatements "had any connection to the FDA non-approval letter and subsequent" decline in the company's stock price).

---

[4]  In fact, on October 22, 2019, the outset of the Class Period when the FDA announced that it viewed the Phase 3 data as sufficient to support an application, Biogen's stock price closed at $281.87. (Trach Decl. Ex. P.) On June 7, 2021, following the FDA's announcement of approval of aducanumab under its accelerated approval program, Biogen's stock price closed at $395.85. (*Id.* Ex. Q.)

Nor can Plaintiffs fall back on the argument that the Advisory Committee vote represents the manifestation of an undisclosed risk. As discussed above, Biogen warned of the risks inherent in the FDA approval process, and even the Massie Appendix—which Plaintiffs contend revealed the statistical counterarguments to Biogen's own scientific interpretations—was published at the same time as the Joint Report and before the Advisory Committee vote.[5] This, too, is fatal to Plaintiffs' claims. *See In re Boston Sci. Corp.*, 708 F. Supp. 2d at 128–29 (dismissal proper where market was aware of the alleged misstatements before stock drop based on publication on FDA's website). Based on the pleaded allegations, the only explanation for the November 9, 2020 stock drop is the new information from the Advisory Committee votes. *See In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 349–50 (D. Mass. 2020) (loss causation not shown where the complaint failed to adequately allege that the press release that caused the company's stock price drop was connected to or corrective of a prior alleged misstatement because loss causation allegations must "eliminate" other causes of stock price drop).

Finally, that Biogen's stock price moved in response to actions by the FDA and the Advisory Committee—and not in response to any alleged misstatements or purported correction thereof—also undercuts Plaintiffs' loss causation pleading. Indeed, all of the events that *Plaintiffs* contend moved the stock price are expressly tied to FDA and Advisory Committee actions, not statements by Defendants: (i) the stock increased at the outset of the Class Period, when the FDA agreed that aducanumab's Phase 3 data was a basis to proceed with an application for approval;

---

[5]     Plaintiffs' effort to plead around this fatal hole in their loss causation theory—that the Massie Appendix "was dense to the point of being impenetrable" (AC ¶ 231)—is unpersuasive. For one, the Massie Appendix itself plainly states in its executive summary that "there is no compelling substantial evidence of treatment effect or disease slowing." (AC Ex. 1, at 256.) Indeed, the very same analysts Plaintiffs cite were able to determine on November 4, 2020, the very day the Massie Appendix was published, that the Massie Appendix was "very negative" and reflected a view that the "entire analysis is flawed." (Trach Decl. Ex. K, at 1.) Plaintiffs could have done the same. *Cf. SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 65 n.5 (D. Del. 2020) (rejecting premise that disclosure could not be discerned when another investor was able to discover "the allegedly undisclosed indenture breach based on the very same public filing to which [plaintiff] points").

31

(ii) the stock price again increased on November 4, 2020, when the FDA published its own views of the aducanumab data for the first time; and, (iii) the stock price declined on November 6, 2020, when the only new information was the Advisory Committee's votes.  (AC ¶¶ 120–22, 220–27, 238–39.)  Plaintiffs' own pleading, which focuses on these stock price movements, demonstrates that Biogen's stock price rose and fell with publicly expressed opinions *of the FDA and Advisory Committee*—not Biogen's scientific interpretations, or any correction thereof.

## IV.    PLAINTIFFS' SECTION 20(a) CLAIMS MUST BE DISMISSED

The Complaint also asserts control-person claims under Section 20(a), seeking to impose liability on the Individual Defendants based on their alleged control of Biogen.  (AC p. 89 (header).)  However, it is established law that such claims cannot survive dismissal of predicate Section 10(b) claims.  *See Mehta*, 955 F.3d at 211 ("[B]ecause the complaint does not state a securities fraud claim under Section 10(b) and Rule 10b-5, plaintiff's derivative claim under Section 20(a) too must fail.").  Thus, because no predicate violation is pleaded, Plaintiffs' control-person claim must also be dismissed.  *See In re Wayfair*, 471 F. Supp. 3d at 350 (dismissing control person claim as "necessarily dependent on the existence of a Section 10(b) violation").

32

## CONCLUSION

For all of the reasons set forth above, Defendants' motion to dismiss should be granted and the Complaint should be dismissed in its entirety and with prejudice.

Dated:  June 25, 2021

Respectfully submitted,

*/s/* Audra J. Soloway_____
Audra J. Soloway (pro hac vice)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3289
Facsimile: (212) 492-0289
asoloway@paulweiss.com

/s/ William J. Trach_____
William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc., Michel*
*Vounatsos, Alfred W. Sandrock, Jr. and*
*Samantha Budd Haeberlein*

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent on June 25, 2021 to those identified as non-registered participants.

 /s/ Audra J. Soloway
Audra J. Soloway

33