**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| NADIA SHASH and AMJAD KHAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD HAEBERLEIN,<br><br>Defendants. | Civil Action No.: 1:21-cv-10479-IT<br><br>**Leave to File 35-Page Memorandum Granted on 8/2/21** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND..........................................................................................................................4

      A.     Clinical Trials of Aducanumab .................................................................................5

      B.     Biogen's Analysis of the Phase 3 Data and Its Discussions with the FDA ............7

      C.     Biogen Seeks Approval for Aducanumab.................................................................8

      D.     The November 4, 2020 Publication of the FDA's Opinions on
             Aducanumab's Clinical Trial Data and Massie's Dissenting View .......................9

      E.     The Advisory Committee Meeting and Negative Votes ......................................11

      F.     FDA Approval of Aducanumab ...........................................................................11

      G.    Shareholders Sue Following Advisory Committee Vote .....................................12

ARGUMENT ............................................................................................................................13

I.      BIOGEN'S SCIENTIFIC INTERPRETATIONS OF CLINICAL TRIAL
       DATA ARE EXPRESSIONS OF OPINION AND ARE NOT MATERIALLY
       FALSE OR MISLEADING STATEMENTS AS A MATTER OF LAW......................13

      A.     The Alleged Misstatements Are Scientific Interpretations of Clinical Trial
             Data, which Constitute Expressions of Opinion....................................................13

      B.     Plaintiffs Do Not Satisfy the *Omnicare* Standard for Pleading
             False or Misleading Expressions of Scientific Opinion ......................................15

          1.     The SAC Does Not Allege Subjective Falsity .........................................16

          2.     The SAC Does Not Allege Objective Falsity............................................16

               a.     Statements Concerning the Efficacy of High Doses of
                     Aducanumab ..................................................................................16

               b.     Statements Concerning the Correlation Between Plaque
                     Reduction and Clinical Outcomes .................................................20

               c.     Statement Concerning Demographics and Characteristics ...........22

                d.     Statement Concerning Clinical Endpoints....................................23

          3.     The SAC Does Not Plead Omissions of Material Facts Under
              *Omnicare*................................................................................................24

II.     THE SAC DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER .................27

III.    THE SAC DOES NOT PLEAD LOSS CAUSATION ....................................................33

IV.   THE SAC DOES NOT PLEAD RELIANCE OR PLAINTIFF STANDING BY
       SHASH AND KHAN.....................................................................................................34

V.     PLAINTIFFS' SECTION 20(a) CLAIMS MUST BE DISMISSED .............................35

CONCLUSION.........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ...................................................................................... 13, 28

*In re Alkermes Sec. Litig.*,
2005 WL 2848341 (D. Mass. Oct. 6, 2005)..................................................................33, 34

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
267 F.3d 30 (1st Cir. 2001) .................................................................................................4

*In re Biogen Inc. Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016) ...................................................................................29

*In re Boston Sci. Corp. Sec. Litig.*,
708 F. Supp. 2d 110 (D. Mass. 2010)................................................................................34

*In re Boston Sci. Corp. Sec. Litig.*,
686 F.3d 21 (1st Cir. 2012) ...............................................................................................13

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)...........................................................................................3, 29

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021)...............................................................26, 30

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014)..................................................................................35

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ..............................................................................................15

*Corban v. Sarepta Therapeutics, Inc.*,
2015 WL 1505693 (D. Mass. Mar. 31, 2015) ............................................................. passim

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017) ....................................................................................15, 23, 27

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013)................................................................................33

*Emerson v. Genocea Biosciences, Inc.*,
353 F. Supp. 3d 28 (D. Mass. 2018)..................................................................................27

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015)..................................................................................32

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020) .....................................................................35

*Guerra v. Teradyne Inc.*,
   2004 WL 1467065 (D. Mass. Jan. 16, 2004) ..........................................................29

*Hackel v. AVEO Pharms., Inc.*,
   474 F. Supp. 3d 468 (D. Mass. 2020).....................................................................25

*Harrington v. Tetraphase Pharm. Inc.*,
   2017 WL 1946305 (D. Mass. May 9, 2017) ....................................................... 14, 27

*Hill v. Gozani*,
   651 F.3d 151 (1st Cir. 2011).............................................................................26, 27

*Kader v. Sarepta Therapeutics, Inc.*,
   2016 WL 1337256 (D. Mass. Apr. 5, 2016) .............................................................4

*Karth v. Keryx Biopharmaceuticals, Inc.*,
   334 F.R.D. 7 (D. Mass. 2019)................................................................................35

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
   2021 WL 3079878 (D. Mass. July 21, 2021)...........................................................19

*Leavitt v. Alnylam Pharms., Inc.*,
   451 F. Supp. 3d 176 (D. Mass. 2020)......................................................................19

*Local No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc.*,
   140 F. Supp. 3d 120 (D. Mass. 2015)................................................................31, 35

*Maldonado v. Dominguez*,
   137 F.3d 1 (1st Cir. 1998) ......................................................................................32

*Mehta v. Ocular Therapeutix, Inc.*,
   955 F.3d 194 (1st Cir. 2020)............................................................................32, 35

*Metzler Asset Mgmt. GmbH v. Kingsley*,
   928 F.3d 151 (1st Cir. 2017).............................................................................13, 28

*Miller Inv. Tr. v. Morgan Stanley & Co., LLC*,
   308 F. Supp. 3d 411 (D. Mass. 2018)......................................................................33

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2008) ....................................................................................32

*Nguyen v. Endologix, Inc.*
  962 F.3d 405 (9th Cir. 2020) ...............................................................................28

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018) .......................................................... 16, 18

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
  2019 WL 1950399 (D. Mass. Apr. 30, 2019) .......................................................16

*Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)....................................................................................3, 13, 16, 26

*In re Rigel Pharms. Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ....................................................................... 18, 25

*Russo v. Bruce*,
  777 F. Supp. 2d 505 (S.D.N.Y. 2011) ...................................................................26

*In re Sanofi Secs. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ............................................................. 14, 18

*Simon v. Abiomed, Inc.*,
  37 F. Supp. 3d 499 (D. Mass. 2014)....................................................................32

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
  499 F. Supp. 3d 49 (D. Del. 2020) .......................................................................34

*Suna v. Bailey*,
  107 F.3d 64 (1st Cir. 1997) ...................................................................................27

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .......................................................................... 15, 16

*Urman v. Novelos Therapeutics, Inc.*,
  796 F. Supp. 2d 277 (D. Mass. 2011)...................................................................30

*In re Wayfair, Inc. Sec. Litig.*,
  471 F. Supp. 3d 332 (D. Mass. 2020)............................................................ 34, 35

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................... 13, 28

**OTHER AUTHORITIES**

Deena Beasley, *Biogen Alzheimer's drug closer to approval with U.S. FDA staff
  backing, shares jump 40%*, REUTERS (Nov. 4, 2020) .......................................12

Defendants Biogen Inc. ("Biogen" or "the Company"), and its officers Michel Vounatsos (Chief Executive Officer), Alfred W. Sandrock, Jr., M.D., Ph.D. (Head of Research and Development), and Samantha Budd Haeberlein, Ph.D. (Head of Neurodegeneration Development) (the "Individual Defendants" and, collectively with Biogen, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint (the "Complaint" or "SAC"), ECF No. 58.

## PRELIMINARY STATEMENT

Biogen is a global biotechnology company that researches, develops and markets treatments for serious neurological diseases. For more than a decade, Biogen has pursued one of the most difficult challenges in modern medicine: a treatment for Alzheimer's disease, a neurodegenerative disease that progressively impairs memory, language and thinking, and affects more than 6 million Americans.

This securities case concerns aducanumab, Biogen's new Alzheimer's drug, branded as ADUHELM™—the first treatment approved by the U.S. Food and Drug Administration (the "FDA") directed at an underlying pathophysiology of Alzheimer's disease. Aducanumab was approved under the FDA's accelerated approval program on June 7, 2021, after which Biogen's stock price increased to a closing price of $395.85—more than 30% higher than the prior day closing, and higher than the closing day stock price during the Class Period.

The shareholder Plaintiffs in this case, however, rushed to file this lawsuit more than six months before the FDA had made its approval decision, focusing on stock price fluctuation during a short time period in November 2020. In an attempt to convert into securities fraud a scientific debate about data interpretation, Plaintiffs focus on statements and events during the FDA review process. In particular, on November 4, 2020, the FDA published a joint briefing book prepared by the FDA and Biogen concerning the aducanumab data, in advance of an FDA advisory

committee convening on November 6, 2020. The advisory committee provides non-binding views to the FDA. In the briefing book, the FDA stated that "the results of Study 302 [one of Biogen's two Phase 3 clinical trials, also known as the EMERGE trial] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab." (Declaration of William J. Trach ("Trach Decl.") Ex. A, at 57.) The FDA included in the appendix to the joint briefing book a dissent prepared by an FDA statistician. Following publication, Biogen's stock price increased. But then, on November 6, 2020, the members of the advisory committee publicly disagreed with several of the FDA's and Biogen's interpretations of the aducanumab data. The Company's stock price decreased following the meeting.

Seizing on this stock price drop, Plaintiffs filed suit. But Plaintiffs purchased Biogen stock on November 4 and 5, 2020, *after* the FDA published the briefing book (and the dissenting appendix), and then sold on November 9, 2020, the first trading day after the advisory committee vote. While Plaintiffs contend that their losses were caused by Biogen's purportedly misleading statements about aducanumab's clinical trial data during the proposed one-year Class Period from October 22, 2019, until November 9, 2020, Plaintiffs' fraud claim is premised entirely on the critiques of the clinical trial data contained in the dissenting appendix, which were available to Plaintiffs *before* they purchased their stock. Plaintiffs' claim fails for several independent reasons.

*First,* the Complaint's allegations at most reflect the existence of a genuine scientific debate about how to interpret complex data—Plaintiffs do not plead facts showing that Defendants made materially false or misleading statements. Biogen never made any predictions about advisory committee views or votes, or FDA approval; instead, the Company warned investors that it would not speculate on the likelihood of FDA approval. *Infra* at n.11. Plaintiffs essentially

complain that Biogen should have drawn different scientific conclusions, and ask this Court to endorse their criticisms of the scientific data, but this theory is precluded by controlling Supreme Court and First Circuit authority. Expressions of opinion, such as Biogen's scientific interpretations challenged here, are actionable only if a plaintiff satisfies the rigorous standards of *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Those standards are not met here; indeed, Plaintiffs' fraud claim here fails based on the legal reasoning in *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693 (D. Mass. Mar. 31, 2015) (Talwani, J.), *aff'd*, 868 F.3d 31 (1st Cir. 2017), in which this Court rejected a similar attempt to convert expressions of scientific opinion made during an FDA process into securities fraud. Nor can Plaintiffs recast their claim as an actionable omission: Defendants were not obligated to disclose alternative opinions alleged by Plaintiffs, and Plaintiffs do not plead that these opinions were known and held by Defendants. (See *infra* Argument Part I.)

*Second,* Plaintiffs fail to plead factual allegations that establish a strong inference of scienter showing that each Defendant intended to deceive shareholders. Plaintiffs' scienter theory here—that the Company was motivated to lie because it had "staked Biogen's future on an Alzheimer's disease treatment" (SAC ¶ 3)—is not factually supported and, moreover, has been squarely rejected by the First Circuit, which has held that alleged general motives to drive financial performance are ***not*** a sufficient basis to plead scienter. *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 616 (1st Cir. 2017). Nor do Plaintiffs offer any motive for Biogen (or any Individual Defendant) to pursue FDA approval if they did not believe their own scientific interpretations of the data. While Plaintiffs amended their complaint to add allegations criticizing *the FDA's approval process*, none of these allegations demonstrate that Defendants did not honestly hold favorable

3

views of aducanumab's efficacy. The SAC therefore does not plead the requisite strong inference of scienter, which is an independent reason to dismiss this lawsuit. (*See infra* Argument Part II.)

*Finally*, the Complaint does not plead loss causation or reliance. Plaintiffs are required to plead that the stock price drop after the advisory committee meeting was caused by Defendants' alleged misstatements. But the only new information that was revealed after the FDA published the briefing book on November 4, 2020, was the publication of the advisory committee votes on November 6, 2020. Those votes were unknowable by Biogen until they happened, and Biogen did not offer *any* predictions about the outcome of the votes, much less misspeak on that topic. Further, both Plaintiffs purchased their shares *after* the dissenting appendix on which they base their complaint was published, and thus cannot claim to have been defrauded. Thus, Plaintiffs cannot plausibly contend that the November 9, 2020, stock drop was actually caused by revelation of any alleged fraudulent statement by Defendants, nor can Plaintiffs plead reliance on the alleged false statements. (*See infra* Argument Parts III and IV.)

For these reasons and others discussed below, the Complaint should be dismissed in its entirety and with prejudice.

## BACKGROUND[1]

Alzheimer's disease is a neurodegenerative disorder affecting more than 6 million Americans in which the "brain cells that process, store and retrieve information degenerate and die." (SAC ¶ 52; Trach Decl. Ex. B, at 3.) No novel therapies have been "approved for

---

[1] In describing the relevant factual background, Defendants rely on documents cited and quoted in the Complaint, which are incorporated by reference. *See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). In addition, the Court may take judicial notice of relevant documents published on the FDA's website, including the FDA's June 7, 2021, press release announcing the agency's approval of aducanumab. *See* Press Release, FDA, (Trach Decl. Ex. C); *Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at *11 (D. Mass. Apr. 5, 2016) ("[A]n official statement of the FDA . . . constitutes a 'public record' of which the Court may take judicial notice.").

Alzheimer's disease since 2003," and, as of the Class Period, no approved treatment had been "directed at the underlying pathophysiology of Alzheimer's disease." (*Id*. at 1.)

As the Complaint alleges, the leading theory concerning Alzheimer's disease concerns an amyloid beta protein in the brain. (SAC ¶¶ 54–57.) "Genetic, neuropathological and cell biological evidence suggest that reducing or removing Aβ [amyloid beta] could be beneficial for patients with Alzheimer's disease." (Trach Decl. Ex. A, at 13; *see also* SAC ¶ 56.) More than ten years ago, Biogen began studying aducanumab as a treatment for Alzheimer's. (SAC ¶¶ 59–62, 66; Trach Decl. Ex. A, at 13.) Biogen submitted an application for investigation of aducanumab to the FDA in 2011. (SAC ¶ 66.)

## A.    Clinical Trials of Aducanumab

**Phase 1b Clinical Trial.**    In 2012, Biogen conducted a safety study of aducanumab referred to as Study 103 or the PRIME Phase 1b Study. (SAC ¶¶ 68–69.) The primary purpose, referred to as an "endpoint" in clinical testing, of the study was to evaluate aducanumab's safety. (*Id*. ¶ 75.) In addition to establishing safety, "even though the study was not powered to detect changes in clinical measures of efficacy," the PRIME Phase 1b Study showed that, at a 10 mg/kg dosage, aducanumab resulted in a "statistically significant" reduction in amyloid beta aggregates in the brain as demonstrated using positron emission tomography analysis, or PET scans, and a corresponding "statistically significant" reduction in clinical decline on a number of indicative scales. (Trach Decl. Ex. A, at 26, 87–88; *see also* SAC ¶ 76.) The FDA later stated that "[d]espite the smaller sample size [than in the later Phase 3 trials], the 10 mg/kg dose arm was able to achieve statistical significance according to the pre-specified analysis plan." (Trach Decl. Ex. A, at 90.)

**Phase 3 Trials.** Following discussion of the PRIME Phase 1b Study with the FDA, Biogen reached agreement with the FDA on Phase 3 testing parameters for two "large, global, randomized, double-blind, placebo-controlled, parallel-group studies designed to assess the efficacy, safety, PK

5

and pharmacodynamics of aducanumab." (Trach Decl. Ex. A, at 28; *see also* SAC ¶ 77.) The "primary objective of the studies was to evaluate the efficacy of aducanumab in reducing clinical decline" using pre-specified measures of clinical decline. (Trach Decl. Ex. A, at 28; *see also* SAC ¶ 83.) By design, approximately two-thirds of the patient population in both studies carried a gene (ApoE4) that predisposed them to Alzheimer's disease ("Carriers"), which increases the risk for Amyloid Related Imaging Abnormalities ("ARIA"), an adverse safety event. (SAC ¶¶ 10, 79.)

**Protocol Amendments**. During the course of the Phase 3 trials, two amendments were made to the protocol that governed dosing of aducanumab:

- Under the original protocol, participants who showed signs of ARIA were to suspend dosing under certain circumstances, and then to resume dosing once ARIA was resolved at lower levels for the remainder of the trial. (SAC ¶ 96; *see also* Trach Decl. Ex. A, at 63.) In July 2016, Protocol Version 3 was put in place, which provided that "participants who suspended dosing due to ARIA, after resolution of the findings, . . . could resume dosing at the same [prior] dose." (Trach Decl. Ex. A , at 33; *see also* SAC ¶¶ 95–96.)

- Then, in March 2017, Protocol Version 4 was put in place, which set the high-dose level for certain participants with greater risk of ARIA to 10 mg/kg, increased from 6 mg/kg. (Trach Decl. Ex. A, at 32; *see also* SAC ¶¶ 99–100.)

Taken together, these amendments had "the effect of increasing exposure to" the 10 mg/kg dose of aducanumab for participants, and, "[d]ue to differences in enrollment timing, the protocol amendments influenced more patients in Study 302 [EMERGE] than Study 301 [ENGAGE] because Study 302 [EMERGE] started later." (Trach Decl. Ex. A, at 63.)

**Futility Analysis**. An interim analysis for futility was pre-specified in the Phase 3 study protocols and statistical analysis plan. (Trach Decl. Ex. A, at 34; *see also* SAC ¶ 101.) A futility analysis is a common tool to provide early warning that a trial is unlikely to achieve its endpoints, which can be used to cease trials and avoid needless testing on humans. (Trach Decl. Ex. A, at 34.) The futility analysis on aducanumab was conducted by a committee independent of Biogen (SAC ¶ 103), based on data through the point at which approximately half of participants were

6

enrolled through Week 78, which occurred on December 26, 2018. (*Id*. ¶ 102; *see also* Trach Decl. Ex. A, at 34–35.)

In March of 2019, the independent committee recommended that Biogen terminate the Phase 3 trials based on the "probability calculated on the data at the interim date that the final data would" not "show statistical significance in favor of aducanumab." (SAC ¶ 104; *see* Trach Decl. Ex. A, at 35.) On March 21, 2019, Biogen publicly announced the discontinuation of the Phase 3 trials based on the independent committee's futility analysis. (SAC ¶ 108.)

### B.    Biogen's Analysis of the Phase 3 Data and Its Discussions with the FDA

Further Phase 3 data was generated between the December 26, 2018, futility analysis cutoff date and the March 21, 2019, termination of the Phase 3 trials—meaning that months of blinded data was not available and had not been studied by either Biogen or the independent committee at the time that futility was declared. (SAC ¶¶ 102, 108, 118; *see* Trach Decl. Ex. A, at 36–37.) Moreover, while the independent committee had reviewed the data from the two parallel studies in pooled form (meaning that the data were combined), it was also possible to analyze the data from each study independently.   (Trach Decl. Ex. A, at 35–36.)

Biogen and its scientific team subsequently evaluated the data from each of the Phase 3 trials on its own, and that evaluation resulted in the significant scientific conclusions that: (i) "the results of [the] futility analysis w[ere] incorrect" (Trach Decl. Ex. D, at 2); (ii) the EMERGE (Study 302) Phase 3 trial had in fact "met its primary endpoint" (*id*. at 7); and (iii) although the ENGAGE (Study 301) Phase 3 trial had not met its primary or secondary endpoints, "the subset of patients who received sufficient exposure to 10 milligram per kilogram aducanumab . . . showed similar results to the comparable population from EMERGE, in terms of both amyloid plaque reduction and reduced clinical decline." (SAC ¶ 177.)

Biogen shared its preliminary findings and the underlying data with the FDA. (SAC ¶ 132; *see also* Trach Decl. Ex. A, at 36–37.) At a June 2019 meeting, the FDA's Office of Neuroscience told Biogen that the futility analysis may have been flawed and that "it would have been more appropriate if futility had not been declared." (SAC ¶ 132.) Thus, "the FDA and Biogen agreed that further analyses of the Phase 3 data were needed to determine the next steps for the aducanumab development program." (Trach Decl. Ex. A, at 37; *see also* SAC ¶ 132.)

On October 21, 2019, the FDA informed Biogen that it had "concluded that early termination of Phase 3 program did not compromise the ability to interpret the results" and thus "the data were suitable for further analysis." (Trach Decl. Ex. A, at 38.)

C.    **Biogen Seeks Approval for Aducanumab**

On October 22, 2019 (the start of the Class Period), Biogen announced that: (i) "the FDA indicated to [Biogen] that it is reasonable for [the Company] to file these two studies"; (ii) "following consultation with the FDA," Biogen believed "it is reasonable to submit a regulatory filing for aducanumab based on these data"; and (iii) "[b]ased on discussions with the FDA," the Company intended to file an application seeking approval of aducanumab. (Trach Decl. Ex. D, at 2, 9, 21.)

Over the following year, Defendants provided public updates on Biogen's ongoing analysis of the aducanumab data, explaining its interpretations of the clinical trial data, and, in particular, its explanations for the different results of the two Phase 3 trials. With respect to the data from the Phase 3 trials, Defendants stated their scientific interpretation that Study 302 (EMERGE) had met its primary endpoint of a reduction on the Clinical Dementia Rating Scale, but that Study 301 (ENGAGE) did not. (*See, e.g.*, SAC ¶ 171, 177, 185, 191.) Biogen also provided its scientific interpretation as to why Study 301 was a negative study, opining that the differences in enrollment timing in the two Phase 3 trials, combined with the effect of the mid-study protocol amendments,

8

resulted in fewer Study 301 participants than Study 302 participants receiving sufficient exposure to the 10 mg/kg dosage of aducanumab. (Trach Decl. Ex. A, at 62–63.) Biogen concluded that the "primary learning from the[] data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints," a finding that "was statistically significant in [Study 302]" and supported by "the data from patients who achieved sufficient exposure to high dose aducanumab in [Study 301]." (SAC ¶ 171.)

**D.      The November 4, 2020 Publication of the FDA's Opinions on Aducanumab's Clinical Trial Data and Massie's Dissenting View**

Part of the review of aducanumab was a review of the clinical trial data by a committee of scientists tasked with providing independent input to the FDA (the "Advisory Committee"). (SAC ¶ 259.) In advance of that review, Biogen and the FDA jointly prepared a briefing document (the "Joint Report"), which the FDA published. (SAC ¶ 262; *see also* Trach Decl. Ex. A.) The Joint Report reflected the scientific conclusions regarding aducanumab's efficacy that Biogen had previously disclosed. As to the FDA, the Joint Report publicized for the first time the FDA's positive views, including: (i) "the results of Study 302 [EMERGE] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab" (Trach Decl. Ex. A, at 57 (quoted at SAC ¶ 266)); (ii) the "results of Study 103 [PRIME Phase 1b] are appropriately viewed as supportive evidence of the effectiveness of aducanumab" (*id*. at 94 (alleged at SAC ¶ 268)); and (iii) the "effect of aducanumab in Study 302 [EMERGE] is robust and exceptionally persuasive on several of the instruments used to evaluate efficacy." (*Id*. (quoted at SAC ¶ 269.))

Also published by the FDA with the Joint Report was an appendix prepared by Tristan Massie, an FDA statistician (the "Massie Appendix"), who dissented from the FDA's position on Biogen's scientific conclusions. Massie made his disagreement with Biogen's and the FDA's

9

position clear, stating: "In summary, the totality of the data does not seem to support the efficacy of the high dose." (SAC, Ex. 3, at 255; *see also* SAC ¶ 273.) Massie stated further: "Inconsistency on many levels summarizes the final clinical efficacy data" related to aducanumab. (SAC, Ex. 3, at 253.) The Massie Appendix sets forth several statistical counterarguments to Biogen's and the FDA's scientific interpretations and opinions described in the Joint Report. (*See id.*)

Massie's dissenting opinion and analyses were public and unmistakable. The Massie Appendix was published on the FDA's website on November 4, 2020—the same day as the entire Joint Report. (SAC ¶¶ 262, 273 & Ex. 3.) The tenor of Massie's dissent also was recognized in the market, as demonstrated by the various analyst reports cited in the Complaint. A November 4, 2020, RBC report cited by Plaintiffs (SAC ¶ 276(e)) noted that the "FDA's statistician reviewer was ***highly critical*** and notes he sees '***no compelling substantial evidence*** of treatment effect or disease slowing'"; the analyst also observed that "we expect the two panel statisticians to mirror that more skeptical view." (Trach Decl. Ex. E (emphasis added).) Similarly, a Raymond James report cited by Plaintiffs (SAC ¶ 277(b)), observed that the Massie Appendix was "very negative" and reflects a view that "***the entire analysis is flawed*** and aducanumab doesn't work." (Trach Decl. Ex. F, at 1 (emphasis added).) A JPMorgan report cited by Plaintiffs (SAC ¶ 277(a)), reported that there was a "conflict of opinions between the FDA reviewers and their statisticians, who are ***far more negative***." (Trach Decl. Ex. G, at 1 (emphasis added).)

Notwithstanding the dissenting views in the Massie Appendix, Biogen's stock price jumped on November 4, 2020. (SAC ¶ 278.) The SAC alleges that this increase was a reaction to what Plaintiffs describe as ***the FDA's*** "effusive" comments regarding the trial data in the Joint Report (*id.* ¶ 264), rather than statements by ***Biogen***.

E.      The Advisory Committee Meeting and Negative Votes

On November 6, 2020, two days after publication of the Joint Report and the Massie Appendix, the Advisory Committee published its mixed votes on the following questions:

| QUESTION | YES | NO | UNCERTAIN |
|---|---|---|---|
| Does Study 302, viewed independently and without regard for Study 301, provide strong evidence that supports the effectiveness of aducanumab for the treatment of Alzheimer's Disease? | 1 | 8 | 2 |
| Does Study 103 provide supportive evidence of the effectiveness of aducanumab for the treatment of Alzheimer's Disease? | 0 | 7 | 4 |
| Has the Applicant presented strong evidence of a pharmacodynamics effect of aducanumab on Alzheimer's disease pathophysiology? | 5 | 0 | 6 |
| In light of the understanding provided by the exploratory analyses of Study 301 and 302, along with the results of Study 103 and evidence of a pharmacodynamics effect on Alzheimer's disease pathophysiology, is it reasonable to consider Study 302 as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease? | 0 | 10 | 1 |

(SAC ¶ 281.)  On November 9, 2020, the first trading day following the Advisory Committee votes, the Company's stock price dropped by approximately 28.2%.  (*Id*. ¶ 294.)

F.      FDA Approval of Aducanumab

On June 7, 2021, the FDA approved aducanumab for the treatment of Alzheimer's disease through its accelerated approval program, based on the surrogate endpoint of reducing amyloid beta plaque in the brain—a hallmark of Alzheimer's disease. (Trach Decl. Ex. C at 2.) According to the FDA: "In all studies in which it was evaluated, . . . Aduhelm consistently and very convincingly reduced the level of amyloid plaques in the brain in a dose- and time-dependent fashion. It is expected that the reduction in amyloid plaque will result in a reduction in clinical decline" in patients with Alzheimer's.  (*Id*. Ex. B at 2.)  The FDA further stated: "The clinical trials for Aduhelm were the first to show that a reduction in these plaques—a hallmark finding in the

11

brain of patients with Alzheimer's—is expected to lead to a reduction in the clinical decline of this devastating form of dementia." (*Id*. at 1.)  In addition, the FDA stated: "Although the Aduhelm data are complicated with respect to its clinical benefits, FDA has determined that there is substantial evidence that Aduhelm reduces amyloid beta plaques in the brain and that the reduction in these plaques is reasonably likely to predict important benefits to patients." (*Id*. at 3.) The FDA stated that it "is requiring Biogen to conduct a post-approval clinical trial to verify the drug's clinical benefit." (*Id*.)  The day of the FDA's announcement, Biogen's stock price closed more than 30 percent higher over the previous close. (*See id*., Ex. H.)

### G.       Shareholders Sue Following Advisory Committee Vote

Lead Plaintiff Nadia Shash and named Plaintiff Amjad Khan purchased Biogen securities on November 4 and 5, 2020, after the Joint Report and Massie Appendix were published,[2] and—rather than waiting for the FDA decision whether to approve aducanumab—sold their shares on November 9, 2020, following the Advisory Committee vote. (ECF No. 10-3, at 2; ECF No. 42-2.) Shareholders filed putative class action lawsuits soon thereafter. (Complaint, Nov. 13, 2020, ECF No. 1; Complaint, *Shapiro v. Biogen Inc*., NO. 21 Civ. 10017, Jan. 5, 2021, ECF No. 1.) An amended complaint was filed on April 26, 2021 (ECF No. 42), but Plaintiffs sought to amend further after Defendants moved to dismiss, and the SAC was filed on August 4, 2021. (ECF Nos. 52 & 58.)

---

[2]     Nadia Shash purchased Biogen shares at $343.00/share on November 4, 2020 (ECF No. 10-3, at 2), which means that Shash purchased no earlier than 10:54 a.m. ET that day. Trach Decl. Ex. I (intraday trading). Biogen shares opened at $253.20 that day, and climbed after the Joint Briefing Book, including the dissenting Massie Appendix, was published that morning on the FDA website. By the time Shash purchased, articles had already been published about the Joint Briefing Book, including discussion of the Massie Appendix. *See, e.g.*, Deena Beasley, *Biogen Alzheimer's drug closer to approval with U.S. FDA staff backing, shares jump 40%*, REUTERS (published Nov. 4, 2020 at 10:43 a.m.), available at https://www.reuters.com/article/biogen-aducanumab-fda-idUSKBN27K24L.

**ARGUMENT**

To state a claim, Plaintiffs must allege facts supporting six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008). Such claims are subject to the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27, 30 (1st Cir. 2012). Specifically, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The Complaint must also "state with *particularity* facts giving rise to a *strong inference* that the defendant acted" with "intentional or willful conduct designed to deceive or defraud" or "a high degree of recklessness." *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## I.    BIOGEN'S SCIENTIFIC INTERPRETATIONS OF CLINICAL TRIAL DATA ARE EXPRESSIONS OF OPINION AND ARE NOT MATERIALLY FALSE OR MISLEADING STATEMENTS AS A MATTER OF LAW

The purported misstatements identified in the Complaint are expressions of Biogen's scientific interpretations of data generated in aducanumab clinical trials. The interpretations reflect a measure of subjective determination and are expressions of opinion, subject to the rigorous pleading standard set forth in *Omnicare*—which is "no small task for an investor." *Omnicare*, 575 U.S. at 194. The Complaint fails to meet this exacting standard.

### A.    The Alleged Misstatements Are Scientific Interpretations of Clinical Trial Data, which Constitute Expressions of Opinion

Plaintiffs identify four categories of alleged misstatements concerning the aducanumab clinical trials:

13

- *First*, Plaintiffs allege that Defendants misled investors when they opined that trial data—including data from Study 302, Study 103, and a subset of Study 301—supported the conclusion that aducanumab was effective for patients who received sufficient exposure to a 10mg/kg dose. (SAC ¶ 150; *see also id.* ¶¶ 171-96.)

- *Second*, Plaintiffs allege that Defendants misled investors when they opined that the data supported the conclusion that reductions in amyloid plaque caused by aducanumab were correlated with better clinical outcomes. (SAC ¶ 221-32.)

- *Third*, Plaintiffs allege that Defendants misled investors by stating their belief that "baseline demographics and characteristics" were not "driving the overall outcomes" of the clinical trials. (SAC ¶ 238; *see also id.* ¶¶ 233-46.)

- *Fourth*, Plaintiffs allege that Defendants misled investors by expressing their belief that the "breadth of [clinical] endpoints" met in Study 302 was "encouraging." (SAC ¶ 248.)

Plaintiffs argue that, because Defendants' interpretations of the clinical data are inconsistent with Plaintiffs' preferred interpretations—which rely entirely on the Massie Appendix—Defendants' scientific conclusions are "false." (For ease of reference, the alleged misstatements identified in the SAC are listed in Trach Decl. Ex. J.)

"[C]ourts have been clear that scientific opinions are just that: opinions," and thus are actionable only if they are "without reasonable basis or objectively false." *Harrington v. Tetraphase Pharm. Inc.*, 2017 WL 1946305, at *5 (D. Mass. May 9, 2017). Here, Biogen's scientific opinions resulted from analyses of clinical data—the hallmark of opinion, not objective fact. *See In re Sanofi Secs. Litig.*, 87 F. Supp. 3d 510, 543–44 (S.D.N.Y. 2015) ("Courts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions.") (collecting cases; quotation marks omitted), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

This Court's decision in *Corban* is instructive on this point. There, the defendant pharmaceutical company was alleged to have misstated the efficacy of its developmental drug by

14

relying on a subset of the tested population. 2015 WL 1505693, at *6. This Court dismissed those claims, noting that investors were "aware of the company's use of the [subset] population" and holding that there was nothing improper about the company "defend[ing] use of the [subset] population and cast[ing] its trial results in a positive light." *Id*. This Court further concluded that "the challenged statements consist of interpretations of the company's data, which constitute non-actionable expressions of opinion" unless *Omnicare* is satisfied. *Id*. This Court's opinion was affirmed by the First Circuit, *see Corban*, 868 F.3d at 31, and also is consistent with opinions from other federal Circuit Courts expressly holding that scientific interpretations of clinical data are opinions that are subject to the standards set forth in *Omnicare*. *See Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (holding that statements about a drug's efficacy "are little more than a dispute about the proper interpretation of data" which are protected expressions of opinion); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (affirming grant of a motion to dismiss on the basis that "[i]nterpretations of clinical trial data are considered opinions"). [3]

**B.  Plaintiffs Do Not Satisfy the *Omnicare* Standard for Pleading False or Misleading Expressions of Scientific Opinion**

Under *Omnicare*, expressions of opinion are not actionable unless: (i) the opinion is "both objectively and subjectively false"; (ii) the opinion includes untrue embedded facts; or (iii) the opinion holder omits material facts about "the inquiry into or knowledge concerning a statement of opinion." *Corban*, 2015 WL 1505693 at *6. Here, none of these exceptions applies.

---

[3]   That Defendants' alleged misstatements reflected opinions subject to *Omnicare* is also supported by the framing in terms of "belief." (*See, e.g.*, SAC ¶ 171 ("[W]e *believe* that the totality of these data support a regulatory filing"); *id*. ¶ 185 ("we do *believe* that data from patients who achieve sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE"); *id*. ¶ 191 ("We *believe* that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE."); *id*. ¶ 238 ("we *believe*, having looked very closely at the baseline demographics and characteristics, that none . . . are driving the overall outcomes . . . or the differences . . . between the studies.") (emphasis added).)

### 1.   The SAC Does Not Allege Subjective Falsity

The Complaint does not even attempt to plead subjective falsity, as required by *Omnicare*. Plaintiffs plead *no* facts showing that Defendants did not honestly believe their scientific opinions regarding the aducanumab data when made. *See Omnicare*, 575 U.S. at 186. This alone is fatal. *Corban*, 2015 WL 1505693, at *6; *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *8 (D. Mass. Apr. 30, 2019) (claim dismissed where defendant prefaced opinions with "we think" and complaint did not plead facts showing subjective disbelief), *aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020).

### 2.   The SAC Does Not Allege Objective Falsity

Nor does the Complaint plead objective falsity, *i.e.*, that Defendants' interpretations of the clinical studies were not "reasonably supported" by the data on which Defendants relied. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 486 (S.D.N.Y. 2018); *Omnicare*, 575 U.S. at 185–86. Indeed, as the Second Circuit has observed, FDA approval undercuts the notion that Defendants' scientific interpretations were so unreasonable as to be objectively false. *See Tongue*, 816 F.3d at 214 (allegations that "Defendants' interpretations of the data was irrational or unreasonable . . . have little merit" following FDA acceptance after resubmission).

Plaintiffs attempt to plead objective falsity by identifying four categories of statements that are allegedly "false" because Defendants' views supposedly conflict with *Dr. Massie's* interpretations of specific subsets of the clinical trial data. These allegations merely reflect Dr. Massie's disagreements with Biogen concerning what scientific conclusions to draw from complex clinical trial data, and cannot plead objective falsity.

#### a.   Statements Concerning the Efficacy of High Doses of Aducanumab

Plaintiffs allege that Defendants misled investors when they expressed their belief that the clinical trial data supported the conclusion that aducanumab was effective for patients who

received sufficient exposure to a 10mg/kg dose. (SAC ¶ 150.) For example, Plaintiffs allege that Defendants misled investors by stating that "[o]ur primary learning from these [clinical] data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints," and that the "reduction in clinical decline was statistically significant in [Study 302], and we believe that patients . . . who achieved sufficient exposure to high dose aducanumab in [Study 301] support the findings of [Study 302]." (SAC ¶ 171; *see also id.* ¶¶ 172-96.)

Defendants' opinion that the trial data supported the efficacy of high doses of aducanumab was based primarily on three analyses. *First*, high-doses of aducanumab in Study 302 "resulted in a statistically significant reduction in clinical decline compared with placebo," including 22% less decline as measured by the primary endpoint (CDR-SB). (Trach Decl. Ex. A, at 41, 56.) *Second*, patients in Study 103 who received 10 mg/kg doses of aducanumab achieved "statistically significant amyloid plaque reduction and reduction in clinical decline." (*Id.* at 89.) *Third*, even though Study 301 failed to meet its endpoints, participants in Study 301 "with sufficient exposure to 10 mg/kg [dosing] have clinical outcomes similar to those in Study 302." (*Id.* at 84.) ***Plaintiffs do not dispute the accuracy of these three statistical analyses relied upon by Biogen (much less claim Biogen falsified this data). In other words, Plaintiffs do not dispute that these three statistical analyses support Defendants' stated opinion that high-dose aducanumab was clinically effective.***

Instead, Plaintiffs argue that Defendants' scientific conclusion was undermined by *different* statistical analyses performed by Dr. Massie, who analyzed the clinical trial data in alternative ways, focusing on sub-groups within the studies. Plaintiffs point to four such analyses:

- Plaintiffs acknowledge that high-dose patients performed better than the placebo in both Studies 301 and 302. (SAC ¶ 153.) They allege, however, that they would have expected the sub-group of non-Carriers to perform *better* than they did, particularly

17

when compared to Carriers, and particularly in Study 302. (*Id.* ¶¶ 154-55.) Thus, they conclude that "10mg/kg was not an effective dose." (*Id.* ¶ 156.)

- Plaintiffs break the trial data down further and allege that they would have expected to see better clinical outcomes among patients who (i) were Carriers who (ii) received a 10 mg/kg dose (iii) in Study 302 (iv) after Protocol Amendment 4 in March 2017. (*Id.* ¶¶ 157-58.) Because the clinical outcomes for this sub-sub-subgroup did not improve after Protocol Amendment 4, Plaintiffs conclude that there was no "dose-dependent clinical improvement from aducanumab." (*Id.* ¶ 161.)

- Focusing only on high-dose patients whose treatments were temporarily interrupted by ARIA, Plaintiffs allege that this subset achieved better clinical outcomes than other patients. (SAC ¶ 162.) Plaintiffs allegedly interpret this finding to mean that ARIA events effectively "unblinded" patients (who learned they were not receiving a placebo), and posit that unblinded patients generally perform better in clinical evaluations, undermining Biogen's findings. (*Id.* ¶ 163.)[4]

- Plaintiffs acknowledge data showing a correlation between increased doses and clinical results for high-dose patients in both Studies 301 and 302. (SAC ¶ 168.) But they criticize Defendants' opinion because Plaintiffs do not think the correlation in Study 302 is as meaningful as in Study 301—notwithstanding the fact that patients who received the full 14-dose regimen performed best in both studies. (*Id.*)

None of Plaintiffs' arguments suggest that Defendants' conclusions are not "reasonably supported by data." *See New Link Genetics*, 297 F. Supp. 3d at 486. The fact that Plaintiffs (relying on Dr. Massie's interpretation) chose to analyze the data differently and reached a different scientific conclusion about aducanumab's efficacy does not render Defendants' interpretation objectively false. "[R]easonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *In re Sanofi*, 87 F. Supp. 3d at 543–44; *see In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012) (falsity not

---

[4]    Plaintiffs argue, without citing particularized facts, that Biogen "inexplicably altered certain historical patient records" so that patients would receive *worse* clinical outcomes. (*See* SAC p. 40 n.17.) The suggestion that Defendants would intentionally "worsen" their trial results to manufacture a specific correlation between dose interruptions and clinical outcomes strains credulity and is unsupported. Plaintiffs also allege that the results for one secondary endpoint slightly improved for high-dose patients in Study 302 in the dataset accompanying Biogen's Biologics License Application ("BLA"), when compared to an earlier dataset presented in a June 2019 FDA meeting. (*See* SAC ¶¶ 254-58.) But again Plaintiffs plead no facts suggesting that the BLA dataset was inaccurate. Nor do Plaintiffs allege that any Individual Defendant (or anyone else at Biogen) modified the data to make the data more compelling—much less that anyone lied to shareholders about this issue, or that it caused any investor losses.

18

pleaded where allegations "concern two different judgments" about the appropriate "statistical methodology adopted by the doctors and scientists who designed and conducted the [drug] study").

Courts in this district routinely dismiss cases premised on a scientific disagreement among statistical experts even where the FDA *disagrees* with the defendants' interpretation. *See In re Karyopharm Therapeutics Inc., Sec. Litig.*, 2021 WL 3079878, at \*8 (D. Mass. July 21, 2021) (dismissing claims because fact that FDA interpreted data differently from defendants "constitutes a non-actionable scientific disagreement," even though "defendants' view of the data may have been erroneous"); *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020) ("Although the FDA interpreted trial results differently . . . those facts alone do not render the statements fraudulent or misleading."). That conclusion applies with greater force here, where the FDA published a Joint Briefing Book cited by the SAC in which the FDA *agreed* with Defendants that "[t]he effect of aducanumab in Study 302 is robust and exceptionally persuasive on several of the instruments used to evaluate efficacy"; "[t]he results of Study 103 are appropriately viewed as supportive evidence of the effectiveness of aducanumab"; and Study 301 "do[es] not meaningfully detract from the persuasiveness of Study 302" because "patients with higher exposure to the 10 mg/kg dose in Study 301 had similar responses to patients in Study 302." (Trach Decl. Ex. A, at 94.) Several of the FDA's statements in the Joint Briefing Book also directly contradict Plaintiffs' alleged alternative interpretations of the trial data. (*E.g.*, *id.* at 94 (finding, contrary to Plaintiffs' position, that Study 302's results were "consistent with a dose-response relationship"); *id.* at 69 (finding, contrary to Plaintiffs' position, that "a systematic bias due to functional unblinding caused by ARIA is not apparent"); *id.* at 94 (finding, contrary to Plaintiffs' position, that Study 302 achieved "favorable results *across subgroups of interest*") (emphasis added).)[5]

---

[5] Several FDA reviewers specifically criticized Dr. Massie's analyses relied on by Plaintiffs. The FDA's primary clinical reviewer, Dr. Kevin Krudys, PhD, "question[ed] the robustness of" Dr. Massie's analyses because they

### b.    Statements Concerning the Correlation Between Plaque Reduction and Clinical Outcomes

Plaintiffs next allege that Defendants misled investors when they interpreted the clinical trial results as showing that high doses of aducanumab caused a reduction in amyloid plaque in patients' brains, and that the reduction correlated to positive clinical outcomes. (*E.g.*, SAC ¶ 221 ("The new analysis of the larger dataset . . . showed that aducanumab had a dose-dependent effect on the underlying pathology as measured by amyloid-PET imaging and reduced clinical decline in patients with early Alzheimer's disease."); *id.* ¶ 227 ("What we demonstrate is that [aducanumab] who's binding to the right part of the amyloid-beta, the aggregated form of amyloid-beta, is able to erode and eliminate the plaque leading to the benefits we see in terms of cognition for the patients."); *see also id.* ¶¶ 221-32.)

Defendants' opinions were based principally on two findings. *First*, as addressed above, the data from the clinical trials supported the conclusion that aducanumab was effective for patients who received sufficient exposure to a 10mg/kg dose. *Supra* at 17.   *Second*, the data from the clinical trials supported the conclusion that aducanumab caused a dose-dependent reduction in amyloid plaque in patients' brains. (*See, e.g.*, Trach Decl. Ex. A, at 48 ("Aducanumab treatment produced statistically significant, dose-dependent reductions in brain amyloid plaque versus placebo, as measured by PET.").)

Once again, Plaintiffs do not dispute Defendants' data—including that aducanumab caused a dose-dependent reduction in amyloid plaque—or identify any errors in Defendants' statistical

---

focused on improper subsets of the patient data. (Trach Decl. Ex. K, at 104-05; *accord id.* Ex. L, at 3-4 (rejecting Dr. Massie's interpretation as "problematic" because it "compares results from subsets of patients within a treatment group rather than from comparison between intact treatment groups"). Dr. Krudys focused instead on the subgroup of patients who had the opportunity to receive all doses (the "OTC" dataset), which suggested "a numerical trend in favor of Aducanumab." (Trach Decl. Ex. K, at 66, 115-16.)  Dr. Krudys also found that, contrary to Dr. Massie's interpretation, Biogen took "steps to address" unblinding in ARIA patients, and that "the results do not suggest a systemic bias due to functional unblinding." (*Id.* at 37, 118.)

analysis.  Instead, Plaintiffs once again analyze the data differently and rely on various subsets of data to question Defendants' scientific conclusion.    Specifically, Plaintiffs argue that the *correlation* between amyloid reduction and positive clinical outcomes was not "meaningful." (SAC ¶ 206.)  Although Plaintiffs *concede* that there was a positive correlation between amyloid beta levels and clinical outcomes across the clinical trials, as well as in both Studies 301 and 302 independently  (SAC ¶ 220), they nonetheless conclude that the correlation was not strong enough to support Defendants' scientific conclusion, particularly when isolating high-dose patients in Study 302.  (SAC ¶¶ 206-08.)

The fact that, according to Plaintiffs' statistical analysis, the correlation among certain subsets of the study was not as high as Plaintiffs may have wanted does not render Defendants' statements false. This is just another example of Plaintiffs forming a different scientific conclusion than Defendants by focusing on a subset of trial data and ascribing it more weight—which does not demonstrate objective falsity.  *Supra* at 18–19; *see also Corban*, 2015 WL 1505693, at *6 (holding that it was not improper for a company to "defend[ its] use of the [subset] population and cast its trial results in a positive light").  Plaintiffs' falsity arguments also cannot be squared with the fact that the FDA reached the same scientific conclusion as Defendants on the efficacy of aducanumab in reducing amyloid plaques, and granted accelerated approval *specifically* because the "FDA has determined that there is substantial evidence that Aduhelm reduces amyloid beta plaques in the brain and that the reduction in these plaques is reasonably likely to predict important benefits to patients."  (Trach Decl. Ex. B, at 3.)[6]

---

[6]    Even several members of the Advisory Committee agreed with this scientific conclusion; when asked whether Biogen presented "strong evidence" of aducanumab's effect on Alzheimer's disease pathophysiology, five members voted "yes," six members voted "uncertain," and *zero* members voted "no."  *Supra* Background Part E.

Ultimately, Plaintiffs ask this Court to reject as fraudulent the very essence of the amyloid hypothesis. (*See* SAC ¶ 210 (alleging that the clinical trial data "show that the amyloid hypothesis *is not true* (emphasis in original)).) But the amyloid hypothesis is the leading theory behind Alzheimer's disease, and has driven clinical research for *30 years.* (SAC ¶¶ 53-57; *see also id.* ¶ 344 (alleging that AbbVie advanced to clinical trials a drug premised on the amyloid hypothesis in June 2021).) While Plaintiffs allege that this leading and long-standing scientific theory "is not true," that opinion does not render Defendants' competing opinion objectively false.[7]

### c.   Statement Concerning Demographics and Characteristics

Plaintiffs next allege that a specific Q&A exchange between an analyst and Defendant Budd Haeberlein in December 2019 was misleading. In the exchange, the analyst noted that the clinical outcomes for high-dose patients in Study 301 "c[aught] up with" patients in Study 302, and asked for confirmation that there is not anything "related to study sites, geography or any other variation that could explain the breadth of the improvement other than just the exposure" to 10mg/kg doses. (Trach Decl. Ex. O, at 3 (selectively quoted at SAC ¶ 238).) Budd Haeberlein responded that "we believe, having looked very closely at the baseline demographics and characteristics, that none of these are driving the overall outcomes that we see or the difference between the studies." (SAC ¶ 238) Plaintiffs allege that this statement was misleading because "there were statistically significant differences between countries in the effect of aducanumab," and "the data showed the U.S. performed significantly worse than average." (*Id.* ¶¶ 240-41.)

Plaintiffs are attacking statements that Defendants did not make. Defendants did not say

---

[7]   Other FDA reviewers specifically rebutted Dr. Massie's statistical analysis. Dr. Stein, for example, found that there were "limitations" to Dr. Massie's "patient-level correlation analysis," and that the "strong *group-level* relationship" between plaque reduction and clinical results supports the conclusion that "reduction in amyloid plaque is reasonably likely to predict clinical benefit." (Trach Decl. Ex. L, at 6-7 (emphasis added); *id.* Ex. M, at 27; *id.* Ex. N, at 8.)

that there were no differences between countries or trial sites during the clinical trials. Budd Haeberlein merely opined, in response to a specific question about the clinical improvement seen in high-dose patients, that there was nothing in the patient "demographics or characteristics" that was "driving the overall outcomes . . . or the difference between the studies." (SAC ¶ 238.) Plaintiffs plead no facts to the contrary. Even if results varied by country, and even if clinical outcomes in the United States were "about 20% less than the global average result" (*id*. ¶ 244), Plaintiffs do not explain how this information was "driving the overall outcomes" of the studies. The disconnect between the alleged misstatement and the supposed contrary facts is fatal to Plaintiffs' claim. *Corban*, 868 F.3d at 40 ("[S]imply pointing us to omitted details, as the plaintiffs have done, and failing to explain how the omitted details rendered the particular disclosures misleading, misses the mark."). Any suggestion that Budd Haeberlein's statement is objectively false is also undermined by the fact that in the Joint Briefing Book the FDA expressed the *same* conclusion after reviewing the same data. (*See* Trach Decl. Ex. A, at 65 ("The FDA agrees that any differences [in demographics and baseline disease characteristics] are minor and do not appear to have a meaningful impact on the outcome of the studies.").)

d.      **Statement Concerning Clinical Endpoints**

Finally, Plaintiffs allege that Budd Haeberlein misled investors when she discussed Study 302's clinical endpoints during the same December 2019 Q&A and stated: "[I]f you take a look at [Study 302], the primary endpoint, CDR sum of boxes, is comprised of both cognitive and functional components, 3 pieces each. Then the others, MMSE and ADAS-Cog are more cognitive tests. Then you've got ADCS-ADL, which is a functional score. So it's the breadth of endpoints having an effect on each of these, which is encouraging rather than any one of them or pieces thereof." (SAC ¶ 248.) Plaintiffs argue that Budd Haeberlein's statement was misleading because, according to Dr. Massie's analysis, the scores on all four endpoints "are closely correlated," and

therefore aducanumab's "statistically significant results on all four endpoints in Study 302 says nothing about whether it was effective." (SAC ¶¶ 249-51.)

Budd Haeberlein's statement merely represents another non-actionable disagreement of opinion.  The fact that Budd Haeberlein found the results across these endpoints "encouraging," whereas Dr. Massie believed that "one or at most 2 captures the key information" (SAC ¶ 250), reflects different views of how much weight to place on the secondary endpoints.  Plaintiffs do not dispute that Study 302 achieved positive results on all four of its primary and secondary endpoints. Nor do Plaintiffs dispute that the different endpoints consisted of different tests that measured different abilities and were divided between cognitive and functional components.  Plaintiffs merely disagree on how much weight to give the findings.  *Supra* at 18–19.  And, as with other scientific disagreements identified in the Complaint, the FDA *again* sided with Defendants in the Joint Briefing Book and agreed that "[t]he effect of aducanumab in Study 302 is robust and exceptionally persuasive on several of the instruments used to evaluate efficacy," and "the effects observed for the primary and secondary endpoints encompass two acceptable approaches to establish effectiveness." (Trach Decl. Ex. A, at 94.)[8]  Furthermore, Budd Haeberlein's December 2019 statement could not have misled investors about the nature of the Phase III clinical endpoints because the endpoints were selected years earlier when the study was designed, and were public knowledge prior to the Class Period.  (*See* Trach Decl. Ex D; *see also id.* Ex. A, at 34.)

### 3.     The SAC Does Not Plead Omissions of Material Facts Under *Omnicare*.

In an attempt to plead around *Omnicare*, Plaintiffs try to recast their case as an "omissions" case, repeatedly alleging that Defendants' scientific opinions were false because they purportedly

---

[8]     Dr. Krudys, for example, explained that Dr. Massie's "[r]eference to statistical significance is misplaced," and that a "more relevant correlation analysis" reveals "a weak degree of correlation between the endpoints," and that "the primary and secondary endpoints capture distinct information and secondary endpoints add to the strength of Study 302." (Trach Decl. Ex. K, at 44; *accord id.* Ex. P, at 5-7.)

24

"concealed" data and Plaintiffs' preferred statistical analyses (addressed above).[9] Plaintiffs' re-framing of their case under an omissions theory does not work for several reasons:

*First*, as a threshold issue, to the extent that Plaintiffs allege that Biogen should have disclosed additional raw data underlying the aducanumab clinical trials so that every subset of data could be studied as Dr. Massie did, their theory fails because there is no such disclosure obligation. The SAC does not identify any regulation or industry standard requiring companies to disclose all clinical trial data to the market so that investors (and competitors) can perform their own statistical analyses. Courts routinely dismiss securities fraud cases alleging that companies failed to disclose sufficient clinical trial data to investors. *See, e.g.*, *Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 481-82 (D. Mass. 2020) (dismissing claim that defendants failed to disclose complete data regarding the number of clinical trial subjects lost to follow-up); *In re Rigel Pharms.*, 697 F.3d at 880-81 (disclosure of "key safety results," and not "all safety results," was not actionable despite investors' desire for "more extensive information"); *see also id.* at 879 n.7 (Section 10(b) does not prohibit "statements that are incomplete or that report cumulative figures instead of detailed breakdowns of the underlying . . . subcategories of data.").[10]

*Second*, Plaintiffs' omissions theory fails because they do not identify any "material facts" concealed from investors. The information that Defendants' allegedly "concealed" from the

---

[9]     *See, e.g.*, SAC ¶ 157 ("Defendants concealed the breakdown of Study 302 clinical outcomes by whether the patient was dosed before or after P[rotocol] A[mendment] 4."); *id.* ¶ 165 ("Defendants concealed the breakdown of clinical outcomes by the number of doses received."); *id.* ¶ 210 ("the data Defendants concealed shows that aducanumab's positive clinical outcomes are not caused by the removal of amyloid plaque."); *id.* ¶ 240 ("Defendants concealed country-by-country and region-by-region data from the public."); *id.* ¶ 251 ("the concealed data shows that Study 302 did well on all endpoints because they measure the same thing.").)

[10]    Plaintiffs quote an analyst exchange in which Defendants stated that Biogen published less data from aducanumab's Phase 3 trials than it had historically published for other Phase 3 trials. (*Id.* ¶¶ 345–48.) But Biogen's transparency about this fact, if anything, undercuts any argument that the allegation supports a theory of fraud. *See Russo v. Bruce*, 777 F. Supp. 2d 505, 526-27 (S.D.N.Y. 2011) (issuer's transparency and "candidness" in public statements "undermines an inference of fraudulent intent").

market was Plaintiffs' preferred ***interpretation*** of clinical trial data.   But Plaintiffs' statistical analyses and scientific conclusions are quintessential examples of scientific *opinions*, not facts. *Supra* at 14–15.   Omissions are actionable under *Omnicare* only when they concern "material facts"—not opinions.   *See Corban*, 2015 WL 1505693 at *6.   Plaintiffs cannot manufacture an omissions claim simply by characterizing competing scientific opinions as material adverse facts.

*Third,* even if differing interpretations of aducanumab trial data *were* facts—and they are not—they would merely constitute certain facts cutting against Defendants' ultimate scientific conclusions.   *See supra* at 17–18.   As the Supreme Court has held, an "opinion . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way" since "investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189.   Defendants were not required to disclose information simply because it might undercut its publicly stated opinions.   *See Hill v. Gozani*, 651 F.3d 151, 153 (1st Cir. 2011) (no duty to disclose employees' internal dissenting opinions "absent existing facts that demonstrated the truth of the employees' opinions").

*Fourth*, Plaintiffs plead no facts showing that the countervailing interpretations of the data were known to and believed by the Defendants throughout the year-long period when Defendants made their supposedly false statements.   (The adverse information identified in the SAC all are statistical analyses and scientific views expressed by individuals, like Dr. Massie, who are not associated with Defendants.)   Absent such allegations, the omissions theory fails.   *See Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *8 (N.D. Cal. Sept. 1, 2021) (rejecting argument that defendants "omitted important clinical data" when touting the results of clinical studies because the plaintiff "nowhere allege[d] who at [defendant] learned" the omitted information, "how they learned it, when they learned it," or even if the omitted information "arose before any

particular Challenged Statement was made"). And even if Plaintiffs *did* plead facts suggesting that Defendants were aware of competing scientific conclusions, their omissions theory would still fail because the SAC does not allege that any Defendants disbelieved their public statements. *See Suna v. Bailey*, 107 F.3d 64, 70 (1st Cir. 1997) (affirming dismissal absent allegations of contemporaneous facts known by defendant showing that defendant disbelieved its own statements); *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 38 (D. Mass. 2018) (similar).

*Finally*, Plaintiffs' omissions theory fails because, under *Omnicare*, Defendants' statements must be considered "in the light of the circumstances under which they were made." *Hill*, 651 F.3d at 152 (citation omitted). Defendants repeatedly cautioned that FDA approval was uncertain, and expressly declined "to speculate on how the regulators would look at this kind of data" or to "comment on FDA's internal processes." (Trach Decl. Ex. O, at 14; *id*. Ex. Q, at 15.)[11] Defendants thus did not omit to disclose that aducanumab may not be approved based on scientific disagreement. *See, e.g.*, *Harrington*, 2017 WL 1946305 at *9 (warning about "possibility of the FDA not approving the drug" was "anything but boilerplate" and provided notice of possible scientific disagreement by the FDA).

## II.   THE SAC DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER

To state a securities fraud claim, the Complaint "must state with ***particularity*** facts giving rise to a ***strong inference*** that the defendant acted with" scienter. *Kingsley*, 928 F.3d at 158

---

[11]   *See also* Trach Decl. Ex. D, at 23 ("[T]here are circumstances where [] FDA can approve a drug based on a single study, it's up to them to determine what those circumstances are."); *id*. Ex. R, at 6 ("[R]egulatory authorities may require additional information or further studies, or may fail or refuse to approve or may delay approval of Biogen's drug candidates, including aducanumab."). Additionally, Defendants stated throughout the Class Period that their study of trial data was in progress (*see, e.g.*, SAC ¶ 223 ("we're still learning as we look at the data")), and Biogen "had no legal obligation to loop the public into each detail" of the ongoing work. *Corban*, 868 F.3d at 40.

(emphasis in original); 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs must show that "a reasonable person would . . . deem" their theory of scienter "cogent and *at least as compelling* as any opposing inference one could draw." *Kingsley*, 928 F.3d at 158 (emphasis added) (internal quotation marks omitted). This "rigorous" test requires a showing of "intentional or willful conduct designed to deceive or defraud investors" or "a high degree of recklessness." *Id.* The First Circuit's application of this rule "is notably strict and rigorous." *Advest*, 512 F.3d at 58 (internal quotation marks omitted). The SAC does not come close to meeting this strict standard.

The only compelling inference to be drawn from the Complaint is that Defendants' statements reflected their honestly held interpretations of clinical trial data. To hold otherwise, the Court would have to assume that Defendants pursued approval of a drug in which they lacked confidence, even after Biogen discontinued clinical trials following an independent futility analysis in March 2019. That the FDA later agreed that futility should not have been declared, encouraged further study of the complete clinical trial data and, ultimately, approved aducanumab for treatment of Alzheimer's disease under its accelerated approval program only reinforces the compelling inference that Biogen reasonably believed in the strength of the evidence. By contrast, courts have repeatedly rejected the inference that a company such as Biogen would invest in a drug when it supposedly knows the drug does not work. *See Cozzarelli*, 549 F.3d at 627 (finding it "improbable that [Defendant] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure"); *Nguyen v. Endologix, Inc.* 962 F.3d 405, 415 (9th Cir. 2020) (affirming dismissal on scienter grounds because theory that defendants would express optimism about FDA approval despite knowledge to the contrary "does not make a whole lot of sense" and has "no basis in logic or common experience").

Plaintiffs allege that Defendants were motivated to knowingly misstate aducanumab's

28

efficacy because they "staked Biogen's future" on it. (SAC ¶ 3.) But Plaintiffs plead no specific facts supporting this allegation.[12]    Further, First Circuit precedent squarely rejects Plaintiffs' scienter theory. In *Brennan*, the plaintiff alleged that "all of the company's hopes . . . hinged on [the developmental drug's] success," and thus that the defendants "had a motive to 'shade the truth'" about clinical study results. 853 F.3d at 616. The First Circuit held that such allegations were no different from "the usual concern by executives to improve financial results" and thus "do not satisfy the PSLRA without something more." *Id*. (quotation marks omitted).

The SAC is devoid of that "something more," much less allegations that any Defendant benefited from the purported fraud. To the contrary, Biogen spent nearly *$10 billion* repurchasing tens of millions of shares during the class period at prices it allegedly knew were inflated.[13]    This negates any inference of scienter, since "[i]t would make little sense for defendants to initiate a repurchase program if they knew Biogen's stock price was artificially inflated by their fraudulent misrepresentations." *See In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017). Nor does the SAC allege any benefit flowing to the Individual Defendants from the purported misstatements; indeed, Plaintiffs do not allege that any Individual Defendant engaged in suspicious sales of Biogen stock for personal gain, which weighs against a finding of scienter. *See Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004) (failure to allege stock sales weighs against scienter); *Carr*, 2021 WL 3913509, at *10

---

[12]    In fact, at the beginning of the Class Period, before aducanumab was approved, Biogen publicly reported more than $11 billion in annual product revenue and nearly $6 billion in annual net income for 2019. Trach Decl. Ex. S, at F-2.)

[13]    Biogen repurchased shares under three different repurchase programs that overlap with the Class Period: (1) ~18.8 million shares at a cost of $5 billion between March 2019 and March 2020, under a repurchase program authorized in March 2019: (2) ~16.7 million shares at a cost of $5 billion between December 2019 and September 2020, under a repurchase program authorized in December 2019; and (3) ~1.6 million shares at a cost of $400 million between October and December 2020, under a repurchase program authorized in October 2020. (Trach Decl. Ex. T, at 49.)

("[T]here is no logical reason why Defendants would tell investors that they believed FDA approval was likely if they secretly knew the FDA was going to delay or reject the application, especially since Plaintiffs here do not allege that Defendants engaged in 'insider stock sales' or other suspicious financial activity.").

Lacking a cogent scienter theory, Plaintiffs added dozens of new paragraphs to the SAC that highlight the *post-class period* controversy surrounding aducanumab's approval. These allegations are a red herring and concern criticisms of *the FDA*, not Biogen. In particular:

- The Complaint adds allegations criticizing the FDA and its process for reviewing and approving aducanumab. Plaintiffs criticize the FDA's lack of thoroughness in the joint briefing materials (SAC ¶ 265)[14]; purported lack of "statistical rigor" (*id.* ¶¶ 295-99); willingness to use the accelerated approval pathway (*id.* ¶ 300-16); and reliance on support from FDA staff that do not typically work on Alzheimer's Disease (*id.* ¶¶ 23, 300-16.) Plaintiffs also cite publicity concerning investigations into the FDA's process (*id.* ¶¶ 31-33; 324-30).

- Plaintiffs allege that the accelerated approval of aducanumab "sparked immediate outrage" (*id.* ¶ 321), inciting a public policy debate about the efficacy of aducanumab and its cost (*id.* ¶¶ 333-44). For example, the SAC alleges that, after the drug was approved, three Advisory Committee members resigned; politicians called for investigations; certain private insurers announced an unwillingness to cover aducanumab; and certain health systems announced they would not administer aducanumab. (*Id.* ¶¶ 26-36; 322-24; 331-32.)

None of these allegations speaks to the question of whether *Defendants* honestly held their beliefs when they expressed their scientific opinions about the clinical trial data. Plaintiffs' criticisms of the FDA have nothing to do with Defendants' beliefs and state of mind during the class period. *See Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 284 (D. Mass. 2011) ("[P]ost-class period events and statements are irrelevant to the scienter determination."). Likewise, any post-

---

[14] Plaintiffs allege that the filing of joint briefing materials was "the first time in FDA history [that] the FDA and a sponsor filed joint materials." (SAC ¶ 265.) This is untrue; joint briefing materials had previously been filed by the FDA and other drug companies. (*Compare* Trach Decl. Ex A *with id.* Ex. U (Dec. 17, 2019 Joint Briefing Document by the FDA and Merck), and *id.* Ex. V (Jul. 14, 2020 Joint Briefing Document by the FDA and GlaxoSmithKline).)

approval controversy over the FDA's decision only underscores the scientific debate about how to interpret aducanumab's trial data, demonstrating that different scientists, doctors, and other constituencies can reach different opinions about the persuasiveness of clinical trial results. As the FDA observed: "As is often the case when it comes to interpreting scientific data, the expert community has offered differing perspectives." (Trach Decl. Ex. B, at 1.) The allegations about these differing perspectives do not show that *Defendants* disbelieved their data interpretations.

Notably, even though Biogen's scienter hinges on the intent of its senior management, the Complaint fails to offer any allegations about the intent of the Individual Defendants, Vounatsos, Sandrock, and Budd Haeberlein. The Complaint does not make a single allegation as to (i) when these three individuals purportedly learned information contradicting the Defendants' stated opinions, (ii) how they had such knowledge, (iii) facts showing their intent to mislead, or (iv) any other basic fact that supports any inference of scienter. Indeed, the only factual allegation about any Individual Defendant concerns Sandrock having a purportedly "secret, off-the-books" meeting before the class period even started with FDA employee Dr. Billy Dunn, who allegedly became an advocate for approving aducanumab within the FDA (SAC ¶¶ 120-33). Not only do Plaintiffs fail to explain how this alleged meeting is relevant (and Plaintiffs identify nothing prohibiting such a meeting), but they also do not allege that Sandrock (or Dunn) did not honestly believe in the strength of the clinical trial data. Scienter requires particularized factual allegations that a defendant "actually *knew*," or recklessly disregarded, "that the [challenged] statements were false"—allegations that are entirely absent here. *Local No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc.*, 140 F. Supp. 3d 120, 132-33 (D. Mass. 2015) (emphasis in original), *aff'd sub nom.*, 838 F.3d 76 (1st Cir. 2016).

Moreover, the lack of specific factual allegations about the Individual Defendants fails to

satisfy the heightened pleading standards under Rule 9(b) and the PLSRA. *Maldonado v. Dominguez*, 137 F.3d 1, 9–10 (1st Cir. 1998) (the First Circuit "has been especially rigorous in applying Rule 9(b) in securities fraud actions," and rejects "general averment[s] of the defendant's knowledge of falsity"). It is telling that the SAC contains no "allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements" the Defendants here were "aware that they were withholding vital information or at least were warned by others that this was so"—which the First Circuit has held are the hallmarks of well-pleaded facts showing scienter. *Mehta*, 955 F.3d at 206-07. Courts in this circuit routinely dismiss securities claims in the absence of such allegations. *E.g.*, *Angelos*, 494 F. Supp. 3d at 57–58 (citing lack of allegations of internal reports or communications indicating defendants knew of problems with Phase 3 trial when allegedly misleading statements were made"); *Sanders*, 2015 WL 1276824 at *9–10 (citing lack of allegations of insider trading or personal gain to defendants, and no divergence of internal reports and external statements); *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 522 (D. Mass. 2014) (same), *aff'd sub nom.*, 778 F.3d 228 (1st Cir. 2015). The SAC's few allegations attributed to anonymous former employees should be afforded no weight both because the allegations shed no light on the Individual Defendants' purported knowledge, and are unsupported by any well-pleaded facts.[15]

---

[15] Plaintiffs rely on anonymous statements from two unspecified former Biogen employees quoted in news articles to suggest that the FDA was "always going to find a way to approve Aduhelm," and a "former Biogen senior medical director" who believed that the FDA's approval of aducanumab "lowers the rigor of regulatory bodies." (*See* SAC ¶¶ 21, 126, 317(e).) These statements do not connect the Defendants to any fraud, do not contradict the Company's scientific conclusions, and do not in any way bear on the Defendants' state of mind. Furthermore, Plaintiffs provide no facts about these employees, such as their involvement in the clinical trials, dates of employment, or (with one exception) their positions within Biogen. The former employees thus "are not described with sufficient particularity for their statements to give rise to the requisite 'strong inference' of scienter." *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015); *see N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) (similar).

### III.   THE SAC DOES NOT PLEAD LOSS CAUSATION

Plaintiffs' claims should be dismissed for an independent reason: the SAC does not allege facts connecting either the purported inflation of or subsequent drop in Biogen's stock price to Defendants' alleged misstatements.  To plead loss causation, Plaintiffs must allege a "causal link between the alleged misconduct and the economic harm ultimately suffered." *In re Alkermes Sec. Litig.*, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005) (citation omitted).  Loss causation should be pleaded with specificity under Rule 9(b), as most courts in this district have held, *e.g.*, *Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 444–45 (D. Mass. 2018), and certainly must satisfy the plausibility standard of Rule 8.  *See Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273-74 (D. Mass. 2013) (finding Rule 9(b) governs, but also dismissing under Rule 8 because it is "not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other.").  Here, the SAC meets neither standard.[16]

In this case, Biogen's stock price dropped on November 9, 2020, the first day of trading following the Advisory Committee's votes on November 6. (SAC ¶¶ 19, 280.)  But the *only* new information in the market alleged in the Complaint is the *outcome* of those votes, which reflect the opinions of the Advisory Committee members. The Complaint alleges no misstatement that was corrected by this new information—nor could it, as Defendants never predicted (and certainly never promised) a particular outcome.  To the contrary, Defendants expressly declined to predict the outcome of the FDA approval process. *Supra* at n.11.  The Complaint thus fails entirely to establish a *connection* between the new information on November 6 (the Advisory Committee votes) and any prior alleged misstatement.  This failure is fatal to the pleading of loss causation.

---

[16]   In fact, on October 22, 2019, the outset of the Class Period when the FDA announced that it viewed the Phase 3 data as sufficient to support an application, Biogen's stock price closed at $281.87. (Trach Decl. Ex. W.) On June 7, 2021, following the FDA's announcement of approval of aducanumab under its accelerated approval program, Biogen's stock price closed at $395.85. (*Id.* Ex. H.)

33

*See Coyne*, 943 F. Supp. 2d at 273 ("If Plaintiff's loss resulted from the disclosure of negative information other than a prior false or misleading statement by the Defendants, then she . . . has not pled an adequate claim for securities fraud."); *see also In re Alkermes*, 2005 WL 2848341 at *11 (dismissal where there was "no allegation" that alleged misstatements "had any connection to the FDA non-approval letter and subsequent" decline in the company's stock price); *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 349–50 (D. Mass. 2020) (loss causation not shown because complaint failed to "eliminate" other causes of stock price drop). Nor can Plaintiffs fall back on the argument that the Advisory Committee vote represents the manifestation of an undisclosed risk. The Massie Appendix—which Plaintiffs contend revealed the statistical counterarguments to Biogen's own scientific interpretations—was published at the same time as the Joint Report and before the Advisory Committee vote.[17] This, too, is fatal to Plaintiffs' claims. *See In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128–29 (D. Mass. 2010) (dismissal proper where market was aware of the alleged misstatements before stock drop based on publication on FDA's website), *aff'd sub nom.*, 649 F.3d 5 (1st Cir. 2011).

## IV. THE SAC DOES NOT PLEAD RELIANCE OR PLAINTIFF STANDING BY SHASH AND KHAN

Neither Shash nor Khan can establish the essential element of reliance, nor do they have standing to sue, because they purchased Biogen shares only *after* the purported misrepresentations and omissions were made public. Plaintiffs' theory is that Defendants concealed conflicting

---

[17]  Plaintiffs' effort to plead around this fatal hole in their loss causation theory—that the Massie Appendix "was dense to the point of being impenetrable" (SAC ¶ 274)—is unpersuasive. The Massie Appendix plainly states in its executive summary that "there is no compelling substantial evidence of treatment effect or disease slowing." (SAC Ex. 3, at 256.) Indeed, the very same analysts Plaintiffs cite immediately reacted on November 4, 2020, the day the Massie Appendix was published, that it was "very negative" and reflected a view that the "entire analysis is flawed." (Trach Decl. Ex. F, at 1.) Plaintiffs could have done the same. *Cf. SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 65 n.5 (D. Del. 2020) (rejecting premise that disclosure could not be discerned when another investor was able to discover "the allegedly undisclosed indenture breach based on the very same public filing to which [plaintiff] points").

interpretations of the clinical trial data expressed in Dr. Massie's report. *Supra* Argument Part I(A)(B)(2). But Dr. Massie's dissenting opinion and analyses were published on the FDA's website on the morning of November 4, 2020, *before* the Lead and Named Plaintiffs purchased Biogen shares. *Supra* at n.2. Because reliance is an essential element of a fraud claim, courts routinely dismiss securities claims in these circumstances "because relying on the earlier misrepresentation would no longer be reasonable in light of the new information." *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 234–35 (D. Mass. 2014); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 206 (S.D.N.Y. 2020) (granting motion to dismiss where lead plaintiffs "chose to purchase" the issuer's stock "in spite of" the company's corrective disclosure the prior day); *see Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 20–21 (D. Mass. 2019) (lead plaintiff "unable to plausibly allege reliance because his July 2016 purchase of [defendant's] shares came after the curative disclosure in February and April 2016"), *aff'd*, 6 F.4th 123 (1st Cir. 2021). Here, as a matter of law, Shash and Khan cannot have reasonably relied on any misrepresentation alleged in the SAC because they "chose to purchase" Biogen stock "in spite of" the public disclosure on the morning of November 4 of the very information they allege was concealed. For the same reason, they lack standing to pursue these claims. *See Vertex*, 12 F. Supp. 3d at 235 (lead plaintiff who purchased stock one day after corrective disclosure "lacks standing to contest" earlier alleged misstatements); *Abengoa*, 481 F. Supp. 3d at 206 (similar).

## V. PLAINTIFFS' SECTION 20(a) CLAIMS MUST BE DISMISSED

Absent a predicate Section 10(b) claim, the control person claims under Section 20(a) must also be dismissed. *See Mehta*, 955 F.3d at 211; *In re Wayfair*, 471 F. Supp. 3d at 350.

## CONCLUSION

For all of the reasons set forth above, Defendants' motion to dismiss should be granted and the Complaint should be dismissed in its entirety and with prejudice.

Dated: September 20, 2021

Respectfully submitted,

/s/ Audra J. Soloway
Audra J. Soloway (pro hac vice)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3289
Facsimile: (212) 492-0289
asoloway@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc., Michel
Vounatsos, Alfred W. Sandrock, Jr., and
Samantha Budd Haeberlein*

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent on September 20, 2021 to those identified as non-registered participants.

/s/ Audra J. Soloway
Audra J. Soloway

36