# Exhibit N

# Summary Memorandum

| | |
|---|---|
| **Date** | June 7, 2021 |
| **From** | Teresa Buracchio, M.D.<br>Deputy Director, Division of Neurology 1 (DN1)<br><br>Sally Jo Yasuda, PharmD<br>Safety Team Lead, DN1<br><br>Eric Bastings, M.D.<br>Director (Acting), DN1<br><br>Billy Dunn, MD<br>Director, Office of Neuroscience |
| **Subject** | Summary Memorandum |
| **BLA #** | 761178 |
| **Applicant** | Biogen Inc. |
| **Date of Submission** | July 7, 2020 |
| **PDUFA Goal Date** | June 7, 2021 |
| **Proprietary Name** | Aduhelm |
| **Established or Proper Name** | aducanumab-avwa |
| **Dosage Form(s)** | Solution for injection |
| **Applicant Proposed Indication(s)/Population(s)** | To delay clinical decline in patients with Alzheimer's disease |
| **Applicant Proposed Dosing Regimen(s)** | 10 mg/kg as an intravenous infusion every four weeks |
| **Recommendation on Regulatory Action** | Approval |
| **Recommended Indication(s)/Population(s)** (if applicable) | Treatment of Alzheimer's disease |

1

Reference ID: 4807245

## 1.    Benefit-Risk Assessment

**Benefit-Risk Assessment Framework**

<div style="border:1px solid">

**Benefit-Risk Integrated Assessment**

Alzheimer's disease (AD) is a neurodegenerative disease that causes progressive impairments in memory, language, and thinking, with the eventual loss of ability to perform social and functional activities in daily life. In general, the average survival is 4 to 8 years after a diagnosis of dementia due to AD. It is estimated that 6.2 million Americans age 65 and older are currently living with AD dementia, and AD is the sixth leading cause of death in the United States. Currently approved treatments for AD include the cholinesterase inhibitors donepezil, rivastigmine, and galantamine, and the N-methyl-D-aspartate (NMDA) receptor antagonist, memantine. These drugs provide modest benefits to patients with AD, but it is unclear if these drugs slow or prevent neurodegeneration in patients with AD. There is an urgent and unmet medical need for effective treatments for AD, and a particular unmet need for therapies in AD that slow, halt, reverse, prevent, or cure the disease, with drugs that target the underlying pathophysiology of AD in an effort to fundamentally affect the course of the disease an important focus of development.

Aducanumab-avwa is a recombinant human immunoglobulin gamma 1 (IgG1) monoclonal antibody targeting aggregated soluble and insoluble forms of amyloid beta (Aβ). Extracellular deposits of Aβ, referred to as amyloid plaques, are one of the pathologic hallmarks of AD, along with intracellular aggregates of hyperphosphorylated tau in the form of neurofibrillary tangles. Accumulation of Aβ in the brain has been proposed to be the primary driver of the disease process and precedes the accumulation of tau pathology and neural degeneration.

Studies 301 and 302 were identically-designed, randomized, double-blind, placebo-controlled studies each comparing two doses (low dose and high dose) of aducanumab to placebo over 18 months in patients at the early stages of symptomatic Alzheimer's disease. The two studies were terminated before their planned completion date based on an interim analysis that suggested futility; however, the collected data from each study was analyzed according to the prespecified statistical analysis plan (SAP).

Study 302 demonstrated a statistically significant treatment benefit (smaller increase in CDR-SB[1]) for aducanumab 10 mg/kg, compared to placebo (-0.39 [-22%], p = 0.0120). Statistically significant treatment effects in favor of aducanumab 10 mg/kg were observed for all three ranked secondary clinical endpoints (MMSE, ADAS-Cog 13, and ADCS-ADL-MCI) and the tertiary endpoint (NPI-10).[2] These endpoints are only modestly correlated, assess different domains that patients have stated are important to them (e.g., maintaining independence in activities of

</div>

[1] Clinical Dementia Rating Scale-Sum of Boxes (CDR-SB), which measures cognitive and functional impairment in AD.

[2] Mini-Mental State Examination (MMSE), Alzheimer's Disease Assessment Scale–Cognitive Subscale - 13 -item version (ADAS-Cog 13), Alzheimer's Disease Cooperative Study-Activities of Daily Living – MCI, Neuropsychiatric Inventory - 10-item version (NPI-10)

2

Reference ID: 4807245

daily living), and contribute largely independent support for the effect of aducanumab. There was some evidence of dose response with the low dose having a non-statistically significant numerical reduction on CDR-SB. The primary results on clinical endpoints were robust to numerous sensitivity analyses and explorations of prespecified subgroups. The effect of aducanumab on clinical endpoints was supported by robust and highly statistically significant dose- and time-dependent reductions of markers of brain amyloid beta plaques, and dose-dependent reductions of relevant markers of downstream Alzheimer's tau pathophysiology and neurodegeneration. The changes on measures of Aβ were correlated with changes on clinical outcomes.

Supportive data is provided from Study 103, a smaller randomized, double-blind, placebo-controlled, sequential cohort, dose-finding study for aducanumab in AD. Study 103 was conducted in a similar population and used many of the same endpoints that were used in Studies 301 and 302. The results on clinical endpoints (CDR-SB and MMSE) at the highest dose studied (10 mg/kg) were nominally significant and consistent with the positive results observed in Study 302, though because of the sequential cohort design, non-concurrent randomization is a factor in active vs. overall placebo comparisons. Nonetheless, there was a notable dose-related numerical reduction relative to placebo for CDR-SB and MMSE. There was a clear dose- and time-dependent reduction of markers of brain amyloid beta plaques. The dose-response relationship for Aβ reduction in Study 103 provides support for the reduction in amyloid observed findings on Study 302, and is consistent with the dose-response relationship observed in Study 302 for CDR-SB and MMSE.

Study 301 is a negative study and does not contribute to the evidence of effectiveness on clinical outcomes for aducanumab; however, the study does contribute to a conclusion that aducanumab reduces amyloid beta plaques, as the PET subset demonstrated statistically significant time- and dose-dependent decreases in amyloid beta plaques. Study 301 also contributes to the understanding of the relationship between change from baseline in reduction in brain Aβ and the estimate of the treatment effect for CDR-SB.

Study 301 and Study 302 had discordant results on the primary endpoint, with one study (301) being negative for the high dose, but the second (302) being positive for the high dose, with persuasive results on secondary endpoints; the two studies had similar but non-significant findings for the low dose. In order to achieve a maximum understanding of the data, exploratory analyses were conducted to investigate the discordance between the studies. These analyses suggested that demographic and baseline characteristics, the possibility of functional unblinding, and differences in placebo response between the two studies did not contribute to the discordant results. Analyses of differences in the proportion of rapidly progressing patients in the two studies and of dosing differences between the two studies suggested a contribution of each of these differences to the discordant results. The analyses of rapid progressors suggested that small imbalances in the number of rapid progressors can have a relatively large impact on the magnitude of the primary and secondary endpoints, and the high-dose arm in Study 301 was disproportionately affected by such an imbalance in rapid progressors. The analyses of dosing differences indicated that dosing is an important consideration for interpretation of the efficacy results in Studies 301 and 302, and patients in Study 301 with higher exposure to the 10 mg/kg dose had treatment effects similar to patients in Study 302 with comparable dose exposure. Lower exposure to the target dose of 10 mg/kg in Study 301 appears to be a small but contributing factor to the differences in results of Study 301 and Study 302. These findings are exploratory and resulted from analytical approaches with varied strengths and weaknesses. Although they are informative, the fundamental issue that Study 301 did not demonstrate the effect on the high dose that was demonstrated in Study 302 remains and clearly introduces

3

Reference ID: 4807245

residual uncertainty that would not be present had Study 301 demonstrated a similar effect as Study 302.

In short, Study 103, a sequential cohort study that was primarily intended to assess safety and tolerability along with pharmacodynamic dose finding, but which included a rigorous design with regard to blinding and assessment, showed a notable dose-related numerical reduction in clinical decline relative to placebo for CDR-SB and MMSE, with nominal significance for both CDR-SB and MMSE at 10 mg/kg, along with a clear and persuasive dose- and time-dependent reduction of amyloid beta plaques. Study 302 and Study 301, though prematurely terminated, when analyzed using data collected per protocol and according to the prespecified analytical plan, show discordant results. Study 302 demonstrated a statistically significant treatment benefit on CDR-SB at 10 mg/kg, and particularly persuasive statistically significant treatment effects for several secondary clinical endpoints that are only modestly correlated with each other and with the primary outcome, since there are many non-overlapping domains assessed, and the approach to assessments are distinct, increasing the relevance of their results; along with some evidence of dose response, and clear and persuasive highly statistically significant dose- and time-dependent reductions of amyloid beta plaque, accompanied by dose-dependent reductions of relevant markers of downstream Alzheimer's tau pathophysiology and neurodegeneration. The changes on measures of Aβ were correlated with changes on clinical outcomes. Study 301 did not demonstrate an effect on the primary endpoint, but did show clear and persuasive highly statistically significant dose- and time-dependent reductions of amyloid beta plaque. Analyses of Study 301 and 302 indicate that the primary findings of Study 302 were robust and suggest that differences between the trials (as discussed above) could have contributed to the lack of observed effect in Study 301, but these are exploratory and do not eliminate the residual uncertainty created by the primary results of Study 301 when considering the overall data.

The primary clinical review argues primarily for standard approval. Despite the early termination of Study 302, Dr. Krudys considers the data submitted to be interpretable and capable of providing evidence for the effectiveness of aducanumab for AD. He considers Study 302 to be a robust and exceptionally persuasive study that provides the primary evidence of effectiveness to support approval. He bases this conclusion on a treatment effect demonstrated on a clinically meaningful endpoint, and reinforced by effects on secondary endpoints, biomarkers, and in relevant subgroups. Dr. Krudys also considers that Study 103, with design features consistent with Study 302, provides support for the findings of Study 302. Dr. Krudys notes that Study 301 is a negative study and does not contribute to the evidence of effectiveness on clinical outcomes; however, he feels that the results of the exploratory analyses contribute to an overall understanding of Study 301 and do not detract from the persuasiveness of Study 302. Dr. Krudys has concluded that the applicant has provided substantial evidence of effectiveness to support approval of aducanumab for AD.

Dr. Krudys has also reviewed the evidence to support accelerated approval and concludes that reduction in brain amyloid as measured by PET is reasonably likely to predict clinical benefit. He also notes that the time- and dose-dependent effect of aducanumab on reduction of brain amyloid beta plaques observed across Studies 103, 301, and 302 meets the standard for substantial evidence of effectiveness in this context. In this setting, where the evidence supporting clinical benefit is strong but associated with the residual uncertainty conveyed by the clinical endpoint results of Study 301 (and the associated contribution of those results to the premature termination of both studies), Dr. Krudys concludes that the accelerated approval pathway is supported by the data.

4

The primary statistical review does not recommend approval. Dr. Massie notes that the only valid analyses of Study 301 and Study 302 are the prespecified randomization supported analyses. This results in a conflict between one positive study and one negative study. The statistical review notes that exploratory analyses cannot take the place of a prespecified primary analysis supported by randomization, arguing that the overall prespecified final analysis of 301 is the only valid analysis of that study and that explorations of the data in Study 301 cannot result in definitive conclusions of the same weight as the prespecified final analysis. Numerous explorations of the data are contained in the statistical review in support of a negative result for Study 301. Additional exploratory analyses are described to suggest that increased placebo progression post-PV4 may account for the treatment effect observed in Study 302. Dr. Massie also argues that Study 103, a smaller study with a sequential cohort design not intended to primarily assess efficacy, should not be weighted more strongly than a large, randomized, parallel group, placebo-controlled study. That statistical review argues that there is no compelling correlation between effects on amyloid beta plaques and effects on CDR-SB at the patient level.

The clinical pharmacology review recommends approval. The clinical pharmacology team finds that four primary findings contribute to the evidence of effectiveness of aducanumab. 1) Positive findings for the high dose group from Study 302. 2) The dose-response relationship observed in Study 103. 3) Positive exposure-response relationships for CDR-SB, ADAS-Cog13, and ADCS-ADL-MCI from Studies 301 and 302. 4) Exposure-SUVR and SUVR-clinical endpoint relationships observed in Studies 301, 302, and 103. In addition, the clinical pharmacology review discusses two important supportive analyses that further increase the persuasiveness of the primary findings. 1) The review team concluded that the relationship between brain amyloid reduction and CDR-SB for aducanumab was consistent with the relationship observed for other compounds targeting amyloid beta based on a review of publicly available information, including compounds for which the reduction in amyloid beta plaque ranged from minimal to a similar extent as that seen with aducanumab. 2) Based on extensive clinical trial simulations, the review team concluded that the probability of the high dose group in Study 302 being a false positive is very low, and the high dose group in Study 301 is likely a chance finding driven by the pre-PV4 subgroup. Also, the probability of observing the overall positive findings from Studies 103, 301, and 302 under the null assumption that aducanumab is the same as placebo was extremely low. The clinical pharmacology review team notes that it is practically impossible to observe the overall pattern of results in these three studies if aducanumab is similar to placebo.

In summary, regarding the evidence of effectiveness of clinical benefit, data from an early phase study (103) showed a notable dose-related numerical reduction in clinical decline relative to placebo for CDR-SB and MMSE, with nominal significance for both CDR-SB and MMSE at 10 mg/kg. Further data are provided by two identically-designed late phase studies (302 and 301) that, though prematurely terminated, provide interpretable efficacy results. When analyzed using data collected per protocol and according to the prespecified analytical plan, these studies show discordant results for the 10 mg/kg arms. Study 302 demonstrated a persuasive statistically significant treatment benefit on the primary endpoint at 10 mg/kg, and particularly persuasive statistically significant treatment effects for several secondary clinical endpoints that are only modestly correlated with each other and with the primary outcome, along with some evidence of dose response. Study 301 did not demonstrate an effect on the primary endpoint. Analyses of Study 301 and 302 indicate that the primary findings of Study 302 were robust and suggest that differences between the trials could have contributed to the lack of observed effect in Study 301, but these analyses are exploratory and do not eliminate the residual uncertainty regarding clinical benefit created by the primary results of Study 301 when

5

Reference ID: 4807245

considering the overall data. These clinical findings are supported by clear and persuasive highly statistically significant dose- and time-dependent reductions of amyloid beta plaque across all three studies, which were correlated with changes on clinical outcome, and dose-dependent reductions of relevant markers of downstream Alzheimer's tau pathophysiology and neurodegeneration.

The primary clinical review and the clinical pharmacology team's review have resulted in a conclusion that substantial evidence has been provided for the clinical benefit of aducanumab and both recommend standard approval. These recommendations are described above and are predicated on the strength of the evidence provided by Study 302, felt by both Dr. Krudys and the entire clinical pharmacology team to be robust and exceptionally persuasive, and the supportive evidence provided by Study 103, with further support from extensive exploratory and sensitivity analyses, dose-response and exposure-response relationships, and SUVR-clinical endpoint relationships observed across all three studies. Further, both reviews note the consistency of aducanumab's relationship between brain amyloid reduction and CDR-SB with the relationship observed for other compounds targeting amyloid beta. Finally, Dr. Krudys and the clinical pharmacology team both note, for the reasons above, and based on extensive clinical trial simulations performed by the clinical pharmacology team, that the probability of the high dose group in Study 302 being a false positive is extremely low , and the high dose group in Study 301 is likely a chance finding, a Type II error – a false negative, driven by the pre-PV4 subgroup of that treatment arm. Dr. Krudys notes that Study 301 is a negative study and does not contribute to the evidence of effectiveness on clinical outcomes; however, he feels that the results of the exploratory analyses contribute to an overall understanding of Study 301 and do not detract from the persuasiveness of Study 302. The clinical pharmacology team agrees with the clinical and statistical reviews that Study 301 was a negative study on its primary endpoint, but notes the contributions of exposure-response relationships for CDR-SB, ADAS-Cog13, and ADCS-ADL-MCI from Studies 301 and 302, and the exposure-SUVR and SUVR-clinical endpoint relationships observed in Studies 301, 302, and 103, to establishing evidence of effectiveness. The statistical review does not agree that substantial evidence has been provided for the clinical benefit of aducanumab and does not recommend approval for the reasons noted above. Fundamentally, the recommendation is based on the conflict between Study 301 and Study 302 on the prespecified randomization supported analyses. Numerous explorations and analyses are included in the statistical review (see the review for details) to reinforce this concern. The statistical review also argues that Study 103 should not be weighted more strongly than a large, randomized, parallel group, placebo-controlled study.

There is common ground here concerning Study 301. All three reviews agree that Study 301 is negative, and that it is critical to consider its impact. All three reviews recognize and address the uncertainty created by the primary high dose result of Study 301. The statistical review notes that exploratory analyses and the results of a small early phase study cannot replace or eliminate the results of Study 301. The clinical and clinical pharmacology reviews agree with this stance. The clinical and clinical pharmacology teams present thoughtful and reasonable arguments in support of approval, based, in part, upon analyses intended to address this uncertainty. Ultimately, Dr. Krudys feels that the results of the exploratory analyses contribute to an overall understanding of Study 301 and do not detract from the persuasiveness of Study 302, and the clinical pharmacology team feel that the overall data, including data from Study 301, support a positive effect of aducanumab.

That there is uncertainty introduced by the findings of Study 301 is clear. Indeed, it is self-evident that the overall findings of Study 302 and Study 103, should they have been the only results being considered, would not be affected by such uncertainty and it might then be reasonable

6

Reference ID: 4807245

and appropriate to view the results of Study 103 as confirmatory evidence in support of the positive results of Study 302. It is in that spectrum of uncertainty that the various recommendations for and against approval reside.

Dr. Krudys, in recognition of the presence of this uncertainty, has discussed the relevance of the accelerated approval pathway to the data at hand. As discussed above, he concludes that the accelerated approval pathway is supported by substantial evidence of the effect on aducanumab on reduction in amyloid beta plaques.

The accelerated approval pathway is intended to provide a path to approval for drugs in certain situations where there is some uncertainty at the time of approval regarding the drug's ultimate clinical benefit. Accelerated approval is based on an outcome that is reasonably likely to predict clinical benefit, rather than on the clinical benefit itself. These outcomes predictive of benefit are generally surrogate markers of disease of some sort, but may also be an intermediate clinical endpoint that can be measured earlier than the outcome of ultimate clinical importance. Substantial evidence of effectiveness is required on such an endpoint to support accelerated approval, just as it is required for an endpoint supporting standard approval. Accelerated approval (AA) is intended for serious conditions where the drug provides a meaningful advantage over available therapies.

Alzheimer's disease is a serious condition, and aducanumab, unlike other approved therapies, is targeted at an underlying, fundamental, and defining pathophysiological feature of the disease, with the potential to alter the inescapable and relentless progression of this disease. The clinical data that exist suggest that an alteration in such progression, assessed as a reduction in clinical decline over a prolonged period of time, is an anticipated benefit of aducanumab. Finally, a surrogate outcome for which there is substantial evidence of effectiveness, reduction in amyloid beta plaques on PET imaging, has been assessed in the aducanumab development program, and is reasonably likely to predict clinical benefit, as demonstrated in the reviews discussing the relationship of amyloid plaque reduction to clinical outcome.

When residual uncertainty exists about the clinical benefit of a drug, it is important to address that uncertainty, and accelerated approval provides an opportunity to address the uncertainty associated with a surrogate outcome that is reasonably likely to predict clinical benefit by requiring a post-approval study to verify the clinical benefit predicted by the effect on the surrogate. Thus, accelerated approval provides an appropriate approval pathway, in a population and situation for which the pathway is intended, that will be accompanied by a requirement to address the residual uncertainty discussed above.

A key issue is whether substantial evidence of effectiveness exists for amyloid beta plaque reduction. Clearly, for the reasons discussed above, it does. Treatment with aducanumab results in clear and persuasive highly statistically significant dose- and time-dependent reductions of amyloid beta plaque in all studies. Studies 301 and 302 were adequate and well controlled late-stage large studies of conventional design. Study 103 is an early-stage smaller study of rigorous design and conduct (e.g., placebo control, blinded assessments, prespecified analytical plan) that represents another adequate and well controlled study for the assessment of the highly objective endpoint of amyloid beta plaque measurement. There is substantial evidence that aducanumab reduces amyloid beta plaque.

7

Reference ID: 4807245

An equally important issue is whether that effect, for which substantial evidence exists, is reasonably likely to predict benefit. Again, for reasons discussed above, this is the case. There are several reasons why this is so.

First, amyloid plaque is an underlying, fundamental, and defining pathophysiological feature of the disease. Although the role of amyloid and its relationship to other pathophysiological features of AD, such as tau and neurodegeneration, is complicated, the presence of amyloid plaques is a primary and essential finding in AD, including early in the disease. Mutations causing abnormalities in amyloid that result in autosomal dominant AD further reinforce its fundamental role. It is reasonable to conclude that treatment that is targeted at reducing amyloid plaque, and that successfully accomplishes that reduction, has the potential to convey clinical benefit.

Second, a strong group-level relationship has been established for the change from baseline in amyloid beta plaque SUVR-change from baseline in CDR-SB clinical endpoint in Studies 301, 302, and 103, as shown and discussed in the clinical and clinical pharmacology reviews. This relationship is evident for all studies in all arms except, as expected, for the high dose arm of Study 301. This overall finding strongly supports the reasonable likelihood that reduction in amyloid beta plaque by aducanumab predicts clinical benefit.

It is important to recognize that patient-level correlations are weaker (but still present), and the statistical review argues in some detail that there is no compelling correlation between effects on amyloid beta plaques and effects on CDR-SB at the patient level. The clinical pharmacology review provides a thorough discussion of the confounded nature of individual-level correlation assessment for patients that were randomized at the group-level, and does not recommend this approach.

Third, the overall findings of Study 302 and Study 103, in the context of the lowering of amyloid beta plaque in those studies, contribute to a reasonable likelihood that a lowering of amyloid beta plaque will result in clinical benefit.

Fourth, the clinical pharmacology review team concluded that the relationship between amyloid beta plaque reduction and CDR-SB for aducanumab was consistent with the relationship observed for other compounds targeting amyloid beta. This relationship exists across a range of plaque reduction. The clinical pharmacology team found that there was a clear relationship between reduction of amyloid beta plaque burden in brain and preservation of clinical function in the aducanumab program, which was consistent across all 6 other available programs of anti-amyloid beta antibodies under development over the past decade based on a review of publicly available information. A larger reduction of amyloid plaque levels in brain was clearly associated with a better maintenance of function as measured by CDR-SB. In contrast, compounds at the tested doses with no/minimal changes in amyloid beta plaque levels consistently failed to demonstrate superiority over placebo in slowing the disease progression in clinical studies with treatment duration of 1.5 to 2 years. This finding across various programs of evidence consistent with the primary findings regarding aducanumab supports a reasonable likelihood that a lowering of amyloid beta plaque will result in clinical benefit.

Fifth, aducanumab's robust and highly statistically significant dose- and time-dependent reductions of markers of brain amyloid beta plaque was accompanied by dose-dependent reductions of relevant markers of downstream Alzheimer's tau pathophysiology and neurodegeneration.

8

Reference ID: 4807245

These additional findings of an effect on other critical aspects of Alzheimer's pathophysiology at doses of aducanumab associated with reduction in amyloid beta plaque and correlated with evidence of clinical benefit contribute to a reasonable likelihood that a lowering of amyloid beta plaque will result in clinical benefit.

Sixth, preliminary data from an ongoing redosing study suggest that patients in Study 302 treated with aducanumab 10 mg/kg who achieved a greater degree of amyloid beta plaque reduction (an SUVR <1.1, the value reported to discriminate between a positive and negative amyloid PET scan) had more stable results upon entry into the redosing study on the Study 302 primary and secondary clinical measures that were assessed upon entry into the redosing study than patients who did not achieve that degree of amyloid plaque reduction. This observation provides further support to the relationship between amyloid beta plaque reduction and clinical benefit.

There are therefore multiple lines of evidence establishing a reasonable likelihood that reduction of amyloid beta plaques will be associated with clinical benefit, and there is substantial evidence that aducanumab reduces amyloid beta plaques. Accordingly, for the reasons discussed above, the criteria for accelerated approval are met.

It is important to note a somewhat less common aspect of these data in the context of accelerated approval. More commonly, accelerated approval is envisioned in a circumstance when the effect on a surrogate is available much sooner than a clinical outcome of ultimate interest. Enquiries from sponsors are often made when studies do not succeed in establishing evidence of clinical benefit, such as proposals to assess effectiveness using an alternative endpoint from the same studies instead (e.g., change in a biomarker of some sort that was measured in the study). In such situations, there are typically little to no data suggesting clinical benefit of the drug, and, not uncommonly, the proposed biomarker is nonspecific or not well understood with regard to the disease under investigations. Under such circumstances, efforts to rescue, or salvage, a failed study via the accelerated approval pathway are typically inappropriate, for a variety of reasons. The character of the biomarker is often insufficient to establish reasonable likelihood to predict clinical benefit, substantial evidence of an effect on the biomarker is often lacking, and the clinical data that exist in the study under question provide no evidence of benefit. The circumstances here are fundamentally different, as discussed above.

It is also important to mention that there have been multiple studies of agents targeting amyloid beta, and they are frequently grouped together as "anti-amyloid" therapies and tend to be viewed as a class. The multiple prior failures of drugs in this space, including monoclonal antibodies, are frequently cited as diminishing confidence in the value of this therapeutic strategy. The clinical review discusses several factors that are relevant to this issue. Different mechanisms characterize these therapies, including various attempts to limit production or enhance clearance of amyloid beta. The character of these investigational drugs can vary widely, and not all are monoclonal antibodies. Dr. Krudys describes a variety of factors that may contribute to previous failures, including insufficient dosing, unknown target engagement, off-target effects, and inclusion of individuals in trials without evidence of brain amyloid beta pathology (i.e., patients without Alzheimer's disease) or at later stages of Alzheimer's disease. Amongst anti-amyloid beta monoclonal antibodies specifically, there are differences due to effector function, binding at different epitopes, and selectivity for amyloid beta variants. For these reasons, as Dr. Krudys notes, previous late-stage failures of anti-amyloid beta therapies do not constitute a demonstrated "class failure" and are not particularly informative for the assessment

9

of the effectiveness of aducanumab.  Dr. Krudys describes how the aducanumab development program in many ways stands apart from these previous failures. The pivotal trials of aducanumab included patients with evidence of brain amyloid beta pathology who were early in the disease process. An early trial, Study 103, demonstrated target engagement and confirmed reduction of amyloid beta plaque burden. Accordingly, aducanumab may more appropriately be grouped with agents which have also demonstrated plaque reduction at appropriate dosages with some early evidence suggesting favorable effects on clinical endpoints.  In short, the spectrum of results seen with prior agents is not of consistent relevance to the aducanumab findings.  Prior failures do not necessarily diminish the reasonable likelihood that amyloid beta plaque reduction with aducanumab treatment will result in clinical benefit, and, in fact, the most relevant and informative information from monoclonal antibody agents which have also demonstrated plaque reduction at appropriate dosages contribute further to a reasonable likelihood that a lowering of amyloid beta plaque will result in clinical benefit.

The safety of aducanumab has been well characterized in a safety database of adequate size.  The safety reviews, including a general review of safety by Dr. Branagan and a focused review of ARIA by Dr. Trummer, show that ARIA is the most important safety concern. Aducanumab can cause amyloid related imaging abnormalities-edema (ARIA-E), which can be observed on MRI as brain edema or sulcal effusions, and amyloid related imaging abnormalities-hemosiderin deposition (ARIA-H), which includes microhemorrhage and superficial siderosis. ARIA (-E and/or -H) was observed in 41% of patients treated with a planned dose of 10 mg/kg (454 out of 1105), compared to 10% of patients on placebo. ARIA-E was observed in 35% of patients treated with 10 mg/kg, compared to 3% of patients on placebo. The incidence of ARIA-E was higher in apolipoprotein E ε4 (ApoE ε4) carriers than in ApoE ε4 non-carriers (42% and 20%, respectively). The majority of ARIA-E radiographic events occurred early in treatment (within the first 8 doses), although ARIA can occur at any time. Among patients treated with a planned dose of 10 mg/kg who had ARIA-E, the maximum radiographic severity was mild in 30%, moderate in 58%, and severe in 13% of patients. Resolution occurred in 68% of ARIA-E patients by 12 weeks, 91% by 20 weeks, and 98% overall after detection. 10% of all patients who received 10 mg/kg had more than one episode of ARIA-E. ARIA-H in the setting of ARIA-E associated with the use of 10 mg/kg was observed in 21% of patients treated with 10 mg/kg, compared to 1% of patients on placebo.  There was no imbalance in isolated ARIA-H (i.e., ARIA-H in patients who did not also experience ARIA-E) between aducanumab and placebo. There was no imbalance in hemorrhage greater than 1 cm between aducanumab and placebo. Clinical symptoms were present in 24% of patients treated with 10 mg/kg who had an observation of ARIA (-E and/or -H), compared to 5% of patients on placebo.  The most common symptom in patients treated with 10 mg/kg with ARIA was headache (13%).  Other frequent symptoms were confusion/delirium/altered mental status/disorientation (5%), dizziness/vertigo (4%), visual disturbance (2%), and nausea (2%).  Serious symptoms associated with ARIA were reported in 0.3% of patients treated with 10 mg/kg. Clinical symptoms resolved in the majority of patients (88%) during the period of observation. In addition, hypersensitivity reactions of angioedema and urticaria occurred in 1 patient in the placebo-controlled clinical trials.

In summary, with regard to the evidence of effectiveness supporting accelerated approval on the basis of a reduction in amyloid beta plaque, the requirements are met.  Alzheimer's disease is a serious and life-threatening condition with a tremendous unmet medical need.  This unmet need is not only well recognized by the Agency and the scientific community, but is clearly articulated by the voices of Alzheimer's disease patients and their caregivers who leave no doubt of the urgent need for an effective treatment.  Even given the residual uncertainty with respect to its clinical benefits, patients and caregivers have clearly stated their desire for a drug that is likely to be effective.  This is exactly the

10

Reference ID: 4807245

situation for which accelerated approval exists – where the evidentiary criteria for accelerated approval are met, it can provide earlier access to a promising drug to patients with unmet needs. There is substantial evidence that aducanumab reduces amyloid beta plaques, and this reduction is reasonably likely to result in clinical benefit for patients. Accelerated approval provides an opportunity to both accelerate the availability of a promising new treatment and address residual uncertainty by requiring the conduct of an additional study to verify clinical benefit.

ARIA is the primary risk associated with the use of aducanumab. It is usually asymptomatic, and when symptomatic, it is rarely serious, though serious asymptomatic (i.e., radiographic) and symptomatic cases can occur. It will receive a warning in labeling describing the risk along with monitoring and dosing recommendations. The applicant will provide a structured educational program for clinicians involved with aducanumab treatment, and will be identifying and characterizing cases of ARIA when used clinically. Aducanumab will be used initially in specialized centers familiar with Alzheimer's disease patients, testing, and monitoring. It is possible that the character of ARIA will be different in clinical practice than in clinical studies. Enhanced pharmacovigilance will be performed to more fully characterize ARIA in the practice setting. A hypersensitivity reaction occurred in a patient in the clinical trials. It will receive a warning in labeling. There are no safety issues that preclude approval.

11

Reference ID: 4807245