**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN, <br><br> Defendants. | CASE No.: 1:21-cv-10479-IT <br><br> **Leave to File 35-Page Memorandum Granted on August 2, 2021** <br><br><br> **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................. 1

II.  FACTS ............................................................................................................................. 4

   A.  Background .................................................................................................................. 4

   B.  Defendants Falsely Tell Investors that Patients Achieved Statistically Significant Positive Responses If and Only If They Received Aducanumab Doses of 10mg/kg ...... 5

      1.  Defendants say Study 301 failed because not enough patients received 10mg/kg ............. 5

      2.  Data Defendants concealed shows the Study 301 results were a statistical artifact .......... 6

   C.  Defendants Falsely Claim Removal of Amyloid Plaque Caused Better Clinical Outcomes .................................................................................................................... 6

      1.  Defendants claim aducanumab's removal of amyloid plaque causes better clinical outcomes .................................................................................................................... 6

      2.  Removal of amyloid plaque is not even correlated with better clinical outcomes ............. 7

   D.  Additional False Statements ..................................................................................... 7

   E.  The Advisory Committee Rejects Dunn's Attempt To Steamroll Them ........................ 8

   F.  The FDA Approved Aducanumab After Improper Contacts Between Defendant Sandrock and Billy Dunn .......................................................................................... 9

   G.  Aducanumab's Approval Becomes the Posterchild for Regulatory Capture ............. 11

III.  THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY ......................................... 12

   A.  Standard .................................................................................................................... 12

   B.  Defendants Made False Statements of Fact and Expressed Opinions That Were Misleading Because They Concealed Facts ....................................................... 13

   C.  All of Defendants' Statements Were Either False or Misleading ................................ 19

   D.  The Complaint Sufficiently Alleges that Defendants Lacked a Reasonable Basis for their Statements ................................................................................................... 22

   E.  Analysts' Reactions Show Defendants' Statements Were Misleading ......................... 22

i

**IV.  DEFENDANTS MADE THEIR MISLEADING STATEMENTS WITH SCIENTER ..** .................................................................................................................................................23

  **A.  Standard** ........................................................................................................................ **23**

  **B.  The Authority and Specificity of Defendants' Statements Supports Scienter ............. 24**

  **C.  Defendants' Investigation Supports Scienter** .................................................................. **27**

  **D.  The Complaint Alleges a Motive** ................................................................................... **28**

**V.  THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION** ........................31

**VI.  THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIMS** .............35

**VII. CONCLUSION** .................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................... 15, 16, 22

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ......................................................................................... 24

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ........................................................................ 24, 27, 29, 30

*In re Alkermes Sec. Litig.*,
2005 WL 2848341 (D. Mass. Oct. 6, 2005)......................................................... 13, 34

*In re Apollo Grp. Inc. Sec. Litig.*,
509 F. Supp. 2d 837 (D. Ariz. 2007)............................................................................ 32

*In re Biogen Inc. Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016) .............................................................................. 31

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)................................................................................. 32, 33

*In re Bos. Sci. Corp. Sec. Litig.*,
708 F. Supp. 2d 110 (D. Mass. 2010) .......................................................................... 35

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017) ....................................................................................... 27

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) .................................................................................. 24, 30

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021)........................................................... 17

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*,
4 F.4th 63 (1st Cir. 2021) ............................................................................................ 12

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) ............................................................................ 35

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014).......................................................................................... 18

iii

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) .......................................................... 19

*Corban v. Sarepta Therapeutics, Inc.*,
   2015 WL 1505693 (D. Mass. Mar. 31, 2015) .................................................... 16, 17

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) ........................................................ 24, 27, 28

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014) .............................................................. 3, 14

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3rd Cir. 2011) ................................................................................ 32

*Emerson v. Genocea Biosciences, Inc.*,
   353 F. Supp. 3d 28 (D. Mass. 2018) .................................................................... 17

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020) .................................................................. 35

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ........................................................................ 33, 34

*Hackel v. AVEO Pharms., Inc.*,
   474 F. Supp. 3d 468 (D. Mass. 2020) .................................................................. 18

*Harrington v. Tetraphase Pharms. Inc.*,
   No. CV 16-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) ............................... 14, 18

*Hill v. Gozani*,
   638 F.3d 40  (1st Cir. 2011) .......................................................................... 18, 19

*Hill v. Gozani*,
   651 F.3d 151 (1st Cir. 2011) ............................................................................ 18

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ................................................ 30

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................................... 3, 24, 30

*Kafenbaum v. GTECH Holdings Corp.*,
   217 F. Supp. 2d 238 (D.R.I. 2002) .................................................................... 29

iv

*Karth v. Keryx Biopharmaceuticals, Inc.*,
   334 F.R.D. 7 (D. Mass. 2019) ................................................................. 35

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
   2021 WL 3079878 (D. Mass. July 21, 2021) ........................................... 17

*Leavitt v. Alnylam Pharms., Inc.*,
   451 F. Supp. 3d 176 (D. Mass. 2020) ...................................................... 17

*Loc. No. 8 IBEW Ret. Plan v. Vertex Pharms.,*
   *Inc.*, 140 F. Supp. 3d 120 (D. Mass. 2015) ............................................. 27

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
   838 F.3d 76 (1st Cir. 2016) ..................................................................... 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).................................................................... 34

*Massachusetts Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) ............................................................ 23, 32

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .................................................................................. 29

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................. 29

*Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2008) .............................................................. 13, 29

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020).................................................................. 28

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)..................................................... 15

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)................................................................ 27

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
   2019 WL 1950399 (D. Mass. Apr. 30, 2019) .................................... 18, 19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ....................................................................... 14, 15, 19

v

*In re OSI Pharms., Inc. Sec. Litig.*,
   2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ...................................................... 19, 20

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................................................ 15, 19, 20

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) .................................................................................. 33

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) .................................................................................. 30

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ............................................................ 31

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................................ 17, 18

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011) ...................................................................... 26

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ........................................................................ 18

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ...................................................................................... 30

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................ 16, 20

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018) ...................................................................... 15

*In re Sepracor, Inc. Sec. Litig.*,
   308 F. Supp. 2d 20 (D. Mass. 2004) ........................................................................ 15

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020) .................................................................................... 24

*Sheet Metal Workers Nat'l Pension Fund v. Bayer*,
   *AG*, 2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) ................................................. 33

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 4208442 (S.D.N.Y. July 21, 2020) ........................................................... 28

vi

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
   499 F. Supp. 3d 49 (D. Del. 2020) ........................................................................... 34

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
   775 F. Supp. 2d 227 (D. Mass. 2011) ..................................................... 22, 25, 32, 33

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ................................................................................... 13

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997) ..................................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 13, 23, 24

*Tomaszewski v. Trevena, Inc.*,
   482 F. Supp. 3d 317 (E.D. Pa. 2020) ...................................................................... 28

*Urman v. Novelos Therapeutics, Inc.*,
   796 F. Supp. 2d 277 (D. Mass. 2011) ..................................................................... 30

*In re Wayfair, Inc. Sec. Litig.*,
   471 F. Supp. 3d 332 (D. Mass. 2020) ..................................................................... 34

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005) ................................................................................... 32

## Rules

Fed. R. Evid. 201(b)(2) ............................................................................................... 13

## Regulations

17 C.F.R. § 240.10b-5(b) ............................................................................................ 13

## Other Authorities

William W. Bratton, *The New Dividend Puzzle*, 93 Geo. L.J. 845 (2005) .................................... 31

## I.    INTRODUCTION[1]

The two most important presentations in Biogen's history were those at which it announced aducanumab's revival. In these presentations, Defendants made specific, unhedged, and confident factual statements about aducanumab's clinical trial data to address analysts' most pressing questions. They had spent three months analyzing the data to answer precisely those questions, so they knew their factual statements misrepresented the data they withheld from investors. The statements artificially inflated Biogen's stock price, until an FDA statistician's report and an expert body revealed their falsity – and Biogen's stock price fell by more than a third.

The pre-Class Period failure of aducanumab, which Defendants had touted as the first therapy that would slow Alzheimer's disease progression, immediately slashed one third from Biogen's market capitalization. Analysts asked whether Biogen had any future at all. So when Defendants announced that they had revived aducanumab, the entire market snapped to attention.

Defendants terminated aducanumab's Phase III clinical trials because a pre-specified futility analysis showed it was unlikely that either of the studies that made up the trials, Study 301 (ENGAGE) and Study 302 (EMERGE), would succeed. Study 301 was still a failure even including data collected after the analysis began but before it concluded. Yet after including this new data, Study 302, though still incomplete, showed a statistically significant treatment effect.

Unless Biogen could explain Study 301's failure, the FDA would never approve aducanumab without additional clinical trials. And Defendants told investors they had just such an explanation. In Study 301, some patients who carried a gene (Carriers), Apoe Ɛ4 (APOE4),

---

[1] Citations to "¶_" or "Ex. _", "Def.Br.", "Trach" or "Horne" "Dec. Ex. _", and "MTS _" are to, respectively: (a) paragraphs of or exhibits to the Second Amended Complaint, dkt. # 58; () Defendants' Memorandum of Law in support of their motion to dismiss ("Motion"), dkt. # 61; (c) the Declarations of William Trach in support of (dkt. # 62) and Jonathan Horne in opposition to (filed herewith), the Motion; and (d) pages of Plaintiffs' Motion to Strike Improper Facts, filed herewith. All emphases are added and quotations omitted.

received maximum doses of 6mg/kg, rather than the full 10mg/kg. The number of such patients was smaller in Study 302. Defendants told investors that Study 301 patients who received the full complement of 10mg/kg doses achieved results as good as Study 302 and that all the groups of patients who received 10mg/kg doses, and only them, achieved statistically significant benefits.

Their statements were false. In Study 302, Carriers who received 6mg/kg did better than those who received 10mg/kg. APOE4 non-carriers (Non-Carriers), who always received 10mg/kg and make up half of Alzheimer's disease patients, saw no benefit in either Study. These facts would have shown investors that Defendants' explanation of Study 301's results was a kind of statistical artifact researchers can always create if they know the results before selecting analyses.

Defendants also told investors that aducanumab worked as intended: it removed amyloid plaque and the removal caused better clinical outcomes. But before obtaining clinical trial results, Defendants had specified a statistical analysis that would show whether plaque removal correlated with better clinical outcomes. *That very analysis*, concealed from investors, showed no correlation. Aducanumab did not work as intended, so it was hard to see how it could work at all.

On November 4, 2020, the FDA published, among other things, a report by its statistical expert Dr. Tristan Massie, in connection with a meeting of an FDA advisory committee. His report revealed data showing that Defendants' statements had been false. Biogen's stock price fell by 7.5% on November 5 as markets began incorporating the news. On November 6, relying on Dr. Massie's report, the Advisory Committee delivered its verdict: 10-0 against approval. Biogen's stock price fell by 28.2% when it resumed trading.

Then, on June 7, 2021, the FDA approved aducanumab.

Defendant Sandrock's longtime colleague Billy Dunn headed the FDA office under whose jurisdiction aducanumab's application was filed. Two months after aducanumab's death, Dunn

2

and Sandrock met covertly to propose a path to approval. Dunn roped his office into the scheme. Having failed with the Advisory Committee, Dunn tried again with an internal FDA advisory committee. It also recommended rejection. Yet Dunn had not asked either committee whether the FDA should approve aducanumab because it removed amyloid plaque (called a surrogate endpoint), rather than because it improved clinical outcomes, so they had not had the occasion to say it shouldn't. With no other options remaining, Dunn rammed aducanumab through to approval based on this surrogate endpoint. Among other consequences of Dunn's reckless gambit: the House of Representatives and the Health and Human Services Office of Inspector General (HHS OIG) are investigating Dunn and the approval; the FDA's acting head will not be nominated as permanent head; 80% of neurologists have lost confidence in the FDA; and Biogen made only $300,000 selling aducanumab in Q3 2021, while analysts had been expecting $17 million.

Defendants' motion to dismiss is an exercise in slamming square pegs at round holes. Defendants claim their statements are not actionable however misleading unless they lacked a reasonable basis, but cite case law addressing interpretations of disclosed facts. Where, as here, defendants make misleading statements about data that was not disclosed, their statements are misleading if they imply facts about the undisclosed data that are not true. *See, e.g., In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014).

Defendants' argument that the Complaint does not allege scienter ignores its allegations. Defendants' precise, unhedged, and clearly false statements, made in presentations after they'd spent months analyzing the data that showed the statements were false, shows they were at least reckless. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). And while Defendants charge that the Complaint does not allege a motive, they ignore the obvious one: Defendants needed to consistently explain to investors, doctors, payors, and patients why

3

aducanumab was worth taking, at a cost of $56,000 per year, and could reasonably hope that if they omitted the facts showing their claims about the data were false, no one would ever find out.

The Court should deny Defendants' motion to dismiss.

## II.    FACTS

This is a securities class action brought on behalf of persons who purchased Biogen securities between October 22, 2019, and November 6, 2020, inclusive (Class Period). ¶1. Defendants are Biogen, its CEO Michel Vounatsos, its CMO Alfred W. Sandrock, and the Head of its Neurodegeneration Development Unit Samantha Budd-Haeberlein. ¶¶42-45.

### A.    Background

At the beginning of the Class Period, Biogen's prospects were bleak and getting bleaker. One of its important patents faced legal challenge; another would soon expire. ¶6. Its only bright spot was aducanumab, a treatment for Alzheimer's disease. ¶¶110-115.

Aducanumab is based on a once-fashionable theory positing that amyloid plaque, large agglomerations of a protein called amyloid beta, causes Alzheimer's disease. ¶¶55-56, 62. A growing minority of researchers abandon the amyloid hypothesis altogether. ¶57. Most who still adhere to it think small molecules of toxic amyloids, not plaque, cause Alzheimer's. ¶¶55-56.

Biogen launched aducanumab's two identical, global, randomized, double-blind Phase III trials in 2015. ¶76. Together, the trials enrolled 3,285 patients, at 348 sites, across 20 countries. ¶78. In each trial, patients were randomized to placebo, low dose aducanumab, or high dose aducanumab. ¶90. The trials' endpoints were patients' performance on clinical measures 78 weeks after they began receiving aducanumab. ¶¶82-89.

In early 2019, the Independent Data Monitoring Committee carried out a pre-planned interim analysis based on the data accumulated by December 2018, which determined that continuing the trials was futile because they likely would not succeed. ¶¶102, 107. Biogen ended

4

aducanumab's Phase III trials, and announced the termination, on March 21, 2019. ¶108. That day, Biogen's stock price fell by almost 30%. ¶109. Stock analysts who covered Biogen reduced their price target by about one third on average, with several cutting their targets by nearly half. ¶110. Some wrote Biogen off; it was the first company J.P. Morgan profiled in a series showcasing companies whose future looked dim. ¶112.

Two weeks later, Defendants announced that they had revived aducanumab. ¶140.

**B.      Defendants Falsely Tell Investors that Patients Achieved Statistically Significant Positive Responses If and Only If They Received Aducanumab Doses of 10mg/kg**

*1.      Defendants say Study 301 failed because not enough patients received 10mg/kg*

Biogen had continued to collect patient data in the three months between beginning and completing the futility analysis. ¶118. Including this data, Defendants claimed, turned Study 302 from a failure to a success. *Id.* But Defendants admitted that Study 301 was a failure with or without the additional data. ¶144. Ordinarily, that one of two Phase III trials was purportedly successful would not suffice for approval. ¶124. So Defendants had to present facts showing why Study 301's failure did not call into question Study 302's "success". ¶¶146-57.

On October 22, 2019, Defendants held a call to announce aducanumab's revival. ¶140. On October 23, Defendant Vounatsos appeared on CNBC to discuss the revival. ¶227. On December 5, 2019, Defendants presented more detailed results from the Phase III clinical trials and held a call to answer investors' questions. ¶140. At these presentations, and later, Defendants made specific factual statements to explain the trial data.

Defendants' explanation centered on the changes made in the fourth version of the Phase III trials' protocol (PV4). APOE4 predisposes Carriers not only to Alzheimer's Disease but also to brain hemorrhages from aducanumab, called ARIA. ¶¶71-73. During the trials, Biogen decided Carriers could receive the full aducanumab dose with acceptable ARIA risks. ¶99. So in PV4, Biogen increased the maximum high dose for Carriers from 6mg/kg to 10mg/kg. *Id.*

Study 301 had started earlier and recruited patients more quickly, so more Study 301 than Study 302 patients completed their treatment or were well underway when Biogen adopted PV4. ¶¶149, 150. Thus, more Study 302 Carriers received full doses which, Defendants said, was why Study 302 succeeded and Study 301 failed. ¶149. Defendants told investors that (1) post-PV4 Study 301 Carriers performed as well as Study 302 Carriers, and (2) patients achieved meaningfully better outcomes than placebo, on average, if and only if they received 10mg/kg doses. ¶150. See 14-15 below.

2.      *Data Defendants concealed shows the Study 301 results were a statistical artifact*

The data Defendants concealed shows their explanation of Study 301 "do[esn't] make any sense at all." ¶168. First, Non-Carriers received 10mg/kg doses at all times but their average responses were 0.066 points better than placebo on an 18-point scale, or virtually nil. ¶153. Second, in Study 302, Carriers performed ***better*** before PV4 than after. ¶¶158-59, 166. Third, Carriers whose treatment was interrupted by ARIA achieved better outcomes than continuously-treated Carriers. ¶162. The concealed data showed the improvement after PV4 in Study 301 was an artifact that statisticians can always generate if they know the results before selecting analyses. ¶138.

**C.      Defendants Falsely Claim Removal of Amyloid Plaque Caused Better Clinical Outcomes**

1.      *Defendants claim aducanumab's removal of amyloid plaque causes better clinical outcomes*

The version of the amyloid hypothesis underlying aducanumab's mechanism of action posits that amyloid plaque causes the cognitive decline associated with Alzheimer's Disease. ¶¶57, 62. Aducanumab removes that plaque. *Id.* If aducanumab worked, plaque removal would cause better clinical outcomes. Defendants' statements claiming exactly that are set out at 14-15 below.

2.      *Removal of amyloid plaque is not even correlated with better clinical outcomes*

As the FDA reminded Biogen at a 2014 meeting, applicants must detail the statistical analyses they will conduct before they unblind the study and analyze any data. ¶213. Otherwise, the applicant can select analyses to obtain the results it desires. ¶215. Defendants formulated a statistical analysis plan in 2018, before seeing any Phase III trial results ("Blinded Plan"). ¶217.

The Blinded Plan called for Biogen to measure whether plaque removal was correlated with better clinical outcomes separately for high and low dose groups. ¶¶200, 201. In Study 301, the correlation Biogen measured was 0.135, or less than half what a leading treatise calls a "poor" correlation. ¶206, Horne Dec. Ex. 1 at 614. In Study 302, more plaque removal was weakly correlated with *worse* clinical outcomes (-0.036). ¶206. A graph plotting plaque removal against outcomes in each Study shows two nearly horizontal lines going in opposite directions. ¶208.

In 2020, after they told investors that plaque removal caused better clinical outcomes, Defendants formulated a new statistical analysis plan ("Unblinded Plan"). ¶215. The Unblinded Plan now *combined* the low and high dose aducanumab groups to test for a correlation. ¶218. Combining the two groups concealed Study 302's negative correlation and that of the four groups, the correlation was strongest in Study 302 patients who received the low dose. ¶220.

D.      **Additional False Statements**

The Phase III trials were conducted in 20 countries in total. ¶240. Alzheimer's disease symptoms vary from patient to patient, culture to culture, and country to country. ¶233. Patient's reports are subjective. ¶234. Thus, the FDA pressed Biogen to determine whether regional or other variations accounted for different results. ¶237. Asked whether geographical or other variations explained the results, Defendants told investors that they did not. ¶ 238. Yet there were large and statistically significant differences in results between countries, ¶¶240, ¶¶242-43, and aducanumab's efficacy in Americans was 20% less than the global average. ¶244. There was

enough data to be confident: the U.S. accounted for 46.3% and 39.8% of the populations of Study 301 and 302. ¶241. And though aducanumab was intended for use early in patients' progression, the only age group whose performance was statistically significantly better than placebo was those over 75. ¶246. Further, more advanced patients performed better than less advanced ones. ¶246.

Defendants told investors that aducanumab's impact over a "breadth" of endpoints in Study 302 was "encouraging". ¶248.[2] In fact, Defendants tampered with the data to produce these results. To minimize the risk of false positives, Biogen ordered the secondary endpoints hierarchically and stopped its analysis as failed once it reached a statistically insignificant endpoint. ¶257. As the p-value for the first secondary endpoint Biogen presented to the FDA in June 2019 was above the 0.05 threshold for statistical significance, Biogen did not meet any secondary endpoints. ¶257. But the dataset Biogen submitted to the FDA for aducanumab's application, drawn from the same data, was just barely statistically significant by 0.0003. ¶258. Biogen had changed just enough patient records to make the first secondary endpoint statistically significant. ¶258.

**E.     The Advisory Committee Rejects Dunn's Attempt To Steamroll Them**

The FDA may empanel an advisory committee of outside experts to publicly advise on a product's approval, improving the quality of decision-making and assuring the public it is responsible. ¶259. It scheduled aducanumab's advisory committee for November 6, 2020. ¶16.

On November 4, during trading hours, the FDA publicly released briefing materials for the advisory committee, including a 343-page joint Biogen-FDA report. The briefing materials were mostly effusive. The body of the 343-page report stated that "[t]he effect of aducanumab in Study 302 is *robust and exceptionally persuasive.*" ¶269. Its Appendix 1, by Dunn's subordinate Dr.

---

[2] Aducanumab's purported impact on many secondary endpoints shows nothing because the data Defendants concealed shows all the secondary endpoints measured the same thing. ¶251. As Massie noted, "rather than four independent factors, one or at most two are needed to explain the variation among the four key endpoints." ¶250

Kevin Krudys, concluded that "the applicant has provided substantial evidence of effectiveness to support approval." ¶271. Further, the questions the advisory committee was asked to vote on steered them to approval. ¶272. Biogen's stock price rose in response. ¶278.

Appendix 2 was Dr. Massie's draft statistical report ("Draft Massie Report"). Parsing the dense Draft Massie Report reveals, among other things, that (a) Non-Carriers achieved no benefit from aducanumab, (b) in Study 302, Carriers performed better before PV4 than after, (c) there was no correlation between plaque removal and clinical outcomes in either Study, (d) performance varied widely across countries, with Americans performing poorly, and (e) the secondary endpoints were closely correlated. ¶275. Biogen's stock price fell 7.5% on November 5 as investors began digesting the Draft Massie Report. ¶279.

Trading was halted for the November 6 meeting. There, the Advisory Committee made clear that the facts disclosed in the Draft Massie Report demolished Biogen's aducanumab application. ¶281. Relying on those facts, the Advisory Committee voted 10-0 against approval. ¶¶281-82, 289-92. On November 9, the next trading day, Biogen's stock price fell 28.2%. ¶294.

Then, on June 7, 2021, the FDA approved aducanumab. ¶20.

**F.      The FDA Approved Aducanumab After Improper Contacts Between Defendant Sandrock and Billy Dunn**

In May 2019, two months after the Independent Data Monitoring Committee declared futility, Defendant Sandrock met Dunn, a longtime colleague. ¶21. The meeting was held under a pretext: both were attending a conference in Philadelphia. ¶¶120-21. Dunn and Sandrock improperly kept the meeting off-the-record and off the FDA's books. ¶121. They later omitted the meeting from the 343-page report's history of Biogen's interactions with the FDA. ¶125.

Dunn was a reliable advocate for aducanumab. A long-time colleague described him as "stubborn": "I've had a lot of experience [with Dunn] and he gets to a conclusion, and then after

9

you bat down the reasons to support his conclusion, he just finds new ones." ¶308. Thus, as a Biogen insider said, "[i]t was clear that Billy Dunn was an ally, so the job for Biogen became figuring out how to support his efforts within the FDA." ¶126.

Biogen (led by Sandrock and Budd-Haeberlein) and the FDA (led by Dunn) met on June 14, 2019. ¶¶50, 128. There, before seeing any other analysis, the FDA ruled out not approving aducanumab and offered Biogen four options for approval. ¶¶129-30. They also established a joint collaborative group to push aducanumab through approval which communicated almost daily between June and August. ¶133. They jointly analyzed data for inclusion in aducanumab's application and decided jointly decided to seek regular approval. *Id*. Yet the FDA and Biogen later told the Advisory Committee the FDA's mind was still open after the meeting. ¶132.

After the devastating Advisory Committee, Dunn again sought cover for aducanumab's pre-determined approval. On March 31 and April 7, 2021, the FDA's Medical Policy and Program Review Council (an internal FDA body that advises on difficult questions) was called to discuss aducanumab. ¶¶309-10. Dunn had no more success than with the Advisory Committee: the "vast majority" of the Council's 15 members voted against approval. ¶311.

At the June 2019 meeting, Dunn had impromptu reversed the FDA's policy to support aducanumab. The FDA may approve a product because it affects a surrogate endpoint rather than the desired clinical outcome. ¶300. This is called accelerated approval because the FDA approves the product before deciding the applicant has shown its efficacy. *Id.*

Surrogate endpoints must be validated before they can be used. *Id.* The FDA told Biogen in 2014, and in 2018 issued guidance for industry stating, there was no scientific consensus to validate plaque removal as a surrogate endpoint. ¶¶301, 303. Indeed, other drugs had removed amyloid plaque without providing clinical benefits. ¶199. Nothing relevant happened between

10

2018 and the June 2019 meeting, ¶302, yet there the FDA proposed to approve aducanumab because it removes plaque. ¶300.

Dunn had preserved the option to grant aducanumab accelerated approval by telling the Advisory Committee he *was not* considering it. ¶¶281, 305-07. With no other options, Dunn reversed himself. ¶312. On April 26, 2021, Dunn and the head of the FDA's Center for Drug Evaluation and Research, Patrizia Cavazzoni, met to decide whether and how to approve aducanumab. ¶314. The heads of the FDA's cancer and vaccine offices, both of which regularly grant accelerated approval, also attended and were given a vote. *Id.* A majority of the stacked panel voted to grant aducanumab accelerated approval. ¶315.

Hours later, Biogen announced that it would charge Medicare $56,000 per patient per year for aducanumab. ¶319. Analysts and the Alzheimer's Association estimate that aducanumab would cost the U.S. Healthcare system between $25 billion and $35 billion per year, with much of these proceeds going to Biogen. ¶337. NASA's FY 2021 budget was $23.3 billion.

**G.    Aducanumab's Approval Becomes the Posterchild for Regulatory Capture**

Aducanumab's approval sparked immediate outrage. Three of the Advisory Committee's nine permanent members resigned in protest. ¶322a. Public Citizen, founded by Ralph Nader, called for the immediate firing of Dunn, Cavazzoni, and FDA acting head Janet Woodcock. ¶323. Senator Manchin called for Woodcock's replacement, ensuring she would not become the FDA's permanent head. ¶324. Two house committees are investigating the approval. ¶325.

But the scandal exploded when a STAT article revealed Dunn and Sandrock's covert dealings. Concerning these new revelations, the Hon. Donna Shalala, HHS's longest-serving Secretary, told reporters it has "got to send in the Office of Inspector General. I mean, you shouldn't hesitate for one second." ¶327. The House investigations demanded that the FDA

11

produce, among other things, documents concerning meetings between FDA and Biogen regarding aducanumab, linking their demand to the revelations in the STAT article. ¶329.

The American Neurological Association found that "based on the clinical evidence, ADU should not have been approved at this time." ¶317a. A poll of 1,400 industry professionals found that 80% disagreed with the FDA's approval decision. ¶317c. A July 2021 survey revealed that 80% of neurologists had lost confidence in the FDA in the previous year. ¶334. A Biogen senior medical director who helped design aducanumab's Phase III trials told *The New York Times* approval "defeats everything I believe in scientifically." ¶317e. Six Blue Cross/Blue Shield state-level affiliates declined to cover aducanumab. ¶331. A 15-member panel of experts which provides pricing guidance to payors voted unanimously that Biogen had not shown aducanumab was safe and effective. ¶333. The Cleveland Clinic and Mt. Sinai Health System, among others, announced they would not administer aducanumab, with the latter citing questions about the "integrity of the F.D.A.-Biogen relationship." ¶332.

The justified outrage has slowed aducanumab's adoption to a trickle. Biogen earned $300,000 from aducanumab in the third quarter of 2021, or just 2% of analysts' consensus estimate of $17 million. Horne Dec. Ex. 2. On November 1, 2021, its stock price closed at $277.02, about where it was before the FDA approval. *Id.* Ex. 3.

## III.    THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY
### A.    Standard

The Complaint survives a Rule 12(b)(6) motion because, taking all the facts alleged as true and drawing all reasonable inferences in Plaintiffs' favor, it alleges "a plausible, not merely conceivable, case for relief." *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021). Defendants concede the Complaint alleges most elements of a § 10(b) claim, challenging only whether it sufficiently pleads they made (a) material misrepresentation (b) with

12

scienter which (c) caused Plaintiffs' losses. *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). As to falsity, Plaintiffs meet their burden by "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and, when an allegation is on information and belief, "stat[ing] with particularity all facts on which that belief is formed." *Id.* at 85.[3] Thus, as they must, Plaintiffs plead "facts that show exactly why the statements or omissions were misleading," but they need not "plead evidence." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005).

As on any other motion to dismiss, the Court may consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Yet the Court may not rely on extrinsic documents like the FDA approval documents to make factual findings that Plaintiffs reasonably dispute. Fed. R. Evid. 201(b)(2). MTS 2-3.

**B.      Defendants Made False Statements of *Fact* and Expressed Opinions That Were Misleading Because They Concealed *Facts***

The Complaint alleges that Defendants "made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made [] not misleading." 17 C.F.R. § 240.10b-5(b). To separate fact from opinion, as even the cases Defendants cite hold, the Court begins with the wording of the statements. *E.g. In re Alkermes Sec. Litig.*, 2005 WL 2848341, at *5 (D. Mass. Oct. 6, 2005)("In the First Circuit [] the challenged statements are analyzed statement-by-statement.").

---

[3] Rule 9(b)'s particularity requirement is "comparable to and effectively subsumed by the requirements of the PSLRA." *Boston Scientific.*, 523 F.3d at 85 n.5.

13

Defendants characterize their statements as opinions without quoting them, Def.Br. 14, but the characterization is wrong. Defendants prefaced almost none with words like "I believe" or "in my opinion", and the statements described the results of trials already completed and analyzed:

- "[T]here is a very sort of sharp dose response, you have to get to [a] high dose of aducanumab and intermediate [6mg/kg] dosing at least in an 18-month trial is not enough". ¶173.

- "You need to achieve high dose for long enough, but also have no interruptions[.]" ¶175.

- "[D]ata from [the Study 302] PV4 population who had the opportunity to be exposed to high dose did support the positive findings of EMERGE." ¶187.

- The ENGAGE and EMERGE "total dataset" shows that "if you give enough of the high dose, you can achieve a certain amount of amyloid removal and that certain amount is what's required to see the reduction in clinical decline in an 18-month study."

- "What we demonstrate is that [aducanumab] who's binding to the right part of the amyloid-beta [] is able to erode and eliminate the plaque leading to the benefits we see in terms of cognition for the patients." ¶227

These are not opinions. The Supreme Court ruled that for the securities laws, "a fact is 'a thing done or existing' or '[a]n actual happening'", while an opinion is "'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'" *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). That in aducanumab's Phase III trial, a 10mg/kg dose was effective, for example, is "a thing done or existing."

Defendants trumpet a court's statement that "scientific opinions are just that: opinions." *Harrington v. Tetraphase Pharms. Inc.*, No. CV 16-10133-LTS, 2017 WL 1946305, at *5 (D. Mass. May 9, 2017). Well, yes: "opinions are [] opinions." What *Harrington* does not say is that statements of fact transmute into opinions when they concern clinical data. Had Defendants disclosed the data undermining their statements, reasonable investors could have looked for themselves, and would have understood Defendants were "trying to explain the data away with a statistical analysis." *Delcath*, 36 F. Supp. 3d at 333. But unable to see for themselves, investors understood that Defendants were describing the data they withheld. *Id.* ("The allegations here do

14

not involve differing interpretations of disclosed data, but rather data that was not disclosed."); *see also In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *13-14 (D.N.J. Aug. 28, 2017) (statement that "totality of data" supported approval is a false statement of fact when only 25% of patients saw clinical benefit); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 898-99 (E.D. Pa. 2018) (statement that data showed a significant reduction in abuse is false statement of fact when some undisclosed evidence suggested that patients were in the process of switching from intranasal to intravenous abuse); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 28 (D. Mass. 2004) (statement that there was no obvious difference between company's drug and competitor's  was a false statement of fact). Here as well, Defendants were not expressing an opinion, but telling investors what the facts were, with no hedges or qualifications.

Only a few of Defendants' statements are opinions. These include:

- "I think what we have learned [is that] if individuals do receive 10 mg/kg then they do have an efficacious response." ¶179.
- "We believe, having looked very closely at the baseline demographics and characteristics, that none of these are driving the overall outcomes that we see." ¶238.
- "It's the breadth of endpoints having an effect on each of these which is encouraging rather than any one of them or pieces thereof." ¶248.

Among other things, opinions are actionable if they omit material facts about the speaker's inquiry into, or knowledge concerning, the opinion, and if those omitted facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself. *Omnicare,* 575 U.S. at  189. Thus, whether an opinion is misleading depends on the context in which it is made, including all the other facts the issuer did disclose. *Id.* at 196.

After *Omnicare*, whether a statement is of fact or opinion matters much less, a point well made by *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020), the appellate opinion that vacated one of the main cases Defendants rely on, *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 478 (S.D.N.Y. 2018). As *Abramson* explained, *Omnicare* "rejected the

15

proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." 965 F.3d at 175. Instead, "a statement of opinion, without providing critical context, [can] impl[y] facts that can be proven false." *Id.* "[W]hen a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Id. Abramson* never asked whether the defendant's interpretation of the literature was reasonable, but only whether it misleadingly suggested it was entirely one-sided. *Id.* at 176. Indeed, in *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016), the Ninth Circuit found the defendants' interpretation that certain clinical trial data did not preclude approval was "reasonable", and the FDA did approve the product. But it didn't matter in *Schueneman*, either, that the interpretation was reasonable, because it implied there was no issue with the data. *Id.* And it doesn't matter whether Defendants' interpretation of the data was reasonable, because they misleadingly failed to disclose materially conflicting facts.[4]

Unlike here, the defendants in the cases Defendants cite expressed opinions based on disclosed facts. Those defendants are like the company that says "we believe we comply with the law" but discloses its lawyer disagrees, and the law protects them accordingly. The Court's opinion in *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693 (D. Mass. Mar. 31, 2015), *aff'd,* 868 F.3d 31 (1st Cir. 2017) is illustrative. There, the Court found the defendants' statements were not misleading because they disclosed the information the plaintiffs claimed was withheld. *Id.* at *10-11. Thus, the plaintiffs simply disagreed with defendants about the facts' import. *Id.* To make *Corban* seem like a case about undisclosed facts, Defendants quote the Court as saying that *all*

---

[4] If the Court finds that the Defendants' other statements are opinions, then they, too, are misleading for failing to disclose facts.

16

"the challenged statements consist of interpretations of the company's data," but omit the previous two words: "many of". *Id.* at *6. A statement prefaced with "I think that we believe" is an opinion, *id.* at *5. "There was no statistically significant difference" is a statement of fact and might have been actionable had the full truth not been disclosed. *Id.*[5]

Almost all[6] of Defendants' other cases resemble *Corban*. In *Karyopharm*, the defendants' optimistic statements were not misleading because they conceded that the drug did worse than standard of care and defendants disclosed the most salient side-effects. *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 2021 WL 3079878, at *6-7 (D. Mass. July 21, 2021). It found that defendants' optimistic statements about another study that did not disclose the prevalence of adverse events *were* misleading. *Id.* at *8. In *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 871 (9th Cir. 2012), the plaintiffs disputed the defendants' publicly-disclosed statistical methodology, arguing only that if they had used a different method, they would have reached different results. *Id.* at 878. The *Rigel* court acknowledged that it might have found for plaintiffs

---

[5] Plaintiffs need not show Defendants subjectively disbelieved their opinions. *Suna v. Bailey Corp.*, 107 F.3d 64, 70 (1st Cir. 1997) predates *Omnicare* and anyway allows that the plaintiffs might have succeeded if they had alleged facts showing that defendants had a reason to suspect their statements were false. In *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 40 (D. Mass. 2018), the issue was that the facts *did not yet exist*: the defendants had not completed the clinical testing whose results the plaintiffs claimed they should have disclosed.

[6] Defendants exaggerate *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *8 (N.D. Cal. Sept. 1, 2021), which was decided on scienter, not falsity. That out-of-circuit district court's skepticism of the plaintiffs' argument when it deliberately avoided reaching the issue is not better than no authority at all. *Id.* at *9. In any case, Plaintiffs allege Defendants' knowledge. Defendants misquote *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020). There, the plaintiffs alleged the defendants' statements were false because they allegedly did not collect or submit any cardiac data. Defendants obscure that they quote they are quoting the Court's finding that the allegation *was not true* rather than that it addressed a difference of opinion by removing words, emphasized here: "just because [the FDA] came to a different conclusion does not mean there is merit in plaintiffs' claims *that no [cardiac] data was presented* or that the challenged statements constituted securities fraud." *Id.* at 184; Def.Br. 17.

17

if, as here, they alleged that "Defendants misrepresented their own statistical methodology, analysis, and conclusions". *Id.* at 879.[7] *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014) did not concern interpretations of data, but whether Pfizer's decision to proceed to Phase III trials was based in part on Phase II data. *Id.* at 168-69. *Pfizer* distinguished cases, like this one, that make "plausible allegations of affirmative false statements." *Id.* at 170.[8]

Defendants cite *Hill v. Gozani*, 651 F.3d 151, 152 (1st Cir. 2011) for their argument that they had no obligation to disclose "internal dissent" "absent existing facts showing the truth of the [dissenting] employees' opinions." Def.Br. 26-27. In *Hill*, the plaintiffs challenged a company's cautionary statement that a risk *might* come to pass. *Hill v. Gozani*, 638 F.3d 40, 56, 61-62, 63 (1st Cir. 2011). Because the statements only concerned risks, the plaintiffs had to show that the risks *would* come to pass. Here, Plaintiffs do not just challenge risk disclosures: Defendants affirmatively mischaracterized clinical trial data. So *Hill* is inapposite.[9]

---

[7] Unlike Defendants, those defendants' failure to disclose some adverse events was consistent with their statement that they would only disclose "key safety results", which they did. *Id.* at 874.

[8] The other cases Defendants cite reach a similar conclusion. In *Harrington*, the defendants said they believed their product worked before starting Phase III clinical trials that later failed. 2017 WL 1946305, at *2. The plaintiffs claimed the defendants should have known their product would not work, but they relied on public data, so the statements were interpretations of disclosed facts. Moreover, *Harrington* ignores *Omnicare* and the changes it wrought. In *Sanofi*, the company (a) conducted single-blind clinical trials (b) which the FDA generally disfavored; both facts were well known when the defendants made false statements, so they only expressed their opinion that the FDA might accept the results. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539 (S.D.N.Y. 2015). It was affirmed on the same grounds, *Tongue v. Sanofi*, 816 F.3d 199, 212-13 (2d Cir. 2016). In *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *7 (D. Mass. Apr. 30, 2019), *aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020) defendants not only contemporaneously disclosed the Forms 483 they allegedly concealed but accurately summarized their contents. In *Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 471 (D. Mass. 2020), the court ruled that the exact number of patients lost to follow-up was ***immaterial*** because they could change the results for better ***or*** worse. *Id.* at 482. Defendants do not even dispute materiality.

[9] If *Hill* suggests that the statement "[b]asically, the reimbursement situation [] is very positive", *id.* at 63-64, is not misleading even though the two experts the company had hired to assess whether

18

### C.    All of Defendants' Statements Were Either False or Misleading

Analyzed under the correct standard, Defendants' statements are all actionable. Companies mislead investors by making sweeping statements about a drug that are untrue as to material subgroups or in other material instances. *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007). In *OSI*, the defendants told investors when announcing topline results that the product's clinical trial "has shown an improvement in survival in any disease setting." *Id.* at \*8. Yet the drug had not proved effective for one group of patients: those who did not carry a particular gene. *Id.* It didn't matter whether the defendants' interpretation was reasonable because their statements misleadingly implied non-carriers saw a benefit. *See also PTC*, 2017 WL 3705801, at \*13-14 (statement that "totality of data" supported approval is false when only 25% of patients saw clinical benefit); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at \*6 (N.D. Cal. Aug. 14, 2008) (statement that drug was "safe and well tolerated" actionable for failing to disclose that in one transgenic mouse study, a side effect was cancer).[10]

Here, Defendants told investors that all patients who received 10mg/kg doses, and only those patients, saw meaningful improvements. Defendants assured investors that *all* the data supported this interpretation. ¶191 ("[C]onsistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think *our data are all consistent with that*."). The statements were false: in both Studies, Non-Carriers (who received 10mg/kg) saw no benefit and in Study 302, Carriers who received 6mg/kg did better than those who received 10mg/kg.

Defendants dismiss the data which show their statements are false as "other analyses". *E.g.* Def.Br. 17. To make their sweeping claim that all and only those patients who received 10mg/kg

---

it was positive had accused it of insurance fraud, *id.* at 48, *Omnicare* overruled it. 575 U.S. at 188 ("we believe we comply with the law" is misleading if the company's lawyer says otherwise.)

[10] *Ocular* makes the same point, holding that it suffices if the "omitted material facts [] would lead an investor to doubt its reality[.]" 2019 WL 1950399, at \*8.

doses saw statistically significantly improved results, Defendants separately analyzed Study 301's pre- and post-PV4 patient populations. The exact same analysis shows that in Study 302, patients who received 6mg/kg did *better* than those who received 10mg/kg. And Defendants' analysis addressed only Carriers who received 10mg/kg. The exact same analysis shows Non-Carriers who received 10mg/kg did not see any benefit. These are not *othe*r analyses, but the same analyses applied to different populations that were encompassed by Defendants' statements but whose data Defendants did not disclose. As in *OSI*, 2007 WL 9672541 at *8 and *PTC*, 2017 WL 3705801 at *13-14 Defendants' sweeping statements are actionable because they are only true as to a small subset of the population, Carriers in Study 301.

As to their argument that Non-Carriers did see a benefit, the "effect" on Non-Carriers was 0.066 points on the 18-point CDR-SB scale. ¶153. That is smaller than the negative difference between placebo and treatment in Study 301 (-0.07). *Id.* And as Defendant Sandrock explained, that -0.07 difference "was just basically no effect [] I would not say that they had a negative effect." Horne Dec. Ex. 4 at 18. If -0.07 is not an effect, then neither is 0.066.

Defendants told investors that plaque removal caused better clinical outcomes. Again, the analysis which showed that Defendants' statements were false is not "another analysis": it is the analysis Defendants had pre-specified to answer the question. Defendants materially misreported its results, which is plainly actionable. *Schueneman*, 840 F.3d at 708.

On the facts, Defendants claim their statements about plaque removal are true because aducanumab (a) reduced plaque (true), and (b) was associated with better clinical outcomes (not true). Def.Br. 20. But even if the two Studies had shown a treatment effect, whether the plaque removal *caused* better clinical outcomes is a different question. Aducanumab, Defendants posit, produces better clinical outcomes by removing plaque. If plaque removal does not cause better

20

clinical outcomes, there is no reason to believe aducanumab works at all. That's why analysts, news reporters, the Advisory Committee[11], and the FDA asked the question.[12]

Stating that plaque removal *caused* better clinical outcomes when there was virtually no *correlation* in one of two clinical studies and the other study showed a *negative* correlation is misleading. ¶206. Indeed, Defendants themselves acknowledged as much by improperly changing their statistical analyses in 2020 so the results would not look as absurd. And while Defendants ignore the Blinded Plan's results in favor of the 2020 Unblinded Plan's, not only is the Unblinded Plan suspicious, but it was only specified in 2020. When they made their false statements, all Defendants had was the Blinded Plan.

Finally, Defendants point to the FDA's decision approving aducanumab because it removed plaque. Def.Br. 21. First, the Court cannot consider these facts for the truth of their contents. MTS 2-3. Second, they do not support Defendants. Not only did the FDA's Peter Stein ignore the Blinded Plan, he also rejected the Unblinded Plan's patient-level analysis in favor of a group level analysis that had apparently not been pre-specified in either Plan.[13] Trach Dec. Ex. L at 6-7. Whatever the merits of Stein's approach, it was not the one Defendants had pre-specified: Biogen was required to examine correlation at the patient level.

---

[11] That Advisory Committee members voted that Biogen had shown that aducanumab removes plaque ignores that its members voted this way because they were told not to consider whether plaque removal affected clinical outcomes. ¶306.

[12] Defendants imply that the Court would overrule the amyloid hypothesis if it found for Plaintiffs. Defendants misled investors about *what the data in aducanumab's clinical trials showed*, not whether the amyloid hypothesis is true. That Biogen misled investors about the results of its trial doesn't mean the particular version of the hypothesis on which aducanumab relies is wrong, only that Studies 301 and 302 contradict it.

[13] The group-level analysis makes its first appearance in the Dr. Krudys's clinical review report, who refers to it as just another analysis Biogen conducted. Trach Dec. Ex. A at 219-20. Biogen's own report instead employs a patient-level analysis. Trach Dec. Ex. A at 56.

Defendants' other statements are also misleading. Stating that Study 301's post-PV4 patient results support Study 302 is misleading because whatever else "support" means, it does not mean "are inconsistent with." Statements that patients' treatment must not be interrupted are misleading because in both Studies patients who had interruptions performed better than those who did not. ¶162. There was no effect on endpoints, and Defendants only told investors there was one because they altered patient data. ¶258. The ***breadth*** of secondary endpoints means nothing because they all measure the same thing. ¶¶250-52. And geographic (non-U.S. sites) and demographic (more advanced cases) were driving outcomes, so Defendants' contrary statements were false. ¶¶240-46.

### D.     The Complaint Sufficiently Alleges that Defendants Lacked a Reasonable Basis for their Statements

Defendants' claim that they had a reasonable basis to believe aducanumab might be approved is irrelevant because under *Omnicare*, the test is whether their statements would lead a reasonable investor to believe a fact that was not true. *Abramson*, 965 F.3d at 176. Yet even applying the pre-*Omnicare* standard, the data Defendants omitted made their statements unreasonable. Defendants' statement that plaque removal ***caused*** (or "led to") better clinical outcomes is an unreasonable interpretation of a test that did not even find a correlation. Defendants told investors that all their data, including both Studies 301 and 302, showed that all and only groups of patients who received 10mg/kg achieved meaningful clinical benefits, when in fact ***only one of four groups did***, Carriers in Study 301.

### E.     Analysts' Reactions Show Defendants' Statements Were Misleading

Substantial analyst attention to particular disclosures shows they are material. *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 242 (D. Mass. 2011).

Further, courts use analyst reports as proxies for the market's understanding. *Massachusetts Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 243 (1st Cir. 2013).

Here, analysts obsessed over two questions: Defendants' explanation of Study 301's failure and whether plaque removal caused better clinical outcomes. And on each point, analysts were clearly misled by Defendants' statements. Analysts found that "continuous exposure to high dose aducanumab provided consistent benefits to patients" in both Studies 301 and 302, and that the analysis showed "[enough] consistency between the trials [] to support approval." ¶169c., e. At least six analysts wrote that Biogen's report on Study 301 data established that aducanumab worked at 10mg/kg doses. ¶169. One analyst called the Study 301 analysis the "most important[]" Biogen presented on December 5, while another called it the "most interesting." ¶169c., d. Two analysts reported that specialists found the correlation between plaque removal and clinical outcomes was critical in showing aducanumab's efficacy. ¶211c., g. One of these analysts concluded that the correlation was aducanumab's "hook". ¶211h. Another analyst wrote that Study 302 "demonstra[ted] strong correlation between reduction in [plaque] and improvements in cognition", though in truth, the correlation was negative. ¶211j. Another asked investors to ignore Study 301 because there, not enough plaque was removed. ¶211d. That analysts were misled by Defendants' statements further shows the statements were misleading.

## IV. DEFENDANTS MADE THEIR MISLEADING STATEMENTS WITH SCIENTER
### A. Standard

To find an inference of scienter, courts must, first, assume all the allegations in the Complaint are true; second, consider the Complaint and documents incorporated by reference and facts subject to judicial notice; and third, consider plausible competing inferences. *Tellabs*, 551 U.S. at 322-23. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*,

of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.[14]

"Courts will allow [] complaints to advance past the pleadings stage when some questions remain unanswered [if] the complaint as a whole is sufficiently particular[]." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002). And a complaint may allege scienter, among other means, by showing the speaker "knew facts suggesting the statements were inaccurate or misleadingly incomplete." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template." *Cabletron*, 311 F.3d at 32. Defendants argue throughout that the Court should dismiss the complaint because it lacks certain types of allegations, but as the Court put it, "no particular types of indicia of scienter are required." *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 256 (D. Mass. 2018).

**B.      The Authority and Specificity of Defendants' Statements Supports Scienter**

Sometimes, "the most powerful evidence of scienter is the content and context of [the] statements themselves." *Avaya*, 564 F.3d at 269. Courts find scienter when officials answer repeated analyst questions with emphatic unhedged statements mischaracterizing key facts. *Id*. at 269-70. Then, "the possibility that [the speaker] was ignorant is not necessarily exculpatory." *Id.* at 270; *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (inference of scienter "especially convincing where multiple analysts homed in on" the misleading

---

[14] Defendants claim that the First Circuit's application of the strong inference PSLRA standard is "notably strict", Def.Br. 28, but the language they quote was explaining that courts could still rely on **pre**-PSLRA cases because the First Circuit's standard had been so strict that the PSLRA did not change it. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 n.7 (1st Cir. 2008).

statements). The First Circuit has endorsed *Avaya*. *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 82 (1st Cir. 2016),[15] and Judge Tauro similarly held that investor and analyst scrutiny of false statements supported scienter. *Dental Partners*, 775 F. Supp. 2d at 243.

In *Avaya*, it was enough defendant denied a few times on a routine quarterly conference call that the company had engaged in unusual discounting, though it had done so. This case is much stronger. Aducanumab *was* the Biogen story. One analyst wrote that Biogen "lives and dies by how aducanumab plays out", ¶116, and another that "[f]or every question related to fundamentals, we get 10 questions on Alzheimer's status." ¶114. Defendant Vounatsos himself admitted that Biogen had nothing that could compensate for aducanumab's failure. ¶64 And the Defendants made their false statements at the most important investor events in Biogen's history, when they were explaining why they were reviving aducanumab.

Two questions were critical to the aducanumab story. The first was Defendants' explanation of Study 301 results. Both the FDA and analysts noted that in order to secure FDA approval, Defendants must explain why Study 301's failure doesn't mean aducanumab in not effective. ¶¶146-47. The second was whether plaque removal and clinical outcomes were linked. For doctors, it "has always been" "the million-dollar question in the field." ¶198. The FDA told Defendants, and Defendants and analysts told investors, that whether plaque removal causes better clinical outcomes was a critical question. ¶¶199, 200, 211.

Analysts asked about both the correlation between plaque removal and clinical outcomes and Defendants' explanation of Study 301's failure. *E.g.* ¶¶ 175, 179, 191, 223, 225, 227, 229,

---

[15] In *Vertex*, the plaintiff pointed to an obscure incongruity in clinical trials that would not have alerted defendants that their statements were false, so the First Circuit affirmed.

231. Defendants repeated their answers confidently with no hedging. *Id.*[16] Defendants chose their words and disclosures carefully. They supported their December 5 presentation with 58 slides of carefully selected data. ¶140. They made false statements in two presentations two months apart.

Defendants' answers were not just misleading, but wildly so. Defendants' claim that a 10mg/kg dose is effective, while a 6mg/kg is not, is only consistent with Carriers in Study 301, the only subgroup whose results Defendants presented. It is inconsistent with *every other* sub-group. And the very analysis Defendants pre-specified to determine whether plaque removal *caused* clinical outcomes showed the two *were not even correlated*.

Defendants emphasized that they had carefully examined the data. ¶238. Defendants' withholding of information was so out of character that analysts even asked why they were so tight-lipped. ¶346. Responding, Sandrock acknowledged that Biogen usually provides "a lot of things, subgroups included", that they had withheld. *Id.* Though subgroup data would have shown Defendants' statements were false, Sandrock falsely told the analyst Defendants had "nothing to hide." *Id.* To conceal that Defendants *had* something to hide, Sandrock said that Defendants were not yet presenting the data because the FDA was reviewing it. *Id.*[17]

Defendants had in-your-face, undeniable evidence that their statements were misleading the markets. The analysts whose questions Defendants answered reported that (i) all and only patients who received 10mg/kg achieved good results and (ii) plaque removal improved clinical outcomes. The analysts weighed these facts heavily in evaluating aducanumab's case.

Thus, after months of preparation, at the most important presentations of Biogen's history,

---

[16] While Defendants point to statements that made clear approval was not guaranteed, Def.Br. 28 the question is whether they hedged their statements that the data supported approval.

[17] Sandrock lied about the data Defendants were withholding and the reasons therefor, so this case is nothing like *Russo v. Bruce*, 777 F. Supp. 2d 505, 526-27 (S.D.N.Y. 2011), where the defendants' disclosures were truthful.

spread over two months, Defendants made false statements about the most important aspects of its most important product. They spoke authoritatively and without qualification. Their statements were *wildly* untrue. ***Defendants knew*** they were misleading the market, both because analysts repeated their misleading statements and because they declined to show the data that would prove them wrong. The slim chance they did not know exactly what they were doing is not exculpatory.[18]

## C.    Defendants' Investigation Supports Scienter

An executive's involvement in particular aspects of a company's business supports scienter. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (CEO's statement that "I love getting involved in every detail of the business" supported scienter); *Dahhan*, 321 F. Supp. 3d at 255 (defendants knew or were reckless in not knowing that number of treatments fell below public statements when they (a) regularly visited clinics, (b) had real-time data, (c) routinely discussed the data).

Defendants assert that the Complaint fails to allege how they learned the facts making their statements misleading, and then spend pages arguing that the purported failure supports dismissal. Def.Br. 31. This is a stronger case than *Aldridge*, where the First Circuit found scienter because price cuts had been planned from a product's launch and it stands to reason someone at the company would have discussed the undisclosed price protection. 284 F.3d at 80, 83. It is even

---

[18] In *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 616 (1st Cir. 2017) the company allegedly withheld information about two ***superficial*** adverse events. The undisclosed information's "marginal materiality", especially as the company disclosed two ***serious*** adverse events, undercut any inference of scienter. Thus, *Zafgen* stands for no more than that just because a disclosure touches on an important topic doesn't make it important. In *Loc. No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc.*, 140 F. Supp. 3d 120, 125 (D. Mass. 2015), *aff'd sub nom. Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76 (1st Cir. 2016), the defendants received faulty topline data from a vendor. They could only have known the data was faulty if they carefully analyzed the raw data, but the plaintiffs did not specify why they had any reason to. Here, the information was critical to Biogen's prospects, the FDA had tasked the Defendants with uncovering it, and the Defendants had completed their analysis.

stronger than *Dahhan*, where the defendants would have learned their statements were false incidentally in the course of running their company. 321 F. Supp. 3d at 255. Here, Defendants planned and supervised the data analyses that showed their statements were false.

After futility was declared, Biogen tasked 49 of its statisticians to pore over the Phase III results. ¶118. Sandrock personally spoke to Dunn to see if the FDA might still approve aducanumab. ¶21. Sandrock and Budd-Haeberlein then personally led Biogen at the June 2019 FDA meeting where the two plotted aducanumab's approval. ¶21. The FDA urged Biogen in June 2019 to determine whether plaque removal was correlated with clinical endpoints. ¶200. The Blinded Plan pre-specified a statistical analysis that showed a lack of correlation. The FDA required that Biogen examine in detail the results of Study 301, which "would be expected to be critical supportive components that establish or contribute to the interpretability of the efficacy results," and established they did not. ¶146.

Biogen and the FDA conducted the analyses from June 2019 through August 2019. ¶133. The work was mostly completed by September 2019, Ex. A at 13, and Biogen presented it to the FDA the day before the Class Period begins. ¶50. Sandrock and Budd-Haeberlein knew the results that made their statements false: they led Biogen at that meeting. *Id.*

### D.    The Complaint Alleges a Motive

Defendants request an exculpatory inference. Citing *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), Def.Br. 28 they claim any misstatements were innocent because they honestly believed the FDA might approve aducanumab. But because Plaintiffs' "theory of scienter is not that Defendants knew that the FDA would not approve [aducanumab][,] *Nguyen* is inapposite." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020); *see also Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 (E.D. Pa. 2020)(same). The Complaint doesn't allege that Defendants believed  FDA approval was hopeless or even unlikely. They had

no reason to. They had Dunn behind them.[19]

More, though the Complaint alleges a motive, "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). Thus, while the Complaint alleges a motive, it would survive even without one.

Motive can be shown by alleging "concrete benefits that could be realized by [] the false statements and wrongful nondisclosures." *Aldridge*, 284 F.3d at 82. The concrete benefit need not arise from misleading investors. In *Boston Scientific*, the plaintiffs alleged that the company concealed defects in its stents from investors so that it could have an inventory of working stents in place when it recalled the defective ones. 523 F.3d at 88–89. While Defendants' false statements aimed to mislead doctors and patients, not just investors, their motive still contributes to scienter. *See also Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 247 (D.R.I. 2002) (company executives' motive to lie to investors to avoid paying substantial refund supported scienter).

FDA officials were not the only people Defendants must convince aducanumab works, and investors were not the only audience for Defendants' false statements. Biogen would earn billions in revenue after approval, but only *if* doctors prescribed it, *if* health systems administered it, *if* insurers reimbursed for it, and *if* desperate patients and their advocacy groups demanded it. If they told investors the truth, analysts, journalists, and doctors would spend a year filling the internet

---

[19] Reporters don't describe their anonymous sources with the particularity the PSLRA requires for former employees the plaintiffs contacted (dates of employment, supervisor, and job responsibilities), so despite what Defendants ask, Def.Br. 32, courts don't senselessly require these details from media sources. Courts credit allegations made in media reports when (a) they result from the journalist's independent investigative efforts (b) by a serious media source and (c) are corroborated. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Both STAT and *The New York Times* are serious media sources and their reporting evidently follows from independent investigations. Not only do the STAT and *New York Times* articles corroborate each other, ¶121 n.12, the Advisory Committee materials so clearly showed that Dunn and Biogen were allies that even analysts who covered Biogen's stock were willing to publicly level the accusation. ¶296.

with articles questioning why Defendants sought the FDA's approval despite data showing aducanumab is not effective. Patients, doctors, and other interested parties would never develop the false hopes that would make aducanumab a blockbuster drug. Yet Defendants could reasonably have hoped that the public would never see the data refuting their claims that plaque removal caused better clinical outcomes and their explanation that 10mg/kg, and only 10mg/kg, is an effective dose. At a minimum, Defendants could hope patients, doctors, health systems and payors would take some time to uncover aducanumab's lack of efficacy. Indeed, after aducanumab's turbulent approval and the resulting investigations and accusations, patients have not demanded immediate access to aducanumab in large numbers, many payors have refused to pay for it, many health systems have refused to administer it, and many doctors have refused to prescribe it or advised patients against it, so Biogen has earned essentially no revenues from it. Defendants' calculation was correct.[20] Thus, as in *Boston Scientific*, Defendants needed to lie to reach a business objective and could not tell investors one thing and patients and doctors another.

That an executive's job may depend on making false statements supports scienter. *Aldridge*, 284 F.3d at 83 ("What makes this case different are the inferences that corporate officers understood in 1997 and 1998 that the success of the new products [] was important to their own survival[.]"); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020) (*citing Cabletron*, 311 F.3d at 39) ("[A]n executive's realistic fears

---

[20] While *Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 284 (D. Mass. 2011) infelicitously stated that post-class period events are "irrelevant", there, the plaintiff relied on a post-class period study that found a flaw in clinical trials that was not related to the allegations. *Id.* at 280. It is black-letter law that post-class period statements, events, or developments are relevant to scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."); *Avaya*, 564 F.3d at 249 n. 13 (same); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981 (8th Cir. 2012) (same).

that his or her career is at stake can support a particularized motive supporting scienter.").

Defendants risked their careers if they announced aducanumab's revival and accurately disclosed the devastating clinical trial data. Investors would wonder why Defendants were spending huge sums of Biogen's money pursuing approval when there was little reason to expect success, even as Biogen faced existential risks. How long would Biogen's investors and Board of Directors tolerate a Captain Ahab at its helm?

Defendants say they had no motive to lie because Biogen did not discontinue its stock repurchasing program once the Class Period began.[21] Def.Br. 29. When Biogen repurchased and retired its stock, it was not investing in itself. Share repurchases are a tax-advantaged alternative to dividends. William W. Bratton, *The New Dividend Puzzle*, 93 Geo. L.J. 845, 846 (2005). Paying dividends does not cut against scienter, so neither does repurchasing shares. Here, moreover, Defendants had a reason to think aducanumab would be approved: Dunn and their manipulation of the clinical data. They just couldn't tell investors the reason. In any case, stock repurchases bear little weight in the scienter analysis.[22] *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013) ("[T]he Court finds that the repurchasing plan weighs neither in favor of nor against an inference of scienter in this case.").

## V.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION

Loss causation is the "causal connection between the material representation and the loss" that Plaintiffs allege by identifying a corrective disclosure and showing the stock price dropped

---

[21] Biogen repurchased $5.0 billion in shares beginning July 2016 and $3.5 billion beginning August 2018, Horne Dec. Ex. 5 at 49, so its stock purchases of $10.4 billion between March 2019 and December 2020 just continued its historical trend.

[22] In *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016), *aff'd,* 857 F.3d 34 (1st Cir. 2017), the court held in a footnote that stock repurchases did not support scienter, and suggested they might undercut it, without placing any weight on them in its scienter analysis.

soon after. *CVS*, 716 F.3d at 238.[23] Plaintiffs also allege loss causation by pointing to a stock price drop after the materialization of risks that Defendants' statements concealed. *Dental Partners*, 775 F. Supp. 2d at 245. Defendants argue that Rule 9(b) applies, but they do not question that the Complaint sets out Plaintiffs' theory's basis with clarity, so their only challenge is whether that theory is plausible under Rule 8. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020) (even under Rule 9(b), plaintiffs' theory need only be plausible).

On November 4, 2020, the FDA posted its Advisory Committee briefing materials on its website. The body of the 343-page report, its first appendix, and the leading questions posed to the Advisory Committee, all showed that Dunn "went to the [advisory committee] basically saying, 'This drug's getting approved.'" *E.g.* ¶276g. One analyst wrote the report "represents the near-best case for [Biogen] shares." ¶276f. On November 4, Biogen's stock price increased, but courts do not demand that news be incorporated on the same day or find reliance unreasonable the minute adverse news is published. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3rd Cir. 2011)("That some information took two days to affect the price does not undermine a finding of efficiency."); *In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 846–47 (D. Ariz. 2007) ("Thus, whether the efficient market would have absorbed the information in the [] reports by the end of trading on September 20 as opposed to September 21 is a genuine issue of material fact[.]"); *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (suggesting that stock prices may take several days to incorporate new information).

The complex and technically sophisticated Draft Massie Report was the second appendix in this 343-page report. Biogen's share price fell 7.5% on November 5, as investors began to absorb

---

[23] While a plaintiff must also disaggregate other possible contributing factors to the share price decline, that is a matter for proof at trial. *See id.* at 241 n. 7.

the new information. ¶279. Courts commonly expect that it will take more than a day to incorporate complicated news that requires expert analysis. *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014); *accord BofI*, 977 F.3d at 795. Indeed, three of the analysts who initially published positive reports later issued corrective reports after they had begun to assimilate the Draft Massie Report. ¶277. Moreover, courts accept that technical news for whom investors are not the primary audience might not be incorporated into the stock price until it is packaged into a form that investors can more easily understand. *E.g. In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (public letter advising doctors not to prescribe drug off label not incorporated into stock price until it resulted in poor earnings).

Trading in Biogen's shares was halted on November 6, pending a decision of the Advisory Committee. ¶280. Following the Advisory Committee's negative vote, on November 9, when Biogen's shares resumed trading, its share price plummeted 28.2%. ¶294.

The meeting was both a corrective disclosure and a materialization of the risk Defendants' statements concealed. In *Dental Partners*, the plaintiffs alleged that the defendants downplayed the risk of ongoing open-court litigation. Judge Tauro held that the jury's verdict against the defendants served as loss causation by revealing that the defendants' confident assessments had been false. 775 F. Supp. 2d at 245. *See also Sheet Metal Workers Nat'l Pension Fund v. Bayer AG*, 2021 WL 4864421, at *7 (N.D. Cal. Oct. 19, 2021) (same). The Advisory Committee's verdict here serves the same role as those juries'. Investors had two reasons to doubt the Draft Massie Report's reliability and relevance: it bore a prominent DRAFT watermark and the rest of the 343-page report ignored it. Before the Advisory Committee, investors who read the Draft Massie Report had to weigh its analyses, credibility included, against the over-the-top recommendations in the rest of the 343-page report. The Committee's world-class experts, Dr. Massie's true

audience, cited the Draft Massie Report at length, endorsed its analyses, and relied on the facts it revealed to vote 10-0 against approval. The Advisory Committee both distilled the Draft Massie Report's essence and made clear that it was reliable and correct in its analyses.

The Advisory Committee's verdict was also a materialization of the risk. Defendants concealed that rejection of aducanumab's application for regular approval was far more likely than their statements let on. That risk materialized when the Advisory recommended that the FDA reject aducanumab's application, 10-0, based on the data Defendants' withheld. Plaintiffs' allegations suffice. *Gilead*, 536 F.3d at 1058 (risk of off label prescription materialized not when disclosed but only when it later affected earnings); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (even though structured note might have collapsed anyway in the 2008 crash, plaintiffs' loss causation allegations sufficed because the facts defendants concealed made that collapse more likely).[24]

Defendants argue that the Complaint does not allege loss causation and that Plaintiffs do not have standing because, they claim, the Draft Massie Report fully revealed the truth to the market the morning of November 4, before Plaintiffs' purchases, and Biogen's share price did not decline by close of trading that day. Def.Br. 33-35. For their argument, Defendants cite the Draft Massie Report's bottom-line conclusion that Biogen had not shown aducanumab should be approved. But the issue is not *that* Massie advised against approval, but *why*. No one ever thought

---

[24] In *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 349 (D. Mass. 2020), the court found loss causation was not adequately alleged because the plaintiffs had not alleged falsity and scienter. The court stated that had they done so, they would have alleged loss causation. *Id. SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 65 (D. Del. 2020) was not about loss causation; instead, the court held that the defendants' disclosures were adequate (i.e., the facts were not "buried"). And Defendants misstate *Alkermes*'s facts. There, the plaintiffs alleged that the defendants made false statements about manufacturing, but the corrective disclosure was the FDA's denial of approval for unrelated reasons. *Alkermes*, 2005 WL 2848341, at *11. Here, the Advisory Committee cited Dr. Massie's criticisms in voting against approval.

34

aducanumab's approval was a slam dunk; Biogen had declared futility and did not complete aducanumab's Phase III trials. But to realize Defendants' statements were false, investors had to actually read and understand Massie's dense and technical analyses. This was not a one-and-a-half-day task.[25]

## VI.    THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIMS

The Complaint sufficiently alleges primary liability. Defendants raise no other argument against control person liability. Thus, the Complaint sufficiently alleges control person liability.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

---

[25] Defendants rely on cases in which simple information indisputably could have been incorporated by the time of the stock drop. *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128 (D. Mass. 2010), *aff'd sub nom. Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011)(market was already aware of undisclosed facts before disclosure); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 206 (S.D.N.Y. 2020)("This was not a case where a careful and sophisticated analysis was required before the disclosures could have been considered reasonably available to shareholders."); *Karth v. Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 20 (D. Mass. 2019), *aff'd,* 6 F.4th 123 (1st Cir. 2021) (defendants published press release with "non-ambiguous language that breaks the causal link between allegedly misleading information [] and reliance on same and resulting loss causation" six months before alleged corrective disclosure); *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225 (D. Mass. 2014)(defendant published press release correcting false statement and describing it as an "error" and "misinterpretation" before plaintiff's purchase).

Dated: November 4, 2021     Respectfully submitted,

             **THE ROSEN LAW FIRM, P.A.**

             */s/Laurence M. Rosen*
             Laurence M. Rosen, Esq. (pro hac vice)
             Jonathan Horne, Esq. (pro hac vice)
             Joshua Baker, Esq. (BBO #695561)
             Sara Fuks (pro hac vice)
             275 Madison Avenue, 40th Floor
             New York, NY 100016
             Tel: (212) 686-1060
             Fax: (212) 202-3827
             lrosen@rosenlegal.com
             jhorne@rosenlegal.com
             jbaker@rosenlegal.com
             sfuks@rosenlegal.com

             *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2021, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** was served by CM/ECF to parties registered to the Court's CM/ECF system.

/s/Laurence Rosen

37