**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

NADIA SHASH and AMJAD KHAN,
Individually and On Behalf of All Others
Similarly Situated,

      Plaintiffs,

      v.

BIOGEN INC., MICHEL VOUNATSOS,
ALFRED W. SANDROCK, JR., and
SAMANTHA BUDD HAEBERLEIN,

      Defendants.

**Civil Action No.: 1:21-cv-10479-IT**

**Leave to File Reply Granted on**
**August 2, 2021**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................................................... ii

ARGUMENT .................................................................................................................. 1

I.      The SAC Does Not Adequately Plead Any False or Misleading Statements .................... 1

        A.      The Challenged Statements Were Statements Of Scientific Opinion .................... 1

                1.      Statements About Efficacy of High-Dose Aducanumab ............................ 1

                2.      Statements About Correlation Between Amyloid Plaque Removal and Clinical Benefit ...................................................................... 5

                3.      Statements About Demographics and Breadth of Clinical Endpoints ........ 6

        B.      Plaintiffs Fail to Plead Omissions of "Conflicting Facts" ..................................... 7

        C.      Plaintiffs' Case Law Is Distinguishable and Supports Defendants' Arguments .... 8

II.     The SAC Does Not Allege a Strong Inference of Scienter .............................................. 10

III.    The SAC Does Not Allege Loss Causation .................................................................... 15

IV.     The SAC Does Not Allege Reliance ............................................................................. 17

CONCLUSION ............................................................................................................. 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corporation*,
965 F.3d 165 (2d Cir. 2020).................................................................................................8, 9

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ........................................................................................7

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ........................................................................................11, 14, 15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013).................................................................................................................16

*Angelos v. Tokai Pharms., Inc.*,
494 F. Supp. 3d 39 (D. Mass. 2020).......................................................................................12

*In re Apollo Group Inc. Securities Litigation*,
509 F. Supp. 2d 837, 845 (D. Ariz. 2007) ..............................................................................16

*Bettis v. Aixtron SE*,
2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ........................................................................14

*In re Biogen Inc. Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016).........................................................................................11

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)......................................................................................................12

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)..............................................................................................12, 13

*Brown v. E.F. Hutton Grp., Inc.*,
991 F.2d 1020 (2d Cir. 1993)...................................................................................................17

*City of Bristol Pension Fund v. Vertex Pharms. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014).......................................................................................17

*In re Connetics Corp. Sec. Litig.*,
2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ........................................................................10

*Corban v. Sarepta Therapeutics, Inc.*,
2015 WL 1505693 (D. Mass. Mar. 31, 2015)........................................................................1, 2

ii

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
   519 F. Supp. 3d 99 (E.D.N.Y. 2021) ................................................................15

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) ................................................................14

*In re Delcath Systems, Inc. Securities Litigation*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)...................................................................9

*In re DVI, Inc. Securities Litigation*,
   639 F.3d 623 (3d Cir. 2011).................................................................................16

*In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)...................................................15

*Institutional Investors Group v. Avaya*,
   564 F.3d 242 (3d Cir. 2009)..................................................................................4

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)................................................................................13

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
   2021 WL 3079878 (D. Mass. July 21, 2021).....................................................2

*Leavitt v. Alnylam Pharms., Inc.*,
   451 F. Supp. 3d 176 (D. Mass. 2020) .................................................................2

*Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008)................................................................................13

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018).................................................................10

*Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015).........................................................................................1, 8

*In re OSI Pharmaceuticals, Inc. Sec. Litig.*,
   2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007)....................................................9

*In re Philip Morris International Inc. Securities Litigation*,
   2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021).....................................................2

*In re PTC Therapeutics, Inc. Securities Litigation*,
   2017 WL 3705801 (D.N.J. Aug. 28, 2017) .....................................................8, 9

*Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys*,
   769 F.3d 313 (5th Cir. 2014) .............................................................................16

iii

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)................................................................................11

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
  697 F.3d 869 (9th Cir. 2012) .......................................................................................7, 12

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).............................................................................2

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .......................................................................................10

*SEB Investment Management AB v. Endo International, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ...........................................................................9

*In re Sepracor, Inc. Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) ............................................................................10

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020)..........................................................................................14

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
  2021 WL 4864421 (N.D. Cal. Oct. 19, 2021)...............................................................15

*Special Situations Fund III, L.P. v. American Dental Partners, Inc.*,
  775 F. Supp. 2d 227 (D. Mass. 2011) ...................................................................14, 15

*In re The First Marblehead Corp. Sec. Litig.*,
  639 F. Supp. 2d 145 (D. Mass. 2009) ..........................................................................15

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)......................................................................................2, 8

*In re Wayfair, Inc. Sec. Litig.*,
  471 F. Supp. 3d 332 (D. Mass. 2020) ....................................................................10, 13

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005).........................................................................................16

iv

**ARGUMENT**

**I.    The SAC Does Not Adequately Plead Any False or Misleading Statements**

In their opposition, Plaintiffs argue that fraud is pleaded because Biogen purportedly misstated or omitted to disclose the particular statistical analyses of the aducanumab clinical trials that were reflected in the report of an FDA statistician who was critical of Biogen's own interpretations of the clinical trial evidence.  But Plaintiffs do not allege that Biogen inaccurately reported data (to the extent quantified by Defendants at all), or that Defendants disbelieved their own interpretations of the trial data, which is required to plead a misleading statement of opinion under *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  Nor do Plaintiffs have any response to Defendants' argument that Biogen was not legally obligated to disclose all of the trial data to let investors make their own judgments. Plaintiffs fail to plead a false or misleading statement.

A.    The Challenged Statements Were Statements Of Scientific Opinion

1.    Statements About Efficacy of High-Dose Aducanumab

Plaintiffs do not purport to have satisfied the first prong of *Omnicare* (Opp. 17 n.5[1]), which requires Plaintiffs to plead facts showing that Defendants' statements of opinion were "both objectively and subjectively false."  *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017).  Instead, Plaintiffs attempt to avoid *Omnicare's* rigorous pleading standard for statements of opinion by arguing that many of Defendants' statements are not opinions at all, but rather quantifiable misstatements of material fact or of implied facts.  (*See* Opp. 13–14.[2])  Plaintiffs are incorrect.  Judgments about "how to

---

[1] Defined terms and abbreviations are the same as in Defendants' opening brief, ECF No. 61. "Br. __" refers to Defendants' opening brief. "Opp. __" refers to Plaintiffs' opposition brief.
[2] Plaintiffs also argue that Defendants' statements "omit[ted] material facts." (Opp. 15.)  As discussed *infra* 7–8, Plaintiffs fail to plead an actionable omission under *Omnicare*.

1

analyze data and interpret results" reflect opinions, not facts, and disagreements about how to analyze clinical trial data reflect non-actionable scientific disagreement. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543–44 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 2021 WL 3079878, at *8 (D. Mass. July 21, 2021) (dismissing claims because fact that FDA interpreted data differently from defendants "constitutes a non-actionable scientific disagreement"); *Corban*, 2015 WL 1505693, at *6.[3]  This conclusion holds true whether or not the words "I think" or "we believe" preface the scientific interpretations—and none of Plaintiffs' cases say otherwise. (*See* Opp. 14.) *See Tongue*, 816 F.3d at 214 (statement that Phase III study "demonstrated strong and robust treatment effect"—not couched as a "belief" or "opinion"—was non-actionable opinion even though plaintiffs and the FDA "disagreed with Defendants' interpretation of the data").

The recent decision in *In re Philip Morris International Inc. Securities Litigation*, 2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021) (appeal filed Oct. 8, 2021), is on point.  There, defendants described the results of their clinical studies for a cigarette alternative (iQOS) in a positive light, explaining that the totality of the data showed that iQOS was less harmful than cigarettes. *Id.* at

---

[3] Plaintiffs fail to distinguish Defendants' cases dismissing claims based on disagreements of scientific opinion. (*See* Br. 18–19.) Plaintiffs claim that Defendants "remov[ed] words" from their quotation of *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020), (Opp. 17 n.6), but they point to language that was neither quoted nor cited in Defendants' brief. (*See* Br. 17.)  Plaintiffs mischaracterize *Sanofi* as a case where defendants "only expressed their opinion that the FDA might accept the [trial] results." (Opp. 18 n.8.)  But the court separately dismissed an entirely different set of opinions "describing and lauding" the results of the clinical trials, similar to this case.  87 F. Supp. 3d at 538.  Plaintiffs point out that, in *Karyopharm*, "defendants' optimistic statements" about trial results were not misleading because they disclosed "that the drug did worse than standard of care." (Opp. 17.)  But that is similar to what happened here, where Defendants candidly disclosed that Study 301 was a failed study.  As for *Corban*, Defendants never said that "all" the challenged statements were opinions. (Opp. 16–17; Br. 15.)  Further, the *Corban* decision held that statements "touting the strength" of the drug involved "interpretations of the company's data, which constitute non-actionable expressions of opinion." 2015 WL 15056693, at *6.

*9.  Shortly before an advisory committee met to discuss FDA approval, the company disclosed for the first time four additional studies it had previously conducted that showed increases in dozens of dangerous chemicals in iQOS as compared to cigarettes.  *Id.* at *3–4.  Based on these new studies, the advisory committee voted against recommending approval.  *Id.* at *4.  Several months later, after a lawsuit was filed, the FDA approved the iQOS application.  *Id.* at *4–5.

The court held that the challenged statements were opinions interpreting the company's clinical studies, and that the studies provided defendants "with a reasonable basis to characterize iQOS as either less harmful or more beneficial than cigarettes," which is "all that is required under the securities laws."  *Id.* at *9–10.  Although plaintiffs' conflicting analyses based on the undisclosed studies "may well be scientifically reasonable," the court was not required "to choose between two competing analyses of data."  *Id.* at *10.  Moreover, that the FDA endorsed Defendants' interpretations (even after considering the contradictory studies) "severely undercuts any allegation that the statements were false or misleading when made."  *Id.*

The same analysis requires dismissal here.  The statements that Plaintiffs challenge as false in the Complaint, which are collected in Trach Decl. Ex. J, state: (i) Study 302 was a successful study that showed a reduction in clinical decline and met its clinical endpoints (*e.g.*, SAC ¶¶ 181, 185); (ii) Study 301 was a "failed" study that did not meet its endpoints (*e.g.*, SAC ¶¶ 177, 191); and (iii) based on a post-hoc analysis, certain data in Study 301 "supports" Study 302 because patients in Study 301 who received sufficient high doses of aducanumab had similar outcomes to comparable patients in Study 302 (*e.g.*, SAC ¶¶ 181, 183, 185, 187, 189, 191, 193, 195).  Plaintiffs do not dispute the factual accuracy of these statements, or any other challenged statements that include quantifiable metrics.  Instead, Plaintiffs dispute the *scientific conclusion* that Defendants drew from these analyses: namely, that the "primary learning from these data is that sufficient

3

exposure to high dose aducanumab reduced clinical decline," (SAC ¶¶ 171, 173, 175, 179).  (*See* Opp. 6, 19–20.)  But the bases for Plaintiffs' disagreement are the inferences they draw from *different analyses* that Massie performed on particular patient subgroups that Defendants did not discuss—such as "Study 302 Carriers."  *See id.*  These disagreements are not actionable because the Court is not required "to choose between two competing analyses of data"—particularly where, as here, other FDA reviewers contradicted Plaintiffs' (and Massie's) alleged alternative interpretations of the trial data.  (*See* Br. 19 & n.5.)

In an effort to generate a factual misstatement by Defendants, Plaintiffs also challenge several purported statements about specific patient subgroups—but these arguments inaccurately describe or misquote the Complaint and/or Defendants' actual statements.  For example:

- Plaintiffs argue that "Defendants told investors that [] post-PV4 Study 301 Carriers performed as well as Study 302 Carriers[.]"  (Opp. 6.)  But this alleged misstatement is not pleaded in the Complaint.  Plaintiffs cite SAC paragraph 150, which does not cite any actual statements by Defendants and, in any event, does not address the subgroup of "post-PV4 Study 301 Carriers."  (SAC ¶ 150.)

- Plaintiffs argue that "Defendants told investors that . . . all the groups of patients who received 10mg/kg doses, and only them, achieved statistically significant benefits," when in fact "only one of four groups did."  (Opp. 2, 22.)  But the Complaint does not allege that Defendants differentiated between "all groups of patients," or the "four groups" discussed in Plaintiffs' brief.

- Plaintiffs attribute to Defendants a statement that the "total dataset" shows that sufficient exposure to aducanumab reduces clinical decline, (Opp. 14 (fourth bullet)), but the quoted language plainly described only Study 302 (not both Studies). (Trach Decl. Ex. D, at 26.)

This attempt to rewrite both the Complaint and Defendants' actual statements cannot support a fraud claim where, as here, the statements *actually* made by Defendants were scientific interpretations and not misstatements of specific subgroup data.

2.   Statements About Correlation Between Amyloid Plaque Removal and
Clinical Benefit

While Plaintiffs concede that aducanumab removes amyloid plaques, (Opp. 20), they disagree with the interpretation that this reduction was "leading to" aducanumab's clinical benefits. (SAC ¶ 227.)  Plaintiffs thus present yet another non-actionable disagreement about the proper interpretation of data.  (*Supra* 1–4.)  Plaintiffs' argument is also undermined because, once again, the FDA reached the same conclusion as Defendants and granted accelerated approval *specifically* because it found the reduction of amyloid plaques caused by aducanumab "reasonably likely to predict important benefits to patients."  (Trach Decl. Ex B, at 3; Br. 21.)[4]

Furthermore, Defendants are not alleged to have quantified the correlation between plaque removal and efficacy in the way Plaintiffs' brief suggests.  (*See* Opp. 7.)  Tellingly, Plaintiffs' falsity argument does not actually quote, cite, or discuss any allegedly misleading statement by Defendants concerning a statistical correlation between plaque removal and clinical benefit.  (*See* Opp. 7, 20–21 (no reference to SAC ¶¶ 221–31).)  Plaintiffs thus do not identify any fact that was misstated, but rather challenge the opinion that Defendants formed from the data.

In any event, Plaintiffs' argument that "there was no correlation between plaque removal and clinical outcomes in either Study," (Opp. 9), misstates their own Complaint, which alleges that Massie's analysis showed a *positive correlation* between plaque removal and clinical outcomes across both studies (0.066), as well as within each study (0.026 in Study 301 and 0.105 in Study 302).  (SAC ¶ 220.)  While the alleged correlation Massie identified may not be as strong as Plaintiffs suggest it should be, that does not render false Defendants' opinion that plaque removal

---

[4] Plaintiffs argue that Defendants "improperly chang[ed] their statistical analyses" to measure correlation between plaque removal and efficacy, which ignores that it was Massie, not Defendants, who allegedly performed the statistical correlation analysis contained in the SAC.  In any event, Plaintiffs plead no facts supporting this assertion, much less that any Individual Defendant was involved in or aware of this supposed change.  (*See* Opp. 7, 21; SAC ¶¶ 215–20.)

5

leads to better outcomes.[5]  Alternatively, Plaintiffs' argue that Defendants' opinions were wrong because "in Study 301, the correlation Biogen measured was 0.135," and in Study 302 the correlation was "-0.036."  (Opp. 7 (citing SAC ¶ 206).)  Again, Plaintiffs misquote their own Complaint, which alleges that these analyses (a) were not "measured" by Biogen, but by Massie, and (b) in any event, Massie's analysis applied only to the subgroup of "high-dose" patients in each Study, not all patients as Plaintiffs claim in their opposition.  (*See* SAC ¶¶ 16, 206.)

### 3.      Statements About Demographics and Breadth of Clinical Endpoints

Plaintiffs argue that Budd Haeberlein's "belie[f]" that "baseline demographics and characteristics" were not "driving the overall outcomes that we see or the difference between [Study 301 and 302]" was false because (i) efficacy in American studies was allegedly lower than the global average, and (ii) clinical outcomes for patients over 75 were better than other age groups. (Opp. 7–8; SAC ¶ 238.)  But Defendants never said there were no differences in results between regions or age groups, and Plaintiffs fail to explain how the alleged variations they cite contradict Budd Haeberlein's opinion—with which the FDA agreed.  (Br. 22–23.)

Plaintiffs also argue that Budd Haeberlein misled investors by saying that she found the "breadth of endpoints . . . encouraging" in the aducanumab trials (SAC ¶ 248) based on Plaintiffs' argument that the secondary endpoints "all measure the same thing," (Opp. 22).  But Plaintiffs do not dispute Defendants' showing that the different endpoints consisted of different tests that measured different cognitive abilities; that the FDA agreed with Defendants; or that the endpoints

---

[5] Plaintiffs argue that certain positive correlations were "poor" by referencing an 18-year old article from the Singapore Medical Journal that is not cited in the Complaint.  (Opp. 7.)  Plaintiffs offer no support for the proposition that this article—which does not discuss clinical trials—is a "leading treatise."  (*See* Opp. 7; Horne Decl. Ex. 1.)  In any event, the Court cannot consider this extra-record document for its truth.  (*See* Mem. of Law in Supp. of Pls.' Mot. to Strike, ECF No. 67.)

themselves were public knowledge prior to the Class Period.  (Br. 24.)  Plaintiffs may disagree

with Budd Haeberlein's opinion, but that does not make the opinion actionable.[6]

    B.   Plaintiffs Fail to Plead Omissions of "Conflicting Facts"

  Plaintiffs also argue that Defendants' scientific conclusions were misleading because they

"failed to disclose materially conflicting facts."  (Opp. 16 & n.4.)  Plaintiffs suggest that

Defendants should have "disclosed the data undermining their statements," so that "investors could

have looked for themselves."  (Opp. 14.)  But as the Ninth Circuit explained in *In re Rigel*

*Pharmaceuticals, Inc. Securities Litigation*, "to the extent Plaintiff[s] suggest[] that parties

conducting clinical trials necessarily are required to release all the detailed data or break that data

down by categories that may plausibly be of interest to some investors, Plaintiff[s] [are] incorrect."

697 F.3d 869, 877 n.7 (9th Cir. 2012); *see In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 569

(E.D. Pa. 2009) (holding that company was not required to provide data or analysis on subgroups

of patients in clinical trial even if subgroup information was material and the company had made

public statements about top-line results).  Plaintiffs do not respond to Defendants' argument that

there is no rule or industry standard requiring companies to disclose clinical trial data so that

investors and competitors can conduct their own analyses.  (Br. 25.)

  To the extent Plaintiffs allege that Defendants failed to disclose conflicting analyses of the

clinical trial data, that also does not plead an actionable omission of fact.  The competing analyses

in the Complaint, and the conclusions that Plaintiffs draw from them, are opinions about how best

---

[6] Plaintiffs now argue that "Defendants tampered with the data" to meet their endpoints. (Opp. 8.)
What Plaintiffs actually allege in the Complaint, however, is that the results for a single secondary
endpoint for a single study slightly improved in the dataset accompanying Biogen's FDA approval
application, when compared to an earlier dataset presented in a June 2019 FDA meeting. (SAC
¶¶ 254–58; Br. 18 n.4.)  But Plaintiffs do not allege that the final dataset accompanying the FDA
application was inaccurate.  Nor do Plaintiffs plead any facts supporting their argument that any
Defendant tampered with the data.

to interpret the data, not "materially conflicting facts." (*Supra* 1–4; Br. 25–26.) Moreover, there are no well-pleaded facts suggesting that, even if Biogen had itself conducted the same analyses as Massie (a fact that is not pleaded), any Defendant credited that analysis and disbelieved Biogen's public statements. (Br. 26–27.)

*Finally*, even assuming *arguendo* that Massie's competing analyses were "facts" known to Defendants when they made their allegedly false and misleading statements (and Plaintiffs do not plead such knowledge), an opinion is "not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because "reasonable investors understand that opinions sometimes rest on a weighing of competing facts." *Omnicare*, 575 U.S. at 189–90; *Tongue*, 816 F.3d at 214 (statements about trial results not misleading where issuer "knows, but fails to disclose, some fact cutting the other way").

> C.    Plaintiffs' Case Law Is Distinguishable and Supports Defendants' Arguments

None of Plaintiffs' cases support their theory that Defendants' scientific conclusions were misleading. Certainly, none of Plaintiffs' cases concern a situation where, as here, Defendants disclosed that one key study had failed to establish efficacy, and expressly declined to predict how the FDA would react to the clinical trial dataset. (Br. 27 & n.11.)

*First*, Plaintiffs rely on cases where, unlike here, defendants allegedly made false or misleading statements about quantifiable metrics:

- In *Abramson v. Newlink Genetics Corporation*, 965 F.3d 165 (2d Cir. 2020), defendants told investors that the results of "all the major American studies" show that "resected pancreatic cancer patients live" no more than "20 months." *Id.* at 174 (emphasis added). In fact, half of the major studies identified in the complaint showed survival rates ranging from 25 to 43 months. *Id.* at 177.[7]

---

[7] Although *Abramson* vacated *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 486 (S.D.N.Y. 2018), it did not discuss or overturn *Nguyen*'s holding that data interpretations are not false if they are "reasonably supported" by data, (*see* Br. 16), which remains the law. (*Supra* 3.)

- In *In re PTC Therapeutics, Inc. Securities Litigation*, 2017 WL 3705801 (D.N.J. Aug. 28, 2017), defendants represented that the "totality of the clinical data . . . demonstrates [the new drug's] ability to slow disease progression." *Id.* at *5. This was false because nearly 60% of patients "reported no clinically meaningful or statistically significant benefit from" the drug, and the two largest clinical trials failed to meet their clinical endpoints. *Id.* at *2–3, 5.

- In *SEB Investment Management AB v. Endo International, PLC*, 351 F. Supp. 3d 874 (E.D. Pa. 2018), defendants stated that a reformulated painkiller was "safer and less prone to abuse." *Id.* at 898. In fact, the company's own consultant had already determined that intravenous abuse of the reformulated pill "had increased significantly," and defendants' "statements were tantamount to a claim that abuse rates were reduced when in fact the intravenous abuse rate had increased." *Id.*

- In *In re Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d 320 (S.D.N.Y. 2014), the defendant disclosed "the number and percentage" of adverse safety events in the treatment group of its study, but not the control group, and stated that the side effects were "similar" in both groups. In fact, the rate of serious adverse events was much higher in the treatment group, including the mortality rate (7% vs. 0%). *Id.* at 331–32.

Here, unlike in Plaintiffs' cases, Defendants did not mislead investors about specific data, as in *Newlink*, where the Second Circuit cited "the specificity of the representation" in finding it false, 965 F.3d at 177, or *Delcath*, where defendants allegedly misled investors about the similarity between adverse safety events in treatment and control groups. 36 F. Supp. 3d at 331–32. Defendants also did not mislead investors about the overall results of the studies, as in *Endo* and *PTC Therapeutics*. To the contrary, Defendants repeatedly disclosed that Study 301 was a "negative study" that had not met its endpoints.

*Second*, Plaintiffs argue that "[c]ompanies mislead investors by making sweeping statements about a drug that are untrue as to material subgroups or in other material instances." (Opp. 19.) But Plaintiffs' cases involve companies that chose to speak about specific subgroups, and then made false statements about subgroup data. In *In re OSI Pharmaceuticals, Inc. Securities Litigation*, defendants said that their experimental lung cancer drug "improved survival in all subsets of patients including smokers," but the clinical study revealed no survival benefit for two key subgroups, including smokers, which constitute approximately 80% of all lung cancer patients.

9

2007 WL 9672541, *8 (E.D.N.Y. Mar. 31, 2007); *see also PTC*, 2017 WL 3705801, at *12–13 (statement that "the pre-specified subgroup results" demonstrated a clinical benefits was false when only one "pre-specified key subgroup" constituting 25% of trial patients achieved benefit). By contrast, here, Defendants disclosed that Study 301 failed, and are not alleged to have told investors that "all" or "key" subgroups achieved clinical benefits despite contrary evidence.[8]

*Finally*, Plaintiffs rely on cases where defendants misrepresented material information about adverse safety events.[9] These cases are inapposite because Plaintiffs do not allege that Defendants concealed studies showing that aducanumab had serious undisclosed side effects.

## II.     The SAC Does Not Allege a Strong Inference of Scienter

In their opening brief, Defendants demonstrated that the Complaint contains no "allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least warned by others that this was so." *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 345 (D. Mass. 2020) (quotation marks omitted). (Br. 31–32.)

---

[8] Plaintiffs argue that Defendant Sandrock represented that "all the data" supported the interpretation that only high-dose aducanumab patients saw meaningful improvement. (Opp. 19.) What Sandrock actually said was that Study 301 was "a negative study" but that "portions of it do support the analysis that we did with [Study 302]," and that "consistent with the findings from [Study 301] and [Study 302], you really need to get to the higher dose. And I think our data are all consistent with that." (SAC ¶ 191.) Plaintiffs point again to certain subgroup analyses, (*see* Opp. 19), but do not dispute that high-dose patients in both Study 301 and 302 saw statistically significant clinical benefits. (*Supra* 3–4; Br. 17.) This statement is also distinguishable from Plaintiffs' cases where defendants made specific false statements about "all" or "key" subgroups.
[9] *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 708 (9th Cir. 2016) (defendants stated that "all the animal studies that have been completed" supported FDA approval when one such study showed that drug caused cancer in rats); *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 28 (D. Mass. 2004) (defendants stated that experimental drug "has demonstrated . . . no observed cardiovascular side effects" even though the drug had caused severe cardiac issues in multiple animal studies); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *1, 6–7, 11 (N.D. Cal. Aug. 14, 2008) (defendants said that drug was "safe and well tolerated" and listed the "most commonly observed adverse effects" without disclosing study showing drug caused cancer in 89 out of 160 mice).

Plaintiffs do not dispute this argument in their opposition, (*see* Opp. 23–31), which focuses instead on internal debate at the FDA (not Biogen) over aducanumab, (Opp. 9–12). Plaintiffs' allegations about Dunn and the FDA approval process show nothing about what ***Defendants*** knew or when, much less that Defendants disbelieved their data interpretations, and are insufficient to plead scienter. (Br. 30–31.)

Nor do Plaintiffs dispute that the Complaint fails to allege *any* insider stock sales or other benefit flowing to Defendants from the alleged fraud. (Br. 29–30.) The lack of financial benefits to insiders weighs heavily against scienter, as does the undisputed fact that Biogen spent approximately $10 billion repurchasing shares during the purported Class Period. (*Id.*) Plaintiffs cite a law review article for the irrelevant proposition that share repurchases have tax advantages, (Opp. 31), but this does not refute the case law holding that share repurchases undermine scienter because companies logically do not repurchase shares they know to be inflated. *See In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016), *aff'd* 857 F.3d 34 (1st Cir. 2017).[10]

Plaintiffs raise various scienter arguments, none of which withstands scrutiny:

***First***, Plaintiffs argue that the "[a]uthority and [s]pecificity" of Defendants' statements support scienter, as well as the supposed fact that Defendants' statements "were not just misleading, but wildly so." (Opp. 24–27.) This argument conflates falsity and scienter; the question in the scienter analysis is not whether the speaker spoke incorrectly (*i.e.*, falsely), but rather whether the speaker *knew* (or was reckless in not knowing) facts contradicting the alleged misstatement. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (cited Opp. 24, 27,

---

[10] Plaintiffs' own case states that share repurchases can "negate a finding of scienter." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013) (repurchase plan did not "wholly negate" inference of scienter that was "otherwise plausible in light of the other factors").

29) ("Of course, more than mere proof that the defendants made a particular false or misleading statement is required to show scienter.").

Similarly, Plaintiffs rely on Defendants' statement that they would not disclose all underlying trial data while it was under review by regulators. (Opp. 26.) Again, this conflates scienter with whether there is an actionable omission: Defendants were not required to disclose all data (*supra* 7–8), and a company's statement to investors about what data it will and will not disclose undermines any inference of fraud. *See Rigel*, 697 F.3d at 880–81 (failure to disclose "all safety results" not actionable when company told investors it would disclose only "key safety results," despite investors' desire for "more extensive information"). (Br. 25 n.10.)

***Second***, Plaintiffs argue (without citing case law) that knowledge of falsity can be inferred because aducanumab was "important" to Biogen, and "*was* the Biogen story." (Opp. 25–26.) These general allegations are routinely rejected as adequate to plead scienter. *See Brennan v. Zafgen, Inc.*, 853 F.3d 606, 616 (1st Cir. 2017) (rejecting argument that scienter could be inferred because drug was critical to company's success)[11]; *Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 59 (D. Mass. 2020) (rejecting allegation that defendants lied about clinical trials "because of the importance of the success" of the developmental drug to the issuer's "continued viability"). (Br. 28–29.) Indeed, the First Circuit found that similar scienter allegations "clearly fall short" when investors argued that scienter could be inferred from the fact that the alleged false and misleading statements concerned a different drug that accounted for approximately one-third of the company's revenue at the time. *See In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017).

---

[11] Plaintiffs attempt to distinguish *Brennan*, Opp. 27 n.18, but they quote and cite a different section of the opinion (titled "Other Considerations") that discusses the *materiality* of the allegedly concealed information, not the scienter analysis. 853 F.3d at 616.

12

Likewise, Plaintiffs cannot plead scienter by alleging that Defendants were motivated to lie to investors so that Biogen could "earn billions in revenue." (Opp. 29–30.)  This is precisely the "usual concern by executives to improve financial results" that the First Circuit rejected in *Brennan*.  853 F.3d at 616.  And if anything, Defendants' purported motive for aducanumab to succeed would *benefit* shareholders, not defraud them.  Every action attributed to Defendants in the Complaint—including conducting a post-futility data review and advocating with the FDA to approve aducanumab—stood to benefit *all shareholders* and cannot support a claim for securities fraud.  *See Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) (rejecting plaintiffs' conflation of intent to defraud merger partner with intent to defraud shareholders because "achieving a superior merger benefitted all shareholders, including the defendants").[12]  The far more powerful inference is that Defendants committed Biogen's resources to pursue aducanumab because they genuinely believed their opinions of its efficacy.[13]

*Third*, Plaintiffs argue that scienter can be inferred because Defendants closely monitored the clinical studies, (Opp. 26), and "planned and supervised" the data analyses, (Opp. 27–28).  But courts routinely reject the argument that fraudulent intent can be inferred simply because defendants closely monitor the operations at issue.  *See Wayfair*, 471 F. Supp. 3d at 345 (rejecting

---

[12] Plaintiffs cite *Miss. Pub. Emps. Ret. Sys. v. Bos. Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008) for the proposition that the motive to maximize revenue supports an inference of scienter.  (Opp. 29.) But scienter was adequately pleaded in that case because there was evidence that defendants knew of the manufacturing defects they allegedly concealed; defendants received numerous reports detailing the defects and later informed the public that they had been "monitoring, analyzing, and investigating the problem and appropriate responses."  *Id.* at 90–91.  Defendants also sold shares for profit during the class period, *id.* at 92–93, which is not alleged here.

[13] Plaintiffs also claim that "Defendants announced they had revived aducanumab" a mere "two weeks" after disclosing the results of the futility analysis and discontinuation of the clinical trials on March 21, 2019.  (Opp. 5 (citing SAC ¶ 140).)  This is contradicted by Plaintiffs' own Complaint, which alleges that Defendants announced aducanumab's "rebirth" on October 22, 2019—more than *7 months* (not "two weeks") after the company disclosed the futility analysis.  (SAC ¶¶ 108, 140.)

13

scienter argument that "because Defendants said that they paid close attention to their financial position and their financial position ended up being different" Defendants must have been lying or reckless).   Further, Plaintiffs ignore that the specific analyses that supposedly conflicted with Defendants' statements were not *Defendants'* analyses, but *Massie's* analyses.   (*Supra* 3–4.) Plaintiffs do not plead that Defendants disbelieved Biogen's publicly stated opinions about the trial data, or endorsed the analyses in the Massie Report.[14]

*Fourth*, Plaintiffs argue that analysts' interest in aducanumab, and the fact that analysts "repeated" Defendants' statements in their reports, support scienter.  (Opp. 27.)  Again, however, this fundamentally misunderstands the scienter analysis, because analysts' reactions show nothing about what *Defendants* knew or believed when they made their statements.  *See Bettis v. Aixtron SE*, 2016 WL 7468194, at *16 (S.D.N.Y. Dec. 20, 2016) (scienter not adequately pleaded for alleged misstatements in response to analyst questions because "nothing in the content or context of the statements" suggested defendants were aware of facts undermining their statements). Plaintiffs' cases do not support the proposition that scienter is supported by analysts repeating alleged false statements; rather, they involved situations where defendants knew that their statements to analysts had misled investors.  *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) (defendant REIT that boasted to investors that key tenant was catching up

---

[14] Plaintiffs cases are inapposite. *See Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247 (D. Mass. 2018) (scienter inferred because defendants stated that they maintained a presence at every clinic performing the developmental treatment, conducted part of every treatment cycle, created a registry of treatment data, and "closely track[ed] all aspects of treatment"); *Aldridge*, 284 F.3d at 79–81, 83–84 (scienter inferred because defendant's director of marketing *admitted* that "we actually had planned [the concealed sales practices] from the get go," and because of individual defendants' "financial incentives" to commit fraud) (brackets omitted).

on rent payments reckless in failing to disclose that it had loaned the tenant several million dollars to make the rent payments).[15]

*Finally*, Plaintiffs argue that the Individual Defendants "risked their careers" if they disclosed the clinical trial data. (Opp. 30–31.) But this speculative argument is not supported by any well-pleaded (or even conclusory) facts and should be rejected.[16]

## III.   The SAC Does Not Allege Loss Causation

Plaintiffs argue that the Advisory Committee's vote on November 6, 2020 was a "corrective disclosure" that revealed the falsity of Defendants' statements about the aducanumab trials. (Opp. 33–34.) But the only new information revealed by the vote was the Advisory Committee members' views on the questions presented to them. Defendants never speculated on how the Advisory Committee would vote, and expressly declined to predict whether the FDA would approve aducanumab. (*See* Br. 27 & n.11.) Plaintiffs themselves *concede* that "[n]o one

---

[15] *See also Special Situations Fund III, L.P. v. American Dental Partners, Inc.*, 775 F. Supp. 2d 227, 243 (D. Mass. 2011) (defendants who "personal[ly] participat[ed]" in alleged breach of contract with largest client were reckless in not knowing their representations to investors that nothing had changed with largest client were misleading). Plaintiffs also rely heavily on the Third Circuit's decision in *Institutional Investors Group v. Avaya*, 564 F.3d 242 (3d Cir. 2009) (cited Opp. 24–25), but the court there made clear that "the specific nature of the analysts' inquiries" *did not* "create a strong inference of a culpable state of mind." *Id.* at 270. Rather, the CFO's "confident, unhedged denials" in response to "direct[] and repeated[]" questions about the company's pricing practices—"taken together" with *five* other factors—sufficiently pleaded scienter. *Id.* at 270, 272.

[16] Plaintiffs' cases involved allegations, absent here, that defendant executives expressed fear for their jobs. *See Aldridge*, 284 F.3d at 83 (defendant alleged to have said: "If I can't turn the company around in one year, I won't be here"); *In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020) (plaintiffs expressly alleged that defendant worried about losing her job if she told investors that the company needed more cash).

ever thought aducanumab's approval was a slam dunk." (Opp. 34–35.[17]) Plaintiffs' cases are clearly distinguishable.[18]

Plaintiffs separately argue that the Massie Report "revealed data showing that Defendants' statements had been false." (Opp. 2.) But the Massie Report was published on the morning of November 4, 2020—two days before the Advisory Committee vote—and Biogen stock *increased* by 39% that day. (Trach Decl. Ex. I.) While Plaintiffs argue that market analysts could not "actually read and understand Massie's dense and technical analyses" prior to the vote (Opp. 34–35), Massie's analyses and scientific conclusions are summarized in the "Executive Summary" and "Conclusions and Recommendations" of his report, both of which succinctly state each of the points Plaintiffs rely on in their brief. (SAC Ex. 3 at 9, 96.)

Further, Plaintiffs' *own Complaint* demonstrates that analysts read, understood, and reacted to Massie's Report shortly after its publication and before the Advisory Committee vote. (*See* SAC ¶ 277(a) (analyst report on November 4 discussing Massie's analyses of non-carriers); SAC ¶ 277(b) (analyst report on November 5 discussing Massie's correlation analyses).) Plaintiffs'

---

[17] Plaintiffs' "materialization of the risk" theory (Opp. 34)—which is not pleaded—fails because Defendants warned investors that regulatory approval was uncertain. (Br. 27 & n.11). *See In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 110 (E.D.N.Y. 2021) (FDA letter identifying violations was "simply the materialization of the risk that was disclosed" and did not satisfy loss causation because company warned that the FDA might issue such a letter); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164–65 (D. Mass. 2009) ("Lead Plaintiffs' loss causation allegations fail because [issuer] provided adequate disclosures.").

[18] In *Dental Partners*, a jury's verdict against defendants was a corrective disclosure because defendants misled investors as to their "likelihood of prevailing in the lawsuit." 775 F. Supp. 2d at 244; *see also Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *7 (N.D. Cal. Oct. 19, 2021) (jury verdict satisfies loss causation where defendants specifically "misled investors as to the litigation risks").

argument that the market did not understand the Massie Report until the Advisory Committee "endorsed its analysis" days later (Opp. 33) is contradicted by their own pleading.[19]

## IV.    **The SAC Does Not Allege Reliance**

Plaintiffs do not dispute that both Shash and Khan purchased Biogen shares *after* the Massie Report was published.  (*See* Br. 34–35.)  This fact requires dismissal "because relying on the earlier misrepresentation would no longer be reasonable in light of the new information." *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 234–35 (D. Mass. 2014).  (Br. 34–35.)  Plaintiffs do not respond to this argument, but instead attempt to distinguish Defendants' cases because they involved "simple information" that could be quickly incorporated into the market price.  (Opp. 35 n.25.)  Plaintiffs conflate the efficiency of market absorption with reliance, which concerns the information available to *these particular plaintiffs*.  If Plaintiffs chose to purchase shares without fully digesting the Massie Report, that nonetheless fatally undermines reliance.  *See Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth.").

---

[19] Plaintiffs' cases are inapposite. *In re DVI, Inc. Securities Litigation*, 639 F.3d 623, 635 (3d Cir. 2011)—which was overturned, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013)—concerned the reliance element at class certification and found that a market is not inefficient if "some information took two days to affect the price."  The court in *In re Apollo Group Inc. Securities Litigation* found loss causation adequately pleaded where an alleged corrective disclosure presented a new analysis based on previously disclosed facts.  509 F. Supp. 2d 837, 845 (D. Ariz. 2007); *see also Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys*, 769 F.3d 313, 323 (5th Cir. 2014) (loss causation adequately pleaded where news article presented a novel analysis of data that "had little to no probative value in its native state").  Finally, the First Circuit in *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) endorsed plaintiffs' price impact analysis at the class certification stage specifically because it "captures the *same-day reaction* of Xcelera's stock price to company-specific events."  Here, the Massie Report contained detailed analyses dissenting from the majority's view of aducanumab's efficacy; it was not raw data with "no probative value," and the Advisory Committee vote did not offer any new analysis.

## CONCLUSION

For these reasons, the Complaint should be dismissed with prejudice.

Dated:  December 6, 2021

Respectfully submitted,

*/s/  Audra J. Soloway*
Audra J. Soloway (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3289
Facsimile: (212) 492-0289
asoloway@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc., Michel Vounatsos, Alfred W. Sandrock, Jr., and Samantha Budd Haeberlein*

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent on December 6, 2021 to those identified as non-registered participants.

*/s/  Audra J. Soloway*
Audra J. Soloway

18