UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

NADIA SHASH and AMJAD KHAN,           )
individually and on behalf of all     )
others similarly situated,            )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )   Civil Action No.
                                      )   1:21-cv-10479-IT
BIOGEN INC.; MICHAEL VOUNATSOS;       )
ALFRED W. SANDROCK, JR.; and SAMANTHA )
BUDD HAEBERLEIN,                      )
                                      )
          Defendants.                 )
                                      )

_____

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

MOTION HEARING BY VIDEOCONFERENCE

Tuesday, May 10, 2022
3:14 p.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**


On behalf of the Plaintiffs:

    THE ROSEN LAW FIRM, PA
    BY:  LAURENCE M. ROSEN
    609 W. South Orange Avenue
    Suite 2P
    South Orange, NJ  07079
    (973) 313-1887
    lrosen@rosenlegal.com


On behalf of the Defendants:

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    BY:  AUDRA J. SOLOWAY
    1285 Avenue of the Americas
    New York, NY  10019
    (212) 373-3000
    asoloway@paulweiss.com


    LATHAM & WATKINS LLP
    BY:  WILLIAM J. TRACH
    200 Clarendon Street
    27th Floor
    Boston, MA  02116
    (617) 880-4500
    william.trach@lw.com

**P R O C E E D I N G S**

(In open court at 3:14 p.m.)

THE DEPUTY CLERK:  United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cv-10479, Shash, et al., versus Biogen Inc., et al.  Will counsel please identify themselves for the record.

MR. ROSEN:  Good afternoon, Your Honor.  This is Laurence Rosen of the Rosen Law Firm on behalf of Plaintiff, Nadia Shash.

THE COURT:  Good afternoon.

MS. SOLOWAY:  Good afternoon, Your Honor.  Audra Soloway from Paul, Weiss, Rifkind, Wharton & Garrison LLP for the defendants.

THE COURT:  Good afternoon.

MS. SOLOWAY:  Good afternoon.

MR. TRACH:  Good afternoon, Your Honor.  William Trach from Latham & Watkins on behalf of the defendants.

THE COURT:  Good afternoon.

MR. TRACH:  Good afternoon.

THE COURT:  So we are here on defendants' motion to dismiss, and I also have plaintiffs' motion to strike certain exhibits.  So maybe let me just start quickly with the record, or the motion to strike.  I'm here on a motion to dismiss.  Why am I not just starting with the complaint and

skipping the additional documents that the defendants have offered me?

MS. SOLOWAY:  Your Honor, I assume that's directed to me?

THE COURT:  Yes.

MS. SOLOWAY:  Yes.  So, Your Honor, the -- you are, of course, starting with the complaint.  And, frankly, we think the complaint can be dismissed without any of the supporting exhibits.

But the complaint references a number of documents over -- repeatedly over many, many paragraphs of the complaint that we believe are appropriately considered by the Court because they are incorporated by reference into the complaint, including, for example, Your Honor, the joint briefing book that is referenced throughout the complaint; and that, of course, includes the dissenting appendix that is the feature of the plaintiffs' case.

THE COURT:  So let me just sort of stop you and give you my -- the First Circuit uses this very broad language of, anything the plaintiffs talk about, you can incorporate by reference.  But I see it somewhat more narrowly than the parties sometimes present it to me.

If there's a document that's referenced, where there's no dispute as to the -- that document and that that is, in fact, the copy of whatever it is -- so the typical

example is someone sues on a contract. They don't include the contract, but there's no dispute which document we're talking about is the contract. The defendant comes in and says, "Look, here's the contract. What plaintiff is saying the contract says is wrong." Clearly that comes in. I don't think there's any dispute.

But if a document is referenced -- the mere fact that a document is referenced doesn't mean that everything about it comes in and that it's offered necessarily for the truth of the matter where it isn't.

So, for example, I have a lot of cases where the defendant has done their own investigation of something, and the plaintiff will say, "The defendant did an investigation; and then after the investigation, they fired me or they broke the -- breached the contract," or did whatever.

And the defendant then comes in and says, "Look, here's the investigation, and all the facts are the way I think it is because that's what the investigation shows." Clearly, that doesn't happen.

So here, to the extent that there are disputed facts, ultimately, at issue, the fact that the FDA says this or somebody else says this, I can't accept those for the truth of the matter, even if they've included the report. So --

MS. SOLOWAY: Your Honor, we -- I think we're in

agreement on that.  None of the documents that the defendants have cited are we asking you to interpret for their truth; meaning, we are not saying, Your Honor, that you should adopt, for example, Biogen's interpretation of any of the statistical evidence or even the majority view of the FDA contained in the joint briefing book.

We -- the reason that those documents, Your Honor, are cited in our papers is simply for the proposition that, you know, the plaintiffs have identified one view within the FDA.  They acknowledge it's the dissenting view.  It's the Massie dissent that's attached to the joint briefing book.

And the -- the case concerns, Your Honor, whether there are conflicting scientific interpretations of evidence. We're not asking Your Honor to find, you know, that the drug is clinically effective.  We're simply saying, Your Honor, that the joint briefing book and the Massie appendix, both of which are referenced throughout the complaint, demonstrate that there existed a robust scientific debate about the clinical trial evidence.  We're not asking you to pick a side.  We're not --

THE COURT:  Is that something that I need to get into right now?  I mean, let's say, for example, that all you had was the Massie opinion and you didn't have a contrary opinion.  That wouldn't make plaintiffs' case any different from your point of view, would it?

MS. SOLOWAY:  No, Your Honor.  Our position would still be that an interpretation of trial data is a scientific opinion.  It gets treated as an opinion under the law, and it wouldn't matter whether you look at every piece of the FDA record or only that one document.

THE COURT:  Okay.  So until you -- either side explains to me why I need to look at something else, I think what I am planning to look at as we go through this discussion are the actual statements -- and to the extent that's fleshed out in a transcript, I think that's sort of fair game -- but the actual statements that are at issue and the allegations of the plaintiffs' complaint and, really, the allegations of the plaintiffs' complaint relevant to the time period of the alleged misstatements.

And what happened afterward with approval or nonapproval of the drug or the Social Security -- I mean, the Medicare or any of those things, it seems to me, is a little beyond today's motion; but you can convince me otherwise, perhaps.

But so that's my focus starting in, is I'd like to focus on the alleged -- the statements which are allegedly actionable and what -- and taking the plaintiffs' allegations of the complaint, as I would on a motion -- as I do on a motion to dismiss, and comparing those -- well, allegations of facts taken as true and going through these statements and

seeing whether there is something here that survives a motion to dismiss or not.

So it's defendants' -- so I think on the motion to strike, I will come back, circle back to it.  But my inclination is that most of what they're objecting to probably -- what plaintiff is objecting to probably doesn't come in.  I don't think I reach any of that.  And I start now with a -- or return now to the motion to dismiss, but I'd like to sort of focus on sort of the actionable time period.

MS. SOLOWAY:  Understood, Your Honor.

THE COURT:  And I usually let the moving party start.  So with that, Ms. Soloway.

MS. SOLOWAY:  Thank you very much, Your Honor. I'll just jump in; but, obviously, please interrupt me with questions.  I want to be useful to the Court.

So, Your Honor, as Your Honor is aware, the challenged statements in this case concern the clinical trial results for an Alzheimer therapy called aducanumab, which has now been approved by the FDA and is branded as Aduhelm.

THE COURT:  Okay.  I don't want to hear about the "now approved."

MS. SOLOWAY:  Understood.  That is pleaded in the complaint, however, Your Honor.

While securities fraud relating to drug testing is common, this case actually proceeds on a somewhat unusual

theory because this isn't a case where the company expressed optimism or assured investors that the FDA was likely to approve the drug.  To the contrary, the company expressly declined to offer speculation on how the regulators would look at the data or comment on the FDA's internal process.

And it's also, Your Honor, not a case where the FDA ultimately declined to approve the drug.  And, again, Your Honor, this is pleaded in the complaint.  The FDA approved the drug under the accelerated approval pathway.

So what is this case about?  And the answer is that this case is about a limited time period leading up well before FDA approval, leading up to an advisory committee vote when the defendants provided their interpretation of the clinical trial data.

And the plaintiffs take issue with those interpretations because of a dissenting view that comes out right before the advisory committee vote from a statistician at the FDA -- Dr. Massie -- who reaches a different view. His view is that the drug is not clinically effective based on analyses that he has performed and based on his sort of competing view of what the outcome of what the ultimate -- the ultimate weight of the evidence is.

Now --

THE COURT:  Okay.  So now let me -- let me stop you and just sort of orient you as to how I'm looking at it thus

far, which is I find neither the fact that it ultimately gets approved or the fact that -- I suppose it's Dr. Massie or Mr. Massie -- has criticized it as, really, here or there.

What I find Massie's analysis is important about is it offers different ways of thinking about what the data is. And for those of us who aren't that familiar with all of this, it's useful in that regard.

And so I think the point of it isn't so much that there was a divergent opinion or that that was his opinion. I think the question is that, recognizing people could look at the data differently and that knowledgeable people could look at the data differently than the most optimistic version of this would be, where are we?  Recognizing that that is there, one could look at data differently, where are we with these statements?  Are these statements actionable, nonactionable?  Where do we go?

And I don't think I get to say, well, there's two votes this way and one vote this way.  I think the question is -- there's a universe of data.  The data clearly has -- there's some ambivalence in what it is showing.  You have, in fact, a futility at one point, and you have -- so given that, given the state of knowledge, are these statements actionable?

MS. SOLOWAY:  And, Your Honor, that's exactly the right inquiry because how you interpret data is, as many

courts have held, opinion, right?  Reasonable minds can look at data differently, draw different conclusions, which places this case right into sort of the *Omnicare* universe, where statements of opinion can be false and actionable under the federal securities laws only if they are both subjectively not believed and objectively false.

And that's the -- sort of the first argument in our briefs, Your Honor, is that the statements simply aren't false because they don't meet either the subjective or the objective falsity prong of the *Omnicare* analysis.

THE COURT:  Okay.  So then let me stop you.  I'm going to push you a little bit more on this, and then I'm going to give Mr. Rosen a chance to respond on this initial state- -- issue.

Some of the statements are couched in "I believe" or "we believe."  Some of them aren't.  And to the extent -- even if one is talking about data, to the extent that someone makes a statement of fact about data, it's still a statement of fact, not necessarily an opinion, right?

So if you say, "I have ten vials, and they all turned red when I put a drop in it," that's a statement of fact.  If you say that means that they're all acids, that might also actually be statement of fact, because there's established scientific methods.  If you say, "That means I can use this fuel to go on a rocket to the moon," that's

probably an opinion.

So just labeling it "data" doesn't get me there to opinion, does it?

MS. SOLOWAY:  Well, I think that's exactly right, Your Honor.  But the problem in this case is that the plaintiffs don't point to a statement that's akin to "I put ten drops in the vials, and they all turned red," when, in fact, they had turned blue, right?  There isn't a statement here, Your Honor, made by the defendants where the plaintiff alleges, "That data was misrepresented.  That number you gave us was simply wrong."  You know --

THE COURT:  Let me stop you here.

Mr. Rosen, why isn't -- why aren't all of these statements opinion, as Ms. Soloway suggests?

MR. ROSEN:  Well, Your Honor, I -- I believe that the statistical analyses are akin to arithmetic.  It's -- just as one plus one equals two as a matter of fact, when you do a pre-specified test, statistical test on data, there is only one outcome.  It is -- you plug the numbers in much like arithmetic.  And --

THE COURT:  Why is --

MR. ROSEN:  -- so the result --

THE COURT:  Why is that true?  I mean, what's the sentence?  Damn lies and statistics and whatever?

MR. ROSEN:  Yes, because -- and this goes to the

heart of the case, Your Honor, because it's one thing to pre-specify a statistical analysis plan and -- for example, the pre-specification to do carrier versus noncarrier analysis, the pre-specification before unblinding to do a correlation analysis between amyloid reduction and clinical efficacy.  These are pre-specified, right?

But it becomes "damn lies" because after unblinding, they then decide to do a different analysis that were not pre-specified, which were called exploratory analyses, present those as if those are the analyses, and ignore completely the contrary pre-specified analyses that show it's not effective and there is no correlation between amyloid reduction and clinical efficacy.

THE COURT:  If you say you're doing one thing and you're doing another thing, that might cause a problem.  But if you say you're doing one thing, and then you decide to do something else and you say, "And now I'm going to do something else," then is that a problem?

I mean, it may not be the scientific rigor you want, but if you're transparent about the lack of scientific rigor -- you know, "We're now only going to look at the people who show up to this event to check their opinion instead of calling randomly" -- it's a different data set, it's a different analysis, but it isn't a false statement.

MR. ROSEN:  Your Honor, I don't think that -- I

don't think they were transparent as to what analyses they were relying on when they were making their unhedged authoritative statements that there was correlation between amyloid reduction and clinical efficacy.  There was no hedging --

THE COURT:  Between amyloid reduction and?

MR. ROSEN:  And clinical efficacy in slowing the decline of -- the decline of the patients and cognitive ability.  And so they -- so these were pre-specified analyses that were the standard in the -- you know, industry standard analyses.  And they definitely did these analyses, and they were aware of them.

And so they then -- and they don't -- they weren't saying that only in certain -- you know, they were saying all of -- all of the patients who were getting sufficient doses were showing improvement, were showing clinical efficacy. There was no hedging.  There was no saying, oh, just -- just a few of them or just in this one subset of many.

It was, once you get a sufficient dose, all -- our data -- they say, "Our data is consistent, consistently shows that if you get a sufficient high dose, sufficient 10 milligrams, you will show clinical efficacy."

And that simply is not true because the pre-specified carrier versus noncarrier analysis showed that noncarriers who always got 10 milligrams had -- were

indistinct from placebo in both tests, Study 301 and 302.

And there were additional analyses that Dr. Massie did that also showed that there was the pre- -- the pre-PV4 analysis versus post PV4 in both studies.  And so it would be one thing if -- you know, so this is -- this goes to the heart of *Omnicare*, which is you can't -- you can't make an unhedged statement that, "Hey, this stuff works," when you know that your pre-specified analyses indicates it doesn't.

And that's where I think --

THE COURT:  So you're saying --

MR. ROSEN:  -- it's not an opinion.  It becomes a misstatement of fact under *Omnicare*.

THE COURT:  So are you saying, once they had the futility -- the futility termination, there's really -- that was it?  They had no business doing anything?

MR. ROSEN:  No, Your Honor.  No, not at all.  No, I just think they needed to be transparent about what all of -- you know, what the tests showed, because they weren't -- they weren't saying which tests -- so they were -- you know, they weren't saying, "Okay.  I'm looking at this particular test or that particular test."

But when they were asked about the correlation, for example -- this is a particularly misleading set of statements that they made over the course of time.  They were specifically asked about the correlation, and they said,

"Yes, the data is crystal" -- you know, "is very clear.  You know, we're getting amyloid reduction, and the reason 301 didn't work was because they didn't get enough amyloid reduction.  Yes, the difference is small, but that small difference between 301 and 302 in amyloid reduction really shows up and was -- and was the reason why you didn't get clinical efficacy in 301.  But our data now shows that there's -- you know, that everyone who -- who gets enough of the dose is getting clinical efficacy, showing clinical efficacy."

So they kept saying that there's -- there's this is connection between amyloid reduction and clinical efficacy.  But if their pre-specified analysis, standard pre-specified analysis, shows it's absolutely false --

THE COURT:  Well --

MR. ROSEN:  -- that's a misstatement.

THE COURT:  If you -- if you make a -- you know, "We think this is going to work across a number of different variables."  It turns out it doesn't work across a number of different variables, and so you say, "Well, our hypothesis is that it's going to work in this narrow circumstance," and you go and you check this narrow circumstance, and it seems that it is working in that narrow circumstance, are you saying you can't say, well, in this narrow circumstance it's working?

MR. ROSEN:  Well, no, I think you can; however, if

your pre-specified analysis of that narrow circumstance shows it's not working --

THE COURT:  Well, but we know that.  I mean, that was --

MR. ROSEN:  No, you don't.  That's the thing. Your Honor, they didn't disclose the correlation coefficients or the carrier versus noncarrier results.  So they came up with this hypothesis, this explanation, they come up with a story.  To salvage the drug, they came up with a story.

THE COURT:  So here's my problem with trying to think about it the way you're trying to think about it. Number one, they don't have a drug company, or anybody sort of working their way through the process, doesn't have an obligation to give every detail about what they're doing on their research.  They will never get funding.  They will never prove through, and that's not what they do.  There's no court that would ever uphold that.

What they can't do is lie, and they can't omit material things.  So they say -- we start out with the premise here we have a failed trial.  We know that.  And that's public.  There's a failed trial.  So then we're starting out -- so then the next thing we're saying is we're trying to figure out if there's -- we know as an overall -- when we did all our overall picture, it didn't work.  But we're trying to figure out if there's a subset where it does

work.

And they say, "There's a subset we think it works." And now they may be aware that there's nine other subsets where it doesn't work, but do they have an obligation to tell the market that "There's nine subsets where it doesn't work, but in this subset, we think it does work"?

MR. ROSEN:  Judge, I don't think that's what -- they're not saying that it works only in a subset.  What they're saying is it works in the high dose --

THE COURT:  That's my subset.

MR. ROSEN:  -- that -- but that's -- it was always -- it was always the belief that the high dose was the correct dose, right?

THE COURT:  No.  No, that's the reason --

MR. ROSEN:  But the high dose is not a subset.  I mean, that's one of the arms, one of the three arms of the trial.

THE COURT:  Okay.  So then call it -- then call it an arm --

MR. ROSEN:  A subset could be carriers versus noncarriers.

THE COURT:  It helps if you let me get my questions in.

MR. ROSEN:  Yes, Your Honor.  I'm sorry.

THE COURT:  I may be cutting you off, but you're

needing to convince me, so --

MR. ROSEN:  I understand.  I'm sorry.

THE COURT:  I -- maybe "subset" is not the word you want to use, but the point I'm making is they were doing different things.  They had it rolled out a lower dose.  They had it rolled out at a higher dose.

And they say, "Okay.  All of a sudden, this doesn't work altogether.  Let's look at our higher dose one and see if that works."  So you don't want to call it a subset.  You want to call it an arm.  I'm not sure.  But whichever way you call it, why is it a false statement of fact to just report on that one arm?

MR. ROSEN:  Well, Your Honor, because they didn't report truthfully about that.

THE COURT:  Okay.  What's the nontruthful statement about that one arm?

MR. ROSEN:  So they said that in Study 302, everyone who got the full dose showed efficacy.  And they said that everyone in 301 who got the full dose showed efficacy and that our data are all consistent with this theory that if you get enough of the high dose, you will get efficacy.  And the tests just don't show that.

They had -- they had one substudy that they did, an exploratory study where they do what's called -- they had a PV4 group, which is people who are randomized after Protocol

Version 4.  And they concluded that the people who were randomized after Protocol Version 4 in Study 301 showed an effect, not necessarily a statistical -- but showed -- you know, showed it was working.  And that -- and that was -- that was a substudy.  That was a subgroup -- right? -- because it's just these people who were randomized after a certain date.

And that may or may not -- I assume it's true with -- I'm not saying that particular statement -- but they weren't just talking about that subset, one study.  They were saying their -- they said their data showed that all you needed to do was get enough of the high dose.  They didn't say just in the PV4 group.  They said the data shows that if you get enough of the drug, it shows efficacy.

Now, in any -- in any event, once they say -- once they make this statement that it's just a question of getting enough of the drug, just getting enough of the high dose, it's based on -- on a study that they claim to be true.

But under *Omnicare*, if they're aware of facts that don't fairly align with those statements, particularly important facts that are the results of pre-specified analysis, like if you remember the judge -- the justice in *Omnicare* said that if they make a statement that what they're doing is legal, but one junior lawyer said -- you know, disagreed, well, that may not be something they need to

disclose; but if, you know, several senior lawyers disagreed, well, then that would be something they would need to disclose.

THE COURT:  And your analogy there is who at Biogen was disagreeing?

MR. ROSEN:  Well, their own pre-specified analyses disagreed.  I mean, these are -- these are arithmetical.  These are num- -- I mean, there's no -- you do the arithmetic.  You put it into the -- into the statistical analysis package on the computer.

THE COURT:  And --

MR. ROSEN:  And --

THE COURT:  You're losing me here.

MR. ROSEN:  Pardon me?

THE COURT:  You're losing me here because I understand, when you say their pre-specified statistics didn't work or analysis didn't work, that's the original one that everybody disclosed was --

MR. ROSEN:  No.  They didn't.  Your Honor, it was never disclosed.  They never --

THE COURT:  Wait.  Are you saying to me that the market did not know that the Biogen product had been rejected?

MR. ROSEN:  I'm saying the market did not know that the subgroup analyses and the correlation analyses that were

pre-specified, they didn't know the results of those.

THE COURT:  Yeah.

MR. ROSEN:  And these were -- right?  So these are -- these are additional studies that are -- or statistical analyses that are pre-specified, that are run and analyzed by the company and the FDA, but the company never disclosed them.  And they were asked about them.  Investors asked about them, and the company misled them and threw them off course, and said, "Oh, we can't" -- you know, "We're not discussing this today, but everything else" --

THE COURT:  But that's --

MR. ROSEN:  -- "you -- you look at" --

THE COURT:  If they are -- if they're asked about it, and they say, "We're not discussing our other substudies, our other -- the other things.  We're not giving you those details because it's under review at the FDA," are you saying that's a misleading statement, an actionable statement?

MR. ROSEN:  No.  What I'm saying -- what I'm saying is two things, Your Honor.  One is, when they make a statement claiming that the drug works when they know their pre-specified analysis, which is the equivalent of a group of senior lawyers saying it doesn't work, that's false and misleading.

And when an analyst asks about and wants clarification because, you know, there -- it looks not --

maybe something's not right and they want some clarification, and instead of clarifying it, they -- they mislead them and say, "Oh, well, you know, we're not going to discuss that today, but, you know, the analysis we got in Study 103 showed that there was a correlation and it worked." So there, at that point, that shows scienter because they're now aware that analysts are asking about it.

And instead of reporting on it, they're sweeping it under the rug and saying, "Oh, you know, all the other analysis looks good." So they were aware that this was an issue, and this was misleading.

THE COURT: I'm going to give Ms. Soloway a chance to respond.

MS. SOLOWAY: Thank you, Your Honor.

I don't know that I'm going the take on everything that was -- that was just said other than to say that I think we need to be really, really precise about what the allegations in the complaint actually say.

I think as Your Honor is aware, the pre- -- the futility analysis that was conducted after which the drug trials were terminated was done under pre-specified analyses. And there was a lot of transparency when the company later came out and said, "We're analyzing the data after the fact. We're doing it in a different way. We're unpooling the two studies, and we're looking at the data that came in in the

interim."  So I think there is a lot of transparency about that.

As Your Honor, I think, also stated, everyone understood that 301 was a failed study.  It did not meet its endpoints that had been pre-specified.  That was absolutely known.  Everyone understood that.  So I think the notion that there was some, you know, data that was misrepresented that was based on the pre-specified endpoints, I don't see that in the complaint.  I don't -- you know, Mr. Rosen should -- should feel free to point me to where he's looking in the complaint, but I don't see that.

He made some statements about "Defendants said all the data, all the data."  I don't see statements where the defendants are saying all the data supports our interpretation.  I see statements where they say, ENGAGE was a failed study.  EMERGE was a positive study.

And they, as Your Honor acknowledged, feel or view, have the opinion that there is a subset of patients within the ENGAGE study who received high dose aducanumab over a sufficiently long period of time where they say those patients looked like they were comparable to similar patients in the successful study, 302.  And I think I heard Mr. Rosen say that he doesn't dispute that that also is true.

So what I think this boils down to, Your Honor, is that there are some subgroups, you know, within 301, within

302, carriers, noncarriers, pre-protocol amendment, post-protocol amendment where Dr. Massie has conducted an analysis that the plaintiffs agree with; and they think that that analysis undermines the overall conclusion that high-dose aducanumab is effective.

And that's an opinion, but defendants never made misrepresentations about that.  And I'd like to see the place in the complaint where Mr. Rosen says a misrepresentation about that was made, because it's simply not there, Your Honor.

The other point that Mr. Rosen was just making about analysts asking questions, I mean, analysts ask questions about lots of things.  When there's a clinical trial that a drug company is undergoing, it's their job to ask questions.  That does not mean -- that does not somehow -- I think what Mr. Rosen is saying -- leads to scienter, that the defendants declined to answer the questions.

They decided what data to release.  They didn't release all of it.  That's -- you know, as Your Honor said, it's hard to imagine a drug company that would want to release every bit of data while it's under review by the FDA so that all their competitors could look at every shred of it.  And that does not lead to a suggestion of fraudulent intent.

THE COURT:  So I'm sort of with you that you don't need to disclose things that aren't overstated.  And I think the caution is what Biogen did or how broadly or how definitively some of these people spoke about the drug.

I'm looking, just going through my quotes from the complaint.  I think this is paragraph 187.  There's a -- I believe I have it cut and pasted here, so hopefully this is correct.  But there is -- one example is a statement from Mr. Haeberlein in a post hoc analysis.  Data from subsets of patients, the PV4 population who had the opportunity to be exposed to high dose, did support the positive findings of EMERGE.

And I guess the question is, is that a definitive enough statement of fact that you can't brush it aside as an opinion?

MS. SOLOWAY:  Well, Your Honor, I think the plaintiffs actually don't challenge that statement as being factually false.  So this is, as Your Honor read it, a post hoc analysis.  So we all know that this is not using the pre-specified criteria, but a post hoc analysis.

And that group has been defined, the PV4 population, as being the patients within 301 who did have the opportunity to get high-dose aducanumab for a sufficient period of time.  And everyone is in agreement, including Dr. Massie, that they did perform comparably to the similar

patients in the successful study, EMERGE.

So I don't think any of that is under attack in terms of factual accuracy. I think what the plaintiffs are saying is that if you're going to, you know, say, yes, we understand ENGAGE was a failed study, but we have some reason for hope -- look at this group -- do you then have to disclose the -- you know, the 15 other analyses that, in this case, Dr. Massie did that Biogen isn't even alleged to have seen before this statement was made and state to -- you know, to your investors, "But, you know, there could be this conflicting view if you do the sub, sub, sub analysis," you know, this --

First of all, I think the fundamental flaw with that, Your Honor, is it's just not alleged that Biogen was aware that Dr. Massie, as of this time, had done that analysis, formed that interpretation, or that anyone inside Biogen had done that analysis and formed the interpretation that it would undermine the findings. So that's, I think, problem number one.

But I think the answer is, as long as this statement is true and accurate and investors understand as they did that they're not getting the totality of the data -- in particular, they certainly understood that they weren't getting the carrier versus the noncarrier breakdowns -- there can be no misrepresentation here, Your Honor.

THE COURT:  So, Mr. Rosen, maybe the best example I could find that I thought was supporting your assertion of fact is a fact that wasn't in dispute.  So maybe you can focus us on what you're saying there is a statement of fact rather than a statement of opinion here.

MR. ROSEN:  (Muted.)

THE COURT:  You're on mute.

MR. ROSEN:  Yes, Your Honor.

So there are a number of statements of fact which, even if one were to consider it an opinion under *Omnicare*, would still be considered false because of the possession and knowledge of their pre-specified and other results that they had run that indicated the falsity or -- of those statements.

And --

THE COURT:  We've just lost your picture.

MR. ROSEN:  Yes.

THE COURT:  There you go.

MR. ROSEN:  So, for example -- for example, there -- they pre-specified -- this is in the -- this is actually in the document that the defendants filed with the Court.  I think it's Exhibit M.  They pre-specified that there would be a carrier versus noncarrier analysis for --

THE COURT:  I think that's one of -- is it N is one of the ones that you want stricken, no?

MR. ROSEN:  M.  Yeah, but I'm just telling you

where it is.  It was in -- it was in, I think, the clinical review, Appendix 2.

In any event, we cite -- we cite the analysis.  It was pre-specified, meaning they did it.  They were aware of it.  It was in their possession, and they looked at it.  That analysis showed that carriers did -- noncarriers did worse than carriers in both studies, meaning --

And carriers -- the reason it's important is because carriers always got the high dose.  They always got the full complement dose.  They -- it would be much more rare for them to have ARIA, and so they would not have the dose interrupted, right?  So that was one example of a study they did that shows that their theory that you just need to get to the high dose for long enough and you'll get efficacy is false, right?  The next one is paragraph -- that's 153 of the complaint.

Paragraph 154 of the complaint --

THE COURT:  Wait, wait, wait.  But -- I'm sorry.  The paragraphs that you're -- 153 and 154 are not statements that you're --

MR. ROSEN:  Well, those are -- that's the evidence that shows that they're false and misleading.

THE COURT:  Okay.  Show me the statements --

MR. ROSEN:  Paragraph 173 of the complaint --

THE COURT:  Okay.

MR. ROSEN:  -- says -- in other words, what I'm saying is that there's a very short, sharp dose response, if you will.  If you have to -- you have to set to the high dose, and the intermediate doses don't work.  You have to at least get to the high dose for 18 months.  So --

THE COURT:  It says at least an 18-month trial is not enough.  So isn't that saying, "We have a theory here, but we haven't had a long enough trial to prove anything yet"?

MR. ROSEN:  No.  What he's saying is for an 18-month trial, you have to get to the end of the 18 months.  The intermediate dosing halfway doesn't work.  That's what he's saying.

THE COURT:  Okay.

MR. ROSEN:  But look at paragraph 171:  "Our primary learning from the data is that sufficient exposure to high-dose aducanumab reduces clinical decline across multiple endpoints."  He says, "The data from the patients who achieved sufficient exposure to high-dose aducanumab, ENGAGE, support the findings of EMERGE."

Now, the noncarriers all got sufficient exposure, but they were indistinguishable from placebo.  All right?  And the same -- and, you know, there's -- paragraph 154 shows another graph where they compare carriers versus noncarriers, and it shows that the noncarriers are doing much, much

worse -- right? -- on all endpoints in both 301 and 302.

So that's -- those are studies that they had in their possession.  There are other studies too.  There's this -- on paragraph --

MS. SOLOWAY:  Your Honor, I'm sorry to interrupt, and I truly try not to interrupt, but when -- there is no pleading that those studies were in defendants' possession at the time that those statements were made.  So, you know, I can respond on the -- on the merits of the science, but that's simply not in the record here or in the pleadings.

MR. ROSEN:  I -- you know, I think it is in the record.  It is in the record.

THE COURT:  Well, the question isn't is it -- the question is have you alleged that these documents were in Biogen's possession at the time that they made the statements you're complaining about?

MR. ROSEN:  Have I alleged that they -- I definitely allege that the first -- well, I have to -- I'd have to look more closely, but these are pre-specified analyses.

And we certainly say that the -- on paragraph 220, there's a table that shows the correlation between amyloid reduction and clinical efficacy.  We do say that that table is the pre-specified unblinded -- I'm sorry -- pre-specified blinded analysis; in other words, it's pre-specified before

unblinding.  It was the one that the FDA said they should do. And it was one they did.  And it completely contradicts their statements about the connection between amyloid reduction and clinical efficacy.  And --

THE COURT:  Okay.  Are you coming back to this same point, though, of whether -- are you saying that this was information that they had, they knew, and they're saying something different?  Because I'm not sure I'm following you.

MR. ROSEN:  Yes.  Yes.  So -- so some of the statements they say concerning the reduction of clinical efficacy and -- I'm sorry -- the reduction of amyloid -- so the whole -- their whole theory is this drug will attack amyloid deposits in the brain, because they believe that amyloid deposits cause Alzheimer's.

Now, there's definitely a correlation between people with Alzheimer's and these amyloid deposits, but the jury is out on whether the amyloid deposits just occur when there's Alzheimer's or the deposits cause the Alzheimer's, right?  So this is sort of the million-dollar question, right?

Now, they claim -- and then they say this many, many times during the class period -- that their drug reduces or destroys, gets rid of the amyloid deposits, flushes them out; and by getting rid of the amyloid deposits, the patients are showing clinical efficacy.

And they're saying there's a direct relationship, and that's why this -- this is the sort of mechanism of the action -- and this is why the drug works.  And they're saying the reason Study 301 was a failure was they weren't getting enough of the amyloid deposits reduced or flushed away.

And so they keep saying that over and over, and, you know, they were asked by analysts, well, you know, we see that there is some reduction in --

THE COURT:  Mr. Rosen, let me stop you, because I think we're going around and around here.

Let's assume that they're saying that over and over as a fact and not as an opinion or -- I don't know how I can say this if it's a fact or an opinion.  If that's what they believed to be true, if that is what they believed to be the fact, do you have a case?

MR. ROSEN:  Yes.  Absolutely.

THE COURT:  Why?  If they believe that fact, then how do you have scienter?  How do you have any intent -- I mean, they may be overly optimistic.  They may believe in the wrong theory of how you're going to solve this problem, and it's going to take another three generations before we figure out Alzheimer's.  That may well be the case.  But how do you get the actionable statement if they truly believe, even if they're on the wrong horse?

MR. ROSEN:  Because under *Omnicare*, if they have

facts in their possession that do not fairly align with their statements, no matter how honestly they may believe, no matter how deluded they may be, if they have facts in their possession that do not fairly align with their statements, they have made a misrepresentation under *Omnicare*.

THE COURT:  So maybe this is really a bad example, but I'm going to put it out there anyway.  My understanding of what happened with ulcer research in this country is that, for 20 years, people thought that, you know, it was stress, and it was this, and you have to eat -- low spice diet and milk and stuff.

And there was some guy out there who thought it was something that could be treated by an antibiotic.  And he was laughed off the medical stage for 25 years.  And finally he did this study and figured it out, and it was accepted.

So they may be 100 percent barking up the wrong tree, and they may have counter-data that if a smarter person than whoever is in the room there looked at, they might say, "You know what?  You're just looking at this puzzle upside down."  That may well be true.  But, again, is it actionable --

MR. ROSEN:  Yes.  Yes, it is.

THE COURT:  -- to say, "This is what I believe in"?

MR. ROSEN:  Yes, it is, because *Omnicare* says you look at -- you know, their subjective belief, standing alone,

does not protect them.  They need to have a reasonable basis, or at least if they have in their possession information clearly contradicting what they're saying, then that's a false statement.

And they were -- you know, they -- over and over again, they say the data shows that if we get -- if we reduce amyloid plaque, we're getting clinical efficacy.  They say it over and over again.  And they say there's a clear dose response.

And the data they had in their possession, it shows -- this was the pre-specified analysis that they said they were going to do with the FDA.  So they clearly did it, and they clearly saw it, and they hid it.

And instead of telling the truth about what it really showed they subsequently, after unblinding, after looking at all the data -- you know, we were talking about statistics and lies and -- you know, so you can manipulate data by -- if you do enough tests on data, you can find a relationship.

So they were able to --

THE COURT:  Right.  And if you -- and if you believe -- you may be -- you know, people shouldn't double down.  They should maybe sort of say, "Look, I looked at this, and maybe I should take this seriously."  But if, in fact, you believe that your results are the right ones and so

you keep doing these other studies so you figure out that yep, in fact, I've got confirmation of what I thought, I just -- I think the problem is turning that into an actionable statement.

And what you're saying is that they're required to provide all the data that somebody could look at another way and say, "You know what?  You're wrong."  And they may be wrong.  But the notion that all of that needs to come out during the course of the development of a drug, I don't see a court in this country upholding that.

MR. ROSEN:  Well, you know, I think that the *PTC* court did.  They -- you know, they did -- on the same issue, there was -- the defendants were focused on a particular -- they -- they made some claims as to efficacy and safety, and it turns out that the analysis they were doing was not the pre-specified analysis.  It was an exploratory analysis.  And the Court found that misleading.

So I think -- this is -- I mean, the pre-specified analysis is the gold standard, right?  It's -- while it's blinded, it's what --

THE COURT:  I guess my problem here --

MR. ROSEN:  -- the FDA is supposed to look at.

THE COURT:  Mr. Rosen --

MR. ROSEN:  Yes.

THE COURT:  -- you're suggesting that there's a

gold standard, a perfect way this should be done.  I might agree with you that, as a society, we would be doing better doing it different ways and having more disclosure.

That's not the test I need to be doing here.  The test I need to be doing here is was there a material misrepresentation or omission?  Not just would this be better this way?

MR. ROSEN:  Well, what about *Omnicare*'s requirement that the defendant, when they speak, they have to have facts in their possession that do not -- that are not contrary to their -- to what they're saying?

Now, it's one thing if -- the analysis was -- the analogy that the judge used, the Supreme Court used, was if you had one junior lawyer who was --

THE COURT:  You gave me that analogy already. We're running out of time.

MR. ROSEN:  But, Judge, this is not -- this is the study they did, right?  And they concealed the true results. And if -- you know, if you run -- so after they failed this study, this particular analysis, they start doing tons of other analyses, trying to look for something --

THE COURT:  Yep.

MR. ROSEN:  -- and they think they find something that supports their position --

THE COURT:  Yep.

MR. ROSEN:  -- but -- that's great, but they didn't say -- tell everyone, oh, this is an exploratory analysis. They didn't say this is something new.

THE COURT:  Okay.  I'm going to let --

MR. ROSEN:  They led them to believe --

THE COURT:  I'm going to let Ms. Soloway cut in.

MS. SOLOWAY:  Okay.  So I think, Your Honor, they actually, in fact, did, because they were candid --

THE COURT:  Mr. Rosen?  Mr. Rosen?

So I've let you talk, and your opposing counsel has listened to you, and then every time she starts talking, you walk off and have a conversation with someone else there.  I know we're not in a courtroom, but I still expect courtroom behavior.

MR. ROSEN:  Yes, Your Honor.

THE COURT:  Ms. Soloway.

MS. SOLOWAY:  So let me -- Your Honor, let me first address this point about pre-specified endpoints and the notion that that was not transparent here.  If you look at the chart of misstatements or the complaint that lists all the alleged misstatements, repeatedly the defendants acknowledge that 301 was a failed study and 302 was a positive study, and that's based on the pre-specified endpoints.

Now, with respect to this idea that there was

somehow some misrepresentation because there was some conflicting information that was omitted, I think there are, again, a couple of problems with that.  One is that there's not an allegation that that omitted information -- which is, of course, Dr. Massie's underlying analyses that become public at the end of the class period -- was actually being circulated within Biogen, was known to the individual defendants, much less that they actually believed that those analyses undercut their opinions.

And that's a real problem both in the falsity context under *Omnicare*, but also in the scienter analysis, because Omnicare, of course, was a Section 11 case.  This is a 10(b) case, and scienter is a totally separate, standalone inquiry.

And without some factual, well-pleaded allegations under the PSLRA and 9(b) that people at the company were aware of information that conflicted with their public statements and that that caused them to understand that what they were saying was untrue, scienter cannot be established, Your Honor.

And here, we don't have any such internal, you know, meetings, conference calls, memos, no CWs who say that inside the company people actually didn't believe these clinical trial results.  We don't have any stock sales. People -- there's no allegation that insiders were selling

for financial gain.  And to the contrary, Biogen was buying back billions of dollars of its own stock at prices that the plaintiffs in this case allege were artificially inflated.

There's no motive, Your Honor.  And as the Ninth Circuit explained in the *Endologix* case, you know, why would a company put all of these resources and energy into developing a drug and putting in that application with the FDA if they honestly believed the drug didn't work?  And there's really no satisfying answer to that in this complaint.  There is -- they offer no explanation for why these individual defendants or the company would do that.

And so even putting aside, again -- and I think, on the falsity point, *Omnicare* very clearly says that investors understand that there may be analyses or facts that cut the other way and that that's not enough for falsity.  But even if we put falsity to the side, scienter is its own standard, and there's really no meaningful answer to the scienter arguments by the plaintiffs in this case, Your Honor.

THE COURT:  Mr. Rosen, scienter?

MR. ROSEN:  Yes, Your Honor.  So, first of all, as to motives, counsel says that they spent hundreds of millions of dollars, and they wouldn't have spent it if they knew it wouldn't work, but what happened here was --

THE COURT:  Okay.  I will get that people -- I think -- I would understand that a company will double down.

They're heavily invested.  They want to keep pushing it.  I get all of that.

But what do you get with these folks that get you scienter more generally than that, more specifically than that sort of general assumption that, once you got the money in, you want to recoup.

MR. ROSEN:  They were in possession of these analyses.  These analyses are not opinions.  They're mathematical --

THE COURT:  So --

MR. ROSEN:  -- the result of mathematical formulae.

THE COURT:  But Ms. Soloway says you haven't alleged that they were in possession of it.  She says that this is -- she says that this is the analysis that happened with the FDA advisory point, but not that the -- Biogen was aware of it at the time of the statements that you're complaining about.

MR. ROSEN:  I can say with certainty that paragraph 220 that has the correlation table we do allege was the pre-specified blinded plan that they were in possession of and were told by the FDA to run.  And that's also what Dr. Massie's report says, which is appended to the complaint.

THE COURT:  I'm sorry; so what's the statement?  Because I don't have 220 as being an actionable statement, so --

MR. ROSEN:  All right.  Well, so that is the fact that they had in their possession, that table, are the facts they had in their possession.  And their statements, I will -- I will read you a handful of their statements.  So --

THE COURT:  Okay.  And --

MR. ROSEN:  So, for example -- let's see -- what we demonstrate is that -- this is paragraph 227.  This is the CEO being interviewed on MSNBC.  He was asked whether aducanumab is -- you know, it's designed to go after beta-amyloid plaques.  And he's asking the CEO, "Are you telling me it actually removes the plaques?"  Because there was some speculation that maybe that's not it, that you get Alzheimer's and the plaque is not the cause, but just happens to occur, right?

And then the CEO's response is, "Oh, yes, more than ever.  What we demonstrate is that aducanumab, who's binding to the right part of the amyloid-beta, the aggregated form of amyloid-beta is able to erode and eliminate the plaque, leading to the benefits we see in terms of cognition for the patients.  It reduces, basically, the decline, and we can see effects such as" --

THE COURT:  Mr. Rosen -- Mr. Rosen, I don't think the court reporter is getting anything when you're facing your computer and reading it.  If you could try to speak so that he can get it.

MR. ROSEN:  Right.  So shall I repeat that, Your Honor?

THE COURT:  Mr. Paschal, where you left off?  The whole thing?

THE COURT REPORTER:  Yes, the whole thing, a little slower for me.

MR. ROSEN:  So in response to the question, the CEO says, "What we demonstrate is that aducanumab, who is binding to the right part of the amyloid-beta, the aggregated form of amyloid-beta is able to erode and eliminate the plaque leading to the benefits we see in terms of cognition for the patients.  It reduces, basically, the decline, and we can see effects such as memory, orientation, language, but also, functionally, the ability to take care of oneself.

And there are additional false statements similar to those by each of the other defendants.  I could read some of those if -- if that would be helpful.

For example, the Defendant Sandrock said -- on paragraph 223 of the complaint, Sandrock says, "If you don't remove a large amount, you're not going to get an effect.  Also, there is a lag.  You remove amyloid, and then there's a little bit of a lag for the clinical effect.  We saw that in PRIME, for example, where we did have amyloid lowering at six months, but what -- we saw no difference in the clinical outcome at six months.  It took the 12-month time period to

see -- to start to see an effect on clinical outcomes."

Then he continues:  "So in addition to a large amount of amyloid removal, I think you need a little bit of time for that, for the biological activity to have an effect on clinical outcomes.  That's what we see, and it's -- I would say, if you look at the amyloid-PET results -- that was one of the slides -- and those who had more than 10 doses of 10 milligrams, you can see the SUVR score is very similar in ENGAGE, in that subgroup of patients in ENGAGE to the EMERGE total dataset.

"And so, again, what it says is that if you give enough of the high dose, you can achieve a certain amount of amyloid removal, and that certain amount is what's required to see the reduction in clinical decline in an 18-month study."

So -- and I can go on.  There's more. Paragraph 221, the CEO says --

THE COURT:  I think the question that we asked was -- the question I asked wasn't just what are all those statements there?  My question was -- I believe -- was that you're saying that there was a material that they were deliberately not reporting on.

And we have the Massie study afterward, and you were saying -- the question was, did you allege that they had it beforehand?  And then you just pointed me to this chart,

and then you proceeded with these number of quotes, but I'm not following you.

MR. ROSEN:  Paragraph 218 and paragraph 219 allege that there was a blinded plan that they were -- had agreed with the FDA to -- a statistical plan that included this correlation analysis.  And that blinded plan, which was agreed to with the FDA before the study was conducted, is reproduced in part in paragraph 220.  And it shows that there is no correlation, that amyloid reduction does not lead to any clinical effect.

THE COURT:  Okay.  And --

MR. ROSEN:  And the allegations in 218 are that this was their statistical analysis plan that they were told to run by the FDA, and they presumably did what they were told in their statistical analysis plan.  That's what drug companies do.  They follow their statistical analysis plan.

THE COURT:  Okay.  Ms. Soloway, do you want to respond?

MS. SOLOWAY:  Yes, Your Honor.  I mean, I'm reading 218 through 220, and I just -- I don't see anywhere in those paragraphs that tells me, you know, what exact -- what analysis was shown to the three individual defendants in this case that undermines the statements that Mr. Rosen just read.

I mean, those are statements of belief by the defendants that the clinical results that they're seeing, the

positive ones, that the -- that the removal of plaque leads to -- and I think those are the words he's focusing to -- leads to those clinical benefits.  That is their interpretation of the mechanism by which this drug works.  It removes amyloid plaque, and then it leads to a clinical improvement.

And I think what plaintiffs are arguing here is that, under various analyses that were performed by Dr. Massie, there's not a sufficiently high mathematical correlation --

THE COURT:  Well, I think --

MS. SOLOWAY:  -- between plaque -- yes.

THE COURT:  I think what Mr. Rosen is saying, no, you must have done the study that the FDA told you to do; and so, therefore, you knew that everything you were saying was false.  I think that's his allegation.

MS. SOLOWAY:  Except I don't think he ever alleges -- and it doesn't say where the chart that's in paragraph 220 comes from.  It certainly doesn't say that it made its way to the three individual defendants.  But more importantly, the chart actually shows Your Honor that there is a positive correlation between amyloid-beta and clinical improvement.

Now, I think what the plaintiffs have argued in this case is that they feel that that correlation is not

sufficiently strong, but it's positive. There's a positive correlation.

So, again, there's probably -- I'm going to go out on a limb and say there's many, many different ways you can run a correlation analysis in this case on this data. I don't know what ultimately -- because there's some reference in 218 to an old statistical analysis plan and a new statistical analysis plan, and I -- I can't quite parse out exactly what the plaintiffs are saying the defendants must have done.

But if it was this, it's a positive correlation; and in any event, it's not alleged to have been shown to the individual defendants, much less, caused them to change their whole understanding of the mechanism by which this drug works. I mean, it's apples and oranges, Your Honor. The drug does remove plaque. Everyone agrees to that. And 302 was a positive study. 103 is a supportive positive study, and a subset of 301 is also positive.

The mechanism by which the defendants believed that works is by removing plaque. Now, if the plaintiffs want to take a different view -- and, in fact, they challenge the entire amyloid hypothesis in their complaint. They say that the data proves that the amyloid hypothesis is not true. That's fine. But they don't show the Court anything that suggests that the individual defendants didn't believe the

amyloid hypothesis.

THE COURT:  Okay.  Well, I'm going to go back and I will look through these statements.

MR. ROSEN:  Can I respond, Your Honor?

THE COURT:  No, because we're running out of time. I have a different area I --

MR. ROSEN:  There's one thing I just have to say, Your Honor.  She said that this chart on 220 shows a correlation, but it's just not high enough to my standards.

Well, if you were to Google "correlation coefficient" and ask what does a correlation coefficient mean, it will say that anything under .25 is either no correlation or a poor correlation.  These are all under .25 by at least half.  So that's, again, a mathematical statistical just pre-step.  It's like one plus one equals two.

THE COURT:  Okay.  So can I get to my question?

MR. ROSEN:  Yes, Your Honor.

THE COURT:  So the defendants also challenged the plaintiffs' standing here.  And I'd like you to address that and whether -- sort of how that plays in here.  If I understand correctly both of these plaintiffs did not purchase stock following any of the these statements.  They purchased stock after the FDA said wonderful things and attached the Massie report.

So I don't know if that's properly a standing problem or a causation problem, but can you speak to that and whether I should be addressing that today?

MS. SOLOWAY:  Yes, Your Honor.

MR. ROSEN:  Yes, Your Honor.

MS. SOLOWAY:  I have -- oh, I'm sorry.

Your Honor, would you like plaintiffs to go first?

THE COURT:  Why don't we start with the defendants since it's your argument and then -- briefly -- and then have Mr. Rosen respond.

MS. SOLOWAY:  Yes, Your Honor.

I think it is both a reliance argument and a standing argument.  I think courts have framed it in both ways.  And I think the fundamental problem here, Your Honor, is that, as a matter of law, a plaintiff cannot have reasonably relied on an alleged misstatement if the information that corrects that statement is already public.

And here, both plaintiffs purchased after the Massie appendices were published on the FDA website; and, therefore, they can't, as a matter of law, be said to have reasonably relied on misstatements made by defendants that purportedly either misrepresented or omitted Dr. Massie's analyses.

THE COURT:  Okay.  Mr. Rosen, what's your response to that?

MR. ROSEN:  Yes, Your Honor.  So we are not alleging direct reliance.  We are alleging -- paragraph 355 of the amended complaint says we are alleging -- we are relying on the fraud on the market, presumption of reliance, which means that the plaintiffs who buy on the open market are relying on the integrity of the market price.

And the allegation here is that the inflation in the price of Biogen's stock remained until November 9th, when the advisory committee issued its decision.  And if you look at what happened in the interim -- so one thing --

THE COURT:  But, Mr. Rosen, if I understand the defendants' argument here, you're saying that the -- Biogen's statements and the officers' statements were material misrepresentations.  Those statements that you are asserting are actionable, if I understand this, those end in September 2020.

Two months later, the Massie study is published along with some other things, and then your clients buy the stock.  How can they show that it was the misrepresentations of the -- Biogen as opposed to the effusive report by the FDA, which you aren't claiming that that's the cause.

MR. ROSEN:  Well, Your Honor, I guess, really, the question is at what point in time did the inflation come out of the stock, right?

THE COURT:  No.  My question is what -- what

caused -- so your client made a decision to buy the stock, right?  That's the question here.

MR. ROSEN:  Yes.

THE COURT:  Why did they buy it?  They bought it because they thought it was a great stock that had great promise.

The thing -- the only causation I see that they have is the FDA report came out.

MR. ROSEN:  Well, no, there's no allegation as to why they bought the stock in the complaint.

THE COURT:  But do you have the timing, which is that they purchased the stock after the FDA report?

MR. ROSEN:  Right.  So they -- they don't need to look at the FDA report.  They don't need to look at the news. They don't have to --

THE COURT:  No, but you have to make a plausible causation argument.

MR. ROSEN:  Yes.

THE COURT:  How can you -- and I have to determine on a motion to dismiss whether there's a plausible allegation here, and you have no explanation for why they purchased it.

But what I have in your complaint is that two months earlier, you have the end of all of these statements from Biogen -- nothing, silence, crickets.  FDA comes out with something, and they race in to buy it before reading

the -- before the analysts get a chance to make it through it, trying to beat the market.  I don't see how you get the causation of the earlier statements.

MR. ROSEN:  Well, because the inflation, the false statements continued to inflate the stock until November 9th when the truth comes -- is disclosed and the market is able to -- so it takes --

THE COURT:  Wait, is that the case?  Is the market high all the way from those false statements?  Or does the market jump up when the FDA comes out with a report?

MS. SOLOWAY:  That's exactly right, Your Honor.

MR. ROSEN:  Yes.

MS. SOLOWAY:  The fundamental problem --

THE COURT:  Mr. Rosen, give her a chance to speak.

MS. SOLOWAY:  Your Honor, the fundamental problem here is that -- I believe what plaintiffs are arguing here is that they're relying on the presumption of reliance, which means that they can presume that, right up until two months before the corrective disclosure, the market accurately reflected the new information that had come out, the purported statements by Biogen.

But that's a completely different inquiry than whether these plaintiffs can come into court and say, "I reasonably relied on those misstatements that were made a year ago" -- two months ago, whenever they were -- because

here, they can't say that they reasonably relied.  And it's irrelevant how long it took the market to incorporate Biogen's two-month-old, one-year-old statements into the market price.  That's irrelevant at this point.

The point is that the plaintiffs purchased after the Massie appendix and, of course, the effusive, you know, Biogen-FDA joint report comes out.  And as a matter of law, they can't claim to have relied on an alleged false statement made two months earlier or a year earlier, because with minimal diligence, they knew that there's new information out there; and, of course, clearly they purchased on the basis of that new information --

MR. ROSEN:  I don't think there's any reason to suggest they have a due diligence responsibility at all, Your Honor.  This is a fraud-on-the-market case.  No plaintiff has due diligence responsibility.  They don't have to read the news.  They don't have to read every analyst's report.

THE COURT:  They don't?  Well, they don't have to read every analyst's report, but to say that -- they don't have to read anything?

MR. ROSEN:  Nothing.  Nothing.  No, none.

MS. SOLOWAY:  No, Your Honor.  I don't think that's the law.

MR. ROSEN:  That's the law.  That's the law.  We

haven't briefed that.  But may I just address this, Your Honor?

So the fact that the stock went up on November 4th, that is for a separate reason.  That's because of the positive things the clinical reviewer said, right?  Now, that doesn't necessarily have anything to do with the inflation that was in the stock as a result of the defendants' false statements earlier, right?

THE COURT:  How does the price -- how does the price of the stock after the bad review, after the negative vote, how does that compare with two weeks earlier?  I mean, my recollection --

MR. ROSEN:  It found -- it found -- I don't know -- about 7 or 10 percent -- I can't remember -- 7½ percent.  So --

THE COURT:  So that would be a more realistic reflection, if you're --

MR. ROSEN:  Right.

THE COURT:  Because you're arguing it's 28 percent, what she purchased it for after the FDA report comes in.

MR. ROSEN:  Judge, usually, expert reports are necessary to really disaggregate fraud from nonfraud reasons for declines.  And I'm not suggesting that 100 percent of the decline from the very top to November 9th is recoverable.

But, certainly, where you have false statements and

then you have a decline, there was a decline from -- from November 4th to -- from November 3rd to November 9th, there was a decline.  So, again, that's 7½ percent.

MS. SOLOWAY:  That's --

MR. ROSEN:  So that would show -- that would show the -- at a minimum, that would show the false statements had an effect, an inflationary effect on the stock because that's -- that's, at a very minimum, the amount that it was reduced.

THE COURT:  Okay.  So my question was really about these two plaintiffs and not about the overall stock.  But let me ask you this question this way, because it's a little bit which way I approach the problem.

If I were to determine that you haven't -- that these two plaintiffs -- based on these allegations of when they bought their stock, if I were to accept the defendants' argument as to these two plaintiffs and, therefore, not have to reach the rest of the motion to dismiss, aren't you in a situation where these two plaintiffs are only the -- the plaintiffs who are leading this case because, when all of the different complaints were filed, they had the most stock?

I mean, I guess my question is, if it was -- if it's just a question of these two people's standing, then maybe there are other class members who originally had filed actions before these all got combined who should be permitted

to proceed; and, therefore, I need to address the rest of the defendants' arguments and not simply address this.

Am I -- and so that makes me think I don't actually need to get into this one way or another.  If I -- if I dismiss on -- if I grant the rest of the motion to dismiss, it doesn't matter, to reach the standing on this question. If I want to address the standing as to these folks, then it would seem to me, if I were to find for the defendants, then maybe there are other plaintiffs who get to come in.  I'm not sure.

And I also anticipate that if I were to grant the motion to dismiss, I anticipate there's an appeal here.  And so it may be important to address standing in order to address that issue on appeal as well.

MR. ROSEN:  Well, Your Honor, as to standing, I would say this.  As Ms. Soloway said, it's related to loss causation.

So if one accepts that the First Circuit allows there to be a three- or four-day window in which a stock's price reaches the equilibrium after a corrective disclosure -- right? -- then they will have purchased before the corrective disclosure is fully incorporated into the stock price.

THE COURT:  So, Mr. Rosen, this may be a little bit out of my -- I haven't had to deal with this issue before,

but let me just put it very bluntly.  There were different plaintiffs who wanted to be here leading this case, correct?

MR. ROSEN:  I recall at least one other.

THE COURT:  Okay.

MR. ROSEN:  Yes.

THE COURT:  And your clients had the most -- had the biggest loss.

MR. ROSEN:  Yes.

THE COURT:  And so I wasn't involved in this, but the Court in California appointed your clients as the lead for the whole class.

If your clients -- you may disagree with my analysis, but if your clients don't have standing, but some other class members do, isn't that something that right now as the lead plaintiff you need to be sort of thinking about in the interest of the class and not simply doubling down as to whether your clients have it?  Shouldn't you be saying to me, "Even if mine don't, you should be substituting, Judge, instead of" --

MR. ROSEN:  Well, Your Honor, depending on the nature of your opinion, yes; but, I mean, I think that, for example, if you dismiss on standing grounds, we could have someone intervene who -- who purchased prior to the November 4th FDA meeting.

You could -- I mean, there's -- you know -- so,

yeah, I mean, I think that's an issue.  I don't know how I would address it now other than through an amended complaint or someone seeking intervention, and so it's a little awkward at the moment.

THE COURT:  Well, it's just -- it's a question -- normally, if this was a class action, there would have been sort of, how do you figure out who should be the lead plaintiff and the lead counsel?  What has happened here is there were several different -- this wasn't a single action that was filed.  I believe there were several different actions.

And so if I reach this argument that Ms. Soloway has -- that the defendants have raised, if I reach the argument, it seems to me, if one of the other cases was brought on behalf of someone who is not in that November thing, that it's an issue that should be probably flagged.

And so one way is I don't reach that issue at all if I'm only dealing with the motion to dismiss.  The other is, if I do reach that issue, we go back and look at the pleading and see whether it makes any difference.

I don't think it's a question of any random class member intervening, but I do think that it does seem that if there was a plaintiff who was -- who had filed, the action shouldn't end in the event that was the grounds for the dismissal, but --

MR. ROSEN:  Yes, Your Honor.  I'm pretty sure that if you were to dismiss just on that ground, there would be a motion for another plaintiff to either reopen the case or intervene or whatever the proper procedure would be.

THE COURT:  Ms. Soloway, did you want to address --

MS. SOLOWAY:  Your Honor, if I may, I would never presume to assign homework to a federal judge.  We've briefed this motion twice now.  This is the second time the plaintiffs -- this is -- the plaintiffs have now amended twice; and there are four arguments in the motion to dismiss, three of which would be dispositive, not just for these two particular named plaintiffs, but for any plaintiff who might be interested in serving.

So I think, as matter of efficiency, if Your Honor -- if Your Honor is going to resolve this case on ground one, two, or three, there's really no need to get to four.  But I do -- we do think that there are standing issues with these two particular lead plaintiffs, yes.

THE COURT:  Yeah.  I guess my -- I don't see only addressing the standing issue.  I think that would be inefficient.  I think I'm addressing the rest of the merits.

I think the question is, do I also address the standing issue?  And if I do address the standing issue, then if I address it adversely to the plaintiff, then it would probably necessitate trying to figure out whether there's

some alternative there.

It may be cleaner to not address the standing issue. And in the event -- I assume that -- if I grant the motion to dismiss, I assume that there will be an appeal. The motion to dismiss is a legal -- would be a legal analysis, and you might want other judges' view on it.

And it would seem, if I don't address the standing issue on the last one and I'm overturned on the merits of it, that the likely course would be the First Circuit would remand to address that now.

On the other hand, I think it would be an unfair situation for the plaintiff class for me to address or for you to -- for the defendants to say up at the appeals, "Oh, by the way, there's this other argument also, and we should -- we should now have that," because I do think that in the event that that goes adversely to the plaintiffs, that there -- another plaintiff may have a reasonable argument for why they should be permitted to intervene in this case.

All right. I think I have my work cut out for me. I will -- I will go through these statements carefully. I do view this as sort of statement by statement what I need to make sure whether any of these amount to material misrepresentations or omissions and the scienter question as well. So I will proceed to do that and hopefully address this soon. I know the motion's been pending a long

time, so --

MS. SOLOWAY:  Thank you, Your Honor.

MR. ROSEN:  Thank you, Your Honor.

THE COURT:  Okay.  We are in recess.

(Court in recess at 4:36 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of December, 2022.


/s/ Robert W. Paschal
_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter