**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD HAEBERLEIN,<br><br>Defendants. | Civil Action No.: 1:21-cv-10479-IT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................2

      A.    Aducanumab and the Phase 3 Clinical Trials ..........................................................2

      B.    Plaintiffs' Sole Remaining Alleged Misstatement......................................................4

      C.    The First Circuit's Decision.......................................................................................7

      D.    Plaintiffs Shash and Khan Purchase Biogen Shares After the FDA
           Released the Massie Report .........................................................................................7

LEGAL STANDARD...............................................................................................................8

ARGUMENT ...........................................................................................................................9

I.      THE SAC DOES NOT PLEAD RELIANCE BY SHASH AND KHAN ...........................9

II.     PLAINTIFFS' SECTION 20(a) CLAIMS MUST ALSO BE DISMISSED.....................12

CONCLUSION......................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aldabe* v. *Cornell Univ.,*
2018 WL 7917918 (1st Cir. Dec. 7, 2018) ...............................................................................14

*Aldridge* v. *A.T. Cross Corp.,*
284 F.3d 72 (1st Cir. 2002)...........................................................................................12, 13

*Ashland Inc.* v. *Morgan Stanley & Co.,*
652 F.3d 333 (2d Cir. 2011)..............................................................................................11

*Brennan* v. *Zafgen, Inc.,*
853 F.3d 606 (1st Cir. 2017).............................................................................................12

*City of Bristol Pension Fund* v. *Vertex Pharms. Inc.,*
12 F. Supp. 3d 225 (D. Mass. 2014) ...........................................................................9, 10, 11

*Corban* v. *Sarepta Therapeutics, Inc.,*
2015 WL 1505693 (D. Mass. Mar. 31, 2015).......................................................................13

*Dahhan* v. *OvaScience, Inc.,*
2021 WL 2186466 (D. Mass. May 28, 2021) .......................................................................13

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.,*
2019 WL 1299673 (D.N.J. Mar. 21, 2019)..........................................................................11

*In re Energy Recovery Inc. Sec. Litig.,*
2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ........................................................................14

*Francisco* v. *Abengoa, S.A.,*
481 F. Supp. 3d 179 (S.D.N.Y. 2020).............................................................................10, 11

*Kando* v. *Rhode Island State Bd. of Elections,*
880 F.3d 53 (1st Cir. 2018)..................................................................................................8

*Karth* v. *Keryx Biopharmaceuticals, Inc.,*
334 F.R.D. 7 (D. Mass. 2019)..............................................................................................9

*Mehta* v. *Ocular Therapeutix, Inc.,*
955 F.3d 194 (1st Cir. 2020)..............................................................................................12

*Middlesex Retirement Sys.* v. *Quest Software, Inc.,*
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...............................................................................13

*Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Entm't Corp.*,
    2023 WL 3781645 (N.D. Tex. June 2, 2023) .......................................................10, 11

*Pearson* v. *Hodgson*,
    468 F. Supp. 3d 459 (D. Mass. 2020) ....................................................................2

*Perez-Acevedo* v. *Rivero-Cubano*,
    520 F.3d 26 (1st Cir. 2008)....................................................................................8

*SEB Inv. Mgmt. AB* v. *Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ..................................................................13

*Shash, et al.* v. *Biogen Inc., et al.*,
    84 F.4th 1 (1st Cir. 2023)...............................................................................1, 14

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).........................................................................12, 13

*Wardrop* v. *Amway Asia Pac. Ltd.*,
    2001 WL 274067 (S.D.N.Y. Mar. 20, 2001) .......................................................11

**STATUTES AND RULES**

Section 10(b)
    15 U.S.C. § 78j(b)............................................................................................2, 12

Section 20(a)
    15 U.S.C. § 78t(a) ......................................................................................2, 12, 14

Rule 10b-5
    17 C.F.R. § 240.10b-5.........................................................................................12

Fed. R. Civ. P. 12(c) .....................................................................................................2, 9

**OTHER AUTHORITIES**

Berkeley Lovelace Jr., *Biogen's stock jumps 42% after FDA staff says it has
    enough data to support approving Alzheimer's drugs*, CNBC (Nov. 4, 2020) ........................8

Deena Beasley, *Biogen Alzheimer's drug closer to approval with U.S. FDA staff
    backing, shares jump 40%*, REUTERS (Nov. 4, 2020)................................................8

Defendants Biogen Inc. ("Biogen" or "the Company"), and its former officers Michel Vounatsos (former Chief Executive Officer), Alfred W. Sandrock, Jr., M.D., Ph.D. (former Head of Research and Development), and Samantha Budd Haeberlein, Ph.D. (former Head of Neurodegeneration Development) (the "Individual Defendants" and, collectively with Biogen, "Defendants"), respectfully submit this memorandum of law in support of their motion for judgment on the pleadings.

## PRELIMINARY STATEMENT

This Court previously dismissed all of Plaintiffs' fraud claims. It held Plaintiffs' Second Amended Class Action Complaint (the "Complaint" or "SAC"), Doc. No. 58, failed to plead that Defendants intentionally made false statements about aducanumab, an Alzheimer's disease treatment later approved under the FDA's accelerated approval pathway. (Mem. & Order, Doc. No. 76.) Defendants had also moved to dismiss on the additional ground that Plaintiffs failed to plead reliance. This Court expressly reserved that ground for decision following any remand after appeal (Doc. No. 76 at 40–41; *see also* 5/10/2022 Hearing Tr., Doc. No. 81 at 60:7–10), and Defendants expressly reserved this ground for dismissal on appeal. (Br. of Defendants-Appellees at 16 n.3, *Shash, et al.* v. *Biogen Inc., et al.*, 84 F.4th 1 (1st Cir. 2023) (No. 22-1773).)

After the First Circuit's decision, Plaintiffs' case has been whittled down. It is now predicated entirely on a single statement by one Individual Defendant. What little remains of Plaintiffs' case should be dismissed now.

***First***, Plaintiffs do not plead that Lead Plaintiff Nadia Shash and named plaintiff Amjad Khan relied on the only remaining alleged misrepresentation. Nor can they because Shash and Khan bought their Biogen shares ***after*** the information allegedly concealed by the sole remaining statement was publicly revealed. As courts have consistently held, shareholders who purchase ***after*** the corrective disclosure can plead neither reliance nor standing. That stands to reason

1

because an investor cannot rely on an allegedly false statement after the alleged falsity has been publicly disclosed. Defendants therefore renew the arguments previously raised before this Court, but on which the Court reserved ruling, in this motion.

**Second**, Plaintiffs' control-person claim under Section 20(a) must be dismissed for the same reason. A Section 20(a) claim cannot survive if, as here, no primary claim under Section 10(b) is established. The Section 20(a) claim also fails against Defendant Budd Haeberlein for the additional reason that Dr. Budd Haeberlein is not alleged to have controlled Defendant Sandrock, the Individual Defendant who made the purported misstatement. Indeed, Dr. Budd Haeberlein is not alleged to have been a senior executive of Biogen when the alleged misstatement was made. Nor have Plaintiffs otherwise plausibly alleged that she "controlled" Dr. Sandrock, who was then a senior executive at Biogen.

For these reasons and as further discussed below, what remains of the Complaint should be dismissed in its entirety with prejudice.

## **BACKGROUND**[1]

### A.    **Aducanumab and the Phase 3 Clinical Trials**

Alzheimer's disease is a degenerative neurological disorder that afflicts more than six million Americans. (Trach Decl. Ex. A, Doc. No. 62-1 at 11; *id.* Ex. B, Doc. No. 62-2 at 3.) Aducanumab is a medication approved for the treatment of Alzheimer's. (SAC ¶ 3.) It targets

---

[1] In describing the relevant factual background, Defendants rely on documents cited and quoted in the Complaint, which are incorporated by reference. *See Pearson* v. *Hodgson*, 468 F. Supp. 3d 459, 462 (D. Mass. 2020) (Talwani, J.) (explaining that in ruling on a Rule 12(c) motion, "[t]he court also takes into consideration 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'" (quoting *Haley* v. *City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011))).

amyloid beta protein in the brain on the theory that reducing or removing this protein can benefit patients who suffer from the disease. (*Id.* ¶¶ 54–57.)

Following an initial safety study called PRIME (*id.* at ¶¶ 68–69), Biogen commenced Phase 3 trials called ENGAGE (Study 301) and EMERGE (Study 302). (*Id.* at ¶ 77.) These were identically designed studies. (*Id.* ¶ 4.) ENGAGE began in August 2015 and EMERGE in September 2015. (Doc. No. 62-1 at 28; *see also* SAC ¶ 77.) Two-thirds of the studies' participants carried the APOE4 gene ("carriers"), which predisposes them to develop both Alzheimer's and Amyloid Related Imaging Abnormalities ("ARIA"), an adverse safety event. (SAC ¶¶ 10, 79.)

During the Phase 3 trials, Biogen amended the dosing protocol for carriers. The first amendment, Protocol Version 3 ("PV3"), allowed carriers to gradually increase (or titrate) to their target dose following an ARIA event once their symptoms were resolved. (Doc. No. 62-1 at 33; *see also* SAC ¶¶ 95–96.) The second amendment, Protocol Version 4 ("PV4"), increased the maximum high dose of aducanumab for carriers from 6 mg/kg to 10mg/kg. (Doc. No. 62-1 at 32; *see also* SAC ¶¶ 99–100.)

In March 2019, Biogen announced that it would discontinue the Phase 3 trials based on an independent committee's futility analysis, which calculated a probability after interim review that the final data would not "show statistical significance in favor of aducanumab." (SAC ¶¶ 104, 108.) After discontinuation, however, Biogen conducted an internal review of the clinical data, including data collected between the cutoff for the futility analysis and the conclusion of the trials. (*Id.* ¶¶ 118, 177; Doc. No. 83 at 7.) As Biogen found, in EMERGE, a high dose of aducanumab reduced clinical decline as measured by the primary and secondary efficacy endpoints. (SAC ¶¶ 177, 181.) By contrast, ENGAGE was a negative study, having failed to reach its endpoints. (*Id.*)

Biogen thereafter engaged with the FDA concerning its findings and continued to analyze the trial data. (*Id.* at ¶¶ 132–33, 181; Doc. No. 62-1 at 36–37.) On October 22, 2019, Biogen announced that, after FDA consultation, it would make a regulatory filing for FDA approval of aducanumab. (Trach Decl. Ex. D, Doc. No. 62-4 at 2, 9.) Biogen explained why it believed the data supported an FDA application: "Our primary learning from these data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints." (SAC ¶ 171.) Biogen further stated: "This reduction in clinical decline was statistically significant in EMERGE, and we believe that patients—that the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE." (*Id.*)[2]

**B.      Plaintiffs' Sole Remaining Alleged Misstatement**

Biogen periodically updated the public on its FDA application and its scientific opinions regarding the clinical trial data. The SAC challenged dozens of these statements as false and made with scienter, but only one such statement remains in the case after the First Circuit's decision.

The sole remaining statement is part of an answer that Dr. Sandrock gave in response to an analyst's question in a July 22, 2020 earnings call. The analyst asked about the analysis of aducanumab data in support of the FDA application. In his response, Dr. Sandrock referred to the EMERGE, ENGAGE, and PRIME clinical trials, and offered his opinion as to what the data indicated. The portion of his answer that the First Circuit held was adequately pleaded as false or misleading appears in bold and italics:

> I think -- look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. We believe that data from ENGAGE -- that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with

---

[2] The First Circuit affirmed this Court's holding that the Plaintiffs failed to state a claim as to this statement. (Doc. No. 83 at 35.)

EMERGE. And then I'll say – and also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as [Clinical Dementia Rating Scale] sum of boxes. And again, very similar that the lower doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***

(SAC ¶ 191; Doc. No. 83 at 18.) The First Circuit referred to the bolded and italicized statement as the "all data" statement and held the SAC sufficiently pleaded a claim based on it. (Doc. No. 83 at 18–19.)

The SAC alleges that Dr. Sandrock's July 22 statement was false because certain subgroups of patients in the Phase 3 clinical trials did not achieve better clinical outcomes on high-dose aducanumab. The SAC contends that the non-carrier group did not perform as well as carriers, and that non-carriers performed only negligibly better than those on a placebo. (SAC ¶¶ 153–54.) The SAC also focuses on patients who were (i) carriers that (ii) received the high dose (iii) in EMERGE (iv) after the Protocol Amendment. It asserts that because clinical outcomes for this sub-sub-subgroup did not improve following the Protocol Amendment, there was no dose-dependent clinical improvement from aducanumab. (*Id.* ¶¶ 158–61.)

The SAC alleges the truth was revealed on November 4, 2020. On that date, the FDA issued both (a) a joint briefing book with Biogen (the "Joint Report") setting out the FDA's favorable conclusions regarding Biogen's clinical trials and (b) a statistical report from FDA statistician Tristan Massie, which criticized the FDA's and Biogen's analyses and discussed the previously undisclosed subgroup data (the "Massie Report"). The SAC alleges that the Massie Report "revealed the data Defendants had concealed and showed that key statements Defendants made to support their narrative were false or misleading." (SAC ¶ 151; *see also id.* ¶ 16 (alleging that the Massie Report "presented the data Biogen had concealed from investors").)

5

Massie's criticisms were readily apparent from his Executive Summary, which stated: "[T]he totality of the data does not seem to support the efficacy of the high dose." (Massie Report, Doc. No. 58-3 at 255.)  The Massie Report detailed the subgroup-level analyses underlying its conclusions, including that "***the APOE non-carriers [had] less treatment effect*** on all four primary and key secondary efficacy endpoints ***despite having 10mg/kg dosing from study start*** . . . [and] ***fewer dose reductions***." (*Id.* at 254 (emphases added).)  Massie's one-paragraph "Conclusions and Recommendations" section of his report reiterated his criticisms, declaring his view that "[t]he totality of the data does not seem to provide sufficient evidence to support the efficacy of the high dose." (*Id.* at 342.)

Each of the specific statistical critiques on which Plaintiffs rely in their Complaint are drawn from the analyses in the Massie Report.  Indeed, the SAC specifically identifies the Massie Report as the source for "the data Defendants concealed." (SAC ¶ 151.)  And Massie's statistical analyses—including charts and graphs from the Massie Report—are identified in the SAC as the purported basis on which Defendants' statements are allegedly false. (*Compare id.* ¶ 153 (citing data regarding non-carriers' clinical outcomes), *with* Doc. No. 58-3 at 333 (citing the same statistics and noting that "[t]he treatment difference on [Clinical Dementia Rating Scale-Sum of Boxes ("CDR-SB")] for the high dose in the APOE- (non-carrier) subgroup . . . [was] very small and not nominally significant"); *compare* SAC ¶¶ 157–58 (citing APOE+ (carrier) data pre-PV4 and post-PV4), *with* Doc. No. 58-3 at 278 (citing the same data); *compare* SAC ¶¶ 162–63 (citing pre-PV4 and post-PV4 data for patients whose high-dose treatments were interrupted by ARIA), *with* Doc. No. 58-3 at 284 (citing the same data); *compare* SAC ¶ 166 (citing data regarding the total number of 10mg/kg doses patients received in Study 302), *with* Doc. No. 58-3 at 290 (citing the same data).)  As discussed below, allegations based on these subgroup analyses—drawn

directly from the Massie Report—were cited by the First Circuit in permitting Plaintiffs' claims to proceed with respect to the July 22 statement.

### C.      The First Circuit's Decision

In its decision, the First Circuit held that the SAC adequately pleaded that the Massie Report, published on November 4, 2020, "revealed the company's misstatements about aducanumab." (Doc. No. 83 at 39.) Addressing the sufficiency of Plaintiff's factual allegations of falsity, the First Circuit referenced Plaintiffs' allegations that "Massie's report revealed . . . that clinical outcomes for high dose noncarriers . . . were statistically insignificant when compared to placebo." (*Id.* at 11 n.7, 18.) The First Circuit also considered Plaintiffs' allegations, likewise drawn from the Massie Report, that carriers who received high-dose aducanumab after the PV4 protocol amendment did not experience better clinical outcomes after the protocol change. (*Id.* at 18.) The First Circuit ultimately concluded that "the complaint plausibly alleges that not <u>all</u> of Biogen's data was 'consistent with' 'need[ing] to get to the higher dose' of aducanumab – some patients did better on a lower dose and others experienced the same lack of clinical benefit whether they were on the higher dose or not. Thus by failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the complaint plausibly alleges that Defendants' omission misled investors." (*Id.* at 19.)[3]

### D.      Plaintiffs Shash and Khan Purchase Biogen Shares *After* the FDA Released the Massie Report

Lead Plaintiff Nadia Shash and named Plaintiff Amjad Khan purchased Biogen stock on November 4 and 5, 2020, after the FDA published the Joint Report and the Massie Report, and

---

[3] With respect to scienter, the First Circuit, applying a recklessness standard, concluded that the failure to disclose the subgroup data in the face of this July 22 statement sufficiently pleaded an "extreme departure from the standards of ordinary care" and thus held that scienter was adequately pleaded as to this statement alone. (Doc. No. 83 at 22–23.)

after several analysts had publicized their views.  (Rosen Decl. Ex. 3, Doc. No. 10-3 at 2; Am. Compl. Ex. 2, Doc. No. 42-2 at 2.)  As this Court stated in its prior Opinion, "[i]t is undisputed that Plaintiffs purchased their stock after the Massie Report had been published and thus after the alleged corrective disclosure was made."  (Doc. No. 76 at 40.)

In particular, Shash purchased Biogen shares at $343.00/share on November 4, 2020 (Doc. No. 10-3 at 2), which means she purchased no earlier than 10:54 a.m. ET that day—after the Massie Report was published.[4]  (Trach Decl. Ex. I (intraday trading), Doc. No. 62-9.)  Khan purchased his Biogen shares at $324.55/share on November 5, 2020, the day after the Massie Report was published.  (Doc. No. 42-2 at 2.)  Plaintiffs then sold their shares on November 9, 2020.  (Doc. No. 10-3 at 2; Doc. No. 42-2 at 2.)

## **LEGAL STANDARD**

To survive a motion for judgment on the pleadings, "a complaint must contain factual allegations that raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  *Perez-Acevedo* v. *Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir.

---

[4] Biogen shares opened at $253.20 that day, and climbed after the Joint Report and the dissenting Massie Report were published.  We know from public sources that the documents were publicly available in the early morning.  Indeed, by 10:11 a.m., Biogen's stock had already jumped 13%. (*See* Laufer Decl. Ex. A (*Biogen jumps 13% to $279.83 after FDA posts aducanumab briefing docs*, theflyonthewall.com (published Nov. 4, 2020 at 10:11 a.m.).)  By the time Shash purchased (no earlier than 10:54 a.m.), articles had already been published about the FDA's posting of the briefing documents—including a Reuters article discussing the Massie Report's conclusion that "[t]here is no compelling substantial evidence of treatment effect or disease slowing."  Deena Beasley, *Biogen Alzheimer's drug closer to approval with U.S. FDA staff backing, shares jump 40%*, Reuters (published Nov. 4, 2020 at 10:43 a.m.), *available at* https://web.archive.org/web/20201105095607/https://www.reuters.com/article/biogen-aducanumab-fda-idUSKBN27K24L; *see also, e.g.,* Berkeley Lovelace Jr., *Biogen's stock jumps 42% after FDA staff says it has enough data to support approving Alzheimer's drugs*, CNBC (published Nov. 4, 2020 at 10:51 a.m.), *available at* https://www.cnbc.com/2020/11/04/biogens-stock-jumps-30percent-after-fda-staff-says-it-has-enough-data-to-support-approving-alzheimers-drug-.html.

8

2008).   In addition to the pleadings, courts may consider "facts drawn from documents fairly incorporated in the pleadings and facts susceptible to judicial notice."  *Kando* v. *Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).  A Rule 12(c) motion "bears a strong family resemblance to a motion to dismiss under [Rule] 12(b)(6), and these two types of motions are treated in much the same way."  *Id.* (citation omitted).

## ARGUMENT

### I.    THE SAC DOES NOT PLEAD RELIANCE BY SHASH AND KHAN

Shash and Khan have not pled, and cannot plead, the essential element of reliance because they purchased their Biogen shares only ***after*** the alleged corrective disclosure was public.  As a result, they lack standing to sue.

As courts have recognized, "a plaintiff who purchased after a corrective disclosure was made would have no standing, because relying on the earlier misrepresentation would no longer be reasonable in light of the new information[.]"  *City of Bristol Pension Fund* v. *Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 235 (D. Mass. 2014) (plaintiff who purchased the day after the corrective disclosure lacked standing to sue); *see also Karth* v. *Keryx Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 21 (D. Mass. 2019) (plaintiff did not plausibly allege reliance because July 2016 purchase of shares came after curative disclosures in February and April 2016), *aff'd on other grounds*, 6 F.4th 123 (1st Cir. 2021).

As Plaintiffs acknowledged in the SAC, the Massie Report, published on the morning of November 4, 2020, "revealed" precisely what was allegedly misleading about Dr. Sandrock's statement on July 22.  (Doc. No. 83 at 39.)  According to Plaintiffs, Dr. Sandrock's statement was misleading because not "all" data at the subgroup level supported the efficacy of aducanumab at high doses.  But the SAC itself concedes that the Massie Report made this abundantly clear.  Indeed, as described above, the SAC relies on the Massie Report for all of its contradictory

9

statistical analyses of the July 22, 2020 statement. The Massie Report was unequivocal in its assessment that not "all" of the data supports the efficacy of aducanumab at the high dose, stating in the Executive Summary that, "the totality of the data does not seem to report the efficacy of the high dose." (Doc. No. 58-3 at 255.) The Massie Report further directly relied on the subgroup analyses that Plaintiffs endorse. (*Id.* at 254 (describing "the APOE non-carriers having ***less treatment effect*** on all four primary and key secondary efficacy endpoints ***despite having 10mg/kg dosing from study start*** . . . [and] ***fewer dose reductions***" (emphases added)).)

Plaintiffs cannot escape the conclusion that the Massie Report "revealed" the alleged fraud. They expressly acknowledge the point. Indeed, it is the basis on which the falsity of the July 22, 2020 statement was pleaded in the SAC. (*See, e.g.*, SAC ¶ 151 ("The Draft Massie Report revealed the data Defendants had concealed and showed that key statements Defendants made to support their narrative were false or misleading"); Doc. No. 63 at 2 ("His [Massie's] report revealed data showing that Defendants' statements had been false.").) And the Massie Report was expressly recognized by the First Circuit as the disclosure that allegedly corrected Dr. Sandrock's allegedly false July 22 statement. (*See* Doc. No. 83 at 39 (identifying Massie Report as alleged corrective disclosure).)

Plaintiffs concededly purchased Biogen stock on November 4, 2020, and November 5, 2020, ***after*** the information supposedly concealed by Dr. Sandrock's July 22, 2020 statement had been disclosed. (Doc. No. 76 at 40.) Shareholder fraud claims are defective as a matter of law where, as here, "relying on the earlier misrepresentation would no longer be reasonable in light of the new information." *Vertex*, 12 F. Supp. 3d at 235; *Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 206–07 (S.D.N.Y. 2020) (granting motion to dismiss where lead plaintiffs "chose to purchase" the issuer's stock "in spite of" the company's corrective disclosure the prior day); *Okla.*

*Firefighters Pension & Ret. Sys.* v. *Six Flags Entm't Corp.*, 2023 WL 3781645, at *6 (N.D. Tex. June 2, 2023) (finding as a matter of law that plaintiff could not have reasonably relied on prior misrepresentations when it purchased stock days after corrective disclosure).[5]

Thus, Plaintiffs lack standing to pursue these claims. "A plaintiff who buys stock after a corrective disclosure cannot suffer an injury in fact because any 'reliance' on the earlier misrepresentation would not be reasonable given the disclosed information; and so a lack of reasonable reliance is a lack of standing under the PSLRA." *Okla. Firefighters*, 2023 WL 3781645, at *6 (citing *Basic, Inc.* v. *Levinson*, 485 U.S. 221, 246–47 (1988)); *see also Vertex*, 12 F. Supp. 3d at 235 (lead plaintiff who purchased stock one day after corrective disclosure "lacks standing to contest" earlier alleged misstatements); *Abengoa*, 481 F. Supp. 3d at 206 (similar).

Plaintiffs previously argued in opposing Defendants' motion to dismiss that reliance is adequately pleaded in the SAC because, even in an efficient market, it allegedly took the market several days to understand the Massie Report and to incorporate it into Biogen's stock price. (Doc. No. 63 at 34–35 n.25.) Plaintiffs thus are merely repeating their loss causation argument (*i.e.*, that Biogen's stock did not react to the Massie Report on November 4, but rather on November 5, causing losses). This argument, however, conflates the element of reliance with the element of loss causation—which is a different element of Plaintiffs' fraud claim. The question presented by

---

[5] *See also Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 338–39 & nn.3–4 (2d Cir. 2011) (affirming dismissal where plaintiffs purchased securities notwithstanding publicly available disclosures of the very liquidity risks about which plaintiff was supposedly misled, because plaintiffs were unable "to plead reasonable reliance on the alleged misrepresentations"); *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *13 (D.N.J. Mar. 21, 2019) (holding plaintiff lacked standing to assert claims relating to misstatements made prior to corrective disclosure, which "sufficiently corrected the prior statements such that reliance on same would no longer be reasonable"); *Wardrop* v. *Amway Asia Pac. Ltd.* 2001 WL 274067, at *5 (S.D.N.Y. Mar. 20, 2001) (dismissing plaintiffs' 10(b), 14(e), and Rule 10b-5 claims for failure to plead reliance where "the allegedly withheld information was publicly available" when the allegedly false statement was made), *aff'd*, 26 F. App'x 89 (2d Cir. 2002).

this motion is not how long it would take the market price to fully incorporate the Massie analyses once released on November 4, 2020.  The relevant question here is whether Shash and Khan can plausibly claim to have relied on the allegedly false July 22, 2020 statement when, by the time they purchased Biogen stock, the Massie Report was public, and they either knew or should have known the very information they now claim to have been concealed.  The answer to that question, under the authorities discussed above, is definitively "no."

The claims asserted by Shash and Khan therefore must be dismissed as a matter of law.

## II.    PLAINTIFFS' SECTION 20(a) CLAIMS MUST ALSO BE DISMISSED

Because the SAC does not state a predicate securities fraud claim under Section 10(b) and Rule 10b-5, the control person claims under Section 20(a) must also be dismissed.  *See Mehta* v. *Ocular Therapeutix, Inc.*, 955 F.3d 194, 211 (1st Cir. 2020); *Brennan* v. *Zafgen, Inc.*, 853 F.3d 606, 618 (1st Cir. 2017).

Plaintiffs' claim against Dr. Budd Haeberlein must be dismissed for the additional reason that no allegations in the SAC support the bare assertion that she was a control person under Section 20(a).[6]  To state a claim for control person liability, plaintiffs must allege (1) an underlying violation of the securities laws by a controlled person or entity, and (2) control of the primary violator by the defendant.  *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 194 (1st Cir. 2005); *Aldridge* v. *A.T. Cross Corp.*, 284 F.3d 72, 84–85 (1st Cir. 2002).  Plaintiffs must allege not only "the general power to control" the primary violator, but also that the alleged control person "actually exercise[d] control over" the primary violator.  *Aldridge*, 284 F.3d 85.  Neither

---

[6] Since the First Circuit affirmed this Court's dismissal of the remainder of Plaintiffs' alleged misstatements, including "statements about aducanumab's general efficacy," (*see* Doc. No. 83 at 25, 35, 42), all claims under Section 10(b) against Individual Defendants Budd Haeberlein and Vounatsos have been dismissed.

requirement is met here with respect to Dr. Budd Haeberlein.

*First*, Plaintiffs do not allege that Dr. Budd Haeberlein controlled Dr. Sandrock, the only remaining alleged primary violator. *Stone & Webster*, 414 F.3d at 194.  Nor could they.  As the SAC alleges, Dr. Sandrock was Executive Vice President—Research & Development, while Dr. Budd Haeberlein was Senior Vice President—Head of Neurodegeneration Development Unit.[7] (SAC ¶¶ 44–45.)  There is no allegation that Dr. Sandrock and Dr. Budd Haeberlein were in "a hierarchical relationship" with Dr. Budd Haeberlein "at the top." *Dahhan* v. *OvaScience, Inc.*, 2021 WL 2186466, at *6 (D. Mass. May 28, 2021) (Talwani, J.); *see also Middlesex Retirement Sys.* v. *Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007) ("[I]t is difficult for the Court to determine how, as a Vice President, [the defendant] was able to exercise control over the other 10b-5 Defendants when the other 10b-5 Defendants held positions of Vice President or higher."); *SEB Inv. Mgmt. AB* v. *Endo Int'l, PLC*, 351 F. Supp. 3d 874, 909 (E.D. Pa. 2018) ("There is no basis to infer that any of these chief officers controlled any other chief officer, especially one in another department.").

*Second*, Plaintiffs fail to allege that Dr. Budd Haeberlein *actually exercised* any control over Dr. Sandrock. *See Aldridge*, 284 F.3d 85 ("To meet the control element, the alleged controlling person must not only have the general power to control the [primary violator], but must also actually exercise control over the [primary violator]." (citing *Sheinkopf* v. *Stone*, 927 F.2d

---

[7] Biogen's public filings dispel any suggestion that Dr. Budd Haeberlein exercised control over Dr. Sandrock.  Dr. Budd Haeberlein is absent from the list of Executive Officers disclosed in Biogen's Form 10-K filings during the relevant time period, while Dr. Sandrock is listed. *See* Biogen Inc., Annual Report (Form 10-K) (Feb. 3, 2021), *available at* https://investors.biogen.com/static-files/64cb9178-15a5-41d8-81bc-e7af029bbfa1; *Corban* v. *Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *5 n.4 (D. Mass. Mar. 31, 2015) (Talwani, J.) (noting that "public filings with the U.S. Securities and Exchange Commission[] are clearly ones in which the court may take judicial notice"), *aff'd,* 868 F.3d 31 (1st Cir. 2017).

1259, 1270 (1st Cir. 1991))); *Dahhan*, 2021 WL 2186466, at *6 (explaining that "evidence of 'actual control' constitutes a necessary element of [a Section 20(a)] violation" (collecting cases)). Here, the SAC does not allege that Dr. Budd Haeberlein had *any role* in disseminating Dr. Sandrock's alleged misstatement. Indeed, Dr. Budd Haeberlein was not even a participant in the earnings call at which Dr. Sandrock made the challenged statement. (*See* Laufer Decl. Ex. B (July 22, 2020 Earnings Call Transcript); *see also* SAC ¶ 191.)[8] This dooms Plaintiffs' Section 20(a) claim. *See In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *26 (N.D. Cal. Jan. 27, 2016) (dismissing Section 20(a) claim where defendant "did not speak on the Company's behalf during earnings conference calls with investors, nor did she sign any SEC filings," and plaintiffs did not allege that "she directed or exercised control over [CEO] who allegedly made the false and misleading statements").

Absent particularized allegations of control, Plaintiffs' Section 20(a) claim against Dr. Budd Haeberlein must be dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' motion for judgment on the pleadings should be granted and the Complaint should be dismissed in its entirety. Defendants respectfully request dismissal with prejudice since Shash and Khan are the only proposed class members before the Court, no class has been certified, and neither Shash nor Khan can remedy the defects raised in this motion through amendment.[9]

---

[8] The Court may consider the transcript of the earnings call in resolving Defendants' motion. *See Shash*, 84 F.4th at 6 n.2.

[9] *See Aldabe* v. *Cornell Univ.*, 2018 WL 7917918, at *1 (1st Cir. Dec. 7, 2018) (finding "dismissal with prejudice . . . appropriate" where "further amendment of the complaint would have been futile"). Through this motion, Defendants seek no relief regarding the potential claims of absent class members.

14

Dated:  February 5, 2024

Respectfully submitted,

 /s/ Audra J. Soloway
Theodore V. Wells, Jr. (*pro hac vice*)
Audra J. Soloway (*pro hac vice*)
Richard C. Tarlowe (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Samantha A. Bui (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
asoloway@paulweiss.com
rtarlowe@paulweiss.com
glaufer@paulweiss.com
sbui@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc., Michel
Vounatsos, Alfred W. Sandrock, Jr., and
Samantha Budd Haeberlein*

15

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 5th day of February, 2024, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

<u>*/s/ Audra J. Soloway*</u>
Audra J. Soloway

16