**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN,<br><br>Defendants. | **CASE No.: 1:21-cv-10479-IT**<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTS AND PROCEDURAL HISTORY ............................................................. 2

III.  ARGUMENT ........................................................................................................ 4

   A.   The First Circuit's Ruling on Loss Causation Establishes That Plaintiffs Are Entitled to A Presumption of Reliance ................................................................................. 4

   B.   The Publication of The Massie Report Did Not Make Reliance on Defendants' False Statement Unreasonable ................................................................................. 8

   C.   The Massie Report Was Only a Partial Corrective Disclosure ........................................ 12

IV.   CONCLUSION.................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashland Inc. v. Morgan Stanley & Co.*,
652 F.3d 333 (2d Cir. 2011)..................................................................................................11

Basic Inc. v. Levinson,
485 U.S. 224 (1988) ...................................................................................... 4, 5, 6

Carey v. Bahama Cruise Lines,
864 F.2d 201 (1st Cir. 1988)........................................................................ 4

City of Bristol Pension Fund v. Vertex Pharms. Inc.,
12 F. Supp. 3d 225 (D. Mass. 2014)............................................................ 3, 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .................................................................................... 5, 7

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................10, 11

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ..................................................................................... 5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................................................................................. 5, 6, 7

*In re Am. Realty Cap. Properties, Inc. Litig.*,
2019 WL 2082508 (S.D.N.Y. May 10, 2019) ............................................. 8

*In re AVEO Pharms., Inc. Sec. Litig.*,
2017 WL 5484672 (D. Mass. Nov. 14, 2017) .................................... 13, 14

*In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*,
2019 WL 1299673 (D.N.J. Mar. 21, 2019) ...............................................11

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009) ............................................................. 13

*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005)........................................................................ 9

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
2012 WL 4482032 (D.N.J. Sept. 25, 2012)............................................. 13

*In re Vivendi Universal, S.A. Sec. Litig.*,
  123 F. Supp. 3d 424 (S.D.N.Y. 2015) ........................................................................... 6

*Kasper v. AAC Holdings, Inc.*,
  2017 WL 3008510 (M.D. Tenn. July 14, 2017) ........................................................... 13

*Oklahoma Firefighters Pension & Ret. Sys. V. Six Flags Ent. Corp.*,
  2023 WL 3781645 (N.D. Tex. June 2, 2023) ............................................................... 10

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ........................................................................................ 8

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................................................................ 4

*Shash v. Biogen, Inc.*,
  84 F.4th 1 (1st Cir. 2023) ................................................................................. 3, 7, 9, 12

*United States v. Almonte-Nunez*,
  963 F.3d 58 (1st Cir. 2020) .......................................................................................... 4

*Wardrop v. Amway Asia Pac. Ltd.*,
  2001 WL 274067 (S.D.N.Y. Mar. 20, 2001) ................................................................11

*Yan v. ReWalk Robotics Ltd.*,
  973 F.3d 22 (1st Cir. 2020) .......................................................................................... 14

iii

## I.    INTRODUCTION[1]

Defendants base their Motion for Judgment on the Pleadings on an argument the First Circuit has already rejected. Plaintiffs allege and will prove that they are entitled to a fraud on the market presumption of reliance. To be entitled to such a presumption at the pleading stage, Plaintiffs only need to allege that Biogen's stock price remained artificially inflated at the time of their purchases. The First Circuit ruled that Plaintiffs had sufficiently pled loss causation by sufficiently alleging that some or all the artificial inflation in Biogen's stock price dissipated ***after*** their purchases. The First Circuit's loss causation ruling thus also compels the conclusion that Biogen's stock price was artificially inflated ***when Plaintiffs bought their shares***. Defendants may challenge reliance with evidence at class certification or summary judgment, but the well-pled allegations show that it took the market several days to incorporate the Massie Report into Biogen's stock price, that the inflation did not dissipate until November 9, and thus that Plaintiffs are entitled to a presumption of reliance.

Even if the Court does not find the First Circuit's ruling legally dispositive, it is still dispositive in a practical sense. Defendants erroneously argue that the publication of Dr. Tristan Massie's complex, lengthy, and contested statistical report ("Massie Report") immediately made any reliance on their previous statements unreasonable. Yet the Massie Report and the information it contained was not immediately incorporated into Biogen's stock price because it was too obscure and too complicated. So Defendants' argument is that all investors must incorporate the news faster than the market, the collective judgment of market participants, in order to be "reasonable." This makes no sense.

---

[1] Citations to "¶_" and "Def.Br. _" are to the Second Amended Complaint ("Complaint"), Dkt. No. 59, and Defendants' Memorandum of Law in Support of their Motion for Judgment on the Pleadings, Dkt. No. 117, respectively. Unless otherwise noted, all emphases are added and citations removed.

Finally, Plaintiffs' reliance was also reasonable because the Massie Report did not fully correct Defendants' false statement. The market had some reason to doubt the Massie Report; among other things, it bore a prominent DRAFT watermark and the main FDA report took a different position. The truth was fully revealed only when the world-class experts on the Advisory Committee adjudicated the dispute in Massie's favor. Biogen's stock continued to be artificially inflated until after that meeting.

## II.    FACTS AND PROCEDURAL HISTORY

The issues in Defendants' Motion for Judgment on the Pleadings revolve around four events: (1) Defendants' July 22 statement that "*So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that*", ¶191 (the "All Data" statement); (2) the posting on the FDA website of briefing materials for an FDA advisory committee, including a "draft" report by statistician Tristan Massie ("Massie Report"), on November 4, 2020, ¶¶262-63; (3) Plaintiffs' subsequent stock purchases on November 4 and 5; and (3) the November 6 Advisory Committee meeting citing the Massie Report in its decision to reject approval of Aducanumab, which closes the Class Period, ¶280. The Defendants assert that Plaintiffs' actual or presumed reliance on the All Data statement was immediately unreasonable upon release of the Massie Report, regardless of whether Plaintiffs or the market had digested or even read that report.

After some initial proceedings that are not relevant here, Defendants filed a motion to dismiss Plaintiffs' operative Second Amended Complaint ("Complaint"). Doc. No. 60. The Court dismissed the Complaint because, among other things, it found that Plaintiffs had not sufficiently alleged loss causation. Doc. No. 76 at 39. The Court reasoned that "causation is not tied to when the market reacts to information, but rather when that information became available to the public[.]" *Id.* at 40. Because Plaintiffs purchased their shares after the Massie Report, the Court

found that "the complaint lacks facts demonstrating that the challenged conduct caused their losses." *Id.*

The Court reserved ruling on whether the Complaint sufficiently alleged reasonable reliance. However, the Court quoted *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 232 (D. Mass. 2014) as holding that "'[a] plaintiff who purchased after a corrective disclosure was made would have no standing,' because (1) 'relying on the earlier misrepresentation would no longer be reasonable in light of the new information,' and (2) 'the market is assumed to have processed the correction, which would be reflected in the stock price.'" Doc. No. 76 at 40.

The First Circuit reversed the Court's ruling on loss causation. It rejected the argument that "investors failed to adequately plead loss causation because the alleged corrective disclosure, Massie's report, was published before investors purchased Biogen stock." *Shash v. Biogen, Inc.*, 84 F.4th 1, 20 (1st Cir. 2023). The First Circuit concluded that, based on "precedent from other circuits [which] addresses delayed market reactions in the loss causation context … investor's allegations cannot be per se implausible simply because a gap in time separates the price drop from the corrective disclosure." *Id.* at 21-22. And the First Circuit explained numerous reasons why Plaintiffs' allegation of a delayed response was plausible:

> Massie's report was released on November 4, 2020, as part of the joint briefing material; the report, which revealed the truth about Biogen's prior fraudulent statements about aducanumab, was "dense," "written for ... world-renowned experts," followed 246 pages of effusive briefing material, and bore a "DRAFT" watermark; investors purchased Biogen stock on the same day that the report was released or, at most, a day later; the stock price did not drop immediately following the release of the report because, for the foregoing reasons, it took time for the market to appreciate the merits of Massie's report; the market's delayed reaction to the report is corroborated by analysts' coverage of the briefing materials; and Biogen's stock price began to drop on November 5, 2020, and "collapsed" on November 9, 2020, the next possible trading day for Biogen stock, when the market fully grasped the significance of Massie's report.

*Id.* at 20.

3

Defendants could have advanced their reliance argument on appeal as an alternative ground for affirming the district court's judgment. *See Carey v. Bahama Cruise Lines*, 864 F.2d 201, 203 n.1 (1st Cir. 1988) ("An appellee need not cross-appeal 'to argue that there are alternative grounds that support the judgment below.' "). But they chose not to. Because defendants did not raise the reliance argument on appeal, the First Circuit did not expressly address it.

## III. ARGUMENT

### A. The First Circuit's Ruling on Loss Causation Establishes That Plaintiffs Are Entitled to A Presumption of Reliance

The "mandate rule prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case." *United States v. Almonte-Nunez*, 963 F.3d 58, 64 (1st Cir. 2020) (cleaned up). The Court may revisit the issue at class certification or summary judgment with the benefit of expert evidence. *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 84 (S.D.N.Y. 2015) ("factual dispute inappropriate for resolution at the pleading stage, before the development of a fuller factual record of discovery, including the opinion of other experts whose testimony may shed better light on these complex economic and industry practice issues."). But Defendants may not overturn issues already implicitly decided by the First Circuit.

Plaintiffs allege that they are entitled to a presumption of reliance based on the fraud on the market theory. ¶¶355-56. The fraud on the market theory was first recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988). It posits that when a security trades in an open and developed market (dubbed an "efficient market"), its price generally reflects publicly available information. *Id.* at 241-42. The market, however, can be misled. *Id.* So if a company makes false public statements about itself, the statements will artificially inflate its stock price. *Id.* Or, as the Court explained in *Basic*:

4

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Id.* (ellipses in original)

The Supreme Court regularly recognizes the fraud on the market theory's viability. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014) ("*Halliburton II*") (expressly reaffirming fraud-on-the-market presumption); *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021).

When a security trades on an efficient market, "anyone who buys or sells the stock at the market price may be considered to have relied on [the] misstatements." *Halliburton II*, 573 U.S. at 263. Because they purchased in reliance on the integrity of the market price, Plaintiffs had no obligation to review anything, let alone to find, read, and decipher the Massie Report, and compare it to both the FDA's positive briefing materials and Defendants' false statements. *Halliburton* II, 573 U.S. at 268 (noting that "the typical investor" does not "scrutinize every piece of public information about a company" but instead buys or sell stock "in reliance on the integrity of [the] price."). It is enough that Plaintiffs relied on the integrity of the stock price and the price incorporated defendants' false statements. *Id.*

The *Basic* presumption has two parts: "[I]f a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price." *Halliburton II*, 573 U.S. at 279. And "if the plaintiff also shows that he purchased the stock at the market price

during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Id.*

To defeat the presumption, defendants must "sever[] the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248-49. Thus, to show that Plaintiffs are ***not*** entitled to a presumption of reliance on the pleadings, Defendants must show one of three things as a matter of law: (1) Plaintiffs did not rely on the integrity of Biogen's stock price because they would have bought Biogen securities at the same price even if they had known that Defendants' statements were false; (2) Biogen's stock does not trade on an efficient market; or (3) the All Data statement had no impact on Biogen's stock price at the time of Plaintiffs' purchases because the inflation had dissipated by then.

Defendants do not dispute that Plaintiffs sufficiently allege they relied on the integrity of the stock price. Nor could they: it is a matter of proof at summary judgment or trial. *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 437 (S.D.N.Y. 2015) (conducting extensive analysis to determine whether company had rebutted presumption of reliance). More, it is rare to find an investor who does not rely on the integrity of the market price. *Basic*, 485 U.S. at 247. Such challenges are limited to the class certification or post-judgment stages and to "pick[ing] off the occasional class member here or there." *Halliburton II*, 573 U.S. at 276.[2]

Defendants do not challenge the Complaint's allegations that Biogen's stock traded on an efficient market. ¶355. Nor could they because it is a matter of proof at class certification. *Halliburton II*, 573 U.S. at 276.

---

[2] There is no evidence anywhere in the record as to what plaintiffs read or relied on before making their purchases, so it is impossible to conclude at the pleading stage that plaintiffs did not rely on the integrity of the market price.

This leaves Defendants with only one way to sever the link between their false statements and Plaintiffs' presumed reliance: showing that the artificial inflation had dissipated by the time of Plaintiffs' purchases. But the First Circuit's holding that Plaintiffs sufficiently alleged loss causation forecloses any such argument. The First Circuit rejected the premise that "any hit to Biogen's stock price would have immediately followed the Defendants' corrective disclosure *and thus was already accounted for in the stock's price when investors purchased shares*." *Shash*, 84 F.4th at 20. Rather, it held that "the issue of when Biogen's stock price actually dropped [in response to the Massie Report] is a question of fact." *Id*. at 21. Thus, the First Circuit found the Complaint plausibly alleged that the artificial inflation of Biogen's stock price continued to dissipate after Plaintiffs bought their shares. *Id.* But that the artificial inflation dissipated *after* Plaintiffs' purchases necessarily means that Biogen's stock price was still artificially inflated *at the time of* the purchases.

*Halliburton II* also states that the fraud-on-the-market presumption requires that the "plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." 573 U.S. at 278. But plaintiffs who bought shares in the window between the corrective disclosure and its incorporation into the stock price still rely on the misrepresentations through the fraud on the market presumption of reliance. Or, as *Halliburton I* put it, "[u]nder *Basic*'s fraud-on-the-market doctrine, an investor *presumptively relies on a defendant's misrepresentation if that 'information is reflected in [the] market price'* of the stock at the time of the relevant transaction." 563 U.S. at 812.

That is what Plaintiffs did here. Ms. Shash and Mr. Khan purchased Biogen stock at a time when, under the First Circuit's ruling, the market price was still artificially inflated by Biogen's misleading public statements. Because Biogen's misleading public statements were still "reflected

7

in [the] market price," *Basic* entitles Plaintiffs to a presumption that they relied on those misleading public statements.

**B.     The Publication of The Massie Report Did Not Make Reliance on Defendants' False Statement Unreasonable**

The dispositive question is whether Biogen's stock price fully incorporated the Massie Report at the time of Plaintiffs' purchases. In answering the question in the negative, the First Circuit implicitly ruled that Plaintiffs had sufficiently alleged reliance as a matter of law.

But even if the Court were to indulge Defendants' argument that whether investors' reliance is a separate question not fully answered by the First Circuit, they still do not establish that reliance was unreasonable. Courts recognize that even when investors are under no time pressure, unlike here, curative disclosures do not negate a presumption of reliance if they require "careful and sophisticated analysis." *In re Am. Realty Cap. Properties, Inc. Litig.*, 2019 WL 2082508, at *2 (S.D.N.Y. May 10, 2019), *opinion withdrawn in other part on reconsideration,* 2019 WL 13084739 (S.D.N.Y. May 20, 2019). Curative disclosures also do not negate reliance if they require expert analysis. *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014).

Defendants argue that investors who purchased Biogen stock after publication of the Massie Report, like Plaintiffs, were unreasonable as a matter of law. To beat the market in making sense of the Massie Report, investors would have to first be aware that it existed. Biogen did not issue a press release announcing the filing of advisory committee briefing materials nor file any notice with the SEC. Then, investors would have to find the briefing materials, because they appeared on the FDA's website, not Biogen's. Investors would then have to notice that the 343-page joint briefing materials included a Statistical Review as its Appendix 2. Investors would have to work through the Massie Report's "dense" writing addressed to "world-renowned experts".

8

*Shash*, 84 F.4th at 20. Investors would also have to be statisticians, because otherwise they could not understand the Massie Report. Investors would have to have known to ignore the FDA's contrary position that the evidence supporting approval was "exceptionally persuasive" and disregard the prominent "DRAFT" watermark on the Massie Report. *Id.*; ¶269. Finally, investors would have to have been familiar with Defendants' past statements to know that the Massie Report was divulging new, contradictory information. All that in a few hours (Ms. Shash) or a day (Mr. Khan).

That the market itself took several days to incorporate the Massie Report, even if it were not legally dispositive, also shows as a practical matter that investors' presumed reliance between the publication of the Massie Report on November 4 and the suspension of trading on November 6 was reasonable. As the First Circuit elsewhere explained, the market's collective ability to react exceeds that of investors. In efficient markets, professional investors (arbitrageurs) "obtain and analyze information about stocks from a variety of sources … thereby causing the stock to move to a price which reflects the latest public information concerning the stock[.]" *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 9 (1st Cir. 2005). Unlike arbitrageurs, "[o]rdinary investors [] lack the time, resources, or expertise to evaluate all the information concerning a security, and are thus unable to act in time to take advantage of opportunities for arbitrage profits." *Id.* (cleaned up). "'An example would be an investor who decides to sell a stock upon the public announcement of a decline in corporate earnings, who finds that by the time she calls her broker, the price has already dropped.'" *Id.* at 9-10.

By finding that artificial inflation dissipated *after* Plaintiffs' purchases, the First Circuit implicitly held that arbitrageurs had not absorbed the Massie Report by the time of Plaintiffs'

purchases. To say that investors were **un**reasonable because they did not act faster than the market asks them to do something that *Polymedica* stated is impossible. This is not the law.

In Defendants' cases, the reliance was unreasonable because the defendants themselves had clearly corrected the statements *before* the plaintiffs' purchases, and the correction caused the stock price to fall, thus showing that the market had incorporated the defendants' correction. In *Vertex*, the plaintiffs alleged that they presumptively relied on information released a month before their purchase, but on the day before their purchase, the defendant both issued a press release and held an investor conference call to explain that the previously reported information was erroneous and why it had been erroneously released. *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 232 (D. Mass. 2014).  The news caused the company's stock price to fall $7.05. *Id.* at 235. Thus, in that case, there was no question that "relying on the earlier misrepresentation would no longer be reasonable in light of the new information; furthermore, the market is assumed to have processed the correction, which would be reflected in the stock price." *Id.* In *Oklahoma Firefighters*, the defendants allegedly concealed that it was unlikely they would complete an amusement park on time. But plaintiffs purchased shares **months after**, as the court saw it, the defendants publicly and repeatedly revealed that they would not meet their completion target. *Oklahoma Firefighters Pension & Ret. Sys. V. Six Flags Ent. Corp.*, 2023 WL 3781645, at *6 (N.D. Tex. June 2, 2023). The court distinguished controlling authority because there, the plaintiffs purchased shares **before** "all artificial inflation [of the stock price was] removed from the market." *Id.* In *Abengoa*, the plaintiffs bought securities after the company held conference calls disclosing precisely the same information the plaintiffs alleged was misstated, allegedly "stun[ing]" the market and causing the company's stock price to fall 50%. *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 201-02, 206-07 (S.D.N.Y. 2020). Reliance was unreasonable because no 'careful

10

and sophisticated analysis' was required before the disclosures could have been considered 'reasonably available to shareholders.'" *Id.* at 206. In *Dr. Reddy's*, the defendants told investors that they were complying with FDA regulations and specifically that they did not anticipate receiving an FDA Warning Letter. ***Months*** before the plaintiffs' purchase, the defendants publicly revealed that they had received a Warning Letter and the FDA publicly filed it, causing the company's stock price to fall 18%. *In re Dr. Reddy's Lab'y Ltd. Sec. Litig.*, 2019 WL 1299673, at *4, 7-8, 12-13 (D.N.J. Mar. 21, 2019). In each case, before the plaintiffs' purchases, the defendants disclosed facts showing, clearly and unambiguously, that their earlier statements were false. Then, the stock price fell, showing that the market had incorporated the correction.

Defendants also cite cases that are inapposite because the plaintiffs did not rely on the fraud-on-the-market presumption of reliance. Nevertheless, in those cases, too, the information revealing that defendants' statements were false was easily available to plaintiffs. In *Ashland*, concerned about disclosures in the industry in which the defendant operated, the SEC had ordered the defendant and others to make certain disclosures to investors. *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 335 (2d Cir. 2011). These disclosures specifically addressed the risks the plaintiffs alleged were concealed. Plaintiffs, who were "sophisticated investor[s]", could not have been misled because they ***received*** these curative disclosures. *Id.* In *Amway*, defendants allegedly concealed that China had acceded to the World Trade Organization. *Wardrop v. Amway Asia Pac. Ltd.*, 2001 WL 274067, at *4 (S.D.N.Y. Mar. 20, 2001), *aff'd,* 26 F. App'x 89 (2d Cir. 2002). It was unreasonable for plaintiffs to ignore one of the biggest news items that year.

To make more palatable their absurd contention that investors were unreasonable for failing to understand the whole of the Massie Report, Defendants suggest that knowledge of the Massie Report's introduction can be imputed to investors and that alone is sufficient to make reliance

11

unreasonable. Yet the sentences Defendants quote from the introduction do not convey anything like the truth contained in the Massie Report. First, they quote its statement that the "[t]otality of the data does not seem to support the efficacy of the high [Aducanumab] dose." Def.Br. 6. Yet Massie's bare opinion, shorn of the statistical analysis supporting it, did not show that the All Data statement was false. Defendants also quote a statement that non-Carriers had "less treatment effect". Def.Br. 6. But that quote substantially understates the information present in the body of the Massie Report: the treatment effect for non-Carriers was virtually nil. ¶¶153-54; *Shash*, 84 F.4th at 12. Nor does it address the other two reasons the All Data statement was false: "carriers, who received high dose aducanumab following PV4, did not experience better clinical outcomes after the dosing protocol change (in EMERGE, carriers' CDR-SB scores got slightly worse); and carriers in ENGAGE are the only subgroup who 'did better' on high dose aducanumab." *Id.* To obtain the information necessary to call the All Data statement into question, Plaintiffs would have had to do the impossible and find, read, understand the whole Massie Report, and compare it to the FDA's main brief and Defendants' false statements. *Cf.* Defs. Mem. at 8 n.4 (arguing that Nadia Shash did not reasonably rely on Biogen's stock price because the FDA released the briefing materials no later than 10:11 a.m. on November 4 and Shash purchased Biogen stock no earlier than a mere 43 minutes later).

### C.     The Massie Report Was Only a Partial Corrective Disclosure

The Court should also deny Defendants' motion because the Massie Report did not completely cure the impact of the All Data statement. Some defendants argue in opposition to motions for class certification in securities action that a class period should be cut short because a curative disclosure made reliance unreasonable thereafter, the same argument Defendants make here. Then, courts hold that "whether or not a particular release or disclosure 'actually cured a prior misrepresentation' is a sensitive issue to rule on at this early stage of the proceedings because

it comes so close to assessing the ultimate merits in the case, and courts therefore decline to find reliance thereafter 'unreasonable, as a matter of law,' unless there is 'no substantial doubt as to the curative effect of the announcement.'" *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 529 (N.D. Cal. 2009). "Whether a disclosure actually cured any previous misrepresentations is a fact sensitive inquiry, and is more appropriately resolved after sufficient fact finding." *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *9 (D.N.J. Sept. 25, 2012). Courts "refuse to narrow the class period if there is a substantial question of fact as to whether the release had cured the market." *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *13 (M.D. Tenn. July 14, 2017).

In *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672 (D. Mass. Nov. 14, 2017), Judge Casper decided a strikingly similar—though weaker—case in the plaintiffs' favor. The case also involved FDA advisory committee materials and the FDA advisory committee meeting itself. There as well, the defendants maintained that the briefing materials were fully curative, such that reliance was not reasonable after their publication. Judge Casper recognized that "some of the salient data and study conclusions had already been revealed" with the briefing materials. *Id.* at *7. But she found that the briefing materials were not fully curative because the advisory committee "members' ***responses to the presentation, and their recommendation therefrom, were new information***." *Id.* On this ground, Judge Casper found that reliance on defendants' false statements was still reasonable until after the advisory committee meeting itself. *Id.* at *5, *7. Without the advisory committee's ***reaction***, the briefing materials "fail[ed] to convey the extent" of the full truth. *Id.* at *7.

Here as well, the Advisory Committee's reaction to the Massie Report was itself new corrective information. Indeed, this is a much stronger case. In *AVEO*, there was nothing to cast doubt on the corrective information contained in the FDA briefing materials. Here, the Massie

13

Report bore a prominent DRAFT watermark. Was it, as one analysis suggested, an old analysis that had been superseded by the later analyses set out in the FDA's primary report? ¶273. In *AVEO*, the advisory committee did not need to adjudicate a dispute between different parts of the FDA. But here, while the FDA's biostatistics reviewers expressed concerns about the data supporting Aducanumab's application, relying on complex statistical analysis, the 243-page FDA principal report and clinical review called one of the studies "exceptionally persuasive". ¶269. Were Massie's criticisms substantial, or were they were mere nits from an overeager tyro? Moreover, the Massie Report was difficult for capital markets to understand because it was written for the world-class experts on the Advisory Committee. These experts, better positioned to evaluate the evidence than the market, adjudicated the dispute between the main report and the Massie Report.

Thus, as in *AVEO*, the truth was not fully revealed until the Advisory Committee members' comments and votes provided one new piece of additional information: Massie was right.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for judgment on the pleadings, except that Plaintiffs do not oppose dismissal of the claims against Samantha Budd-Haeberlein. If the Court grants the motion for judgment on the pleadings, it should grant leave to amend to add named plaintiffs who purchased Biogen shares before the release of the Massie Report. *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 36-39 (1st Cir. 2020).

14

Dated: February 20, 2024                    Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            <u>*/s/Laurence M. Rosen*</u>
                                            Laurence M. Rosen, Esq. (pro hac vice)
                                            Jonathan Horne, Esq. (pro hac vice)
                                            Joshua Baker, Esq. (BBO #695561)
                                            Sara Fuks, Esq. (pro hac vice)
                                            Brian B. Alexander, Esq. (pro hac vice)
                                            275 Madison Avenue, 40th Floor
                                            New York, NY 100016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            lrosen@rosenlegal.com
                                            jhorne@rosenlegal.com
                                            jbaker@rosenlegal.com
                                            sfuks@rosenlegal.com
                                            balexander@rosenlegal.com

                                            *Counsel for Plaintiffs*

15

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** was served by CM/ECF to parties registered to the Court's CM/ECF system.

/s/Laurence Rosen