1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

NADIA SHASH and AMJAD KHAN,            )
Individually and On Behalf of All      )
Others Similarly Situated,             )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )    Civil Action No.
                                       )    1:21-cv-10479-IT
BIOGEN INC., MICHEL VOUNATSOS,         )
ALFRED W. SANDROCK, JR., and           )
SAMANTHA BUDD HAEBERLEIN,              )
                                       )
          Defendants.                  )
                                       )
_____


BEFORE THE HONORABLE INDIRA TALWANI DISTRICT JUDGE


MOTION HEARING BY VIDEOCONFERENCE



Tuesday, February 11, 2025
2:33 p.m.




John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

    THE ROSEN LAW FIRM, PA
    BY:   LAURENCE ROSEN
         JONATHAN R. HORNE
    275 Madison Avenue
    40th Floor
    New York, NY  10016
    (212) 686-1060
    lrosen@rosenlegal.com
    jhorne@rosenlegal.com


    MOLOLAMKEN LLP
    BY:  ROBERT KRY
    600 New Hampshire Avenue NW
    Washington, DC  20037
    (202) 556-2000
    rkry@mololamken.com


    MOLOLAMKEN LLP
    BY:  SWARA SARAIYA
    430 Park Avenue
    New York, NY  10022
    (212) 607-8160
    ssaraiya@mololamken.com


On behalf of the Defendants:

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    BY:  AUDRA J. SOLOWAY
         SAMUEL PATTERSON
    1285 Avenue of the Americas
    New York, NY  10019
    (212) 373-3000
    asoloway@paulweiss.com
    spatterson@paulweiss.com

**P R O C E E D I N G S**

(In open court at 2:33 p.m.)

THE DEPUTY CLERK:  United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cv-10479, Shash, et al., v. Biogen Inc., et al.  Will counsel please identify themselves for the record.

MR. ROSEN:  For the plaintiffs, Your Honor, Laurence Rosen.  I will be addressing the motion for judgment on the pleadings.  And Mr. Horne, Jonathan Horne, will address the motion to amend.

THE COURT:  Okay.  Good afternoon.

MR. ROSEN:  Good afternoon.

MR. HORNE:  Good afternoon, Your Honor.

MR. KRY:  Good afternoon, Your Honor.  Robert Kry with MoloLamken for plaintiffs.  We're co-counsel in the case, and my colleague Swara Saraiya is with me as well.

THE COURT:  Good afternoon.

MS. SOLOWAY:  Good afternoon, Your Honor.  Audra Soloway from Paul Weiss for the defendants.  And with me is my colleague Sam Patterson, who is right here, but you can't see him on the screen.

THE COURT:  Okay.  Good afternoon.

So on short notice, I have your long-pending motions ready for hearing here.  I'm not sure I'm prepared to

proceed in the separate format, Mr. Rosen, that you have suggested.

I would like to start with subject matter jurisdiction and then proceed to the motion to dismiss, and then proceed to the motion to amend; because if this Court has no subject-matter jurisdiction as defendants contend, then I shouldn't be deciding a motion to dismiss under 12(b)(6) or 12(c).  And I am concerned that this has been proceeding for this many years, including a decision on a merits decision from the First Circuit, if you are now contending that there's a lack of subject-matter jurisdiction.

So I will start with Ms. Soloway.  And I will put a few things just on the table to start with.  Obviously, as we all know, subject-matter jurisdiction can be raised at any time.  That said, you have an obligation of candor to the Court.  And when you assert to me that you have raised constitutional Article III standing repeatedly and I go and look for that -- I can't find that anywhere -- it raises very serious problems.

So you're certainly free to argue Article III standing today, but that's not what your papers are saying.

MS. SOLOWAY:  So let me -- Your Honor, let me address that first.

So as Your Honor, I think, has noted, when we filed

our motion to dismiss the second amended complaint, which was filed a couple years ago, we did raise reliance on standing as an argument.  I think what Your Honor is saying is we did not use the words "Article III standing" --

THE COURT:  It's not just that you didn't use the words "Article III," but standing has two different meanings.  So one can argue that there's a statutory problem.  Standing can come up in a lot of contexts.

But standing for Article III purposes is -- well, among other things, it means that the courts aren't to go and address the merits.  You have to start with that, because you have no basis to say anything as a court.

So you filed a motion to dismiss under Rule 12(b)(6) the first time around.

MS. SOLOWAY:  Correct, Your Honor.

THE COURT:  Rule 12 requires you to either -- requires you, when you answer a complaint -- let's start with that -- Rule 12 requires you, when you answer a complaint, to assert an affirmative defense if you have it of lack of subject-matter jurisdiction.  That's not in your answer.  It gives you the option of raising that affirmative defense by motion.  It's not in your 12 -- your Rule 12 motion.  You filed a Rule 12(b)(6) motion, not a Rule 12(b)(2) motion when you -- sorry, a 12(b)(1) motion when you first filed this.

And then when you were up in the First Circuit, you

never suggested to the First Circuit that this is a standing problem, that this is Article III and the courts have no authority to do it.

So if you want to tell me that you've now learned or come to realize that you think this is of constitutional magnitude, we can have that conversation. But if you're telling me that you have asserted this for the last three years, you've simply lost all credibility with me.

MS. SOLOWAY: So, Your Honor, let me address that.

So when we argued the motion both before Your Honor and in the First Circuit, I think we did describe a standing challenge, which we tied into the lack of reliance and argued both alternatively that the fact that the lead plaintiff and the named plaintiff here purchased after the alleged corrective disclosure meant that they couldn't as a matter of law plead either reliance or that they didn't have standing.

I agree we didn't use the words "Article III," but we did argue standing.

THE COURT: Well, but you're dodging the point here, Ms. Soloway, right? The point here is that standing has two or three or five different meanings. And you have never said that when you say "standing," you mean constitutional standing; because if that's what you meant, the First Circuit should not have affirmed most of the dismissal in my decision on the merits.

The First Circuit should have said, "Remanding to the Court for dismissing it for lack of subject-matter jurisdiction."  That would have been the appropriate thing if you were right about it being a standing -- but to say, "Oh, but we chose not to elaborate our standing discussion to the First Circuit and say it was constitutional standing," is to mislead the Court, if that's what you believed.

MS. SOLOWAY:  So, Your Honor, there was certainly no intent to mislead the Court.  The question of whether this was an issue of statutory standing or constitutional standing really was sort of not an issue in the case until this most recent round of briefing, when the -- when the --

THE COURT:  It's always an issue.  That's the reason that standing can be raised forever, because standing -- a federal court must always first ascertain that it has jurisdiction.  And you can't pick and choose.  You can't say, "You know what?  I think I'm winning.  I think I've got the Court on my side on this.  I'm not going to talk about dismissing it without prejudice for lack of standing."

MS. SOLOWAY:  Your Honor, 100 percent agreed, and I'm not suggesting that it wasn't always embedded in the case.  I'm just explaining why we had not -- "we," meaning the defense lawyers in this case -- had not focused on this distinction.  It wasn't through any attempt to mislead the Court.

And to be -- just to understand, when we went back and looked at the case law on this in connection with this most recent round of briefing, the issue of whether this is constitutional or statutory standing really did not sort of -- we didn't really start thinking about that issue until it -- candidly, until it became an issue for whether that meant that these additional plaintiffs could come in and intervene in a case that either had or hadn't been properly filed.

And as Your Honor, I'm sure, saw from the admissions, this issue was one that hasn't been well briefed in a lot of the cases where this issue has been addressed. For example, in the *Vertex* case, which is another case in the District of Massachusetts, in the *Abengoa* case, which is a New York case we cite, there's a lot of discussion of standing that doesn't really explain are we about statutory standing or constitutional standing --

THE COURT:  But, Ms. Soloway, again, every federal court has an obligation to consider standing first.  So if a Court is discussing standing and they're not saying, "Wait a minute.  Do we have subject-matter jurisdiction?" I think you can generally assume that they're statutory standing; because, otherwise, they don't get to pick and choose which way you win.  What we have to do as federal courts is make sure we have jurisdiction to hear the case.

MS. SOLOWAY:  Understood, Your Honor.

I think the other point I would make on this is that the law, I think, has been recently clarified by -- at least to the extent out-of-circuit precedent is instructive here by the Fifth Circuit's decision in the *Six Flags* case, which is a case that we cited in our briefs and which was partially reversed by the Fifth Circuit.

But what the First Circuit said in that case and addressed this issue of is this statutory, is it constitutional Article III standing?  And it said that in this context, this issue of reliance is, in fact, an issue of constitutional standing.

So --

THE COURT:  And does it make a difference --

MS. SOLOWAY:  -- I think it developed over the time just that we've been briefing these issues, Your Honor, to make -- to put this issue into sharper contrast.

THE COURT:  So, Ms. Soloway, I would recommend going forward that you start with the candid position and not pretend that you've done something different than you have. And it just -- it just -- we are -- you know, look at how many of you are sitting there and how many of you are in the room.

I don't have the manpower that you have.  And I rely on lawyers to be candid.  I don't expect that you're

going to change your stories -- I understand there's developments along -- you're certainly free to make arguments that the law has developed.

But to change your story about what you've said for the last three years, you simply lose credibility, and I really strongly recommend that you don't proceed that way.

MS. SOLOWAY:  Your Honor --

THE COURT:  When you're talking about the *Six Flags*, that's the Oklahoma case?

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  Now, am I -- when I go through *Six Flags*, there is the sentence that you quote that says when it's disclosed; but in the other ten references, it discusses fully disclosed.

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  And isn't it a -- you need to face back or we can't hear you.

MS. SOLOWAY:  Oh, yes, Your Honor.

THE COURT:  Isn't it a fair distinction on the standing point -- I'm going to use very less than formal wording here, but as a very practical matter, on standing, if you're wholly outside of what's protected by a statute, you may well lose on Article III grounds.

If we're fighting about the nuances of that protection, that tends to be a 12(b)(6) case and not an

Article III case.

MS. SOLOWAY:  So I think, Your Honor, what the *Six Flags* Court is saying is that -- and it's not totally clear whether they're tying it into traceability or injury in fact because they sort of use both sets of words.

But I think what the Fifth Circuit is saying in that case is that, when a plaintiff purchases after they knew or could easily have known the consequences of -- or that the alleged false statement was, in fact, allegedly false, that this implicates Article III standing issues.  And the words that they use -- yes.

THE COURT:  The word they use is "fully disclosed." So in other words, when you're completely outside of the parameters of anything, then we're not going to allow you to come and waste the time of the Court because you just have no business being there.

MS. SOLOWAY:  Exactly.

THE COURT:  But if you're fighting about the nuances whether this applies or doesn't apply, the statutory provisions, I think that tends to be more a question of -- a 12(b)(6)-type question and not an Article III question, even in this case, where they're talking about "fully disclosed, fully disclosed, fully disclosed."

MS. SOLOWAY:  Well, I think the "fully disclosed" point actually goes to a different debate between the parties

in this paper, Your Honor, which is:  What was the full disclosure here, the full corrective disclosure?  So we have submitted, as the First Circuit seems to have held, that the Massie report is the full corrective disclosure.

THE COURT:  They use -- many more times they use the word "a corrective disclosure" and not "the."  They use the word "the corrective disclosure," I think, once; but the rest of the time, it's "a corrective disclose."

MS. SOLOWAY:  But they make no reference, Your Honor, to the advisory committee vote being a corrective disclosure or the corrective disclosure at all, even though they were faced with a complaint that contains two alleged stock drops.  And they make no reference whatsoever to that.

So I think the First Circuit looked at the papers, drew the conclusion the Massie report was the corrective disclosure, and then followed from there the analysis of whether that could sufficiently plead loss causation.

I mean, there are a lot of reasons why, frankly, the advisory committee vote doesn't plead loss causation.  It's not only because of the First Circuit's reasoning, but I think the plaintiffs haven't also identified any separate new information that came --

THE COURT:  I'm sorry; did you just say the First Circuit didn't find loss causation?

MS. SOLOWAY:  I'm sorry; if I said that, I

misspoke, Your Honor.  I meant that there are additional reasons not addressed by the First Circuit, Your Honor, that wouldn't have been in that decision why loss causation would not be pleaded by the advisory committee vote.  I'm happy to address those.  That's something else that's debated by the parties.

But I think, going back to your original question, Your Honor, when the *Six Flags* case talks about fully disclosed, I think they're implying the issue of was this a full corrective disclosure, not the question of how long does it take information to work its way into the market, which is a separate issue that the plaintiffs have raised.

THE COURT:  I think -- I will go back and read these things.  I think where I am focusing here is I think there are lots of different interesting questions raised here.  I don't think Article III is one of them.

So there may be a standing problem under the statute, and I think that's where we head next.  But I don't think this is an Article III issue.  And I think the fact that you didn't recognize it as an Article III issue before is not because you missed it, but because it really isn't an Article III.  It's a statutory interpretation question.

So I will look through this one more time, but I don't find compelling the idea that I should be issuing a decision here that the complaint is dismissed without

prejudice and the -- for lack of subject-matter jurisdiction; and the First Circuit decision is, therefore, of zero moment. That doesn't seem to me -- I mean, frankly, it's not what you even asked for.

MS. SOLOWAY:  That's -- that's correct, Your Honor.

I think, irrespective, frankly, the issue that the constitutional standing issue rose to prominence in this briefing, Your Honor, is because of the issue of whether additional plaintiffs could be added to --

THE COURT:  But that -- but that's the problem, Ms. Soloway, is you don't get to pick and choose when I have to have subject-matter jurisdiction.  I always have to have it.

MS. SOLOWAY:  Understood.

THE COURT:  And if it is your view that I don't have subject-matter jurisdiction, then when we turn to the motion to dismiss, what you are asking me is to dismiss their complaint for lack of subject-matter jurisdiction; i.e., without prejudice.

MS. SOLOWAY:  So I think what we're asking alternatively, Your Honor, is either that or to dismiss because reliance is, in fact, an element of the cause of action and because the two plaintiffs here cannot plead reliance, that that is a basis on which to dismiss.

And as I mentioned, the cases that we've cited, the

*Vertex* case, the *Abengoa* case, the other cases we cite, talk about lack of reasonable reliance as well as they raised the wording "standing."  And so whether it's standing or reasonable reliance, the -- in our view, the outcome is the same, which is dismissal of the claim.

THE COURT:  I don't even have a problem with using the word "standing."  It's the question of whether you are making a constitutional argument, because if you're making that argument, then I don't get to go into the alternative.

I have to tell you, I've tried that once on an immigration case.  I didn't know if I have subject-matter jurisdiction, but if I did have subject-matter jurisdiction, I would deny it on a failure to deny a claim.  And the First Circuit would reverse me, not because they thought the guy had stated a claim, but they basically said you can't get there.  You can't make that jurisdiction if you don't have jurisdiction.

So I can't pick and choose.  I have to start with the question of:  Is there subject-matter jurisdiction?  And I understood your 12(c) motion to not be asking me to dismiss it without prejudice for lack of subject-matter jurisdiction. If I'm misunderstanding you, please be clear here.

MS. SOLOWAY:  No, Your Honor.  We are asking for a dismissal with prejudice as against the two named plaintiffs; and we have asked, I believe, in the alternative to find

either no reliance pleaded or lack of standing.

And, yes, we have -- even if we are wrong that there are -- is no Article III standing, there is still the concept of standing that's mentioned in all of the cases, which the courts sometimes describe as statutory standing.

THE COURT:  I'm just trying to hold you to -- I'm just trying to -- if your argument is a 12(b)(6) argument, either based on lack of reliance or lack of statutory standing, I think that's an appropriate thing for us to talk about.

If your argument is that this is a constitutional problem and I find anything that you're saying here to be with merit, the result is a dismissal without prejudice.

MS. SOLOWAY:  A dismissal without prejudice as to these particular plaintiffs?  Is that -- I'm sorry, Your Honor.

THE COURT:  That's the only case that's in front of me.

MS. SOLOWAY:  I'm just not sure how it's -- Your Honor, I really am not trying to be argumentative. They -- this is a problem that they cannot cure.  They purchased when they purchased.  So I don't think it's a problem that they can fix.  They can't create injury in fact based upon their stock purchases if they don't have it right now.

THE COURT:  If these two people don't have it right now, then these two people would -- their claim -- the action, which is being led by these two people -- but they're the only plaintiffs in front of me as we speak right now.

MS. SOLOWAY:  Exactly, Your Honor.

THE COURT:  But it would be dismissal without prejudice, which would mean anybody else is -- there's nothing there then.  The First Circuit decision, all of the other stuff disappears, as to any collateral estoppel or, you know, resolution of the issues.  I don't think that's what you're asking for.

MS. SOLOWAY:  Actually, Your Honor, the -- and I apologize.  I think we may have buried this in a footnote in our opening brief.  When we asked for dismissal with prejudice, we did say only with respect to these two named plaintiffs and that we were not seeking any relief from Your Honor with respect to potentially absent class members.  So just to be clear, that is always what we have been asking for.

THE COURT:  But even with them, it's a dismissal without prejudice as to them if it's for lack of subject-matter jurisdiction.

MS. SOLOWAY:  Well, again, Your Honor --

THE COURT:  Maybe they can't cure it, but that's not my problem.

MS. SOLOWAY:  Okay.  Understood, Your Honor.  Got it.

THE COURT:  Okay.  Let's turn to your 12(b)(6) motion, which -- and here, I need to go back and forth on the question of the presumption of reliance.

Normally, in a fraud case, a plaintiff has to show actual reliance.  The cases that the plaintiff has cited to me I think come up a lot in the class certification context, but suggesting that there is a presumption and we proceed on that presumption.

If I were to accept the defendants' arguments that you're not entitled to that here, is it your view that your complaint as stated alleges actual reliance, or is it reliance solely based on the presumption?

MR. ROSEN:  Your Honor, our complaint proceeds under the fraud on the market presumption of reliance theory.  And we are not alleging direct reliance.

THE COURT:  Okay.  So it doesn't matter whether I'm at the class cert stage or at the pleading stage.  Either way, as you are alleging that you've met the reliance element, your pleading is based on the market.

MR. ROSEN:  Yes, Your Honor.  But I think that addressing the fraud on the market reliance, typically -- class certification --

(Connection lost and reestablished.)

THE COURT:  Let me proceed this way.  Plaintiffs' brief raises the presumption, the market presumption, using the factors under the *Basic v. Levinson* case.  And defendants don't mention that in their reply one way or another.

But for defendants now, any disagreement that at the pleading stage a plaintiff may allege facts under the basic test to create a presumption that would lead to a presumption, which a defendant could then rebut, but for purposes of a 12(b)(6) motion, you would go with the presumption as pled.

Putting aside the question whether that happened here or not, you would agree with that framing, yes?

MS. SOLOWAY:  Yes, Your Honor.  Typically in a securities class action, a plaintiff may argue that they're relying on the basic presumption of reliance, rather than coming in and saying, "On July 22, 2020, I heard the alleged false statement, and I relied on it."  In a normal securities case and in an average case, that is common.

What is not -- go ahead, Your Honor.

THE COURT:  No, go on.

MS. SOLOWAY:  What I was going to say is what is not common, Your Honor, is this other doctrine of reliance coming into play, which is that the plaintiffs, who have filed the lawsuit and are proposing to represent the class, had actually purchased after the corrective disclosure of the

fraud has come out.

And there is this other doctrine which we have cited in our briefs, Your Honor, that says that a plaintiff who purchases after the corrective disclosure cannot be said to have reasonably relied on the alleged misstatement.

THE COURT:  Okay.

MS. SOLOWAY:  So what the plaintiff --

THE COURT:  But isn't the whole question going to at some point turn then on the notion of whether you're cutting off -- whether they fail to establish the presumption if the purchase happens one second after the disclosure happened, or have they adequately pled this by suggesting that the disclosure took a few hours or days to permeate the market, and so the purchase is during a time when the -- maybe a way to put it is the corrective disclosure is in the process of getting heard by the market?

And isn't that going to a question at some point that is going to be more one that experts would argue about when the corrective disclosure is reflected in the market rather than saying at the pleading stage that you're going to take the corrective disclosure as being this second in time and anything after that second is no good?

MS. SOLOWAY:  Yeah, so I think, Your Honor, there is sort of -- like, I think this is an apples/oranges issue, right?  It is true that, at class certification or at later

stages of the case, there can be a debate about how long it takes information to get incorporated into the market price.

And that may be relevant for the question of how much the damages are or whether there was a back-end price impact that serves as a proxy for front-end impact under the class certification analysis where we're allowed to rebut the presumption of reliance.

But I think those principles operate separately from the legal principle that a plaintiff who purchases after the corrected information is available can't come into court. Even though they could have spent two seconds on the Internet and found the answer, they can't come into court and say, "I reasonably relied on the integrity of the market price."

THE COURT:  And you're saying that as a matter of law, not as a matter of fact.

MS. SOLOWAY:  Correct, Your Honor.

THE COURT:  And my question for you is -- maybe the question is what's your best case to say, as a matter of law, where a corrective disclosure is alleged to be buried, essentially, it nonetheless, as a matter of law, bars the claim the moment it is out there.

MS. SOLOWAY:  So let me address two things.

One, I think -- let me just address whether the corrective disclosure was actually buried here.  So the plaintiffs' theory, right, is now reduced to one statement by

Dr. Sandrock, the statement the First Circuit referred to as the "all data statement."  And Dr. Massie's report that comes out the morning of the 4th in summary says the totality of the evidence does not support the efficacy of the high dose.

So I don't think there's anything about this that was buried.  We've cited in our brief there's a newspaper report by 10:43, I believe, that morning that talks about Dr. Massie's report --

THE COURT:  Which I don't get to look at, do I, on a Rule 12(c)?

MS. SOLOWAY:  So I think I can take judicial notice of things, for example, that are in the world --

THE COURT:  I've accepted all our arguments once before.  And I've been reversed on this one.  So let's be careful here and make sure that are you're giving me something --

I don't necessarily accept the likelihood of the cause of action that the plaintiffs are suggesting.  I mean, it -- it's much -- you know, it could just equally plausibly be that these two individuals read the frontline of the information that came out on November 4th and purchased because of that and didn't read the attachment.  That's as equally plausible probably, but that's not for me to weigh right now.

And for you to -- to say that I can't -- that I

have to accept your version, I can go and look at how many -- you know, what the newspapers are out there and so forth, I have to take your version that they -- that they know this, I need that as a matter of law if you're going to want me to hang my hat on it.

And I don't see case law where there is a debate about how long it took for, or where the disclosure was, I don't see that as precluding a presumption at the motion -- at the pleading stage.

MS. SOLOWAY:  So, Your Honor, we're -- we -- so I don't think we're arguing -- we are not arguing that we know what Mr. Khan or Ms. Shash knew or didn't know.  We are purely arguing this as a matter of law.  There are several cases that the shareholder purchased the very next day and --

THE COURT:  Yes, but nobody is arguing in those cases the argument they're making here, correct?

MS. SOLOWAY:  Well, to be fair, Your Honor, usually the plaintiffs cut off the class period the day before the corrective disclosure.  So this doesn't usually come up in --

THE COURT:  And if you thought the class period -- you know, I mean, we're getting here and we're saying these are really bad plaintiffs, right?  And you're saying that they -- they are -- they don't have a claim.  They don't have a stake in the thing.

Well, you know, maybe that means that one of the

other contenders to be plaintiffs at the get-go should have been the correct ones, and maybe there should have been an argument that this cutoff happened two days earlier than it did, and maybe that argument should have happened three years ago.

But nobody disagreed until we get to this point that this is the right class.  I mean, their allegation in their complaint is that it goes through November 6th.  And that's the allegation I have.  That's how the plaintiffs were picked with that allegation.

So, yes, normally, you would have probably wanted your class period to end earlier.  Sure.  And then you would have picked a different set of plaintiffs three years ago.

MS. SOLOWAY:  Well, see, Your Honor, I can't speak for what the plaintiffs' thinking was, but I suspect they chose the 6th because they actually believe that the stock drop on the 9th is their last actionable stock drop.  So they picked the day before the last drop.

And that is typical in these cases.  If the 9th -- if the plaintiffs were not trying to proceed on the 9th, frankly, I suspect that they would have picked the -- since the information comes out the morning of the 4th, I suspect they would have ended their class the day before that, but for the fact that their lead plaintiff purchased on the 4th, which is, of course, what puts us in this situation that

we're in now.

So, normally, in these cases, again, just as a matter of course, the plaintiffs do end the class period before the corrective informing comes out.  Here they happen to have a lead plaintiff who is in the very unusual position of having purchased at some point during the day clearly after the news came out.

As Your Honor noted, we did cite news sources for the time of day, but the plaintiffs have not challenged that that is inaccurate or said that the Court can't take judicial notice of that, so we know that they did purchase after the news was already available.

So I think what -- I think the cases that we've cited, which are the *Vertex* case, the *Abengoa* case, both cases were decided where the plaintiff had bought the next day.

Here, I think our view is the legal principle behind those cases have to hold true whether it's the next day or even a few hours later.  There --

THE COURT:  Or even a few seconds later.

MS. SOLOWAY:  There has to be a moment in time, Your Honor, when it's just not reasonable to have relied; and it should be when, with an exercise of meager diligence, a plaintiff could know that information has come out that in the executive summary makes clear that the alleged false

statement has been corrected, in the plaintiffs' view.

I mean, this is not a case where the plaintiffs would have needed to understand all of the tables or all of the data. The plaintiffs are now arguing they would have needed an expert to understand it. The executive summary says the totality of the evidence does not support high dose adu's efficacy. And the theory that the plaintiffs are proceeding on is that Dr. Sandrock somehow said all the data supports its efficacy, so --

THE COURT: That theory I have to -- that's there, right? You've convinced me once I couldn't go with that. I was flipped. So don't -- let's not spend time on that again.

MS. SOLOWAY: I mean, that is the theory that the First Circuit has now reinstated. That's what we have.

THE COURT: Yes, that's what we have. So don't -- I'm not sure where you want to go with that with me.

MS. SOLOWAY: I think the point I'm making, Your Honor, is it actually is down to a single misstatement.

THE COURT: Yes.

MS. SOLOWAY: And when you look at the Massie report, you only need to read the executive summary to come to the conclusion that that purported misstatement is false. This is not a case where you have to understand all the charts and the tables, as the plaintiffs are now arguing.

But I think, really, at the end of the day,

Your Honor, it's a legal question.  Once the information is out there in the world, it's knowable, and it's just not legally proper to rely on, as plaintiffs claim, the integrity of the market price.  The information is knowable.  You just can't come into court and claim fraud when you could easily and quickly find out that there is, you know, accurate information out there.

THE COURT:  Mr. Rosen, what's your response to that?

MR. ROSEN:  I think that it's important to focus on the fact that we're not alleging individual reliance or direct reliance.  We're alleging fraud on the market.

And so the question is not whether Nadia Shash read this report, you know, in the hour before she purchased the stock or two hours before; but it's a question of how long it took for the market to process the totality of the information that was released on the FDA website that morning.

And there was not just this 343-page report that was very complicated, but it also included a host of other information on the website.

And so as the complaint alleges and as the -- the First Circuit credited, you know, the allegations of the complaint, that there was a lot of information, very dense, very complex, scientific information, that required days to

process.

THE COURT:  Well, so let me ask you this question, then.  This presumption has been set up as a way to sort of use a shorthand or use -- use a way to allow class actions to proceed, because -- if you had to prove the individual one, but there's a set of rules that was laid out for those.

If your argument is that the market is inefficient, then don't we have a problem on the presumption in the first place?

MR. ROSEN:  If -- if I were to say that, I -- I would, and we would.  But that's not what we're saying. We're saying the market is efficient, and there's -- and the defendants can, I'm sure, concede it's an efficient market -- well, they should because Biogen's a huge stock and it has a lot of institutional following.

The question, Your Honor, is -- and the defendants don't contest that the misrepresentation inflated the stock price.  I mean, there's no -- there's no -- there's no suggestion, there's no fact that there wasn't an inflated stock price.  So under the *Basic* case, we have everything necessary for a fraud on the market presumption of reliance.

We have a material misrepresentation as accepted by the First Circuit.  We have allegations of inflated stock price, right?

And so the only question under the *Basic* case is

when did the inflation in the stock price dissipate?  That's really the operative question, Your Honor.  When did it dissipate?

THE COURT:  But that's not the word -- that's not what they're saying -- the test as it is written uses these words of stock trading in an efficient market and then the truth revealed, suggesting that when the truth, which is the argument Ms. Soloway is making, that once -- the second that the truth is revealed in an efficient market, that's it.

MR. ROSEN:  Well --

THE COURT:  And to say, no, it's going to take a few days --

MR. ROSEN:  Well, but if you read the *Halliburton* case, which affirmed the continued validity of the *Basic* case, they discuss that efficient markets don't necessarily respond, you know, immediately; that not every, you know -- you know, you have to look in the context of what's being disclosed.

You have a complex set of -- you have an FDA report, joint report, with a company that is effusive and saying we should approve this -- right?  This is -- there's a lot of positive --

THE COURT:  Let me ask you a question.

MR. ROSEN:  Right.

THE COURT:  The stock price goes down from the 4th

to the -- from -- the 5th is lower than the 4th, and the 9th is lower than the 5th.  Where's the stock price on the 3rd versus the 4th?

MR. ROSEN:  So I believe the 3rd -- on the 3rd, the price was lower.  On the 4th, with the effusive FDA report, before investors had a chance to get the benefit of not just the Massie report, but the FDA advisory committee's position and analysis, initially, it goes up on the 4th.  And so when Ms. Shash purchased her stock, there had been no dissipation of inflation.

THE COURT:  But when --

MR. ROSEN:  The price actually had increased.

THE COURT:  And when she -- where did -- the price, when she sold it, compared to the price on the 3rd?

MR. ROSEN:  I am not 100 percent sure, but I know that when she sold it on the 9th -- I think it was on the 9th or later -- it was lower than she purchased it.  I would have to look --

THE COURT:  Sorry.  My question is compared to the 3rd.

MR. ROSEN:  I don't know off the top of my head.

THE COURT:  Do you know, Ms. Soloway?

MS. SOLOWAY:  I don't know for Ms. Shash.  I will confirm, though, Your Honor, that the stock price shot way up on the 4th.

And I just want to make sure that we're all clear on the facts.  The joint briefing book was released in the morning with all of the FDA analysis that the plaintiffs describe as effusive, but simultaneously with the Massie report.

So we will deal with this if we need to later in the case, Your Honor, but we do disagree that there is a -- you know, this idea that you can have a first day positive impact and a second day negative impact from information that's all released at the same time, that is not something we would agree with, but that would be an issue for class certification or potentially later.

I think the fundamental problem here, Your Honor, is all of the principles that Mr. Rosen is talking about, which is how long does it take the market and when is this piece of information adopted and when is that piece of information adopted, all of that might be perfectly interesting in trying to figure out was there inflation being maintained in the stock or being injected into the stock from the front end when Dr. Sandrock spoke on July 22nd, which is an issue we could deal with at class certification, but that's mixing, again, apples and oranges with the legal principle that a shareholder who purchases after the corrective disclosure just, as a matter of law, can't allege reliance or standing.

And so I think that this is sort of an apples-to-oranges argument because none of this price impact analysis where you might have to look at how long it took in an efficient market the stock price to fully incorporate information has undermined the fundamental core doctrine that, as a plaintiff in a fraud case, you just can't come in when the information has already been released.

MR. ROSEN:  But, Your Honor, I don't think that's true, and I don't think that applies to a fraud on the market case.  She's talking about individual reliance, and then you'd have to --

THE COURT:  But don't we have a problem --

MR. ROSEN:  -- individual -- what they did and why they did it.

THE COURT:  Don't we have a problem here on the fraud on the market theory, which is one way to look at it is to say we're just going to have this very formal rule that will substitute for approving actual reliance, and that -- if you just -- it's just a safe harbor.  You meet those -- that formal rule, and then the question of whether that's actually what happened can be rebutted by the defendant.  That's one way of looking at it.  It's very, very formal, very, very strict.

Another way to look at it is to say it's a rule that makes kind of sense because we know that the market --

that people purchase in this -- the reasoning behind this, that we know that people purchase in this market.  They're not talking to their individual person.  And so we're going to use these things as proxies; and so, therefore, it's a rule, but it comes from a practical logic about how the market works.

Under that theory, under that explanation of what we have here for the presumption, do I, as a practical note -- right? -- at the end of the day, if you're trying to prove reliance, but also ultimately trying to prove the loss causation, but trying to prove reliance, if the facts are the following, which is the statement is made in the summer or the year earlier or some other period of time, the price has gone down, is that a lower -- it's at a particular value.

And then you have a series of things that happen, one of which is a new set of information in the market and the corrective disclosure both happening at the same time; and that this new -- isn't it sort of like an intervening cause when the FDA report comes up?

And so this whole idea that you're giving me here, which is, well, we've got to take a few minutes for the corrective disclosure to be understood, isn't it a little bit, as a practical matter, not in a technical legal read, but just thinking of it from a commonsense point of view, isn't what's really going on here that you have this FDA

briefing initially, and that's what's driving the market up, not that it was the statement from before?

And so the whole -- the whole presumption isn't kind of happening as a practical matter. And so the only reason to use it is because of this very strict rule, in which case, why doesn't Ms. Soloway get to make her really strict rule?

MR. ROSEN: So, Your Honor, the inflation is in the stock price from the day of the misrepresentation. And then, to the extent --

THE COURT: Is it?

MR. ROSEN: Well, that's -- there's no -- that's the allegation, and it's been accepted by the -- by the First Circuit, and the defendants don't dispute in any respect that there's inflation in the stock price. It's nowhere in any of their filings that there's no inflation in the stock price.

And so the real question is -- so what happens is the inflation's in the stock price. On November 4th, there's new information. And this new information is -- there's a tremendous amount of new information. And the bulk of it is this -- is this very positive information that, you know, the FDA wants to approve this based on these clinical studies that, you know, supposedly the high dose shows efficacy.

And then a part in the back is this Massie report

that questions that.  And it's got a draft watermarking, and it's been sort of shunt to the side to third-rate status in this the -- in the -- you know, as an exhibit to the report and ignored in the body of the report.

So -- so there is other information that's affecting the stock price, but that does not mean that the inflation from the original misrepresentation has dissipated.  It's still there.  The price can go up.  Like, during the class period, the price can go up for reasons unrelated to the fraud, and it can go down for reasons unrelated to the fraud, but that doesn't change the fact it's still inflated to the extent of the fraud.

And the expert will assess what the amount of inflation is in the stock price during -- on each day during the class period, and he will produce a report to that effect.

THE COURT:  But my question is -- my question is -- and maybe I framed it very poorly -- it seems to me that I have to look at this test -- I don't know if I have to.  I could look at this test one of two ways.  Whether the presumption applies, I could look at it one of two ways.  One is I could look at it very literally and say the test says, when these four things are met, you have the presumption.

Then I'm stuck a little bit with the defendants' argument that there is a corrective disclosure and -- under

the very strict words of the test and that you haven't made the presumption.

Alternatively, I look at the facts sort of more practically that -- as you're describing, which is the report is, you know -- attached as an attachment, is marked as draft, it's buried, etc.  As a very practical matter, it took a while for people to get to it.

But when I start looking at it from that practical point of view -- and maybe the answer is this is a problem at class cert or it's a problem at a later stage, not at the pleading stage, but just bear with me for a minute.

If I'm ultimately thinking about the test the way you want me to do it where I'm thinking, you know, what is really happening, i.e., how does the draft report really look, how long does it take to sort of seep in, don't I also look at that with what's actually motivating the market and the reason the prices are going up was not the misstatement from July, but was the FDA report?  Which it may not be actionable, but that's what's making the market move.

MR. ROSEN:  Well, on that specific day, yes.  Yes.

THE COURT:  And that's when she bought, they bought.

MR. ROSEN:  Yeah, but she's buying when it's still being inflated by the July 22nd misrepresentation.

THE COURT:  That's the strict rule.  And I'm

saying, if you were to sort of actually deal with it as sort of a practical matter, have they -- you know, on the -- maybe you're saying they're rebutting it with evidence at this point and that's the evidence, how they're going to rebut it, I just -- I'm --

MR. ROSEN:  But, Your Honor, I think the question is if the -- if the market price is inflated by the misrepresentation on July 22nd, and there is -- the market price continues to be tainted by that misrepresentation and continues to be inflated on November 4th and November 5th and not until November 6th, does -- with the benefit of the advisory committee -- committee's responses and analysis on the briefing materials, is there a full disclosure, then -- then under the *Basic* case they -- the integrity of the market price continues to be tainted until November 6th.

And I think that the First Circuit's decision supports this.  It says, you know -- is that -- implicit in the district court's decision is the presumption that any hit to Biogen's stock price would have immediately followed the defendants' corrective disclosure and thus was already accounted for in the stock's price when investors purchased shares.

And then it goes on to say there's no such per se rule in our circuit, the circuit's loss causation precedent. And it goes through a bunch of cases on --

THE COURT:  Well, but that's about loss causation.  That's not about reliance.

MR. ROSEN:  Yes.  But conceptually, it's the same analysis of an efficient market.  It's the same analysis, the same expert analysis that will happen.  When you try to --

THE COURT:  And that may --

MR. ROSEN:  -- detangle the effects of a disclosure on a stock price, it's the identical analysis in an event study and other -- other techniques, but maybe an event study, in which they untangle the effects of disclosures on stock prices, and it's indistinguishable in the actual economic analysis.

THE COURT:  So all of that, we'll get to.  Assuming I let this get past the pleading stage, I think what I'm saying is this all may come back then to it being a very rebuttable presumption.  And you certainly don't get any great moment by saying -- it doesn't stop them from making all of these arguments as to what is actually rebutting the presumption here.

Let me move on.  We're going to be running out of time soon, so let me move on to a different issue, which is even assuming that these plaintiffs get past the pleading stage, how could these plaintiffs be good class representatives given this problem?

MR. ROSEN:  Because a large number of class members

purchased stock on the last two days of the class period. And so they will be representative of that -- you know, if -- there's quite a bit of volume in the stock --

THE COURT:  There are a lot of other people --

MR. ROSEN:  Yes.

THE COURT:  -- who are included in this class whose interest wouldn't be represented by them.

MR. ROSEN:  Yes.  And we have a motion to amend to add additional representatives, additional plaintiffs, to shore up that potential problem.  And I think to protect the class, it would make sense to grant that motion.

But, certainly, they -- they are good representatives.  And -- but that's an issue at class certification, Your Honor.  I have no doubt that class certification is going to be a very hotly contested motion. It's going to have a lot of expert analysis.  It's going to be very complex.

But that's really where these factual issues about -- about when the inflation came out of the stock, that's really when these factual issues should be addressed and --

THE COURT:  Well, in some ways, maybe these issues should have been addressed at the stage of picking the lead plaintiff in the first instance.  But that wasn't -- that wasn't in front of me.

MR. ROSEN:  That -- yeah, I mean, it's very hard because there are so many -- you know, there are so many issues on the -- potential issues, and so oftentimes a Court will not go too deep into those potential issues.

THE COURT:  Um --

MR. ROSEN:  They also have to be addressed.  They were not addressed.  I mean, nobody brought them up, so --

THE COURT:  So let's talk for a few minutes about the additional plaintiffs, if I end up going there.

And here you have an argument about the date for the lookback 90-day rule.  So let me -- let me hear first from the plaintiff on this, on the -- why you contend that the later date applies.

MR. HORNE:  I do want to note, first of all, that this doesn't affect Plaintiff Aftoora.  He has suffered damages even if the date is November 4th.

As to the later date, the origin of the 90-day lookback is the Private Securities Litigation Reform Act.  At that point, Congress was concerned that stock prices may overreact to bad news.  And, you know, as a result, they enacted the 90-day lookback, which says, you know, there's a 90-day lookback price, which is, you know, only as relevant here.  It's the average trading price from the date the information is disseminated to the date of the sale.

And they chose the word "disseminated" carefully.

I mean, they could have gone with "published."  They could have gone with "revealed."  But they went with "disseminated" because "disseminated" means distribution.  It means the facts are understood.  It means that the impact on the stock price has been made and that a stock price is no longer artificially inflated because of the false statements.

And what that means is it's got to start at the end.  It's got to start on November 9th because that's when the stock price was no longer inflated.  And so --

THE COURT:  Say that again, those last few sentences.

MR. HORNE:  Sure.  The 90-day lookback has to start when the information is fully incorporated into the stock price, and that's November 9th.  It's not November 4th, the -- at least on the pleadings.  The First Circuit has said the information -- the plaintiffs have sufficiently alleged that there is a delayed response.  So it's not November 4th.  And, you know, we would argue the November 6th disclosure itself provides additional information.

So you start counting the 90-day lookback on November 9th.  And if you do that, none of the plaintiffs are knocked out.

THE COURT:  Wait, why are we using the November 6th date?  I mean, why are you considering that information?

MR. HORNE:  The November 6th date is the date of

the advisory committee meeting.  And the advisory committee meeting itself provided additional information.  The initial information is the evaluation of the advisory committee. It's very similar to *Aveo*, which the same thing happened, and Judge Casper didn't cut off a class because it found -- she found that the advisory committee meeting provided additional information.

And so for that reason, it's got to start on the 9th.  But, you know, regardless of that, the First Circuit said that we sufficiently alleged a delayed response.  And, you know, a delayed response, I mean, the only thing that could possibly mean is start on the 5th or the 9th or later.

And if you start on the 5th, the only plaintiff who is knocked out is Havrda.  So, you know, in other words, there's all the -- in order to find that the 90-day lookback starts on November 4th, the Court would have to rewrite the First Circuit's opinion.

MS. SOLOWAY:  Your Honor, may I address that?

THE COURT:  Yeah.

MS. SOLOWAY:  So a couple of problems with that argument.

Number one, it rewrites the language of the PSLRA, which expressly states that the 90-day period looks at the mean trading price quote beginning on the date on which the information correcting the misstatement or omission that is

the basis for the action is disseminated to the market.

So, Your Honor, "disseminated" is a clear word.  It means disseminated.  It does not say "and fully incorporated into the market price over the next few days," as plaintiffs claim here.  It just doesn't say that.  And they haven't cited any cases, Your Honor, that hold that that is what the 90-day lookback provision means.

THE COURT:  Do you have any cases on either side that helps me with what the word "disseminated" means in this context?

MR. HORNE:  We have a case, Your Honor, that holds -- it's *Jaffe*, J-a-f-f-e -- that holds that the 90-day lookback starts on the day -- it was after a jury trial -- on the date after the jury found that there's no more artificial inflation in the stock price.

MS. SOLOWAY:  Your Honor, I believe, but I will be happy to be double-checked, that there is at least a couple of cases in the plaintiffs' brief where the -- there was a second alleged corrective disclosure; and the Court held that the 90-day period could begin after the second day, the second corrective disclosure.

The problem here, Your Honor, is that there is no second disclosure because the advisory committee vote, which the plaintiffs just described as telling the market about the content of the votes, is simply not a corrective disclosure.

Biogen is not alleged to have lied about the content of the votes.  In the *Aveo* case, which the plaintiffs are citing, part of the alleged misstatement was that the company had allegedly predicted the outcome of a committee vote and allegedly had lied about it.

Here Biogen expressly said, "We are not predicting the outcome of the FDA process."  There is no alleged misstatement in this case that is corrected by the outcome of the advisory committee vote.  And the plaintiffs don't claim that there's any new information that wasn't already revealed in the Massie report days earlier that comes out on the day of the advisory committee vote.

There is simply no second corrective disclosure here, Your Honor.

THE COURT:  Can't the advisory committee vote be understood to take what is a draft and -- marked "draft" and stapled to the back of the report and, essentially, move it to the front of the report?

MS. SOLOWAY:  So I think the advisory committee vote is -- reflects, obviously, bad news that's conveyed to the market about how the various people on the advisory committee feel about all of the information that has been presented to them.

But the question is what is corrective of Dr. Sandrock's statement?  And the plaintiffs in their

complaint allege that the information that is corrective are the tables and the information in Dr. Massie's report that comes out on the 4th. They don't identify anything new that comes out from the advisory committee process other than how the advisory committee members feel about all of the scientific evidence that's before them.

And so in this, Your Honor, we submitted a supplemental authority, the *FibroGen* case. I think if you read the *Aveo* case and the *FibroGen* case, even though they come out differently, the reason is because it really comes down to whether the plaintiffs can point to new information that is actually corrective of the alleged misstatements. Here the complaint does not point to any new information other than the content of the votes.

And I would just also point Your Honor to a Second Circuit decision in *Omnicom*, which I believe we also cited in our briefs. *Omnicom* explained that sometimes there are sort of negative things that happen after some corrective disclosure. In that case, it was, I believe, a board member resigned in the aftermath of a fraud announcement, and the stock dropped further.

And the Court said, look, not all of the parade of terrible things that can happen after a so-called fraud is revealed, even when they're connected to the alleged fraud, that bad news does not create yet a new corrective disclosure

date.  And I think it's a similar concept here.  Biogen isn't alleged to have lied about the advisory committee votes; therefore, that can't be a corrective disclosure.

THE COURT:  Mr. Horne, do you want to respond to that?

MR. HORNE:  I do, Your Honor.  I think it misstates the facts of *Aveo*.  The company had never predicted anything from the advisory committee meeting.  It just said there's going to be an advisory committee meeting.  And, in fact, the company would not be in a position to predict what would happen at the advisory committee meeting.

Second, the Court is correct.  Sometimes you have information that is presented to a market in a way that is hard for a market to digest.  You know, in this case, you have this report.  It's stapled at the back, as the Court put it, and it's complicated.  And it has a big draft watermark on it.  I mean, what does it mean?

And you needed the people to whom it was intended.  The practitioners, the leading lights on the advisory committee itself, the people the FDA turns to for advice, it needed those people.  The market needed those people to make sense of it.

And this is -- this happens; you know, and I think the First Circuit's opinion reflects it.  I mean, I'm quoting from the opinion:  "Investors' complaint alleges the

following" -- skipping a few lines -- "It took time for the market to appreciate the merits of Massie's report; the market's delayed reaction of the report is corroborated by analysts' coverage of the briefing materials; and Biogen's stock price began to drop on November 5, 2020, and 'collapsed' on November 9th, the next possible trading day for Biogen's stock, when the market fully grasped the significance of Massie's report."

That happens because, in part, the advisory committee explains it and says that this isn't just a prank. This isn't just, you know, some statistician, an overeager tyro with a point to prove.  These are good analyses, and they're supported by the facts, and they undercut Biogen's false statements.

Now, the all data statement, I do want to come back to that.  The all data statement is the statement that -- Biogen needed to explain why one of its trials worked and the other one didn't.  And it came up with an explanation, which is you need to have a higher dose.  The all data statement is the statement that if you don't get the higher dose, you don't get a benefit.

So merely stating in the introduction to the report that there are data that contradict efficacy, it doesn't undercut the argument.  The real thing that undercuts the argument is proof that some people did get to a higher dose

and didn't see a benefit.  And it's -- sorry -- that there does not seem to be a connection between the actual dose and the benefit.

And that's contained in the report itself.  And that's something you really need to read it for.  You know, you need to go through the report, you know, have however many cups of coffee it takes.  And, you know, it takes time.

And you can see it in the analysts' reports.  You can see the analysts initially say, "Wow, this is a home run," and then, you know, "We're going to go through it for the rest of the day," and then saying things like, "Actually, no, this is -- parts of this seem bad."  And the thing that really catalyzed it is the advisory committee meeting on November 6th.

And so that's why it's a corrective disclosure. You have uncertainty.  You have information that's presented in making the matter difficult for the market to digest.  And the advisory committee meeting helped the market digest it.

MS. SOLOWAY:  Your Honor, if I may, I think the plaintiffs are conflating two things.  The First Circuit decision that Mr. Horne just quoted is simply reciting the plaintiffs' allegations.

THE COURT:  Right.  But that's the point, is that this is not a 56 -- a Rule 56 motion.  They -- we are stuck with the plaintiffs' allegations.

MS. SOLOWAY:  Agreed, Your Honor.  And I think what is critical here is we have to look at the complaint to see what information did the plaintiffs allege actually came out from the advisory committee meeting that is corrective of Dr. Sandrock's statement.

And the complaint, in every paragraph that it talks about this is false and misleading, this is false and misleading, and here's why, the complaint comes back to Dr. Massie's report and said here's why this information that defendants allegedly lied about is false or misleading.  It's because Dr. Massie found to some other conclusion.

And that really does distinguish this case from the *Aveo* case.  Just looking at the decision -- and, Your Honor, this is on page 12 of the decision.  In that case, one of the factors that the -- that the Court relied on is that the defendants had made public -- excuse me -- it's not page 12. I misspoke.  I believe it's page 7.

They say that the *Aveo* defendants had made public statements offering their own view of the outcome of the meeting.  And that's what differentiates, among other things, the *Aveo* case from this one.  The *Aveo* case focused on what new information that's corrective actually came out at the ad com.

And when you look at the complaint here, Your Honor, every time the plaintiffs say this statement is

false or misleading or that statement is false or misleading and in particular, the only remaining statement that's allegedly false or misleading, their theory is because Dr. Massie came to a different conclusion when Dr. Massie analyzed the subgroup data and found X, Y, or Z.

That is why Dr. Massie's report is the corrective disclosure. And the First Circuit did not find otherwise, Your Honor.

THE COURT: I'm not sure I followed all of that.

But I am -- I think the question is nobody is -- I don't think the point is that there is different information than in the Massie report, but it is that the Massie report is amplified through the advisory committee meeting, no?

MS. SOLOWAY: So I think it depends what Your Honor means by "amplified." I think the *Omnicom* case, for example, talks about a situation where there are additional follow-on pieces of information that come following the corrective revelation. But it says that it has to be both -- the information has to be both new and corrective of the fraud to count as a corrective disclosure.

The advisory committee's votes, how the different scientists that sat on that committee felt about the data that they'd been presented with when faced with scientific questions, that information is new, but it's not corrective of what Dr. Massie said.

THE COURT:  So let me -- let me put this back to Mr. Horne.

Are you saying that the advisory committee meeting is a new corrective disclosure?

MR. HORNE:  Your Honor, corrective disclosures -- yes.  Let me answer your question first.  Yes, we are saying that.

And the reason is that in -- even in efficient markets, information may be presented to the market in a way that's difficult for the market to digest.  And that's the point the First Circuit was making on -- in this very case.  You know, for the First Circuit cited a case called *Gilead* from the Ninth Circuit in which the defendant was engaged in unlawful off-label marketing.

And, you know, the FDA said so publicly during the class period.  The stock price didn't fall.  The stock price fell when it was revealed when the company reported poor earnings the next quarter, even though -- the fact of the unlawful marketing had already been disclosed.

And there's other cases like that.  There's a recent Ninth Circuit case where a company made false statements about how frequently its programs were being played on television.  And, I mean, the point of putting it on television is so that it's public.  But it took a short seller to look at the data and show that the programs hadn't

been played as often as the company did.

In this case, you have a combination of a difficult report, difficult to understand.  You have some signs of unreliability.  And you have a limited amount of time.  And given these factors, the fact that the advisory committee, the people for whom the report was written, were able to go in there and say this information is accurate or these analyses are accurate, you know, that is --

THE COURT:  I guess, though, that gets to the point.  Is it that they are endorsing the Massie report, or are they themselves saying something different?

MR. HORNE:  They are endorsing -- I would say that they are clarifying the value of the Massie report and its accuracy, and the way they do that is by agreeing with it.  But that's different than, you know, if you or I were to say the Massie report is great because we're not in a position to tell.  These are the people who are in a position to tell.  This is who the report is written for.

THE COURT:  So let me play devil's advocate for a minute.  Supposing I -- you have a corrective disclosure, and five days later, some newsletter on the market writes a really critical report on the stock, and after that, the stock plummets, for that, do I use the letter -- the initial -- when the company says, "Hey, we're fixing things," or do I look at when it gets amplified by the commentator for

the newsletter?

MR. HORNE:  You know, I think one of the good explanations for exactly how you're doing the analysis is *BofI* out of the Ninth Circuit.  And the point that *BofI* makes is that it's fact bound.

In the case that you're mentioning, there really isn't a plausible allegation that the newsletter clarified anything or added new information.  There really isn't any way in which it could.

And so in this case, it would not be -- in that case, assuming I've understood the facts correctly, it would not be proper to look to the newsletter because some random person, you know, wrote a newsletter.

THE COURT:  But isn't what you're saying -- isn't the point here then that when the FDA took seriously the Massie letter, Massie report, it wasn't that there are new facts, but what the market is now learning is that what Massie said matters to the FDA.  But that -- and I think that may be what -- where Ms. Soloway is trying to go with this, is that that is a fact, that what Massie says matters, but that's different than what the initial misleading statement was.

The misleading statement wasn't this is how the FDA will consider this.  The misleading statement was this is what the test results are.

MR. HORNE:  And I think that's a key point, because the advisory committee isn't the FDA.  The advisory committee is a group of experts that the FDA has consulted.  The advisory committee is not able to tell anyone how the FDA is going to think about something.  It's just providing advice. What it's doing --

THE COURT:  But so I got the label wrong, but I don't think that undermines my point, that what the market may be responding to is -- that the market's responding to what the advisory committee -- how the advisory committee values what Massie has to say.

MR. HORNE:  And --

THE COURT:  But it's not -- it's not in and of itself correcting anything that the misleading statement said.

MR. HORNE:  But I think that's the critical difference.  The advisory committee can only advise.  What it can say is these are good analyses or these are bad analyses. And it's in a position to evaluate it.

You know, if this were, you know, somebody at the FDA saying, "Look, we don't really care about, you know, this other stuff.  We care about this thing," then yes.  I think you would be getting insight into how the FDA thinks, and that would be separate.

But all the advisory committee is doing is

advising, analyzing and advising.  And so they're providing clarification on the importance and the worth of the analyses that Massie ran.

MS. SOLOWAY:  I think, Your Honor, if you -- I think Mr. Horne has just walked himself into the answer.  If you read the case law, that is precisely why the advisory committee vote is not a corrective disclosure, because the information that the market learns is the opinions of a set of doctors sitting on the advisory committee who have been given the briefing book with all its positive information, the Massie report with its negative take, and all the other information out there in the world.

And those folks have voted on certain questions that had been presented to them.  And Biogen is not alleged to have known in an advance how they would vote or anything else about what the outcome of that advisory committee outcome process would be.  And that is exactly why it's not a corrective disclosure.

The Ninth Circuit cases that the plaintiffs are relying on are completely different.  They are cases where there was some raw data out there in the world that nobody had ever thought about.  Some of it might not even have been publicly available.  And the question was, oh, well, the short seller or someone else found this information and published it, and the stock price reacted.  Some of those

cases go one way.  Some go the other way.

That's not even our fact pattern, Your Honor.  The fact pattern here is that the plaintiffs claim that everything that is corrective about the alleged false statement was in the Massie report; therefore, the Massie report is the end of the analysis.  That is the corrective disclosure.

THE COURT:  Okay.  I've got a bit more work to do here.  I do wish that all of these arguments had been presented while you were up at the First Circuit, but here we are.  And I will try to get something out soon.

In the meantime -- oh, I guess the one other housekeeping matter was there was no opposition to dismissing the claims as to Haeberlein, correct?

MS. SOLOWAY:  Yes, thank you for reminding me. Dr. Budd Haeberlein is named as a control person.  She neither made a statement nor controlled anyone.  The plaintiffs have not argued otherwise.  So I think, clearly, she's out.

MR. ROSEN:  Yeah, we're not contesting that, Your Honor.

THE COURT:  Okay.  So that's a footnote. Everything else I need to do a little more work on.  So thank you very much.

MS. SOLOWAY:  Thank you, Your Honor.

THE COURT:  And, hopefully, I will get something to you fairly soon.

MR. ROSEN:  Thank you, Your Honor.

THE DEPUTY CLERK:  We are in recess.  Thank you, Your Honor.

(Court in recess at 3:54 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of March, 2025.


/s/ Robert W. Paschal
_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter