UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN, individually and on behalf of all others similarly situated, | * * * * |
| Plaintiffs, | * * |
| v. | * Civil Action No. 1:21-cv-10479-IT * |
| BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN, | * * * * |
| Defendants. | * |

MEMORANDUM & ORDER

March 27, 2025

TALWANI, D.J.

This securities fraud class action is before the court on remand from the First Circuit. In September 2022, the court granted the Motion to Dismiss filed by Defendants Biogen, Inc., and three of its executives (collectively, "Biogen"). See Mem. & Order [Doc. No. 76]. On appeal, the First Circuit affirmed the dismissal except as to one allegedly misleading statement and remanded the case for further proceedings as to that statement. Now pending are Biogen's Motion for Judgment on the Pleadings [Doc. No. 116] and Plaintiffs Nadia Shash and Amjad Khan's Motion for Leave to Add Additional Plaintiffs [Doc. No. 138]. For the reasons that follow, Biogen's motion is DENIED, except as unopposed as to the dismissal of claims against Defendant Samantha Budd-Haeberlein; and Plaintiffs' motion is GRANTED as to two of the proposed additional plaintiffs and DENIED as to one.

## I.    Factual Background

A fulsome recounting of the facts alleged in Plaintiffs' Second Amended Complaint [Doc. No. 58] can be found in Shash v. Biogen, Inc., 84 F.4th 1, 6-10 (1st Cir. 2023). The facts alleged as relevant to the remaining statement at issue are as follows:

### A.    Clinical Trials

Biogen developed aducanumab, a drug intended to treat Alzheimer's disease by targeting aggregated amyloid beta. Second Am. Compl. ¶¶ 57-58, 61 [Doc. No. 58]. To study the effects of aducanumab on Alzheimer's patients and generate the data necessary to seek full approval of the drug, Biogen submitted an investigational new drug application to the Food and Drug Administration ("FDA") in 2011. Id. ¶ 66. Relevant here are the results of aducanumab's Phase III trials, named ENGAGE and EMERGE. Id. ¶¶ 77, 81, 149-50.

In March 2019, Biogen announced the termination of both studies on futility grounds. Id. ¶ 108. However, when Biogen conducted its own internal review of the data, disaggregating it to analyze ENGAGE and EMERGE independently (as opposed to pooling data from both studies as required for the futility analysis), Biogen found "that in EMERGE, the high dose reduced clinical decline . . . ." Id. ¶¶ 101, 118, 181. Biogen brought these findings to the FDA and, on October 22, 2019,[1] announced that it would seek FDA approval of aducanumab because the data showed "that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints." Id. ¶ 171.

---

[1] The class period in this action runs between October 22, 2019, and November 6, 2020, inclusive. Id. ¶ 1.

### B.    The "All Data" Statement

Biogen reported its findings on aducanumab on multiple occasions, but the only relevant statement for present purposes is what the First Circuit and this court refer to as the "'all data' statement." See Shash, 84 F.4th at 12. The "all data" statement was made by Defendant Alfred Sandrock, Jr., at a quarterly earnings call on July 22, 2020, in which he said: "So consistent with the findings from ENGAGE and EMERGE, you really need to get the higher dose. And I think our data are all consistent with that." Second Am. Compl. ¶ 191 (emphasis added) [Doc. No. 58].

### C.    The Briefing Materials and Massie Report

The FDA empaneled an advisory committee (the "Advisory Committee") to assist in its review of Biogen's application for full FDA approval of aducanumab. Id. ¶¶ 259-61. "The primary role of an advisory committee is to provide independent advice that will contribute to the quality of the agency's regulatory decision-making and lend credibility to the product review process." Id. ¶ 259. Given the controversial nature of the clinical trials and uncertainty around the results, stock analysts recognized the Advisory Committee's decision would be a critical factor in determining the fate of aducanumab. Id. ¶¶ 260-61.

In advance of the Advisory Committee meeting scheduled for November 6, 2020, Biogen and the FDA jointly prepared briefing materials (the "Briefing Materials"), which the FDA published on its website during the trading day on November 4, 2020. Id. ¶¶ 262-63, 280. In the Briefing Materials, the FDA provided an "effusive" endorsement of Biogen's post hoc analysis, methodology, and conclusions. Id. ¶ 264. The Briefing Materials set out Biogen's position and the FDA's responses, the majority of which expressed agreement with Biogen's position. Id. ¶ 265.

Appendix 2 to the Briefing Materials contained a dissenting report prepared by the

FDA's statistical reviewer on aducanumab's application, Tristan Massie (the "Massie Report").

Id. ¶¶ 16, 273; see also id., Ex. 3 [Doc. No. 58-3]. The Massie Report bore a "DRAFT"

watermark on its pages. See generally id., Ex 3. The Massie Report challenged the Briefing

Material's support for approval, concluding in its Executive Summary that "the totality of the

data does not seem to support the efficacy of the high dose" and that "there is no compelling

substantial evidence of treatment effect or disease slowing." Id., Ex. 3 at 9-10.

### D.    Plaintiffs' Stock Purchases

On November 4, 2020, the same day the Briefing Materials and Massie Report were

published, Biogen's stock price increased from $253.20 per share at opening to $355.63. Second

Am. Compl. ¶¶ 276-78 [Doc. No. 58]. "[I]t [was] plain that even analysts whose job was to cover

Biogen had not read the Draft Massie Report but had noticed the FDA's clear bias in favor of

approval[.]" Id. ¶ 276. Lead Plaintiff Shash purchased her shares the same day. Decl. of

Laurence M. Rosen ISO Mot. for Appointment as Lead Pl., Ex. 2 at 2 (Shash Certification) [Doc.

No. 10-2].

On November 5, 2020, "after investors had begun to digest the Massie Report's findings,

Biogen's stock price had fallen" to $328.90 per share. Second Am. Compl. ¶ 279 [Doc. No. 58].

Plaintiff Khan purchased shares the same day. Am. Compl., Ex. 2 at 1 (Khan Certification) [Doc.

No. 42-2].

On Friday, November 6, 2020, trading in Biogen's shares was halted pending the

Advisory Committee's meeting to discuss aducanumab, and trading did not resume until

Monday, November 9, 2020. Second Am. Compl. ¶ 280 [Doc. No. 58]. After a full day of

review, the Advisory Committee voted on several questions related to aducanumab; as relevant

here, it voted almost unanimously that the post-hoc analyses of data from EMERGE could not reasonably be considered as "primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease." Id. ¶ 281. "The cause of the panel's dissatisfaction was the facts revealed in the Draft Massie Report." Id. ¶ 282.

On November 9, 2020, when trading resumed, Biogen's stock closed at $236.26 per share. Id. ¶ 294.

## II.    Procedural Background

### A.    This Court's Order of Dismissal

On September 12, 2022, the court granted Biogen's Motion to Dismiss. See Mem. & Order [Doc. No. 76]. The court found that Plaintiffs failed to state a claim that Biogen misled investors about the efficacy of aducanumab because: Plaintiffs did not sufficiently allege that Biogen's statements were misrepresentations, id. at 19-33; Plaintiffs did not sufficiently plead scienter, id. at 34-38; and Plaintiffs failed to plead loss causation because the Massie Report was published prior to Plaintiffs' purchase of Biogen stock, and "causation is not tied to when the market reacts to information, but rather when that information became available to the public." Id. at 40. The court did not reach the question of reliance. See id. at 41.

### B.    The First Circuit's Remand

The First Circuit affirmed the court's dismissal of all claims except as to the "all data" statement. The First Circuit found that certain subgroup data suggested Sandrock's "all data" statement was not "fairly align[ed] with the facts known to Biogen at the time," and by failing to disclose this subgroup data to contextualize the "all data" statement, Biogen's omission plausibly misled investors. Shash, 84 F.4th at 12. And the "all data" statement was a material misrepresentation because whether all or only some of Biogen's data supported high dose aducanumab is critical information that "[a reasonable investor would have] considered in

evaluating [Biogen] as an investment." Id. at 13 (citations omitted). The First Circuit found it could be reasonably inferred that Defendants were aware of the contradictory subgroup data and that failing to disclose that data strongly suggests scienter. Id. at 14.

As relevant here, the First Circuit also found Plaintiffs had pleaded loss causation. The First Circuit took issue with this court's finding that Plaintiffs could not plead loss causation based on their purchase of shares after the alleged corrective disclosure, i.e., the Massie Report, and explained that it was improper at the pleading stage to presume the Massie Report's effect on Biogen's stock price must have been immediate, such that the price would have been "corrected" when Plaintiffs purchased shares. Id. at 20-20. The First Circuit also rejected Biogen's argument that "a stock's price must drop immediately following a corrective disclosure for loss causation to be sufficiently pled." Id. at 21. Finding the issue unsettled under circuit precedent, the First Circuit turned to other circuits and concluded that (1) "the issue of when Biogen's stock price actually dropped is a question of fact," and (2) "[Plaintiffs'] allegations cannot be per se implausible simply because a gap in time separates the price drop from the corrective disclosure." Id. at 21-22. The First Circuit held that Plaintiffs had "plausibly established that Biogen's stock price dropped after Massie's report revealed the company's misstatements about aducanumab," and thus survived a motion to dismiss. Id. at 22.

The First Circuit did not address the element of reliance.

C.    **The Present Motions**

After the First Circuit issued its mandate, Biogen filed an <u>Answer</u> [Doc. No. 115] and the

pending <u>Motion for Judgment on the Pleadings</u> [Doc. No. 116]. Plaintiffs subsequently filed the

pending <u>Motion for Leave to Add Additional Plaintiffs</u> [Doc. No. 138].[2]

III.    **Discussion**

A.    **The Court's Subject Matter Jurisdiction**

The court first addresses Biogen's challenge to Plaintiffs' Constitutional standing in its

opposition to Plaintiffs' Motion for Leave to Add Additional Plaintiffs, an argument not

previously raised before this court or the First Circuit.[3] The court is "obliged to resolve questions

pertaining to subject-matter jurisdiction before addressing the merits of a case." <u>Acosta-Ramirez</u>

<u>v. Banco Popular de Puerto Rico</u>, 712 F.3d 14, 18 (1st Cir. 2013) (citations omitted).

"Constitutional standing goes to the power of the court: the question is whether the

parties have presented the kind of case or controversy that the Constitution allows federal courts

to hear." <u>Vander Luitgaren v. Sun Life Assur. Co. of Canada</u>, 765 F.3d 59, 62 (1st Cir. 2014)

(citation omitted). "It is firmly established . . . that the absence of a valid (as opposed to

arguable) cause of action does not implicate subject-matter jurisdiction, <u>i.e.</u>, the courts' statutory

or constitutional power to adjudicate the case[] . . . unless the claim clearly appears to be

immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is

---

[2] Both motions were opposed and fully briefed, and in addition, the parties have notified the court of supplemental authority. <u>See</u> Notices [Doc. Nos. 150, 151, 153]; Letter Responses [Doc. Nos. 152, 154].

[3] Biogen's briefing for its Motion for Judgment on the Pleadings and prior Motion to Dismiss only occasionally references "standing," but only in terms of "the essential [statutory] element of reliance." <u>See, e.g.</u>, Defs.' Mem. ISO Mot. for J. on the Pleadings ("Defs.' MJOP Mem.") at 9, 11 [Doc. No. 117]; Defs.' Mem. ISO Mot. to Dismiss at 34-35 [Doc. No. 63].

wholly insubstantial and frivolous." <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 89 (1998).

Biogen's argument that Plaintiffs lack "standing" depends entirely on its argument that Plaintiffs cannot plead reliance, one of the six elements of a securities fraud claim. <u>See</u> <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 58 (1st Cir. 2008). But the invocation of the word "standing" does not convert that issue into a defect of Constitutional standing. <u>See</u> <u>Env't Barrier Co., LLC v. Slurry Sys., Inc.</u>, 540 F.3d 598, 605 (7th Cir. 2008) ("Everything from the fundamental requirement imposed by Article III that there must be a 'case or controversy' between the parties seeking relief in federal court, to various prudential doctrines such as the restrictions on invoking the rights of third parties, to the inquiry whether a statute is designed to protect the rights of the person before the court, has been swept into the word 'standing.'"). Because this argument goes entirely to the merits of Plaintiffs' ability to state a claim under Rule 12(b)(6), it does not implicate the court's subject-matter jurisdiction. <u>See</u> <u>Steel Co.</u>, 523 U.S. at 89.[4]

### B.    Biogen's Motion for Judgment on the Pleadings

#### 1.    Standard of Review

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Where "a motion for judgment on the pleadings 'is employed as a vehicle to test the plausibility of a complaint, it must be evaluated as if it were a motion to dismiss.'" <u>Shay v. Walters</u>, 702 F.3d 76, 82 (1st Cir. 2012). In evaluating a motion to dismiss, the court assumes "the truth of all well-pleaded facts" and draws "all

---

[4] In any event, for the reasons discussed below, Plaintiffs' allegations of reliance are sufficient to state a claim, and thus their claim is not only "arguable" but "valid." <u>See</u> <u>Steel Co.</u>, 523 U.S. at 89.

reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . ." Twombly, 550 U.S. at 555 (internal citations and quotations omitted).

In deciding such a motion, a court is ordinarily limited to considering "only the complaint, documents attached to it, and documents expressly incorporated into it." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014). When, however, "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); see also Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 26 F.3d 30, 33-34 (1st Cir. 2001) (the court may consider documents outside of the pleadings, the authenticity of which are not disputed by parties, where the complaint sufficiently refers to the document itself or its terms).

### 2.  The Basic Presumption of Reliance

Biogen argues that Plaintiffs' claims must be dismissed because they purchased stock after the Massie Report was published, meaning that, as a matter of law, they cannot have relied on any misrepresentations corrected by the Massie Report. Plaintiffs respond that they are

entitled to a presumption of reliance based on the fraud-on-the-market doctrine. Specifically, they allege that at the time of Plaintiffs' purchases, the market price was still artificially inflated by the alleged misrepresentations and had yet to absorb the impact of the Massie Report. See Second Am. Compl. ¶ 366 [Doc. No. 58].

The fraud-on-the-market doctrine, or "[w]hat is called the Basic presumption[,] . . . incorporates two constituent presumptions: First, if a plaintiff shows that the defendant's misrepresentation was [1] public and [2] material and [3] that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price. Second, if the plaintiff also shows [4] that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 279 (2014); see Basic Inc. v. Levinson, 485 U.S. 224, 245-47 (1988). The Basic presumption is predicated on "common sense and probability": rather than expecting investors to prove that they individually relied on specific misstatements when purchasing stock, it allows for the presumption that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." Basic, 485 U.S. at 247.

The presumption is rebuttable by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Id. at 248. For example, if "news of the [truth behind the misstatements] credibly entered the market and dissipated the effects of the misstatements, those who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud." Id. at 249. Importantly, the Basic Court noted: "[b]y accepting this rebuttable presumption, we do not intend conclusively to adopt any particular theory of how quickly and

completely publicly available information is reflected in market price." Id. at 248 n.28. It also clarified that, as to the potential "incongruity between the assumption that [defendant's] shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed" on the basis of misstatements, "[p]roof of that sort is a matter for trial." Id. at 249 n.29.

Here, the First Circuit found that the "all data" statement, which was made publicly at an earnings call, was plausibly materially misleading. Shash, 84 F.4th at 13. Plaintiffs have alleged that they purchased Biogen's stock while it traded in an efficient market, Second Am. Compl. ¶ 355 [Doc. No. 58], which Biogen has not challenged. Thus, under the Basic framework, the only question remaining is whether Plaintiffs purchased their stock during the "relevant period," that is, while the stock was still artificially inflated by the "all data" statement.

Plaintiffs allege that on November 4, when the Massie Report was released, "it [was] plain that even analysts whose job was to cover Biogen had not read the Draft Massie Report but had noticed the FDA's clear bias in favor of approval[.]" Id. ¶ 276. Not until November 5 did "some investors beg[i]n to digest and give credence to the information that had been made public, though buried, in the Draft Massie Report," causing the 7.5% dip in Biogen's stock that day. Id. ¶ 279. In its analysis of loss causation, the First Circuit found that these allegations "plausibly established that Biogen's stock price dropped after Massie's report revealed the company's misstatements" despite the "gap in time separat[ing] the price drop from the corrective disclosure." Shash, 84 F.4th at 21-22. However, "the issue of when Biogen's stock price actually dropped is a question of fact." Id. at 21 (emphasis added).

The court finds that these allegations also sufficiently allege a presumption of reliance. As both the Supreme Court in Basic and the First Circuit in Shash acknowledged, the precise

question of when a corrective disclosure is fairly reflected in the market price is a question of evidence and fact. See id.; Basic, 485 U.S. at 249 n.29. That is not a question for the court at this time, when it must assume "the truth of all well-pleaded facts" and draw "all reasonable inferences in the plaintiff's favor." Nisselson, 469 F.3d at 150. Assuming the truth of Plaintiffs' allegations, the corrective effect of the Massie Report had not yet been absorbed by the market until at least the next day, November 5. Lead Plaintiff Shash is thus entitled to the Basic presumption because she purchased her shares on November 4.

Named Plaintiff Khan may be a closer case because he purchased his shares on November 5. Biogen attempts to pinpoint the moment of Khan's purchase based on trading data about price fluctuations that day, see Defs.' Reply ISO MJOP Mem. at 10 [Doc. No. 136], but the mathematical and market-based estimations required for such a determination make this precisely the type of fact question inappropriate for resolution at the pleading stage. See Shash, 84 F.4th at 21 ("the issue of when Biogen's stock price actually dropped is a question of fact"). The court therefore finds that Khan is also entitled to the Basic presumption of reliance at the pleading stage.

Biogen points to nothing in the pleadings or in caselaw that requires this court to dismiss Plaintiffs' claims as a matter of law merely because their purchases were made after the publication of the Massie Report. Biogen cites two cases for the proposition that "the fraud-on-the-market presumption does not defeat" the more general principle that "shareholders who purchase after the corrective disclosure cannot as a matter of law have reasonably relied on the alleged false statement predating that disclosure." Defs.' Reply ISO MJOP at 2, 5 [Doc. No. 136]. First, Biogen cites a District of Massachusetts case it claims found "that plaintiffs lacked standing for failure to plead reasonable reliance notwithstanding plaintiffs' reliance on the fraud-

on-the-market presumption." Id. at 5 (emphasis added). But there the plaintiff argued that no corrective disclosure had been made at the time it purchased shares; nothing in the court's opinion indicated that the plaintiff was relying on a fraud-on-the-market presumption to overcome the issue of the corrective disclosure's timing. See City of Bristol Pension Fund v. Vertex Pharms. Inc., 12 F. Supp. 3d 225, 235 (D. Mass. 2014). And Biogen cites a Northern District of Texas case which held that partial disclosures "sever[ed] the link between the alleged misrepresentation[s] and [Plaintiff's] decision to trade at a fair market price," Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp., 675 F. Supp. 3d 731, 741 (N.D. Tex. 2023) (quoting Basic at 248). But that holding was subsequently reversed by the Fifth Circuit. See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp., 2024 WL 1674125, at *4 (5th Cir. Apr. 18, 2024).

The court cannot find as a matter of law that Plaintiffs have failed to plead reliance when they have plausibly alleged a fraud-on-the-market theory in which the corrective effect of the Massie Report had not yet absorbed by the market at the time of their purchase of shares. Biogen may rebut that presumption with competent evidence on summary judgment or at trial. But Biogen may not do so here, where the pleadings are taken as true for purposes of this motion.

Accordingly, the court denies Biogen's Motion for Judgment on the Pleadings as to Plaintiffs Shash and Khan.

### 3. The Section 20(a) Control-Person Claim

Biogen separately argues that Plaintiffs' claims against Budd-Haeberlein must be dismissed because there are no surviving allegations against her to support control person liability under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Because the

First Circuit affirmed this court's dismissal of Plaintiffs' other alleged misstatements, all claims

against Budd-Haeberlein under Section 10(b), 15 U.S.C. § 78j(b), have been dismissed. See

Shash, 84 F.4th at 15-19. And Plaintiffs do not allege Budd-Haeberlein controlled or exercised

any control over Sandrock, whose "all data" statement makes him the only remaining alleged

primary violator. See Defs.' MJOP Mem. at 13-14 [Doc. No. 117]. Plaintiffs "do not oppose

dismissal of the claims against Samantha Budd-Haeberlein." Pls.' Opp. to MJOP at 14 [Doc. No.

122].

Accordingly, the court grants Biogen's Motion for Judgment on the Pleadings as

unopposed as to the Section 20(a) claims against Budd-Haeberlein.

### C.    Plaintiffs' Motion for Leave to Add Additional Plaintiffs

Plaintiffs seek to amend the Second Amended Complaint solely to add three additional

named plaintiffs: Jiri Havrda, Albert Aftoora, and Raymond Pawloski. See Pls.' Mem. ISO Mot.

for Leave to Add Add'l Pls. ("Pls.' Leave Mem.") at 1 [Doc. No. 139]; Decl. of Jonathan Horne

("Horne Decl."), Ex. 3 (Proposed Third Amended Complaint) [Doc. No. 140-3]; id., Ex. 4

(redline against Second Amended Complaint) [Doc. No. 140-4].

#### 1.    Standard of Review

Fed. R. Civ. P. 15(a) provides that amendments to pleadings not made as a matter of

course under Rule 15(a)(1) may be allowed "only with the opposing party's consent or the

court's leave." Decisions to allow amendment are within the court's discretion, but courts

"should freely give leave when justice so requires." Id.; Foman v. Davis, 371 U.S. 178, 182

(1962). Leave to amend should be allowed absent "any apparent or declared reason—such as

undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]" Foman, 371 U.S. at 182.

### 2. Statutory Cap on Recoverable Damages (Pawloski and Havrda)

Biogen argues that adding Pawloski and Havrda as named plaintiffs would be futile because they sold their shares shortly after the alleged corrective disclosure and are not damaged as a matter of law under the Private Securities Litigation Reform Act's ("PSLRA") statutory cap on recoverable damages. Defs.' Leave Opp. at 10-13 [Doc. No. 143]. That rule limits a plaintiff's damages to the difference between the purchase price and "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," 15 U.S.C. § 78u-4(e)(1), with the "mean trading price" defined as "an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period[,]" id. § 78u-4(e)(3).[5] When plaintiffs sell their shares before the 90-day period ends, the damages are further limited to the difference between their purchase price and "the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells . . . the security." Id. § 78u-4(e)(2).

---

[5] In calculating the "daily trading price . . . determined as of the close of the market[,]" this court takes judicial notice of the historical data reported on Biogen Inc. Common Stock (BIIB) Historical Data, Nasdaq, https://www.nasdaq.com/market-activity/stocks/biib/historical ("BIIB Historical Data"). Judicial notice is appropriate here because the stock was "publicly traded" and "its stock price can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Wang Yan v. ReWalk Robotics Ltd., 391 F. Supp. 3d 150, 154 n.2 (D. Mass. 2019), aff'd on other grounds sub nom. Yan v. ReWalk Robotics Ltd., 973 F.3d 22 (1st Cir. 2020); see also Fed. R. Evid. 201(b)(2).

The parties argue over when the statutory cap period begins. Biogen contends that the period begins on November 4, 2020, the date the Massie Report was published. Plaintiffs make two arguments in the alternative: first, that the period begins from a final corrective disclosure on November 9, 2020; and second, that the period begins from the market's first digestion of the Massie Report's conclusions, November 5, 2020. The court addresses each in turn.

a.    **Final Corrective Disclosure**

Plaintiffs argue that the Advisory Committee's vote on November 6, 2020, constituted a final corrective disclosure and, because trading was halted on November 6, the statutory cap period should begin on the next trading day, November 9. See Pls.' Leave Mem. at 8 [Doc No. 139]. Calculating the mean trading price on that basis, all proposed named plaintiffs would be able to allege damages. Id. at 8-9.

Assuming without deciding that Congress intended the statutory cap period to be a single period beginning from the date of the final corrective disclosure, see Gruber v. Gilbertson, 647 F. Supp. 3d 100, 121-22 (S.D.N.Y. 2022), the court nevertheless rejects Plaintiffs' argument here where they have not plausibly alleged the Advisory Committee vote was a corrective disclosure.

Plaintiffs cite principally to loss causation cases from the Ninth Circuit, which has held that "some information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance." In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 794 (9th Cir. 2020). However, "[t]he ultimate question is . . . one of plausibility: Based on plaintiffs' particularized allegations, can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price?" Id. at 795 (emphasis added). For example, in In re Gilead Scis. Sec. Litig., the Ninth Circuit found that a public warning letter from the FDA had a detrimental effect on the

16

defendant's sales, a fact wholesalers recognized but which remained "[u]nbeknownst to investors" until the defendant issued a press release three months later detailing the significant drop in sales. 536 F.3d 1049, 1053-54 (9th Cir. 2008). Importantly, "[t]he complaint specifically allege[d] that physicians were less eager to prescribe [the defendant's product], and competitors used the [FDA's] Warning Letter to lure [defendant's] customers to other drugs" and the court found it "not unreasonable that physicians—the targets of the off-label marketing—would respond to the Warning Letter while the public failed to appreciate its significance." Id. at 1058.

Similarly, in In re Genius Brands Int'l, Inc. Sec. Litig., the alleged misrepresentation was about the frequency with which a show aired, and "[a] shareholder hoping to fact check [that claim] would have no easy time doing so" until a report tallied the raw data from a website's schedule of hundreds of listings and made "the truth [] known." 97 F.4th 1171, 1187 (9th Cir. 2024). Importantly, the shareholders "allege[d] that the [report] 'reveal[ed] the discrepancy'" and attached to the complaint printouts of over twenty-five pages demonstrating the difficulty of sifting through the raw data. Id. at 1186-87.

Finally, Plaintiffs cite a Fifth Circuit case in which a Wall Street Journal article was found to reveal new information to the marketplace despite it relying on publicly available Medicare records because, "as the Appellants allege, the efficient market was not aware of the hidden meaning of the Medicare data that required expert analysis, especially where the data itself is only available to a narrow segment of the public and not the public at large." Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 323 (5th Cir. 2014).

The common thread across these loss causation holdings is that the plaintiffs in each case made "particularized allegations" that the corrective disclosure provided "new information,"

even if the revelation was based on data that was previously available to the public. In re BofI Holding, 977 F.3d at 795. Plaintiffs have not made similar allegations about the Advisory Committee vote. At most, they allege that, "as stock analysts recognized, the decision of the advisory committee would be a critical factor in the success of aducanumab." Second Am. Compl. ¶ 261 [Doc. No. 58]. But that does not amount to a specific allegation that the vote was a corrective disclosure or that it presented any new information the market had not already "beg[u]n to digest" on the previous day. Id. ¶ 279. To the contrary, Plaintiffs allege that it was the "Massie Report [that] revealed the data Defendants had concealed," and "[t]he cause of the [Advisory Committee's] dissatisfaction was the facts revealed in the Draft Massie Report." Id. ¶¶ 151, 282. Although the First Circuit was not presented with this question, its opinion did not treat the Advisory Committee vote as a corrective disclosure, and it also read Plaintiffs' allegations as focusing on the Massie Report: "investors' loss causation allegations plausibly indicate that Biogen's stock price dropped after Massie's report revealed the company's misstatements." Shash, 84 F.4th at 20-21; see also id. at 22 ("allegations contained [in the complaint] otherwise plausibly established that Biogen's stock price dropped after Massie's report revealed the company's misstatements about aducanumab").

The court finds that Plaintiffs have not specifically alleged that the Advisory Committee vote was a corrective disclosure providing new information to the market, and therefore the statutory cap period cannot begin on November 9, 2020. Plaintiffs concede that without a November 9, 2020 date to begin the statutory cap period, Havrda is unable to allege damages.

See Pls.' Leave Mem. at 8-9 & n.5 [Doc No. 139].[6] Because Havrda is not damaged as a matter

of law, the court finds that it would be futile to add him as a named plaintiff.

### b.    Dissemination of the Massie Report

Plaintiffs argue in the alternative that the statutory cap period begins on November 5,

2020, the day investors began digesting the Massie Report and Biogen's stock dipped. See Pls.'

Leave Mem. at 8 [Doc. No. 139]; Second Am. Compl. ¶ 279 [Doc. No. 58]. Biogen counters that

it must begin on November 4, 2020, "the date of the corrective disclosure." Defs.' Leave Opp. at

13 [Doc. No. 143].

The statute refers to "the date on which the information . . . is disseminated to the

market" only when the full 90-day period applies. 15 U.S.C. § 78u-4(e)(1) (emphasis added).

When the statutory cap period is shortened by an earlier sale of the shares, as is the case here, the

statute provides instead that the period begins "immediately after dissemination of [the

corrective] information[.]" Id. § 78u-4(e)(2) (emphasis added). Moreover, "[t]he PSLRA's

legislative history indicates that Congress imposed this limitation because it believed that

'[c]alculating damages based on the date corrective information is disclosed may substantially

overestimate plaintiff's actual damages.'" Acticon AG v. China N. E. Petroleum Holdings Ltd.,

692 F.3d 34, 39 (2d Cir. 2012) (quoting S. Rep. No. 104-98, at 20 (1995), reprinted in 1995

U.S.C.C.A.N. 679, 699).

---

[6] Havrda purchased Biogen shares for $264.99 and $263.52 per share on October 21 and 26, 2020, respectively. Horne Decl., Ex. 1, Schedule A [Doc. No. 140-1]. He sold those shares for $229.50 per share on November 9, 2020. Id. Excluding the non-trading days of November 6-8, the mean trading price from November 4 through 9, 2020, is $306.93, and the mean trading price from November 5 through 9, 2020, is $282.58; in either case, these figures exceed the price at which Havrda purchased his shares. See BIIB Historical Data (closing prices of $355.63 on November 4; $328.90 on November 5; and $236.26 on November 9).

Here, the market did not overreact to corrective information on November 4; on the

contrary, Biogen's stock price increased from $253.20 at opening to $355.63 at closing. BIIB

Historical Data. The earliest point at which the market began to react to corrective information

was on November 5, when the share price dropped to $328.90 at closing. See id. Accordingly,

the court finds that the period "immediately after dissemination of [the corrective] information,"

15 U.S.C. § 78u-4(e)(2), begins on November 5, 2020.

Pawloski purchased Biogen shares for $265.85 per share on October 23, 2020, and on

November 12, 2020, sold 70 of those shares for $246.75 and the remaining 30 for $244.51.

Horne Decl., Ex. 2 at ECF pp. 4-5 [Doc. No. 140-2]. Calculating the statutory cap period from

November 5 to 12, 2020, and excluding the non-trading days of November 6-8, the mean trading

price is $257.42. See BIIB Historical Data (closing prices of $328.90 on November 5; $236.26

on November 9; $236.34 on November 10; $244.03 on November 11; and $241.55 on November

12). This price is lower than Pawloski's purchase price. He adequately alleges damages and it

would not be futile to add him as a named plaintiff.

### 3.    Adequacy of Lead Plaintiff

Biogen does not contest that Aftoora can plead damages under any permutation of the

statutory cap but argues instead that those damages are too nominal for Aftoora (or, for that

matter, Pawloski or Havrda) to serve as lead plaintiff under the PSLRA. Defs.' Leave Opp. at 15

[Doc. No. 143]; see 15 U.S.C. § 78u-4(a)(3)(B)(i) (court "shall appoint as lead plaintiff the

member or members of the purported plaintiff class that the court determines to be most capable

of adequately representing the interests of class members"). But Plaintiffs do not seek to add

Aftoora (or Pawloski or Havrda) as a lead plaintiff. See Horne Decl., Ex. 3 (Proposed Third

Amended Complaint) ¶¶ 40-41 (identifying Shash as "Lead Plaintiff" and Khan, Havrda,

Aftoora, and Pawloski as "Named Plaintiffs") [Doc. No. 140-3]. And, for the reasons discussed above, the court has declined to dismiss Lead Plaintiff Shash.

The court therefore finds it is not futile to amend the complaint to add Aftoora and Pawloski as named plaintiffs. Cf. In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 286 (S.D.N.Y. 2003) ("[N]othing in the text of the PSLRA indicates that every named plaintiff who satisfies the requirements of Rule 23 must also satisfy the criteria established under the PSLRA for appointment as lead plaintiff and actually be appointed as a lead plaintiff.").

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Leave to Add Additional Plaintiffs [Doc. No. 138] is GRANTED as to Pawloski and Aftoora and DENIED as to Havrda. Biogen's Motion for Judgment on the Pleadings [Doc. No. 116] is GRANTED as unopposed as to Defendant Budd-Haeberlein and DENIED in all other respects.

IT IS SO ORDERED

March 27, 2025                              /s/ Indira Talwani
                                           United States District Judge