**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated,<br><br>   Plaintiffs,<br> v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN,<br><br>   Defendants. | **CASE No.: 1:21-cv-10479-IT**<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTS ........................................................................................................................ 2

III.  PROCEDURAL HISTORY......................................................................................... 5

IV.   ARGUMENT .............................................................................................................. 7

      A.   The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23 ......... 7

           1.   Standards for Class Certification................................................................. 7

           2.   The Rule 23(a) Requirements are Satisfied................................................. 7

                a.   The Proposed Class is So Numerous that Joinder is Impracticable ............ 7

                b.   There Are Common Questions of Law and Fact......................................... 8

                c.   Plaintiffs' Claims are Typical of the Class................................................. 8

                d.   Plaintiffs Will Fairly and Adequately Protect the Interests of the Class...... 9

      B.   The Requirements of Rule 23(b)(3) Are Satisfied......................................... 10

           1.   Common Questions of Law and Fact Predominate............................................. 10

                i.    Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic v. Levinson* ..................................................................... 10

                ii.   Biogen Securities Traded in an Efficient Market During the Class Period..12

                iii.  Damages can be Calculated on a Classwide Basis ................................... 14

           2.   A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy ........................................................................ 15

      C.   Plaintiffs' Counsel Satisfies the Rule 23(g) Prerequisite for Appointment as Class Counsel ............................................................................................................ 16

V.    DEFENDANTS WILL NOT BE ABLE TO REBUT THE FRAUD ON THE MARKET PRESUMPTION AND, THOUGH NOT REQUIRED, THERE IS AFFIRMATIVE EVIDENCE THAT THEIR THEIR MISREPRESENTATION HAD AN IMPACT ON BIOGEN'S SHARE PRICE ............................................................................................ 17

VI.   CONCLUSION........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ...................................................................... 18

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ....................................... 10

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds,*
    568 U.S. 455 (2013) .............................................................................................. 7, 18

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ...................................................................................... 9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................................................. 10, 11

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J.1989) ........................................................................... 12, 13

*City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.*,
    2018 WL 4931543 (N.D.Cal., 2018) ......................................................................... 14

*Christine Asia Co. v. Yun Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ........................................................... 16

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ..................................................................................................... 14

*Dahhan v. OvaScience, Inc.*,
    No. 1:17-CV-10511-IT, 2020 WL 2602138 (D. Mass. May 8, 2020) .................... 9, 10

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113, (2021) .................................................................................................. 17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ........................................................................................ 10, 11, 17

*In re AVEO Pharms., Inc. Sec. Litig.*,
    No. CV 13-11157, 2017 WL 5484672 (D. Mass. Nov. 14, 2017) .......................... 7, 8, 15

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ................................................................................. 14

*In re Bos. Sci. Corp. Sec. Litig.*,
   604 F. Supp. 2d 275 (D. Mass. 2009) .............................................................................. 7, 8, 15

*In re Credit Suisse-AOL Sec. Litig.*,
   253 F.R.D. 17 (D. Mass. 2008) ........................................................................................... 12

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) .......................................................................................... 13

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
   275 F.R.D. 382 (D. Mass. 2011) ........................................................................................... 8

*In re Intuitive Surgical Sec. Litig.*,
   No. 5:13-CV-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .............................. 14

*In re Petrobras Sec*,
   862 F.3d 250 (2d Cir. 2017)................................................................................................. 13

*In re Waste Mgmt. Sec. Litig.*,
   2025 WL 958467 (S.D.N.Y. Mar. 31, 2025) ........................................................................ 17

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)................................................................................................ 12

*Luna v. Carbonite, Inc.*,
   2023 WL 4539855 (D. Mass. July 14, 2023)..................................................................... 14, 18

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014).................................................................................... 13

*Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*,
   348 F.R.D. 268 (D. Mass. 2025).................................................................................. 12, 15, 18

*Pace v. Quintanilla*,
   2014 WL 4180766 (C.D. Cal. Aug. 19, 2014)....................................................................... 16

*Shash v. Biogen, Inc.*,
   84 F.4th 1 (1st Cir. 2023).................................................................................................... 11

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).......................................................................................... 13, 18, 19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)............................................................................................................... 7

**Rules**

Fed. R. Civ. P. 23 ......................................................................................................... passim

## I.  __INTRODUCTION__[1]

As the Supreme Court, the First Circuit, and courts in this District have all acknowledged, securities class actions like this one are ideally suited to class treatment. Without a class action, all investors who would otherwise be part of a class would use the same extensive evidence to prove the elements of falsity, scienter, and loss causation. Even reliance presents a common issue, because investors would rely on the fraud on the market presumption to meet this element. Moreover, for most class members, individual actions are not solutions at all, because most investors will not have suffered losses large enough to justify a trial. Thus, a class action prevents an extensive drain on the court's resources while ensuring that class members can have real remedies.

The Court should certify a class consisting of:

All persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded Biogen Inc. ("Biogen") securities between July 22, 2020 and November 6, 2020, inclusive ("Class Period").

The Court should also appoint Lead Plaintiff Nadia Shash and Named Plaintiffs Amjad Khan and Albert Aftoora as class representatives, and appoint Laurence M. Rosen, Jonathan Horne, Brian B. Alexander, Joshua Baker, and Sara Fuks ("Lead Attorneys") of The Rosen Law Firm, P.A. ("Rosen") as Class Counsel. Plaintiffs and Lead Attorneys have taken this case through three complaints, a motion to dismiss, a partially successful appeal, then, on remand, a motion for judgment on the pleadings, discovery, and this motion for class certification. Plaintiffs have kept abreast of the case and monitored counsel through four years of litigation and are well-qualified to

---

[1] Citations to "¶_" are to paragraphs of the [Proposed] Third Amended Complaint, ECF No. 140-3. Citations to "Ex._" are to exhibits to the Declaration of Jonathan Horne in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Horne Dec.") (ECF No. 171). Citations to "Tabak Dec. ¶_" are to paragraphs of the Expert Report of David I. Tabak, Ph.D, attached as Exhibit 1 to the Horne Dec. (ECF No. 171). Unless otherwise noted, ___all bold and italicized emphases are added.___

serve as class representatives. They meet all requirements for certification.

## II.   <u>FACTS</u>

Defendants staked Biogen's future on aducanumab, a drug Biogen claimed would be the first treatment to slow the progression of Alzheimer's. ¶3. Biogen's dual Phase 3 trials, Study 301 (ENGAGE) and Study 302 (EMERGE) began before the Class Period. ¶4. They also ended before the Class Period when, in March 2019, Biogen declared that continuing with the trials was futile because they were unlikely to succeed. ¶5.

The declaration of futility was based on the data as of December 2018. After declaring futility, Defendants analyzed the clinical trials' data to look for favorable results—but including data that had accumulated after the December futility declaration. ¶118. As they later told investors, based on this analysis, Defendants purportedly concluded that Study 302 showed a statistically significant slowdown in Alzheimer's progression, though the slowdown was clinically marginal. ¶¶ 141, 150, 341. Defendants then acknowledged that the other trial, Study 301, was a failure. But they explained away the results by citing a modification of the clinical trial protocol implemented after the trials had started. ¶149. After this modification, a subgroup of patients who carried a gene predisposing them to aducanumab-related side-effects ("Carriers") could receive a maximum dose of 10mg/kg; before, their maximum dose was 6mg/kg. ¶¶99-100. The change had more of an impact on Study 302 because Study 301 had started earlier and recruited faster. ¶150. Thus, fewer Study 301 patients had the opportunity to receive a complement of 10mg/kg doses. *Id.*

In late 2019, Defendants publicly presented these results along with an analysis of the subgroup of Study 301 patients who could have received substantial 10mg/kg doses. ¶¶140-42. Defendants claimed this latter Study 301 subgroup showed a statistically significant (but again,

clinically marginal) slowdown in progression. ¶150. Defendants also claimed to have found a correlation between the amount of plaque removed and clinical results. ¶199.

Then, on a July 22, 2020 conference call, purporting to summarize what *all* the data—Study 301, Study 302, an earlier Phase 2 Study—showed, Defendant Sandrock stated:

> We believe that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE. And then I'll say in also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as CDR sum of boxes. And again, very similar that the lower doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***

*Id.* ¶191 (the highlighted statement is the "All Data" statement).

Sandrock's All Data statement was critical because it explained away the poor Study 301 results. Crediting Sandrock's claims, Study 301 failed because 6mg/kg is not a sufficient dose. ¶150. Study 302 patients received enough Aducanumab so they saw good results; Study 301 patients did not receive enough, so they saw poor results. *Id.* Thus, Defendants claimed, investors could discount the Study 301 results that would otherwise stand in the way of approval.

Yet Sandrock's explanation of the Study 301 results was belied by other facts he knew about the clinical trials but did not disclose to investors. First, in Study 302, Carriers whose treatment preceded the switch from 6mg/kg to 10mg/kg saw better results, not worse, than Carriers who received 10mg/kg. ¶¶159-60. Second, non-Carriers had the opportunity to reach the 10mg/kg from inception but saw no benefit in either trial. ¶¶152-53. Third, there was no meaningful correlation between plaque removal and clinical results. ¶207. These facts undercut Biogen's explanation of Study 301's poor results because they showed that the better performance of Carriers who received 10mg/kg doses because of the protocol amendment was a mere statistical

artifact.

The FDA held a meeting of an institutional committee of outside experts ("Advisory Committee") to advise it on aducanumab's approval. ¶¶259-61. On November 4, 2020, the FDA publicly released briefing materials for the Advisory Committee meetings. The materials were glowing. ¶¶265-71. A joint Biogen-FDA brief claimed Study 302 provided "highly persuasive" evidence of effectiveness. ¶266. A clinical review echoed the main brief's conclusion. ¶271. As one UBS analyst observed in the title of an article he published soon after the release, "First pass of briefing docs suggest FDA has constructive view – *this changes everything*." ¶277 (c). Thus, predictably, Biogen's stock price soared to $355.63. ¶278.

Tucked away at the back of the package was a report from an FDA statistical reviewer, Tristan Massie, setting out complicated biostatistical analyses which suggested that the Advisory Committee should vote against approving aducanumab. ¶273. The Massie Report did more than show the test results did not support efficacy. Dr. Massie cited the discrepancy between Study 301 and 302 6mg/kg subgroup results, the lack of a benefit for patients who could always receive 10mg/kg, and the absence of any correlation between plaque removal and clinical results. ¶275.

While it took little time for markets to digest that the FDA favored approval, the Massie Report was no easy read. It was dense and technical. It contained many analyses that did not bear on the All Data statement. Beyond that, investors' impression of its reliability would have been significantly undercut by a prominent DRAFT watermark on all its pages.  But investors both skilled enough to take in Massie's analysis and dogged enough to make it through his prose would have, eventually, had reason to question the All Data statement.

These facts delayed the market's assessment of the Massie Report; contemporaneous analyst reports show as much. Some analysts discounted the report. Some analysts gave the Massie

4

Report little credit. ¶273. On November 5, the day after publication, the above-referenced UBS analyst published a second report observing that the Massie Report was "buried at the end of the documents and seemed superseded by FDA's prior commentary." ¶275. Other analysts documented their gradual understanding of the Massie Report in real time. For instance, after the Advisory Committee materials' release, a JP Morgan analyst quickly published a report titled "To Be Brief … the FDA Wants to Approve Adu." ¶277 (a). After trading closed, the same analyst published a second report stating that "[o]ur more thorough review was eye opening in terms of conflict of opinions between the FDA reviewers and their statisticians." *Id.* The second JP Morgan report noted that the statistician's report "conflicts with [Biogen]'s hypothesis that high aducanumab dosing leads to a better benefit as non-carriers were always able to dose up to 10mg/kg." *Id.* Likewise, a Raymond James analyst published an initial report lauding the materials as a "landslide win" for Biogen. A day later, the analyst published a second report observing that "the statistician … essentially annihilated the pro-aducanumab position." ¶234 (b).

Thus, after the initial jubilant response, market participants slowly began incorporating the analyses set out in the dense, turgid, and questionably reliable Massie Report. Biogen's stock price fell to $328.90 on November 5. ¶279.

The Advisory Committee met on November 6. That day, trading in Biogen's stock was halted. The Committee's world class experts found the Massie Report both reliable and persuasive, leading to a nearly unanimous vote that Biogen had not shown aducanumab's efficacy. On November 9, when trading resumed, Biogen's stock price fell, closing at $236.26 that day. ¶294.

**III.    PROCEDURAL HISTORY**

This action was filed on November 13, 2020, in the Central District of California. Nadia Shash was appointed lead plaintiff by the California Court, and Laurence Rosen, Jonathan Horne,

5

Sara Fuks, and Joshua Baker were appointed as lead counsel by this Court. ECF No. 41. Ms. Shash and Amjad Khan filed their amended complaint on April 26, 2021. ECF No. 42. They subsequently amended their complaint on August 4, 2021. The second amended complaint included allegations drawn from a trove of documents released after the FDA approved Aducanumab and two investigative reports following approval. ECF No. 58. The latter that highlighted questionable tactics Biogen and an FDA official had engaged in to push Aducanumab through to approval. *Id.*

The Court granted Defendants' motion to dismiss in September 2022. ECF Nos. 76-77. Plaintiffs appealed, and the First Circuit affirmed in part and reversed in part in October 2023, preserving the claims based on Sandrock's All Data statement as well as secondary liability claims against all individual defendants. ECF Nos. 83, 84. On remand, Defendants sought to file a renewed motion to dismiss based on an argument they had neglected to press before the First Circuit. ECF No. 107. The Court denied Defendants' request as procedurally improper, but they subsequently filed a motion for judgment on the pleadings raising the same argument, securing a stay of discovery during the motion's pendency. ECF Nos. 116, 141. Meanwhile, three plaintiffs, including Albert Aftoora, filed motions to intervene and/or amend the Complaint to add them as Plaintiffs. ECF No. 138. Opposing the motion, Defendants for the first time argued that the Court never had subject matter jurisdiction over this action. *Id.*

In March 2025, the Court entered an order denying the motion for judgment on the pleadings, except as to Defendant Budd Haeberlein (which was unopposed), and granting the motion to intervene as to Aftoora. ECF No. 163.

IV.    **ARGUMENT**

A.  **The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23**

1.      **Standards for Class Certification**

"In order for a class to be certified, a plaintiff must satisfy the four prerequisites of Fed. R. Civ. P. 23(a) – numerosity, commonality, typicality, and adequacy – as well as one of the categories of requirements of Fed. R. Civ. P. 23(b)." *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 279-80 (D. Mass. 2009).

Courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). But Rule 23 does not "license … free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 568 U.S. 455, 465-66 (2013); "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466.

2.      **The Rule 23(a) Requirements are Satisfied**

a.      **The Proposed Class is So Numerous that Joinder is Impracticable**

Rule 23(a)(1) requires a finding that "the class is so numerous that joinder of all members is impracticable." In a securities fraud case, "the class size may be reasonably inferred to be in the hundreds or thousands when there are millions of shares outstanding and … millions of transactions during the class period." *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *3 (D. Mass. Nov. 14, 2017).

This case easily meets numerosity. During the Class Period, the common stock of Biogen traded on the NASAQ under the ticker "BIIB." During the Class Period, Biogen had an average of 158 million shares of common stock outstanding, and during the Class Period, more than 2.5

million Biogen shares were traded each week. ECF No. 171-1 ¶¶16-17 and at 86. Joinder of all these class members is plainly impracticable.

### b.      There Are Common Questions of Law and Fact

Commonality exists if there are "questions of law or fact common to the class." *AVEO*, 2017 WL 5484672, at *4. In securities class actions, courts have found commonality where "the statements Plaintiffs allege were misleading due to material omissions were made to all of the class members." *Id.*

Almost all questions of law and fact in this case are common to Plaintiffs and Class members. Whether Defendants made false statements, whether they had scienter, and whether these statements caused Plaintiffs' losses, are all common questions. That is enough for commonality.

### c.      Plaintiffs' Claims Are Typical of the Class

The claims of the representative plaintiffs must also be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The plaintiff can meet this requirement by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class." *Boston Scientific*, 604 F. Supp. 2d at 281–82; *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 390 (D. Mass. 2011). Ultimately, typicality is satisfied where "all members of the class are purchasers of [the company's] stock which they allege was inflated in price due to Defendants' material omissions and were harmed by the later revelations that cured the omission." *AVEO*, 2017 WL 5484672, at *4.

Plaintiffs' claims and those of all Class members arise from the same misrepresentation. Like all Class members, Plaintiffs purchased Biogen securities during the Class Period not

knowing that Defendants had made a materially false and misleading statement that artificially inflated the price of Biogen securities. Plaintiffs and the Class all relied on the integrity of the market when they purchased Biogen securities at artificially inflated prices and were damaged when that artificial inflation dissipated after revelations that Defendants' statement was a misrepresentation. Plaintiffs' claims and the Class's are based on the same violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Thus, Plaintiffs' claims are typical.

### d. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is satisfied here. Plaintiffs show, as they must, "that the interests of the representative party will not conflict with the interests of any of the class members, and … that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" *Dahhan v. OvaScience, Inc.*, 2020 WL 2602138, at *4 (D. Mass. May 8, 2020) (quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)).

Plaintiffs' claims are aligned with those of the Class. Plaintiffs will recover if, and only if, they prove the Class's claims. Further, Plaintiffs understand their duties as Class representatives and are willing and able to serve as representative parties on behalf of the Class. In addition, Plaintiffs have submitted declarations affirming (i) they understand their responsibilities as fiduciaries of the Class, (ii) are willing to accept these responsibilities, and (iii) are willing to be deposed and attend trial. *See* ECF Nos. 171-2 ¶¶15-22, 171-3 ¶¶13-20, and 171-4 ¶¶12-19.

Finally, Lead Attorneys are experienced in complex class litigation, especially securities fraud actions, and can prosecute this action vigorously. *See e.g.,* ECF Nos. 171 ¶¶3-5, 171-5, 171-6 ¶¶4-6, 171-7 ¶¶3-5, 171-8 ¶¶3-5, 171-9 ¶¶3-5. They have already done so, securing a partial

victory on appeal, defeating Defendants' motion for judgment on the pleadings, and successfully moving to add a plaintiff to protect the Class's claims. *See Id*. Thus, Lead Attorneys can manage this case.

### B.     The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication. Both requirements are met here.

### 1.     Common Questions of Law and Fact Predominate

"Predominance is … readily met in certain cases alleging consumer or securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "With the exception of reliance, the elements of the § 10(b) and Rule 10b-5 claims … are amenable to common proof and thus 'the question of predominance here boils down to the element of reliance.'" *OvaScience*, 2020 WL 2602138, at *5.

In securities fraud cases, plaintiffs may raise a class-wide presumption of reliance under the fraud-on-the-market theory recognized in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988). *OvaScience*, 2020 WL 2602138, at *5 ("Although reliance is often an individual-specific inquiry, the Supreme Court has identified two circumstances in which a class-wide presumption of reliance is appropriate [one of which is] where there has been a fraud on the market.").

With reliance a common question, Defendants' liability predominantly turns on issues common to the Class.

### i.     Plaintiffs and the Class Are Entitled to a Presumption of Reliance Under *Basic*

*Basic* "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton Co. v.*

10

*Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246-47). Thus, whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action.'" *Id.* That false positive statements artificially inflate the prices of securities that trade on an efficient market is hardly disputed, as "[e]ven the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices." *Id*. at 272.

To invoke the presumption of reliance under this theory, a plaintiff must show: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id*. at 268.

Plaintiffs readily satisfy each of *Basic*'s requirements and are entitled to a presumption of reliance. First, the First Circuit and this Court have already held that Plaintiffs alleged Defendants made a public misrepresentation to the market. *Shash v. Biogen, Inc*., 84 F.4th 1, 14 (1st Cir. 2023). Second, courts do not resolve materiality until the merits stage because it "is an objective issue susceptible to common, classwide proof." *Halliburton II*, 573 U.S. at 282. As to the timing of Plaintiffs' purchases, *Halliburton II* clarifies that plaintiffs can benefit from the presumption of reliance even if they purchase after the corrective information is released, so long as the correction has not been fully impounded into the company's stock price. *Id.* at 278 ("[A]n investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction.").

Finally, as detailed below, the market for Biogen securities was efficient during the Class Period.

Thus, *Basic*'s requirements are met.

11

     **ii.**       **Biogen Securities Traded in an Efficient Market During the Class Period**

Biogen is one of the country's largest companies. During the Class Period, its smallest market capitalization was $37 billion. ECF No. 171-1 ¶47. On that day, it was approximately the 168th largest U.S.-traded company by market cap. This is not even the first case ***this year*** to consider whether Biogen's common stock traded on an efficient market. Judge Young recently found that Biogen's securities traded on an efficient market between June 8, 2021, and January 11, 2022, or less than a year after the Class Period herein. *Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*, 348 F.R.D. 268, 274 (D. Mass. 2025).

In any case, "[i]n determining whether the market for a specific security is efficient, the First Circuit uses the factors laid out by the court in *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J.1989)." *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 27 (D. Mass. 2008). The *Cammer* factors are: "1) the stock's average trading volume; 2) the number of securities analysts that follow and report on the stock; 3) the presence of market makers and arbitrageurs; 4) the company's eligibility to file a Form S-3 Registration Statement; and 5) a cause-and-effect relationship over time between unexpected corporate events or financial releases and an immediate response in stock price." *Id*. These factors are an analytical tool, and no one factor is dispositive.

Courts have noted that average weekly trading volume of 1% or 2% of outstanding shares serves "as the benchmark for supporting a presumption of efficiency." *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514 (1st Cir. 2005). Biogen's average weekly trading volume during the Class Period was at least 2.5 million shares, which represented 3.7% of total outstanding shares. ECF No. 171-1 ¶17.

Coverage by as few as three analysts supports a finding of efficiency. *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011). During the three-month Class Period, twenty-seven analysts covered Biogen. ECF No. 171-1 ¶¶20-21.

A "20-market-maker average supports a presumption of market efficiency." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014). During the Class Period, at least 91 firms made a market for Biogen stock, and 1,400 institutional investors held its shares. ECF No. 171-1 ¶¶22, 24.

"[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1284-85. Biogen was eligible to file Forms S-3 with the SEC during the Class Period. ECF No. 171-1 ¶¶29-30.

"[A] plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017). Biogen is a large, well known company; it would be surprising if its stock did not trade on an efficient market. And the overwhelming showing on *Cammer* factors one through four renders *Cammer* factor five unnecessary. *Waggoner*, 875 F.3d at 97; *In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017).

Yet, still, Dr. Tabak shows *Cammer* factor five supports approval. *See* ECF No. 171-1 ¶¶ 41, 43, 45. Dr. Tabak performed a series of event studies which show "a cause and effect relationship between company disclosures and resulting movements in stock price." *Cammer*, 711 F. Supp. at 1287, 1291. To do so, Dr. Tabak created a model of trading in Biogen's stock that controls for broader movements in the market and Biogen's industry, leaving the remaining daily price movements as "excess returns." ECF 171-1 n. 42 and at 93. Though fewer than half (35/75) the trading days in the Class Period saw Biogen-specific news released ("news days"), Dr. Tabak

13

found that the four days during the Class Period with the largest excess returns (5% of the total) were all news days. *Id*. ¶¶39, 43, and at 93. While the limited number of trading days during the Class Period introduces some uncertainty, overall, Dr. Tabak finds "reasonable evidence that Biogen's share price responded to material news information." *Id*. ¶45.

### iii.    Damages can be Calculated on a Classwide Basis

At class certification, plaintiffs must show that they will be able to proffer a damages model that comports with their theory of liability. *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). "Plaintiff's burden for purposes of class certification 'is simply to propose'"—and not to establish—"'a methodology for calculating damages that corresponds to its theory of liability.'" *Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *10 (D. Mass. July 14, 2023) (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16CIV6728CMRWL, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019)).

Dr. Tabak shows that he will be able to calculate damages on a classwide basis. Dr. Tabak describes the method he will use to calculate the out-of-pocket measure of damages. ECF 171-1 ¶¶58-62. This is "the standard measurement of damages in Section 10(b) securities cases." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases)). To calculate out-of-pocket damages, Dr. Tabak will use an event study to isolate fraud-related losses following the corrective disclosure. ECF 171-1 ¶¶59-61. This use of an event study to calculate out-of-pocket damages "limit[s] damages to those that are attributable to [Plaintiffs'] theory of liability." *RH*, 2018 WL 4931543, at *3; *see also Luna*, 2023 WL 4539855, at *10 (citing cases). "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section

14

10(b) class action." *RH*, 2018 WL 4931543, at *3 (collecting cases)). Plaintiffs will thus show how "their damages stemmed from the defendant's actions that created the legal liability." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016); *see also Oklahoma Firefighters,* 348 F.R.D. at 286 (finding *Comcast* met by proposal to use event study to disaggregate losses not linked to fraud).

Thus, although damages for each individual Class member may vary, the methodology for calculating damages will apply commonly to each Class member for all of Plaintiffs' claims.

**2.      A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy**

Rule 23(b)(3) also requires that a class action be superior to other methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). To determine the issue of "superiority," Rule 23(b)(3) enumerates the following factors for the court to consider:

> (A) the class members' interests in individually controlling the prosecution … of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by … class members; (C) the desirability … of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Securities class actions advance Rule 23(b)(3)'s "core purpose" by "provid[ing] the opportunity for individual investors to vindicate potentially valid claims, even where those investors suffered relatively small damages and have insufficient resources to pursue litigation on their own." *Boston Scientific*, 604 F. Supp. 2d at 287-88; *AVEO*, 2017 WL 5484672, at *7. Securities class actions are also superior because if numerous plaintiffs file individual actions, "the burden on the courts, with a sizable class, would be significant." *AVEO*, 2017 WL 5484672, at *7.

15

This case is no different. The Class members' interests in individually controlling the prosecution of separate actions are minimal. The burden on the courts from adjudicating potentially thousands of separate actions arising from the same facts would be significant.

Finally, neither Plaintiffs nor Defendants have cited any significant difficulties that could be encountered in the management of this case as a class action.

## C.    Plaintiffs' Counsel Satisfies the Rule 23(g) Prerequisite for Appointment as Class Counsel

In confirming its appointment of Lead Attorneys as Class Counsel, the Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Lead Attorneys at Rosen have substantial experience in the field of securities class action litigation in this and other districts. *See* ECF Nos. 171 ¶¶2-5, 171-5, 171-6 ¶¶3-6, 171-7 ¶¶2-5, 171-8 ¶¶2-5, 171-9 ¶¶2-5. Lead Attorneys are qualified and the Court should confirm their appointment as Class Counsel in this case.

Th Rosen Law Firm, whose named partner is Lead Attorney Mr. Rosen, has recovered more than $1 billion for investors in securities class actions. Each of the Lead Attorneys has achieved significant recoveries for investors in securities litigation and class actions. *See* ECF Nos. 171 ¶¶3-4, 171-5, 171-6 ¶¶4-5, 171-7 ¶¶3-4, 171-8 ¶¶3-4, 171-9 ¶¶3-4; *Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019), *appeal withdrawn sub nom. Tan Chao v. William*, 2020 WL 763277 (2d Cir. Jan. 2, 2020) (finding in approving $250 million settlement in case in which Rosen was lead counsel that "the quality of representation by … [Rosen, led by

16

Mr. Rosen personally] … was high in this case."); *see also Pace v. Quintanilla*, 2014 WL 4180766, at \*3 (C.D. Cal. Aug. 19, 2014) ("The Rosen Law Firm [including through its attorneys Messrs. Rosen and Horne] has appeared before this Court several times before, and the Court is confident that it has the necessary skill and knowledge to effectively prosecute this action.").

Lead Attorneys have, for four years, through an appeal, zealously advanced the interests of Plaintiffs and the putative Class. Lead Attorneys are continuing to spend the resources necessary to properly represent the class, having retained Dr. Tabak, a preeminent financial expert, in connection with this Motion for Class Certification.

Lead Attorneys will continue to dedicate the funds and resources necessary to pursue Plaintiffs' claims, on behalf of the Class, including through trial and any potential appeals. *See* ECF Nos. 171 ¶6, 171-6 ¶7, 171-7 ¶6, 171-8 ¶6, 171-9 ¶6.

## V.   DEFENDANTS WILL NOT BE ABLE TO REBUT THE FRAUD ON THE MARKET PRESUMPTION AND, THOUGH NOT REQUIRED, THERE IS AFFIRMATIVE EVIDENCE THAT THEIR MISREPRESENTATION HAD AN IMPACT ON BIOGEN'S SHARE PRICE

To rebut the fraud on the market presumption, Defendants must show "***through evidence that the misrepresentation did not in fact affect*** the stock price." *Halliburton II*, 573 U.S. at 279. Defendants bear the burden of persuasion, not merely a burden of production. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 126, (2021).

The All Data statement maintained inflation of Biogen's stock price rather than adding new inflation. In the All Data statement, Sandrock inaccurately summarized the results of Biogen's clinical trials, which results had been selectively and misleadingly disclosed earlier.  Thus, the All Data statement would not be expected to cause Biogen's stock price to increase when Sandrock

17

uttered it, but rather prevent the decline that would have occurred had Sandrock told the truth.

"To prove a lack of price impact in an inflation-maintenance case, the defendant must sever the causal link between the disclosure of the truth and the price drop." *Waste Management*, 2025 WL 958467, at *12 (S.D.N.Y. Mar. 31, 2025). "[S]imply pointing to other potential causes for a stock price change following a corrective disclosure is ... not enough to rebut the *Basic* presumption." *Luna*, 2023 WL 4539855, at *10. That is because Defendants must show that none of the stock price decline results from the correction of the false statement. *Waggoner*, 875 F.3d at 105 ("[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security.") (emphasis in original).

Again, Plaintiffs **need not** show price impact. Defendants must, instead, show a complete absence of price impact by a preponderance of the evidence. Nevertheless, Plaintiffs' affirmative showing of price impact, as a matter of logic, establishes that Defendants cannot possibly meet their burden.

There is price impact evidence from both November 5 and November 9. It often takes several days for companies' stock prices to fully impound complicated news. *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 486 (E.D. Pa. 2022) (collecting cases); *accord Oklahoma Firefighters*, 348 F.R.D. at 284 n.8. Thus, "when information credibly entered the market is a matter for trial." *Allegheny County*, 623 F. Supp. 3d at 498 (citing *Amgen*, 568 U.S. at 482) (cleaned up). That Biogen's stock price increased on November 4 does not show an absence of price impact. And there is contemporaneous evidence that markets incorporated the good news first (the FDA supports the application) but took far longer to incorporate the bad news (the data is much worse than Biogen had let on). That's exactly what the JP Morgan and Raymond

18

James analysts did, publishing glowing articles during trading on November 4, then, after trading closed or on November 5, publishing more sober reports that discussed Dr. Massie's analysis. *See* page 5, above.

Dr. Tabak provides further evidence of price impact. Unusual stock price movements are evidence that the market is incorporating news. Dr. Tabak finds a statistically significant excess stock price decline on November 5. ECF No. 171-1 ¶72. It would not be enough for Defendants to point to other news released on November 5. *Waggoner*, 875 F.3d at 105. But even so, according to Dr. Tabak, there was no Biogen-specific news on November 5 that could account for the abnormal return that day. ECF No. 171-1 ¶75. Because there is clear evidence of price impact on November 5, Defendants will not be able to show a complete absence of price impact.

Dr. Tabak also finds a statistically significant excess decline on November 9. Though the factfinder may—but need not—find that the Advisory Committee vote was an intervening fact unrelated to the fraud, as of the morning of November 9, investors had benefited from another 3 days to consider the Massie Report. They also benefited from the Advisory Committee's discussion of the evidence, which focused on the Massie Report. The market had reason to continue to consider the Massie Report regardless of how the Advisory Committee voted. Indeed, the market did continue to find the Massie Report relevant: on every day through November 11, at least 40% of the analyst reports about Biogen used the words "Massie," "statistician," or "statistical review." ECF No. 171-1 ¶74. Disaggregation of the portion of the loss attributable to revelation of Defendants' fraud is for summary judgment or trial. *Waggoner*, 875 F.3d at 105. At class certification, Defendants must show that ***none*** of the decline had ***anything*** to do with the fraud.

With this evidence of price impact, as a matter of pure logic, Defendants cannot meet their

19

burden of showing a complete absence of price impact.

## VI.    **CONCLUSION**

The Court should issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs Nadia Shash, Amjad Khan, and Albert Aftoora as the Class Representatives; (3) appointing Laurence M. Rosen, Jonathan Horne, Brian B. Alexander, Joshua Baker, and Sara Fuks of The Rosen Law Firm, P.A. as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: June 27, 2025                         Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             _/s/Laurence M. Rosen_
                                             Laurence M. Rosen, Esq. (*pro hac vice*)
                                             Jonathan Horne, Esq. (*pro hac vice*)
                                             Brian B. Alexander, Esq. (*pro hac vice*)
                                             Joshua Baker, Esq. (BBO #695561)
                                             Sara Fuks, Esq. (*pro hac vice*)
                                             275 Madison Avenue, 40th Floor
                                             New York, NY 100016
                                             Tel: (212) 686-1060
                                             Fax: (212) 202-3827
                                             lrosen@rosenlegal.com
                                             jhorne@rosenlegal.com
                                             balexander@rosenlegal.com
                                             jbaker@rosenlegal.com
                                             sfuks@rosenlegal.com

                                             *Counsel for Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** was served by CM/ECF to parties registered to the Court's CM/ECF system.

/s/Laurence Rosen

22