# Exhibit B

Page 1

FOR THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:21-cv-10479-IT
- - - - - - - - - - - - - - - - - - - x
NADIA SHASH and AMJAD KHAN
Individually and On Behalf of All
Others Similarly Situated,

                    Plaintiffs,

      - against -

BIOGEN INC., MICHEL VOUNATSOS,
ALFRED W. SANDROCK, JR., and
SAMANTHA BUDD-HAEBERLEIN,

                    Defendants.

- - - - - - - - - - - - - - - - - - - x
                    July 29, 2025
                    10:26 a.m.


     VIDEO RECORDED DEPOSITION of DAVID TABAK,
PH.D., an Expert Witness for the Plaintiffs
herein, taken by the Defendants, held at the
offices of Paul Weiss Rifkind Wharton &
Garrison, LLP, 1285 Avenue of the Americas, new
York, New York, before Sara K. Killian, a
Registered Professional Reporter, Realtime
Certified Reporter and Notary Public.

Page 2

A P P E A R A N C E S :

THE ROSEN LAW FIRM
Attorneys for Plaintiffs
275 Madison Avenue, 40th Floor
New York, New York  10016
BY: JONATHAN HORNE, ESQ.
     BRIAN ALEXANDER, ESQ.

MOLOLAMKEN LLP
Attorneys for Plaintiffs
600 New Hampshire Avenue NW
Washington DC  20037
BY: ROBERT KRY, ESQ.

Page 3

A P P E A R A N C E S: (cont'd)

PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
Attorneys for Defendants
1285 Avenue of the Americas
New York, New York  10019
BY: AUDRA SOLOWAY, ESQ.
    DANIEL SINNREICH, ESQ.
    CHARLES THAU, ESQ.

ALSO PRESENT:
    JON DIFILLIPO, Videographer

Page 4

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Dr. Tabak | Ms. Soloway | 9 |

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of David I. Tabak, Ph.D. | 19 |
| Exhibit 2 | Exhibit 1 to the Expert Report of David I. Tabak, Ph.D. | 20 |
| Exhibit 3 | Biogen Inc. chart entitled Percent of Days with Statistically Significant Returns of News Days as Compared to Non-News Days for Biogen Common Stock, Analysis Period: July 22, 2020 to November 4, 2020 | 36 |
| Exhibit 4 | Transcript of the Biogen Inc. FQ 2 2020 Earnings Call, Wednesday, July 22, 2020 | 45 |
| Exhibit 5 | Expert Report of David Tabak, Ph.D. with attachments | 89 |
| Exhibit 6 | Spreadsheet | 100 |
| Exhibit 7 | Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel | 113 |

Page 5

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | United States Court of Appeals for the First Circuit Decision | 152 |
| Exhibit 9 | An article from the Journal of Financial Economics entitled "Market Efficiency in Real Time" by Jeffrey A. Busse and T. Clifton Green | 187 |
| Exhibit 10 | Brief of Financial Economists as Amici Curiae in Support of Respondents in Halliburton Co. and David Lesar v. Erica P. John Fund, Inc. | 196 |
| Exhibit 11 | Study entitled "Determination of the Appropriate Event Window Length in Individual Stock Event Studies" by Dmitry Krivin, Robert Patton, Erica Rose and David Tabak | 218 |
| Exhibit 12 | Statistical Review and Evaluation Report by Tristan Massie | 249 |
| Exhibit 13 | Raymond James report regarding Biogen Inc., November 4, 2020 | 256 |
| Exhibit 14 | Raymond James briefing document regarding Biogen Inc., November 5, 2020 | 262 |

2 (Pages 2 - 5)

Page 6

E X H I B I T S

EXHIBITS    DESCRIPTION          PAGE

Exhibit 15    JP Morgan report          268
              regarding Biogen Inc.,
              November 3, 2020

Exhibit 16    JP Morgan report          272
              regarding Biogen Inc.,
              November 4, 2020

Exhibit 17    Atlantic Equities report  290
              regarding Biogen Inc.,
              November 5, 2020

Exhibit 18    November 4, 2020 Intraday 307
              Stock Price chart

Exhibit 19    RBC Capital Markets       328
              report regarding Biogen
              Inc., November 5, 2020

Exhibit 20    JP Morgan report          331
              regarding Biogen Inc.,
              November 4, 2020

Exhibit 21    Expert Report of David    360
              Tabak, Ph.D. in re:
              Alibaba Group Ltd.
              Securities Litigation

Page 7

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and among counsel for the respective parties hereto, that the sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED all objections except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

Page 8

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:26 a.m. on July 29th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Dr. David Tabak in the matter of Nadia Shash and Amjad Khan vs. Biogen Inc., et al, filed in the United States District Court, District of Massachusetts, Case No. 1:21-cv-10479-IT.

The location of this deposition is Paul Weiss Rifkind Wharton & Garrison LLP.

My name is John DiFillipo representing Veritext and I am the videographer.  The court reporter is

Page 9

Sara Killian from the firm Veritext. I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the preceding, please state them at the time of your appearance.  Counsel and all present have been previously noted for the stenographic record.

Will the court reporter please swear in the witness and then counsel may proceed.

D A V I D  T A B A K, Ph. D., after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MS. SOLOWAY:

Q.    Good morning, Dr. Tabak.

A.    Good morning, Counsel.

Q.    So I assume you've been deposed a number of times before.

A.    I have.

3 (Pages 6 - 9)

Page 10

D. Tabak, Ph.D.

Q. How many do you think roughly?

A. Probably over 50.

Q. Over 50.

So I'll just quickly say if you don't understand one of my questions, just let me know and I'll rephrase it.

And is there any reason you can't give truthful testimony here today?

A. There is not.

Q. Okay.

So why don't we jump in and just go through your education and employment history quickly.

What do you consider your primary area of expertise?

A. It's probably securities and finance and overlapping with statistics.

Q. Okay.

Any other areas of academic or professional expertise?

A. Valuation, maybe some others, but you asked for my primary ones, so I think that's it.

Q. Okay.

Page 11

D. Tabak, Ph.D.

And do you have any expertise in the pharmaceutical industry?

A. No.

Q. Any expertise relevant to the treatment of Alzheimer's disease?

A. No.

Q. Any expertise relevant to the process of receiving FDA approval of a drug?

A. I have some background, but not holding myself out as an expert in that.

Q. Okay.

And in order -- in forming the opinions you formed in this case, did you do any work to understand treatments for Alzheimer's?

A. I did not.

Q. What about the process for receiving first degree approval for a drug?

A. As I said I've seen it before, I have some background understanding, but again, I'm not going to hold myself out as an expert in that area.

Q. Okay.

So you mentioned that you've --

Page 12

D. Tabak, Ph.D.

I think you've said you've been deposed more than 50 times. That was in connection with being an expert witness?

A. Yes.

Q. Have you ever been deposed in a case where you were a fact witness?

A. I have not.

Q. Okay.

How many expert engagements would you say you've had in your career?

A. Several hundred.

Q. Over how many years?

A. Over 25 years.

Q. And is that -- just to take a step back. Is that in connection with your work at Nera?

A. Yes.

Q. Has it been in connection with your work at NERA over that entire time period?

A. Yes, it has.

Q. Okay.

And is serving as an expert witness your full-time job?

Page 13

D. Tabak, Ph.D.

A. Well, probably very little of the time is actually serving as the witness here. More of it is probably consulting, as well as I have various administrative roles.

Q. Okay.

So just to break that down, and we can just do, you know, in the time that you've been at NERA, when you say serving as an expert is actually very little time, do you mean actually sitting in a chair and testifying as an expert?

A. Correct.

Q. Okay.

So of the work that you do, of the time that you spend, you spend your time on expert consulting engagements?

A. I would say that's probably the bulk of it yes.

Q. Okay.

Would you say that's more than 90% of your time?

A. No.

Q. Eighty percent of your time?

A. Probably a little less.

4 (Pages 10 - 13)

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 14

D. Tabak, Ph.D.

Q.    Okay.

Seventy percent of your time?

A.    Maybe.

Q.    Okay.

And the time that you're not spending on expert consulting engagements, you said administrative.

What would that be?

A.    It's everything from helping with recruiting to -- I was until recently the head of our New York City office, helping managing our practice area, training, and so forth.

Q.    So it's making NERA function well, correct?

A.    I hope so.

Q.    Okay. All right.

Is it fair to say that 100% of your compensation comes from NERA?

A.    Yes.

Q.    Okay.

And of the work that you do for NERA, it consists of that administrative working as well as your expert consulting

Page 15

D. Tabak, Ph.D.

works, correct?

A.    Correct.

Q.    Okay.

Does your compensation depend on the amount that you generate in your expert consulting engagements?

A.    Yes.

Q.    You mentioned that you've served as an ex -- earlier that you served as an expert in securities litigations?

A.    I think you just asked how many times I've been deposed, but the answer will still be yes.

Q.    I think when I asked you what your areas of expertise where you may have said securities. But let's go back. When I say a securities fraud class action, what does that mean to?

A.    I think formally a 10(b)(5) class action, but if you want a kind of a general term, it's when there's an allegation that a defendant or defendants misled the market through alleged omissions or misrepresentations for a 10(b)(5) claim

Page 16

D. Tabak, Ph.D.

typically or through actions through A or C scheme claim.

Q.    Okay.

And how many cases of that type have you been involved in?

A.    Well over a 100.

Q.    Would you say that that makes up the majority of your expert consulting work?

A.    Yes.

Q.    And in the cases that you've been involved in, have you worked for the plaintiffs side, the defense side, or both?

A.    Both.

Q.    Okay.

And what's the proportion roughly of plaintiff to defense work that you've done?

A.    It's hard to say. My guess is it's probably close to 50/50 over the course of my career.

Q.    And this is in securities fraud class actions?

A.    Yes.

Page 17

D. Tabak, Ph.D.

Q.    Okay.

And over your career, it's 50/50. What about over the past five years?

THE VIDEOGRAPHER:  Sorry to interrupt. Your hair is hitting the --

MS. SOLOWAY:  Sorry. Maybe I'll just tie it back.

Go on, Dr. Tabak.

A.    I'm not sure, but I actually could probably give you an estimate of roughly the last ten years based on an outside source.

Q.    Sure.

What's your outside source?

A.    There is an academic article that came out recently looking at plaintiffs and defense experts, and said only two of them has worked on both sides. One was somewhere else and only worked on one, and then said someone from NERA in their database appeared in twelve plaintiff's cases and six defense cases in the docket in the roughly past ten years.

Q.    Okay.

5 (Pages 14 - 17)

Page 18

D. Tabak, Ph.D.

So in the past ten years, you think, based on that source, you've worked on twelve plaintiff cases and six defense cases in the securities class action realm?

A.    No. I'd say I appeared on the docket because if a report or something has been put in there. I would think that's probably not bad as an estimate. Although I've done additional work for the defendants as a consultant helping colleagues at NERA.

Q.    I'm going to have you put aside the work you've done helping colleagues at NERA.

In the past five years, can you identify any cases where you served as the defense expert in a securities class action?

A.    Sure. Those that I believe are public would include Kandi, K-A-N-D-I, Technologies, Rivian, R-I-V-I-A-N, or maybe it's Rivian Automotive. If you gave me my CV, it would be a bit easier, but ...

Q.    We can do that. Let me actually get you your report with your exhibits attached.

Page 19

D. Tabak, Ph.D.

A.    Sure.

(Discussion off the stenographic record)

(Whereupon, Exhibit 1 was marked for identification.)

BY MS. SOLOWAY:

Q.    So here is a copy of your report, which you can just have on hand.

Can you confirm, Dr. Tabak, that that's a copy of the report you prepared in this case?

MR. HORNE:  Can you give us a copy, please?

MS. SOLOWAY:  Yes.

A.    I haven't checked every page, but it appears to be a copy of the complete text of the report.

MS. SOLOWAY:  Charlie, if I'm wondering if it would make your life easier to mark the exhibits as all one, rather than having,like, 14 separate exhibit tabs.

MR. THAU:  We could do that.

(Whereupon, Exhibit 2 was

Page 20

D. Tabak, Ph.D.

marked for identification.)

MS. SOLOWAY:  So I'm going to hand you what's been marked -- can we get the plaintiffs copies, too -- Exhibit 2, which is Exhibit 1 to your report. Just to make things nice and confusing.

THE WITNESS:  Of course.

MS. SOLOWAY:  Jonathan, do you mind if I proceed since you have the exhibits?

MR. HORNE:  Go ahead.

MS. SOLOWAY:  Thank you.

BY MS. SOLOWAY:

Q.    So we've just handed you Exhibit 2, which I think is the information you've provided with your report -- about your background, correct?

A.    Correct.

Q.    Okay.

So with the benefit of that, I think you had said that you worked for defendants in the Kandi Tech case and the Rivian case.

Page 21

D. Tabak, Ph.D.

Any others?

A.    You've asked in the past five years?

Q.    Yes, in the past five years.

A.    And you're limiting to securities class actions?

Q.    Mm-hmm. Yes.

(Witness reviews document)

A.    Also Grupo Tele Visa, G-R-U-P-O T-E-L-E V-I-S-A.

On page seven, it's Mesa, M-E-S-A, Air Group. And unless I missed anything, that's it for the ones that I've submitted a report or had oral testimony for securities class actions for defendants in the past five years.

Q.    Okay. Thank you.

Has your testimony or expert opinion ever been excluded in a case?

A.    No. The only one conflict that is in General Electric where the court ruled I couldn't talk about materiality, would have to use terms like economic importance.

Q.    Any others?

6 (Pages 18 - 21)

Page 22

D. Tabak, Ph.D.

A.    In a bankruptcy hearing, some of my written testimony went beyond my deposition, so the court would not consider that part of my written testimony, but accepted the rest, and I testified at the bankruptcy hearing.  And that was -- I guess it would be -- well, it was Adelfia, and the other side -- think it was Nextera, N-E-X-T-E-R-A.

Q.    Okay.
Any others?

A.    That's it.

Q.    Okay.
And what about criticized?  Has your expert opinion been criticized in any opinions?

MR. HORNE:  Objection.
Vague.

A.    Yeah, I'd say there were courts that tend to agree estimates with the opposing expert and did not accept my views.

Q.    Okay.
So putting aside courts that have just disagreed with you -- any -- and

Page 23

D. Tabak, Ph.D.

just to put a finer point on what credit similar means, have any said your opinion proved unreliable or your methodology was, you know, unsupportable for some reason.  Those types of criticisms.

A.    I don't think so.  I'd have to check wording, but I don't think so.

Q.    Okay.

A.    Certainly not excluded.

Q.    How did your retention in this matter come about?

A.    I was contacted at some point by counsel for Plaintiff.

Q.    The Rosen firm?

A.    Yes.

Q.    Okay.
Have you previously been retained by the Rosen firm?

A.    A few times, yes.

Q.    Can you put a number on how many?

A.    Probably about half a dozen.

Q.    In the past how many years?

A.    Over the course of my career.

Page 24

D. Tabak, Ph.D.

Q.    And how many times in the past five years?

A.    I can't say.  A subset of those.

Q.    Not sure how many?

A.    No, I don't keep track.

Q.    Okay.
Your compensation for your work in this case is hourly?

A.    NERA's compensation for my work in this case is hourly.

Q.    And your compensation, is it based on what NERA -- just to put a finer point, NERA pays you, correct?

A.    Correct.

Q.    And is your compensation from NERA based in part on compensation generated by you in this matter?

A.    Yes.

Q.    You charge the plaintiffs an hourly rate?

A.    I do.

Q.    Twelve fifty an hour?

A.    Correct.

Page 25

D. Tabak, Ph.D.

Q.    And who is paying your hour?

A.    I assume it's the Rosen law firm.

Q.    I think you say in your report that you're assisted by individuals at NERA who work at your direction?

A.    That is correct.

Q.    Okay.
How many?

A.    In this case, it probably would have been seven, or up to seven.

Q.    In what ways do these seven folks assist you?

A.    So they actually run the various analyses that you've seen in the -- some of the other exhibits to my report that I don't have yet.  They also reviewed the text of my report after I wrote it, checking for logic, correct citations, typos, and so forth.

Q.    Okay.
Do they contribute to writing the report?

A.    They created most of the

7 (Pages 22 - 25)

Page 26

D. Tabak, Ph.D.
exhibits, although those on market efficiency, because the theory of market efficiency hasn't changed that much, are pretty much templates. They probably did some first drafts on some of the footnotes for some of the later exhibits.

Q. So when you say there's some templates, to make sure I understand this, is there some language in your report that explains principals like market efficiency that you -- that is a template you use in other reports as well?

A. Yes, although they are specifically referring to the exhibits that my staff created, because they based -- you know, if they're going to do a test of volume, we've done tests of volume before. There's no need to recreate how to explain measuring trade involvement.

Q. Got it.
Okay.
So there's some templates for the exhibits?

A. For the market efficiency

Page 27

D. Tabak, Ph.D.
exhibits, yes.

Q. Okay.
And then what about the report itself? Is there language that you customarily use in many reports?

A. Yes, some of it is the same.

Q. Okay.
Which language in the reports is sort of the same?

A. Well, my background is going to be the same. There's a section that starts with the theory of market efficiency, that'll probably be the same. And then the market efficiency test, the discussion of those tests is the same, but obviously the results, the calculated figures are different. And then I will edit the conclusions based on the results.

Q. Okay.
You were also asked in this case to opine on whether damages can be calculated on a class wide basis?

A. Correct.

Q. Is there language in that

Page 28

D. Tabak, Ph.D.
section that is also part of your standard template?

A. Yes.

Q. Okay. We'll come back to that.
Do you know how many hours you've spent on this case so far?

A. I do not.

Q. Do you know how many hours your team has spent?

A. I don't recall.

Q. Do you know whether your team is compensated for their work in this case?

A. Not directly. They have a salary, but if they spend -- you know, if they put in a lot of hours over the course of a year, they may get a bonus.

Q. But that's not specifically based on this case, correct?

A. Correct.

Q. It's based on a total number of hours they work?

A. Correct.

Q. Okay.
Do you know the total amount

Page 29

D. Tabak, Ph.D.
that NERA has billed Plaintiff to date for this matter?

A. Sorry. I haven't looked, so I don't recall.

Q. Does your compensation in any way impact the opinions that you offer in this matter?

A. No, in no way.

Q. Do you currently own any Biogen stock?

A. I do not.

Q. Have you ever?

A. I have not.

Q. What was your assignment in this case? And feel free to look at your report.

A. Okay. So I'll summarize what's in paragraph two of the report, to examine whether Biogen shares traded in an efficient market to analyze whether damages, to investors can be calculated through a common methodology, and to exam whether there's evidence of what's known as price impact.

Q. Okay.

8 (Pages 26 - 29)

Page 30

D. Tabak, Ph.D.

And what materials did you rely on in drafting your report?

A.    That would be in Exhibit 2 to my report.

Q.    Okay.

I'll get you -- we'll get you a copy of all of the exhibits, but sitting here right now, are you aware of any materials that were left off of that exhibit?

A.    No.

Q.    Okay.

How do you select the documents that you review in forming the opinions in your report?

A.    So some of it for market efficiency, you'll see it's kind of obvious if you're going to measure volume, we get data on volume and so forth.  There are various cases I cite there, because a lot of tests come from the case law, such as the Cammer, C-A-M-M-E-R, case.

When it comes moving beyond that to looking at case-specific things,

Page 31

D. Tabak, Ph.D.

such as my consideration of whether damages can be calculated in a class wide fashion and my view of price impact, it's going to depend on what's in the case, so that's often looking at the corrective disclosure information and often analyst reports.

Q.    How did you ascertain which analyst reports to review?

A.    I looked through them and looked for relevant information.

Q.    What set of analyst reports did you look through?

A.    That should be included in the back up, the list of analyst reports.

Q.    I'm sorry.  I'm asking a different question.

How did you identify analyst reports to comprise the universe to look through?

A.    Oh, we used a data vendor, I can check in here for which one, and basically looked at, you know, period including the proposed class period and a little before and a little after.

Page 32

D. Tabak, Ph.D.

Q.    Okay.

And did you review all of the analyst reports that fall within that -- those parameters?

A.    No.  Some of those were just for the camera test about the number of analyst reports.  I reviewed those, for example, generally in the November 4th through the November 9th, 2020 range as well as some before that.

Q.    Which ones before that?

A.    In particular, hopefully I get the exhibits, we compared, you'll remember, price targets after November 4th to analyze the price targets before November 4th.  So when we had that before and after comparison, I wanted to see the before report.

Q.    Okay.

Any other analyst reports that you reviewed in advance -- sorry.  That were in advance of the November 4th to 9th time period that you mentioned?

A.    I don't recall specifically.  I

Page 33

D. Tabak, Ph.D.

may have, but I don't recall specifically.

Q.    Okay.

Fair to say you did not read all of the analyst reports that were issued during the class period?

A.    That is correct.

Q.    Did you read any analyst reports issued before the class period?  Sorry.  Actually let me just put a finer -- the proposed class period in this case, do you understand it to be July 22nd, 2020 through November -- sorry.  Give me one second.

MR. HORNE:  Can we go off the record?

MS. SOLOWAY:  No.  Just give me a second.

A.    If you can see, it's in the first paragraph of my report.

Q.    Yeah.  Thank you.

So do you understand the proposed class period in this case to be July 22nd, 2020, until November 6, 2020?

A.    I do.  I think now we both do.

9 (Pages 30 - 33)

Page 34

D. Tabak, Ph.D.

Q. Okay. Excellent. Thank you. I had a momentary lapse.

So going back to the question, did you read any analyst reports that were issued before that time period?

A. I don't believe I did.

Q. Your report also relies in part on news articles.

Is that right?

A. I believe that's right, yes.

Q. And who chose the news articles that you relied on?

A. Well, I think ultimately it was data vendor, Factiva, F-A-C-T-I-V-A, but I gave the instruction to say my staff about what, you know, inputs to put in, what parameters to put in to obtain those news articles.

Q. And then once the parameters had been put in, did you personally look at those news articles that met those parameters?

A. No, because a lot of them were for the fifth camera factor press response

Page 35

D. Tabak, Ph.D.

to news, and I did not review all of those.

Q. Okay.

How did you identify which news articles you would look at?

A. I looked at the ones that were associated with statistically significant responses, and then I think I looked at a few in the November 2020 timeframe.

Q. Okay.

So just to make sure I understand that, when you say that you looked at the ones associated with statistically significant responses, I'm not sure what you mean. What do you mean by that?

A. Do you have any Exhibit 8A?

MS. SOLOWAY: Give us a second. We'll mark -- we're going to mark all the exhibits as one and we're just having them collated. So I'm going to hand this to you, but we'll, if it's okay, we'll do a new exhibit that has all the exhibits, if that's all right.

MR. HORNE: Fine with us.

Page 36

D. Tabak, Ph.D.

MS. SOLOWAY: Why don't we mark this as Exhibit 3.

(Whereupon, Exhibit 3 was marked for identification.)

BY MS. SOLOWAY:

Q. Dr. Tabak, can I give you the one that's officially marked? I just don't want to ...

A. Sure.

MR. HORNE: So I'm sorry, is this Exhibit 3 or is it 1?

MS. SOLOWAY: So this is Exhibit 8A, but I've marked it as Exhibit 3. But later, we're going to give you one exhibit that has all of his exhibits in it, so that it's just easier going forward. This is Exhibit 3.

MR. HORNE: Yeah, I'm just wondering what it's going to look like on the record. Like is the later exhibit, is it going to be Exhibit 1/3 or ...

MS. SOLOWAY: Why don't we

Page 37

D. Tabak, Ph.D.

decide that on a break. I don't have a strong view, but if you guys want to replace exhibits, we could do that.

MR. HORNE: Okay.

BY MS. SOLOWAY:

Q. So again, I'm going to use the focus on what you called it in your report just to make the record clear.

That is Exhibit 8A from your report, correct?

A. That's correct.

Q. And I think the question I was asking you about was about news. I think you had told me you read the articles that were associated with statistic and significant responses.

So what does that mean?

A. So if you look in column one here, we've got the number of days that we're considering news days, and under various categories -- and the first part of Exhibit 8A, you'll see that two days have statistically significant responses. Sometimes they appear in column two,

10 (Pages 34 - 37)

Page 38

D. Tabak, Ph.D.
sometimes in column five, and sometimes they may be split one on each of column two and five. So I reviewed the articles corresponding to those two days.

Q. Okay.
And the purpose of this analysis was part of your market efficiency test, correct?

A. Correct.

Q. Okay.
Apart from what you read for Exhibit 8A to your report for market efficiency, what other news did you read?

A. I would have you to think if I read any of the news in November 2020, the news stories. I don't recall, sitting here.

Q. Do you want to think on it?

A. If it comes to me, I'll let you know. But I don't want to waste time.

Q. So fair to say you're not sure if you read the news stories that came out in November?

A. I just don't recall, sitting here.

Page 39

D. Tabak, Ph.D.

Q. Okay.
Anything else that you -- news stories that you know, sitting here right now, that you've read?

A. Not offhand.

Q. Okay.
Is your report complete?

A. To the best of my knowledge, it is.

Q. Are there any changes that you want to make?

A. No.

Q. Did you identify any mistakes as you were preparing for this deposition today?

A. No. The closest -- not a mistake, but kind of ugly at the end of paragraph two, I would -- I insert -- I inserted the bit about price impact, and I probably should have inputted that after the final sentence about reliable methods to calculate damages on a class wide basis rather than where it is right now.

Q. Feeling irked that it's out of

Page 40

D. Tabak, Ph.D.
order?

A. Yes.

Q. Okay.
Other than you would like to change the order of those sentences, are you making any changes to your report today?

A. I'm not even changing those, just irked, but no other corrections.

Q. Fair enough.
Sitting here today, do you have hold any other opinions in this matter that have not been summarized in your report?

A. No, I do not.

Q. Did you prep for this deposition today?

A. I did.

Q. How did you do that?

A. I spoke with counsel remotely on Friday. And then yesterday, and a little bit on Saturday, I reviewed materials, including my report.

Q. You met with counsel yesterday?

A. No, on Friday I met with them remotely, and then Saturday and Monday, on

Page 41

D. Tabak, Ph.D.
my own, I reviewed materials.

Q. How many hours would you say you spent reviewing materials?

A. I believe a little over an hour.

Q. Between --

A. I'm sorry -- just on my own, and probably about two hours or so meeting with counsel remotely on Friday.

Q. Okay.
So just to make sure I've got this right, in preparation for this deposition, you spent approximately two hours meeting with counsel, and you spent approximately one hour reviewing materials on your own?

A. Yeah, maybe a bit more, but sometimes it was, you know, not that in depth, so I didn't bill it and I don't count it.

Q. Like, you know, when you're mulling things over in your brain, walking down the street kind of a thing?

A. Exactly.

11 (Pages 38 - 41)

Page 42

D. Tabak, Ph.D.

Q.   Okay.

Did you review any new materials in preparing for this deposition that you hadn't seen before?

A.   I think one -- at one point I just looked up what happened to adu, A-D-U, the drug in question, just to see where it stood today.  Has no affected my opinions.

Q.   Anything else?

A.   That's it.

Q.   Okay.

So I'm going to -- I'd like to start by making sure that I understand what your understanding is of the plaintiffs' theory of the case.

Have you read the second amended complaint?

A.   That's the operative complaint?

Q.   It is.

A.   Yes.

Q.   And what is your general understanding of the plaintiffs' theory of liability as articulated in the second amended complaint?

Page 43

D. Tabak, Ph.D.

A.   Let me just -- so do you want as articulated there or after the First Circuit opinion?

Q.   Why don't we start as articulated, and then we'll flip to the First Circuit opinion?

A.   Okay.  So very broadly, in the operative complaint, my understanding is plaintiffs hat that point alleged a series of statements, but all broadly going to the point that they allege that defendants knew that -- can I call the drug adu?

Q.   Please.  Why don't we agree that today we'll refer to aducanumab to adu.

Deal?

A.   Deal.

Q.   Go.

A.   Plaintiffs allege that defendants knew that there were issues in the data supporting adu, but they misled the market about that.  At this point, I've -- I'm sorry.  I don't remember all the details of the second amended complaint as opposed to focusing on what's been called the all

Page 44

D. Tabak, Ph.D.

data statement from the First Circuit opinion.

Q.   Okay.

And just because you've already raised it, what is your understanding of the import of First Circuit decision on what continues to be pleaded in the second amended complaint in this case?

A.   Sure.  And just to be clear, I know you're not asking for a legal opinion, so as you said, this is my understanding, not a legal opinion.  My understanding is that the First Circuit basically said that only one alleged misrepresentation can be relied upon for the allegations in this case or that's the only basis for the case going forward.

Q.   Okay.

And that alleged misstatement is the statement that was made by Dr. Al Sandrock on July 2nd, 2020?

A.   Yes.

MS. SOLOWAY:  So I'm going to actually show you the statement.

Page 45

D. Tabak, Ph.D.

(Whereupon, Exhibit 4 was marked for identification.)

BY MS. SOLOWAY:

Q.   Dr. Tabak, this is what's been marked as Exhibit 4.

Do you recognize this document?

A.   I do.

Q.   What is it?

MR. HORNE:  Can you wait until we have copies, please?

MS. SOLOWAY:  Take a minute.  Let's your counsel look at it.

MR. HORNE:  We're ready.

BY MS. SOLOWAY:

Q.   Dr. Tabak, this is a transcript from the Q2 2020 earnings call of Biogen?

A.   That is my understanding, yes.

Q.   And it's on Wednesday, July 22nd, 2020?

A.   Correct.

Q.   Okay.

Obviously, you can feel free to look at the document, but I want to direct your attention to the top of page 14.

12 (Pages 42 - 45)

Page 46

D. Tabak, Ph.D.

A.    Okay.

Q.    Is it your understanding that this is the alleged misstatement that remains in this case following the First Circuit's ruling?

A.    Are you referring to the whole paragraph?

Q.    Well, let me rephrase the question.

Is it your understanding that the alleged misstatement is contained in that first paragraph on page 14?

A.    Yes, it is.

Q.    Okay.

What is your understanding of what the alleged false statement is?

A.    I've seen it referred to as the last two sentences.  So "So consistent with the findings from ENGAGE in all caps and EMERGE in all caps, you really need to get to the higher dose, and I think our data are all consistent with that."

Q.    And you'll agree that there are sentences before what you just read.

Page 47

D. Tabak, Ph.D.

Correct?

A.    There are.

Q.    Okay.

Have you read this statement before today?

A.    Yes.

Q.    In what context?  And let me just clarify.  Have you read the paragraph at the top of page 14 in its entirety before today?

A.    I believe so.

Q.    In what context?

A.    Since some documents here may have been in the complaint.

Q.    Okay.

Sitting here today, what do you understand Dr. Sandrock to be saying in this July 2020 statement?

A.    Do you want the whole paragraph or just the last two sentences?

Q.    For definition purposes today, I'm going to call the alleged misstatement in this case the July 22nd statement, just so you and I are on the same page today.

Page 48

D. Tabak, Ph.D.

Fair enough?

A.    Okay.

Q.    Okay.

And you told me it's your understanding that the last two sentences of this paragraph are the basis of the remaining claim.

That's what you've told me, correct?

A.    That is my understanding.  Obviously I'm not giving a legal opinion or anything like that, but yes.

Q.    Okay.

And what is your understanding of what the alleged misstatement is conveying?

A.    Well, focusing on the last sentence, when they say our data are all consistent with that, it means there's no -- Biogen does not have any data that is inconsistent with prior statements about needing to get to a higher dose to show efficacy, as well as referring to the findings from ENGAGE and EMERGE.

Page 49

D. Tabak, Ph.D.

Q.    Have you engaged in -- well, let me start with:  Have you formed a view about whether that statement is false or misleading?

A.    I have not.

MR. HORNE:  Objection.

Calls for a legal conclusion.

MS. SOLOWAY:  I'm just asking the witness what he has done.

BY MS. SOLOWAY:

Q.    Have you engaged in any analysis regarding what the statement actually means?

A.    I would say no.  I'm not sure what you mean by analysis there.

Q.    Well, have you done any research to figure out how investors interpreted the statement?

A.    No, I have not done that.

Q.    Have you done any research to, you know, try to figure out what analysts did or didn't think about this statement?

A.    I did not take a look at how they respond to this particular statement.

13 (Pages 46 - 49)

Page 50

D. Tabak, Ph.D.

Q. Okay.

Is your understanding, for purposes of providing your opinion of what the July 22nd statement means, coming from assumptions that you've been provided by counsel?

MR. HORNE: Objection. Vague.

A. No.

Q. So when you told me earlier what your understanding of the statement was, was that based on you reading it and interpreting the English language, or was it based on your understanding of what the alleged misunderstanding is from the complaint?

MR. HORNE: Objection. Vague.

A. I think a combination of it was referenced in the complaint and you asked me to interpret it, which that would be based on my understanding of the English language.

Q. Okay.

So it is your interpretation of

Page 51

D. Tabak, Ph.D.

the statement that -- the statement is representing that Biogen does not have any data that is inconsistent with needing to get to a higher dose of adu?

A. Yes.

Q. That's your interpretation?

A. That's my interpretation, only with this point none of any analysis depends on that particular interpretation.

Q. Why did you call the July 22nd report in your report the "all data statement"?

A. I believe that's how it was referred to in the First Circuit opinion.

Q. Would you agree the phrase all data doesn't appear in the alleged misstatement at the top of page 14?

MR. HORNE: Objection.

A. Not in that order. But the final sentence: I think our data are all consistent with that.

Q. Right.

And so even though we're calling it the "all data statement," you're

Page 52

D. Tabak, Ph.D.

not telling me that the words all data appear next to each other in the statement.

Correct?

A. I am not telling you that.

Q. Would you agree with me that in this statement, Dr. Sandrock is referring to three sets of data?

A. So when you're talking about this statement, now we're talking about this whole paragraph?

Q. Yeah. So why don't we start at the top. He says: The filing is based on these three studies, EMERGE, ENGAGE, and PRIME.

Do you see that?

A. I see that.

Q. Do you know what EMERGE, ENGAGE, and PRIME are?

A. I'm not going to give -- hold myself out as a scientific or biomedical expert, but generally, yes, I do know what they are.

Q. Okay.

EMERGE and ENGAGE are clinical

Page 53

D. Tabak, Ph.D.

studies.

Correct?

A. They are Phase III clinical studies, yes.

Q. And PRIME is --

A. A Phase I study.

Q. Okay.

And he goes on to say -- feel free to follow along: EMERGE is the first study to show an effect, not only on the primary end point, but all three prespecified primary endpoints.

Do you see that?

A. I do see that.

Q. Do you have any basis to think that that sentence reflects any misrepresentation?

A. I'm not going to say one way or the other. I'm not providing an opinion on that.

Q. Do you understand the plaintiffs' theory to be that that sentence contains a misrepresentation?

A. I would want to check the

14 (Pages 50 - 53)

Page 54

D. Tabak, Ph.D.

complaint. I don't believe that that is considered part of the all data statement, but whatever is in the complaint is obviously the plaintiffs' theory.

Q. Okay.

The next sentence is: We believe that data from ENGAGE, that portions of the data from ENGAGE, a negative study, that portions of its do support the analysis that we did with EMERGE.

Do you see that?

A. I do.

Q. Okay.

So Dr. Sandrock is saying that portions of ENGAGE support the analysis they did with EMERGE.

Correct?

A. That appears to be what he's saying, yes.

Q. Okay.

And he says that ENGAGE is a negative study.

Correct?

A. Yes.

Page 55

D. Tabak, Ph.D.

Q. What does it mean to be a negative study?

A. Again, this is not my area, but my understanding would be that presumably at least the primary end point was not met.

Q. Okay.

So Dr. Sandrock is acknowledging that there is data in ENGAGE that reflects that the end points were not met, correct?

A. I said the primary end point. I don't know about secondary end points.

Q. That's fine. But you'll agree with me that ENGAGE being a negative study refers to the fact that it didn't satisfy at least certain of its end points, correct?

A. That is how I would interpret this.

Q. Okay.

So you would agree with me then that ENGAGE reflects that all data does not support adu's efficacy.

Correct?

A. The general statement about

Page 56

D. Tabak, Ph.D.

adu's efficacy, yes.

Q. I'm not talking about a general statement. I just want to be very clear.

ENGAGE is expressly referenced in this paragraph as a negative study, correct?

A. Correct.

Q. So Dr. Sandrock is expressly saying here that not "all data" supports adu's efficacy, correct?

A. So if you're focusing on adu's efficacy as opposed to the questions of higher doses versus lower doses, I think that's correct.

Q. Okay.

Well, then let's focus on higher efficacy.

A. I'm sorry. That's not what I said. I said higher versus lower doses.

Q. Sorry. I apologize. I misspoke.

Do you know, sitting here today, in the ENGAGE study, there was statistical significance in efficacy for

Page 57

D. Tabak, Ph.D.

patients who were taking the higher dose?

MR. HORNE: Objection.

Vague as to higher dose.

A. Sitting here, I don't recall. I didn't review the studies or their outcomes in depth.

Q. Okay.

And then he goes on to say: PRIME, which was published, shows even though the clinical end points were exploratory end points at the highest dose, there was effect on MMSC as well as CDR sum of boxes.

Do you see that?

A. I see that.

Q. What do you understand that to mean?

A. I'm not sure.

Q. Okay.

Do you have any understanding of whether that sentence reflects a misstatement?

A. I will defer to whatever the court's -- whatever the First Circuit said

15 (Pages 54 - 57)

Page 58

D. Tabak, Ph.D.

about what constitutes the all data statement, but I have no independent opinion on that.

Q.    And then next sentence says: And again, very similar that the lower doses did not show much of an effect.

Do you see that?

A.    I do.

Q.    Do you have any reason to think that's a misstatement?

A.    It relates to doses, so I'm not sure, and I'm not going to provide an opinion on what is or what is not alleged to be a misstatement.

Q.    Okay.

It then goes on to say:  So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose.

That's referring back to the PRIME study, correct?

MR. HORNE:  Objection.

A.    It says consistent with ENGAGE and EMERGE, it must be talking about

Page 59

D. Tabak, Ph.D.

something that is consistent with them, which would appear to be PRIME.  I believe that's how you're interpreting this?

Q.    Well, I think there's a sentence there that says PRIME, right? We're talking about PRIME on the highest dose, there was an effect on MMSE as well as CDR sum of boxes, right?

A.    I see that.

Q.    And then it says:  Very similar lower doses did not show much of an effect.

That's about PRIME, correct?

A.    I see that as well.  That's my interpretation.

Q.    Okay.

And then it goes on to say so consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose.

What do you understand that to mean?  That there's consistency across the three studies that you need to get to the higher dose?

A.    I haven't thought about it in

Page 60

D. Tabak, Ph.D.

much detail, but that does seem reasonable.

Q.    Okay.

And then it says:  I think our data are all consistent with that.

Correct?

A.    It does say that, yes.

Q.    Okay.

So the data that are being referred to in this last sentence are the data described in the prior sentences, correct?  The data from EMERGE, ENGAGE, and PRIME.

Correct?

MR. HORNE:  Objection.

A.    That is an interpretation.  It doesn't -- it says our data are all consistent with that.  It doesn't say our data from these three studies.

Q.    Do you see anywhere in this paragraph, Dr. Sandrock making any references to subgroup data?

A.    I do not.

Q.    Do you know what subgroup data is?

Page 61

D. Tabak, Ph.D.

A.    I have a general understanding, yes.

Q.    What's your understanding?

A.    It's when you look at different subgroups or portions of people in the studies.  So for example, it can be male versus female, it can be people who perhaps received a low dose versus a high dose.  It could be people with different levels of preexisting conditions versus not.  Anywhere where you take the population in this type of pharmaceutical study and split it up into different groups.

Q.    Okay.

Do you see any reference in this paragraph to subgroup data?

A.    I do not.

Q.    Do you understand Dr. Sandrock to be communicating anything about subgroup data in this statement?

A.    In this paragraph, I do not see that.

The one thing I will say, just pointing out, is in the fourth line, it does

16 (Pages 58 - 61)

Page 62

D. Tabak, Ph.D.
talk about portions of ENGAGE.  So it's not clear what he's referring to with portions.  That could be subgroup data, could be something else perhaps.

MR. HORNE:  Counsel, would you like him to look at the question that prompted this answer?

MS. SOLOWAY:  No, that's okay.  I understood his answer.

MR. HORNE:  No, I mean the question from the analyst that prompted the answer.

MS. SOLOWAY:  Feel free to look at any portion of the document that you'd like.

BY MS. SOLOWAY:

Q.    Dr. Tabak, do you have an understanding that among other things the clinical trials for adu looked at the reactions of carriers and noncarriers?

A.    Again, that is my understanding, yes.

Q.    What does that mean?

A.    Carriers versus noncarriers of

Page 63

D. Tabak, Ph.D.
some particular -- I don't remember if it was a condition or a potential to have a condition.  I've seen that, but I have not dug into the statistical analysis of adu.

Q.    Do you know what being a carrier is in connection with Alzheimer's disease?

A.    Sitting here, I don't recall.  I knew it when I was reading it, but I didn't commit it to memory.

Q.    Okay.

Looking at the statement by Dr. Sandrock, would you agree that he's not conveying anything about carriers versus noncarriers in this statement?

MR. HORNE:  If you need to take time to review something --

MS. SOLOWAY:  We don't need your interruptions.  Thank you, Counsel.

MR. HORNE:  You can always ask her to repeat the question.  The witness is clearly reading something else.

Page 64

D. Tabak, Ph.D.
MS. SOLOWAY:  He's reading it in response to my question, and I'm waiting and I'm not interrupting him.  We don't need speaking objections.  Thank you.

A.    Can I have the question back after all that?

Q.    Sure.

Looking at the statement by Dr. Sandrock, would you agree that he's not conveying anything about carriers versus noncarriers in his statement?

A.    Well, putting aside where he says portions of it, it's not clear what he's referring to as portions, but he's not specifically mentioning carriers versus noncarriers in this statement.

Q.    Okay.

Is he conveying anything about subgroup results for carriers in this statement?

A.    Again, we've got portions of it referring to ENGAGE.  It's not clear what that is, but he's not specifically

Page 65

D. Tabak, Ph.D.
mentioning carriers versus noncarriers.

Q.    In your report, and feel free to look at it -- you can put this document to the side -- you -- and I'll direct your attention to paragraph 65.  You say -- and I'll give you a minute to get there.

A.    Okay.  Sounds like we're almost done.

Q.    That's exactly how this is going to work.  I'm going to be all over the place, so ...

Let me know when you're at paragraph 65.

A.    I am there.

Q.    Okay.

I'm going to just read from your report:  Because plaintiffs' allegations economically should be characterized as omissions, i.e. Plaintiffs allege that Defendants failed to disclose certain negative information about aducanumab, one would not expect Biogen's stock price to react to the alleged misrepresentations, something known as

17 (Pages 62 - 65)

Page 66

D. Tabak, Ph.D.
front-end price impact.

Q. Did I read that correctly?

A. You did. Unfortunately, my missing apostrophe doesn't affect the pronunciation.

Q. Is that something that's also a little tweaking today?

A. It always will.

Q. What does "economically characterized as omissions" mean?

A. So I'm distinguishing this from anything that might be a legal consideration as to what is a missed representation or omission, but typically, economically, we think of something like an affirmative misrepresentation that states something unduly positive that would cause a stock price to increase.

For the typical case, we're alleging inflation and an omission as something that allegedly should have been disclosed that had it been disclosed would have caused a stock price to decrease, but because it was not disclosed, the market

Page 67

D. Tabak, Ph.D.
doesn't know it should react and therefore the price or the inflation is maintained or left at the same level as a result of the omission.

Q. And so I think you described an affirmative misrepresentation case as being one where something was represented that was unduly positive.

Am I getting that right?

A. Yes, relative to market expectations.

Q. Okay.

And you do not view this as that kind of case?

A. Again, that's not a -- not from a legal perspective, but from an economic perspective, I think that's fair.

Q. And why did you draw that conclusion?

A. Because there already had not been any statements of, you know, here is what's -- let me think about the -- give me a second to think about the best way to phrase this. I think that the market would

Page 68

D. Tabak, Ph.D.
have expected any particularly negative data to have been discussed so saying that our data is consistent with that, it's kind of in accord with market expectations by time that you're at that point in the discussion.

Q. When you say all data are consistent with that, what is the "that"? I'm just trying to understand your theory?

A. That is literally the last few words in the all data statement.

Q. Understood. I'm trying to understand as a matter of economic analysis, I think what you're telling me is that you don't view this as an affirmative misrepresentation, case. You view this as an omission case?

A. Right. Affirmative misrepresentation might be saying something and by the way, we also discovered that adu cures cancer and that would presumably be viewed very positively by the market, believed, and cause the stock price to go up. The all data statement is not one that should cause the market -- the price to go

Page 69

D. Tabak, Ph.D.
up.

Q. Why?

A. Because at this point, the company's already disclosed its results. One would generally expect that if there were substantial negative data, that would have been disclosed already. So this is basically confirming a market view.

Q. So is it your -- in forming your opinion, did you assume that the July 22nd statement is repeating information that's already in the market?

A. The all data statement is kind of confirming the view of everything that we've said earlier here.

Q. Is it adding anything new?

A. It is certainly supporting kind of a market view, maybe making it a bit more firm. But, so in that sense, it's definitely confirming something and maintaining the price if the alternative is to say we do have some data that are not consistent with that, whatever "that" is.

Q. So I just, again, want to make

18 (Pages 66 - 69)

Page 70

D. Tabak, Ph.D.

sure I understand where you're going with this.

You wouldn't expect the stock price to increase on July 22nd because your understanding is that the July 22nd statement was confirming information that the market already knew and not bringing new value-relevant information to the market.

Correct?

A.    I think generally that's fair with the understanding that something that is, you know, by omitting value-relevant information, that would have mattered to the market. But yes, I agree with you.

Q.    The theory here is that information was omitted that would have mattered to the market, correct?

A.    Correct.

Q.    But as a matter of why you view this economically as an omission, it's because you view the statement as confirming information that the market already knew and not adding new value-relevant information.

Correct?

Page 71

D. Tabak, Ph.D.

A.    I think that's fair. I mean, I think the other way I would put it is that the all data statement is rendered false because of the omission, but it doesn't add new inflation in. It simply prevents the stock price from declining.

Q.    I'm going to turn away from the alleged false statement for a minute and turn to the alleged corrective disclosure.

What's your understanding of what, if any, disclosure allegedly corrected the July 22nd statement?

A.    So my understanding is that plaintiffs allege that the presentation by Dr. Tristan Massie, M-A-S-S-I-E, contained information that corrected the all data statement.

Q.    Okay.

Do you know what in particular in that report by Dr. Massie allegedly corrected the all data statement?

A.    I haven't memorized it, but it was involving looking at the effects of the placebo, at the effects of the high dose

Page 72

D. Tabak, Ph.D.

versus low dose group, and the 301 and 302 studies. There may have been some other areas, but I haven't focused on the particulars.

Q.    Okay.

Are there any other corrective disclosures that you understand to be relevant to this case?

A.    I think that is the corrective disclosure, but I understand the parties have a dispute about, for example, whether some of the discussion in the November 6th meeting of the advisory committee helped explicate and inform the market about that, what was in the Massie report and whether that can count as being corrective.

Q.    And do you have an understanding of whether that dispute has been resolved by the Court?

A.    I do not believe it has. I may be wrong, but I do not believe it has.

Q.    Have you reviewed the Court's March 2025 order?

A.    Is that what I'm calling the

Page 73

D. Tabak, Ph.D.

MTV order? Yes, I call it the March 2025 order in footnote three.

Q.    What's your understanding of what the Court held in that order with respect to the advisory vote?

A.    Okay. I talked about the discussion. You now changed that to the vote.

My understanding is that in their theory that it may have taken time for the market to understand the material in the Massie report, that Plaintiffs at least reserved the right to allege that the discussion in the advisory committee, similar to discussion by analysts helped explain that. That is different than the actual vote.

Q.    Okay. I'm sorry. I want to -- I think we're talking past each other.

I'm just trying to understand whether corrective -- I'm not talking about how long it took for information to get out. We'll come back to that. I'm asking about whether you understand there to be another

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 74

D. Tabak, Ph.D.

corrective disclosure apart from the Massie report?

A. Okay. So the answer to that would be no. If I misinterpreted you, I apologize.

Q. No problem. That's why we ask the questions.

Is it your understanding, Dr. Tabak, of plaintiffs' theory that the price impact of the Massie report began on November 5th, 2020?

A. I'm just trying to make sure I get all the dates right as to what happened.

I understand they may have alleged that for a particular purpose related to the all caps PSLRA, but I don't know if that is something that applies -- would have to apply from an economic basis when looking at damages.

Q. Okay.

I think you're going to have to unpack that for me. Explain what that means.

A. So my understanding is there

Page 75

D. Tabak, Ph.D.

were some arguments about when the -- what's sometimes called the bounce back or look book cap from the PSLRA should begin. And there were arguments made there, but my understanding that that also depends on -- I think the Court referred to it as -- there was talk about both the dissemination of the corrective disclosure and when the price impact of the corrective disclosure began.

So I reviewed the Court's order there. I don't believe I reviewed the underlying pleadings. So I'm basing this on what the Court said.

Q. Okay. We'll come back to this.

In paragraph 61 of your report --

A. Okay.

Q. Just reading that first sentence, you say there's a -- feel free to read the whole sentence, but I'm just focusing you on the words: What I understand to be potentially affected by the alleged corrective disclosures in this case, i.e. November 5th, 2020, potentially

Page 76

D. Tabak, Ph.D.

November 9th, 2020, and November 4th, 2020.

Do you see that?

A. I do.

Q. Okay.

So -- and you cite for that the March order, and you say the March order held that the market began to react to the Massie report on March 2025?

Do you see that?

A. I do.

Q. Do you understand that the plaintiffs have pled to the market began to react to the Massie report on March 5th?

A. I believe so, but I don't recall -- I think I saw something -- I think I saw that in the complaint, yes.

Q. So we agree on that, the plaintiffs pled that the -- that the market began to react to the Massie report on November 5th, correct?

A. Well, obviously whatever the evidence pled is what they've pled and I'll defer to that in terms of what they did, but that is my understanding.

Page 77

D. Tabak, Ph.D.

Q. Okay.

You are not offering an opinion here that the market began to react to the Massie report on November 4th, correct?

A. I am saying that if I'm not bound by the Court's order, that is possible, but I'm not going to contradict the court order either, and I think I discuss that in my price impact section.

Q. When you say the court order, you're referring to the judge's March 2025 order?

A. Yes, because if my recollection is right, what the Court said in there, that it had to make a decision, but that it hadn't seen, you know, all the evidence at that point.

Q. Okay.

What you're telling me, I think, is that for present purposes, you are not arguing or opining that the November -- withdrawn.

For present purposes, you are not opining that price impact from the

20 (Pages 74 - 77)

Page 78

D. Tabak, Ph.D.

Massie report can be observed on November 4, correct?

A.    I'm opining that we can observe price impact. I'm not opining on whether we see that on the fourth, the fifth or split between the two.

Q.    Well, I'm trying to focus on the fourth. Your opinion on fourth. Are you opining that we could see price impact from the Massie report on November 4th, sitting here today?

A.    I'm not being that specific. I'm saying we could see price impact, but at this point I'm not saying when we served that price impact.

Q.    Again, I'm just limiting you to the fourth. I don't want to talk about the fifth or ninth yet. We'll get to those. Sitting here today, are you offering an opinion that we can see price impact on November 4th from the Massie report?

MR. HORNE: Objection. Asked and answered.

A.    I'm saying we may see it there,

Page 79

D. Tabak, Ph.D.

but I'm not saying it is definitely there on the fourth.

Q.    Are you offering opinion on that you have identified price impact on the fourth?

A.    I'm saying I've identified price impact, and depending on what the effect is of the Court's ruling on this case going forward, that will determine whether we attribute that price impact to the fourth, fifth or possibly split between the two days.

Q.    Okay. But you have -- sitting here, you have not done that separation between the fourth, fifth, or other days, correct?

A.    Correct.

Q.    So with respect to the fourth alone, you're not coming in and offering opinion t Judge Talwani that I have observed price impact from the Massie report on November 4th, period?

MR. HORNE: Objection.

A.    It's a very particular way of

Page 80

D. Tabak, Ph.D.

phrasing it. If you limit it to that way of saying it, the answer would have to be yes, but again, you could also then ask that about the fifth and it might sound like I'm saying I haven't seen price impact on the fourth or the fifth. But I'm saying I have seen price impact over the course of those two days. So just one without the other might potentially be unintentionally misleading.

Q.    Okay. But if I'm appropriately limiting my question and asking whether you are coming in and telling the Court that you've identified price impact exclusively for the fourth, you would agree with me that that's not your opinion, correct?

A.    Again, in a very technical sense, but I think it could be misleading, because you could ask that about both the fourth and the fifth and then you say, ahh, not saying there's price impact, when I am saying there's price impact, I simply haven't allocated it either to the fourth,

Page 81

D. Tabak, Ph.D.

the fifth, or the two.

Q.    Okay. And then I want to just point out in your report in paragraph 61, you say potentially November 9, 20020.

A.    I do say that.

Q.    So you're saying that November 9, 2020 was potentially affected by the Massie report?

A.    Yes, if there was a continuing reaction to the Massie report from -- whether it's November 4th or November 5th, to the next day on which Biogen stock traded, which is November 9th.

Q.    Okay. Let's just set the table and make sure we're on the same page about timing. You agree with me that the Massie report came out in the morning of November 4th, correct?

A.    Correct.

Q.    It came out contemporaneous with various other FDA materials, correct?

A.    Correct.

21 (Pages 78 - 81)

Page 82

D. Tabak, Ph.D.

Q.    What came out all at the same time on the morning of the November 4th?

A.    My understanding essentially is the FDA briefing book, which had the kind of FDA materials as well as the Massie materials, which likes to point out were labeled draft at the back.

Q.    Anything else?

A.    I'd have to check if the Massie video came out then or not. I believe so. I think that's basically it.

Q.    Okay. Some other materials from others at the FDA as well?

A.    Yes, when I said the FDA materials, that's what I was referring to.

Q.    Okay.
So fair to say that the FDA releases various materials on the morning of November 4th, correct?

A.    That is my understanding, yes.

Q.    Okay.
And what time did that happen?

A.    I don't remember the exact time.

Page 83

D. Tabak, Ph.D.

Q.    Do you know whether it was before 10:30 in the morning?

A.    I just don't recall.

Q.    Sitting here today, you don't know what time the alleged corrective disclosure happened in this case?

A.    I know the date. I haven't looked at the time or maybe I have looked at some point, but I don't remember the exact time of it other than it was obviously before market close.

Q.    Are you able to be any more specific in pinpointing what time of day it was?

A.    Well, you asked about 10:30, so that might be a good guess, but sitting here -- but other than working off of your question, I don't have an independent recollection.

Q.    Okay.

A.    Actually, I take that back. One of my exhibits actually mentions analyst reports and some of them that reference Massie I believe on the fourth, so that

Page 84

D. Tabak, Ph.D.

would give me some indication obviously of the earliest analyst report would have to be after the release of the information.

Q.    Okay.
So we can agree it's the morning of the fourth?

A.    That is my recollection.

Q.    Okay.
So the FDA materials, including the Massie report, are available in the morning of the fourth, correct?

A.    Yes.

Q.    And they're available up through market close on the fourth, correct?

A.    Sure. They don't disappear.

Q.    Right. And then on the fifth, we've got a whole trading day on the fifth, correct?

A.    We do.

Q.    Okay.
And then what happens on the sixth?

A.    I think in terms of what you're asking is that trading in Biogen was halted

Page 85

D. Tabak, Ph.D.

on the sixth and did not trade during the day.

Q.    Yeah.
Do you know whether the market has any advance notice that trading would be halted on the sixth?

A.    I don't recall.

Q.    Did you look into that question?

A.    No.

Q.    Do you know why trading halted?

A.    My understanding is because of the advisory committee meeting on adu.

Q.    Do you know who makes the decision to halt trading?

A.    I think ultimately it would be the stock market, but it will take information and recommendations from a company.

MR. HORNE: Counsel, we've been going for more than an hour --

MS. SOLOWAY: Yeah, let me just finish this line of questions and then we'll take a good break.

22 (Pages 82 - 85)

Page 86

D. Tabak, Ph.D.

BY MS. SOLOWAY:

Q.    So in this case, do you know whether the market knew in advance that training would be halted on the sixth?

A.    I think you already asked that, and I said I did not know.

Q.    Okay.  And then what also happens on the sixth?

MR. HORNE:  Objection. Vague.

A.    I assume you're referring to the advisory committee meeting, the discussions, and the vote.

Q.    Okay.

And then -- that's a Friday, correct?

A.    That is correct.

Q.    Okay.

And then there's a weekend, correct?

A.    Also correct.

Q.    Okay.

So that takes us to the seven and eighth, those are the weekend days,

Page 87

D. Tabak, Ph.D.

right?

A.    Correct.

Q.    Okay.

And then we're at the ninth, right?  November 9th?

A.    That follows the eighth, yes.

Q.    Okay.

So the ninth is a Monday?

A.    Also correct.

Q.    Okay.

Are you offering the opinion in this case that the stock price reaction from the Massie report that was released on the morning of November 4th is continuing into the day on November 9th, that Monday?

A.    At this point, I'm not at this point.  I'm simply saying or giving some information about what it would take to prove a complete lack of price impact on the ninth.

Q.    Why aren't you offering the opinion that the stock price on the ninth is continuing to react to the Massie report?

A.    Again, I'm not going to offer a

Page 88

D. Tabak, Ph.D.

legal conclusion, but it's my understanding that price impact is something that is often discussed at class certification, and it's Defendant's burden to prove there was a complete lack of price impact.

Q.    So I'm not going to -- we won't have a conversation about the legalities of what it means to have the burden, and we'll just put the burden issue to the side.

I'm just trying to understand what opinion you are offering.  You are not offering -- again, the judge will decide what burden applies.

A.    I understand, but your question, I believe, was:  Why are you not offering that?

So the burden is actually the reason why I'm not offering that opinion. If it were plaintiffs' burden, I would look into it and offer such an opinion.

Q.    Okay.  Thank you.  I didn't understand your answer.  Now I do.

Is it your opinion that price decline on November 9th was attributable to

Page 89

D. Tabak, Ph.D.

the Massie report being issued on November 4th in the morning?

A.    At this point, I'm saying it is uncertain, and I'm not at this point offering an affirmative opinion on that.

MS. SOLOWAY:  Why don't we take the break that your counsel requested and we'll pick this back up.

THE VIDEOGRAPHER:  Time is 11:40 a.m.

We're off the record.

(Recess take)

THE VIDEOGRAPHER:  Time is 11:56 a.m.

We're back on the record.

You may proceed.

(Whereupon, Exhibit 5 was marked for identification.)

BY MS. SOLOWAY:

Q.    So just for the record, I'm going to hand you Exhibit 5, which is a complete copy of your report with all the exhibits, and we could use that going forward.

23 (Pages 86 - 89)

Page 90

D. Tabak, Ph.D.

Do you want to confirm that's what that is?

A.    I haven't checked every page, but that appears to be correct.

Q.    Okay.

So we were talking about the alleged corrective disclosure before the break. And based on what you understand from what you've read in this case, what was it about the Massie report that you understand to have been value relevant to Biogen investors?

A.    Well, broadly, the explanation about data or analyses that did not support efficacy, and I think I mentioned earlier Dr. Massie talked about, for example, the differences in placebos across studies. He looked at the high dose versus low dose influence that basically was not the higher dose that was causing the efficacy.

Q.    Right.

But I guess what I'm trying to understand is what was it about the Massie report that you believe caused investors to

Page 91

D. Tabak, Ph.D.

have a reaction in terms of valuing Biogen stock, if anything?

A.    Well, let me try again. Basically, the data he presented and how he presented the data.

Q.    Okay. So but if you're a Biogen investor, right, and the Massie report gets published, right, are there implications that the Massie report has that bear on the value of Biogen stock?

A.    Ahh. Okay. Yes, so the implications are that it suggests that adu is less likely to be effective, and therefore one would presume less likely to be ultimately approved by the FDA, and therefore less likely to be marketed by Biogen, and therefore less likely to create profits and cash flow for Biogen.

Q.    Okay.

Are there any, to your understanding implications, for the Massie report to the upcoming Ad Comm vote?

A.    So you're talking about the Massie report on the fourth to the vote on

Page 92

D. Tabak, Ph.D.

the sixth?

Q.    Correct?

A.    Yes, in the sense that it's generally assumed that the Ad Comm members look at or view the statistical report or any similar reports and that may influence the way they vote.

Q.    Okay.

And why would that matter to a Biogen investor?

A.    Similar to the same reason I said before. The Ad Comm vote may have an effect on whether the FDA ultimately approves adu, and we can go from there to Biogen cash flows and profits.

Q.    In your experience, do investors who invest in -- and feel free to tell me if you consider this outside of your area of expertise -- but do investors in pharma companies that have drugs under review by the FDA for approval sometimes invest or make investment decisions based on upcoming events?

MR. HORNE:  Objection.

Page 93

D. Tabak, Ph.D.

Vague.

MS. SOLOWAY:  Let me put a finer point on it.

BY MS. SOLOWAY:

Q.    There's a long-term decision here by the FDA about whether to approve adu or not.

Correct?

A.    I'm not sure what you mean by long-term, but there is presumably a likely upcoming decision by the FDA on whether to approve adu.

Q.    As of November, there's also a short-term anticipated event, which is the Ad Comm meeting, right?

A.    Also correct.

Q.    Okay.

And my question is do investors sometimes make investment decisions in advance of a near-term event such as an Ad Comm, thinking, like, oh, well, there is a big event happening on November 6th, and if I think it's going to be positive, I might invest for the short-term to see if I can

24 (Pages 90 - 93)

Page 94

D. Tabak, Ph.D.

benefit from the upside, or if I think it's going to be negative, I might get out of this stock because the Ad Comm vote might go south and if I sell now, I'll make more money than if I sell in a week.

Do you understand the point I'm making?

MR. HORNE: Objection.

A.    I think you're basically asking whether investors may make investment decisions based on an upcoming Ad Comm meeting for company like Biogen, the answer would be yes.

Q.    Okay.

So some investors would potentially review the Massie report and appreciate that this may have implications for the upcoming Ad Comm meeting and make decisions on that basis alone.

Correct?

MR. HORNE: Objection.

A.    First off, I'm going to guess that anyone who reviews the Massie report is not basing their investment decisions solely

Page 95

D. Tabak, Ph.D.

on the Massie report. That sounds like an investor is reviewing a lot of information as opposed to just this one thing. So unlikely would probably be the answer to the just based solely on the Massie report.

Q.    What if we correct my question to understand that, like, investors may review a lot of information, but the Massie report may be just one of the many things that an investor reviews?

Is it fair to say that some investors may be investing in the lead-up to an Ad Comm based on expectations of what's going to happen from that near-term event?

MR. HORNE: Objection.

A.    Well, to the end part of the question, might they be investing based on expectations, the answer is yes. If you're talking about the Massie report, that obviously couldn't affect anyone until at least November 4th.

Q.    Okay.

So I want to go back again now to the July 22nd statement.

Page 96

D. Tabak, Ph.D.

Is it your understanding that the plaintiff is pursuing a theory that the July 22nd statement caused Biogen's share price to become artificially inflated?

A.    Yes.

Q.    In what way?

A.    In that if a truthful statement would be something like there are data that are not consistent with what I've said earlier -- the word that -- the market would have interpreted that negatively and Biogen's stock price would have declined.

Q.    Okay.

Let's put that to the side for a moment.

Did you identify or did you examine -- withdrawn.

Did you examine whether the July 22nd statement caused Biogen's share price to move in a statistically significant manner?

A.    I think that might have fallen into part of the analysis. But I didn't look at -- part of the market efficiency

Page 97

D. Tabak, Ph.D.

analysis, I didn't look at it specifically in terms of considering price impact, for example.

Q.    Well, I think you did. Let's look at footnote 34 of your report.

A.    Okay.

Okay.

Q.    Okay.

So I think unless I'm misunderstanding you, you're acknowledging in footnote 34 that there does not seem to be evidence that the initial day of the analysis period was chosen because of a stock price increase.

Do you see that?

A.    Well, that is part of the sentence. The remainder says: But rather was effectively chosen by the First Circuit based on its factual analysis of the statement made that day and not based on any associated stock price movement.

Q.    Okay.

So you're characterizing the First Circuit's finding here?

25 (Pages 94 - 97)

Page 98

D. Tabak, Ph.D.

A.    Not getting a legal conclusion, but I think it's fair to say when you read it, that analysis was based on a view of how it interpreted the all data statement rather than saying we looked at the stock price and this is -- this is why we're going to start the class period here.

Q.    Okay.
Meaning the First Circuit didn't think about whether the stock had moved in a statistically significant manner when it decided that the July 22nd statement was the only remaining statement in the case, correct?

MR. HORNE:  Objection.

A.    It didn't state that it looked at it.  What it may have done behind closed doors, I can't say, but I don't see that in the opinion.

Q.    Oaky.
You did analyze whether Biogen stock price moved in a statistically significant amount on July 22nd, correct?

A.    I think that probably would

Page 99

D. Tabak, Ph.D.

have fallen somewhere in the market efficiency analysis.  In fact, it would have, yes.

Q.    Okay.
And what was your finding?

A.    Looks like you have it over there.  I can't see it detail.  I can't recall offhand.

(Cross-talk)

Q.    So sitting here today --

MS. SOLOWAY:  Excuse me?

MR. HORNE:  Do you want the witness to look at his report?

MS. SOLOWAY:  No.

MR. HORNE:  Okay.

BY MS. SOLOWAY:

Q.    Sitting here today, Dr. Tabak, sitting here today, is it your testimony that you don't recall whether the stock moved in a statistically significant manner on July 22nd when the alleged false statement was made?

A.    I mean, it may be somewhere in my report, but just sitting here, I don't

Page 100

D. Tabak, Ph.D.

remember.

MS. SOLOWAY:  Okay.
Can we have tab 16?  I'm sorry.  I'm talking to Charlie.  We'll mark it as an exhibit.  Just give me a second.

(Whereupon, Exhibit 6 was marked for identification.)

BY MS. SOLOWAY:

Q.    Okay.
Dr. Tabak, do you recognize this document I just provided to you, which is marked Exhibit 6?

A.    I mean, I haven't seen it printed like this, but I definitely recognize this is part of the Excel file that would be part of our backup.

Q.    Okay.
And would you agree with me that in this back up for your -- this is back up for your event study, correct?

A.    For the event studies used in my market efficiency analysis, yes.

Q.    Okay.
And you would agree with me

Page 101

D. Tabak, Ph.D.

that on July 22nd, 2020, you find that there is no statistically significant stock price movement that day?

A.    That is correct.

Q.    Okay.
So you would agree with me, Dr. Tabak, that the July 22nd statement did not cause inflation to enter the stock price after it was made, correct?

A.    No.

MR. HORNE:  Objection.

Q.    It caused new inflation to enter the stock price that day?  Like, you can find inflation that entered the stock price on July 22nd?  Show me where?

A.    Ms. Soloway, I assume you're familiar with the price maintenance theory that says but for a statement, a stock price would have fallen.  Therefore under such circumstances, you do not expect to see a stock price moving up, but inflation enters because a truthful statement allegedly would have caused the stock price to fall.
So for example, a stock price

26 (Pages 98 - 101)

Page 102

D. Tabak, Ph.D.

can start at 100 and after that misrepresentation, that's why I say economically it's an omission, it can stay at 100, but if the stock price should have fallen to 90, that means that $10 worth of inflation was created by that statement.

Q.    Okay.

So putting aside the inflation maintenance theory, just let's focus on front-end price impact theory.  You are not asserting that the July 22nd statement created new inflation that hadn't preexisted in the stock price already.

Correct?

MR. HORNE:  Objection.

A.    Your question is putting aside the price maintenance theory, you're not asserting something that I say comes from the price maintenance theory.  So I think your question is basically saying give me an answer to something, but don't consider the thing that you think is important.

Q.    I mean I'm not really -- this is not a trick question.  In paragraph 65 of

Page 103

D. Tabak, Ph.D.

your report, you say:  One would not expect Biogen stock price to react to the alleged misrepresentation, something known as front-end pricing .

I'm just confirming you do not believe there was front-end price impact here, correct?

A.    Okay.  But just to explain, you asked me about inflation before.  Not price impact.

Q.    Okay.  So why don't we use the word price impact.  You are not arguing in this case that you have identified price impact, correct?

A.    If by price impact, as I'm using it here, you mean an upward change in the price, I've not seen that.

If you interpret price impact as holding the price steady or maintaining it, then you can't see that directly, but I would say that if it is shown that the corrective disclosure led to reduction inflation, then you would have an unobserved front-end price impact.

Page 104

D. Tabak, Ph.D.

Q.    Okay.  Okay.

So you mentioned price maintenance theory?

A.    I did.

Q.    What is your understanding of what price maintenance theory is?

A.    Again, not offering a legal conclusion, it's basically by saying not representing something negative or misrepresenting something negative to be, let's say neutral, a defendant in this type of case can maintain a price.

So for example, go back to my example, the stock price is 100 and if for some reason Defendants are required to say something like, our factory burned down, but they say something like, I toured the factory yesterday, everything seemed fine, and the stock price stays at 100 because people are, like, okay, you toured the factory, no big deal, that is the price maintenance theory.  The stock price was a 100 before, it wasn't a 100 after.  But a truthful statement of, I couldn't tour the

Page 105

D. Tabak, Ph.D.

factory because it was burned down might have lowered the price to 90.

Q.    So in the example you just gave, I think you're saying that they statement that is allegedly false maintained some preexisting expectation in the market in that example that the factory existed.

Correct?

A.    Correct.

Q.    Okay.

What did the alleged false statement in this case maintain that already existed?

A.    That there was no hidden or undisclosed data that was at odds with the way that Biogen was presenting adu and its results.

Q.    And when did that, that there was no hidden or undisclosed data that was at odds, when did that get into the market price, in your opinion?

MR. HORNE:  Objection.

Not subject to expert testimony.

27 (Pages 102 - 105)

Page 106

D. Tabak, Ph.D.

A. Well, I'm not legally -- obviously we only consider it from the all data statement. If you're asking, you know, when the market believed that, it's only ever been generally believing that with every statement Biogen made about adu. If you're assuming that Biogen was generally being truthful.

Q. When did that start? Like when did that -- you said Biogen was communicating that there was no hidden or undisclosed data that was at odds with the efficacy, right, of high-dose adu. I'm just trying to understand, like, when did Biogen first make that representation, in your opinion?

MR. HORNE: Same objection.

A. Well, put this it way, you don't have to make that representation. Just, like, you know, you generally assume if a company is supposed to disclose its factory burned down, you don't say every day, I wonder if it's factory burned down or not.

Page 107

D. Tabak, Ph.D.

At some point, it might be legally cognizable as a misstatement -- but I think generally the market would be assuming that Biogen was being truthful.

Q. Okay. So I want to put aside the question of whether the market assumes truthfulness or lack of truthfulness for a moment, and I want to focus on the economic question of what information the market already had that was preexisting before the July 22nd statement that the July 22nd statement maintained.

I'm just trying to understand that. So in the period before July 22nd, Biogen made a bunch of statements about aducanumab, correct?

A. Correct.

Q. Okay.

Can you tell me, sitting here today, what statements Biogen made that in your opinion introduced inflation into the stock price that was then maintained by the July 22nd statement? Is that something you can tell me?

Page 108

D. Tabak, Ph.D.

MR. HORNE: Objection.

A. No, because inflation is a legal concept. The price was maintained. It's not that the inflation was maintained. The inflation was introduced with the first legally cognizable alleged misstatement. Price maintenance, but inflation enters on July 22nd.

Q. Okay.

MR. HORNE: Just to -- are we sticking with you calling it adu, or --

THE WITNESS: We can use both terms. I think you used the full name once, but that's fine.

BY MS. SOLOWAY:

Q. Okay. So I think we're getting caught up here in, like, lingo. Right?

So I just -- I want to make sure I'm really understanding the theory because I think maybe I'm using the word artificial inflation and you're saying inflation. I want to be really precise.

So in your regression that you performed, let's just actually jump to the

Page 109

D. Tabak, Ph.D.

end of the class period. Right? You jump -- you perform an analysis to see upon the corrective disclosure is there a statistically significant stock price movement, correct?

A. Correct.

Q. And then you identify -- you're going to tell me if I get the words wrong -- the amount of the abnormal return.

Is that right?

A. That's good.

Q. Okay.

And I think what you're telling me in your damages section is that you can calculate damages for adu -- excuse me -- for this case based on the amount of the abnormal return, although you might need to make adjustments, for example, for confounding information.

Am I getting that right?

A. That's fair.

Q. And so you've calculated in this case that at the end of the class period, there is an abnormal return.

28 (Pages 106 - 109)

Page 110

D. Tabak, Ph.D.

Correct?

A. Correct.

Q. And that abnormal return, your theory is, reflects inflation that's maintained by the July 22nd statement, correct?

A. Putting in the adjustments and so forth, but again, you say inflation that was maintained. It was the price that was maintained, and by maintaining the price, inflation entered. So again, I'll go to that example. Price of 100 before, price of 100 after, price is maintained.

True value because there's been no misrepresentation of a 100 before, no inflation before, true value of 90 after because there was some obligation to reveal the truth mean that the inflation went from zero to ten. So it's not inflation maintenance here, it is price maintenance on July 22nd and introduction of inflation on July 22nd.

Q. Okay.

So the market had already

Page 111

D. Tabak, Ph.D.

priced in -- before July 22nd, the market had already priced in an expectation about adu and its significance to Biogen, correct?

A. Correct.

Q. And you're saying that on July 22nd, what the company said in the alleged false statement was confirmatory of the market's existing valuation?

A. I think that's fair.

Q. And that's why the stock price doesn't move on July 22nd, following the statement, correct, in your opinion?

A. Correct.

Q. Do you know when the market priced in that preexisting expectation?

A. Well, it would have been continuous over time with every statement made by Biogen and -- or every statement about adu made by Biogen, and it would have evolved to the point where it wasn't July 22nd.

Q. Can you tell me what those statements were?

A. I think we agreed that there

Page 112

D. Tabak, Ph.D.

were a number of statements made before. I knew them when I reviewed the complaint, but again, I said I'm only now focused on the all data statement, but there were certainly statements made prior to that.

Q. Sitting here today, there's no one statement that you have in mind that you can point me to as being one of those statements that was made before that created that preexisting expectation?

A. None in particular.

Q. In your view, was the information conveyed in the July 22nd statement new as compared to these other prior disclosures?

A. I think generally not because, as I said again, economically, it's more of an omission in not saying that there are data that allegedly are not consistent.

MS. SOLOWAY: Can I have the plaintiffs' brief? I think it's tab six.

I'm marking the plaintiffs' brief Exhibit 10.

Page 113

D. Tabak, Ph.D.

(Whereupon, Exhibit 7 was marked for identification.)

MR. HORNE: Are we up to ten?

MS. SOLOWAY: I'm sorry. I marked it seven and said ten. Excuse me. Exhibit 7.

MR. HORNE: Thank you.

BY MS. SOLOWAY:

Q. Do you recognize this document?

A. I do.

Q. You've read it before?

A. I have.

Q. Is there anything in this filing by the plaintiffs that you disagree with?

A. Not that I recall.

MR. HORNE: Objection.

A. And obviously I don't disagree, but they make allegations that I have no opinion on one way or the other.

Q. Okay.

If you take a look at the -- sorry, just give me a second -- bottom of page 17.

29 (Pages 110 - 113)

Page 114

D. Tabak, Ph.D.

A.   Okay.  I'm with you.

Q.   I'll read you the beginning of the paragraph that ends at the bottom of 17: The all data statement maintained inflation of Biogen stock price rather than adding new inflation.  In the all data statement, Sandrock inaccurately summarized the results of Biogen's clinical trials which results had been selectively and misleadingly disclosed earlier.

Do you see that?

A.   I do.

Q.   So in forming your opinion about price maintenance in this case, did you understand that Biogen had selectively and misleadingly disclosed the results of its clinical trials earlier?

A.   I understood that those statements had been made -- allegations had been made in some ways earlier, but I was not considering that as the live allegation after the First Circuit opinion.

Q.   Okay.

So again, I just want to make

Page 115

D. Tabak, Ph.D.

sure I understand the difference between what you're saying and what the plaintiffs' brief is saying.

You are not assuming that the results of Biogen's clinical trials have been disclosed in a misleading manner earlier?

A.   I am not assuming that one way or the other.

Q.   Is it relevant to your opinion? Because you're saying you're not assuming it one way or the other.

Is it relevant to your opinion whether there had been misleading statements before July 22nd?

A.   Give me a second because I hadn't thought about that.

If they were misleading before, but they're not legally allowed to be in this case, then you could say that there was -- I mean, the problem is inflation, you often think of as a legal term, but if you want to think of it as just a pure economic term, there could be inflation before and

Page 116

D. Tabak, Ph.D.

then the all data statement would start the class period because that was -- that would be the first statement for which a claim would be made.

Again, I'm not giving a legal opinion, just my economic interpretation.

Q.   Did you attempt to identify when an alleged misleading statement was disclosed earlier than July 22nd?

A.   I'm sorry.  You're saying misleading statement was disclosed?  You mean just that my --

Q.   They say disclosed.  But yeah, did you as part of your analysis consider --

A.   No, no, but wait.  They say the results were misleadingly when disclosed, not a misleading statement --

Q.   But they say which results have been selectively and misleadingly disclosed earlier.

I'm just asking whether you tried to identify what results had been selectively and misleadingly disclosed earlier?

Page 117

D. Tabak, Ph.D.

A.   No.  Although I read the complaint, so obviously if they'd listed anything there at one point, I would have read it.  Not for the purposes of this report.

Q.   Did you attempt to investigate whether any such selective and misleading earlier disclosure had actually injected new inflation into the stock price?

A.   No, I did not.

Q.   Do you have an opinion about whether -- you can put that to the side.

Do you have an opinion about whether prior to the proposed class period the market understood that "all data" supported efficacy of high dose aducanumab?

A.   I haven't considered that.

Q.   You didn't investigate that question as part of your analysis?

A.   No, I didn't think it was relevant.

Q.   Did you check to see if market analysts or commentators held that view?

A.   If I didn't investigate it, I

30 (Pages 114 - 117)

Page 118

D. Tabak, Ph.D.
didn't check.

Q. So the answer is no?

A. The answer is no.

Q. Do you have an opinion about whether during the proposed class period the market believed that "all data" supported efficacy of high dose aducanumab?

A. I haven't investigated that specifically.

Q. Did you look to see if market analysts or commentators expressed the view that all data supported the efficacy of high dose aducanumab during the class period?

A. No, nor did I expect them to necessarily mention that.

Q. And you don't believe that that's relevant to your -- to ascertaining whether there's price impact from the alleged misrepresentation in this case?

A. Oh, it very well may be. You can make an argument, but again, it's defendant's burden, so I did not believe it was necessary for me to affirmatively demonstrate price impact. I presented

Page 119

D. Tabak, Ph.D.
information that there was evidence in favor of it, but I've not done a complete price impact analysis since my understanding is that's not plaintiffs' burden.

Q. Let me just make sure I understand this.

One of things that an economist may look at to ascertain whether a statement has price impact is whether analysts held a view during the class period that is consistent with what the alleged false statement says, correct?

A. Sometimes.

Q. And you did not investigate that here, correct?

A. Correct.

Q. And you did not investigate that here because it was your view that it's defendant's burden?

A. For price impact, yes.

Q. But you formed your own opinion that there is price impact in this case, correct?

A. Again, I think you are

Page 120

D. Tabak, Ph.D.
misstating my opinion.

I said on page 31 there is evidence of price impact. And again, not giving a legal conclusion, I think there's a difference between evidence and proof.

Q. Okay.

So that's a very interesting and nuanced interpretation.

Are you offering an opinion in this case, Dr. Tabak, that the July 22nd statement had price impact on Biogen's shares?

A. At this point, I am not. And to the extent that it is a nuance to believe that there's a difference between evidence and proof, I'm going with the nuance that I said evidence and I meant the word evidence rather than the word proof when I used that word.

Q. I want to make sure we're really clear on this point because this seems quite important to me.

Would you agree with me that whenever you investigate something as an

Page 121

D. Tabak, Ph.D.
economist, you would consider both the evidence that supports the position and also the evidence that doesn't support the position, correct? You would want to have all of that information available?

A. If you are to make an ultimate conclusion, yes.

Q. Okay.

And so here -- I want to make sure I understand this -- you have not formed the ultimate conclusion that the July 22nd statement had price impact?

A. As of here in my opening report, I have not yet formed that collusion. My expectation is that it's possible that you and your expert may raise that, at which point maybe I will form a conclusion or not, but as of the opening report, no.

Q. But nonetheless, in your report, you go through evidence that you believe supports the proposition of price impact, correct?

A. Correct.

31 (Pages 118 - 121)

Page 122

D. Tabak, Ph.D.

Q.    But you do not go through evidence that you believe does not support price impact, correct?

A.    Correct.  If I may, I said evidence.  Not all evidence.

Q.    In fact -- and in fact, you didn't consider in forming the opinions expressed in this report whether during the class period the market was under the impression that all data supported the efficacy of high dose aducanumab, correct?

MR. HORNE:  Objection.
Misstates the testimony.

A.    I don't think it misstates it.
I did not perform that study.

MS. SOLOWAY:  I like when the witness rejects the objection.
Let's keep that up.  That's excellent.

MR. HORNE:  My issue is the use of the word efficacy.  The statement isn't about efficacy.  The statement is about high dose.

MS. SOLOWAY:  The statement

Page 123

D. Tabak, Ph.D.

isn't about efficacy and yet you guys have problems with our document review guidelines?  That's funny.
Okay.  We will move on.
Just give me one second.  We're going to skip some stuff, so I just wanted to make sure --

THE WITNESS:  No problem.

BY MS. SOLOWAY:

Q.    Okay.
So we previously marked the actual July 22nd statement itself, so if you want to have that on hand, feel free.

A.    Okay.

Q.    Actually, I have a copy of the Massie report, which I can put in front of you as well.  If I'm going to ask you questions, I'm happy to do that, but you'll tell me if you want it.

A.    I was going to say if you're about me, I didn't know what questions you're going to.

Q.    Yeah, yeah.  That's fine.
I'll ask you some questions,

Page 124

D. Tabak, Ph.D.

you'll tell me if you want to see it.
Would you agree with me that the Massie report is lengthy?

A.    Yes.  I would agree.

Q.    Would you agree with me that it contains specific statistical analyses?

A.    Yes.

Q.    Would you agree with me that it contains more detail than the July 22nd statement?

A.    Yes.

Q.    Do you know whether the Massie report makes any reference to the July 22nd statement?

A.    I don't recall anyone saying that it has, but I have also not reviewed the entire Massie report for that question.

Q.    Okay.
To the best of your knowledge, the Massie report doesn't make an express reference back to the July 22nd statement, correct?

A.    That is my understanding, yes.

Q.    I want to direct you again.

Page 125

D. Tabak, Ph.D.

Do you have the plaintiffs' brief which we just marked?

A.    I do.

Q.    There's another statement in here.  It's the bottom of the page.  It says --

A.    Sorry.  Bottom of which page?

Q.    Sorry.  Bottom of page four.
Thank you.

A.    Mm-hmm.

Q.    Do you see where it says:
Well, it took little time for the market to digest that the FDA favored approval.  The Massie report was no easy read.  It was dense and technical?

A.    I see that.

Q.    Do you agree with that?

A.    I haven't studied it, but I'm willing to accept it.

Q.    The paragraph then goes on to say:  It contained many analyses that did not bear on the all data statement.
Do you see that?

A.    I do.

32 (Pages 122 - 125)

Page 126

D. Tabak, Ph.D.

Q.    Do you know what analyses the Massie report contained that did not bear on the all data statement?

A.    Sitting here, I don't.

Q.    Have you performed any analysis of whether the July 22nd statement, the content of it, matches with the Massie report?

A.    Certainly there is overlap, but I haven't looked to try to see if it's kind of a one-to-one match.

Q.    I apologize for all the exhibit flipping.

Do you mind going back to your report, Dr. Tabak?

A.    No problem.

Q.    Thank you.

Flip to paragraph 69 in your report.

A.    Okay.

Q.    Have you had a chance to review paragraph 69?

A.    Yes.

Q.    Okay.

Page 127

D. Tabak, Ph.D.

I want to just draw your attention to the portion of that paragraph that says:  This is an indication that analysts who reviewed the Massie report took a less favorable view of Biogen's value, the argument that plaintiffs are making about how the market would have reacted had the analysis in the Massie report been made public earlier in the analysis period.

Then it goes on to say:  In other words, this analysis provides evidence of price impact from the alleged misrepresentations as revealed by the analyses disclosed in the Massie report.

I want to understand what do you mean by the argument that plaintiffs are making about how the market would have reacted had the analysis in the Massie report been made public earlier in the analysis period?  What's the argument that plaintiffs are making?

A.    Well, the basic argument is that Biogen's stock price was inflated.

Q.    Right.

Page 128

D. Tabak, Ph.D.

A.    They're also making the argument that the Massie report revealed the falsity of the all data statement and that had that falsity been revealed earlier, Biogen stock price would have declined.

Q.    Right.  But is the argument that the plaintiffs are making that the market would have had this -- I just want to try to understand as a matter of economics.

We talked about how there was an abnormal return in your opinion following the issuance of the Massie report, correct?

A.    Correct.

Q.    And you've tried to measure that, correct?

A.    Correct.

Q.    Okay.

Is the argument that you understand the plaintiffs to be making that that abnormal return would have happened earlier if the analysis in the Massie report had been made public earlier?

A.    Well, we discussed earlier there was other confounding news on

Page 129

D. Tabak, Ph.D.

November 4th and so forth.  So I don't think they're saying that a -- necessarily that a particular observed stock price movement in November would have occurred earlier, but rather that had that -- that information been disclosed, there would have been some negative stock price movement earlier.

Q.    Okay.

Is it your understanding that the decline that the plaintiffs are pointing to at the end of the class period would have happened on July 22nd but for the omission in this case?

A.    Well, again, you say the decline.  As I just said, we may have to make some adjustment for other news and so forth.  But I think they're saying that what if the portion of the stock price movement in November related to the Massie report would have occurred earlier and there may be some adjustments in bringing it back earlier, but that's the basic theory.

Q.    What would the adjustments need to be in bringing it back earlier?

33 (Pages 126 - 129)

Page 130

D. Tabak, Ph.D.

MR. HORNE: Objection. Vague.

A. So one of things I've done in cases like this is I've tried to see if the market had different views about the value of the drug in question.

So to put it simply, if the value of adu, let's say, was 80% as big on July 22nd as it was in November, then you would presumably say the inflation was only 80% as big in July as it was in November.

Q. So I think what you're saying is that the value of information in the Massie report released in November may not have had the same value if that same information were released in July?

A. That is possible, yes.

Q. Okay.

What other types of adjustments?

A. I think that's the primary adjustment I'm thinking of.

Q. Okay.

Have you considered as part of

Page 131

D. Tabak, Ph.D.

your expert opinion whether the information in the Massie report that was released on November 4th was available to Biogen as of July 22nd?

A. I have not considered that at this point.

Q. Okay.

If it was not -- if the information in the Massie report was not available to Biogen on July 22nd, would you agree that Biogen couldn't have disclosed it?

A. I will agree that Biogen could not have disclosed information that was not available to it, sure.

Q. Okay.

If that turns out to be the case, is there a way in your opinion that you can address a stock price decline that happens in November being, you know, a measurement of the amount of inflation injected by a false statement in July?

A. It is possible.

Q. How would you do that?

Page 132

D. Tabak, Ph.D.

A. Well, part of it -- first of all, I'm going to give you what I'm thinking of. Do not take this to mean the universe of all possible ways of addressing it.

One possibility, for example, is to get, I'll call it broadly an FDA expert or FDA approval expert who can say look, here's the probability of approval given what was, you know, stated publicly, what was in the Massie report and what should have been stated publically. If you're saying what should have been stated publically maybe at different levels or something different, that expert may say okay, here is the effect of stating that information, being, you know, whatever you say Biogen could have disclosed at an earlier point in time.

Q. Okay.

So I'm -- this is what I'm struggling with. I think what the plaintiffs' theory here is, IS that the back end decline that is -- again, I understand that there may be some work you have to do

Page 133

D. Tabak, Ph.D.

to take out confounding factors, but let's just call it like the back end decline that's actually attributable to the corrective information in the Massie report, right?

A. You can call it the back end drop in inflation.

Q. Thank you. Let's call it the back end drop just for simplicity.

What I understand the plaintiffs to be saying in their maintenance theory here is that the back end drop is a proxy for the amount of inflation that was maintained on July 22nd.

Is that right?

A. Well, the inflation maintenance theory doesn't say it has to be -- the price maintenance theory doesn't say it has to be the same. It basically says you can use the back end drop to somehow infer the inflation at earlier points in time.

Q. Okay.

And so then the question is: You would agree with me that the back-end

34 (Pages 130 - 133)

Page 134

D. Tabak, Ph.D.

inflation would not be a proxy for the same amount of front-end inflation if, for example, Biogen didn't have all of the information in the Massie report as of July?

MR. HORNE: Objection. Calls for a legal conclusion.

A. Not going to address it legally. If the difference is material, then it would not be a proxy. If the difference is not material, it can very well be a proxy.

Q. Okay. And another reason it might not be a proxy, which you identified, is that it's also possible that over time the importance of Biogen -- excuse me -- the importance of adu to Biogen could change?

A. Correct.

Q. In which case you can't say the back-end amount is necessarily a proxy for that same information released months earlier. Am I getting that right?

MR. HORNE: Objection.

Page 135

D. Tabak, Ph.D.

Calls for a legal conclusion.

A. Not a one-to-one proxy, but it would be a good starting point.

Q. Okay. Are there other reasons that you could think of, putting aside the value of adu to Biogen or the availability of the corrective information to Biogen in July, that would impact whether the back-end decline can serve as a proxy for the front-end inflation?

A. Not sitting here, but just because I can't think of it sitting here doesn't mean it doesn't exist.

Q. And if forming your opinions that you offer in this report about price impact, did you consider any of those factors?

A. No, because, again, I did not make a "all evidence statement." I was careful to make a statement about evidence. So I'm not saying there isn't -- there aren't other things to consider.

Q. Does your analysis test whether

Page 136

D. Tabak, Ph.D.

a truthful but equally generic substitute for the July 22nd statement would have caused a price decline?

A. No. I haven't considered the Second Circuit's Goldman opinion there at this point, again, because in terms of price impact, it's my understanding that Plaintiffs don't have the burden, so I just put out some information there, since to help your experts to see what we might say, but I haven't reached the ultimate conclusion on price impact.

Q. Okay. So clearly you recognize my reference to the case. I take it you had a chance to read the Second Circuit's decision in the Goldman case?

A. It's been a while, but I have read it, yes.

Q. Okay. And I'm referring to the final decision where the Second Circuit decertified the class.

Page 137

D. Tabak, Ph.D.

Are you with me?

A. I'm with you, because that's where your quote came from.

Q. Correct. What is your understanding -- again, I know you're not a lawyer, but as an economist -- of what a truthful but equally but generic substitute for the July 22nd statement would be?

A. It could be that not all data support that. That, again, is the last word in the phrase there. Not all of our data support that.

Q. Okay. And if Biogen had issued some corrective information between July and November that said not all data supports the efficacy of high-dose aducanumab, would you expect to see a stock price drop?

MR. HORNE: Objection. Misstates the evidence.

A. It's a hypothetical. Yes. And I can explain why.

Q. Please.

35 (Pages 134 - 137)

Page 138

D. Tabak, Ph.D.

A. The issue is there would either be follow-up or questions or why aren't you telling us what data is, and there's basically good economic literature, it's called the lemons literature from George Akerlof, A-K-E-R-L-O-F, and others basically say if you aren't disclosing the particulars of the negative, people tend to assume it is among the worst possible outcomes, otherwise you would disclose it if it weren't particularly bad.

Q. So how would you apply that theory to the subgroup data that the plaintiffs allege was omitted from the July 22nd statement?

A. So it depends on what you think of as the but-for world. If we're forced to say that Biogen would only make an equally generic truthful statement that not all data support us, you would expect -- assuming that analysts ask, they say, sorry, we're only making this generic statement, you would expect, you know, a very large stock price drop because people would say if it

Page 139

D. Tabak, Ph.D.

weren't bad, you know, particularly important data that didn't agree with you, you would have told us that.

So they will kind of, you know, not quite assume the absolute worse, but near the worst. If you assume, kind of that in the follow-up we are allowed to assume that Biogen makes a more specific statement, putting aside what's said in Goldman, then we can evaluate that information.

Q. So I'm trying to understand how that hypothesis -- forgive me. I'm trying to muddle through this.

You would agree with me that the subgroup analysis is not available to investors during the class period, correct?

A. That is my understanding, correct.

Q. Okay.

And under the hypothesis that you just presented, would the market therefore assume that the subgroup data is negative as opposed to positive?

A. Well, the hypothesis that

Page 140

D. Tabak, Ph.D.

Biogen simply said not all data support us?

Q. No, no, I'm -- put aside the -- put aside the all data statement for a minute, the one that you're calling the all data statement, just put that aside. Under the hypothesis --

A. Which --

Q. -- the lemon --

A. Yeah, like, you know, you bought a lemon.

Q. Right.

Under the lemon hypothesis, I think what you're telling me is that the market will assume that if it's not given information that means the information is bad. Am I getting that -- just at a high level?

A. Sure.

Q. Okay.

So the market does not have the subgroup data, correct, during the class period?

A. Correct.

Q. And it know it doesn't have a

Page 141

D. Tabak, Ph.D.

subgroup data, correct?

A. Correct.

Q. Okay.

Does that mean under the lemon hypothesis that the market would make the assumption that the subgroup data is more likely to be bad than good?

A. Well, I don't know if the market would necessarily focus on the subgroup data, it would assume there are data that are more like -- well, first of all, if you say that they don't support us, it's bad.

But if you say there's bad data, we're not telling you what it is, the market will assume that those bad data are particularly bad because you aren't telling us, and if it were a very minor thing, you would have told us that. I don't know if the market would say it must be the subgroup data.

Q. Did you investigate whether the market had an understanding during the class period that it didn't have the subgroup

36 (Pages 138 - 141)

Page 142

D. Tabak, Ph.D.

data?

A.    I did not investigate that.

Q.    Did you investigate whether the market had any understanding about whether Biogen had offered, even at a high level, any information about what the subgroup data would show?

A.    I've not looked into that.

Q.    Okay.

So going back to the truthful equally generic substitute for the July 22nd statement, I take it that what you're saying is that if Biogen had offered a truthful but equally generic substitute for the July 22nd statement it would have been not all data support that, am I getting that right?

A.    I'm not saying that's the only one.  There may be other ways to phrase it, but I think that's reasonable.

Q.    And your opinion is that would have caused the stock price to drop?

A.    Yes.

Q.    But you have not investigated whether the market actually understood that

Page 143

D. Tabak, Ph.D.

not all data supports that?  Meaning you haven't gone out and checked to see whether the market had a contemporaneous understanding consistent with that truthful substitute?

A.    I've not looked into that.

Q.    Okay.

So one of the things you do in your report --

MS. SOLOWAY:  Are we doing okay?  Like, I can keep going a little bit longer or maybe we break at 1:00.

MR. HORNE:  Sure.  I mean, does that work for you, Doctor?

MS. SOLOWAY:  You're going to tell us if you need a break, please.

THE WITNESS:  If you're saying in about ten minutes, that's fine.

MS. SOLOWAY:  Great.

Let's go for ten more minutes.

BY MS. SOLOWAY:

Q.    One of the things that you do in your report is you look at whether -- whether and what analysts have to say about

Page 144

D. Tabak, Ph.D.

various topics, correct?

A.    Yes.

Q.    Okay.

Is contemporaneous analyst commentary one way of assessing whether a public disclosure conveys new value-relevant information into the market?

A.    It could be.  Doesn't always work, but it's certainly an option to attempt.

Q.    And one of the things you do in your report is you look at what the analysts reactions are to the Massie report, correct?

A.    Yes.

Q.    Okay.

And would you consider that how analysts react to new disclosures is an important factor in the analysis of whether there's price impact?

A.    It may be an important factor, it may not be, depending on what you observe in the analysts.

Q.    Can you explain that to me?

A.    First of all, you might get

Page 145

D. Tabak, Ph.D.

conflicting information from analysts, which would make it much less of an important factor than if it went all one way or the other.

Q.    Okay.

So if you have a bunch of analysts who mention something but their interpretations of it are varied and conflicting, your view is that it -- what does that mean?

A.    In some sense, it may not give you a clear answer about whether that information -- well, put it this way.  It would be important to some of the markets.

So I guess it would be fair to say that it at least had some affect, but certainly if some of them said this is positive news and others said this is negative news, that would make it quite challenging to figure out on net the analysts consider it to be positive or negative.

Q.    What if information is released and there is no analyst commentary at all?

37 (Pages 142 - 145)

Page 146

D. Tabak, Ph.D.

What does that suggest to you?

A.    Several possibilities.  One that is that it was expected or not different than expected.  Another is that it might not be economically important.

Another bit might be if there's a lot of other information to the time that analysts did not focus on it or did not want to, you know, create humongous reports that covered things that were not the most important issue.  There are probably others that if I thought about it, I might come up with.

Q.    Take a minute.

Can you think of anything else?

A.    It might be that if the information was not important given other information disclosed at the same time.  So for example, two pieces of information are, we have, you know, different projections for the market share of our drug, it's one piece, and the second one is we've discovered that our drug kills people and we're going to have to pull it from the

Page 147

D. Tabak, Ph.D.

market, the market decides that the first piece doesn't matter anymore.

Q.    That sounds kind of improbable, doesn't it?

A.    It does, but you're asking me to come up with something here on the fly.

Q.    Okay.

So I just asked you about analyst reports.  I want to ask you about news reports.  Are contemporaneous news reports another way of assessing whether a public disclosure conveys new value-relevant information to the market?

A.    They may be.  It depends what you see in those reports again.

Q.    Tell me how you would assess that?

A.    You can take a look at how often they reference various things as a starting point.  You can also review the reports in detail to see how they discuss something.

Q.    And you did look at news reports following the Massie report,

Page 148

D. Tabak, Ph.D.

correct?

A.    Following and also a little bit before, yes.

Q.    Okay.

And in ascertaining whether a disclosure has a price impact, would you consider news coverage an important factor in that analysis?

A.    It depends.  It might be.

Q.    What would it depend on?

A.    Sometimes it might depend on the size of the company.  There's some companies that just won't get news coverage, but doesn't mean that the news wasn't important to investors in that company.

Q.    What about for Biogen?

A.    Biogen had a decent about of news coverage.

Q.    Okay.

So what would -- using Biogen in your -- in your example, what would it tell you about, you know, using Biogen in particular, in ascertaining whether a disclosure has a price impact, would you

Page 149

D. Tabak, Ph.D.

consider news coverage an important factor in that analysis?

A.    I would at least consider it a factor.  What's important might depend on what other factors you've got to deal with.

Q.    Okay.

Turning to the July 22nd statement, did you review whether news reports referenced the July 22nd statement?

A.    Oh, of course not.

Q.    You did not look at that?

A.    I mean, you wouldn't expect it to, because this is again kind of a price maintenance issue, so I don't see why one would do that, and I did not do that.

Q.    Okay.

Same question for analyst reports.

Did you examine analyst reports in the period following the July 22nd statement to see if they referenced the July 22nd statement?

A.    Again, I think the answer is of course not.

38 (Pages 146 - 149)

Page 150

D. Tabak, Ph.D.

Q. For the same reason?

A. Correct.

Q. So I want to try to understand why that wouldn't have been important to you in this case.

So you'll recall that the First Circuit decision finds that there is something different about the July 22nd statement as compared to the other misstatements that it evaluated, correct?

A. You're calling them misstatements as opposed to alleged misstatements, but yes.

Q. Can I actually re-ask the question? Take a step back.

There were a number of alleged misstatements in this case, correct?

A. Correct.

Q. And the First Circuit dismissed the case with respect to all but the July 22nd alleged misstatement, correct?

A. Correct.

Q. And in doing that, the First Circuit distinguished the July 22nd

Page 151

D. Tabak, Ph.D.

statement as being different, correct?

A. For legal reasons, I assume, yes.

Q. Okay.

As an economist, you obviously read the First Circuit decision, we talked about it earlier, what is your understanding, I know you're not a lawyer, of what distinction the First Circuit made as between the July 22nd statement and the other statements that were dismissed?

MR. HORNE: Objection.

Falls outside the scope of expert testimony.

A. I would have the review the First Circuit opinion before I answer that. I don't recall the specifics of why they distinguish the all data statement from the others at the moment.

Q. At a high level, do you have a recollection of why the First Circuit came out differently on the July 22nd statement?

A. I'm not sure. I would want to see the First Circuit opinion before

Page 152

D. Tabak, Ph.D.

offering an opinion on that.

MR. HORNE: Same objection.

MS. SOLOWAY: Okay.

I'm going to get it for you because this isn't a memory test. Well, sometimes it's a memory test.

We'll do this and then we'll take lunch.

What are we up to? Eight?

MR. THAU: Mm-hmm.

(Whereupon, Exhibit 8 was marked for identification.)

MS. SOLOWAY: So I'm handing you Exhibit 8, which is the First Circuit decision.

(Witness reviews document)

MS. SOLOWAY: I can help you, but I'm not telling you can't review the whole thing.

THE WITNESS: Understood, but it would be helpful to tell me where to look.

MS. SOLOWAY: If you would like to look at page 20, for example --

Page 153

D. Tabak, Ph.D.

THE WITNESS: Okay. I don't see any reference to the other statements on page 20.

BY MS. SOLOWAY:

Q. I think maybe if you read that whole paragraph you'll see -- and again, I'm not putting words in your mouth, but at the end of the paragraph, they say: We simply assume arguendo, that the remaining statements are misleading and they proceed to see enter.

Do you see that?

A. I do see that.

Q. Okay.

So they're assuming without finding that the other statements are misleading.

But if you look at the top of the paragraph they talk about the all data statement.

Do you see that?

A. I do.

Q. Okay.

And they say: It logically

39 (Pages 150 - 153)

Page 154

D. Tabak, Ph.D.

follows that whether -- then that whether all, underlined, of Biogen's data supported high-dose aducanumab or only some was "a significant part of the mix of information" a reasonable investor would have considered in evaluating Biogen as an investment given that FDA approval of aducanumab had not yet occurred when the statement was made, thus investors have adequately made that Sandrock's "all data statement" was a material misrepresentation or omission.

Do you have an understanding of what the First Circuit is saying about the all data statement?

A. Again, not giving a legal conclusion, but they're saying that the statement was material or important because it was something that would have been considered by investors.

Q. Okay. Then if you turn to page 18 ...

A. Sure.

Q. And again, feel free to look at as much of the decision as you want, but it

Page 155

D. Tabak, Ph.D.

says per Carbonite --

A. I'm sorry where are you?

Q. Page 18, first paragraph: Per Carbonite, the all data statement plausibly conveyed three facts -- I won't read them all. I'll give you a second to read it.

(Witness reviews document)

A. Okay.

Q. Okay.

So again, do you have an understanding of what -- of what, if anything, the First Circuit communicated -- the First Circuit decision said that the all data statement conveyed? Do you have an understanding of that?

MR. HORNE: Objection.

Goes beyond the scope of expert testimony.

A. I'm not giving a legal opinion, as we've said many times, but it says here there are three facts basically that Sandrock -- Mr. -- or Dr. Sandrock -- excuse me -- believed the data were all consistent, that Dr. Sandrock's opinion fairly aligned

Page 156

D. Tabak, Ph.D.

with the facts known, so versus that he has a belief. The second is that the belief was consistent with the facts he knew, and the third, that the facts he knew were kind of the type that one would expect someone in his position to know if making such a statement.

Q. Okay.

And so the question I have for you is whether you identified any market commentary in looking -- in preparing your opinion in this case that supported that investors, with respect to the all data statement as it's described in the First Circuit decision, actually understood those things from the all data statement?

MR. HORNE: Objection.

Goes beyond the scope of expert testimony.

Calls for a legal conclusion.

A. Well, it's the type of thing that, you know, you wouldn't expect people to say, he said something I guess he believes it, or he said something, it's

Page 157

D. Tabak, Ph.D.

probably based on facts that he had available to him, and he said something, I'm guessing that he thought about it before he said that. You could say that about every statement that pretty much any corporate executive makes. But people don't just generally go around saying so and so said something, I guess they actually believe it.

Q. Hang on a second.

This says that the all data statement plausibly conveyed that Sandrock genuinely believed all of Biogen's data was consistent with needing to get to high dose aducanumab to benefit clinically.

Do you see that?

A. I do.

Q. Would you agree with me that that would be quite a statement if the chief medical officer of a company came out and said all data conveys -- sorry -- that Sandrock genuinely believed that all of Biogen's data was consistent with needing to get to high dose to benefit clinically, that would be a significant belief to

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 158

D. Tabak, Ph.D.

communicate, correct?

MR. HORNE: Same objections.

A. The belief that the data support the drug they're putting up for FDA approval?

Q. Well, I think there's a deference between -- would you agree with me that there's a difference between communicating that generally speaking we believe the data supports approval and saying all the data supports approval?

Those are two different things, correct?

A. Yes.

Q. Okay.

And you're not aware of any prior instance when anyone at Biogen communicated all the data supports approval, correct?

A. Well, I haven't looked, so I can't say that one way or the other.

Q. Okay.

You're not aware of any other statement in the second amended complaint

Page 159

D. Tabak, Ph.D.

where the plaintiffs point to a place where Biogen said all the data supports that you need to get to high dose aducanumab to benefit clinically, correct, before July 22nd?

A. I'm not aware of any other such statement before July 22nd.

MR. HORNE: Counsel, are you about to wrap up? It's been 15 minutes. You said ten minutes.

BY MS. SOLOWAY:

Q. So just to wrap this point up, you would agree with me that it would be a new piece of information for the chief medical officer of a company for the first time to say I believe that all of Biogen's data is consistent with needing to get to high dose aducanumab to benefit clinically?

That would be significant, correct?

A. First you said new, then you said significant.

Q. Let's do new first.

That would be new, correct?

Page 160

D. Tabak, Ph.D.

A. Probably new, yes.

Q. Okay. Now let's do significant.

That would be significant, correct?

MR. HORNE: Objection. Calls for speculation.

A. I would have to think about it.

Put it this way: If the market previously believed essentially that if you weight the data by how important it is, 98% of the data support this conclusion. Now he says all. Okay, goes from 98 to a hundred. That may not be that significant.

But if the truth is you should have said -- having spoken you should have said well, really it's only about 75, that might be significant.

So it depends how close to all the market was thinking before.

Q. Let's actually do the real facts here. Okay?

The real facts here, and I know you know the facts, right, are that Biogen

Page 161

D. Tabak, Ph.D.

declared futility on this drug, right? You remember that?

A. Yes, on the 301 and 302, sure.

Q. Okay.

And then they did a post hoc analysis of the results, correct?

A. Also correct.

Q. They disclosed that EMERGE was a successful study and that had met its end points, correct?

A. Yes.

Q. And they --

A. I have to keep the two straight.

Q. And they disclosed that ENGAGE was not a successful study and that it had not met its end points, correct?

A. Correct.

Q. The market fully -- the market also understood that when you go to the FDA with a clinical trial, phase three trial where one of your studies meets its end points and the other does not, that is generally not a good thing, correct?

41 (Pages 158 - 161)

Page 162

D. Tabak, Ph.D.

A.    We kind of wandered away from the all data about high dose adu, but yes.

Q.    But you agree with me that when you have a clinical trial where one meets its end points and one does not, this is not a good thing for the company, correct?

A.    Different than the high dose issue, of course that's not a good thing.

MS. SOLOWAY:  Okay.

MR. HORNE:  Counsel, this entire day you have been misleading the witness about what the statement says.

MS. SOLOWAY:  That's fine.  You can make your -- just say objection. You can just say objection.

MR. HORNE:  Stop misleading the witness, first of all.

MS. SOLOWAY:  I am not misleading this witness.  This witness could probably run circles around me. He has a PhD.  I don't think you need to worry about him.

MR. HORNE:  I'm not worried about him.  I'm worried about you

Page 163

D. Tabak, Ph.D.

trying to create a record in which you're going to use some little snippet --

MS. SOLOWAY:  Yeah, yeah, yeah.

MR. HORNE:  -- to create an impression that simply isn't true.

BY MS. SOLOWAY:

Q.    Okay.

So going back to the record before the all data statement is made, right?

So the market knows all the things that we just talked about, correct?

A.    Except -- okay.  I think I know which things we're talking about, yes.

Q.    Sorry.  We're talking about the declaration of futility, the fact that they're doing a post hoc analysis, the fact that EMERGE is a successful study, the fact that ENGAGE is not a successful study.

We're on the same page about that?

A.    The market knew all of those things.

Page 164

D. Tabak, Ph.D.

Q.    The market understood that all data, right, did not support the efficacy of adu at the high dose, correct?

A.    Wait a second.  Those studies were about adu in general.  My understanding is that Biogen then said when we re-evaluated this, we determined that actually at a high dose, it is supported.

Q.    That's not the question I'm asking, though.

The market understands that all the data does not support the efficacy of adu at a high dose, correct?

A.    I'm not sure you can make that statement because my understanding is, for example, one of the things you talked about was the studies were stopped for futility. Was that based on futility at both a high dose and low dose or just an overall stopping because of -- without consideration of high or low dose.

Q.    You don't know the answer to that question?

A.    I thought -- I thought the

Page 165

D. Tabak, Ph.D.

answer was it was stopping just in general as opposed to doing the post hoc analysis that said oh, look, here the high dose is actually working.

So the futility studies, or the futility decisions were made not based on separating between high and low dose, then saying oh, wait, it actually is effective for a high dose would counteract the futility studies as being negative for high dose adu.

Q.    So the thing you don't know about is what was the market's existing knowledge of the efficacy of high dose adu as of July 22nd?

MR. HORNE:  Objection.

Q.    I just want to make sure we're on the same page.

A.    I know what the market was told by Biogen, and I also know the market didn't have all of the data.

Q.    Okay.

I'm just asking before July 22nd when the statement that's at issue

42 (Pages 162 - 165)

Page 166

D. Tabak, Ph.D.

in this case was made, you don't know what the market's preexisting base of information was on high dose adu.

Is that what you're saying?

MR. HORNE:  Objection.

A.    Its base of information or its conclusion?

I mean, the base of information I think we got, from the things you said, but also from the statements made by the company about high dose adu.

Q.    Okay.

Again, you don't know what the -- sort of the total mix of information on high dose adu was leading into the July 22nd statement.

Am I getting that right?

MR. HORNE:  Objection.

Calls for a legal conclusion.

A.    I don't have it sitting here, but I reviewed the complaint and I know generally what statements were made, but I can't tell you statement by statement what was said about high dose adu.

Page 167

D. Tabak, Ph.D.

Q.    Based on what you have reviewed, what is your understanding of what the market's preexisting conception was of high dose adu before the July 22nd statement was made?

A.    Again, I haven't looked at the market's perception but that's different from what you call the base of knowledge that they were given.  One is the information, the other is how it treated that information.

Q.    So answer both questions.  Why don't we start with the market's perception.

What was the market's perception?

A.    I haven't looked at that in particular.

Q.    Okay.

And then what were the given?

A.    The given, maybe it were four negative things that you mentioned over here, as well as Biogen's statement that by doing the post hoc analysis, it discovered that high dose adu was actually effective,

Page 168

D. Tabak, Ph.D.

very broadly speaking.

Q.    That's your understanding of what Biogen communicated to the market?

MR. HORNE:  Objection.

A.    Put it this way, effective enough to attempt to seek FDA approval.

MS. SOLOWAY:  Why don't we take a break?

THE VIDEOGRAPHER:  Time is 1:11 p.m.

We're off the record.

(Recess taken)

THE VIDEOGRAPHER:  Time is 2:04 p.m.

We are back on the record.

You may proceed.

BY MS. SOLOWAY:

Q.    Dr. Tabak, when we spoke earlier, we talked a little bit about the fact that some alleged misstatements were dismissed under the First Circuit ruling whereas the July 22nd statement survived.

Do you recall that?

A.    I do recall that.

Page 169

D. Tabak, Ph.D.

Q.    How, if at all, would your price impact analysis be different in the alleged misstatements in the second amended complaint had survived that First Circuit ruling?

A.    Well, again, my price impact analysis was just to look at whether there was some evidence of price impact and I looked at back end price impact.  So I could think about it, but at the moment, I don't think it would change.

MR. HORNE:  I'm sorry.  Is realtime working for everyone else?

MS. SOLOWAY:  It is for us, yes.

(Discussion off the stenographic record.)

BY MS. SOLOWAY:

Q.    Can I ask you to turn to what's Exhibit 2 of your report?

A.    So materials?

Q.    Yes.

A.    Okay.

Q.    Particularly, I think this

43 (Pages 166 - 169)

Page 170

D. Tabak, Ph.D.
analyst report starting at page 12.

A.    Some starting at page one.

Q.    So yeah, the list at page 12 is the list of the analyst reports used in Exhibit 14A, right?

A.    Yes.

Q.    Okay.

And these are analyst reports that are issued in November, correct?

A.    Of 2020, yes.

Q.    Okay.

Fair to say there are dozen of analyst reports on the list?

A.    That's right, yes.

Q.    I think you may have given this testimony earlier, but these are among the reports that you reviewed, correct?

A.    Correct.

Q.    Okay.

Do any of these reports mention or discuss the July 22nd statement?

A.    Not that I recall.

Q.    Just to orient you in time, I want to focus on the post Massie report

Page 171

D. Tabak, Ph.D.
publication.

So that happens, as we agreed earlier, the morning of November 4th?

A.    Correct.

Q.    After the Massie report is published, did you find any analyst who said, you know, this is inconsistent with what Biogen previously told us, that all data supported the efficacy of adu at the high dose or something of that ilk?

A.    I didn't specifically look for that. Didn't jump out at me, but I didn't specifically look for that.

Q.    So it wasn't -- I just want to make sure you understand this.

It wasn't relevant to your evaluation of the back end price impact to ascertain whether any analyst had commented that the Massie report was inconsistent with or different from something that Biogen had previously said?

MR. HORNE:  Objection.

A.    I wasn't looking for that, so it wasn't part of my analysis.

Page 172

D. Tabak, Ph.D.

Q.    Why weren't you looking for it?

A.    Well, first of all, analysts, I know that lawyers in a securities fraud case like to think that everyone is focused on whether or not something was a misrepresentation, but typically analysts are just looking going forward.  So they often don't bother to go back and say hey, is this inconsistent with any particular statement made at some point in the past.

Q.    Fair to say that there are cases where analysts upon receiving new information will say this is inconsistent with information the company previously provided, correct?

A.    Sometimes, yes.

Q.    That's not just to say that they're accusing the company of fraud.  I'm just talking about inconsistent information. That happens sometimes, correct?

A.    It can happen sometimes, yes.

Q.    Let's break that out.

In this particular case, did you find any instance in which an analyst

Page 173

D. Tabak, Ph.D.
after receiving the Massie report said this is inconsistent with prior statements Biogen had made?

MR. HORNE:  Objection.

A.    I don't recall, but again, I didn't look for that specifically.

Q.    Did you identify any instance where any analyst said wow, you know, Biogen previously told us that all data supported the efficacy of high dose adu and now we've got this Massie report, this is a big deal?

MR. HORNE:  Objection.

Is that a question, by the way?

MS. SOLOWAY:  It is.

MR. HORNE:  Okay.

A.    They certainly said things like now we've got this Massie report, this is a big deal.

I don't recall if they ever tied it back to a particular statement by Biogen before.

Q.    But you don't remember seeing that, correct?

A.    Yes, but again, I wasn't

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 174

D. Tabak, Ph.D.

specifically looking for it, so I can't say it's not there either.

Q. I'm going to -- you also -- we talked about how you looked at news stories that postdated the Massie report publication, right?

A. Correct.

Q. You read those news stories, correct?

A. Most of them I actually did not read. My staff did. All we did was look at basically whether or not certain words or phrases were mentioned.

Q. Okay.

So do you think your staff read them all or do you think they were mostly just making sure that they contained the words that you ran the word search for?

A. They were making sure that they contained the words. They didn't read the full stories necessarily.

Q. Are you able to point me to any news story that says that the Massie report contradicts earlier statements by Biogen?

Page 175

D. Tabak, Ph.D.

A. Again, because I didn't read them, I can't do that.

Q. Same thing for -- same question for the sort of all data statement. Are you able to point to any news commentary that after the Massie report is published says in sum or substance the Massie report is inconsistent with the company's prior July 22nd statement?

A. Same answer.

Q. So among other opinions in your report, you opine that the evidence strongly supports a finding of market efficiency for Biogen stock, correct?

A. Correct.

Q. And you also write -- and this is in paragraph eight of your report -- that the modern theory of market efficiency or efficient market hypothesis was developed in the 1960s, correct?

A. Yes.

Q. And you say that there have been some later refinements of theory, but the general outlines are still correct.

Page 176

D. Tabak, Ph.D.

That's in footnote nine, correct?

A. That's not in footnote nine.

Q. I'm sorry. Paragraph eight, note nine. Maybe I wrote it down wrong.

A. Footnote nine is in paragraph ten.

Q. Then I did. Hang on.

A. You mean footnote six?

Q. Yes. That's fine.

Thank you.

Okay.

So going back to these later refinements -- are you with me?

A. I'm with you.

Q. What are the later refinements of the efficient market theory?

A. As I mentioned over there, there are concerns about the risk entailed and trying to profit from expected pricing. Sometimes you can have movements that are slightly -- that have some expected movement on average, but are compensated for by the higher risk involved. So you can expect to

Page 177

D. Tabak, Ph.D.

make money slightly but it's riskier and therefore on a risk adjusted basis, it's not going to be a problem.

Q. So these are some of the academic studies that have been published since the efficient market theory was first put out in the '60s.

Am I getting that right?

A. Yes.

Q. One of the things I wanted to talk about with you today is the speed at which information is incorporated into the market and I want to start with like back in the 1960s.

How did news get disseminated into the market in the 1960s?

A. Everywhere from newspapers probably were pretty big. A lot of studies dealt with Wall Street Journal and so forth. Obviously, there could be news broadcasts, radio. Those probably were among the bigger ones.

Q. If a company was publishing, like, quarterly results back in the 1960s,

45 (Pages 174 - 177)

Page 178

D. Tabak, Ph.D.

how did people get ahold of their, like, SEC filings?

A.    You know, I'm not that old that I was getting the reports back then.

Q.    I know.  I thought you might know as an expert in the field?

A.    I assume you could actually go somewhere to try to obtain a physical copy, but obviously you didn't just download it from the internet.

Q.    Is it fair to say that as time progressed from the 1960s to today, it grew considerably easier for people to obtain -- for people in the market to obtain information?

A.    I think that's fair.

Q.    Okay.

And that includes because of the internet, correct?

A.    Yes.

Q.    Okay.

And so for folks that buy and sell stocks today, they have access to realtime information, correct?

Page 179

D. Tabak, Ph.D.

A.    Depends.  Some of it is realtime, some is close enough to realtime, sure.

Q.    Okay.

And for people who buy and sell stocks, they can see news within maybe seconds of publication, is that fair to say?

A.    Might depend on your internet connection, but that's fair.

Q.    In fact, isn't it true that there are -- there are pipelines that are hooked up would so that certain traders can get information milliseconds before others?

A.    Trading information, certainly.

Q.    Yeah.  And why are milliseconds valuable in that context?

A.    Because if you -- you generally expect that the largest potential profits will be made on the first couple of trades.

Q.    Right.  And when do those first couple of trades have to happen?

A.    Well, technically before any of the other trades.

That's all it means.  But if

Page 180

D. Tabak, Ph.D.

other people are going to trade in five minutes, you have to be less than five minutes.  If they're going to be one second, you have to be less than one second.  If they're going to trade in less than two milliseconds, you have to be less than two milliseconds.

Q.    Right.

There are folks out in the market that are generating profits by trading on the information advantage that's measured in milliseconds, correct?

A.    Well, usually that information is based on other trades, not on public news.

Q.    Meaning the speed at which they can -- they can execute trades, correct?

A.    Well, usually when you're talking about the milliseconds thing, you're generally talking about people are concerned with seeing that buy orders are coming in and -- or sell orders.  They're not generally looking at public news.  They're looking at what's actually happening with

Page 181

D. Tabak, Ph.D.

other traders and figuring out if buy orders are coming in, the price is going to go up.  So therefore, for example, I shouldn't be selling right now if the price is going to go up shortly.

Q.    But even the information -- your -- I just want to make sure I'm understanding this.  The information advantage in that context is the information might be trading orders, right, but you're saying that the value of having a millisecond or some milliseconds of information before everyone else can still be valuable in that context, correct?

A.    Correct.

Q.    And your report talks about the semi-strong form of efficiency, correct?

A.    Semi-strong form of market efficiency, yes.

Q.    Yup.

And the semi-strong form posits that the price of a stock rapidly incorporates all publically available information, correct?

46 (Pages 178 - 181)

Page 182

D. Tabak, Ph.D.

A. Correct.

Q. And that's the convention you're following in your report?

A. Yes.

Q. Okay.

And you say -- and this is also in your report, I think paragraph ten, that efficient markets should begin the process of reacting to news as soon as it is available, correct?

A. Yeah. Of course even efficient markets may take time to fully absorb the material information, but they should begin the process of reacting to news as soon as it is available. Yes.

Q. Okay.

And as soon as it is available is how long? Immediate? Almost immediate?

A. Well, to begin the process?

Q. Yes.

A. Basically almost immediate, as soon as market participants are able to review and process that information.

Q. Okay.

Page 183

D. Tabak, Ph.D.

And in the context of -- so that's beginning to process information, correct?

A. Correct.

Q. And then I think in paragraph -- sorry. In footnote eight, in the end of the footnote, it says: In an efficient market, the length of time that it takes for the market to fully incorporate news is indeterminate and depends on the nature of the news.

Do you see that?

A. I do.

Q. Okay.

So what do you mean by "it's indeterminate"?

A. In other words, we can't say that all news will necessarily be incorporated in a certain fixed period of time, such as one trading day, or one hour, or five trading days.

Q. Is that true universally? Meaning is there any news that you could give me an actual rule for, like, X type of

Page 184

D. Tabak, Ph.D.

news is always going to be incorporated within X amount of time?

A. No, I don't think there's any type of news where you could say that as a rule.

Q. What about if I gave you some leeway, like, you know, X type of news is going to be incorporated within X amount of time 90% of the time? I'm trying to figure out if there are any --

A. I don't know, it's just irking me that you're using X for news and the time.

Q. That is a fair criticism. We can change the question.

But what I'm trying to figure out is if what you're saying is that it's indeterminate, I'm trying to figure out whether there are any parameters you could put on this. So for a certain type of news, are you able to say based on, you know, scientific studies that have looked at this that, you know, certain types of information will be incorporated within Y minutes 90% of

Page 185

D. Tabak, Ph.D.

the time, for example?

A. Oh, well if you try to do a percentage -- first of all, you don't go to 100%, it is possible you'll find something. I doubt you'd ever find something with 100%. If you look for something, like, 90% of the time, there may be a study out there. I don't recall seeing any that say that. I mean, I've seen some that say that, you know, the bulk of the price movement occurs in the first -- you know, maybe it's like five, ten minutes, but you still see price movements in the following trading day.

Q. Okay.

A. That one is Busse, B-U-S-S-E, and Green, G-R-E-E-N.

Q. Would you agree that the market today incorporates information more quickly than it did when the efficient market hypothesis was developed in the 1960s?

A. I haven't looked, but I would certainly expect that to be true.

Q. Are there academic studies that have come out over the past decade, for

47 (Pages 182 - 185)

Page 186

D. Tabak, Ph.D.

example, that have examined how quickly modern work gets incorporated information?

A. I don't know if in the past decade. That literature used to be more popular. I think maybe in the '90s or so, but I think that -- I may be wrong, but I haven't seen as much literature on it recently, so none come to mind.

Q. Okay.

What is the most recent piece of literature that does come to mind? Is it that Busse and Green article?

A. I think Busse and Green was a while back. I mean --

Q. Again, no memory test. I'm going to give it to you.

A. You're going to tell me what the most recent article is?

Q. No, no. I'm going to give you the most recent Busse and Green so you don't have to guess what year it was.

A. I will guess 1985. How am I doing?

Q. Oh, you're so off. Maybe it's

Page 187

D. Tabak, Ph.D.

a different article. I'm going to give it to you. You tell me.

MS. SOLOWAY: Are we up to nine?

MR. THAU: Nine.

(Whereupon, Exhibit 9 was marked for identification.)

BY MS. SOLOWAY:

Q. Is that the article you were thinking of?

A. Yes. 2002. I should have stuck with the '90s and been closer. That is the article.

Q. Is it two or one? Oh, I see. it says 2002. At the top it says when it was accepted is 2001. You're right. 2002.

Just for the record, we just marked an article called "Market Efficiency in Real Time" by Busse, B-U-S-S-E, and Green.

Does this refresh your recollection about when the article was written?

A. Well, written through 2001. I

Page 188

D. Tabak, Ph.D.

don't know when they started, and as you say published in 2002.

Q. Okay.

And what's the gist of the finding of this particular study?

A. The gist is that prices start to respond within seconds and that you get an unbiased prediction of -- I think they did it by the end of the trading day, but you get that unbiased prediction within a minute or so, but they still say that the markets can take time, so give me a second here.

Yeah, I mean, the very last sentence of the article on page 435 is "although security prices do not fully reflect all available information instantaneously, the market is efficient enough that a trader cannot generate profits based on widely disseminated news unless he acts almost immediately."

Q. And that's the point you were making earlier, right? That, like, in order to generate profits, you really have to get

Page 189

D. Tabak, Ph.D.

your trade in before other people do.

Is that the same point?

A. Yes.

Q. I want to draw your attention to the question though of how long it takes for information to be incorporated. If you turn to page 416, and under the -- it's the third paragraph down, third full paragraph down that starts with: Summarizing the results.

And again, take your time. I know you're familiar with the article: We find that stocks discussed positively experienced statistically and economically significant price impact beginning seconds after the stock is first mentioned.

That's consistent with your understanding, correct?

A. Yes.

Q. And lasting approximately one minute.

Do you see that?

A. I do.

Q. And that's for positive

48 (Pages 186 - 189)

Page 190

D. Tabak, Ph.D.
experiences, right? Am I getting that right?

A.    It's not positive experience. They say --

Q.    Discussed positively?

A.    Yes. Experience is the verb not the noun.

Q.    Okay.
And then it says: The response to negative reports is more gradual, lasting 15 minutes, perhaps due to the higher cost of short-selling.
Do you see that?

A.    I do.

Q.    What do you understand these authors to be saying about how quickly information is incorporated fully into the stock prices based on this study?

A.    Well, so what they're saying is when you take a look at stocks that are featured on Morning Call or Midday Call, which at least back then was on CNBC, maybe still is, so that people know to expect something there and they're basically

Page 191

D. Tabak, Ph.D.
sitting around waiting for it, the response is fairly quick.

Q.    Okay.
Do you have any basis to dispute that -- again, depending on whether it's a positive news or negative news -- the full incorporation under those circumstances is one to 15 minutes?

A.    Well, let me take a look.
So there are a couple things. If you look at page 423 in the second full paragraph under subsection 3.2, speed of price response, last sentence is "however, we should caution that our relatively small sample size leads to higher standard errors, making it difficult to estimate the precise speed of a price adjustment and in particular when adjustment ceases."

Q.    Mm-hmm.
So is that a way of saying that there are exceptions when it can take longer for the market price to adjust completely than 15 minutes?

A.    Well, it's also saying that the

Page 192

D. Tabak, Ph.D.
15 minutes itself is tough to estimate, but in addition certainly there will be exceptions, some that take less, some that take more time.

Q.    Is this case, the Biogen case, an exception in your opinion?

A.    I think it very likely is, as we fount out -- there's no footnote in my report where I point out, there are two analysts, I believe, JP Morgan, and I can't remember the other one at the moment -- basically issued -- initially issued reports saying one thing and then issued additional reports saying that they were taking a deeper dive into the data. So that would be pretty strong evidence that it took longer than 15 minutes.

Q.    Okay. We'll come back to those reports, but I just want to make sure that you and I are on the same page.
Well, first of all, you mentioned earlier that -- that one of things about this particular study is that people knew that there was that midday show or

Page 193

D. Tabak, Ph.D.
afternoon show so they were, I think you used the word sitting around waiting for it.
Did I get that right?

A.    Yeah, I mean, there were definitely traders who were watching that show, waiting to see what would be recommended.

Q.    Okay.

A.    By the way, Raymond James is going to be the other one.

Q.    Okay.
Do you know -- about the Biogen case, do you know whether the folks that were keeping an eye on Biogen in advance of the advisory committee meeting were sitting around, waiting for the FDA briefing materials?

A.    Analysts may have been. I don't know if individual investors, you know, the broad-base investors who invest in whatever is hot were sitting around waiting for that.

Q.    Okay.
But this was not -- the release

49 (Pages 190 - 193)

Page 194

D. Tabak, Ph.D.

by the FDA of materials was not unexpected, correct?

A.    That is correct.

Q.    And sophisticated participants in the market knew were coming, correct?

A.    Correct.

Q.    This article was published 23 years ago.

Am I getting that right?

A.    Yes.

Q.    Do you have any reason to dispute that since this article was published, technology has further accelerated the pace at which the markets can disseminate information?

A.    I would not dispute that. Although put it this way, here they were talking about things on TV, so basically those recommendations were disseminated effectively in realtime to traders.

Q.    I wonder whether the method -- the speed at which people could place orders since that time has also gotten faster. I don't know if that's something you know

Page 195

D. Tabak, Ph.D.

anything about. Meaning if you were sitting in realtime waiting for the show to come on TV and you immediately decided to make an order, do those orders go through even faster now than they did in 2001?

A.    I would guess that at least some of them go through faster.

Q.    One of the economists who advanced the efficient market hypothesis was Eugene Fama, correct?

A.    Correct.

Q.    And you cite his work a few times in your report, correct?

A.    Also correct.

Q.    Okay.

And you think he is a very smart guy who knows a lot about efficient market theory?

A.    I would definitely agree with that.

Q.    Okay.

Have you read the amicus brief that he submitted with others in the Halliburton case?

Page 196

D. Tabak, Ph.D.

A.    I may have. I believe I have, but it's certainly been a while.

Q.    That's fair. I'll give it to you.

MS. SOLOWAY:  What are we up to, Charlie?

MR. THAU:  Should be nine.

THE WITNESS:  No.  Nine was the article.

MS. SOLOWAY:  Ten.  Thank you.

(Whereupon, Exhibit 10 was marked for identification.)

BY MS. SOLOWAY:

Q.    I just marked as Exhibit 10 the amicus brief submitted in the Halliburton case before the Supreme Court, and it looks like it's dated February of 2104.

Do you see that?

A.    I do see that.

Q.    Okay.

So it's something like 50 years or so after Professor Fama helped develop the efficient market hypothesis, right?

A.    Yes.

Page 197

D. Tabak, Ph.D.

Q.    If you look at page five --

A.    Okay.

Q.    No, it's starred page five, which is actually page four in the PDF if that helps you.

At the top, it says argument.

Are we looking at the same page?

A.    Yes.

Q.    In there -- and again, feel free to, you know, to look at how -- whatever you want to. It says the SSEMH -- what does that stand for?

A.    Semi-strong form of the efficient market hypothesis.

Q.    Thank you -- entails that the market price instantly or at least very quickly and fully incorporates all publically available information about the stock.

Do you see that?

A.    I'm sorry. Where are you reading from?

Q.    It's the paragraph that starts

50 (Pages 194 - 197)

Page 198

D. Tabak, Ph.D.

with the key point. It's about two-thirds of the way down the page. Do you see the paragraph that starts with the key point?

A. You mean at the very bottom of page?

Q. You're on the page that says argument on the top? Right?

A. It says argument not quite at the top, but yes.

Q. Oh, okay. You know what? We must have different printouts.

Do you mind if I come around and point to the right section --

A. I see the paragraph starts the key point, if that's what --

Q. Yeah. Great. Sorry. Apologies.

What page is that on for you, sir?

A. Well, it starts on the end of page four and carries over to page five.

Q. I'm going to read a sentence out loud. Tell me if you're following along: The SSEMH entails that -- do you see

Page 199

D. Tabak, Ph.D.

where I am?

A. Yes.

Q. The market price instantly or at least very quickly and fully incorporates all publically available information about the stock.

Do you see that?

A. I do.

Q. Do you agree with it?

A. I want to be very careful as to what you're saying there, because I know what they said in the headline of Section 2, which on my version is page two, and they talk about the modest assumption that securities prices generally respond to information reasonably promptly in a predictable direction.

Q. I'm really just asking whether you -- again, feel free to read as much of the document as you need for context, but I want to know whether we agree that Professor Fama is a very smart guy.

Do you agree with the sentence: The SSEMH entails that the market price

Page 200

D. Tabak, Ph.D.

instantly, or at least very quickly, and fully incorporates all publically available information about the stock?

Do you agree or disagree with that sentence?

MR. HORNE: Objection. Vague.

A. Putting these two things together, by fully, the way the literature works and what I believe they're saying here is basically that it does so in an unbiased manner, not that there would be no additional price movements as long as they can't be predicted.

So when economists would talk about fully reflecting all the information, it would mean that we can't say that the information would have in the future a positive or negative effect. It is fully incorporated now, but there still can be additional volatility as the market continues to react.

Q. So I just want to make sure -- forgive me, but I'm not sure I understand

Page 201

D. Tabak, Ph.D.

what you're saying.

Are you saying that yes, the market fully incorporates information quickly, but that then you can continue to have price reactions or volatility after the information is fully incorporated? Is that what you're saying?

A. Yes, by fully incorporated, it means that the market is giving its best estimate of all of the information at that point in time. It's not just taking some of the information that can be incorporated and ignoring other information that can be incorporated that quickly.

Q. Okay.

So then what is the volatility that follows? Is that a reaction to the price movement then?

A. It is the -- it's the market continuing to understand the information. For example, if you said our earnings are and you put out a tough algebraic equation, I don't think anyone would say -- or maybe at least not until artificial intelligence

51 (Pages 198 - 201)

Page 202

D. Tabak, Ph.D.

comes along, would say that the market would get the correct answer instantaneously just because we have the efficient market hypothesis. The market can't operate more quickly than people or machines can actually process information.

What they're saying is that the market will make its best estimate and therefore it has fully incorporated that information at that point, but there could be additional movements as long as you cannot predict in advance which way those additional movements will go.

Q.    When you have those additional -- so I think I understand what you just said. So the market will make its best guess and that we agree happens almost instantly or quickly according to Dr. Fama, right?

A.    Yes.

Q.    And then when the market then does that additional processing that you're talking about, what is the market taking into account?

Page 203

D. Tabak, Ph.D.

A.    So it can be various things. For example, one of the factors that we look at in market efficiency in securities fraud cases is analyst coverage.

Analysts certainly do not put out reports on information in the first 15 seconds after an announcement is made. If you're going to accept, as I believe courts in general accept, that analyst reports add to market efficiency, you've got to at least wait until the analyst reports are published before the information can be fully incorporated in the sense of not having additional price movements.

Otherwise, you know, if all the price movements end within 15 seconds, I just don't see how it could be possible that analyst reports add to market efficiency.

Q.    Aren't the market investors waiting for analyst reports reacting and making investment decisions based on the analyst's opinion and assessment rather than the information itself?

A.    But it's the analyst opinion

Page 204

D. Tabak, Ph.D.

and assessment of that information. Right? If we believe that analyst reports are a good Cammer factor, it's because they help the market incorporate news.

Q.    See, I always thought that the reason analysts were important to Cammer was because analyst coverage shows information about how widely watched the stock is, meaning people are really looking, and incentivized to find information, find it quickly, and then make trading decisions based on it. That's why I always understood that analyst coverage was relevant to market efficiency. What you're saying is that no, no, you actually can't fully -- the market can't actually fully incorporate new information until the analysts have spoken on it. That's what I hear you saying?

A.    I've not said that as a general rule. I'm saying that sometimes the analysts help the market incorporate information. You're basically saying that analyst coverage is correlated with market efficiency, it is a proxy as a means of

Page 205

D. Tabak, Ph.D.

determining whether a security trades in efficient market, not because the analysts are doing anything really to help investors, but they're existence seems to show that. I think that's what you're saying.

Q.    Well, I thought that was -- I actually thought that was what Cammer analyst factor was looking at.

Do you disagree?

MR. HORNE:  Objection.

Calls for a legal conclusion.

A.    Well, we can actually see in my report --

Q.    Yeah, when you look at the Cammer factor in your report, you're really just counting up how many analysts and you're looking to make sure there's robust coverage over the relevant time period. You're not checking to see what length of time it is between a new development and a report, correct?

A.    No, but what Cammer actually said, and this is on page nine of my report, is that the existence of such analysts would

52 (Pages 202 - 205)

Page 206

D. Tabak, Ph.D.

imply, for example, that the reports -- and there they're actually talking about audit reports -- were closely reviewed by investment professionals who in turn would make buy-sell recommendations to client investors.

Q. Mm-hmm.

A. So if the buy-sell recommendations didn't matter, then that quote wouldn't make sense. The quote itself is suggesting that the buy-sell recommendations by the analysts influence client investors and therefore aid in market efficiency. So it's not just correlation, it's causation.

Q. Okay.

So let's put Cammer, which is a legal decision, to the side, because I don't think we should have a fight about that. Doesn't seem worth our time.

I'm just trying to understand as a matter of the economic literature, are there articles that you can cite, for example, for the proposition that the time

Page 207

D. Tabak, Ph.D.

that it takes analysts to get out their reports and then for the market to reaction should be taken into account in terms of figuring out how quickly information is fully incorporated into the stock price?

A. I wouldn't say anyone has tried to do that. But I think the general idea that it can take time for the market to settle down and not have any more volatility has certainly been studied in the literature.

Q. Okay.

Other than -- just to go back to the volatility point, other than analysts putting out reports later that might then cause, you know, more people to react, what else contributes to that volatility after the market has that initial period of incorporating the information?

A. I think it depends on the type of information. So the less standard the information is, the more likely it is that the market will take time to absorb that information and, you know, reach a more

Page 208

D. Tabak, Ph.D.

complete understanding of all of the effects and value of that information.

Q. So can you give me an example other than analyst coverage that would fall into that category?

A. It's literally working through and reading information, a 10-K is, you know, more than just the top line earnings number. So if something is buried within a 10-K it can find a long time to find that and understand its importance.

Q. Are you assuming that investors actually sit and read new information from beginning to end, like, in order and process it, like, over a multi-hour period as they start to read and finish reading?

A. I think, well, obviously, I think people some do read from beginning to end. In fact, that's what analysts often are paid to do so that individual investors don't have to do that. I think we saw, as I mentioned with JP Morgan and Raymond James, they put out reports saying one thing, and then they said we did a deeper dive, we've

Page 209

D. Tabak, Ph.D.

read more information, and here is our new conclusion.

Q. We'll come back to that, but any other -- I mean, I just want to make sure I know what academic literature or studies there are that are on this topic. Is there anything else you can point me to that would support the proposition that after this initial period where the market reacts to information that the subsequent volatility in the stock price is caused by some other combination of factors? I just want to make sure I know what you're looking at and what we're talking about. Any other factors you can think of and any literature?

I can do it in two questions. Why don't we just start with, any other factors you can think of?

I'm a fast talker, I make everyone --

A. I think it's just people processing it, trying to figure out what the information means. It may be talking to others who may have more information out

53 (Pages 206 - 209)

Page 210

D. Tabak, Ph.D.
there, internal consults. If you want literature, I can't remember, but you can find one -- unfortunately the actual article is not mentioned, but if you go back through the expert reports in Gelt, G-E-L-T, in versus Co-Diagnostics earlier this year, one is cited for the proposition of a multi-day price reaction, and I'll certainly give you the one by Krivin, K-R-I-V-I-N, I think, or E-N, et al, about the length of time it takes for a market to react. And you may have seen that one if you look through my work.

Q. I think you're giving me too much credit.

I'm going back to the Fama sentence. So I just wanted to make sure we close this out. The sentence that I read to you before: The SSEMH entails that the market price instantly or at least very quickly and fully incorporates all publically available information about the stock.

You do agree with that

Page 211

D. Tabak, Ph.D.
statement?

A. I think if fully incorporates meaning giving its best initial estimate, yes.

Q. Okay.

And then in the next sentence, it says: It does not tolerate even modest lags or another anomalies.

Do you agree with that statement?

A. Again, if we're talking about the best estimate, yes.

Q. Okay.

So now I'm not sure we're talking about the best estimate, right?

A. Well, I think we are, but I also want to point out the very next sentence. Next paragraph. Professional -- professional economists have debated for decades the extent to which the security markets actually conform to the SSEMH. Excellent work has been done on both sides of this debate indeed the Nobel Committee awarded last year's prize in economics to

Page 212

D. Tabak, Ph.D.
both Eugene Fama, the "father" of the efficient markets hypothesis, and Robert Shiller, one of that hypothesis's leading critics.

So the pure theory might say absolutely instantaneously, but the question is always the degree of market efficiency, and no one believes that the pure theory is absolutely true.

Q. Okay.

Well, I think what you told me earlier is that the pure theory is true in a majority of cases, but there are exceptions.

Is that right?

MR. HORNE: Objection.

A. Well, when you -- the pure theory may be a good, I mean, approximation. You know, if you want to take the most extreme pure theory, why not a millisecond rather than 15 seconds or something like that. I don't believe anyone believes it's that pure, but I think it is a good approximation. The idea that the bulk of the price movement occurs very quickly in

Page 213

D. Tabak, Ph.D.
most cases is true.

Q. Okay.

And very quickly, would that be like the 15 minutes from the Busse Green study that we looked at earlier?

A. For cases where you got a lot of traders watching CNBC, probably, yes.

Q. And what about cases where you've got a lot of market analysts watching for an FDA briefing book?

A. Well, again, if the market analysts are simply analysts and not trading, you've got to wait until they put out that their reports.

Q. What about the actual investors themselves? You don't think in this case that Biogen investors, like sophisticated institutional investors knew that the briefing materials were coming?

A. I think some of them did, sure.

Q. And they were looking for them, correct?

A. Yes.

Q. And within minutes of them

54 (Pages 210 - 213)

Page 214

D. Tabak, Ph.D.

Q. being published there were also additional news sources that reported that they had been published, right?

A. I believe so.

Q. So the market was alerted immediately that the briefing materials were available?

A. Yes.

Q. So even if you hadn't been looking, if anyone had a Bloomberg, they found out, correct?

A. That assumes that they're all looking at Biogen on their Bloomberg machine.

Q. Well, I mean, if you're an investor in Biogen, wouldn't you -- isn't that how traders operate, right, they, like, set their machines to tell them about things they would want to know about?

MR. HORNE: Calls for speculation.

Q. Do you know?

A. First of all, you said everyone who has a Bloomberg --

Page 215

D. Tabak, Ph.D.

Q. Let me rephrase.

A. Not all investors in Biogen --

Q. Investors in -- investors -- many sophisticated investors in Biogen have set up news sources to ping them when new news comes out, correct?

A. I would assume that to be the case.

Q. Okay.

And so you have every reason to believe that here, they were pinged, correct?

A. At least certain investors were pinged in one way or another, sure.

Q. Okay.

And then the sentence: It does not tolerate even modest lags or other anomalies, what does that mean to you?

A. It means that the theory, again, does not tolerate anything like that. I would say that almost no one believes the theory. It's that pure and that accurate.

Q. So is it -- I just want to understand, again, if there is a lag or an

Page 216

D. Tabak, Ph.D.

anomaly, is that the exception?

A. I think it depends on how long -- are you going to call 15 minutes or 15 seconds a lag? In that case, that would not be the exception generally. That would probably be fairly common for there being at least some degree of lag.

Q. Let's say 15 minutes is like the rule, based on the Busse and Green article.

I mean, I'm asking, you know, if you're talking about lags of hours for example, is that the exception?

A. When you say -- are we talking about the beginning or the end of the price reaction?

Q. The end of the price reaction.

A. Oh, no, I wouldn't say that was the exception. That's fairly common.

Q. What about days?

A. To what type of news? I would say to some news, it's probably more of an exception. To big news in the sense of having a large impact on the stock price,

Page 217

D. Tabak, Ph.D.

it's often unexpected, it may not be an exception.

Q. And is there any objective way to assess that? I mean I feel like -- you just told me that, like, sometimes it's one thing and sometimes it's another thing. How do we objectively approach this so that we understand what's usual, what's customary when it comes to lags or anomalies?

A. I am surprised that after everything you've picked up of mine you have not shown me -- let me get it for you. It'll make life easier -- my working paper from 2003, which you'll find as the third entry on page 27 of Exhibit 1 of my report.

Q. Okay.

Would you like a copy of that?

A. I thought earlier you said I gave you too much credit for believing that you'd read it.

MS. SOLOWAY: What are we up to? Exhibit 11, I think.

THE WITNESS: Yes.

(Whereupon, Exhibit 11 was

55 (Pages 214 - 217)

Page 218

D. Tabak, Ph.D.
marked for identification.)

BY MS. SOLOWAY:

Q.   Is there something you want to refer me to in Exhibit 11?

A.   I haven't looked at this in a while, but I think at the end there's somewhere, we have some analysis.

MS. SOLOWAY:  Charlie, what tab is that in my binder?  Do you know?

MR. THAU:  Should say on the folder.

(Witness reviews document)

A.   If you turn on the bottom of page sixteen, table two, I have a table there, an average length of event windows for three groups of assumptions.  In this case, we're talking about an announcement that ends a class period, so it would be the middle row, and depending on the assumption used, the average length is small, it's about 1.1 trading days, and long is rounded up to 2.6 trading days, and those are of course averages, meaning that some are smaller, some are larger.

Page 219

D. Tabak, Ph.D.

Q.   This is a study that examines the amount of time that you believe it takes the market to react to certain type of announcements, correct?

A.   Correct.

Q.   And one of the categories that you've included are announcements that are at the ends of class periods, correct?

A.   Correct.

Q.   So these are cases that have been selected by the plaintiffs for to bring, correct?

A.   Correct.

Q.   Okay.
Did it ever occur to you that maybe the plaintiffs' bar selects cases based on stock price movements?

A.   Of course, but not necessarily the length of the stock price movement as opposed to the size of the stock price movement and often the direction.

Q.   I disagree.  I think they pick them based on both.
Is there anything other than

Page 220

D. Tabak, Ph.D.
that study that you can point me to?

A.   I would have to take a look.  There's one -- I can't remember the name, but if you look at an opinion in Gelt versus Co-Diagnostics, it cites an article.  I think it was in the Journal of Financial Economics.  Unfortunately, it doesn't mention the name of the article, but if you pull the expert report in that case that it's citing, you can find that one --

Q.   Okay.

A.   -- and it talks about something leading to more than one day of price reaction.

Q.   I just want to be really clear.  You would agree with me that a two-day price reaction is an exception, not the ordinary event to new news, correct?

MR. HORNE:  Objection.

A.   I don't like the word exception.  I would say it's in the minority, but not an exception in the sense that it is violating a rule any way.

Q.   What about a three-day --

Page 221

D. Tabak, Ph.D.
three-trading day period of incorporation of news?  Would that be an exception?

A.   Again, I wouldn't call it an exception.  I think it's in the minority, but it's not as if it's violating any type of rule.

Q.   Okay.
One of the things that you look at in your report is the institutional holdings by institutions for Biogen common stock, correct?

A.   Institutional holdings by institutions, yes, indeed.

Q.   And you find that there's a significant percent of shares that are owned by institution investors, correct?

A.   Yes.

Q.   And what is the significance of that?

A.   Well, this is, again, relates to one of the Cammer factors, the third Cammer factor describes market makers and arbitrageurs, arbitrageurs are, you know, somewhat ill-defined, but in the sense of

56 (Pages 218 - 221)

Page 222

D. Tabak, Ph.D.

looking for them the data and the proxy for those are sophisticated investors that are presumed to be willing to trade based on -- trade large amounts based on news. So we use reporting institutions as a proxy for that.

Q. Okay. And why? Why does a high proportion of institutional investors tell you something about market efficiency?

A. Because it suggests that a substantial portion of the holders of the stock are those that would have the ability and likely the incentive to pay attention to news.

Q. Institutions as opposed to retail investors are viewed as more closely following new developments.

Am I getting that right?

A. I think that's fair. I mean, put it this way, I own 100 shares of Biogen stock, I'm really not going to sit by, you know, the computer waiting for something to pop up.

Q. Are you familiar with the study

Page 223

D. Tabak, Ph.D.

by -- and I might be mispronouncing it -- Boehmer and Kelly?

A. Not offhand.

Q. It's called Institutional Investors and the Informational Efficiency of Prices.

Does that sound familiar?

A. Doesn't ring a bell.

Q. Okay.

I want to -- okay, I know you have it in front of you, but I can't remember what exhibit it is. Can you find the plaintiffs' brief?

A. Sure. It's Exhibit 7 for the record.

Q. Thank you. I'm going to have you look at pages four and five.

Ready?

A. Sure. Yes.

Q. At the bottom of page four, it says: These facts delayed the market's assessment of the Massie report, contemporaneous analyst reports show as much.

Page 224

D. Tabak, Ph.D.

Do you see that?

A. I see that.

Q. Is it your understanding that the plaintiffs are saying their theory in this case is that the market's assessment of the Massie report didn't start right away?

A. Well, I'm not going to say what they're saying, whether delays means the start or the end, but if you look after or the next sentence says: Some analysts discounted the report, some analysts gave the Massie report little credit. So that doesn't sound like they're saying that the start it was delayed, if you're -- I mean, you're certainly assessing that the Massie report if you're discounting it or giving it little credit.

MR. HORNE: Objection. Goes beyond the scope of expert testimony.

Q. You would not -- you're not suggesting that the market didn't immediately begin processing the Massie report when it was released on November 4th,

Page 225

D. Tabak, Ph.D.

correct?

A. Correct. Because you said begin processing.

Q. Okay.

So you and I are on the same page, that when the Massie report was released on the morning of November 4th, the market would have begun processing it?

A. Yes.

Q. Just like as other information was released by the FDA on the morning of November 4th, the market would begin processing it?

A. That would be my view, yes.

Q. Okay.

Turn to the bottom of page 18 of the plaintiffs' brief.

A. Okay.

Q. Okay.

The plaintiffs say that there is contemporaneous evidence that markets incorporated the good news first, the FDA supports the application, but took far longer to incorporate the bad news, the data

57 (Pages 222 - 225)

Page 226

D. Tabak, Ph.D.
is much worse than Biogen had led on.

Do you see that?

A.    I do.

Q.    Okay.

So do you understand the plaintiffs to be saying that the market did not incorporate the Massie report on November 4th?

MR. HORNE:  Objection.

Goes beyond the scope of expert testimony.

A.    Well, it says here far longer to incorporate.  It doesn't say far longer to begin to incorporate.  I'm not going to debate whether -- exactly how to read that language, or how accurate, inaccurate, or whatever it is, but it certainly does not seem to distinguish between begin and -- to incorporate or fully incorporate.

If you look at the next sentence, says "That's exactly what the JP Morgan and Raymond James analysts did, publishing glowing articles during trading on November 4th and after trading closed, or

Page 227

D. Tabak, Ph.D.
on November 5th, publishing more sober reports that discussed Dr. Massie's analysis."

So the reader can interpret that however they want.  I don't think I have any particular expertise on that.

Q.    Let's just take a step back.

You would agree with me that markets -- that markets, when provided both good news and bad news simultaneously, markets begin processing them both, correct, immediately?

A.    Yes.

Q.    Okay.

And there's no rule that good news gets processed -- let me start with -- there's no rule that good news begins to get processed before bad news, correct?

A.    There is no such rule.

Q.    Okay.

And so to the extent that the plaintiffs are suggesting that the market begins to process good news first and then moves on to the bad news, that's not

Page 228

D. Tabak, Ph.D.
supported by economic principles, correct?

A.    To the extent they are suggesting that, and I'm not saying whether they are or not, I would say that economic principles do not support that.

Q.    Okay.

And then on the concept of how long it takes the market to incorporate information, right, what if any evidence is there that the market incorporates good news more quickly than it incorporates bad news?

MR. HORNE:  Objection.

A.    I don't know if any -- if that is a general principle.

Q.    So you can't point me to economic literature that says markets fully incorporate good news more quickly than they fully incorporate bad news?

A.    Wait a second.  Since you brought up --

Q.    The Busse article?

A.    The Busse article, literally that one says that good news -- says "we find that stocks discussed positively

Page 229

D. Tabak, Ph.D.
experience a statistically and economically significant price impact beginning seconds after the stock is first mentioned and lasting approximately one minute.  The response to negative reports is more gradual, lasting 15 minutes, perhaps due to the higher cost of short-selling."

Q.    Right.

A.    So this is the article you brought up.

Q.    No, no.  I know.  What is your understanding of what it means to say perhaps due to the -- what was the word -- the highest cost of short-selling?  They're saying that there are some costs to -- there's some costs that are affected when -- implicated when an investor has to sell that aren't implicated when an investor is buying, correct?

A.    No.  They say short-selling, not selling.

Q.    So in this case, short-selling has some costs that are implicated that wouldn't be implicated by buying, correct?

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 230

D. Tabak, Ph.D.

A.    Yeah, although I think it's more -- I think they're referring to the time costs as opposed to necessarily the financial costs.

Q.    Can you explain what that means?

A.    Sure.  So in order to sell short, you're selling shares that you don't have.  So technically, not sure it's always true, your broker is supposed to find those shares in another account, borrow them from that other account, place them in your account and then sell short.  So there's additional processing work of finding those shares and moving them over and basically putting an I.O.U. in the account from which the broker has borrowed the shares.

Q.    Okay.

So you would say that's sort of, like, an administrative thing that gets done that creates a time delay.

Am I getting that right?

A.    I wouldn't use administrative. I'm not sure what the other word is, but it

Page 231

D. Tabak, Ph.D.

is a process that has to be done, at least in theory.

Q.    Okay.

So putting aside this process issue, are you aware of any economic principle that would stand for the proposition that good news and bad news that are released at the same time take different amounts of time to be incorporated?

A.    Not as a general rule.

Q.    So the plaintiffs theory in this case is that the decline on November 5th represents the market's reaction to the Massie report.

Is that correct?

A.    I think that may be one way of doing it.  I don't know if they are committed to saying that is the response to the Massie report, as opposed to -- well, first of all, I think they're certainly suggesting that they're keeping their options open as whether the ninth or part of the decline on the ninth would be included. And I don't think they've ruled out the idea

Page 232

D. Tabak, Ph.D.

that some of that decline would be observed on November 4th.

Q.    Fair point.

I'm going to ask you to put the ninth to the side for a moment and ask you to put the fourth to the side for the moment.

Okay?

A.    I will, but again, if doing that makes any answer misleading, I will have to bring them back in.

Q.    Okay.

We talked earlier about the fact that you identified in your analysis an abnormal return on the fifth, correct?

A.    Correct.

Q.    And you also said that we would have to do some work on that abnormal return to identify the amount of artificial inflation that may be included within that number, correct?

A.    Assuming we don't just assume that that is simply the artificial inflation, if we don't make that pure

Page 233

D. Tabak, Ph.D.

assumption, then yes.

Q.    And is it your opinion that some portion of the abnormal return on November 5th reflects the market incorporating the Massie report?

A.    So as I said earlier, I've done at least a preliminary analysis that identifies a negative price movement related to the Massie report.  I've not said, this is what I testified to you earlier, whether that's all on the fourth, all on the fifth, or split between the two, for example.

Q.    So this is, like, where I'm struggling.  Because I'm trying to understand what the plaintiffs' theory of price impact is.  And I understand the plaintiff's position that they don't have the burden, but I still want to understand their theory.

Right?

If the plaintiffs at the moment are not seeking price impact for the fourth, and they are claiming that there is price impact on the fifth, I'm just trying to

59 (Pages 230 - 233)

Page 234

D. Tabak, Ph.D.

figure out where I can find that? Right? So is it some portion of the abnormal return on the fifth is attributable to the Massie report?

Is that the argument?

MR. HORNE: Objection.

A.    Okay. So you're asking for plaintiffs' argument --

Q.    Yes.

A.    -- or my argument? If you're asking for plaintiffs' argument, you can read what they've written as well as I can.

Q.    Then I'll have yours.

A.    My argument is by looking at -- as I've done here, analyst reports that mention the Massie report or do not, I can find a difference and that is the impact of the Massie report. I have not, as I've said before, purported this point to say whether all of that's on the fourth, all of that's on the fifth, or whether it's split between the two.

Q.    Okay.

And on the fourth, you have not

Page 235

D. Tabak, Ph.D.

identified a methodology, if I'm getting this right, that would suss out -- because the stock price went up that, day correct?

A.    Correct. It did.

Q.    And your theory is that there could have been an amount that the stock would have gone up by more but for the Massie report, correct?

A.    Correct.

Q.    And have you identified a methodology that would help you identify that amount?

A.    Again, I've identified an amount, at least preliminary, simply not allocated it between the fourth and the fifth.

So that is more than I think is typically done by plaintiffs at this stage. I've said I can essentially value the information. I'm just not telling you over these two days at the moment how to split that value up.

Q.    Okay. And ...

Okay. We'll come back to that.

Page 236

D. Tabak, Ph.D.

MR. HORNE: Is this a good time to break, Counsel?

MS. SOLOWAY: Give me one second.

MR. HORNE: Sure.

MS. SOLOWAY: Yes, let's take a break.

THE VIDEOGRAPHER: Time is 3:10 p.m.

We're off the record.

(Recess taken)

THE VIDEOGRAPHER: Time is 3:24 p.m.

Back on the record.

You may proceed.

BY MS. SOLOWAY:

Q.    Have you had a case before where the plaintiffs allege that both good news and bad news was announced at the same time and have you had to disaggregate the good news from the bad news?

A.    I must have.

Q.    Does any case in particular -- case come to mind?

Page 237

D. Tabak, Ph.D.

A.    I think some with two pieces of bad news -- I submit there must be some with good news and bad news, but just at the moment, none to come mind.

Q.    I'm focused on November 4th, right, where we agreed that there was a stock price increase, correct?

A.    Correct, if you -- yes.

Q.    And you were saying earlier that there could be some additional increase that would have happened but for the negative news in the Massie report, correct?

A.    Correct.

Q.    How would you approach calculating that?

A.    Well, again, I've done a preliminary analysis that you've seen in my report that talks about the effect of the Massie report. What I haven't done is divided that between fifth -- November 4th and November 5th. But I think the way to do it is to essentially value the information in the Massie report.

Q.    And how would you do that?

60 (Pages 234 - 237)

Page 238

D. Tabak, Ph.D.

A.    I think the way I've done it, by looking at analyst reports that mention Massie versus those that don't and comparing the changes in their price targets is one way to do it, may not be the only way, because I'm not here to give a damages analysis at this point, but I think that is certainly one possibility.

Q.    Okay. And --

A.    Sorry. I do have another one that I didn't mention earlier in the context of what information could be disclosed earlier, you might have what I call an FDA expert or something like that would say basically, you know, without the Massie report, let's say the probability of approval, and I'll make up numbers, is 60% with the Massie report, it's 40%, therefore the difference is 20 percentage points, and you could apply that to the value of adu.

Q.    And if you were going to do that -- I've had stock drop cases where the plaintiffs allege that the stock declined for two consecutive days as a result of bad

Page 239

D. Tabak, Ph.D.

news.

Are you with me? I assume you've had cases like that too?

A.    Yes.

Q.    Okay.

How do you normally calculate the damages in a case like that? Do you look at the close before the news comes out to the close on the end of the second day or -- I'll pause there.

Is that how you would normally calculate the decline?

A.    Well, overall. I mean, if there's no confounding news, for example, we say -- you'll say part of the inflation came out on the first day and part of the inflation came out on the second day.

Q.    But for purposes of assessing damages, I'm just trying to figure out do you look at -- do you look at one starting point and one ending point, meaning the close right before the news comes out and then the close at the end of the second day, or do you generally do close to close and

Page 240

D. Tabak, Ph.D.

then close to close and calculate two different days and sum them?

A.    The latter.

Q.    Okay.

And why do you do it that way?

A.    Well, the only reason is that what if you have someone who sold after the first day decline but not the second day decline.

Q.    I see. So you want to -- that's a good point.

So you want to be able to separate the damages from day one and day two?

A.    Right. Because you may have had people who sold -- let's pretend to make life easy. Think of it as overnight between day one and day two.

Q.    Okay.

And in this case, if you performed that analysis, again, without taking out confounding information, you would have a positive stock price increase on the fourth and it would end up being --

Page 241

D. Tabak, Ph.D.

and you would add -- and you would add that to a negative stock price decrease on the fifth, correct?

A.    Well, that's not the way -- I mean, that's not the way I would measure it in this case because of the confounding information exists, so I don't think that that's an appropriate methodology here.

Q.    So you're saying that it's not appropriate in this case to look at the total stock price reaction on the fourth and the fifth with the mix of positive and negative news?

A.    I mean, you can look at it, but you have to disaggregate because the positive news is unrelated to the allegations.

Q.    Okay.

So how -- would you be -- wouldn't you need to disaggregate the positive news on both the fourth and the fifth?

A.    Either overall or individually, but somehow you have to disaggregate all of

61 (Pages 238 - 241)

Page 242

D. Tabak, Ph.D.

the positive news, yes.

Q.    Okay.

So you are not suggesting that the decline on the fifth doesn't reflect the positive news from the full briefing book that was published on the morning of the fourth, correct?

A.    I'm sorry.  Can you say the question again.

Q.    Sure.  I think what you're telling me is that whether you do it by looking at two days consecutively or two separate days, the first thing you have to do is you have to remove -- find some way to remove the confounding information, which is the positive news.  Am I getting that right?

A.    You have you to do that, yes.

Q.    Okay.

So have you ascertained whether if you did -- if you undertook that analysis for the first day whether you would, in fact, end up with a negative number?

A.    In other words, if I remove the positive news on the first day and left only

Page 243

D. Tabak, Ph.D.

the negative news from the corrective disclosure, whether the price movement impact be negative.

Q.    Correct?

A.    Well, if you assume that any portion of the effect of the negative news that's on the first day, then by definition, once you remove all the positive stuff and you're only left with negative news, the news has to be negative.

Q.    Okay.

And what about the non-fraud related news on the first day?  So the plaintiffs -- I think we talked about this earlier, the plaintiffs acknowledge that there is negative non-fraud related news that comes out in the Massie report.

Correct?

MR. HORNE:  Objection.

A.    I will leave it to them whether that is related to the allegations or not, but if you're going to assume that the Massie report includes negative non-fraud related news at some point, you would have

Page 244

D. Tabak, Ph.D.

to -- and that can be in no way tied to the allegations, you would have to remove it.

Q.    Have you ascertained how to do that?

A.    I have not at this point.

Q.    Do you have any methodologies that you could say point to that would help us do that?

A.    I think one of the things to do is bring in an FDA expert who can say -- if, I said before, probability of approval is 60% without Massie, 40% with Massie, maybe there's an intermediate point like 45% where when broken up into fifteen and five one of those is allegation related, one of those is not allegation related.

Q.    Okay.

And the reason we're focused at the end of the class period on the probability of FDA approval is because your view is that what's driving the stock price reaction is the market's assessment based on the new information of how likely it is that the FDA will approve adu, correct?

Page 245

D. Tabak, Ph.D.

A.    Correct.

Q.    So I want to ask you, are you opining in your report that the level of complexity of the alleged corrective disclosure is having an impact on how quickly the market fully incorporates it?

A.    I don't know.  I may have said that in my report.  I agree with that, but since the question is am I opining on that in my report let me actually check --

Q.    I actually -- I actually didn't see it in your report, so I am asking are you opining that?

A.    If I don't say it in my report, I'm not opining that at this moment, but obviously if I get to a reply report and that's relevant, I may consider that.

Q.    Have you undertaken analysis here of how complex the alleged corrective disclosure is?

A.    I haven't taken a formal analysis, but I've seen the Massie report and what is it, dozens and dozens of pages of statistical analysis.

62 (Pages 242 - 245)

Page 246

D. Tabak, Ph.D.

Q. And is there any academic literature you could point me to that would support the proposition that the market needs more time to fully process complicated information?

A. I'll get back to you on that. I can't think of the names of any offhand, but I think that that's not surprising.

Q. Okay.

And when we're talking about more time to process the information, are we talking about more time -- let's go back to the 15 minutes that we were talking about, which you, I think, acknowledged there are many pieces of information that can be fully incorporated within 15 minutes, correct?

MR. HORNE: Objection.

A. Are you talking about fully incorporating reaching an unbiased estimate or completely accounting for then there's no more additional volatility?

Q. Let's put the additional volatility -- the additional volatility is what you were talking about with analysts

Page 247

D. Tabak, Ph.D.

coming out with reports and then people reacting to those, et cetera?

A. Well, its prices continue to react to the news whether directly or indirectly, but in a way that you can't determine which direction they're going -- the prices are going to move.

Q. So let's start with the unbiased reaction at the beginning, yeah?

A. Okay.

Q. We spoke earlier about the 15 minutes.

Are you aware of any studies that -- that for complicated information attempted to sort of set some boundaries on what would be within the range of ordinary for complicated information?

A. I don't know offhand. I'd have to take a look back at the literature that, again, hasn't been as much recently as it was in the '90s and 2000s.

Q. And you would want to see recent studies on this because markets have changed?

Page 248

D. Tabak, Ph.D.

A. Well, just in general you always like the more recent stuff, but that could be a reason.

Q. If you look at your report, footnote 61 --

A. Okay.

MS. SOLOWAY: Just give me one second.

BY MS. SOLOWAY:

Q. Are you there?

A. I am there.

Q. It says: The complaint effectively alleges that the market could not have performed the analyses and reached the conclusions presented in the Massie report before November 4th, 2020.

Do you see that?

A. I see that.

Q. What do you understand that to mean?

A. When you say "that," you mean that sentence that you just read?

Q. Mm-hmm.

A. I understand it to mean that

Page 249

D. Tabak, Ph.D.

the complaint is arguing that the analysis presented in the Massie report were new information in the sense using whatever information the market had available to it before, it could not have performed those analyses, so those analyses themselves incorporated new information to the market.

(Whereupon, Exhibit 12 was marked for identification.)

BY MS. SOLOWAY:

Q. Let's just look at the Massie report itself. Okay.

I'm handing you Exhibit 12 --

A. Thank you.

Q. -- which is, the Massie report from November 4.

Do you recognize it?

A. I do.

Q. Can you turn to the page that's numbered 253? It starts with 247, so it's still at the beginning of the document or close to the beginning.

A. On the page labeled 253 at the bottom?

63 (Pages 246 - 249)

Page 250

D. Tabak, Ph.D.

Q.   Yeah.  You with me?

A.   I'm there.

Q.   Okay.

You agree that the Massie report has an executive summary?

A.   It does.

Q.   And how long is the executive summary?

A.   Just a little over three pages long.

Q.   Okay.

And do you understand this to summarize Dr. Massie's findings?

A.   I reviewed it, I think that's probably fair.

Q.   Okay.

In the final paragraph of his report, he writes:  In summary the totality of the data --

A.   Wait, wait, wait, final paragraph of his report.

Q.   Excuse me.  I misspoke.  The final paragraph of the executive summary.  Page 255.

Page 251

D. Tabak, Ph.D.

A.   Okay.

Q.   In summary, the totality of the data does not seem to support the efficacy of the high dose.

Do you see that?

A.   I do.

Q.   Is it fair to say that that sentence communicates that Dr. Massie's view is that all data does not support the efficacy of the high dose?

A.   I think that is a fair interpretation of that sentence.

Q.   Okay.

Fair to say that this is a conclusion in the executive summary that's not tucked away from the market?

A.   I think that's fair.  It's in a roughly three-page executive summary.

Q.   The market was capable of incorporating the bottom line summary quickly, correct?

MR. HORNE:  Objection.

Calls for speculation.

A.   Once it got to this report, it

Page 252

D. Tabak, Ph.D.

was able to make an unbiased estimate based on the executive summary.  I think that's fair.

Q.   Okay.

And all you had to do was read the executive summary to understand that the totality of the data does not seem to support the efficacy of the high dose, correct?

MR. HORNE:  Objection.

A.   Just that sentence, it's stated there, so if you read it, obviously you'd under -- I'd presume you'd understand it.

Q.   Okay.

That sounds an awful lot like the truthful substitute that you told me about earlier, correct?

A.   I would say so.

Q.   And that was readily apparent in the executive summary, correct?

A.   Yeah, putting aside the draft mark and so forth, you could certainly see this was an executive summary.  Sure.

Q.   What was it then that in your

Page 253

D. Tabak, Ph.D.

opinion took the market a longer period of time to absorb about the Massie report?

A.   I think it's understanding, you know, more of the details.

Q.   And what were the implications of understanding the details?

A.   Well, this is kind of -- as we discussed earlier the question is how much of an effect this would have.  And as we said earlier, if the market only was told -- well, first of all, presumably there's a difference between being told this by Dr. Massie versus by the company.

If it were the company, you'd say, well, tell us more, what are you hiding.  With Dr. Massie, we know everything else.  He's not really hiding anything.  He's got basically about a hundred pages or so of detail over here.

Q.   I guess what I'm asking is for an investor who wants to get the bottom line, they could get it from the executive summary, correct?

A.   I think that's fair.

64 (Pages 250 - 253)

Page 254

D. Tabak, Ph.D.

Q.    Okay.

And an investor who wants to read the whole report, it's available, right?

A.    Yes.

Q.    It would take some time to read, correct?

A.    Oh, definitely.

Q.    Okay.

And do you have an opinion about why an investor in Biogen would read the entire report?

A.    Well, generally, put it this way.  The totality does not seem to support the efficacy of the high dose, says, okay, there's less of a probability of approval if people listen to Dr. Massie than otherwise, but it doesn't tell you how much less than probability is, so an investor certainly might be interested in knowing, are you saying that the data don't seem to support this and say it's, you know, not quite great, or are you saying that the data suggests this is terrible.

Page 255

D. Tabak, Ph.D.

Q.    I think what you're saying is that understanding the details of the statistical analysis might help an investor weigh the likelihood of FDA approval.

Am I getting that right?

A.    Yes.

Q.    You had mentioned -- am I remembering correctly you mentioned you had looked at the JP Morgan and the Raymond James reports?

A.    Yes, I did mention that.

Q.    And I think you said you thought those were good examples of analysts issues something positive in the morning but then something negative in the afternoon.

Is that right?

MR. HORNE:  Objection.

A.    I think one wasn't the afternoon, may have been the next day, but basically yes.

MS. SOLOWAY:  Okay.  So let's look at those.

All right.  So I'm going to hand you Exhibit 13.

Page 256

D. Tabak, Ph.D.

(Whereupon, Exhibit 13 was marked for identification.)

BY MS. SOLOWAY:

Q.    Exhibit 13 is the Raymond James report, correct?

A.    Why.

Q.    The date is and time is November 4, 2020, 11:15 a.m. Eastern?

A.    That is correct.

Q.    Okay.

This is the earlier of the two Raymond James reports that you're referencing in your report, correct?

A.    Correct.

Q.    Okay.

What is the purpose for which you're citing this report?  You're not suggesting that Raymond James didn't appreciate how negative Massie's report was, are you?

A.    Well, first of all, did I cite this report?

Q.    I think told me about it --

A.    I told you about the second

Page 257

D. Tabak, Ph.D.

Raymond James report.  I'm not sure if I mentioned the first one offhand.

Q.    Have you read the first report?

A.    Yes.

Q.    Okay.

Do you have a view about whether the first report supports your conclusion in your expert report about price impact?

A.    Well, think in and of itself, it does not.  I think what I note in, what is it, footnote 64, that it took time for Raymond James to develop what they called a deeper look.

Q.    Okay.

So you're focused on the second report because Raymond James acknowledges they've taken a deeper look?

A.    Yes.

Q.    Okay.

Do you think you read this document before?

A.    Which document?

Q.    The earlier report that I've

65 (Pages 254 - 257)

Page 258

D. Tabak, Ph.D.

now put in front of you?

A.    I believe so.

Q.    Okay.

Take a look at the bullets on the first page.

Do you see that there's a set of bullets there and that the line immediately before that says:  Quick takes on the just posted advisory committee meeting briefing documents for aducanumab.

Do you see that?

A.    Yes.

Q.    Okay.

And this is at 11:15 a.m., correct?

A.    Correct.

Q.    So look at the fifth bullet down.

A.    Yes.

Q.    Okay.

FDA presentation, stats reviewer minus sign VE for Biogen.

Do you see that?

A.    I do.

Page 259

D. Tabak, Ph.D.

Q.    This is the first, and as far as we can tell, piece of the application which is negative for Biogen, although it's very negative, FDA statistician seemingly thinks the entire analysis is flawed and aducanumab doesn't work.

Do you see that?

A.    I do.

Q.    Okay.

So as of 11:15 a.m., the Raymond James analysts understood that Tristan Massie believed that the entire analysis was flawed and adu doesn't work, correct?

A.    Correct.

Q.    He was able to reach this conclusion -- or they, I should say -- were able to reach this conclusion within approximately an hour of the briefing materials being published, correct?

A.    Correct.

Q.    Raymond James has an under perform rating on the stock, correct?  Under perform four?

Page 260

D. Tabak, Ph.D.

A.    It does.

Q.    Under perform is defined in the report and this is on page five if you want to follow along?

A.    I do.  Give me a second.

Q.    The security is expected to underperform the S & P 500 or its sector over the next six to 12 months and should be sold.

Do you see that?

A.    I do.

Q.    Fair to say an under perform rating is a sell rating?

A.    Yes.

Q.    Okay.

You didn't quote this analyst report in your expert report, correct?

A.    I don't believe I did.

Q.    Is there a reason why you didn't address it?

A.    No.  There's lot of analyst reports I didn't address.

Q.    Would you describe this as a glowing JP Morgan report?

Page 261

D. Tabak, Ph.D.

A.    I wouldn't even describe it as a JP Morgan report at all.

Q.    I'm sorry.  Excuse me.  Thank you.  Withdrawn.

Would you describe this as a glowing Raymond James report?

A.    I think so.  I mean, the opening sentence is, "The briefing documents for aducanumab are a landslide win for BIIB and increase the likelihood of aducanumab approval substantially and present an extreme risk to our underperform thesis (which is already getting blown up today) through this Friday's discussion/vote."

Q.    You don't think it's relevant that this analyst has a sell rating on this stock?  They're telling people to sell the stock?

A.    It literally says extreme risk to our underperform thesis.

Q.    And they what do they do?

A.    Publish a report.

Q.    No, later in the day, what do they do?  What does Raymond James do?  Do

66 (Pages 258 - 261)

Page 262

D. Tabak, Ph.D.

they change their sell rating?

A.   They don't publish anything later in the day.  They publish something the next morning.

Q.   The next morning, do they change their sell rating?

A.   I do not recall.

MS. SOLOWAY:  Why don't we take out that report?  Are we up to --

THE WITNESS:  This was 13.

MS. SOLOWAY:  Thank you very much.

(Whereupon, Exhibit 14 was marked for identification.)

THE WITNESS:  If you want, you can number them ahead of time and then just keep pulling.

MS. SOLOWAY:  Oh, that's a good idea.  Thank you.

Here is 14.

BY MS. SOLOWAY:

Q.   Is that the Raymond James report from the next morning?

A.   Yes.  I think I had a slightly

Page 263

D. Tabak, Ph.D.

different version of it, but I recognize this.

Q.   So this is the Raymond James report called A House Divided.

Right?

A.   Correct.

Q.   Okay.

And then if you look at that first paragraph --

Do you see that?

A.   I see the first paragraph.

Q.   Okay.

So the report says that the briefing documents are effusive, correct?

A.   Yes.

Q.   So the analysts continue to believe that the briefing documents are effusive, correct?

A.   Correct.

Q.   Okay.

But then they go on to talk about the statistician.

Do you see that?

A.   Yes.

Page 264

D. Tabak, Ph.D.

Q.   They say:  We completely agree with the statistician who essentially annihilated the pro aducanumab position put forth by the efficacy reviewer.

Do you see that?

A.   I see that.

Q.   And they go on to say:  The statistical basis against adu seemed apparent within five minutes of learning almost a year ago that Biogen planned on filing.

Do you see that?

A.   I see that.

Q.   What do you understand these analysts to be saying in that sentence?

MR. HORNE:  Objection.

A.   I think that they're saying that about a year ago, there were certain known issues, for example, that you didn't have two confirmatory phase three studies as typically the case.  That would probably be the biggest one.  But, you know, anything else they would have known about at that time.

Page 265

D. Tabak, Ph.D.

Q.   Fair to say that that observation is not based on the new data?

MR. HORNE:  Objection.

A.   The observation about what was apparent a year ago or almost a year ago?  That was not based on new information.

Q.   Okay.

So they did not hold the view before the Massie report came out that all data supported efficacy, correct?

MR. HORNE:  Objection.

MS. SOLOWAY:  Actually, let me rephrase that.

BY MS. SOLOWAY:

Q.   These analysts did not hold the view that all data supported the efficacy of adu at the high dose, correct?

MR. HORNE:  Objection.

A.   Not 100% clear because they may have thought that just going to the high dose is a problem because it's an ex-post type of analysis, which is generally frowned upon by the FDA.  So just the fact of looking only at the high dose is problematic

67 (Pages 262 - 265)

Page 266

D. Tabak, Ph.D.

as well.

Q. Which only further underscores that these analysts did not hold the view even before November 4th that all data supported efficacy, correct?

A. Now you've moved to supporting efficacy.

Put it this way: I think it's fair to say that they didn't believe that all data supported an FDA approval based on how the FDA would do things.

Q. Do you know whether Biogen was asking the FDA to approve the drug at a low dose?

A. I don't know, but I know their arguments in favor of approval depended on the high dose.

Q. And then they continue to have an underperform rating on the stock, correct?

A. Correct.

Q. So they're still saying to sell?

A. Yes.

Page 267

D. Tabak, Ph.D.

Q. What significance, if any, does it have to your market efficiency opinion that this report was issued at 8:00 in the morning -- 8:05 a.m. on November 5th?

A. As opposed to what? Some other time?

Q. I think you focused on -- I think you focused on the fact that there were a couple analysts who issued reports saying we've taken a closer look, right?

A. Yes.

Q. And this particular report comes out at 8:05 a.m. on November 4th, correct?

A. Correct.

Q. Does that matter, the fact it comes out at 8:05 a.m. on November 5th?

A. I mean, I haven't focused on the fact that it's not, for example, 11:20 a.m. on November 4th would suggest they spent some time before coming to this more considered conclusion. But I haven't focused on that -- I was -- I wanted to look at reports that came out before the vote on

Page 268

D. Tabak, Ph.D.

November 6, but I wasn't really focused on the particular time of this report.

Q. The other report that you mentioned was JP Morgan.

A. Correct.

(Whereupon, Exhibit 15 was marked for identification.)

THE WITNESS: See how much easier it is when it's premarked.

MS. SOLOWAY: What was that? I handed you 16, right?

THE WITNESS: Next is 16. This is 15.

MS. SOLOWAY: Okay. Thank you.

BY MS. SOLOWAY:

Q. Is this -- does this look familiar to you, this JP Morgan report?

A. It does.

Q. Okay.

And this is the report issued at the top right corner it says 04 November 2020.

Do you see that?

A. I do.

Page 269

D. Tabak, Ph.D.

Q. And I think the -- I know the time of day is somewhere on here. If you look at the bottom, in the footer on the end of the last page, it says 11:35 a.m. Eastern.

A. I see that.

Q. Just to situate you --

A. Okay.

Q. Okay.

So this is shortly after the briefing materials become available on November 4, correct?

A. About an hour after, I believe, yes.

Q. And in the first paragraph, do you see that they say: The much anticipated aducanumab FDA briefing docs were released this morning?

A. I do.

Q. Okay.

And they say: As clearly indicated by the market reaction, they provide a favorable overall assessment.

Do you see that?

68 (Pages 266 - 269)

Page 270

D. Tabak, Ph.D.

A.    I do.

Q.    Okay.

About two-thirds of the way down, they say:  That said, it's not all positive ... there are some discrepancies between FDA clinical and statistical teams on why 301 was negative, and there is a lack of efficacy in APOE4, noncarriers.

Do you see that?

A.    I do.

Q.    Do you understand that to be a reference to the Massie report?

A.    Yes.

Q.    Okay.

So this analyst report that comes out at 11:35 a.m. has already ascertained that there's a lack of efficacy in noncarriers, correct?

A.    Wait, wait, wait.

(Witness reviews document)

Yes, that's their conclusion.

Q.    You would agree that this report recognized that the FDA materials weren't entirely positive, correct?

Page 271

D. Tabak, Ph.D.

A.    Correct.

Q.    And that they're observing that there was a lack of efficacy in noncarriers, correct?

A.    Correct.

Q.    Did you quote this analyst report in your expert report?

A.    I believe I did not.

Q.    Why?

A.    I didn't see a need to.

Q.    Are you aware of whether there are other analyst reports issued on the morning of November 4th that reference the Massie report?

A.    Not offhand.  There may be, but I'm not sure.

Q.    Okay.

Why don't we flip to the later -- you did reference the later JP Morgan report, correct?

A.    Correct.

MS. SOLOWAY:  Okay.

Why don't we do that one?

(Whereupon, Exhibit 16 was

Page 272

D. Tabak, Ph.D.

marked for identification.)

BY MS. SOLOWAY:

Q.    Here's Exhibit 16, the JP Morgan report.

A.    Okay.

MR. HORNE:  The exhibit we were discussing, was it 15 or 16?

THE WITNESS:  The one we were discussing was 15.  The new one is 16.

MR. HORNE:  The Raymond James prior to that, I thought was 15 --

THE WITNESS:  No, 13 and 14.

MR. HORNE:  I apologize.

MS. SOLOWAY:  No problem.

THE WITNESS:  You're trying to mess up my advice here, that it didn't work?

MS. SOLOWAY:  Okay.  Sorry. Just give me one second.  I lost my own way.

BY MS. SOLOWAY:

Q.    All right.

So we're looking at Exhibit 16, which is a JP Morgan report, correct?

Page 273

D. Tabak, Ph.D.

A.    Correct.

Q.    And it says:  A closer look at the adu briefing docs and the tale of two FDAs.

Correct?

A.    Correct.

Q.    This is a report published on November 4th, correct?

A.    Correct.

Q.    And it looks like, based on the footer at the end of the report, it's at 9:17 p.m. Eastern time.

Do you see that?

A.    I do see that.

Q.    Okay.  All right.

So they say in the first paragraph:  Our overarching take away remains that the FDA showed its cards today and it's quite evident in our view that the agency wants to approve this product.  That said, our more thorough review was eye opening in terms of the conflict of opinions between the FDA reviewers and their statisticians that are far more negative.

69 (Pages 270 - 273)

Page 274

D. Tabak, Ph.D.

A.    I do see that.

Q.    And then they say:  We doubt whether this makes a difference on Friday, and it's questionable whether a statistician will even have a speaking presence, but any skeptical panelist could have branches to grab on to.  At this point, we're increasingly doubtful they will.  And in the end, we suspect that even a close negative vote isn't enough to dissuade the FDA on approval.

Is it your position that this report is more -- like, based on the passage of time more -- profoundly more negative analyst reports the earlier report?  What's your position on this?

A.    I think it's more in depth.  I don't think that it's profoundly more negative.

Q.    Did you look at whether JP Morgan changed its rating?

A.    I had not looked before.

Q.    Did it?

A.    It did not.

Page 275

D. Tabak, Ph.D.

Q.    Did it change its price target?

A.    It did.

Q.    What did it do?

A.    Well, first of all, I would like to see what the price was before the November 4th report, but the November 4th report says $247.01, and the November -- I'm sorry.  The morning report says $247.01 and the evening, shall I call it, or afternoon -- the evening report says $355.63.

Q.    What does that reflect?

A.    The change, an increase of a little over $100 per share.

Q.    An increase in the positive direction?

A.    Yes.  As opposed to an increase in the negative direction?

MR. HORNE:  Just for the record, that looks like the actual trading price --

THE WITNESS:  Oh, I'm sorry. you're right.  That is the trading price.  You're correct.

Page 276

D. Tabak, Ph.D.

MS. SOLOWAY:  Are you looking at top right corner where it says --

A.    I'm sorry.  Yes, I was in error there.  Price target -- I don't see a price target offhand.

Q.    There's no notation that they're changing their price target, correct?  That's really what I was going towards.

A.    I do not see any reflection of a change in their price.

Q.    They keep their rating the same, correct?

A.    Correct.

Q.    And they don't note that they're changing their price target, correct?

A.    Also correct.

Q.    Okay.

And the fact that they're not changing their price target, what does that signify --

MR. HORNE:  Objection.

Q.    -- if anything?

Page 277

D. Tabak, Ph.D.

A.    Either that they don't think anything is materially different or they are not -- haven't gotten around to changing their price target, because they don't always do that immediately.

Oh, I've seen many analyst reports where they make substantial comments and just plug things into a template and leave the old price target.

Q.    Do you have any reason to think that happened here?

A.    I do not know.  It could be. It may not be.

Q.    Sitting here today, you have no reason to think that they meant to change their price target but didn't do it, correct?

A.    Well, not meant it.  Just didn't get around to doing it.  Let's put it this way, if the price went from 247 to 355, you might think that might cause them to consider whether their price target -- actually, they do mention old price targets in the report, I believe -- yeah, their most

70 (Pages 274 - 277)

Page 278

D. Tabak, Ph.D.

recent price target you'll see on page eight of this report, was dated October 21st, and was $269. I think the idea that if the stock is trading at 355, it would be interesting if they are really are maintaining a price target of 269 as opposed that's an old price target that they haven't updated.

Or put it this way, let's put it this way, if the stock is 355 and they're price target is 269, I don't know why they have a neutral rating as opposed to a sell rating.

Q. Right.

It would make sense actually for them to downgrade their --

A. Or to up -- or to increase their price target. It makes sense to move on of though two things to be consistent. So I standby the fact that something here might be a bit stale.

Q. So I think in your report you cited these JP Morgan and Raymond James analysts for the proposition that analysts

Page 279

D. Tabak, Ph.D.

were still processing and the market was still receiving information on the divergent results of the Massie report and other FDA briefing materials after the November 4 close.

Correct?

A. Yes.

Q. Does this now harken back to the point we were talking about earlier that sometimes information can come out and then analysts will issue reports where they offer their own opinions on that news and that that can later -- the analysts, you know, offering new commentary can sometimes then drive additional price reactions?

A. Yes, I think that's fair.

Q. Is that why you're citing these reports?

A. I was citing it more for the proposition that it took time to fully analyze the Massie report.

Q. But you'll agree with me that both of these analysts recognized right off the bat that the Massie report was negative,

Page 280

D. Tabak, Ph.D.

right?

A. Yes.

Q. And so when an analyst -- withdrawn.

Have you done any work to try to understand whether when an analyst drafts a report it's immediately published?

MR. HORNE: Objection.

A. It tends to be fairly quickly. Obviously -- put it this way, two of these were within about a hour of the briefing docs being put out. So if -- we can get into this debate. If immediately means within 15 seconds, I assume not. But if it means within less than an hour, yes.

Q. Yeah.

Do you know whether an analyst has to get approval to publish a new report?

A. I don't know the details in every investment bank, so I'm not going to give an answer to that.

Q. Do you know anything about the process of what needs to happen from the time an analyst at an investment bank writes

Page 281

D. Tabak, Ph.D.

a report and it can be actually publically available?

A. I may know some, but not enough to provide an expert opinion.

Q. Okay.

In light of the fact that there may be process behind the scenes at these financial institutions that could explain what time a report actually gets issued, do you think it's appropriate to draw conclusions about how quickly information is incorporated from the, you know, from the difference of, you know, time between when the news comes out and when the analyst comments on it?

MR. HORNE: Objection.

A. I think obviously to the extents analysts are helping the market to process information, then yes, that is relevant because the market can't absorb the analyst information until it's actually published.

Q. But what about to the extent you are using the analyst report as a proxy

71 (Pages 278 - 281)

Page 282

D. Tabak, Ph.D.

for when the market could have incorporated the information? There's some arbitrariness to when the reports get issued, correct?

A.    There is some, but as we pointed out, the early reports basically came out, one at 11:15, the other at 11:35. So about an hour or so after the briefing materials were made public.

The other ones came out, one at 8:05 a.m. the next day, and one at -- let me check. Sorry -- at 9:17 p.m. that day. So even if these reports were written instantaneously, the processing time for the morning reports was about an hour at most. Even if we take an hour off of each of the two later reports, that's still a large difference in time.

Q.    On Exhibit 11 to your report -- now, I'm jumping back to your report --

A.    Okay.

Q.    You have a list of -- here, let me flip to it.

You have a list of analyst reports, correct?

Page 283

D. Tabak, Ph.D.

A.    That is correct.

Q.    What is it that you're analyzing in your Exhibit 11?

A.    So I'm looking at analyst reports that had a change in price target on November 4th or November 5th, 2020. I'm breaking those up into two groups, those that mentioned the Massie or statistical report, those that didn't, and taking a look at the changes in price targets between the two groups and seeing how those changes differ, finding essentially that the analysts that mentioned a Massie report had a smaller increase in their price target than the analysts that did not mention the Massie report.

Q.    Did you perform any kind of statistical analysis to ascertain whether the conclusions that you draw about these price changes would be statistically significant given the sample size here?

A.    I did not. I'm glad that you mentioned the sample size. These sample size is very small and therefore the

Page 284

D. Tabak, Ph.D.

standard error, the measure of how much dispersion you expect would be very large. It would take a very, very large difference to be statistically significant given that we only have a total of, I believe, seven observations here split into two groups.

Q.    So does that mean you're not suggesting by providing Exhibit 11 that you've reached, like, a statistically significant conclusion that analysts who mention Massie, you know, are discounting him less -- excuse me -- are crediting him more than analysts who don't?

A.    That question was objectionable probably.

Q.    Let me ask it again.

You said that what you're doing here is you're analyzing the change in analyst price targets following the release of the briefing documents on the fourth, correct?

A.    Correct.

Q.    And there's a small sample size. I think you just said seven analysts,

Page 285

D. Tabak, Ph.D.

correct?

A.    Yes.

Q.    And I think what you said is that what you identified the average price in change target is smaller for the analysts who mention Massie report than those who don't, correct?

A.    Correct.

Q.    Are you suggesting that there's statistical significance to that finding?

A.    I am not suggesting that the difference is statistically significant.

Q.    Okay.

How did you pick these particular reports?

A.    We looked through all the reports we had, and these are the ones that reported a new price target.

Q.    On the fourth, if I'm reading your chart correctly, is it fair to say that during the trading day on fourth, which is the first one, two, three, four, five entries, three out of five mention the Massie report, correct?

72 (Pages 282 - 285)

Page 286

D. Tabak, Ph.D.

A.    The final three, or the latest three on that day, yes.

Q.    Yes.  But three of the five do mention the Massie report, correct?

A.    Correct.

Q.    And that's a majority of the five, three of five, correct?

A.    Well, if you're not asking for statistical significance, sure, three is a majority of five.

Q.    Okay.

There are two Wells Fargo reports, correct?

A.    That is correct.

Q.    Okay.

And the first Wells Fargo report did not mention Massie, correct?

A.    Correct.

Q.    And the second one did, correct?

A.    Correct.

Q.    And the second one also made a change to the price target, correct?

A.    Correct.

Page 287

D. Tabak, Ph.D.

Q.    What did it do?

A.    It increased its price target from $390 a share to $437 a share.

Q.    Okay.

So -- and just to go back to the first Wells Fargo report, what did that report do?

A.    It increased its previous price target of $324 a share to a new price target to $390 per share.

Q.    Okay.

So basically both the Wells Fargo report that didn't mention Massie and the one that did, increased the price target, correct?

A.    Correct.

Q.    Okay.

Why didn't you count the -- you say that you didn't count the italicized part, right?

A.    To be clear for the record, italicized is the second Wells Fargo report, correct.

Q.    Correct.  Why didn't you count

Page 288

D. Tabak, Ph.D.

it?

A.    We already had one Wells Fargo analysis that was it's initial analysis. The second one would have incorporated all kinds of things.

Q.    I don't understand what that means?

A.    In other words, it wasn't a comparison of someone who had, you know, gone -- the other -- what we were trying to do is find what is the initial reaction of analysts based -- and splitting those up based on whether they mentioned the Massie report or not.  This was not the initial reaction from Wells Fargo.

Q.    Why wouldn't it be more appropriate to consider Wells Fargo together and say that they, you know, within a very short period of time, you know, increased their price target twice -- I'm just not following why you would exclude one?

A.    Well, first of all, then you get two reports from the same analyst, which is simply a matter of whether they decide to

Page 289

D. Tabak, Ph.D.

publish two reports as opposed to, for example, one giant report.  People can play with different methodologies.  The methodology I wanted to use was what was the first reaction of any analyst.

Q.    Okay.

So basically, you excluded it based on the methodology that you wanted to only look at the first reaction?

A.    Correct.  But we didn't hide it.  You could see it here in the table.

Q.    Okay.

Is there any -- like anything you can point me to that says that this methodology that you use in Exhibit 11 is an appropriate methodology for purposes of measuring price impact?

A.    It's interesting because I don't think there's any real economic literature on price impact, because it's a legal concept.  But, you know, it's a logical way to at least begin the analysis and saying do people who care about something or reference it act differently

73 (Pages 286 - 289)

Page 290

D. Tabak, Ph.D.
than those who do not. I say it's basically logic.

Q. Okay.
Does this include all of the analysts who change their price targets following the release of the briefing documents on November 4th and including the fourth and fifth?

A. I believe so.
MS. SOLOWAY: Can I have --
(Whereupon, Exhibit 17 was marked for identification.)

BY MS. SOLOWAY:
Q. I'm handing you Exhibit 17.
I've handed you Exhibit 17 as an Atlantic Equities report.
Do you see that?

A. I do.
Q. And this is from November 5th, correct?

A. Correct.
Q. And it's from 9:19 GMT.
Do you know what that means?

A. Greenwich mean time.

Page 291

D. Tabak, Ph.D.
Q. Is that 4:19 p.m. Eastern time?

A. Seven hour difference? I thought Greenwich was usually five or six --

Q. Five. So 9:19 would turn into 4:19, no?

A. That's a -- ten, 11, 12, one, two, three, four. That's a seven-hour difference.

MR. HORNE: It would turn into 14:19, which is 2:19.
MS. SOLOWAY: Sorry. I thought -- apologies. Greenwich meantime is ahead of us, correct?
MR. THAU: Yeah.
THE WITNESS: Oh, I'm sorry.

Q. I'm not making representations. You either know or you don't know.
Is 9:19 Greenwich meantime the same as 4:19 Eastern time to your knowledge?

A. Yes, I believe so.
Q. All right.
Does this report appear in your Exhibit 11?

A. No, I don't recognize this

Page 292

D. Tabak, Ph.D.
report. I don't think we got anything from Atlantic Equities, which is -- yeah. No, I don't think we had anything from Atlantic Equities in our data.

Q. Okay.
And Atlantic Equities moves its price target on Biogen from 270 to 380, correct?

A. Correct.
Q. And that's a change -- a positive change of $110?

A. Also correct.
Q. And it also, if you look at the first page, the first bullet, it references the Massie report, correct? It's at the bottom of the first bullet.

A. Yes.
Q. It says: The statistical review, however, appeared critical of the data, suggesting that Biogen's explanations for the lack of efficacy in study 301 did not hold up to rigorous scrutiny. In fact, the review actually suggested that inadvertent unblinding in study 302 may have

Page 293

D. Tabak, Ph.D.
contributed to the observed treatment effect.
Do you see that?

A. I do see that.
Q. Okay.
So that is a reference to the Massie report, correct?

A. Yes.
Q. Okay.
And it acknowledges the Massie report as a negative interpretation of the data?

A. It does.
Q. Is there a reason that Exhibit 11 was not included -- did not include this report?

A. I don't believe our data vendor provided us with this report.

Q. Okay.
It would change the average price movement calculations in your report, correct?

A. Sure. New data is going to make a change, yes.

74 (Pages 290 - 293)

Page 294

D. Tabak, Ph.D.

Q.    Okay.

Is there anything else that you're aware of that's missing from Exhibit 11 of your report?

A.    No.  I mean, I was not aware of this, and I would have told you if there were anything that I thought were missing.

Q.    As drafted, Exhibit 11 is not accurate, correct?

A.    Well, it's based on the analyst reports we obtained.  You can certainly add another analyst report to it, I have no problem with that.

Q.    But as drafted, it's not complete, correct?

A.    Well, the sources are the supports we obtained from counsel, so it's correct based on -- it's a correct representation of the analyst reports we had.  It does not include this -- and I agree with you -- you can certainly add Atlantic Equities into this.

Q.    So there might be other reports that counsel didn't provide you that might

Page 295

D. Tabak, Ph.D.

be missing from this table?

A.    It's always possible that you're missing something and not know about it.

Q.    Okay.

A.    Maybe not always, but in many cases.

Q.    There's a whole world of possibilities, correct?

A.    Fair enough.

MS. SOLOWAY:  Do you want to keep going?  Do you need a break?

THE WITNESS:  I'm fine.

MR. HORNE:  How much more do you think you have?

MS. SOLOWAY:  We're getting there, we're getting there, but I still have some stuff.

MR. HORNE:  Like half an hour?

MS. SOLOWAY:  No, more.

MR. HORNE:  No more?

MS. SOLOWAY:  No, comma, more.

MR. HORNE:  Why don't we take a break then?

Page 296

D. Tabak, Ph.D.

THE VIDEOGRAPHER:  Time is 4:25 p.m.

We're off the record.

(Recess taken)

THE VIDEOGRAPHER:  Time is 4:44 p.m.

We are back on the record.

You may proceed.

BY MS. SOLOWAY:

Q.    Dr. Tabak, just returning to Exhibit 11 of your report briefly, which we were discussing before the break, this chart looks at analysts who have changed their price targets, correct?

A.    Yes.

Q.    You didn't cover analysts who hadn't changed their price targets, correct?

A.    Correct.

Q.    And I think you say it in another place in the report that the number of analysts covering Biogen is somewhere between 25 and 30 during the proposed class period, correct?

A.    I may have said that, sure.

Page 297

D. Tabak, Ph.D.

Q.    Feel free to look.  I think it's Exhibit 4 to your report, I think.

A.    Yes.

Q.    So around the time of the alleged corrective disclosure, there was somewhere between 27 and 30 analysts covering the company?

A.    Yes.

Q.    Of those analysts, only a small number changed their price targets on the fourth and the fifth, correct?

A.    That is correct.

Q.    Do you take that to mean that the analysts who didn't change their price targets did not view the joint briefing book to materially change their assessment of the company?

A.    No.

Q.    Then why didn't they release new reports?

A.    That's not fair.  I didn't say they didn't release new reports.  I said they didn't change their price targets.

Q.    Why didn't they release reports

75 (Pages 294 - 297)

Page 298

D. Tabak, Ph.D.

changing their price targets if you think they would have changed their material -- materially changed their assessment of company?

MR. HORNE: Objection.

A. Because analysts are estimates slow with this, and we've gone over that JP Morgan maintained a price target of the $267 while the actual price was 355 and a neutral rating.

And I think we agreed that either their rating or their price target should have been changed and they were stale. It's my experience that often analysts do not change their price targets immediately.

Q. So analysts cannot be counted on for promptness, is what you're saying?

MR. HORNE: Objection.

A. No, for the price targets. I mean, if they put out a report, you know, you can see what time they put out the report, but often the price target is something that they take some time,

Page 299

D. Tabak, Ph.D.

particularly when there's the equivalent of breaking news and they just want to get all of their analysis, or their discussion out there without doing all of the analysis to come up with a new price target right away.

Q. If an analyst report was issued on the fourth and the fifth that didn't mention the Massie report, are you inferring that the analyst had not read it?

A. Not necessarily.

Q. This chart wouldn't reflect an analyst who read the Massie report and took it into account, but didn't reference it in his report, correct?

MR. HORNE: Objection.

A. Well, if they changed their price target, they would be on -- in Exhibit 11, they would just get a no for mentioning statistical support.

Q. Let me rephrase the question. So Exhibit 11 reflects only analysts that changed their price report?

A. Correct.

Q. Within that universe, you are

Page 300

D. Tabak, Ph.D.

not assuming that an analyst who doesn't mention Massie hasn't read the report, correct?

A. I'm assuming they did not give it much -- either they didn't read it, or they didn't read it fully and think about it, or they didn't give it much weight. But all I'm saying is that they did not mention the report.

Q. Okay. And so it is possible that among the analysts who said -- who you found didn't mention Massie in your exhibit, it is possible that they did, in fact, read the report but didn't find it important, correct?

A. That is a possibility.

Q. Among other things in your report, you address trading volume. Is that right?

A. That is correct.

Q. And it's your view that elevated trading volume is a sign that the market is ingesting corrected information?

Page 301

D. Tabak, Ph.D.

A. Generally, yes.

Q. Okay. And you point out in your report -- feel free to look at it, paragraph 71 -- that five million shares of Biogen traded on November 5th. Is that right?

A. Give me one second. Over five million shares, yes.

Q. And that's, by your findings, more than any day in the analysis period other than November 4th, correct?

A. Correct.

Q. And that suggests to you that the market was still processing information on November 5?

A. Correct.

Q. Okay. Is there a relationship between trading volume and price impact?

A. Well, price impact, again, it's a legal concept, but if the question is, is there reason to believe that an announcement on November 4th is still affecting the price

76 (Pages 298 - 301)

Page 302

D. Tabak, Ph.D.

on November 5th, a large volume would lend support to that view.

Q.    Okay.

What else could a large trading volume on the fifth represent?

A.    I mean, generally it's interest in buying or selling the stock, which you generally think would be because of, you know, new information.

Q.    Could investors who are trading on the fifth be doing that because they would like to monetize their investment in Biogen before the advisory committee vote?

A.    It is possible, but -- sure.  I mean, if you don't have any support, almost anything -- any explanation like that is possible.

Q.    Well, let me try to make it more concrete.

You've looked at Biogen's stock price over the class period, correct?

A.    Correct.

Q.    Fair to say that it takes a very significant increase on the fourth?

Page 303

D. Tabak, Ph.D.

A.    It does, sure.

Q.    So for many investors that purchased during the class period, if they purchased during the class period but sell after the large increase after the fourth, they're going to make a lot of money, right?

A.    Presumably, yes.

Q.    But if they hold through the advisory committee vote, they run the risk that the profit comes out of the stock that went in on the fourth, correct?

A.    Essentially, they run the risk that they make either more or less money.

Q.    Right.

A.    Sure.

Q.    But an investor who bought during the class period and sells before the advisory committee vote has the potential to make a lot of money, correct?

A.    Potential, sure.

Q.    Is that something you've considered in forming your opinion about whether there continues to be price impact on November 5th from the announcement on the

Page 304

D. Tabak, Ph.D.

morning of November 4th?

A.    Sure.  What you're basically suggesting is that if there is a price increase right before a scheduled announcement you might expect to see a price decrease afterwards, which would be completely inconsistent with the efficient market hypothesis, because you're saying, essentially, you should be able to predict which way the price moves on the fifth, given how it moved on the fourth.

Q.    So you think it is not possible that investors selling on the fifth are doing so to, like, lock in a profit or to, for example, cover their cost basis in making their Biogen investment?

MR. HORNE:  Objection.

A.    If the market is efficient and that is, you know, a widely expected phenomenon, the market price on the fourth should account for that already.  In other words, who would be buying on the fourth, you know, especially near the end of the day thinking if we thought generally, well, we

Page 305

D. Tabak, Ph.D.

expect the price to go down on the fifth as people sell to lock in gains.

Q.    I'll ask you your view of the same question.

Didn't you say there were some people who were kind of sitting around and not paying attention to the stock price?

MR. HORNE:  Objection.

Q.    Didn't you say that earlier?

A.    Not paying attention to the stock price, they're not following the news.

Q.    Right.  They're not following the news, and so some of those people wake up on the morning of the fifth and say, huh, I could sell, make a lot of money?

A.    Sure, there are people who do that.  But in an efficient market, if that were an empirical regularity, then the sophisticated investors on the fourth, basically the ones who are effectively setting the price would say, I'm not buying at this price because I know it's going to be a lot cheaper tomorrow.

Q.    Okay.

77 (Pages 302 - 305)

Page 306

D. Tabak, Ph.D.

Q. Do you know whether the fact that the market was going to be closed on the sixth could have had an impact on the stock price on the fifth?

Sorry. I don't mean that the market was going to be closed, but that trading was going to be halted for Biogen on the sixth could have had an impact on trading on the fifth?

A. I mean, if you're going to say could have, probably almost anything is possible. But again, anything that was knowable on the fourth should have already been incorporated into the market price on the fourth.

Q. Do you know whether -- we're specifically talking about the increased volume on the fifth.

Do you know of any support for the proposition that an anticipated halt in trading might generate higher volume ahead of it?

A. I haven't looked at that one way or the other.

Page 307

D. Tabak, Ph.D.

MS. SOLOWAY: I'm going to show you -- it's tab 48, Charlie.

(Whereupon, Exhibit 18 was marked for identification.)

BY MS. SOLOWAY:

Q. Here you go.

I know you haven't seen this before, but Exhibit 18 is a chart that we put together showing intraday trading on November 4th.

Are you familiar with tick data?

A. Yes, I am.

Q. Okay.

And we also put -- just in the interest of full disclosure, we also put on there the beginning and end of day stock price, just to orient you.

Are you following?

A. I am following what you're saying.

Q. Did you look at the intraday trading -- well, let's start with volume.

Did you look at the intraday

Page 308

D. Tabak, Ph.D.

volume on November 4th?

A. I may have. I don't recall.

Q. You're not sure if you looked at it?

A. I know I looked at intraday prices briefly, but I don't remember if I looked at volume.

Q. Okay.

And then you said you looked at intraday prices briefly.

Did you analyze the intraday trading on November 4th?

A. No.

Q. Fair to say that just starting with volume, trading volume was the highest during the first 60 to 90 minutes following the release of the joint report?

A. I think that's generally fair.

Q. And would it be fair to say that that high volume of trading reflects investors who are both buying and selling?

A. How could it not? Every trade is a buy and a sell.

Q. That's right.

Page 309

D. Tabak, Ph.D.

And then after that, the trading volume remained relatively stable for the rest of the day.

Correct?

A. There's a spike around 2:30 and then there's a spike at closing auction, but otherwise, it's relatively low.

Q. You said there's a spike around the closing action. That's customary, correct?

A. I think after closing action, yes, that is customary.

Q. Can you explain why it's common to see that at the end of the day?

A. First of all, there are a lot of trades that are marked trade at the end of the day, as opposed to in realtime or when they're put in.

Q. So what you're saying, I think, is that financial institutions regularly clear a lot of trades at the last -- end of the day?

A. Well, there's actually closing auctions so it's all done in kind of one

Page 310

D. Tabak, Ph.D.

giant trade, but yes.

Q. Okay. Got it.

And then there's one spike I think you said around 2:30, right?

A. Yes.

Q. But apart from that, it's pretty stable from around, you know, 11:30 or so on.

Correct?

A. It depends what you mean by stable. I mean, some of the numbers I see, let's say, around 1:07 look like zero almost for one minute, and then they're percentage-wise much bigger. I mean, they're generally low, but it would depend on your definition of stable.

Q. Well, certainly compared to the beginning of the day, there's a noticeable difference, correct?

A. Yes. Or, well the beginning of the day after 10:30.

Q. Okay.

And the same is true -- do you mean 10:30? I'm sorry. You mean around the

Page 311

D. Tabak, Ph.D.

time that the joint -- the FDA briefing materials come out, correct?

A. Yes, 9:30 is not terribly different than most of the day.

Q. Mm-hmm. And then what happens?

A. Then there's a little bit of a spike, a little after around 10:10 or so, a gap, and then it's higher at 10:30 when it looks like there was a small trading halt.

Q. Yeah.

And that trading halt, do you have an understanding of why that happened?

A. I'm going to assume it's related to the FDA document release.

Q. Is it true that when the stock price shoots up very quickly, it can cause a halt in training?

A. Yes, there are circuit breakers.

Q. Okay.

And so the stock price goes up in the morning, it comes down a little bit around -- somewhere around, what, 10:30-ish, right?

Page 312

D. Tabak, Ph.D.

A. Again, I'm just trying to -- I want to be sure I understand how -- yeah, around 10:30-ish perhaps.

Q. And then it goes up, I would say sometime around 11:00-ish, around 11:00-ish it peaks, right?

A. Somewhere around there, yeah.

Q. Okay.

Then it comes down, yes?

A. Yes.

Q. And then I guess, you know, understanding that relatively stable is relative, it doesn't -- it doesn't have dramatic movements for the rest of the day, correct?

A. Well, other than something around 2:30.

Q. It looks like maybe there's a big -- you think it's possible there's a big trade at 2:30?

A. It's possible.

Q. Is this something you analyzed in forming your opinions about price impact in this case?

Page 313

D. Tabak, Ph.D.

A. No.

Q. And fair to say that the pattern in the intraday stock price follows pretty closely with the pattern in the volume, correct?

MR. HORNE: Objection.

A. I'm going to say you can see larger price movements generally when volume is higher.

Q. Okay.

Turning to November 5th -- you could put that down, thank you.

Would you agree that when there is value-relevant news that takes place between the time of the market closing and the time of the market reopening, the stock price reacts at the market opening?

A. It should certainly begin to react at the market opening.

Q. Did you conduct in this case an analysis of whether as between the close on November 4th and the open on November 5th there was a statistically significant stock price movement?

79 (Pages 310 - 313)

Page 314

D. Tabak, Ph.D.

A.    I don't believe so, no.

Q.    And what, if anything, would it mean to you if there was a statistically significant stock price movement between the close on the fourth and the open on the fifth?

A.    That the market was either continuing to react to news on the fourth or if there were some news that came out overnight, the market could be reacting to that.

Q.    And what about the opposite? What would it mean to you if there was no statistically significant stock price movement between the close on the fourth and the open on the fifth?

A.    One possibility is that there is no additional news, but the other question is why you pick that. I mean, the problem with none is that you may be -- it depends if you're cherrypicking, looking for periods of no statistically significant movement.

Q.    Let's putting the cherrypicking

Page 315

D. Tabak, Ph.D.

problem to the side. Let's assume we're not doing any cherrypicking.

What, as a general principal, does it mean if you don't find statistically significant price movement between the close and the open, doesn't it mean that either -- the market is not -- I want to do the opposite of what you said before.

You said before the market is not still processing information that was already available to it, correct?

A.    That is one possibility.

Q.    And the other one was you said that there could be new information that could come out after hours, but that's not -- I think the opposite of that is harder to do with the no stock price reaction?

MR. HORNE:  Objection. Compound.

BY MS. SOLOWAY:

Q.    I guess you could have multiple pieces of information that confound each other and that could explain why you don't

Page 316

D. Tabak, Ph.D.

have a stock price reaction from the close to the open, correct?

A.    So one possibility is that the net news is zero, and another is that the market is still processing information, but it happens that people are viewing it positively and negatively, and over the period you've chosen, the net movement happens to be zero.

Q.    Do you ever in your expert analyses look at close-to-open price movements?

A.    I may have on occasion.

Q.    When do you think it's appropriate to do that?

A.    Generally, if you think that the market is being very -- well, first of all, sometimes it can be appropriate to do that if you want to disaggregate between news, for example, that came out overnight versus news that, let's say, came out a few minutes after the open. That can be a very useful way of trying to do that disaggregation.

Page 317

D. Tabak, Ph.D.

Q.    Any other situations?

A.    Maybe if you think the market is being volatile so you want to not just look at full day price movements, but I've often looked at partial day price movements, I think, including close to open, because if it's bouncing up and down over the course of the trading day it's possible that the end closing price happens to be similar to the closing price the day before.

But if you see a lot of volatility over the trading day, it's more likely the market is trying to figure out the news and still process it even if the net over the whole trading day happened to be close to zero.

Q.    Okay.

I mean, in the case of Biogen in this particular case, your theory is that the market was still processing the Massie report even after the close on November 4th, correct?

A.    I'm saying that there's evidence that would support that, yes.

80 (Pages 314 - 317)

Page 318

D. Tabak, Ph.D.

Q. And how many hours are there between the close on the fourth and the open on the fifth?

A. Between the close on the fourth and the open on the fifth? So 4:00 to 9:30, you know I'm not good at times, at least with GMT.

Q. I know you're good at math though.

A. Yeah, but it's doing it right. So 4:00 to -- another 4:00 is 12 hours, and then adding another 5.5 hours is 17.5 hours.

Q. Okay. So the market has 17.5 hours between the close and the open to additionally process the Massie report, correct?

A. Correct.

Q. Okay. And if the Massie -- if the stock price is not experiencing a statistically significant decline as of the open on the fifth, that would suggest that the market either does not think it's

Page 319

D. Tabak, Ph.D.

materially new or that the market, just to use your framework, is still also taking into account the confounding positive news. Am I getting that right?

MR. HORNE: Objection. Counsel, statistically significant decline as of the open on the fifth compared to what? Compared to the previous day's close?

MS. SOLOWAY: The close on the fourth.

MR. HORNE: Okay.

A. Yeah, I think first of all you said it is materially new -- I think the "it" is a bit vague there. I think it would mean all the new information between the close and the fourth and the fifth.

Q. Yeah, so let's just -- let's take it in pieces. The fact pattern here is I'm thinking about the close on the fourth to the open on the fifth. You with me?

A. I'm with you.

Page 320

D. Tabak, Ph.D.

Q. Okay. And if there's no statistically significant change that could be because the market has finished processing the Massie report and does not conclude that it contains new value-relevant negative information. Correct?

A. Well, the problem with that is that we know that there is a statistically significant decline over the course of November 5. So what would cause that in your hypothetical? Did it stop processing the information overnight and then accidentally magically happen to have a statistically significant stock price decline on the fifth?

Q. Well, I'm as mystified as you are, right? I mean, if the market has 17.5 hours to process information and it opens without a statistically significant stock price movement, that should tell us something, right?

MR. HORNE: Objection.

Page 321

D. Tabak, Ph.D.

A. It may, but don't forget one of the ways that we think of markets as reaching efficiency is by people seeing what other people have done and responding. You don't see that right at the open.

Q. I see. So one explanation could be that at the open, the market is not experiencing a statistically significant reaction because the information available so far as been baked in as of the close. But then what happens on the fifth is that the market sees new reactions, and then the stock price reacts to the new reactions?

A. Essentially, yes.

Q. Okay. Is that more of that volatility stuff we were talking about earlier where you're saying that markets sometimes take additional time to incorporate information because investors are reacting to what others are doing or saying?

A. Yeah. I mean, put it this way, the idea behind market efficiency is that

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 322

D. Tabak, Ph.D.

the market incorporates information that everybody has. It can't do that until people actually trade.

Q.   So I'm still on November 5th.

Is it your opinion that Biogen's price decline on November 5th was due at least in part to continued incorporation of the Massie report into the stock price?

A.   So I'm going to give the same answer I think I did before, that I believe there was likely price impact from the Massie report, but I've not allocated yet to the fourth, fifth, or between the two, so that is one possibility. Another is just general sometimes you know market moves one way one day, and then reverses the next day.

Q.   Okay.

So you did an analysis in your report -- and feel free to look in paragraph 74 -- where you say that 100% of Biogen analyst reports included Massie, statistician, or statistical review on November 5th.

Page 323

D. Tabak, Ph.D.

Have I got that right?

A.   Yes.

Q.   Are we on the -- we speaking the same language?

A.   Yes.

Q.   Okay.

So what are you trying teach us in paragraph 74 with that analysis of analyst reports that included those three words?

A.   Well, first of all, included --

Q.   Those three terms?

A.   At least one of those three words, not necessarily all three.

So, you know, I'm addressing is there evidence -- not proof, but evidence -- in favor of price impact on various days, including November 5th.

The fact -- and I think we even talked about this. If analysts or news stories are talking about something, that may be an indication that the market is responding to what they're talking about.

Q.   Okay.

Page 324

D. Tabak, Ph.D.

But you would agree with me that old information when it's repeated does not generate price reaction in an efficient market.

Correct?

MR. HORNE:  Objection.

A.   Unless there's a reason for the repetition or something like that, that is correct.

Q.   Okay.

So it's not the case that an accumulation of old information, even though it may have a large volume, still shows price impact for the time on which it's reported, correct?

A.   Well, let's put it this way: It doesn't mean that those analyst reports are causing the price impact. This may go back to more of what -- this might be a reflection the analysts are talking about what the market is doing as opposed to causing that price movement.

Q.   Right.

So the timing of the commentary

Page 325

D. Tabak, Ph.D.

doesn't necessarily mean that the commentator is absorbing new information in that moment, correct?

A.   Correct. They may simply be reflecting what they see happening at that moment.

Q.   Or they may be talking about something that happened yesterday?

A.   That is also possible.

Q.   Okay.

So if you turn -- I think you're referring us to Exhibit 14A of your report.

A.   I am.

Q.   Okay.

So 14A is, I think, just showing us how often those keywords show up in analyst reports.

Am I getting that right?

A.   The percentage of analyst reports that have those keywords, not how often. So if they show up twice or ten times, it doesn't make the bars any bigger.

Q.   Got it.

82 (Pages 322 - 325)

Page 326

D. Tabak, Ph.D.

And your finding is you get a very high percentage on the fifth?

A.    Yes.

Q.    A hundred percent?

A.    Correct.

Q.    But you also get, if I'm getting this right, a very high percentage on the 11th?

A.    Also correct.

Q.    Is that 100%?

A.    I believe it is.  Maybe it's high 90s.  I don't remember.  But one or the other.

Q.    Functionally, it's extremely similar, correct?

A.    Yes.

Q.    Okay.

So are you suggesting that on November 11th, Biogen stock price is still reacting because analyst reports on the 11th, 100% mentioned those three keyword terms?

A.    Again, at least one of the three, not all three of them. No, I'm not

Page 327

D. Tabak, Ph.D.

saying that.

Q.    So what -- like, you could probably understand my head scratching here.

The 11th, even the plaintiffs in this case don't claim there's price impact still happening that they can claim damages for on the 11th, but the 11th and the fifth are functionally the same, right?

A.    Well, when you say functionally, the same, you mean -- the bars here are very similar.

Q.    Yes.

A.    Yes.

Q.    And you're not arguing that on November 11th, there's still price impact.

A.    No additional price impact, correct.

Q.    From the Massie report?

A.    Correct.

Q.    Have you read the reports that go into these bars?

A.    I've read some of them, not all of them.

MS. SOLOWAY:  Okay.

Page 328

D. Tabak, Ph.D.

Can I have 50A?

(Whereupon, Exhibit 19 was marked for identification.)

MR. HORNE:  While we're waiting, how are we doing on time?

THE VIDEOGRAPHER:  A little over five hours.

BY MS. SOLOWAY:

Q.    I'm handing you Exhibit 19.

A.    Thank you.

Q.    This is an RBC report, correct?

A.    It is.

Q.    It's dated November 5th?

A.    It is.

Q.    This is one of the -- feel free to look at your report, but this is, I think, one of the materials that you relied on.  It's in tab three of your report, page 12.

A.    Exhibit 2?

Q.    I'm sorry.  I'm using my own conventions.  Yes, Exhibit 2.

A.    Yes, it's listed there.

Q.    It's on page 12 of your

Page 329

D. Tabak, Ph.D.

exhibit -- it says list of analyst reports used in Exhibit 14A, right?  That's your Exhibit 2?

A.    Yes.

Q.    So we've confirmed that is in fact the RBC report listed in there?

A.    Yes.

Q.    Do you know where in this analyst report the relevant terms appear?

A.    Sitting here, I don't know.  I'd have to look through it.

Q.    Okay.

One of the relevant terms is statistician, right?

A.    I believe that's correct.  Let me just confirm.  Yes.

Q.    If you look at page three of the RBC report --

A.    Okay.

Q.    There's a reference to a statistician.  Do you see that in the second to last row of that chart?

A.    Paid the -- Richard P. Hoffman?

Q.    Above that one.  Scott Emerson.

Page 330

D. Tabak, Ph.D.

If you look at the miscellaneous notes to the right, do you see recent interaction with BIIB statistician?

A. Yes.

Q. Statistician is one of your search terms, correct?

A. Correct.

Q. But this chart is not about the aducanumab vote, correct?

A. Well, it's not about the -- well, it is about the upcoming vote, is it not? Oh, well, wait. It says -- I'm not going to -- I'll spell the name of what I see. The E-T-E-P-I -- sorry -- E-T-E-P-L-I-R-S-C-N Ad Comm vote. I assume that's not adu.

Q. Not to my knowledge. I'm really just wondering whether, you know, you think that your search picked up this reference to statistician that's actually about another drug?

A. It presumably would have and if the other terms are not mentioned here, that

Page 331

D. Tabak, Ph.D.

would be the reason that this was counted.

Q. So this search is a bit of a blunt instrument, correct?

A. It is. It's not meant to be perfect. Any broad search, there'll be false positives and false negatives potentially.

MS. SOLOWAY: Okay. Let's take a look at one more.

Let's look at the ...

(Whereupon, Exhibit 20 was marked for identification.)

BY MS. SOLOWAY:

Q. I'm going to hand you have a JP Morgan report that I've marked as Exhibit 20.

A. Okay.

Q. Do you know why this -- feel free to look, but this is a JP Morgan report that's also part of your exhibit that we were just looking at. Exhibit 11 -- 11A, right? And JP Morgan is on page 12 of your Exhibit 2 to your report.

I have to find the right one,

Page 332

D. Tabak, Ph.D.

there's multiple page numbers -- there it is. It's about three-quarters of the way down on page 12 of 20.

A. I'll take your word for it.

Q. It lists a November 5th report called Docs on Docs.

That's the report you're looking at, correct?

A. This is called Docs on Docs.

Q. Do you know why this particular analyst report pinged on your search?

A. Sitting here, no. Wait, I'm sorry. No, I don't.

Q. So I'll put page -- there's no page numbers on here. Okay. Let's try for what is page six, I think. At the top, it says table five, open responses to changing views based on briefs docs. Are we on the same page?

A. I'm on that page.

Q. Under respondent five, this is a poll, correct? Just to follow along?

A. That's my understanding.

Q. They're polling doctors,

Page 333

D. Tabak, Ph.D.

correct?

A. Yes.

Q. And there's the word statisticians appears in this note?

A. Yes.

Q. But the note is that both clinical and statisticians reports were at a much lower quality than in the past and they were not allowed to make an independent assessment.

Do you see that?

A. I do.

Q. Okay.

So this -- and this is what pinged your test, this is a criticism of I think the full scope of clinical and statistical reports, this particular participant thought they were of low quality, correct?

A. Lower than the past, yes.

Q. Not clear if this is a reference to the Tristan Massie report, correct?

MR. HORNE: Objection.

84 (Pages 330 - 333)

Page 334

D. Tabak, Ph.D.

A.    What other statistician report do we think it might be in reference to?

Q.    Well, there were statistical analyses in the -- in the joint briefing book as well.

A.    That were statistical analyses, but the statistician was generally believed to be Massie.  Is there someone else who's generally treated as the statistician submitting the report?

Q.    Again, I mean this is a poll of some doctor.  I have no idea what he's referring to, but I don't think you have any idea what he's referring to either?

A.    Well, I think that's unfair.  I mean, Massie was described as the statistician and provided the statistical analysis, comparing the clinical and statistician reports, my guess is Massie, I can't prove that.  To say I have no idea I think is unfair.

Q.    Let's just imagine that one of the statisticians being referenced here is Massie.  This person's observation is that

Page 335

D. Tabak, Ph.D.

the report is of a low quality, correct?

A.    Lower than in the past.

Q.    They're not crediting the quality of Massie's work, correct?

A.    Well, they're saying it's lower quality and that they were not allowed to make an independent assessment, yes.

Q.    Is there any academic support for this exercise that you're doing in the bar charts that the market is continuing to incorporate information based on the number of references to certain key terms on each trading day?

A.    Yeah.  There's a field called content analysis that basically says that references to issues may be a reflection of interest in those issues, or it actually says it is a reflection of that, and therefore may be useful in understanding what the market is reacting to and, you know, people like my colleague Lucy Allen have done reports with content analysis.

Q.    In the field of content analysis, how do you take into account

Page 336

D. Tabak, Ph.D.

repeated -- so you and I agreed earlier that old information, even when repeated, is not proof of market efficiency, right?

Let me withdraw that.

A.    Repeating information will not say anything one way or another about market efficiency by itself.

Q.    Old information when repeated does not move markets, correct?

A.    Unless the repetition has a -- the fact of the repetition has a particular meaning, yes.

Q.    Okay.

And how does the field of content --

A.    Analysis.

Q.    -- analysis deal with the fact that it's very common for newspapers, for example, to repeat the same content over and over?

MR. HORNE:  Objection.

A.    Sure.  Put it this way:  If there's both new news and old news, I think you take that into account.

Page 337

D. Tabak, Ph.D.

Over here, we can ask -- you know, there's definitely knew news on the fourth.  I don't think we have in any new news on the fifth.  So to the extent the market is still reacting, it is reacting to news on the fourth.

Then we can go on and, in fact, later on look at this as effective trading days, and then you basically put everything after the fifth through the ninth into one day, because that's the next time the market for Biogen stock was open.

Q.    Right.

And on the sixth is the Ad Comm vote, correct?

A.    Correct.

Q.    And on the fifth the market is anticipating the vote, correct?

A.    Sure.

Q.    And on the sixth, seventh, eighth, et cetera, the market is reacting to the Ad Comm vote, correct?

A.    Well, the market for Biogen stock is closed on the sixth, seventh, and

85 (Pages 334 - 337)

Page 338

D. Tabak, Ph.D.

eight so ...

Q.    I'm sorry. I didn't mean the stock market. I meant commentators so let me withdraw the question.

On the sixth, seventh, eighth, et cetera, commentators are reacting to the vote, correct?

MR. HORNE: Objection.

A.    Yes. Among other things, but yes.

Q.    So the Massie analysis was presented as part of the Ad Comm, correct?

A.    Part of the briefing back on the fourth, yes.

Q.    Right.

And so it would make sense it would get public attention in connection with coverage of the Ad Comm, correct?

MR. HORNE: Objection.

A.    That would be reasonable.

Q.    And the Ad Comm was big news, correct?

A.    I'm assuming you mean the vote when you're saying the Ad Comm, yes.

Page 339

D. Tabak, Ph.D.

Q.    Well, the meeting and the vote.

A.    The meeting and the vote for Biogen, yes.

Q.    Did you go through the articles that come out on the various days or the analyst reports, the fifth, sixth, seven, eighth, ninth, to ascertain whether the references to Massie or the statistician, et cetera, were in the context of assessing what would happen at the Ad Comm vote or what had happened at the Ad Comm vote versus looking at it for the purposes of understanding his analysis?

A.    I looked at them, but I did not perform that analysis.

Q.    You would agree with MRI that based on what you've read, there was a lot of market noise about what the Massie report would mean for the Ad Comm, correct?

A.    I don't know if I would refer to it as noise, but yes, I would agree with you.

Q.    And why is that?

A.    Because in theory, the

Page 340

D. Tabak, Ph.D.

statistical analysis may have an effect on how the Ad Comm members vote. And that matters a lot for Biogen because it affects the likely potential future of adu.

Q.    So in your report, and this is paragraph 76 of your report, you say it is not clear that defendants can prove that none of -- sorry.

A.    Sorry. Where?

Q.    Paragraph 76.

A.    Where in the paragraph, just to help me out.

Q.    I'm going to point you there.

A.    Oh, I see it. Second -- or third sentence.

Q.    Yeah. I just want to make sure I'm reading it correctly: It is not clear that defendants can prove that none of this price movement -- I think you're referring back to the 28th -- excuse me -- the ninth -- excuse me -- relates to the market incorporating information from the Massie report.

We talked about that earlier,

Page 341

D. Tabak, Ph.D.

correct?

A.    Correct.

Q.    And you said that you understand that it's Defendants' burden, and you're making the observation that you're not sure Defendants can meet their burden, correct?

A.    That is fair.

Q.    Okay.

You also write that it's your understanding -- this is in footnote 66 -- the defendants must prove a complete lack of price impact.

What do you mean by complete lack of price impact?

A.    I'm pretty sure that's a phrase that's used, so again, I'm not going to give a legal opinion, but my understanding is it means they can't say it -- you know, if they say, for example, 99% of the price -- the price movement is unrelated, but 1% is, well, the case should go forward on the 1%.

So my understanding is that Defendants have to show that there is zero

86 (Pages 338 - 341)

Page 342

D. Tabak, Ph.D.

price impact as opposed to saying, for example, it's small.

Q. Okay.

And I want to differentiate between that and another possibility.

Is it your understanding that if Defendants can provide evidence that it is more likely than not that the price reaction on November 9th is due to the Ad Comm, that they do not succeed in meeting their burden?

MR. HORNE: Objection.

Calls for a legal conclusion.

A. I'm not going to give a legal conclusion, but first of all, you say if they can provide evidence. What if there's competing evidence? If there's competing evidence, the answer is no.

I can rework your question to say what if on net the evidence is that it is more likely than not that the price movement, then again the question is more likely than not that the entirety of the price movement or the bulk of the price

Page 343

D. Tabak, Ph.D.

movement. If it's only the bulk, well, then, it's more likely than not that some portion of it is related to the Massie report.

My understanding -- again, not giving a legal conclusion -- is you haven't met your burden. If you prove that the entirety of the price movement more likely than not is unrelated to the allegations, then my understanding is that you've proven a lack of price impact.

Q. So you think that -- again, I know you're not a lawyer and you're not offering a legal opinion, but it's your understanding that the defendants have to come forward with evidence that accounts for all dollars, all pennies of the stock price movement?

MR. HORNE: Objection.

Just for the record.

Calls for a legal conclusion.

A. I'm going to make a continuing statement if necessary that I'm not giving legal conclusions. Yes, that is my

Page 344

D. Tabak, Ph.D.

understanding, you have to show a complete lack of price impact, not a mostly lack of price impact.

Q. When you do a disaggregation analysis for the purposes of damages -- let's put aside price impact for a moment -- is it your understanding that the plaintiff bears the burden of proving down to the penny exactly how much of the decline is fraud related versus non-fraud related?

A. No, that is not my understanding.

Q. What's your understanding of the standard that applies to the plaintiff in that context?

MR. HORNE: Objection.

Calls for a legal conclusion.

THE WITNESS: You can assume that anything that's legal related, I'm disclaiming a legal conclusion, just giving my understanding.

MR. HORNE: I still need to make the objection.

THE WITNESS: I know. I know.

Page 345

D. Tabak, Ph.D.

A. My understanding is there are various things such as it has to be a reasonable estimate or rough estimate, I think I may have seen.

Q. Okay.

Is your understanding about the burden that you just articulated that's on defendants for price impact, does that come from counsel?

A. No.

Q. Where does that come from?

A. It comes from having read cases on price and opinions on price impact for a number of years now.

Q. Can you point me to any economic or academic literature that would support continued price movement on November 9th from the news released on the morning of November 4th, five days earlier?

A. First of all, on those five days, three of them are non-trading days. So really it's basically two trading days later. In fact, a little bit less than since the news on the fourth came out a

87 (Pages 342 - 345)

Page 346

D. Tabak, Ph.D.

little after the open.

Q. Yeah, but it's a lot of time for people to think, right?

A. Sure, but if they thought on the seventh and the eighth, or the sixth, the seventh, and eighth, when would you expect to see the price impact of them thinking other than on the ninth?

Q. Okay.

But on the sixth, seventh, and the eighth, the investors also have the benefit of knowing about the Ad Comm vote, correct?

A. That's true, but your question was basically can there be price movement from November 4th on the ninth, and I'm pointing out if people on the sixth for whatever reason thought, yes, I'm going to put more weight on the Massie report, they can't reflect that in the market until the ninth.

Q. Okay.

So just to be clear, you do agree with me that investors have all day on

Page 347

D. Tabak, Ph.D.

the fourth to incorporate -- to think about and incorporate the information in the Massie report, correct?

MR. HORNE: Objection.

A. All day after 10:30?

Q. Yeah.

A. After 10:30, sure.

Q. Then they have a full trading day on the fifth, correct?

A. Correct.

Q. I'm trying to figure out under what circumstances you think that there would be after the weekend and on that trading day on the ninth continuing price impact from November 9th?

A. Okay. So two things.

Q. On November 9th?

A. I understand, but this after the weekend I think is a bit misleading because you're not going to see the price impact on the weekend. So that makes it sound like it's taking more time, but that's --

Q. Okay. I'll withdraw the --

Page 348

D. Tabak, Ph.D.

I'll withdraw the after the weekend. You've got two --

A. It's essentially two trading days later.

Q. Correct.

Two trading days later, the morning of the ninth -- yeah?

A. Yes.

Q. Okay.

What is the basis for suggesting that the market is still incorporating information from the morning of the fourth on the morning of the ninth?

A. In the answer, I'm saying it's a possibility because we have seen multi-day price reactions. Those do exist.

Q. Where have you seen them?

A. I'll give you an example. Let's go to the Krivin article. Where did it put it? Oh, there we go.

Q. Which exhibit is that?

A. Eleven.

Q. Okay. Thank you.

A. Let me know when you're ready.

Page 349

D. Tabak, Ph.D.

Q. Give me a second.

A. Sure. Once you're there, if you look at page 16 --

Q. Uh-huh.

A. And you have table two, average event window lengths, if you look at the bottom row, announcement they're both earnings announcement the end of the class period, depending on what you look at, you have an average length of between one and a half to three trading days, and of course if those are averages, some are shorter, some are longer.

Q. Okay.

Putting aside this article, can you point me to any other support for a three-day trading window?

A. Offhand, I have -- again, I don't know if there is recent literature on this. But in theory, there's nothing wrong with it as long as you do not know in advance which way the price movement will be on the third day.

Q. Okay.

88 (Pages 346 - 349)

Page 350

D. Tabak, Ph.D.

So I hear you saying that there's nothing wrong with it, but you would agree that -- I think we had this conversation earlier, that in most cases information is incorporated quickly into stock prices, correct?

MR. HORNE: Objection.

A.    And by incorporated, you mean begin to be incorporated, fully --

Q.    I think we agreed that begin happens instantaneously --

A.    We agree either instantaneously or near instantaneously, yes.

Q.    And then full incorporation, in most cases happens within minutes, correct?

MR. HORNE: Objection.

A.    If by full you mean that we're talking about an unbiased estimate of the future, yes. If you mean accounting for all future volatility, probably not within minutes.

Q.    Okay.

So we'll do the unbiased. So what I'm asking you about is: Do you

Page 351

D. Tabak, Ph.D.

believe that based on the current state of the academic literature you could still be having that unbiased price reaction here on November ninth from the Massie report?

MR. HORNE: Objection.

A.    I think it is possible and therefore it has to be answered through some type of empirical analysis. I don't think you can just say it is not possible.

Q.    Okay.

Is there any cut off that you would impose where you would say, all right, maybe I can get comfortable with three days, maybe I can get comfortable with four days, but I just can't get comfortable with five days. Like, is there any limit where you would impose and say under an efficient market it simply isn't possible anymore for the market to still be reacting to that old information? Where's your limit?

A.    I don't know if I have a specific one, but obviously the further out you go the less likely and less reasonable it seems. But again, no, I don't think

Page 352

D. Tabak, Ph.D.

there's -- the theory doesn't have a particular magic cut off.

Q.    Are you able to tell me -- again, this is your opinion, this is your expertise that you're bringing to the table. Are you able to tell me that in 90% of cases you will see stock price fully incorporate new information within a day?

A.    I can't give you a particular percentage. Probably not quite that high, but I think it's, you know, a reasonably large percentage that you stop seeing the higher volatility after a full trading day.

Q.    If not 90, what would you put it at?

A.    I really haven't thought about it.

Q.    Think about it now?

A.    To think about it, I would like to see data rather than just do it based on theory, so I can't give you an answer without data.

Q.    I would like to see data too. Can you point me towards it?

Page 353

D. Tabak, Ph.D.

A.    I've pointed you towards it, and then you say to stop referring to that article.

Q.    Just that article? Do you have anything else for me?

A.    I have not looked for something like that recently. I know that there are academic papers that follow this article.

MS. SOLOWAY: Okay.

MR. HORNE: Counsel, we've been going for more than an hour. Are we talking about another hour before we're done?

MS. SOLOWAY: No. No. Just give me a couple minutes.

MR. HORNE: Okay.

BY MS. SOLOWAY:

Q.    Have you provided any methodology for disentangling -- well, let me take a step back.

For November 9th, you would agree be me with me that the advisory committee vote is impacting the stock price on November 9th, correct?

89 (Pages 350 - 353)

Page 354

D. Tabak, Ph.D.

A.    Correct.

Q.    Okay.
Have you identified any methodology for disentangling the portion of the stock price reaction on November 9th that was from the Ad Comm vote from what you say there might be some lingering effect from the Massie report?

A.    At this point, I have not.

Q.    Are you able to share with me any ideas on what that methodology might look like?

A.    I would say it would probably involve a review of analyst reports, but at this point, I've not considered such a methodology.

Q.    Is there anything else you can tell me about how you might tackle that?

A.    At this point, I don't have anything to add to that.  I mean, there's various techniques that are used, but I haven't thought about how to apply them here in particular.

MS. SOLOWAY:  That's a good

Page 355

D. Tabak, Ph.D.

segue.
I have one more section, which I think is going to be quick.  You want to just power through or do you want to take a break?

THE WITNESS:  I'm happy to power through it.

MR. HORNE:  Let's do it.

BY MS. SOLOWAY:

Q.    Your opinion on damages, which you drop a footnote, I think, you referred to the Supreme Court's decision on Comcast, right?

A.    I believe I referred to it.  If you say so, I believe you.

Q.    You know, I have a lot of these cases so I could have hallucinated it all.

A.    It's there.  It's footnote 53.

Q.    Okay.  Thank you.
I'm going to call this your Comcast opinion, if that's okay?

A.    That's fine.

Q.    Okay.
So you write in your report

Page 356

D. Tabak, Ph.D.

that a common methodology in this matter is possible.
Correct, for damages?

A.    Correct.

Q.    Okay.
And what is that common methodology?

A.    I mean, generally called the out-of-pocket method.  That's what you're looking for.

Q.    What is that?

A.    Saying that damages before accounting for a couple factors I'll get into, are purchase inflation less sale inflation, and if you retain, then that would be simply purchase inflation, those that are capped both based on loss causation issues from the Supreme Court's Dura, D-U-R-A, decision, as well as the -- I believe we call it the bounce back or look back cap from the 1995 PSLRA.

Q.    You say that the out-of-pocket measure is the most common.
Are you aware of any other ways

Page 357

D. Tabak, Ph.D.

to calculate damages in 10(b) cases?

A.    I believe it's possible to do rescission and other things, be it's generally not done.  I don't think the statute itself mentions out-of-pocket.

Q.    Is the damages methodology that is articulated in your report in the Comcast section tailored to the specific facts of this case?

A.    Well, what I point out over here is that --

Q.    Tell me where you are.

A.    In what we're calling the Comcast section.

Q.    Okay.

A.    A couple of things.  First of all, footnote 56 refers to issues between November 4th and November 5th and then I think I reference the entire price impact section somewhere within the Comcast section.

Q.    But apart from that, is there anything about your Comcast opinion that's tailored to the facts of this case?

90 (Pages 354 - 357)

Page 358

D. Tabak, Ph.D.

A.    You mean the entire price impact section, which is -- goes from page 31 to 37?

Q.    Well, so the footnote that you're referring to about price impact is what? Footnote 56, correct? That's what you just sent me to.

A.    It's there, but I think I also -- oh, no, paragraph 61. The carryover part on page 31, I mentioned that there will "likely be disputes as to how much of the price movements on each of those dates may be attributed to corrective information, a point I address in the next section of this report." The quote continues.

So basically rather than just saying, yeah, I'm going to do something to disaggregate, I provide much more than what you usually see in a Comcast section, an entire section here talking about how to at least begin, if not actually get to a potential conclusion on disaggregation.

Q.    And that disaggregation methodology is the analyst report analysis

Page 359

D. Tabak, Ph.D.

that you did?

A.    Yes. Again, it's preliminary. Obviously, take a look at the Atlantic report -- and I may change things -- but at this point, it's just to say, yes, there are data that would allow one to disaggregate.

Q.    Okay.

Other -- but other than the analyst report -- analysis that you did that you said you were going to take a look at and think about whether it needs to be changed, there's nothing else I'm missing? Like, that's the disaggregation methodology that you're referring to?

A.    A potential disaggregation methodology, yes.

Q.    Okay.

And so putting that to the side, these paragraphs that you've included in your report, paragraphs 58, 59 through 62, fair to say that these are part of your usual approach to your -- to Comcast?

A.    Well, they're part of -- but again, putting aside the six pages on price

Page 360

D. Tabak, Ph.D.

impact, the footnote on the March 2025 order, yes, then I think, yes the remainder is standard.

(Whereupon, Exhibit 21 was marked for identification.)

Q.    Okay.

So I have two expert reports that I'm just going to hand you. Let's do them at the same time, just to quickly knock them out.

Let's start with Alibaba actually. Sorry.

A.    Which Alibaba?

Q.    Exactly.

I'm going to hand you Exhibit 21.

Do you recognize this?

A.    Yes.

Q.    This is an expert report that you offered in the Alibaba case?

A.    It is.

Q.    In connection with class certification, correct?

A.    Just give me one second to be

Page 361

D. Tabak, Ph.D.

sure.

Yes.

Q.    Okay.

And if you look at page 27 of this report -- no, wait --sorry.

A.    Yes. You're right.

Q.    Yes. Okay. Turn to page 27.

A.    Okay.

Q.    There's a series of paragraphs that says that damages for investors in Alibaba's ABSs can be calculated through a common methodology.

Do you see that?

A.    I do.

Q.    You would agree with me that the content of these paragraphs is very similar to the content of the paragraphs that you provided in that case, correct?

A.    Well, again, putting aside the reference to the six pages on price impact that I referenced there, yes, it's generally similar. And, again, putting aside the reference to the March 2025 order.

Q.    Okay.

91 (Pages 358 - 361)

Page 362

D. Tabak, Ph.D.

And then is it fair to say that this is part of the template that gets copied and pasted from one report to the other to the extent it overlaps?

A.    Yes.

Q.    How much time, if any, do you think you spent on the Comcast analysis in this report?

A.    Well, I viewed the Comcast analysis as intertwined with the price impact analysis, so quite a bit of time thinking about the price impact analysis.

Q.    If I excluded the price impact portion of your analysis, how much time would you say you spent on the Comcast section?

MR. HORNE:  Objection.

A.    It's kind of a weird question if you exclude the bulk of the time, how much time is left.  The answer is some time to make sure that it made sense and thinking about the November 5th order.

But again, if you exclude the bulk, you're left with a, you know, I don't

Page 363

D. Tabak, Ph.D.

know, probably at least five to ten hours because thinking of how to deal with the November 5th order.

Q.    You think you spent five to ten hours thinking about how the deal with the order?

A.    Yes.

MR. HORNE:  Objection.

Q.    Explain that.  I think I'm missing something.

Why is that?

A.    Well, so the order basically said that for the purposes of doing what you can think of as a PSLRA analysis, the stock price response begins on November 5th.

Q.    Mm-hmm.

A.    Yet as we've discussed here, we would expect the stock price to respond or to at least begin to respond on November 4th.  So I had to think about what to do if I -- if that order is just meant to be kind of temporary or restricted to just relating to the PSLRA versus if it is in some sense binding on the future.

Page 364

D. Tabak, Ph.D.

Q.    Okay.

So that's -- that was the source of your focus for purposes of thinking about a damages methodology?

A.    Yes, because depending on whether that bid in the order is kind of limited to a PSLRA analysis or binding on the future, that would affect my damages analysis.

Q.    Okay.

Have you had a case before -- I know we talked a little bit before about how unusual this case is.  But have you had a case before where you've got a corrective disclosure that happened simultaneously with other non-fraud related information, and you have that day a significant stock price increase, and then the next day a stock price decrease where the stock price stays above the stock price as of the time of the corrective disclosure.

Have you ever had that before?

MR. HORNE:  Objection.

Compound.

Page 365

D. Tabak, Ph.D.

MS. SOLOWAY:  Let me first --

A.    I don't think it's compound.

Q.    Let me -- let me -- let's just be clear.

I accurately described the fact pattern here, correct?

A.    I believe that's correct, yes.

Q.    Okay.

Have you ever had a case that presents that fact pattern?

A.    That particular fact pattern, I do not recall such a case.

Q.    Okay.

Would you agree with me that this fact pattern presents some real complications for how to analyze the amount of stock price movement that can be attributed to the corrective disclosure?

A.    I'm not sure if it's necessarily that different than other cases where there's confounding moves.  So it's more interesting definitely, but it's still a question of moving confounding news.

In this case, the confounding

92 (Pages 362 - 365)

Page 366

D. Tabak, Ph.D.

news happens to be in the opposite direction of the corrective information, and happens on net to outweigh it.

But in the sense of you're disaggregating two pieces of news, I don't think it's necessarily that way, and that's -- though certainly because it was interesting and different, that is one of the reasons that I put in the price -- the six pages or so on the price impact analysis.

Q.    Okay.

In paragraph 62 of your report, you say that further discovery should aid in some of the exact para --

A.    Parameterizations.

Q.    Thank you.

-- of the damages calculations.

What do you mean by that?

A.    So for example, that could include expert discovery or even discovery from Biogen about beliefs on what the -- you know, we'll call it the negative information, would have on the probability

Page 367

D. Tabak, Ph.D.

of approval by the FDA.

Q.    So just to be clear, you know that the FDA had all the information, right?

MR. HORNE:  Objection.

A.    All the information that appeared in the briefing book and so forth, yes.

Q.    So they had the subgroup analyses, correct?

A.    Yes.

Q.    Okay.

So what you're saying is that you would want to explore whether the market's expectations for the likelihood of approval differed from what the market's expectations for the likelihood of approval would have been if they had all the information, including the subgroup analyses.

Am I getting that right?

A.    If that's what's required to be disclosed, then yes.  I mean, if the alternative is to disclose a generic statement, then I would compare what the

Page 368

D. Tabak, Ph.D.

market actually believed with what we think it would have believed had there been some type of generic alternative statement made.

Q.    Right.  And I just want to make sure I understand.

Like, would it affect your analysis?  Because I think what you're saying is that the reason that the data is relevant to investors is because they're trying to figure out what the likelihood of approval of adu is, right?

A.    Yes.

Q.    Okay.

If it turned out that Biogen had made other statements to the market that, for example, warned that it would be unusual for the FDA to approve a drug where you've got, you know, one positive study and one negative study, wouldn't it be the case then that the market would be on notice of the risk that in the situation where you've got some positive data and some negative data, that may have a negative impact on the likelihood of approval?

Page 369

D. Tabak, Ph.D.

MR. HORNE:  Objection.

BY MS. SOLOWAY:

Q.    Do you understand the question?

A.    Well, the problem is on notice -- I know it's kind of a legal term here.  I'm not going to give a legal opinion, again, but putting that aside, you know, if you're on notice of certain risk but other risks, you know or the extent of the risk has been hidden, I'm not going to know the legal answer, by the answer is the market would still be misled and can still overestimate the likelihood of approval because of the additional information that had not been disclosed to the market.

Q.    And you haven't formed a view in this particular case of what the market's assessment was of the extent of the risk of non-approval here, correct?

A.    I've seen some evidence where analysts have made that call, but I haven't, you know, formally analyzed that.  But they certainly -- analysts have certainly -- we've seen various ones say we think there's

93 (Pages 366 - 369)

Page 370

D. Tabak, Ph.D.

an X percent chance of approval.

Q.    Right.  And many analysts believe that the chance of approval was low, correct?

A.    There was a range of analyst beliefs.

MS. SOLOWAY:  Just give me one second.

THE WITNESS:  Sure.

MS. SOLOWAY:  Okay.  I think I have exhausted my questions.

Do you guys have anything?

MR. HORNE:  We might.  Give us a second.

THE VIDEOGRAPHER:  Want to go off the record real quick?

MR. HORNE:  Yes, please.

THE VIDEOGRAPHER:  Time is 5:58 p.m.

We're off the record.

(Recess taken)

THE VIDEOGRAPHER:  The time is 6:06 p.m.

We are coming back on the

Page 371

D. Tabak, Ph.D.

record to say that this is the conclusion of today's testimony by David -- by Dr. David Tabak.

The time is 6:06 p.m.  The deposition is concluded.

Page 372

A C K N O W L E D G M E N T

I, DAVID TABAK, Ph.D., hereby certify that I have read the transcript of my testimony taken under oath in my examination of July 29, 2025; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____

DAVID TABAK, Ph.D.

Signed and subscribed to before me, this      day of
        2025.

_____

Notary Public

Page 373

CERTIFICATION

I, SARA K. KILLIAN, RPR, RCR, CCR, do hereby certify that DAVID TABAK, Ph.D., the witness whose examination under oath is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of July, 2025.

SARA K. KILLIAN, RPR, RCR, CCR

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

Page 374

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Shash v Biogen, et al
DATE OF DEPOSITION: 7/29/2025
WITNESS' NAME: DAVID TABAK, Ph.D.

PAGE/LINE(S)/    CHANGE    REASON
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
___/_____/_____/_____
_____
        DAVID TABAK, Ph.D.

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF _____, 2025.

_____
  NOTARY PUBLIC
MY COMMISSION EXPIRES_____

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

**[& - 2001]**                                                                 Page 1

| & | | | |
|---|---|---|---|

**&**  1:19 3:5 8:21 260:8

**0**

**04**  268:22

**1**

**1**  4:9,10 19:5 20:6 36:12 217:16 341:22 341:23
**1.1**  218:22
**1/3**  36:23
**10**  5:10 15:20 15:25 102:6 112:25 196:12 196:15 208:8 208:11 357:2
**100**  4:22 14:19 16:7 102:2,5 104:15,20,24 104:24 110:13 110:14,16 185:5,6 222:21 265:20 275:15 322:22 326:11 326:22
**10016**  2:7
**10019**  3:8
**10479**  1:3 8:19
**10:10**  311:8
**10:26**  1:13 8:4

**10:30**  83:3,16 310:22,25 311:9,24 312:4 347:6,8
**11**  5:14 217:23 217:25 218:5 282:19 283:4 284:9 289:16 291:7,24 293:16 294:5,9 296:12 299:19 299:22 331:22
**110**  292:12
**113**  4:23
**11:00**  312:6,7
**11:15**  256:9 258:15 259:11 282:7
**11:20**  267:21
**11:35**  269:5 270:17 282:7
**11:40**  89:11
**11:56**  89:15
**11a**  331:22
**11th**  326:9,20 326:22 327:5,8 327:8,16
**12**  5:18 170:2,4 249:9,14 260:9 291:7 318:12 328:20,25 331:23 332:4
**1285**  1:20 3:7

**13**  5:20 255:25 256:2,5 262:11 272:13
**14**  5:22 19:22 45:25 46:13 47:10 51:18 262:14,21 272:13
**14:19**  291:11
**14a**  170:6 325:13,17 329:3
**15**  6:4 159:10 190:12 191:9 191:24 192:2 192:18 203:7 203:17 212:21 213:5 216:4,5 216:9 229:7 246:14,17 247:12 268:7 268:14 272:8 272:10,12 280:15
**152**  5:4
**16**  6:6 100:4 268:12,13 271:25 272:4,8 272:10,24 349:4
**17**  6:8 113:25 114:4 290:12 290:15,16

**17.5**  318:13,15 320:20
**18**  6:10 154:22 155:4 225:17 307:4,9
**187**  5:6
**19**  4:9 6:11 328:3,10
**196**  5:10
**1960s**  175:21 177:15,17,25 178:13 185:21
**1985**  186:23
**1995**  356:22
**1:00**  143:13
**1:07**  310:13
**1:11**  168:11
**1:21**  1:3 8:19

**2**

**2**  4:10,18 19:25 20:6,17 30:4 169:21 199:13 328:21,23 329:4 331:24
**2.6**  218:23
**20**  4:10 6:13 152:25 153:4 238:20 331:12 331:17 332:4
**2000s**  247:22
**2001**  187:17,25 195:6

**[2002 - 435]**

**2002** 187:12,16 187:17 188:3
**20020** 81:6
**2003** 217:15
**20037** 2:18
**2020** 4:16,16,18 4:19 5:21,23 6:5,7,9,10,12 6:14 32:10 33:12,24,24 35:9 38:16 44:22 45:17,20 47:19 74:12 75:25 76:2,2 81:9 101:2 170:11 248:17 256:9 268:23 283:7
**2025** 1:13 8:4 72:24 73:2 76:9 77:12 360:2 361:24 372:7,17 373:16 374:21
**21** 6:15 360:5 360:17
**2104** 196:18
**218** 5:14
**21st** 278:3
**22** 4:16,18
**22nd** 33:12,24 45:20 47:24 50:5 51:11 69:12 70:5,6

71:13 95:25 96:4,20 98:13 98:24 99:22 101:2,8,16 102:12 107:12 107:12,15,24 108:9 110:6,22 110:23 111:2,7 111:12,22 112:14 115:16 116:10 120:11 121:13 123:13 124:10,14,22 126:7 129:13 130:10 131:5 131:11 133:15 136:3 137:9 138:16 142:12 142:15 149:8 149:10,21,23 150:9,22,25 151:11,23 159:6,8 165:16 165:25 166:17 167:5 168:23 170:22 175:10
**23** 194:8
**247** 249:21 277:21
**247.01** 275:8,9
**249** 5:18
**25** 12:14 296:23

**253** 249:21,24
**255** 250:25
**256** 5:20
**262** 5:22
**267** 298:9
**268** 6:4
**269** 278:4,7,12
**27** 217:16 297:7 361:5,8
**270** 292:8
**272** 6:6
**275** 2:6
**28th** 340:21
**29** 1:13 372:6
**290** 6:8
**29th** 8:4 373:15
**2:04** 168:15
**2:19** 291:11
**2:30** 309:6 310:5 312:18 312:21
**2nd** 44:22

**3**

**3** 4:12 6:5 36:3 36:4,12,15,19
**3.2** 191:13
**30** 296:23 297:7
**301** 72:2 161:4 270:8 292:22
**302** 72:2 161:4 292:25

**307** 6:10
**31** 120:3 358:4 358:11
**324** 287:10
**328** 6:11
**331** 6:13
**34** 97:6,12
**355** 277:21 278:5,11 298:10
**355.63.** 275:12
**36** 4:12
**360** 6:15
**37** 358:4
**380** 292:8
**390** 287:4,11
**3:10** 236:10
**3:24** 236:14

**4**

**4** 4:16,17 5:21 6:7,10,14 45:2 45:6 78:2 249:17 256:9 269:13 279:5 297:3
**40** 238:19 244:13
**40th** 2:6
**416** 189:8
**423** 191:12
**4268** 373:19
**435** 188:16

**437**   287:4
**45**   4:17 244:14
**48**   307:3
**4:00**   318:6,12
   318:12
**4:19**   291:2,6,20
**4:25**   296:3
**4:44**   296:7
**4th**   32:9,15,16
   32:23 76:2
   77:5 78:11,22
   79:23 81:13,21
   82:3,20 87:15
   89:3 95:22
   129:2 131:4
   171:4 224:25
   225:8,13 226:9
   226:25 232:3
   237:6,21
   248:17 266:5
   267:14,21
   271:14 273:9
   275:7,7 283:7
   290:8 301:13
   301:25 304:2
   307:11 308:2
   308:13 313:23
   317:22 345:20
   346:17 357:19
   363:21

**5**

**5**   4:20 5:23 6:9
   6:12 15:20,25

89:18,22
   301:17 320:13
**5.5**   318:13
**50**   10:3,4 12:3
   196:22
**50/50**   16:21
   17:4
**500**   260:8
**50a**   328:2
**53**   355:19
**56**   357:18
   358:7
**58**   359:21
**59**   359:21
**5:58**   370:20
**5th**   74:12 75:25
   76:14,21 81:13
   227:2 231:14
   233:5 237:22
   267:5,18 283:7
   290:20 301:7
   302:2 303:25
   313:12,23
   322:5,7,25
   323:19 328:14
   332:6 357:19
   362:23 363:4
   363:16

**6**

**6**   4:22 33:24
   100:7,13 268:2
**60**   238:18
   244:13 308:17

**600**   2:17
**60s**   177:8
**61**   75:16 81:5
   248:6 358:10
**62**   359:22
   366:14
**64**   257:13
**65**   65:6,14
   102:25
**66**   341:12
**69**   126:19,23
**6:06**   370:24
   371:5
**6th**   72:13 93:23

**7**

**7**   4:23 113:2,7
   223:15
**7/29/2025**
   374:4
**71**   301:6
**74**   322:22
   323:9
**75**   160:18
**76**   340:7,11

**8**

**8**   5:4 152:12,15
**80**   130:9,12
**89**   4:20
**8:00**   267:4
**8:05**   267:5,14
   267:18 282:11
**8a**   35:17 36:14
   37:10,23 38:13

**9**

**9**   4:5 5:6 81:6,9
   187:7
**90**   13:22 102:6
   105:3 110:17
   184:10,25
   185:7 308:17
   352:7,15
**90s**   186:6
   187:13 247:22
   326:13
**98**   160:12,14
**99**   341:21
**9:17**   273:13
   282:12
**9:19**   290:23
   291:5,19
**9:30**   311:4
   318:6
**9th**   32:10,23
   76:2 81:15
   87:6,16 88:25
   342:10 345:19
   347:16,18
   353:22,25
   354:6

**a**

**a.m.**   1:13 8:4
   89:11,15 256:9
   258:15 259:11
   267:5,14,18,21
   269:5 270:17
   282:11

ability 222:13
able 83:13
174:23 175:6
182:23 184:22
240:13 252:2
259:17,19
304:10 352:4,7
354:11
abnormal
109:10,18,25
110:4 128:12
128:21 232:16
232:19 233:4
234:3
above 329:25
364:21
absolute 139:6
absolutely
212:7,10
absorb 182:13
207:24 253:3
281:21
absorbing
325:3
abss 361:12
academic 10:20
17:16 177:6
185:24 209:6
246:2 335:9
345:17 351:3
353:9
accelerated
194:15

accept 22:22
125:20 203:9
203:10
accepted 22:6
187:17
access 178:24
accidentally
320:16
accord 68:5
account 202:25
207:4 230:12
230:13,14,17
299:14 304:22
319:4 335:25
336:25
accounting
246:21 350:20
356:14
accounts
343:17
accumulation
324:13
accurate
215:23 226:17
294:10
accurately
365:6
accusing
172:19
acknowledge
243:16
acknowledged
246:15

acknowledges
257:18 293:11
acknowledging
55:9 97:11
act 289:25
action 9:5
15:18,21 18:5
18:17 309:10
309:12 373:11
actions 16:2,24
21:7,16
acts 188:22
actual 73:18
123:13 183:25
210:4 213:16
275:21 298:10
actually 13:3
13:10,11 17:10
18:24 25:15
33:10 44:25
49:14 83:22,23
88:18 108:25
117:9 123:16
133:4 142:25
150:15 156:16
157:9 160:22
164:9 165:5,9
167:25 174:11
178:8 180:25
197:5 202:6
204:16,17
205:8,13,23
206:3 208:14
211:22 245:11

245:12,12
265:13 277:24
278:16 281:2
281:10,22
292:24 309:24
322:4 330:22
335:18 358:22
360:13 368:2
ad 91:23 92:5
92:13 93:16,21
94:4,12,19
95:14 330:16
337:15,23
338:13,19,22
338:25 339:11
339:12,20
340:3 342:10
346:13 354:7
add 71:5
203:10,19
241:2,2 294:12
294:22 354:21
adding 69:17
70:24 114:6
318:13
addition 192:3
additional
18:10 192:14
200:14,22
202:12,14,16
202:23 203:15
214:2 230:15
237:11 246:22
246:23,24

**[additional - ahh]**                                                        Page 5

| | | | |
|---|---|---|---|
| 279:16 314:19 321:21 327:17 369:15 | 108:12 109:16 111:4,20 130:9 134:18 135:8 162:3 164:4,6 | **advantage** 180:12 181:10 **advice** 272:17 **advisory** 72:14 | 63:14 64:11 70:15 76:18 80:17 81:19 84:6 100:19,25 |
| **additionally** 318:17 | 164:14 165:12 165:15 166:4 166:12,16,25 | 73:6,15 85:14 86:13 193:16 258:10 302:14 | 101:7 120:24 124:3,5,6,9 125:18 131:12 |
| **address** 131:20 134:8 260:21 260:23 300:20 358:15 | 167:5,25 171:10 173:11 238:21 244:25 259:14 264:9 | 303:10,19 353:23 **affect** 66:5 95:21 145:17 | 131:14 133:25 139:3,15 157:18 158:8 159:14 162:4 |
| **addressing** 132:5 323:16 | 265:18 273:4 330:17 340:5 | 364:9 368:7 **affected** 42:9 | 185:18 195:20 199:10,22,24 |
| **adelfia** 22:8 **adequately** 154:10 | 368:12 **adu's** 55:23 56:2,11,12 | 75:23 81:9 229:17 **affecting** | 200:5 202:18 210:25 211:10 220:17 227:9 |
| **adjust** 191:23 **adjusted** 177:3 **adjustment** | **aducanumab** 43:15 65:23 107:17 117:17 | 301:25 **affects** 340:4 **affirmative** | 245:9 250:5 264:2 270:23 279:23 294:22 |
| 129:17 130:23 191:18,19 | 118:8,14 122:12 137:19 154:4,8 157:15 | 66:16 67:7 68:15,18 89:6 **affirmatively** | 313:14 324:2 339:17,22 346:25 350:4 |
| **adjustments** 109:19 110:8 129:22,24 130:21 | 159:4,19 258:11 259:7 261:10,11 | 118:24 **afternoon** 193:2 255:16 | 350:13 353:23 361:16 365:15 **agreed** 7:4,10 |
| **administer** 9:3 **administrative** 13:5 14:8,24 | 264:4 269:18 330:10 **advance** 32:22 | 255:20 275:11 **agency** 273:21 **ago** 194:9 | 7:15 111:25 171:3 237:7 298:12 336:2 |
| 230:21,24 **adu** 42:7 43:13 43:15,21 51:5 | 32:23 85:6 86:4 93:21 193:15 202:13 | 264:11,19 265:6,6 **agree** 8:12 | 350:11 **ahead** 20:13 262:17 291:14 |
| 62:20 63:5 68:20 85:14 91:13 92:15 | 349:23 **advanced** 195:10 | 22:21 43:14 46:24 51:16 | 306:22 **ahh** 80:22 91:12 |
| 93:7,13 105:17 106:7,14 | | 52:6 55:14,21 | |

**ahold** 178:2
**aid** 206:14
 366:15
**air** 21:13
**akerlof** 138:7
**al** 8:16 44:21
 210:11 374:3
**alerted** 214:6
**alexander** 2:9
**alfred** 1:9
**algebraic**
 201:23
**alibaba** 6:16
 360:12,14,21
**alibaba's**
 361:12
**aligned** 155:25
**allegation**
 15:23 114:22
 244:16,17
**allegations**
 44:16 65:19
 113:20 114:20
 241:18 243:22
 244:3 343:10
**allege** 43:12,19
 65:21 71:15
 73:14 138:15
 236:19 238:24
**alleged** 15:24
 43:10 44:15,20
 46:4,12,17
 47:23 48:16
 50:16 51:17

58:14 65:24
71:9,10 74:16
75:24 83:6
90:8 99:22
103:3 105:12
108:7 111:8
116:9 118:20
119:12 127:13
150:13,17,22
168:21 169:4
245:5,20 297:6
**allegedly** 66:22
 71:12,21
 101:23 105:6
 112:20
**alleges** 248:14
**alleging** 66:21
**allen** 335:22
**allocated** 80:25
 235:16 322:14
**allow** 359:7
**allowed** 115:20
 139:8 333:10
 335:7
**alternative**
 69:22 367:24
 368:4
**alzheimer's**
 11:6,16 63:7
**amended** 42:18
 42:25 43:24
 44:9 158:25
 169:4

**americas** 1:20
 3:7
**amici** 5:10
**amicus** 195:23
 196:16
**amjad** 1:4 8:16
**amount** 15:6
 28:25 98:24
 109:10,17
 131:22 133:14
 134:3,21 184:3
 184:9 219:3
 232:20 235:7
 235:13,15
 365:17
**amounts** 222:5
 231:10
**analyses** 25:16
 90:15 124:7
 125:22 126:2
 127:15 248:15
 249:7,7 316:12
 334:5,7 367:10
 367:20
**analysis** 4:15
 38:8 49:13,16
 51:9 54:10,16
 63:5 68:13
 96:24 97:2,14
 97:20 98:4
 99:3 100:23
 109:3 116:15
 117:20 119:4
 126:6 127:9,10

127:12,19,21
128:22 135:25
139:16 144:19
148:9 149:3
161:7 163:19
165:3 167:24
169:3,8 171:25
218:8 227:4
232:15 233:8
237:18 238:8
240:22 242:21
245:19,23,25
249:2 255:4
259:6,14
265:23 283:19
288:4,4 289:23
299:4,5 301:12
313:22 322:20
323:9 334:19
335:16,23,25
336:17,18
338:12 339:14
339:16 340:2
344:6 351:9
358:25 359:10
362:8,11,12,13
362:15 363:15
364:8,10
366:12 368:8
**analyst** 31:7,9
 31:12,15,18
 32:4,8,21 33:5
 33:8 34:5
 62:12 83:23

84:3 144:5 145:25 147:10 149:18,20 170:2,5,9,14 171:7,19 172:25 173:9 203:5,10,12,19 203:21,25 204:3,8,14,24 205:9 208:5 223:24 234:16 238:3 260:17 260:22 261:17 270:16 271:7 271:13 274:16 277:7 280:4,7 280:18,25 281:15,22,25 282:24 283:5 284:20 288:24 289:6 294:11 294:13,20 299:7,10,13 300:2 322:23 323:10 324:18 325:19,21 326:21 329:2 329:10 332:12 339:7 354:15 358:25 359:10 370:6

**analyst's** 203:23

**analysts** 49:22 73:16 117:24 118:12 119:10 127:5 138:22 143:25 144:13 144:18,23 145:2,8,22 146:9 172:3,7 172:13 192:11 193:19 203:6 204:7,18,22 205:3,17,25 206:13 207:2 207:15 208:20 213:10,13,13 224:11,12 226:23 246:25 255:14 259:12 263:17 264:16 265:16 266:4 267:10 278:25 278:25 279:12 279:14,24 281:19 283:14 283:16 284:11 284:14,25 285:6 288:13 290:6 296:14 296:17,22 297:7,10,15 298:7,16,18 299:23 300:13 323:21 324:21 369:22,24

370:3

**analyze** 29:21 32:15 98:22 279:22 308:12 365:17

**analyzed** 312:23 369:23

**analyzing** 283:4 284:19

**annihilated** 264:4

**announced** 236:20

**announcement** 203:8 218:18 301:24 303:25 304:6 349:8,9

**announcements** 219:5,8

**anomalies** 211:9 215:19 217:10

**anomaly** 216:2

**answer** 15:13 62:8,10,13 74:4 80:3 88:23 94:13 95:5,19 102:22 118:3,4 145:13 149:24 151:17 164:23 165:2 167:13 175:11 202:3 232:11 280:22 322:12

342:19 348:15 352:22 362:21 369:12,12

**answered** 78:24 351:8 372:8

**answers** 372:10

**anticipated** 93:15 269:17 306:21

**anticipating** 337:19

**anymore** 147:3 351:19

**apart** 38:12 74:2 310:7 357:23

**apoe4** 270:9

**apologies** 198:18 291:13

**apologize** 56:21 74:6 126:13 272:14

**apostrophe** 66:5

**apparent** 252:20 264:10 265:6

**appeals** 5:4

**appear** 37:25 51:17 52:3 59:3 291:23 329:10

**appearance** 9:9

**appeared** 17:22
18:6 292:20
367:7

**appears** 19:17
54:19 90:5
333:5

**application**
225:24 259:3

**applies** 74:18
88:14 344:15

**apply** 74:19
138:13 238:21
354:23

**appointment**
4:24

**appreciate**
94:18 256:20

**approach**
217:8 237:15
359:23

**appropriate**
5:15 241:9,11
281:11 288:18
289:17 316:16
316:19

**appropriately**
80:13

**approval** 11:9
11:19 92:22
125:14 132:8,9
154:8 158:6,11
158:12,19
168:7 238:18

244:12,21
254:17 255:5
261:12 266:11
266:17 274:12
280:19 367:2
367:16,17
368:12,25
369:14,20
370:2,4

**approve** 93:7
93:13 244:25
266:14 273:21
368:18

**approved**
91:16

**approves** 92:15

**approximately**
41:14,16
189:21 229:5
259:20

**approximation**
212:18,24

**arbitrageurs**
221:24,24

**arbitrariness**
282:3

**area** 10:16
11:23 14:13
55:4 92:20

**areas** 10:20
15:16 72:4

**arguendo**
153:10

**arguing** 77:22
103:13 249:2
327:15

**argument**
118:22 127:7
127:17,21,23
128:3,7,19
197:7 198:8,9
234:6,9,11,12
234:15

**arguments**
75:2,5 266:17

**article** 5:6
17:16 186:13
186:19 187:2
187:10,14,19
187:23 188:16
189:13 194:8
194:13 196:10
210:4 216:11
220:6,9 228:22
228:23 229:10
348:20 349:16
353:4,5,9

**articles** 34:9,12
34:19,22 35:5
37:15 38:4
206:24 226:24
339:5

**articulated**
42:24 43:3,6
345:8 357:8

**artificial**
108:22 201:25

232:20,24

**artificially** 96:5

**ascertain** 31:8
119:9 171:19
283:19 339:8

**ascertained**
242:20 244:4
270:18

**ascertaining**
118:18 148:6
148:24

**aside** 18:12
22:24 64:14
102:9,17 107:6
135:7 139:10
140:3,4,6
231:5 252:22
344:7 349:16
359:25 361:20
361:23 369:8

**asked** 10:23
15:12,15 21:3
27:21 50:21
78:24 83:16
86:6 103:10
147:9 372:8

**asking** 31:16
37:14 44:11
49:9 73:24
80:14 84:25
94:10 106:4
116:22 147:6
164:11 165:24
199:19 216:12

234:8,12
245:13 253:21
266:14 286:9
350:25

**asserting**
102:12,19

**assess** 147:17
217:5

**assessing** 144:6
147:12 224:16
239:19 339:10

**assessment**
203:23 204:2
223:23 224:6
244:23 269:24
297:17 298:4
333:11 335:8
369:19

**assignment**
29:15

**assist** 25:14

**assisted** 25:6

**associated** 35:7
35:13 37:16
97:22

**assume** 9:23
25:3 69:11
86:12 101:17
106:21 138:9
139:6,7,8,23
140:15 141:11
141:17 151:3
153:10 178:8
215:8 232:23

239:3 243:6,23
280:15 311:14
315:2 330:16
344:19

**assumed** 92:5

**assumes** 107:7
214:13

**assuming** 106:8
107:5 115:5,9
115:12 138:21
153:16 208:13
232:23 300:2,5
338:24

**assumption**
141:7 199:15
218:20 233:2

**assumptions**
50:6 218:17

**atlantic** 6:8
290:17 292:3,4
292:7 294:23
359:4

**attached** 18:25

**attachments**
4:21

**attempt** 116:8
117:7 144:11
168:7

**attempted**
247:16

**attention** 45:25
65:6 127:3
189:5 222:14
305:8,11

338:18

**attorneys** 2:5
2:16 3:6

**attributable**
88:25 133:4
234:4

**attribute** 79:11

**attributed**
358:14 365:19

**auction** 309:7

**auctions**
309:25

**audio** 8:10

**audit** 206:3

**audra** 3:9

**authorized** 9:3

**authors** 190:17

**automotive**
18:21

**availability**
135:8

**available** 84:11
84:14 121:6
131:4,11,16
139:16 157:3
181:24 182:11
182:16,18
188:18 197:20
199:6 200:3
210:23 214:8
249:5 254:4
269:12 281:3
315:12 321:11

**avenue** 1:20 2:6
2:17 3:7

**average** 176:24
218:16,21
285:5 293:21
349:6,11

**averages**
218:24 349:13

**awarded**
211:25

**aware** 30:9
158:17,24
159:7 231:6
247:14 271:12
294:4,6 356:25

**awful** 252:16

**b**

**b** 4:7 5:2 6:2
9:15 15:20,25
185:16 187:20
357:2

**back** 12:16
15:17 17:8
28:5 31:15
34:4 58:21
64:7 73:24
75:3,15 82:8
83:22 89:9,16
95:24 100:20
100:21 104:14
124:22 126:15
129:22,25
132:23 133:3,7

133:10,13,21
133:25 134:21
135:10 142:11
150:16 163:10
168:16 169:10
171:18 172:9
173:21 176:14
177:14,25
178:5 186:15
190:23 192:19
207:14 209:4
210:5,17 227:8
232:12 235:25
236:15 246:7
246:13 247:20
279:9 282:20
287:6 296:8
324:20 338:14
340:21 353:21
356:21,22
370:25
**background**
11:10,21 20:19
27:11
**backup** 100:17
**bad** 18:9
138:12 139:2
140:17 141:8
141:14,15,17
141:18 225:25
227:11,19,25
228:12,19
231:8 236:20
236:22 237:3,4

238:25
**baked** 321:12
**bank** 280:21,25
**bankruptcy**
22:2,7
**bar** 219:17
335:11
**bars** 325:24
327:11,22
**base** 166:3,7,9
167:9 193:21
**based** 17:12
18:3 24:14,18
26:16 27:19
28:19,21 50:13
50:15,22 52:13
90:9 92:23
94:12 95:6,14
95:18 97:20,21
98:4 109:17
157:2 164:19
165:7 167:2
180:15 184:22
188:21 190:19
203:22 204:13
216:10 219:18
219:24 222:4,5
244:23 252:2
265:3,7 266:11
273:11 274:14
288:13,14
289:9 294:11
294:19 332:19
335:12 339:18

351:2 352:21
356:18
**basic** 127:23
129:23
**basically** 31:23
44:14 69:9
82:12 90:20
91:5 94:10
102:21 104:9
133:20 138:5,7
155:22 174:13
182:22 190:25
192:13 194:19
200:12 204:23
230:16 238:16
253:19 255:21
282:6 287:13
289:8 290:2
304:3 305:21
335:16 337:10
345:23 346:16
358:17 363:13
**basing** 75:13
94:25
**basis** 27:23
39:23 44:17
48:7 53:16
74:19 94:20
177:3 191:5
264:9 304:16
348:11
**bat** 279:25
**bear** 91:11
125:23 126:3

**bears** 344:9
**began** 74:11
75:10 76:8,13
76:20 77:4
**beginning**
114:3 183:3
189:16 208:15
208:19 216:16
229:3 247:10
249:22,23
307:18 310:19
310:21
**begins** 227:18
227:24 363:16
**begun** 225:9
**behalf** 1:5
**belief** 156:3,3
157:25 158:4
**beliefs** 366:23
370:7
**believe** 18:18
34:7,11 41:5
47:12 51:14
54:2,8 59:3
72:21,22 75:12
76:15 82:11
83:25 88:16
90:25 103:7
118:17,23
120:15 121:23
122:3 157:9
158:11 159:17
192:11 196:2
200:11 203:9

**[believe - borrowed]**

204:3 212:22 214:5 215:12 219:3 258:3 260:19 263:18 266:10 269:14 271:9 277:25 284:6 290:10 291:21 293:18 301:24 314:2 322:12 326:12 329:16 351:2 355:15,16 356:21 357:3 365:8 370:4

**believed** 68:23 106:5 118:7 155:24 157:13 157:22 160:11 259:13 334:8 368:2,3

**believes** 156:25 212:9,22 215:22

**believing** 106:6 217:20

**bell** 223:9

**benefit** 20:22 94:2 157:15,24 159:5,19 346:13

**best** 39:9 67:24 124:20 201:10 202:9,18 211:4 211:13,16

**beyond** 22:3 30:24 155:18 156:19 224:20 226:11

**bid** 364:7

**big** 93:23 104:22 130:9 130:12 173:12 173:19 177:19 216:24 312:20 312:20 338:22

**bigger** 177:22 310:15 325:24

**biggest** 264:23

**biib** 261:10 330:4

**bill** 41:20

**billed** 29:2

**binder** 218:10

**binding** 363:25 364:8

**biogen** 1:8 4:12 4:15,17 5:21 5:23 6:4,6,8,12 6:14 8:16 29:10,20 45:17 48:21 51:3 81:14 84:25 90:13 91:2,8 91:11,18,19 92:11,16 94:13 98:22 103:3 105:17 106:7,8 106:11,15

107:5,16,21 111:4,19,20 114:6,16 128:6 131:4,11,12,14 132:18 134:4 134:17,18 135:8,9 137:16 138:19 139:9 140:2 142:6,14 148:17,18,21 148:23 154:7 158:18 159:3 160:25 164:7 165:21 168:4 171:9,21 173:3 173:9,22 174:25 175:15 192:6 193:13 193:15 213:18 214:14,17 215:3,5 221:11 222:21 226:2 254:12 258:23 259:4 264:11 266:13 292:8 296:22 301:6 302:14 304:17 306:8 317:19 322:22 326:20 337:13,24 339:4 340:4 366:23 368:15 374:3

**biogen's** 65:23 96:4,13,20 114:9 115:6 120:12 127:6 127:24 154:3 157:13,23 159:17 167:23 292:21 302:21 322:7

**biomedical** 52:21

**bit** 18:22 39:20 40:21 41:18 69:19 143:13 146:7 148:3 168:20 278:22 311:7,23 319:16 331:3 345:24 347:20 362:12 364:13

**blood** 373:11

**bloomberg** 214:11,14,25

**blown** 261:14

**blunt** 331:4

**boehmer** 223:3

**bonus** 28:17

**book** 75:4 82:5 213:11 242:6 297:16 334:6 367:7

**borrow** 230:12

**borrowed** 230:18

**[bother - call]**

**bother** 172:9
**bottom** 113:24
  114:4 125:6,8
  125:9 198:5
  218:14 223:21
  225:17 249:25
  251:21 253:22
  269:4 292:17
  349:8
**bought** 140:11
  303:17
**bounce** 75:3
  356:21
**bouncing** 317:8
**bound** 77:7
**boundaries**
  247:16
**boxes** 57:14
  59:9
**brain** 41:23
**branches** 274:7
**break** 13:7 37:2
  85:25 89:8
  90:9 143:13,17
  168:9 172:23
  236:3,8 295:13
  295:25 296:13
  355:6
**breakers**
  311:20
**breaking** 283:8
  299:3
**brian** 2:9

**brief** 5:10
  112:22,25
  115:4 125:3
  195:23 196:16
  223:14 225:18
**briefing** 5:22
  82:5 193:17
  213:11,20
  214:7 242:6
  258:11 259:20
  261:9 263:15
  263:18 269:12
  269:18 273:4
  279:5 280:12
  282:8 284:21
  290:7 297:16
  311:2 334:5
  338:14 367:7
**briefly** 296:12
  308:7,11
**briefs** 332:19
**bring** 219:13
  232:12 244:11
**bringing** 70:8
  129:22,25
  352:6
**broad** 193:21
  331:6
**broadcasts**
  177:21
**broadly** 43:8
  43:11 90:14
  132:7 168:2

**broken** 244:15
**broker** 230:11
  230:18
**brought** 228:21
  229:11
**budd** 1:9
**bulk** 13:19
  185:11 212:24
  342:25 343:2
  362:20,25
**bullet** 258:18
  292:15,17
**bullets** 258:5,8
**bunch** 107:16
  145:7
**burden** 88:5,9
  88:10,14,18,20
  118:23 119:5
  119:20 136:9
  233:19 341:5,7
  342:12 343:8
  344:9 345:8
**buried** 208:10
**burned** 104:17
  105:2 106:23
  106:24
**busse** 5:8
  185:16 186:13
  186:14,21
  187:20 213:5
  216:10 228:22
  228:23
**buy** 178:23
  179:6 180:22

  181:2 206:6,9
  206:12 308:24
**buying** 229:20
  229:25 302:8
  304:23 305:22
  308:22

---

**c**

**c** 2:2 3:2 16:2
  30:23 34:15
  330:16 372:2
**calculate** 39:23
  109:16 239:7
  239:13 240:2
  357:2
**calculated**
  27:17,23 29:22
  31:3 109:23
  361:12
**calculating**
  237:16
**calculations**
  293:22 366:19
**call** 4:18 43:13
  45:17 47:23
  51:11 73:2
  132:7 133:3,7
  133:9 167:9
  190:22,22
  216:4 221:4
  238:14 275:10
  355:21 356:21
  366:24 369:22

| | | | |
|---|---|---|---|
| **called** 37:8 43:25 75:3 138:6 187:19 223:5 257:14 263:5 332:7,10 335:15 356:9 | **cards** 273:19 | 114:15 115:21 | 238:23 239:4 |
| **calling** 51:25 72:25 108:12 140:5 150:12 357:14 | **care** 289:24 | 118:20 119:23 | 295:8 345:13 |
| | **career** 12:11 16:22 17:3 23:25 | 120:11 129:14 | 350:5,16 352:7 |
| | | 131:19 134:20 | 355:18 357:2 |
| | | 136:16,19 | 365:21 |
| | **careful** 135:22 199:11 | 150:6,18,21 | **cash** 91:19 92:16 |
| **calls** 49:8 134:7 135:2 156:21 160:8 166:20 205:12 214:21 251:24 342:14 343:22 344:18 | | 156:13 166:2 | |
| | **carrier** 63:7 | 172:4,24 192:6 | **categories** 37:22 219:7 |
| | **carriers** 62:21 62:25 63:15 64:12,17,21 65:2 | 192:6 193:14 | **category** 208:6 |
| | | 195:25 196:17 | **caught** 108:18 |
| | | 213:17 215:9 | **causation** 206:16 356:18 |
| | | 216:5 218:18 | |
| | **carries** 198:22 | 220:10 224:6 | |
| **camera** 32:7 34:25 | **carryover** 358:10 | 229:23 231:13 | **cause** 66:18 68:23,25 101:9 207:17 277:22 311:17 320:13 |
| | | 236:18,24,25 | |
| | **case** 1:3 8:18 11:14 12:7 19:12 20:24,25 21:20 24:10,12 25:11 27:22 28:7,13,19 29:16 30:22,23 30:25 31:5 33:11,23 42:16 44:9,16,17 46:5 47:24 66:20 67:7,15 68:16,17 72:9 75:24 79:9 83:7 86:3 87:13 90:10 98:15 103:14 104:13 105:13 109:17,24 | 239:8 240:21 | |
| | | 241:7,11 | |
| | | 264:22 312:25 | **caused** 66:24 90:25 96:4,20 101:13,24 136:4 142:22 209:12 |
| **cammer** 30:23 204:4,7 205:8 205:16,23 206:18 221:22 221:23 | | 313:21 317:19 | |
| | | 317:20 324:12 | |
| | | 327:6 341:23 | |
| | | 357:10,25 | |
| | | 360:21 361:19 | **causing** 90:21 324:19,23 |
| **cancer** 68:21 | | 364:12,14,15 | |
| **cap** 75:4 356:22 | | 365:10,13,25 | **caution** 191:15 |
| | | 368:20 369:18 | **ccr** 373:4,20 |
| **capable** 251:20 | | 374:3 | **cdr** 57:13 59:9 |
| **capital** 6:11 | | **cases** 16:5,12 17:23,23 18:4 18:5,16 30:21 130:5 172:13 203:5 212:14 213:2,7,9 219:11,17 | **ceases** 191:19 |
| **capped** 356:18 | | | **certain** 55:17 65:22 174:13 179:13 183:20 184:21,24 215:14 219:4 264:19 335:13 |
| **caps** 46:20,21 74:17 | | | |
| **carbonite** 155:2,5 | | | |

**[certain - class]**

369:9
**certainly** 23:10
69:18 112:5
126:10 144:10
145:18 173:17
179:15 185:23
192:3 196:3
203:6 207:11
210:9 224:16
226:18 231:21
238:9 252:23
254:20 294:12
294:22 310:18
313:19 366:8
369:24,24
**certification**
4:24 7:6 88:4
360:24 373:2
**certified** 1:23
**certify** 372:4
373:4,9
**cetera** 247:3
337:22 338:7
339:10
**chair** 13:11
**challenging**
145:21
**chance** 126:22
136:17 370:2,4
**change** 40:6
103:17 134:18
169:12 184:16
262:2,7 275:2
275:14 276:12

277:16 283:6
284:19 285:6
286:24 290:6
292:11,12
293:21,25
297:15,17,24
298:16 320:4
359:5 374:5
**changed** 26:4
73:8 247:25
274:22 296:14
296:18 297:11
298:3,4,14
299:17,23
359:13
**changes** 39:11
40:7 238:5
283:11,12,21
**changing** 40:8
276:8,17,22
277:4 298:2
332:18
**characterized**
65:20 66:11
**characterizing**
97:24
**charge** 24:21
**charles** 3:11
**charlie** 19:19
100:5 196:7
218:9 307:3
**chart** 4:12 6:10
285:21 296:13
299:12 307:9

329:23 330:9
**charts** 335:11
**cheaper** 305:24
**check** 23:8
31:22 53:25
82:10 117:23
118:2 245:11
282:12
**checked** 19:16
90:4 143:3
**checking** 25:19
205:20
**cherrypicking**
314:22,25
315:3
**chief** 157:19
159:15
**chose** 34:12
**chosen** 97:14
97:19 316:9
**circles** 162:21
**circuit** 5:5 43:4
43:7 44:2,7,14
51:15 57:25
97:19 98:10
114:23 136:24
150:8,20,25
151:7,10,17,22
151:25 152:16
154:14 155:13
155:14 156:16
168:22 169:5
311:19

**circuit's** 46:6
97:25 136:6,18
**circumstances**
101:21 191:8
347:13
**citations** 25:20
**cite** 30:21 76:6
195:13 206:24
256:22
**cited** 210:8
278:24
**cites** 220:6
**citing** 220:11
256:18 279:18
279:20
**city** 14:12
**claim** 15:25
16:3 48:8
116:4 327:6,7
**claiming**
233:24
**clarify** 47:9
**class** 4:24,24,25
15:18,21 16:24
18:5,17 21:7
21:16 27:23
31:3,24 33:6,9
33:11,23 39:23
88:4 98:8
109:2,24 116:3
117:15 118:6
118:14 119:11
122:10 129:12
136:25 139:17

140:22 141:24
218:19 219:9
244:20 296:23
302:22 303:4,5
303:18 349:9
360:23
**clear**  37:9
  44:10 56:4
  62:3 64:15,24
  120:22 145:13
  220:16 265:20
  287:22 309:22
  333:22 340:8
  340:18 346:24
  365:5 367:3
**clearly**  63:24
  136:15 269:22
**client**  206:6,14
**clifton**  5:8
**clinical**  52:25
  53:4 57:11
  62:20 114:9,18
  115:6 161:22
  162:5 270:7
  333:8,17
  334:19
**clinically**
  157:15,24
  159:5,19
**close**  16:21
  83:12 84:15
  160:20 179:3
  210:19 239:9
  239:10,23,24

239:25,25
240:2,2 249:23
274:10 279:6
313:22 314:6
314:16 315:6
316:2,12 317:7
317:17,22
318:3,5,16
319:10,11,18
319:22 321:12
**closed**  98:18
  226:25 306:3,7
  337:25
**closely**  206:4
  222:17 313:5
**closer**  187:13
  267:11 273:3
**closest**  39:17
**closing**  309:7
  309:10,12,24
  313:16 317:10
  317:11
**cnbc**  190:23
  213:8
**cognizable**
  107:3 108:7
**collated**  35:21
**colleague**
  335:22
**colleagues**
  18:11,13
**collusion**
  121:16

**column**  37:19
  37:25 38:2,3
**combination**
  50:20 209:13
**comcast**  355:13
  355:22 357:8
  357:15,21,24
  358:20 359:23
  362:8,10,16
**come**  23:12
  28:5 30:22
  73:24 75:15
  146:13 147:7
  185:25 186:9
  186:12 192:19
  195:3 198:13
  209:4 235:25
  236:25 237:5
  279:11 299:6
  311:3 315:16
  339:6 343:17
  345:9,12
**comes**  14:20
  30:24 38:19
  102:19 202:2
  215:7 217:10
  239:9,23
  243:18 267:14
  267:18 270:17
  281:15 303:11
  311:23 312:10
  345:13
**comfortable**
  351:14,15,16

**coming**  50:5
  79:20 80:15
  180:22 181:3
  194:6 213:20
  247:2 267:22
  370:25
**comm**  91:23
  92:5,13 93:16
  93:22 94:4,12
  94:19 95:14
  330:16 337:15
  337:23 338:13
  338:19,22,25
  339:11,12,20
  340:3 342:11
  346:13 354:7
**comma**  295:23
**commentary**
  144:6 145:25
  156:12 175:6
  279:15 324:25
**commentator**
  325:3
**commentators**
  117:24 118:12
  338:4,7
**commented**
  171:19
**comments**
  277:8 281:16
**commission**
  374:24
**commit**  63:11

**committed**
231:19
**committee**
72:14 73:15
85:14 86:13
193:16 211:24
258:10 302:14
303:10,19
353:24
**common** 4:15
29:22 216:7,20
221:11 309:14
336:19 356:2,7
356:24 361:13
**communicate**
158:2
**communicated**
155:13 158:19
168:4
**communicates**
251:9
**communicating**
61:20 106:12
158:10
**companies**
92:21 148:14
**company** 85:20
94:13 106:22
111:7 148:13
148:16 157:20
159:16 162:7
166:12 172:15
172:19 177:24
253:14,15

297:8,18 298:5
**company's**
69:5 175:9
**compare**
367:25
**compared** 4:14
32:14 112:15
150:10 310:18
319:9,9
**comparing**
238:4 334:19
**comparison**
32:18 288:10
**compensated**
28:13 176:24
**compensation**
14:20 15:5
24:9,11,13,17
24:18 29:6
**competing**
342:18,18
**complaint**
42:18,19,25
43:9,24 44:9
47:15 50:17,21
54:2,4 76:17
112:3 117:3
158:25 166:22
169:5 248:13
249:2
**complete** 19:17
39:8 87:20
88:6 89:23
119:3 208:2

294:16 341:13
341:15 344:2
372:7
**completely**
191:23 246:21
264:2 304:8
**complex**
245:20
**complexity**
245:5
**complicated**
246:5 247:15
247:18
**complications**
365:17
**compound**
315:21 364:25
365:3
**comprise** 31:19
**computer**
222:23
**concept** 108:4
228:8 289:22
301:23
**conception**
167:4
**concerned**
180:21
**concerns**
176:20
**conclude** 320:6
**concluded**
371:6

**conclusion** 49:8
67:20 88:2
98:2 104:9
120:5 121:8,12
121:19 134:7
135:2 136:13
154:17 156:21
160:13 166:8
166:20 205:12
209:3 251:16
257:9 259:18
259:19 267:23
270:22 284:11
342:14,16
343:7,22
344:18,21
358:23 371:3
**conclusions**
27:19 248:16
281:12 283:20
343:25
**concrete**
302:20
**condition** 63:3
63:4
**conditions**
61:11
**conduct** 313:21
**confirm** 19:10
90:2 329:17
**confirmatory**
111:8 264:21
**confirmed**
329:6

**confirming**
69:9,15,21
70:7,22 103:6
**conflict** 21:21
273:23
**conflicting**
145:2,10
**conform**
211:22
**confound**
315:24
**confounding**
109:20 128:25
133:2 239:15
240:23 241:7
242:16 319:4
365:22,24,25
**confusing** 20:8
**connection**
12:3,16,19
63:7 179:10
338:18 360:23
**consecutive**
238:25
**consecutively**
242:13
**consider** 10:15
22:4 92:19
102:22 106:3
116:15 121:2
122:8 135:18
135:24 144:17
145:22 148:8
149:2,4 245:18

277:23 288:18
**considerably**
178:14
**consideration**
31:2 66:13
164:21
**considered**
54:3 117:18
130:25 131:6
136:5 154:6,20
267:23 303:23
354:16
**considering**
37:21 97:3
114:22
**consistency**
59:22
**consistent**
46:19,23 48:20
51:22 58:18,24
59:2,18 60:5
60:18 68:4,8
69:24 96:10
112:20 119:12
143:5 155:24
156:4 157:14
157:23 159:18
189:18 278:20
**consists** 14:24
**constitutes**
58:2
**consultant**
18:11

**consulting** 13:4
13:17 14:7,25
15:7 16:9
**consults** 210:2
**cont'd** 3:2
**contacted**
23:13
**contained**
46:12 71:16
125:22 126:3
174:18,21
**contains** 53:24
124:7,10 320:7
**contemporan...**
81:23 143:4
144:5 147:11
223:24 225:22
**content** 126:8
335:16,23,24
336:16,20
361:17,18
**context** 47:8,13
179:17 181:10
181:15 183:2
199:21 238:12
339:10 344:16
**continue** 8:11
201:5 247:4
263:17 266:19
**continued**
322:8 345:18
**continues** 44:8
200:23 303:24
358:16

**continuing**
81:11 87:15,24
201:21 314:9
335:11 343:23
347:15
**continuous**
111:18
**contradict** 77:8
**contradicts**
174:25
**contribute**
25:23
**contributed**
293:2
**contributes**
207:18
**convention**
182:3
**conventions**
328:23
**conversation**
88:8 350:5
**conversations**
8:8
**conveyed**
112:14 155:6
155:15 157:12
**conveying**
48:17 63:15
64:12,20
**conveys** 144:7
147:13 157:21
**copied** 362:4

**[copies - correct]**

| | | | |
|---|---|---|---|
| **copies** 20:5 | 94:21 95:7 | 175:15,16,21 | 263:15,19,20 |
| 45:11 | 98:15,24 | 175:25 176:3 | 265:11,18 |
| **copy** 19:8,11,14 | 100:21 101:5 | 178:20,25 | 266:6,21,22 |
| 19:17 30:8 | 101:10 102:15 | 180:13,18 | 267:15,16 |
| 89:23 123:16 | 103:8,15 105:9 | 181:15,16,18 | 268:6 269:13 |
| 178:9 217:18 | 105:10 107:17 | 181:25 182:2 | 270:19,25 |
| **corner** 268:22 | 107:18 109:6,7 | 182:11 183:4,5 | 271:2,5,6,21,22 |
| 276:3 | 110:2,3,7 | 189:19 194:3,4 | 272:25 273:2,6 |
| **corporate** | 111:4,5,13,14 | 194:6,7 195:11 | 273:7,9,10 |
| 157:6 | 119:13,16,17 | 195:12,14,15 | 275:25 276:9 |
| **correct** 13:13 | 119:24 121:5 | 202:3 205:22 | 276:14,15,18 |
| 14:16 15:2,3 | 121:24,25 | 213:23 214:12 | 276:19 277:18 |
| 20:19,20 24:15 | 122:4,5,12 | 215:7,13 219:5 | 279:7 282:4,25 |
| 24:16,25 25:8 | 124:23 128:13 | 219:6,9,10,13 | 283:2 284:22 |
| 25:20 27:24 | 128:14,16,17 | 219:14 220:19 | 284:23 285:2,8 |
| 28:19,20,23 | 134:19 137:5 | 221:12,17 | 285:9,25 286:5 |
| 33:7 37:11,12 | 139:17,19 | 225:2,3 227:12 | 286:6,8,14,15 |
| 38:9,10 45:21 | 140:22,24 | 227:19 228:2 | 286:18,19,21 |
| 47:2 48:10 | 141:2,3 144:2 | 229:20,25 | 286:22,24,25 |
| 52:4 53:3 | 144:14 148:2 | 231:16 232:16 | 287:16,17,24 |
| 54:18,24 55:11 | 150:3,11,18,19 | 232:17,22 | 287:25 289:11 |
| 55:17,24 56:7 | 150:22,23 | 235:4,5,9,10 | 290:21,22 |
| 56:8,11,15 | 151:2 158:2,14 | 237:8,9,13,14 | 291:14 292:9 |
| 58:22 59:13 | 158:20 159:5 | 241:4 242:8 | 292:10,13,16 |
| 60:6,12,14 | 159:21,25 | 243:5,19 | 293:8,23 |
| 70:10,18,19,25 | 160:6 161:7,8 | 244:25 245:2 | 294:10,16,19 |
| 76:21 77:5 | 161:11,18,19 | 246:17 251:22 | 294:19 295:10 |
| 78:3 79:17,18 | 161:25 162:7 | 252:10,18,21 | 296:15,18,19 |
| 80:18 81:21,22 | 163:14 164:4 | 253:24 254:8 | 296:24 297:12 |
| 81:24,25 82:20 | 164:14 170:10 | 256:6,10,14,15 | 297:13 299:15 |
| 84:12,15,19 | 170:18,19 | 258:16,17 | 299:24 300:4 |
| 86:17,18,21,22 | 171:5 172:16 | 259:15,16,21 | 300:17,22 |
| 87:3,10 90:5 | 172:21 173:24 | 259:22,24 | 301:13,14,18 |
| 92:3 93:9,17 | 174:8,10 | 260:18 263:7 | 302:22,23 |

303:12,20 309:5,11 310:10,20 311:3 312:16 313:6 315:12 316:3 317:23 318:18,19 320:9 324:6,10 324:16 325:4,5 326:6,10,16 327:18,20 328:12 329:16 330:7,8,10 331:4 332:9,23 333:2,20,24 335:2,5 336:10 337:16,17,19 337:23 338:8 338:13,19,23 339:20 341:2,3 341:8 346:14 347:4,10,11 348:6 350:7,16 353:25 354:2 356:4,5 358:7 360:24 361:19 365:7,8 367:10 369:20 370:5 372:8,11

**corrected** 71:12 71:17,22 300:25

**corrections** 40:9

**corrective** 31:6 71:10 72:7,10 72:17 73:22 74:2 75:9,10 75:24 83:6 90:8 103:23 109:4 133:5 135:9 137:17 243:2 245:5,20 297:6 358:14 364:15,22 365:19 366:3

**correctly** 66:3 255:9 285:21 340:18

**correlated** 204:24

**correlation** 206:15

**corresponding** 38:5

**cost** 190:12 229:8,15 304:16

**costs** 229:16,17 229:24 230:4,5

**counsel** 4:25 7:5 9:9,13,22 23:14 40:19,23 41:10,15 45:13 50:7 62:6 63:21 85:21 89:8 159:9 162:11 236:3

294:18,25 319:7 345:10 353:11

**count** 41:20 72:17 287:19 287:20,25

**counted** 298:18 331:2

**counteract** 165:10

**counting** 205:17

**couple** 179:20 179:22 191:11 267:10 353:16 356:14 357:17

**course** 16:21 20:9 23:25 28:16 80:8 149:11,25 162:9 182:12 218:24 219:19 317:8 320:12 349:12

**court** 1:2 5:4 7:18 8:18,25 9:12 21:22 22:4 72:20 73:5 75:7,14 77:9,11,15 80:15 196:17

**court's** 57:25 72:23 75:11 77:7 79:9

355:13 356:19

**courts** 22:20,24 203:9

**cover** 296:17 304:16

**coverage** 148:8 148:14,19 149:2 203:5 204:8,14,24 205:19 208:5 338:19

**covered** 146:11

**covering** 296:22 297:8

**create** 91:18 146:10 163:2,6

**created** 25:25 26:16 102:7,13 112:10

**creates** 230:22

**credit** 23:2 210:16 217:20 224:13,18

**crediting** 284:13 335:4

**critical** 292:20

**criticism** 184:15 333:16

**criticisms** 23:6

**criticized** 22:15 22:16

**critics** 212:5

**cross** 99:10

**[cures - d]**                                                      Page 20

| | | | |
|---|---|---|---|
| **cures** 68:21 | 61:1 62:1 63:1 | 142:1 143:1 | 210:1 211:1 |
| **curiae** 5:11 | 64:1 65:1 66:1 | 144:1 145:1 | 212:1 213:1 |
| **current** 351:2 | 67:1 68:1 69:1 | 146:1 147:1 | 214:1 215:1 |
| **currently** 29:10 | 70:1 71:1 72:1 | 148:1 149:1 | 216:1 217:1 |
| **customarily** | 73:1 74:1 75:1 | 150:1 151:1 | 218:1 219:1 |
| 27:6 | 76:1 77:1 78:1 | 152:1 153:1 | 220:1 221:1 |
| **customary** | 79:1 80:1 81:1 | 154:1 155:1 | 222:1 223:1 |
| 217:9 309:10 | 82:1 83:1 84:1 | 156:1 157:1 | 224:1 225:1 |
| 309:13 | 85:1 86:1 87:1 | 158:1 159:1 | 226:1 227:1 |
| **cut** 351:12 | 88:1 89:1 90:1 | 160:1 161:1 | 228:1 229:1 |
| 352:3 | 91:1 92:1 93:1 | 162:1 163:1 | 230:1 231:1 |
| **cv** 1:3 8:19 | 94:1 95:1 96:1 | 164:1 165:1 | 232:1 233:1 |
| 18:22 | 97:1 98:1 99:1 | 166:1 167:1 | 234:1 235:1 |
| **d** | 100:1 101:1 | 168:1 169:1 | 236:1 237:1 |
| | 102:1 103:1 | 170:1 171:1 | 238:1 239:1 |
| **d** 4:2 9:15,15 | 104:1 105:1 | 172:1 173:1 | 240:1 241:1 |
| 9:15 10:1 11:1 | 106:1 107:1 | 174:1 175:1 | 242:1 243:1 |
| 12:1 13:1 14:1 | 108:1 109:1 | 176:1 177:1 | 244:1 245:1 |
| 15:1 16:1 17:1 | 110:1 111:1 | 178:1 179:1 | 246:1 247:1 |
| 18:1,19 19:1 | 112:1 113:1 | 180:1 181:1 | 248:1 249:1 |
| 20:1 21:1 22:1 | 114:1 115:1 | 182:1 183:1 | 250:1 251:1 |
| 23:1 24:1 25:1 | 116:1 117:1 | 184:1 185:1 | 252:1 253:1 |
| 26:1 27:1 28:1 | 118:1 119:1 | 186:1 187:1 | 254:1 255:1 |
| 29:1 30:1 31:1 | 120:1 121:1 | 188:1 189:1 | 256:1 257:1 |
| 32:1 33:1 34:1 | 122:1 123:1 | 190:1 191:1 | 258:1 259:1 |
| 35:1 36:1 37:1 | 124:1 125:1 | 192:1 193:1 | 260:1 261:1 |
| 38:1 39:1 40:1 | 126:1 127:1 | 194:1 195:1 | 262:1 263:1 |
| 41:1 42:1,7 | 128:1 129:1 | 196:1 197:1 | 264:1 265:1 |
| 43:1 44:1 45:1 | 130:1 131:1 | 198:1 199:1 | 266:1 267:1 |
| 46:1 47:1 48:1 | 132:1 133:1 | 200:1 201:1 | 268:1 269:1 |
| 49:1 50:1 51:1 | 134:1 135:1 | 202:1 203:1 | 270:1 271:1 |
| 52:1 53:1 54:1 | 136:1 137:1 | 204:1 205:1 | 272:1 273:1 |
| 55:1 56:1 57:1 | 138:1 139:1 | 206:1 207:1 | 274:1 275:1 |
| 58:1 59:1 60:1 | 140:1 141:1 | 208:1 209:1 | 276:1 277:1 |

**[d - day]**                                                          Page 21

| | | | |
|---|---|---|---|
| 278:1 279:1 | 346:1 347:1 | 60:12,17,19,22 | 173:10 175:5 |
| 280:1 281:1 | 348:1 349:1 | 60:24 61:17,21 | 192:16 222:2 |
| 282:1 283:1 | 350:1 351:1 | 62:4 68:2,4,7 | 225:25 250:20 |
| 284:1 285:1 | 352:1 353:1 | 68:11,24 69:7 | 251:4,10 252:8 |
| 286:1 287:1 | 354:1 355:1 | 69:14,23 71:4 | 254:22,24 |
| 288:1 289:1 | 356:1,20 357:1 | 71:17,22 90:15 | 265:3,11,17 |
| 290:1 291:1 | 358:1 359:1 | 91:5,6 96:9 | 266:5,11 292:5 |
| 292:1 293:1 | 360:1 361:1 | 98:5 105:16,20 | 292:21 293:13 |
| 294:1 295:1 | 362:1 363:1 | 106:4,13 112:5 | 293:18,24 |
| 296:1 297:1 | 364:1 365:1 | 112:20 114:5,7 | 307:13 352:21 |
| 298:1 299:1 | 366:1 367:1 | 116:2 117:16 | 352:23,24 |
| 300:1 301:1 | 368:1 369:1 | 118:7,13 | 359:7 368:9,23 |
| 302:1 303:1 | 370:1 371:1 | 122:11 125:23 | 368:24 |
| 304:1 305:1 | 372:2 | 126:4 128:4 | **database**  17:22 |
| 306:1 307:1 | **damages**  27:22 | 137:11,13,18 | **date**  29:2 83:8 |
| 308:1 309:1 | 29:21 31:2 | 138:4,14,20 | 256:8 374:4 |
| 310:1 311:1 | 39:23 74:20 | 139:3,23 140:2 | **dated**  196:18 |
| 312:1 313:1 | 109:15,16 | 140:4,6,22 | 278:3 328:14 |
| 314:1 315:1 | 238:7 239:8,20 | 141:2,7,11,12 | **dates**  74:14 |
| 316:1 317:1 | 240:14 327:8 | 141:16,17,22 | 358:13 |
| 318:1 319:1 | 344:6 355:11 | 142:2,7,16 | **david**  1:16 4:9 |
| 320:1 321:1 | 356:4,13 357:2 | 143:2 151:19 | 4:11,20 5:12 |
| 322:1 323:1 | 357:7 361:11 | 153:20 154:3 | 5:17 6:15 8:14 |
| 324:1 325:1 | 364:5,9 366:19 | 154:11,15 | 371:4,4 372:4 |
| 326:1 327:1 | **daniel**  3:10 | 155:5,15,24 | 372:13 373:4 |
| 328:1 329:1 | **data**  30:20 | 156:14,17 | 374:4,19 |
| 330:1 331:1 | 31:21 34:15 | 157:11,13,21 | **day**  81:14 |
| 332:1 333:1 | 43:21 44:2 | 157:23 158:4 | 83:14 84:18 |
| 334:1 335:1 | 46:22 48:19,21 | 158:11,12,19 | 85:3 87:16 |
| 336:1 337:1 | 51:4,12,17,21 | 159:3,18 | 97:13,21 101:4 |
| 338:1 339:1 | 51:25 52:2,8 | 160:12,13 | 101:14 106:24 |
| 340:1 341:1 | 54:3,8,9 55:9 | 162:3 163:11 | 162:12 183:21 |
| 342:1 343:1 | 55:22 56:10 | 164:3,13 | 185:14 188:10 |
| 344:1 345:1 | 58:2 60:5,9,11 | 165:22 171:10 | 210:8 220:14 |

220:17,25
221:2 235:4
239:10,17,18
239:24 240:9,9
240:14,14,19
240:19 242:22
242:25 243:8
243:14 255:20
261:24 262:4
269:3 282:11
282:12 285:22
286:3 301:12
304:24 307:18
309:4,15,18,23
310:19,22
311:5 312:15
317:5,6,9,11,13
317:16 322:18
322:18 335:14
337:12 346:25
347:6,10,15
348:16 349:18
349:24 352:9
352:14 364:18
364:19 372:16
373:15 374:21
**day's** 319:10
**days** 4:13,14,15
37:20,21,23
38:5 79:13,17
80:9 86:25
183:22 216:21
218:22,23
235:22 238:25

240:3 242:13
242:14 323:18
337:10 339:6
345:20,22,22
345:23 348:5,7
349:12 351:14
351:15,17
**dc** 2:18
**deal** 43:16,17
104:22 149:6
173:12,19
336:18 363:3,6
**dealt** 177:20
**debate** 211:24
226:16 280:14
**debated** 211:20
**decade** 185:25
186:5
**decades** 211:21
**decent** 148:18
**decertified**
136:25
**decide** 37:2
88:13 288:25
**decided** 98:13
195:4
**decides** 147:2
**decision** 5:5
44:7 77:16
85:16 93:6,12
136:18,24
150:8 151:7
152:16 154:25
155:14 156:16

206:19 355:13
356:20
**decisions** 92:23
93:20 94:12,20
94:25 165:7
203:22 204:12
**declaration**
163:18
**declared** 161:2
**decline** 88:25
129:11,16
131:20 132:24
133:3 135:11
136:4 231:13
231:24 232:2
239:13 240:9
240:10 242:5
318:23 319:8
320:12,18
322:7 344:10
**declined** 96:13
128:6 238:24
**declining** 71:7
**decrease** 66:24
241:3 304:7
364:20
**deeper** 192:16
208:25 257:15
257:19
**defendant**
15:23 104:12
**defendant's**
88:5 118:23
119:20

**defendants**
1:10,18 3:6
15:23 18:10
20:24 21:16
43:12,20 65:21
104:16 340:8
340:19 341:5,7
341:13,25
342:8 343:16
345:9
**defense** 16:14
16:18 17:18,23
18:4,17
**defer** 57:24
76:24
**deference**
158:8
**defined** 221:25
260:3
**definitely** 69:21
79:2 100:15
193:6 195:20
254:9 337:3
365:23
**definition**
47:22 243:8
310:17
**degree** 11:19
212:8 216:8
**delay** 230:22
**delayed** 223:22
224:15
**delays** 224:9

**[demonstrate - disclosed]**                                    Page 23

**demonstrate**
  118:25
**dense**  125:16
**depend**  15:5
  31:5 148:11,12
  149:5 179:9
  310:16
**depended**
  266:17
**depending**  79:8
  144:22 191:6
  218:20 349:10
  364:6
**depends**  51:9
  75:6 138:17
  147:15 148:10
  160:20 179:2
  183:11 207:21
  216:3 310:11
  314:22
**deposed**  9:23
  12:2,6 15:13
**deposition**  1:16
  7:7,16 8:14,20
  22:4 39:15
  40:16 41:14
  42:4 371:6
  372:9 373:7
  374:4
**depth**  41:20
  57:7 274:18
**describe**
  260:24 261:2,6

**described**
  60:11 67:6
  156:15 334:17
  365:6
**describes**
  221:23
**description**  4:8
  5:3 6:3
**detail**  60:2 99:8
  124:10 147:22
  253:20
**details**  43:23
  253:5,7 255:3
  280:20
**determination**
  5:14
**determine**
  79:10 247:7
**determined**
  164:8
**determining**
  205:2
**develop**  196:23
  257:14
**developed**
  175:20 185:21
**development**
  205:21
**developments**
  222:18
**diagnostics**
  210:7 220:6
**differ**  283:13

**differed**  367:16
**difference**
  115:2 120:6,16
  134:9,11 158:9
  234:18 238:20
  253:13 274:4
  281:14 282:18
  284:4 285:13
  291:3,9 310:20
**differences**
  90:18
**different**  27:18
  31:17 61:5,10
  61:14 73:17
  130:6 132:14
  132:15 146:5
  146:21 150:9
  151:2 158:13
  162:8 167:8
  169:3 171:21
  187:2 198:12
  231:9 240:3
  263:2 277:3
  289:4 311:5
  365:21 366:9
**differentiate**
  342:5
**differently**
  151:23 289:25
**difficult**  191:17
**difillipo**  3:17
  8:23
**digest**  125:14

**direct**  45:24
  65:5 124:25
**direction**  25:7
  199:18 219:22
  247:7 275:17
  275:19 366:2
**directly**  28:14
  103:21 247:5
**disaggregate**
  236:21 241:16
  241:21,25
  316:20 358:19
  359:7
**disaggregating**
  366:6
**disaggregation**
  316:25 344:5
  358:23,24
  359:14,16
**disagree**
  113:15,19
  200:5 205:10
  219:23
**disagreed**
  22:25
**disappear**
  84:16
**disclaiming**
  344:21
**disclose**  65:21
  106:22 138:11
  367:24
**disclosed**  66:23
  66:23,25 69:5

**[disclosed - dose]** Page 24

69:8 114:11,17
115:7 116:10
116:12,14,17
116:20,24
127:15 129:7
131:12,15
132:18 146:19
161:9,16
238:13 367:23
369:16
**disclosing**
138:8
**disclosure** 31:6
71:10,12 72:11
74:2 75:9,10
83:7 90:8
103:23 109:4
117:9 144:7
147:13 148:7
148:25 243:3
245:6,21 297:6
307:17 364:16
364:22 365:19
**disclosures**
72:8 75:24
112:16 144:18
**discounted**
224:12
**discounting**
224:17 284:12
**discovered**
68:20 146:24
167:24

**discovery**
366:15,22,22
**discrepancies**
270:6
**discuss** 77:10
147:22 170:22
**discussed** 68:3
88:4 128:24
189:14 190:6
227:3 228:25
253:9 363:18
**discussing**
272:8,10
296:13
**discussion** 19:3
27:15 68:6
72:13 73:8,15
73:16 169:17
261:15 299:4
**discussions**
86:14
**disease** 11:6
63:8
**disentangling**
353:20 354:5
**dismissed**
150:20 151:12
168:22
**dispersion**
284:3
**dispute** 72:12
72:19 191:6
194:13,17

**disputes** 358:12
**disseminate**
194:16
**disseminated**
177:16 188:21
194:20
**dissemination**
75:8
**dissuade**
274:11
**distinction**
151:10
**distinguish**
151:19 226:19
**distinguished**
150:25
**distinguishing**
66:12
**district** 1:2,2
8:17,18
**dive** 192:16
208:25
**divergent**
279:3
**divided** 237:21
263:5
**dmitry** 5:16
**docket** 17:23
18:7
**docs** 269:18
273:4 280:13
332:7,7,10,10
332:19

**doctor** 143:15
334:13
**doctors** 332:25
**document** 5:23
21:9 45:7,24
62:15 65:4
100:12 113:10
123:3 152:17
155:8 199:21
218:13 249:22
257:23,24
270:21 311:15
**documents**
30:14 47:14
258:11 261:9
263:15,18
284:21 290:8
**doing** 143:11
150:24 163:19
165:3 167:24
186:24 205:4
231:18 232:10
277:20 284:18
299:5 302:12
304:15 315:3
318:11 321:23
324:22 328:6
335:10 363:14
**dollars** 343:18
**doors** 98:19
**dose** 46:22
48:23 51:5
57:2,4,12
58:20 59:8,20

59:24 61:9,9 71:25 72:2 90:19,19,21 106:14 117:17 118:8,14 122:12,24 137:19 154:4 157:14,24 159:4,19 162:3 162:8 164:4,9 164:14,20,20 164:22 165:4,8 165:10,12,15 166:4,12,16,25 167:5,25 171:11 173:11 251:5,11 252:9 254:16 265:18 265:22,25 266:15,18

**doses** 56:14,14 56:20 58:6,12 59:12

**doubt** 185:6 274:3

**doubtful** 274:9

**downgrade** 278:17

**download** 178:10

**dozen** 23:23 170:13

**dozens** 245:24 245:24

**dr** 4:5 8:14 9:21 17:9 19:10 36:7 44:21 45:5,16 47:18 52:7 54:15 55:8 56:9 60:21 61:19 62:18 63:14 64:11 71:16,21 74:10 90:17 99:18 100:11 101:8 120:11 126:16 155:23,25 168:19 202:19 227:3 250:14 251:9 253:14 253:17 254:18 296:11 371:4

**draft** 82:8 252:22

**drafted** 294:9 294:15

**drafting** 30:3

**drafts** 26:6 280:7

**dramatic** 312:15

**draw** 67:19 127:2 189:5 281:11 283:20

**drive** 279:16

**driving** 244:22

**drop** 133:8,10 133:13,21 137:20 138:25 142:22 238:23 355:12

**drug** 11:9,19 42:8 43:13 130:7 146:22 146:24 158:5 161:2 266:14 330:23 368:18

**drugs** 92:21

**due** 190:12 229:7,14 322:8 342:10

**dug** 63:5

**duly** 9:16 373:6

**dura** 356:19

**e**

**e** 2:2,2 3:2,2 4:2 4:7 5:2 6:2 21:11,11,13 22:10,10 30:23 71:16 138:7 185:16,17,17 187:20 210:6 210:11 330:15 330:15,16,16 372:2,2

**earlier** 15:10 50:11 69:16 90:16 96:11 114:11,18,21

115:8 116:10 116:21,25 117:9 127:10 127:20 128:5 128:22,23,24 129:5,8,21,23 129:25 132:19 133:22 134:23 151:8 168:20 170:17 171:4 174:25 188:24 192:23 210:7 212:13 213:6 217:19 232:14 233:7,11 237:10 238:12 238:14 243:16 247:12 252:18 253:9,11 256:12 257:25 274:16 279:10 305:10 321:19 336:2 340:25 345:20 350:5

**earliest** 84:3

**early** 282:6

**earnings** 4:18 45:17 201:22 208:9 349:9

**easier** 18:22 19:21 36:18 178:14 217:14 268:10

eastern 256:9
269:6 273:13
291:2,20
easy 125:15
240:18
economic 21:24
67:17 68:13
74:19 107:9
115:24 116:7
138:5 206:23
228:2,5,17
231:6 289:20
345:17
economically
65:19 66:10,15
70:21 102:4
112:18 146:6
189:15 229:2
economics 5:7
128:10 211:25
220:8
economist
119:8 121:2
137:8 151:6
economists
5:10 195:9
200:16 211:20
edit 27:18
education
10:13
effect 7:17
53:11 57:13
58:7 59:8,12
79:9 92:14

132:16 200:20
237:19 243:7
253:10 293:3
340:2 354:8
effective 91:14
165:9 167:25
168:6 337:9
effectively
97:19 194:21
248:14 305:21
effects 71:24,25
208:2
efficacy 48:24
55:23 56:2,11
56:13,18,25
90:16,21
106:14 117:17
118:8,13
122:12,22,23
123:2 137:19
164:3,13
165:15 171:10
173:11 251:4
251:11 252:9
254:16 264:5
265:11,17
266:6,8 270:9
270:18 271:4
292:22
efficiency 5:7
26:3,4,11,25
27:13,15 30:18
38:8,14 96:25
99:3 100:23

175:14,19
181:18,20
187:19 203:4
203:11,19
204:15,25
206:15 212:8
222:10 223:6
267:3 321:4,25
336:4,8
efficient 29:20
175:20 176:18
177:7 182:9,12
183:9 185:20
188:19 195:10
195:18 196:24
197:16 202:4
205:3 212:3
304:8,19
305:18 324:4
351:18
effusive 263:15
263:19
eight 152:10
175:18 176:5
183:7 278:2
338:2
eighth 86:25
87:7 337:22
338:6 339:8
346:6,7,12
eighty 13:24
either 77:9
80:25 138:2
174:3 241:24

277:2 291:18
298:13 300:6
303:14 314:8
315:7 318:25
334:15 350:13
electric 21:22
elevated 300:24
eleven 348:23
emerge 46:21
48:25 52:14,18
52:25 53:10
54:11,17 58:19
58:25 59:19
60:12 161:9
163:20
emerson
329:25
empirical
305:19 351:9
employment
10:14
endpoints
53:13
ends 114:4
218:19 219:9
engage 46:20
48:25 52:14,19
52:25 54:8,9
54:16,22 55:9
55:15,22 56:5
56:24 58:18,24
59:18 60:12
62:2 64:24
161:16 163:21

**[engaged - example]**                                          Page 27

engaged  49:2 49:12

engagements 12:10 13:17 14:7 15:7

english  50:14 50:23

entailed  176:20

entails  197:17 198:25 199:25 210:20

enter  101:9,14 153:12

entered  101:15 110:12

enters  101:22 108:8

entire  12:20 124:18 162:12 254:13 259:6 259:13 357:20 358:2,21

entirely  270:25

entirety  47:10 342:24 343:9

entitled  4:13 5:7,14

entries  285:24

entry  217:16

equally  136:2 137:8 138:19 142:12,15

equation 201:23

equities  6:8 290:17 292:3,5 292:7 294:23

equivalent 299:2

erica  5:12,17

errata  374:2

error  276:4 284:2

errors  191:16

especially 304:24

esq  2:8,9,19 3:9 3:10,11

essentially  82:4 160:11 235:20 237:23 264:3 283:13 303:13 304:10 321:16 348:4

estimate  17:11 18:9 191:17 192:2 201:11 202:9 211:4,13 211:16 246:20 252:2 345:4,4 350:19

estimates  22:21 298:7

et  8:16 210:11 247:3 337:22 338:7 339:9 374:3

eugene  195:11 212:2

evaluate 139:11

evaluated 150:11 164:8

evaluating 154:7

evaluation  5:19 171:18

evening  275:10 275:11

event  5:15,16 93:15,21,23 95:15 100:21 100:22 218:16 220:19 349:7

events  92:24

everybody 322:3

evidence  29:24 76:23 77:17 97:13 119:2 120:4,6,16,18 120:18 121:3,4 121:22 122:3,6 122:6 127:12 135:21,22 137:22 169:9 175:13 192:17 225:22 228:10 317:25 323:17 323:17 342:8 342:17,18,19

342:21 343:17 369:21

evident  273:20

evolved  111:21

ex  15:10 265:22

exact  82:24 83:10 366:16

exactly  41:25 65:10 226:16 226:22 344:10 360:15

exam  29:23

examination 4:4 9:19 372:6 373:5

examine  29:19 96:18,19 149:20

examined  9:17 186:2

examines  219:2

example  32:9 61:7 72:12 90:17 97:4 101:25 104:14 104:15 105:4,8 109:19 110:13 132:6 134:4 146:20 148:22 152:25 164:17 181:4 185:2 186:2 201:22 203:3 206:2,25 208:4 216:14

233:13 239:15
264:20 267:20
289:3 304:16
316:21 336:20
341:21 342:3
348:19 366:21
368:17
**examples**
255:14
**excel** 100:16
**excellent** 34:2
122:20 211:23
**except** 7:11
163:15
**exception**
192:7 216:2,6
216:14,20,24
217:3 220:18
220:22,23
221:3,5
**exceptions**
191:22 192:4
212:14
**exclude** 288:22
362:20,24
**excluded** 21:20
23:10 289:8
362:14
**exclusively**
80:16
**excuse** 99:12
109:16 113:6
134:17 155:23
250:23 261:4

284:13 340:21
340:22
**execute** 180:18
**executive** 157:7
250:6,8,24
251:16,19
252:3,7,21,24
253:23
**exercise** 335:10
**exhausted**
370:12
**exhibit** 4:9,10
4:10,12,17,20
4:22,23 5:4,6
5:10,14,18,20
5:22 6:4,6,8,10
6:11,13,15
19:5,23,25
20:6,6,17 30:4
30:11 35:17,23
36:3,4,12,14,15
36:16,18,23,23
37:10,23 38:13
45:2,6 89:18
89:22 100:6,7
100:13 112:25
113:2,7 126:13
152:12,15
169:21 170:6
187:7 196:12
196:15 217:16
217:23,25
218:5 223:13
223:15 249:9

249:14 255:25
256:2,5 262:14
268:7 271:25
272:4,7,24
282:19 283:4
284:9 289:16
290:12,15,16
291:24 293:15
294:4,9 296:12
297:3 299:18
299:22 300:14
307:4,9 325:13
328:3,10,21,23
329:2,3,4
331:12,16,21
331:22,24
348:22 360:5
360:16
**exhibits** 4:8 5:3
6:3 18:25
19:21 20:12
25:17 26:2,7
26:15,24 27:2
30:8 32:14
35:20,24 36:17
37:4 83:23
89:24
**exist** 135:15
348:17
**existed** 105:8
105:14
**existence** 205:5
205:25

**existing** 111:9
165:14
**exists** 241:8
**expect** 65:23
69:6 70:4
101:21 103:2
118:15 137:20
138:21,24
149:13 156:6
156:23 176:25
179:19 185:23
190:24 284:3
304:6 305:2
346:8 363:19
**expectation**
105:7 111:3,16
112:11 121:16
**expectations**
67:12 68:5
95:14,19
367:15,17
**expected** 68:2
146:4,5 176:21
176:23 260:7
304:20
**experience**
92:17 190:4,7
229:2 298:15
**experienced**
189:15
**experiences**
190:2
**experiencing**
318:22 321:10

**expert** 1:17 4:9 4:10,20 6:15 11:11,23 12:4 12:10,24 13:10 13:12,17 14:7 14:25 15:7,11 16:9 18:17 21:19 22:16,22 52:22 105:24 121:17 131:2 132:8,8,15 151:15 155:18 156:19 178:7 210:6 220:10 224:20 226:11 238:15 244:11 257:9 260:18 271:8 281:5 316:11 360:8 360:20 366:22

**expertise** 10:16 10:21 11:2,5,8 15:16 92:20 227:7 352:6

**experts** 17:18 136:11

**expires** 374:24

**explain** 26:19 73:17 74:23 103:9 137:24 144:24 230:6 281:9 309:14 315:25 363:10

**explains** 26:11

**explanation** 90:14 302:17 321:8

**explanations** 292:21

**explicate** 72:15

**exploratory** 57:12

**explore** 367:14

**express** 124:21

**expressed** 118:12 122:9

**expressly** 56:5 56:9

**extent** 120:15 211:21 227:22 228:3 281:24 337:5 362:5 369:10,19

**extents** 281:19

**extreme** 212:20 261:13,20

**extremely** 326:15

**eye** 193:15 273:22

**f**

**f** 34:15 138:7

**fact** 12:7 55:16 99:3 122:7,7 163:18,19,20 168:21 179:11

208:20 232:15 242:23 265:24 267:9,17,20 276:21 278:21 281:7 292:23 300:15 306:2 319:21 323:20 329:7 336:12 336:18 337:8 345:24 365:6 365:11,12,16

**factiva** 34:15

**factor** 34:25 144:19,21 145:4 148:8 149:2,5 204:4 205:9,16 221:23

**factors** 133:2 135:19 149:6 203:3 209:13 209:16,19 221:22 356:14

**factory** 104:17 104:19,22 105:2,8 106:23 106:24

**facts** 155:6,22 156:2,4,5 157:2 160:23 160:24,25 223:22 357:9 357:25

**factual** 97:20

**failed** 65:21

**fair** 14:19 33:4 38:21 40:10 48:2 67:18 70:11 71:2 82:18 95:12 98:3 109:22 111:10 145:16 170:13 172:12 178:12,17 179:8,10 184:15 196:4 222:20 232:4 250:16 251:8 251:12,15,18 252:4 253:25 260:13 265:2 266:10 279:17 285:21 295:11 297:22 302:24 308:15,19,20 313:3 341:9 359:22 362:2

**fairly** 155:25 191:3 216:7,20 280:10

**fall** 32:4 101:24 208:5

**fallen** 96:23 99:2 101:20 102:6

**falls** 151:14

false 46:17 49:4 71:4,9 99:22 105:6,12 111:8 119:12 131:23 331:7,7
falsity 128:4,5
fama 195:11 196:23 199:23 202:19 210:17 212:2
familiar 101:18 189:13 222:25 223:8 268:18 307:12
far 28:7 225:24 226:13,14 259:2 273:25 321:12
fargo 286:13 286:17 287:7 287:14,23 288:3,16,18
fashion 31:3
fast 209:20
faster 194:24 195:6,8
father 212:2
favor 119:2 266:17 323:18
favorable 127:6 269:24
favored 125:14
fda 11:9 81:24 82:5,6,14,15,18

84:10 91:16 92:14,22 93:7 93:12 125:14 132:7,8 154:8 158:5 161:21 168:7 193:17 194:2 213:11 225:12,23 238:14 244:11 244:21,25 255:5 258:22 259:5 265:24 266:11,12,14 269:18 270:7 270:24 273:19 273:24 274:11 279:4 311:2,15 367:2,4 368:18
fdas 273:5
featured 190:22
february 196:18
feel 29:16 45:23 53:9 62:14 65:3 75:20 92:18 123:14 154:24 197:11 199:20 217:5 297:2 301:5 322:21 328:16 331:19
feeling 39:25

female 61:8
field 178:7 335:15,24 336:15
fifteen 244:15
fifth 34:25 78:6 78:19 79:12,17 80:5,7,22 81:2 84:17,18 232:16 233:12 233:25 234:4 234:22 235:17 237:21 241:4 241:13,23 242:5 258:18 290:9 297:12 299:8 302:6,12 304:11,14 305:2,15 306:5 306:10,19 314:7,17 318:4 318:6,24 319:9 319:18,23 320:18 321:13 322:15 326:3 327:9 337:5,11 337:18 339:7 347:10
fifty 24:24
fight 206:20
figure 49:18,22 145:21 184:10 184:17,19 209:23 234:2

239:20 317:14 347:12 368:11
figures 27:17
figuring 181:2 207:5
file 100:16
filed 8:17
filing 52:13 113:15 264:12
filings 178:3
final 39:22 51:21 136:23 250:18,21,24 286:2
finance 10:18
financial 5:6,10 220:7 230:5 281:9 309:21
financially 9:5
find 101:2,15 171:7 172:25 185:5,6 189:14 204:11,11 208:11,11 210:4 217:15 220:11 221:15 223:13 228:25 230:11 234:2 234:18 242:15 288:12 300:16 315:5 331:25
finding 97:25 99:6 153:17 175:14 188:6

**[finding - footnote]**

230:15 283:13 285:11 326:2
**findings** 46:20 48:25 58:18 59:18 250:14 301:11
**finds** 150:8
**fine** 35:25 55:14 104:19 108:15 123:24 143:19 162:14 176:11 295:14 355:23
**finer** 23:2 24:14 33:10 93:4
**finish** 85:24 208:17
**finished** 320:5
**firm** 2:4 9:2 23:15,19 25:4 69:20
**first** 5:4 9:16 11:19 26:6 33:20 37:22 43:3,7 44:2,7 44:14 46:5,13 51:15 53:10 57:25 75:19 94:23 97:19,25 98:10 106:16 108:6 114:23 116:4 132:2 141:12 144:25

147:2 150:7,20 150:24 151:7 151:10,17,22 151:25 152:15 154:14 155:4 155:13,14 156:15 159:16 159:22,24 162:18 168:22 169:5 172:3 177:7 179:20 179:21 185:4 185:12 189:17 192:22 203:7 214:24 225:23 227:24 229:4 231:21 239:17 240:9 242:14 242:22,25 243:8,14 253:12 256:22 257:3,4,8 258:6 259:2 263:10,12 269:16 273:17 275:5 285:23 286:17 287:7 288:23 289:6 289:10 292:15 292:15,17 308:17 309:16 316:18 319:14 323:12 342:16 345:21 357:17

365:2
**five** 17:4 18:15 21:3,5,17 24:3 38:2,4 180:2,3 183:22 185:13 197:2,4 198:22 223:18 244:15 260:4 264:10 285:23,24 286:4,8,8,11 291:4,5 301:6 301:9 328:8 332:18,22 345:20,21 351:16 363:2,5
**fixed** 183:20
**flawed** 259:6 259:14
**flip** 43:6 126:19 271:19 282:23
**flipping** 126:14
**floor** 2:6
**flow** 91:19
**flows** 92:16
**fly** 147:7
**focus** 37:8 56:17 78:8 102:10 107:9 141:10 146:9 170:25 364:4
**focused** 72:4 112:4 172:5 237:6 244:19 257:17 267:8,9

267:19,24 268:2
**focusing** 43:25 48:18 56:12 75:22
**folder** 218:12
**folks** 25:14 178:23 180:10 193:14
**follow** 53:10 138:3 139:8 260:5 332:23 353:9
**following** 46:5 111:12 128:12 147:25 148:3 149:21 182:4 185:14 198:24 222:18 284:20 288:22 290:7 305:12,13 307:20,21 308:17
**follows** 9:18 87:7 154:2 201:18 313:4
**footer** 269:4 273:12
**footnote** 73:3 97:6,12 176:2 176:4,7,10 183:7,8 192:9 248:6 257:13 341:12 355:12

355:19 357:18 358:5,7 360:2

**footnotes** 26:6

**force** 7:17

**forced** 138:18

**forget** 321:2

**forgive** 139:13 200:25

**form** 7:11 121:18 181:18 181:19,22 197:15

**formal** 245:22

**formally** 15:20 369:23

**formed** 11:14 49:3 119:22 121:12,15 369:17

**forming** 11:13 30:15 69:10 114:14 122:8 135:16 303:23 312:24

**forth** 14:14 25:21 30:20 110:9 129:2,18 177:20 252:23 264:5 367:7 373:6

**forward** 36:18 44:18 79:10 89:25 172:8 341:23 343:17

**found** 214:12 300:13

**fount** 192:9

**four** 125:9 167:21 197:5 198:22 223:18 223:21 259:25 285:23 291:8 351:15

**fourth** 61:25 78:6,9,9,18 79:3,6,12,17,19 80:7,17,22,25 83:25 84:7,12 84:15 91:25 232:7 233:12 233:23 234:21 234:25 235:16 240:25 241:12 241:22 242:8 284:21 285:20 285:22 290:9 297:12 299:8 302:25 303:6 303:12 304:12 304:21,23 305:20 306:14 306:16 314:6,9 314:16 318:3,5 319:12,18,22 322:15 337:4,7 338:15 345:25 347:2 348:14

**fq** 4:18

**framework** 319:3

**fraud** 15:18 16:23 172:4,19 203:4 243:13 243:17,24 344:11,11 364:17

**free** 29:16 45:23 53:10 62:14 65:3 75:20 92:18 123:14 154:24 197:12 199:20 297:2 301:5 322:21 328:16 331:20

**friday** 40:20,24 41:10 86:16 274:4

**friday's** 261:15

**front** 66:2 102:11 103:5,7 103:25 123:17 134:3 135:12 223:12 258:2

**frowned** 265:23

**full** 12:25 108:14 174:22 189:9 191:8,12 242:6 307:17 317:5 333:17

347:9 350:15 350:18 352:14

**fully** 161:20 182:13 183:10 188:17 190:18 197:19 199:5 200:3,10,17,20 201:4,7,9 202:10 203:13 204:16,17 207:6 210:22 211:3 226:20 228:17,19 245:7 246:5,16 246:19 279:21 300:7 350:10 352:8

**function** 14:15

**functionally** 326:15 327:9 327:11

**fund** 5:13

**funny** 123:4

**further** 7:10,15 194:14 266:3 351:23 366:15 373:9

**futility** 161:2 163:18 164:18 164:19 165:6,7 165:11

**future** 200:19 340:5 350:20 350:21 363:25

364:9

**g**

**g** 21:10 185:17 210:6 372:2
**gains** 305:3
**gap** 311:9
**garrison** 1:20 3:5 8:22
**gelt** 210:6 220:5
**general** 15:22 21:22 42:22 55:25 56:3 61:2 164:6 165:2 175:25 203:10 204:20 207:8 228:15 231:11 248:2 315:4 322:17
**generally** 32:9 52:22 69:6 70:11 92:5 106:6,8,21 107:4 112:17 157:8 158:10 161:25 166:23 179:18 180:21 180:24 199:16 216:6 239:25 254:14 265:23 301:2 302:7,9 304:25 308:19 310:16 313:9

316:17 334:8 334:10 356:9 357:5 361:22
**generate** 15:6 188:20,25 306:22 324:4
**generated** 24:18
**generating** 180:11
**generic** 136:2 137:9 138:20 138:23 142:12 142:15 367:24 368:4
**genuinely** 157:13,22
**george** 138:6
**getting** 67:10 98:2 108:17 109:21 134:24 140:17 142:17 166:18 177:9 178:5 190:2 194:10 222:19 230:23 235:2 242:17 255:6 261:14 295:17 295:18 319:5 325:20 326:8 367:21
**giant** 289:3 310:2

**gist** 188:5,7
**give** 10:9 17:11 19:13 33:13,17 35:18 36:7,16 52:20 65:7 67:23 84:2 100:6 102:21 113:24 115:17 123:6 132:3 145:12 155:7 183:25 186:17 186:20 187:2 188:13 196:4 208:4 210:9 236:4 238:7 248:8 260:6 272:20 280:22 300:5,8 301:9 322:11 341:18 342:15 348:19 349:2 352:10 352:22 353:16 360:25 369:7 370:8,14
**given** 132:10 140:15 146:18 154:7 167:10 167:20,21 170:16 283:22 284:5 304:12 372:10 373:8
**giving** 48:12 87:18 116:6 120:5 154:16

155:20 201:10 210:15 211:4 224:17 343:7 343:24 344:22
**glad** 283:23
**glowing** 226:24 260:25 261:7
**gmt** 290:23 318:8
**go** 8:12 10:13 15:17 17:9 20:13 33:15 43:18 68:23,25 92:15 94:4 95:24 104:14 110:12 121:22 122:2 143:21 157:8 161:21 172:9 178:8 181:3,6 185:4 195:5,8 202:14 207:14 210:5 246:13 263:22 264:8 287:6 305:2 307:7 324:19 327:22 337:8 339:5 341:23 348:20 348:21 351:24 370:16
**goes** 53:9 57:9 58:17 59:17 125:21 127:11 155:18 156:19

160:14 224:20
226:11 311:22
312:5 358:3
**going** 8:3 11:22
18:12 20:3
26:17 27:11
30:19 31:4
34:4 35:19,21
36:15,18,21,23
37:7 42:13
43:11 44:17,24
47:23 52:20
53:19 58:13
65:11,11,17
70:2 71:8
74:22 77:8
79:10 85:22
87:25 88:7
89:22,24 93:24
94:3,23 95:15
98:7 109:9
120:17 123:7
123:18,21,23
126:15 132:3
134:8 142:11
143:12,16
146:25 152:5
163:3,10 172:8
174:4 176:14
177:4 180:2,4
180:6 181:3,5
184:2,9 186:17
186:18,20
187:2 193:11

198:23 203:9
210:17 216:4
222:22 223:17
224:8 226:15
232:5 238:22
243:23 247:7,8
255:24 265:21
276:9 280:21
293:24 295:13
303:7 305:23
306:3,7,8,11
307:2 311:14
313:8 322:11
330:14 331:15
340:14 341:18
342:15 343:23
346:19 347:21
353:12 355:4
355:21 358:18
359:11 360:9
360:16 369:7
369:11
**goldman** 136:6
136:19 139:10
**good** 8:2 9:21
9:22 83:17
85:25 109:12
135:4 138:5
141:8 161:25
162:7,9 204:4
212:18,23
225:23 227:11
227:16,18,24
228:11,18,24

231:8 236:2,19
236:22 237:4
240:12 255:14
262:19 318:7,9
354:25
**gotten** 194:24
277:4
**grab** 274:8
**gradual** 190:11
229:7
**great** 143:20
198:17 254:24
**green** 5:9
185:17 186:13
186:14,21
187:21 213:5
216:10
**greenwich**
290:25 291:4
291:13,19
**grew** 178:13
**group** 6:16
21:13 72:2
**groups** 61:14
218:17 283:8
283:12 284:7
**grupo** 21:10
**guess** 16:20
22:7 83:17
90:23 94:23
145:16 156:24
157:9 186:22
186:23 195:7
202:18 253:21

312:12 315:23
334:20
**guessing** 157:4
**guidelines**
123:4
**guy** 195:18
199:23
**guys** 37:3 123:2
370:13

**h**

**h** 4:7 5:2 6:2
**haeberlein** 1:9
**hair** 17:6
**half** 23:23
295:20 349:12
**halliburton**
5:12 195:25
196:16
**hallucinated**
355:18
**halt** 85:16
306:21 311:10
311:12,18
**halted** 84:25
85:7,12 86:5
306:8
**hampshire**
2:17
**hand** 19:9 20:4
35:22 89:22
123:14 255:25
331:15 360:9
360:16 373:15

handed 20:16 268:12 290:16
handing 152:14 249:14 290:15 328:10
hang 157:10 176:9
happen 82:23 95:15 172:22 179:22 280:24 320:16 339:11
happened 42:7 74:14 83:7 128:21 129:13 237:12 277:12 311:13 317:16 325:9 339:12 364:16
happening 93:23 180:25 325:6 327:7
happens 84:22 86:9 131:21 171:3 172:21 202:18 311:6 316:7,10 317:10 321:13 350:12,16 366:2,3
happy 123:19 355:7
hard 16:20
harder 315:18

harken 279:9
hat 43:10
head 14:12 327:4
headline 199:13
hear 204:19 350:2
hearing 22:2,7
held 1:18 73:5 76:8 117:24 119:10
help 136:11 152:18 204:4 204:22 205:4 235:12 244:8 255:4 340:13
helped 72:14 73:16 196:23
helpful 152:22
helping 14:10 14:13 18:11,13 281:19
helps 197:6
hereinbefore 373:6
hereto 7:6
hereunto 373:15
hey 172:9
hidden 105:15 105:20 106:12 369:11

hide 289:11
hiding 253:17 253:18
high 61:9 71:25 90:19 106:14 117:17 118:8 118:13 122:12 122:24 137:19 140:17 142:6 151:21 154:4 157:14,24 159:4,19 162:3 162:8 164:4,9 164:14,19,22 165:4,8,10,11 165:15 166:4 166:12,16,25 167:5,25 171:11 173:11 222:9 251:5,11 252:9 254:16 265:18,21,25 266:18 308:21 326:3,8,13 352:11
higher 46:22 48:23 51:5 56:14,18,20 57:2,4 58:19 59:19,24 90:20 176:25 190:12 191:16 229:8 306:22 311:9 313:10 352:14

highest 57:12 59:7 229:15 308:16
history 10:14
hitting 17:6
hmm 21:8 125:11 152:11 191:20 206:8 248:24 311:6 363:17
hoc 161:6 163:19 165:3 167:24
hoffman 329:24
hold 11:22 40:12 52:20 265:9,16 266:4 292:23 303:9
holders 222:12
holding 11:11 103:20
holdings 221:11,13
hooked 179:13
hope 14:17
hopefully 32:13
horne 2:8 19:13 20:13 22:18 33:15 35:25 36:11,20 37:5 45:10,14 49:7 50:8,18 51:19 57:3 58:23

60:15 62:6,11 63:17,22 78:23 79:24 85:21 86:10 92:25 94:9,22 95:16 98:16 99:13,16 101:12 102:16 105:23 106:18 108:2,11 113:4 113:8,18 122:13,21 130:2 134:6,25 137:21 143:14 151:13 152:3 155:17 156:18 158:3 159:9 160:7 162:11 162:17,24 163:6 165:17 166:6,19 168:5 169:13 171:23 173:5,13,16 200:7 205:11 212:16 214:21 220:20 224:19 226:10 228:13 234:7 236:2,6 243:20 246:18 251:23 252:11 255:18 264:17 265:4,12,19 272:7,11,14 275:20 276:24 280:9 281:17

291:10 295:15 295:20,22,24 298:6,20 299:16 304:18 305:9 313:7 315:20 319:6 319:13 320:25 324:7 328:5 333:25 336:22 338:9,20 342:13 343:20 344:17,23 347:5 350:8,17 351:6 353:11 353:17 355:9 362:18 363:9 364:24 367:5 369:2 370:14 370:18
**hot** 193:22
**hour** 24:24 25:2 41:6,16 85:22 183:21 208:16 259:20 269:14 280:12 280:16 282:8 282:15,16 291:3,8 295:20 353:12,14
**hourly** 24:10 24:12,22
**hours** 28:6,9,16 28:22 41:3,9 41:15 216:13

315:16 318:2 318:12,13,13 318:15 320:21 328:8 363:2,6
**house** 263:5
**huh** 305:15 349:5
**humongous** 146:10
**hundred** 12:12 160:14 253:19 326:5
**hypothesis** 139:13,21,25 140:7,13 141:6 175:20 185:21 195:10 196:24 197:16 202:5 212:3 304:9
**hypothesis's** 212:4
**hypothetical** 137:23 320:14

**i**

**i.e.** 65:20 75:25
**i.o.u.** 230:17
**idea** 207:8 212:24 231:25 262:20 278:4 321:25 334:13 334:15,21
**ideas** 354:12

**identification** 19:6 20:2 36:5 45:3 89:19 100:8 113:3 152:13 187:8 196:13 218:2 249:10 256:3 262:15 268:8 272:2 290:13 307:5 328:4 331:13 360:6
**identified** 79:5 79:7 80:16 103:14 134:15 156:11 232:15 235:2,11,14 285:5 354:4
**identifies** 233:9
**identify** 18:16 31:18 35:4 39:14 96:17 109:8 116:8,23 173:8 232:20 235:12
**ignoring** 201:14
**iii** 53:4
**ilk** 171:11
**imagine** 334:23
**immediate** 182:19,19,22
**immediately** 188:22 195:4 214:7 224:24

227:13 258:9
277:6 280:8,14
298:17
**impact** 29:7,24
31:4 39:20
66:2 74:11
75:10 77:10,25
78:5,10,14,16
78:21 79:5,8
79:11,22 80:6
80:8,16,23,24
87:20 88:3,6
97:3 102:11
103:7,11,13,15
103:16,19,25
118:19,25
119:4,10,21,23
120:4,12
121:13,24
122:4 127:13
135:10,18
136:8,13
144:20 148:7
148:25 169:3,7
169:9,10
171:18 189:16
216:25 229:3
233:17,23,25
234:18 243:4
245:6 257:10
289:18,21
301:21,22
303:24 306:4,9
312:24 322:13

323:18 324:15
324:19 327:7
327:16,17
341:14,16
342:2 343:12
344:3,4,7
345:9,14 346:8
347:16,22
357:20 358:3,6
360:2 361:21
362:12,13,14
366:11 368:24
**impacting**
353:24
**implicated**
229:18,19,24
229:25
**implications**
91:10,13,22
94:18 253:6
**imply** 206:2
**import** 44:7
**importance**
21:24 134:17
134:18 208:12
**important**
102:23 120:23
139:3 144:19
144:21 145:3
145:15 146:6
146:12,18
148:8,16 149:2
149:5 150:5
154:18 160:12

204:7 300:16
**impose** 351:13
351:18
**impression**
122:11 163:7
**improbable**
147:4
**inaccurate**
226:17
**inaccurately**
114:8
**inadvertent**
292:25
**incentive**
222:14
**incentivized**
204:11
**include** 18:19
290:5 293:16
294:21 366:22
**included** 31:14
219:8 231:24
232:21 293:16
322:23 323:10
323:12 359:20
**includes** 178:19
243:24
**including** 31:24
40:22 84:10
290:8 317:7
323:19 367:19
**inconsistent**
48:22 51:4
171:8,20

172:10,14,20
173:3 175:9
304:8
**incorporate**
183:10 204:5
204:17,22
225:25 226:8
226:14,15,20
226:20 228:9
228:18,19
321:21 335:12
347:2,3 352:8
**incorporated**
177:13 183:20
184:2,9,25
186:3 189:7
190:18 200:21
201:7,9,13,15
202:10 203:14
207:6 225:23
231:10 246:17
249:8 281:13
282:2 288:5
306:15 350:6,9
350:10
**incorporates**
181:24 185:19
197:19 199:5
200:3 201:4
210:22 211:3
228:11,12
245:7 322:2
**incorporating**
207:20 233:6

246:20 251:21 340:23 348:13

**incorporation** 191:8 221:2 322:9 350:15

**increase** 66:19 70:5 97:15 237:8,11 240:24 261:11 275:14,16,18 278:18 283:15 302:25 303:6 304:5 364:19

**increased** 287:3,9,15 288:20 306:18

**increasingly** 274:9

**independent** 58:3 83:19 333:10 335:8

**indeterminate** 183:11,17 184:19

**indicated** 269:23

**indication** 84:2 127:4 323:23

**indirectly** 247:6

**individual** 5:15 193:20 208:21

**individually** 1:5 241:24

**individuals** 25:6

**industry** 11:3

**infer** 133:21

**inferring** 299:9

**inflated** 96:5 127:24

**inflation** 66:21 67:3 71:6 101:9,13,15,22 102:7,9,13 103:10,24 107:22 108:3,5 108:6,8,22,23 110:5,9,12,17 110:19,20,22 114:5,7 115:22 115:25 117:10 130:11 131:22 133:8,14,17,21 134:2,3 135:12 232:21,25 239:16,18 356:15,16,17

**influence** 90:20 92:7 206:13

**inform** 72:15

**information** 20:17 31:7,11 65:22 69:12 70:7,9,14,17,23 70:24 71:17 73:23 84:4 85:19 87:19

95:3,9 107:10 109:20 112:14 119:2 121:6 129:6 130:14 130:17 131:2 131:10,15 132:17 133:5 134:5,22 135:9 136:10 137:17 139:11 140:16 140:16 142:7 144:8 145:2,14 145:24 146:8 146:18,19,20 147:14 154:5 159:15 166:3,7 166:9,15 167:11,12 172:14,15,20 177:13 178:16 178:25 179:14 179:15 180:12 180:14 181:7,9 181:10,14,25 182:14,24 183:3 184:24 185:19 186:3 188:18 189:7 190:18 194:16 197:20 199:6 199:17 200:4 200:17,19 201:4,7,11,13 201:14,21

202:7,11 203:7 203:13,24 204:2,8,11,18 204:23 207:5 207:20,22,23 207:25 208:3,8 208:14 209:2 209:11,24,25 210:23 225:11 228:10 235:21 237:23 238:13 240:23 241:8 242:16 244:24 246:6,12,16 247:15,18 249:4,5,8 265:7 279:3,11 281:12,20,22 282:3 300:25 301:16 302:10 315:11,15,24 316:6 319:17 320:8,15,21 321:11,21 322:2 324:3,13 325:3 335:12 336:3,6,9 340:23 347:3 348:13 350:6 351:21 352:9 358:14 364:17 366:3,25 367:4 367:6,19 369:15

**informational**
  223:6
**ingesting**
  300:25
**initial**  97:13
  207:19 209:10
  211:4 288:4,12
  288:15
**initially**  192:13
**injected**  117:9
  131:23
**inputs**  34:17
**inputted**  39:21
**insert**  39:19
**inserted**  39:20
**instance**  158:18
  172:25 173:8
**instantaneous...**
  188:19 202:3
  212:7 282:14
  350:12,13,14
**instantly**
  197:18 199:4
  200:2 202:19
  210:21
**institution**
  221:17
**institutional**
  213:19 221:10
  221:13 222:9
  223:5
**institutions**
  221:11,14
  222:6,16 281:9

309:21
**instruction**
  34:16
**instrument**
  331:4
**intelligence**
  201:25
**interaction**
  330:3
**interest**  302:7
  307:17 335:18
**interested**  9:6
  254:21 373:12
**interesting**
  120:8 278:6
  289:19 365:23
  366:9
**intermediate**
  244:14
**internal**  210:2
**internet**  178:11
  178:20 179:9
**interpret**  50:22
  55:18 103:19
  227:5
**interpretation**
  50:25 51:7,8
  51:10 59:15
  60:16 116:7
  120:9 251:13
  293:12
**interpretations**
  145:9

**interpreted**
  49:19 96:12
  98:5
**interpreting**
  50:14 59:4
**interrupt**  17:6
**interrupting**
  64:4
**interruptions**
  63:20
**intertwined**
  362:11
**intraday**  6:10
  307:10,23,25
  308:6,11,12
  313:4
**introduced**
  107:22 108:6
**introduction**
  110:22
**invest**  92:18,23
  93:25 193:21
**investigate**
  117:7,19,25
  119:15,18
  120:25 141:23
  142:3,4
**investigated**
  118:9 142:24
**investing**  95:13
  95:18
**investment**
  92:23 93:20
  94:11,25 154:7

203:22 206:5
  280:21,25
  302:13 304:17
**investor**  91:8
  92:11 95:3,11
  154:6 214:17
  229:18,19
  253:22 254:3
  254:12,20
  255:4 303:17
**investors**  29:22
  49:18 90:13,25
  92:18,20 93:19
  94:11,16 95:8
  95:13 139:17
  148:16 154:10
  154:20 156:14
  193:20,21
  203:20 205:4
  206:7,14
  208:13,21
  213:16,18,19
  215:3,4,4,5,14
  221:17 222:3,9
  222:17 223:6
  302:11 303:3
  304:14 305:20
  308:22 321:22
  346:12,25
  361:11 368:10
**involve**  354:15
**involved**  16:6
  16:13 176:25

**involvement** 26:20
**involving** 71:24
**irked** 39:25 40:9
**irking** 184:12
**ish** 311:24 312:4,6,7
**issuance** 128:13
**issue** 88:10 122:21 138:2 146:12 149:15 162:9 165:25 231:6 279:12
**issued** 33:5,9 34:6 89:2 137:16 170:10 192:13,13,14 267:4,10 268:21 271:13 281:10 282:4 299:7
**issues** 43:20 255:15 264:20 335:17,18 356:19 357:18
**it'll** 217:14
**italicized** 287:20,23

**j**

**james** 5:20,22 193:10 208:23

226:23 255:11 256:5,13,19 257:2,14,18 259:12,23 261:7,25 262:23 263:4 272:11 278:24
**jeffrey** 5:8
**job** 12:25
**john** 5:12 8:23
**joint** 297:16 308:18 311:2 334:5
**jon** 3:17
**jonathan** 2:8 20:10
**journal** 5:6 177:20 220:7
**jp** 6:4,6,13 192:11 208:23 226:22 255:10 260:25 261:3 268:5,18 271:20 272:4 272:25 274:21 278:24 298:8 331:15,20,23
**jr** 1:9
**judge** 79:21 88:13
**judge's** 77:12
**july** 1:13 4:16 4:18 8:4 33:12 33:24 44:22

45:20 47:19,24 50:5 51:11 69:12 70:5,6 71:13 95:25 96:4,20 98:13 98:24 99:22 101:2,8,16 102:12 107:12 107:12,15,24 108:9 110:6,22 110:23 111:2,7 111:12,22 112:14 115:16 116:10 120:11 121:13 123:13 124:10,14,22 126:7 129:13 130:10,12,17 131:5,11,23 133:15 134:5 135:9 136:3 137:9,17 138:16 142:12 142:15 149:8 149:10,21,23 150:9,22,25 151:11,23 159:6,8 165:16 165:25 166:17 167:5 168:23 170:22 175:10 372:6 373:16
**jump** 10:12 108:25 109:3

171:13
**jumping** 282:20

**k**

**k** 1:21 9:15 18:19 138:7 208:8,11 210:10 372:2 373:3,20
**kandi** 18:19 20:24
**keep** 24:7 122:19 143:12 161:14 262:18 276:13 295:13
**keeping** 193:15 231:22
**kelly** 223:3
**key** 198:2,4,16 335:13
**keyword** 326:22
**keywords** 325:18,22
**khan** 1:4 8:16
**killian** 1:21 9:2 373:3,20
**kills** 146:24
**kind** 15:21 30:18 39:18 41:24 67:15 68:4 69:14,18 82:5 126:11

**[kind - language]**

139:5,7 147:4
149:14 156:5
162:2 253:8
283:18 305:7
309:25 362:19
363:23 364:7
369:6
**kinds** 288:6
**knew** 43:12,20
63:10 70:8,23
86:4 112:3
156:4,5 163:24
192:25 194:6
213:19 337:3
**knock** 360:10
**know** 10:7 13:8
23:5 26:17
28:6,9,12,15,25
31:23 34:17
38:20 39:4
41:19,22 44:11
49:22 52:18,22
55:13 56:23
60:24 63:6
65:13 67:2,22
70:13 71:20
74:18 77:17
83:2,6,8 85:5
85:12,15 86:3
86:7 106:4,21
111:15 123:22
124:13 126:2
131:21 132:10
132:17 137:7

138:24 139:2,5
140:10,25
141:9,20
146:10,21
148:23 151:9
156:7,23
160:24,25
163:15 164:23
165:13,20,21
166:2,14,22
171:8 172:4
173:9 178:4,6
178:7 184:8,12
184:22,24
185:11,12
186:4 188:2
189:13 190:24
193:13,14,20
193:21 194:25
194:25 197:12
198:11 199:12
199:22 203:16
207:17,25
208:9 209:6,14
212:19 214:20
214:23 216:12
218:10 221:24
222:23 223:11
228:14 229:12
231:18 238:16
245:8 247:19
253:5,17
254:23 264:23
266:13,16,16

269:2 277:13
278:12 279:14
280:18,20,23
281:4,13,14
284:12 288:10
288:19,20
289:22 290:24
291:18,18
295:4 298:22
302:10 304:20
304:24 305:23
306:2,17,20
307:8 308:6
310:8 312:12
318:7,9 320:11
322:17 323:16
329:9,11
330:20 331:19
332:11 335:22
337:3 339:21
341:20 343:14
344:25,25
348:25 349:20
349:22 351:22
352:12 353:8
355:17 362:25
363:2 364:13
366:24 367:3
368:19 369:6,9
369:10,12,23
**knowable**
306:14
**knowing**
254:21 346:13

**knowledge**
39:9 124:20
165:15 167:9
291:20 330:18
**known** 29:24
65:25 103:4
156:2 264:20
264:24
**knows** 163:13
195:18
**krivin** 5:16
210:10 348:20
**kry** 2:19

**l**

**l** 21:11 138:7
210:6 330:16
372:2
**labeled** 82:8
249:24
**lack** 87:20 88:6
107:8 270:8,18
271:4 292:22
341:13,16
343:12 344:3,3
**lag** 215:25
216:5,8
**lags** 211:9
215:18 216:13
217:10
**landslide**
261:10
**language** 26:10
27:5,9,25

**[language - little]**                                                      Page 42

50:14,23
226:17 323:5
**lapse** 34:3
**large** 138:24
216:25 222:5
282:17 284:3,4
302:2,5 303:6
324:14 352:13
**larger** 218:25
313:9
**largest** 179:19
**lasting** 189:21
190:11 229:5,7
**latest** 286:2
**law** 2:4 4:23
25:3 30:22
**lawyer** 137:7
151:9 343:14
**lawyers** 172:4
**lead** 95:13
**leading** 166:16
212:4 220:14
**leads** 191:16
**learning**
264:10
**leave** 243:21
277:10
**led** 103:23
226:2
**leeway** 184:8
**left** 30:10 67:4
242:25 243:10
362:21,25

**legal** 44:11,13
48:12 49:8
66:13 67:17
88:2 98:2
104:8 108:4
115:23 116:6
120:5 134:7
135:2 151:3
154:16 155:20
156:21 166:20
205:12 206:19
289:22 301:23
341:19 342:14
342:15 343:7
343:15,22,25
344:18,20,21
369:6,7,12
**legalities** 88:8
**legally** 106:2
107:3 108:7
115:20 134:9
**lemon** 140:9,11
140:13 141:5
**lemons** 138:6
**lend** 302:2
**length** 5:15
183:9 205:20
210:11 218:16
218:21 219:20
349:11
**lengths** 349:7
**lengthy** 124:4
**lesar** 5:12

**level** 67:4
140:18 142:6
151:21 245:4
**levels** 61:10
132:14
**liability** 42:24
**life** 19:20
217:14 240:18
**light** 281:7
**likelihood**
255:5 261:11
367:15,17
368:11,25
369:14
**likely** 91:14,15
91:17,18 93:11
141:8 192:8
207:23 222:14
244:24 317:14
322:13 340:5
342:9,22,24
343:3,9 351:24
358:12
**likes** 82:7
**limit** 80:2
351:17,21
**limited** 364:8
**limiting** 21:6
78:17 80:14
**line** 61:25
85:24 208:9
251:21 253:23
258:8 374:5

**lingering** 354:8
**lingo** 108:18
**list** 31:15 170:4
170:5,14
282:22,24
329:2
**listed** 117:3
328:24 329:7
**listen** 254:18
**lists** 332:6
**literally** 68:10
208:7 228:23
261:20
**literature**
138:5,6 186:5
186:8,12
200:10 206:23
207:12 209:6
209:16 210:3
228:17 246:3
247:20 289:21
345:17 349:20
351:3
**litigation** 6:17
**litigations**
15:11
**little** 13:2,10,25
31:25,25 40:20
41:5 66:8
125:13 143:12
148:3 163:3
168:20 224:13
224:18 250:10
275:15 311:7,8

311:23 328:7
345:24 346:2
364:13
**live** 114:22
**llc** 374:2
**llp** 1:20 2:15
3:5 8:22
**location** 8:20
**lock** 304:15
305:3
**logic** 25:20
290:3
**logical** 289:23
**logically**
153:25
**long** 73:23 93:6
93:11 182:19
189:6 200:14
202:12 208:11
216:4 218:22
228:9 250:8,11
349:22
**longer** 143:13
191:22 192:17
225:25 226:13
226:14 253:2
349:14
**look** 29:16
31:13,19 34:21
35:5 36:21
37:19 45:13,24
49:24 61:5
62:7,14 65:4
75:3 85:9

88:20 92:6
96:25 97:2,6
99:14 113:23
118:11 119:9
132:9 143:24
144:13 147:19
147:24 149:12
152:23,25
153:19 154:24
165:4 169:8
171:12,14
173:7 174:12
185:7 190:21
191:10,12
197:2,12 203:3
205:15 210:13
220:3,5 221:9
223:18 224:10
226:21 239:9
239:21,21
241:11,15
247:20 248:5
249:12 255:23
257:15,19
258:5,18 263:9
267:11,24
268:17 269:4
273:3 274:21
283:10 289:10
292:14 297:2
301:5 307:23
307:25 310:13
316:12 317:5
322:21 328:17

329:12,18
330:2 331:10
331:11,20
337:9 349:4,7
349:10 354:13
356:21 359:4
359:11 361:5
**looked** 29:4
31:10,11,23
35:6,8,13 42:7
62:20 83:9,9
90:19 98:6,17
126:11 142:9
143:7 158:21
167:7,17
169:10 174:5
184:23 185:22
213:6 218:6
255:10 274:23
285:17 302:21
306:24 308:4,6
308:8,10 317:6
339:15 353:7
**looking** 17:17
30:25 31:6
63:13 64:10
71:24 74:20
156:12 171:24
172:2,8 174:2
180:24,25
197:8 204:10
205:9,18
209:14 213:22
214:11,14

222:2 234:15
238:3 242:13
265:25 272:24
276:2 283:5
314:22 331:22
332:9 339:13
356:11
**looks** 99:7
196:17 273:11
275:21 296:14
311:10 312:19
**loss** 356:18
**lost** 272:20
**lot** 28:16 30:21
34:24 95:3,9
146:8 177:19
195:18 213:7
213:10 252:16
260:22 303:7
303:20 305:16
305:24 309:16
309:22 317:12
339:18 340:4
346:3 355:17
**loud** 198:24
**low** 61:9 72:2
90:19 164:20
164:22 165:8
266:14 309:8
310:16 333:19
335:2 370:4
**lower** 56:14,20
58:6 59:12
333:9,21 335:3

335:6
**lowered** 105:3
**lucy** 335:22
**lunch** 152:9

**m**

**m** 21:13 30:23
30:23 71:16
372:2
**machine**
214:15
**machines** 202:6
214:19
**made** 44:21
75:5 97:21
99:23 101:10
106:7 107:16
107:21 111:19
111:20 112:2,6
112:10 114:20
114:21 116:5
127:9,20
128:23 151:10
154:9,10
163:11 165:7
166:2,11,23
167:6 172:11
173:4 179:20
203:8 282:9
286:23 362:22
368:4,16
369:22
**madison** 2:6

**magic** 352:3
**magically**
320:16
**maintain**
104:13 105:13
**maintained**
67:3 105:6
107:13,23
108:4,5 110:6
110:10,11,14
114:5 133:15
298:9
**maintaining**
69:22 103:20
110:11 278:7
**maintenance**
101:18 102:10
102:18,20
104:4,7,23
108:8 110:21
110:21 114:15
133:12,17,19
149:15
**majority** 16:9
212:14 286:7
286:11
**make** 19:20
20:7 26:9
35:11 37:9
39:12 41:12
69:25 74:13
77:16 81:18
92:23 93:20
94:5,11,19

106:16,20
108:19 109:19
113:20 114:25
118:22 119:6
120:21 121:7
121:10 123:8
124:21 129:17
135:21,22
138:19 141:6
145:3,20
162:15 164:15
165:18 171:16
177:2 181:8
192:20 195:4
200:24 202:9
202:17 204:12
205:18 206:6
206:11 209:5
209:14,20
210:18 217:14
232:25 238:18
240:17 252:2
277:8 278:16
293:25 302:19
303:7,14,20
305:16 325:24
333:10 335:8
338:17 340:17
343:23 344:24
362:22 368:5
**makers** 221:23
**makes** 16:8
85:15 124:14
139:9 157:7

232:11 274:4
278:19 347:22
**making** 14:15
40:7 42:14
60:21 69:19
94:8 127:7,18
127:22 128:2,8
128:20 138:23
156:7 174:18
174:20 188:24
191:17 203:22
291:17 304:17
341:6
**male** 61:7
**managing**
14:13
**manner** 96:22
98:12 99:21
115:7 200:13
**march** 72:24
73:2 76:7,7,9
76:14 77:12
360:2 361:24
**mark** 19:21
35:19,19 36:2
100:5 252:23
**marked** 19:6
20:2,4 36:5,8
36:14 45:3,6
89:19 100:8,13
113:3,6 123:12
125:3 152:13
187:8,19
196:13,15

**[marked - massie]**

218:2 249:10 256:3 262:15 268:8 272:2 290:13 307:5 309:17 328:4 331:13,16 360:6

**market** 5:7 15:24 26:2,3 26:11,25 27:13 27:15 29:21 30:17 38:8,13 43:22 66:25 67:11,25 68:5 68:22,25 69:9 69:13,19 70:8 70:9,15,18,23 72:15 73:12 76:8,13,19 77:4 83:12 84:15 85:5,18 86:4 96:11,25 99:2 100:23 105:7,21 106:5 107:4,7,10 110:25 111:2 111:15 117:16 117:23 118:7 118:11 122:10 125:13 127:8 127:18 128:9 130:6 139:22 140:15,21 141:6,10,17,21

141:24 142:5 142:25 143:4 144:8 146:22 147:2,2,14 156:11 160:10 160:21 161:20 161:20 163:13 163:24 164:2 164:12 165:20 165:21 168:4 175:14,19,20 176:18 177:7 177:14,17 178:15 180:11 181:19 182:23 183:9,10 185:18,20 187:19 188:19 191:23 194:6 195:10,19 196:24 197:16 197:18 199:4 199:25 200:22 201:4,10,20 202:2,4,5,9,17 202:22,24 203:4,11,19,20 204:5,14,16,22 204:24 205:3 206:14 207:3,9 207:19,24 209:10 210:12 210:21 212:8 213:10,12

214:6 219:4 221:23 222:10 224:23 225:9 225:13 226:7 227:23 228:9 228:11 233:5 245:7 246:4 248:14 249:5,8 251:17,20 253:2,11 267:3 269:23 279:2 281:19,21 282:2 300:25 301:16 304:9 304:19,21 305:18 306:3,7 306:15 313:16 313:17,18,20 314:8,11 315:8 315:10 316:6 316:18 317:3 317:14,21 318:15,25 319:2 320:5,20 321:9,14,25 322:2,17 323:23 324:5 324:22 335:11 335:21 336:4,7 337:6,12,18,22 337:24 338:4 339:19 340:22 346:21 348:12 351:19,20

368:2,16,21 369:13,16

**market's** 111:9 165:14 166:3 167:4,8,14,15 223:22 224:6 231:14 244:23 367:15,16 369:18

**marketed** 91:17

**markets** 6:11 145:15 182:9 182:13 188:13 194:15 211:22 212:3 225:22 227:10,10,12 228:17 247:24 321:3,20 336:10

**marking** 112:24

**marriage** 373:11

**massachusetts** 1:2 8:18

**massie** 5:19 71:16,21 72:16 73:13 74:2,11 76:9,14,20 77:5 78:2,11 78:22 79:22 81:10,12,19 82:6,10 83:25

84:11 87:14,24
89:2 90:11,17
90:24 91:8,10
91:22,25 94:17
94:24 95:2,6,9
95:20 123:17
124:4,13,18,21
125:15 126:3,8
127:5,9,15,19
128:3,13,22
129:20 130:15
131:3,10
132:11 133:5
134:5 144:14
147:25 170:25
171:6,20 173:2
173:12,18
174:6,24 175:7
175:8 223:23
224:7,13,16,24
225:7 226:8
231:15,20
233:6,10 234:4
234:17,19
235:9 237:13
237:20,24
238:4,16,19
243:18,24
244:13,13
245:23 248:16
249:3,12,16
250:5 253:3,14
253:17 254:18
259:13 265:10

270:13 271:15
279:4,22,25
283:9,14,17
284:12 285:7
285:25 286:5
286:18 287:14
288:14 292:16
293:8,11 299:9
299:13 300:3
300:14 317:21
318:17,21
320:5 322:9,14
322:23 327:19
333:23 334:9
334:17,20,25
338:12 339:9
339:19 340:23
343:4 346:20
347:4 351:5
354:9
**massie's** 227:3
250:14 251:9
256:20 335:5
**match** 126:12
**matches** 126:8
**material** 73:12
134:9,11
154:12,18
182:14 298:3
**materiality**
21:23
**materially**
277:3 297:17
298:4 319:2,15

**materials** 30:2
30:10 40:21
41:2,4,16 42:4
81:24 82:6,7
82:13,16,19
84:10 169:22
193:18 194:2
213:20 214:7
259:21 269:12
270:24 279:5
282:9 311:3
328:18
**math** 318:9
**matter** 8:15
23:12 24:19
29:3,8 40:12
68:13 70:20
92:10 128:10
147:3 206:10
206:23 267:17
288:25 356:2
373:13
**mattered** 70:14
70:18
**matters** 340:4
**mean** 13:11
15:19 35:15,15
37:18 49:16
55:2 57:18
59:22 62:11,24
66:11 71:2
93:10 99:24
100:14 102:24
103:17 110:19

115:22 116:13
127:17 132:4
135:15 141:5
143:14 145:11
148:15 149:13
166:9 176:10
183:16 185:10
186:15 188:15
193:5 198:5
200:18 209:5
212:18 214:16
215:19 216:12
217:5 222:20
224:15 239:14
241:6,15
248:21,22,25
261:8 267:19
284:8 290:25
294:6 297:14
298:22 302:7
302:16 306:6
306:11 310:11
310:12,15,25
310:25 314:4
314:14,20
315:5,7 317:19
319:17 320:20
321:24 324:18
325:2 327:11
334:12,17
338:3,24
339:20 341:15
350:9,18,20
354:21 356:9

358:2 366:20 367:23

**meaning** 98:10 143:2 180:17 183:24 195:2 204:10 211:4 218:24 239:22 336:13

**means** 23:3 48:20 49:14 50:5 74:24 88:9 102:6 140:16 179:25 201:10 204:25 209:24 215:20 224:9 229:13 230:7 280:14 280:16 288:8 290:24 341:20

**meant** 120:18 277:16,19 331:5 338:4 363:22

**measure** 30:19 128:15 241:6 284:2 356:24

**measured** 180:13

**measurement** 131:22

**measuring** 26:20 289:18

**media** 8:13

**medical** 157:20 159:16

**meet** 341:7

**meeting** 41:9 41:15 72:14 85:14 86:13 93:16 94:13,19 193:16 258:11 339:2,3 342:11

**meets** 161:23 162:5

**members** 92:5 340:3

**memorandum** 4:23

**memorized** 71:23

**memory** 63:11 152:6,7 186:16

**mention** 118:16 145:8 170:21 220:9 234:17 238:3,12 255:12 277:24 283:16 284:12 285:7,24 286:5 286:18 287:14 299:9 300:3,9 300:14

**mentioned** 11:25 15:9 32:24 90:16 104:3 167:22 174:14 176:19

189:17 192:23 208:23 210:5 229:4 255:8,9 257:3 268:5 283:9,14,24 288:14 326:22 330:25 358:11

**mentioning** 64:17 65:2 299:19

**mentions** 83:23 357:6

**mesa** 21:12

**mess** 272:17

**met** 34:22 40:23,24 55:6 55:11 161:10 161:18 343:8

**method** 194:22 356:10

**methodologies** 244:7 289:4

**methodology** 23:4 29:23 235:2,12 241:9 289:5,9,16,17 353:20 354:5 354:12,17 356:2,8 357:7 358:25 359:14 359:17 361:13 364:5

**methods** 39:22

**michel** 1:8

**microphones** 8:6

**midday** 190:22 192:25

**middle** 218:20

**million** 301:6 301:10

**millisecond** 181:13 212:20

**milliseconds** 179:14,16 180:7,8,13,20 181:13

**mind** 20:11 112:8 126:15 186:9,12 198:13 236:25 237:5

**mine** 217:12

**minor** 141:19

**minority** 220:23 221:5

**minus** 258:23

**minute** 45:12 65:7 71:9 140:5 146:15 188:12 189:22 229:5 310:14

**minutes** 143:19 143:21 159:11 159:11 180:3,4 184:25 185:13 190:12 191:9

**[minutes - movement]** Page 48

191:24 192:2 192:18 213:5 213:25 216:4,9 229:7 246:14 246:17 247:13 264:10 308:17 316:23 350:16 350:22 353:16

**miscellaneous** 330:2

**misinterpreted** 74:5

**misleading** 49:5 80:11,20 115:7,15,19 116:9,12,18 117:8 153:11 153:18 162:12 162:17,20 232:11 347:20

**misleadingly** 114:10,17 116:17,20,24

**misled** 15:24 43:21 369:13

**mispronounc...** 223:2

**misrepresent...** 44:15 53:18,24 66:17 67:7 68:16,19 102:3 103:4 110:16 118:20 154:12 172:7

**misrepresent...** 15:25 65:25 127:14

**misrepresenti...** 104:11

**missed** 21:13 66:14

**missing** 66:5 294:4,8 295:2 295:4 359:13 363:11

**misspoke** 56:22 250:23

**misstatement** 44:20 46:4,12 47:23 48:16 51:18 57:23 58:11,15 107:3 108:7 150:22

**misstatements** 150:11,13,14 150:18 168:21 169:4

**misstates** 122:14,15 137:22

**misstating** 120:2

**mistake** 39:18

**mistakes** 39:14

**misunderstan...** 50:16 97:11

**mix** 154:5 166:15 241:13

**mm** 21:8 125:11 152:11 191:20 206:8 248:24 311:6 363:17

**mmsc** 57:13

**mmse** 59:8

**modern** 175:19 186:3

**modest** 199:15 211:8 215:18

**mololamken** 2:15

**moment** 96:16 107:9 151:20 169:11 192:12 232:6,8 233:22 235:22 237:5 245:16 325:4,7 344:7

**momentary** 34:3

**monday** 40:25 87:9,16

**monetize** 302:13

**money** 94:6 177:2 303:7,14 303:20 305:16

**months** 134:22 260:9

**morgan** 6:4,6 6:13 192:11 208:23 226:23

255:10 260:25 261:3 268:5,18 271:21 272:5 272:25 274:22 278:24 298:9 331:16,20,23

**morning** 8:3 9:21,22 81:20 82:3,19 83:3 84:7,12 87:15 89:3 171:4 190:22 225:8 225:12 242:7 255:15 262:5,6 262:24 267:5 269:19 271:14 275:9 282:15 304:2 305:15 311:23 345:20 348:8,13,14

**motion** 4:23

**mouth** 153:8

**move** 96:21 111:12 123:5 247:8 278:19 336:10

**moved** 98:12 98:23 99:21 266:7 304:12

**movement** 97:22 101:4 109:6 129:4,8 129:19 176:23 185:11 201:19

212:25 219:20
219:22 233:9
243:3 293:22
313:25 314:5
314:16,24
315:6 316:9
320:23 324:23
340:20 341:22
342:23,25
343:2,9,19
345:18 346:16
349:23 365:18
**movements**
176:22 185:14
200:14 202:12
202:14 203:15
203:17 219:18
312:15 313:9
316:13 317:5,6
358:13
**moves** 227:25
292:7 304:11
322:17 365:22
**moving** 30:24
101:22 230:16
365:24
**mri** 339:17
**mtv** 73:2
**muddle** 139:14
**mulling** 41:23
**multi** 208:16
210:8 348:16
**multiple**
315:23 332:2

**mute** 8:8
**mystified**
320:19

**n**

**n** 2:2 3:2 4:2
18:19,20 22:10
185:17 210:10
210:11 330:16
372:2,2
**nadia** 1:4 8:15
**name** 8:23
108:14 220:4,9
330:14 374:3,4
**names** 246:8
**nature** 183:12
**near** 93:21
95:15 139:7
304:24 350:14
**necessarily**
118:16 129:3
134:21 141:10
174:22 183:19
219:19 230:4
299:11 323:15
325:2 365:21
366:7
**necessary**
118:24 343:24
**need** 26:19
46:21 58:19
59:19,23 63:17
63:19 64:5
109:18 129:24

143:17 159:4
162:22 199:21
241:21 271:11
295:13 344:23
**needing** 48:23
51:4 157:14,23
159:18
**needs** 246:5
280:24 359:12
**negative** 54:9
54:23 55:3,15
56:6 65:22
68:2 69:7 94:3
104:10,11
129:8 138:9
139:24 145:20
145:23 165:11
167:22 190:11
191:7 200:20
229:6 233:9
237:13 241:3
241:14 242:23
243:2,4,7,10,11
243:17,24
255:16 256:20
259:4,5 270:8
273:25 274:10
274:15,20
275:19 279:25
293:12 320:7
366:24 368:20
368:23,24
**negatively**
96:12 316:8

**negatives** 331:7
**nera** 12:17,20
13:9 14:15,20
14:24 17:21
18:11,14 24:14
24:15,18 25:6
29:2
**nera's** 24:11
**net** 145:21
316:5,9 317:16
342:21 366:4
**neutral** 104:12
278:13 298:10
**new** 1:20,21 2:7
2:7,17 3:8,8
9:17 14:12
35:23 42:3
69:17 70:8,24
71:6 101:13
102:13 112:15
114:6 117:9
144:7,18
147:13 159:15
159:22,24,25
160:2 172:13
204:17 205:21
208:14 209:2
215:6 220:19
222:18 244:24
249:3,8 265:3
265:7 272:10
279:15 280:19
285:19 287:10
293:24 297:21

297:23 299:6
302:10 315:15
319:2,15,17
320:7 321:14
321:15 325:3
336:24 337:4
352:9 374:2
**news**  4:14,15
34:9,12,18,22
35:2,4 37:14
37:21 38:14,16
38:17,22 39:3
128:25 129:17
145:19,20
147:11,11,24
148:8,14,15,19
149:2,9 174:5
174:9,24 175:6
177:16,21
179:7 180:16
180:24 182:10
182:15 183:11
183:12,19,24
184:2,5,8,13,21
188:21 191:7,7
204:5 214:3
215:6,7 216:22
216:23,24
220:19 221:3
222:5,15
225:23,25
227:11,11,17
227:18,19,24
227:25 228:11

228:12,18,19
228:24 231:8,8
236:20,20,22
236:22 237:3,4
237:4,13 239:2
239:9,15,23
241:14,17,22
242:2,6,17,25
243:2,7,10,11
243:14,17,25
247:5 279:13
281:15 299:3
305:12,14
313:15 314:9
314:10,19
316:5,21,22
317:15 319:4
323:21 336:24
336:24 337:3,5
337:7 338:22
345:19,25
365:24 366:2,6
**newspapers**
177:18 336:19
**nextera**  22:9
**nice**  20:7
**nine**  176:2,4,6
176:7 187:5,6
196:8,9 205:24
**ninth**  78:19
87:5,9,21,23
231:23,24
232:6 337:11
339:8 340:22

346:9,17,22
347:15 348:8
348:14 351:5
**nobel**  211:24
**noise**  339:19,22
**non**  4:15
243:13,17,24
344:11 345:22
364:17 369:20
**noncarriers**
62:21,25 63:16
64:13,18 65:2
270:9,19 271:4
**normally**  239:7
239:12
**notary**  1:23
7:17 9:16
372:19 374:23
**notation**  276:7
**note**  8:5 176:6
257:12 276:16
333:5,7
**noted**  9:10
**notes**  330:2
**notice**  85:6
368:21 369:6,9
**noticeable**
310:19
**noun**  190:8
**november**  4:16
5:21,23 6:5,7,9
6:10,12,14
32:9,10,15,16
32:23 33:13,24

35:9 38:16,23
72:13 74:12
75:25 76:2,2
76:21 77:5,22
78:2,11,22
79:23 81:6,9
81:13,13,15,21
82:3,20 87:6
87:15,16 88:25
89:3 93:14,23
95:22 129:2,5
129:20 130:10
130:12,15
131:4,21
137:18 170:10
171:4 224:25
225:8,13 226:9
226:25 227:2
231:14 232:3
233:5 237:6,21
237:22 248:17
249:17 256:9
266:5 267:5,14
267:18,21
268:2,23
269:13 271:14
273:9 275:7,7
275:8 279:5
283:7,7 290:8
290:20 301:7
301:13,17,25
302:2 303:25
304:2 307:11
308:2,13

313:12,23,23 317:22 320:13 322:5,7,25 323:19 326:20 327:16 328:14 332:6 342:10 345:19,20 346:17 347:16 347:18 351:5 353:22,25 354:6 357:19 357:19 362:23 363:4,16,21

**nuance** 120:15 120:17

**nuanced** 120:9

**number** 9:24 23:21 28:21 32:7 37:20 112:2 150:17 208:10 232:22 242:23 262:17 296:21 297:11 335:12 345:15

**numbered** 249:21

**numbers** 238:18 310:12 332:2,16

**nw** 2:17

**o**

**o** 21:10 138:7 372:2

**oaky** 98:21

**oath** 9:4 372:6 373:5

**objection** 22:18 49:7 50:8,18 51:19 57:3 58:23 60:15 78:23 79:24 86:10 92:25 94:9,22 95:16 98:16 101:12 102:16 105:23 106:18 108:2 113:18 122:13 122:18 130:2 134:6,25 137:21 151:13 152:3 155:17 156:18 160:7 162:15,16 165:17 166:6 166:19 168:5 171:23 173:5 173:13 200:7 205:11 212:16 220:20 224:19 226:10 228:13 234:7 243:20 246:18 251:23 252:11 255:18 264:17 265:4 265:12,19 276:24 280:9 281:17 298:6

298:20 299:16 304:18 305:9 313:7 315:20 319:6 320:25 324:7 333:25 336:22 338:9 338:20 342:13 343:20 344:17 344:24 347:5 350:8,17 351:6 362:18 363:9 364:24 367:5 369:2

**objectionable** 284:15

**objections** 7:11 9:7 64:5 158:3

**objective** 217:4

**objectively** 217:8

**obligation** 110:18

**observation** 265:3,5 334:25 341:6

**observations** 284:7

**observe** 78:4 144:22

**observed** 78:2 79:21 129:4 232:2 293:2

**observing** 271:3

**obtain** 34:18 178:9,14,15

**obtained** 294:12,18

**obvious** 30:18

**obviously** 27:16 45:23 48:12 54:5 76:22 83:11 84:2 95:21 106:3 113:19 117:3 151:6 177:21 178:10 208:18 245:17 252:13 280:11 281:18 351:23 359:4

**occasion** 316:14

**occur** 219:16

**occurred** 129:5 129:21 154:9

**occurs** 185:11 212:25

**october** 278:3

**odds** 105:16,21 106:13

**offer** 29:7 87:25 88:21 135:17 279:12

**offered** 142:6 142:14 360:21

**offering** 77:3 78:20 79:4,20

**[offering - okay]**                                                                     Page 52

| | | | |
|---|---|---|---|
| 87:12,22 88:12 | 24:8 25:9,22 | 92:9 93:18 | 160:3,14,23 |
| 88:13,17,19 | 26:22 27:3,8 | 94:15 95:23 | 161:5 162:10 |
| 89:6 104:8 | 27:20 28:5,24 | 96:14 97:7,8,9 | 163:9,15 |
| 120:10 152:2 | 29:18,25 30:6 | 97:23 98:9 | 165:23 166:13 |
| 279:15 343:15 | 30:13 32:2,20 | 99:5,16 100:3 | 167:19 169:24 |
| **offhand**  39:6 | 33:3 34:2 35:3 | 100:10,18,24 | 170:8,12,20 |
| 99:9 223:4 | 35:10,23 37:5 | 101:6 102:8 | 173:16 174:15 |
| 246:8 247:19 | 38:6,11 39:2,7 | 103:9,12 104:2 | 176:13 178:18 |
| 257:3 271:16 | 40:4 41:11 | 104:2,21 | 178:22 179:5 |
| 276:6 349:19 | 42:2,12 43:8 | 105:11 107:6 | 182:6,17,25 |
| **office**  14:12 | 44:4,19 45:22 | 107:19 108:10 | 183:15 185:15 |
| **officer**  157:20 | 46:2,15 47:4 | 108:17 109:13 | 186:10 188:4 |
| 159:16 | 47:16 48:3,4 | 110:24 113:22 | 190:9 191:4 |
| **offices**  1:19 | 48:14 50:2,24 | 114:2,24 120:7 | 192:19 193:9 |
| **officially**  36:8 | 52:24 53:8 | 121:9 123:5,11 | 193:12,24 |
| **oh**  31:21 93:22 | 54:6,14,21 | 123:15 124:19 | 195:16,22 |
| 118:21 149:11 | 55:7,20 56:16 | 126:21,25 | 196:21 197:3 |
| 165:4,9 185:3 | 57:8,20 58:16 | 128:18 129:9 | 198:11 201:16 |
| 186:25 187:15 | 59:16 60:3,8 | 130:19,24 | 206:17 207:13 |
| 198:11 216:19 | 61:15 62:9 | 131:8,17 | 211:6,14 |
| 254:9 262:19 | 63:12 64:19 | 132:16,20 | 212:11 213:3 |
| 275:23 277:7 | 65:8,16 67:13 | 133:23 134:13 | 215:10,16 |
| 291:16 330:13 | 71:19 72:6 | 135:5 136:14 | 217:17 219:15 |
| 340:15 348:21 | 73:7,19 74:4 | 136:22 137:15 | 220:12 221:8 |
| 358:10 | 74:21 75:15,18 | 139:20 140:20 | 222:8 223:10 |
| **okay**  10:11,19 | 76:5 77:2,19 | 141:4 142:10 | 223:11 225:5 |
| 10:25 11:12,24 | 79:14 80:12 | 143:8,12 144:4 | 225:16,19,20 |
| 12:9,23 13:6 | 81:3,16 82:13 | 144:16 145:6 | 226:5 227:15 |
| 13:14,20 14:2 | 82:17,22 83:21 | 147:8 148:5,20 | 227:21 228:7 |
| 14:5,18,22 | 84:5,9,21 86:8 | 149:7,17 151:5 | 230:19 231:4 |
| 15:4 16:4,16 | 86:15,19,23 | 152:4 153:2,15 | 232:9,13 234:8 |
| 17:2,25 20:21 | 87:4,8,11 | 153:24 154:21 | 234:24 235:24 |
| 21:18 22:11,14 | 88:22 90:6 | 155:9,10 156:9 | 235:25 238:10 |
| 22:23 23:9,17 | 91:7,12,20 | 158:16,23 | 239:6 240:5,20 |

**[okay - opinion]**                                          Page 53

241:19 242:3
242:19 243:12
244:18 246:10
247:11 248:7
249:13 250:4
250:12,17
251:2,14 252:5
252:15 254:2
254:10,16
255:22 256:11
256:16 257:6
257:16,21
258:4,14,21
259:10 260:16
263:8,13,21
265:8 268:15
268:20 269:9
269:10,21
270:3,15
271:18,23
272:6,19
273:16 276:20
281:6 282:21
285:14 286:12
286:16 287:5
287:12,18
289:7,13 290:4
292:6 293:6,10
293:20 294:2
295:6 300:11
301:3,19 302:4
305:25 307:15
308:9 310:3,23
311:21 312:9

313:11 317:18
318:14,20
319:13 320:2
321:17 322:19
323:7,25
324:11 325:11
325:16 326:18
327:25 329:13
329:20 331:9
331:18 332:16
333:14 336:14
341:10 342:4
345:6 346:10
346:23 347:17
347:25 348:10
348:24 349:15
349:25 350:23
351:11 353:10
353:17 354:3
355:20,22,24
356:6 357:16
359:8,18 360:7
361:4,8,9,25
364:2,11 365:9
365:14 366:13
367:12 368:14
370:11
**old**  178:4
277:10,24
278:8 324:3,13
336:3,9,24
351:20
**omission**  66:15
66:21 67:5

68:17 70:21
71:5 102:4
112:19 129:13
154:12
**omissions**
15:24 65:20
66:11
**omitted**  70:17
138:15
**omitting**  70:13
**once**  34:20
108:15 243:9
251:25 349:3
**ones**  10:23
21:14 32:12
35:6,13 177:23
282:10 285:18
305:21 369:25
**open**  231:23
313:23 314:6
314:17 315:7
316:3,12,23
317:7 318:3,6
318:16,24
319:8,23 321:6
321:9 332:18
337:13 346:2
**opening**  121:14
121:19 261:9
273:23 313:18
313:20
**opens**  320:21
**operate**  202:5
214:18

**operative**  42:19
43:9
**opine**  27:22
175:13
**opining**  77:22
77:25 78:4,5
78:10 245:4,10
245:14,16
**opinion**  21:20
22:16 23:3
43:4,7 44:3,11
44:13 48:12
50:4 51:15
53:20 58:3,14
69:11 77:3
78:9,21 79:4
79:21 80:18
87:12,23 88:12
88:19,21,24
89:6 98:20
105:22 106:17
107:22 111:13
113:21 114:14
114:23 115:11
115:14 116:7
117:12,14
118:5 119:22
120:2,10
128:12 131:2
131:19 136:6
142:21 151:17
151:25 152:2
155:20,25
156:13 192:7

**[opinion - papers]** Page 54

203:23,25 220:5 233:3 253:2 254:11 267:3 281:5 303:23 322:6 341:19 343:15 352:5 355:11 355:22 357:24 369:8

**opinions** 11:14 22:17 29:7 30:15 40:12 42:9 122:8 135:16 175:12 273:23 279:13 312:24 345:14

**opposed** 43:24 56:13 95:4 139:24 150:13 165:3 219:21 222:16 230:4 231:20 267:6 275:18 278:7 278:13 289:2 309:18 324:22 342:2

**opposing** 22:22

**opposite** 314:13 315:9 315:17 366:2

**option** 144:10

**options** 231:23

**oral** 21:15

**order** 11:13 40:2,6 51:20 72:24 73:2,3,5 75:11 76:7,7 77:7,9,11,13 188:24 195:5 208:15 230:8 360:3 361:24 362:23 363:4,7 363:13,22 364:7

**orders** 180:22 180:23 181:2 181:11 194:23 195:5

**ordinary** 220:18 247:17

**orient** 170:24 307:19

**outcome** 9:6 373:13

**outcomes** 57:7 138:10

**outlines** 175:25

**outside** 17:13 17:15 92:19 151:14

**outweigh** 366:4

**overall** 164:20 239:14 241:24 269:24

**overarching** 273:18

**overestimate** 369:14

**overlap** 126:10

**overlapping** 10:18

**overlaps** 362:5

**overnight** 240:18 314:11 316:21 320:15

**own** 29:10 41:2 41:8,17 119:22 222:21 272:20 279:13 328:22

**owned** 221:16

**p**

**p** 2:2,2 3:2,2 5:12 21:10 260:8 329:24 330:15,16

**p.m.** 168:11,15 236:10,14 273:13 282:12 291:2 296:3,7 370:20,24 371:5

**pace** 194:15

**page** 4:4,8 5:3 6:3 19:16 21:12 45:25 46:13 47:10,25 51:18 81:18 90:4 113:25 120:3 125:6,8

125:9 152:25 153:4 154:21 155:4 163:22 165:19 170:2,3 170:4 188:16 189:8 191:12 192:21 197:2,4 197:5,9 198:3 198:6,7,19,22 198:22 199:14 205:24 217:16 218:15 223:21 225:7,17 249:20,24 250:25 251:19 258:6 260:4 269:5 278:2 292:15 328:19 328:25 329:18 331:23 332:2,4 332:15,16,17 332:20,21 349:4 358:3,11 361:5,8 374:5

**pages** 223:18 245:24 250:10 253:19 359:25 361:21 366:11

**paid** 208:21 329:24

**panelist** 274:7

**paper** 217:14

**papers** 353:9

**para** 366:16
**paragraph**
29:19 33:20
39:19 46:8,13
47:9,20 48:7
52:11 56:6
60:21 61:17,22
65:6,14 75:16
81:5 102:25
114:4 125:21
126:19,23
127:3 153:7,9
153:20 155:4
175:18 176:5,7
182:8 183:7
189:9,9 191:13
197:25 198:4
198:15 211:19
250:18,22,24
263:10,12
269:16 273:18
301:5 322:21
323:9 340:7,11
340:12 358:10
366:14
**paragraphs**
359:20,21
361:10,17,18
**parameterizat...**
366:17
**parameters**
32:5 34:18,20
34:23 184:20

**part** 22:5 24:18
28:2 34:8
37:22 38:8
54:3 95:17
96:24,25 97:17
100:16,17
116:15 117:20
130:25 132:2
154:5 171:25
231:23 239:16
239:17 287:21
322:8 331:21
338:13,14
358:11 359:22
359:24 362:3
**partial** 317:6
**participant**
333:19
**participants**
182:23 194:5
**particular**
32:13 49:25
51:10 63:2
71:20 74:16
79:25 112:12
129:4 148:24
167:18 172:10
172:24 173:21
188:6 191:19
192:24 227:7
236:24 267:13
268:3 285:16
317:20 332:11
333:18 336:12

352:3,10
354:24 365:12
369:18
**particularly**
68:2 138:12
139:2 141:18
169:25 299:2
**particulars**
72:5 138:8
**parties** 7:5 8:12
72:11 373:10
**party** 9:4
**passage** 274:14
**past** 17:4,24
18:2,15 21:3,5
21:17 23:24
24:2 73:20
172:11 185:25
186:4 333:9,21
335:3
**pasted** 362:4
**patients** 57:2
**pattern** 313:4,5
319:21 365:7
365:11,12,16
**patton** 5:17
**paul** 1:19 3:5
8:21
**pause** 239:11
**pay** 222:14
**paying** 25:2
305:8,11
**pays** 24:15

**pdf** 197:5
**peaks** 312:7
**pennies** 343:18
**penny** 344:10
**people** 61:6,8
61:10 104:21
138:9,25
146:24 156:23
157:7 178:2,14
178:15 179:6
180:2,21 189:2
190:24 192:24
194:23 202:6
204:10 207:17
208:19 209:22
240:17 247:2
254:18 261:18
289:3,24 305:3
305:7,14,17
316:7 321:4,5
322:4 335:22
346:4,18
**percent** 4:13
13:24 14:3
221:16 326:5
370:2
**percentage**
185:4 238:20
310:15 325:21
326:3,8 352:11
352:13
**perception**
167:8,14,16

**[perfect - ph.d.]** Page 56

| | | | |
|---|---|---|---|
| **perfect** 331:6 | **person's** | 85:1 86:1 87:1 | 158:1 159:1 |
| **perform** 109:3 | 334:25 | 88:1 89:1 90:1 | 160:1 161:1 |
| 122:16 259:24 | **personally** | 91:1 92:1 93:1 | 162:1 163:1 |
| 259:25 260:3 | 34:21 | 94:1 95:1 96:1 | 164:1 165:1 |
| 260:13 283:18 | **perspective** | 97:1 98:1 99:1 | 166:1 167:1 |
| 339:16 | 67:17,18 | 100:1 101:1 | 168:1 169:1 |
| **performed** | **ph** 9:15 | 102:1 103:1 | 170:1 171:1 |
| 108:25 126:6 | **ph.d.** 1:17 4:9 | 104:1 105:1 | 172:1 173:1 |
| 240:22 248:15 | 4:11,20 6:16 | 106:1 107:1 | 174:1 175:1 |
| 249:6 | 10:1 11:1 12:1 | 108:1 109:1 | 176:1 177:1 |
| **period** 4:16 | 13:1 14:1 15:1 | 110:1 111:1 | 178:1 179:1 |
| 12:21 31:23,24 | 16:1 17:1 18:1 | 112:1 113:1 | 180:1 181:1 |
| 32:24 33:6,9 | 19:1 20:1 21:1 | 114:1 115:1 | 182:1 183:1 |
| 33:11,23 34:6 | 22:1 23:1 24:1 | 116:1 117:1 | 184:1 185:1 |
| 79:23 97:14 | 25:1 26:1 27:1 | 118:1 119:1 | 186:1 187:1 |
| 98:8 107:15 | 28:1 29:1 30:1 | 120:1 121:1 | 188:1 189:1 |
| 109:2,25 116:3 | 31:1 32:1 33:1 | 122:1 123:1 | 190:1 191:1 |
| 117:15 118:6 | 34:1 35:1 36:1 | 124:1 125:1 | 192:1 193:1 |
| 118:14 119:11 | 37:1 38:1 39:1 | 126:1 127:1 | 194:1 195:1 |
| 122:10 127:10 | 40:1 41:1 42:1 | 128:1 129:1 | 196:1 197:1 |
| 127:21 129:12 | 43:1 44:1 45:1 | 130:1 131:1 | 198:1 199:1 |
| 139:17 140:23 | 46:1 47:1 48:1 | 132:1 133:1 | 200:1 201:1 |
| 141:25 149:21 | 49:1 50:1 51:1 | 134:1 135:1 | 202:1 203:1 |
| 183:20 205:19 | 52:1 53:1 54:1 | 136:1 137:1 | 204:1 205:1 |
| 207:19 208:16 | 55:1 56:1 57:1 | 138:1 139:1 | 206:1 207:1 |
| 209:10 218:19 | 58:1 59:1 60:1 | 140:1 141:1 | 208:1 209:1 |
| 221:2 244:20 | 61:1 62:1 63:1 | 142:1 143:1 | 210:1 211:1 |
| 253:2 288:20 | 64:1 65:1 66:1 | 144:1 145:1 | 212:1 213:1 |
| 296:24 301:12 | 67:1 68:1 69:1 | 146:1 147:1 | 214:1 215:1 |
| 302:22 303:4,5 | 70:1 71:1 72:1 | 148:1 149:1 | 216:1 217:1 |
| 303:18 316:9 | 73:1 74:1 75:1 | 150:1 151:1 | 218:1 219:1 |
| 349:10 | 76:1 77:1 78:1 | 152:1 153:1 | 220:1 221:1 |
| **periods** 219:9 | 79:1 80:1 81:1 | 154:1 155:1 | 222:1 223:1 |
| 314:23 | 82:1 83:1 84:1 | 156:1 157:1 | 224:1 225:1 |

**[ph.d. - plaintiffs]** Page 57

| | | | |
|---|---|---|---|
| 226:1 227:1 | 294:1 295:1 | 362:1 363:1 | **ping** 215:6 |
| 228:1 229:1 | 296:1 297:1 | 364:1 365:1 | **pinged** 215:12 |
| 230:1 231:1 | 298:1 299:1 | 366:1 367:1 | 215:15 332:12 |
| 232:1 233:1 | 300:1 301:1 | 368:1 369:1 | 333:16 |
| 234:1 235:1 | 302:1 303:1 | 370:1 371:1 | **pinpointing** |
| 236:1 237:1 | 304:1 305:1 | 372:4,13 373:4 | 83:14 |
| 238:1 239:1 | 306:1 307:1 | 374:4,19 | **pipelines** |
| 240:1 241:1 | 308:1 309:1 | **pharma** 92:21 | 179:12 |
| 242:1 243:1 | 310:1 311:1 | **pharmaceutical** | **place** 8:11 |
| 244:1 245:1 | 312:1 313:1 | 11:3 61:13 | 65:12 159:2 |
| 246:1 247:1 | 314:1 315:1 | **phase** 53:4,7 | 194:23 230:13 |
| 248:1 249:1 | 316:1 317:1 | 161:22 264:21 | 296:21 313:15 |
| 250:1 251:1 | 318:1 319:1 | **phd** 162:22 | **placebo** 71:25 |
| 252:1 253:1 | 320:1 321:1 | **phenomenon** | **placebos** 90:18 |
| 254:1 255:1 | 322:1 323:1 | 304:21 | **plaintiff** 16:18 |
| 256:1 257:1 | 324:1 325:1 | **phones** 8:8 | 18:4 23:14 |
| 258:1 259:1 | 326:1 327:1 | **phrase** 51:16 | 29:2 96:3 |
| 260:1 261:1 | 328:1 329:1 | 67:25 137:13 | 344:8,15 |
| 262:1 263:1 | 330:1 331:1 | 142:19 341:17 | **plaintiff's** |
| 264:1 265:1 | 332:1 333:1 | **phrases** 174:14 | 17:22 233:18 |
| 266:1 267:1 | 334:1 335:1 | **phrasing** 80:2 | **plaintiffs** 1:6 |
| 268:1 269:1 | 336:1 337:1 | **physical** 178:9 | 1:17 2:5,16 |
| 270:1 271:1 | 338:1 339:1 | **pick** 8:6 89:9 | 4:23 16:14 |
| 272:1 273:1 | 340:1 341:1 | 219:23 285:15 | 17:17 20:5 |
| 274:1 275:1 | 342:1 343:1 | 314:20 | 24:21 42:15,23 |
| 276:1 277:1 | 344:1 345:1 | **picked** 217:12 | 43:10,19 53:23 |
| 278:1 279:1 | 346:1 347:1 | 330:21 | 54:5 65:18,20 |
| 280:1 281:1 | 348:1 349:1 | **piece** 146:23 | 71:15 73:13 |
| 282:1 283:1 | 350:1 351:1 | 147:3 159:15 | 74:10 76:13,19 |
| 284:1 285:1 | 352:1 353:1 | 186:11 259:3 | 88:20 112:22 |
| 286:1 287:1 | 354:1 355:1 | **pieces** 146:20 | 112:24 113:15 |
| 288:1 289:1 | 356:1 357:1 | 237:2 246:16 | 115:3 119:5 |
| 290:1 291:1 | 358:1 359:1 | 315:24 319:20 | 125:2 127:7,17 |
| 292:1 293:1 | 360:1 361:1 | 366:6 | 127:22 128:8 |

**[plaintiffs - possible]** Page 58

128:20 129:11
132:23 133:12
136:9 138:15
159:2 219:12
219:17 223:14
224:5 225:18
225:21 226:7
227:23 231:12
233:16,22
234:9,12
235:19 236:19
238:24 243:15
243:16 327:5
**planned** 264:11
**plausibly** 155:5
  157:12
**play** 289:3
**pleaded** 44:8
**pleadings**
  75:13
**please** 8:5,8 9:8
  9:12 19:14
  43:14 45:11
  137:25 143:17
  370:18
**pled** 76:13,19
  76:23,23
**plug** 277:9
**pocket** 356:10
  356:23 357:6
**point** 23:2,13
  24:15 42:6
  43:10,12,22
  51:9 53:12

55:6,12 68:6
69:4 77:18
78:15 81:4
82:7 83:10
87:17,18 89:4
89:5 93:4 94:7
107:2 111:21
112:9 117:4
120:14,22
121:18 131:7
132:19 135:4
136:7 147:21
159:2,13
172:11 174:23
175:6 188:23
189:3 192:10
198:2,4,14,16
201:12 202:11
207:15 209:8
211:18 220:2
228:16 232:4
234:20 238:8
239:22,22
240:12 243:25
244:6,8,14
246:3 274:8
279:10 289:15
301:4 340:14
345:16 349:17
352:25 354:10
354:16,20
357:11 358:15
359:6

**pointed** 282:6
  353:2
**pointing** 61:25
  129:11 346:18
**points** 55:10,13
  55:17 57:11,12
  133:22 161:11
  161:18,24
  162:6 238:20
**poll** 332:23
  334:12
**polling** 332:25
**pop** 222:24
**popular** 186:6
**population**
  61:12
**portion** 62:15
  127:3 129:19
  222:12 233:4
  234:3 243:7
  343:4 354:5
  362:15
**portions** 54:8
  54:10,16 61:6
  62:2,3 64:15
  64:16,23
**position** 121:3
  121:5 156:7
  233:18 264:4
  274:13,17
**positive** 66:18
  67:9 93:24
  139:24 145:19
  145:22 189:25

190:4 191:7
200:20 240:24
241:13,17,22
242:2,6,17,25
243:9 255:15
270:6,25
275:16 292:12
319:4 368:19
368:23
**positively**
  68:22 189:14
  190:6 228:25
  316:8
**positives** 331:7
**posits** 181:22
**possibilities**
  146:3 295:10
**possibility**
  132:6 238:9
  300:18 314:18
  315:13 316:4
  322:16 342:6
  348:16
**possible** 77:8
  121:17 130:18
  131:24 132:5
  134:16 138:10
  185:5 203:18
  295:3 300:12
  300:15 302:15
  302:18 304:13
  306:13 312:20
  312:22 317:9
  325:10 351:7

**[possible - price]**                                                          Page 59

| | | | |
|---|---|---|---|
| 351:10,19 356:3 357:3 | **preexisting** 61:11 105:7 107:11 111:16 112:11 166:3 167:4 | **press** 34:25 | 80:6,8,16,23,24 87:13,20,23 88:3,6,24 96:5 96:13,21 97:3 |
| **possibly** 79:12 | | **presumably** 55:5 68:21 93:11 130:11 253:12 303:8 330:24 | 97:15,22 98:6 98:23 101:3,9 |
| **post** 161:6 163:19 165:3 167:24 170:25 265:22 | **preliminary** 233:8 235:15 237:18 359:3 | | 101:14,16,18 101:19,22,24 101:25 102:5 |
| **postdated** 174:6 | **premarked** 268:10 | **presume** 91:15 252:14 | 102:11,14,18 102:20 103:3,7 |
| **posted** 258:10 | **prep** 40:15 | **presumed** 222:4 | 103:10,13,14 103:16,18,19 |
| **potential** 63:3 179:19 303:19 303:21 340:5 358:23 359:16 | **preparation** 41:13 | **pretend** 240:17 | 103:20,25 104:3,7,13,15 |
| | **prepared** 19:12 | **pretty** 26:5 157:6 177:19 192:17 310:8 313:5 341:17 | 104:20,22,23 105:3,22 |
| **potentially** 75:23,25 80:10 81:6,9 94:17 331:8 | **preparing** 39:15 42:4 156:12 | | 107:23 108:4,8 109:5 110:10 110:11,13,13 110:14,21 |
| | **presence** 274:6 | **prevents** 71:6 | |
| **power** 355:5,8 | **present** 3:16 9:10 77:21,24 261:12 | **previous** 287:9 319:10 | |
| **practice** 14:13 | | **previously** 9:10 23:18 123:12 160:11 171:9 171:22 172:15 173:10 | 111:11 114:6 114:15 117:10 |
| **preceding** 9:8 | | | 118:19,25 119:3,10,21,23 |
| **precise** 108:23 191:17 | **presentation** 71:15 258:22 | | 120:4,12 121:13,23 |
| **predict** 202:13 304:10 | **presented** 91:5 91:6 118:25 139:22 248:16 249:3 338:13 | **price** 6:10 29:24 31:4 32:15,16 39:20 65:24 66:2,19 66:24 67:3 68:23,25 69:22 70:5 71:7 74:11 75:9 77:10,25 78:5 78:10,14,16,21 79:5,8,11,22 | 122:4 127:13 127:24 128:6 |
| **predictable** 199:18 | | | 129:4,8,19 131:20 133:18 |
| **predicted** 200:15 | **presenting** 105:17 | | 135:17 136:4,7 136:13 137:20 |
| **prediction** 188:9,11 | **presents** 365:11,16 | | 138:25 142:22 |
| **preexisted** 102:13 | **prespecified** 53:13 | | |

**[price - probably]**

144:20 148:7
148:25 149:14
169:3,7,9,10
171:18 181:3,5
181:23 185:11
185:13 189:16
191:14,18,23
197:18 199:4
199:25 200:14
201:6,19
203:15,17
207:6 209:12
210:9,21
212:25 216:16
216:18,25
219:18,20,21
220:14,17
229:3 233:9,17
233:23,24
235:4 237:8
238:5 240:24
241:3,12 243:3
244:22 257:9
275:2,6,22,25
276:5,5,8,12,17
276:22 277:5
277:10,17,21
277:23,24
278:2,7,8,12,19
279:16 283:6
283:11,15,21
284:20 285:5
285:19 286:24
287:3,9,10,15

288:21 289:18
289:21 290:6
292:8 293:22
296:15,18
297:11,15,24
298:2,9,10,13
298:16,21,24
299:6,18,23
301:21,22,25
302:22 303:24
304:4,6,11,21
305:2,8,12,22
305:23 306:5
306:15 307:19
311:17,22
312:24 313:4,9
313:18,25
314:5,15 315:6
315:18 316:2
316:12 317:5,6
317:10,11
318:22 320:17
320:23 321:15
322:7,10,13
323:18 324:4
324:15,19,23
326:20 327:6
327:16,17
340:20 341:14
341:16,21,22
342:2,9,22,25
342:25 343:9
343:12,18
344:3,4,7

345:9,14,14,18
346:8,16
347:15,21
348:17 349:23
351:4 352:8
353:24 354:6
357:20 358:2,6
358:13 359:25
361:21 362:11
362:13,14
363:16,19
364:18,20,20
364:21 365:18
366:10,11
**priced**  111:2,3
  111:16
**prices**   188:7,17
  190:19 199:16
  223:7 247:4,8
  308:7,11 350:7
**pricing**   103:5
  176:21
**primary**   10:16
  10:23 53:12,13
  55:6,12 130:22
**prime**   52:15,19
  53:6 57:10
  58:22 59:3,6,7
  59:13 60:13
**principal**   315:4
**principals**
  26:11
**principle**
  228:15 231:7

**principles**
  228:2,6
**printed**  100:15
**printouts**
  198:12
**prior**   48:22
  60:11 112:6,16
  117:15 158:18
  173:3 175:9
  272:12
**private**  8:7
**prize**   211:25
**pro**  264:4
**probability**
  132:9 238:17
  244:12,21
  254:17,20
  366:25
**probably**   10:3
  10:17 13:2,4
  13:18,25 16:21
  17:11 18:9
  23:23 25:11
  26:5 27:14
  39:21 41:9
  95:5 98:25
  146:12 157:2
  160:2 162:21
  177:19,22
  213:8 216:7,23
  250:16 264:22
  284:16 306:12
  327:4 350:21
  352:11 354:14

363:2
**problem**  74:7
  115:22 123:9
  126:17 177:4
  265:22 272:15
  294:14 314:21
  315:2 320:10
  369:5
**problematic**
  265:25
**problems**  123:3
**proceed**  9:14
  20:11 89:17
  153:11 168:17
  236:16 296:9
**process**  11:9,18
  182:9,15,20,24
  183:3 202:7
  208:15 227:24
  231:2,5 246:5
  246:12 280:24
  281:8,20
  317:15 318:17
  320:21
**processed**
  227:17,19
**processing**
  202:23 209:23
  224:24 225:4,9
  225:14 227:12
  230:15 279:2
  282:14 301:16
  315:11 316:6
  317:21 320:5

320:14
**product**  273:21
**professional**
  1:22 10:21
  211:19,20
**professionals**
  206:5
**professor**
  196:23 199:22
**profit**  176:21
  303:11 304:15
**profits**  91:19
  92:16 179:19
  180:11 188:20
  188:25
**profoundly**
  274:15,19
**progressed**
  178:13
**projections**
  146:21
**prompted**  62:8
  62:12
**promptly**
  199:17
**promptness**
  298:19
**pronunciation**
  66:6
**proof**  120:6,17
  120:19 323:17
  336:4
**proportion**
  16:17 222:9

**proposed**  31:24
  33:11,23
  117:15 118:6
  296:23
**proposition**
  121:23 206:25
  209:9 210:8
  231:8 246:4
  278:25 279:21
  306:21
**prove**  87:20
  88:5 334:21
  340:8,19
  341:13 343:8
**proved**  23:4
**proven**  343:11
**provide**  58:13
  269:24 281:5
  294:25 342:8
  342:17 358:19
**provided**  20:18
  50:6 100:12
  172:16 227:10
  293:19 334:18
  353:19 361:19
**provides**
  127:12
**providing**  50:4
  53:20 284:9
**proving**  344:9
**proxy**  133:14
  134:2,10,12,15
  134:21 135:3
  135:11 204:25

222:2,6 281:25
**pslra**  74:17
  75:4 356:22
  363:15,24
  364:8
**public**  1:23
  7:17 9:16
  18:19 127:10
  127:20 128:23
  144:7 147:13
  180:15,24
  282:9 338:18
  372:19 374:23
**publically**
  132:12,14
  181:24 197:20
  199:6 200:3
  210:23 281:2
**publication**
  171:2 174:7
  179:8
**publicly**  132:10
**publish**  261:23
  262:3,4 280:19
  289:2
**published**
  57:10 91:9
  171:7 175:7
  177:6 188:3
  194:8,14
  203:12 214:2,4
  242:7 259:21
  273:8 280:8
  281:23

**[publishing - quote]**

**publishing**
177:24 226:24
227:2
**pull** 146:25
220:10
**pulling** 262:18
**purchase**
356:15,17
**purchased**
303:4,5
**pure** 115:24
212:6,9,13,17
212:20,23
215:23 232:25
**purported**
234:20
**purpose** 38:7
74:16 256:17
**purposes** 47:22
50:4 77:21,24
117:5 239:19
289:17 339:13
344:6 363:14
364:4
**pursuing** 96:3
**put** 18:8,12
23:2,21 24:14
28:16 33:10
34:17,18,21
65:4 71:3
88:10 93:3
96:15 106:19
107:6 117:13
123:17 130:8

136:10 140:3,4
140:6 145:14
160:10 168:6
177:8 184:21
194:18 201:23
203:6 206:18
208:24 213:14
222:21 232:5,7
246:23 254:14
258:2 264:4
266:9 277:20
278:10,10
280:11,13
298:22,23
307:10,16,17
309:19 313:13
321:24 324:17
332:15 336:23
337:10 344:7
346:20 348:21
352:15 366:10
**putting** 22:24
64:14 102:9,17
110:8 135:7
139:10 153:8
158:5 200:9
207:16 230:17
231:5 252:22
314:25 349:16
359:19,25
361:20,23
369:8

**q**

**q2** 45:17
**quality** 333:9
333:20 335:2,5
335:7
**quarterly**
177:25
**quarters** 332:3
**question** 7:12
31:17 34:4
37:13 42:8
46:10 62:7,12
63:23 64:3,7
80:14 83:19
85:10 88:16
93:19 95:7,18
102:17,21,25
107:7,10
117:20 124:18
130:7 133:24
149:18 150:16
156:10 164:10
164:24 173:14
175:4 184:16
189:6 212:7
242:10 245:10
253:9 284:15
299:21 301:23
305:5 314:20
338:5 342:20
342:23 346:15
362:19 365:24
369:4

**questionable**
274:5
**questions** 10:6
56:13 74:8
85:24 123:19
123:22,25
138:3 167:13
209:17 370:12
**quick** 191:3
258:9 355:4
370:17
**quickly** 10:5,14
185:19 186:2
190:17 197:19
199:5 200:2
201:5,15 202:6
202:19 204:12
207:5 210:22
212:25 213:4
228:12,18
245:7 251:22
280:10 281:12
311:17 350:6
360:10
**quite** 120:23
139:6 145:20
157:19 198:9
254:23 273:20
352:11 362:12
**quote** 137:4
206:11,11
260:17 271:7
358:16

[r - really]                                                                    Page 63

| r | | | |
|---|---|---|---|
| **r**  2:2 3:2 18:20 21:10 22:10 30:23 138:7 185:17 210:10 330:16 356:20 | 259:12,23 261:7,25 262:23 263:4 272:11 278:24 | 216:18 220:15 220:18 231:15 241:12 244:23 247:10 269:23 | 234:13 248:23 252:6,13 254:4 254:8,12 257:4 257:22 299:10 |
| **radio**  177:22 | **rbc**  6:11 328:12 329:7,19 | 288:12,16 289:6,10 | 299:13 300:3,6 300:7,15 |
| **raise**  121:17 | **rcr**  373:3,20 | 315:19 316:2 | 327:21,23 |
| **raised**  44:6 | **reach**  207:25 259:17,19 | 321:11 324:4 342:10 351:4 | 339:18 345:13 372:5 |
| **ran**  174:19 | **reached**  136:12 248:15 284:10 | 354:6 | **reader**  227:5 |
| **range**  32:10 247:17 370:6 | **reaching** 246:20 321:4 | **reactions**  62:21 144:14 201:6 279:16 321:14 321:15 348:17 | **readily**  252:20 |
| **rapidly**  181:23 | **react**  65:24 67:2 76:8,14 76:20 77:4 87:24 103:3 144:18 200:23 207:17 210:12 219:4 247:5 313:20 314:9 | | **reading**  50:13 63:10,24 64:2 75:19 197:24 208:8,17 285:20 340:18 |
| **rate**  24:22 | | **reacts**  209:11 313:18 321:15 | |
| **rather**  19:22 39:24 97:18 98:5 114:6 120:19 129:6 203:23 212:21 352:21 358:17 | | **read**  33:4,8 34:5 37:15 38:12,14,16,22 39:5 42:17 46:25 47:5,9 65:17 66:3 75:21 90:10 98:3 113:12 114:3 117:2,5 125:15 136:18 136:21 151:7 153:6 155:6,7 174:9,12,16,21 175:2 195:23 198:23 199:20 208:14,17,19 209:2 210:19 217:21 226:16 | **ready**  45:14 223:19 348:25 |
| **rating**  259:24 260:14,14 261:17 262:2,7 266:20 274:22 276:13 278:13 278:14 298:11 298:13 | **reacted**  127:8 127:19 | | **real**  5:8 160:22 160:24 187:20 289:20 365:16 370:17 |
| | **reacting**  182:10 182:15 203:21 247:3 314:11 321:22 326:21 335:21 337:6,6 337:22 338:7 351:20 | | **really**  46:21 58:19 59:19 102:24 108:20 108:23 120:22 160:18 188:25 199:19 204:10 205:4,16 220:16 222:22 253:18 268:2 276:9 278:6 330:19 345:23 352:17 |
| **raymond**  5:20 5:22 193:10 208:23 226:23 255:10 256:5 256:13,19 257:2,14,18 | **reaction**  81:12 87:13 91:2 201:18 207:3 210:9 216:17 | | |

**realm** 18:5
**realtime** 1:22
  169:14 178:25
  179:3,3 194:21
  195:3 309:18
**reason** 10:8
  23:5 58:10
  88:19 92:12
  104:16 134:14
  150:2 194:12
  204:7 215:11
  240:7 244:19
  248:4 260:20
  277:11,16
  293:15 301:24
  324:8 331:2
  346:19 368:9
  374:5
**reasonable**
  60:2 142:20
  154:6 338:21
  345:4 351:24
**reasonably**
  199:17 352:12
**reasons** 135:6
  151:3 366:10
**recall** 28:11
  29:5 32:25
  33:2 38:17,24
  57:5 63:9
  76:16 83:4
  85:8 99:9,20
  113:17 124:16
  150:7 151:18

  168:24,25
  170:23 173:6
  173:20 185:9
  262:8 308:3
  365:13
**received** 61:9
**receiving** 11:9
  11:19 172:13
  173:2 279:3
**recent** 186:11
  186:19,21
  247:24 248:3
  278:2 330:3
  349:20
**recently** 14:11
  17:17 186:9
  247:21 353:8
**recess** 89:13
  168:13 236:12
  296:5 370:22
**recognize** 45:7
  100:11,16
  113:10 136:15
  249:18 263:2
  291:25 360:18
**recognized**
  270:24 279:24
**recollection**
  77:14 83:20
  84:8 151:22
  187:23
**recommendat...**
  85:19 194:20
  206:6,10,13

**recommended**
  193:8
**record** 8:3,12
  9:11 19:4
  33:16 36:22
  37:9 89:12,16
  89:21 163:2,10
  168:12,16
  169:18 187:18
  223:16 236:11
  236:15 275:21
  287:22 296:4,8
  343:21 370:17
  370:21 371:2
  372:8,10 373:7
**recorded** 1:16
  8:14
**recording** 8:10
**recreate** 26:19
**recruiting**
  14:11
**reduction**
  103:23
**refer** 43:15
  218:5 339:21
**reference** 61:16
  83:24 124:14
  124:22 136:16
  147:20 153:3
  270:13 271:14
  271:20 289:25
  293:7 299:14
  329:21 330:21
  333:23 334:3

  357:20 361:21
  361:24
**referenced**
  50:21 56:5
  149:10,22
  334:24 361:22
**references**
  60:22 292:15
  335:13,17
  339:9
**referencing**
  256:14
**referred** 46:18
  51:15 60:10
  75:7 355:12,15
**referring** 26:15
  46:7 48:24
  52:7 58:21
  62:3 64:16,24
  77:12 82:16
  86:12 136:23
  230:3 325:13
  334:14,15
  340:20 353:3
  358:6 359:15
**refers** 55:16
  357:18
**refinements**
  175:24 176:15
  176:17
**reflect** 188:18
  242:5 275:13
  299:12 346:21

**reflecting**
  200:17 325:6
**reflection**
  276:11 324:21
  335:17,19
**reflects**  53:17
  55:10,22 57:22
  110:5 233:5
  299:22 308:21
**refresh**  187:22
**regarding**  5:21
  5:23 6:4,6,8,12
  6:14 49:13
**registered**  1:22
**regression**
  108:24
**regularity**
  305:19
**regularly**
  309:21
**rejects**  122:18
**related**  9:4
  74:17 129:20
  233:9 243:14
  243:17,22,25
  244:16,17
  311:15 343:4
  344:11,11,20
  364:17 373:10
**relates**  58:12
  221:21 340:22
**relating**  363:24
**relationship**
  301:20

**relative**  67:11
  312:14
**relatively**
  191:15 309:3,8
  312:13
**release**  84:4
  193:25 284:20
  290:7 297:20
  297:23,25
  308:18 311:15
**released**  87:14
  130:15,17
  131:3 134:22
  145:24 224:25
  225:8,12 231:9
  269:18 345:19
**releases**  82:19
**relevant**  11:5,8
  31:11 70:9,13
  70:24 72:9
  90:12 115:11
  115:14 117:22
  118:18 144:7
  147:13 171:17
  204:14 205:19
  245:18 261:16
  281:21 313:15
  320:7 329:10
  329:14 368:10
**reliable**  39:22
**relied**  34:13
  44:16 328:18
**relies**  34:8

**rely**  30:2
**remainder**
  97:18 360:3
**remained**  309:3
**remaining**  48:8
  98:14 153:10
**remains**  46:5
  273:19
**remember**
  32:14 43:23
  63:2 82:24
  83:10 100:2
  161:3 173:23
  192:12 210:3
  220:4 223:13
  308:7 326:13
**remembering**
  255:9
**remotely**  40:19
  40:25 41:10
**remove**  242:15
  242:16,24
  243:9 244:3
**rendered**  71:4
**reopening**
  313:17
**repeat**  63:23
  336:20
**repeated**  324:3
  336:2,3,9
**repeating**
  69:12 336:6
**repetition**
  324:9 336:11

  336:12
**rephrase**  10:7
  46:9 215:2
  265:14 299:21
**replace**  37:4
**reply**  245:17
**report**  4:9,11
  4:20 5:19,20
  6:4,6,8,12,13
  6:15 18:7,24
  19:9,11,18
  20:7,18 21:15
  25:5,17,19,24
  26:10 27:4
  29:17,19 30:3
  30:5,16 32:19
  33:20 34:8
  37:8,11 38:13
  39:8 40:7,13
  40:22 51:12,12
  65:3,18 71:21
  72:16 73:13
  74:3,11 75:17
  76:9,14,20
  77:5 78:2,11
  78:22 79:22
  81:5,10,12,20
  84:3,11 87:14
  87:24 89:2,23
  90:11,25 91:9
  91:10,23,25
  92:6 94:17,24
  95:2,6,10,20
  97:6 99:14,25

**[report - reports]**

103:2 117:6 121:15,20,22 122:9 123:17 124:4,14,18,21 125:15 126:3,9 126:16,20 127:5,9,15,20 128:3,13,22 129:20 130:15 131:3,10 132:11 133:5 134:5 135:17 143:10,24 144:13,14 147:25 169:21 170:2,25 171:6 171:20 173:2 173:12,18 174:6,24 175:7 175:8,13,18 181:17 182:4,8 192:10 195:14 205:14,16,22 205:24 217:16 220:10 221:10 223:23 224:7 224:12,13,17 224:25 225:7 226:8 231:15 231:20 233:6 233:10 234:5 234:17,19 235:9 237:13 237:19,20,24

238:17,19 243:18,24 245:4,9,11,13 245:15,17,23 248:5,17 249:3 249:13,16 250:6,19,22 251:25 253:3 254:4,13 256:6 256:14,18,20 256:23 257:2,4 257:8,9,18,25 260:4,18,18,25 261:3,7,23 262:10,24 263:5,14 265:10 267:4 267:13 268:3,4 268:18,21 270:13,16,24 271:8,8,15,21 272:5,25 273:8 273:12 274:14 274:16 275:7,8 275:9,11 277:25 278:3 278:23 279:4 279:22,25 280:8,19 281:2 281:10,25 282:19,20 283:10,14,17 285:7,25 286:5 286:18 287:7,8

287:14,23 288:15 289:3 290:17 291:23 292:2,16 293:8 293:12,17,19 293:22 294:5 294:13 296:12 296:21 297:3 298:22,24 299:7,9,13,15 299:23 300:3 300:10,16,20 301:5 308:18 317:22 318:17 320:6 322:9,14 322:21 325:14 327:19 328:12 328:17,19 329:7,10,19 331:16,20,24 332:6,8,12 333:23 334:2 334:11 335:2 339:19 340:6,7 340:24 343:5 346:20 347:4 351:5 354:9 355:25 357:8 358:16,25 359:5,10,21 360:20 361:6 362:4,9 366:14 **reported** 214:3 285:19 324:16

**reporter** 1:22 1:23 8:25 9:12 **reporting** 222:6 374:2 **reports** 26:13 27:6,9 31:7,9 31:12,15,19 32:4,8,21 33:5 33:9 34:5 83:24 92:7 146:10 147:10 147:11,12,16 147:22,25 149:10,19,20 170:5,9,14,18 170:21 178:5 190:11 192:13 192:15,20 203:7,10,12,19 203:21 204:3 206:2,4 207:3 207:16 208:24 210:6 213:15 223:24 227:3 229:6 234:16 238:3 247:2 255:11 256:13 260:23 267:10 267:25 271:13 274:16 277:8 279:12,19 282:4,6,13,15 282:17,25 283:6 285:16

**[reports - right]**                                           Page 67

285:18 286:14 288:24 289:2 294:12,20,24 297:21,23,25 322:23 323:10 324:18 325:19 325:22 326:21 327:21 329:2 333:8,18 334:20 335:23 339:7 354:15 360:8

**represent** 302:6

**representation** 66:14 106:16 106:20 294:20

**representations** 291:17

**representatives** 4:25

**represented** 67:8

**representing** 8:24 51:3 104:10

**represents** 231:14

**requested** 89:8

**required** 104:16 367:22

**rescission** 357:4

**research** 49:18 49:21

**reserved** 7:12 73:14

**resolved** 72:20

**respect** 73:6 79:19 150:21 156:14

**respective** 7:5

**respond** 49:25 188:8 199:16 363:19,20

**respondent** 332:22

**respondents** 5:11

**responding** 321:5 323:24

**response** 34:25 64:3 190:10 191:2,14 229:6 231:19 363:16

**responses** 35:8 35:14 37:17,24 332:18

**rest** 22:6 309:4 312:15

**restricted** 363:23

**result** 67:4 238:25

**results** 27:17 27:19 64:21 69:5 105:18

114:8,9,17 115:6 116:17 116:19,23 161:7 177:25 189:11 279:4

**retail** 222:17

**retain** 356:16

**retained** 23:19

**retention** 23:11

**return** 109:10 109:18,25 110:4 128:12 128:21 232:16 232:19 233:4 234:3

**returning** 296:11

**returns** 4:14

**reveal** 110:18

**revealed** 127:14 128:3,5

**reverses** 322:18

**review** 5:18 30:15 31:9 32:3 35:2 42:3 57:6 63:18 92:22 94:17 95:9 123:3 126:22 147:21 149:9 151:16 152:19 182:24 273:22 292:20 292:24 322:24 354:15

**reviewed** 25:18 32:8,22 38:4 40:21 41:2 72:23 75:11,12 112:3 124:17 127:5 166:22 167:3 170:18 206:4 250:15

**reviewer** 258:23 264:5

**reviewers** 273:24

**reviewing** 41:4 41:16 95:3

**reviews** 21:9 94:24 95:11 152:17 155:8 218:13 270:21

**rework** 342:20

**richard** 329:24

**rifkind** 1:19 3:5 8:21

**right** 14:18 30:9 34:10,11 35:24 39:4,24 41:13 51:23 59:6,9 67:10 68:18 73:14 74:14 77:15 84:17 87:2,6 90:22 91:8,9 93:16 106:14 108:18 109:2 109:11,21

**[right - saying]**

127:25 128:7
133:6,16
134:24 140:12
142:17 160:25
161:2 163:12
164:3 166:18
170:6,15 174:7
177:9 179:21
180:9 181:5,11
187:17 188:24
190:2,3 193:4
194:10 196:24
198:8,14
202:20 204:2
211:16 212:15
214:4,18
222:19 224:7
228:10 229:9
230:23 233:21
234:2 235:3
237:7 239:23
240:16 242:17
254:5 255:6,17
255:24 263:6
267:11 268:12
268:22 272:23
273:16 275:24
276:3 278:15
279:24 280:2
287:21 291:22
299:6 300:21
301:8 303:7,15
304:5 305:13
308:25 310:5

311:25 312:7
318:11 319:5
320:20,24
321:6 323:2
324:24 325:20
326:8 327:9
329:3,15 330:3
331:23,25
336:4 337:14
338:16 346:4
351:13 355:14
361:7 367:4,21
368:5,12 370:3
**rigorous**
292:23
**ring** 223:9
**risk** 176:20,25
177:3 261:13
261:20 303:10
303:13 368:22
369:9,11,19
**riskier** 177:2
**risks** 369:10
**rivian** 18:20,21
20:25
**robert** 2:19
5:16 212:3
**robust** 205:18
**roles** 13:5
**rose** 5:17
**rosen** 2:4 23:15
23:19 25:3
**rough** 345:4

**roughly** 10:2
16:18 17:12,24
251:19
**rounded**
218:22
**row** 218:20
329:23 349:8
**rpr** 373:3,20
**rule** 183:25
184:6 204:21
216:10 220:24
221:7 227:16
227:18,20
231:11
**ruled** 21:22
231:25
**ruling** 46:6
79:9 168:22
169:6
**run** 25:15
162:21 303:10
303:13

**s**

**s** 2:2 3:2 4:7 5:2
6:2 21:11,13
71:16,16
185:16,16
187:20,20
260:8 330:16
374:5
**salary** 28:15
**sale** 356:15

**samantha** 1:9
**sample** 191:16
283:22,24,24
284:24
**sandrock** 1:9
44:22 47:18
52:7 54:15
55:8 56:9
60:21 61:19
63:14 64:11
114:8 155:23
155:23 157:12
157:22
**sandrock's**
154:11 155:25
**sara** 1:21 9:2
373:3,20
**satisfy** 55:16
**saturday** 40:21
40:25
**saw** 76:16,17
208:22
**saying** 47:18
54:15,20 56:10
68:3,19 77:6
78:14,15,25
79:2,7 80:3,6,7
80:23,24 81:8
87:18 89:4
98:6 102:21
104:9 105:5
108:22 111:6
112:19 115:3,4
115:12 116:11

**[saying - see]**

| | | | |
|---|---|---|---|
| 124:16 129:3 | **says** 52:13 | **scope** 151:14 | 360:25 370:9 |
| 129:18 130:13 | 54:22 58:5,24 | 155:18 156:19 | 370:15 |
| 132:13 133:12 | 59:6,11 60:4 | 224:20 226:11 | **secondary** |
| 135:23 142:13 | 60:17 64:15 | 333:17 | 55:13 |
| 142:18 143:18 | 97:18 101:19 | **scott** 329:25 | **seconds** 179:8 |
| 154:14,17 | 119:13 125:7 | **scratching** | 188:8 189:16 |
| 157:8 158:12 | 125:12 127:4 | 327:4 | 203:8,17 |
| 165:9 166:5 | 133:20 155:2 | **scrutiny** 292:23 | 212:21 216:5 |
| 181:12 184:18 | 155:21 157:11 | **sealing** 7:6 | 229:3 280:15 |
| 190:17,20 | 160:14 162:13 | **search** 174:19 | **section** 27:12 |
| 191:21,25 | 174:24 175:7 | 330:7,21 331:3 | 28:2 77:10 |
| 192:14,15 | 183:8 187:16 | 331:6 332:12 | 109:15 198:14 |
| 199:12 200:11 | 187:16 190:10 | **sec** 178:2 | 199:13 355:3 |
| 201:2,3,8 | 197:7,13 198:7 | **second** 33:14 | 357:9,15,21,22 |
| 202:8 204:15 | 198:9 211:8 | 33:18 35:18 | 358:3,15,20,21 |
| 204:19,21,23 | 223:22 224:11 | 42:17,24 43:24 | 362:17 |
| 205:6 208:24 | 226:13,22 | 44:8 67:24 | **sector** 260:8 |
| 224:5,9,14 | 228:17,24,24 | 100:6 113:24 | **securities** 6:17 |
| 226:7 228:4 | 248:13 254:16 | 115:17 123:6 | 10:17 15:11,17 |
| 229:16 231:19 | 258:9 261:20 | 136:6,18,24 | 15:18 16:23 |
| 237:10 241:10 | 263:14 268:22 | 146:23 155:7 | 18:5,17 21:7 |
| 254:22,24 | 269:5 273:3 | 156:3 157:10 | 21:16 172:4 |
| 255:2 264:16 | 275:8,9,11 | 158:25 164:5 | 199:16 203:4 |
| 264:18 266:23 | 276:3 289:15 | 169:4 180:4,5 | **security** 188:17 |
| 267:11 289:24 | 292:19 329:2 | 188:13 191:12 | 205:2 211:21 |
| 298:19 300:9 | 330:13 332:18 | 228:20 236:5 | 260:7 |
| 304:9 307:22 | 335:16,19 | 239:10,18,24 | **see** 30:18 32:18 |
| 309:20 317:24 | 361:11 | 240:9 248:9 | 33:19 37:23 |
| 321:20,23 | **scenes** 281:8 | 256:25 257:17 | 42:8 52:16,17 |
| 327:2 335:6 | **scheduled** | 260:6 272:20 | 53:14,15 54:12 |
| 338:25 342:2 | 304:5 | 286:20,23 | 57:15,16 58:8 |
| 348:15 350:2 | **scheme** 16:3 | 287:23 288:5 | 59:10,14 60:20 |
| 356:13 358:18 | **scientific** 52:21 | 301:9 329:22 | 61:16,22 76:3 |
| 367:13 368:9 | 184:23 | 340:15 349:2 | 76:10 78:6,10 |

78:14,21,25
93:25 97:16
98:19 99:8
101:21 103:21
109:3 114:12
117:23 118:11
124:2 125:12
125:17,24
126:11 130:5
136:11 137:20
143:3 147:16
147:22 149:15
149:22 151:25
153:2,7,12,13
153:14,22
157:16 179:7
183:13 185:13
187:15 189:23
190:14 193:7
196:19,20
197:22 198:3
198:15,25
199:8 203:18
204:6 205:13
205:20 224:2,3
226:3 240:11
245:13 247:23
248:18,19
251:6 252:23
258:7,12,24
259:8 260:11
263:11,12,24
264:6,7,13,14
268:9,24 269:7

269:17,25
270:10 271:11
273:14,15
274:2 275:6
276:5,11 278:2
289:12 290:18
293:4,5 298:23
304:6 309:15
310:12 313:8
317:12 321:6,7
325:6 329:22
330:3,15
333:12 340:15
346:8 347:21
352:8,21,24
358:20 361:14
**seeing** 173:23
180:22 185:9
283:12 321:4
352:13
**seek** 168:7
**seeking** 233:23
**seem** 60:2
97:12 206:21
226:19 251:4
252:8 254:15
254:22
**seemed** 104:19
264:9
**seemingly**
259:5
**seems** 120:23
205:5 351:25

**seen** 11:20
25:16 42:5
46:18 63:4
77:17 80:6,8
100:14 103:18
185:10 186:8
210:13 237:18
245:23 277:7
307:8 345:5
348:16,18
369:21,25
**sees** 321:14
**segue** 355:2
**select** 30:14
**selected** 219:12
**selective** 117:8
**selectively**
114:10,16
116:20,24
**selects** 219:17
**sell** 94:5,6
178:24 179:6
180:23 206:6,9
206:12 229:18
230:8,14
260:14 261:17
261:18 262:2,7
266:24 278:13
303:5 305:3,16
308:24
**selling** 181:5
190:13 229:8
229:15,21,22
229:23 230:9

302:8 304:14
308:22
**sells** 303:18
**semi** 181:18,19
181:22 197:15
**sense** 69:20
80:20 92:4
145:12 203:14
206:11 216:24
220:23 221:25
249:4 278:16
278:19 338:17
362:22 363:25
366:5
**sensitive** 8:6
**sent** 358:8
**sentence** 39:22
48:19 51:21
53:17,23 54:7
57:22 58:5
59:6 60:10
75:20,21 97:18
188:16 191:14
198:23 199:24
200:6 210:18
210:19 211:7
211:19 215:17
224:11 226:22
248:23 251:9
251:13 252:12
261:9 264:16
340:16
**sentences** 40:6
46:19,25 47:21

**[sentences - sitting]** Page 71

48:6 60:11
**separate** 19:22
  240:14 242:14
**separating**
  165:8
**separation**
  79:16
**series** 43:10
  361:10
**serve** 135:11
**served** 15:10,10
  18:16 78:15
**serving** 12:24
  13:3,9
**set** 31:12 81:17
  214:19 215:6
  247:16 258:7
  373:6,15
**sets** 52:8
**setting** 305:22
**settle** 207:10
**seven** 21:12
  25:12,12,13
  86:24 113:6
  284:6,25 291:3
  291:8 339:7
**seventh** 337:21
  337:25 338:6
  346:6,7,11
**seventy** 14:3
**several** 12:12
  146:3
**share** 96:4,20
  146:22 275:15

287:4,4,10,11
  354:11
**shares** 29:20
  120:13 221:16
  222:21 230:9
  230:12,16,18
  301:6,10
**shash** 1:4 8:15
  374:3
**sheet** 374:2
**shiller** 212:4
**shoots** 311:17
**short** 93:15,25
  190:13 229:8
  229:15,21,23
  230:9,14
  288:20
**shorter** 349:13
**shortly** 181:6
  269:11
**show** 44:25
  48:23 53:11
  58:7 59:12
  101:16 142:8
  192:25 193:2,7
  195:3 205:5
  223:24 307:2
  325:18,23
  341:25 344:2
**showed** 273:19
**showing** 307:10
  325:18
**shown** 103:22
  217:13

**shows** 57:10
  204:8 324:14
**side** 16:14,14
  22:9 65:5
  88:10 96:15
  117:13 206:19
  232:6,7 315:2
  359:20
**sides** 17:19
  211:23
**sign** 258:23
  300:24
**signature**
  373:19
**signed** 7:16,18
  372:15
**significance**
  56:25 111:4
  221:19 267:2
  285:11 286:10
**significant** 4:14
  35:7,14 37:17
  37:24 96:21
  98:12,24 99:21
  101:3 109:5
  154:5 157:25
  159:20,23
  160:4,5,15,19
  189:16 221:16
  229:3 283:22
  284:5,11
  285:13 302:25
  313:24 314:5
  314:15,23

315:6 318:23
  319:8 320:4,12
  320:17,22
  321:10 364:18
**signify** 276:23
**similar** 23:3
  58:6 59:11
  73:16 92:7,12
  317:10 326:16
  327:12 361:18
  361:23
**similarly** 1:5
**simplicity**
  133:10
**simply** 71:6
  80:24 87:18
  130:8 140:2
  153:9 163:7
  213:13 232:24
  235:15 288:25
  325:5 351:19
  356:17
**simultaneously**
  227:11 364:16
**sinnreich** 3:10
**sir** 198:20
**sit** 208:14
  222:22
**sitting** 13:11
  30:8 38:17,24
  39:4 40:11
  47:17 56:23
  57:5 63:9
  78:12,20 79:15

83:5,17 99:11
99:18,19,25
107:20 112:7
126:5 135:13
135:14 166:21
191:2 193:3,16
193:22 195:2
277:15 305:7
329:11 332:13
**situate** 269:8
**situated** 1:5
**situation**
368:22
**situations**
317:2
**six** 17:23 18:4
112:23 176:10
260:9 291:4
332:17 359:25
361:21 366:11
**sixteen** 218:15
**sixth** 84:23
85:2,7 86:5,9
92:2 306:4,9
337:15,21,25
338:6 339:7
346:6,11,18
**size** 148:13
191:16 219:21
283:22,24,25
284:25
**skeptical** 274:7
**skip** 123:7

**slightly** 176:23
177:2 262:25
**slow** 298:8
**small** 191:15
218:21 283:25
284:24 297:10
311:10 342:3
**smaller** 218:25
283:15 285:6
**smart** 195:18
199:23
**snippet** 163:4
**sober** 227:2
**sold** 240:8,17
260:10
**solely** 94:25
95:6
**soloway** 3:9 4:5
9:20 17:7 19:7
19:15,19 20:3
20:10,14,15
33:17 35:18
36:2,6,13,25
37:6 44:24
45:4,12,15
49:9,11 62:9
62:14,17 63:19
64:2 85:23
86:2 89:7,20
93:3,5 99:12
99:15,17 100:3
100:9 101:17
108:16 112:21
113:5,9 122:17

122:25 123:10
143:11,16,20
143:22 152:4
152:14,18,24
153:5 159:12
162:10,14,19
163:5,8 168:8
168:18 169:15
169:19 173:15
187:4,9 196:6
196:11,14
217:22 218:3,9
236:4,7,17
248:8,10
249:11 255:22
256:4 262:9,12
262:19,22
265:13,15
268:11,15,16
271:23 272:3
272:15,19,22
276:2 290:11
290:14 291:12
295:12,17,21
295:23 296:10
307:2,6 315:22
319:11 327:25
328:9 331:9,14
353:10,15,18
354:25 355:10
365:2 369:3
370:8,11
**somewhat**
221:25

**soon** 182:10,15
182:18,23
**sophisticated**
194:5 213:18
215:5 222:3
305:20
**sorry** 17:5,7
29:4 31:16
32:22 33:10,13
36:11 41:8
43:23 56:19,21
73:19 100:4
113:5,24
116:11 125:8,9
138:22 155:3
157:21 163:17
169:13 176:5
183:7 197:23
198:17 238:11
242:9 261:4
272:19 275:9
275:23 276:4
282:12 291:12
291:16 306:6
310:25 328:22
330:15 332:14
338:3 340:9,10
360:13 361:6
**sort** 27:10
166:15 175:5
230:20 247:16
**sound** 80:5
223:8 224:14
347:23

**[sounds - statement]**

**sounds** 65:8 95:2 147:4 252:16
**source** 17:13,15 18:3 364:4
**sources** 214:3 215:6 294:17
**south** 94:5
**speaking** 64:5 158:10 168:2 274:6 323:4
**specific** 30:25 78:13 83:14 124:7 139:9 351:23 357:9
**specifically** 26:15 28:18 32:25 33:2 64:17,25 97:2 118:10 171:12 171:14 173:7 174:2 306:18
**specifics** 151:18
**speculation** 160:8 214:22 251:24
**speed** 177:12 180:17 191:13 191:18 194:23
**spell** 330:14
**spend** 13:16,16 28:15

**spending** 14:7
**spent** 28:7,10 41:4,14,15 267:22 362:8 362:16 363:5
**spike** 309:6,7,9 310:4 311:8
**split** 38:3 61:13 78:6 79:12 233:13 234:22 235:22 284:7
**splitting** 288:13
**spoke** 40:19 168:19 247:12
**spoken** 160:17 204:18
**spreadsheet** 4:22
**ssemh** 197:13 198:25 199:25 210:20 211:22
**stable** 309:3 310:8,12,17 312:13
**staff** 26:16 34:16 174:12 174:16
**stage** 235:19
**stale** 278:22 298:15
**stand** 197:14 231:7
**standard** 28:2 191:16 207:22

284:2 344:15 360:4
**standby** 278:21
**starred** 197:4
**start** 42:14 43:5 49:3 52:12 98:7 102:2 106:10 116:2 167:14 177:14 188:7 208:17 209:18 224:7,10,15 227:17 247:9 307:24 360:12
**started** 188:2
**starting** 135:4 147:21 170:2,3 239:21 308:15
**starts** 27:12 189:10 197:25 198:4,15,21 249:21
**state** 9:8,17 98:17 351:2
**stated** 132:10 132:12,13 252:12
**statement** 44:2 44:21,25 46:17 47:5,19,24 49:4,13,19,23 49:25 50:5,12 51:2,2,13,25 52:3,7,10 54:3

55:25 56:4 58:3 61:21 63:13,16 64:10 64:13,18,22 68:11,24 69:12 69:14 70:7,22 71:4,9,13,18,22 95:25 96:4,8 96:20 97:21 98:5,13,14 99:23 101:8,19 101:23 102:7 102:12 104:25 105:6,13 106:4 106:7 107:12 107:13,24 110:6 111:8,13 111:18,19 112:5,8,15 114:5,7 116:2 116:4,9,12,18 119:9,13 120:12 121:13 122:22,23,25 123:13 124:11 124:15,22 125:5,23 126:4 126:7 128:4 131:23 135:21 135:22 136:3 137:10 138:16 138:20,23 139:9 140:4,6 142:13,16

**[statement - stock]**

149:9,10,22,23
150:10 151:2
151:11,19,23
153:21 154:9
154:11,15,18
155:5,15 156:8
156:15,17
157:6,12,19
158:25 159:8
162:13 163:11
164:16 165:25
166:17,24,24
167:5,23
168:23 170:22
172:11 173:21
175:5,10 211:2
211:11 343:24
367:25 368:4

**statements**
43:11 48:22
67:22 107:16
107:21 111:24
112:2,6,10
114:20 115:15
151:12 153:3
153:11,17
166:11,23
173:3 174:25
368:16

**states** 1:2 5:4
8:17 66:17

**stating** 132:16

**statistic** 37:16

**statistical** 5:18
56:25 63:5
92:6 124:7
245:25 255:4
264:9 270:7
283:9,19
285:11 286:10
292:19 299:20
322:24 333:18
334:4,7,18
340:2

**statistically**
4:13 35:7,14
37:24 96:21
98:12,23 99:21
101:3 109:5
189:15 229:2
283:21 284:5
284:10 285:13
313:24 314:4
314:15,23
315:5 318:23
319:7 320:3,11
320:17,22
321:10

**statistician**
259:5 263:23
264:3 274:5
322:24 329:15
329:22 330:4,6
330:22 334:2,8
334:10,18,20
339:9

**statisticians**
273:25 333:5,8
334:24

**statistics** 10:18

**stats** 258:22

**statute** 357:6

**stay** 102:4

**stays** 104:20
364:20

**steady** 103:20

**stenographic**
9:11 19:4
169:18

**step** 12:16
150:16 227:8
353:21

**sticking** 108:12

**stipulated** 7:4
7:10,15

**stipulations** 7:2

**stock** 4:15 5:16
6:10 29:11
65:24 66:18,24
68:23 70:4
71:7 81:14
85:18 87:13,23
91:3,11 94:4
96:13 97:15,22
98:6,11,23
99:20 101:3,9
101:14,15,19
101:22,24,25
102:5,14 103:3
104:15,20,23

107:23 109:5
111:11 114:6
117:10 127:24
128:6 129:4,8
129:19 131:20
137:20 138:24
142:22 175:15
181:23 189:17
190:19 197:21
199:7 200:4
204:9 207:6
209:12 210:24
216:25 219:18
219:20,21
221:12 222:13
222:22 229:4
235:4,7 237:8
238:23,24
240:24 241:3
241:12 244:22
259:24 261:18
261:19 266:20
278:5,11 302:8
302:21 303:11
305:8,12 306:5
307:18 311:16
311:22 313:4
313:17,24
314:5,15
315:18 316:2
318:22 320:17
320:22 321:15
322:10 326:20
337:13,25

338:4 343:18
350:7 352:8
353:24 354:6
363:15,19
364:18,19,20
364:21 365:18
**stocks** 178:24
179:7 189:14
190:21 228:25
**stood** 42:9
**stop** 162:17
320:14 352:13
353:3
**stopped** 164:18
**stopping**
164:21 165:2
**stories** 38:17,22
39:4 174:5,9
174:22 323:22
**story** 174:24
**straight** 161:15
**street** 41:24
177:20
**strong** 37:3
181:18,19,22
192:17 197:15
**strongly** 175:13
**struggling**
132:22 233:15
**stuck** 187:13
**studied** 125:19
207:11
**studies** 5:16
52:14 53:2,5

57:6 59:23
60:19 61:7
72:3 90:18
100:22 161:23
164:5,18 165:6
165:11 177:6
177:19 184:23
185:24 209:7
247:14,24
264:21
**study** 5:14 53:7
53:11 54:9,23
55:3,15 56:6
56:24 58:22
61:13 100:21
122:16 161:10
161:17 163:20
163:21 185:8
188:6 190:19
192:24 213:6
219:2 220:2
222:25 292:22
292:25 368:19
368:20
**stuff** 123:7
243:9 248:3
295:19 321:19
**subgroup**
60:22,24 61:17
61:20 62:4
64:21 138:14
139:16,23
140:22 141:2,7
141:11,21,25

142:7 367:9,19
**subgroups** 61:6
**subject** 105:24
**submit** 237:3
**submitted**
21:15 195:24
196:16
**submitting**
334:11
**subscribed**
372:15 374:20
**subsection**
191:13
**subsequent**
209:11
**subset** 24:4
**substance**
175:8
**substantial**
69:7 222:12
277:8
**substantially**
261:12
**substitute**
136:2 137:9
142:12,15
143:6 252:17
**succeed** 342:11
**successful**
161:10,17
163:20,21
**suggest** 146:2
267:21 318:24

**suggested**
292:24
**suggesting**
206:12 224:23
227:23 228:4
231:22 242:4
256:19 284:9
285:10,12
292:21 304:4
326:19 348:12
**suggests** 91:13
222:11 254:25
301:15
**sum** 57:13 59:9
175:8 240:3
**summarize**
29:18 250:14
**summarized**
40:13 114:8
**summarizing**
189:10
**summary** 250:6
250:9,19,24
251:3,16,19,21
252:3,7,21,24
253:24
**support** 4:23
5:11 54:10,16
55:23 90:15
121:4 122:3
137:12,14
138:21 140:2
141:13 142:17
158:5 160:13

164:3,13 209:9
228:6 246:4
251:4,10 252:9
254:15,22
299:20 302:3
302:16 306:20
317:25 335:9
345:18 349:17
**supported**
117:17 118:7
118:13 122:11
154:3 156:13
164:9 171:10
173:10 228:2
265:11,17
266:6,11
**supporting**
43:21 69:18
266:7
**supports** 56:10
121:3,23
137:18 143:2
158:11,12,19
159:3 175:14
225:24 257:8
294:18
**supposed**
106:22 230:11
**supreme**
196:17 355:13
356:19
**sure** 17:10,14
18:18 19:2
24:6 26:9

35:11,15 36:10
38:21 41:12
42:14 44:10
49:15 57:19
58:13 64:9
70:2 74:13
81:18 84:16
93:10 108:20
115:2 119:6
120:21 121:11
123:8 131:16
140:19 143:14
151:24 154:23
161:4 164:15
165:18 171:16
174:18,20
179:4 181:8
192:20 200:24
200:25 205:18
209:6,14
210:18 211:15
213:21 215:15
223:15,20
230:8,10,25
236:6 242:11
252:24 257:2
271:17 286:10
293:24 296:25
302:15 303:2
303:16,21
304:3 305:17
308:4 312:3
336:23 337:20
340:17 341:7

341:17 346:5
347:8 349:3
361:2 362:22
365:20 368:6
370:10
**surprised**
217:11
**surprising**
246:9
**survived**
168:23 169:5
**suspect** 274:10
**suss** 235:3
**swear** 9:13
**sworn** 7:18
9:16 373:6
374:20

**t**

**t** 4:7 5:2,8 6:2
9:15 21:11
22:10 34:15
79:21 210:6
330:15,16
372:2
**tab** 100:4
112:22 218:9
307:3 328:19
**tabak** 1:16 4:5
4:9,11,20 5:17
6:16 8:15 9:21
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1,9

18:1 19:1,10
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1,7
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
45:5,16 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1,18 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1,10
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1,18 100:1
100:11 101:1,8
102:1 103:1
104:1 105:1
106:1 107:1

**[tabak - table]**                                                          Page 77

| | | | |
|---|---|---|---|
| 108:1 109:1 | 176:1 177:1 | 244:1 245:1 | 312:1 313:1 |
| 110:1 111:1 | 178:1 179:1 | 246:1 247:1 | 314:1 315:1 |
| 112:1 113:1 | 180:1 181:1 | 248:1 249:1 | 316:1 317:1 |
| 114:1 115:1 | 182:1 183:1 | 250:1 251:1 | 318:1 319:1 |
| 116:1 117:1 | 184:1 185:1 | 252:1 253:1 | 320:1 321:1 |
| 118:1 119:1 | 186:1 187:1 | 254:1 255:1 | 322:1 323:1 |
| 120:1,11 121:1 | 188:1 189:1 | 256:1 257:1 | 324:1 325:1 |
| 122:1 123:1 | 190:1 191:1 | 258:1 259:1 | 326:1 327:1 |
| 124:1 125:1 | 192:1 193:1 | 260:1 261:1 | 328:1 329:1 |
| 126:1,16 127:1 | 194:1 195:1 | 262:1 263:1 | 330:1 331:1 |
| 128:1 129:1 | 196:1 197:1 | 264:1 265:1 | 332:1 333:1 |
| 130:1 131:1 | 198:1 199:1 | 266:1 267:1 | 334:1 335:1 |
| 132:1 133:1 | 200:1 201:1 | 268:1 269:1 | 336:1 337:1 |
| 134:1 135:1 | 202:1 203:1 | 270:1 271:1 | 338:1 339:1 |
| 136:1 137:1 | 204:1 205:1 | 272:1 273:1 | 340:1 341:1 |
| 138:1 139:1 | 206:1 207:1 | 274:1 275:1 | 342:1 343:1 |
| 140:1 141:1 | 208:1 209:1 | 276:1 277:1 | 344:1 345:1 |
| 142:1 143:1 | 210:1 211:1 | 278:1 279:1 | 346:1 347:1 |
| 144:1 145:1 | 212:1 213:1 | 280:1 281:1 | 348:1 349:1 |
| 146:1 147:1 | 214:1 215:1 | 282:1 283:1 | 350:1 351:1 |
| 148:1 149:1 | 216:1 217:1 | 284:1 285:1 | 352:1 353:1 |
| 150:1 151:1 | 218:1 219:1 | 286:1 287:1 | 354:1 355:1 |
| 152:1 153:1 | 220:1 221:1 | 288:1 289:1 | 356:1 357:1 |
| 154:1 155:1 | 222:1 223:1 | 290:1 291:1 | 358:1 359:1 |
| 156:1 157:1 | 224:1 225:1 | 292:1 293:1 | 360:1 361:1 |
| 158:1 159:1 | 226:1 227:1 | 294:1 295:1 | 362:1 363:1 |
| 160:1 161:1 | 228:1 229:1 | 296:1,11 297:1 | 364:1 365:1 |
| 162:1 163:1 | 230:1 231:1 | 298:1 299:1 | 366:1 367:1 |
| 164:1 165:1 | 232:1 233:1 | 300:1 301:1 | 368:1 369:1 |
| 166:1 167:1 | 234:1 235:1 | 302:1 303:1 | 370:1 371:1,4 |
| 168:1,19 169:1 | 236:1 237:1 | 304:1 305:1 | 372:4,13 373:4 |
| 170:1 171:1 | 238:1 239:1 | 306:1 307:1 | 374:4,19 |
| 172:1 173:1 | 240:1 241:1 | 308:1 309:1 | **table**  81:17 |
| 174:1 175:1 | 242:1 243:1 | 310:1 311:1 | 218:15,15 |

289:12 295:2
332:18 349:6
352:6
**tabs** 19:23
**tackle** 354:19
**tailored** 357:9
357:25
**take** 8:11 12:15
45:12 49:24
61:12 63:17
83:22 85:18,25
87:19 89:7,13
113:23 132:4
133:2 136:17
142:13 146:15
147:19 150:16
152:9 168:8
182:13 188:13
189:12 190:21
191:10,22
192:4,5 207:9
207:24 212:19
220:3 227:8
231:9 236:7
247:20 254:7
258:5 262:9
273:18 282:16
284:4 295:24
297:14 298:25
319:20 321:20
331:9 332:5
335:25 336:25
353:21 355:6
359:4,11

**taken** 1:18
73:11 168:13
207:4 236:12
245:22 257:19
267:11 296:5
370:22 372:6
**takes** 86:24
183:10 189:6
207:2 210:12
219:3 228:9
258:9 302:24
313:15
**tale** 273:4
**talk** 21:23 62:2
75:8 78:18
99:10 153:20
177:12 199:15
200:16 263:22
**talked** 73:7
90:17 128:11
151:7 163:14
164:17 168:20
174:5 232:14
243:15 323:21
340:25 364:13
**talker** 209:20
**talking** 52:9,10
56:3 58:25
59:7 73:20,22
90:7 91:24
95:20 100:5
163:16,17
172:20 180:20
180:21 194:19

202:24 206:3
209:15,24
211:12,16
216:13,15
218:18 246:11
246:13,14,19
246:25 279:10
306:18 321:19
323:22,24
324:21 325:8
350:19 353:13
358:21
**talks** 181:17
220:13 237:19
**talwani** 79:21
**target** 275:2
276:5,6,8,17,22
277:5,10,17,23
278:2,7,8,12,19
283:6,15 285:6
285:19 286:24
287:3,10,10,16
288:21 292:8
298:9,13,24
299:6,18
**targets** 32:15
32:16 238:5
277:24 283:11
284:20 290:6
296:15,18
297:11,16,24
298:2,16,21
**teach** 323:8

**team** 28:10,12
**teams** 270:7
**tech** 20:24
**technical** 80:19
125:16
**technically**
179:23 230:10
**techniques**
354:22
**technologies**
18:20
**technology**
194:14
**tele** 21:10
**tell** 92:19
107:20,25
109:9 111:23
123:20 124:2
143:17 147:17
148:23 152:22
166:24 186:18
187:3 198:24
214:19 222:10
253:16 254:19
259:3 320:23
352:4,7 354:19
357:13
**telling** 52:2,5
68:14 77:20
80:15 109:14
138:4 140:14
141:16,18
152:19 235:21
242:12 261:18

**[template - think]**

**template** 26:12
28:3 277:9
362:3
**templates** 26:5
26:9,23
**temporary**
363:23
**ten** 17:12,24
18:2 110:20
113:4,6 143:19
143:21 159:11
176:8 182:8
185:13 196:11
291:7 325:23
363:2,5
**tend** 22:21
138:9
**tends** 280:10
**term** 15:22
93:6,11,15,21
93:25 95:15
115:23,25
369:6
**terms** 21:24
76:24 84:24
91:2 97:3
108:14 136:7
207:4 273:23
323:13 326:23
329:10,14
330:7,25
335:13
**terrible** 254:25

**terribly** 311:4
**test** 26:17
27:15 32:7
38:9 135:25
152:6,7 186:16
333:16
**testified** 9:18
22:6 233:11
**testifying** 13:12
**testimony** 10:9
21:15,19 22:3
22:5 99:19
105:25 122:14
151:15 155:19
156:20 170:17
224:21 226:12
371:3 372:5
373:8
**tests** 26:18
27:16 30:22
**text** 19:18
25:19
**thank** 20:14
21:18 33:21
34:2 63:20
64:6 88:22
113:8 125:10
126:18 133:9
176:12 196:11
197:17 223:17
249:15 261:4
262:12,20
268:15 313:13
328:11 348:24

355:20 366:18
**thau** 3:11 19:24
152:11 187:6
196:8 218:11
291:15
**theory** 26:3
27:13 42:16,23
53:23 54:5
68:9 70:16
73:11 74:10
96:3 101:18
102:10,11,18
102:20 104:4,7
104:23 108:20
110:5 129:23
132:23 133:13
133:18,19
138:14 175:19
175:24 176:18
177:7 195:19
212:6,9,13,18
212:20 215:20
215:23 224:5
231:3,12
233:16,20
235:6 317:20
339:25 349:21
352:2,22
**thesis** 261:13
261:21
**thing** 41:24
61:24 95:4
102:23 141:19
152:20 156:22

161:25 162:7,9
165:13 175:4
180:20 192:14
208:24 217:7,7
230:21 242:14
**things** 20:7
30:25 41:23
62:19 95:10
119:8 130:4
135:24 143:9
143:23 144:12
146:11 147:20
156:17 158:13
163:14,16,25
164:17 166:10
167:22 173:17
177:11 191:11
192:23 194:19
200:9 203:2
214:19 221:9
244:10 266:12
277:9 278:20
288:6 300:19
338:10 345:3
347:17 357:4
357:17 359:5
**think** 10:2,24
12:2 15:12,15
15:20 18:3,8
20:17,23 22:9
23:7,8 25:5
33:25 34:14
35:8 37:13,14
38:15,18 42:6

**[think - thought]**

| | | | |
|---|---|---|---|
| 46:22 49:23 | 162:22 163:15 | 256:24 257:11 | 352:12,19,20 |
| 50:20 51:21 | 166:10 169:11 | 257:12,22 | 355:4,12 357:5 |
| 53:16 56:14 | 169:12,25 | 261:8,16 | 357:20 358:9 |
| 58:10 59:5 | 170:16 172:5 | 262:25 264:18 | 359:12 360:3 |
| 60:4 66:16 | 174:16,17 | 266:9 267:8,9 | 362:8 363:5,10 |
| 67:6,18,23,24 | 178:17 182:8 | 269:2 274:18 | 363:15,21 |
| 67:25 68:14 | 183:6 184:4 | 274:19 277:2 | 365:3 366:7 |
| 70:11 71:2,3 | 186:6,7,14 | 277:11,16,22 | 368:2,8 369:25 |
| 72:10 73:20 | 188:9 192:8 | 278:4,23 | 370:11 |
| 74:22 75:7 | 193:2 195:17 | 279:17 281:11 | **thinking** 93:22 |
| 76:16,16 77:9 | 201:24 202:16 | 281:18 284:25 | 130:23 132:3 |
| 77:21 80:20 | 205:6 206:20 | 285:4 289:20 | 160:21 187:11 |
| 82:12 84:24 | 207:8,21 | 292:2,4 295:16 | 304:25 319:22 |
| 85:17 86:6 | 208:18,19,22 | 296:20 297:2,3 | 346:9 362:13 |
| 90:16 93:24 | 209:16,19,22 | 298:2,12 300:7 | 362:22 363:3,6 |
| 94:2,10 96:23 | 210:10,15 | 302:9 304:13 | 364:5 |
| 97:5,10 98:3 | 211:3,17 | 308:19 309:12 | **thinks** 259:6 |
| 98:11,25 | 212:12,23 | 309:20 310:5 | **third** 156:5 |
| 102:20,23 | 213:17,21 | 312:20 315:17 | 189:9,9 217:15 |
| 105:5 107:4 | 216:3 217:23 | 316:15,17 | 221:22 340:16 |
| 108:14,17,21 | 218:7 219:23 | 317:3,7 318:25 | 349:24 |
| 109:14 111:10 | 220:7 221:5 | 319:14,15,16 | **thirds** 198:2 |
| 111:25 112:17 | 222:20 227:6 | 321:3 322:12 | 270:4 |
| 112:22 115:23 | 230:2,3 231:17 | 323:20 325:12 | **thorough** |
| 115:24 117:21 | 231:21,25 | 325:17 328:18 | 273:22 |
| 119:25 120:5 | 235:18 237:2 | 330:20 332:17 | **thought** 59:25 |
| 122:15 129:2 | 237:22 238:2,8 | 333:17 334:3 | 115:18 146:13 |
| 129:18 130:13 | 240:18 241:8 | 334:14,16,22 | 157:4 164:25 |
| 130:22 132:22 | 242:11 243:15 | 336:24 337:4 | 164:25 178:6 |
| 135:7,14 | 244:10 246:8,9 | 340:20 343:13 | 204:6 205:7,8 |
| 138:17 140:14 | 246:15 250:15 | 345:5 346:4 | 217:19 255:14 |
| 142:20 146:16 | 251:12,18 | 347:2,13,20 | 265:21 272:12 |
| 149:24 153:6 | 252:3 253:4,25 | 350:4,11 351:7 | 291:4,13 294:8 |
| 158:7 160:9 | 255:2,13,19 | 351:9,25 | 304:25 333:19 |

**[thought - tough]**                                                       Page 81

346:5,19
352:17 354:23
**three** 52:8,14
53:12 59:23
60:19 73:3
155:6,22
161:22 218:17
220:25 221:2
250:10 251:19
264:21 285:23
285:24 286:2,3
286:4,8,10
291:8 323:10
323:13,14,15
326:22,25,25
328:19 329:18
332:3 345:22
349:12,18
351:14
**tick** 307:12
**tie** 17:8
**tied** 173:21
244:2
**time** 5:8 7:12
8:9 9:9 12:20
12:25 13:3,8
13:10,16,16,22
13:24 14:3,6
32:23 34:6
38:20 63:18
68:5 73:11
82:3,23,25
83:6,9,11,14
89:10,14

111:18 125:13
132:19 133:22
134:16 146:8
146:19 159:17
168:10,14
170:24 178:12
182:13 183:9
183:21 184:3
184:10,10,14
185:2,8 187:20
188:13 189:12
192:5 194:24
201:12 205:19
205:21 206:21
206:25 207:9
207:24 208:11
210:11 219:3
230:4,22 231:9
231:10 236:2,9
236:13,21
246:5,12,13
253:3 254:7
256:8 257:13
262:17 264:25
267:7,22 268:3
269:3 273:13
274:15 279:21
280:25 281:10
281:14 282:14
282:18 288:20
290:25 291:2
291:20 296:2,6
297:5 298:23
298:25 311:2

313:16,17
321:21 324:15
328:6 337:12
346:3 347:23
360:10 362:7
362:12,15,20
362:21,21
364:21 370:19
370:23 371:5
**timeframe** 35:9
**times** 9:24 12:3
15:13 23:20
24:2 155:21
195:14 318:7
325:24
**timing** 81:19
324:25
**today** 10:9
39:16 40:7,11
40:16 42:9
43:15 47:6,11
47:17,22,25
56:24 66:8
78:12,20 83:5
99:11,18,19
107:21 112:7
177:12 178:13
178:24 185:19
261:14 273:19
277:15
**today's** 371:3
**together**
200:10 288:18
307:10

**told** 37:15 48:5
48:9 50:11
139:4 141:20
165:20 171:9
173:10 212:12
217:6 252:17
253:11,13
256:24,25
294:7
**tolerate** 211:8
215:18,21
**tomorrow**
305:24
**took** 73:23
125:13 127:5
192:17 225:24
253:2 257:13
279:21 299:13
**top** 45:25 47:10
51:18 52:13
153:19 187:16
197:7 198:8,10
208:9 268:22
276:3 332:17
**topic** 209:7
**topics** 144:2
**total** 28:21,25
166:15 241:12
284:6
**totality** 250:19
251:3 252:8
254:15
**tough** 192:2
201:23

**tour**  104:25
**toured**  104:18
  104:21
**towards**  276:10
  352:25 353:2
**track**  24:7
**trade**  26:20
  85:2 180:2,6
  189:2 222:4,5
  308:23 309:17
  310:2 312:21
  322:4
**traded**  29:20
  81:15 301:7
**trader**  188:20
**traders**  179:13
  181:2 193:6
  194:21 213:8
  214:18
**trades**  179:20
  179:22,24
  180:15,18
  205:2 309:17
  309:22
**trading**  84:18
  84:25 85:6,12
  85:16 179:15
  180:12 181:11
  183:21,22
  185:14 188:10
  204:12 213:14
  218:22,23
  221:2 226:24
  226:25 275:22

275:24 278:5
285:22 300:20
300:24 301:21
302:5,11 306:8
306:10,22
307:10,24
308:13,16,21
309:3 311:10
311:12 317:9
317:13,16
335:14 337:9
345:22,23
347:9,15 348:4
348:7 349:12
349:18 352:14
**training**  14:14
  86:5 311:18
**transcript**  4:17
  45:16 372:5,7
**treated**  167:11
  334:10
**treatment**  11:6
  293:2
**treatments**
  11:15
**trial**  7:13
  161:22,22
  162:5
**trials**  62:20
  114:9,18 115:6
**trick**  102:25
**tried**  116:23
  128:15 130:5
  207:7

**tristan**  5:19
  71:16 259:13
  333:23
**true**  110:15,17
  163:7 179:11
  183:23 185:23
  212:10,13
  213:2 230:11
  310:24 311:16
  346:15 372:7
  372:10 373:7
**truth**  110:19
  160:16
**truthful**  10:9
  96:8 101:23
  104:25 106:9
  107:5 136:2
  137:8 138:20
  142:11,14
  143:5 252:17
**truthfulness**
  107:8,8
**try**  49:22 91:4
  126:11 128:10
  150:4 178:9
  185:3 280:6
  302:19 332:16
**trying**  68:9,12
  73:21 74:13
  78:8 88:11
  90:23 106:15
  107:14 139:12
  139:13 163:2
  176:21 184:10

184:17,19
206:22 209:23
233:15,25
239:20 272:16
288:11 312:2
316:24 317:14
323:8 347:12
368:11
**tucked**  251:17
**turn**  71:8,10
  154:21 169:20
  189:8 206:5
  218:14 225:17
  249:20 291:5
  291:10 325:12
  361:8
**turned**  368:15
**turning**  149:8
  313:12
**turns**  131:18
**tv**  194:19 195:4
**tweaking**  66:8
**twelve**  17:22
  18:4 24:24
**twice**  288:21
  325:23
**two**  17:18
  29:19 37:23,25
  38:3,5 39:19
  41:9,14 46:19
  47:21 48:6
  78:7 79:13
  80:9 81:2
  146:20 158:13

161:14 180:6,7
187:15 192:10
198:2 199:14
200:9 209:17
218:15 220:17
233:13 234:23
235:22 237:2
238:25 240:2
240:15,19
242:13,13
256:12 264:21
270:4 273:4
278:20 280:11
282:17 283:8
283:12 284:7
285:23 286:13
288:24 289:2
291:8 322:15
345:23 347:17
348:3,4,7
349:6 360:8
366:6
**type** 16:5 61:12
104:12 156:6
156:22 183:25
184:5,8,21
207:21 216:22
219:4 221:6
265:23 351:9
368:4
**types** 23:6
130:20 184:24
**typical** 66:20

**typically** 16:2
66:15 172:7
235:19 264:22
**typos** 25:20

**u**

**u** 21:10 42:7
185:16 187:20
356:20
**ugly** 39:18
**uh** 349:5
**ultimate** 121:7
121:12 136:12
**ultimately**
34:14 85:17
91:16 92:14
**unbiased** 188:9
188:11 200:12
246:20 247:10
252:2 350:19
350:24 351:4
**unblinding**
292:25
**uncertain** 89:5
**under** 37:21
92:21 101:20
122:10 139:21
140:6,13 141:5
168:22 189:8
191:8,13
252:14 259:23
259:24 260:3
260:13 332:22
347:12 351:18

372:6 373:5
**underlined**
154:3
**underlying**
75:13
**underperform**
260:8 261:13
261:21 266:20
**underscores**
266:3
**understand**
10:6 11:15
26:9 33:12,22
35:12 42:14
47:18 53:22
57:17 59:21
61:19 68:9,13
70:2 72:8,11
73:12,21,25
74:15 75:23
76:12 88:11,15
88:23 90:9,12
90:24 94:7
95:8 106:15
107:14 114:16
115:2 119:7
121:11 127:16
128:10,20
132:24 133:11
139:12 150:4
171:16 190:16
200:25 201:21
202:16 206:22
208:12 215:25

217:9 226:6
233:16,17,19
248:20,25
250:13 252:7
252:14 264:15
270:12 280:7
288:7 312:3
327:4 341:5
347:19 368:6
369:4
**understanding**
11:21 42:15,23
43:9 44:6,12
44:13 45:18
46:3,11,16
48:6,11,15
50:3,12,15,23
55:5 57:21
61:2,4 62:19
62:23 70:6,12
71:11,14 72:19
73:4,10 74:9
74:25 75:6
76:25 82:4,21
85:13 88:2
91:22 96:2
104:6 108:20
119:4 124:24
129:10 136:8
137:6 139:18
141:24 142:5
143:5 151:9
154:13 155:12
155:16 164:6

164:16 167:3 168:3 181:9 189:19 208:2 224:4 229:13 253:4,7 255:3 311:13 312:13 332:24 335:20 339:14 341:12 341:19,24 342:7 343:6,11 343:16 344:2,8 344:13,14,22 345:2,7

**understands** 164:12

**understood** 62:10 68:12 114:19 117:16 142:25 152:21 156:16 161:21 164:2 204:13 259:12

**undertaken** 245:19

**undertook** 242:21

**undisclosed** 105:16,20 106:13

**unduly** 66:18 67:9

**unexpected** 194:2 217:2

**unfair** 334:16 334:22

**unfortunately** 66:4 210:4 220:8

**unintentionally** 80:10

**unit** 8:13

**united** 1:2 5:4 8:17

**universally** 183:23

**universe** 31:19 132:4 299:25

**unobserved** 103:24

**unpack** 74:23

**unrelated** 241:17 341:22 343:10

**unreliable** 23:4

**unsupportable** 23:5

**unusual** 364:14 368:18

**upcoming** 91:23 92:24 93:12 94:12,19 330:12

**updated** 278:9

**upside** 94:2

**upward** 103:17

**use** 21:24 26:12 27:6 37:7

89:24 103:12 108:13 122:21 133:20 163:3 222:6 230:24 289:5,16 319:3

**used** 31:21 100:22 108:14 120:19 170:5 186:5 193:3 218:21 329:3 341:18 354:22

**useful** 316:24 335:20

**using** 103:17 108:21 148:21 148:23 184:13 249:4 281:25 328:22

**usual** 217:9 359:23

**usually** 180:14 180:19 291:4 358:20

**v**

**v** 5:12 9:15 18:20 21:11 34:15 210:10 374:3

**vague** 22:19 50:9,19 57:4 86:11 93:2 130:3 200:8 319:16

**valuable** 179:17 181:15

**valuation** 10:22 111:9

**value** 70:9,13 70:24 90:12 91:11 110:15 110:17 127:6 130:6,9,14,16 135:7 144:7 147:13 181:12 208:3 235:20 235:23 237:23 238:21 313:15 320:7

**valuing** 91:2

**varied** 145:9

**various** 13:5 25:16 30:21 37:22 81:24 82:19 144:2 147:20 203:2 323:18 339:6 345:3 354:22 369:25

**vendor** 31:21 34:15 293:18

**verb** 190:7

**veritext** 8:24 9:2 374:2

**version** 199:14 263:2

**versus** 56:14,20 61:8,9,11

62:25 63:15 64:12,17 65:2 72:2 90:19 156:2 210:7 220:5 238:4 253:14 316:22 339:12 344:11 363:24

**video** 1:16 8:10 8:14 82:11

**videographer** 3:17 8:2,25 17:5 89:10,14 168:10,14 236:9,13 296:2 296:6 328:7 370:16,19,23

**view** 31:4 37:3 49:3 67:14 68:15,16 69:9 69:15,19 70:20 70:22 92:6 98:4 112:13 117:24 118:12 119:11,19 127:6 145:10 225:15 244:22 251:9 257:7 265:9,17 266:4 273:20 297:16 300:23 302:3 305:4 369:17

**viewed** 68:22 222:17 362:10

**viewing** 316:7

**views** 22:22 130:6 332:19

**violating** 220:24 221:6

**visa** 21:10

**volatile** 317:4

**volatility** 200:22 201:6 201:17 207:10 207:15,18 209:12 246:22 246:24,24 317:13 321:18 350:21 352:14

**volume** 26:18 26:18 30:19,20 300:20,24 301:21 302:2,6 306:19,22 307:24 308:2,8 308:16,16,21 309:3 313:6,9 324:14

**vote** 73:6,9,18 86:14 91:23,25 92:8,13 94:4 261:15 267:25 274:11 302:14 303:10,19 330:10,12,16 337:16,19,23 338:8,24 339:2 339:3,11,12

340:3 346:13 353:24 354:7

**vounatsos** 1:8

**vs** 8:16

**w**

**w** 1:9 372:2

**wait** 45:10 116:16 164:5 165:9 203:12 213:14 228:20 250:21,21,21 270:20,20,20 330:13 332:13 361:6

**waiting** 64:4 191:2 193:3,7 193:17,22 195:3 203:21 222:23 328:6

**waived** 7:8

**wake** 305:14

**walking** 41:23

**wall** 177:20

**wandered** 162:2

**want** 15:21 36:9 37:3 38:18,20 39:12 43:2 45:24 47:20 53:25 56:4 69:25 73:19 78:18 81:4 90:2

95:24 99:13 107:6,9 108:19 108:23 114:25 115:24 120:21 121:5,10 123:14,20 124:2,25 127:2 127:16 128:9 146:9 147:10 150:4 151:24 154:25 165:18 170:25 171:15 177:14 181:8 189:5 192:20 197:13 199:11 199:22 200:24 209:5,14 210:2 211:18 212:19 214:20 215:24 218:4 220:16 223:11 227:6 233:19 240:11 240:13 245:3 247:23 260:4 262:16 295:12 299:3 312:3 315:8 316:20 317:4 340:17 342:5 355:4,5 367:14 368:5 370:16

**wanted** 32:18 123:8 177:11 210:18 267:24

**[wanted - words]** Page 86

289:5,9
**wants** 253:22
254:3 273:21
**warned** 368:17
**washington**
2:18
**waste** 38:20
**watched** 204:9
**watching** 193:6
213:8,10
**way** 29:7,9
53:19 67:24
68:20 71:3
79:25 80:2
92:8 96:7
105:17 106:19
113:21 115:9
115:13 131:19
144:6 145:4,14
147:12 158:22
160:10 168:6
173:14 191:21
193:10 194:18
198:3 200:10
202:13 215:15
217:4 220:24
222:21 231:17
237:22 238:2,6
238:6 240:6
241:5,6 242:15
244:2 247:6
254:15 266:9
270:4 272:21
277:21 278:10

278:11 280:11
289:23 304:11
306:25 316:24
321:24 322:18
324:17 332:3
336:7,23
349:23 366:7
373:12
**ways** 25:13
114:21 132:5
142:19 321:3
356:25
**we've** 20:16
26:18 37:20
64:23 69:16
84:18 85:21
146:23 155:21
173:11,18
208:25 267:11
298:8 329:6
353:11 363:18
369:25
**wednesday**
4:18 45:19
**week** 94:6
**weekend** 86:20
86:25 347:14
347:20,22
348:2
**weigh** 255:5
**weight** 160:12
300:8 346:20
**weird** 362:19

**weiss** 1:19 3:5
8:21
**wells** 286:13,17
287:7,13,23
288:3,16,18
**went** 22:3
110:19 145:4
235:4 277:21
303:12
**wharton** 1:19
3:5 8:21
**whereof** 373:14
**whispering** 8:7
**wide** 27:23
31:3 39:23
**widely** 188:21
204:9 304:20
**willing** 125:20
222:4
**win** 261:10
**window** 5:15
349:7,18
**windows**
218:16
**wise** 310:15
**withdraw**
336:5 338:5
347:25 348:2
**withdrawn**
77:23 96:18
261:5 280:5
**witness** 1:17
4:4 9:13 12:4,7
12:25 13:3

20:9 21:9
49:10 63:24
99:14 108:13
122:18 123:9
143:18 152:17
152:21 153:2
155:8 162:13
162:18,20,20
196:9 217:24
218:13 262:11
262:16 268:9
268:13 270:21
272:9,13,16
275:23 291:16
295:14 344:19
344:25 355:7
370:10 373:5,8
373:14 374:4
**wonder** 106:24
194:22
**wondering**
19:20 36:21
330:19
**word** 96:11
103:13 108:21
120:18,19,20
122:22 137:12
174:19 193:3
220:21 229:14
230:25 332:5
333:4
**wording** 23:8
**words** 52:2
68:11 75:22

109:9 127:12 153:8 174:13 174:19,21 183:18 242:24 288:9 304:23 323:11,15

**work** 11:15 12:17,20 13:15 14:23 16:10,18 18:10,13 24:9 24:11 25:7 28:13,22 65:11 132:25 143:15 144:10 186:3 195:13 210:14 211:23 230:15 232:19 259:7 259:14 272:18 280:6 335:5

**worked** 16:13 17:19,20 18:3 20:23

**working** 14:25 83:18 165:5 169:14 208:7 217:14

**works** 15:2 200:11

**world** 138:18 295:9

**worried** 162:24 162:25

**worry** 162:23

**worse** 139:6 226:2

**worst** 138:10 139:7

**worth** 102:6 206:21

**wow** 173:9

**wrap** 159:10,13

**write** 175:17 341:11 355:25

**writes** 250:19 280:25

**writing** 25:23

**written** 22:3,5 187:24,25 234:13 282:13

**wrong** 72:22 109:9 176:6 186:7 349:21 350:3

**wrote** 25:19 176:6

**x**

**x** 1:4,12 4:2,7 5:2 6:2 22:10 183:25 184:3,8 184:9,13 370:2

**y**

**y** 184:25

**yeah** 22:20 33:21 36:20 41:18 52:12 85:4,23 116:14

123:24,24 140:10 163:5,5 163:5 170:4 179:16 182:12 188:15 193:5 198:17 205:15 230:2 247:10 250:2 252:22 277:25 280:17 291:15 292:3 311:11 312:3,8 318:11 319:14 319:19 321:24 335:15 340:17 346:3 347:7 348:8 358:18

**year** 28:17 186:22 210:7 264:11,19 265:6,6

**year's** 211:25

**years** 12:13,14 17:4,12,24 18:2,15 21:4,5 21:17 23:24 24:3 194:9 196:22 345:15

**yesterday** 40:20,23 104:19 325:9

**york** 1:21,21 2:7,7 3:8,8 9:17 14:12 374:2

**yup** 181:21

**z**

**zero** 110:20 310:13 316:5 316:10 317:17 341:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.