# Exhibit D

# (Redacted Version)

                                              Page 1

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
2

    NADIA SHASH, ET AL.,           §
3                                  §
            Plaintiffs,            §
4                                  §
    VS.                            §
5                                  § Case No. 21-cv-10479
    BIOGEN INC.,                   §
6                                  §
            Defendant.             §
7   ----------------------------------------------------------
8              ORAL & VIDEOTAPED DEPOSITION OF
                         AMJAD KHAN
9                     AUGUST 6, 2025
10  ----------------------------------------------------------
11
12          ORAL & VIDEOTAPED DEPOSITION OF AMJAD KHAN,
13  produced as a witness at the instance of the Defendant
14  and duly sworn, was taken in the above-styled and
15  numbered cause on Wednesday, August 6, 2025, from 9:00
16  a.m. to 3:09 P.M., before Kari Behan, CCR, CSR, a Texas
17  certified machine shorthand reporter, at the law offices
18  of Haynes and Boone LLP 2801 N. Harwood Street, Suite
19  2300, Dallas, Texas, 75201, pursuant to the Federal
20  Rules of Civil Procedure and the provisions stated on
21  the record herein.
22
23
24
25

Page 2

```
1              A P P E A R A N C E S
2
   FOR THE PLAINTIFFS, NADIA SHASH, ET AL.:
3
      GONEN HAKLAY, ESQ.
4     THE ROSEN LAW FIRM, P.A.
      101 Greenwood Avenue
5     Suite 440
      Jenkintown, Pennsylvania 19046
6     (215) 600-2817
      ghaklay@rosenlegal.com
7
8
   FOR THE DEFENDANT, BIOGEN INC.:
9
      RICHARD C. TARLOWE, ESQ.
10    SAMUEL PATTERSON, ESQ.
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
11    1285 Avenue of the Americas
      New York, New York 10019
12    (212) 373-3035
      rtarlowe@paulweiss.com
13    spatterson@paulweiss.com
14
15 THE VIDEOGRAPHER:
16    Tony McGough
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            - - -
           I N D E X
2            - - -
   WITNESS: AMJAD KHAN              PAGE
3
4  BY MR. TARLOWE.......................  6
5  BY MR. HAKLAY.......................187
6  BY MR. TARLOWE.....................197
7  CHANGES AND SIGNATURE...............200
8  REPORTER'S CERTIFICATION............202
9           * * *
10      E X H I B I T S
11 EXHIBITS      DESCRIPTION        PAGE
12 Exhibit 1                         46

13              , PLA_000003 and
        000004, Confidential
14
   Exhibit 2                     ,   49
15
                , PLA_000132
16     through 145, Confidential
17 Exhibit 3                         76

18              , PLA_000001 and
        000002, Confidential
19
   Exhibit 4  Exhibit B, Final Transcript,  98
20     Q2 2020 Earnings Call
21 Exhibit 5  November 4, 2020 Intraday  112
       Stock Price
22
   Exhibit 6  November 5, 2020 Intraday  112
23     Stock Price
24 Exhibit 7  Document entitled "Biogen   112
       (BIIB) Stock Price
25
```

Page 4

```
1  EXHIBITS (CONTINUED):
2  Exhibit 8  Wall Street Journal Article    139
       "Biogen, at a Crossroads,
3      Surges on Promising
       Alzheimer's Drug Assessment,"
4      dated November 4, 2020
5  Exhibit 9  Document titled "FDA's         158
       Decision to Approve New
6      Treatment for Alzheimer's
       Disease"
7
   Exhibit 10  Exhibit 3, Declaration of      183
8      Amjad Khan in Support of
       Plaintiffs' Motion for Class
9      Certification and Appointment
       of Class Representatives and
10     Class Counsel
11
12
13
14    (REPORTER'S NOTE: All quotations from exhibits are
15 reflected in the manner in which they were read into the
16 record and do not necessarily denote an exact quote from
17 the document.)
18
19
20
21
22
23
24
25
```

Page 5

```
1           PROCEEDINGS:
2      (Wednesday, August 6, 2025, at 9:00 a.m.)
3           THE VIDEOGRAPHER:  We are now going on the
4  record.  The time is 9 o'clock a.m.  Today's date is
5  August 6, 2025.  This is the video-recorded deposition
6  of Amjad Khan in the matter of Shash, et al., versus
7  Biogen Incorporated, filed in the United States District
8  Court for the District of Massachusetts, Case
9  No. 21-cv-10479.  Location this deposition is taking
10 place at, 2801 North Harwood Street, Suite 2300, Dallas,
11 Texas.
12           My name is Tony McGough and I'm the legal
13 videographer.  And the court reporter is Kari Behan.  We
14 are here for the firm of Veritext Legal Solutions.
15           Will counsel please state your appearances.
16 Afterwards, the court reporter will swear in the
17 witness.
18           MR. HAKLAY:  Gonen Haklay from The Rosen
19 Law Firm, on behalf of the plaintiff.
20           MR. TARLOWE:  Richard Tarlowe of Paul,
21 Weiss, on behalf of the defendants.
22           MR. PATTERSON:  Sam Patterson of Paul,
23 Weiss, also on behalf of the defendants.
24           AMJAD KHAN,
25 after having been first duly sworn by the
```

2 (Pages 2 - 5)

Page 6

1  above-mentioned Certified Court Reporter, was examined
2  and testified as follows:
3                    EXAMINATION
4  BY MR. TARLOWE:
5      Q.  Good morning, Mr. Khan.
6      A.  Good morning.
7      Q.  Before we get started, I just wanted to go over
8  some ground rules with you.
9      A.  Uh-huh.
10     Q.  This is going to be a question and answer
11 format.  And so the way it'll work is, I'll ask
12 questions, and then you'll answer those questions.
13 There's a court reporter who's taking down everything
14 that's said, and so it's important that we try not to
15 talk over each other.
16     A.  Okay.
17     Q.  So I'll ask you to just let me finish the
18 question, and then I'll allow you to finish your answer.
19          Does that make sense?
20     A.  Absolutely.
21     Q.  If -- if during the deposition you don't
22 understand a question, just let me know and I'll try to
23 rephrase it --
24     A.  Okay.
25     Q.  -- so it's clear.

Page 7

1          And it's important -- because there's a
2  court reporter taking down what you say, it's important
3  that you respond verbally.  Because if you nod your head
4  or shake your head, that's not something that the
5  reporter can record.
6      A.  Understood.
7      Q.  We can take breaks as needed, and I anticipate
8  we'll take a bunch of breaks throughout the day.
9      A.  Okay.
10     Q.  If at any point you'd like to take a break,
11 just let us know.  I just ask that you not do that while
12 a question is pending.
13     A.  Understood.
14     Q.  You understand that you are under oath today?
15     A.  I do.
16     Q.  And you understand that you are required to
17 tell the truth?
18     A.  I do.
19     Q.  Is there any reason that you're not able to
20 give complete and truthful testimony today?
21     A.  Say that again, please.
22     Q.  Sure.
23          Is there any reason that you're not able to
24 give complete and truthful testimony today?
25     A.  There's no reason.

Page 8

1      Q.  Are you under the influence of any medication
2  or any substance that might affect your ability to
3  testify truthfully today?
4      A.  No.
5      Q.  Anything that is impairing your memory in any
6  way?
7      A.  No.
8      Q.  And can you please state your full name?
9      A.  Amjad Khan.
10     Q.  Do you go by any other names?
11     A.  No.
12     Q.  Have you ever gone by any other name?
13     A.  No.
14     Q.  What is your date of birth?
15     A.  ████████
16     Q.  What is your current address?
17     A.  ████████████████████████████.
18     Q.  How long have you been living at that address?
19     A.  Since 2020.
20     Q.  Do you rent or own your home?
21     A.  Own.
22     Q.  And does anyone live there with you?
23     A.  Yes.
24     Q.  Who?
25     A.  My family.

Page 9

1      Q.  Who is that?
2      A.  My wife and my two daughters.
3      Q.  How old are your daughters?  Are they adults or
4  children?
5      A.  One is old, 18; one is adult.  One is in the
6  teens.
7      Q.  Before living in your current home, where did
8  you -- where was your -- prior address before that?
9      A.  ██████████████████████████████,
10 ████████████
11     Q.  How long were you living there?
12     A.  Since 2002 to 2020.
13     Q.  Did you own or rent that home?
14     A.  I owned it.
15     Q.  Did you attend college?
16     A.  Yes.
17     Q.  Did you graduate from college?
18     A.  Yes.
19     Q.  Where?
20     A.  In Pakistan.
21     Q.  When did you graduate?
22     A.  1987.
23     Q.  Did you receive a degree?
24     A.  That's correct.
25     Q.  What kind of degree?

3 (Pages 6 - 9)

Page 10

1     A.  It was a bachelor's of arts, BA.
2     Q.  And what -- what was the name of the
3 university?
4     A.  It was University of the Punjab.
5     Q.  Do you have any postgraduate education?
6     A.  Yes.
7     Q.  What is that?
8     A.  Law degree.
9     Q.  When did you receive your law degree?
10     A.  '92.
11     Q.  From where?
12     A.  Same, Punjab University Law College.
13     Q.  Did you ever practice law?
14     A.  That's right; I did.
15     Q.  Did you practice law in the United States?
16     A.  No.
17     Q.  Okay.  Where did you practice law?
18     A.  Pakistan.
19     Q.  During what time period?
20     A.  From '93 to '95.
21     Q.  What kind of law did you practice in Pakistan?
22     A.  It was a general practitioner.
23     Q.  What does that mean?
24     A.  It means mostly it was civil litigation, and a
25 little bit criminal.  A combination of both, but mainly

Page 11

1 it was civil.
2     Q.  Where were you born?
3     A.  In Pakistan.
4     Q.  When did you -- at some point, I gather, you
5 moved to the United States?
6     A.  In '98.
7     Q.  What led you to move to the United States in
8 '98?
9     A.  I wanted to pursue my education, and that's why
10 I ended up here.
11     Q.  When you came to the United States, what --
12 under what status did you come to the United States?
13     A.  Green Card holder, immigrant.
14     Q.  Are you a citizen?
15     A.  I am.
16     Q.  When did you get your citizenship?
17     A.  I'm not sure, but I think it was somewhere
18 around 2005.
19     Q.  When you came to the United States, did you
20 attend school in the United States?
21     A.  I did.
22     Q.  What school?
23     A.  Paralegal school.
24     Q.  What's the name of the school?
25     A.  It was Southeastern Paralegal Institute.

Page 12

1     Q.  Did you receive a degree or certificate?
2     A.  I did receive a certificate.
3     Q.  What kind of certificate?
4     A.  Paralegal certificate.
5     Q.  When was that?
6     A.  2002.
7     Q.  Any other education in the United States?
8     A.  When you say "education," does that include --
9 can you elaborate on education?
10     Q.  Sure.
11         Did you attend any other schools in the
12 United States?
13     A.  No.
14     Q.  Is there some other type of education that you
15 obtained or pursued in the United States?
16     A.  Yes.
17     Q.  What is that?
18     A.  It's a real estate education.
19     Q.  What education for real estate?
20     A.  It was -- sorry.
21         It was a real estate exam.
22     Q.  When did you take that real estate exam?
23     A.  2018.  I don't exactly sure the month.  It was
24 somewhere around November, December 2018 -- '17, and
25 then I passed in 2018.

Page 13

1     Q.  What do you do for work?
2     A.  I work for a company, Vistra Energy.
3     Q.  Can you spell that?
4     A.  V-I-S-T-R-A, Vistra Energy.
5     Q.  When did you start working at Vistra Energy?
6     A.  There are two parts, answer.  I started with --
7 there is a acquired company, where I started working in
8 2012 that became a part of Vistra Energy in 2014, I
9 believe.
10     Q.  So let's start with 2012.  You joined a company
11 that later became part of Vistra Energy?
12     A.  That's correct.
13     Q.  What was the company you joined in 2012?
14     A.  Ambit Energy.
15     Q.  Can you spell that?
16     A.  Ambit, A-M-B-I-T.
17     Q.  What kind of business is that?
18     A.  They generate and manage electric --
19 electricity.
20     Q.  What was your job there?
21     A.  Transaction analyst.
22     Q.  What does that entail?
23     A.  That entails to managing day-to-day
24 transactions.
25     Q.  What types of transactions?

4 (Pages 10 - 13)

1    A.  When a customer calls in to become a customer,
2  so there is a certain transaction that goes from one
3  computer system to the other computer system.  That's
4  called a transaction.  I managed them.
5    Q.  And I believe you said that it became -- Ambit
6  became part of Vistra in 2014?
7    A.  Somewhere -- somewhere around, yes.
8    Q.  After that, did your job responsibilities
9  change in any way?
10    A.  My job responsibilities did change.
11    Q.  How did they change?
12    A.  I had more work in the same line, but more
13  transactions, because now I'm working in a different
14  company where they had more companies underneath.  And I
15  was -- previously, I was managing transactions for
16  Ambit, and then I started managing transactions for
17  other acquired companies, as well, under the same
18  company, Vistra Energy.
19    Q.  What is your job today?
20    A.  Transactions analyst, senior.
21    Q.  You mentioned that you obtained -- well, did
22  you obtain a real estate license?
23    A.  That's correct.
24    Q.  Do you do any work in the real estate area?
25    A.  I do.

1    Q.  What do you do?
2    A.  I'm a agent, real estate agent.
3    Q.  Do you work for a company?
4    A.  I work for a brokerage.
5    Q.  What brokerage?
6    A.  United Real Estate.
7    Q.  That's in addition to your work at Vistra?
8    A.  That's correct.
9    Q.  How do you split your time between the two?
10    A.  I do the real estate on the weekends and
11  usually in the evenings.
12    Q.  And is that residential real estate?
13    A.  Residential real estate.
14    Q.  Purchase and sale of homes?
15    A.  That's correct.
16    Q.  Does Vistra -- do you know whether your
17  employer, Vistra, is aware that you are also a real
18  estate agent on the weekends?
19    A.  My colleagues know.
20    Q.  Does your employer know?
21    A.  When you say "employer," what do you mean?
22    Q.  Well, do you know whether Vistra Energy is
23  aware that you have another job?
24    A.  I'm not -- I don't think so.
25    Q.  Have you told them?

1    A.  Yes.  My manager knows about it.
2    Q.  Okay.  Do you know whether there's a policy at
3  Vistra Energy that -- let me rephrase that.
4        Do you know whether Vistra Energy has a
5  policy about whether employees can maintain other
6  employment while being a Vistra employee?
7    A.  I'm not aware of.
8    Q.  Okay.  And approximately how much money do you
9  make a in your job at Vistra Energy?
10        MR. HAKLAY:  Objection, relevance.
11        Good ahead.  You can answer, yes.
12        THE WITNESS:  About -- package is around
13  70-plus.
14  BY MR. TARLOWE:
15    Q.  70-plus thousand?
16    A.  Yes.
17    Q.  And about how much do you make a year as a real
18  estate agent?
19        MR. HAKLAY:  Objection.
20        You can answer.
21        THE WITNESS:  Depends how many transactions
22  I make.  Because it is a part-time, so not a whole lot.
23  BY MR. TARLOWE:
24    Q.  How much in 2024 do you think you made,
25  approximately, from the real estate work?

1    A.  '24, around 10- -- 10- or 11,000 dollars,
2  something like that.
3    Q.  Okay.  Do you have a salary, or is it all based
4  on commissions?
5    A.  About what?
6    Q.  Real estate work.
7    A.  No, all commission.
8    Q.  And when you came to the United States in
9  1998 -- you came to the United States in 1998; is that
10  right?
11    A.  That's correct.
12    Q.  When you came to the United States, did you
13  work?
14    A.  Yes.
15    Q.  What did you do for work when you first came
16  here?
17    A.  I was a cashier in a computers company --
18  store.
19    Q.  At what store?
20    A.  CompUSA.
21    Q.  And at the time, you held a Green Card?
22    A.  That's correct.
23    Q.  And did that permit you to work?
24    A.  That's correct.
25    Q.  Have you ever made any false statements to any

Page 18

1  immigration authorities in the United States?
2      A.  No.
3      Q.  Have you ever concealed information from
4  immigration authorities in the United States?
5      A.  No.
6      Q.  Have you ever exceeded the scope of your
7  authorization to be in the United States?
8      A.  No.
9      Q.  Have you ever taken any courses in economics?
10     A.  Yes.
11     Q.  What courses have you taken in economics?
12     A.  That was my -- one of my subjects when I did my
13  bachelor's in Pakistan.
14     Q.  And did that involve -- did that include
15  anything on finance?
16     A.  If I remember correctly, yes, finance -- not
17  specifically finance.  But, yes, demand and supply was a
18  part of one of the topics in economics.
19     Q.  What about -- did any of your classes on -- did
20  any of your classes in economics relate to the stock
21  market?
22     A.  No.
23     Q.  Have you taken any courses in accounting?
24     A.  No.
25     Q.  What about statistics?

Page 19

1      A.  I did.
2      Q.  What courses did you take on statistics?
3      A.  It was, again, the -- one of my majors in --
4  when I did my bachelor's.
5      Q.  Do you have any scientific or medical
6  background?
7      A.  No.
8      Q.  Have you taken any courses, whether in a
9  university setting or otherwise, relating to investing
10  in the stock market?
11     A.  No.
12     Q.  Do you have any training in investing in the
13  stock market?
14     A.  No.
15     Q.  Have you read any books on that?
16     A.  Yes, I can say that.
17     Q.  What book?
18     A.  Just generic books when I -- you know,
19  sometimes when I go to library, just at a glance.  Not
20  really -- I cannot say that I actually read it, but just
21  glanced through it and skimmed through it.
22     Q.  What kinds of books did you skim through?
23     A.  General investing and -- something like that.
24     Q.  Have you taken any online classes about
25  investing in the stock market?

Page 20

1      A.  No.
2      Q.  Have you ever worked in the securities
3  industry?
4      A.  No.
5      Q.  Have you ever worked in the pharmaceutical
6  industry?
7      A.  No.
8      Q.  Have you personally participated in any drug
9  studies?
10     A.  No.
11     Q.  Have you had any involvement at all in drug
12  studies?
13     A.  No.
14     Q.  Does anyone in your family work in the
15  securities industry?
16     A.  No.
17     Q.  Do you have any close friends who work in the
18  securities industry?
19     A.  Not that I'm aware of.
20     Q.  Does anyone in your family work in the
21  pharmaceutical industry?
22     A.  Not that I'm aware of.
23     Q.  What does your adult daughter do for work, if
24  anything?
25     A.  She is a part-time -- working for a coffee

Page 21

1  shop.
2      Q.  Is she in school?
3      A.  She does.
4      Q.  Is anyone in your family, to your knowledge --
5  has anyone in your family, to your knowledge, been
6  involved in any drug studies?
7      A.  No.
8      Q.  Okay.  It seemed like you paused.  Is there
9  something that you're thinking of?
10     A.  I was trying to think if I can recall somebody.
11  I'm not aware of...
12     Q.  Okay.  Has anyone in your family, to your
13  knowledge, ever worked for or with the FDA?
14     A.  No.
15     Q.  Do you personally know anyone who currently
16  works or previously worked for the FDA?
17     A.  No.
18     Q.  Okay.  Are you familiar with the company
19  Biogen?
20     A.  I am.
21     Q.  Do you know anyone who currently works or
22  previously worked at Biogen?
23     A.  No.
24     Q.  Have you spoken to anyone who, to your
25  knowledge, works or previously worked at Biogen?

6 (Pages 18 - 21)

Page 22

1    A.  No.
2    Q.  Have you communicated in any way with anyone
3  who, to your knowledge, works for Biogen or previously
4  worked for Biogen?
5    A.  No.
6    Q.  Have you spoken to anyone who, to your
7  knowledge, works for or previously worked for the FDA?
8    A.  No.
9    Q.  Do you personally know any doctors who treat
10  Alzheimer's patients?
11    A.  I know a couple of doctors, but I am not sure
12  if they treat Alzheimer's.
13    Q.  Okay.  What kind of -- do you know what kind of
14  doctors they are?
15    A.  No.
16    Q.  Did you ever speak with any of those doctors
17  about Biogen?
18    A.  No.
19    Q.  Do you know any Alzheimer's patients?
20    A.  No.
21    Q.  Okay.  Have you ever served on the board of a
22  company?
23    A.  I am currently serving -- it's a nonprofit
24  board.  This is for my mosque.
25    Q.  Okay.  Other than that, have you ever served on

Page 23

1  a board of a company, whether it's for a profit or
2  nonprofit?
3    A.  No.
4    Q.  Have you ever been arrested?
5    A.  No.
6    Q.  Have you ever been charged with any crime of
7  any sort?
8    A.  Yes.
9    Q.  Okay.  What crime were you charged with?
10    A.  It was a Class C misdemeanor for disorderly
11  conduct.
12    Q.  When was that?
13    A.  Back in 2002.
14    Q.  What were the circumstances of that?
15    A.  A friend of mine had a scuffle on the road, and
16  I tried to be like a -- make peace out of them.  So
17  that's how I was attacked by the other person as well.
18  So that's how it was.
19    Q.  And had -- and were you charged with a crime?
20    A.  Yes.
21    Q.  You were charged with disorderly conduct?
22    A.  That's right.
23    Q.  What happened with that charge?
24    A.  It was dismissed as a probation.
25    Q.  Were you -- did you -- were you -- did you

Page 24

1  plead guilty to it?
2    A.  No.
3    Q.  Were you found guilty of it?
4    A.  If I remember correctly -- it's been a long
5  time -- I was fined $250.
6    Q.  Did you have to appear in court?
7    A.  Yes.
8    Q.  What happened when you appeared in court?
9    A.  It was kind of a -- initially started as a --
10  as a -- as a case, like a regular case, and then it
11  was -- I think it was -- judge gave us the probation
12  for, I think, six months.
13    Q.  What were you accused of doing?
14    A.  It was of disorderly conduct.
15    Q.  Do you remember what you were accused of doing?
16    A.  Can you elaborate your question?
17    Q.  Sure.
18       So the charge was disorderly conduct,
19  right?
20    A.  Yes.
21    Q.  Do you recall what you were accused of doing
22  that resulted in a disorderly conduct charge?
23    A.  Because when the police came, I was found there
24  because I was -- I was hit by the other person, so
25  that's how -- you know, the cop came.  When the police

Page 25

1  came, he just charged all three of us.  All three of us
2  were given tickets and were asked to appear before the
3  judge.
4    Q.  Okay.  But do you remember whether there was an
5  allegation that you did something?
6    A.  I don't remember that.
7    Q.  Okay.  Other than that, any other instances in
8  which you've been charged with or accused of a crime?
9    A.  No.
10    Q.  And did you -- did you ever have your license
11  to practice law in Pakistan revoked or suspended for any
12  reason?
13    A.  No.
14    Q.  Did you ever work as a paralegal in the United
15  States?
16    A.  Yes.
17    Q.  When?
18    A.  I believe it was somewhere around 2020 -- 2003.
19    Q.  Do you recall where you worked as a paralegal?
20    A.  It was a very small law firm.  Like, I think
21  there were about one main attorney and one clerk, and
22  I -- I'm sorry.  I don't recall the name of the firm
23  because I only worked there for -- probably for about a
24  month and only on the -- on the weekends.  It was a
25  part-time.

7 (Pages 22 - 25)

Page 26

1    Q. Other than that, did you ever work as a
2  paralegal?
3       A. I want to say as a paralegal, I was -- it was a
4  law firm. Since you asked, I -- I recall. Yes, it was
5  a -- before that, it was a -- when I -- 1999, 2000 --
6  about '99, I joined that law firm. And I did not have
7  my paralegal certificate at that time, so I just worked
8  as a -- they didn't -- I didn't have any designation,
9  but he just hired me to work some -- do some research
10 or -- or, you know, sometimes go through some files and
11 all that.
12    Q. Do you remember the name of that law firm?
13    A. Yes. It was Hans Yoo.
14    Q. Have you worked for any other law firms?
15    A. No, not in the United States.
16    Q. Have you ever filed for bankruptcy?
17    A. No.
18    Q. Aside from this case, have you ever been a
19 party to a lawsuit?
20    A. Not in the United States.
21    Q. Have you ever filed a lawsuit in the United
22 States?
23    A. No.
24    Q. Have you ever been named as a defendant in a
25 lawsuit in the United States?

Page 27

1    A. Not that I remember.
2    Q. Have you ever testified at a deposition before?
3    A. No.
4    Q. Have you ever testified in court in the United
5  States?
6       A. Not as a witness because -- part of your
7  question, if I remember, when I -- when I had my
8  incidence of -- of that disorderly conduct, I don't know
9  if you call it a test- -- test- -- testimony. Because I
10 remember I was in the -- in the court, and I was asked
11 some questions. Other than that, no.
12    Q. And have you ever submitted a sworn statement
13 to a court before?
14    A. Not that I remember.
15    Q. Have you ever participated in any way in any
16 other class action lawsuit besides the one we're here
17 for today?
18    A. No.
19    Q. What, if anything, did you do to prepare for
20 your deposition today?
21    A. I met with Mr. Gonen.
22    Q. Anything else?
23    A. No, nothing else for my deposition.
24    Q. When did you -- when did you meet with your
25 lawyer?

Page 28

1    A. Yesterday.
2    Q. For about how long?
3    A. I would say about an hour and a half.
4    Q. Was anyone else present?
5    A. No.
6    Q. Did you speak with anyone other than your
7  lawyer in preparation for this deposition today?
8    A. No.
9    Q. Did you review any documents in connection with
10 this deposition?
11    A. No.
12    Q. And have you talked with anyone other than your
13 lawyer about this deposition today?
14    A. Yes.
15    Q. Who?
16    A. My wife.
17    Q. Okay. Other than your wife?
18    A. No.
19    Q. Have you told your employer why you're not at
20 work today?
21    A. No.
22    Q. Would you normally be at work today?
23    A. Yes.
24    Q. Okay. So do you have to give them a reason for
25 not coming to work?

Page 29

1    A. No.
2    Q. You just don't go?
3    A. I mean, you apply for PTO. It's called paid
4  time off. But you don't have to give a reason.
5    Q. And so you're -- you're getting paid by your
6  employer --
7    A. That's correct.
8    Q. -- for today?
9       Let me finish the question, please.
10      You're getting paid by your employer for
11 today?
12    A. That's correct.
13    Q. And you're represented by a lawyer here today?
14    A. That's correct.
15    Q. And how long -- do you know what law firm he's
16 with?
17    A. Rosen Law Firm.
18    Q. How long has The Rosen Law Firm represented
19 you?
20    A. Since 2020.
21    Q. Has The Rosen Law Firm represented you in any
22 other matters?
23    A. No.
24    Q. Do you have a retainer agreement with The Rosen
25 Law Firm?

8 (Pages 26 - 29)

Page 30

1      A.  Yes.
2      Q.  Do you recall when you entered into that
3  agreement?
4      A.  Around that time.
5      Q.  Did you have any prior relationship with The
6  Rosen Law Firm before this case?
7      A.  No.
8      Q.  Did you reach out to them, or did they reach
9  out to you?
10      A.  I reached out to them.
11      Q.  How did you find them?
12      A.  I believe -- it was a long time ago.  I went on
13  to some Google search, and there was some -- some kind
14  of form I filled in.
15      Q.  What were you searching for?
16      A.  I was -- I think, if I remember correctly, I
17  was searching for Biogen and found out that, you know, I
18  can reach to some attorneys and -- who can represent me.
19      Q.  Do you recall why you were searching for
20  Biogen?
21      A.  To see what happened, you know, because I had a
22  loss.
23      Q.  Okay.  And we're going to go through your
24  trades in Biogen.  The loss you're referring to, is that
25  in November of 2020?

Page 31

1      A.  November of 2020.
2      Q.  And do you recall approximately how long after
3  that you searched for a lawyer?
4      A.  No, I don't remember that exactly.
5      Q.  Do you think it was close in time?  A long time
6  after?  Any idea?
7      A.  I would say November -- probably sometimes in
8  December.  That's my -- my guess.
9          MR. HAKLAY:  Please don't guess.  He
10  doesn't want you to guess.
11          THE WITNESS:  Okay.
12          MR. HAKLAY:  If you know, you know.  If you
13  don't know, tell him that.
14          THE WITNESS:  Okay.
15          MR. HAKLAY:  But don't guess.
16          THE WITNESS:  Okay.
17  BY MR. TARLOWE:
18      Q.  Are you represented by other -- any other
19  lawyers in this case?
20      A.  No.
21      Q.  Are you familiar with a law firm called
22  MoloLamken?
23      A.  Yes.
24      Q.  How are you familiar with that firm?
25      A.  They are part of this transaction.

Page 32

1      Q.  Okay.  What's their -- what do you mean a "part
2  of this transaction"?
3      A.  They are representing -- they are participating
4  in this -- in this case.
5      Q.  What's their role, if you know?
6      A.  I don't know.
7      Q.  Do they represent you?
8      A.  I'm not sure.
9      Q.  Do you have any sort of retainer agreement with
10  MoloLamken?
11      A.  I'm not aware of.
12      Q.  Do you recall whether they were involved from
13  the outset or whether they became involved later?
14      A.  I don't know.
15      Q.  Do you have any idea why they became involved?
16      A.  No.
17      Q.  Okay.  And do you know how your lawyers at the
18  Rosen firm get paid for their work on this case?
19      A.  It's a contingency.
20      Q.  Which means what?
21      A.  If we win, then they get paid.
22      Q.  Is that arrangement reflected in the retainer
23  agreement that you have with the Rosen firm?
24      A.  That's correct.
25      Q.  Have you paid them any money?

Page 33

1      A.  No.
2      Q.  Are you being compensated in any way for your
3  time today?
4      A.  No.
5      Q.  What about have you incurred any expenses in
6  connection with the lawsuit?
7      A.  Just a Uber ride.
8      Q.  Do you expect to be reimbursed for that?
9      A.  Yes.
10      Q.  By whom?
11      A.  By Rosen Law Firm.
12      Q.  And you understand that this case may go to
13  trial at some point?  Do you understand that?
14      A.  I understand.
15      Q.  And do you know where that trial would be held?
16      A.  Massachusetts.
17      Q.  Would you be willing to attend that trial?
18      A.  If I'm advised by my attorneys.
19      Q.  Okay.  And you understand that trial could
20  take several weeks?
21      A.  Yes.
22      Q.  And you'd be able to be in court in
23  Massachusetts for several weeks?
24      A.  I'm not sure at this point.
25      Q.  What -- what might make it difficult for you to

9 (Pages 30 - 33)

Page 34

1  do that?
2      A.  My current job.
3      Q.  And if you travel to Massachusetts to attend
4  the trial, do you have any understanding as to who would
5  cover the expenses of that trip?
6      A.  My law firm.
7      Q.  And your law firm is incurring expenses as this
8  case progresses, right?
9          MR. HAKLAY:  Objection.
10          You can answer.
11          THE WITNESS:  That's correct.
12  BY MR. TARLOWE:
13      Q.  And do you know who's paying those expenses?
14      A.  I don't.
15      Q.  Do you know whether there's some third party
16  that's paying The Rosen Law Firm expenses?
17      A.  I don't know.
18      Q.  What do you believe that you stand to recover
19  from this lawsuit?
20      A.  The loss I incurred when I sold my stock at a
21  lower price.
22      Q.  Approximately how much did you lose, if you
23  remember?
24      A.  $12,000.
25      Q.  And do you have an understanding as to what is

Page 35

1  the maximum amount that you could potentially recover in
2  this case?
3      A.  I'm not aware of that.
4      Q.  Do you have an understanding as to whether you
5  can recover more than $12,000?
6      A.  I would let my lawyers decide it.
7      Q.  Well, what's your under- -- do you have an
8  understanding today --
9      A.  No.
10      Q.  Okay.  And do you understand that you are --
11  what's your understanding of your role in the lawsuit?
12      A.  I am a -- a class representative.
13      Q.  What does that mean?
14      A.  I'm a plaintiff.
15      Q.  Okay.  Is every plaintiff a class
16  representative, or is there a difference between class
17  representative and plaintiff, if you know?
18      A.  I'm a named plaintiff.
19      Q.  What does that mean?
20      A.  That means I would become a part of the class
21  action.
22      Q.  Does that entitle you to any extra
23  compensation?
24      A.  I'm not sure.
25      Q.  Do you know whether being a class

Page 36

1  representative carries any special obligations or
2  duties?
3      A.  Yes.  Basically, to -- to manage the case, to
4  get it in touch with the attorneys.
5      Q.  Do you know whether there are any other named
6  plaintiffs in this litigation?
7      A.  Yes.
8      Q.  Who are -- who are they?
9      A.  Nadia Shash.
10      Q.  Any others that you're aware of?
11      A.  Albert Atoof [phonetic].
12      Q.  How do you spell that, if you know?
13      A.  A-L-B-E-R-T.  I'm not sure about the last name.
14      Q.  Any others?
15      A.  There are probably thousands of other
16  plaintiffs.
17      Q.  Okay.  Do you know if there are any other named
18  plaintiffs?
19      A.  I don't.
20      Q.  Do you know whether there's a lead plaintiff?
21      A.  Yes.
22      Q.  One or more than one?
23      A.  One.
24      Q.  Who's that?
25      A.  Nadia Shash.

Page 37

1      Q.  And do you know how long Ms. Shash has been
2  involved in this case?
3      A.  I don't remember.
4      Q.  Have you spoken with her?
5      A.  No.
6      Q.  And the other person you named, Albert -- I
7  think you're not positive of the last name, or at least
8  the spelling of it -- do you know how long he's been
9  involved in this case?
10      A.  I don't remember.
11      Q.  Do you know anything about the circumstances
12  under which he became a named plaintiff?
13      A.  No.
14      Q.  Do you know whether he was a named plaintiff
15  from the outset or was added at some point subsequent?
16      A.  He was added subsequent.
17      Q.  Do you know why?
18      A.  No.
19      Q.  Have you ever spoken with him?
20      A.  No.
21      Q.  Have you ever heard of a company called PolyCon
22  Solutions?
23      A.  No.
24      Q.  Do you know what that is?
25      A.  No.

10 (Pages 34 - 37)

Page 38

1    Q. Okay. As far as you know, is PolyCon Solutions
2  a party to this litigation?
3    A. I'm not aware of that.
4    Q. You haven't spoken with anyone from PolyCon
5  Solutions, as far as you're aware?
6    A. I have not.
7    Q. Has there ever been a circumstance where
8  there's a difference of opinion between you and
9  Ms. Shash about something having to do with the
10  litigation?
11    A. Not that I'm aware of.
12    Q. What -- what, if any, understanding do you have
13  about your obligation to preserve documents that may be
14  relevant to this case?
15    A. I am not sure what your question is.
16    Q. Sure.
17       Do you have an understanding -- well, do
18  you believe that you -- let me take a step back.
19       Did you, at any time, have any documents
20  concerning your trading in Biogen stock in November of
21  2020?
22    A. If you don't mind, repeat it one more time,
23  please.
24    Q. Sure.
25       Did you have in your possession, documents

Page 39

1  relating to your purchase or sale of Biogen stock in
2  November 2020?
3    A. That's correct. I do.
4    Q. What types of documents?
5    A. These are trade confirmations and my monthly
6  statement.
7    Q. Are there any other documents, whether or not
8  you have them today, that you believe you had in
9  November 2020 relating to the purchase or sale of Biogen
10  stock?
11    A. Not besides these two documents.
12    Q. Okay. Did you email with anybody about Biogen?
13       MR. HAKLAY: Objection.
14       I instruct you not to answer with respect
15  to any communication with counsel. Other than that...
16  BY MR. TARLOWE:
17    Q. Excluding communications with counsel, did you
18  email with anybody about Biogen?
19    A. No.
20    Q. Excluding counsel, did you text with anybody
21  about Biogen?
22    A. No.
23    Q. Did you any newspaper articles about
24  Biogen?
25    A. No.

Page 40

1    Q. Did you print out anything from the internet
2  about Biogen?
3    A. No.
4    Q. And the trade confirmations and account
5  statements that you mentioned, did you save those or --
6  well, did you save those?
7    A. I --
8       MR. HAKLAY: Objection, vague as to "save."
9       You can answer if you understand. Go
10  ahead.
11       THE WITNESS: I did not save those.
12  BY MR. TARLOWE:
13    Q. Did you recently obtain those?
14    A. Yes.
15    Q. In November 2020, in that time frame, did you
16  receive statements from █████████
17    A. They sent statements to me automatically.
18    Q. Hard copy, electronic, or both?
19    A. Electronic.
20    Q. Did you receive those by email?
21    A. No, not -- I -- I don't remember that.
22    Q. I thought you said that they sent them to you
23  automatically?
24    A. If I remember correctly, if I look back then --
25  I'm not sure. I don't remember if I was set up on

Page 41

1  electronic. I remember one time I received a mail, and
2  then I think I changed it to -- I -- I don't remember.
3  I will say I don't remember.
4    Q. Okay. And did you have any understanding or do
5  you have any understanding as to whether you're required
6  to preserve any documents you have relating to Biogen?
7    A. Not to my understanding.
8    Q. So as to your understanding, there's no
9  obligation to preserve documents relating to Biogen?
10    A. Not that I'm -- I'm aware of.
11    Q. Okay. Can you think of any documents relating
12  to Biogen that were in your possession at some point in
13  the past but that no longer are in your possession?
14    A. I'm not aware of that.
15    Q. Do you keep any sort of spreadsheet or other
16  document tracking your trading activity?
17    A. No.
18    Q. How do you track or monitor your trading
19  activity?
20    A. I go online and check, time to time.
21    Q. We may have covered this earlier, but I just
22  want to make sure. In 2020, you were working at Vistra
23  Energy?
24    A. That's correct.
25    Q. Was that a full-time position in 2020?

11 (Pages 38 - 41)

1    A. That's correct.
2    Q. In 2020 -- and it may matter, the time period.
3         So November 2020, were you physically at
4    the Vistra office, or were you working remotely?
5    A. November, I was working -- I don't recall.
6    Q. Is the job today remote, or are -- do you work
7    in person?
8    A. It's both.
9    Q. What's the -- is there a split?
10   A. Yes.
11   Q. What is the split?
12   A. Three times at office; two times from home.
13   Q. And do you remember, in November of 2020,
14   whether you were working from home or in the office or
15   both?
16   A. I don't remember that.
17   Q. Do you buy and sell stocks while you're at
18   Vistra?
19   A. No.
20   Q. You do that from home?
21   A. Yes.
22   Q. Only from home?
23   A. Yes.
24   Q. Are you aware that the defendants in this case
25   served document requests for certain documents?

1    A. Say that again, please.
2    Q. Sure.
3         Are you aware that the defendants in this
4    case served document requests seeking certain documents
5    from you and others?
6    A. I'm not aware of that.
7    Q. Have you done anything to search whether you
8    have in your possession documents relating to Biogen?
9    A. Yes.
10   Q. What did you do to search?
11   A. I went to my email address at the time, search
12   it from there.
13   Q. Which email address?
14   A. Hotmail.
15   Q. What is the address?
16   A. ████████████████
17   Q. Do you still use that email address?
18   A. Hardly.
19   Q. But you were still using it in 2020?
20   A. That's correct.
21   Q. How did you search that?
22   A. Search what?
23   Q. I think you said -- I asked you what you did to
24   search. You said you went to your email address at the
25   time, search it from there.

1         What did you mean by that?
2    A. I searched for Biogen in my email about my
3    transactions on -- with my -- with my attorneys.
4    Q. So I want you to walk us through sort of
5    precisely what you did to check your Hotmail email.
6    A. I went in to do the search, and I typed in
7    "Biogen," and that pull me all the emails.
8    Q. Okay. And did that pull emails other than with
9    your lawyers?
10   A. No.
11   Q. And to run the search, you used the name
12   "Biogen"?
13   A. That's correct.
14   Q. Did you run any other words or terms?
15   A. Yes.
16   Q. What else?
17   A. "BIIB."
18   Q. And did that generate any hits, if you recall?
19   A. No.
20   Q. In 2020, were you using any other email
21   addresses?
22   A. Yes.
23   Q. What other email addresses?
24   A. ████████████████ and then I had another one for
25   my real estate.

1    Q. What was that?
2    A. ████████████████
3    Q. Did you search either of those email addresses
4    for any communications relating to Biogen?
5    A. No.
6    Q. Why not?
7    A. There was no need to.
8    Q. Why?
9    A. I was not advised by my attorneys to do that.
10   Q. Do you know, sitting here today, whether there
11   are or are not communications about Biogen in either of
12   those email accounts?
13   A. There is one.
14   Q. There is?
15   A. There is.
16   Q. Is that with your lawyer or with somebody else?
17   A. With my lawyer.
18   Q. Which email address is that?
19   A. ████████████████
20   Q. Did you do anything to search your computer?
21   A. What do you mean by that?
22   Q. Sure.
23        Other than searching the Hotmail, did you
24   look anywhere else for documents relating to Biogen?
25   A. No.

Page 46

```
1       Q.  Okay.  Do you have a computer?
2       A.  I have a laptop.
3       Q.  Is that a work laptop, personal, or both?
4       A.  Personal.
5       Q.  Did you do anything to search that laptop for
6   anything about Biogen?
7       A.  No.
8       Q.  Do you have any hard copy files in your house
9   relating to your investments?
10      A.  No.
11      Q.  Do you generally keep records relating to your
12  stock investments?
13          MR. HAKLAY:  Objection to the -- vague as
14  to "records."
15          You can answer.
16          THE WITNESS:  It's saved in my ████████
17  accounts, but I don't specifically save them anywhere
18  else.
19          MR. TARLOWE:  Okay.  So let me show you --
20  let's -- I'm going to mark this as Exhibit 1.
21          (Exhibit 1 was marked for identification.)
22          MR. HAKLAY:  Has it been marked?
23          MR. TARLOWE:  Not yet.
24          (Off-record exhibit discussion.)
25  BY MR. TARLOWE:
```

Page 47

```
1       Q.  Do you recognize that document?
2       A.  I do.
3       Q.  What is that?
4       A.  ███████████████████.
5       Q.  ████████████████████████
6       A.  That's correct.
7       Q.  ████████████████████████?
8       A.  ████████████
9       Q.  And where did you attain this document from?
10      A.  From ███████
11      Q.  Okay.  When did you obtain this from ██████
12      A.  Approximately -- I don't remember exactly.
13      Q.  Approximately?
14      A.  A month ago.
15      Q.  So this is not -- let me ask it this way:  This
16  is not something you had in your house?
17      A.  I had it in my computer.
18      Q.  Okay.
19      A.  On the ██████ website.
20      Q.  Okay.  So let -- I just want to be clear.  Was
21  it saved on your computer -- prior to a month or so ago,
22  was it saved on your computer?  Or you went onto the
23  computer and accessed it from ████████?
24      A.  I accessed it from ████████
25      Q.  Okay.  So you -- it wasn't -- it wasn't already
```

Page 48

```
1   in your possession before you -- you went on to the
2   ████████ website?
3       A.  That's correct.
4       Q.  Now, if you see the bottom of half of the page,
5   there's a big black box covering the text.
6       A.  Yes.
7       Q.  Do you know what's under that black box?
8       A.  No, I can't see it.
9       Q.  But you -- you saw this document approximately
10  a month ago, correct?
11      A.  I believe.
12      Q.  You provided this document to your lawyers,
13  right?
14      A.  That's correct.
15      Q.  Do you have any recollection of what's under
16  that black box?
17      A.  I don't recall.
18      Q.  Okay.  Do you know why it's blacked out?
19      A.  Because it's confidential information about me.
20      Q.  What's your basis for believing that?
21      A.  To protect my privacy.
22      Q.  But if you don't remember what's under there,
23  how are you able to say that it's confidential
24  information?
25      A.  So in that case I will say, no, I don't know.
```

Page 49

```
1       Q.  You don't know why it's blacked out?
2       A.  That's right.
3           MR. TARLOWE:  Let me show you --
4           MR. HAKLAY:  Can you put that aside?
5           MR. TARLOWE:  Yeah.  We'll -- we'll come
6   back to that later.  He can put it aside now.
7           I'm going to mark this as Exhibit 2.
8           (Exhibit 2 was marked for identification.)
9   BY MR. TARLOWE:
10      Q.  Do you recognize that document, Mr. Khan?
11      A.  Yes.
12      Q.  What is that?
13      A.  ███████████████████.
14      Q.  From -- do you know who from -- is it from
15  ████████?
16      A.  It looks like it.
17      Q.  ███████████████████████████
18  ████████████████████████████████
19  ████████████████████████████████
20  ████████████████████
21          Do you see that?
22      A.  That's correct.
23      Q.  ████████████████████
24      A.  ████████████████
25      Q.  Do you -- are you aware that this document has
```

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

Page 50

1  been produced to the defendants in this case?
2      A. I'm not aware of that.
3      Q. Okay. Did you obtain this document from
4  ████?
5      A. I did.
6      Q. Do you recall when?
7      A. I don't recall.
8      Q. Do you recall whether it was in the last week?
9      A. Yes.
10     Q. It was?
11     A. (Witness nods head affirmatively.)
12     Q. Okay. Do you recall when --
13         MR. HAKLAY: I'm sorry. You have to answer
14  out loud.
15         THE WITNESS: Yes.
16  BY MR. TARLOWE:
17     Q. Yes, it was within the last week?
18     A. That's correct.
19     Q. Do you know why -- well, why did you do that?
20     A. I was asked by my attorneys.
21     Q. Had you -- when you -- when you obtained the
22  ████████████ we looked at a moment ago that's
23  marked Exhibit 1, at that time, did you obtain the
24  document we're looking at now that's marked Exhibit 2?
25     A. No.

Page 51

1      Q. Why not?
2          MR. HAKLAY: Objection.
3          You can answer.
4          THE WITNESS: I was not aware of it, that I
5  need to produce it.
6  BY MR. TARLOWE:
7      Q. You were not aware that it existed, or you were
8  not aware that you needed to obtain it?
9      A. I was not aware that I needed to send it to
10  them.
11     Q. ████████████████████████
12  ████████████████
13     A. ████████████████
14     Q. Sure. Let me be more precise.
15         ████████████████████
16     A. ████████
17     Q. ████████████████████
18  ████?
19     A. No.
20     Q. ████████████████████
21  ██████████
22     A. ████.
23     Q. ██████
24     A ████
25     Q. Let me finish.

Page 52

1          MR. HAKLAY: Let him finish.
2  BY MR. TARLOWE:
3      Q. ████████████████████████████
4  ████████████████
5      A. No. Sorry.
6          MR. TARLOWE: It's okay. I'm going to move
7  on to another topic. Would you like to take a short
8  break?
9          MR. HAKLAY: Yes, let's do that.
10         MR. TARLOWE: Okay.
11         THE VIDEOGRAPHER: We're off the record at
12  10:01 a.m.
13         (Brief recess taken.)
14         THE VIDEOGRAPHER: We're back on the record
15  at 10:12 a.m.
16  BY MR. TARLOWE:
17     Q. Mr. Khan, I want to ask you some questions
18  about your approach to investing in stocks. Okay?
19     A. Okay.
20     Q. When did you begin buying or selling stocks?
21     A. 2016.
22     Q. Have you invested in other types of securities,
23  besides stocks?
24     A. No.
25     Q. Have you ever traded options?

Page 53

1      A. No.
2      Q. Have you ever purchased stock on margin?
3      A. No.
4      Q. Have you ever shorted any stocks?
5      A. I don't understand that.
6      Q. Do you know what it means to "sell short" a
7  stock?
8      A. I don't.
9      Q. Do you consider yourself a sophisticated
10  trader?
11         MR. HAKLAY: Objection, vague.
12         You can answer, sir.
13         THE WITNESS: Not really.
14  BY MR. TARLOWE:
15     Q. Do you consider yourself an active trader?
16         MR. HAKLAY: Objection, vague as to
17  "active."
18         You can answer.
19         THE WITNESS: Kind of.
20  BY MR. TARLOWE:
21     Q. Why do you say that?
22     A. I look at the stocks maybe a couple of times a
23  week and see what -- what is available and what is good.
24     Q. How do you do that?
25     A. I look at the trends chart.

Page 54

1    Q. What trends do you look at?
2    A. I see whether the stock is -- I go back, look
3  into the history of the stock two, three months, six
4  months back and see how it's -- how the chart is moving.
5    Q. And how do you -- where do you get that
6  information from?
7    A. Most of the time, I go to Yahoo Finance.
8    Q. Do you look for particular stocks? Or do you
9  have a way of identifying stocks that may be of interest
10  to you?
11    A. I have recently started going into -- it's
12  called Earning Calendar [sic].
13    Q. Earnings Calendar?
14    A. Earning Calendar.
15    Q. Okay. What is that?
16    A. That tells us the list of stocks they have an
17  earning coming today or tomorrow or next week.
18    Q. What's the significance of that to you?
19    A. That gives us an idea that -- which stock
20  has -- is likely to do better. That doesn't mean that
21  what it transpires will be true.
22    Q. The Earnings Calendar, is that a website? What
23  is that?
24    A. You just Google it.
25    Q. Earnings Calendar?

Page 55

1    A. Earnings Calendar, and you get a couple of
2  different links that you can check, a few of those.
3    Q. What does it tell you? What type of
4  information does it give you?
5    A. It tells us that these are the stocks that has
6  an earning today. You have an option to choose today,
7  tomorrow, yesterday, a week from today.
8    Q. And why are you interested in identifying
9  companies that have earnings coming up?
10    A. So that I can have some basic idea which stock
11  is better to look at or better to involve in or trade
12  in.
13    Q. How do you make that assessment?
14    A. Honestly, most of the time it's guesswork.
15    Q. But what are you looking for?
16    A. Again, I go back and look in the trends, the
17  chart. I don't recall -- there's a technical name for
18  those, like, little things that tells you, This is
19  where -- at this time, it hit the maximum; this time, it
20  hits the lower.
21        So I will say I will call myself a
22  guesswork investor.
23    Q. What sort of -- what are some of the
24  characteristics you're looking for in a stock?
25    A. Characteristics? What do you mean by that?

Page 56

1    Q. Well, I want to try to understand your approach
2  to investing. So you described, as I understand it,
3  going to this Earnings Calendar. That will show you
4  companies that have earnings announcements coming up in
5  the near future; is that right?
6    A. That's correct.
7    Q. And then when you see that list, what's the
8  next step in your process?
9    A. I go in the -- sometimes I go and try to read
10  their financial statement. That's not very -- very
11  often, though. Sometimes I do and -- not that I'm very
12  well-conversed [sic] with those or very well -- very
13  well understand those, but just get a basic idea.
14        As I said before, I think most of -- if I
15  consider myself, most of my stocks purchasing and
16  selling is my guesswork.
17    Q. Okay. So if you look at the Earnings Calendar,
18  I imagine that it lists multiple companies that have
19  earnings coming up?
20    A. That's correct.
21    Q. And then how do you decide which of those
22  you're going to do more research into?
23    A. Random.
24    Q. And what is the significance of there being
25  upcoming earnings? Why is that of any relevance to you?

Page 57

1    A. Because if -- if the -- if the earning is going
2  to be good, there is a -- there is a character in the
3  earning report. It's called "EPS," earning per share.
4  In one line item, it tells us that this is what it's
5  expected, and this is what the actual is. That, I look
6  at more care- -- closely. So that leads me to decide if
7  that is a good stock to buy or trade in.
8    Q. So you're looking at -- you're looking at the
9  actual EPS?
10    A. It says -- it shows actual EPS.
11    Q. But the actual EPS, not for the upcoming
12  Earnings Calendar?
13    A. That's correct.
14    Q. For a prior?
15    A. For the prior, yes.
16    Q. Okay. And what are you comparing that to?
17    A. What I do is I -- I -- for example, if I go
18  into Earnings Calendar, I look at the calendar and look
19  at the stock. I take that stock and going to Yahoo
20  Finance. And if you go into Yahoo Finance, you -- you
21  put the name there or put the symbol there, it gives you
22  the details of that stock. And there you can click on
23  chart.
24        I usually -- most of the time, I will say I
25  look in the charts. I look -- go back three months

15 (Pages 54 - 57)

Page 58

1  before and see how it's trending, you know, if it's --
2  if it has been going down, if it has been going up.  So
3  based on that, I make my decision.  But that decision is
4  not always based on the same thing.  It's a mixture of
5  combinations, mixture of charts, mixture of guesswork.
6      Q.  What -- what charts do you look at?
7      A.  It's a -- it's a -- it's a trading chart.  I'm
8  not sure if it's actually called "trading chart."  I'm
9  calling it a trading chart because that tells you how
10  the trading is going, up and down.  It has different --
11  different formats.  You have a -- like a, I think, hill,
12  or you have, like, a -- a -- I don't recall everything
13  else, but that's basically it.  It has lines that goes
14  up and down.  It has red line; it has green line.
15      Q.  What do those lines represent?
16      A.  If it's in red, that means that it's going in a
17  loss; if it's in green, it means it's going into profit,
18  as to my understanding.
19      Q.  Okay.
20      A.  I may not be absolutely correct.
21      Q.  When you look at the charts, is there a certain
22  pattern that you're looking for that makes the stock
23  more attractive, in your view?
24      A.  Yes.
25      Q.  What is that?

Page 59

1      A.  That pattern is if the stock keeps going up.
2  If I go back and -- let's say if I look at three months
3  stock, if the stock I see the trend is it keeps -- you
4  know, it keeps going up, so that attracts me.
5      Q.  If it's going up?
6      A.  Yes.
7      Q.  Would you say that you have a system of
8  trading?
9      A.  No.
10      Q.  Are you familiar with the term "day trader"?
11      A.  I've heard about it.
12      Q.  Okay.  Do you know what that is?
13      A.  Not really.
14      Q.  Okay.  Do you consider yourself a day trader?
15          MR. HAKLAY:  Objection.
16          THE WITNESS:  Since I don't know what a day
17  trader is, so I can't say what I consider myself about
18  it.
19  BY MR. TARLOWE:
20      Q.  Okay.  When you buy stocks, are you -- do you
21  have a long-term outlook or short-term?
22      A.  I've never paid attention to that.
23      Q.  Well, how -- how long do you typically hold
24  stocks?
25      A.  It depends upon the stock.

Page 60

1      Q.  Okay.  What's the longest you've held a stock?
2      A.  My -- I will say three -- three months.
3      Q.  Okay.  What stock was that?
4      A.  That's my company's stock.
5      Q.  The company where you work?
6      A.  Yes.
7      Q.  Okay.  Do you typically sell shortly after you
8  buy?
9          MR. HAKLAY:  Objection, vague as to the
10  word "shortly."
11          You can answer.
12          THE WITNESS:  I would request to rephrase
13  your question, please.
14  BY MR. TARLOWE:
15      Q.  Sure.
16          Do you have a sense of, sort of, on average
17  how long you hold stocks after you buy them?
18      A.  It depends.
19      Q.  Do you have a sense of an average?
20      A.  Sometimes five days, sometimes one month.
21      Q.  And you have no sense of what the average is?
22          MR. HAKLAY:  Objection, asked and answered.
23          You can answer.
24          THE WITNESS:  No, I don't.
25  BY MR. TARLOWE:

Page 61

1      Q.  Do you follow the stock market?
2          MR. HAKLAY:  Objection, vague as to
3  "follow."
4          You can answer.
5          THE WITNESS:  No.
6  BY MR. TARLOWE:
7      Q.  Are you a member of any online platforms, chat
8  rooms, blogs, discussing the stock market?
9      A.  No.
10      Q.  Have you ever posted anything online about the
11  stock market?
12      A.  No.
13      Q.  Do you try to diversify your holdings?
14      A.  In what way?
15      Q.  Well, when you're thinking about buying or
16  selling stocks, do you consider diversification?
17      A.  I don't.
18      Q.  Do you use an investment advisor?
19      A.  No.
20      Q.  Have you ever?
21      A.  No.
22      Q.  And I want to go back to the 2020 time period,
23  focusing on November.
24      A.  Uh-huh.
25      Q.  Was your approach to investing in November of

16 (Pages 58 - 61)

Page 62

1  2020 the same as the approach you described today, or
2  was it different?
3       A.  About the same.
4       Q.  In 2020, did you make investment decisions for
5  anyone other than yourself?
6       A.  No.
7       Q.  In November of 2020, what investment accounts
8  did you have?
9       A.  Pertaining to what?
10      Q.  What accounts did you hold that could be used
11  to buy or sell stocks?
12      A.  I definitely had I- -- rollover IRA.
13      Q.  At ▮▮▮▮▮▮?
14      A.  Yes.
15          I had my -- the other one, HSA.
16      Also at ▮▮▮▮▮?
17      A.  Also at ▮▮▮▮▮.
18          And I also had a -- I don't recall.  But I
19  think around that time, I opened another one.  It's
20  called joint tenants with the rights of survivorship.
21          THE COURT REPORTER:  Can you repeat that.
22          THE WITNESS:  Joint tenants with the rights
23  of survivorship.
24  BY MR. TARLOWE:
25      Q.  Where was that account?

Page 63

1       A.  ▮▮▮▮▮.
2       Q.  Did you have accounts anywhere other than
3  ▮▮▮▮▮ that could be used to buy or sell securities?
4       A.  My 401(k).
5       Q.  Where is that?
6       A.  That's with my employer.  That's under -- still
7  under ▮▮▮▮▮
8       Q.  Any other accounts?
9       A.  No.
10      Q.  The 401(k), where is that money invested, if
11  you know?
12      A.  I don't remember.
13      Q.  Is it in -- do you know whether it's in
14  individual stocks or some sort of fund?
15      A.  It's mutual funds.
16      Q.  And focusing on the ▮▮▮▮ rollover IRA
17  account, in the 2020 time period, if you decided to buy
18  a stock in that account, how did you execute that
19  decision?
20      A.  Pretty much -- not pretty much -- but kind of
21  the same way I do today.  I would -- besides, I did not
22  look into Earning Calendar at that time.  I just went
23  online and look at the chart and bought it.
24      Q.  Okay.  So let me ask you a -- a more precise
25  question.  Once you made a decision that you were going

Page 64

1  to buy a stock, how did you actually go about placing
2  that trade?
3       A.  I will go to my ▮▮▮▮ account, and I'll
4  trade -- there is an option to trade from there.
5       Q.  Okay.  So you did it online?
6       A.  I did it online.
7       Q.  And what type of -- well, let's look at --
8  let's look at what's marked Exhibit 2. ▮▮▮▮
9  ▮▮▮.  And why don't you turn to page 6 of 14.
10          Okay.  You see that?
11      A.  Yes.
12      Q.  Okay. ▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮
14          Do you see that?
15      A.  Yes.
16      Q.  Okay.  And then it says, ▮▮▮▮
17  ▮▮▮▮▮▮▮
18          Do you see that?
19      A.  Yes.
20      Q ▮▮▮▮▮▮▮▮▮▮▮
21      A. ▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮
23      Q.  And how does ▮▮▮▮▮▮▮▮▮
24  ▮▮▮, if you know?
25      A.  I don't know.

Page 65

1       Q.  Okay. ▮▮▮▮▮▮▮▮▮▮▮
2          You see that?
3       A.  That's correct.
4       Q. ▮▮▮▮▮▮▮▮
5          You see that?
6       A.  I do see.
7       Q.  Okay.  Do you recall why ▮▮▮▮▮
8  ▮▮▮▮▮▮
9       A.  I don't remember why I purchased that amount.
10      Q.  Do you remember why you purchased Biogen?
11      A.  Again, I looked -- must have looked at the
12  trends.
13      Q.  Okay.  So -- so sitting here today, do you
14  actually have a recollection of why you purchased Biogen
15  in November 2020?
16      A.  No.
17      Q.  Okay.  You have -- based on your practice at
18  the time, you have an idea of why you bought Biogen in
19  November 2020?
20      A.  As of today?
21      Q.  Yeah.
22      A.  I had -- you mean to say if I have an idea why
23  I bought them?
24      Q.  Yeah.
25      A.  I don't recall.

17 (Pages 62 - 65)

Page 66

1    Q.  Okay.  What was your practice at the time?
2  What -- in November 2020, what would lead you or what
3  led you to purchase a particular stock?
4    A.  I will say the same thing as of today.
5    Q.  So --
6    A.  Looking at the -- at the chart.
7    Q.  So in November 2020 -- before November 2020,
8  were you aware -- did you know what Biogen was?
9    A.  No.
10    Q.  Had you ever bought or sold Biogen stock before
11  November 2020?
12    A.  Not that I recall.
13    Q.  How did you -- how did Biogen end up on your
14  radar?
15    A.  I don't remember exactly.  So to answer your
16  question, I don't remember what led me to bought this
17  stock.
18    Q.  What was your -- did you have a practice at the
19  time in terms of identifying stocks to purchase?
20    A.  Same as before, as I said, looking at the
21  charts.
22    Q.  Okay.  So walk us through what you did in the
23  November 2020 time frame when deciding whether to
24  purchase a stock.
25    A.  Any stock or Biogen?

Page 67

1    Q.  Well, it sounds like you don't remember Biogen
2  in particular.
3    A.  That's right.
4    Q.  Okay.  So I guess any stock.
5    A.  I mean, I remember Biogen.  I remember buying
6  it, but I don't remember exactly what I -- what trend I
7  had to -- that led me to buy -- buy the stock.
8    Q.  Okay.  But you recall it was some trend?
9    A.  I'm sure.
10    Q.  And what -- do you have any idea what type of
11  trend?
12    A.  I don't remember that.
13    Q.  What types of trends led you to purchase stocks
14  in the November 2020 time period?
15    A.  I don't recall.
16    Q.  You can't recall a -- a single trend that led
17  you to purchase a stock in the November 2020 time
18  period?
19    A.  Other than looking at the charts, no.
20    Q.  But if you look at the charts, what type of
21  trends did you see that led you to purchase a stock?
22    A.  I would say same thing, the -- if the trend is
23  the stock is going up or down.
24    Q.  What specifically did you look for?
25    A.  I don't recall.

Page 68

1    MR. HAKLAY:  With respect do Biogen or
2  generally?
3    MR. TARLOWE:  Generally.
4    MR. HAKLAY:  Did you understand the
5  question to be generally?
6    THE WITNESS:  A few times, I thought
7  about -- I will say I don't remember.
8  BY MR. TARLOWE:
9    Q.  Did it involve guesswork?
10    A.  It's -- it's fair to say that.
11    Q.  Did you have access to any information --
12  first, with respect to Biogen, did you have any access
13  to any information that was not, to your knowledge,
14  publicly available?
15    A.  No.
16    Q.  Did you have information as to any other stock
17  you've traded that, to your knowledge, was not publicly
18  available?
19    A.  I don't remember that.
20    Q.  You don't remember ever having information that
21  was nonpublic about a stock you traded?
22    A.  That's correct.
23    Q.  And with respect to Biogen, if you did not have
24  information that wasn't publicly available, why did you
25  think you could make money buying Biogen?

Page 69

1    A.  I must have looked at the chart.  Without
2  recalling, I may have read some material on Biogen, but
3  I don't recall that I did.
4    Q.  Okay.  You say you must have looked at the
5  chart.  In the 2020 time period, did you buy stocks
6  based solely on the chart?
7    Were there instances where you bought a
8  stock based solely on the chart?
9    A.  Yes.
10    Q.  What types of things might you see in a chart
11  that would lead you to buy a stock?
12    A.  Trending.
13    Q.  What kind of trending?
14    A.  Going up and down, if it's -- if it's -- if
15  it's on the decline, if it's on the rise.
16    Q.  What sort of pattern on a decline led you to --
17  would lead you to buy a stock?
18    A.  I must have thought that the stock is going up,
19  so it will go -- if I buy today, it will go more up.  At
20  times, there were some stocks that I may have bought
21  where it went -- I looked in the past history.  It was
22  up, but the thought came to me that, you know, it's down
23  now; it's a good time to buy.  Maybe tomorrow, it might
24  go up.  That -- one of the -- that could be one of the
25  leading factors of having me buy the stock at that time.

18 (Pages 66 - 69)

Page 70

1  Q.  So you were looking at how the stock price was
2  trending?
3  A.  Yes.
4  Q.  Would you say that was the most important
5  factor in your decision-making at that time?
6  A.  In general?
7  Q.  Yeah.
8  A.  I will say yes.
9  Q.  Any reason to think that wasn't the most
10  important factor in your decision to buy Biogen?
11  A.  No.
12  Q.  Do you recall, when you purchased Biogen,
13  whether you had any expectation as to how long you would
14  hold the stock?
15  A.  No.
16  Q.  In that time --
17       MR. HAKLAY:  I'm sorry.  You don't recall,
18  or you had no expectation?
19       THE WITNESS:  I'm sorry?
20       MR. TARLOWE:  I -- I --
21       MR. HAKLAY:  You asked him a yes-or-no
22  question about recalling.
23       MR. TARLOWE:  Okay.  That's fair.
24  BY MR. TARLOWE:
25  Q.  So when you purchased Biogen, did you have any

Page 71

1  expectation as to how long you would hold the stock?
2  A.  No expectation.
3  Q.  Did you think you were going to hold it short
4  term, long term, or no idea?
5  A.  I probably would have looked -- waited for the
6  stock to go up and hold it until then.
7  Q.  In the 2020 time period, generally -- not
8  specific to Biogen, because you don't recall Biogen, but
9  generally in 2020 time period, did you purchase stocks
10  based solely on the trends?
11  A.  I believe so.
12  Q.  And if you were purchasing based solely on a
13  trend, I gather you wouldn't do any additional research
14  into the company?
15  A.  Sometimes I do -- I will not call it a
16  research.  Maybe reading some article, maybe reading --
17  you know, when you go on to Yahoo Finance, when you
18  punch in the stock name or stock symbol so you get
19  different links down there, sometimes there are some
20  analyst reports, some analyst writings.  Sometimes you
21  get a link there where they -- it's a general -- they
22  generally talk about that one, that, you know, this
23  stock has a good -- may have a good future.  These are
24  the analyst report, things like that nature.
25  Q.  With respect to Biogen, did you do any research

Page 72

1  into Biogen before purchasing the stock in November of
2  2020?
3       MR. HAKLAY:  Objection, asked and answered.
4  You can answer.
5       THE WITNESS:  No.
6  BY MR. TARLOWE:
7  Q.  Do you recall when you first became aware of
8  the company Biogen?
9  A.  Probably in -- in 2020, around that time when I
10  bought it.
11  Q.  Do you know how you became aware of it?
12  A.  I don't remember that.
13  Q.  What is Biogen?
14  A.  Biogen is a company that makes medicines to
15  treat Alzheimer's.
16  Q.  And if you look back at ███████████████████
17  ████████████████████████████████████████████████
18  █████████████████████████████
19  A.  That's correct.
20  Q.  ████████████████████████████████████?
21  A.  ████████████████████████
22  Q.  ███████████████████████████████████████
23  ███████████████████████████████████
24  ██████████████████████████████
25  A.  ██████████████████████

Page 73

1  Q.  ████████
2  A.  ███████████████████████████████
3  Q.  ████████████████████████████████
4  ██████
5  A.  ██████████████████████████████.
6  Q.  Okay.  Do you understand the question?
7  A.  Okay.  May -- may have to repeat it.
8  Q.  Yeah, yeah.  Sure.
9  A.  Sorry.
10  Q.  So when you buy a stock, you need cash to buy
11  the stock, right?
12  A.  (Witness nods head affirmatively.)
13  Q.  Right?
14       MR. HAKLAY:  You have to answer out loud.
15       THE WITNESS:  That's right.
16  BY MR. TARLOWE:
17  Q.  Okay.  And you could either have a cash balance
18  that you use or you could sell a security to generate
19  cash to then use; you understand that?
20  A.  Yes, I understand it.  And I don't remember.
21  Q.  Okay.  Did you use -- did you speak to anybody
22  about Biogen before you purchased those Biogen shares?
23  A.  No.
24  Q.  Okay.  Other than -- well, withdrawn.
25       Did you rely on any news reports in

19 (Pages 70 - 73)

Page 74

1  purchasing Biogen stock in November 2020?
2      A. I don't remember that.
3      Q. You don't remember or you -- you didn't?
4      A. I don't remember if I did.
5      Q. Say that again.
6      A. I don't remember if I did rely on any news.
7      Q. Okay. Do you recall -- let me show you --
8  well, do you recall submitting amended responses and
9  objections to defendants' first set of interrogatories
10  in this case?
11      A. Yes.
12      Q. You do?
13      A. I do.
14      Q. Did you review that document?
15      A. Yes, I did.
16      Q. Okay. Did you sign that document?
17      A. I did.
18      Q. Okay. And you signed that those -- the
19  responses are true and correct to the best of your
20  knowledge, information, and belief, correct?
21      A. That's correct.
22      Q. Okay. And you -- one of your responses states,
23  "Plaintiff Khan responds that he did not rely on any
24  news in purchasing Biogen securities."
25      A. That's correct.

Page 75

1      Q. Okay. Is that statement true?
2      A. That's correct.
3      Q. Okay. So you did not rely on any news in
4  purchasing Biogen securities?
5      A. That's correct.
6      Q. Okay. After you purchased Biogen, did you take
7  any steps to monitor it?
8      A. I looked at it.
9      Q. What does that mean?
10      A. It means that -- to see where the stock is
11  going.
12      Q. How did you monitor it?
13      A. I just go -- go to Yahoo Finance or to my
14  ████████ account.
15      Q. Do you -- did you do that throughout the day?
16  With what frequency did you do that?
17      A. Maybe once a day or twice a day.
18      Q. Do you remember how long you held that Biogen
19  stock?
20      A. I do not remember.
21      Q. Do you remember whether it was a short time or
22  a long time?
23      A. It was a short time.
24      Q. Okay. So if we look back at Exhibit 1 --
25          MR. HAKLAY: Can we put 2 aside for now?

Page 76

1          MR. TARLOWE: Yeah.
2          MR. HAKLAY: Here you go.
3  BY MR. TARLOWE:
4      Q. If you look back at Exhibit 1, ████████
5  ██████████████████████████████████████
6  ████████████████████
7      A. Yes.
8      Q. ████████████████████████████
9      A. ████████████
10          MR. TARLOWE: Okay. Now I'm going to show
11  you...
12          MR. HAKLAY: Can I put this on the side?
13          MR. TARLOWE: Yeah.
14          I'm going to show you what's marked
15  Exhibit 3.
16          (Exhibit 3 was marked for identification.)
17  BY MR. TARLOWE:
18      Q. Do you recognize this ████████████████████
19  ██████████████████████████████
20      A. Yes, I do.
21      Q. Do you know what's under the black box?
22      A. No.
23      Q. ████████████████████████████████
24  ████████████████████████████████
25      A. Yes.

Page 77

1      Q. Does that refresh your recollection as to how
2  long you held Biogen stock?
3      A. I don't recall. ████████████████████████
4  ████████████████████████
5      Q. During that time period between the purchase
6  and the sale, how often did you check the Biogen stock
7  price?
8      A. Couple of times.
9      Q. What were you looking for?
10      A. To see where the stock was going.
11      Q. Did you have some reason to think that the
12  stock would go up?
13      A. Yes.
14      Q. What was that reason?
15      A. It's a -- again, it was on the trends that --
16  the one I was seeing.
17      Q. Have you read any articles or books or taken
18  any courses on analyzing trends in stocks?
19      A. No.
20      Q. Is this a sort of system you developed
21  yourself?
22      A. Yes.
23      Q. When you're looking at trends, do you have
24  certain quantitative thresholds; for example, if a stock
25  has gone up or down by a certain percentage?

20 (Pages 74 - 77)



Page 78

1    A.  No, I don't understand that part.
2    Q.  Okay.  And with respect to Biogen in November
3  2020, do you remember whether there was an upward or a
4  downward trend at the time you purchased?
5    A.  I don't recall.
6    Q.  When you see an upward or downward trend, do
7  you try to determine what's causing that?
8    A.  No.
9    Q.  And in November 2020, after you sold Biogen --
10  and you can look at Exhibit 2 if it helps you -- ▮▮▮▮
11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
12        Do you see that?
13        MR. HAKLAY:  Can you refer him to the page?
14        MR. TARLOWE:  Sure.
15  BY MR. TARLOWE:
16    Q.  On 6 of 14.
17    A.  Yes, I do see that.
18    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮
20    A.  If it's here, then yes.
21    Q.  But let me ask you -- I think we can all agree
22  it's on the page --
23    A.  Yes.
24    Q.  -- and I don't think anyone has any reason to
25  doubt the accuracy of what's on the page.

Page 79

1        But sitting here today, do you have any
2  memory of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    A.  Not a memory.  I -- I can't go back and --
4    Q.  Any idea why ▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6    A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮.
8    Q.  Okay.
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10    A.  Yes.
11    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12    A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13    Q.  And then if you turn to the next page, ▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  Do you see that?
16    A.  Yes.
17    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18
19    A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22  ▮▮▮
23    Q.  And so what we just looked at -- ▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 80

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4    A.  Yes.
5    Q.  And if we look at the first page of this --
6  sorry -- it's actually page -- I misspoke.  It's page 4
7  of 14.  And I'm going to direct your attention ▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10        Do you see that?
11    A.  Yes.
12    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14        Do you see those?
15    A.  Yes.
16    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
17  ▮▮▮▮▮▮▮▮▮
18    A.  Yes.
19    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
20        Do you see that?
21    A.  Yes.
22    Q.  What does that reflect?
23    A.  I don't know.
24    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 81

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
2    A.  Would you say that question again, please?
3    Q.  Sure.
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮
7    A.  I don't recall that.  But if this document says
8  that, yes.
9    Q.  Okay.  No reason to question that, the accuracy
10  of that?
11    A.  The accuracy of this document?
12    Q.  Yeah.
13    A.  I don't -- I don't have any reason to --
14    Q.  Okay.
15    A.  -- question that.
16    Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
18  ▮▮▮▮▮▮
19    A.  That's correct.
20    Q.  Okay.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22
23    A.  No, I don't think so.
24    Q.  What do you think was sort of the average size
25  of a stock purchase for you in the 2020 time period?

21 (Pages 78 - 81)

Page 82

1    A. What do you mean by average size of the stock
2  purchase?
3    Q. How -- how much money did you -- did you put
4  into a stock at a given time?
5    A. Around that -- you know, the -- that 40,000
6  or -- 40,000 or 30- -- 30,000, around that time, you
7  know, that figure.
8    Q. Okay. ████████████████████
9  ████████████████████████████
10   A. I don't know. I don't know how they reached
11  out this much, so I can't say yes or no.
12   Q. Okay.
13   A. I will say I don't know.
14   Q. Okay. Now, what is -- what is this case about?
15   A. This is a case about -- about -- okay. Let me
16  ask you -- elaborate your question, please.
17   Q. Well, do you know what this lawsuit is about?
18   A. This is a class action lawsuit against Biogen
19  where I, along with other classes, incurred a loss in
20  the -- in their -- in the stock. I bought a stock and
21  it went down, and this is the -- considered securities
22  fraud. And pertaining, in short, if I'd say, this is a
23  security fraud case.
24   Q. You understand when you purchase a stock that
25  there's a risk it may go down, correct?

Page 83

1    A. I do understand.
2    Q. Okay. And you understand when you purchase a
3  stock there's a risk that you're going to lose money?
4    A. I do understand.
5    Q. What does -- what do you allege that Biogen did
6  wrong in this case?
7    A. If I understand it correctly, Biogen, the
8  medicine that they made was -- I don't know how to
9  explain it, but the medicine that they made was supposed
10  to treat Alzheimer, and -- which it did not do as it was
11  expected. And that's what the -- the way they posed it,
12  it did not go that way, and that's why the -- the stock
13  went down.
14   Q. Well -- so your understanding is that the
15  medicine that Biogen made was supposed to treat
16  Alzheimer's?
17   A. That's my understanding.
18   Q. What's the name of that medicine; do you know?
19   A. I don't remember.
20   Q. And you said, "The way they posed it, it did
21  not go that way."
22      What did you mean by that?
23   A. They -- they -- they -- in simple words, they
24  provided some statements or some -- some transaction or
25  some state- -- financial statement according to which

Page 84

1  the Biogen will treat the Alzheimer patients. I might
2  be saying it wrong, but my understanding is that they --
3  they issued some statements according to which the -- it
4  would treat it. But it did not go the way it was -- it
5  was posed.
6    Q. You said "they" issued some statements. Who --
7  who are -- who are you referring to?
8    A. I'm talking about Biogen, their chief
9  executive, their -- their officers or directors of the
10  company, or chief medical officer, if I say it
11  correctly.
12   Q. You said, "they issued some statements." What
13  statements?
14   A. They presented a report, I believe.
15   Q. Presented...
16   A. A report.
17   Q. Report.
18      What kind of report?
19   A. Showed that it's going to treat Alzheimer's
20  patients.
21   Q. Was that an oral report? A written report?
22  Something else?
23   A. It must have been a written report.
24   Q. Was that report a publicly available report?
25   A. I believe so.

Page 85

1    Q. Did you read that report?
2    A. I did not read that report.
3    Q. Do you know who the defendants are in this
4  case?
5    A. If I recall, the defendants are -- I don't
6  recall their names. I believe one is the CEO. And the
7  chief medical officer --
8    Q. Okay. You don't remember --
9    A. I don't remember the name.
10   Q. Does the name Michel Vounatsos ring any bells?
11   A. It rings a bell.
12   Q. Who is that?
13   A. That, I believe, is one of the directors.
14   Q. Is he a defendant in this case?
15   A. I'm not sure.
16   Q. Do you allege that he did something wrong?
17   A. I can't say for sure.
18   Q. And the -- when you described the case, you
19  referred to statements that Biogen made, correct?
20   A. Uh-huh.
21   Q. That -- you did not rely on those statements
22  when you purchased Biogen stock, correct?
23   A. That's correct.
24   Q. Dr. Alfred Sandrock, are you familiar with that
25  individual?

22 (Pages 82 - 85)

Page 86

1    A. Yes.
2    Q. Who is that?
3    A. He is the CEO of the company Biogen.
4    Q. Do you know if -- if he is still at the company
5  still today?
6    A. I'm not sure.
7    Q. Is he a defendant in this case?
8    A. That's correct; he is.
9    Q. Do you allege that he did something wrong?
10    A. Yes.
11    Q. What did he do wrong?
12    A. He issued statements.
13    Q. When?
14    A. Sometimes in November, in 2020, I would say.
15    Q. Do you know that statements?
16    A. About the -- about the -- about medicine often
17  made by Biogen.
18    Q. What, specifically, did he say?
19    A. He said that it's going to -- it's going to
20  treat the Alzheimer's patients.
21    Q. Anything else?
22    A. I don't remember if there was.
23    Q. And you allege that that statement is false?
24    A. Yes.
25    Q. What's your basis for believing that that

Page 87

1  statement was false?
2    A. Because after he made the statement, it did not
3  come out to be true and the stock went down.
4    Q. Do you recall why the stock went down?
5    A. Because people started selling their stocks
6  when they found out it's not treating Alzheimer's as it
7  was supposed to -- or as it was portrayed as.
8    Q. Have you heard of something called an Advisory
9  Committee?
10    A. I've heard about it.
11    Q. What is it?
12    A. I'm not sure, exactly.
13    Q. What do you think it is?
14      MR. HAKLAY: Objection, asked and answered.
15      If you know, you can answer.
16      THE WITNESS: I can tell you, like,
17  generally that I can think of.
18  BY MR. TARLOWE:
19    Q. Well, do you recall -- do you know whether or
20  not there was a meeting of an Advisory Committee
21  relating to a Biogen drug in November of 2020?
22    A. I'm not aware of that.
23    Q. Do you allege that Dr. Sandrock committed
24  fraud?
25    A. Yes.

Page 88

1    Q. Do you have any personal basis to believe that
2  he committed fraud?
3      MR. HAKLAY: Objection as to "personal
4  basis."
5      You can answer.
6      THE WITNESS: I don't.
7  BY MR. TARLOWE:
8    Q. Okay. Do you have any knowledge as to whether
9  or not he committed fraud?
10    A. I don't have any personal knowledge.
11    Q. And other than what's alleged in the complaint,
12  do you have any other information to support the claim
13  that Dr. Sandrock engaged in fraud?
14    A. I don't.
15    Q. Do you know anything about Dr. Sandrock's
16  background?
17    A. No.
18    Q. Do you allege that -- let me take a step back.
19      You described certain statements that you
20  believe Dr. Sandrock made that you allege were not true;
21  is that correct?
22    A. That's correct.
23    Q. And do you have any personal knowledge as to
24  whether the statements he made were or were not true?
25    A. No personal knowledge.

Page 89

1    Q. Other than what's in the complaint, do you have
2  any information bearing on whether the statements he
3  made were true or not true?
4    A. Not other than the complaint.
5    Q. Does the complaint allege that Dr. Sandrock
6  knew, when he made those statements, that they were not
7  true?
8    A. I don't recall.
9    Q. Do you know that Dr. Sandrock graduated from
10  Stanford with a bachelor's degree in human biology?
11    A. I don't know that.
12      MR. HAKLAY: Objection, relevance.
13      He's already answered it, so...
14  BY MR. TARLOWE:
15    Q. Do you know -- do you know that Dr. Sandrock
16  obtained a medical degree from Harvard Medical School?
17    A. I don't know.
18    Q. Do you know that he has a Ph.D. in neurobiology
19  from Harvard?
20    A. I don't know.
21    Q. Do you know that he dedicated years of his life
22  to developing treatment for Alzheimer's patients?
23    A. I don't know.
24    Q. Do you know that he identified and developed
25  novel therapies for a variety of serious diseases?

23 (Pages 86 - 89)

Page 90

1    A. I don't know.
2    Q. Do you think any of that's relevant to
3  assessing whether he committed fraud?
4    A. I can't say that. That's up to the attorneys
5  to decide.
6    Q. Well, you've read the complaint in this case,
7  right?
8    A. I did.
9    Q. You understand that the complaint makes serious
10  allegations against Dr. Sandrock and others?
11   A. That's correct.
12   Q. Do you believe the complaint -- do you believe
13  the complaint is meritorious -- or let me ask it a
14  different way.
15       Do you have a basis to give an opinion as
16  to whether the complaint is meritorious or not?
17   A. I will let my attorneys decide that.
18   Q. Well, I'm asking you: Do you have a basis --
19  maybe the answer is you don't; only the attorneys do.
20       But do you have a basis personally to give
21  an opinion as to whether the complaint is meritorious or
22  not?
23   A. Not personally.
24   Q. So you don't have an opinion as to whether it's
25  meritorious or not?

Page 91

1       MR. HAKLAY: Objection, misstates.
2  BY MR. TARLOWE:
3    Q. I'm asking a question: You don't have an
4  opinion as to whether it's meritorious or not?
5    A. I will let my attorneys decide it.
6    Q. So you personally don't have an opinion?
7       MR. HAKLAY: Objection, asked and answered.
8       You can answer, yes.
9       THE WITNESS: I will let my attorneys
10  decide it.
11  BY MR. TARLOWE:
12   Q. Okay. Have you heard of a drug called
13  aducanumab?
14   A. I've heard about it.
15   Q. What is it?
16   A. That that treats Alzheimer's patients.
17   Q. Does that have anything to do with Biogen?
18   A. That is produced by Biogen.
19   Q. Okay. What is that -- does that have anything
20  to do with this case?
21   A. Yes.
22   Q. What does it have to do with this case?
23   A. That is what -- that -- that medicine is given
24  -- was given to those Alzheimer's patients, and that was
25  supposed to treat the Alzheimer's in basically delaying

Page 92

1  the disease.
2    Q. Do you know whether that drug received FDA
3  approval or not?
4    A. I'm not sure.
5    Q. And I think you said earlier that the
6  statements you alleged to be false were that the drug
7  treated Alzheimer's patients?
8    A. Say that again, please.
9    Q. Yeah.
10       I believe you testified that you allege
11  statements made by Biogen were false because they
12  claimed that the drug worked in treating Alzheimer's?
13   A. That's correct.
14   Q. If the FDA approved that drug for the treatment
15  of Alzheimer's, would that, in your view, be relevant to
16  whether or not the company's statements were true?
17   A. I can't answer that. I don't know.
18   Q. Okay. What do you -- what do you think?
19   A. I -- I would not know that.
20       MR. HAKLAY: Can I just -- whenever you
21  finish a topic, can we take a break?
22       MR. TARLOWE: Sure.
23  BY MR. TARLOWE:
24   Q. Do you know whether Biogen conducted any
25  clinical trials to study aducanumab?

Page 93

1    A. I'm not sure.
2    Q. Have you ever heard of the ENGAGE Study?
3    A. No.
4    Q. Have you ever heard of the EMERGE Study?
5    A. No.
6    Q. PRIME?
7    A. No.
8    Q. Do you understand that the complaint alleges
9  one or more than one misstatement?
10   A. Say that question again, please.
11   Q. Sure.
12       You understand that the complaint alleges
13  that there was at least one misstatement?
14   A. Yes.
15   Q. Does the complaint allege one misstatement or
16  more than one misstatement?
17   A. If I remember correctly, more than one
18  state- -- misstatement.
19   Q. And are you aware of any court decisions
20  impacting the number of alleged misstatements that are
21  still in the case today?
22   A. I don't know that.
23   Q. Do you know how many alleged misstatements are
24  in the case today?
25   A. I don't remember.

24 (Pages 90 - 93)

Page 94

1    Q. Do you know who allegedly made a misstatement?
2    A. Mr. Sandrock.
3    Q. Anyone else?
4    A. I don't remember the name, but CMO, chief
5  medical officer. That's the designation.
6         MR. TARLOWE: All right. We can take a
7  break now.
8         THE WITNESS: Okay.
9         THE VIDEOGRAPHER: We're off the record at
10  11:12 a.m.
11      (Brief recess taken.)
12         THE VIDEOGRAPHER: We're back on the record
13  at 11:29 a.m.
14  BY MR. TARLOWE:
15    Q. So, Mr. Khan, this morning, you talked about
16  the earnings update site. Is that --
17    A. Earning Calendar.
18    Q. Earnings Calendar. Sorry, Earnings Calendar.
19        And that lists companies that have earnings
20  announcements coming up?
21    A. It contains one of those coming-up list. It
22  contains the same day, also for the past.
23    Q. Okay. And are -- do you understand that when
24  companies announce earnings, that can impact the
25  company's stock price?

Page 95

1    A. That's -- I do understand that.
2    Q. And -- because if -- if the earnings are better
3  than the market expects, you would expect the stock to
4  go up?
5    A. That's the expectation.
6    Q. And if the earnings are worse than the market
7  expected, you expect it to go down?
8    A. That's the expectation.
9    Q. Are you interested in stocks that have earnings
10  announcements coming up, because of that expected
11  movement?
12    A. Say that again, please.
13    Q. Yeah.
14        So are you familiar with the concept of
15  volatility?
16    A. I am familiar.
17    Q. What is -- what do you understand that to mean?
18    A. Volatility tells us that this is going to be a
19  good stock or a bad stock. It is a volatile -- it can
20  mean to -- that it can go down. That's what my
21  understanding is.
22    Q. How does volatility tell you if it's a good
23  stock or a bad stock?
24    A. I don't know that.
25    Q. Okay. Is volatility something that you look at

Page 96

1  when you're deciding whether to buy or sell a stock?
2    A. No.
3    Q. If a company has an earnings announcement
4  coming up, you understand that there's a specific event
5  that's known to the market, correct?
6    A. What kind of event?
7    Q. The earnings announcement.
8    A. Yes.
9    Q. Like, the market generally knows when the
10  earnings announcement is going to take place.
11    A. That's correct.
12    Q. And you might -- as we just talked about, you
13  might expect there to be a stock price reaction to the
14  earnings announcement?
15    A. That's correct.
16    Q. Do you -- is -- is part of your strategy -- is
17  part of your strategy to buy companies that have an
18  earnings announcement coming up?
19    A. Not all the time.
20    Q. Sometimes?
21    A. This is recent.
22    Q. Why -- explain to us the thinking there.
23    A. Explain to what?
24    Q. The -- your thinking. How does that factor
25  into your decision-making?

Page 97

1         MR. HAKLAY: Objection, vague.
2         You can answer.
3         THE WITNESS: It is -- when I looked at the
4  Earning Calendar, I go into the particular stock. Most
5  of my selection of the stocks are random, unless I see
6  something that -- sometimes there is a -- on that
7  Earning Calendar, there are different colors. It has a
8  green color; it has a red color. Sometimes it has also
9  the earning timings. Sometime it's before the market
10  opens; sometime after the market opens.
11        So I look those -- if it has some green
12  signals, that gives me a clue that might be a good stock
13  to buy. And if it's before a market opens, so it
14  probably already has the new EPS versus estimated EPS.
15    Q. Okay.
16    A. I don't know if that makes sense.
17    Q. And the fact that there's an upcoming earnings
18  announcement, does that ever factor into your decision
19  to buy or sell a stock?
20    A. Not always.
21    Q. Does it ever?
22    A. Very rare.
23    Q. Are you aware that public companies file -- let
24  me rephrase that.
25        Are you aware that public companies

25 (Pages 94 - 97)

Page 98

1  announce earnings on a quarterly basis?
2      A.  I -- I -- no.
3      Q.  Are you aware that public companies sometimes
4  have earnings calls when they announce earnings?
5      A.  Yes.
6      Q.  Have you ever listened in to one of those
7  calls?
8      A.  No.
9      Q.  Have you ever read transcripts -- a transcript
10  of an earnings call?
11      A.  No.
12          MR. TARLOWE:  I'm going to show you what's
13  marked as Exhibit 4.
14          (Exhibit 4 was marked for identification.)
15  BY MR. TARLOWE:
16      Q.  And if you go to the -- what's marked page 1 of
17  26 -- it's the second page, but it says 1 of 26.
18          Do you see that this indicates it's a
19  "Final Transcript Biogen, Inc., Q2 2020 Earnings Call"?
20  Do you see that?
21      A.  What paragraph?
22      Q.  At the very top --
23      A.  Oh, at the very top.
24      Q.  -- the top left, "Final Transcript."
25      A.  That -- I do see that.

Page 99

1      Q.  Okay.  What -- do you know what "Q2" means?
2      A.  Quarter 2, second quarter.
3      Q.  Have you seen this document before?
4      A.  No.
5      Q.  And I think you've answered this, but just so
6  we're clear:  When you purchased Biogen stock in November
7  of 2020, you had not reviewed the transcript of this
8  earnings call?
9      A.  That's correct.
10      Q.  Let me direct your attention to -- let me
11  direct your attention to page 16 of 26.
12          Okay.  You see a little -- a few lines down
13  from the top, it says "Q. Geoff Meacham."
14          Do you see that?
15      A.  I do see.
16      Q.  Do you know who that is?
17      A.  No.
18      Q.  And then further down, it says "A. Alfred
19  Sandrock."
20          We talked about Dr. Sandrock, right?
21      A.  That's correct.
22      Q.  And if you look at that paragraph, it has
23  Dr. Sandrock's response to a question asked on the call.
24          Do you see that?
25      A.  I do see the -- the -- this paragraph.

Page 100

1      Q.  Yeah.
2          Have you seen this before?
3      A.  Yes.
4      Q.  When have you seen this?
5      A.  When I signed the document.
6      Q.  What document?
7      A.  The complaint.
8      Q.  Okay.  And what is the relevance of this
9  paragraph to the complaint?
10      A.  The relevance of this paragraph is where --
11  based on which appellate court made its decision.
12      Q.  What do you mean by that?
13      A.  That is -- that's in the -- when I signed one
14  of the documents, that -- this paragraph was in there.
15  That's the statement of Dr. Sandrock.  And -- so it says
16  the last -- the third-last line (as read):  And again,
17  very similar to that, the lower does does not -- did not
18  show much of effects consistent with the findings of
19  ENGAGE and EMERGE.  You really need to get to the higher
20  dose.  And I think our data are all consistent.
21          So this is the statement based on which
22  investors bought the stocks.
23      Q.  What's your basis for saying that investors
24  bought the stock on that -- based on that statement?
25      A.  That leads me to assume -- or that leads me to

Page 101

1  come to a -- to think that the stock is going to be a
2  good buy.
3      Q.  Why does that statement lead you to think the
4  stock was going to be a good buy?
5      A.  Because it says this -- the -- this medicine or
6  the -- Biogen, it would lower the doses, and that does
7  not show an im- -- effect.
8      Q.  So it says the lower doses did not show much of
9  an effect.  Why do you think -- why would that indicate
10  to you that the stock is going to be a good buy?
11      A.  The lower doses -- the -- okay.  So the -- the
12  purpose of -- of this medicine was to delay the
13  Alzheimer's disease.  And the low dose -- okay.  Let
14  me -- can I read it?
15      Q.  Sure.
16      A.  Yeah.  (Witness examines document.)
17          So the lower dose did not really have an
18  impact, so that's why it had to go to the high dose.
19  And because of that higher dose, the company made the
20  investors believe to buy the stock.  And when it did
21  not -- did not -- it did not happen the way it was
22  posed, that's where I believe the -- the stock went
23  down.
24      Q.  You -- we've already established, I think, you,
25  personally -- you did not rely on this statement when

26 (Pages 98 - 101)

Page 102

1  you purchased Biogen stock in November 2020?
2        MR. HAKLAY: Objection, asked and answered.
3        You can answer.
4        THE WITNESS:  That's correct.
5  BY MR. TARLOWE:
6     Q.  Do you have any personal knowledge as to
7  whether any other investor relied on that statement?
8     A.  No, I don't.
9     Q.  And in your view, is that statement in this
10  paragraph, is that -- is that significant information?
11     A.  Sorry.  Can I go back to your previous
12  question?
13     Q.  Sure.
14     A.  What was your previous question again?
15     Q.  Do you have any personal knowledge as to
16  whether any other investor relied on that statement?
17     A.  I don't have a personal knowledge, but that is
18  the -- that is a part of the complaint, where the other
19  class members also relied on that statement.
20     Q.  You're saying "also."  But you did not rely on
21  it?
22        MR. HAKLAY:  Objection, asked and answered.
23        THE WITNESS:  I did rely on that statement.
24  BY MR. TARLOWE:
25     Q.  You relied on a statement that you didn't see?

Page 103

1     A.  It's on my -- it's in the complaint.
2     Q.  Sorry.
3        When you bought the stock --
4     A.  Oh, when I bought the stock.
5     Q.  -- you did not rely on that statement?
6     A.  That's correct.
7     Q.  And you don't have personal knowledge as to
8  whether any other investor who purchased Biogen stock
9  relied on that statement?
10     A.  What year?
11     Q.  Ever.
12     A.  I don't have a personal information.
13     Q.  Do you have -- do you know whether any of the
14  information in this paragraph was new information?  Let
15  me be clear: information that had not already been
16  publicly disclosed.
17     A.  I don't know.
18     Q.  Would you agree that if information was already
19  publicly disclosed and there's nothing new here, then
20  there -- that would not provide an indication that it's
21  a good stock to buy?
22        MR. HAKLAY:  Objection.
23        You can answer.
24        THE WITNESS:  I -- I would request you to
25  repeat your question, please.

Page 104

1  BY MR. TARLOWE:
2     Q.  Forget it.  I'll withdraw the question.
3        Do you know what happened to the stock
4  price the day of this earnings call?
5     A.  Stock price went down.
6     Q.  On the day of this earnings call?
7     A.  That, I don't know.
8     Q.  Okay.  Do you know what happened to the stock
9  price the day of this earnings call?
10     A.  I don't remember.
11     Q.  Does the complaint allege that Dr. Sandrock's
12  statement on this earnings call was false?
13     A.  That's correct.
14     Q.  What part of this statement is allegedly false?
15  The whole paragraph or just some portion of it?
16     A.  Some portion of it.
17     Q.  What portion?
18     A.  I will say the second -- the third-last line
19  (as read):  And again, very similar to that, lower dose
20  did not show much of an effect.  So consistent with the
21  findings of ENGAGE and EMERGE, you really need to get to
22  the higher dose.  And I think our data are all
23  consistent with that.
24     Q.  What do you understand that to mean?
25     A.  That it was a misstatement.

Page 105

1     Q.  Well, putting aside whether it was a
2  misstatement or not, what did you understand -- what do
3  you understand Dr. Sandrock to be saying in those
4  sentences?
5     A.  He's saying that the lower dose did not show
6  any impact; whereas it was not true.
7     Q.  Okay.  If this information was significant to
8  investors, would you expect to see the stock price react
9  to it?
10        MR. HAKLAY:  Objection, calls for
11  speculation.
12        You can answer.
13        THE WITNESS:  I don't know.
14  BY MR. TARLOWE:
15     Q.  Well, you've been investing for years in the
16  stock market, right?
17     A.  Yes, I do.
18     Q.  You had -- do you have any opinion as to
19  whether or not you'd expect to see a stock price
20  reaction if this news was significant to investors?
21        MR. HAKLAY:  Objection, asked and answered.
22        THE WITNESS:  I don't know.  I'm unaware of
23  that.
24  BY MR. TARLOWE:
25     Q.  The first -- the second sentence of

27 (Pages 102 - 105)

Page 106

1 Dr. Sandrock's remarks says, "The filing is based on
2 these three studies, EMERGE, ENGAGE, and PRIME."
3          I think you testified earlier you're not
4 familiar with those terms?
5     A. Well, since it's -- the document is in front of
6 me, so I can recall now that, yes, I saw these ones in
7 complaint.
8     Q. What are those?
9     A. EMERGE, ENGAGE, and PRIME.
10    Q. What are those?
11    A. Those are the -- those are the -- these are the
12 studies.
13    Q. What do you know about EMERGE?
14    A. I don't know much details about that.
15    Q. Do you know anything about EMERGE?
16    A. I can tell you that this is the -- this is the
17 study that was done, conducted by Dr. Sandrock.
18    Q. Okay. Anything else?
19    A. That's it. I don't know something -- anything
20 else.
21    Q. Okay. Do you know anything about the results
22 of the EMERGE study?
23    A. Yes.
24    Q. Okay. What, if anything, do you know about
25 ENGAGE?

Page 107

1     A. It's also a study.
2     Q. Do you know anything about the results of
3 ENGAGE?
4     A. No.
5     Q. What do you know about PRIME?
6     A. It's just a study. That's all I know.
7     Q. Do you know anything about the results of
8 PRIME?
9     A. No.
10    Q. Okay. And then it says, "EMERGE is the first
11 study to show an effect, not only on the primary
12 endpoint, but all three prespecified secondary
13 endpoints."
14          Do you know what an endpoint is?
15    A. No.
16    Q. And then it says (as read): We believe that
17 data from ENGAGE -- portions of the data from ENGAGE, a
18 negative study -- portions of it do support the analysis
19 that we did with EMERGE.
20          Do you know what a negative study is?
21    A. I don't know.
22    Q. Okay. Do you know that a negative study
23 indicates that the objectives were not met?
24    A. I don't know.
25    Q. Do you know whether a negative study is a good

Page 108

1 thing or a bad thing?
2          MR. HAKLAY: Objection, asked and answered.
3          THE WITNESS: I can't say.
4 BY MR. TARLOWE:
5     Q. Okay. Do you know whether it's a positive
6 outcome or a negative outcome?
7          MR. HAKLAY: Objection.
8          THE WITNESS: No.
9 BY MR. TARLOWE:
10    Q. And you see where Dr. Sandrock says, "Portions
11 of the data from ENGAGE -- portions of it do support the
12 analysis." What do you understand "portions" to mean?
13    A. Okay. According to the sentence, it says that
14 it does support the analysis -- analysis that we did
15 with EMERGE.
16    Q. What supports the analysis?
17    A. The -- this -- this report.
18    Q. Well, what specifically did Dr. Sandrock say
19 supported the analysis that we did with EMERGE?
20    A. I don't -- I don't know.
21    Q. Well, do you see that it says, "portions of the
22 data from ENGAGE"?
23    A. Yes.
24    Q. Okay. Do you know what "portions" means?
25    A. No.

Page 109

1          MR. HAKLAY: In this context or generally?
2 BY MR. TARLOWE:
3     Q. The word "portion."
4     A. Portion, that's part of anything --
5     Q. Okay.
6     A. -- in general.
7     Q. Okay. So do you understand Dr. Sandrock to be
8 saying that part of the data from ENGAGE -- part of it
9 supports the analysis we did with EMERGE?
10    A. That's what it's saying.
11    Q. And you understand that "portion" means
12 something other than all?
13    A. Yes.
14    Q. Portion is something less than all?
15    A. Yes.
16    Q. Why do you believe that Dr. Sandrock's
17 statements in this call was false? What about it do you
18 believe was false?
19    A. Because, honestly, I -- I -- I don't really
20 recall. I don't remember.
21    Q. Okay. Let's -- I'm going to show you -- let's
22 look at an --
23          MR. HAKLAY: Is this still in front of him,
24 or we can put it aside?
25          MR. TARLOWE: You can put that aside.

28 (Pages 106 - 109)

Page 110

1  BY MR. TARLOWE:
2      Q.  And I'm sorry.  Just one other -- you don't
3  need it in front of you, but one other question on that.
4          Are you aware of anyone in the market --
5  any reporters, analysts -- anyone in the market who
6  discussed Dr. Sandrock's statement on that earnings call
7  after he made it?
8      A.  No, I don't.
9      Q.  And if that comment were considered -- if that
10 comment were significant to investors, would you expect
11 to see some discussion of it somewhere?
12         MR. HAKLAY:  Objection, calls for
13 speculation.
14         THE WITNESS:  Repeat the question again,
15 please.
16 BY MR. TARLOWE:
17     Q.  Sure.
18         If that information was significant to the
19 market, would you expect to see that -- some discussion
20 of it somewhere?
21         MR. HAKLAY:  Objection, hypothetical; calls
22 for speculation.
23         THE WITNESS:  Maybe.
24 BY MR. TARLOWE:
25     Q.  You haven't seen that, correct?

Page 111

1      A.  I have not.
2          (Off-record discussion.)
3  BY MR. TARLOWE:
4      Q.  While -- while Mr. Patterson's pulling that
5  document, I'm going to read you a statement.  I'm going
6  to ask you whether you believe it to be true or false.
7          "In all studies in which it was evaluated,
8  adu" -- I'm using "adu" for aducanumab -- "consistently
9  and very convincingly reduced the level of amyloid
10 plaques in the brain in a dose- and time-dependent
11 fashion."
12         Do you believe that to be true or not true?
13     A.  I can't say.
14     Q.  Do you believe that to be consistent or not
15 consistent with Dr. Sandrock's statement?
16     A.  Not consistent.
17     Q.  How is that not consistent?
18     A.  That, I don't know.
19     Q.  So why did you say it's not consistent?
20     A.  It's -- if you don't mind, would you just read
21 the statement again.
22     Q.  Sure.
23         "In all studies in which it was evaluated,
24 adu consistently and very convincingly reduced the level
25 of amyloid plaques in the brain in a dose- and

Page 112

1  time-dependent fashion."
2      A.  So your question is?
3      Q.  Is that consistent or not consistent with what
4  Dr. Sandrock said in the earnings call we just looked
5  at?
6      A.  I don't know.
7          MR. TARLOWE:  Okay.  I'm going to show you
8  three documents that we're marking as Exhibits 5, 6, and
9  7.
10         (Exhibit 5 was marked for identification.)
11         (Exhibit 6 was marked for identification.)
12         (Exhibit 7 was marked for identification.)
13 BY MR. TARLOWE:
14     Q.  So if you look at Exhibit 5, I'm going to
15 represent to you that Exhibit 5 shows intraday stock
16 prices for Biogen on November 4th, 2020.
17         Do you know what "intraday" means?
18     A.  Intraday, no.
19     Q.  Okay.  It means the stock prices within the
20 trading day.  So instead of just looking at it at open
21 and at close, this shows the prices throughout the day.
22     A.  Okay.
23     Q.  Exhibit 6, I'll represent to you, shows the
24 prices -- the intraday prices of Biogen on November 5th,
25 2020, and then Exhibit 7 shows open and close prices of

Page 113

1  Biogen stock price on November 3rd, 4th, 5th and 9th of
2  2020.
3          Do you see those?
4      A.  Yes.
5      Q.  Okay.  So let's look at Exhibit 7 first.
6      A.  Okay.
7      Q.  You can see that on November 3rd, the stock
8  opened at 250, closed at 247.
9          You see that?
10     A.  Yes.
11     Q.  Okay.  I'm leaving out the -- decimals.
12     A.  Yes.
13     Q.  November 4th, it opened at 253, and it closed
14 at 355.  So you see it went up a lot on November 4th,
15 correct?
16     A.  That's correct.
17     Q.  And then November 5th, it opened at 348, closed
18 at 328.
19         You see that?
20     A.  That's right.
21     Q.  And you recall you purchased on November 5th?
22     A.  Yes.
23     Q.  Do you remember what time of day you purchased
24 Biogen on November 5th?
25     A.  No, I don't.

29 (Pages 110 - 113)

Page 114

1  Q. Does looking at that, those price movements,
2  jog any memory for you as to why you bought Biogen on
3  November 5th, 2020?
4     A. I don't remember why I bought that.
5     Q. Okay. And if you look at Exhibit 6, right, so
6  we looked at -- on November 4th, the price went up about
7  $100 a share --
8     A. Uh-huh.
9     Q. -- right?
10         And then on November 5th, you can see that
11 during the day, it goes down a little bit. You see
12 that?
13    A. Uh-huh. Yes.
14    Q. And you bought at a price of $324 and change,
15 okay?
16    A. I don't have that in front of me.
17    Q. I'll represent to you it's $324.
18    A. Okay.
19    Q. Does that -- if you look at this chart, does
20 that help jog any memory as to why you purchased Biogen
21 on November 5th?
22    A. I don't remember that --
23    Q. Do you remember whether you were -- bought when
24 it was trending up or trending down?
25    A. I bought it when it -- trending down.

Page 115

1  Q. Okay. Why?
2     A. With the hope that it will go up back.
3     Q. Why would you hope it would go back up?
4     A. Because it's -- the -- it closed at 355. When
5  it came down to 348, I was hoping that it will go back.
6     Q. What -- what might cause a stock to go down --
7  well, let me -- let me ask a different question.
8         What was your basis for believing or hoping
9  that it would go up?
10    A. It was my guesswork.
11    Q. Because of where the price was the prior day?
12    A. That's correct. That's what my thought
13 processes was.
14    Q. Now, when we looked at the statement -- I don't
15 think you need it, but if you need to go back, that's
16 fine. Exhibit 2, I think it shows that you lost about
17 $12,000?
18    A. That's correct.
19    Q. On your Biogen trades.
20    A. That's correct.
21    Q. Okay. I assume that you've lost money on other
22 trades and other stocks as well over the years; is that
23 correct?
24    A. Possibly.
25    Q. Possibly or yes?

Page 116

1     A. Yes. I would say yes.
2     Q. Okay. Sometimes you make money; sometimes you
3  lose money?
4     A. That's correct.
5     Q. And if we look at the stock chart, you -- you
6  allege that when you purchased it on November 5th at
7  approximately $324 per share, you allege that that price
8  was artificially inflated; is that right?
9     A. That's correct.
10    Q. Why do you believe it was artificially
11 inflated?
12    A. Again, I'll -- I'll -- I will go back to my
13 trends to see if it was -- it -- you know, it was -- it
14 went up, and then it came down.
15    Q. Okay. But do you understand the complaint to
16 be alleging that because of false statements made by
17 Biogen, the price was artificially inflated on
18 November 5th when you bought it?
19    A. Yes, I do.
20    Q. Why do you believe it was artificially inflated
21 when you bought it on November 5th?
22    A. I didn't buy it because it was art- -- I did
23 not know at that time it was artificially inflated.
24    Q. Right.
25    A. Again, as I -- I bought it because of the --

Page 117

1  because of the prior trend. Because of the prior trend,
2  I was with the impression that, you know, it will come
3  back.
4     Q. Sitting here today, why do you believe it was
5  artificially inflated when you bought it on
6  November 5th?
7     A. I didn't buy it because it was artificially
8  inflated. I bought it because of the trend.
9     Q. Right.
10        But sitting here today, do you now, today,
11 believe that it was artificially inflated?
12    A. Yes.
13    Q. Why do you believe that today?
14    A. It is because of the statement that
15 Mr. Sandrock made.
16    Q. Why do you believe that that -- what's your
17 basis for believing that Dr. Sandrock's statement
18 artificially inflated the price?
19    A. Because when he made the statement about the
20 impact or effect of that medicine to treat the Alzheimer
21 patients, and that's what led at least me to believe
22 that, you know, this is going -- it's -- it's -- it's
23 going to have a good impact on the stock to go up.
24    Q. Well, it didn't -- you didn't know about the
25 statement, so it didn't lead you to believe that the

30 (Pages 114 - 117)

Page 118

1  stock was going to go up.
2         MR. HAKLAY: Objection, asked and answered.
3         THE WITNESS: Yeah, I -- I would not know
4  that.
5  BY MR. TARLOWE:
6     Q.  Do you believe that the stock price was
7  artificially inflated on November 4th?
8     A.  Yes.
9     Q.  November 5th?
10    A.  I beg your pardon. Go back --
11    Q.  Do you believe it was artificially inflated on
12 November 5th?
13    A.  Yes.
14    Q.  Do you believe it was artificially inflated on
15 November 9th?
16    A.  November 9th? I don't know about that.
17    Q.  Okay. Well, at what point do you think the
18 stock was no longer artificially inflated?
19    A.  I don't know that.
20    Q.  Does the complaint allege that, at some point,
21 the alleged false statement was revealed to be false?
22    A.  Repeat your question, please.
23    Q.  Sure.
24        You understand that the complaint alleges
25 that Dr. Sandrock made a false statement?

Page 119

1     A.  I agree. I understand that.
2     Q.  Okay. And do you understand that at some
3  point -- the complaint alleges that, at some point, it
4  was revealed to the market that his statement was false?
5     A.  I understand that.
6     Q.  Okay. How was it revealed to the market that
7  his statement was false?
8     A.  I don't know.
9     Q.  Okay. Are you familiar with a -- a -- a report
10 by somebody named Dr. Massie?
11    A.  I don't know. I'm not familiar.
12    Q.  Okay. Do you know that on November 4th, 2025,
13 certain briefing materials were made available to the
14 public in connection with an upcoming Advisory Committee
15 meeting?
16    A.  No.
17    Q.  And you'd agree that -- well, let me ask a
18 different question.
19        When you purchased your Biogen stock on
20 November 5th, you had not read the briefing materials
21 that were made publicly available on November 4th in
22 connection with the upcoming Advisory Committee meeting?
23    A.  That's true.
24    Q.  And if it was publicly available, you could
25 have read it, correct?

Page 120

1     A.  I could have.
2     Q.  Do you know that the complaint alleges that the
3  briefing materials that were made publicly available on
4  November 4th, that those materials revealed that
5  Dr. Sandrock's statement had been false?
6     A.  Which year are you talking about?
7     Q.  2020.
8     A.  Do I know?
9     Q.  Yeah.
10    A.  No, I don't.
11    Q.  Okay. You've read the complaint?
12    A.  Yes.
13    Q.  Carefully --
14    A.  I skimmed through the complaint.
15    Q.  You what?
16    A.  I skimmed through the complaint.
17    Q.  Okay. Did you authorize the lawyers to file
18 the complaint?
19    A.  Yes, I did.
20    Q.  And just to be clear, when we say "complaint,"
21 you're aware that there's a first amended complaint and
22 a second amended complaint?
23    A.  I'm aware of that.
24    Q.  Did you authorize the filing of the first
25 amended complaint?

Page 121

1     A.  I did.
2     Q.  And did you also authorize the filing of the
3  second amended complaint?
4     A.  I did.
5     Q.  Do you know why the complaint was amended
6  between the first and the second amended complaints?
7     A.  Some more plaintiffs were added.
8     Q.  Okay. Any other change?
9     A.  I'm not aware. I don't remember.
10    Q.  Do you recall what -- what plaintiff or
11 plaintiffs were added?
12    A.  Albert Atoof was added.
13    Q.  Do you know why?
14    A.  He's one of the class members.
15    Q.  Do you know why he was added, if he had
16 previously been a named plaintiff?
17    A.  I don't know.
18    Q.  Okay. I'm going to represent to you -- I can
19 show you the complaint, but I'm going to represent to
20 you that the complaint alleges that certain material
21 that was made public on the morning of November 4th,
22 2020, is what revealed that Dr. Sandrock's statement was
23 untrue.
24        MR. HAKLAY: Just for clarity, what
25 complaint are you talking about?

31 (Pages 118 - 121)

Page 122

1          MR. TARLOWE: The second amended complaint.
2          MR. HAKLAY: Thank you.
3          THE WITNESS: One more time, please.
4    BY MR. TARLOWE:
5      Q. Yeah, yeah. Sure.
6      A. Yeah.
7      Q. So if you'd like, we can show you the -- the
8    complaint, but -- but I'll represent to you the second
9    amended complaint alleges that certain information that
10   was made public on the morning of November 4th, 2020,
11   revealed that Dr. Sandrock's statement had been false.
12     A. Yes, I'm aware of that.
13     Q. Are you with me?
14     A. Yes.
15     Q. Okay. Do you know what that information was
16   that was reveal- -- that was made public on
17   November 4th?
18         MR. HAKLAY: Objection, asked and answered.
19         THE WITNESS: I don't remember that.
20   BY MR. TARLOWE:
21     Q. And you can see from Exhibit 7 that on
22   November 4th, the stock price went up more than $100 per
23   share.
24         Do you see that?
25     A. Yes.

Page 123

1      Q. And if Dr. Sandrock's statement was revealed to
2    be false on November 4th, why do you think the stock
3    price went up by more than $100 per share?
4          MR. HAKLAY: Objection, calls for expert
5    opinion.
6          THE WITNESS: I don't know.
7    BY MR. TARLOWE:
8      Q. Okay. And when you purchased on November 5th,
9    the information that was made public on November 4th was
10   available?
11     A. That's correct.
12     Q. Okay. Somebody who bought on November 3rd did
13   not have that information available to them?
14     A. I don't know.
15     Q. Well, if information was released on
16   November 4th, then somebody who bought on November 3rd
17   didn't have access to that information.
18     A. I can't say that.
19     Q. You can't say whether -- if information comes
20   out on the 4th, you can't say whether it's available or
21   not --
22     A. Yeah. I don't know.
23     Q. -- on the 3rd?
24     A. I don't know. I don't remember.
25     Q. Okay. But as a matter of logic and common

Page 124

1    sense, if information is made available for the first
2    time on November 4th, then somebody who traded on
3    November 3rd didn't have access to that information?
4      A. That's fair to say.
5      Q. Okay. So somebody who traded on November --
6    someone who bought on November 3rd did not have access
7    to the information that came out on the 4th?
8      A. I can't say that.
9      Q. Well, I think we just established that if
10   somebody bought on the 3rd, they couldn't have had
11   information that didn't become available until the 4th?
12     A. That's fair to say.
13     Q. Okay.
14     A. Yeah.
15     Q. It's not -- it's not a trick here.
16     A. Yeah. Yeah.
17     Q. So somebody who bought on November 3rd did not
18   have access to the information that came out on the
19   morning of the 4th?
20         MR. HAKLAY: Objection, asked and answered.
21         THE WITNESS: Well, somebody who -- who
22   maybe -- you know, when you say "someone," that could
23   be -- that someone could be an employee of the company
24   or -- that -- that employee or that individual might --
25   might already know about it.

Page 125

1    BY MR. TARLOWE:
2      Q. Okay. So let's make it somebody who has no
3    access to nonpublic information.
4      A. Uh-huh.
5      Q. Okay?
6      A. Okay.
7      Q. They have no access to nonpublic information.
8    If they buy on November 3rd, they're not privy to
9    information that is made public on November 4th?
10     A. That's correct.
11     Q. Okay. You bought on November 5th. So whether
12   or not you actually looked at it, you had information
13   that was accessible to you -- available to you on
14   November 5th?
15         MR. HAKLAY: Objection.
16         THE WITNESS: That's correct.
17   BY MR. TARLOWE:
18     Q. Do you think that you're equally as harmed as a
19   person who bought on November 3rd and didn't have access
20   to the materials that came out on the morning of the
21   4th?
22         MR. HAKLAY: Objection.
23         THE WITNESS: I can't say that.
24   BY MR. TARLOWE:
25     Q. Well, do you understand that there are other

32 (Pages 122 - 125)

Page 126

1  plaintiffs in this case who purchased the stock prior to
2  November 4th?
3      A. I'm not aware of that.
4      Q. You don't know whether the class of plaintiffs
5  includes individuals or institutions that purchased
6  prior to November 4th?
7          MR. HAKLAY: Misstates his testimony.
8  Objection.
9          THE WITNESS: I am aware of that, but I
10 don't know the dates when --
11 BY MR. TARLOWE:
12     Q. Okay. But do you understand there are other
13 plaintiffs in this case who purchased the stock prior to
14 November 4th?
15     A. I am aware of other plaintiffs who bought the
16 stock, but I don't know the dates.
17     Q. But do you know that there are plaintiffs who
18 bought prior to November 4th --
19         MR. HAKLAY: Objection.
20 BY MR. TARLOWE:
21     Q. Even if you don't know the exact date, do you
22 know that there are plaintiffs who bought Biogen stock
23 prior to November 4th?
24         MR. HAKLAY: Objection, asked and answered.
25         THE WITNESS: I don't know that.

Page 127

1  BY MR. TARLOWE:
2      Q. You don't know that?
3      A. No.
4      Q. You think every plaintiff in this case
5  purchased on or after November 4th?
6      A. I can't say that.
7          MR. HAKLAY: Objection, misstates -- you
8  gotta let me object, sir.
9          Objection, misstates the testimony.
10         Did you get his answer, Kari?
11         THE COURT REPORTER: (Nods head.)
12         MR. HAKLAY: Okay.
13 BY MR. TARLOWE:
14     Q. Do you know what the class period is for the
15 complaint?
16     A. July 22nd, 2020, to November 9th, 2020.
17     Q. What does that mean? What is a class period?
18     A. That's where, during that time frame, the
19 statements were made that led people to believe to --
20 that the stock is going up.
21     Q. Okay. So as a class representative, you
22 understand that you have some duties that you owe to the
23 entire class?
24     A. Yes, I do.
25     Q. And that includes people who bought Biogen

Page 128

1  stock prior to November 4th?
2      A. That's correct.
3      Q. Those people who bought prior to November 4th
4  didn't have the ability to review the materials that
5  were publicly released on the morning of November 4th?
6          MR. HAKLAY: Objection.
7          THE WITNESS: I don't know.
8          MR. HAKLAY: Asked and answered several
9  times.
10         He answered.
11 BY MR. TARLOWE:
12     Q. What do you mean you don't know?
13     A. I'm not privy to their statements. I'm not
14 privy to their record or their data.
15     Q. Okay. Assume that there are plaintiffs who
16 purchased Biogen stock before November 4th. Okay?
17     A. (Witness nods head affirmatively.)
18     Q. They did not have the ability to access
19 information that was released on November 4th.
20         MR. HAKLAY: Objection.
21 BY MR. TARLOWE:
22     Q. You had the ability to access that information;
23 you chose not to, but you had the ability.
24         MR. HAKLAY: Objection.
25 BY MR. TARLOWE:

Page 129

1      Q. Do you think those people are harmed the same
2  as you, more than you, or less than you?
3          MR. HAKLAY: Objection, asked and answered.
4          THE WITNESS: I don't know.
5  BY MR. TARLOWE:
6      Q. Well, what would you say to somebody who bought
7  before November 4th, who says they were harmed because
8  they didn't have the information that supposedly
9  revealed that Dr. Sandrock's statement was false? When
10 you bought, you could have accessed that information --
11         MR. HAKLAY: Objection.
12 BY MR. TARLOWE:
13     Q. -- but you chose not to.
14         MR. HAKLAY: I'm sorry. I didn't mean to
15 step on you. Objection -- let me get the objection,
16 sir, then you can answer.
17         Objection, calls for a hypothetical; calls
18 for speculation as to what he would tell other people --
19 other hypothetical people.
20         MR. TARLOWE: I think we could go with
21 objection.
22         MR. HAKLAY: Well, we could, but I decided
23 to go with all of that.
24         THE WITNESS: I don't know.
25 BY MR. TARLOWE:

33 (Pages 126 - 129)

Page 130

1   Q. And somebody who bought on November 3rd and
2   sold on November 5th would have made money, correct?
3   A. That's correct.
4   Q. And you think somebody who did that was harmed?
5       MR. HAKLAY: Objection, calls for a legal
6   conclusion. He is not an expert on causation.
7       THE WITNESS: I don't know.
8   BY MR. TARLOWE:
9   Q. You don't know whether somebody was harmed by
10  the fraud if they'd bought on November 3rd and sold on
11  November 5th?
12      MR. HAKLAY: Objection, asked and answered
13  just now.
14      THE WITNESS: I don't know.
15  BY MR. TARLOWE:
16  Q. Well, do you think you can adequately represent
17  somebody who made money on their Biogen trading?
18      MR. HAKLAY: Objection, foundation.
19  Assumes facts not in evidence.
20      You can answer, sir.
21      THE WITNESS: Because I am a part of the --
22  part of the class action, so I am -- yes, I can
23  represent them as a -- as a class, as a named --
24  plaintiffs.
25  BY MR. TARLOWE:

Page 131

1   Q. You lost $12,000 on your Biogen trading, right?
2   A. That's correct.
3   Q. Do you think somebody who made money trading
4   Biogen deserves to be a member of the class?
5       MR. HAKLAY: Objection -- same objections
6   as the last two.
7       MR. TARLOWE: He's a class representative.
8   How is any of that objectionable?
9       MR. HAKLAY: Well, one of them was that you
10  already asked that question.
11      MR. TARLOWE: Well, he's not answering it.
12      MR. HAKLAY: He answered it.
13      MR. TARLOWE: If he answers, I can move on.
14      THE WITNESS: I would not know that.
15      MR. HAKLAY: If you're done with that
16  topic, can we eat?
17      MR. TARLOWE: Sure.
18      MR. HAKLAY: To put it as bluntly as
19  possible.
20      THE VIDEOGRAPHER: We're off the record at
21  12:18 p.m.
22      (Lunch break taken.)
23      THE VIDEOGRAPHER: We're back on the record
24  at 1:11 p.m.
25  BY MR. TARLOWE:

Page 132

1   Q. Good afternoon, Mr. Khan.
2   A. Good afternoon.
3   Q. We -- we looked earlier today at a ██████
4   ████████████████████████████████████████████
5       Do you remember that?
6   A. Yes.
7   Q. Okay. ████████████████████████████████████
8   ████████████████████████████████████████████████
9   ████████████
10  A. That's correct.
11  Q. Do you remember what other stocks you bought
12  and sold in 2020?
13  A. ████████████████████████████████████████████
14  ████████████████████████████
15  Q. And I think that was just for the month of
16  November. Do you recall any of the other stocks you
17  bought --
18  A. No, I don't.
19      MR. HAKLAY: You've got to let him finish.
20      THE WITNESS: Sorry.
21  BY MR. TARLOWE:
22  Q. Do you recall any of the other stocks you
23  bought in 2020?
24  A. No.
25  Q. Did you buy any other drug company stocks?

Page 133

1   A. I don't remember.
2   Q. And over the course of your -- not limiting it
3   to 2020 -- in the course of your trading history, have
4   you bought stocks in other drug companies?
5   A. Not that I remember.
6   Q. I think you mentioned earlier today some stock
7   that you had in the company you worked for; is that
8   right?
9   A. That's correct.
10  Q. Do you hold that stock today?
11  A. I recently bought it -- I recently rebought it,
12  basically.
13  Q. So you -- you bought it in the past, sold it,
14  and then you rebought it?
15  A. That's correct.
16  Q. When you bought it, did you buy it in the
17  market or did you get it as part of your compensation?
18  A. From the market.
19  Q. Both times you purchased, you got it --
20  A. From the market.
21  Q. Do you receive any stock in the company as part
22  of your compensation?
23  A. No.
24  Q. And does the company have any restrictions on
25  buying or selling its stock?

34 (Pages 130 - 133)

Page 134

1    A.  I'm not aware of.
2    Q.  You -- you don't have to get approval from the
3  company to buy or sell the stock?
4    A.  I don't know.
5    Q.  And when you bought or sold stock in the
6  company you work for, were you privy to any material
7  nonpublic information about the company?
8    A.  No.
9    Q.  You mentioned this morning an account, a joint
10  tenants in common account?
11    A.  Joint tenants with the rights of survivorship.
12    Q.  And that's an account at ███████?
13    A.  That's under ███████.
14    Q.  What is that account for?
15    A.  That was my kind of separate account that --
16  that the money I withdrew -- basically transferred from
17  a bank to a ███████ account, and -- and used it as
18  joint tenants with rights of survivorship.
19    Q.  Do you use that account to buy or sell stocks?
20    A.  Yes.
21    Q.  And do you use it in the same way that you use
22  the 401(k) account that we were looking at?
23    A.  No.
24    Q.  How -- how do you use it differently?
25    MR. HAKLAY:  Did you mean the rollover IRA?

Page 135

1    MR. TARLOWE:  Yes.  Yeah, sorry.
2    MR. HAKLAY:  He meant the rollover IRA.
3    THE WITNESS:  I'm sorry --
4    MR. HAKLAY:  He said the 401(k).
5    THE WITNESS:  The 401(k).  Okay.  Yes,
6  that's right.
7  BY MR. TARLOWE:
8    Q.  So -- so, to be clear, you used it in the same
9  way you used the rollover account?
10    A.  That's correct.
11    Q.  Who has -- who makes the investment decisions
12  for that account?
13    A.  Myself.
14    Q.  Anybody else?
15    A.  No.
16    Q.  Did you ever buy Biogen stock in that account?
17    A.  Not from that account.
18    Q.  Okay.  Other than the purchase and sale that we
19  looked at this morning, both in November of 2020, have
20  you ever traded Biogen stock at any other time in any
21  account?
22    A.  No.
23    Q.  Does your wife have an investment account?
24    A.  No.
25    Q.  We talked earlier about your purchase of Biogen

Page 136

1  stock on November 5th, 2020.
2    A.  That's correct.
3    Q.  And I think you testified earlier that you
4  bought because the stock was trending downward; is that
5  right?
6    A.  I don't -- I'm not sure if I said that.  But I
7  don't remember, when I bought Biogen, if that was the
8  reason.
9    Q.  Okay.  But I thought we looked at -- remember
10  we looked at the stock price charts, and I thought that
11  that jogged a memory that you thought you bought as the
12  stock was on a downward trend.
13    A.  The reason for my purchase of Biogen at that
14  time, I cannot say for sure if that was the reason I
15  bought it for.
16    Q.  But looking at the stock price charts, you
17  believe that's the reason why you bought it in November
18  of 2020?
19    A.  I will say I don't recall.
20    Q.  And is the reason to buy on a downward trend
21  that you anticipate it going back to where it had been
22  trading before?
23    A.  If that's the reason, that's the thought
24  process at that time, yes.
25    Q.  And is the thought process -- can you just

Page 137

1  explain a little bit more the thought process behind
2  that.
3    A.  Thought process means -- sorry.  Thought
4  process means when I'm looking at the stock, if it has
5  gone down, by looking at the previous price, I'm
6  assuming and I'm hoping that it will come back.
7    Q.  Okay.  Got it.  Okay.
8    Because you think if it's come down, it's
9  undervalued?
10    A.  I have not thought about undervalued.  I just
11  looked at the chart and the previous prices.
12    Q.  Okay.  And the previous prices you're looking
13  at are the prior day, two days, three days?  What's the
14  time period?
15    A.  It can be a day, or it can be the past two
16  months or one week or two weeks.
17    Q.  Okay.  What do you think it was for Biogen?
18    A.  I don't remember.
19    Q.  And the fact that -- if you want to refer to
20  Exhibit 7 just to refresh your memory, the fact that the
21  stock went up about $100 per share on the 4th and you
22  bought on the 5th, does that lead you to believe that
23  you were looking at the price the prior day?
24    A.  I cannot -- I cannot say for sure the basis of
25  my decisions to buy the stock of Biogen at that time.

35 (Pages 134 - 137)

Page 138

1    Q. And although you can't say for sure, do you
2  believe, given the fact that you bought the day after it
3  went up $100 per share, that that price -- it would've
4  been the 4th -- was relevant to your decision to buy?
5         MR. HAKLAY: Objection, asked and answered.
6         THE WITNESS: I think I didn't understand
7  your question.
8  BY MR. TARLOWE:
9    Q. Sure.
10        So you see that the stock price went up
11 $100 per share, roughly, on November 4th?
12   A. That's correct.
13   Q. You bought the very next day, correct?
14   A. That's correct.
15   Q. Does that fact lead you to believe that the
16 price movement on the 4th, that price increase on the
17 4th, was at least a factor in your decision to buy
18 Biogen stock on November 5th?
19        MR. HAKLAY: Objection, asked and answered.
20 You can answer.
21        THE WITNESS: I don't remember that.
22 BY MR. TARLOWE:
23   Q. Are you aware that on November 6th, 2020, there
24 was a decision by an Advisory Committee that was tasked
25 with providing advice on aducanumab?

Page 139

1    A. I am not aware.
2    Q. What prompted you to sell on November 9th?
3    A. To prevent further loss.
4    Q. Okay. Do you recall doing any research into
5  Biogen before making the decision to sell?
6    A. Not that I remember.
7    Q. Okay. It was basically you saw the stock price
8  drop, and you got out to avoid further losses?
9    A. That is correct.
10        MR. TARLOWE: Let me show you -- I'm going
11 to mark this as Exhibit 8.
12        (Exhibit 8 was marked for identification.)
13 BY MR. TARLOWE:
14   Q. This is a Wall Street Journal article. Have
15 you seen this before?
16   A. No.
17   Q. Okay. And I'm going to direct your attention
18 to the second page of this article, and the further
19 paragraph that starts with, "An agency medical
20 reviewer..."
21        Do you see that?
22   A. I do see.
23   Q. And it says, "An agency medical reviewer wrote
24 in documents the FDA released ahead of the meeting that,
25 quote, 'the evidence supporting the effectiveness of

Page 140

1  aducanumab is highly persuasive,'" end quotes.
2         Do you see that?
3    A. I do see.
4    Q. Do you know who the medical reviewer is that's
5  being referenced there?
6    A. I do not know.
7    Q. You see it's a medical reviewer from the FDA?
8    A. That's what it says.
9    Q. Any reason to doubt the truthfulness of that
10 medical reviewer's view that the evidence supporting the
11 effectiveness of aducanumab is highly persuasive?
12   A. I cannot say that. I don't know.
13   Q. The next sentence says, "But an FDA statistical
14 reviewer was more critical, writing that there is
15 conflicting evidence for the drug's effectiveness and
16 that approving the medicine could set back studies of
17 other Alzheimer's drugs because it would be harder to
18 recruit volunteers."
19        Do you see that?
20   A. I do.
21   Q. Do you know who the FDA statistical reviewer is
22 who is being referenced there?
23   A. No.
24   Q. Would you agree -- what do you understand that
25 statement to mean about the FDA statistical reviewer?

Page 141

1    A. Are you asking me what is the meaning of the
2  statement, or how on do I interpret it? I'm sorry.
3  What's your question?
4    Q. Yeah. What do you understand that sentence
5  to -- to -- to mean?
6         MR. HAKLAY: I'm sorry. The one that
7  starts about an FDA --
8         MR. TARLOWE: Yeah.
9         MR. HAKLAY: -- statistician?
10        MR. TARLOWE: Okay.
11        THE WITNESS: Okay. So what that -- what I
12 would interpret it as that an FDA reviewer provided a
13 report saying that there is conflicting evidence of
14 drug's effectiveness because there were not enough
15 recruiters -- volunteer recruiters available, and that
16 would set back studies.
17        So basically, that's what I understand
18 about it; that FDA reviewer, he said there was a
19 conflicting evidence for the drug's effectiveness.
20 BY MR. TARLOWE:
21   Q. Okay. Do you interpret that as a positive
22 comment for Biogen stock, or a negative comment?
23   A. Negative comment.
24   Q. Why?
25   A. According to -- from this -- according to this

36 (Pages 138 - 141)

Page 142

1  paragraph and according to a general -- as a layman
2  understanding, if FDA is approving something and later
3  on -- if FDA -- if the agency's reviewer already
4  reviewed it and data comes back and reviews and issues a
5  of statistical report that shows that it's a conflict,
6  it means it is not -- basically, it was conflicting
7  information. That's why it was negative --
8      Q. I see.
9      A. -- and that has a negative impact, I would say,
10 on the stock.
11     Q. I see.
12         And that's not -- you don't view that as a
13 particularly complicated sentence to understand, right?
14     A. Not really.
15         MR. HAKLAY: Objection.
16         He answered.
17 BY MR. TARLOWE:
18     Q. Okay. But you -- you did not read this article
19 before buying Biogen stock?
20     A. I did not.
21     Q. Would it have mattered if you had read this
22 before buying the stock?
23     A. Probably, yes.
24     Q. Why so?
25     A. If I had -- if I had read this article or this

Page 143

1  paragraph, it would have given me a clue that it might
2  have a negative impact on the stock, and price can go
3  down.
4      Q. Okay. And you're not aware -- I think you said
5  you're not aware that on November 6th, an Advisory
6  Committee had a meeting to discuss aducanumab?
7      A. That's correct.
8      Q. You're not aware?
9      A. I'm not aware.
10     Q. You don't recall being aware of that at the
11 time either?
12     A. That is correct.
13     Q. Do you think that a negative vote by the
14 Advisory Committee would have an effect on the stock of
15 Biogen?
16         MR. HAKLAY: Objection.
17         THE WITNESS: I don't know.
18 BY MR. TARLOWE:
19     Q. Well, if someone had told you on November 5th
20 that there was going to be a meeting of an Advisory
21 Committee the next day and that they were going to
22 advise against approving aducanumab, would that have
23 been relevant to your decision to buy the stock?
24         MR. HAKLAY: Objection.
25         THE WITNESS: I can't say. I don't know.

Page 144

1  BY MR. TARLOWE:
2      Q. You don't think that would have been relevant?
3          MR. HAKLAY: Objection, asked and answered
4  and calls for a hypothetical.
5          THE WITNESS: I don't know if it was
6  relevant or not.
7  BY MR. TARLOWE:
8      Q. When the stock went down on November 9th and
9  you sold -- let me ask you this: Do you recall what time
10 of day you sold your stock on November 9th?
11     A. I don't remember.
12     Q. You sold your stock through your ▮▮▮▮▮
13 online account?
14     A. That is correct.
15     Q. When you -- and that's the same way you bought
16 the Biogen stock?
17     A. That's correct.
18     Q. When you bought Biogen stock, did you set a
19 particular price for the order?
20     A. I don't remember.
21     Q. When you -- generally or typically when you
22 purchase stock, do you do a market purchase or do you
23 set a particular price?
24     A. It depends on that particular stock or -- or
25 that day.

Page 145

1      Q. Okay. Do you know what it's called when you
2  set a particular price?
3      A. Yes, I do see --
4      Q. What's that?
5      A. -- I do -- that, basically, you have an option.
6  You can either buy it on the market; it means you buy it
7  right away. Or you can set a -- set a particular price.
8      Q. And if you set a particular price, the purchase
9  only happens if the stock exceeds that price?
10     A. Hits that price. Sorry.
11         MR. TARLOWE: I -- I think the answer was
12 exceeds that price.
13 BY MR. TARLOWE:
14     Q. Let -- I just want to make sure it's clear
15 because we were talking over each other --
16     A. Okay. Go ahead.
17     Q. -- I -- so if you put in an order for stock at
18 a certain price, how does that work?
19     A. If I put a certain price on the order, when it
20 hits that order -- that price, that -- that trade gets
21 executed.
22     Q. When the stock hits that price?
23     A. That stock hits that price.
24     Q. Then the trade gets executed?
25     A. That's correct.

37 (Pages 142 - 145)

Page 146

1     Q.  You don't remember whether Biogen was a market
2  order or whether you set a particular price?
3     A.  That's correct.  I don't remember.
4     Q.  In what circumstances do you set a price on an
5  order?
6     A.  It depends upon the day.  It depends upon the
7  trading patterns.  If the stock has been going up and
8  down in -- in minutes or seconds and if the price was
9  low yesterday, if it -- if it closes -- I'll give an
10  example just to answer your question.  If it closes at
11  $100; today, it opens at $105; and then it -- in five
12  minutes, it goes down to $99; then I would probably --
13  if it hits below 100, the last price, I will pick up a
14  price point much below $100.  That's how I -- I would
15  decide.
16        So to answer your question, so it depends
17  upon the -- and if the price is not really -- you know,
18  it -- it keeps going up and up and it comes down very
19  little and then goes up, then I would probably do a
20  market to -- to make sure that, you know, I buy it at
21  the right place, right time, right price.  So when I'm
22  seeing the trend is really going high, I would do the
23  market price.
24     Q.  Okay.  And so how do you try to determine when
25  it's the right time and the right price to buy

Page 147

1  something?
2     A.  Again, as I answered before, that it's -- it's
3  that -- it's the -- it's the trending.  It's the graph.
4  That's what I determine by.
5     Q.  And looking at the stock price movements of
6  Biogen on November 4th and November 5th, 2020, does that
7  jog any memory for you as to whether you put in a market
8  order or whether you set a price limit?
9     A.  On Exhibit 7?
10     Q.  Yeah.
11     A.  No, that doesn't tell me anything, and I don't
12  remember.
13     Q.  Okay.  And you don't remember what time of day
14  on November 9th you put in the order to sell?
15     A.  That's correct.
16        MR. HAKLAY:  Objection, asked -- objection,
17  asked and answered.
18        He answered.
19  BY MR. TARLOWE:
20     Q.  Do you know that you placed the order on
21  November 9th?
22     A.  If this document says, then yes.
23     Q.  And do you know that you placed the order to
24  buy on November 5th?
25     A.  According to this document, yes.

Page 148

1     Q.  What if it -- what if you had entered a limit
2  order a day earlier --
3        MR. HAKLAY:  Objection --
4  BY MR. TARLOWE:
5     Q.  -- couldn't then the trade happen on the 5th
6  even though you placed the order on the 4th?
7        MR. HAKLAY:  My apologies for interrupting.
8        Objection to the hypothetical.  Assumes
9  facts not in evidence.  You can answer.
10        THE WITNESS:  I would not know that.
11  BY MR. TARLOWE:
12     Q.  Do you know whether the limit order is good for
13  one day only, or whether it extends for more than one
14  day?
15        MR. HAKLAY:  Objection.
16        THE WITNESS:  It's good for one day.
17  BY MR. TARLOWE:
18     Q.  Would you say that you've kept abreast of this
19  case since it was filed?
20     A.  Yes.
21     Q.  How so?
22     A.  Through emails.
23     Q.  Emails with whom?
24     A.  With my law firm.
25     Q.  Have you read court filings in this case?

Page 149

1     A.  Give me an example of court filings.
2     Q.  Well, why don't you tell me?  Are there court
3  files that you've read?
4        MR. HAKLAY:  Objection.  He's expressed
5  that he doesn't know what you mean by "court filing."
6        THE WITNESS:  I don't know what a court
7  filing is.
8  BY MR. TARLOWE:
9     Q.  You don't know what a court filing is?
10     A.  Yeah.  No.
11     Q.  Okay.  Have you read any documents from this
12  case that have been filed with a court?
13     A.  Yes.
14     Q.  What documents?
15     A.  I have read -- I will not say that I have read.
16  Read means that you thoroughly go through that.  I --
17  I've glanced it.  I've -- you know, very vaguely, I went
18  through it when I received these documents from my --
19  from the law firm, and I just looked at them.  I
20  verified the information, my name, my address, and a
21  brief facts of the case, and -- and I signed it.  So
22  that was the -- if I remember correctly, that's the
23  amended complaint.
24     Q.  Okay.  And other than the amended complaint,
25  are there other documents in this case that you recall

38 (Pages 146 - 149)

Page 150

1 reviewing or glancing at?
2 A. I don't remember.
3 Q. Are you aware of any court decisions that have
4 been issued in this case?
5 A. I have been advised about the court -- court
6 decisions.
7 Q. What court decisions are you aware of?
8 A. One is from the appellate court, and one is
9 from the United States District Court, Mass-- --
10 Massachusetts.
11 Q. What is the decision from the appellate court?
12 A. They reversed the order of the United States
13 District Court and remanded it back to the court --
14 lower court.
15 Q. What does that mean?
16 A. That means that they accepted the partial claim
17 and sent it back to the lower court to decide.
18 Q. Do you know what portion of it they sent back?
19 A. I don't remember that.
20 Q. I think you also mentioned you were familiar
21 with the decision of the district court. What decision
22 is that?
23 A. I don't remember that.
24 Q. Do you understand whether the district court
25 has ruled on some of the alleged misstatements?

Page 151

1 A. Yes.
2 Q. What do you understand the district court to
3 have ruled?
4 A. I don't remember. I don't recall.
5 Q. Do you know whether any of the misstatements
6 have been dismissed from the case?
7 A. I don't know.
8 Q. Have you -- would you say you've monitored
9 counsel through the course of the litigation?
10 A. What do you mean by "monitor"?
11 Q. Well, have you -- do you believe that you've
12 monitored counsel?
13 MR. HAKLAY: Objection. He just said he
14 doesn't understand the word.
15 THE WITNESS: Yeah. I need to know what do
16 you mean by "monitor."
17 BY MR. TARLOWE:
18 Q. So you don't know what the word "monitor"
19 means?
20 MR. HAKLAY: Objection, misstates.
21 THE WITNESS: Monitor can refer to so many
22 different things.
23 BY MR. TARLOWE:
24 Q. Have you ever told anyone that you would
25 monitor counsel in this case?

Page 152

1 MR. HAKLAY: Objection.
2 THE WITNESS: I need to know more
3 information about the monitor.
4 BY MR. TARLOWE:
5 Q. Well, have you ever used those words in
6 describing your role in this case, that you would
7 monitor counsel?
8 A. I'm not sure.
9 Q. Okay. And so if you were asked whether you
10 monitored counsel, you would say you don't know what
11 that means?
12 A. I will ask you a question. Monitor means am I
13 following up with my law firm? Is that what you're
14 trying to refer to?
15 Q. Well, have you taken any steps to monitor your
16 counsel in this litigation?
17 MR. HAKLAY: Same objection, same word.
18 THE WITNESS: I need to know more when you
19 say "monitor."
20 BY MR. TARLOWE:
21 Q. Okay. Have you done anything to oversee the
22 litigation?
23 A. Yes.
24 Q. What have you done to oversee the litigation?
25 A. I have emailed my -- my -- my attorneys, my law

Page 153

1 firm about the updates --
2 MR. HAKLAY: You cannot talk about what you
3 did or did not write and what response you did or did
4 not get. You can talk about communicating with counsel,
5 but --
6 THE WITNESS: Yes.
7 BY MR. TARLOWE:
8 Q. How often do you communicate with counsel?
9 A. There is no fixed time.
10 Q. Well, before yesterday -- I think you met with
11 your counsel yesterday, you said?
12 A. Yes.
13 Q. Before that, how many times would you say
14 you've talked to the lawyers about this case?
15 A. Are you talking in general, starting from the
16 beginning?
17 Q. From the time that the case was filed.
18 A. I don't know the counts on the top of my head.
19 Q. Ballpark?
20 A. I don't remember.
21 Q. Have you met with them in person before
22 yesterday?
23 A. No.
24 Q. Have you talked to them on the phone?
25 A. No.

39 (Pages 150 - 153)

Page 154

1    Q. Do you email them, or the emails only come from
2  them to you?
3    A. I email them.
4    Q. Okay. Do you have a primary point of contact
5  at the Rosen firm?
6    A. Yes.
7    Q. Who is that?
8    A. Jon.
9    Q. Do you know Jon's last name?
10    A. I know him, but I don't remember right now.
11  Jonathan, his full name, I guess. Yeah.
12    Q. How much time do you think you've spent working
13  on this case since it was filed?
14        MR. HAKLAY: Objection.
15        You can answer.
16        THE WITNESS: If you are asking on a daily
17  basis, then hardly any time.
18  BY MR. TARLOWE:
19    Q. Okay. And what about not on a daily basis, if
20  you add it together?
21    A. I can't -- I can't recall.
22    Q. You think it's more than ten hours? Less than
23  ten hours?
24    A. I can't say that.
25    Q. Are you aware that the lawyers for both sides

Page 155

1  have filed briefs in this case?
2    A. I cannot know the other side.
3    Q. Have your lawyers filed briefs in this case?
4    A. I'm not sure.
5    Q. Have you read any briefs that were filed in
6  this case?
7    A. I have not.
8    Q. Are you aware of any settlement discussions in
9  this case?
10    A. Yes.
11    Q. What are you aware of?
12        MR. HAKLAY: Again, without disclosing what
13  a lawyer might have told you.
14        THE WITNESS: It's a -- it's a -- if -- if
15  we win, then we -- you know, we get compensated.
16  BY MR. TARLOWE:
17    Q. Do you know what a mediation is?
18    A. In what context?
19    Q. In a legal context, are you familiar with the
20  concept of a mediation?
21    A. Yes.
22    Q. What is it?
23    A. It's kind of an out-of-court discussion about
24  the case.
25    Q. For what purpose?

Page 156

1    A. If we can -- if parties agree to mediate and
2  they come up with a mutual decision, that's what's a
3  mediation.
4    Q. Do you know if that's happened in this case?
5    A. I'm not sure. I don't know.
6    Q. You haven't attended a mediation in this case?
7    A. I'm sorry?
8    Q. You haven't attended a mediation in this case?
9    A. No.
10    Q. Have you taken any steps to ensure that the
11  lawyers in this case prosecute the case vigorously?
12    A. Can you say your question again, please?
13    Q. Sure.
14        Do you know what it means for a lawyer to
15  prosecute a case vigorously?
16    A. Yes.
17    Q. What does that mean to you?
18    A. They need to file the relevant pleadings on
19  time. They need to attend the court hearings.
20    Q. Who -- who do you understand the lawyers to
21  represent? Do they represent anybody other than you?
22    A. I don't know that.
23    Q. And since you're a lead plaintiff, do you
24  understand that you're entitled to some preferential
25  treatment as compared to other plaintiffs?

Page 157

1        MR. HAKLAY: Objection. He's not a lead
2  plaintiff. And asked and answered.
3        THE WITNESS: I'm not a lead plaintiff.
4  BY MR. TARLOWE:
5    Q. Do you understand that, as a class
6  representative, you're entitled to any preferential
7  treatment?
8    A. I don't know.
9    Q. Would you expect for your lawyers to prioritize
10  your interests over those of other class members who are
11  not class representatives?
12    A. No.
13    Q. So I want to go back to that Wall Street
14  Journal article that we looked at a moment ago. And the
15  part we looked at before talked about a medical
16  reviewer, who thought the evidence was highly
17  persuasive, and a statistical reviewer, who was more
18  critical, writing that there was conflicting evidence.
19        You recall that?
20    A. Yes.
21    Q. Okay. And you'd agree that that -- would you
22  agree that that indicates that there were conflicting
23  views on the -- on the data?
24    A. Yes.
25    Q. And you're not -- I think you testified you

40 (Pages 154 - 157)

Page 158

1 don't have a science background. You're not in a
2 position yourself to assess -- I'll withdraw that.
3         If one reviewer thinks the evidence is
4 persuasive and another thinks the evidence is
5 conflicting, does that mean that one of those people is
6 lying?
7         MR. HAKLAY: Objection.
8         THE WITNESS: I would not know that.
9 BY MR. TARLOWE:
10    Q. You understand that different people can have
11 different views of the same data?
12        MR. HAKLAY: Objection.
13        THE WITNESS: Yes.
14 BY MR. TARLOWE:
15    Q. And just because people have different views,
16 it doesn't mean that one person is lying.
17    A. It's fair to say that.
18        MR. TARLOWE: Let me show you -- I'm going
19 to hand you a document that's marked Exhibit 9.
20        (Exhibit 9 was marked for identification.)
21 BY MR. TARLOWE:
22    Q. Have you seen this document before?
23    A. No.
24    Q. Okay. You see the headline is "FDA's Decision
25 to Approve New Treatment for Alzheimer's Disease."

Page 159

1         Do you see that?
2    A. Yes.
3    Q. And I want to direct your attention to the
4 second page. You see the section with the heading "What
5 the Data Show"?
6    A. Yes, I do.
7    Q. The first sentence says, "The late-stage
8 development program for Aduhelm consisted of two Phase 3
9 clinical trials."
10        Do you know whether that's a reference to
11 the EMERGE and ENGAGE studies that we talked about
12 earlier?
13    A. I don't know.
14    Q. If then says, "One study met the primary
15 endpoint, showing reduction in clinical decline."
16        Do you know what that means?
17    A. I don't.
18    Q. Okay. It then says, "The second trial did not
19 meet the primary endpoint."
20        Do you know what that means?
21    A. No, I don't.
22    Q. Okay. Even if you don't know the details, do
23 you understand that one of those is a positive outcome
24 and one is a negative outcome?
25    A. We can assume so.

Page 160

1    Q. Then it goes on to say, "In all studies in
2 which it was evaluated, however, Aduhelm consistently
3 and very convincingly reduced the level of amyloid
4 plaques in the brain in a dose- and time-dependent
5 fashion."
6         Do you see that?
7    A. Yes, I do.
8    Q. Do you understand what that means?
9    A. I don't.
10    Q. Okay. Do you believe that to be consistent
11 with the statement that Dr. Sandrock made on the
12 July 2020 earnings call that we looked at earlier today?
13        MR. HAKLAY: Objection.
14        THE WITNESS: Please repeat your question.
15 BY MR. TARLOWE:
16    Q. Sure.
17        What -- what's your -- what do you think
18 that statement means?
19    A. I can't interpret that.
20    Q. Okay. We looked at a statement this morning by
21 Dr. Sandrock in a second quarter of 2020 earnings call.
22        You remember that?
23    A. I think so, yeah.
24    Q. And you understand the complaint alleges that
25 at least a portion of that statement was not true?

Page 161

1    A. That is correct.
2    Q. And it was not true, in your view, because of
3 what he said about the effectiveness of adu?
4    A. What I understood is the statement that he made
5 that all data was -- was consistent is not true, is --
6 is -- is a misrepresentation of the -- of the facts
7 because of the other statistical report that we looked
8 at in the -- in the FDA approval is not consistent with
9 that.
10    Q. What statistical report did we look at?
11    A. The one that we're just looking at in this one.
12    Q. The Wall Street Journal article?
13    A. Yes.
14    Q. Well, that's not a statistical report, is it?
15    A. It's the FDA approval report.
16    Q. Okay. And we spent a fair amount of time this
17 morning on Dr. Sandrock's statement, right?
18    A. Uh-huh. Yes.
19    Q. And during that discussion, you never once
20 mentioned "all data," did you?
21    A. I don't recall.
22    Q. Okay. Is there a reason that you now recall
23 the "all data" statement?
24        MR. HAKLAY: Objection.
25        I'll remind you not to discuss discussions

41 (Pages 158 - 161)

Page 162

1  with counsel.  Other than that, you can answer.
2        THE WITNESS:  I don't -- I don't remember
3  that I did not discuss that.  I don't recall.
4  BY MR. TARLOWE:
5      Q.  So you don't recall, one way or the other,
6  whether during your testimony this morning, you ever
7  used the phrase "all data"?
8      A.  I don't remember.
9      Q.  Did you look at something that refreshed your
10  recollection about the "all data" comment?
11      A.  What do you mean "look at"?
12      Q.  Well, did you look at a document that refreshed
13  a memory that Dr. Sandrock said something about "all
14  data"?
15      A.  I -- I guess I looked at it yesterday.
16      Q.  Okay.  But when we went over that statement
17  this morning and I asked you what you thought made it
18  false, you didn't say anything about "all data"; now,
19  you are.  And what I'm asking is whether you looked at
20  something between the testimony this morning and now
21  that led do you recall this "all data" phrase?
22      A.  I probably knew about it but may have missed it
23  this morning.
24      Q.  That's not my question.
25        MR. HAKLAY:  Objection.

Page 163

1  BY MR. TARLOWE:
2      Q.  My question is --
3        MR. HAKLAY:  He answered your question
4  directly.
5  BY MR. TARLOWE:
6      Q.  My question is: Did you look at a document that
7  refreshed your recollection as to the "all data"
8  statement?
9      A.  After this -- yes, I did.
10      Q.  Okay.  Did you look at that within the last
11  hour?
12      A.  Yes.
13      Q.  Did you look at that during the last break?
14      A.  Yes.
15      Q.  Okay.  What document did you look at?
16      A.  The -- I think the document that was signed by
17  me.
18      Q.  In the -- in the transcript we looked at of
19  that earnings call, Dr. Sandrock never said "all data,"
20  did he?
21        MR. HAKLAY:  Objection.  You mean those
22  exact words in that exact order?
23        THE WITNESS:  Which earning call?
24  BY MR. TARLOWE:
25      Q.  We looked this morning at a transcript of a

Page 164

1  second quarter 2020 earnings call.
2        Do you remember that?
3      A.  I've looked at so many documents.  I'm not
4  really sure.
5      Q.  Okay.  We'll show it to you, then.  It's
6  Exhibit 4, and it's page 16 of 26.
7      A.  16 of 26?
8      Q.  Yep.  You see sort of the bottom third of the
9  page, it has "Answer: Alfred Sandrock?"
10      A.  Yes.
11      Q.  Okay.  And just to help you out here, the last
12  sentence says, "So, consistent with the findings of
13  ENGAGE and EMERGE, you really need to get to the higher
14  dose, and I think our data are all consistent with
15  that."
16        The words "data" and the words "all" appear
17  there, but it doesn't say "all data," correct?
18      A.  Our data...
19      Q.  It does not say the words "all data," in that
20  order?
21      A.  No, it does not.
22      Q.  And it says, "You really need to get to the
23  higher dose, and I think our data are all consistent
24  with that."
25        What's the "that"?

Page 165

1      A.  I do not -- I would not know that.
2      Q.  And when he refers to "our data," you
3  understand that to mean the three studies that are
4  mentioned here, EMERGE, ENGAGE, and PRIME?
5        MR. HAKLAY:  I'm going to object just
6  because it doesn't say PRIME in that sentence.
7        MR. TARLOWE:  I didn't say "that sentence."
8        MR. HAKLAY:  You directed him to that
9  sentence.
10        But go ahead, you can answer.
11        THE WITNESS:  What's your question again?
12  BY MR. TARLOWE:
13      Q.  Yes.  When he says "our data," do you
14  understand him to be referring to the three studies
15  mentioned in this paragraph, EMERGE, ENGAGE, and PRIME?
16      A.  I would not know that.
17      Q.  And now I'm going to go back to the FDA
18  document.  Keep that in front of you too.
19      A.  Okay.
20      Q.  Now I want to go back to the sentence that we
21  read a moment ago, "In all studies in which" --
22        MR. HAKLAY:  I'm sorry.  Where are you?
23        MR. TARLOWE:  On page 2, under "What the
24  Data Show" --
25        THE WITNESS:  Is that "FDA's Decision to

42 (Pages 162 - 165)

Page 166

1 Approve...?"
2        MR. TARLOWE: (Nods head.)
3        THE WITNESS: Second paragraph?
4 BY MR. TARLOWE:
5     Q. Under "What the Data Show" --
6        MR. HAKLAY: "In all studies," okay.
7        MR. TARLOWE: Yeah.
8        MR. HAKLAY: Okay. Third line down, "In
9 all studies."
10       THE WITNESS: Okay.
11 BY MR. TARLOWE:
12    Q. Now, you see that that says "all studies,"
13 correct?
14    A. That's correct.
15    Q. And it says, "In all studies in which it was
16 evaluated, Aduhelm consistently and very convincingly
17 reduced the level of amyloid plaques in the brain."
18       Do you see that?
19    A. Yes, I do.
20    Q. You understand that to be a positive statement
21 on the effectiveness of adu?
22    A. Positive in what way?
23       MR. HAKLAY: You just get to answer
24 questions, not ask them.
25 BY MR. TARLOWE:

Page 167

1     Q. Positive as to its effectiveness.
2     A. That's correct.
3     Q. And what do you understand it to mean when it
4 says "consistently and very convincingly"?
5     A. I would not know that.
6     Q. Do you have any reason to believe that that
7 statement is not true?
8     A. I do not.
9     Q. And if that was the conclusion of the FDA, do
10 you have any reason to believe that Dr. Sandrock did not
11 believe what he said on the July 2020 earnings call?
12       MR. HAKLAY: Objection.
13       THE WITNESS: Repeat that again, please.
14 BY MR. TARLOWE:
15    Q. Sure.
16       The document we're looking at has the FDA's
17 conclusion. Okay?
18    A. Okay.
19    Q. And in a section called "What the Data Show,"
20 it has a conclusion based on all studies.
21       Are you with me?
22    A. Okay. Let's see here.
23       "In all studies," yes.
24    Q. Okay. And it says (as read): In all studies
25 in which the drug was evaluated, it consistently and

Page 168

1 very convincingly reduced the level of amyloid plaques."
2        You see that?
3     A. Yes, I do.
4     Q. And even if you don't understand all the
5 details, you understand that that means that
6 consistently and convincingly demonstrated
7 effectiveness?
8        MR. HAKLAY: Objection to the word
9 "effectiveness," which is not in here.
10       MR. TARLOWE: Okay. Let's just stick with
11 "objection," please.
12       MR. HAKLAY: I'll stick with what I need to
13 stick with.
14       MR. TARLOWE: What's that?
15       MR. HAKLAY: I'll stick with what I need to
16 stick with.
17       MR. TARLOWE: Well, it's not -- it's not
18 proper.
19       MR. HAKLAY: Okay. Well, you can put that
20 on the record.
21       MR. TARLOWE: You've been coaching him all
22 day.
23       MR. HAKLAY: I have not coached him at all.
24 You misrepresented what the sentence said.
25       Do you recall the question he asked you?

Page 169

1        THE WITNESS: Yeah, please.
2 BY MR. TARLOWE:
3     Q. Sure.
4        Even if you don't understand all the
5 details, you understand that that means that it
6 consistently and convincingly demonstrated
7 effectiveness?
8        MR. HAKLAY: Objection.
9        THE WITNESS: To the extent of reading,
10 yes.
11 BY MR. TARLOWE:
12    Q. And if that's the case, then why do you believe
13 Dr. Sandrock's statement in the July 2020 earnings call
14 to be false?
15    A. Because the report that came, I think, on
16 July 4th or 5th, that is -- that -- that report is
17 inconsistent with what Dr. Sandrock said.
18    Q. What -- what report are you talking about?
19    A. I'm talking about that 300 pages report that
20 came on November 4th that shows that what Dr. Sandrock
21 said is not -- is -- is misrepresented.
22    Q. This morning, Mr. Khan, you testified that you
23 weren't aware of any report released on November 4th,
24 2020.
25       MR. HAKLAY: Is that a statement or a

43 (Pages 166 - 169)

Page 170

1  question?
2  BY MR. TARLOWE:
3    Q. Did you testify this morning, Mr. Khan, that
4  you were not aware of any report released on
5  November 4th, 2020?
6    A. I don't recall.
7    Q. What did that November 4th report show?
8    A. That report mentions about what Dr. Sandrock
9  mentioned in the -- in the statement that we read
10  earlier is misrepresentation, that -- that it's all
11  consistent with the -- with the studies.
12   Q. And how is the November 4th report inconsistent
13  with Dr. Sandrock's statement?
14   A. That report -- that that report is -- that's a
15  statistical report that is saying that data is not
16  consistent what Dr. Sandrock is -- is basically saying.
17   Q. In what way is it not consistent?
18   A. Where it says that you really need to get the
19  higher dose, and I think when he's saying -- means that
20  Dr. Sandrock thinks that our data are all consistent, so
21  that's -- not all the data is consistent. Probably part
22  of the data is consistent.
23   Q. Not all the data is consistent with what?
24   A. With those reports.
25   Q. What report?

Page 171

1    A. With these reports that's mentioned in this
2  paragraph.
3    MR. HAKLAY: For the record, he's looking
4  at Exhibit 4. He's got two exhibits in front of him.
5  BY MR. TARLOWE:
6    Q. Have you read the statistical report?
7    A. I have not.
8    Q. And so you've just described why you believe
9  the statistical report is inconsistent with what
10  Dr. Sandrock said; is that right?
11   A. I'm sorry. Say that again, please.
12   Q. Yeah.
13    I'll ask you a different question. The
14  statistical report, do you understand that to be the
15  opinion of a reviewer?
16   A. I don't know.
17   Q. And do you know whether the statistical report
18  is consistent or inconsistent with the statement I read
19  you from the FDA about adu consistently and very
20  convincingly reducing the level of amyloid plaques?
21   A. I don't know.
22   Q. Well, does -- does that statistical report
23  render the FDA statement false?
24   A. I would not know that.
25   Q. Well, you're claiming that the statistical

Page 172

1  report renders Dr. Sandrock's statement false, right?
2    A. That's -- that -- that statistical report is
3  not in-- is not consistent with what Dr. Sandrock said.
4    Q. Okay. So you -- you believe that you do have a
5  basis to compare the statistical report to
6  Dr. Sandrock's statement?
7    A. If we -- if I -- not if. Yes. I will say yes.
8    Q. Okay. Is that based on what's in the
9  complaint?
10   A. I don't remember that.
11   Q. Well, you haven't read the report, right?
12    MR. HAKLAY: Objection, asked and answered.
13    THE WITNESS: I'm sorry?
14    MR. HAKLAY: I made an objection. You can
15  answer his question.
16    THE WITNESS: I have not read the report.
17  BY MR. TARLOWE:
18   Q. Okay. So how are you able to assess whether
19  the report is consistent or not consistent with what
20  Dr. Sandrock said?
21   A. That is as per the complaint.
22   Q. And so are you able to compare Dr. Sand- --
23  sorry. Withdrawn.
24    Are you able to compare what was reported
25  in the statistical review with the FDA statement?

Page 173

1    A. Am I able -- say that question again.
2    Q. Sure.
3    Can you compare -- let me take a step back.
4  You attempted to compare the statistical report to
5  Dr. Sandrock's statement, correct?
6    A. I'm saying that that statistical report is
7  contrary to what Dr. Sandrock is saying.
8    Q. Okay. And is the FDA statement contrary to
9  what Dr. Sandrock was saying?
10    MR. HAKLAY: Objection.
11    THE WITNESS: I can't understand that.
12  BY MR. TARLOWE:
13   Q. Is the FDA report contrary to the statistical
14  review?
15   A. I don't know.
16   Q. And is it possible that the statistical
17  reviewer had one opinion of the data and Dr. Sandrock
18  had a different opinion of the data?
19   A. No.
20   Q. That's not possible?
21   A. No.
22   Q. Why is that not possible?
23   A. This is just my understanding, that when
24  statistical review or report came in, that says that the
25  statement by Dr. Sandrock, specifically about all data

44 (Pages 170 - 173)

Page 174

1  is consistent, data is all consistent, that report says
2  it's not all -- not everything is consistent with the --
3  with the -- with that statement of high dose. That's --
4  that's the way I see the discrepancy there.
5  BY MR. TARLOWE:
6      Q. And that's based --
7          MR. HAKLAY: Just whenever you've finished
8  this topic, it's been over an hour.
9          MR. TARLOWE: Okay.
10 BY MR. TARLOWE:
11     Q. That's based on your reading of the complaint?
12     A. That's correct.
13         MR. TARLOWE: Okay. We can take a break
14 now.
15         THE VIDEOGRAPHER: We're off the record at
16 2:14 p.m.
17         (Brief recess taken.)
18         THE VIDEOGRAPHER: We're back on the record
19 at 2:30 p.m.
20 BY MR. TARLOWE:
21     Q. Mr. Khan, how often do you look at the charts
22 that you described earlier?
23     A. It depends.
24     Q. Daily? Weekly? What frequency do you think
25 you look at those?

Page 175

1      A. Sometimes it's daily. Sometimes I don't look
2  at it for days.
3      Q. How many hours a week would you say you spend
4  on your stock investments?
5      A. Less than an hour.
6      Q. And do you do that only from home, or do you
7  sometimes also do that from work?
8      A. Home.
9      Q. And I know you testified earlier you don't know
10 what time of day you placed the trades on November 5th
11 or November 9th. Do you know whether you have the
12 ability to determine what time of the day you purchased
13 or sold Biogen in November 2020?
14     A. No, I don't.
15     Q. Do you know if you can get that information
16 from ███████?
17     A. Maybe.
18     Q. But if you place the trade -- we've established
19 that you placed the purchase on November 5th, 2020.
20 Does that indicate that you were home that day and not
21 at your office?
22     A. I would not know that. I would not remember
23 that.
24     Q. But if you only trade when you're home, then if
25 you traded on November 5th, doesn't that mean that you

Page 176

1  had to be home that day?
2      A. Following that scenario, yes.
3      Q. Is there any other scenario you can think of?
4      A. No.
5      Q. And you sold the stock on November 9th. So
6  does that mean you were home on November 9th, as well?
7      A. Fair to say that.
8      Q. ████████████████████████████████████
9  ████████████████████████████████████
10     A. If I want to say typical, then I don't
11 remember.
12     Q. I don't understand that answer.
13     A. What that means is that if -- simple words, I
14 don't remember.
15     Q. But you've testified that you only trade from
16 home.
17     A. Yes.
18     Q. So how could it be that you were somewhere
19 other than home on a day when you traded?
20     A. I could have been in the library.
21     Q. Okay.
22     A. Could have been at my friend's house.
23     Q. Okay. So --
24     A. I could have been off from work.
25     Q. So -- so when you place trades, you're not

Page 177

1  always placing them from your home, but you're -- is
2  that correct, you're not always home when you place the
3  trades?
4      A. That's -- I'm sorry. Say that again.
5      Q. Okay. When you buy or sell stocks, do you ever
6  do that from your office?
7      A. Sometimes I do.
8      Q. Didn't you testify that you never do that from
9  your office?
10     A. I -- very rare, though, but during my lunchtime
11 I may have done that. But, again, I -- I don't recall.
12 I will say most of the time, it's from home.
13     Q. Why did you testify earlier that you never
14 trade stocks from your office?
15         MR. HAKLAY: Objection.
16         THE WITNESS: I missed -- I -- I forgot
17 about the lunchtimes.
18 BY MR. TARLOWE:
19     Q. How often do you think you've traded from your
20 office?
21     A. Very rare.
22     Q. Only during lunch?
23     A. Yes.
24     Q. Okay. So if a trade was placed in your
25 ████████ account from your office, it would necessarily

45 (Pages 174 - 177)

Page 178

1  be during lunchtime?
2      A.  Probably, yes.
3      Q.  Probably or definitely?
4      A.  I cannot be sure.
5      Q.  Okay.  I believe you testified a moment ago
6  that if you ever traded from your office, it would be
7  during lunch.  Was that not correct?
8      A.  That is correct.
9      Q.  Okay.  Then doesn't that mean that if you
10 traded from your office, it would be during lunchtime?
11     A.  Yes, fair to say that.
12     Q.  Okay.  With respect to clinical studies of
13 aducanumab, do you know what the term "carrier" means?
14     A.  No, I don't.
15     Q.  Do you know what "subgroup" means?
16     A.  No.
17     Q.  If you were made whole for your losses from
18 trading Biogen, approximately $12,000, would you still
19 pursue this litigation?
20         MR. HAKLAY:  Objection, calls for
21 speculation.
22         THE WITNESS:  I think I need to rehear your
23 question.
24 BY MR. TARLOWE:
25     Q.  Sure.

Page 179

1          If somebody wrote you a check for $12,000,
2  would you still pursue this litigation?
3          MR. HAKLAY:  Objection, vague as to
4  somebody.
5          You can answer.
6          THE WITNESS:  I trust my attorneys.  I will
7  act on their advice.
8  BY MR. TARLOWE:
9      Q.  Whatever that advice is?
10     A.  I have to get consent from them.
11     Q.  You have to get --
12     A.  I have to get consent or advice from my
13 attorney if I should take it or not.
14     Q.  You don't think that that's a determination
15 that you're able to make?
16     A.  That is correct.
17     Q.  Do you think it's fair for somebody who made
18 money trading Biogen to participate in this lawsuit?
19     A.  I don't know.
20     Q.  And you understand that if there is a recovery
21 of money by the plaintiffs in this case, it gets shared
22 among plaintiffs?  You understand that?
23     A.  I do.
24     Q.  And do you think it's fair that somebody who
25 made money trading Biogen could get a portion of any

Page 180

1  recovery?
2          MR. HAKLAY:  Objection.
3          THE WITNESS:  I wouldn't know that.
4  BY MR. TARLOWE:
5      Q.  Well, do you think it's fair?
6          MR. HAKLAY:  Objection.
7          THE WITNESS:  I don't know.
8  BY MR. TARLOWE:
9      Q.  Well, do you think somebody like you, who lost
10 a lot of money, deserves to be repaid more than somebody
11 who made money?
12         MR. HAKLAY:  Objection.
13         THE WITNESS:  My opinion does not count
14 here, because I trust my attorneys, and I will make --
15 let them make this decision.
16 BY MR. TARLOWE:
17     Q.  I'm just asking for your opinion.  You're
18 entitled to have an opinion, regardless of what your
19 lawyers think.
20         In your opinion, if there's only a certain
21 pool of money potentially available to go to plaintiffs,
22 do you think you should have to share that money with
23 people who profited from trading Biogen?
24         MR. HAKLAY:  Objection.
25         Go ahead.

Page 181

1          THE WITNESS:  I -- being the fiduciary, I
2  would not like to put my interests in front of the
3  other -- other named classes of this law- -- lawsuit.
4  BY MR. TARLOWE:
5      Q.  What does it mean, that you're a fiduciary?
6      A.  I'm a fiduciary.  What I mean is that, you
7  know, I need -- I'm not only looking for my interest,
8  I'm looking about their interest because I'm the named
9  fiduciary here.
10     Q.  How are you looking out for their interests?
11     A.  In a way that -- I don't want to take
12 advantage.  Like coming back to your previous question,
13 if I'm offering -- if I'm being offered or if I'm given
14 the amount of my loss, if I'm ready to -- if that's what
15 you meant to say, withdraw, and I said no, I will let my
16 attorneys make this decision then, and -- and I will
17 consult my attorneys.
18         Similarly, in the same token, to answer
19 your question, I -- my opinion would be that I -- I
20 don't mind with that, staying then in the -- in the
21 lawsuit.
22     Q.  Okay.  But the question's a little different.
23         So do you think it's fair if you recover
24 less money because people who made money trading Biogen
25 get some of the recovery?

46 (Pages 178 - 181)

Page 182

1        MR. HAKLAY: Objection.
2        THE WITNESS: It's not unfair.
3  BY MR. TARLOWE:
4      Q. Why?
5      A. Because we are working as a class. Because
6  it's a class action lawsuit and we are all working
7  together. And if -- even if they made money but because
8  they are -- they are the -- part of this class action
9  and I have no reason -- or I have no way to say on my
10 own if they should stay or not. Again, I will let my
11 attorneys decide about that.
12     Q. But it's not a legal question; it's just a
13 question of your opinion of what's fair, what's not
14 fair.
15        Do you think it's fair for you to get less
16 money because somebody who made money gets a portion of
17 any recovery?
18        MR. HAKLAY: Objection.
19        THE WITNESS: It's not unfair.
20 BY MR. TARLOWE:
21     Q. And so you would be prepared to receive less
22 money so that somebody who made money could get money
23 out of this lawsuit.
24        MR. HAKLAY: Objection.
25        THE WITNESS: Yes.

Page 183

1        MR. TARLOWE: I'm going to show you a
2  document marked Exhibit 10.
3        (Exhibit 10 was marked for identification.)
4  BY MR. TARLOWE:
5      Q. You recognize that document?
6      A. Yes, I do.
7      Q. What is it?
8      A. It's declaration of Amjad Khan in support of
9  plaintiffs' motion for class certification, and ap- --
10 appointment of class representative and class counsel.
11     Q. And you signed this document?
12     A. I did.
13     Q. Under penalty of perjury?
14     A. That's correct.
15     Q. And you've seen this document earlier today?
16     A. Yes.
17     Q. And before you signed it, you read it
18 carefully?
19     A. Yes.
20     Q. You understood it?
21     A. To some extent.
22     Q. Were there portions you did not understand?
23     A. When I signed it, I did not thoroughly went
24 through this, but I read it.
25     Q. Were there portions you did not understand?

Page 184

1      A. No.
2      Q. Okay. I asked you if you understood it. You
3  said, "To some extent."
4        What did you mean by that?
5      A. It means that I did not thoroughly -- I did
6  not, like, read each one. I basically have verified my
7  information, my name, and -- and just -- just skimmed
8  through that, basically. That's what I meant to say.
9      Q. Did you understand that this was going to be
10 submitted to the court?
11     A. Yes.
12     Q. Do you understand that it's important to make
13 sure that things that are submitted to the court are
14 truthful, complete, and accurate?
15     A. It is important.
16     Q. How long do you think it would take you to read
17 this document?
18     A. Right now?
19     Q. Any time.
20     A. Depends where I'm sitting, in what mood I'm
21 sitting.
22     Q. Well, it's -- it's three pages, right?
23     A. So if I'm sitting at work, it might take more
24 time versus I'm sitting in my living room or if I'm
25 sitting in my study, and I'm in a mood to read that. So

Page 185

1  it might take me probably 10 minutes or 15 minutes.
2      Q. Okay. But you chose to skim it?
3      A. I didn't skip it, but I had a glance on it.
4      Q. Okay. And if you take a look at paragraph 19,
5  it says, "I will continue to work with counsel to
6  monitor and oversee the litigation."
7        Do you see that?
8      A. Yes.
9      Q. When you signed this, did you understand what
10 that meant?
11     A. Kind of.
12     Q. Kind of or yes?
13     A. Yeah, because this -- this sentence really did
14 not -- I did not pay attention to this particular
15 sentence. Or, as I said, I just went through that and I
16 just signed it.
17     Q. Do you understand what that sentence means?
18     A. Yes.
19     Q. When I asked you earlier today whether you had
20 worked with counsel to monitor the litigation, you said
21 you didn't understand what that means.
22     A. I was not understanding the word "monitor."
23     Q. So when you read this, how did you understand
24 it?
25     A. Now I'm reading it, now I understand it.

47 (Pages 182 - 185)

Page 186

1    Q.  Okay.  And how have you worked with counsel to
2  monitor and oversee the litigation?
3    A.  Say that question again, please.
4    Q.  Sure.
5        How have you worked with counsel to monitor
6  and oversee the litigation?
7    A.  Through emails.
8    Q.  Have you submitted any other documents to a
9  court in connection with this case?
10   A.  I personally did not.
11   Q.  Okay.  Did you sign any other documents
12 understanding that they would be submitted to the court?
13   A.  Unless I see that, I don't remember.
14   Q.  Okay.  So sitting here today, you have no
15 recollection -- you don't know, one way or the other,
16 whether you signed documents knowing that they would be
17 submitted to the court?
18   A.  I signed more than this document.
19   Q.  Okay.  And of the other documents you signed,
20 did you know whether any of those documents would be
21 submitted to the court?
22   A.  If I'm signing it, it will be for the court.
23   Q.  Did you review all of those carefully?
24   A.  I will say I reviewed them the way I did this
25 one.

Page 187

1    Q.  And when you say you reviewed it like you
2  reviewed this one, what do you mean by that?
3    A.  It means that I just glanced and skimmed those
4  ones as well.
5        MR. TARLOWE:  Could we go off the record?
6        THE VIDEOGRAPHER:  We're off the record at
7  2:50 p.m.
8        (Brief recess taken.)
9        THE VIDEOGRAPHER:  We're back on the record
10 at 2:54 p.m.
11       MR. TARLOWE:  Okay.  Thank you, Mr. Khan.
12 At this time --
13       THE WITNESS:  You're welcome.
14       MR. TARLOWE:  -- I don't have any further
15 questions.  Thank you.
16       MR. HAKLAY:  Now he stepped on you.
17       MR. TARLOWE:  What?
18       MR. HAKLAY:  Now he stepped on you.
19       I have some questions for you, sir.  Are
20 you ready?
21       THE WITNESS:  Okay.  Yes, I am.
22       MR. HAKLAY:  Okay.  Please don't step on my
23 questions.  I'm just kidding.
24            EXAMINATION
25 BY MR. HAKLAY:

Page 188

1    Q.  You said earlier that you -- you sometimes
2  traded at lunch at work, correct?
3    A.  That's correct.
4    Q.  You said you trade from home?
5    A.  That's correct.
6    Q.  You mentioned something about your brother's
7  house.  Did you ever trade there?
8    A.  No.
9    Q.  Okay.  When you trade at home, do you always do
10 it during the day, or do you do it at night sometimes?
11   A.  Always day.
12   Q.  Oh, okay.  So not at night?
13   A.  Not at night.
14   Q.  Do you ever do it before you go to work in the
15 morning?
16   A.  No.
17   Q.  Okay.  That answers that.
18       I want you to -- I'm going to show you
19 Exhibit 10, which is the last one.  You've already read
20 that title into the record, so we won't do that anymore.
21       I'm going to read you something.
22   A.  Okay.
23   Q.  I'm going to ask if I read it correctly to make
24 sure I did.
25   A.  Okay.  Okay.

Page 189

1    Q.  And I'm going to ask a question.  Okay?  So
2  please follow along with me.
3        Looking at Number 13: "I am bringing this
4  class action lawsuit not only on my own behalf, but also
5  on behalf of other shareholders that have been wronged
6  in the same way by defendants' same conduct."
7        Did I read that correctly?
8    A.  You did.
9    Q.  Is that correct, as you sit here today on --
10 what day is it? -- Septem-- August 6th?  Is that still
11 correct?
12   A.  That is correct.
13   Q.  Number 15: "I have communicated with counsel
14 throughout the course of this action."
15       As you sit here today, is that correct?
16   A.  That is correct.
17   Q.  Number 16 -- oh, no, excuse me -- Number 17 --
18 apparently I'm only doing odd numbers -- "I understand
19 that a rep-- a class representative is someone who
20 acts on behalf of other class members in directing the
21 litigation."
22       Did I read that correctly?
23   A.  Yes, you did.
24   Q.  Are you -- is that -- is that your
25 understanding of what a class representative would be?

48 (Pages 186 - 189)

Page 190

1    A. Yes.
2    Q. Continuing: "I understand that I have a
3 responsibility to the absent class members to oversee
4 the litigation and ensure that counsel for plaintiffs
5 prosecute the case vigorously and in the interest of all
6 class members equally. I accept this responsibility."
7        As you sit here today on August 6th, 2025,
8 do you still accept that responsibility?
9    A. I accept.
10    Q. Okay. Am I reading too fast?
11    A. No.
12    Q. Okay. Number 18: "I will continue to
13 communicate with counsel about the status of the
14 litigation, case strategies, settlement negotiations,
15 and other matters pertinent to overseeing the
16 litigation."
17        As you sit here today, is that still true?
18    A. That is correct.
19    Q. Okay. Should there be settlement negotiations,
20 should you be asked to confer with Nadia Shash and Al --
21 let me give the correct name -- Aftoora, would you be
22 willing to do that?
23    A. Repeat your question, please.
24    Q. Would you be willing to meet with the other two
25 class representatives, Nadia and Al, if called to do so?

Page 191

1    A. I would.
2    Q. Okay. Would you be willing to give your --
3 your opinions -- your honest opinions about any
4 settlement negotiation or potential settlement to your
5 lawyers?
6    A. I will.
7    Q. Okay. Number 20: "I understand that as a class
8 representative, my duties may include consulting with
9 counsel on proposed strategies and tactics during the
10 course of the litigation, deciding whether to accept a
11 particular settlement offer, and testifying at
12 deposition and trial. I accept and will diligently
13 perform all such duties."
14        Are you still willing to accept and
15 diligently perform those duties?
16    A. I do accept.
17    Q. Okay. Obviously, you're willing to testify at
18 deposition. I think we can cross that one out.
19        Are you willing to fly to Massachusetts to
20 testify at the trial of this matter?
21    A. If advised by my counsels, my lawyers, I will.
22    Q. Right. So you -- are you willing to?
23    A. Yes.
24    Q. Okay. And this was given under penalty of
25 perjury, as counsel pointed out, correct?

Page 192

1    A. That's correct.
2    Q. You can put that one aside.
3        Way early this morning, you were asked
4 about email accounts you had. Do you recall that?
5    A. Yes.
6    Q. And you said you had a -- a Hotmail account?
7    A. That's correct.
8    Q. A Gmail account?
9    A. That's correct.
10    Q. And then a -- a real estate account email?
11    A. All are Gmail, the second one you said and the
12 real estate one.
13    Q. Okay. Which is the one that you searched
14 before today for either Biogen or BIIB?
15    A. Hotmail.
16    Q. Okay. Did you today, during this day, after
17 you were asked this morning, search your Gmail
18 account -- not your real estate one, but your Gmail
19 account -- for the words "Biogen" or "BIIB"?
20    A. Yes, I did.
21    Q. Other than communications with counsel, with
22 your lawyers, were there any other mentions of Biogen?
23    A. No.
24    Q. Did you have a chance to search your Gmail
25 account that is your real estate business Gmail after

Page 193

1 you testified this morning?
2    A. That's correct. I did.
3    Q. And other than communications with counsel, if
4 there were any, did you find any emails related to
5 Biogen or BIIB?
6    A. No.
7    Q. If you could take out Exhibit 9. It's the FDA
8 report.
9    A. Okay.
10    Q. You can put this one back.
11        And we're going to be looking at the same
12 paragraph you looked at today --
13    A. Uh-huh.
14    Q. -- on page 2 under "What the Data Show."
15        Do you see that?
16    A. Yes.
17    Q. And I'm going to start with -- just where
18 counsel started at one point with "In all studies..."
19        Do you see that?
20    A. Okay. Yes.
21    Q. "In all studies in which it was evaluated,
22 however, Aduhelm consistently and very convincingly
23 reduced the level of amyloid plaques in the brain in a
24 dose- and time-dependent fashion."
25        Do you see that?

49 (Pages 190 - 193)

Page 194

1    A. I do see.
2    Q. Anywhere in that sentence, does it talk about
3  whether Aduhelm retarded or stopped the progression of
4  Alzheimer's?
5    A. No.
6    Q. Anywhere in that sentence, does it talk about
7  the -- the effectiveness of or ineffectiveness of high
8  doses versus low doses versus medium doses of Aduhelm?
9    A. No.
10    Q. Do you know what plaques are in the brain?
11    A. No.
12    Q. Okay. Do you know whether or not, as you sit
13  here today, it's been shown that reducing plaques means
14  that the -- that the progression of Alzheimer's is
15  arrested or slowed?
16    A. Say that again. I'm sorry.
17    Q. Sure.
18        As you sit here today, do you know whether
19  the reduction of plaques means that the progression of
20  Alzheimer's is arrested or slowed?
21    A. Yes, I do understand.
22    Q. Do you know whether they're connected?
23    A. (No response.)
24    Q. Do you want me to repeat it?
25    A. Yes, please.

Page 195

1    Q. Okay. I'm -- I'm just going to move on from
2  it. You can put that aside.
3    A. Okay.
4    Q. Give me a second.
5        During this case, since your involvement,
6  have you composed emails to your counsel?
7    A. Yes.
8    Q. Have you received emails from your counsel?
9    A. Yes.
10    Q. Have you been sent documents that have been
11  filed or otherwise created in this case via emails?
12    A. Yes.
13    Q. I think a moment ago you said you at least
14  skimmed them.
15        Did you read or skim these documents?
16    A. Yes.
17    Q. Okay. I believe you said you never had phone
18  calls. Is that still correct, your answer that you
19  never had phone calls about this case with your lawyers?
20    A. That's correct.
21    Q. Okay. Do you recall a phone call with me and
22  Jon Horne two weeks ago?
23    A. Sorry. I'm sorry. I forgot that.
24    Q. Okay. Were you ever contacted by a person
25  named Phillip Kim?

Page 196

1    A. Yes.
2    Q. Did you have a phone conversation with Mr. Kim?
3    A. No.
4    Q. Oh, okay. Well, that's easy.
5        If you could take out Exhibit 8. There you
6  go. This is the -- is it the Wall Street Journal
7  article?
8    A. Uh-huh.
9    Q. I want to look at the page 1. I don't want to
10  look where you looked before.
11    A. Okay.
12    Q. I'm going to read the very first sentence,
13  which is three lines: "Biogen, Inc. received a big
14  boost on Wednesday after U.S. Food & Drug Administration
15  regulators appeared to give a positive assessment of the
16  company's experimental Alzheimer's disease drug, sending
17  shares up 44 percent."
18        Did I read that correctly?
19    A. That's correct.
20    Q. Mostly.
21        Would you consider that news positive or
22  negative for the company?
23    A. Positive.
24        MR. HAKLAY: You can put that aside. I
25  just need one minute and I'll probably be done.

Page 197

1        I have nothing further.
2              EXAMINATION
3  BY MR. TARLOWE:
4    Q. Just very briefly.
5        When you place a trade in your ███████
6  account, do you receive an email notification of any
7  kind?
8        MR. HAKLAY: Just for the record, beyond
9  the scope.
10        But go ahead. I'm not going to complain.
11        Go ahead, you can answer, sir.
12        THE WITNESS: Not email. Text message.
13  BY MR. TARLOWE:
14    Q. What type of notification do you get?
15    A. It's a trade confirmation.
16    Q. Do you save these text messages or do you
17  delete those?
18    A. I delete them.
19    Q. Did you search Biogen or the Biogen ticker
20  through your text messages?
21    A. No.
22    Q. Do you use any other messaging applications?
23    A. WhatsApp.
24    Q. Did you search your WhatsApp --
25    A. No.

Page 198

1    Q.  -- for Biogen?
2        Do you use any other messaging platforms?
3    A.  Facebook.
4    Q.  Do you use Facebook to communicate with people?
5    A.  Yes, but very rare.
6    Q.  Have you posted anything on Facebook about
7  Biogen?
8    A.  No.
9    Q.  Did you search your Facebook messages for the
10  word "Biogen" or the ticker symbol?
11    A.  No.
12    Q.  If we could go back to Exhibit 10, the
13  declaration.  And your lawyer asked you about
14  paragraph 13, which says, "I am bringing this class
15  action lawsuit not only on my own behalf, but also on
16  behalf of other shareholders that have been wronged in
17  the same way by defendants' same conduct."
18        How have other shareholders been wronged in
19  the same way that you believe you have been wronged?
20    A.  They have bought the shares during the same
21  time frame, and they had a loss as well.
22    Q.  And you'd agree that somebody who had a gain
23  has not been wronged in the same way as you by
24  defendants' same conduct?
25    A.  I didn't say that.

Page 199

1    Q.  Well --
2        MR. HAKLAY:  He's asking a question.
3        THE WITNESS:  No, I think -- he asked if I
4  agreed.
5  BY MR. TARLOWE:
6    Q.  Well, I asked you:  "How have other shareholders
7  been wronged in the same way that you believe you have
8  been wronged?"  You answered:  "They have bought shares
9  during the same time frame, and they had a loss as
10  well."
11    A.  That's correct.
12        MR. TARLOWE:  Okay.  Nothing further.
13        THE WITNESS:  Okay.
14        MR. HAKLAY:  Nothing further based on that.
15        THE VIDEOGRAPHER:  Can we go off record?
16        MR. HAKLAY:  Yes.  Oh, sorry, thought you
17  were asking me.
18        THE VIDEOGRAPHER:  We're off the record,
19  3:09 p.m.
20        (Deposition concluded at 3:09 p.m.)
21
22
23
24
25

Page 200

1        UNITED STATES DISTRICT COURT
        DISTRICT OF MASSACHUSETTS
2
NADIA SHASH, ET AL.,          §
3                             §
        Plaintiffs,  §
4                             §
VS.                           §
5                             § Case No. 21-cv-10479
BIOGEN INC.,                  §
6                             §
        Defendant.   §
7  ---------------------------------
8        REPORTER'S CERTIFICATION
    ORAL & VIDEOTAPED DEPOSITION OF
9            AMJAD KHAN
    WEDNESDAY, AUGUST 6, 2025
10
    I, Kari J. Behan, CCR, CSR, and in and for the
11  State of Texas, do hereby certify that the facts as
    stated by me in the caption hereto are true;
12    That there came before me the aforementioned named
    person, who was by me duly sworn to testify the truth
13  concerning the matters in controversy in this cause;
    And that the examination was reduced to writing by
14  computer transcription under my supervision; that the
    deposition is a true record of the testimony given by
15  the witness.
    I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any of the
    parties to the action in which this deposition is taken,
17  and further that I am not a relative or employee of any
    attorney or counsel employed by the parties hereto, or
18  financially interested in the action.
    Given under my hand and seal of office on this 7th
19  day of August, 2025.
20
21        _Kari J. Behan_
22  --------------------------------------
23  Texas CSR NO. 8564;
24  Expiration Date: 7-31-2026
    VERITEXT LEGAL SOLUTIONS
25  Firm Registration No. 571
    Telephone (800) 336-4000

Page 201

1    GONEN HAKLAY, ESQ.
2    ghaklay@rosenlegal.com
3        August 7, 2025
4  RE:   Shash, Et Al. v. Biogen Inc.
5    8/6/2025, Amjad Khan , Party Deponent (#7506150)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com
16    Return completed errata within 30 days from
17  receipt of testimony.
18    If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24
25

```
                                           Page 202
 1  Shash, Et Al. v. Biogen Inc.
 2  Amjad Khan , Party Deponent (#7506150)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Amjad Khan , Party Deponent           Date
25
```

```
                                           Page 203
 1  Shash, Et Al. v. Biogen Inc.
 2  Amjad Khan , Party Deponent (#7506150)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4     I, Amjad Khan , Party Deponent, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____  _____
12  Amjad Khan , Party Deponent           Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
```

[& - 21]                                                                                              Page 1

| & | | | |
|---|---|---|---|
| **&**   1:8,12 2:10 196:14 200:8 | **11/5/20**   76:9<br>**112**   3:21,22,24<br>**11:12**   94:10<br>**11:29**   94:13 | **1998**   17:9,9<br>**1999**   26:5<br>**1:11**   131:24 | 61:22 62:1,4,7<br>63:17 65:8,15<br>65:19 66:2,7,7<br>66:11,23 67:14 |
| **0** | **12,000**   34:24 | **2** | 67:17 69:5 |
| **000001**   3:18<br>**000002**   3:18<br>**000003**   3:13<br>**000004**   3:13<br>**000132**   3:15 | 35:5 115:17<br>131:1 178:18<br>179:1<br>**1285**   2:11<br>**12:18**   131:21 | **2**   3:14 49:7,8<br>49:18 50:24<br>64:8 72:17<br>75:25 78:10<br>99:2 115:16 | 71:7,9 72:2,9<br>74:1 76:24<br>78:3,9,19 79:2<br>79:5,18,24<br>80:3 81:1,5,25 |
| **1** | **13**   189:3 | 165:23 193:14 | 86:14 87:21 |
| **1**   3:12,15 46:20<br>46:21 50:23<br>75:24 76:4<br>98:16,17 196:9<br>**10**   4:7 17:1,1<br>183:2,3 185:1<br>188:19 198:12<br>**100**   114:7<br>122:22 123:3<br>137:21 138:3<br>138:11 146:11<br>146:13,14<br>**10019**   2:11<br>**101**   2:4<br>**10479**   1:5 5:9<br>200:5<br>**105**   146:11<br>**10:01**   52:12<br>**10:12**   52:15<br>**11**   80:25 81:17<br>**11,000**   17:1 | 198:14<br>**131**   65:1,7<br>76:23<br>**139**   4:2<br>**14**   49:18 64:9<br>78:16 80:7<br>**145**   3:16<br>**15**   185:1<br>189:13<br>**158**   4:5<br>**16**   99:11 164:6<br>164:7 189:17<br>**17**   12:24<br>189:17<br>**18**   9:5 190:12<br>**1809**   8:17<br>**183**   4:7<br>**187**   3:5<br>**19**   185:4<br>**19046**   2:5<br>**197**   3:6<br>**1987**   9:22 | **20**   191:7<br>203:15<br>**200**   3:7<br>**2000**   26:5<br>**2002**   9:12 12:6<br>23:13<br>**2003**   25:18<br>**2005**   11:18<br>**2012**   13:8,10,13<br>**2014**   13:8 14:6<br>**2016**   52:21<br>**2018**   12:23,24<br>12:25<br>**202**   3:8<br>**2020**   3:13,15,15<br>3:18,20,21,22<br>4:4 8:19 9:12<br>25:18 29:20<br>30:25 31:1<br>38:21 39:2,9<br>40:15 41:22,25<br>42:2,3,13<br>43:19 44:20 | 98:19 99:7<br>102:1 112:16<br>112:25 113:2<br>114:3 120:7<br>121:22 122:10<br>127:16,16<br>132:4,12,23<br>133:3 135:19<br>136:1,18<br>138:23 147:6<br>160:12,21<br>164:1 167:11<br>169:13,24<br>170:5 175:13<br>175:19 176:9<br>**2024**   16:24<br>**2025**   1:9,15 5:2<br>5:5 119:12<br>190:7 200:9,19<br>201:3<br>**20807**   200:22<br>**21**   1:5 5:9<br>200:5 |

**[212 - 9619]**

**212**  2:12
**215**  2:6
**22nd**  127:16
**2300**  1:19 5:10
**24**  17:1
**247**  113:8
**250**  24:5 113:8
**253**  113:13
**26**  98:17,17
  99:11 164:6,7
**2801**  1:18 5:10
**2:14**  174:16
**2:30**  174:19
**2:50**  187:7
**2:54**  187:10

**3**

**3**  3:17 4:7
  76:15,16 159:8
**3/12/1967**  8:15
**30**  3:15 82:6
  201:16
**30,000**  82:6,9
**300**  169:19
**324**  114:14,17
  116:7
**324.55730.**  65:4
**328**  113:18
**336-4000**
  200:25
**348**  113:17
  115:5
**355**  113:14
  115:4

**373-3035**  2:12
**3:09**  1:16
  199:19,20
**3rd**  113:1,7
  123:12,16,23
  124:3,6,10,17
  125:8,19 130:1
  130:10

**4**

**4**  3:19,21 4:4
  80:6 98:13,14
  164:6 171:4
**40,000**  82:5,6
**401**  63:4,10
  134:22 135:4,5
**42,517**  72:18
**44**  196:17
**440**  2:5
**46**  3:12
**49**  3:14
**4th**  112:16
  113:1,13,14
  114:6 118:7
  119:12,21
  120:4 121:21
  122:10,17,22
  123:2,9,16,20
  124:2,7,11,19
  125:9,21 126:2
  126:6,14,18,23
  127:5 128:1,3
  128:5,16,19
  129:7 137:21

138:4,11,16,17
147:6 148:6
169:16,20,23
170:5,7,12

**5**

**5**  3:13,21,22
  112:8,10,14,15
**571**  200:25
**5th**  112:24
  113:1,17,21,24
  114:3,10,21
  116:6,18,21
  117:6 118:9,12
  119:20 123:8
  125:11,14
  130:2,11 136:1
  137:22 138:18
  143:19 147:6
  147:24 148:5
  169:16 175:10
  175:19,25

**6**

**6**  1:9,15 3:4,22
  5:2,5 64:9
  78:16 112:8,11
  112:23 114:5
  200:9
**600-2817**  2:6
**6th**  138:23
  143:5 189:10
  190:7

**7**

**7**  3:24 112:9,12
  112:25 113:5
  122:21 137:20
  147:9 201:3
**7-31-2026**
  200:24
**70**  16:13,15
**7108**  9:9
**7506150**  201:5
  202:2 203:2
**75081**  8:17
**75201**  1:19
**75243**  9:10
**76**  3:17
**7th**  200:18

**8**

**8**  4:2 139:11,12
  196:5
**8/6/2025**  201:5
**800**  200:25
**8564**  200:23

**9**

**9**  3:18 4:5 5:4
  158:19,20
  193:7
**900,000**  81:21
**92**  10:10
**93**  10:20
**95**  10:20
**9619**  9:9

**98**   3:19 11:6,8
**99**   26:6 146:12
**993,000**   80:19
  80:25 81:5,17
  82:8 132:8
**993,393.98**
  80:17
**999**   80:24
  132:8
**9th**   64:17 76:24
  113:1 118:15
  118:16 127:16
  139:2 144:8,10
  147:14,21
  175:11 176:5,6

**a**

**a.m.**   1:16 5:2,4
  52:12,15 94:10
  94:13
**ability**   8:2
  128:4,18,22,23
  175:12
**able**   7:19,23
  33:22 48:23
  172:18,22,24
  173:1 179:15
**above**   1:14 6:1
  201:6 203:7
**abreast**   148:18
**absent**   190:3
**absolutely**   6:20
  58:20

**accept**   190:6,8
  190:9 191:10
  191:12,14,16
**accepted**
  150:16
**access**   68:11,12
  123:17 124:3,6
  124:18 125:3,7
  125:19 128:18
  128:22
**accessed**   47:23
  47:24 129:10
**accessible**
  125:13
**account**   40:4
  47:7 49:20
  62:25 63:17,18
  64:3,21 72:21
  72:23 75:14
  76:19 80:8
  134:9,10,12,14
  134:15,17,19
  134:22 135:9
  135:12,16,17
  135:21,23
  144:13 177:25
  192:6,8,10,18
  192:19,25
  197:6
**accounting**
  18:23
**accounts**   45:12
  46:17 47:5
  49:18,23 51:11

  51:12,15,18,21
  52:4 62:7,10
  63:2,8 192:4
**accuracy**   78:25
  81:9,11 201:9
**accurate**
  184:14
**accused**   24:13
  24:15,21 25:8
**acknowledge...**
  203:3
**acknowledg...**
  201:12
**acquired**   13:7
  14:17
**act**   179:7
**action**   27:16
  35:21 82:18
  130:22 182:6,8
  189:4,14
  198:15 200:16
  200:18
**active**   53:15,17
**activity**   41:16
  41:19 64:13
  132:8
**acts**   189:20
**actual**   57:5,9
  57:10,11
**actually**   19:20
  58:8 64:1
  65:14 80:6
  125:12

**add**   154:20
**added**   37:15,16
  121:7,11,12,15
**addition**   15:7
**additional**
  71:13
**additions**   203:6
**address**   8:16,18
  9:8 43:11,13
  43:15,17,24
  45:18 149:20
**addresses**
  44:21,23 45:3
**adequately**
  130:16
**administration**
  196:14
**adu**   111:8,8,24
  161:3 166:21
  171:19
**aducanumab**
  91:13 92:25
  111:8 138:25
  140:1,11 143:6
  143:22 178:13
**aduhelm**   159:8
  160:2 166:16
  193:22 194:3,8
**adult**   9:5 20:23
**adults**   9:3
**advantage**
  181:12
**advice**   138:25
  179:7,9,12

**[advise - answer]** Page 4

advise 143:22
advised 33:18
  45:9 150:5
  191:21
advisor 61:18
advisory 87:8
  87:20 119:14
  119:22 138:24
  143:5,14,20
affect 8:2
affirmatively
  50:11 73:12
  128:17
aforemention...
  200:12
afternoon
  132:1,2
aftoora 190:21
agency 139:19
  139:23
agency's 142:3
agent 15:2,2,18
  16:18
ago 30:12
  47:14,21 48:10
  50:22 157:14
  165:21 178:5
  195:13,22
agree 78:21
  103:18 119:1
  119:17 140:24
  156:1 157:21
  157:22 198:22

agreed 199:4
agreement
  29:24 30:3
  32:9,23
ahead 16:11
  40:10 139:24
  145:16 165:10
  180:25 197:10
  197:11
akhan1967
  44:24 45:19
akhan2226
  43:16
al 1:2 2:2 5:6
  190:20,25
  200:2 201:4
  202:1 203:1
albert 36:11
  37:6 121:12
alfred 85:24
  99:18 164:9
allegation 25:5
allegations
  90:10
allege 83:5
  85:16 86:9,23
  87:23 88:18,20
  89:5 92:10
  93:15 104:11
  116:6,7 118:20
alleged 88:11
  92:6 93:20,23
  118:21 150:25

allegedly 94:1
  104:14
alleges 93:8,12
  118:24 119:3
  120:2 121:20
  122:9 160:24
alleging 116:16
allotted 201:19
allow 6:18
alzheimer
  83:10 84:1
  117:20
alzheimer's 4:3
  4:6 22:10,12
  22:19 72:15
  83:16 84:19
  86:20 87:6
  89:22 91:16,24
  91:25 92:7,12
  92:15 101:13
  140:17 158:25
  194:4,14,20
  196:16
ambit 13:14,16
  14:5,16
amended 74:8
  120:21,22,25
  121:3,5,6
  122:1,9 149:23
  149:24
americas 2:11
amjad 1:8,12
  3:2 4:8 5:6,24
  8:9 183:8

200:9 201:5
  202:2,24 203:2
  203:4,12
amount 35:1
  65:9 72:17
  161:16 181:14
amyloid 111:9
  111:25 160:3
  166:17 168:1
  171:20 193:23
analysis 107:18
  108:12,14,14
  108:16,19
  109:9
analyst 13:21
  14:20 71:20,20
  71:24
analysts 110:5
analyzing
  77:18
announce
  94:24 98:1,4
announcement
  96:3,7,10,14,18
  97:18
announcements
  56:4 94:20
  95:10
answer 6:10,12
  6:18 13:6
  16:11,20 34:10
  39:14 40:9
  46:15 50:13
  51:3 53:12,18

**[answer - assess]** Page 5

60:11,23 61:4
66:15 72:4
73:14 87:15
88:5 90:19
91:8 92:17
97:2 102:3
103:23 105:12
127:10 129:16
130:20 138:20
145:11 146:10
146:16 148:9
154:15 162:1
164:9 165:10
166:23 172:15
176:12 179:5
181:18 195:18
197:11
**answered**
60:22 72:3
87:14 89:13
91:7 99:5
102:2,22
105:21 108:2
118:2 122:18
124:20 126:24
128:8,10 129:3
130:12 131:12
138:5,19
142:16 144:3
147:2,17,18
157:2 163:3
172:12 199:8
**answering**
131:11

**answers** 131:13
188:17
**anticipate** 7:7
136:21
**anybody** 39:12
39:18,20 51:12
51:17,23 73:21
135:14 156:21
**anymore**
188:20
**ap** 183:9
**apartment** 9:9
**apologies** 148:7
**apparently**
189:18
**appear** 24:6
25:2 164:16
**appearances**
5:15
**appeared** 24:8
196:15
**appellate**
100:11 150:8
150:11
**appended**
203:7
**applicable**
201:8
**applications**
197:22
**apply** 29:3
**appointment**
4:9 183:10

**approach**
52:18 56:1
61:25 62:1
**approval** 92:3
134:2 161:8,15
**approve** 4:5
158:25 166:1
**approved**
92:14
**approving**
140:16 142:2
143:22
**approximately**
16:8,25 31:2
34:22 47:12,13
48:9 72:18
116:7 132:7
178:18
**area** 14:24
**arrangement**
32:22
**arrested** 23:4
194:15,20
**art** 116:22
**article** 4:2
71:16 139:14
139:18 142:18
142:25 157:14
161:12 196:7
**articles** 39:23
77:17
**artificially**
116:8,10,17,20
116:23 117:5,7

117:11,18
118:7,11,14,18
**arts** 10:1
**aside** 26:18
49:4,6 75:25
105:1 109:24
109:25 192:2
195:2 196:24
**asked** 25:2 26:4
27:10 43:23
50:20 60:22
70:21 72:3
87:14 91:7
99:23 102:2,22
105:21 108:2
118:2 122:18
124:20 126:24
128:8 129:3
130:12 131:10
138:5,19 144:3
147:16,17
152:9 157:2
162:17 168:25
172:12 184:2
185:19 190:20
192:3,17
198:13 199:3,6
**asking** 90:18
91:3 141:1
154:16 162:19
180:17 199:2
199:17
**assess** 158:2
172:18

**[assessing - based]**                                   Page 6

| | | | |
|---|---|---|---|
| **assessing** 90:3 | 90:19 91:5,9 | **avoid** 139:8 | 61:22 72:16 |
| **assessment** 4:3 | 152:25 179:6 | **aware** 15:17,23 | 75:24 76:4 |
| 55:13 196:15 | 180:14 181:16 | 16:7 20:19,22 | 79:3,20 88:18 |
| **assume** 100:25 | 181:17 182:11 | 21:11 32:11 | 94:12 102:11 |
| 115:21 128:15 | **attractive** | 35:3 36:10 | 115:2,3,5,15 |
| 159:25 | 58:23 | 38:3,5,11 | 116:12 117:3 |
| **assumes** 130:19 | **attracts** 59:4 | 41:10,14 42:24 | 118:10 131:23 |
| 148:8 | **august** 1:9,15 | 43:3,6 49:25 | 136:21 137:6 |
| **assuming** 137:6 | 5:2,5 189:10 | 50:2 51:4,7,8,9 | 140:16 141:16 |
| **atoof** 36:11 | 190:7 200:9,19 | 66:8 72:7,11 | 142:4 150:13 |
| 121:12 | 201:3 | 87:22 93:19 | 150:17,18 |
| **attached** | **authorities** | 97:23,25 98:3 | 157:13 165:17 |
| 201:11 | 18:1,4 | 110:4 120:21 | 165:20 173:3 |
| **attacked** 23:17 | **authorization** | 120:23 121:9 | 174:18 181:12 |
| **attain** 47:9 | 18:7 | 122:12 126:3,9 | 187:9 193:10 |
| **attempted** | **authorize** | 126:15 134:1 | 198:12 |
| 173:4 | 120:17,24 | 138:23 139:1 | **background** |
| **attend** 9:15 | 121:2 | 143:4,5,8,9,10 | 19:6 88:16 |
| 11:20 12:11 | **automatically** | 150:3,7 154:25 | 158:1 |
| 33:17 34:3 | 40:17,23 | 155:8,11 | **bad** 95:19,23 |
| 156:19 | **available** 53:23 | 169:23 170:4 | 108:1 |
| **attended** 156:6 | 68:14,18,24 | | **balance** 73:17 |
| 156:8 | 84:24 119:13 | **b** | 80:9 81:21 |
| **attention** 59:22 | 119:21,24 | **b** 3:10,19 13:16 | **ballpark** |
| 80:7 99:10,11 | 120:3 123:10 | 36:13 | 153:19 |
| 139:17 159:3 | 123:13,20 | **ba** 10:1 | **bank** 134:17 |
| 185:14 | 124:1,11 | **bachelor's** 10:1 | **bankruptcy** |
| **attorney** 25:21 | 125:13 141:15 | 18:13 19:4 | 26:16 |
| 179:13 200:15 | 180:21 201:6 | 89:10 | **based** 17:3 58:3 |
| 200:17 201:13 | **avenue** 2:4,11 | **back** 23:13 | 58:4 65:17 |
| **attorneys** 30:18 | **average** 60:16 | 38:18 40:24 | 69:6,8 71:10 |
| 33:18 36:4 | 60:19,21 81:24 | 49:6 52:14 | 71:12 100:11 |
| 44:3 45:9 | 82:1 | 54:2,4 55:16 | 100:21,24 |
| 50:20 90:4,17 | | 57:25 59:2 | 106:1 167:20 |

**[based - books]** Page 7

172:8 174:6,11
199:14
**basic** 55:10
56:13
**basically** 36:3
58:13 91:25
133:12 134:16
139:7 141:17
142:6 145:5
170:16 184:6,8
**basis** 48:20
86:25 88:1,4
90:15,18,20
98:1 100:23
115:8 117:17
137:24 154:17
154:19 172:5
**bearing** 89:2
**beg** 118:10
**beginning**
153:16
**behalf** 5:19,21
5:23 189:4,5
189:20 198:15
198:16
**behan** 1:16
5:13 200:10,23
**belief** 74:20
**believe** 13:9
14:5 25:18
30:12 34:18
38:18 39:8
48:11 71:11
84:14,25 85:6

85:13 88:1,20
90:12,12 92:10
101:20,22
107:16 109:16
109:18 111:6
111:12,14
116:10,20
117:4,11,13,16
117:21,25
118:6,11,14
127:19 136:17
137:22 138:2
138:15 151:11
160:10 167:6
167:10,11
169:12 171:8
172:4 178:5
195:17 198:19
199:7
**believing** 48:20
86:25 115:8
117:17
**bell** 85:11
**bells** 85:10
**best** 74:19
**better** 54:20
55:11,11 95:2
**beyond** 197:8
**big** 48:5 196:13
**biib** 3:24 44:17
192:14,19
193:5
**biogen** 1:5 2:8
3:24 4:2 5:7

21:19,22,25
22:3,4,17
30:17,20,24
38:20 39:1,9
39:12,18,21,24
40:2 41:6,9,12
43:8 44:2,7,12
45:4,11,24
46:6 64:17
65:8,10,14,18
66:8,10,13,25
67:1,5 68:1,12
68:23,25 69:2
70:10,12,25
71:8,8,25 72:1
72:8,13,14,18
73:22,22 74:1
74:24 75:4,6
75:18 76:5,24
77:2,6 78:2,9
79:25 82:18
83:5,7,15 84:1
84:8 85:19,22
86:3,17 87:21
91:17,18 92:11
92:24 98:19
99:6 101:6
102:1 103:8
112:16,24
113:1,24 114:2
114:20 115:19
116:17 119:19
126:22 127:25
128:16 130:17

131:1,4 135:16
135:20,25
136:7,13
137:17,25
138:18 139:5
141:22 142:19
143:15 144:16
144:18 146:1
147:6 175:13
178:18 179:18
179:25 180:23
181:24 192:14
192:19,22
193:5 196:13
197:19,19
198:1,7,10
200:5 201:4
202:1 203:1
**biology** 89:10
**birth** 8:14
**bit** 10:25
114:11 137:1
**black** 48:5,7,16
76:21
**blacked** 48:18
49:1
**blogs** 61:8
**bluntly** 131:18
**board** 22:21,24
23:1
**book** 19:17
**books** 19:15,18
19:22 77:17

**boone**  1:18
**boost**  196:14
**born**  11:2
**bottom**  48:4
64:12 80:8
164:8
**bought**  63:23
65:1,18,23
66:10,16 69:7
69:20 72:10
79:4 80:12,16
80:24 81:5
82:20 100:22
100:24 103:3,4
114:2,4,14,23
114:25 116:18
116:21,25
117:5,8 123:12
123:16 124:6
124:10,17
125:11,19
126:15,18,22
127:25 128:3
129:6,10 130:1
130:10 132:11
132:17,23
133:4,11,13,16
134:5 136:4,7
136:11,15,17
137:22 138:2
138:13 144:15
144:18 198:20
199:8

**box**  48:5,7,16
76:21
**brain**  111:10
111:25 160:4
166:17 193:23
194:10
**break**  7:10 52:8
92:21 94:7
131:22 163:13
174:13
**breaks**  7:7,8
**brief**  52:13
94:11 149:21
174:17 187:8
**briefing**  119:13
119:20 120:3
**briefly**  197:4
**briefs**  155:1,3,5
**bringing**  189:3
198:14
**brokerage**  15:4
15:5
**brother's**  188:6
**bunch**  7:8
**business**  13:17
192:25
**buy**  42:17 57:7
59:20 60:8,17
62:11 63:3,17
64:1,22 67:7,7
69:5,11,17,19
69:23,25 70:10
73:10,10 79:17
79:22 96:1,17

97:13,19 101:2
101:4,10,20
103:21 116:22
117:7 125:8
132:25 133:16
134:3,19
135:16 136:20
137:25 138:4
138:17 143:23
145:6,6 146:20
146:25 147:24
177:5
**buying**  52:20
61:15 67:5
68:25 79:2
133:25 142:19
142:22
**buys**  82:9

**c**

**c**  2:1,9 23:10
**calendar**  54:12
54:13,14,22,25
55:1 56:3,17
57:12,18,18
63:22 94:17,18
94:18 97:4,7
**call**  3:20 27:9
55:21 71:15
98:10,19 99:8
99:23 104:4,6
104:9,12
109:17 110:6
112:4 160:12

160:21 163:19
163:23 164:1
167:11 169:13
195:21
**called**  14:4 29:3
31:21 37:21
54:12 57:3
58:8 62:20
78:11 87:8
91:12 145:1
167:19 190:25
**calling**  58:9
**calls**  14:1 98:4
98:7 105:10
110:12,21
123:4 129:17
129:17 130:5
144:4 178:20
195:18,19
**caption**  200:11
**card**  11:13
17:21
**care**  57:6
**carefully**
120:13 183:18
186:23
**carrier**  178:13
**carries**  36:1
**case**  1:5 5:8
24:10,10 26:18
30:6 31:19
32:4,18 33:12
34:8 35:2 36:3
37:2,9 38:14

42:24 43:4
48:25 50:1
74:10 82:14,15
82:23 83:6
85:4,14,18
86:7 90:6
91:20,22 93:21
93:24 126:1,13
127:4 148:19
148:25 149:12
149:21,25
150:4 151:6,25
152:6 153:14
153:17 154:13
155:1,3,6,9,24
156:4,6,8,11,11
156:15 169:12
179:21 186:9
190:5,14 195:5
195:11,19
200:5
**cash** 72:22,24
73:1,2,4,10,17
73:19 80:9
**cashier** 17:17
**causation**
130:6
**cause** 1:15
115:6 200:13
**causing** 78:7
**ccr** 1:16 200:10
200:23
**ceo** 85:6 86:3

**certain** 14:2
42:25 43:4
58:21 77:24,25
88:19 119:13
121:20 122:9
145:18,19
180:20
**certificate** 12:1
12:2,3,4 26:7
**certification**
3:8 4:9 183:9
200:8
**certified** 1:17
6:1
**certify** 200:11
200:15
**chance** 192:24
**change** 14:9,10
14:11 80:19
114:14 121:8
202:4,7,10,13
202:16,19
**changed** 41:2
**changes** 3:7
201:10 203:6
**character** 57:2
**characteristics**
55:24,25
**charge** 23:23
24:18,22
**charged** 23:6,9
23:19,21 25:1
25:8

**chart** 53:25
54:4 55:17
57:23 58:7,8,9
63:23 66:6
69:1,5,6,8,10
114:19 116:5
137:11
**charts** 57:25
58:5,6,21
66:21 67:19,20
79:21 136:10
136:16 174:21
**chat** 61:7
**check** 41:20
44:5 55:2 77:6
179:1
**chief** 84:8,10
85:7 94:4
**children** 9:4
**chip** 79:6,7
**choose** 55:6
**chose** 128:23
129:13 185:2
**circumstance**
38:7
**circumstances**
23:14 37:11
146:4
**citizen** 11:14
**citizenship**
11:16
**civil** 1:20 10:24
11:1

**claim** 88:12
150:16
**claimed** 92:12
**claiming**
171:25
**clarity** 121:24
**class** 4:8,9,10
23:10 27:16
35:12,15,16,20
35:25 82:18
102:19 121:14
126:4 127:14
127:17,21,23
130:22,23
131:4,7 157:5
157:10,11
182:5,6,8
183:9,10,10
189:4,19,20,25
190:3,6,25
191:7 198:14
**classes** 18:19
18:20 19:24
82:19 181:3
**clear** 6:25
47:20 81:20
99:6 103:15
120:20 135:8
145:14
**clerk** 25:21
**click** 57:22
**clinical** 92:25
159:9,15
178:12

**[close - computer]**                                                 Page 10

| | | | |
|---|---|---|---|
| close 20:17 | 96:4,18 181:12 | 97:23,25 98:3 | 90:6,9,12,13,16 |
| 31:5 112:21,25 | comment 110:9 | 133:4 | 90:21 93:8,12 |
| closed 113:8,13 | 110:10 141:22 | company 13:2 | 93:15 100:7,9 |
| 113:17 115:4 | 141:22,23 | 13:7,10,13 | 102:18 103:1 |
| closely 57:6 | 162:10 | 14:14,18 15:3 | 104:11 106:7 |
| closes 146:9,10 | commission | 17:17 21:18 | 116:15 118:20 |
| clue 97:12 | 17:7 | 22:22 23:1 | 118:24 119:3 |
| 143:1 | commissions | 37:21 60:5 | 120:2,11,14,16 |
| cmo 94:4 | 17:4 | 71:14 72:8,14 | 120:18,20,21 |
| coached 168:23 | committed | 84:10 86:3,4 | 120:22,25 |
| coaching | 87:23 88:2,9 | 96:3 101:19 | 121:3,5,19,20 |
| 168:21 | 90:3 | 124:23 132:25 | 121:25 122:1,8 |
| coffee 20:25 | committee 87:9 | 133:7,21,24 | 122:9 127:15 |
| colleagues | 87:20 119:14 | 134:3,6,7 | 149:23,24 |
| 15:19 | 119:22 138:24 | 196:22 | 160:24 172:9 |
| college 9:15,17 | 143:6,14,21 | company's | 172:21 174:11 |
| 10:12 | common 80:2 | 60:4 92:16 | complaints |
| color 97:8,8 | 123:25 134:10 | 94:25 196:16 | 121:6 |
| colors 97:7 | communicate | compare 172:5 | complete 7:20 |
| combination | 153:8 190:13 | 172:22,24 | 7:24 184:14 |
| 10:25 | 198:4 | 173:3,4 | 203:8 |
| combinations | communicated | compared | completed |
| 58:5 | 22:2 189:13 | 156:25 | 201:16 |
| come 11:12 | communicating | comparing | complicated |
| 49:5 87:3 | 153:4 | 57:16 | 142:13 |
| 101:1 117:2 | communication | compensated | composed |
| 137:6,8 154:1 | 39:15 | 33:2 155:15 | 195:6 |
| 156:2 | communicati... | compensation | compusa 17:20 |
| comes 123:19 | 39:17 45:4,11 | 35:23 133:17 | computer 14:3 |
| 142:4 146:18 | 192:21 193:3 | 133:22 | 14:3 45:20 |
| coming 28:25 | companies | complain | 46:1 47:17,21 |
| 54:17 55:9 | 14:14,17 55:9 | 197:10 | 47:22,23 |
| 56:4,19 94:20 | 56:4,18 94:19 | complaint | 200:14 |
| 94:21 95:10 | 94:24 96:17 | 88:11 89:1,4,5 | |

**[computers - correct]** Page 11

**computers**
17:17 79:7
**concealed** 18:3
**concept** 95:14
155:20
**concerning**
38:20 200:13
**concluded**
199:20
**conclusion**
130:6 167:9,17
167:20
**conduct** 23:11
23:21 24:14,18
24:22 27:8
189:6 198:17
198:24
**conducted**
92:24 106:17
**confer** 190:20
**confidential**
3:13,16,18
48:19,23
**confirmation**
3:12,17 47:4
50:22 76:18
197:15
**confirmations**
39:5 40:4
**conflict** 142:5
**conflicting**
140:15 141:13
141:19 142:6
157:18,22

158:5
**connected**
194:22
**connection**
28:9 33:6
119:14,22
186:9
**consent** 179:10
179:12
**consider** 53:9
53:15 56:15
59:14,17 61:16
196:21
**considered**
82:21 110:9
**consisted** 159:8
**consistent**
100:18,20
104:20,23
111:14,15,16
111:17,19
112:3,3 160:10
161:5,8 164:12
164:14,23
170:11,16,17
170:20,21,22
170:23 171:18
172:3,19,19
174:1,1,2
**consistently**
111:8,24 160:2
166:16 167:4
167:25 168:6
169:6 171:19

193:22
**consult** 181:17
**consulting**
191:8
**contact** 154:4
**contacted**
195:24
**contains** 94:21
94:22
**context** 109:1
155:18,19
**contingency**
32:19
**continue** 185:5
190:12
**continued** 4:1
**continuing**
190:2
**contrary** 173:7
173:8,13
**controversy**
200:13
**conversation**
196:2
**conversed**
56:12
**convincingly**
111:9,24 160:3
166:16 167:4
168:1,6 169:6
171:20 193:22
**cop** 24:25
**copies** 201:14

**copy** 40:18
46:8
**core** 80:8
**corner** 80:8
**correct** 9:24
13:12 14:23
15:8,15 17:11
17:22,24 29:7
29:12,14 32:24
34:11 39:3
41:24 42:1
43:20 44:13
47:6,8 48:3,10
48:14 49:22,24
50:18 56:6,20
57:13 58:20
65:3 68:22
72:19 74:19,20
74:21,25 75:2
75:5 81:18,19
82:25 85:19,22
85:23 86:8
88:21,22 90:11
92:13 96:5,11
96:15 99:9,21
102:4 103:6
104:13 110:25
113:15,16
115:12,18,20
115:23 116:4,9
119:25 123:11
125:10,16
128:2 130:2,3
131:2 132:10

**[correct - day]**                                              Page 12

| | | | |
|---|---|---|---|
| 133:9,15 | 153:4,8,11 | 155:23 156:19 | **data**  100:20 |
| 135:10 136:2 | 162:1 183:10 | 184:10,13 | 104:22 107:17 |
| 138:12,13,14 | 185:5,20 186:1 | 186:9,12,17,21 | 107:17 108:11 |
| 139:9 143:7,12 | 186:5 189:13 | 186:22 200:1 | 108:22 109:8 |
| 144:14,17 | 190:4,13 191:9 | **cover**  34:5 | 128:14 142:4 |
| 145:25 146:3 | 191:25 192:21 | **covered**  41:21 | 157:23 158:11 |
| 147:15 161:1 | 193:3,18 195:6 | **covering**  48:5 | 159:5 161:5,20 |
| 164:17 166:13 | 195:8 200:16 | **created**  195:11 | 161:23 162:7 |
| 166:14 167:2 | 200:17 201:14 | **credit**  80:9 | 162:10,14,18 |
| 173:5 174:12 | **counsels** | **crime**  23:6,9,19 | 162:21 163:7 |
| 177:2 178:7,8 | 191:21 | 25:8 | 163:19 164:14 |
| 179:16 183:14 | **count**  180:13 | **criminal**  10:25 | 164:16,17,18 |
| 188:2,3,5 | **counts**  153:18 | **critical**  140:14 | 164:19,23 |
| 189:9,11,12,15 | **couple**  22:11 | 157:18 | 165:2,13,24 |
| 189:16 190:18 | 53:22 55:1 | **cross**  191:18 | 166:5 167:19 |
| 190:21 191:25 | 77:8 | **crossroads**  4:2 | 170:15,20,21 |
| 192:1,7,9 | **course**  133:2,3 | **cs**  201:15 | 170:22,23 |
| 193:2 195:18 | 151:9 189:14 | **csr**  1:16 200:10 | 173:17,18,25 |
| 195:20 196:19 | 191:10 | 200:23,23 | 174:1 193:14 |
| 199:11 203:8 | **courses**  18:9,11 | **current**  8:16 | **date**  5:4 8:14 |
| **corrections** | 18:23 19:2,8 | 9:7 34:2 | 64:16,20,23,24 |
| 203:6 | 77:18 | **currently**  21:15 | 76:5,8 80:16 |
| **correctly**  18:16 | **court**  1:1 5:8 | 21:21 22:23 | 126:21 132:9 |
| 24:4 30:16 | 5:13,16 6:1,13 | **customer**  14:1 | 200:24 202:24 |
| 40:24 79:19 | 7:2 24:6,8 27:4 | 14:1 | 203:12 |
| 83:7 84:11 | 27:10,13 33:22 | **cv**  1:5 5:9 200:5 | **dated**  3:12,15 |
| 93:17 149:22 | 62:21 93:19 | | 3:17 4:4 |
| 188:23 189:7 | 100:11 127:11 | **d** | **dates**  126:10,16 |
| 189:22 196:18 | 148:25 149:1,2 | **d**  3:1 | **daughter**  20:23 |
| **counsel**  4:10 | 149:5,6,9,12 | **daily**  154:16,19 | **daughters**  9:2,3 |
| 5:15 39:15,17 | 150:3,5,5,7,8,9 | 174:24 175:1 | **day**  7:8 13:23 |
| 39:20 151:9,12 | 150:11,13,13 | **dallas**  1:19 | 13:23 59:10,14 |
| 151:25 152:7 | 150:14,17,21 | 5:10 9:9 | 59:16 75:15,17 |
| 152:10,16 | 150:24 151:2 | | 75:17 94:22 |

104:4,6,9
112:20,21
113:23 114:11
115:11 137:13
137:15,23
138:2,13
143:21 144:10
144:25 146:6
147:13 148:2
148:13,14,16
168:22 175:10
175:12,20
176:1,19
188:10,11
189:10 192:16
200:19 203:15
**days** 60:20 77:4
79:9 137:13,13
175:2 176:8
201:16
**december**
12:24 31:8
**decide** 35:6
56:21 57:6
90:5,17 91:5
91:10 146:15
150:17 182:11
**decided** 63:17
129:22
**deciding** 66:23
96:1 191:10
**decimals**
113:11

**decision** 4:5
58:3,3 63:19
63:25 70:5,10
96:25 97:18
100:11 138:4
138:17,24
139:5 143:23
150:11,21,21
156:2 158:24
165:25 180:15
181:16
**decisions** 51:20
51:23 52:3
62:4 93:19
135:11 137:25
150:3,6,7
**declaration** 4:7
183:8 198:13
**declare** 203:4
**decline** 69:15
69:16 159:15
**dedicated**
89:21
**deemed** 203:6
**defendant** 1:6
1:13 2:8 26:24
85:14 86:7
200:6
**defendants**
5:21,23 42:24
43:3 50:1 74:9
85:3,5 189:6
198:17,24

**definitely** 62:12
178:3
**degree** 9:23,25
10:8,9 12:1
89:10,16
**delay** 101:12
**delaying** 91:25
**delete** 197:17
197:18
**demand** 18:17
**demonstrated**
168:6 169:6
**denote** 4:16
**dependent**
111:10 112:1
160:4 193:24
**depends** 16:21
59:25 60:18
144:24 146:6,6
146:16 174:23
184:20
**deponent** 201:5
201:13 202:2
202:24 203:2,3
203:4,12
**deposing**
201:13
**deposition** 1:8
1:12 5:5,9 6:21
27:2,20,23
28:7,10,13
191:12,18
199:20 200:8
200:14,16

**described** 56:2
62:1 85:18
88:19 171:8
174:22
**describing**
152:6
**description**
3:11
**deserves** 131:4
180:10
**designation**
26:8 94:5
**details** 57:22
106:14 159:22
168:5 169:5
**determination**
179:14
**determine** 78:7
146:24 147:4
175:12
**developed**
77:20 89:24
**developing**
89:22
**development**
159:8
**difference**
35:16 38:8
**different** 14:13
49:18 55:2
58:10,11 62:2
71:19 90:14
97:7 115:7
119:18 151:22

**[different - drugs]**                                                        Page 14

158:10,11,15
171:13 173:18
181:22
**differently**
134:24
**difficult** 33:25
**diligently**
191:12,15
**direct** 80:7
99:10,11
139:17 159:3
**directed** 165:8
**directing**
189:20
**directly** 163:4
**directors** 84:9
85:13
**disclosed**
103:16,19
**disclosing**
155:12
**discrepancy**
174:4
**discuss** 143:6
161:25 162:3
**discussed** 110:6
**discussing** 61:8
**discussion**
46:24 110:11
110:19 111:2
155:23 161:19
**discussions**
155:8 161:25

**disease** 4:6 92:1
101:13 158:25
196:16
**diseases** 89:25
**dismissed**
23:24 151:6
**disorderly**
23:10,21 24:14
24:18,22 27:8
**district** 1:1,1
5:7,8 150:9,13
150:21,24
151:2 200:1,1
**diversification**
61:16
**diversify** 61:13
**doctors** 22:9,11
22:14,16
**document** 3:24
4:5,17 41:16
42:25 43:4
47:1,9 48:9,12
49:10,25 50:3
50:24 74:14,16
77:3 81:7,11
81:16 99:3
100:5,6 101:16
106:5 111:5
132:13 147:22
147:25 158:19
158:22 162:12
163:6,15,16
165:18 167:16
183:2,5,11,15

184:17 186:18
**documents**
28:9 38:13,19
38:25 39:4,7
39:11 41:6,9
41:11 42:25
43:4,8 45:24
100:14 112:8
139:24 149:11
149:14,18,25
164:3 186:8,11
186:16,19,20
195:10,15
**doing** 24:13,15
24:21 139:4
189:18
**dollars** 17:1
**dose** 100:17,20
101:13,17,18
101:19 104:19
104:22 105:5
111:10,25
160:4 164:14
164:23 170:19
174:3 193:24
**doses** 101:6,8
101:11 194:8,8
194:8
**doubt** 78:25
140:9
**downward**
78:4,6 136:4
136:12,20

**dr** 85:24 87:23
88:13,15,20
89:5,9,15
90:10 99:20,23
100:15 104:11
105:3 106:1,17
108:10,18
109:7,16 110:6
111:15 112:4
117:17 118:25
119:10 120:5
121:22 122:11
123:1 129:9
160:11,21
161:17 162:13
163:19 167:10
169:13,17,20
170:8,13,16,20
171:10 172:1,3
172:6,20,22
173:5,7,9,17,25
**drive** 8:17
**drop** 139:8
**drug** 4:3 20:8
20:11 21:6
87:21 91:12
92:2,6,12,14
132:25 133:4
167:25 196:14
196:16
**drug's** 140:15
141:14,19
**drugs** 140:17

**[duly - eps]** Page 15

| | | | |
|---|---|---|---|
| **duly** 1:14 5:25 | 98:10,19 99:8 | **electronic** | **employment** |
| 200:12 | 104:4,6,9,12 | 40:18,19 41:1 | 16:6 |
| **duties** 36:2 | 110:6 112:4 | **email** 39:12,18 | **ended** 11:10 |
| 127:22 191:8 | 160:12,21 | 40:20 43:11,13 | **endpoint** |
| 191:13,15 | 163:19 164:1 | 43:17,24 44:2 | 107:12,14 |
| **e** | 167:11 169:13 | 44:5,20,23 | 159:15,19 |
| | **easy** 196:4 | 45:3,12,18 | **endpoints** |
| **e** 2:1,1 3:1,10 | **eat** 131:16 | 154:1,3 192:4 | 107:13 |
| 36:13 202:3,3 | **economics** 18:9 | 192:10 197:6 | **energy** 13:2,4,5 |
| 202:3 | 18:11,18,20 | 197:12 | 13:8,11,14 |
| **earlier** 41:21 | **education** 10:5 | **emailed** 152:25 | 14:18 15:22 |
| 92:5 106:3 | 11:9 12:7,8,9 | **emails** 44:7,8 | 16:3,4,9 41:23 |
| 132:3 133:6 | 12:14,18,19 | 148:22,23 | **engage** 93:2 |
| 135:25 136:3 | **effect** 101:7,9 | 154:1 186:7 | 100:19 104:21 |
| 148:2 159:12 | 104:20 107:11 | 193:4 195:6,8 | 106:2,9,25 |
| 160:12 170:10 | 117:20 143:14 | 195:11 | 107:3,17,17 |
| 174:22 175:9 | **effectiveness** | **emerge** 93:4 | 108:11,22 |
| 177:13 183:15 | 139:25 140:11 | 100:19 104:21 | 109:8 159:11 |
| 185:19 188:1 | 140:15 141:14 | 106:2,9,13,15 | 164:13 165:4 |
| **early** 192:3 | 141:19 161:3 | 106:22 107:10 | 165:15 |
| **earning** 54:12 | 166:21 167:1 | 107:19 108:15 | **engaged** 88:13 |
| 54:14,17 55:6 | 168:7,9 169:7 | 108:19 109:9 | **ensure** 156:10 |
| 57:1,3,3 63:22 | 194:7 | 159:11 164:13 | 190:4 |
| 94:17 97:4,7,9 | **effects** 100:18 | 165:4,15 | **entail** 13:22 |
| 163:23 | **either** 45:3,11 | **employed** | **entails** 13:23 |
| **earnings** 3:20 | 51:17 52:4 | 200:16,17 | **entered** 30:2 |
| 54:13,22,25 | 73:17 143:11 | **employee** 16:6 | 148:1 |
| 55:1,9 56:3,4 | 145:6 192:14 | 124:23,24 | **entire** 127:23 |
| 56:17,19,25 | **elaborate** 12:9 | 200:17 | **entitle** 35:22 |
| 57:12,18 94:16 | 24:16 82:16 | **employees** 16:5 | **entitled** 3:24 |
| 94:18,18,19,24 | **electric** 13:18 | **employer** 15:17 | 156:24 157:6 |
| 95:2,6,9 96:3,7 | **electricity** | 15:20,21 28:19 | 180:18 |
| 96:10,14,18 | 13:19 | 29:6,10 63:6 | **eps** 57:3,9,10 |
| 97:17 98:1,4,4 | | | 57:11 97:14,14 |

**[equally - false]** Page 16

equally 125:18
190:6
errata 201:11
201:13,16
esq 2:3,9,10
201:1
established
101:24 124:9
175:18
estate 12:18,19
12:21,22 14:22
14:24 15:2,6
15:10,12,13,18
16:18,25 17:6
44:25 192:10
192:12,18,25
estimated
97:14
et 1:2 2:2 5:6
200:2 201:4
202:1 203:1
evaluated
111:7,23 160:2
166:16 167:25
193:21
evenings 15:11
event 96:4,6
evidence
130:19 139:25
140:10,15
141:13,19
148:9 157:16
157:18 158:3,4

exact 4:16
126:21 163:22
163:22
exactly 12:23
31:4 47:12
66:15 67:6
87:12
exam 12:21,22
examination
6:3 187:24
197:2 200:13
examined 6:1
examines
101:16
example 57:17
77:24 146:10
149:1
exceeded 18:6
exceeds 145:9
145:12
excluding
39:17,20
excuse 189:17
execute 63:18
executed
145:21,24
executive 84:9
exhibit 3:12,14
3:17,19,19,21
3:22,24 4:2,5,7
4:7 46:20,21
46:24 49:7,8
50:23,24 64:8
72:17 75:24

76:4,15,16
78:10 98:13,14
112:10,11,12
112:14,15,23
112:25 113:5
114:5 115:16
122:21 137:20
139:11,12
147:9 158:19
158:20 164:6
171:4 183:2,3
188:19 193:7
196:5 198:12
exhibits 3:11
4:1,14 112:8
171:4
existed 51:7
expect 33:8
95:3,7 96:13
105:8,19
110:10,19
157:9
expectation
70:13,18 71:1
71:2 95:5,8
expected 57:5
83:11 95:7,10
expects 95:3
expenses 33:5
34:5,7,13,16
experimental
196:16
expert 123:4
130:6

expiration
200:24
explain 83:9
96:22,23 137:1
expressed
149:4
extends 148:13
extent 169:9
183:21 184:3
extra 35:22

**f**

facebook 198:3
198:4,6,9
fact 97:17
137:19,20
138:2,15
factor 70:5,10
96:24 97:18
138:17
factors 69:25
facts 130:19
148:9 149:21
161:6 200:11
fails 201:18
fair 68:10
70:23 124:4,12
158:17 161:16
176:7 178:11
179:17,24
180:5 181:23
182:13,14,15
false 17:25
86:23 87:1

**[false - found]**                                                    Page 17

92:6,11 104:12
104:14 109:17
109:18 111:6
116:16 118:21
118:21,25
119:4,7 120:5
122:11 123:2
129:9 162:18
169:14 171:23
172:1
**familiar**  21:18
31:21,24 59:10
85:24 95:14,16
106:4 119:9,11
150:20 155:19
**family**  8:25
20:14,20 21:4
21:5,12
**far**  38:1,5
**fashion**  111:11
112:1 160:5
193:24
**fast**  190:10
**fda**  21:13,16
22:7 92:2,14
139:24 140:7
140:13,21,25
141:7,12,18
142:2,3 161:8
161:15 165:17
167:9 171:19
171:23 172:25
173:8,13 193:7

**fda's**  4:5
158:24 165:25
167:16
**federal**  1:19
███████  3:12,14
3:17 40:16
46:16 47:10,11
47:19,23,24
48:2 49:15
50:4 62:13,16
62:17 63:1,3,7
63:16 64:3
75:14 76:19
132:3 134:12
134:13,17
144:12 175:16
177:25 197:5
**fiduciary**  181:1
181:5,6,9
**figure**  82:7
132:7
**file**  97:23
120:17 156:18
**filed**  5:7 26:16
26:21 148:19
149:12 153:17
154:13 155:1,3
155:5 195:11
**files**  26:10 46:8
149:3
**filing**  106:1
120:24 121:2
149:5,7,9

**filings**  148:25
149:1
**filled**  30:14
**final**  3:19 98:19
98:24
**finance**  18:15
18:16,17 54:7
57:20,20 71:17
75:13
**financial**  56:10
83:25
**financially**
200:18
**find**  30:11
193:4
**findings**  100:18
104:21 164:12
**fine**  115:16
**fined**  24:5
**finish**  6:17,18
29:9 51:25
52:1 92:21
132:19
**finished**  174:7
**firm**  2:4 5:14
5:19 25:20,22
26:4,6,12
29:15,17,18,21
29:25 30:6
31:21,24 32:18
32:23 33:11
34:6,7,16
148:24 149:19
152:13 153:1

154:5 200:25
**firms**  26:14
**first**  5:25 17:15
68:12 72:7
74:9 80:5,25
105:25 107:10
113:5 120:21
120:24 121:6
124:1 159:7
196:12
**five**  60:20
146:11
**fixed**  153:9
**flow**  80:9
**fly**  191:19
**focusing**  61:23
63:16
**follow**  61:1,3
189:2
**following**
152:13 176:2
**follows**  6:2
**food**  196:14
**foregoing**
203:5
**forget**  104:2
**forgot**  177:16
195:23
**form**  30:14
**format**  6:11
**formats**  58:11
**found**  24:3,23
30:17 87:6

**[foundation - going]**                                               Page 18

| | | | |
|---|---|---|---|
| **foundation** | **gather**  11:4 | **glance**  19:19 | 165:10,17,20 |
| 130:18 | 71:13 | 185:3 | 180:21,25 |
| **frame**  40:15 | **general**  10:22 | **glanced**  19:21 | 187:5 188:14 |
| 66:23 127:18 | 19:23 70:6 | 149:17 187:3 | 196:6 197:10 |
| 198:21 199:9 | 71:21 109:6 | **glancing**  150:1 | 197:11 198:12 |
| **fraud**  82:22,23 | 142:1 153:15 | **gmail**  44:24 | 199:15 |
| 87:24 88:2,9 | **generally**  46:11 | 45:19 192:8,11 | **goes**  14:2 58:13 |
| 88:13 90:3 | 68:2,3,5 71:7,9 | 192:17,18,24 | 114:11 146:12 |
| 130:10 | 71:22 87:17 | 192:25 | 146:19 160:1 |
| **frequency** | 96:9 109:1 | **gmail.com.** | **going**  5:3 6:10 |
| 75:16 174:24 | 144:21 | 45:2 | 30:23 46:20 |
| **friend**  23:15 | **generate**  13:18 | **go**  6:7 8:10 | 49:7 52:6 |
| **friend's**  176:22 | 44:18 72:24 | 19:19 26:10 | 54:11 56:3,22 |
| **friends**  20:17 | 73:18 | 29:2 30:23 | 57:1,19 58:2,2 |
| **front**  106:5 | **generic**  19:18 | 33:12 40:9 | 58:10,16,17 |
| 109:23 110:3 | **geoff**  99:13 | 41:20 54:2,7 | 59:1,4,5 63:25 |
| 114:16 165:18 | **getting**  29:5,10 | 55:16 56:9,9 | 67:23 69:14,18 |
| 171:4 181:2 | **ghaklay**  2:6 | 57:17,20,25 | 71:3 75:11 |
| **full**  8:8 41:25 | 201:2 | 59:2 61:22 | 76:10,14 77:10 |
| 154:11 | **give**  7:20,24 | 64:1,3 69:19 | 80:7 83:3 |
| **fund**  63:14 | 28:24 29:4 | 69:19,24 71:6 | 84:19 86:19,19 |
| **funds**  63:15 | 55:4 90:15,20 | 71:17 75:13,13 | 95:18 96:10 |
| **further**  99:18 | 146:9 149:1 | 76:2 77:12 | 98:12 101:1,4 |
| 139:3,8,18 | 190:21 191:2 | 79:3 82:25 | 101:10 109:21 |
| 187:14 197:1 | 195:4 196:15 | 83:12,21 84:4 | 111:5,5 112:7 |
| 199:12,14 | **given**  25:2 | 95:4,7,20 97:4 | 112:14 117:22 |
| 200:15,17 | 81:22 82:4 | 98:16 101:18 | 117:23 118:1 |
| **future**  56:5 | 91:23,24 138:2 | 102:11 115:2,3 | 121:18,19 |
| 71:23 | 143:1 181:13 | 115:5,6,9,15 | 127:20 136:21 |
| | 191:24 200:14 | 116:12 117:23 | 139:10,17 |
| **g** | 200:18 203:9 | 118:1,10 | 143:20,21 |
| **gain**  198:22 | **gives**  54:19 | 129:20,23 | 146:7,18,22 |
| **garrison**  2:10 | 57:21 97:12 | 143:2 145:16 | 158:18 165:5 |
| | | 149:16 157:13 | 165:17 183:1 |

[going - heard]                                                    Page 19

184:9 188:18
188:21,23
189:1 193:11
193:17 195:1
196:12 197:10
**gonen**  2:3 5:18
   27:21 201:1
**good**  6:5,6
   16:11 53:23
   57:2,7 69:23
   71:23,23 95:19
   95:22 97:12
   101:2,4,10
   103:21 107:25
   117:23 132:1,2
   148:12,16
**google**  30:13
   54:24
**gotta**  127:8
**graduate**  9:17
   9:21
**graduated**  89:9
**graph**  147:3
**green**  11:13
   17:21 58:14,17
   97:8,11
**greenwood**  2:4
**ground**  6:8
**guess**  31:8,9,10
   31:15 67:4
   154:11 162:15
**guesswork**
   55:14,22 56:16
   58:5 68:9

115:10
**guilty**  24:1,3

**h**

**h**  3:10 202:3
**haklay**  2:3 3:5
   5:18,18 16:10
   16:19 31:9,12
   31:15 34:9
   39:13 40:8
   46:13,22 49:4
   50:13 51:2
   52:1,9 53:11
   53:16 59:15
   60:9,22 61:2
   68:1,4 70:17
   70:21 72:3
   73:14 75:25
   76:2,12 78:13
   87:14 88:3
   89:12 91:1,7
   92:20 97:1
   102:2,22
   103:22 105:10
   105:21 108:2,7
   109:1,23
   110:12,21
   118:2 121:24
   122:2,18 123:4
   124:20 125:15
   125:22 126:7
   126:19,24
   127:7,12 128:6
   128:8,20,24

129:3,11,14,22
130:5,12,18
131:5,9,12,15
131:18 132:19
134:25 135:2,4
138:5,19 141:6
141:9 142:15
143:16,24
144:3 147:16
148:3,7,15
149:4 151:13
151:20 152:1
152:17 153:2
154:14 155:12
157:1 158:7,12
160:13 161:24
162:25 163:3
163:21 165:5,8
165:22 166:6,8
166:23 167:12
168:8,12,15,19
168:23 169:8
169:25 171:3
172:12,14
173:10 174:7
177:15 178:20
179:3 180:2,6
180:12,24
182:1,18,24
187:16,18,22
187:25 196:24
197:8 199:2,14
199:16 201:1

**half**  28:3 48:4
**hand**  158:19
   200:18
**hans**  26:13
**happen**  101:21
   148:5
**happened**
   23:23 24:8
   30:21 104:3,8
   156:4
**happens**  145:9
**hard**  40:18
   46:8
**harder**  140:17
**harmed**  125:18
   129:1,7 130:4
   130:9
**harvard**  89:16
   89:19
**harwood**  1:18
   5:10
**haynes**  1:18
**head**  7:3,4
   50:11 73:12
   127:11 128:17
   153:18 166:2
**heading**  159:4
**headline**
   158:24
**health**  49:20
**heard**  37:21
   59:11 87:8,10
   91:12,14 93:2
   93:4

**[hearings - individuals]**                                    Page 20

| | | | |
|---|---|---|---|
| **hearings** 156:19 | **holdings** 61:13 | **human** 89:10 | **impairing** 8:5 |
| **held** 17:21 | **home** 8:20 9:7 | **hypothetical** | **important** 6:14 |
| 33:15 60:1 | 9:13 42:12,14 | 110:21 129:17 | 7:1,2 70:4,10 |
| 75:18 77:2 | 42:20,22 175:6 | 129:19 144:4 | 184:12,15 |
| **help** 114:20 | 175:8,20,24 | 148:8 | **impression** |
| 164:11 | 176:1,6,16,19 | **i** | 117:2 |
| **helps** 78:10 | 177:1,2,12 | **idea** 31:6 32:15 | **incidence** 27:8 |
| **hereto** 200:11 | 188:4,9 | 54:19 55:10 | **include** 12:8 |
| 200:17 203:7 | **homes** 15:14 | 56:13 65:18,22 | 18:14 191:8 |
| **high** 101:18 | **honest** 191:3 | 67:10 71:4 | **includes** 126:5 |
| 146:22 174:3 | **honestly** 55:14 | 79:4,11 | 127:25 |
| 194:7 | 109:19 | **identification** | **inconsistent** |
| **higher** 100:19 | **hope** 115:2,3 | 46:21 49:8 | 169:17 170:12 |
| 101:19 104:22 | **hoping** 115:5,8 | 76:16 98:14 | 171:9,18 |
| 164:13,23 | 137:6 | 112:10,11,12 | **incorporated** |
| 170:19 | **horne** 195:22 | 139:12 158:20 | 5:7 |
| **highly** 140:1,11 | **hotmail** 43:14 | 183:3 | **increase** 138:16 |
| 157:16 | 44:5 45:23 | **identified** | **incurred** 33:5 |
| **hill** 58:11 | 192:6,15 | 89:24 | 34:20 82:19 |
| **hired** 26:9 | **hotmail.com.** | **identifying** | **incurring** 34:7 |
| **history** 54:3 | 43:16 | 54:9 55:8 | **indicate** 76:5 |
| 69:21 133:3 | **hour** 28:3 | 66:19 | 80:24 81:4 |
| **hit** 24:24 55:19 | 163:11 174:8 | **imagine** 56:18 | 101:9 175:20 |
| **hits** 44:18 | 175:5 | **immigrant** | **indicates** 81:16 |
| 55:20 145:10 | **hours** 154:22 | 11:13 | 98:18 107:23 |
| 145:20,22,23 | 154:23 175:3 | **immigration** | 157:22 |
| 146:13 | **house** 46:8 | 18:1,4 | **indication** |
| **hold** 59:23 | 47:16 176:22 | **impact** 94:24 | 103:20 |
| 60:17 62:10 | 188:7 | 101:18 105:6 | **individual** |
| 70:14 71:1,3,6 | **hsa** 62:15 | 117:20,23 | 63:14 85:25 |
| 133:10 | **huh** 6:9 61:24 | 142:9 143:2 | 124:24 |
| **holder** 11:13 | 85:20 114:8,13 | **impacting** | **individuals** |
| | 125:4 161:18 | 93:20 | 126:5 |
| | 193:13 196:8 | | |

**industry**  20:3,6
  20:15,18,21
**ineffectiveness**
  194:7
**inflated**  116:8
  116:11,17,20
  116:23 117:5,8
  117:11,18
  118:7,11,14,18
**influence**  8:1
**information**
  18:3 48:19,24
  54:6 55:4
  68:11,13,16,20
  68:24 74:20
  88:12 89:2
  102:10 103:12
  103:14,14,15
  103:18 105:7
  110:18 122:9
  122:15 123:9
  123:13,15,17
  123:19 124:1,3
  124:7,11,18
  125:3,7,9,12
  128:19,22
  129:8,10 134:7
  142:7 149:20
  152:3 175:15
  184:7
**initially**  24:9
**instance**  1:13
**instances**  25:7
  69:7

**institute**  11:25
**institutions**
  126:5
**instruct**  39:14
**interest**  54:9
  181:7,8 190:5
**interested**  55:8
  95:9 200:18
**interests**
  157:10 181:2
  181:10
**internet**  40:1
**interpret**  141:2
  141:12,21
  160:19
**interrogatories**
  74:9
**interrupting**
  148:7
**intraday**  3:21
  3:22 112:15,17
  112:18,24
**invested**  52:22
  63:10 72:17
**investing**  19:9
  19:12,23,25
  52:18 56:2
  61:25 105:15
**investment**
  3:14 49:13
  51:20,23 52:3
  61:18 62:4,7
  135:11,23

**investments**
  46:9,12 175:4
**investor**  55:22
  102:7,16 103:8
**investors**
  100:22,23
  101:20 105:8
  105:20 110:10
**involve**  18:14
  55:11 68:9
**involved**  21:6
  32:12,13,15
  37:2,9
**involvement**
  20:11 195:5
**ira**  47:7 62:12
  63:16 72:21
  76:19 134:25
  135:2
**issued**  84:3,6
  84:12 86:12
  150:4
**issues**  142:4
**it'll**  6:11
**item**  57:4

**j**

**j**  200:10
**january**  81:4
**jenkintown**  2:5
**job**  13:20 14:8
  14:10,19 15:23
  16:9 34:2 42:6

**jog**  114:2,20
  147:7
**jogged**  136:11
**joined**  13:10,13
  26:6
**joint**  62:20,22
  134:9,11,18
**jon**  154:8
  195:22
**jon's**  154:9
**jonathan**
  154:11
**journal**  4:2
  139:14 157:14
  161:12 196:6
**judge**  24:11
  25:3
**july**  127:16
  160:12 167:11
  169:13,16

**k**

**k**  63:4,10
  134:22 135:4,5
**kari**  1:16 5:13
  127:10 200:10
  200:23
**keep**  41:15
  46:11 165:18
**keeps**  59:1,3,4
  146:18
**kept**  148:18
**khan**  1:8,12 3:2
  4:8 5:6,24 6:5

| | | | |
|---|---|---|---|
| 8:9 49:10 | 32:6,14,17 | 107:24,25 | 157:8 158:8 |
| 52:17 74:23 | 33:15 34:13,15 | 108:5,20,24 | 159:10,13,16 |
| 94:15 132:1 | 34:17 35:17,25 | 111:18 112:6 | 159:20,22 |
| 169:22 170:3 | 36:5,12,17,20 | 112:17 116:13 | 165:1,16 167:5 |
| 174:21 183:8 | 37:1,8,11,14,17 | 116:23 117:2 | 171:16,17,21 |
| 187:11 200:9 | 37:24 38:1 | 117:22,24 | 171:24 173:15 |
| 201:5 202:2,24 | 45:10 48:7,18 | 118:3,16,19 | 175:9,9,11,15 |
| 203:2,4,12 | 48:25 49:1,14 | 119:8,11,12 | 175:22 178:13 |
| **khanamj023** | 50:19 53:6 | 120:2,8 121:5 | 178:15 179:19 |
| 45:2 | 58:1 59:4,12 | 121:13,15,17 | 180:3,7 181:7 |
| **kidding** 187:23 | 59:16 63:11,13 | 122:15 123:6 | 186:15,20 |
| **kim** 195:25 | 64:20,24,25 | 123:14,22,24 | 194:10,12,18 |
| 196:2 | 66:8 69:22 | 124:22,25 | 194:22 |
| **kind** 9:25 10:21 | 71:17,22 72:11 | 126:4,10,16,17 | **knowing** |
| 12:3 13:17 | 73:2 76:21 | 126:21,22,25 | 186:16 |
| 22:13,13 24:9 | 80:23 82:5,7 | 127:2,14 128:7 | **knowledge** |
| 30:13 53:19 | 82:10,10,13,17 | 128:12 129:4 | 21:4,5,13,25 |
| 63:20 69:13 | 83:8,18 85:3 | 129:24 130:7,9 | 22:3,7 68:13 |
| 84:18 96:6 | 86:4,15 87:15 | 130:14 131:14 | 68:17 74:20 |
| 134:15 155:23 | 87:19 88:15 | 134:4 140:4,6 | 88:8,10,23,25 |
| 185:11,12 | 89:9,11,15,15 | 140:12,21 | 102:6,15,17 |
| 197:7 | 89:17,18,20,21 | 143:17,25 | 103:7 |
| **kinds** 19:22 | 89:23,24 90:1 | 144:5 145:1 | **known** 96:5 |
| **knew** 89:6 | 92:2,17,19,24 | 146:17,20 | **knows** 16:1 |
| 162:22 | 93:22,23 94:1 | 147:20,23 | 96:9 |
| **know** 6:22 7:11 | 95:24 97:16 | 148:10,12 | **l** |
| 15:16,19,20,22 | 99:1,16 103:13 | 149:5,6,9,17 | **l** 36:13 |
| 16:2,4 19:18 | 103:17 104:3,7 | 150:18 151:5,7 | **laptop** 46:2,3,5 |
| 21:15,21 22:9 | 104:8 105:13 | 151:15,18 | **late** 159:7 |
| 22:11,13,19 | 105:22 106:13 | 152:2,10,18 | **law** 1:17 2:4 |
| 24:25 26:10 | 106:14,15,19 | 153:18 154:9 | 5:19 10:8,9,12 |
| 27:8 29:15 | 106:21,24 | 154:10 155:2 | 10:13,15,17,21 |
| 30:17,21 31:12 | 107:2,5,6,7,14 | 155:15,17 | 25:11,20 26:4 |
| 31:12,13 32:5 | 107:20,21,22 | 156:4,5,14,22 | |

**[law - looked]** Page 23

26:6,12,14
29:15,17,18,21
29:25 30:6
31:21 33:11
34:6,7,16
148:24 149:19
152:13,25
181:3
**lawsuit** 26:19
26:21,25 27:16
33:6 34:19
35:11 82:17,18
179:18 181:3
181:21 182:6
182:23 189:4
198:15
**lawyer** 27:25
28:7,13 29:13
31:3 45:16,17
155:13 156:14
198:13
**lawyers** 31:19
32:17 35:6
44:9 48:12
120:17 153:14
154:25 155:3
156:11,20
157:9 180:19
191:5,21
192:22 195:19
**layman** 142:1
**lead** 36:20 66:2
69:11,17 101:3
117:25 137:22

138:15 156:23
157:1,3
**leading** 69:25
**leads** 57:6
100:25,25
**leaving** 113:11
**led** 11:7 66:3
66:16 67:7,13
67:16,21 69:16
117:21 127:19
162:21
**left** 80:8 98:24
**legal** 5:12,14
130:5 155:19
182:12 200:24
201:23
**level** 111:9,24
160:3 166:17
168:1 171:20
193:23
**library** 19:19
176:20
**license** 14:22
25:10
**life** 89:21
**likely** 54:20
**limit** 147:8
148:1,12
**limiting** 133:2
**line** 14:12 57:4
58:14,14
100:16 104:18
166:8 202:4,7
202:10,13,16

202:19
**lines** 58:13,15
99:12 196:13
**link** 71:21
**links** 55:2
71:19
**list** 54:16 56:7
94:21
**listened** 98:6
**lists** 49:18
56:18 94:19
**litigation** 10:24
36:6 38:2,10
151:9 152:16
152:22,24
178:19 179:2
185:6,20 186:2
186:6 189:21
190:4,14,16
191:10
**little** 10:25
55:18 99:12
114:11 137:1
146:19 181:22
**live** 8:22
**living** 8:18 9:7
9:11 184:24
**llp** 1:18 2:10
**location** 5:9
**logic** 123:25
**long** 8:18 9:11
24:4 28:2
29:15,18 30:12
31:2,5 37:1,8

59:21,23 60:17
70:13 71:1,4
75:18,22 77:2
184:16
**longer** 41:13
118:18
**longest** 60:1
**look** 40:24
45:24 53:22,25
54:1,2,8 55:11
55:16 56:17
57:5,18,18,25
57:25 58:6,21
59:2 63:22,23
64:7,8 67:20
67:24 72:16
75:24 76:4
78:10 80:5
95:25 97:11
99:22 109:22
112:14 113:5
114:5,19 116:5
161:10 162:9
162:11,12
163:6,10,13,15
174:21,25
175:1 185:4
196:9,10
**looked** 50:22
65:11,11 69:1
69:4,21 71:5
75:8 79:21,23
97:3 112:4
114:6 115:14

**[looked - mass]**                                                      Page 24

| | | | |
|---|---|---|---|
| 125:12 132:3,7 | **lost** 115:16,21 | 116:16 117:15 | **making** 70:5 |
| 132:13 135:19 | 131:1 180:9 | 117:19 118:25 | 96:25 139:5 |
| 136:9,10 | **lot** 16:22 | 119:13,21 | **manage** 13:18 |
| 137:11 149:19 | 113:14 180:10 | 120:3 121:21 | 36:3 |
| 157:14,15 | **loud** 50:14 | 122:10,16 | **managed** 14:4 |
| 160:12,20 | 73:14 | 123:9 124:1 | **manager** 16:1 |
| 161:7 162:15 | **low** 101:13 | 125:9 127:19 | **managing** |
| 162:19 163:18 | 146:9 194:8 | 130:2,17 131:3 | 13:23 14:15,16 |
| 163:25 164:3 | **lower** 34:21 | 160:11 161:4 | **manner** 4:15 |
| 193:12 196:10 | 55:20 100:17 | 162:17 172:14 | **margin** 53:2 |
| **looking** 50:24 | 101:6,8,11,17 | 178:17 179:17 | **mark** 46:20 |
| 55:15,24 57:8 | 104:19 105:5 | 179:25 180:11 | 49:7 139:11 |
| 57:8 58:22 | 150:14,17 | 181:24 182:7 | **marked** 46:21 |
| 66:6,20 67:19 | **lunch** 131:22 | 182:16,22 | 46:22 49:8,17 |
| 70:1 77:9,23 | 177:22 178:7 | 203:5 | 50:23,24 64:8 |
| 112:20 114:1 | 188:2 | **mail** 41:1 | 72:16 76:14,16 |
| 134:22 136:16 | **lunchtime** | **main** 25:21 | 98:13,14,16 |
| 137:4,5,12,23 | 177:10 178:1 | **maintain** 16:5 | 112:10,11,12 |
| 147:5 161:11 | 178:10 | **majors** 19:3 | 139:12 158:19 |
| 167:16 171:3 | **lunchtimes** | **make** 6:19 16:9 | 158:20 183:2,3 |
| 181:7,8,10 | 177:17 | 16:17,22 23:16 | **market** 18:21 |
| 189:3 193:11 | **lying** 158:6,16 | 33:25 41:22 | 19:10,13,25 |
| **looks** 49:16 | | 51:23 52:3 | 61:1,8,11 95:3 |
| 72:17 78:11 | **m** | 55:13 58:3 | 95:6 96:5,9 |
| **lose** 34:22 83:3 | | 62:4 68:25 | 97:9,10,13 |
| 116:3 | **m** 13:16 | 116:2 125:2 | 105:16 110:4,5 |
| **loss** 30:22,24 | **machine** 1:17 | 145:14 146:20 | 110:19 119:4,6 |
| 34:20 58:17 | **made** 16:24 | 179:15 180:14 | 133:17,18,20 |
| 82:19 139:3 | 17:25 63:25 | 180:15 181:16 | 144:22 145:6 |
| 181:14 198:21 | 82:8 83:8,9,15 | 184:12 188:23 | 146:1,20,23 |
| 199:9 | 85:19 86:17 | **makes** 51:20 | 147:7 |
| **losses** 139:8 | 87:2 88:20,24 | 58:22 72:14 | **marking** 112:8 |
| 178:17 | 89:3,6 92:11 | 90:9 97:16 | **mass** 150:9 |
| | 94:1 100:11 | 135:11 | |
| | 101:19 110:7 | | |

**[massachusetts - misrepresentation]**                    Page 25

**massachusetts**
  1:1 5:8 33:16
  33:23 34:3
  150:10 191:19
  200:1
**massie** 119:10
**material** 69:2
  121:20 134:6
**materials**
  119:13,20
  120:3,4 125:20
  128:4
**matter** 5:6 42:2
  123:25 191:20
**mattered**
  142:21
**matters** 29:22
  190:15 200:13
**maximum** 35:1
  55:19
**mcgough** 2:16
  5:12
**meacham**
  99:13
**mean** 10:23
  15:21 29:3
  32:1 35:13,19
  44:1 45:21
  51:13 54:20
  55:25 65:22
  67:5 73:2 75:9
  82:1 83:22
  95:17,20
  100:12 104:24

108:12 127:17
128:12 134:25
140:25 141:5
149:5 150:15
151:10,16
156:17 158:5
158:16 162:11
163:21 165:3
167:3 175:25
176:6 178:9
181:5,6 184:4
187:2
**meaning** 141:1
**means** 10:24
  32:20 35:20
  53:6 58:16,17
  75:10 99:1
  108:24 109:11
  112:17,19
  137:3,4 142:6
  145:6 149:16
  150:16 151:19
  152:11,12
  156:14 159:16
  159:20 160:8
  160:18 168:5
  169:5 170:19
  176:13 178:13
  178:15 184:5
  185:17,21
  187:3 194:13
  194:19
**meant** 129:14
  135:2 181:15

184:8 185:10
**mediate** 156:1
**mediation**
  155:17,20
  156:3,6,8
**medical** 19:5
  84:10 85:7
  89:16,16 94:5
  139:19,23
  140:4,7,10
  157:15
**medication** 8:1
**medicine** 83:8
  83:9,15,18
  86:16 91:23
  101:5,12
  117:20 140:16
**medicines**
  72:14
**medium** 194:8
**meet** 27:24
  159:19 190:24
**meeting** 87:20
  119:15,22
  139:24 143:6
  143:20
**member** 61:7
  131:4
**members**
  102:19 121:14
  157:10 189:20
  190:3,6
**memory** 8:5
  79:2,3 114:2

114:20 136:11
137:20 147:7
162:13
**mentioned** 6:1
  14:21 40:5
  133:6 134:9
  150:20 161:20
  165:4,15 170:9
  171:1 188:6
**mentions** 170:8
  192:22
**meritorious**
  90:13,16,21,25
  91:4
**message** 197:12
**messages**
  197:16,20
  198:9
**messaging**
  197:22 198:2
**met** 27:21
  107:23 153:10
  153:21 159:14
**michel** 85:10
**mind** 38:22
  111:20 181:20
**mine** 23:15
**minute** 196:25
**minutes** 146:8
  146:12 185:1,1
**misdemeanor**
  23:10
**misrepresent...**
  161:6 170:10

**misrepresented**
168:24 169:21
**missed** 162:22
177:16
**misspoke** 80:6
**misstatement**
93:9,13,15,16
93:18 94:1
104:25 105:2
**misstatements**
93:20,23
150:25 151:5
**misstates** 91:1
126:7 127:7,9
151:20
**mixture** 58:4,5
58:5
**mololamken**
31:22 32:10
**moment** 50:22
157:14 165:21
178:5 195:13
**money** 16:8
32:25 63:10
64:22 68:25
72:20,22 82:3
83:3 115:21
116:2,3 130:2
130:17 131:3
134:16 179:18
179:21,25
180:10,11,21
180:22 181:24
181:24 182:7

182:16,16,22
182:22,22
**monitor** 41:18
75:7,12 151:10
151:16,18,21
151:25 152:3,7
152:12,15,19
185:6,20,22
186:2,5
**monitored**
151:8,12
152:10
**month** 12:23
25:24 47:14,21
48:10 60:20
132:15
**monthly** 39:5
**months** 24:12
54:3,4 57:25
59:2 60:2
80:25 81:17
137:16
**mood** 184:20
184:25
**morning** 6:5,6
94:15 121:21
122:10 124:19
125:20 128:5
134:9 135:19
160:20 161:17
162:6,17,20,23
163:25 169:22
170:3 188:15
192:3,17 193:1

**mosque** 22:24
**motion** 4:8
183:9
**move** 11:7 52:6
131:13 195:1
**moved** 11:5
**movement**
95:11 138:16
**movements**
114:1 147:5
**moving** 54:4
**multiple** 56:18
**mutual** 63:15
156:2

**n**

**n** 1:18 2:1 3:1
**nadia** 1:2 2:2
36:9,25 190:20
190:25 200:2
**name** 5:12 8:8
8:12 10:2
11:24 25:22
26:12 36:13
37:7 44:11
55:17 57:21
71:18 83:18
85:9,10 94:4
149:20 154:9
154:11 184:7
190:21
**named** 26:24
35:18 36:5,17
37:6,12,14

119:10 121:16
130:23,23
181:3,8 195:25
200:12
**names** 8:10
85:6
**nature** 71:24
**near** 56:5
**necessarily**
4:16 177:25
**necessary**
203:6
**need** 45:7 51:5
73:10 100:19
104:21 110:3
115:15,15
151:15 152:2
152:18 156:18
156:19 164:13
164:22 168:12
168:15 170:18
178:22 181:7
196:25
**needed** 7:7 51:8
51:9
**negative**
107:18,20,22
107:25 108:6
141:22,23
142:7,9 143:2
143:13 159:24
196:22
**negotiation**
191:4

| | | | **o** |
|---|---|---|---|

**negotiations**
190:14,19
**neighborhood**
82:9
**neither** 200:15
**neurobiology**
89:18
**never** 59:22
161:19 163:19
177:8,13
195:17,19
**new** 2:11,11 4:5
97:14 103:14
103:19 158:25
**news** 73:25
74:6,24 75:3
105:20 196:21
**newspaper**
39:23
**night** 188:10,12
188:13
**nod** 7:3
**nods** 50:11
73:12 127:11
128:17 166:2
**nonprofit**
22:23 23:2
**nonpublic**
68:21 125:3,7
134:7
**normally** 28:22
**north** 5:10
**notary** 203:13
203:19

**note** 4:14
201:10
**noted** 203:7
**notification**
197:6,14
**novel** 89:25
**november** 3:12
3:15,15,17,21
3:22 4:4 12:24
30:25 31:1,7
38:20 39:2,9
40:15 42:3,5
42:13 61:23,25
62:7 64:17
65:8,15,19
66:2,7,7,11,23
67:14,17 72:1
74:1 76:24
78:2,9,18 79:2
79:5,17,24
81:5 86:14
87:21 99:6
102:1 112:16
112:24 113:1,7
113:13,14,17
113:21,24
114:3,6,10,21
116:6,18,21
117:6 118:7,9
118:12,15,16
119:12,20,21
120:4 121:21
122:10,17,22
123:2,8,9,12,16

123:16 124:2,3
124:5,6,17
125:8,9,11,14
125:19 126:2,6
126:14,18,23
127:5,16 128:1
128:3,5,16,19
129:7 130:1,2
130:10,11
132:4,16
135:19 136:1
136:17 138:11
138:18,23
139:2 143:5,19
144:8,10 147:6
147:6,14,21,24
169:20,23
170:5,7,12
175:10,11,13
175:19,25
176:5,6,9
**number** 93:20
189:3,13,17,17
190:12 191:7
**numbered** 1:15
**numbers**
189:18
**nvidia** 78:11,18
79:2,4,9 80:1
132:14 176:9
**ny** 201:15

**o'clock** 5:4
**oath** 7:14
**object** 127:8
165:5
**objection** 16:10
16:19 34:9
39:13 40:8
46:13 51:2
53:11,16 59:15
60:9,22 61:2
72:3 87:14
88:3 89:12
91:1,7 97:1
102:2,22
103:22 105:10
105:21 108:2,7
110:12,21
118:2 122:18
123:4 124:20
125:15,22
126:8,19,24
127:7,9 128:6
128:20,24
129:3,11,15,15
129:17,21
130:5,12,18
131:5 138:5,19
142:15 143:16
143:24 144:3
147:16,16
148:3,8,15
149:4 151:13

**[objection - okay]**                                        Page 28

| | | | |
|---|---|---|---|
| 151:20 152:1 | **offering**   181:13 | 65:1,7,13,17 | 127:21 128:15 |
| 152:17 154:14 | **office**   42:4,12 | 66:1,22 67:4,8 | 128:16 132:7 |
| 157:1 158:7,12 | 42:14 175:21 | 69:4 70:23 | 135:5,18 136:9 |
| 160:13 161:24 | 177:6,9,14,20 | 73:6,7,17,21,24 | 137:7,7,12,17 |
| 162:25 163:21 | 177:25 178:6 | 74:7,16,18,22 | 139:4,7,17 |
| 167:12 168:8 | 178:10 200:18 | 75:1,3,6,24 | 141:10,11,21 |
| 168:11 169:8 | **officer**   84:10 | 76:10 78:2 | 142:18 143:4 |
| 172:12,14 | 85:7 94:5 | 79:8 81:9,14 | 145:1,16 |
| 173:10 177:15 | **officers**   84:9 | 81:20 82:8,12 | 146:24 147:13 |
| 178:20 179:3 | **offices**   1:17 | 82:14,15 83:2 | 149:11,24 |
| 180:2,6,12,24 | **oh**   98:23 103:4 | 85:8 88:8 | 152:9,21 154:4 |
| 182:1,18,24 | 188:12 189:17 | 91:12,19 92:18 | 154:19 157:21 |
| **objectionable** | 196:4 199:16 | 94:8,23 95:25 | 158:24 159:18 |
| 131:8 | **okay**   6:16,24 | 97:15 99:1,12 | 159:22 160:10 |
| **objections**   74:9 | 7:9 10:17 16:2 | 100:8 101:11 | 160:20 161:16 |
| 131:5 | 16:8 17:3 21:8 | 101:13 104:8 | 161:22 162:16 |
| **objectives** | 21:12,18 22:13 | 105:7 106:18 | 163:10,15 |
| 107:23 | 22:21,25 23:9 | 106:21,24 | 164:5,11 |
| **obligation** | 25:4,7 28:17 | 107:10,22 | 165:19 166:6,8 |
| 38:13 41:9 | 28:24 30:23 | 108:5,13,24 | 166:10 167:17 |
| **obligations** | 31:11,14,16 | 109:5,7,21 | 167:18,22,24 |
| 36:1 | 32:1,17 33:19 | 112:7,19,22 | 168:10,19 |
| **obtain**   14:22 | 35:10,15 36:17 | 113:5,6,11 | 172:4,8,18 |
| 40:13 47:11 | 38:1 39:12 | 114:5,15,18 | 173:8 174:9,13 |
| 50:3,23 51:8 | 41:4,11 44:8 | 115:1,21 116:2 | 176:21,23 |
| **obtained**   12:15 | 46:1,19 47:7 | 116:15 118:17 | 177:5,24 178:5 |
| 14:21 50:21 | 47:11,18,20,25 | 119:2,6,9,12 | 178:9,12 |
| 89:16 | 48:18 50:3,12 | 120:11,17 | 181:22 184:2 |
| **obviously** | 52:6,10,18,19 | 121:8,18 | 185:2,4 186:1 |
| 191:17 | 54:15 56:17 | 122:15 123:8 | 186:11,14,19 |
| **odd**   189:18 | 57:16 58:19 | 123:12,25 | 187:11,21,22 |
| **offer**   191:11 | 59:12,14,20 | 124:5,13 125:2 | 188:9,12,17,22 |
| **offered**   181:13 | 60:1,3,7 63:24 | 125:5,6,11 | 188:25,25 |
| | 64:5,10,12,16 | 126:12 127:12 | 189:1 190:10 |

**[okay - particularly]** Page 29

190:12,19
191:2,7,17,24
192:13,16
193:9,20
194:12 195:1,3
195:17,21,23
195:24 196:4
196:11 199:12
199:13
**old** 9:3,5
**once** 63:25
75:17 161:19
**ones** 106:6
187:4
**online** 19:24
41:20 61:7,10
63:23 64:5,6
144:13
**open** 112:20,25
**opened** 62:19
113:8,13,17
**opens** 97:10,10
97:13 146:11
**opinion** 38:8
90:15,21,24
91:4,6 105:18
123:5 171:15
173:17,18
180:13,17,18
180:20 181:19
182:13
**opinions** 191:3
191:3

**option** 55:6
64:4 145:5
**options** 52:25
**oral** 1:8,12
84:21 200:8
**order** 144:19
145:17,19,20
146:2,5 147:8
147:14,20,23
148:2,6,12
150:12 163:22
164:20
**outcome** 108:6
108:6 159:23
159:24
**outlook** 59:21
**outset** 32:13
37:15
**oversee** 152:21
152:24 185:6
186:2,6 190:3
**overseeing**
190:15
**owe** 127:22
**own** 8:20,21
9:13 182:10
189:4 198:15
**owned** 9:14
**owner** 51:15
**owns** 51:17

**p**

**p** 2:1,1

**p.a.** 2:4
**p.m.** 1:16
131:21,24
174:16,19
187:7,10
199:19,20
**package** 16:12
**page** 3:2,11
48:4 49:18
64:9 78:13,22
78:25 79:13
80:5,6,6 98:16
98:17 99:11
139:18 159:4
164:6,9 165:23
193:14 196:9
202:4,7,10,13
202:16,19
**pages** 169:19
184:22
**paid** 29:3,5,10
32:18,21,25
59:22
**pakistan** 9:20
10:18,21 11:3
18:13 25:11
**paragraph**
98:21 99:22,25
100:9,10,14
102:10 103:14
104:15 139:19
142:1 143:1
165:15 166:3
171:2 185:4

193:12 198:14
**paralegal** 11:23
11:25 12:4
25:14,19 26:2
26:3,7
**pardon** 118:10
**part** 13:8,11
14:6 16:22
18:18 20:25
25:25 27:6
31:25 32:1
35:20 78:1
96:16,17
102:18 104:14
109:4,8,8
130:21,22
133:17,21
157:15 170:21
182:8
**partial** 150:16
**participate**
179:18
**participated**
20:8 27:15
**participating**
32:3
**particular** 54:8
66:3 67:2 97:4
144:19,23,24
145:2,7,8
146:2 185:14
191:11
**particularly**
142:13

parties  156:1
  200:16,17
parts  13:6
party  26:19
  34:15 38:2
  201:5 202:2,24
  203:2,4,12
passed  12:25
past  41:13
  69:21 94:22
  133:13 137:15
patients  22:10
  22:19 84:1,20
  86:20 89:22
  91:16,24 92:7
  117:21
pattern  58:22
  59:1 69:16
  80:2
patterns  146:7
patterson  2:10
  5:22,22
patterson's
  111:4
paul  2:10 5:20
  5:22
paulweiss.com
  2:12,13
paused  21:8
pay  185:14
paying  34:13
  34:16
peace  23:16

penalty  183:13
  191:24
pending  7:12
pennsylvania
  2:5
people  79:20
  87:5 127:19,25
  128:3 129:1,18
  129:19 158:5
  158:10,15
  180:23 181:24
  198:4
percent  196:17
percentage
  77:25
perform  191:13
  191:15
period  10:19
  42:2 61:22
  63:17 67:14,18
  69:5 71:7,9
  77:5 80:3
  81:25 127:14
  127:17 137:14
perjury  183:13
  191:25
permit  17:23
person  23:17
  24:24 37:6
  42:7 125:19
  153:21 158:16
  195:24 200:12
personal  46:3,4
  49:19 88:1,3

88:10,23,25
  102:6,15,17
  103:7,12
personally  20:8
  21:15 22:9
  90:20,23 91:6
  101:25 186:10
persuasive
  140:1,11
  157:17 158:4
pertaining  62:9
  82:22
pertinent
  190:15
ph.d.  89:18
pharmaceutical
  20:5,21
phase  159:8
phillip  195:25
phone  153:24
  195:17,19,21
  196:2
phonetic  36:11
phrase  162:7
  162:21
physically  42:3
pick  146:13
pla  3:13,15,18
place  5:10
  96:10 146:21
  175:18 176:25
  177:2 197:5
placed  147:20
  147:23 148:6

175:10,19
  177:24
placing  64:1
  177:1
plaintiff  5:19
  35:14,15,17,18
  36:20 37:12,14
  74:23 121:10
  121:16 127:4
  156:23 157:2,3
plaintiffs  1:3
  2:2 4:8 36:6,16
  36:18 121:7,11
  126:1,4,13,15
  126:17,22
  128:15 130:24
  156:25 179:21
  179:22 180:21
  183:9 190:4
  200:3
plaques  111:10
  111:25 160:4
  166:17 168:1
  171:20 193:23
  194:10,13,19
platforms  61:7
  198:2
plead  24:1
pleadings
  156:18
please  5:15
  7:21 8:8 29:9
  31:9 38:23
  43:1 60:13

81:2 82:16
92:8 93:10
95:12 103:25
110:15 118:22
122:3 156:12
160:14 167:13
168:11 169:1
171:11 186:3
187:22 189:2
190:23 194:25
**plus** 16:13,15
**point** 7:10 11:4
33:13,24 37:15
41:12 81:22
118:17,20
119:3,3 146:14
154:4 193:18
**pointed** 191:25
**police** 24:23,25
**policy** 16:2,5
**polycon** 37:21
38:1,4
**pool** 180:21
**portion** 104:15
104:16,17
109:3,4,11,14
150:18 160:25
179:25 182:16
**portions**
107:17,18
108:10,11,12
108:21,24
183:22,25

**portrayed** 87:7
**posed** 83:11,20
84:5 101:22
**position** 41:25
158:2
**positive** 37:7
108:5 141:21
159:23 166:20
166:22 167:1
196:15,21,23
**possession**
38:25 41:12,13
43:8 48:1
**possible** 131:19
173:16,20,22
**possibly** 115:24
115:25
**posted** 61:10
198:6
**postgraduate**
10:5
**potential** 191:4
**potentially**
35:1 180:21
**practice** 10:13
10:15,17,21
25:11 65:17
66:1,18
**practitioner**
10:22
**precise** 51:14
63:24
**precisely** 44:5

**preferential**
156:24 157:6
**preparation**
28:7
**prepare** 27:19
**prepared**
182:21
**present** 28:4
**presented**
84:14,15
**preserve** 38:13
41:6,9
**prespecified**
107:12
**pretty** 63:20,20
**prevent** 139:3
**previous**
102:11,14
137:5,11,12
181:12
**previously**
14:15 21:16,22
21:25 22:3,7
121:16
**price** 3:21,23
3:24 34:21
65:4 70:1 77:7
94:25 96:13
104:4,5,9
105:8,19 113:1
114:1,6,14
115:11 116:7
116:17 117:18
118:6 122:22

123:3 136:10
136:16 137:5
137:23 138:3
138:10,16,16
139:7 143:2
144:19,23
145:2,7,8,9,10
145:12,18,19
145:20,22,23
146:2,4,8,13,14
146:17,21,23
146:25 147:5,8
**prices** 112:16
112:19,21,24
112:24,25
137:11,12
**primary**
107:11 154:4
159:14,19
**prime** 93:6
106:2,9 107:5
107:8 165:4,6
165:15
**print** 40:1
**prior** 9:8 30:5
47:21 57:14,15
115:11 117:1,1
126:1,6,13,18
126:23 128:1,3
137:13,23
**prioritize** 157:9
**privacy** 48:21
**privy** 125:8
128:13,14

**[privy - question]**

134:6

**probably** 25:23
31:7 36:15
71:5 72:9
97:14 142:23
146:12,19
162:22 170:21
178:2,3 185:1
196:25

**probation**
23:24 24:11

**procedure** 1:20

**proceedings**
5:1

**process** 56:8
136:24,25
137:1,3,4

**processes**
115:13

**produce** 51:5

**produced** 1:13
50:1 91:18

**profit** 23:1
58:17

**profited** 180:23

**program** 159:8

**progresses** 34:8

**progression**
194:3,14,19

**promising** 4:3

**prompted**
139:2

**proper** 168:18

**proposed** 191:9

**prosecute**
156:11,15
190:5

**protect** 48:21

**provide** 103:20

**provided** 48:12
83:24 141:12

**providing**
138:25

**provisions** 1:20

**pto** 29:3

**public** 97:23,25
98:3 119:14
121:21 122:10
122:16 123:9
125:9 203:19

**publicly** 68:14
68:17,24 84:24
103:16,19
119:21,24
120:3 128:5

**pull** 44:7,8

**pulling** 111:4

**punch** 71:18

**punjab** 10:4,12

**purchase** 15:14
39:1,9 66:3,19
66:24 67:13,17
67:21 71:9
76:5 77:5
81:25 82:2,24
83:2 135:18,25
136:13 144:22

144:22 145:8
175:19

**purchased** 53:2
65:7,9,10,14
70:12,25 73:22
75:6 78:4,11
79:14 85:22
99:6 102:1
103:8 113:21
113:23 114:20
116:6 119:19
123:8 126:1,5
126:13 127:5
128:16 133:19
175:12 176:9

**purchasing**
56:15 71:12
72:1 74:1,24
75:4 78:18

**purpose** 101:12
155:25

**pursuant** 1:19

**pursue** 11:9
178:19 179:2

**pursued** 12:15

**put** 49:4,6
57:21,21 75:25
76:12 82:3
109:24,25
131:18 145:17
145:19 147:7
147:14 168:19
181:2 192:2
193:10 195:2

196:24

**putting** 105:1

**q**

**q2** 3:20 98:19
99:1

**quantitative**
77:24

**quarter** 99:2,2
160:21 164:1

**quarterly** 98:1

**question** 6:10
6:18,22 7:12
24:16 27:7
29:9 38:15
60:13 63:25
66:16 68:5
70:22 73:6
81:2,9,15
82:16 91:3
93:10 99:23
102:12,14
103:25 104:2
110:3,14 112:2
115:7 118:22
119:18 131:10
138:7 141:3
146:10,16
152:12 156:12
160:14 162:24
163:2,3,6
165:11 168:25
170:1 171:13
172:15 173:1

178:23 181:12
181:19 182:12
182:13 186:3
189:1 190:23
199:2
**question's**
181:22
**questions**   6:12
6:12 27:11
52:17 166:24
187:15,19,23
**quotations**   4:14
**quote**   4:16
139:25
**quotes**   140:1

**r**

**r**   2:1 13:4 36:13
202:3,3
**radar**   66:14
**random**   56:23
97:5
**rare**   97:22
177:10,21
198:5
**reach**   30:8,8,18
**reached**   30:10
82:10
**react**   105:8
**reaction**   96:13
105:20
**read**   4:15 19:15
19:20 56:9
69:2 77:17

85:1,2 90:6
98:9 100:16
101:14 104:19
107:16 111:5
111:20 119:20
119:25 120:11
142:18,21,25
148:25 149:3
149:11,15,15
149:16 155:5
165:21 167:24
170:9 171:6,18
172:11,16
183:17,24
184:6,16,25
185:23 188:19
188:21,23
189:7,22
195:15 196:12
196:18 201:9
203:5
**reading**   71:16
71:16 169:9
174:11 185:25
190:10
**ready**   181:14
187:20
**real**   12:18,19
12:21,22 14:22
14:24 15:2,6
15:10,12,13,17
16:17,25 17:6
44:25 192:10
192:12,18,25

**really**   19:20
53:13 59:13
100:19 101:17
104:21 109:19
142:14 146:17
146:22 164:4
164:13,22
170:18 185:13
**reason**   7:19,23
7:25 25:12
28:24 29:4
70:9 77:11,14
78:24 81:9,13
136:8,13,14,17
136:20,23
140:9 161:22
167:6,10 182:9
201:11 202:6,9
202:12,15,18
202:21
**rebought**
133:11,14
**recall**   21:10
24:21 25:19,22
26:4 30:2,19
31:2 32:12
42:5 44:18
48:17 50:6,7,8
50:12 55:17
58:12 62:18
65:7,25 66:12
67:8,15,16,25
69:3 70:12,17
71:8 72:7 74:7

74:8 77:3 78:5
78:18 81:7
85:5,6 87:4,19
89:8 106:6
109:20 113:21
121:10 132:16
132:22 136:19
139:4 143:10
144:9 149:25
151:4 154:21
157:19 161:21
161:22 162:3,5
162:21 168:25
170:6 177:11
192:4 195:21
**recalling**   69:2
70:22
**receipt**   201:17
**receive**   9:23
10:9 12:1,2
40:16,20
133:21 182:21
197:6
**received**   41:1
92:2 149:18
195:8 196:13
**recent**   96:21
**recently**   40:13
54:11 133:11
133:11
**recess**   52:13
94:11 174:17
187:8

recognize  47:1
49:10 76:18
183:5
recollect
132:13
recollection
48:15 65:14
77:1 162:10
163:7 186:15
record  1:21
4:16 5:4 7:5
46:24 52:11,14
94:9,12 111:2
128:14 131:20
131:23 168:20
171:3 174:15
174:18 187:5,6
187:9 188:20
197:8 199:15
199:18 200:14
recorded  5:5
records  46:11
46:14
recover  34:18
35:1,5 181:23
recovery
179:20 180:1
181:25 182:17
recruit  140:18
recruiters
141:15,15
red  58:14,16
97:8

reduced  111:9
111:24 160:3
166:17 168:1
193:23 200:13
reducing
171:20 194:13
reduction
159:15 194:19
refer  78:13
137:19 151:21
152:14
reference
159:10
referenced
140:5,22 201:6
referred  85:19
referring  30:24
84:7 165:14
refers  165:2
reflect  76:23
80:22
reflected  4:15
32:22
refresh  77:1
137:20
refreshed
162:9,12 163:7
regardless
180:18
registration
200:25
regular  24:10
regulators
196:15

rehear  178:22
reimbursed
33:8
relate  18:20
64:23
related  193:4
200:16
relating  19:9
39:1,9 41:6,9
41:11 43:8
45:4,24 46:9
46:11 87:21
relationship
30:5
relative  200:17
released  123:15
128:5,19
139:24 169:23
170:4
relevance
16:10 56:25
89:12 100:8,10
relevant  38:14
90:2 92:15
138:4 143:23
144:2,6 156:18
relied  102:7,16
102:19,25
103:9
rely  73:25 74:6
74:23 75:3
85:21 101:25
102:20,23
103:5

remanded
150:13
remarks  106:1
remember
18:16 24:4,15
25:4,6 26:12
27:1,7,10,14
30:16 31:4
34:23 37:3,10
40:21,24,25
41:1,2,3 42:13
42:16 47:12
48:22 63:12
65:9,10 66:15
66:16 67:1,5,5
67:6,12 68:7
68:19,20 72:12
73:20 74:2,3,4
74:6 75:18,20
75:21 78:3
79:19 83:19
85:8,9 86:22
93:17,25 94:4
104:10 109:20
113:23 114:4
114:22,23
121:9 122:19
123:24 132:5
132:11 133:1,5
136:7,9 137:18
138:21 139:6
144:11,20
146:1,3 147:12
147:13 149:22

150:2,19,23
151:4 153:20
154:10 160:22
162:2,8 164:2
172:10 175:22
176:11,14
186:13
**remind** 161:25
**remote** 42:6
**remotely** 42:4
**render** 171:23
**renders** 172:1
**rent** 8:20 9:13
**rep** 189:19
**repaid** 180:10
**repeat** 38:22
62:21 73:7
103:25 110:14
118:22 160:14
167:13 190:23
194:24
**rephrase** 6:23
16:3 60:12
97:24
**report** 3:14
49:13 57:3
71:24 84:14,16
84:17,18,21,21
84:23,24,24
85:1,2 108:17
119:9 141:13
142:5 161:7,10
161:14,15
169:15,16,18

169:19,23
170:4,7,8,12,14
170:14,15,25
171:6,9,14,17
171:22 172:1,2
172:5,11,16,19
173:4,6,13,24
174:1 193:8
**reported**
172:24
**reporter** 1:17
5:13,16 6:1,13
7:2,5 62:21
127:11
**reporter's** 3:8
4:14 200:8
**reporters** 110:5
**reports** 71:20
73:25 170:24
171:1
**represent**
30:18 32:7
58:15 112:15
112:23 114:17
121:18,19
122:8 130:16
130:23 156:21
156:21
**representative**
35:12,16,17
36:1 127:21
131:7 157:6
183:10 189:19
189:25 191:8

**representatives**
4:9 157:11
190:25
**represented**
29:13,18,21
31:18
**representing**
32:3
**request** 60:12
103:24
**requests** 42:25
43:4
**required** 7:16
41:5 203:13
**research** 26:9
56:22 71:13,16
71:25 139:4
**residential**
15:12,13
**respect** 39:14
68:1,12,23
71:25 78:2
178:12
**respond** 7:3
**responds** 74:23
**response** 99:23
153:3 194:23
**responses** 74:8
74:19,22
**responsibilities**
14:8,10
**responsibility**
190:3,6,8

**restrictions**
133:24
**resulted** 24:22
**results** 106:21
107:2,7
**retainer** 29:24
32:9,22
**retarded** 194:3
**retirement**
49:19
**return** 201:13
201:16
**reveal** 122:16
**revealed**
118:21 119:4,6
120:4 121:22
122:11 123:1
129:9
**reversed**
150:12
**review** 28:9
74:14 128:4
172:25 173:14
173:24 186:23
201:7
**reviewed** 99:7
142:4 186:24
187:1,2
**reviewer**
139:20,23
140:4,7,14,21
140:25 141:12
141:18 142:3
157:16,17

158:3 171:15
173:17
**reviewer's**
140:10
**reviewing**
150:1
**reviews** 142:4
**revoked** 25:11
**richard** 2:9
5:20
**richardson**
8:17
**ride** 33:7
**rifkind** 2:10
**right** 10:14
17:10 23:22
24:19 34:8
48:13 49:2
56:5 67:3
73:11,13,15
81:22 90:7
94:6 99:20
105:16 113:20
114:5,9 116:8
116:24 117:9
131:1 133:8
135:6 136:5
142:13 145:7
146:21,21,21
146:25,25
154:10 161:17
171:10 172:1
172:11 184:18
184:22 191:22

**rights** 62:20,22
134:11,18
**ring** 85:10
**rings** 85:11
**rise** 69:15
**risk** 82:25 83:3
**road** 23:15
**role** 32:5 35:11
152:6
**rollover** 47:7
62:12 63:16
76:19 134:25
135:2,9
**room** 184:24
**rooms** 61:8
**rosen** 2:4 5:18
29:17,18,21,24
30:6 32:18,23
33:11 34:16
154:5
**rosenlegal.com**
2:6 201:2
**roughly** 138:11
**row** 80:12,13
**rtarlowe** 2:12
**ruled** 150:25
151:3
**rules** 1:20 6:8
**run** 44:11,14

**s**

**s** 2:1 3:10 13:4
202:3

**salary** 17:3
**sale** 15:14 39:1
39:9 77:6
135:18
**sam** 5:22
**samuel** 2:10
**sand** 172:22
**sandrock** 85:24
87:23 88:13,20
89:5,9,15
90:10 94:2
99:19,20
100:15 105:3
106:17 108:10
108:18 109:7
112:4 117:15
118:25 160:11
160:21 162:13
163:19 164:9
167:10 169:17
169:20 170:8
170:16,20
171:10 172:3
172:20 173:7,9
173:17,25
**sandrock's**
88:15 99:23
104:11 106:1
109:16 110:6
111:15 117:17
120:5 121:22
122:11 123:1
129:9 161:17
169:13 170:13

172:1,6 173:5
**save** 40:5,6,8
40:11 46:17
197:16
**saved** 46:16
47:21,22
**savings** 49:20
**saw** 48:9 106:6
139:7
**saying** 84:2
100:23 102:20
105:3,5 109:8
109:10 141:13
170:15,16,19
173:6,7,9
**says** 49:19,19
57:10 64:12,13
64:16 80:8,12
80:13 81:7
98:17 99:13,18
100:15 101:5,8
106:1 107:10
107:16 108:10
108:13,21
129:7 139:23
140:8,13
147:22 159:7
159:14,18
164:12,22
165:13 166:12
166:15 167:4
167:24 170:18
173:24 174:1
185:5 198:14

**scenario**   176:2
176:3
**school**   11:20,22
11:23,24 21:2
89:16
**schools**   12:11
**science**   158:1
**scientific**   19:5
**scope**   18:6
197:9
**scuffle**   23:15
**seal**   200:18
**search**   30:13
43:7,10,11,21
43:22,24,25
44:6,11 45:3
45:20 46:5
192:17,24
197:19,24
198:9
**searched**   31:3
44:2 192:13
**searching**
30:15,17,19
45:23
**second**   98:17
99:2 104:18
105:25 120:22
121:3,6 122:1
122:8 139:18
159:4,18
160:21 164:1
166:3 192:11
195:4

**secondary**
107:12
**seconds**   146:8
**section**   64:13
159:4 167:19
**securities**   20:2
20:15,18 52:22
63:3 74:24
75:4 80:12,13
80:16,19 81:17
81:21 82:21
**security**   73:3
73:18 82:23
**see**   30:21 48:4
48:8 49:18,21
53:23 54:2,4
56:7 58:1 59:3
64:10,14,18
65:2,5,6 67:21
69:10 75:10
77:4,10 78:6
78:12,17 79:8
79:14,15,24
80:10,14,16,20
97:5 98:18,20
98:25 99:12,14
99:15,24,25
102:25 105:8
105:19 108:10
108:21 110:11
110:19 113:3,7
113:9,14,19
114:10,11
116:13 122:21

122:24 138:10
139:21,22
140:2,3,7,19
142:8,11 145:3
158:24 159:1,4
160:6 164:8
166:12,18
167:22 168:2
174:4 185:7
186:13 193:15
193:19,25
194:1
**seeing**   77:16
146:22
**seeking**   43:4
**seemed**   21:8
**seen**   99:3 100:2
100:4 110:25
139:15 158:22
183:15
**selection**   97:5
**sell**   42:17 53:6
60:7 62:11
63:3 73:18
96:1 97:19
134:3,19 139:2
139:5 147:14
177:5
**selling**   52:20
56:16 61:16
87:5 133:25
**send**   51:9
**sending**   196:16

**senior**   14:20
**sense**   6:19
60:16,19,21
97:16 124:1
**sent**   40:17,22
150:17,18
195:10 201:14
**sentence**
105:25 108:13
140:13 141:4
142:13 159:7
164:12 165:6,7
165:9,20
168:24 185:13
185:15,17
194:2,6 196:12
**sentences**   105:4
**separate**
134:15
**septem**   189:10
**series**   82:9
**serious**   89:25
90:9
**served**   22:21,25
42:25 43:4
**serving**   22:23
**set**   40:25 74:9
140:16 141:16
144:18,23
145:2,7,7,8
146:2,4 147:8
**setting**   19:9
**settlement**
64:16,20,23

155:8 190:14
190:19 191:4,4
191:11
**settles** 64:21
**several** 33:20
33:23 128:8
**shake** 7:4
**share** 51:11,13
57:3 114:7
116:7 122:23
123:3 137:21
138:3,11
180:22
**shared** 179:21
**shareholders**
189:5 198:16
198:18 199:6
**shares** 65:1,8
73:22 76:23
79:8 196:17
198:20 199:8
**shash** 1:2 2:2
5:6 36:9,25
37:1 38:9
190:20 200:2
201:4 202:1
203:1
**sheet** 201:11
**shop** 21:1
**short** 52:7 53:6
59:21 71:3
75:21,23 82:22
**shorted** 53:4

**shorthand** 1:17
**shortly** 60:7,10
**show** 46:19
49:3 56:3 74:7
76:10,14 98:12
100:18 101:7,8
104:20 105:5
107:11 109:21
112:7 121:19
122:7 139:10
158:18 159:5
164:5 165:24
166:5 167:19
170:7 183:1
188:18 193:14
**showed** 84:19
**showing** 159:15
**shown** 194:13
**shows** 57:10
65:1 112:15,21
112:23,25
115:16 142:5
169:20
**sic** 54:12 56:12
**side** 76:12
155:2
**sides** 154:25
**sign** 74:16
186:11 201:12
**signals** 97:12
**signature** 3:7
200:22
**signed** 74:18
100:5,13

149:21 163:16
183:11,17,23
185:9,16
186:16,18,19
201:19
**significance**
54:18 56:24
**significant**
102:10 105:7
105:20 110:10
110:18
**signing** 186:22
**similar** 100:17
104:19
**similarly**
181:18
**simple** 83:23
176:13
**single** 67:16
**sir** 53:12 127:8
129:16 130:20
187:19 197:11
**sit** 189:9,15
190:7,17
194:12,18
**site** 94:16
**sitting** 45:10
65:13 79:1
117:4,10
184:20,21,23
184:24,25
186:14
**six** 24:12 54:3

**size** 81:24 82:1
**skim** 19:22
185:2 195:15
**skimmed** 19:21
120:14,16
184:7 187:3
195:14
**skip** 185:3
**slowed** 194:15
194:20
**small** 25:20
**sold** 34:20
66:10 76:23
78:9 79:8,11
79:12,14 80:13
80:19 81:16
130:2,10
132:12 133:13
134:5 144:9,10
144:12 175:13
176:5
**solely** 69:6,8
71:10,12
**solutions** 5:14
37:22 38:1,5
200:24 201:23
**somebody**
21:10 45:16
119:10 123:12
123:16 124:2,5
124:10,17,21
125:2 129:6
130:1,4,9,17
131:3 179:1,4

[somebody - statistical]                                                    Page 39

179:17,24
180:9,10
182:16,22
198:22
**sophisticated**
53:9
**sorry**  12:20
25:22 50:13
52:5 70:17,19
73:9 80:6,25
94:18 102:11
103:2 110:2
129:14 132:8
132:20 135:1,3
137:3 141:2,6
145:10 156:7
165:22 171:11
172:13,23
177:4 194:16
195:23,23
199:16
**sort**  23:7 32:9
41:15 44:4
55:23 60:16
63:14 69:16
77:20 79:24
81:24 164:8
**sounds**  67:1
**source**  72:20
**southeastern**
11:25
**spatterson**  2:13
**speak**  22:16
28:6 73:21

**special**  36:1
**specific**  71:8
96:4
**specifically**
18:17 46:17
67:24 86:18
108:18 173:25
**speculation**
105:11 110:13
110:22 129:18
178:21
**spell**  13:3,15
36:12
**spelling**  37:8
**spend**  175:3
**spent**  154:12
161:16
**split**  15:9 42:9
42:11
**spoken**  21:24
22:6 37:4,19
38:4
**spreadsheet**
41:15
**stage**  159:7
**stand**  34:18
**stanford**  89:10
**start**  13:5,10
193:17
**started**  6:7 13:6
13:7 14:16
24:9 54:11
87:5 193:18

**starting**  153:15
**starts**  139:19
141:7
**state**  5:15 8:8
83:25 93:18
200:11
**stated**  1:20
200:11
**statement**
27:12 39:6
56:10 64:9
72:16 75:1
83:25 86:23
87:1,2 100:15
100:21,24
101:3,25 102:7
102:9,16,19,23
102:25 103:5,9
104:12,14
110:6 111:5,15
111:21 115:14
117:14,17,19
117:25 118:21
118:25 119:4,7
120:5 121:22
122:11 123:1
129:9 132:4
140:25 141:2
160:11,18,20
160:25 161:4
161:17,23
162:16 163:8
166:20 167:7
169:13,25

170:9,13
171:18,23
172:1,6,25
173:5,8,25
174:3
**statements**
17:25 40:5,16
40:17 83:24
84:3,6,12,13
85:19,21 86:12
86:15 88:19,24
89:2,6 92:6,11
92:16 109:17
116:16 127:19
128:13
**states**  1:1 5:7
10:15 11:5,7
11:11,12,19,20
12:7,12,15
17:8,9,12 18:1
18:4,7 25:15
26:15,20,22,25
27:5 74:22
150:9,12 200:1
**statistical**
140:13,21,25
142:5 157:17
161:7,10,14
170:15 171:6,9
171:14,17,22
171:25 172:2,5
172:25 173:4,6
173:13,16,24

**[statistician - suite]**                                    Page 40

| | | | |
|---|---|---|---|
| **statistician** | 70:1,14 71:1,6 | 138:10,18 | 161:12 196:6 |
| 141:9 | 71:18,18,23 | 139:7 141:22 | **studies** 20:9,12 |
| **statistics** 18:25 | 72:1 73:10,11 | 142:10,19,22 | 21:6 106:2,12 |
| 19:2 | 74:1 75:10,19 | 143:2,14,23 | 111:7,23 |
| **status** 11:12 | 76:6,24 77:2,6 | 144:8,10,12,16 | 140:16 141:16 |
| 190:13 | 77:10,12,24 | 144:18,22,24 | 159:11 160:1 |
| **stay** 182:10 | 78:11 79:14,17 | 145:9,17,22,23 | 165:3,14,21 |
| **staying** 181:20 | 79:21 81:25 | 146:7 147:5 | 166:6,9,12,15 |
| **step** 38:18 56:8 | 82:1,4,20,20,24 | 175:4 176:5 | 167:20,23,24 |
| 88:18 129:15 | 83:3,12 85:22 | **stocks** 42:17 | 170:11 178:12 |
| 173:3 187:22 | 87:3,4 94:25 | 52:18,20,23 | 193:18,21 |
| **stepped** 187:16 | 95:3,19,19,23 | 53:4,22 54:8,9 | **study** 92:25 |
| 187:18 | 95:23 96:1,13 | 54:16 55:5 | 93:2,4 106:17 |
| **steps** 75:7 | 97:4,12,19 | 56:15 59:20,24 | 106:22 107:1,6 |
| 152:15 156:10 | 99:6 100:24 | 60:17 61:16 | 107:11,18,20 |
| **stick** 168:10,12 | 101:1,4,10,20 | 62:11 63:14 | 107:22,25 |
| 168:13,15,16 | 101:22 102:1 | 66:19 67:13 | 159:14 184:25 |
| **stock** 3:21,23 | 103:3,4,8,21 | 69:5,20 71:9 | **styled** 1:14 |
| 3:24 18:20 | 104:3,5,8 | 77:18 80:25 | **subgroup** |
| 19:10,13,25 | 105:8,16,19 | 81:6 87:5 95:9 | 178:15 |
| 34:20 38:20 | 112:15,19 | 97:5 100:22 | **subjects** 18:12 |
| 39:1,10 46:12 | 113:1,7 115:6 | 115:22 132:11 | **submitted** |
| 53:2,7 54:2,3 | 116:5 117:23 | 132:16,22,25 | 27:12 184:10 |
| 54:19 55:10,24 | 118:1,6,18 | 133:4 134:19 | 184:13 186:8 |
| 57:7,19,19,22 | 119:19 122:22 | 177:5,14 | 186:12,17,21 |
| 58:22 59:1,3,3 | 123:2 126:1,13 | **stopped** 194:3 | **submitting** |
| 59:25 60:1,3,4 | 126:16,22 | **store** 17:18,19 | 74:8 |
| 61:1,8,11 | 127:20 128:1 | **strategies** | **subscribed** |
| 63:18 64:1,22 | 128:16 133:6 | 190:14 191:9 | 203:14 |
| 66:3,10,17,24 | 133:10,21,25 | **strategy** 96:16 | **subsequent** |
| 66:25 67:4,7 | 134:3,5 135:16 | 96:17 | 37:15,16 |
| 67:17,21,23 | 135:20 136:1,4 | **street** 1:18 4:2 | **substance** 8:2 |
| 68:16,21 69:8 | 136:10,12,16 | 5:10 9:9 | **suite** 1:18 2:5 |
| 69:11,17,18,25 | 137:4,21,25 | 139:14 157:13 | 5:10 |

**supervision**
200:14
**supply**  18:17
**support**  4:8
88:12 107:18
108:11,14
183:8
**supported**
108:19
**supporting**
139:25 140:10
**supports**
108:16 109:9
**supposed**  83:9
83:15 87:7
91:25
**supposedly**
129:8
**sure**  7:22 11:17
12:10,23 22:11
24:17 32:8
33:24 35:24
36:13 38:15,16
38:24 40:25
41:22 43:2
45:22 51:14
58:8 60:15
67:9 73:8
78:14 81:3
85:15,17 86:6
87:12 92:4,22
93:1,11 101:15
102:13 110:17
111:22 118:23

122:5 131:17
136:6,14
137:24 138:1,9
145:14 146:20
152:8 155:4
156:5,13
160:16 164:4
167:15 169:3
173:2 178:4,25
184:13 186:4
188:24 194:17
**surges**  4:3
**survivorship**
62:20,23
134:11,18
**suspended**
25:11
**swear**  5:16
**sworn**  1:14
5:25 27:12
200:12 203:14
**symbol**  57:21
71:18 198:10
**system**  14:3,3
59:7 77:20

**t**

**t**  3:10 13:4,16
36:13 202:3,3
**tactics**  191:9
**take**  7:7,8,10
12:22 19:2
33:20 38:18
52:7 57:19

75:6 88:18
92:21 94:6
96:10 173:3
174:13 179:13
181:11 184:16
184:23 185:1,4
193:7 196:5
**taken**  1:14 18:9
18:11,23 19:8
19:24 52:13
77:17 94:11
131:22 152:15
156:10 174:17
187:8 200:16
**talk**  6:15 71:22
79:19 153:2,4
194:2,6
**talked**  28:12
94:15 96:12
99:20 135:25
153:14,24
157:15 159:11
**talking**  79:20
84:8 120:6
121:25 145:15
153:15 169:18
169:19
**tarlowe**  2:9 3:4
3:6 5:20,20 6:4
16:14,23 31:17
34:12 39:16
40:12 46:19,23
46:25 49:3,5,9
50:16 51:6

52:2,6,10,16
53:14,20 59:19
60:14,25 61:6
62:24 68:3,8
70:20,23,24
72:6 73:16
76:1,3,10,13,17
78:14,15 87:18
88:7 89:14
91:2,11 92:22
92:23 94:6,14
98:12,15 102:5
102:24 104:1
105:14,24
108:4,9 109:2
109:25 110:1
110:16,24
111:3 112:7,13
118:5 122:1,4
122:20 123:7
125:1,17,24
126:11,20
127:1,13
128:11,21,25
129:5,12,20,25
130:8,15,25
131:7,11,13,17
131:25 132:21
135:1,7 138:8
138:22 139:10
139:13 141:8
141:10,20
142:17 143:18
144:1,7 145:11

[tarlowe - thought]                                              Page 42

145:13 147:19
148:4,11,17
149:8 151:17
151:23 152:4
152:20 153:7
154:18 155:16
157:4 158:9,14
158:18,21
160:15 162:4
163:1,5,24
165:7,12,23
166:2,4,7,11,25
167:14 168:10
168:14,17,21
169:2,11 170:2
171:5 172:17
173:12 174:5,9
174:10,13,20
177:18 178:24
179:8 180:4,8
180:16 181:4
182:3,20 183:1
183:4 187:5,11
187:14,17
197:3,13 199:5
199:12
**tasked** 138:24
**technical** 55:17
**teens** 9:6
**telephone**
200:25
**tell** 7:17 31:13
55:3 87:16
95:22 106:16

129:18 147:11
149:2
**tells** 54:16 55:5
55:18 57:4
58:9 95:18
**ten** 154:22,23
**tenants** 62:20
62:22 134:10
134:11,18
**term** 59:10,21
59:21 71:4,4
178:13
**terms** 44:14
66:19 106:4
**tesla** 79:14,17
80:1 132:14
176:9
**test** 27:9,9
**testified** 6:2
27:2,4 92:10
106:3 136:3
157:25 169:22
175:9 176:15
178:5 193:1
**testify** 8:3
170:3 177:8,13
191:17,20
200:12
**testifying**
191:11
**testimony** 7:20
7:24 27:9
126:7 127:9
162:6,20

200:14 201:9
201:17 203:8
**texas** 1:16,19
5:11 8:17 9:10
200:11,23
**text** 39:20 48:5
197:12,16,20
**thank** 122:2
187:11,15
**therapies** 89:25
**thing** 58:4 66:4
67:22 108:1,1
176:8
**things** 55:18
69:10 71:24
151:22 184:13
**think** 11:17
15:24 16:24
21:10 24:11,12
25:20 30:16
31:5 37:7 41:2
41:11 43:23
56:14 58:11
62:19 68:25
70:9 71:3
77:11 78:21,24
81:23,24 87:13
87:17 90:2
92:5,18 99:5
100:20 101:1,3
101:9,24
104:22 106:3
115:15,16
118:17 123:2

124:9 125:18
127:4 129:1,20
130:4,16 131:3
132:15 133:6
136:3 137:8,17
138:6 143:4,13
144:2 145:11
150:20 153:10
154:12,22
157:25 160:17
160:23 163:16
164:14,23
169:15 170:19
174:24 176:3
177:19 178:22
179:14,17,24
180:5,9,19,22
181:23 182:15
184:16 191:18
195:13 199:3
**thinking** 21:9
61:15 96:22,24
**thinks** 158:3,4
170:20
**third** 34:15
100:16 104:18
164:8 166:8
**thoroughly**
149:16 183:23
184:5
**thought** 40:22
68:6 69:18,22
115:12 136:9
136:10,11,23

**[thought - trades]**                                          Page 43

| | | | |
|---|---|---|---|
| 136:25 137:1,3 | 66:1,19,23 | **timings**  97:9 | **tony**  2:16 5:12 |
| 137:3,10 | 67:14,17 69:5 | **title**  188:20 | **top**  98:22,23,24 |
| 157:16 162:17 | 69:23,25 70:5 | **titled**  4:5 | 99:13 153:18 |
| 199:16 | 70:16 71:7,9 | **today**  7:14,20 | **topic**  52:7 |
| **thousand**  16:15 | 72:9 75:21,22 | 7:24 8:3 14:19 | 92:21 131:16 |
| **thousands** | 75:23 77:5 | 27:17,20 28:7 | 174:8 |
| 36:15 | 78:4 80:3 | 28:13,20,22 | **topics**  18:18 |
| **three**  25:1,1 | 81:25 82:4,6 | 29:8,11,13 | **touch**  36:4 |
| 42:12 54:3 | 96:19 111:10 | 33:3 35:8 39:8 | **town**  79:20 |
| 57:25 59:2 | 112:1 113:23 | 42:6 45:10 | **track**  41:18 |
| 60:2,2 77:4 | 116:23 122:3 | 54:17 55:6,6,7 | **tracking**  41:16 |
| 106:2 107:12 | 124:2 127:18 | 62:1 63:21 | **trade**  39:5 40:4 |
| 112:8 137:13 | 135:20 136:14 | 65:13,20 66:4 | 50:22 55:11 |
| 165:3,14 | 136:24 137:14 | 69:19 79:1 | 57:7 64:2,4,4 |
| 184:22 196:13 | 137:25 143:11 | 86:5 93:21,24 | 64:24 76:5,8 |
| **thresholds** | 144:9 146:21 | 117:4,10,10,13 | 76:18 145:20 |
| 77:24 | 146:25 147:13 | 132:3 133:6,10 | 145:24 148:5 |
| **ticker**  197:19 | 153:9,17 | 146:11 160:12 | 175:18,24 |
| 198:10 | 154:12,17 | 183:15 185:19 | 176:15 177:14 |
| **tickets**  25:2 | 156:19 160:4 | 186:14 189:9 | 177:24 188:4,7 |
| **time**  5:4 10:19 | 161:16 175:10 | 189:15 190:7 | 188:9 197:5,15 |
| 15:9 16:22 | 175:12 177:12 | 190:17 192:14 | **traded**  52:25 |
| 17:21 20:25 | 184:19,24 | 192:16 193:12 | 68:17,21 124:2 |
| 24:5 25:25 | 187:12 193:24 | 194:13,18 | 124:5 135:20 |
| 26:7 29:4 30:4 | 198:21 199:9 | **today's**  5:4 | 175:25 176:19 |
| 30:12 31:5,5 | 201:18 | **together** | 177:19 178:6 |
| 33:3 38:19,22 | **timeframe** | 154:20 182:7 | 178:10 188:2 |
| 40:15 41:1,20 | 201:8 | **token**  181:18 | **trader**  53:10,15 |
| 41:20,25 42:2 | **times**  42:12,12 | **told**  15:25 | 59:10,14,17 |
| 43:11,25 50:23 | 53:22 68:6 | 28:19 143:19 | **trades**  30:24 |
| 54:7 55:14,19 | 69:20 77:8 | 151:24 155:13 | 115:19,22 |
| 55:19 57:24 | 128:9 133:19 | **tomorrow** | 175:10 176:25 |
| 61:22 62:19 | 153:13 | 54:17 55:7 | 177:3 |
| 63:17,22 65:18 | | 69:23 | |

**[trading - under]**                                                    Page 44

**trading**  38:20
  41:16,18 58:7
  58:8,9,10 59:8
  112:20 130:17
  131:1,3 132:8
  133:3 136:22
  146:7 178:18
  179:18,25
  180:23 181:24
**training**  19:12
**transaction**
  3:12,17 13:21
  14:2,4 31:25
  32:2 47:4
  72:24 83:24
**transactions**
  13:24,25 14:13
  14:15,16,20
  16:21 44:3
**transcript**  3:19
  98:9,19,24
  99:7 163:18,25
  201:6,19 203:5
  203:8
**transcription**
  200:14
**transcripts**
  98:9
**transferred**
  134:16
**transpires**
  54:21
**travel**  34:3

**treat**  22:9,12
  72:15 83:10,15
  84:1,4,19
  86:20 91:25
  117:20
**treated**  92:7
**treating**  87:6
  92:12
**treatment**  4:6
  89:22 92:14
  156:25 157:7
  158:25
**treats**  91:16
**trend**  59:3 67:6
  67:8,11,16,22
  71:13 78:4,6
  117:1,1,8
  136:12,20
  146:22
**trending**  58:1
  69:12,13 70:2
  114:24,24,25
  136:4 147:3
**trends**  53:25
  54:1 55:16
  65:12 67:13,21
  71:10 77:15,18
  77:23 116:13
**trial**  33:13,15
  33:17,19 34:4
  159:18 191:12
  191:20
**trials**  92:25
  159:9

**trick**  124:15
**tried**  23:16
**trip**  34:5
**true**  54:21
  74:19 75:1
  87:3 88:20,24
  89:3,3,7 92:16
  105:6 111:6,12
  111:12 119:23
  160:25 161:2,5
  167:7 190:17
  200:11,14
  203:8
**trust**  179:6
  180:14
**truth**  7:17
  200:12
**truthful**  7:20
  7:24 184:14
**truthfully**  8:3
**truthfulness**
  140:9
**try**  6:14,22
  56:1,9 61:13
  78:7 146:24
**trying**  21:10
  152:14
**turn**  49:17 64:9
  79:13
**twice**  75:17
**two**  9:2 13:6
  15:9 39:11
  42:12 49:18
  51:11 54:3

  131:6 137:13
  137:15,16
  159:8 171:4
  190:24 195:22
**type**  12:14 55:3
  64:7 67:10,20
  197:14
**typed**  44:6
**types**  13:25
  39:4 52:22
  67:13 69:10
**typical**  176:10
**typically**  59:23
  60:7 144:21

**u**

**u.s.**  196:14
**uber**  33:7
**uh**  6:9 61:24
  85:20 114:8,13
  125:4 161:18
  193:13 196:8
**unaware**
  105:22
**under**  7:14 8:1
  11:12 14:17
  35:7 37:12
  48:7,15,22
  63:6,7 76:21
  134:13 165:23
  166:5 183:13
  191:24 193:14
  200:14,18

**underneath**
14:14
**understand**
6:22 7:14,16
33:12,13,14,19
35:10 40:9
53:5 56:1,2,13
68:4 73:6,19
73:20 78:1
82:24 83:1,2,4
83:7 90:9 93:8
93:12 94:23
95:1,17 96:4
104:24 105:2,3
108:12 109:7
109:11 116:15
118:24 119:1,2
119:5 125:25
126:12 127:22
138:6 140:24
141:4,17
142:13 150:24
151:2,14
156:20,24
157:5 158:10
159:23 160:8
160:24 165:3
165:14 166:20
167:3 168:4,5
169:4,5 171:14
173:11 176:12
179:20,22
183:22,25
184:9,12 185:9

185:17,21,23
185:25 189:18
190:2 191:7
194:21
**understanding**
34:4,25 35:4,8
35:11 38:12,17
41:4,5,7,8
58:18 83:14,17
84:2 95:21
142:2 173:23
185:22 186:12
189:25
**understood**  7:6
7:13 161:4
183:20 184:2
**undervalued**
137:9,10
**unfair**  182:2,19
**united**  1:1 5:7
10:15 11:5,7
11:11,12,19,20
12:7,12,15
15:6 17:8,9,12
18:1,4,7 25:14
26:15,20,21,25
27:4 150:9,12
200:1
**university**  8:17
10:3,4,12 19:9
**untrue**  121:23
**upcoming**
56:25 57:11
97:17 119:14

119:22
**update**  94:16
**updates**  153:1
**upward**  78:3,6
**use**  43:17 61:18
64:22 73:18,19
73:21 134:19
134:21,21,24
197:22 198:2,4
**used**  44:11
62:10 63:3
134:17 135:8,9
152:5 162:7
201:19
**using**  43:19
44:20 111:8
**usually**  15:11
57:24

**v**

**v**  13:4 201:4
202:1 203:1
**vague**  40:8
46:13 53:11,16
60:9 61:2 97:1
179:3
**vaguely**  149:17
**variety**  89:25
**verbally**  7:3
**verified**  149:20
184:6
**verify**  201:9
**veritext**  5:14
200:24 201:14

201:23
**veritext.com**
201:15
**versus**  5:6
97:14 184:24
194:8,8
**video**  5:5
**videographer**
2:15 5:3,13
52:11,14 94:9
94:12 131:20
131:23 174:15
174:18 187:6,9
199:15,18
**videotaped**  1:8
1:12 200:8
**view**  58:23
92:15 102:9
140:10 142:12
161:2
**views**  157:23
158:11,15
**vigorously**
156:11,15
190:5
**vistra**  13:2,4,5
13:8,11 14:6
14:18 15:7,16
15:17,22 16:3
16:4,6,9 41:22
42:4,18
**volatile**  95:19
**volatility**  95:15
95:18,22,25

| | | | |
|---|---|---|---|
| **volunteer** 141:15 | 83:11,12,20,21 | 63:22 69:21 | 51:4 53:13,19 |
| **volunteers** 140:18 | 84:4 90:14 | 79:12,20 82:21 | 59:16 60:12,24 |
| **vote** 143:13 | 101:21 134:21 | 83:13 87:3,4 | 61:5 62:22 |
| **vounatsos** 85:10 | 135:9 144:15 | 101:22 104:5 | 68:6 70:19 |
| **vs** 1:4 200:4 | 162:5 166:22 | 113:14 114:6 | 72:5 73:12,15 |
| | 170:17 174:4 | 116:14 122:22 | 87:16 88:6 |
| **w** | 181:11 182:9 | 123:3 137:21 | 91:9 94:8 97:3 |
| **waited** 71:5 | 186:15,24 | 138:3,10 144:8 | 101:16 102:4 |
| **walk** 44:4 66:22 | 189:6 192:3 | 149:17 162:16 | 102:23 103:24 |
| **wall** 4:2 139:14 | 198:17,19,23 | 183:23 185:15 | 105:13,22 |
| 157:13 161:12 | 199:7 | **wharton** 2:10 | 108:3,8 110:14 |
| 196:6 | **we've** 101:24 | **whatsapp** | 110:23 118:3 |
| **walnut** 9:9 | 175:18 | 197:23,24 | 122:3,19 123:6 |
| **want** 26:3 | **website** 47:19 | **wife** 9:2 28:16 | 124:21 125:16 |
| 31:10 41:22 | 48:2 54:22 | 28:17 135:23 | 125:23 126:9 |
| 44:4 47:20 | **wednesday** | **willing** 33:17 | 126:25 128:7 |
| 52:17 56:1 | 1:15 5:2 | 190:22,24 | 128:17 129:4 |
| 61:22 137:19 | 196:14 200:9 | 191:2,14,17,19 | 129:24 130:7 |
| 145:14 157:13 | **week** 50:8,17 | 191:22 | 130:14,21 |
| 159:3 165:20 | 53:23 54:17 | **win** 32:21 | 131:14 132:20 |
| 176:10 181:11 | 55:7 137:16 | 155:15 | 135:3,5 138:6 |
| 188:18 194:24 | 175:3 | **withdraw** | 138:21 141:11 |
| 196:9,9 | **weekends** | 104:2 158:2 | 143:17,25 |
| **wanted** 6:7 | 15:10,18 25:24 | 181:15 | 144:5 148:10 |
| 11:9 | **weekly** 174:24 | **withdrawn** | 148:16 149:6 |
| **way** 6:11 8:6 | **weeks** 33:20,23 | 73:24 172:23 | 151:15,21 |
| 14:9 22:2 | 137:16 195:22 | **withdrew** | 152:2,18 153:6 |
| 27:15 33:2 | **weiss** 2:10 5:21 | 134:16 | 154:16 155:14 |
| 47:15 54:9 | 5:23 | **witness** 1:13 | 157:3 158:8,13 |
| 61:14 63:21 | **welcome** | 3:2 5:17 16:12 | 160:14 162:2 |
| | 187:13 | 16:21 27:6 | 163:23 165:11 |
| | **went** 30:12 | 31:11,14,16 | 165:25 166:3 |
| | 43:11,24 44:6 | 34:11 40:11 | 166:10 167:13 |
| | 47:22 48:1 | 46:16 50:11,15 | 169:1,9 172:13 |

| | | y |
|---|---|---|

172:16 173:11
177:16 178:22
179:6 180:3,7
180:13 181:1
182:2,19,25
187:13,21
197:12 199:3
199:13 200:15
201:8,10,12,18
**word** 60:10
109:3 151:14
151:18 152:17
168:8 185:22
198:10
**words** 44:14
83:23 152:5
163:22 164:16
164:16,19
176:13 192:19
**work** 6:11 13:1
13:2 14:12,24
15:3,4,7 16:25
17:6,13,15,23
20:14,17,20,23
25:14 26:1,9
28:20,22,25
32:18 42:6
46:3 60:5
134:6 145:18
175:7 176:24
184:23 185:5
188:2,14
**worked** 20:2,5
21:13,16,22,25

22:4,7 25:19
25:23 26:7,14
92:12 133:7
185:20 186:1,5
**working** 13:5,7
14:13 20:25
41:22 42:4,5
42:14 154:12
182:5,6
**works** 21:16,21
21:25 22:3,7
**worse** 95:6
**worth** 80:25
81:5,17,21
**would've** 138:3
**write** 153:3
**writing** 140:14
157:18 200:13
**writings** 71:20
**written** 84:21
84:23
**wrong** 83:6
84:2 85:16
86:9,11
**wronged** 189:5
198:16,18,19
198:23 199:7,8
**wrote** 139:23
179:1

| x |
|---|

**x** 3:1,10

**yahoo** 54:7
57:19,20 71:17
75:13
**yeah** 49:5
65:21,24 70:7
73:8,8 76:1,13
81:12 92:9
95:13 100:1
101:16 118:3
120:9 122:5,5
122:6 123:22
124:14,16,16
135:1 141:4,8
147:10 149:10
151:15 154:11
160:23 166:7
169:1 171:12
185:13
**year** 16:17
80:16 81:1
103:10 120:6
132:8
**years** 89:21
105:15 115:22
**yep** 164:8
**yesterday** 28:1
55:7 146:9
153:10,11,22
162:15
**yoo** 26:13
**york** 2:11,11

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.