# Exhibit Q

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE CELGENE CORPORATION SECURITIES LITIGATION | Case No. 18-cv-04772 (JMV) (JBC) |

# EXPERT REPORT OF DAVID I. TABAK, PH.D.

## I.     SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   This report concerns a securities action brought on behalf of Court-appointed Lead Plaintiff AMF Pensionsförsäkring AB ("Lead Plaintiff") and "all persons or entities who purchased or otherwise acquired the publicly traded common stock of Celgene Corporation ('Celgene' or the 'Company') during the period from April 27, 2017 through April 27, 2018, inclusive (the 'Class Period') and were damaged thereby[.]"[1]

2.   Counsel for Lead Plaintiff in this matter have asked me to examine whether Celgene's common stock traded in an efficient market during the Class Period.  As discussed below, relevant analyses demonstrate that Celgene's common stock traded in an efficient market.  Counsel have also asked me to analyze whether damages for putative members of the alleged class (i.e., purchasers of Celgene's common stock during

---

[1] Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Class Certification Motion"), p. 1.  Footnote 2 of the Class Certification Motion expands on this to state: "Excluded from the Class are: (i) Celgene; (ii) any directors and officers of Celgene during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Celgene; (iv) any firm, trust, corporation or other entity in which Celgene has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party."

the Class Period (the "Class")) can be calculated through a common methodology. I find that there are reliable methods to calculate damages on a common, Class-wide basis.

## II. QUALIFICATIONS AND REMUNERATION

3. I received Bachelor's degrees in Physics and in Economics from the Massachusetts Institute of Technology and a Master's degree and a Ph.D. in Economics from Harvard University. I have appeared as an expert in federal district courts; state trial courts; bankruptcy court; and in arbitration forums, including the National Association of Securities Dealers, the International Chamber of Commerce International Court of Arbitration, and the American Arbitration Association. I have published in my fields of expertise on subjects such as market efficiency, loss causation, statistics, and the analysis of stock price movements.

4. National Economic Research Associates ("NERA") was established in 1961 and now employs approximately 500 people in over twenty offices worldwide. NERA provides consulting for economic matters to parties for their internal use, to parties in litigation, and to governmental and regulatory authorities. I have worked at NERA for over twenty years and am a managing director in NERA's securities and finance practice. My work entails providing analyses for parties in litigation and consulting for parties in non-litigation settings. I have served as a speaker at events providing CLE credits for attorneys and at academic conferences on areas related to securities litigation. I have provided reports and/or testimony for plaintiffs and defendants in numerous securities class actions.

5. My curriculum vitae, which sets forth in further detail my publications and prior testimony experience, is attached to this report as Exhibit 1.

6. NERA is being compensated on a non-contingent basis for out-of-pocket costs and at our usual rates for time. My billing rate is $975 per hour. I have been assisted by a number of individuals at NERA working at my direction who are billing at their standard rates. My compensation and the compensation of NERA are in no way contingent on the conclusions I reach or the opinions I provide in this litigation.

## III.   MATERIALS CONSIDERED

7. Materials considered for the purposes of this report are listed in Exhibit 2.

## IV.   THE THEORY OF MARKET EFFICIENCY

8. In the 1960s, economists Paul Samuelson and Eugene Fama each developed theories that developed into the modern theory of market efficiency, known as the "Efficient Market Hypothesis."[2] Professors Samuelson and Fama recognized that if market participants are rational, a security cannot have an expected change in price.[3] For example, suppose that the market expected a stock price to be $15 tomorrow. The stock could not trade at $10 today, because there would be little reason for anyone to sell at $10 today given that there would be buyers more than happy to pay $11 today for a stock that they could sell at $15 tomorrow. This process would result in an equilibrium where the price today would be bid up to nearly $15. Similarly, no rational investor would

---

[2] See, for example, the *New Palgrave Dictionary of Economics*, 2008 edition, entry on Efficient Markets Hypothesis, available online at https://rd.springer.com/referenceworkentry/10.1057/978-1-349-95121-5_42-2.

[3] While later refinements of the theory examined whether certain types of stock price movements are possible because of factors such as the risk entailed in trying to profit from those expected movements (e.g., there is a risk-return tradeoff and sometimes there may be expected profits, on average, to compensate for higher risk), the general outlines of the theory discussed above are still correct. Throughout the discussion, I abstract away from any such issues.

purchase a stock at $16 today if it was believed that the price would be $15 tomorrow. Thus, the stock price today would be nearly equal to the price tomorrow, and any changes in stock prices would be due to *unexpected* information or randomness, leading to the theory that stock prices follow a "random walk."

9.   In particular, there are three forms of the Efficient Market Hypothesis, known as weak-form efficiency, semi-strong-form efficiency, and strong-form efficiency.  Weak-form efficiency posits that the price of a stock rapidly incorporates all information contained in prior stock prices.  Semi-strong-form efficiency posits that the price of a stock rapidly incorporates all publicly available information.  Strong-form efficiency posits that the price of a stock rapidly incorporates all public and private information.[4] When discussing the "Efficient Market Hypothesis" with regard to publicly traded securities such as Celgene's, financial economists are generally referring to the semi-strong form of market efficiency.  I will follow the same convention here.

10. One of the implications of the Efficient Market Hypothesis is that the market begins to incorporate unexpected news quickly into security prices.  Therefore, if the market learns of material new, unexpected positive (negative) information about an issuer, then the price of the issuer's common stock will rise (fall) if the market is efficient.  Of course, even efficient markets may take time to fully absorb new material information, but they should begin the process of reacting to news as soon as it is available.[5]

---

[4] This is a standard taxonomy of Efficient Market Hypothesis theories, discussed, for example in Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970.  (See, for example, p. 388.)

[5] Under the Efficient Market Hypothesis, a market may initially underestimate or overestimate the effects of news.  However, these two effects should roughly balance each other.  Consequently, in an efficient market, initial price movements should reflect, on average, an unbiased estimate of the effects of the new information (i.e., later price movements are roughly equally likely to be positive or negative).

11. To assess whether a market is efficient, financial economists and the courts have developed various tests. These tests can broadly be divided into direct tests of whether a market violates the conditions of market efficiency (e.g., whether the price of a security actually responds to material new unexpected information) and indirect tests of the conditions that one expects would be present in an efficient market (e.g., substantial analyst coverage of the issuer, which suggests that market participants are interested in understanding and responding to news). In the following sections, I discuss the results of these tests when applied to Celgene's common stock.

## V.   SUMMARY OF LEAD PLAINTIFF'S CLAIMS

12. As alleged in the Second Amended Consolidated Class Action Complaint ("Complaint") filed by Lead Plaintiff in this action, during the Class Period, Celgene was a "global biopharmaceutical company engaged primarily in the discovery, development, and commercialization of therapies for the treatment of cancer and inflammatory diseases."[6]

13. During the Class Period, shares of Celgene common stock traded on the NASDAQ Global Select Market under the ticker "CELG." Complaint ¶ 64. Lead Plaintiff asserted that Celgene "and several of its key officers and/or employees engaged in fraud under Section 10(b) and Rule 10b-5, as well as Section 20(a) of the Securities Exchange Act of 1934 … as to public statements relating to three drugs in Celgene's new product pipeline."[7] The "products at issue are (1) GED-0301, (2) Otezla, and (3) Ozanimod."[8]

14. Lead Plaintiff's counsel instructed me to proceed on the understanding that, in the Order, the Court sustained Lead Plaintiff's Section 10(b) claims related to certain alleged

---

[6] Complaint, ¶64.

[7] Opinion in this matter dated December 19, 2019 ("Order"), p. 1.

[8] Order, p. 3.

misstatements and/or omissions concerning Otezla and Ozanimod during the Class Period, April 27, 2017-April 27, 2018, but dismissed claims concerning (1) alleged misstatements and/or omissions concerning GED-0301 and (2) alleged misstatements and/or omissions made prior to April 27, 2017, as well as Lead Plaintiff's Section 20(a) claims.[9]

15. The Court further found that Lead Plaintiff had sufficiently alleged the elements of a Section 10(b) claim known as loss causation (which the Court summarized as "a causal connection between the material misrepresentation and the loss") and economic loss with respect to the claims concerning Otezla and Ozanimod that were sustained.[10]

## VI.   TESTS OF MARKET EFFICIENCY FOR CELGENE'S COMMON STOCK

16. Lead Plaintiff has asked me to analyze whether the market for Celgene's common stock was efficient during the Class Period.

---

[9] GED-0301 allegations dismissed in the Order, p. 28.  In the Order, the Court sustained Lead Plaintiff's allegations concerning a class period of April 27, 2017-April 27, 2018. (The Complaint had alleged a class period of January 12, 2015-April 27, 2018.  See Order, p. 1.)  Although I am not a lawyer, Counsel's instruction concerning the Court's ruling is consistent with my own review of the Order.  On pp. 30 and 33, the Order distinguishes and upholds (to that point in its analysis) claims based on certain statements regarding Otezla made on April 27, 2017 from claims based on other statements regarding Otezla including all such statements before April 27, 2017.  On pp. 37-38, the Order dismisses claims based on statements regarding Ozanimod made on January 9 and March 15, 2017 but upholds (to that point in its analysis) claims made regarding later statements regarding Ozanimod on p. 39.  (The Order also later dismisses certain claims based on an analysis of scienter.)

[10] Order, pp. 46-47.

17. One seminal legal case providing for tests of market efficiency is *Cammer v. Bloom*.[11]  This decision discussed five factors that support market efficiency, commonly referred to as the "*Cammer* factors":

> (1) an "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption";

> (2) "a significant number of securities analysts followed and reported on a company's stock during the class period";

> (3) the "stock had numerous market makers. The existence of market makers and arbitrageurs" would aid in market efficiency;

> (4) "the Company was entitled to file an S-3 Registration Statement in connection with public offerings"; and

> (5) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[12]

18. In addition to these factors, the Third Circuit in *DVI Securities Litigation* stated that (6) "the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."[13]  Furthermore, three additional factors that may be relevant, as discussed in *Krogman v. Sterritt* and other cases, are measures of a company's: (7) market capitalization, (8) bid-ask spread, and (9) float.[14]

19. Academics and courts have also looked at whether there was autocorrelation (also known as serial correlation) in the returns of a security, i.e., whether rather than behaving randomly, a movement in the price of a security was more likely to be followed by

---

[11] *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

[12] This factor is typically addressed through the use of a statistical analysis known as an "event study," as discussed below.

[13] *In re DVI, Inc. Securities Litigation*, 639 F.3d 623, 634 (3d Cir. 2011) ("*DVI II*").

[14] *Krogman, Inc. v. Sterritt,* 202 F.R.D. 467, 478 (N.D. Tex. 2001).

another movement in the same direction (positive autocorrelation) or by a movement in the opposite direction (negative autocorrelation).[15]

20. I will discuss each of these factors in more detail as they are presented below, and then present my conclusions based on the totality of the information obtained by examining each of these factors.

### (1) Trading Volume

21. The first *Cammer* factor is the average weekly trading volume as a percent of shares outstanding. As noted on page 1286 of that decision, "[t]he reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company." Exhibit 3 shows the weekly volume of trading in Celgene's common stock as reported by Bloomberg, L.P., a recognized data vendor, and the last reported number of shares outstanding for each week. The volume figures in Exhibit 3 are adjusted to remove trades created by estimated market-maker participation.[16] I next calculate the mean and median percentage of shares outstanding traded in each week during the Class Period. The mean is simply the arithmetic average of the weekly percentages of trading volume for each full week in the Class Period.[17] The median is the midpoint of the weeks if arranged by the percentage of shares traded relative to shares

---

[15] See, e.g., *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196, 213 (E.D. Pa. 2008) ("*DVI I*"). Autocorrelation can also be measured based on the size of the price movements and not just their direction.

[16] A market maker sometimes serves as the counterparty to investor orders. For example, one investor may sell shares to the market maker at $20 and later the market maker sells those shares to another investor at $21. Both trades would be reported, but there really was only one transfer of shares between actual investors. Support for this type of adjustment is found in *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005).

[17] Including any partial week at the beginning or end of the Class Period would have minimal effects on the results.

outstanding, meaning that that half of the weeks have the same or a larger percentage as the median week and half have the same or a smaller percentage than the median week.

22. Over the Class Period, the average market-maker-adjusted weekly trading volume (i.e., reported volume reduced by 54.76%) of Celgene's common stock is 1.68 percent of the shares outstanding and the median figure is 1.37 percent, corresponding to an average of 13 million and a median of 10 million shares traded weekly. Had I not adjusted for market-maker participation, the figures would be more than twice as large. As previously noted, the *Cammer* court stated that an "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption…" Thus, the volume figures for Celgene's stock support a "substantial presumption" in favor of market efficiency for the stock during the Class Period under *Cammer* and would support a "strong presumption" had I not conservatively adjusted for market-maker participation.[18]

### (2) Analyst Coverage

23. In discussing the relevance of analyst coverage, the *Cammer* court stated on page 1286 that "[t]he existence of such analysts would imply, for example, the [auditor] reports [on the issuer] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." (Closing footnote omitted.) That is, analysts seek out, review, and disseminate information about a company and make it easier for market participants to understand and react, or choose not to react, to that information, thus facilitating the process that leads to market efficiency.

---

[18] As noted above, market-maker participation reflects the fact that if Investor A sells to Investor B, often the actual series of transactions is that Investor A sells to Market Maker I who then sells to Investor B. Sometimes Investor A sells to Market Maker I who then sells to Market Maker II who then sells to Investor B (and sometimes even more market makers are involved). Each of these transactions is included in reported volume but involves more trades than just trades between actual investors. Hence, I reduce reported volume to account for an estimate of market-maker participation.

24. While analysts provide coverage that is meant to inform investors about a company, different analysts provide varying levels of coverage that may have differential impacts with respect to whether that coverage should be considered to be a material factor in aiding market efficiency.  For example, some analysts may provide limited analysis or merely repeat what a company has said, while others may provide informative analyses of a company's current and future expected revenues.

25. There are many ways to focus an examination on analysts that are providing at least some meaningful coverage.  One such way is to identify the number of analysts included in the Institutional Brokers' Estimate System ("I/B/E/S") consensus earnings estimate for a given company.  Exhibit 4 shows the number of analysts included in the I/B/E/S earnings estimate for the upcoming quarter for Celgene for each month in the Class Period.  As can be seen in the exhibit, the average and median number of analysts that had provided such estimates were an average of 25 and a median also of 25 each month. (Note that these are estimates for the upcoming quarter and need not have been provided in the month indicated.)

26. The *Cammer* court found efficiency where the security at issue (the common stock of Coated Sales, Inc.) was the subject of "[a]t least 15 research reports … from July 1987 through June 1988" (p. 1283), a 12-month period.  Here, by contrast, there were at least 22 analysts issuing one or more reports each month.[19]  Thus, this factor weighs in favor of a finding of market efficiency.

---

[19] If one looked at the raw number of analyst reports (without removing those that may not have provided an earnings estimate but discussed topics other than earnings), a search on the Thomson Reuters database for Celgene analyst reports yields hundreds of reports over the Class Period, from firms including Bank of America Merrill Lynch, Citi, Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, RBC Capital Markets, UBS Equities, and Wells Fargo.

### (3) Market Makers and Arbitrageurs

27. Celgene's stock traded on the NASDAQ stock exchange, which is widely regarded as one of the most open, developed, and efficient exchanges in the world. There were 152 market makers who traded Celgene's stock on the NASDAQ stock exchange during the Class Period.[20]

28. Arbitrageurs are investors who attempt to profit from any possible mispricing of a security. There are two types of arbitrageurs that we can examine: those who take a "long" (or positive) position in the stock and those that take a "short" (or negative) position. While there are no data on the identities of arbitrageurs in particular securities or their holdings of those securities, one would expect many of the arbitrageurs who are active enough to move the market to be found among the largest market participants. We can therefore use information about institutional holdings, which are reported quarterly, as a proxy for arbitrageurs that take a long position. Though not all institutions are arbitrageurs, many of the major arbitrageurs who take a long position large enough to affect the price of a stock would be institutional investors, as non-institutional investors generally do not have the capital to take a long-term position of the same magnitude.

29. Over 1,800 institutions are known to have collectively held over 629 million shares of Celgene, or 80.9 percent of the shares outstanding as of March 31, 2017, the last calendar quarter-end before the start of the Class Period, as seen in Exhibit 5. This figure did not remain constant. As of March 31, 2018, the last quarter-end within the Class Period, institutions held 76.9 percent of the shares outstanding. The direction of the change in institutional holdings here is not important; what is important is that there was a potential for change, with institutions buying or selling in response to factors including news about Celgene and changes in its stock price.

30. As alluded to above, if an institution held the same number of shares throughout the Class Period, it may not be adding to market efficiency, since it would be providing

---

[20] Bloomberg, L.P.

neither upward pressure through buy orders nor downward pressure through sell orders. However, an examination of the data underlying Exhibit 5 shows that most institutions did change their positions, with numerous examples of a single reporting institution changing its holdings up or down by more than one million shares over the course of a single quarter. Moreover, during the Class Period, of the institutions with a non-zero holding of shares at the end of a quarter, 82.8 percent reported a different holding figure at the end of the next quarter. These observations show that as a group, institutions were not passive investors, but changed their positions, a hallmark of arbitrage activity. Even among the institutions that did not change their positions, there may be some that actively evaluated news about Celgene and changes in its share price and were comfortable maintaining their prior position. The fact that on average more than eight out of ten institutions holding Celgene shares changed their position is evidence that a substantial number of large investors were following the company.

31. With regard to arbitrageurs who held a short position in Celgene shares, I obtained data on the aggregate short position, which is reported twice a month by Bloomberg, L.P., and shown in Exhibit 6. The average aggregate short position over the Class Period was 1.53 percent of Celgene's shares outstanding. The minimum monthly short position over the Class Period as a percentage of shares outstanding was 1.09 percent, while the largest was 2.23 percent, more than twice as large. This difference is important because it allows us to infer that those who wanted to create or increase a short position were generally not prevented from doing so. If, in contrast, the aggregate short position were always approximately the same, one would have to consider whether the shares available for shorting were always used or close to used, thereby preventing investors who wanted to take a short position in response to new information from doing so.[21]

---

[21] To short a share of Celgene stock, the investor who wants to take the short position must, through their broker, find a share held by another investor to borrow. The investor going short delivers this share to the counterparty (the purchaser) in the short transaction and is required to later return a share to the investor from whom he or she borrowed the
(continued)

32. Overall, I find that both institutions and short sellers actively changed their holdings over the Class Period, an indication of their attention to the price of Celgene's shares.[22]  Institutional holdings varied from 76.9 percent to 82.5 percent of shares outstanding over the quarter-ends encompassing the Class Period, with 82.8 percent of institutions with a positive holding in one quarter reporting a different amount of holdings in the next.  The maximum aggregate short position was more than twice the minimum.  This supports the conclusion that investors were able to, and did, take and change positions in Celgene's stock to reflect their views, the core mechanism by which financial markets are driven to efficiency.

### (4) S-3 Registration Statement

33. Another *Cammer* factor is the ability of an issuer to register new shares through a Form S-3 registration statement rather than using a Form S-1 or S-2, both of which require more disclosure than a Form S-3.  The SEC allows qualifying companies to register shares using the less burdensome S-3 based on the assumption that news about such companies is already publicly available to market participants and therefore does not need to be included in the registration statement.  At the time of the *Cammer* opinion, an issuer had to have a float (i.e., shares outstanding that are not held by insiders) with a market value of at least $150 million to use a Form S-3.  That requirement was later reduced to $75 million.  Exhibit 7 shows the market capitalization and float of Celgene's common stock during the Class Period.  The market capitalization of Celgene's common stock exceeded $63 billion (i.e., more than 800 times the $75 million requirement) throughout the Class Period, and the market value of the float also always exceeded $63 billion.

---

share.  When there are not enough shares available for borrowing, investors may not be able to establish or expand their short positions, and therefore would not be able to contribute to arbitrage and market efficiency by varying the size of their short positions.

[22] Some changes in institutional holdings may be due to other factors, such as a decision to sell shares for liquidity purposes.  Still, the substantial number of changes is evidence of active monitoring of Celgene by many institutions.

34. A second requirement for Form S-3 eligibility is that the issuer be current in its SEC filings. Celgene was not delinquent in its SEC filings during the Class Period. As it satisfied the two requirements, Celgene was eligible to file a Form S-3, thereby satisfying this *Cammer* factor and supporting a finding of market efficiency.

### (5) Price Response to News

35. Whether a stock price responds to material, new, unexpected information is often considered the most direct and important of the *Cammer* factors.[23] The *Cammer* court noted on page 1291 that "one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."

36. Accordingly, I performed statistical analyses, based on tests known as "event studies," the standard means of quantifying stock price responses to news, to examine this factor. An event study is a statistical test that first measures the movement in the price of a stock or other security by removing the influence of general market and/or industry effects. The remaining movement is then compared to a "control period" of similar market-adjusted price movements to see if it is unusual (i.e., statistically significant). If so, then one may be able to make the inference that the news was the cause of the unusual stock price movement.[24] In general, we expect that the price of a

---

[23] I note, however, that courts have often held that this factor is not a necessary factor when the other *Cammer* factors weigh in favor of market efficiency and that particular forms of proof of this factor are not necessary. See, for example, *Waggoner v. Barclays PLC*, 875 F.3d 79, 96-97 (2d Cir. 2017) ("We conclude that direct evidence of price impact under *Cammer* 5 is not always necessary to establish market efficiency and invoke the *Basic* presumption[.]"). See also *In re Petrobras Securities,* 862 F.3d 250, 277-278 (2d Cir. July 7, 2017), holding that requiring "direct evidence of market efficiency … consist[ing] of empirical data showing that the price of the relevant securities predictably moved up in response to good news and down in response to bad news …. attempt[s] to relabel a *sufficient* condition as a *necessary* one." (Emphases in original.)

[24] Event studies or similar analyses are often required in securities fraud litigation. See, for example, *In re Executive Telecard, Ltd. Securities Litigation*, 979 F. Supp. 1021, (continued)

stock will increase in response to unexpectedly positive news and fall in response to unexpectedly negative news.

37. To test the general proposition of whether a stock price responds to news, it is necessary to examine the stock price responses to two different groups of dates: those with news and those without news.[25]  That is, one conducts event studies on the different news and non-news days, and then compares the results of those two analyses.  This is the same idea behind a medical study that has a control group and a treatment group.  Here, the control group (i.e., the group not receiving treatment) consists of the "non-news days" while the treatment group consists of the "news days."  Establishing two such groups is necessary because even if the market for a stock were not efficient, there would generally still be some news days that were randomly associated with stock price movements.  Selecting a few examples of such instances and claiming to have thereby found an association between news and stock price movements would be clearly incorrect.[26]

38. Another relevant consideration in this analysis is to recognize that we typically cannot use the news and price movement at the end of a class period in an analysis of

---

1027 (S.D.N.Y. 1997) ("The Expert Witness' failure to conduct a thorough 'event study' would be reason enough to exclude his proposed testimony.").   The event studies I employ here are consistent with my own published work (David Tabak and Frederick Dunbar, in *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001)).

[25] Ideally, one wants to define news as unexpected material new information.  Other news may be consistent with prior expectations and should not be expected to cause a change in a stock's price.

[26] For example, if such a methodology were valid, one could identify several people with blue eyes who are right-handed and then claim to have "found" an association between blue eyes and right-handedness.  One could also, under the same methodology, identify several left-handed blue-eyed people and also claim to have "found" an association between blue eyes and left-handedness.   A description of the method of analysis I use here is found in Paul Ferrillo, Frederick Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," 78 *St. John's L. Rev.* 81, 120-21 (2004).

market efficiency. This is because most class periods are chosen to end with a news event corresponding with a large stock price decline. Defining our analysis period to include such a date would result in an improper bias toward finding an association between news and stock price movements.[27] Thus, I end the analysis before the price movements associated with the end of the Class Period.

39. As noted above, the test of a stock price's response to news depends on classifying days into news days and non-news days. One generally wishes to use an objective measure of news, or at least one where any subjective decisions have been made by others who are not part of the analysis of market efficiency.[28] My standard procedure is to begin with an analysis that minimizes any possible subjectivity on my part as to which "news days" were selected for examination by first defining news days as days with Celgene earnings announcements. In this particular case, there are only four earnings-announcement days within the Class Period. The limited number of earnings announcements results in this test having "low power," meaning that it will be difficult for the test, on its own, to demonstrate market efficiency even if a market is truly efficient because of the small number of data points representing news days. Nevertheless, because this is part of my standard set of analyses, I choose to present these results, along with the results of additional empirical tests described below, rather than eliminate a low-power test that I know in advance would require very strong empirical support to point towards market efficiency.

---

[27] One would also want to exclude the first day of a class period if it were chosen because of news causing a large increase in the stock price. Here, there does not seem to be evidence that the initial day of the Class Period was chosen because of a stock price increase, but rather was chosen because of the alleged misrepresentation on that day.

[28] See, for example, *In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 618 (C.D. Cal. 2009) ("It should be obvious, even to those without a background in statistics or econometrics, that the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied (here, stock returns). Relatedly, unless the expert uses articulable objective criteria, it is difficult to evaluate the probative value of expert evidence without evaluating also the expert's own credibility.").

40. Because news about a company can arrive on days other than earnings-announcement dates, defining news days as days with earnings announcements represents an overly restrictive definition of "news days," and results in comparing (1) a set of particular news days with (2) a mixed set composed of both non-news days and days that would (but for the restrictive definition) be considered news days. Because the second set of days has a mix of types of days, this will tend to make it harder for a comparison of (1) and (2) to show that Celgene's stock price responded to news.[29] I also performed another analysis with broader sets of news days, in which I define news days as days with stories published by the *Dow Jones Newswires*. In this analysis, I limited news stories to those that have references to Celgene as a company in either the headline or the lead paragraph.[30] Finally, per my protocol in recent cases, I performed three additional tests to obtain more material sets of news. For the first two of these additional tests, I sorted the news days by the number of stories about Celgene on each day. I then looked at (1) the top half of this group (i.e., those days with more news stories than the bottom half) and (2) the top 10% of this group.[31] The theory here is that the more material a news

---

[29] To see this, imagine that Celgene's stock price moved by ten percent on news days and by zero on non-news days. If we had perfectly identified news days and non-news days, we would be comparing a set of days with an average price movement of ten percent to another set of days with an average price movement of zero. Because the second set of days includes some news days, we may wind up comparing a set of days with an average stock price movement of ten percent (some of the news days) to some positive figure such as five percent (if half of the second set consisted of news days). Thus, rather than a difference of ten percentage points, the difference would be only five percentage points, making it harder to prove that there is a meaningful difference between the two figures. One should note that under some circumstances (e.g., if non-earnings news has a very small impact on prices), grouping those with non-news days may make the average price impact of the remaining news stories greater, which could aid in reaching a correct finding that a stock responds to earnings news.

[30] If a news story came out before 4 p.m. (i.e., before the close of trading), that day was characterized as a news day. If the story occurred after 4 p.m. but before midnight, then the following trading day was characterized as a news day.

[31] Because some days had the same number of news stories, there will not be a perfect division into two halves, and the top half is defined here to contain 51 news days out of (continued)

item is, the more likely it is to either be repeated or updated during the same trading day. For my final analysis of materiality in this set of analyses, I reviewed the stories identified as news days from the top 10% of *Dow Jones Newswires* and reclassified one as a non-news day because the news on that day was arguably just follow-on news to that of the day before. This was a conservative adjustment that could bias that test against a finding of market efficiency.

41. Exhibit 8a compares (A) the percentage of news days within the Class Period that are associated with statistically significant market-adjusted stock price movements with (B) the percentage of statistically significant market-adjusted stock price movements in the control group of non-news days for Celgene's stock. The first row in Exhibit 8a was run using the definition of news days as days with Celgene earnings announcements. The second row was run with news days defined as those days with any reported news mentioning Celgene in the headline or in the lead paragraph of articles in *Dow Jones Newswires*, obtained from Factiva, a well-recognized data vendor. The third and fourth rows were run by looking at the frequency of news on each day, as described above, and the fifth row was run after reclassifying one news days from the fourth row as a non-news day.

42. The market model (i.e., the statistical analysis that I employed as part of my event study to control for the effect of general market factors on Celgene's stock) used the Nasdaq Biotechnology Index as a proxy for the relevant industry and market effects and is presented in Exhibit 8b. As set forth in Exhibit 8b, the R-squared, a measure of how well movements in the chosen index relate to movements in Celgene's stock price was 61.09%, or 0.6109, higher than the values that I have typically observed in similar analyses.[32]

---

the original 109 news days rather than 54 or 55 days. Also note that some news stories appear to be duplicates based on the headline and timestamp, but, in fact, represent two separate releases (for example, a stand-alone story and a story within a news roundup).

[32] As Celgene was a member of the Nasdaq Biotechnology Index, that index was reconstituted to show returns as if Celgene was not a member.

(continued)

Case 1:21-cv-10479-IT   Document 189-17   Filed 09/10/25   Page 21 of 147

43. As seen in the first row of Exhibit 8a ("Earnings Dates"), in the Class Period, when I limit the definition of news days to earnings announcements and examine the common stock, 25.0 percent of the news days are associated with a statistically significant stock price movement, while only 6.0 percent of the non-news days are associated with a statistically significant stock price movement.  Thus, statistically significant returns were more than four times as likely to be observed on earnings-announcement days as on other days.  Despite this large difference, with earnings-announcement days being more than four times as likely to be associated with a statistically significant return as other days, the difference between these two percentages is not statistically significant at the commonly used 5% level due to the small number of news days in this version of the analysis.[33]  The standard level of statistical significance for tests in financial economics is the five-percent level, meaning that there is only a five percent chance that a result as strong as or stronger than the one observed in the data would appear if the market did not react to news.  This means that we consider results to be statistically significant if they have a false-positive error rate (i.e., a finding of a reaction to news when no such reaction exists) of five percent or less.

---

To the extent that a different market model would provide a better explanation of Celgene's stock price movements in the absence of news (i.e., if Celgene's stock-price movements were more correlated with an index or indices used in a different market model), then my analysis has understated the results of this test of market efficiency. That is, because a better model would result in data with less noise, the differences in returns on news days and non-news days would likely be sharper and more easily identifiable through statistical analysis.

[33] The test is run by comparing the proportions of the news and non-news days with statistically significant returns.  A test of proportions implicitly assumes equal variances under the null hypothesis, an update in methodology that I have used in prior cases relative to that used in a publication I co-authored in 2004 (Paul Ferrillo, Frederick Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," 78 *St. John's L. Rev.* 81 (2004).)

44. In the second row of Exhibit 8a ("*Dow Jones Newswires*"), where news days are defined based on headline and lead paragraph mentions in the *Dow Jones Newswires*, we see that in the Class Period, 11.0 percent of the news days are associated with a statistically significant stock price movement in the stock, while 2.8 percent of the non-news days are associated with a statistically significant price movement. The difference in these results is statistically significant at the standard five-percent level.[34]

45. For the third through fifth rows of Exhibit 8a, I reduced the number of news days from the "*Dow Jones Newswires*" row as described above. With each of the first two objective adjustments to which days qualify as news days for that row based on a count of the number of news stories, the results become stronger than those from the second row of Exhibit 8a and are statistically significant not only at the standard 5% significance level but also at the more stringent 1% significance level. This supports the view that more material news stories generated larger price movements on average. The analysis shown in the fifth row of Exhibit 8a also results in a statistically significant difference, at both the standard 5% level and the stricter 1% level, between the likelihood that news days and non-news days would be associated with a statistically significant stock-price response, again supporting a finding of market efficiency.

46. One can also examine the distribution of the excess returns on news and non-news days. Exhibit 8c shows that the distribution of excess returns is statistically significantly different for the same four analyses as in Exhibit 8a. Exhibit 8c also shows that the

---

[34] It is worth noting that there is no meaningful benchmark for the percent of news days that should be associated with a statistically significant return. As the definition of news days becomes looser (i.e., less likely to contain material new information), then the expected percent of such days associated with a statistically significant return should fall. In addition, the results presented are based on the five-percent significance level. The use of a more or less stringent significance level would result in fewer or more price movements, respectively, passing the test of statistical significance. Given the variability of both the definition of news and of statistical significance, there is no reason to expect any particular percentage of news days to be associated with statistically significant returns.

average absolute value of the excess returns on news days ranges from nearly twice as large to over five times as large as on non-news days, depending on the definition of news employed.[35]  These results further support a finding of market efficiency.

47. The tests of stock price response to news, the *Cammer* factor that most directly tests market efficiency, provide strong evidence that Celgene's stock price responded to material new information.  Four of the five tests, which are all of the tests in which there are a reasonably large number of "news days," provide evidence in favor of efficiency, with Celgene's stock price passing each of these by demonstrating statistically significant results.  When we refine the definition of news to include stories that are likely to be material, based on an objective count of news stories per day, Celgene's stock price exhibits an even more statistically significant response to news. In summary, there is very strong evidence that Celgene's stock price responded to new information during the Class Period.

### (6)  Trading on a Major Securities Market

48. The court in *DVI II*, citing prior case law, stated on page 634, "Securities markets like the NYSE and the NASDAQ are 'open and developed,' ... and are therefore 'well suited for application of the fraud on the market theory,'….  Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."  That is, major securities markets, such as the NASDAQ, have mechanisms in place to ensure conditions such as the rapid dissemination of price and volume information that allow investors to trade easily and with reliable information about recent trading.  Market participants are then better able to spot any potential

---

[35] Notably, the average absolute value of excess returns on earnings-announcement days was over five times as large as the absolute value of excess returns on other days.  This again suggests that the market was responding to earnings news, but that the limited number (i.e., four) of earnings announcement days prevents a finding of statistical significance.  As an analogy, if one flipped a coin four times and it came up heads three times, that would be consistent with the coin having a bias toward heads, but the small number of flips would not allow one to say that the result was statistically significant.

deviations of the stock price from an efficient value and move to quickly eliminate any such inefficiencies. Celgene's stock traded on the NASDAQ exchange during the Class Period and therefore satisfies this criterion, supporting a finding of market efficiency.

### (7) Market Capitalization

49. A large market capitalization is another factor that courts have found to weigh in favor of finding an efficient market for common stock. As noted previously, Exhibit 7 shows Celgene's market capitalization over the Class Period. Celgene's market capitalization over the Class Period was always at least $63 billion.

50. The large capitalization means that there would have been opportunities for investors to make large profits if there were any apparent mispricing, thus providing an incentive for investors to carefully analyze news and information about Celgene. This conclusion supports a finding of market efficiency for Celgene's common stock.

### (8) Bid-Ask Spread

51. A narrow bid-ask spread is a potential indicator of market efficiency because the spread provides information about the cost of arbitrage, with a narrow spread meaning that those costs are lower. Market makers typically work to keep a market functioning by being continuously willing to buy at a certain price (the bid) and to sell at another price (the ask). Market makers make a profit by keeping the bid price below the ask. For example, if the bid is $20.00, the ask may be $20.50. If a market maker receives one market order to buy and one to sell, it buys at $20.00 from the seller and sells at $20.50 to the purchaser. The market maker's gross profit of $0.50 is reduced by the costs of maintaining an inventory of securities (in case there are more buyers than sellers) and the other costs of running a market-making operation. While the market maker earns $0.50 in this transaction, an arbitrageur who thinks that a stock is undervalued would pay $0.50 on their round-trip transaction, hoping that between the purchase and sale times the stock rises by more than this amount. Thus, the spread between the bid and ask represents the cost of arbitrage, and thus equals a degree of mispricing that arbitrageurs may not seek to

exploit because doing so will be unprofitable after taking into account the arbitrageur's transaction costs.[36]

52. Exhibit 9 shows the daily bid-ask spread for Celgene's stock for each trading day in the Class Period.  The bid-ask spread averaged 0.02% of the same-day's closing price over the Class Period.  In dollar terms, the bid-ask spread typically was only $0.01 (the smallest possible amount for a security with bids and asks in levels denominated to the penny[37]).  This indicates that, on average, it would be profitable (in expectation) for investors to trade in Celgene stock if they felt that it was mispriced by as little as 0.02%.  This low bid-ask spread supports a finding that arbitrageurs would have an incentive to trade on any perceived mispricing, and therefore would have an incentive to undertake the activities that lead to a stock trading in an efficient market, supporting a finding of market efficiency.

### (9) Float

53. Courts have considered the size of an issuer's float (i.e., the shares outstanding not held by insiders) as another indicator of efficiency for the issuer's common stock.  A larger float suggests greater liquidity for shares, making it easier to purchase and sell shares in the market.  Exhibit 7 shows the float in Celgene's stock, or the shares not held by insiders.  Courts have often found that a float representing a large percentage of the shares outstanding is an indicator of efficiency.[38]  This would be true because investors are only able to trade shares that are in the float.  Thus, investors' ability to profit from any apparent mispricing, and their incentives to examine a company's stock price and news about the company, will be related to the number of shares that they can attempt to

---

[36] In reality, arbitrageurs may be able to trade "between the quotes" and not pay the full bid-ask spread.  However, it is still generally true that the larger the bid-ask spread, the larger are the expected costs of arbitrage activities.

[37] Celgene's closing bids and asks were nearly always at exact cent amounts (i.e., did not contain fractions of a cent) during the Class Period.

[38] See, for example, *Krogman* 202 F.R.D. 467, at 474.

trade in order to make potential profits.  Over the Class Period, Celgene's float averaged over 99% of the shares outstanding, indicating a high level of float that strongly supports a finding of efficiency.

### (10)    *Autocorrelation*

54. A final test of market efficiency is whether there is autocorrelation in Celgene's stock prices, or whether there is a predictable statistical pattern of positive and negative changes in those prices.[39]  For example, if a price rises on Monday, then if the market were able to predict that the stock was more likely to move in the same direction (i.e., rise) than move in the opposite direction on Tuesday, there would be evidence of positive autocorrelation.  Similarly, if the market were able to predict that the market would move in the opposite direction on Tuesday to its movement on Monday, there would be evidence of negative autocorrelation.  Evidence of autocorrelation would be an indicator counter to market efficiency and would invite the question of how severe that violation of market efficiency would be.  In particular, persistent autocorrelation beyond transaction costs would represent a potential failure of investors to exploit profit opportunities in the stock, suggesting that investors may not be properly analyzing the company's stock price movements.

55. In Exhibit 10a, I show the measure of first-degree, or one-day, autocorrelation in Celgene's stock prices for the Class Period.  When first-degree autocorrelation is present, then the size and direction of the price movement of a security on one day can be statistically estimated (though, of course, not precisely, but with some degree of uncertainty) in advance based on the size and direction of the security's price movement on the prior trading day.  As can be seen, there is no statistically significant degree of

---

[39] Autocorrelation, also known as serial correlation, is discussed as a test of potential market efficiency in Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970.  ("More of the literature has, however, been concerned with tests of serial covariances of returns." p. 391.)

autocorrelation at the standard 5% level in the stock over the Class Period or in any individual year (technically, portions of the year for 2017 and 2018) in the Class Period.

56. A second way to examine autocorrelation is by means of what is called a "runs test."[40]  To see how such a test works, imagine flipping a coin N times.  We would expect that if the coin were unbiased it would sometimes come up heads and sometimes tails; sometimes there may be a single head followed by tails, and sometimes there may be a string of heads in a row.  Suppose first that in running this experiment the coin switched back and forth between heads and tails on every flip.  Then the number of runs in the N flips would also be N, as every single flip would start a new run of heads or tails.  This would be a form of negative autocorrelation because a result in one direction would indicate that we should expect the next result to be in the other direction.  Now suppose instead that the first N/2 flips were heads and the second N/2 flips were tails.  In this case, we have only two runs, one of heads and one of tails.  This would be a form of positive autocorrelation, because with one exception right in the middle, one could always predict a flip of the coin by assuming that it would be the same as the last flip.  Probability theory allows us to show that a fair coin would have approximately N/2 runs.  Probability theory also lets us determine how many runs represent a statistically significant deviation from this expected number of runs.

57. This theory has been applied to stock price movements by examining the number of runs of increases or decreases in the stock price during some time period.[41]  If the

---

[40] See, for example, footnote 15 of Prof. Fama's 1970 paper.  ("For the daily price changes, the actual number of runs of price changes of the same sign is less than the expected number for 26 out of 30 stocks.  Moreover, of the eight stocks for which the actual number of runs is more than two standard errors less than the expected number [i.e., is statistically significant at the five-percent level], five of the same stocks have positive daily, first order serial correlations in Table 1 that are more than twice their standard errors [i.e., are statistically significant at the five-percent level].  But in both cases the statistical 'significance' of the results is largely a reflection of the large sample sizes.")

[41] The analysis is actually run comparing the number of runs of returns, or percentage price changes, above and below the median.  Because stock prices tend to have a median (continued)

number of runs is sufficiently small, there is evidence of positive autocorrelation while if the number of runs is sufficiently large, there is evidence of negative autocorrelation. The number of runs needed to result in a statistically significant deviation from the results of an unpredictable outcome can be determined by the use of probability and statistical theory. One of the benefits of a runs test is that a single event will not have an outsized effect on the results.

58. The results of the runs test for Celgene's stock prices similarly point very strongly toward a lack of autocorrelation, which weighs in favor of a finding of efficiency. As shown in Exhibit 10b, there is no statistically significant autocorrelation over the Class Period. There is also no statistically significant autocorrelation at the 5% level in any year (or, technically, portions of a year) within the Class Period.

### (11)   Summary

59. The above analyses indicate that Celgene's common stock traded in an efficient market. The market for Celgene's common stock shows clear evidence of efficiency under all five *Cammer* tests. It also does extremely well on the *Krogman* tests. Adding my tests for autocorrelation, I find additional evidence supportive of a finding of market efficiency. Viewed as a whole, the evidence strongly supports a finding of market efficiency for Celgene's common stock during the Class Period.

## VII.   DAMAGES FOR INVESTORS IN CELGENE'S COMMON STOCK CAN BE CALCULATED THROUGH A COMMON METHODOLOGY

60.     While I have not yet been asked to determine the level of inflation in Celgene's common stock, I have been asked to provide an opinion on whether such an analysis can be performed on a Class-wide basis. As discussed below, the answer is

---

return of around zero, for present purposes one can imagine looking at runs of positive and negative returns.

unambiguously that the formulation of such a common methodology is possible in this matter.

61.      In the most common type of fraud-on-the-market securities-fraud cases, including this action, damages are "out-of-pocket" damages, and the damages analysis begins with an allegation that members of the class have overpaid because the market price of the security they purchased was artificially inflated.  Thus, the proper form of analysis depends not on what an individual investor believed, but on the degree, if any, by which the market price of the security in question was inflated.[42]  As all investors face the same market price at any given point in time, the proper analysis of damages will be the same across all investors in any given security.

62.      The starting point for calculating damages for an investor who both buys and sells during the class period is determined by the amount of artificial inflation in a security at the time of their purchase less the inflation in that security when sold.  If an investor holds their purchase past the end of the class period, then the starting point for damages is the amount of inflation at the time of purchase.  Further adjustments may be necessary if the amount of inflation declines for reasons other than a corrective disclosure (e.g., if inflation changes due to market, industry, or company-specific reasons unrelated to the allegations) in order to obtain the "out-of-pocket" measure of damages.  In addition, the 1995 Private Securities Litigation Reform Act provides a limitation on damages.[43]  Notably, all the above calculations are performed on a class-wide basis.

---

[42] Certain investors, such as defendants, may be excluded from a class based on their knowledge or beliefs, as the fraud-on-the-market theory applies to an investor who "buys or sells stock at the price set by the market[.]" (*Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).)

[43] For shares held beyond the disclosure that corrects the misrepresentation(s) that is (are) the basis for the action, damages are limited to the purchase price less (1) the 90-day average closing price following that disclosure if the shares are held through this 90-day period or (2) the average closing price through the time of sale if the shares are sold within the 90-day period.

63.     The inflation calculation referenced above is begun with an event study, or the analysis of the change in the market prices of Celgene's common stock, accounting for changes in market and/or industry effects, on the dates of (or the trading dates following) the corrective disclosures alleged in this case (i.e., October 26, 2017; February 27, 2018; and April 29, 2018).[44]  These calculations show the effect of the three alleged corrective disclosure announcements.

64.     In quantifying damages, it will be necessary to review the alleged corrective disclosures to determine whether any of the information disclosed was unrelated to the alleged fraud.  If so, the effects of such unrelated, "confounding" information on Celgene's stock price would be removed.[45]  At this point, I have not yet performed the analyses that would be required to quantify the effect, if any, of confounding information that I may identify on the alleged disclosure dates.  However, my review to date finds that to the extent that there is confounding news that requires disaggregation, should such news be material, it should be possible to quantify the effect of that news using standard tools in financial economics in a manner that applies on a Class-wide basis.  The first alleged corrective disclosure (i.e., the October 26, 2017 announcement that 2017 Otezla sales were expected to be $1.25 billion rather than the previously announced guidance of $1.5 billion to $1.7 billion) was part of a quarterly earnings announcement.  In contrast, the February 27, 2018 receipt of the Refusal-to-File letter for Ozanimod and the April 29, 2018 Morgan Stanley analyst report regarding Ozanimod were stand-alone news stories, meaning that they were not released along with other news.  While my review of the latter two dates is ongoing, at this point, I have not encountered any material confounding news on those two dates.  That is, there appears to be no information unrelated to the alleged fraud released on those dates that would require a disaggregation of the relevant

---

[44] See Order, p. 47.

[45] Such analyses are routinely performed by valuations of different business practices and/or reviews of analyst reports to determine the relative importance of different aspects of an alleged corrective disclosure.

stock-price movements.  With regard to the first date, many analysts who followed Celgene before and after the earnings announcement provided descriptions of their views of the company, often including detailed forecasts.  This information will allow me to employ standard financial techniques to disaggregate the effects of the corrective disclosure from other material news, if any, that reached the market at the same time.  If appropriate, a combination of the public information and information obtained in fact discovery will allow for the implementation of a reasonable methodology to disaggregate the effects of any identifiable material news unrelated to the corrective disclosure.  Notably, this analysis will affect the level of inflation applicable to all Class members who hold through this disclosure, meaning that it will apply on a Class-wide basis.

65.     Thus, while further discovery should aid in some of the exact parameterizations of the damages calculations, a common method for determining inflation at any date, and thus damages for any Class member, will be feasible.  While there may be questions about how to calculate inflation, those questions will affect all members of the Class who purchased Celgene's common stock and will be resolved by common Class-wide proof.  Consequently, the inflation in Celgene's stock will be determined in a common manner for all Class members.  The resultant figures will then be applied to each Class member's transactions in a mechanical fashion to determine the appropriate claim for each member of the Class.


I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.



_David I. Tabak_

David I. Tabak
April 30, 2020



**David I. Tabak**
Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 2176
david.tabak@nera.com
www.nera.com

# EXHIBIT 1
# DAVID I. TABAK
## MANAGING DIRECTOR

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology.  While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, Delaware Chancery, and bankruptcy courts, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, the International Dispute Resolution Centre, and the International Chamber of Commerce International Court of Arbitration.  He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*.  Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals.  His publications have covered topics such as commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses.  Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for accountants and valuation professionals.

Dr. Tabak has been retained as an expert to address issues including allegations of valuations, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, analysis of potential insider trading for a financial institution, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

David I. Tabak

## Education

**Harvard University**
Ph.D., Economics, 1996
M.A., Economics, 1992

**Massachusetts Institute of Technology**
B.S., Economics, 1990
B.S., Physics, 1990

## Professional Experience

**NERA Economic Consulting**

2005- *Managing Director (f/k/a Senior Vice President)*
Provide written and oral testimony. Conduct and supervise economic analyses, with a focus on securities litigation and valuation cases.

2001-2005 *Vice President*

1998-2001 *Senior Consultant*

1996-1998 *Senior Analyst*

**Harvard University**

1991-1996 *Teaching Fellow in Economics*
Participated in teaching various courses from introductory principles of economics to graduate macroeconomics. Ran coursewide tutorial program for the largest class at Harvard for two academic years, with a staff of over fifty part-time employees.

**Worth Publishers**

1991, 1993 *Research Assistant/Independent Contractor*
Worked on data collection, software analysis, and creation of a problem bank for an educational economics software package.

**National Bureau of Economic Research**

1991 *Research Assistant*
Performed data collection and econometric analysis for a project on comparisons of international growth rates.

## Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009, 2011, 2012, 2015

David I. Tabak

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

David I. Tabak

## Expert Reports and Testimony

Deposition testimony before the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, April 28, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New Jersey in *In re Grupo Televisa Securities Litigation*, April 25, 2020.

Deposition testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., January 17, 2020.

Expert Report of David I. Tabak, Ph.D. in the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, January 15, 2020.

Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, October 18, 2019.

Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., September 23, 2019.

Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, August 21, 2019.

Deposition before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, July 11, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, June 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, June 17, 2019.

Expert Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois in *George Hedick Jr. v. The Kraft Heinz Company, et al.* and in *Iron Workers District Council (Philadelphia and vicinity) Retirement and Pension Plan v. The Kraft Heinz Company, et al.*, May 15, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, April 8, 2019.

Deposition before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 29, 2019.

NERA Economic Consulting

4

David I. Tabak

Deposition before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 27, 2019.

Deposition before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, March 20, 2019.

Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 8, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 7, 2019.

Expert Declaration of David I. Tabak before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, February 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, February 11, 2019.

Testimony before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., June 12, 2018.

Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., June 4-5, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., May 14, 2018.

Deposition testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, April 6, 2018.

Deposition testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., March 23, 2018.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 9, 2018.

Expert Report of David I. Tabak, Ph.D. before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., February 21, 2018.

Expert Report of David I. Tabak, Ph.D. before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., February 16, 2018.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, November 17, 2017.

David I. Tabak

Deposition testimony before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, October 26, 2017.

Report of David I. Tabak, PhD in *Babscay Pty Ltd v. Slater & Gordon Limited*, Federal Court Proceeding VID 659 / 2017, Australia, October 26, 2017.

Deposition testimony before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 28, 2017.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 20, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, September 14, 2017.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, August 24, 2017.

Supplement to Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 9, 2017.

Deposition Testimony before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 1, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., June 15, 2017.

Sur-Reply Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., May 31, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., May 26, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., May 8, 2017.

Deposition Testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., April 21, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., April 13, 2017.

NERA Economic Consulting

6

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., March 23, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., March 16, 2017.

Supplement to Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, February 21, 2017.

Deposition Testimony before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, February 8, 2017.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, January 17, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, December 12, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., December 9, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, December 8, 2016.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, November 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, October 7, 2016.

Rebuttal Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, May 6, 2016.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, February 11, 2016.

Deposition Testimony before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 9, 2016.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 3, 2016.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, January 29, 2016.

Expert Report of David Tabak, Ph.D. before the Securities and Exchange Commission in *In the Matter of Arthur F. Jacob, CPA and Innovative Business Solutions, LLC,* January 29, 2016.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Symbol Technologies, Inc. Securities Litigation*, January 28, 2016.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, December 23, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Symbol Technologies, Inc. Securities Litigation*, December 11, 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, December 2, 2015.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, November 16, 2015.

Expert Report of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, November 12, 2015.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, September 2, 2015.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, July 20, 2015.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 15, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 1, 2015.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 30, 2015.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *George Byrun et al. v. Salix Pharmaceuticals et al.*, 30 January 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, January 13, 2015.

David I. Tabak

Expert Report of David Tabak before the Securities and Exchange Commission in the matter of *Airtouch Communications, Inc., Hideyuki Kanakubo, and Jerome Kaiser, CPA*, December 16, 2014.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Puda Coal Securities et al. Litigation*, November 13, 2014.

Deposition Testimony before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, July 2, 2014.

Testimony before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 16, 2014.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, June 11, 2014.

Supplemental Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 3, 2014.

Deposition before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 31, 2014.

Cross Examination in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation et al. before the Ontario Superior Court of Justice (Commercial List), March 19, 2014.

Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. *against AriZona Beverages USA LLC et al.*, March 11, 2014.

Report of David I. Tabak in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation *et al.* before the Ontario Superior Court of Justice (Commercial List), February 28, 2014.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2013.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, September 4, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2013.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, June 27, 2013.

David I. Tabak

Deposition Testimony before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, May 10, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, April 11, 2013.

Declaration of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, March 21, 2013.

Reply Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2012.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, November 6, 2012.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2012.

Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, May 3, 2012.

Written Direct Testimony of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, April 17, 2012.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, April 10, 2012.

Rebuttal Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, January 30, 2012.

Expert Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, December 5, 2011.   (Affidavits testifying to the report executed on December 9, 2011 and December 20, 2011.)

Deposition Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, August 1, 2011.

Expert Report of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, July 8, 2011.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, February 3, 2011.

David I. Tabak

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, January 11, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Securities and Exchange Commission v. Alfred S. Teo, et al.*, November 4, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 29, 2010.

Deposition Testimony before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 7, 2010.

Expert Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, September 16, 2010.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, August 30, 2010.

Rebuttal Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., April 25, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., March 12, 2010.

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, October 19, 2009.

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd.*, September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

David I. Tabak

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition Testimony before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

David I. Tabak

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund,* et al. *vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007.  (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

NERA Economic Consulting                                                                                    13

David I. Tabak

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Case 2:18-cv-04472-JMV-JBC   Document 90-2   Filed 05/01/20   Page 48 of 148 PageID: 5215
Case 1:21-cv-10479-LT   Document 189-17   Filed 09/10/25   Page 47 of 147

David I. Tabak

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* June 19, 2003.

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

David I. Tabak

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

NERA Economic Consulting

17

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 25, 2000.

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

David I. Tabak

## Publications

"Economic and Financial Analyses in Australian Securities Litigation in the Wake of *TPT Patrol Pty Limited as trustee for Amies Superannuation Fund v Myer Holdings Limited*," (co-authored with William S. Taylor), NERA Working Paper, January 2020.

"Testing Securities Market Efficiency With Cammer Factors," *Law360.com*, February 5, 2019.

"Securities Class Actions Appear to Be Largely 'Price-Maintenance' and Omissions Cases," *NERA Working Paper*, April 10, 2017.

"Further Insight into 'What Should We Expect When Testing for Price Response to News in Securities Litigation?'," *Oxford Business Law Blog*, September 27, 2016.

"Gauging Share-Price Response to News in Securities Litigation," *The CLS Blue Sky Blog, Columbia Law School's Blog on Corporations and the Capital Markets*, September 8, 2016.

"What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Working Paper*, August 11, 2016.

"Should Solvency Tests Give the Same Answer?" *NERA Working Paper*, July 28, 2015

"Implications for Market Efficiency and Damages Analysis of Plaintiff Interpretations of *Halliburton II's* Statement that 'market efficiency is a matter of degree,'" *Loyola University Chicago Law Journal*, Spring 2015.

"The Solvency Two-Step," Guest Post on the Weil Bankruptcy Blog.  March 2013.

"Do Courts Count *Cammer* Factors?" NERA Working Paper, republished in the Harvard Law School Forum on Corporate Governance and Financial Regulation.  Also published in modified form as "Counting Cammer Factors – A Review of Case Law" at Law360.com, August 2012.

"Settlement reasonableness from negotiations to coverage disputes," *Litigation and Dispute Resolution 2012 Global Reference* Guide.  A prior version of this was published as a NERA Working Paper, February 2012.

"Guesstimating Loss for Sentencing," published in Law360.com, February 2012.  (Originally published with the title "Estimating Loss For Sentencing Purposes."  Retitled by Law360.com after initial publication on its website.)

"Economic Analysis of Loss in the United States Sentencing Commission's Proposed Methodologies," NERA Working Paper, February 2012.

"Guideline Companies in Valuation: A Careful View of the Market Approach," *Journal of Business Valuation*, 2011 Volume 1.  (A previous version appeared as a NERA working paper entitled "Guideline Companies in Valuation: The Economist's View of the Market Approach" in October 2008.)

David I. Tabak

"The Matrixx of Materiality and Statistical Significance in Securities Fraud Cases," (co-authored with Frederick Lee of Boies, Schiller & Flexner) NERA Working Paper, December 2010.

"Materiality and Statistical Significance Explained" (co-authored with Frederick Lee of Boies, Schiller & Flexner), published in Law360.com, December 2010.

"Satisfying Fiduciary Duty Under ERISA," *Employment Law Strategist*, June 2010.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 2010.  (A previous version appeared in September 2009, and a condensed version appeared as a Guest Column, "On the Misuse of Event Studies to Examine Market Efficiency," in May 2010 on www.securitiesdocket.com.)

"Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

"Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,"* Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006.  (Previously published as a NERA Working Paper.)

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004.  (Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.)

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

David I. Tabak

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003.  (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

 "Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. (Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.)

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

David I. Tabak

## Selected Presentations

Panelist, "Emerging Issues in Securities Class Actions," Duke Law Center for Judicial Studies, New York, NY, July 20, 2017.

Panelist, "Keeping Or Closing The Employer Stock Fund: A *Dudenhoeffer*-Based Process," American Bar Association Section of Taxation, Chicago, IL, September 19, 2015.

Presenter, "Multiple Comparisons and the Known or Potential Error Rate," National Association of Forensic Economics session at the Eastern Economics Association, New York, NY, 27 February 2015.

Panelist, Annual Institute for Investor Protection Conference at Loyola University Chicago Law School, 24 October 2014.

Panelist, 2014 Business Law Section Annual Meeting, American Bar Association, Chicago, 11 September 2014.

Moderator, New York University Ross Roundtable, April 7, 2014.

Commentator, Institute for Law and Economic Policy Conference: "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court," April 4, 2014.

Panelist, "The Supreme Court's Decision in Amgen and Other Recent Cases," Securitiesdocket.com; July 24, 2013.

Panelist, "Securities Law: Fraud-on-the-Market Theory Demystified," The Knowledge Congress; July 23, 2013.

Moderator, New York University Ross Roundtable, April 15, 2013.

Panelist, 1st Annual Securities Litigation & Enforcement Institute; New York City Bar; New York, NY; December 11, 2012.

Panelist, The Litigation Summit and Exposition; Washington DC; November 12, 2012.

Panelist, The Society of Corporate Secretaries on materiality issues in determining corporate disclosures, October 18, 2012; New York, NY.

Panelist, Symposium in honor of Nobel Prize Winner Daniel Kahneman at Loyola University, Chicago, IL; October 5, 2012.

Panelist, Practising Law Institute, "Taking and Defending Expert Depositions"; New York, NY June 27, 2012.

Discussant, National Association of Forensics Economics; Chicago IL; January 7, 2012.

Panelist, Advanced eDiscovery Institute (session: Statistics and Sampling for Lawyers: How to Apply a Well-Accepted Methodology in the World of eDiscovery); Washington DC; November 17, 2011.

Presenter, Securities Regulation Committee of the New York State Bar Association; New York, New York; July 20, 2011.

Panelist, 2nd Annual Law Firm Marketing U& Business Development Leadership Forum, sponsored by *The American Lawyer* (session: Macro Economic Industry-by-Industry Overview – a power-packed session exploring the sectors that will shape 2011 and beyond); New York, NY; May 24, 2011.

Presenter in webinar on "Fair Value Measurement Consideration for 2010 and Beyond," The Knowledge Congress, July 13, 2010.

Panelist, Forum for Institutional Investors, sponsored by Bernstein Litowitz Berger & Grossman LLP; New York, NY; October 24, 2008.

Presenter, Office of Litigation Support, Securities and Exchange Commission; Washington, DC; May 20, 2008.

Presenter, IQPC Subprime Litigation Conference; New York, New York; February 27, 2008.

Presenter, IQPC Securities Litigation Conference; New York, New York; May 18, 2007.

Presenter, "Everything You Were Afraid To Know About Experts," Fordham University; January 19, 2006.

Presenter, *Eugene P. and Delia S. Murphy Conference on Corporate Law,* Fordham University; November 4, 2005.

Panel Member, *Directors & Officers Under Fire: Protecting Your Interests in this Hostile Environment*, a Directors Roundtable seminar; Washington, D.C.; June 8, 2004.

Guest Lecturer, Fordham University; New York, New York; March 8, 2004.

Panel Member, Business Valuation Resources audio conference on discounts for lack of marketability; May 14, 2003.

Presenter, *Third Annual Law and Business Conference*, Vanderbilt University Law School, ("Inflation Methodologies in Securities Fraud Cases: Theory and Practice"); March 28, 2003.

Guest Lecturer, Middlebury College; Middlebury, Vermont; January 28, 2003.

Panel Member, *Second Annual Grant & Eisenhofer Institutional Investor Conference;* New York, New York; December 9, 2002.

Guest Speaker, Deutsche Bank institutional investor conference call; November 22, 2002.

David I. Tabak

Panel Member, *Key Issues Facing Board Members: The Coming Tide in Securities Class Actions,* a Directors Roundtable seminar; Chicago, Illinois; February 22, 2001.

Panel Member, *Securities Litigation: Risk Management and Avoidance, Emerging Challenges for CXOs*, a seminar sponsored by Jones, Day, Reavis and Pogue and PriceWaterhouseCoopers; Reston, Virginia; September 20, 2000.

"When the Litigation Comes In and the Money Goes Out: What Determines Settlement Values?" presented at *Balancing Disclosure and Litigation Risks for Public Companies (or Soon-to-Be Public Companies)*, a seminar sponsored by Alston & Bird and RR Donnelley Financial; Raleigh, North Carolina; November 10, 1999.

April 2020

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**

### Academic Literature

David Tabak and Frederick Dunbar, Chapter 19 of *Litigation Services Handbook, The Role of the Financial Expert* (3d ed. 2001).

Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance*, 1970.

Fernando Avalos and Marcia Kramer Mayer, "Dealer Participation on the New York Stock Exchange and Nasdaq," *NERA Working Paper,* May 2002.

Paul Ferrillo, Frederick Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases," 78 *St. John's L. Rev.* 81, 120-21 (2004).

### Case Law

*Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

*Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87, 1291 (D.N.J. 1989).

*In re Countrywide Financial Corporation Securities Litigation*, 273 F.R.D. 586, 618 (C.D. Cal. 2009).

*In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196, 213 (E.D. Pa. 2008).

*In re DVI, Inc. Securities Litigation*, 639 F.3d 623, 634 (3d Cir. 2011).

*In re Executive Telecard, Ltd. Securities Litigation,* 979 F. Supp. 1021, 1027 (S.D.N.Y. 1997).

*In re Petrobras Securities,* 862 F.3d 250, 277-278 (2d Cir. 2017).

*Krogman, Inc. v. Sterritt,* 202 F.R.D. 467, 474-78 (N.D. Tex. 2001).

Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737, codified as amended in 15 U.S.C §78j.

*Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005).

*Waggoner v. Barclays PLC,* 875 F.3d 79, 96-97 (2d Cir. 2017).

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**

### Data

Celgene Corporation common stock closing price, bid price, ask price, trading volume, and short interest data obtained from Bloomberg L.P.

Celgene Corporation earnings report dates and number of analyst estimates obtained from Institutional Brokers' Estimate System (I/B/E/S) via FactSet Research Systems, Inc.

Celgene Corporation common stock shares outstanding and insider holdings data obtained from SEC Filings.

Celgene Corporation quarterly institutional holdings for common stock obtained from FactSet Research Systems, Inc.

Market makers on the NASDAQ Exchange data obtained from Bloomberg L.P.

Nasdaq Biotechnology Index data obtained from Bloomberg L.P.

### News Articles

See pages 3-12 for a list of news stories obtained from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d.

### Pleadings in This Matter

Second Amended Consolidated Class Action Complaint dated February 27, 2019.

Opinion on Defendants' Motion to Dismiss dated December 19, 2019.

Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

### Other Materials

*New Palgrave Dictionary of Economics*, 2008 edition, entry on Efficient Markets Hypothesis, available online at:
https://rd.springer.com/referenceworkentry/10.1057/978-1-349-95121-5_42-2.

Nasdaq Biotechnology Index Methodology, available online at:
https://indexes.nasdaqomx.com/docs/methodology_NBI.pdf

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|-------------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 4/27/2017 | 8:40 AM | 4/27/2017 | Celgene Narrows EPS Outlook, Revenue Disappoints -- Market Talk | Dow Jones Institutional News |
| 4/27/2017 | 8:40 AM | 4/27/2017 | Celgene Narrows EPS Outlook, Revenue Disappoints -- Market Talk | Dow Jones Institutional News |
| 4/27/2017 | 9:18 AM | 4/27/2017 | Celgene Takes Pricing Hit on Otezla, But Gains Share -- Market Talk | Dow Jones Institutional News |
| 4/27/2017 | 9:18 AM | 4/27/2017 | Celgene Takes Pricing Hit on Otezla, But Gains Share -- Market Talk | Dow Jones Institutional News |
| 4/27/2017 | 1:07 PM | 4/27/2017 | Alliqua BioMedical Files 8K - Other Events >ALQA | Dow Jones Institutional News |
| 4/27/2017 | 3:58 PM | 4/27/2017 | Celgene Q1 2017 Results -- Earnings Call Transcript >CELG | Dow Jones Institutional News |
| 5/5/2017 | 1:53 PM | 5/5/2017 | Celgene: Too Much of a Good Thing? -- Barron's Blog | Dow Jones Institutional News |
| 5/9/2017 | 4:07 PM | 5/10/2017 | Press Release: Juno Therapeutics to Present at the Bank of America Merrill Lynch 2017 Health Care Conference | Dow Jones Institutional News |
| 5/10/2017 | 5:21 PM | 5/11/2017 | Acceleron Pharma Files 8K - Other Events >XLRN | Dow Jones Institutional News |
| 5/12/2017 | 2:14 PM | 5/12/2017 | Look Out! Can Celgene Weather A Step Patent Cliff? -- Barron's Blog | Dow Jones Institutional News |
| 5/17/2017 | 4:41 PM | 5/18/2017 | Celgene Corporation Presents at Bank of America Merrill Lynch 2017 Healthcare Conference - Call Transcript >CELG | Dow Jones Institutional News |
| 5/22/2017 | 7:30 AM | 5/22/2017 | Press Release: Celgene Announces Positive Results from RADIANCE, the Second Pivotal Phase III Trial of Oral Ozanimod in Patients with Re... | Dow Jones Institutional News |
| 5/22/2017 | 7:45 AM | 5/22/2017 | Celgene Files 8K - Other Events >CELG | Dow Jones Institutional News |
| 5/22/2017 | 11:39 AM | 5/22/2017 | Celgene's MS Drug Moves Forward, But Questions Remain -- Market Talk | Dow Jones Institutional News |
| 5/22/2017 | 11:39 AM | 5/22/2017 | Celgene's MS Drug Moves Forward, But Questions Remain -- Market Talk | Dow Jones Institutional News |
| 5/23/2017 | 4:50 PM | 5/24/2017 | Celgene Corporation Presents at UBS Global Healthcare Conference 2017 - Call Transcript >CELG | Dow Jones Institutional News |
| 5/31/2017 | 8:55 PM | 6/1/2017 | Celgene's (CELG) CEO Mark Alles Presents at Sanford C. Bernstein Strategic Decisions Conference 2017 (Transcript) >CELG | Dow Jones Institutional News |
| 6/1/2017 | 7:30 AM | 6/1/2017 | Press Release: Celgene and Acceleron Complete Target Enrollment in the MEDALIST and BELIEVE Phase 3 Studies of Luspatercept in Myelodys... | Dow Jones Institutional News |
| 6/5/2017 | 2:33 AM | 6/5/2017 | Biotech ETFs Are Getting Hearts Pumping Again -- WSJ | Dow Jones Institutional News |
| 6/5/2017 | 7:30 AM | 6/5/2017 | *Bluebird Bio and Celgene Corp Announce Updated Clinical Results From Ongoing First-in-Human Multicenter Study of Bb2121 Anti-BCMA CAR T ... | Dow Jones Institutional News |
| 6/5/2017 | 9:34 AM | 6/5/2017 | Bluebird Bio Stock Rises 5% On Positive Data From Ongoing Early-stage Clinical Trial -- MarketWatch | Dow Jones Institutional News |
| 6/5/2017 | 9:46 AM | 6/5/2017 | Update: Bluebird Bio Stock Rises 7.4% On Positive Data From Ongoing Early-stage Clinical Trial -- MarketWatch | Dow Jones Institutional News |
| 6/6/2017 | 4:27 PM | 6/7/2017 | Agios Pharmaceuticals Files 8K - Other Events >AGIO | Dow Jones Institutional News |
| 6/6/2017 | 5:16 PM | 6/7/2017 | Acceleron Pharma Files 8K - Other Events >XLRN | Dow Jones Institutional News |
| 6/12/2017 | 9:04 AM | 6/12/2017 | *Dragonfly Therapeutics in Collaboration With Celgene for Natural Killer Cell-Based Immunotherapies Using Dragonfly's TriNKET Technology... | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 6/14/2017 | 7:30 AM | 6/14/2017 | Press Release: Phase 2a Safety and Efficacy Data Support Further Development of Oral CC-220 in Patients with Lupus | Dow Jones Institutional News |
| 6/14/2017 | 4:59 PM | 6/15/2017 | Celgene Files 8K - Changes Exec Mgmt >CELG | Dow Jones Institutional News |
| 6/16/2017 | 8:30 AM | 6/16/2017 | Morning Movers: Celgene Gains, Nike Drops, Valeant Rises -- Barron's Blog | Dow Jones Institutional News |
| 6/16/2017 | 9:48 AM | 6/16/2017 | Leerink Sees Upside in Celgene Ahead of 2Q Results -- Market Talk | Dow Jones Institutional News |
| 6/16/2017 | 2:50 PM | 6/16/2017 | Why Celgene is Bucking Biotech Weakness Today -- Barron's Blog | Dow Jones Institutional News |
| 6/24/2017 | 8:05 AM | 6/26/2017 | New Data from Phase 1/2 Trial of Oral IDHIFA(R) (enasidenib) Demonstrate Durable Complete Responses in Patients with IDH2 Mutant Relapsed or... | GlobeNewswire |
| 7/1/2017 | 1:17 AM | 7/3/2017 | Celgene Could Rally Another 20% on Drug Gains -- Barrons.com | Dow Jones Institutional News |
| 7/1/2017 | 6:00 AM | 7/3/2017 | Review & Preview Follow-Up -- A Return Visit to Earlier Stories: Celgene Shares Could Shine -- Barron's | Dow Jones Institutional News |
| 7/5/2017 | 11:50 AM | 7/5/2017 | Celgene: What's in the Pipeline? -- Barron's Blog | Dow Jones Institutional News |
| 7/5/2017 | 9:00 PM | 7/6/2017 | Press Release: Celgene Corporation Enters Into Global Strategic Immuno-Oncology Collaboration with BeiGene to Advance PD-1 Inhibitor Program for Solid Tumor Cancers | Dow Jones Institutional News |
| 7/5/2017 | 9:15 PM | 7/6/2017 | BeiGene to Host Investor Conference Call on Global Strategic Collaboration with Celgene | GlobeNewswire |
| 7/6/2017 | 6:14 AM | 7/6/2017 | BeiGene Files 8K - Entry Into Definitive Agreement >BGNE | Dow Jones Institutional News |
| 7/6/2017 | 8:27 AM | 7/6/2017 | BeiGene Stock Surges 12% On Celgene Cancer Collaboration -- MarketWatch | Dow Jones Institutional News |
| 7/6/2017 | 4:03 PM | 7/7/2017 | BeiGene's (BGNE) CEO John Oyler on Discuss Global Strategic Collaboration with Celgene Investor Call (Transcript) >BGNE | Dow Jones Institutional News |
| 7/10/2017 | 8:45 AM | 7/10/2017 | Press Release: Dermavant Sciences Appoints Dr. Jacqualyn Fouse as Executive Chairman | Dow Jones Institutional News |
| 7/10/2017 | 11:32 AM | 7/10/2017 | Investors' Soapbox: BeiGene Boosted by Celgene Deal -- Barrons.com | Dow Jones Institutional News |
| 7/11/2017 | 7:59 AM | 7/11/2017 | Celgene Coverage Assumed by Jefferies at Buy | Dow Jones Institutional News |
| 7/12/2017 | 3:31 PM | 7/12/2017 | Celgene Price Increases Could Add 3 Cents In EPS This Year -- Barron's Blog | Dow Jones Institutional News |
| 7/21/2017 | 3:06 PM | 7/21/2017 | Nothing Can Keep Celgene Down -- Barron's Blog | Dow Jones Institutional News |
| 7/22/2017 | 3:42 AM | 7/24/2017 | DJ Celgene Corporation, Inst Holders, 2Q 2017 (CELG) | Dow Jones Institutional News |
| 7/25/2017 | 4:00 PM | 7/26/2017 | *Celgene Corp Announces Settlement of Civil Litigation | Dow Jones Institutional News |
| 7/25/2017 | 6:21 PM | 7/26/2017 | Celgene Settles Lawsuit Over Improper Promotion of Cancer Drugs | Dow Jones Institutional News |
| 7/25/2017 | 6:30 PM | 7/26/2017 | Celgene Settles Lawsuit Over Improper Promotion of Cancer Drugs | Dow Jones Institutional News |
| 7/25/2017 | 10:41 PM | 7/26/2017 | Celgene Settles Lawsuit Over Improper Promotion of Cancer Drugs | Dow Jones Newswires Chinese (English) |
| 7/27/2017 | 7:47 AM | 7/27/2017 | Celgene Shares Surge 1.6% On Second-quarter Profit, Revenue Beats -- MarketWatch | Dow Jones Institutional News |
| 7/27/2017 | 3:47 PM | 7/27/2017 | Celgene Q2 2017 Results -- Earnings Call Transcript >CELG | Dow Jones Institutional News |
| 7/28/2017 | 7:30 AM | 7/28/2017 | Press Release: Celgene Corporation to Webcast at Upcoming Investor Conference | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|-----------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 7/28/2017 | 10:47 AM | 7/28/2017 | Celgene Is Maintained at Outperform by Leerink Swann | Dow Jones Institutional News |
| 7/28/2017 | 11:05 AM | 7/28/2017 | Celgene Is Maintained at Outperform by BMO Capital | Dow Jones Institutional News |
| 8/1/2017 | 9:33 AM | 8/1/2017 | Moody's Assigns Baa2 To Celgene's Notes; Stable Outlook | Dow Jones Institutional News |
| 8/1/2017 | 11:12 AM | 8/1/2017 | *S&PGR Rates Celgene Corp. Sr Unsec Nts 'BBB+' | Dow Jones Institutional News |
| 8/1/2017 | 4:41 PM | 8/2/2017 | Agios Pharmaceuticals Files 8K - Other Events >AGIO | Dow Jones Institutional News |
| 8/10/2017 | 1:31 PM | 8/10/2017 | Celgene Files 8K - Other Events >CELG | Dow Jones Institutional News |
| 8/21/2017 | 4:22 PM | 8/22/2017 | Press Release: Celularity, Inc., Accelerates Breakthrough Placental Discovery & Therapeutic Platform | Dow Jones Institutional News |
| 8/21/2017 | 4:22 PM | 8/22/2017 | Press Release: Celularity, Inc., Accelerates Breakthrough Placental Discovery & Therapeutic Platform | Dow Jones Institutional News |
| 8/21/2017 | 5:22 PM | 8/22/2017 | Press Release: Sorrento Contributes To The Formation Of Celularity, Inc. For Breakthrough Placental Therapeutic Platform In Consortium With... | Dow Jones Institutional News |
| 8/22/2017 | 9:23 AM | 8/22/2017 | Celgene Files 8K - Changes Exec Mgmt >CELG | Dow Jones Institutional News |
| 8/22/2017 | 9:23 AM | 8/22/2017 | Celgene Files 8K - Other Events >CELG | Dow Jones Institutional News |
| 8/28/2017 | 11:09 AM | 8/28/2017 | Juno Therapeutics: Celgene's Next Target? -- Barron's Blog | Dow Jones Institutional News |
| 8/31/2017 | 4:05 PM | 9/1/2017 | BeiGene Announces Closing of Global Strategic Oncology Collaboration with Celgene Corporation | GlobeNewswire |
| 8/31/2017 | 4:05 PM | 9/1/2017 | Press Release: BeiGene Announces Closing of Global Strategic Oncology Collaboration with Celgene Corporation | Dow Jones Institutional News |
| 9/1/2017 | 6:05 AM | 9/1/2017 | BeiGene Files 8K - Other Events >BGNE | Dow Jones Institutional News |
| 9/6/2017 | 8:01 AM | 9/6/2017 | Press Release: Vital Therapies Appoints Former Receptos President and CEO Faheem Hasnain as Chairman of the Board of Directors | Dow Jones Institutional News |
| 9/6/2017 | 8:01 AM | 9/6/2017 | Vital Therapies Appoints Former Receptos President and CEO Faheem Hasnain as Chairman of the Board of Directors | GlobeNewswire |
| 9/6/2017 | 10:00 AM | 9/6/2017 | Celgene Corporation (Nasdaq: CELG) to Ring The Nasdaq Stock Market Opening Bell | GlobeNewswire |
| 9/6/2017 | 9:42 PM | 9/7/2017 | Celgene (CELG) Presents at Robert W Baird Global Healthcare Broker Conference (Transcript) >CELG | Dow Jones Institutional News |
| 9/7/2017 | 7:30 AM | 9/7/2017 | Press Release: Celgene Provides Update on the Fusion(TM) Clinical Program | Dow Jones Institutional News |
| 9/7/2017 | 7:52 AM | 9/7/2017 | Celgene Shares Drop 1% On News That FDA Has Placed Six Trials On Partial Or Full Clinical Hold -- MarketWatch | Dow Jones Institutional News |
| 9/12/2017 | 1:34 PM | 9/12/2017 | Hot Research: Celgene Launch to Lift BeiGene -- Barrons.com | Dow Jones Institutional News |
| 9/13/2017 | 8:00 AM | 9/13/2017 | bluebird bio Files 8K - Regulation FD >BLUE | Dow Jones Institutional News |
| 9/13/2017 | 2:56 PM | 9/13/2017 | Celgene's (CELG) CEO Mark Alles Presents at Morgan Stanley Global Healthcare Unplugged Brokers Conference (Transcript) >CELG | Dow Jones Institutional News |
| 9/14/2017 | 6:05 PM | 9/15/2017 | Celgene (CELG) Presents at Bank of America Merrill Lynch Global Healthcare Broker Conference (Transcript) >CELG | Dow Jones Institutional News |
| 9/15/2017 | 7:58 AM | 9/15/2017 | Celgene Initiated at Top Pick by RBC Capital | Dow Jones Institutional News |
| 9/19/2017 | 7:00 AM | 9/19/2017 | Acceleron Pharma Files 8K - Entry Into Definitive Agreement >XLRN | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|-------------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 9/26/2017 | 1:19 PM | 9/26/2017 | Celgene's Management Presents at Cantor Fitzgerald 3rd Annual Healthcare Conference Transcript >CELG | Dow Jones Institutional News |
| 9/28/2017 | 9:00 AM | 9/28/2017 | BeiGene Presents Preliminary Phase 1 Data for BGB-A317 in Chinese Patients with Advanced Tumors at the 20th Annual Meeting of CSCO | GlobeNewswire |
| 9/28/2017 | 4:05 PM | 9/29/2017 | Press Release: bluebird bio Announces First Patient Treated with Second Anti-BCMA CAR T bb21217 in CRB-402 Phase 1 Study in Patients w... | Dow Jones Institutional News |
| 9/29/2017 | 5:50 AM | 9/29/2017 | Celgene Investments in Acceleron, BeiGene -- Barrons.com | Dow Jones Institutional News |
| 10/5/2017 | 8:16 AM | 10/5/2017 | Morning Movers: Constellation Brands Jumps, Biogen Bounces, Celgene Slips -- Barron's Blog | Dow Jones Institutional News |
| 10/10/2017 | 1:30 AM | 10/10/2017 | PRESS RELEASE: EVOTEC ACHIEVES FIRST MILESTONE IN NEURODEGENERATION ALLIANCE WITH CELGENE | Dow Jones Institutional News |
| 10/10/2017 | 1:58 AM | 10/10/2017 | Press Release: Evotec Achieves First Milestone in Neurodegeneration Alliance with Celgene | Dow Jones Institutional News |
| 10/10/2017 | 9:45 AM | 10/10/2017 | Strategic Research Analysis SHY Positioning to Benefit on Abbott, Rite Aid, Kroger, Celgene, Twitter, and NIKE SHY Effects of Key Drive... | GlobeNewswire |
| 10/13/2017 | 1:12 PM | 10/13/2017 | Celgene Is Maintained at Equal-Weight by Barclays | Dow Jones Institutional News |
| 10/17/2017 | 8:28 AM | 10/17/2017 | Celgene Initiated at Outperform by Bernstein | Dow Jones Institutional News |
| 10/17/2017 | 12:48 PM | 10/17/2017 | Celgene Is Maintained at Outperform by BMO Capital | Dow Jones Institutional News |
| 10/19/2017 | 7:30 AM | 10/19/2017 | Press Release: Phase III Efficacy and Safety Data for Oral Ozanimod in Relapsing Multiple Sclerosis to Be Presented at MSParis2017 -- 7th... | Dow Jones Institutional News |
| 10/19/2017 | 4:29 PM | 10/20/2017 | Celgene Corp. (CELG) Halted due to pending news | Dow Jones Institutional News |
| 10/19/2017 | 4:30 PM | 10/20/2017 | Press Release: Celgene Provides Update on GED-0301 (mongersen) Inflammatory Bowel Disease Program | Dow Jones Institutional News |
| 10/19/2017 | 4:55 PM | 10/20/2017 | Celgene Corp. (CELG) Paused (quotes only) due to news pending | Dow Jones Institutional News |
| 10/19/2017 | 5:00 PM | 10/20/2017 | Celgene Corp. (CELG) Resumed Trading | Dow Jones Institutional News |
| 10/19/2017 | 5:13 PM | 10/20/2017 | Celgene Shares Drop After Crohn's Disease Drug Trials Halted -- MarketWatch | Dow Jones Institutional News |
| 10/19/2017 | 5:16 PM | 10/20/2017 | Celgene Files 8K - Exits Or Disposals >CELG | Dow Jones Institutional News |
| 10/19/2017 | 5:52 PM | 10/20/2017 | Celgene shares drop after Crohn's disease drug trials halted | Dow Jones Newswires Chinese (English) |
| 10/19/2017 | 6:44 PM | 10/20/2017 | Celgene Halts Crohn's Disease Drug Trials | Dow Jones Institutional News |
| 10/20/2017 | 7:29 AM | 10/20/2017 | Celgene Downgraded To Neutral At Baird For 'increasing Risks To Long-term Goals' -- MarketWatch | Dow Jones Institutional News |
| 10/20/2017 | 8:32 AM | 10/20/2017 | Morning Movers: GE Slumps, Procter & Gamble Slips, Celgene Sinks -- Barron's Blog | Dow Jones Institutional News |
| 10/20/2017 | 9:27 AM | 10/20/2017 | Celgene downgraded to neutral at Baird for 'increasing risks to long-term goals&am | Dow Jones Newswires Chinese (English) |
| 10/20/2017 | 9:36 AM | 10/20/2017 | Celgene Falls on Crohn's Drug Failure -- Market Talk | Dow Jones Institutional News |
| 10/20/2017 | 9:36 AM | 10/20/2017 | Celgene Falls on Crohn's Drug Failure -- Market Talk | Dow Jones Institutional News |
| 10/20/2017 | 9:53 AM | 10/20/2017 | Ford's Self-driving Technology Subsidiary Hires 300 -- Market Talk | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|------------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 10/20/2017 | 10:41 AM | 10/20/2017 | Celgene Is Maintained at Buy by UBS | Dow Jones Institutional News |
| 10/20/2017 | 10:55 AM | 10/20/2017 | Celgene: No Surprise? It's 10% Drop Says Different. -- Barron's Blog | Dow Jones Institutional News |
| 10/20/2017 | 11:31 AM | 10/20/2017 | Update: Celgene Downgraded To Neutral At Baird For 'increasing Risks To Long-term Goals' -- MarketWatch | Dow Jones Institutional News |
| 10/20/2017 | 1:08 PM | 10/20/2017 | Celgene Is Maintained at Equal-Weight by Barclays | Dow Jones Institutional News |
| 10/20/2017 | 4:47 PM | 10/23/2017 | The Biggest Loser: Does Celgene Neet to Pipe Up? -- Barron's Blog | Dow Jones Institutional News |
| 10/22/2017 | 3:40 AM | 10/23/2017 | DJ Celgene Corporation, Inst Holders, 3Q 2017 (CELG) | Dow Jones Institutional News |
| 10/23/2017 | 7:34 AM | 10/23/2017 | Celgene Coverage Assumed by PiperJaffray at Neutral vs Previous Rating of Overweight | Dow Jones Institutional News |
| 10/23/2017 | 10:28 AM | 10/23/2017 | Celgene Is Maintained at Underweight by Morgan Stanley | Dow Jones Institutional News |
| 10/24/2017 | 9:31 AM | 10/24/2017 | Celgene Initiated at Buy by Guggenheim | Dow Jones Institutional News |
| 10/26/2017 | 7:49 AM | 10/26/2017 | Celgene Shares Drop 11% On Updated 2017 Guidance -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 8:33 AM | 10/26/2017 | Update: Celgene Shares Drop 15% On Updated 2017 Guidance -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 9:46 AM | 10/26/2017 | Celgene: Otezla Hurt By Restrictive PBM Controls -- Market Talk | Dow Jones Institutional News |
| 10/26/2017 | 9:46 AM | 10/26/2017 | Celgene: Otezla Hurt By Restrictive PBM Controls -- Market Talk | Dow Jones Institutional News |
| 10/26/2017 | 9:53 AM | 10/26/2017 | Biotech ETFs Tumble, With Celgene's Stock Headlining Weakness -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 10:09 AM | 10/26/2017 | Celgene Shares Fall as Outlook Dims | Dow Jones Institutional News |
| 10/26/2017 | 10:21 AM | 10/26/2017 | Update: Celgene Shares Drop 15% On Updated 2017 Guidance -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 10:24 AM | 10/26/2017 | Update: Biotech ETFs Tumble, With Celgene's Stock Headlining Weakness -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 10:30 AM | 10/26/2017 | Celgene Shares Plummet on Bleaker Outlook for New Drugs | Dow Jones Institutional News |
| 10/26/2017 | 11:02 AM | 10/26/2017 | Celgene's Health Scare Is a Wake Up Call for Biotechs - Heard on the Street | Dow Jones Institutional News |
| 10/26/2017 | 11:12 AM | 10/26/2017 | Moody's: Celgene's Slowing Otezla Growth Is Credit Negative | Dow Jones Institutional News |
| 10/26/2017 | 11:19 AM | 10/26/2017 | Celgene's Big Plunge Drags Down Biotech Shares | Dow Jones Institutional News |
| 10/26/2017 | 2:16 PM | 10/26/2017 | Celgene Q3 2017 Results -- Earnings Call Transcript >CELG | Dow Jones Institutional News |
| 10/26/2017 | 3:22 PM | 10/26/2017 | *S&PGRBulletin: Celgene Rtgs Unfctd By Reduced Guidance | Dow Jones Institutional News |
| 10/26/2017 | 3:55 PM | 10/26/2017 | Celgene: Short Sellers Stand Tall -- Barron's Blog | Dow Jones Institutional News |
| 10/26/2017 | 4:38 PM | 10/27/2017 | Update: Dow, S&P 500 Close Higher; Biotech Weakness Pressures Nasdaq -- MarketWatch | Dow Jones Institutional News |
| 10/26/2017 | 4:54 PM | 10/27/2017 | The Biggest Loser: Celgene Selloff is Worst in Years -- Barron's Blog | Dow Jones Institutional News |
| 10/27/2017 | 2:32 AM | 10/27/2017 | Celgene's Plunge Sickens Biotech Sector -- WSJ | Dow Jones Institutional News |
| 10/27/2017 | 12:06 PM | 10/27/2017 | Celgene Is Maintained at Equal-Weight by Barclays | Dow Jones Institutional News |
| 10/27/2017 | 1:42 PM | 10/27/2017 | Celgene Is Maintained at Outperform by BMO Capital | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|-----------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 10/27/2017 | 2:28 PM | 10/27/2017 | Celgene Is Maintained at Buy by Canaccord Genuity | Dow Jones Institutional News |
| 10/27/2017 | 4:12 PM | 10/30/2017 | Celgene Is Maintained at Buy by UBS | Dow Jones Institutional News |
| 10/30/2017 | 6:52 AM | 10/30/2017 | Press Release: Lannett And Celgene Enter Into Settlement And License Agreement Related To Thalomid(R) | Dow Jones Institutional News |
| 10/30/2017 | 11:33 AM | 10/30/2017 | Celgene Is Maintained at Outperform by Oppenheimer | Dow Jones Institutional News |
| 10/31/2017 | 9:00 AM | 10/31/2017 | Press Release: Celgene Announces Offering of Senior Unsecured Notes | Dow Jones Institutional News |
| 10/31/2017 | 10:16 AM | 10/31/2017 | Moody's Assigns Baa2 To Celgene's Notes; Stable Outlook | Dow Jones Institutional News |
| 10/31/2017 | 12:31 PM | 10/31/2017 | *S&PGR Rates Celgene Corp. Senior Unsecured Notes 'BBB+' | Dow Jones Institutional News |
| 11/1/2017 | 7:30 AM | 11/1/2017 | Press Release: Celgene Prices $3 Billion of Senior Unsecured Notes | Dow Jones Institutional News |
| 11/4/2017 | 3:34 AM | 11/6/2017 | DJ Celgene Corporation, Inst Holders, 3Q 2017 (CELG) | Dow Jones Institutional News |
| 11/13/2017 | 4:05 PM | 11/14/2017 | BeiGene Reports Third Quarter 2017 Financial Results | GlobeNewswire |
| 11/14/2017 | 7:56 PM | 11/15/2017 | Celgene (CELG) Presents at 2017 Stifel Healthcare Conference (Transcript) >CELG | Dow Jones Institutional News |
| 11/16/2017 | 8:30 AM | 11/16/2017 | *Celgene Corporation And Bluebird Bio Announce Bb2121 Anti-BCMA CAR-T Cell Therapy Has Been Granted Breakthrough Therapy Designation From ... | Dow Jones Institutional News |
| 11/17/2017 | 9:39 AM | 11/17/2017 | Celgene Is Maintained at Outperform by BMO Capital | Dow Jones Institutional News |
| 11/30/2017 | 5:04 PM | 12/1/2017 | Celgene (CELG) Presents at Evercore ISI Biopharma Catalyst/Deep Dive Conference (Transcript) >CELG | Dow Jones Institutional News |
| 12/5/2017 | 7:30 AM | 12/5/2017 | Press Release: Celgene Launches Celgene Cancer Care Links TM to Support Cancer Healthcare Capacity Building in Resource-Constrained... | Dow Jones Institutional News |
| 12/5/2017 | 8:30 AM | 12/5/2017 | Sarepta Therapeutics Elects Biopharmaceutical Veteran, Michael W. Bonney, to its Board of Directors | GlobeNewswire |
| 12/7/2017 | 11:45 AM | 12/7/2017 | Press Release: Long-Term Efficacy Data from the Phase III GeparSepto Study in High Risk Early Breast Cancer Patients Treated with ABRAXANE(R... | Dow Jones Institutional News |
| 12/8/2017 | 9:01 AM | 12/8/2017 | Morning Movers: United, Celgene Climb; Ciena Slips -- Barron's Blog | Dow Jones Institutional News |
| 12/11/2017 | 7:01 AM | 12/11/2017 | *Juno Therapeutics and Celgene Corp Release Additional Data From TRANSCEND Trial of JCAR017 in Patients With Relapsed or Refractory Aggr... | Dow Jones Institutional News |
| 12/13/2017 | 8:48 AM | 12/13/2017 | Celgene Initiated at Hold by Deutsche Bank | Dow Jones Institutional News |
| 12/21/2017 | 4:30 PM | 12/22/2017 | Press Release: Celgene and LYSARC Provide Update on Phase III 'RELEVANCE' Study of REVLIMID(R) in Combination with Rituximab (R2) for the Tr... | Dow Jones Institutional News |
| 12/21/2017 | 4:44 PM | 12/22/2017 | Celgene Stock Falls After Revlimid Cancer Study Fails -- MarketWatch | Dow Jones Institutional News |
| 12/21/2017 | 8:55 PM | 12/22/2017 | Barron's After-Hours: SMART Global Surges, SS&C Technologies Jumps, Celgene Falls -- Barron's Blog | Dow Jones Institutional News |
| 12/22/2017 | 11:18 AM | 12/22/2017 | Celgene: It's Not That Bad! -- Barron's Blog | Dow Jones Institutional News |
| 12/27/2017 | 12:01 PM | 12/27/2017 | Significant Setbacks: Why Celgene's No Longer the Biotech Outperformer It Once Was -- Barron's Blog | Dow Jones Institutional News |
| 12/27/2017 | 1:24 PM | 12/27/2017 | Celgene: Two Small-Cap Biotech Stocks It's Selling -- Barrons.com | Dow Jones Institutional News |
| 12/27/2017 | 1:32 PM | 12/27/2017 | Celgene Shares Slide 2% After Bernstein Downgrade -- MarketWatch | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|---|---|---|---|---|
| **(1)** | **(2)** | **(3)** | **(4)** | **(5)** |
| 1/3/2018 | 7:30 AM | 1/3/2018 | Press Release: Celgene Corporation to Announce Fourth Quarter and Full-Year 2017 Results on January 25, 2018 | Dow Jones Institutional News |
| 1/4/2018 | 8:00 PM | 1/5/2018 | *Former Receptos Executives Launch Gossamer Bio, Inc., a New Biopharma Co | Dow Jones Institutional News |
| 1/5/2018 | 9:02 AM | 1/5/2018 | Morning Movers: Lowe's, Target Gain; Celgene Slips -- Barron's Blog | Dow Jones Institutional News |
| 1/7/2018 | 2:32 PM | 1/8/2018 | *Celgene Nears Deal to Buy Impact Biomedicines for as Much as $7 Billion -- Sources | Dow Jones Institutional News |
| 1/7/2018 | 4:35 PM | 1/8/2018 | Celgene Nears Deal to Buy Impact Biomedicines, Sources Say -- Update | Dow Jones Institutional News |
| 1/7/2018 | 6:00 PM | 1/8/2018 | *Celgene To Acquire Impact Biomedicines, Adding Fedratinib To Its Pipeline Of Novel Therapies For Hematologic Malignancies >CELG | Dow Jones Institutional News |
| 1/7/2018 | 7:13 PM | 1/8/2018 | Celgene to Buy Impact Biomedicines | Dow Jones Institutional News |
| 1/7/2018 | 8:13 PM | 1/8/2018 | Celgene to Buy Impact Biomedicines | Dow Jones Newswires Chinese (English) |
| 1/7/2018 | 9:00 PM | 1/8/2018 | News Highlights: Top Company News of the Day | Dow Jones Institutional News |
| 1/8/2018 | 2:32 AM | 1/8/2018 | Celgene to Make $7 Billion Acquisition -- WSJ | Dow Jones Institutional News |
| 1/8/2018 | 3:00 AM | 1/8/2018 | News Highlights: Top Company News of the Day | Dow Jones Institutional News |
| 1/8/2018 | 5:00 AM | 1/8/2018 | News Highlights: Top Company News of the Day | Dow Jones Institutional News |
| 1/8/2018 | 7:00 AM | 1/8/2018 | News Highlights: Top Company News of the Day | Dow Jones Institutional News |
| 1/8/2018 | 9:02 AM | 1/8/2018 | Morning Movers: Celgene, Kohl's Climb; Snap Slips -- Barron's Blog | Dow Jones Institutional News |
| 1/8/2018 | 10:21 AM | 1/8/2018 | *S&PGRBulletin: Celgene Corp. Rtgs Unaffected By Acq. Plan | Dow Jones Institutional News |
| 1/8/2018 | 10:35 AM | 1/8/2018 | Press Release: Celgene Corporation Announces Preliminary 2017 Unaudited Results and 2018 Financial Guidance | Dow Jones Institutional News |
| 1/8/2018 | 11:31 AM | 1/8/2018 | Celgene Slumps Yet Again, This Time on Biomedicines Deal -- Barron's Blog | Dow Jones Institutional News |
| 1/8/2018 | 11:37 AM | 1/8/2018 | Celgene's Acquisition Of Impact Biosciences Credit Positive | Dow Jones Institutional News |
| 1/8/2018 | 11:41 AM | 1/8/2018 | Health-care ETF Tumbles As Biotechnology Stocks Weigh -- MarketWatch | Dow Jones Institutional News |
| 1/8/2018 | 12:29 PM | 1/8/2018 | Celgene's Stock Falls After It Experienced 'choppy Weather' In 2017 And Provided A Downbeat Outlook -- MarketWatch | Dow Jones Institutional News |
| 1/8/2018 | 1:13 PM | 1/8/2018 | Celgene Can't Cure the Biotech Blues -- Heard on the Street | Dow Jones Institutional News |
| 1/8/2018 | 2:54 PM | 1/8/2018 | Celgene (CELG) CEO Mark Alles Presents at 36th Annual JPMorgan Healthcare Brokers Conference (Transcript) >CELG | Dow Jones Institutional News |
| 1/9/2018 | 2:32 AM | 1/9/2018 | Heard on the Street: Celgene's Plans Can't Cure the Biotech Blues -- WSJ | Dow Jones Institutional News |
| 1/16/2018 | 4:51 PM | 1/17/2018 | Celgene In Talks To Buy Juno Therapeutics: Report -- MarketWatch | Dow Jones Institutional News |
| 1/16/2018 | 5:02 PM | 1/17/2018 | Celgene in Talks to Buy Juno Therapeutics | Dow Jones Institutional News |
| 1/16/2018 | 5:18 PM | 1/17/2018 | Celgene in Talks to Buy Juno Therapeutics -- Update | Dow Jones Institutional News |
| 1/16/2018 | 5:20 PM | 1/17/2018 | Celgene in Talks to Buy Juno Therapeutics | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|-------------------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 1/16/2018 | 5:22 PM | 1/17/2018 | Celgene in Talks to Buy Juno Therapeutics | Dow Jones Newswires Chinese (English) |
| 1/17/2018 | 2:32 AM | 1/17/2018 | Celgene Conducts Deal Talks With Juno -- WSJ | Dow Jones Institutional News |
| 1/17/2018 | 10:09 AM | 1/17/2018 | Celgene 's Big Spending Ways Met With Skepticism -- Market Talk | Dow Jones Institutional News |
| 1/17/2018 | 10:09 AM | 1/17/2018 | Celgene's Big Spending Ways Met With Skepticism -- Market Talk | Dow Jones Institutional News |
| 1/17/2018 | 12:03 PM | 1/17/2018 | Celgene Can't Put Away Its Wallet Yet -- Heard on the Street | Dow Jones Institutional News |
| 1/19/2018 | 5:30 PM | 1/22/2018 | Press Release: Investigational Data Presented at ASCO GI Evaluate ABRAXANE(R) Regimen for Patients with Locally Advanced Pancreatic Cancer | Dow Jones Institutional News |
| 1/22/2018 | 3:36 AM | 1/22/2018 | DJ Celgene Corporation, Inst Holders, 4Q 2017 (CELG) | Dow Jones Institutional News |
| 1/22/2018 | 6:30 AM | 1/22/2018 | *Celgene Corporation To Acquire Juno Therapeutics, Inc., Advancing Global Leadership In Cellular Immunotherapy >CELG JUNO | Dow Jones Institutional News |
| 1/22/2018 | 6:31 AM | 1/22/2018 | Celgene Corp to Buy Juno Therapeutics For $87 A Share >CELG JUNO | Dow Jones Newswires Chinese (English) |
| 1/22/2018 | 7:00 AM | 1/22/2018 | Celgene To Acquire Juno Therapeutics For $9 Billion, Or $87 A Share -- MarketWatch | Dow Jones Institutional News |
| 1/22/2018 | 7:11 AM | 1/22/2018 | Celgene to Buy Juno Therapeutics For $9 Billion >CELG JUNO | Dow Jones Newswires Chinese (English) |
| 1/22/2018 | 7:29 AM | 1/22/2018 | Celgene to Buy Juno Therapeutics for $9 Billion -- Update | Dow Jones Institutional News |
| 1/22/2018 | 8:00 AM | 1/22/2018 | Celgene to Buy Juno Therapeutics for $9 Billion | Dow Jones Institutional News |
| 1/22/2018 | 9:13 AM | 1/22/2018 | Morning Movers: Juno Soars on Celgene Takeout; GE Slumps on Merrill Cut -- Barron's Blog | Dow Jones Institutional News |
| 1/22/2018 | 10:49 AM | 1/22/2018 | Celgene to Buy Juno Therapeutics for $9 Billion -- 2nd Update | Dow Jones Institutional News |
| 1/22/2018 | 11:12 AM | 1/22/2018 | Moody's Affirms Celgene At Baa2; Stable Outlook | Dow Jones Institutional News |
| 1/22/2018 | 11:51 AM | 1/22/2018 | Press Release: ALERT: Rowley Law PLLC is Investigating Proposed Acquisition of Juno Therapeutics, Inc. | Dow Jones Institutional News |
| 1/22/2018 | 12:03 PM | 1/22/2018 | *Celgene, Juno Merger Pact Includes Termination Fee of $300 Million Payable by Juno | Dow Jones Institutional News |
| 1/22/2018 | 12:09 PM | 1/22/2018 | Celgene, Juno Merger Pact Also Includes Reverse Termination Fee of $600 Million Payable by Celgene | Dow Jones Newswires Chinese (English) |
| 1/22/2018 | 1:00 PM | 1/22/2018 | News Highlights: Top Company News of the Day | Dow Jones Institutional News |
| 1/22/2018 | 1:45 PM | 1/22/2018 | *S&PGR Affirms Celgene Corp. 'BBB+' Rating; Outlook Stable | Dow Jones Institutional News |
| 1/23/2018 | 10:04 AM | 1/23/2018 | Cynata Executes MoU for Commercial Evaluation with Celularity, Inc. | GlobeNewswire |
| 1/24/2018 | 12:40 PM | 1/24/2018 | Press Release: WeissLaw LLP Investigates Juno Therapeutics Inc. Acquisition | Dow Jones Institutional News |
| 1/25/2018 | 7:30 AM | 1/25/2018 | *Celgene 4Q Loss/Shr 10c >CELG | Dow Jones Institutional News |
| 1/25/2018 | 7:53 AM | 1/25/2018 | Celgene's Stock Gains After Profit Beats Expectations -- MarketWatch | Dow Jones Institutional News |
| 1/25/2018 | 8:10 AM | 1/25/2018 | Celgene Sales Fueled by Domestic Growth -- Earnings Review | Dow Jones Institutional News |
| 1/25/2018 | 9:40 AM | 1/25/2018 | Higher Prices Helped Drive Celgene's 4Q Sales Growth -- Market Talk | Dow Jones Institutional News |
| 1/25/2018 | 9:40 AM | 1/25/2018 | Higher Prices Helped Drive Celgene's 4Q Sales Growth -- Market Talk | Dow Jones Institutional News |

Page 10 of 13

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|------|------|----------|----------|--------|
| (1) | (2) | (3) | (4) | (5) |
| 1/25/2018 | 10:02 AM | 1/25/2018 | Celgene Has Plans For Tax Overhaul Cash -- Market Talk | Dow Jones Institutional News |
| 1/25/2018 | 10:02 AM | 1/25/2018 | Celgene Has Plans For Tax Overhaul Cash -- Market Talk | Dow Jones Institutional News |
| 1/25/2018 | 6:23 PM | 1/26/2018 | Celgene's CEO Mark Alles on Q4 2017 Results -- Earnings Call Transcript >CELG | Dow Jones Institutional News |
| 1/29/2018 | 10:54 AM | 1/29/2018 | Press Release: Celgene Announces Retirement of Executive Chairman Bob Hugin and Appointment of CEO Mark Alles as Chairman of the Board of Directors | Dow Jones Institutional News |
| 1/29/2018 | 11:05 AM | 1/29/2018 | Celgene Chairman To Retire After 2 Years In The Role -- MarketWatch | Dow Jones Institutional News |
| 1/29/2018 | 11:12 AM | 1/29/2018 | Celgene Names CEO Mark Alles as Chairman | Dow Jones Institutional News |
| 1/29/2018 | 12:01 PM | 1/29/2018 | Celgene Files 8K - Director, Officer or Compensation Filing >CELG | Dow Jones Institutional News |
| 1/29/2018 | 12:25 PM | 1/29/2018 | Celgene Names CEO Mark Alles as Chairman | Dow Jones Newswires Chinese (English) |
| 1/31/2018 | 1:29 PM | 1/31/2018 | Bayer Buys More Crispr Stock After Celgene Sells -- Barrons.com | Dow Jones Institutional News |
| 2/2/2018 | 7:30 AM | 2/2/2018 | Press Release: Celgene Corporation Commences Tender Offer for Juno Therapeutics, Inc. | Dow Jones Institutional News |
| 2/5/2018 | 6:00 PM | 2/6/2018 | BeiGene Announces Commercial Availability of VIDAZA(R) (Azacitidine for Injection) in China | GlobeNewswire |
| 2/6/2018 | 7:30 AM | 2/6/2018 | Press Release: Celgene Corporation Announces Positive Results from the Pivotal Phase III 'OPTIMISMM' Study of POMALYST/IMNOVID(R) for the Tr... | Dow Jones Institutional News |
| 2/8/2018 | 8:55 AM | 2/8/2018 | Press Release: Celgene Announces Offering of Senior Unsecured Notes | Dow Jones Institutional News |
| 2/8/2018 | 10:54 AM | 2/8/2018 | *S&PGR Rates Celgene Corp. Sr Unsec Notes 'BBB+' | Dow Jones Institutional News |
| 2/8/2018 | 12:16 PM | 2/8/2018 | Moody's Rates Celgene's Notes Baa2; Stable Outlook | Dow Jones Institutional News |
| 2/9/2018 | 7:30 AM | 2/9/2018 | Press Release: Celgene Prices $4.5 Billion of Senior Unsecured Notes | Dow Jones Institutional News |
| 2/14/2018 | 7:30 AM | 2/14/2018 | *Celgene Announces Additional $5 Billion Share Repurchase Authorization >CELG | Dow Jones Institutional News |
| 2/14/2018 | 7:37 AM | 2/14/2018 | Celgene Announces Additional $5 Billion Share Buyback Program -- MarketWatch | Dow Jones Institutional News |
| 2/15/2018 | 7:30 AM | 2/15/2018 | Press Release: Celgene Corporation Elects John Weiland to Its Board of Directors | Dow Jones Institutional News |
| 2/15/2018 | 8:27 AM | 2/15/2018 | Celgene Files 8K - Director, Officer or Compensation Filing >CELG | Dow Jones Institutional News |
| 2/15/2018 | 9:30 AM | 2/15/2018 | Press Release: OTEZLA(R) (Apremilast) Phase II Data Showed Clinically Meaningful Improvements in Patients with Active Ulcerative Colitis | Dow Jones Institutional News |
| 2/20/2018 | 7:00 AM | 2/20/2018 | Amunix announces XTEN(R) and ProTIA technology licensing agreement with Celgene | GlobeNewswire |
| 2/21/2018 | 7:30 AM | 2/21/2018 | Press Release: Celgene Receives Antitrust Clearance for Juno Acquisition | Dow Jones Institutional News |
| 2/27/2018 | 7:30 AM | 2/27/2018 | Press Release: Celgene Corporation to Webcast at Upcoming Investor Conferences | Dow Jones Institutional News |
| 2/27/2018 | 4:30 PM | 2/28/2018 | Press Release: Celgene Provides Regulatory Update on Ozanimod for the Treatment of Relapsing Multiple | Dow Jones Institutional News |
| 2/27/2018 | 4:48 PM | 2/28/2018 | FDA Rejects Celgene Multiple-sclerosis Drug -- Market Talk | Dow Jones Institutional News |
| 2/27/2018 | 4:48 PM | 2/28/2018 | FDA Rejects Celgene Multiple-sclerosis Drug -- Market Talk | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date (1) | Time (2) | Effective Date[2] (3) | Headline (4) | Source (5) |
|---|---|---|---|---|
| 2/27/2018 | 4:58 PM | 2/28/2018 | Celgene Shares Drop After FDA Refuses Multiple Sclerosis Drug Application -- MarketWatch | Dow Jones Institutional News |
| 2/27/2018 | 6:00 PM | 2/28/2018 | BeiGene Announces Approval of REVLIMID(R) for Newly Diagnosed Multiple Myeloma in China | GlobeNewswire |
| 2/28/2018 | 10:30 AM | 2/28/2018 | Celgene Is Maintained at Outperform by Credit Suisse | Dow Jones Institutional News |
| 2/28/2018 | 11:14 AM | 2/28/2018 | Celgene Is Maintained at Buy by Stifel Nicolaus | Dow Jones Institutional News |
| 2/28/2018 | 11:49 AM | 2/28/2018 | Celgene Is Maintained at Outperform by BMO Capital | Dow Jones Institutional News |
| 2/28/2018 | 12:11 PM | 2/28/2018 | Analysts Guess At Reason For Celgene Drug Rejection -- Market Talk | Dow Jones Institutional News |
| 2/28/2018 | 12:11 PM | 2/28/2018 | Analysts Guess At Reason For Celgene Drug Rejection -- Market Talk | Dow Jones Institutional News |
| 2/28/2018 | 12:15 PM | 2/28/2018 | Biotech ETFs Fall, Led By Celgene -- MarketWatch | Dow Jones Institutional News |
| 2/28/2018 | 1:24 PM | 2/28/2018 | Selling Celgene, Buying Time Warner, AT&T -- Barrons.com | Dow Jones Institutional News |
| 2/28/2018 | 4:05 PM | 3/1/2018 | BeiGene Reports Fourth Quarter and Full Year 2017 Financial Results | GlobeNewswire |
| 3/1/2018 | 5:30 AM | 3/1/2018 | Can Celgene Save Itself? -- Heard on the Street | Dow Jones Institutional News |
| 3/2/2018 | 2:32 AM | 3/2/2018 | Heard on the Street: Celgene's Missteps Becoming Too Frequent for Investors -- WSJ | Dow Jones Institutional News |
| 3/5/2018 | 7:30 AM | 3/5/2018 | Press Release: Celgene Announces Expiration of Cash Tender Offer for Shares of Juno Therapeutics, Inc. | Dow Jones Institutional News |
| 3/6/2018 | 7:30 AM | 3/6/2018 | *Celgene Completes Acquisition Of Juno Therapeutics, Inc., Advancing Global Leadership In Cellular Immunotherapy >CELG | Dow Jones Institutional News |
| 3/6/2018 | 8:00 AM | 3/6/2018 | Celgene Files 8K - Asset Acquisition Or Disposition >CELG | Dow Jones Institutional News |
| 3/16/2018 | 10:26 PM | 3/19/2018 | Celgene's (CELG) Management Presents at Barclays Global Healthcare Conference Call (Transcript) >CELG | Dow Jones Institutional News |
| 3/20/2018 | 2:51 PM | 3/20/2018 | Press Release: Lifshitz & Miller LLP Announces Investigation of Atlas Financial Holdings, Inc., Bellicum Pharmaceuticals, Inc., Celgene Corporation, Foot Locker, Inc., Kraton Corporation, Riot Blockchain, Inc., and Ulta Beauty, Inc. | Dow Jones Institutional News |
| 3/20/2018 | 4:05 PM | 3/21/2018 | Press Release: Prothena Announces Global Neuroscience Research & Development Collaboration with Celgene for Novel Therapies for Patients... | Dow Jones Institutional News |
| 3/20/2018 | 4:05 PM | 3/21/2018 | Press Release: Prothena Announces Global Neuroscience Research & Development Collaboration with Celgene for Novel Therapies for Patients... | Dow Jones Institutional News |
| 3/20/2018 | 4:05 PM | 3/21/2018 | Prothena Announces Global Neuroscience Research & Development Collaboration with Celgene for Novel Therapies for Patients with... | GlobeNewswire |
| 3/20/2018 | 5:19 PM | 3/21/2018 | Prothena Shares Surge On Celgene Collaboration -- MarketWatch | Dow Jones Institutional News |
| 3/20/2018 | 5:45 PM | 3/21/2018 | Prothena shares surge on Celgene collaboration | Dow Jones Newswires Chinese (English) |
| 3/26/2018 | 9:40 AM | 3/26/2018 | Celgene Shares Rise On Expectation Of Revlimid Patent Settlement -- MarketWatch | Dow Jones Institutional News |
| 3/28/2018 | 8:01 AM | 3/28/2018 | *Bluebird Bio and Celgene Corp Enter Into Agreement to Co-Develop and Co-Promote Anti-BCMA CAR T Cell Therapy Bb2121 in U.S. | Dow Jones Institutional News |
| 3/28/2018 | 8:19 AM | 3/28/2018 | Bluebird Bio's Stock Surges After Celgene Co-development And Promotion Agreement -- MarketWatch | Dow Jones Institutional News |

**Exhibit 2**
**Celgene Corporation**
**Materials Considered**
**List of Stories from Factiva Dow Jones used in Exhibits 8a, 8c, and 8d**
**April 27, 2017 to April 27, 2018[1]**

| Date | Time | Effective Date[2] | Headline | Source |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 3/28/2018 | 8:48 AM | 3/28/2018 | Bluebird Bio's Stock Surges After Celgene Co-development And Promotion Agreement - | Dow Jones Newswires Chinese (English) |
| 3/28/2018 | 10:10 AM | 3/28/2018 | Nasdaq Turns Positive, Lifted By Facebook And Biotech Stocks -- MarketWatch | Dow Jones Institutional News |
| 3/30/2018 | 10:50 PM | 4/2/2018 | CELGENE SHAREHOLDER ALERT BY FORMER LOUISIANA ATTORNEY GENERAL: KAHN SWICK & FOTI, LLC REMINDS INVESTORS WITH LOSSES IN EXCESS OF $100... | GlobeNewswire |
| 4/2/2018 | 2:53 PM | 4/2/2018 | SHAREHOLDER ALERT: Brower Piven Notifies Investors of Class Action Lawsuit And Encourages Those Who Have Losses In Excess Of $100,000 From I... | GlobeNewswire |
| 4/2/2018 | 4:31 PM | 4/3/2018 | *Celgene Corporation Announces Departure Of President And Chief Operating Officer Scott A. Smith >CELG | Dow Jones Institutional News |
| 4/2/2018 | 4:57 PM | 4/3/2018 | Celgene Files 8K - Director, Officer or Compensation Filing >CELG | Dow Jones Institutional News |
| 4/2/2018 | 6:25 PM | 4/3/2018 | Celgene Shares Tick Lower As Operating Chief Leaves -- MarketWatch | Dow Jones Institutional News |
| 4/2/2018 | 6:33 PM | 4/3/2018 | Celgene shares tick lower as operating chief leaves | Dow Jones Newswires Chinese (English) |
| 4/3/2018 | 10:00 AM | 4/3/2018 | SHAREHOLDER ALERT - Bronstein, Gewirtz & Grossman, LLC Notifies Investors of Class Action Against Celgene Corporation (CELG) and Lead Plaintiff Deadline: May 29, 2018 | GlobeNewswire |
| 4/5/2018 | 2:02 PM | 4/5/2018 | Press Release: Long-Term Celgene (CELG) Investors: Johnson Fistel Investigates Celgene Corporation; Encourages Long-Term Investors to Contact the Firm | Dow Jones Institutional News |
| 4/6/2018 | 4:30 PM | 4/9/2018 | Hagens Berman Alerts Investors in Celgene Corporation to the May 29, 2018 Lead Plaintiff Deadline in the Pending Securities Class Actio... | GlobeNewswire |
| 4/9/2018 | 7:30 AM | 4/9/2018 | Press Release: Celgene Corporation to Announce First Quarter 2018 Results on May 04, 2018 | Dow Jones Institutional News |
| 4/13/2018 | 10:50 PM | 4/16/2018 | CELGENE SHAREHOLDER ALERT: CLAIMSFILER REMINDS INVESTORS WITH LOSSES IN EXCESS OF $100,000 of Lead Plaintiff Deadline in Class Action... | GlobeNewswire |
| 4/16/2018 | 3:09 PM | 4/16/2018 | SHAREHOLDER ALERT: Levi & Korsinsky, LLP Notifies Shareholders of Celgene Corporation of a Class Action Lawsuit and a Lead Plaintiff Deadline of May 29, 2018 -- CELG | GlobeNewswire |
| 4/19/2018 | 7:48 AM | 4/19/2018 | Press Release: Celgene Corporation Announces Changes to Its Board of Directors | Dow Jones Institutional News |
| 4/19/2018 | 4:03 PM | 4/20/2018 | Celgene Files 8K - Director, Officer or Compensation Filing >CELG | Dow Jones Institutional News |
| 4/22/2018 | 3:51 AM | 4/23/2018 | DJ Celgene Corporation, Inst Holders, 1Q 2018 (CELG) | Dow Jones Institutional News |
| 4/23/2018 | 4:05 PM | 4/24/2018 | Press Release: Zymeworks and Celgene Expand Bispecific Antibody Collaboration | Dow Jones Institutional News |
| 4/23/2018 | 5:00 PM | 4/24/2018 | CELG SHAREHOLDER ALERT: The Law Offices of Vincent Wong Notifies Investors of Commencement of a Class Action Involving Celgene Corporation a... | GlobeNewswire |

**Notes and Sources:**

News stories were obtained through a search for the company "Celgene Corporation" between April 27, 2017 to April 27, 2018. The search included news stories published by Dow Jones Newswires, searching headlines and lead paragraph only, excluding "Recurring pricing and market data" and "Obituaries, sports, calendars...."

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] On days when news came out after 4:00PM or when there was news on a non-trading day, the next trading day was considered the effective date.

**Exhibit 3**
**Celgene Corporation**
**Weekly Trading Volume as a Percent of Shares Outstanding**
**for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Week | First Trading Date of Week | Weekly Volume[2] | Shares Outstanding[3] | Percent of Shares Traded Weekly |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (3) / (4) |
| 1 | 4/27/2017 | 3,701,990 | 780,824,335 | 0.47 % |
| 2 | 5/1/2017 | 7,059,983 | 780,824,335 | 0.90 |
| 3 | 5/8/2017 | 8,560,173 | 780,824,335 | 1.10 |
| 4 | 5/15/2017 | 7,416,757 | 780,824,335 | 0.95 |
| 5 | 5/22/2017 | 8,644,960 | 780,824,335 | 1.11 |
| 6 | 5/30/2017 | 7,629,825 | 780,824,335 | 0.98 |
| 7 | 6/5/2017 | 7,880,346 | 780,824,335 | 1.01 |
| 8 | 6/12/2017 | 9,942,206 | 780,824,335 | 1.27 |
| 9 | 6/19/2017 | 17,950,952 | 780,824,335 | 2.30 |
| 10 | 6/26/2017 | 9,786,199 | 780,824,335 | 1.25 |
| 11 | 7/3/2017 | 5,290,801 | 780,824,335 | 0.68 |
| 12 | 7/10/2017 | 7,202,786 | 780,824,335 | 0.92 |
| 13 | 7/17/2017 | 7,027,430 | 781,129,602 | 0.90 |
| 14 | 7/24/2017 | 9,634,306 | 782,350,672 | 1.23 |
| 15 | 7/31/2017 | 7,408,349 | 782,350,672 | 0.95 |
| 16 | 8/7/2017 | 7,126,791 | 782,350,672 | 0.91 |
| 17 | 8/14/2017 | 7,391,825 | 782,350,672 | 0.94 |
| 18 | 8/21/2017 | 5,668,944 | 782,350,672 | 0.72 |
| 19 | 8/28/2017 | 8,741,367 | 782,350,672 | 1.12 |
| 20 | 9/5/2017 | 7,437,515 | 782,350,672 | 0.95 |
| 21 | 9/11/2017 | 7,624,734 | 782,350,672 | 0.97 |
| 22 | 9/18/2017 | 7,177,020 | 782,350,672 | 0.92 |
| 23 | 9/25/2017 | 7,724,945 | 782,350,672 | 0.99 |
| 24 | 10/2/2017 | 12,705,458 | 782,350,672 | 1.62 |
| 25 | 10/9/2017 | 9,610,239 | 782,350,672 | 1.23 |
| 26 | 10/16/2017 | 20,453,281 | 782,350,672 | 2.61 |
| 27 | 10/23/2017 | 53,039,667 | 787,316,931 | 6.74 |
| 28 | 10/30/2017 | 24,893,645 | 787,316,931 | 3.16 |
| 29 | 11/6/2017 | 16,425,079 | 787,316,931 | 2.09 |
| 30 | 11/13/2017 | 15,342,495 | 787,316,931 | 1.95 |
| 31 | 11/20/2017 | 8,988,959 | 787,316,931 | 1.14 |
| 32 | 11/27/2017 | 14,351,326 | 787,316,931 | 1.82 |
| 33 | 12/4/2017 | 11,277,143 | 787,316,931 | 1.43 |
| 34 | 12/11/2017 | 15,698,797 | 787,316,931 | 1.99 |
| 35 | 12/18/2017 | 13,444,823 | 787,316,931 | 1.71 |
| 36 | 12/26/2017 | 7,728,869 | 787,316,931 | 0.98 |
| 37 | 1/2/2018 | 12,083,807 | 787,316,931 | 1.53 |
| 38 | 1/8/2018 | 19,538,389 | 787,316,931 | 2.48 |
| 39 | 1/16/2018 | 16,069,172 | 787,316,931 | 2.04 |
| 40 | 1/22/2018 | 23,542,766 | 787,316,931 | 2.99 |

**Exhibit 3**
**Celgene Corporation**
**Weekly Trading Volume as a Percent of Shares Outstanding**
**for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Week | First Trading Date of Week | Weekly Volume[2] | Shares Outstanding[3] | Percent of Shares Traded Weekly |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (3) / (4) |
| 41 | 1/29/2018 | 15,338,231 | 780,288,666 | 1.97 % |
| 42 | 2/5/2018 | 21,385,447 | 752,175,608 | 2.84 |
| 43 | 2/12/2018 | 15,758,933 | 752,175,608 | 2.10 |
| 44 | 2/20/2018 | 7,960,846 | 752,175,608 | 1.06 |
| 45 | 2/26/2018 | 27,154,931 | 752,175,608 | 3.61 |
| 46 | 3/5/2018 | 14,585,765 | 752,175,608 | 1.94 |
| 47 | 3/12/2018 | 19,020,729 | 752,175,608 | 2.53 |
| 48 | 3/19/2018 | 17,949,982 | 752,175,608 | 2.39 |
| 49 | 3/26/2018 | 13,651,628 | 752,175,608 | 1.81 |
| 50 | 4/2/2018 | 17,666,139 | 752,175,608 | 2.35 |
| 51 | 4/9/2018 | 12,388,983 | 752,175,608 | 1.65 |
| 52 | 4/16/2018 | 9,994,980 | 741,837,870 | 1.35 |
| 53 | 4/23/2018 | 10,099,710 | 724,827,113 | 1.39 |
| **Average:[4]** | | 13,047,662 | 775,613,515 | 1.68 % |
| **Median:[4]** | | 10,047,345 | 782,350,672 | 1.37 % |

**Notes and Sources:**
Daily trading volume data obtained from Bloomberg L.P.
Shares outstanding data obtained from SEC filings.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] Daily trading volume is adjusted for the NASDAQ specialist rate, which is taken to be 54.76%. For more information, see Fernando Avalos and Marcia Kramer Mayer, "Dealer Participation on the New York Stock Exchange and Nasdaq," *NERA Working Paper,* May 2002.

[3] Shares outstanding figures are as of the most recent reported date.

[4] Calculated using weeks 2 through 53 only as they are wholly included in the Class Period. All weeks are weighted equally.

**Exhibit 4**
**Celgene Corporation**
**Analysts Contributing to**
**Quarterly I/B/E/S[1] Consensus Earnings Estimates**
**April 2017 to May 2018[2]**

| Estimate Date | Fiscal Quarter End | Earnings Announcement Date | Number of Analysts Submitting Quarterly Earnings Estimates to I/B/E/S[3] |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| 4/20/2017 | 03/2017 | 04/27/2017 | 23 |
| 5/18/2017 | 06/2017 | 07/27/2017 | 22 |
| 6/15/2017 | 06/2017 | 07/27/2017 | 23 |
| 7/20/2017 | 06/2017 | 07/27/2017 | 22 |
| 8/17/2017 | 09/2017 | 10/26/2017 | 23 |
| 9/14/2017 | 09/2017 | 10/26/2017 | 24 |
| 10/19/2017 | 09/2017 | 10/26/2017 | 25 |
| 11/16/2017 | 12/2017 | 01/25/2018 | 26 |
| 12/14/2017 | 12/2017 | 01/25/2018 | 27 |
| 1/18/2018 | 12/2017 | 01/25/2018 | 29 |
| 2/15/2018 | 03/2018 | 05/04/2018 | 23 |
| 3/15/2018 | 03/2018 | 05/04/2018 | 25 |
| 4/19/2018 | 03/2018 | 05/04/2018 | 26 |
| 5/17/2018 | 06/2018 | 07/26/2018 | 24 |

| | |
|---|---|
| **Average Number of Analyst Estimates:[4]** | 25 |
| **Median Number of Analyst Estimates:[4]** | 25 |

**Notes and Sources:**

Earnings dates and number of analyst estimates obtained from I/B/E/S Consensus
EPS Surprise History via FactSet Research Systems, Inc.

[1] Institutional Brokers' Estimate System.

[2] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the
Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[3] Number of analysts covering Celgene common stock.

[4] Calculated using earnings estimate data within the Class Period (observations from
May 18, 2017 to April 19, 2018). If data immediately before and after the Class
Period are used (April 20, 2017 and May 17, 2018), the average number of analyst
estimates is 24 and the median number of analyst estimates is 24.

**Exhibit 5**
**Celgene Corporation**
**Summary of Quarterly Institutional Holdings for Celgene Common Stock**
**March 31, 2017 to June 30, 2018[1]**

| As of Date<br>(1) | Number of<br>Institutional<br>Holders[2]<br>(2) | Total<br>Institutional<br>Holdings[3]<br>(3) | Shares<br>Outstanding[4]<br>(4) | Total<br>Institutional Holdings<br>As a Percent of<br>Shares Outstanding<br>(5)<br>(3) / (4) |
|---|---|---|---|---|
| 3/31/2017 | 1,849 | 629,336,506 | 777,966,471 | 80.90 % |
| 6/30/2017 | 1,895 | 640,016,108 | 780,824,335 | 81.97 |
| 9/30/2017 | 1,951 | 645,295,934 | 782,350,672 | 82.48 |
| 12/31/2017 | 1,926 | 607,693,120 | 787,316,931 | 77.19 |
| 3/31/2018 | 1,852 | 578,311,366 | 752,175,608 | 76.89 |
| 6/30/2018 | 1,817 | 539,698,620 | 724,827,113 | 74.46 |

| | |
|---|---|
| **Average Quarterly Holdings as a Percent of Shares Outstanding:[5]** | 79.63 % |

| | |
|---|---|
| **Median Quarterly Holdings as a Percent of Shares Outstanding:[5]** | 79.58 % |

**Notes and Sources:**

Institutional holdings data obtained from FactSet Research Systems, Inc.

Shares outstanding data obtained from SEC filings.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] Number of institutions that reported non-zero holdings during the quarter.

[3] Total calculated by summing individual institutional holdings figures from institutions that reported holdings.

[4] Daily shares outstanding figures are as of the most recent reported date.

[5] Calculated using institutional holdings data for periods wholly within the Class Period (observations from June 30, 2017 to March 31, 2018. If data immediately before and after the Class Period are used (March 31, 2017 and June 30, 2018), the average quarterly institutional holdings as a percent of shares outstanding is 78.98% and the median quarterly institutional holdings as a percent of shares outstanding is 79.04%.

**Exhibit 6**
**Celgene Corporation**
**Summary of Short Interest for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| As of Date<br>(1) | Short<br>Interest<br>(2) | Shares<br>Outstanding[2]<br>(3) | Short Interest<br>As a Percent of<br>Shares Outstanding<br>(4)<br>(2) / (3) |
|---|---|---|---|
| 4/13/2017 | 8,961,078 | 777,966,471 | 1.15 % |
| 4/28/2017 | 8,975,192 | 780,824,335 | 1.15 |
| 5/15/2017 | 9,362,628 | 780,824,335 | 1.20 |
| 5/31/2017 | 9,481,452 | 780,824,335 | 1.21 |
| 6/15/2017 | 10,022,677 | 780,824,335 | 1.28 |
| 6/30/2017 | 10,990,917 | 780,824,335 | 1.41 |
| 7/14/2017 | 10,220,037 | 780,824,335 | 1.31 |
| 7/31/2017 | 9,112,367 | 782,350,672 | 1.16 |
| 8/15/2017 | 8,562,271 | 782,350,672 | 1.09 |
| 8/31/2017 | 8,970,239 | 782,350,672 | 1.15 |
| 9/15/2017 | 10,133,194 | 782,350,672 | 1.30 |
| 9/29/2017 | 10,239,042 | 782,350,672 | 1.31 |
| 10/13/2017 | 10,159,327 | 782,350,672 | 1.30 |
| 10/31/2017 | 8,920,850 | 787,316,931 | 1.13 |
| 11/15/2017 | 12,302,389 | 787,316,931 | 1.56 |
| 11/30/2017 | 11,514,288 | 787,316,931 | 1.46 |
| 12/15/2017 | 13,477,756 | 787,316,931 | 1.71 |
| 12/29/2017 | 13,617,265 | 787,316,931 | 1.73 |
| 1/12/2018 | 13,038,301 | 787,316,931 | 1.66 |
| 1/31/2018 | 14,380,412 | 787,316,931 | 1.83 |
| 2/15/2018 | 16,628,423 | 752,175,608 | 2.21 |
| 2/28/2018 | 16,747,003 | 752,175,608 | 2.23 |
| 3/15/2018 | 16,732,433 | 752,175,608 | 2.22 |
| 3/29/2018 | 15,648,221 | 752,175,608 | 2.08 |
| 4/13/2018 | 15,654,690 | 752,175,608 | 2.08 |
| 4/30/2018 | 13,818,817 | 724,827,113 | 1.91 |

| | |
|---|---|
| **Average Short Interest as a Percent of Shares Outstanding:[3]** | 1.53 % |

| | |
|---|---|
| **Median Short Interest as a Percent of Shares Outstanding:[3]** | 1.36 % |

**Notes and Sources:**
Short interest data obtained from Bloomberg L.P.
Shares outstanding data obtained from SEC filings.
[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.
[2] Daily shares outstanding figures are as of the most recent reported date.

**Exhibit 6**
**Celgene Corporation**
**Summary of Short Interest for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

[3] Calculated using short interest data within the Class Period (observations from April 28, 2017 to April 13, 2018). If data immediately before and after the Class Period are used (April 13, 2017 and April 30, 2018), both the rounded average and rounded median as a percent of shares outstanding stay the same.

**Exhibit 7**
**Celgene Corporation**
**Daily Market Capitalization and Float for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Shares Outstanding[2] | Market Capitalization | Insider Holdings[3,4] | Float | Market Value of Float | Float as a Percent of Shares Outstanding |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | | | (2) × (3) | | (3) - (5) | (2) × (6) | (6) / (3) |
| 4/27/2017 | $ 123.97 | 780,824,335 | $  96,798,792,810 | 1,934,124 | 778,890,211 | $  96,559,019,458 | 99.75 % |
| 4/28/2017 | 124.05 | 780,824,335 | 96,861,258,757 | 1,934,124 | 778,890,211 | 96,621,330,675 | 99.75 |
| 5/1/2017 | 124.06 | 780,824,335 | 96,869,067,000 | 1,934,124 | 778,890,211 | 96,629,119,577 | 99.75 |
| 5/2/2017 | 123.82 | 780,824,335 | 96,681,669,160 | 1,934,124 | 778,890,211 | 96,442,185,926 | 99.75 |
| 5/3/2017 | 123.43 | 780,824,335 | 96,377,147,669 | 1,934,124 | 778,890,211 | 96,138,418,744 | 99.75 |
| 5/4/2017 | 124.46 | 780,824,335 | 97,181,396,734 | 1,934,124 | 778,890,211 | 96,940,675,661 | 99.75 |
| 5/5/2017 | 122.41 | 780,824,335 | 95,580,706,847 | 1,934,124 | 778,890,211 | 95,343,950,729 | 99.75 |
| 5/8/2017 | 118.36 | 780,824,335 | 92,418,368,291 | 1,934,124 | 778,890,211 | 92,189,445,374 | 99.75 |
| 5/9/2017 | 120.10 | 780,824,335 | 93,777,002,634 | 1,934,124 | 778,890,211 | 93,544,714,341 | 99.75 |
| 5/10/2017 | 119.68 | 780,824,335 | 93,449,056,413 | 1,934,124 | 778,890,211 | 93,217,580,452 | 99.75 |
| 5/11/2017 | 119.52 | 780,824,335 | 93,324,124,519 | 1,934,124 | 778,890,211 | 93,092,958,019 | 99.75 |
| 5/12/2017 | 119.32 | 780,824,335 | 93,167,959,652 | 1,934,124 | 778,890,211 | 92,937,179,977 | 99.75 |
| 5/15/2017 | 119.04 | 780,824,335 | 92,949,328,838 | 1,934,124 | 778,890,211 | 92,719,090,717 | 99.75 |
| 5/16/2017 | 119.36 | 780,824,335 | 93,199,192,626 | 1,934,124 | 778,890,211 | 92,968,335,585 | 99.75 |
| 5/17/2017 | 117.10 | 780,824,335 | 91,434,529,629 | 1,934,124 | 778,890,211 | 91,208,043,708 | 99.75 |
| 5/18/2017 | 117.40 | 780,824,335 | 91,668,776,929 | 1,934,124 | 778,890,211 | 91,441,710,771 | 99.75 |
| 5/19/2017 | 116.93 | 780,824,335 | 91,301,789,492 | 1,934,124 | 778,890,211 | 91,075,632,372 | 99.75 |
| 5/22/2017 | 115.71 | 780,824,335 | 90,349,183,803 | 1,934,124 | 778,890,211 | 90,125,386,315 | 99.75 |
| 5/23/2017 | 117.31 | 780,824,335 | 91,598,502,739 | 1,934,124 | 778,890,211 | 91,371,610,652 | 99.75 |
| 5/24/2017 | 117.75 | 780,824,335 | 91,942,065,446 | 1,934,124 | 778,890,211 | 91,714,322,345 | 99.75 |
| 5/25/2017 | 116.74 | 780,824,335 | 91,153,432,868 | 1,934,124 | 778,890,211 | 90,927,643,232 | 99.75 |
| 5/26/2017 | 116.78 | 780,824,335 | 91,184,665,841 | 1,934,124 | 778,890,211 | 90,958,798,841 | 99.75 |
| 5/30/2017 | 115.13 | 780,824,335 | 89,896,305,689 | 1,934,124 | 778,890,211 | 89,673,629,992 | 99.75 |
| 5/31/2017 | 114.41 | 780,824,335 | 89,334,112,167 | 1,934,124 | 778,890,211 | 89,112,829,041 | 99.75 |
| 6/1/2017 | 116.41 | 780,824,335 | 90,895,760,837 | 1,934,124 | 778,890,211 | 90,670,609,463 | 99.75 |
| 6/2/2017 | 118.73 | 780,824,335 | 92,707,273,295 | 1,934,124 | 778,890,211 | 92,477,634,752 | 99.75 |
| 6/5/2017 | 118.10 | 780,824,335 | 92,215,353,964 | 1,934,124 | 778,890,211 | 91,986,933,919 | 99.75 |
| 6/6/2017 | 116.88 | 780,824,335 | 91,262,748,275 | 1,934,124 | 778,890,211 | 91,036,687,862 | 99.75 |
| 6/7/2017 | 117.57 | 780,824,335 | 91,801,517,066 | 1,934,124 | 778,890,211 | 91,574,122,107 | 99.75 |
| 6/8/2017 | 117.06 | 780,824,335 | 91,403,296,655 | 1,934,124 | 778,890,211 | 91,176,888,100 | 99.75 |
| 6/9/2017 | 118.19 | 780,824,335 | 92,285,628,154 | 1,934,124 | 778,890,211 | 92,057,034,038 | 99.75 |
| 6/12/2017 | 119.35 | 780,824,335 | 93,191,384,382 | 1,934,124 | 778,890,211 | 92,960,546,683 | 99.75 |
| 6/13/2017 | 119.62 | 780,824,335 | 93,402,206,953 | 1,934,124 | 778,890,211 | 93,170,847,040 | 99.75 |
| 6/14/2017 | 121.04 | 780,824,335 | 94,510,977,508 | 1,934,124 | 778,890,211 | 94,276,871,139 | 99.75 |
| 6/15/2017 | 120.61 | 780,824,335 | 94,175,223,044 | 1,934,124 | 778,890,211 | 93,941,948,349 | 99.75 |
| 6/16/2017 | 122.36 | 780,824,335 | 95,541,665,631 | 1,934,124 | 778,890,211 | 95,305,006,218 | 99.75 |
| 6/19/2017 | 125.16 | 780,824,335 | 97,727,973,769 | 1,934,124 | 778,890,211 | 97,485,898,809 | 99.75 |
| 6/20/2017 | 126.22 | 780,824,335 | 98,555,647,564 | 1,934,124 | 778,890,211 | 98,311,522,432 | 99.75 |
| 6/21/2017 | 132.83 | 780,824,335 | 103,716,896,418 | 1,934,124 | 778,890,211 | 103,459,986,727 | 99.75 |
| 6/22/2017 | 133.68 | 780,824,335 | 104,380,597,103 | 1,934,124 | 778,890,211 | 104,122,043,406 | 99.75 |
| 6/23/2017 | 134.31 | 780,824,335 | 104,872,516,434 | 1,934,124 | 778,890,211 | 104,612,744,239 | 99.75 |
| 6/26/2017 | 133.85 | 780,824,335 | 104,513,337,240 | 1,934,124 | 778,890,211 | 104,254,454,742 | 99.75 |
| 6/27/2017 | 130.85 | 780,824,335 | 102,170,864,235 | 1,934,124 | 778,890,211 | 101,917,784,109 | 99.75 |
| 6/28/2017 | 134.23 | 780,824,335 | 104,810,050,487 | 1,934,124 | 778,890,211 | 104,550,433,023 | 99.75 |
| 6/29/2017 | 131.70 | 780,824,335 | 102,834,564,920 | 1,934,124 | 778,890,211 | 102,579,840,789 | 99.75 |
| 6/30/2017 | 129.87 | 780,824,335 | 101,405,656,386 | 1,934,124 | 778,890,211 | 101,154,471,703 | 99.75 |
| 7/3/2017 | 130.18 | 780,824,335 | 101,647,711,930 | 1,934,124 | 778,890,211 | 101,395,927,668 | 99.75 |
| 7/5/2017 | 133.20 | 780,824,335 | 104,005,801,422 | 1,934,124 | 778,890,211 | 103,748,176,105 | 99.75 |
| 7/6/2017 | 131.95 | 780,824,335 | 103,029,771,003 | 1,934,124 | 778,890,211 | 102,774,563,341 | 99.75 |
| 7/7/2017 | 132.56 | 780,824,335 | 103,506,073,848 | 1,934,124 | 778,890,211 | 103,249,686,370 | 99.75 |
| 7/10/2017 | 131.93 | 780,824,335 | 103,014,154,517 | 1,934,124 | 778,890,211 | 102,758,985,537 | 99.75 |
| 7/11/2017 | 132.25 | 780,824,335 | 103,264,018,304 | 1,934,124 | 778,890,211 | 103,008,230,405 | 99.75 |
| 7/12/2017 | 133.56 | 780,824,335 | 104,286,898,183 | 1,934,124 | 778,890,211 | 104,028,576,581 | 99.75 |
| 7/13/2017 | 134.47 | 780,824,335 | 104,997,448,327 | 1,934,124 | 778,890,211 | 104,737,366,673 | 99.75 |
| 7/14/2017 | 134.57 | 780,824,335 | 105,075,530,761 | 1,934,124 | 778,890,211 | 104,815,255,694 | 99.75 |
| 7/17/2017 | 134.87 | 780,824,335 | 105,309,778,061 | 1,934,124 | 778,890,211 | 105,048,922,758 | 99.75 |
| 7/18/2017 | 134.27 | 780,824,335 | 104,841,283,460 | 1,934,124 | 778,890,211 | 104,581,588,631 | 99.75 |

**Exhibit 7**
**Celgene Corporation**
**Daily Market Capitalization and Float for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Shares Outstanding[2] | Market Capitalization | Insider Holdings[3,4] | Float | Market Value of Float | Float as a Percent of Shares Outstanding |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | | | (2) × (3) | | (3) - (5) | (2) × (6) | (6) / (3) |
| 7/19/2017 | $ 135.00 | 780,824,335 | $ 105,411,285,225 | 1,934,124 | 778,890,211 | $ 105,150,178,485 | 99.75 % |
| 7/20/2017 | 136.31 | 780,824,335 | 106,434,165,104 | 1,934,124 | 778,890,211 | 106,170,524,661 | 99.75 |
| 7/21/2017 | 137.74 | 782,350,672 | 107,760,981,561 | 1,934,124 | 780,416,548 | 107,494,575,322 | 99.75 |
| 7/24/2017 | 137.84 | 782,350,672 | 107,839,216,628 | 1,934,124 | 780,416,548 | 107,572,616,976 | 99.75 |
| 7/25/2017 | 136.44 | 782,350,672 | 106,743,925,688 | 1,934,124 | 780,416,548 | 106,480,033,809 | 99.75 |
| 7/26/2017 | 137.75 | 782,350,672 | 107,768,805,068 | 1,934,124 | 780,416,548 | 107,502,379,487 | 99.75 |
| 7/27/2017 | 134.15 | 782,350,672 | 104,952,342,649 | 1,934,124 | 780,416,548 | 104,692,879,914 | 99.75 |
| 7/28/2017 | 134.10 | 782,350,672 | 104,913,225,115 | 1,934,124 | 780,416,548 | 104,653,859,087 | 99.75 |
| 7/31/2017 | 135.41 | 782,350,672 | 105,938,104,496 | 1,934,124 | 780,416,548 | 105,676,204,765 | 99.75 |
| 8/1/2017 | 135.18 | 782,350,672 | 105,758,163,841 | 1,934,124 | 780,416,548 | 105,496,708,959 | 99.75 |
| 8/2/2017 | 134.85 | 782,350,672 | 105,499,988,119 | 1,934,124 | 780,416,548 | 105,239,171,498 | 99.75 |
| 8/3/2017 | 135.90 | 782,350,672 | 106,321,456,325 | 1,934,124 | 780,416,548 | 106,058,608,873 | 99.75 |
| 8/4/2017 | 136.70 | 782,350,672 | 106,947,336,862 | 1,934,124 | 780,416,548 | 106,682,942,112 | 99.75 |
| 8/7/2017 | 137.06 | 782,350,672 | 107,228,983,104 | 1,934,124 | 780,416,548 | 106,963,892,069 | 99.75 |
| 8/8/2017 | 135.27 | 782,350,672 | 105,828,575,401 | 1,934,124 | 780,416,548 | 105,566,946,448 | 99.75 |
| 8/9/2017 | 135.57 | 782,350,672 | 106,063,280,603 | 1,934,124 | 780,416,548 | 105,801,071,412 | 99.75 |
| 8/10/2017 | 130.37 | 782,350,672 | 101,995,057,109 | 1,934,124 | 780,416,548 | 101,742,905,363 | 99.75 |
| 8/11/2017 | 130.61 | 782,350,672 | 102,182,821,270 | 1,934,124 | 780,416,548 | 101,930,205,334 | 99.75 |
| 8/14/2017 | 132.96 | 782,350,672 | 104,021,345,349 | 1,934,124 | 780,416,548 | 103,764,184,222 | 99.75 |
| 8/15/2017 | 131.37 | 782,350,672 | 102,777,407,781 | 1,934,124 | 780,416,548 | 102,523,321,911 | 99.75 |
| 8/16/2017 | 131.26 | 782,350,672 | 102,691,349,207 | 1,934,124 | 780,416,548 | 102,437,476,090 | 99.75 |
| 8/17/2017 | 127.58 | 782,350,672 | 99,812,298,734 | 1,934,124 | 780,416,548 | 99,565,543,194 | 99.75 |
| 8/18/2017 | 127.65 | 782,350,672 | 99,867,063,281 | 1,934,124 | 780,416,548 | 99,620,172,352 | 99.75 |
| 8/21/2017 | 127.43 | 782,350,672 | 99,694,946,133 | 1,934,124 | 780,416,548 | 99,448,480,712 | 99.75 |
| 8/22/2017 | 130.29 | 782,350,672 | 101,932,469,055 | 1,934,124 | 780,416,548 | 101,680,472,039 | 99.75 |
| 8/23/2017 | 129.19 | 782,350,672 | 101,071,883,316 | 1,934,124 | 780,416,548 | 100,822,013,836 | 99.75 |
| 8/24/2017 | 130.05 | 782,350,672 | 101,744,704,894 | 1,934,124 | 780,416,548 | 101,493,172,067 | 99.75 |
| 8/25/2017 | 129.68 | 782,350,672 | 101,455,235,145 | 1,934,124 | 780,416,548 | 101,204,417,945 | 99.75 |
| 8/28/2017 | 131.65 | 782,350,672 | 102,996,465,969 | 1,934,124 | 780,416,548 | 102,741,838,544 | 99.75 |
| 8/29/2017 | 132.44 | 782,350,672 | 103,614,523,000 | 1,934,124 | 780,416,548 | 103,358,367,617 | 99.75 |
| 8/30/2017 | 134.34 | 782,350,672 | 105,100,989,276 | 1,934,124 | 780,416,548 | 104,841,159,058 | 99.75 |
| 8/31/2017 | 138.93 | 782,350,672 | 108,691,978,861 | 1,934,124 | 780,416,548 | 108,423,271,014 | 99.75 |
| 9/1/2017 | 139.38 | 782,350,672 | 109,044,036,663 | 1,934,124 | 780,416,548 | 108,774,458,460 | 99.75 |
| 9/5/2017 | 139.35 | 782,350,672 | 109,020,566,143 | 1,934,124 | 780,416,548 | 108,751,045,964 | 99.75 |
| 9/6/2017 | 140.16 | 782,350,672 | 109,654,270,188 | 1,934,124 | 780,416,548 | 109,383,183,368 | 99.75 |
| 9/7/2017 | 141.76 | 782,350,672 | 110,906,031,263 | 1,934,124 | 780,416,548 | 110,631,849,844 | 99.75 |
| 9/8/2017 | 140.50 | 782,350,672 | 109,920,269,416 | 1,934,124 | 780,416,548 | 109,648,524,994 | 99.75 |
| 9/11/2017 | 140.92 | 782,350,672 | 110,248,856,698 | 1,934,124 | 780,416,548 | 109,976,299,944 | 99.75 |
| 9/12/2017 | 142.07 | 782,350,672 | 111,148,559,971 | 1,934,124 | 780,416,548 | 110,873,778,974 | 99.75 |
| 9/13/2017 | 141.26 | 782,350,672 | 110,514,855,927 | 1,934,124 | 780,416,548 | 110,241,641,570 | 99.75 |
| 9/14/2017 | 140.61 | 782,350,672 | 110,006,327,990 | 1,934,124 | 780,416,548 | 109,734,370,814 | 99.75 |
| 9/15/2017 | 142.04 | 782,350,672 | 111,125,089,451 | 1,934,124 | 780,416,548 | 110,850,366,478 | 99.75 |
| 9/18/2017 | 142.84 | 782,350,672 | 111,750,969,988 | 1,934,124 | 780,416,548 | 111,474,699,716 | 99.75 |
| 9/19/2017 | 143.47 | 782,350,672 | 112,243,850,912 | 1,934,124 | 780,416,548 | 111,966,362,142 | 99.75 |
| 9/20/2017 | 144.24 | 782,350,672 | 112,846,260,929 | 1,934,124 | 780,416,548 | 112,567,282,884 | 99.75 |
| 9/21/2017 | 143.78 | 782,350,672 | 112,486,379,620 | 1,934,124 | 780,416,548 | 112,208,291,271 | 99.75 |
| 9/22/2017 | 143.89 | 782,350,672 | 112,572,438,194 | 1,934,124 | 780,416,548 | 112,294,137,092 | 99.75 |
| 9/25/2017 | 144.94 | 782,350,672 | 113,393,906,400 | 1,934,124 | 780,416,548 | 113,113,574,467 | 99.75 |
| 9/26/2017 | 143.63 | 782,350,672 | 112,369,027,019 | 1,934,124 | 780,416,548 | 112,091,228,789 | 99.75 |
| 9/27/2017 | 142.97 | 782,350,672 | 111,852,675,576 | 1,934,124 | 780,416,548 | 111,576,153,868 | 99.75 |
| 9/28/2017 | 142.76 | 782,350,672 | 111,688,381,935 | 1,934,124 | 780,416,548 | 111,412,266,392 | 99.75 |
| 9/29/2017 | 145.82 | 782,350,672 | 114,082,374,991 | 1,934,124 | 780,416,548 | 113,800,341,029 | 99.75 |
| 10/2/2017 | 146.04 | 782,350,672 | 114,254,492,139 | 1,934,124 | 780,416,548 | 113,972,032,670 | 99.75 |
| 10/3/2017 | 146.08 | 782,350,672 | 114,285,786,166 | 1,934,124 | 780,416,548 | 114,003,249,332 | 99.75 |
| 10/4/2017 | 146.52 | 782,350,672 | 114,630,020,461 | 1,934,124 | 780,416,548 | 114,346,632,613 | 99.75 |
| 10/5/2017 | 140.01 | 782,350,672 | 109,536,917,587 | 1,934,124 | 780,416,548 | 109,266,120,885 | 99.75 |
| 10/6/2017 | 139.21 | 782,350,672 | 108,911,037,049 | 1,934,124 | 780,416,548 | 108,641,787,647 | 99.75 |

**Exhibit 7**
**Celgene Corporation**
**Daily Market Capitalization and Float for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Shares Outstanding[2] | Market Capitalization | Insider Holdings[3,4] | Float | Market Value of Float | Float as a Percent of Shares Outstanding |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | | | (2) × (3) | | (3) - (5) | (2) × (6) | (6) / (3) |
| 10/9/2017 | $ 139.27 | 782,350,672 | $ 108,957,978,089 | 1,934,124 | 780,416,548 | $ 108,688,612,640 | 99.75 % |
| 10/10/2017 | 139.69 | 782,350,672 | 109,286,565,372 | 1,934,124 | 780,416,548 | 109,016,387,590 | 99.75 |
| 10/11/2017 | 139.56 | 782,350,672 | 109,184,859,784 | 1,934,124 | 780,416,548 | 108,914,933,439 | 99.75 |
| 10/12/2017 | 138.50 | 782,350,672 | 108,355,568,072 | 1,934,124 | 780,416,548 | 108,087,691,898 | 99.75 |
| 10/13/2017 | 136.46 | 782,350,672 | 106,759,572,701 | 1,934,124 | 780,416,548 | 106,495,642,140 | 99.75 |
| 10/16/2017 | 136.71 | 782,350,672 | 106,955,160,369 | 1,934,124 | 780,416,548 | 106,690,746,277 | 99.75 |
| 10/17/2017 | 138.86 | 782,350,672 | 108,637,214,314 | 1,934,124 | 780,416,548 | 108,368,641,855 | 99.75 |
| 10/18/2017 | 137.17 | 782,350,672 | 107,315,041,678 | 1,934,124 | 780,416,548 | 107,049,737,889 | 99.75 |
| 10/19/2017 | 135.96 | 782,350,672 | 106,368,397,365 | 1,934,124 | 780,416,548 | 106,105,433,866 | 99.75 |
| 10/20/2017 | 121.33 | 782,350,672 | 94,922,607,034 | 1,934,124 | 780,416,548 | 94,687,939,769 | 99.75 |
| 10/23/2017 | 122.37 | 787,316,931 | 96,343,972,846 | 1,934,124 | 785,382,807 | 96,107,294,093 | 99.75 |
| 10/24/2017 | 120.34 | 787,316,931 | 94,745,719,477 | 1,934,124 | 785,382,807 | 94,512,966,994 | 99.75 |
| 10/25/2017 | 119.56 | 787,316,931 | 94,131,612,270 | 1,934,124 | 785,382,807 | 93,900,368,405 | 99.75 |
| 10/26/2017 | 99.99 | 787,316,931 | 78,723,819,931 | 1,934,124 | 785,382,807 | 78,530,426,872 | 99.75 |
| 10/27/2017 | 98.17 | 787,316,931 | 77,290,903,116 | 1,934,124 | 785,382,807 | 77,101,030,163 | 99.75 |
| 10/30/2017 | 100.97 | 787,316,931 | 79,495,390,523 | 1,934,124 | 785,382,807 | 79,300,102,023 | 99.75 |
| 10/31/2017 | 100.97 | 787,316,931 | 79,495,390,523 | 1,934,124 | 785,382,807 | 79,300,102,023 | 99.75 |
| 11/1/2017 | 100.53 | 787,316,931 | 79,148,971,073 | 1,934,124 | 785,382,807 | 78,954,533,588 | 99.75 |
| 11/2/2017 | 98.20 | 787,316,931 | 77,314,522,624 | 1,934,124 | 785,382,807 | 77,124,591,647 | 99.75 |
| 11/3/2017 | 100.04 | 787,316,931 | 78,763,185,777 | 1,934,124 | 785,382,807 | 78,569,696,012 | 99.75 |
| 11/6/2017 | 101.64 | 787,316,931 | 80,022,892,867 | 1,934,124 | 785,382,807 | 79,826,308,503 | 99.75 |
| 11/7/2017 | 102.33 | 787,316,931 | 80,566,141,549 | 1,934,124 | 785,382,807 | 80,368,222,640 | 99.75 |
| 11/8/2017 | 101.65 | 787,316,931 | 80,030,766,036 | 1,934,124 | 785,382,807 | 79,834,162,332 | 99.75 |
| 11/9/2017 | 102.46 | 787,316,931 | 80,668,492,750 | 1,934,124 | 785,382,807 | 80,470,322,405 | 99.75 |
| 11/10/2017 | 102.34 | 787,316,931 | 80,574,014,719 | 1,934,124 | 785,382,807 | 80,376,076,468 | 99.75 |
| 11/13/2017 | 101.16 | 787,316,931 | 79,644,980,740 | 1,934,124 | 785,382,807 | 79,449,324,756 | 99.75 |
| 11/14/2017 | 98.86 | 787,316,931 | 77,834,151,799 | 1,934,124 | 785,382,807 | 77,642,944,300 | 99.75 |
| 11/15/2017 | 100.34 | 787,316,931 | 78,999,380,857 | 1,934,124 | 785,382,807 | 78,805,310,854 | 99.75 |
| 11/16/2017 | 103.35 | 787,316,931 | 81,369,204,819 | 1,934,124 | 785,382,807 | 81,169,313,103 | 99.75 |
| 11/17/2017 | 104.10 | 787,316,931 | 81,959,692,517 | 1,934,124 | 785,382,807 | 81,758,350,209 | 99.75 |
| 11/20/2017 | 103.15 | 787,316,931 | 81,211,741,433 | 1,934,124 | 785,382,807 | 81,012,236,542 | 99.75 |
| 11/21/2017 | 104.50 | 787,316,931 | 82,274,619,290 | 1,934,124 | 785,382,807 | 82,072,503,332 | 99.75 |
| 11/22/2017 | 105.16 | 787,316,931 | 82,794,248,464 | 1,934,124 | 785,382,807 | 82,590,855,984 | 99.75 |
| 11/24/2017 | 104.50 | 787,316,931 | 82,274,619,290 | 1,934,124 | 785,382,807 | 82,072,503,332 | 99.75 |
| 11/27/2017 | 103.33 | 787,316,931 | 81,353,458,480 | 1,934,124 | 785,382,807 | 81,153,605,447 | 99.75 |
| 11/28/2017 | 103.99 | 787,316,931 | 81,873,087,655 | 1,934,124 | 785,382,807 | 81,671,958,100 | 99.75 |
| 11/29/2017 | 103.12 | 787,316,931 | 81,188,121,925 | 1,934,124 | 785,382,807 | 80,988,675,058 | 99.75 |
| 11/30/2017 | 100.83 | 787,316,931 | 79,385,166,153 | 1,934,124 | 785,382,807 | 79,190,148,430 | 99.75 |
| 12/1/2017 | 102.14 | 787,316,931 | 80,416,551,332 | 1,934,124 | 785,382,807 | 80,218,999,907 | 99.75 |
| 12/4/2017 | 102.61 | 787,316,931 | 80,786,590,290 | 1,934,124 | 785,382,807 | 80,588,129,826 | 99.75 |
| 12/5/2017 | 102.56 | 787,316,931 | 80,747,224,443 | 1,934,124 | 785,382,807 | 80,548,860,686 | 99.75 |
| 12/6/2017 | 102.17 | 787,316,931 | 80,440,170,840 | 1,934,124 | 785,382,807 | 80,242,561,391 | 99.75 |
| 12/7/2017 | 102.73 | 787,316,931 | 80,881,068,322 | 1,934,124 | 785,382,807 | 80,682,375,763 | 99.75 |
| 12/8/2017 | 106.09 | 787,316,931 | 83,526,453,210 | 1,934,124 | 785,382,807 | 83,321,261,995 | 99.75 |
| 12/11/2017 | 108.00 | 787,316,931 | 85,030,228,548 | 1,934,124 | 785,382,807 | 84,821,343,156 | 99.75 |
| 12/12/2017 | 109.04 | 787,316,931 | 85,849,038,156 | 1,934,124 | 785,382,807 | 85,638,141,275 | 99.75 |
| 12/13/2017 | 108.20 | 787,316,931 | 85,187,691,934 | 1,934,124 | 785,382,807 | 84,978,419,717 | 99.75 |
| 12/14/2017 | 108.24 | 787,316,931 | 85,219,184,611 | 1,934,124 | 785,382,807 | 85,009,835,030 | 99.75 |
| 12/15/2017 | 109.41 | 787,316,931 | 86,140,345,421 | 1,934,124 | 785,382,807 | 85,928,732,914 | 99.75 |
| 12/18/2017 | 108.04 | 787,316,931 | 85,061,721,225 | 1,934,124 | 785,382,807 | 84,852,758,468 | 99.75 |
| 12/19/2017 | 107.06 | 787,316,931 | 84,290,150,633 | 1,934,124 | 785,382,807 | 84,083,083,317 | 99.75 |
| 12/20/2017 | 108.27 | 787,316,931 | 85,242,804,119 | 1,934,124 | 785,382,807 | 85,033,396,514 | 99.75 |
| 12/21/2017 | 107.88 | 787,316,931 | 84,935,750,516 | 1,934,124 | 785,382,807 | 84,727,097,219 | 99.75 |
| 12/22/2017 | 106.33 | 787,316,931 | 83,715,409,273 | 1,934,124 | 785,382,807 | 83,509,753,868 | 99.75 |
| 12/26/2017 | 106.97 | 787,316,931 | 84,219,292,109 | 1,934,124 | 785,382,807 | 84,012,398,865 | 99.75 |
| 12/27/2017 | 104.46 | 787,316,931 | 82,243,126,612 | 1,934,124 | 785,382,807 | 82,041,088,019 | 99.75 |
| 12/28/2017 | 104.75 | 787,316,931 | 82,471,448,522 | 1,934,124 | 785,382,807 | 82,268,849,033 | 99.75 |

**Exhibit 7**
**Celgene Corporation**
**Daily Market Capitalization and Float for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Shares Outstanding[2] | Market Capitalization | Insider Holdings[3,4] | Float | Market Value of Float | Float as a Percent of Shares Outstanding |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | | | (2) × (3) | | (3) - (5) | (2) × (6) | (6) / (3) |
| 12/29/2017 | $ 104.36 | 787,316,931 | $ 82,164,394,919 | 1,934,124 | 785,382,807 | $ 81,962,549,739 | 99.75 % |
| 1/2/2018 | 106.16 | 787,316,931 | 83,581,565,395 | 1,934,124 | 785,382,807 | 83,376,238,791 | 99.75 |
| 1/3/2018 | 109.14 | 787,316,931 | 85,927,769,849 | 1,934,124 | 785,382,807 | 85,716,679,556 | 99.75 |
| 1/4/2018 | 106.68 | 787,316,931 | 83,990,970,199 | 1,934,124 | 785,382,807 | 83,784,637,851 | 99.75 |
| 1/5/2018 | 104.99 | 787,316,931 | 82,660,404,586 | 1,934,124 | 785,382,807 | 82,457,340,907 | 99.75 |
| 1/8/2018 | 104.18 | 787,316,931 | 82,022,677,872 | 1,934,124 | 785,382,807 | 81,821,180,833 | 99.75 |
| 1/9/2018 | 105.49 | 787,316,931 | 83,054,063,051 | 1,934,124 | 785,382,807 | 82,850,032,310 | 99.75 |
| 1/10/2018 | 105.46 | 787,316,931 | 83,030,443,543 | 1,934,124 | 785,382,807 | 82,826,470,826 | 99.75 |
| 1/11/2018 | 104.58 | 787,316,931 | 82,337,604,644 | 1,934,124 | 785,382,807 | 82,135,333,956 | 99.75 |
| 1/12/2018 | 106.00 | 787,316,931 | 83,455,594,686 | 1,934,124 | 785,382,807 | 83,250,577,542 | 99.75 |
| 1/16/2018 | 104.82 | 787,316,931 | 82,526,560,707 | 1,934,124 | 785,382,807 | 82,323,825,830 | 99.75 |
| 1/17/2018 | 102.02 | 787,316,931 | 80,322,073,301 | 1,934,124 | 785,382,807 | 80,124,753,970 | 99.75 |
| 1/18/2018 | 101.72 | 787,316,931 | 80,085,878,221 | 1,934,124 | 785,382,807 | 79,889,139,128 | 99.75 |
| 1/19/2018 | 102.65 | 787,316,931 | 80,818,082,967 | 1,934,124 | 785,382,807 | 80,619,545,139 | 99.75 |
| 1/22/2018 | 102.91 | 787,316,931 | 81,022,785,369 | 1,934,124 | 785,382,807 | 80,823,744,668 | 99.75 |
| 1/23/2018 | 104.55 | 787,316,931 | 82,313,985,136 | 1,934,124 | 785,382,807 | 82,111,772,472 | 99.75 |
| 1/24/2018 | 103.11 | 787,316,931 | 81,180,248,755 | 1,934,124 | 785,382,807 | 80,980,821,230 | 99.75 |
| 1/25/2018 | 104.39 | 787,316,931 | 82,188,014,427 | 1,934,124 | 785,382,807 | 81,986,111,223 | 99.75 |
| 1/26/2018 | 105.17 | 787,316,931 | 82,802,121,633 | 1,934,124 | 785,382,807 | 82,598,709,812 | 99.75 |
| 1/29/2018 | 103.26 | 787,316,931 | 81,298,346,295 | 1,934,124 | 785,382,807 | 81,098,628,651 | 99.75 |
| 1/30/2018 | 101.58 | 787,316,931 | 79,975,653,851 | 1,934,124 | 785,382,807 | 79,779,185,535 | 99.75 |
| 1/31/2018 | 101.16 | 787,316,931 | 79,644,980,740 | 1,934,124 | 785,382,807 | 79,449,324,756 | 99.75 |
| 2/1/2018 | 100.34 | 787,316,931 | 78,999,380,857 | 1,934,124 | 785,382,807 | 78,805,310,854 | 99.75 |
| 2/2/2018 | 99.80 | 752,175,608 | 75,067,125,678 | 1,934,124 | 750,241,484 | 74,874,100,103 | 99.74 |
| 2/5/2018 | 93.74 | 752,175,608 | 70,508,941,494 | 1,934,124 | 750,241,484 | 70,327,636,710 | 99.74 |
| 2/6/2018 | 96.25 | 752,175,608 | 72,396,902,270 | 1,934,124 | 750,241,484 | 72,210,742,835 | 99.74 |
| 2/7/2018 | 95.16 | 752,175,608 | 71,577,030,857 | 1,934,124 | 750,241,484 | 71,392,979,617 | 99.74 |
| 2/8/2018 | 91.02 | 752,175,608 | 68,463,023,840 | 1,934,124 | 750,241,484 | 68,286,979,874 | 99.74 |
| 2/9/2018 | 92.51 | 752,175,608 | 69,583,765,496 | 1,934,124 | 750,241,484 | 69,404,839,685 | 99.74 |
| 2/12/2018 | 91.51 | 752,175,608 | 68,831,589,888 | 1,934,124 | 750,241,484 | 68,654,598,201 | 99.74 |
| 2/13/2018 | 91.98 | 752,175,608 | 69,185,112,424 | 1,934,124 | 750,241,484 | 69,007,211,698 | 99.74 |
| 2/14/2018 | 94.39 | 752,175,608 | 70,997,855,639 | 1,934,124 | 750,241,484 | 70,815,293,675 | 99.74 |
| 2/15/2018 | 96.14 | 752,175,608 | 72,314,162,953 | 1,934,124 | 750,241,484 | 72,128,216,272 | 99.74 |
| 2/16/2018 | 95.26 | 752,175,608 | 71,652,248,418 | 1,934,124 | 750,241,484 | 71,468,003,766 | 99.74 |
| 2/20/2018 | 93.85 | 752,175,608 | 70,591,680,811 | 1,934,124 | 750,241,484 | 70,410,163,273 | 99.74 |
| 2/21/2018 | 93.89 | 752,175,608 | 70,621,767,835 | 1,934,124 | 750,241,484 | 70,440,172,933 | 99.74 |
| 2/22/2018 | 93.78 | 752,175,608 | 70,539,028,518 | 1,934,124 | 750,241,484 | 70,357,646,370 | 99.74 |
| 2/23/2018 | 95.61 | 752,175,608 | 71,915,509,881 | 1,934,124 | 750,241,484 | 71,730,588,285 | 99.74 |
| 2/26/2018 | 96.49 | 752,175,608 | 72,577,424,416 | 1,934,124 | 750,241,484 | 72,390,800,791 | 99.74 |
| 2/27/2018 | 95.78 | 752,175,608 | 72,043,379,734 | 1,934,124 | 750,241,484 | 71,858,129,338 | 99.74 |
| 2/28/2018 | 87.12 | 752,175,608 | 65,529,538,969 | 1,934,124 | 750,241,484 | 65,361,038,086 | 99.74 |
| 3/1/2018 | 87.19 | 752,175,608 | 65,582,191,262 | 1,934,124 | 750,241,484 | 65,413,554,990 | 99.74 |
| 3/2/2018 | 89.33 | 752,175,608 | 67,191,847,063 | 1,934,124 | 750,241,484 | 67,019,071,766 | 99.74 |
| 3/5/2018 | 89.04 | 752,175,608 | 66,973,716,136 | 1,934,124 | 750,241,484 | 66,801,501,735 | 99.74 |
| 3/6/2018 | 89.17 | 752,175,608 | 67,071,498,965 | 1,934,124 | 750,241,484 | 66,899,033,128 | 99.74 |
| 3/7/2018 | 90.22 | 752,175,608 | 67,861,283,354 | 1,934,124 | 750,241,484 | 67,686,786,686 | 99.74 |
| 3/8/2018 | 91.19 | 752,175,608 | 68,590,893,694 | 1,934,124 | 750,241,484 | 68,414,520,926 | 99.74 |
| 3/9/2018 | 92.56 | 752,175,608 | 69,617,613,398 | 1,934,124 | 750,241,484 | 69,438,600,552 | 99.74 |
| 3/12/2018 | 92.28 | 752,175,608 | 69,410,765,106 | 1,934,124 | 750,241,484 | 69,232,284,144 | 99.74 |
| 3/13/2018 | 91.56 | 752,175,608 | 68,869,198,668 | 1,934,124 | 750,241,484 | 68,692,110,275 | 99.74 |
| 3/14/2018 | 91.61 | 752,175,608 | 68,906,807,449 | 1,934,124 | 750,241,484 | 68,729,622,349 | 99.74 |
| 3/15/2018 | 89.91 | 752,175,608 | 67,628,108,915 | 1,934,124 | 750,241,484 | 67,454,211,826 | 99.74 |
| 3/16/2018 | 89.61 | 752,175,608 | 67,402,456,233 | 1,934,124 | 750,241,484 | 67,229,139,381 | 99.74 |
| 3/19/2018 | 88.53 | 752,175,608 | 66,590,106,576 | 1,934,124 | 750,241,484 | 66,418,878,579 | 99.74 |
| 3/20/2018 | 88.27 | 752,175,608 | 66,394,540,918 | 1,934,124 | 750,241,484 | 66,223,815,793 | 99.74 |
| 3/21/2018 | 88.31 | 752,175,608 | 66,424,627,942 | 1,934,124 | 750,241,484 | 66,253,825,452 | 99.74 |
| 3/22/2018 | 86.91 | 752,175,608 | 65,371,582,091 | 1,934,124 | 750,241,484 | 65,203,487,374 | 99.74 |

**Exhibit 7**
**Celgene Corporation**
**Daily Market Capitalization and Float for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Shares Outstanding[2] | Market Capitalization | Insider Holdings[3,4] | Float | Market Value of Float | Float as a Percent of Shares Outstanding |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) $(2) \times (3)$ | (5) | (6) $(3) - (5)$ | (7) $(2) \times (6)$ | (8) $(6) / (3)$ |
| 3/23/2018 | $ 84.98 | 752,175,608 | $ 63,919,883,168 | 1,934,124 | 750,241,484 | $ 63,755,521,310 | 99.74 % |
| 3/26/2018 | 87.17 | 752,175,608 | 65,567,147,749 | 1,934,124 | 750,241,484 | 65,398,550,160 | 99.74 |
| 3/27/2018 | 85.81 | 752,175,608 | 64,544,188,922 | 1,934,124 | 750,241,484 | 64,378,221,742 | 99.74 |
| 3/28/2018 | 88.41 | 752,175,608 | 66,499,845,503 | 1,934,124 | 750,241,484 | 66,328,849,600 | 99.74 |
| 3/29/2018 | 89.21 | 752,175,608 | 67,101,585,990 | 1,934,124 | 750,241,484 | 66,929,042,788 | 99.74 |
| 4/2/2018 | 87.07 | 752,175,608 | 65,491,930,189 | 1,934,124 | 750,241,484 | 65,323,526,012 | 99.74 |
| 4/3/2018 | 86.83 | 752,175,608 | 65,311,408,043 | 1,934,124 | 750,241,484 | 65,143,468,056 | 99.74 |
| 4/4/2018 | 90.47 | 752,175,608 | 68,049,327,256 | 1,934,124 | 750,241,484 | 67,874,347,057 | 99.74 |
| 4/5/2018 | 88.84 | 752,175,608 | 66,823,281,015 | 1,934,124 | 750,241,484 | 66,651,453,439 | 99.74 |
| 4/6/2018 | 86.95 | 752,175,608 | 65,401,669,116 | 1,934,124 | 750,241,484 | 65,233,497,034 | 99.74 |
| 4/9/2018 | 86.94 | 752,175,608 | 65,394,147,360 | 1,934,124 | 750,241,484 | 65,225,994,619 | 99.74 |
| 4/10/2018 | 89.44 | 752,175,608 | 67,274,586,380 | 1,934,124 | 750,241,484 | 67,101,598,329 | 99.74 |
| 4/11/2018 | 88.71 | 752,175,608 | 66,725,498,186 | 1,934,124 | 750,241,484 | 66,553,922,046 | 99.74 |
| 4/12/2018 | 89.74 | 752,175,608 | 67,500,239,062 | 1,934,124 | 750,241,484 | 67,326,670,774 | 99.74 |
| 4/13/2018 | 89.40 | 752,175,608 | 67,244,499,355 | 1,934,124 | 750,241,484 | 67,071,588,670 | 99.74 |
| 4/16/2018 | 90.54 | 752,175,608 | 68,101,979,548 | 1,934,124 | 750,241,484 | 67,926,863,961 | 99.74 |
| 4/17/2018 | 91.10 | 752,175,608 | 68,523,197,889 | 1,934,124 | 750,241,484 | 68,346,999,192 | 99.74 |
| 4/18/2018 | 91.01 | 752,175,608 | 68,455,502,084 | 1,934,124 | 750,241,484 | 68,279,477,459 | 99.74 |
| 4/19/2018 | 89.62 | 726,331,264 | 65,093,807,880 | 2,078,704 | 724,252,560 | 64,907,514,427 | 99.71 |
| 4/20/2018 | 88.95 | 726,331,264 | 64,607,165,933 | 2,078,704 | 724,252,560 | 64,422,265,212 | 99.71 |
| 4/23/2018 | 89.49 | 724,827,113 | 64,861,154,207 | 2,078,704 | 722,748,409 | 64,675,141,379 | 99.71 |
| 4/24/2018 | 89.14 | 724,827,113 | 64,611,088,853 | 2,078,704 | 722,748,409 | 64,425,793,178 | 99.71 |
| 4/25/2018 | 89.20 | 724,827,113 | 64,654,578,480 | 2,078,704 | 722,748,409 | 64,469,158,083 | 99.71 |
| 4/26/2018 | 92.08 | 724,827,113 | 66,742,080,565 | 2,078,704 | 722,748,409 | 66,550,673,501 | 99.71 |
| 4/27/2018 | 91.18 | 724,827,113 | 66,089,736,163 | 2,078,704 | 722,748,409 | 65,900,199,933 | 99.71 |

| | |
|---|---|
| **Average Float as a Percent of Shares Outstanding:** | 99.75 % |

| | |
|---|---|
| **Median Float as a Percent of Shares Outstanding:** | 99.75 % |

**Notes and Sources:**
Closing price data obtained from Bloomberg L.P.
Insider holdings and shares outstanding data obtained from SEC filings.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] Daily shares outstanding figures are as of the most recent reported date.

[3] Insider holding figures are as of the most recent reported date and exclude any shares of Celgene common stock that may be acquired upon exercise of options exercisable or vesting of restricted stock units (RSUs) within 60 days of the date reported in Forms DEF 14A filed on June 14, 2017 and June 13, 2018.

[4] Total insider holdings as of April 19, 2018 includes shares held by Mr. Robert J. Hugin, former Executive Chairman of Celgene's Board of Directors, and Mr. Scott A. Smith, Celgene's former President and Chief Operating Officer, even though Mr. Hugin retired on February 5, 2018 and Mr. Smith left Celgene on April 2, 2018, since both were recently Celgene's insiders and might still have inside information.

**Exhibit 8a**
**Celgene Corporation**
**Percent of Days with Statistically Significant Returns on News Days as Compared to Non-News Days for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**
*Using the Nasdaq Biotechnology Index [2]*

| | News Days | | | Non-News Days | | | Difference between News Days and Non-News Days | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Number | Number with Significant Excess Returns[3] | Percent of Days with Significant Excess Returns | Total Number | Number with Significant Excess Returns[3] | Percent of Days with Significant Excess Returns | Difference in Percentages | z - Statistic[4] | Different from Zero at 5% Significance Level?[5] |
| | (1) | (2) | (3) (2) / (1) | (4) | (5) | (6) (5) / (4) | (7) (3) - (6) | (8) | (9) |
| **Earnings Dates[6]** | 4 | 1 | 25.0% | 249 | 15 | 6.0% | 19.0% | 1.55 | No |
| *Dow Jones Newswires [7]* | 109 | 12 | 11.0% | 144 | 4 | 2.8% | 8.2% | 2.66 | Yes |
| *Dow Jones Newswires - Top 50%[8]* | 51 | 10 | 19.6% | 202 | 6 | 3.0% | 16.6% | 4.36 | Yes |
| *Dow Jones Newswires - Top 10%[9]* | 13 | 7 | 53.8% | 240 | 9 | 3.8% | 50.1% | 7.23 | Yes |
| *Dow Jones Newswires - Top 10% and Excluding Selected Articles[10]* | 12 | 6 | 50.0% | 241 | 10 | 4.1% | 45.9% | 6.37 | Yes |

**Notes and Sources:**

Data obtained from Bloomberg L.P., Factiva Dow Jones, and SEC filings.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] The weight of Celgene in the Nasdaq Biotechnology Index is estimated to be the smaller of 8% or the previous day's closing market cap of Celgene divided by the closing market cap of the Nasdaq Biotechnology Index (as obtained from Bloomberg L.P.) for the first trading day in March, June, September, and December of each year, as detailed in the Index Rebalancing section of the Nasdaq Biotechnology Index Methodology, available online at: https://indexes.nasdaqomx.com/docs/methodology_NBI.pdf. For all other trading days, the weight of Celgene in the Nasdaq Biotechnology Index on day x is estimated as [(market cap of Celgene on day x-2) / (market cap of Celgene on day x-1)] × (estimated weight of Celgene on day x-1). The daily returns of Celgene are then removed from the daily returns of the Nasdaq Biotechnology Index based on its estimated weight.

[3] Days for which the excess return was statistically significant at the 5% level. Returns are predicted using a regression of the returns of Celgene common stock on the returns of the Nasdaq Biotechnology Index run over the period from April 27, 2016 through April 26, 2017 [N=252]. For more information, see Exhibit 8b.

[4] The z-statistic is a test statistic for a two-sample test of binomial proportions. It measures the probability of obtaining results as or more extreme as those observed if the returns for news and non-news days were drawn from the same distribution. The further the z-statistic is from zero, the less likely that the observed difference could have been seen if the returns for news and non-news days were drawn from the same distribution.

[5] A 5% significance level means that the difference in percentages in column (7) is of a magnitude that would be observed no more than 5% of the time if there is no difference in market reaction to news and non-news days.

[6] Earnings dates obtained from I/B/E/S Consensus EPS Surprise History via FactSet Research Systems, Inc and verified via Factiva Dow Jones.

**Exhibit 8a**

**Celgene Corporation**

**Percent of Days with Statistically Significant Returns on News Days as Compared to Non-News Days for Celgene Common Stock**

**April 27, 2017 to April 27, 2018[1]**

*Using the Nasdaq Biotechnology Index [2]*

[7] News days are defined as days on which there was at least one news article on Celgene published by *Dow Jones Newswires* as downloaded from Factiva Dow Jones. News stories were obtained through a search for the company "Celgene Corporation" from April 27, 2017 to April 27, 2018. The search included news stories published by *Dow Jones Newswires,* searching headlines and lead paragraph only, excluding "Recurring pricing and market data" and "Obituaries, sports, calendars...." On days when news came out after 4:00PM or when there was news on a non-trading day, the next trading day was considered the effective date.

[8] News days are defined as days in the top 50% of all *Dow Jones Newswires* news days where the number of articles is greater than the 50th percentile of all news days, ranked by the number of articles on Celgene published by *Dow Jones Newswires* per day from April 27, 2017 to April 28, 2017, inclusive.

[9] News days are defined as days in the top 10% of all *Dow Jones Newswires* news days, ranked by the number of articles on Celgene published by *Dow Jones Newswires* per day from April 27, 2017 to April 27, 2018, inclusive.

[10] Exhibit 8d is a list of news days that were excluded from the top 10% of all *Dow Jones Newswires* news days as they contained only news stories that appeared to be duplicates of previously reported news.

**Exhibit 8b**
**Celgene Corporation**
**Statistical Model of Daily Logarithmic Returns for Celgene Common Stock**
**Estimation Period: April 27, 2016 to April 26, 2017**

| Log Return of | = | 0.00 [1] | + | **0.82** [2] | × | Log Return of Nasdaq |
|---|---|---|---|---|---|---|
| Celgene Common Stock | | *0.73* | | *19.81* | | Biotechnology Index [5] |

| | | |
|---|---|---|
| **Observations** | = | 252 |
| **R-Squared** [4] | = | 61.09% |
| **Adjusted R-Squared** [5] | = | 60.94% |
| **Standard Error** [6] | = | 0.010 |

**Notes and Sources:**

Data obtained from Bloomberg L.P.

t-statistics are shown in *italics*. Statistically significant coefficients (at the 5% level) are shown in **bold**.

[1] The constant is the expected value of the dependent variable (Celgene Common Stock returns) if the independent variable (Nasdaq Biotechnology Index returns) equals to 0.

[2] This coefficient measures the change in the dependent variable (Celgene Common Stock returns) associated with a one unit change in the independent variable (Nasdaq Biotechnology Index returns).

[3] The weight of Celgene in the Nasdaq Biotechnology Index is estimated to be the smaller of 8% or the previous day's closing market cap of Celgene divided by the closing market cap of the Nasdaq Biotechnology Index (as obtained from Bloomberg L.P.) for the first trading day in March, June, September, and December of each year, as detailed in the Index Rebalancing section of the Nasdaq Biotechnology Index Methodology, available online at: https://indexes.nasdaqomx.com/docs/methodology_NBI.pdf. For all other trading days, the weight of Celgene in the Nasdaq Biotechnology Index on day x is estimated as [(market cap of Celgene on day x-2) / (market cap of Celgene on day x-1)] × (estimated weight of Celgene on day x-1). The daily returns of Celgene are then removed from the daily returns of the Nasdaq Biotechnology Index based on its estimated weight.

[4] R-squared is the percent of the variance in the dependent variable (Celgene Common Stock returns) that is explained by the variance of the independent variable (Nasdaq Biotechnology Index returns).

[5] Adjusted R-squared is the percent of the variance in the dependent variable (Celgene Common Stock returns) that is explained by the variance of the independent variable (Nasdaq Biotechnology Index returns), adjusted for the number of predictors in the market model.

[6] Denotes the standard error of the regression model, which is a statistical measure of the variability of predictions made with the regression model.

**Exhibit 8c**
**Celgene Corporation**
**Absolute Value of Excess Returns on News Days as Compared to Non-News Days for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

*Using the Nasdaq Biotechnology Index [2]*

| | News Days | | Non-News Days | | Kolmogorov-Smirnov Test of the Equality of Distributions of News Days and Non-News Days[4] | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Number | Average Absolute Value of Excess Returns[3] | Total Number | Average Absolute Value of Excess Returns[3] | Kolmogorov-Smirnov Distance[5] | p-value[6] | Different in Distribution at 5% Significance Level?[7] |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| **Earnings Dates[8]** | 4 | 0.0501 | 249 | 0.0085 | 0.5622 | 0.1082 | No |
| *Dow Jones Newswires [9]* | 109 | 0.0126 | 144 | 0.0065 | 0.2494 | 0.0007 | Yes |
| *Dow Jones Newswires - Top 50%[10]* | 51 | 0.0175 | 202 | 0.0070 | 0.3061 | 0.0007 | Yes |
| *Dow Jones Newswires - Top 10%[11]* | 13 | 0.0396 | 240 | 0.0075 | 0.5051 | 0.0019 | Yes |
| *Dow Jones Newswires - Top 10% and Excluding Selected Articles[12]* | 12 | 0.0407 | 241 | 0.0076 | 0.4627 | 0.0094 | Yes |

**Notes and Sources:**

Data obtained from Bloomberg L.P., Factiva Dow Jones, and SEC filings.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] The weight of Celgene in the Nasdaq Biotechnology Index is estimated to be the smaller of 8% or the previous day's closing market cap of Celgene divided by the closing market cap of the Nasdaq Biotechnology Index (as obtained from Bloomberg L.P.) for the first trading day in March, June, September, and December of each year, as detailed in the Index Rebalancing section of the Nasdaq Biotechnology Index Methodology, available online at: https://indexes.nasdaqomx.com/docs/methodology_NBI.pdf. For all other trading days, the weight of Celgene in the Nasdaq Biotechnology Index on day x is estimated as [(market cap of Celgene on day x-2) / (market cap of Celgene on day x-1)] × (estimated weight of Celgene on day x-1). The daily returns of Celgene are then removed from the daily returns of the Nasdaq Biotechnology Index based on its estimated weight.

[3] Returns are predicted using a regression of the returns of Celgene common stock on the returns of the Nasdaq Biotechnology Index run over the period from April 27, 2016 through April 26, 2017 [N=252]. For more information, see Exhibit 8b.

[4] The Kolmogorov-Smirnov test is a nonparametric test of the equality of continuous distributions. It quantifies a distance between the empirical cumulative distributions of two samples and tests the null hypothesis that both samples are drawn from the same distribution.

[5] The Kolmogorov-Smirnov distance is a statistic that quantifies the maximum distance between the distributions of news and non-news days.

[6] The p-value represents the probability of measuring a test statistic as or more extreme than the calculated test statistic assuming that the null hypothesis is true.

**Exhibit 8c**
**Celgene Corporation**
**Absolute Value of Excess Returns on News Days as Compared to Non-News Days for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

*Using the Nasdaq Biotechnology Index [2]*

[7] A 5% significance level means that the distance in column (5) is of a magnitude that would be observed no more than 5% of the time if there is no difference in the distributions of news days and non-news days.

[8] Earnings dates obtained from I/B/E/S Consensus EPS Surprise History via FactSet Research Systems, Inc and verified via Factiva Dow Jones.

[9] News days are defined as days on which there was at least one news article on Celgene published by *Dow Jones Newswires* as downloaded from Factiva Dow Jones. News stories were obtained through a search for the company "Celgene Corporation" from April 27, 2017 to April 27, 2018. The search included news stories published by *Dow Jones Newswires,* searching headlines and lead paragraph only, excluding "Recurring pricing and market data" and "Obituaries, sports, calendars...." On days when news came out after 4:00PM or when there was news on a non-trading day, the next trading day was considered the effective date.

[10] News days are defined as days in the top 50% of all *Dow Jones Newswires* news days where the number of articles is greater than the 50th percentile of all news days, ranked by the number of articles on Celgene published by *Dow Jones Newswires* per day from April 27, 2017 to April 28, 2017, inclusive.

[11] News days are defined as days in the top 10% of all *Dow Jones Newswires* news days, ranked by the number of articles on Celgene published by *Dow Jones Newswires* per day from April 27, 2017 to April 27, 2018, inclusive.

[12] Exhibit 8d is a list of news days that were excluded from the top 10% of all *Dow Jones Newswires* news days as they contained only news stories that appeared to be duplicates of previously reported news.

**Exhibit 8d**
**Celgene Corporation**
**News Dates Removed[1,2]**

**April 27, 2017 to April 27, 2018[3]**

| Date |
|:----:|
| (1) |

10/27/2017

**Notes and Sources:**

Articles downloaded from Factiva Dow Jones.

[1] News days are defined as days on which there was at least one news article on Celgene published by *Dow Jones Newswires* as downloaded from Factiva Dow Jones. News stories were obtained through a search for the company "Celgene Corporation" between April 27, 2017 and April 27, 2018. The search included news stories published by *Dow Jones Newswires,* searching headlines and lead paragraph only, excluding "recurring pricing and market data" and "Obituaries, sports, calendars...." On days when news came out after 4:00PM or when there was news on a non-trading day, the next trading day was considered the effective date.

[2] News dates were excluded because they contained only news stories that appeared to be duplicates of previously reported news.

[3] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 4/27/2017 | $ 123.97 | $ 123.95 | $ 123.97 | $ 0.02 | 0.02 % |
| 4/28/2017 | 124.05 | 124.05 | 124.06 | 0.01 | 0.01 |
| 5/1/2017 | 124.06 | 124.07 | 124.15 | 0.08 | 0.06 |
| 5/2/2017 | 123.82 | 123.80 | 123.83 | 0.03 | 0.02 |
| 5/3/2017 | 123.43 | 123.42 | 123.43 | 0.01 | 0.01 |
| 5/4/2017 | 124.46 | 124.46 | 124.48 | 0.02 | 0.02 |
| 5/5/2017 | 122.41 | 122.36 | 122.43 | 0.07 | 0.06 |
| 5/8/2017 | 118.36 | 118.30 | 118.32 | 0.02 | 0.02 |
| 5/9/2017 | 120.10 | 120.10 | 120.11 | 0.01 | 0.01 |
| 5/10/2017 | 119.68 | 119.67 | 119.68 | 0.01 | 0.01 |
| 5/11/2017 | 119.52 | 119.49 | 119.53 | 0.04 | 0.03 |
| 5/12/2017 | 119.32 | 119.31 | 119.32 | 0.01 | 0.01 |
| 5/15/2017 | 119.04 | 119.03 | 119.04 | 0.01 | 0.01 |
| 5/16/2017 | 119.36 | 119.34 | 119.36 | 0.02 | 0.02 |
| 5/17/2017 | 117.10 | 117.07 | 117.10 | 0.03 | 0.03 |
| 5/18/2017 | 117.40 | 117.38 | 117.39 | 0.01 | 0.01 |
| 5/19/2017 | 116.93 | 116.92 | 116.93 | 0.01 | 0.01 |
| 5/22/2017 | 115.71 | 115.65 | 115.71 | 0.06 | 0.05 |
| 5/23/2017 | 117.31 | 117.32 | 117.33 | 0.01 | 0.01 |
| 5/24/2017 | 117.75 | 117.74 | 117.75 | 0.01 | 0.01 |
| 5/25/2017 | 116.74 | 116.74 | 116.76 | 0.02 | 0.02 |
| 5/26/2017 | 116.78 | 116.76 | 116.78 | 0.02 | 0.02 |
| 5/30/2017 | 115.13 | 115.10 | 115.14 | 0.04 | 0.03 |
| 5/31/2017 | 114.41 | 114.39 | 114.41 | 0.02 | 0.02 |
| 6/1/2017 | 116.41 | 116.41 | 116.42 | 0.01 | 0.01 |
| 6/2/2017 | 118.73 | 118.72 | 118.73 | 0.01 | 0.01 |
| 6/5/2017 | 118.10 | 118.09 | 118.10 | 0.01 | 0.01 |
| 6/6/2017 | 116.88 | 116.87 | 116.88 | 0.01 | 0.01 |
| 6/7/2017 | 117.57 | 117.57 | 117.60 | 0.03 | 0.03 |
| 6/8/2017 | 117.06 | 117.04 | 117.06 | 0.02 | 0.02 |
| 6/9/2017 | 118.19 | 118.19 | 118.21 | 0.02 | 0.02 |
| 6/12/2017 | 119.35 | 119.34 | 119.36 | 0.02 | 0.02 |
| 6/13/2017 | 119.62 | 119.63 | 119.64 | 0.01 | 0.01 |
| 6/14/2017 | 121.04 | 121.04 | 121.06 | 0.02 | 0.02 |
| 6/15/2017 | 120.61 | 120.61 | 120.66 | 0.05 | 0.04 |
| 6/16/2017 | 122.36 | 122.35 | 122.36 | 0.01 | 0.01 |
| 6/19/2017 | 125.16 | 125.13 | 125.15 | 0.02 | 0.02 |
| 6/20/2017 | 126.22 | 126.22 | 126.23 | 0.01 | 0.01 |
| 6/21/2017 | 132.83 | 132.82 | 132.95 | 0.13 | 0.10 |
| 6/22/2017 | 133.68 | 133.64 | 133.65 | 0.01 | 0.01 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|------|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 6/23/2017 | $ 134.31 | $ 134.30 | $ 134.31 | $ 0.01 | 0.01 % |
| 6/26/2017 | 133.85 | 133.84 | 133.86 | 0.02 | 0.01 |
| 6/27/2017 | 130.85 | 130.85 | 130.86 | 0.01 | 0.01 |
| 6/28/2017 | 134.23 | 134.24 | 134.26 | 0.02 | 0.01 |
| 6/29/2017 | 131.70 | 131.69 | 131.70 | 0.01 | 0.01 |
| 6/30/2017 | 129.87 | 129.86 | 129.87 | 0.01 | 0.01 |
| 7/3/2017 | 130.18 | 130.16 | 130.19 | 0.03 | 0.02 |
| 7/5/2017 | 133.20 | 133.19 | 133.20 | 0.01 | 0.01 |
| 7/6/2017 | 131.95 | 131.98 | 132.01 | 0.03 | 0.02 |
| 7/7/2017 | 132.56 | 132.55 | 132.56 | 0.01 | 0.01 |
| 7/10/2017 | 131.93 | 131.96 | 131.97 | 0.01 | 0.01 |
| 7/11/2017 | 132.25 | 132.31 | 132.34 | 0.03 | 0.02 |
| 7/12/2017 | 133.56 | 133.54 | 133.55 | 0.01 | 0.01 |
| 7/13/2017 | 134.47 | 134.48 | 134.49 | 0.01 | 0.01 |
| 7/14/2017 | 134.57 | 134.54 | 134.56 | 0.02 | 0.01 |
| 7/17/2017 | 134.87 | 134.87 | 134.89 | 0.02 | 0.01 |
| 7/18/2017 | 134.27 | 134.26 | 134.27 | 0.01 | 0.01 |
| 7/19/2017 | 135.00 | 134.98 | 135.00 | 0.02 | 0.01 |
| 7/20/2017 | 136.31 | 136.31 | 136.33 | 0.02 | 0.01 |
| 7/21/2017 | 137.74 | 137.74 | 137.79 | 0.05 | 0.04 |
| 7/24/2017 | 137.84 | 137.94 | 137.95 | 0.01 | 0.01 |
| 7/25/2017 | 136.44 | 136.45 | 136.46 | 0.01 | 0.01 |
| 7/26/2017 | 137.75 | 137.76 | 137.80 | 0.04 | 0.03 |
| 7/27/2017 | 134.15 | 134.08 | 134.16 | 0.08 | 0.06 |
| 7/28/2017 | 134.10 | 134.08 | 134.10 | 0.02 | 0.01 |
| 7/31/2017 | 135.41 | 135.61 | 135.63 | 0.02 | 0.01 |
| 8/1/2017 | 135.18 | 135.18 | 135.19 | 0.01 | 0.01 |
| 8/2/2017 | 134.85 | 134.82 | 134.83 | 0.01 | 0.01 |
| 8/3/2017 | 135.90 | 135.91 | 135.92 | 0.01 | 0.01 |
| 8/4/2017 | 136.70 | 136.68 | 136.69 | 0.01 | 0.01 |
| 8/7/2017 | 137.06 | 137.05 | 137.06 | 0.01 | 0.01 |
| 8/8/2017 | 135.27 | 135.26 | 135.27 | 0.01 | 0.01 |
| 8/9/2017 | 135.57 | 135.55 | 135.57 | 0.02 | 0.01 |
| 8/10/2017 | 130.37 | 130.35 | 130.36 | 0.01 | 0.01 |
| 8/11/2017 | 130.61 | 130.59 | 130.61 | 0.02 | 0.02 |
| 8/14/2017 | 132.96 | 132.93 | 132.96 | 0.03 | 0.02 |
| 8/15/2017 | 131.37 | 131.33 | 131.35 | 0.02 | 0.02 |
| 8/16/2017 | 131.26 | 131.25 | 131.26 | 0.01 | 0.01 |
| 8/17/2017 | 127.58 | 127.56 | 127.57 | 0.01 | 0.01 |
| 8/18/2017 | 127.65 | 127.65 | 127.66 | 0.01 | 0.01 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 8/21/2017 | $ 127.43 | $ 127.38 | $ 127.39 | $ 0.01 | 0.01 % |
| 8/22/2017 | 130.29 | 130.31 | 130.32 | 0.01 | 0.01 |
| 8/23/2017 | 129.19 | 129.18 | 129.19 | 0.01 | 0.01 |
| 8/24/2017 | 130.05 | 130.03 | 130.04 | 0.01 | 0.01 |
| 8/25/2017 | 129.68 | 129.70 | 129.73 | 0.03 | 0.02 |
| 8/28/2017 | 131.65 | 131.65 | 131.66 | 0.01 | 0.01 |
| 8/29/2017 | 132.44 | 132.46 | 132.47 | 0.01 | 0.01 |
| 8/30/2017 | 134.34 | 134.36 | 134.39 | 0.03 | 0.02 |
| 8/31/2017 | 138.93 | 138.93 | 138.94 | 0.01 | 0.01 |
| 9/1/2017 | 139.38 | 139.38 | 139.39 | 0.01 | 0.01 |
| 9/5/2017 | 139.35 | 139.35 | 139.39 | 0.04 | 0.03 |
| 9/6/2017 | 140.16 | 140.14 | 140.17 | 0.03 | 0.02 |
| 9/7/2017 | 141.76 | 141.83 | 141.84 | 0.01 | 0.01 |
| 9/8/2017 | 140.50 | 140.50 | 140.51 | 0.01 | 0.01 |
| 9/11/2017 | 140.92 | 140.90 | 140.91 | 0.01 | 0.01 |
| 9/12/2017 | 142.07 | 142.06 | 142.07 | 0.01 | 0.01 |
| 9/13/2017 | 141.26 | 141.25 | 141.26 | 0.01 | 0.01 |
| 9/14/2017 | 140.61 | 140.61 | 140.64 | 0.03 | 0.02 |
| 9/15/2017 | 142.04 | 141.99 | 142.05 | 0.06 | 0.04 |
| 9/18/2017 | 142.84 | 142.83 | 142.84 | 0.01 | 0.01 |
| 9/19/2017 | 143.47 | 143.45 | 143.47 | 0.02 | 0.01 |
| 9/20/2017 | 144.24 | 144.19 | 144.22 | 0.03 | 0.02 |
| 9/21/2017 | 143.78 | 143.80 | 143.82 | 0.02 | 0.01 |
| 9/22/2017 | 143.89 | 143.87 | 143.91 | 0.04 | 0.03 |
| 9/25/2017 | 144.94 | 144.98 | 144.99 | 0.01 | 0.01 |
| 9/26/2017 | 143.63 | 143.66 | 143.70 | 0.04 | 0.03 |
| 9/27/2017 | 142.97 | 142.96 | 142.97 | 0.01 | 0.01 |
| 9/28/2017 | 142.76 | 142.76 | 142.79 | 0.03 | 0.02 |
| 9/29/2017 | 145.82 | 145.79 | 145.81 | 0.02 | 0.01 |
| 10/2/2017 | 146.04 | 146.02 | 146.03 | 0.01 | 0.01 |
| 10/3/2017 | 146.08 | 146.08 | 146.09 | 0.01 | 0.01 |
| 10/4/2017 | 146.52 | 146.51 | 146.52 | 0.01 | 0.01 |
| 10/5/2017 | 140.01 | 139.99 | 140.01 | 0.02 | 0.01 |
| 10/6/2017 | 139.21 | 139.12 | 139.13 | 0.01 | 0.01 |
| 10/9/2017 | 139.27 | 139.26 | 139.27 | 0.01 | 0.01 |
| 10/10/2017 | 139.69 | 139.69 | 139.70 | 0.01 | 0.01 |
| 10/11/2017 | 139.56 | 139.54 | 139.55 | 0.01 | 0.01 |
| 10/12/2017 | 138.50 | 138.47 | 138.50 | 0.03 | 0.02 |
| 10/13/2017 | 136.46 | 136.44 | 136.46 | 0.02 | 0.01 |
| 10/16/2017 | 136.71 | 136.71 | 136.72 | 0.01 | 0.01 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 10/17/2017 | $ 138.86 | $ 138.87 | $ 138.88 | $ 0.01 | 0.01 % |
| 10/18/2017 | 137.17 | 137.13 | 137.17 | 0.04 | 0.03 |
| 10/19/2017 | 135.96 | 135.98 | 135.99 | 0.01 | 0.01 |
| 10/20/2017 | 121.33 | 121.29 | 121.30 | 0.01 | 0.01 |
| 10/23/2017 | 122.37 | 122.37 | 122.38 | 0.01 | 0.01 |
| 10/24/2017 | 120.34 | 120.36 | 120.37 | 0.01 | 0.01 |
| 10/25/2017 | 119.56 | 119.53 | 119.54 | 0.01 | 0.01 |
| 10/26/2017 | 99.99 | 99.96 | 99.97 | 0.01 | 0.01 |
| 10/27/2017 | 98.17 | 98.02 | 98.03 | 0.01 | 0.01 |
| 10/30/2017 | 100.97 | 100.97 | 100.98 | 0.01 | 0.01 |
| 10/31/2017 | 100.97 | 100.97 | 100.98 | 0.01 | 0.01 |
| 11/1/2017 | 100.53 | 100.53 | 100.54 | 0.01 | 0.01 |
| 11/2/2017 | 98.20 | 98.19 | 98.21 | 0.02 | 0.02 |
| 11/3/2017 | 100.04 | 100.04 | 100.05 | 0.01 | 0.01 |
| 11/6/2017 | 101.64 | 101.66 | 101.67 | 0.01 | 0.01 |
| 11/7/2017 | 102.33 | 102.33 | 102.34 | 0.01 | 0.01 |
| 11/8/2017 | 101.65 | 101.65 | 101.68 | 0.03 | 0.03 |
| 11/9/2017 | 102.46 | 102.44 | 102.45 | 0.01 | 0.01 |
| 11/10/2017 | 102.34 | 102.32 | 102.33 | 0.01 | 0.01 |
| 11/13/2017 | 101.16 | 101.16 | 101.17 | 0.01 | 0.01 |
| 11/14/2017 | 98.86 | 98.86 | 98.88 | 0.02 | 0.02 |
| 11/15/2017 | 100.34 | 100.35 | 100.36 | 0.01 | 0.01 |
| 11/16/2017 | 103.35 | 103.36 | 103.38 | 0.02 | 0.02 |
| 11/17/2017 | 104.10 | 104.09 | 104.10 | 0.01 | 0.01 |
| 11/20/2017 | 103.15 | 103.15 | 103.16 | 0.01 | 0.01 |
| 11/21/2017 | 104.50 | 104.50 | 104.51 | 0.01 | 0.01 |
| 11/22/2017 | 105.16 | 105.16 | 105.17 | 0.01 | 0.01 |
| 11/24/2017 | 104.50 | 104.46 | 104.50 | 0.04 | 0.04 |
| 11/27/2017 | 103.33 | 103.33 | 103.34 | 0.01 | 0.01 |
| 11/28/2017 | 103.99 | 104.01 | 104.03 | 0.02 | 0.02 |
| 11/29/2017 | 103.12 | 103.10 | 103.12 | 0.02 | 0.02 |
| 11/30/2017 | 100.83 | 100.73 | 100.76 | 0.03 | 0.03 |
| 12/1/2017 | 102.14 | 102.10 | 102.11 | 0.01 | 0.01 |
| 12/4/2017 | 102.61 | 102.61 | 102.63 | 0.02 | 0.02 |
| 12/5/2017 | 102.56 | 102.56 | 102.57 | 0.01 | 0.01 |
| 12/6/2017 | 102.17 | 102.14 | 102.16 | 0.02 | 0.02 |
| 12/7/2017 | 102.73 | 102.70 | 102.72 | 0.02 | 0.02 |
| 12/8/2017 | 106.09 | 106.08 | 106.09 | 0.01 | 0.01 |
| 12/11/2017 | 108.00 | 107.97 | 107.99 | 0.02 | 0.02 |
| 12/12/2017 | 109.04 | 109.05 | 109.06 | 0.01 | 0.01 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 12/13/2017 | $ 108.20 | $ 108.21 | $ 108.23 | $ 0.02 | 0.02 % |
| 12/14/2017 | 108.24 | 108.28 | 108.30 | 0.02 | 0.02 |
| 12/15/2017 | 109.41 | 109.36 | 109.37 | 0.01 | 0.01 |
| 12/18/2017 | 108.04 | 108.04 | 108.07 | 0.03 | 0.03 |
| 12/19/2017 | 107.06 | 107.04 | 107.06 | 0.02 | 0.02 |
| 12/20/2017 | 108.27 | 108.27 | 108.28 | 0.01 | 0.01 |
| 12/21/2017 | 107.88 | 107.88 | 107.91 | 0.03 | 0.03 |
| 12/22/2017 | 106.33 | 106.31 | 106.33 | 0.02 | 0.02 |
| 12/26/2017 | 106.97 | 106.99 | 107.00 | 0.01 | 0.01 |
| 12/27/2017 | 104.46 | 104.41 | 104.42 | 0.01 | 0.01 |
| 12/28/2017 | 104.75 | 104.72 | 104.73 | 0.01 | 0.01 |
| 12/29/2017 | 104.36 | 104.37 | 104.38 | 0.01 | 0.01 |
| 1/2/2018 | 106.16 | 106.14 | 106.15 | 0.01 | 0.01 |
| 1/3/2018 | 109.14 | 109.10 | 109.11 | 0.01 | 0.01 |
| 1/4/2018 | 106.68 | 106.66 | 106.68 | 0.02 | 0.02 |
| 1/5/2018 | 104.99 | 104.89 | 104.90 | 0.01 | 0.01 |
| 1/8/2018 | 104.18 | 104.14 | 104.17 | 0.03 | 0.03 |
| 1/9/2018 | 105.49 | 105.46 | 105.50 | 0.04 | 0.04 |
| 1/10/2018 | 105.46 | 105.40 | 105.41 | 0.01 | 0.01 |
| 1/11/2018 | 104.58 | 104.53 | 104.54 | 0.01 | 0.01 |
| 1/12/2018 | 106.00 | 105.92 | 105.95 | 0.03 | 0.03 |
| 1/16/2018 | 104.82 | 104.84 | 104.85 | 0.01 | 0.01 |
| 1/17/2018 | 102.02 | 102.00 | 102.01 | 0.01 | 0.01 |
| 1/18/2018 | 101.72 | 101.70 | 101.71 | 0.01 | 0.01 |
| 1/19/2018 | 102.65 | 102.62 | 102.63 | 0.01 | 0.01 |
| 1/22/2018 | 102.91 | 102.89 | 102.90 | 0.01 | 0.01 |
| 1/23/2018 | 104.55 | 104.53 | 104.54 | 0.01 | 0.01 |
| 1/24/2018 | 103.11 | 103.12 | 103.13 | 0.01 | 0.01 |
| 1/25/2018 | 104.39 | 104.37 | 104.39 | 0.02 | 0.02 |
| 1/26/2018 | 105.17 | 105.09 | 105.10 | 0.01 | 0.01 |
| 1/29/2018 | 103.26 | 103.24 | 103.25 | 0.01 | 0.01 |
| 1/30/2018 | 101.58 | 101.57 | 101.58 | 0.01 | 0.01 |
| 1/31/2018 | 101.16 | 101.19 | 101.21 | 0.02 | 0.02 |
| 2/1/2018 | 100.34 | 100.32 | 100.33 | 0.01 | 0.01 |
| 2/2/2018 | 99.80 | 99.78 | 99.79 | 0.01 | 0.01 |
| 2/5/2018 | 93.74 | 93.73 | 93.76 | 0.03 | 0.03 |
| 2/6/2018 | 96.25 | 96.27 | 96.28 | 0.01 | 0.01 |
| 2/7/2018 | 95.16 | 95.16 | 95.18 | 0.02 | 0.02 |
| 2/8/2018 | 91.02 | 91.01 | 91.02 | 0.01 | 0.01 |
| 2/9/2018 | 92.51 | 92.47 | 92.51 | 0.04 | 0.04 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 2/12/2018 | $ 91.51 | $ 91.49 | $ 91.50 | $ 0.01 | 0.01 % |
| 2/13/2018 | 91.98 | 91.98 | 91.99 | 0.01 | 0.01 |
| 2/14/2018 | 94.39 | 94.39 | 94.41 | 0.02 | 0.02 |
| 2/15/2018 | 96.14 | 96.14 | 96.15 | 0.01 | 0.01 |
| 2/16/2018 | 95.26 | 95.26 | 95.28 | 0.02 | 0.02 |
| 2/20/2018 | 93.85 | 93.84 | 93.85 | 0.01 | 0.01 |
| 2/21/2018 | 93.89 | 93.89 | 93.91 | 0.02 | 0.02 |
| 2/22/2018 | 93.78 | 93.78 | 93.80 | 0.02 | 0.02 |
| 2/23/2018 | 95.61 | 95.61 | 95.62 | 0.01 | 0.01 |
| 2/26/2018 | 96.49 | 96.48 | 96.49 | 0.01 | 0.01 |
| 2/27/2018 | 95.78 | 95.76 | 95.76 | 0.00 | 0.00 |
| 2/28/2018 | 87.12 | 87.12 | 87.13 | 0.01 | 0.01 |
| 3/1/2018 | 87.19 | 87.18 | 87.19 | 0.01 | 0.01 |
| 3/2/2018 | 89.33 | 89.31 | 89.32 | 0.01 | 0.01 |
| 3/5/2018 | 89.04 | 89.00 | 89.02 | 0.02 | 0.02 |
| 3/6/2018 | 89.17 | 89.16 | 89.17 | 0.01 | 0.01 |
| 3/7/2018 | 90.22 | 90.20 | 90.21 | 0.01 | 0.01 |
| 3/8/2018 | 91.19 | 91.18 | 91.20 | 0.02 | 0.02 |
| 3/9/2018 | 92.56 | 92.55 | 92.56 | 0.01 | 0.01 |
| 3/12/2018 | 92.28 | 92.28 | 92.30 | 0.02 | 0.02 |
| 3/13/2018 | 91.56 | 91.53 | 91.55 | 0.02 | 0.02 |
| 3/14/2018 | 91.61 | 91.63 | 91.64 | 0.01 | 0.01 |
| 3/15/2018 | 89.91 | 89.92 | 89.93 | 0.01 | 0.01 |
| 3/16/2018 | 89.61 | 89.55 | 89.58 | 0.03 | 0.03 |
| 3/19/2018 | 88.53 | 88.53 | 88.54 | 0.01 | 0.01 |
| 3/20/2018 | 88.27 | 88.27 | 88.30 | 0.03 | 0.03 |
| 3/21/2018 | 88.31 | 88.31 | 88.33 | 0.02 | 0.02 |
| 3/22/2018 | 86.91 | 86.91 | 86.93 | 0.02 | 0.02 |
| 3/23/2018 | 84.98 | 84.98 | 85.01 | 0.03 | 0.04 |
| 3/26/2018 | 87.17 | 87.17 | 87.19 | 0.02 | 0.02 |
| 3/27/2018 | 85.81 | 85.84 | 85.88 | 0.04 | 0.05 |
| 3/28/2018 | 88.41 | 88.41 | 88.47 | 0.06 | 0.07 |
| 3/29/2018 | 89.21 | 89.21 | 89.22 | 0.01 | 0.01 |
| 4/2/2018 | 87.07 | 87.05 | 87.07 | 0.02 | 0.02 |
| 4/3/2018 | 86.83 | 86.82 | 86.83 | 0.01 | 0.01 |
| 4/4/2018 | 90.47 | 90.47 | 90.48 | 0.01 | 0.01 |
| 4/5/2018 | 88.84 | 88.83 | 88.84 | 0.01 | 0.01 |
| 4/6/2018 | 86.95 | 86.92 | 86.95 | 0.03 | 0.03 |
| 4/9/2018 | 86.94 | 86.94 | 86.97 | 0.03 | 0.03 |
| 4/10/2018 | 89.44 | 89.43 | 89.44 | 0.01 | 0.01 |

**Exhibit 9**
**Celgene Corporation**
**Daily Bid-Ask Spread for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Date | Closing Price | Bid | Ask | Bid-Ask Spread | Bid-Ask Spread as a Percentage of Closing Price |
|------|--------------|-----|-----|----------------|-------------------------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (4) - (3) | (5) / (2) |
| 4/11/2018 | $ 88.71 | $ 88.71 | $ 88.72 | $ 0.01 | 0.01 % |
| 4/12/2018 | 89.74 | 89.75 | 89.76 | 0.01 | 0.01 |
| 4/13/2018 | 89.40 | 89.40 | 89.42 | 0.02 | 0.02 |
| 4/16/2018 | 90.54 | 90.53 | 90.54 | 0.01 | 0.01 |
| 4/17/2018 | 91.10 | 91.10 | 91.11 | 0.01 | 0.01 |
| 4/18/2018 | 91.01 | 91.01 | 91.03 | 0.02 | 0.02 |
| 4/19/2018 | 89.62 | 89.61 | 89.62 | 0.01 | 0.01 |
| 4/20/2018 | 88.95 | 88.95 | 88.98 | 0.03 | 0.03 |
| 4/23/2018 | 89.49 | 89.48 | 89.49 | 0.01 | 0.01 |
| 4/24/2018 | 89.14 | 89.14 | 89.15 | 0.01 | 0.01 |
| 4/25/2018 | 89.20 | 89.21 | 89.22 | 0.01 | 0.01 |
| 4/26/2018 | 92.08 | 92.08 | 92.09 | 0.01 | 0.01 |
| 4/27/2018 | 91.18 | 91.17 | 91.18 | 0.01 | 0.01 |

| | |
|---|---|
| **Average Bid-Ask Spread as a Percent of Closing Price:** | 0.02 % |

| | |
|---|---|
| **Median Bid-Ask Spread as a Percent of Closing Price:** | 0.01 % |

**Notes and Sources:**
Data obtained from Bloomberg L.P.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

**Exhibit 10a**
**Celgene Corporation**
**One-Day Autocorrelation of Daily Log Returns for Celgene Common Stock**
**April 27, 2017 to April 27, 2018[1]**

| Window<br>(1) | Number of<br>Observations<br>(2) | Autocorrelation<br>in Daily Actual<br>Log Returns[2]<br>(3) | t-statistic[3]<br>(4) |
|---|---|---|---|
| *Class Period* | | | |
| April 27, 2017 to April 27, 2018 | 253 | 0.02 | 0.35 |
| *Year* [4] | | | |
| 2017 | 172 | 0.06 | 0.83 |
| 2018 | 81 | (0.07) | (0.65) |

**Notes and Sources:**

Data obtained from Bloomberg L.P.

[1] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[2] This is the coefficient of the independent variable in the autocorrelation model.

[3] Two stars (**) represent significance at the 5% level and one star (*) represents significance at the 10% level.

[4] Only days within the Class Period (April 27, 2017 to April 27, 2018) are used.

**Exhibit 10b**
**Celgene Corporation**
**Runs Test for Celgene Common Stock[1]**
**April 27, 2017 to April 27, 2018[2]**

| Window (1) | Number of Observations (2) | Number of Runs[3] (3) | z-statistic[4] (4) | p-value (5) |
|---|---|---|---|---|
| **Class Period** | | | | |
| April 27, 2017 to April 27, 2018 | 253 | 137 | 1.20 | 0.23 |
| **Year[5]** | | | | |
| 2017 | 172 | 89 | 0.31 | 0.76 |
| 2018 | 81 | 42 | 0.11 | 0.91 |

**Notes and Sources:**

Data obtained from Bloomberg L.P.

[1] A runs test is a non-parametric test whereby the number of sequences of values above and below the median value of the data set is tabulated and compared against its sampling distribution under the random walk hypothesis.

[2] The Class Period is assumed to be from April 27, 2017 to April 27, 2018, per the Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification.

[3] A run is defined as a series of values above or below the median value of the data set.

[4] The z-statistic is a test statistic for a test of binomial proportions. It measures the likelihood of observing results as or more extreme than those actually observed if the data were generated by a theoretical process with no autocorrelation. Two stars (**) represent significance at the 5% level and one star (*) represents significance at the 10% level.

[5] Only days within the Class Period (April 27, 2017 to April 27, 2018) are used.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE CELGENE CORPORATION SECURITIES LITIGATION | Case No. 2:18-cv-04772 (JMV) (JBC) |

## DECLARATION OF ANDERS GREFBERG ON BEHALF OF AMF PENSIONSFÖRSÄKRING AB IN SUPPORT OF LEAD PLAINTIFF'S <u>MOTION FOR CLASS CERTIFICATION</u>

I, Anders Grefberg, declare as follows:

1.      I respectfully submit this Declaration in support of the application of AMF Pensionsförsäkring AB ("AMF" or "Plaintiff"), the Court-appointed Lead Plaintiff in the above-captioned action (the "Action"), to serve as the representative for the Class (as defined in Lead Plaintiff's Motion for Class Certification).

2.      I am Legal Counsel with AMF.  I am authorized to make this Declaration on behalf of AMF and have personal knowledge about the information in this Declaration.

3.      Established in 1973, AMF is one of the largest pension companies in Sweden.  As set forth in its motion for appointment as Lead Plaintiff and supporting papers, AMF purchased or acquired a significant number of shares of common stock issued by Celgene Corporation ("Celgene") at artificially inflated prices during the

1

Class Period and suffered substantial losses when Celgene's stock price declined following the corrective disclosures alleged in the Second Amended Consolidated Class Action Complaint (the "Complaint") (ECF No. 57).

4.     AMF understands that the Private Securities Litigation Reform Act of 1995 ("PSLRA") was intended to encourage institutional investors and others with meaningful losses to direct securities class actions.  As Class Representative, AMF, a sophisticated institutional investor, is committed to vigorously prosecuting this litigation.  AMF intends to obtain the largest recovery for the proposed class consistent with good faith and sound judgment.

5.     AMF has diligently pursued the effective prosecution of this Action and actively monitored its progress.  Among other things, AMF has: (i) regularly communicated with Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") regarding all aspects of the case, including the progress of discovery and the filing of significant pleadings and Court orders; (ii) reviewed and authorized submissions to the Court and Defendants; and (iii) begun searching for and collecting documents responsive to Defendants' discovery requests.  Additionally, AMF, through Kessler Topaz, has: (i) investigated and filed an amended complaint; (ii) successfully opposed Defendants' motion to dismiss; and (iii) reviewed thousands of pages of documents produced by the U.S. Food and Drug Administration.

6.      AMF understands that as Class Representative, it would owe a fiduciary duty to all members of the proposed Class to provide fair and adequate representation and would continue to work actively with Class Counsel in order to prosecute this Action in the interests of the Class members it represents and to try to obtain the best outcome for them, consistent with good faith and meritorious advocacy.  AMF is committed to continuing to actively direct this litigation and maximize the recovery for the proposed Class by attending hearings and/or trial, sitting for deposition, overseeing the preparation and filing of pleadings, as appropriate, and supervising the actions of Class Counsel.

7.      AMF seeks appointment of Kessler Topaz as Class Counsel for the proposed Class, based on its substantial experience and expertise in prosecuting securities class actions.  AMF understands that Kessler Topaz has enlisted Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") to serve as additional counsel to the Class and Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne") and Seeger Weiss, LLP ("Seeger Weiss") to serve as Liaison Counsel.  AMF believes that Kessler Topaz, Bernstein Litowitz, Carella Byrne, and Seeger Weiss possess the necessary experience and resources to prosecute this case vigorously and effectively on behalf of the proposed Class.

8.      Finally, AMF understands that its service as a Class Representative does not entitle it to any benefits not enjoyed by the rest of the Class.  If there is a

3

recovery in this case, AMF does not expect to receive any more than its pro-rata share of the amount recovered, beyond that which is provided by the PSLRA.

9.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of April , 2020.

_____

Anders Grafberg
*On behalf of AMF Pensionsförsäkring*

4

# EXHIBIT 3



**280 King of Prussia Road, Radnor, Pennsylvania 19087 • 610-667-7706 • Fax: 610-667-7056 • info@ktmc.com**
**One Sansome Street, Suite 1850, San Francisco, CA 94104 • 415-400-3000 • Fax: 415-400-3001 • info@ktmc.com**

**www.ktmc.com**

# FIRM PROFILE

Since 1987, Kessler Topaz Meltzer & Check, LLP has specialized in the prosecution of securities class actions and has grown into one of the largest and most successful shareholder litigation firms in the field. With offices in Radnor, Pennsylvania and San Francisco, California, the Firm is comprised of 94 attorneys as well as an experienced support staff consisting of over 80 paralegals, in-house investigators, legal clerks and other personnel. With a large and sophisticated client base (numbering over 180 institutional investors from around the world -- including public and Taft-Hartley pension funds, mutual fund managers, investment advisors, insurance companies, hedge funds and other large investors), Kessler Topaz has developed an international reputation for excellence and has extensive experience prosecuting securities fraud actions. For the past several years, the National Law Journal has recognized Kessler Topaz as one of the top securities class action law firms in the country. In addition, the Legal Intelligencer recently awarded Kessler Topaz with its Class Action Litigation Firm of The Year award. Lastly, Kessler Topaz and several of its attorneys are regularly recognized by Legal500 and Benchmark: Plaintiffs as leaders in our field.

Kessler Topaz is serving or has served as lead or co-lead counsel in many of the largest and most significant securities class actions pending in the United States, including actions against: Bank of America, Duke Energy, Lehman Brothers, Hewlett Packard, Johnson & Johnson, JPMorgan Chase, Morgan Stanley and MGM Mirage, among others. As demonstrated by the magnitude of these high-profile cases, we take seriously our role in advising clients to seek lead plaintiff appointment in cases, paying special attention to the factual elements of the fraud, the size of losses and damages, and whether there are viable sources of recovery.

Kessler Topaz has recovered billions of dollars in the course of representing defrauded shareholders from around the world and takes pride in the reputation we have earned for our dedication to our clients. Kessler Topaz devotes significant time to developing relationships with its clients in a manner that enables the Firm to understand the types of cases they will be interested in pursuing and their expectations. Further, the Firm is committed to pursuing meaningful corporate governance reforms in cases where we suspect that systemic problems within a company could lead to recurring litigation and where such changes also have the possibility to increase the value of the underlying company. The Firm is poised to continue protecting rights worldwide.

# NOTEWORTHY ACHIEVEMENTS

*During the Firm's successful history, Kessler Topaz has recovered billions of dollars for defrauded stockholders and consumers. The following are among the Firm's notable achievements:*

## Securities Fraud Litigation

### *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* **Master File No. 09 MDL 2058:**

Kessler Topaz, as Co-Lead Counsel, brought an action on behalf of lead plaintiffs that asserted claims for violations of the federal securities laws against Bank of America Corp. ("BoA") and certain of BoA's officers and board members relating to BoA's merger with Merrill Lynch & Co. ("Merrill") and its failure to inform its shareholders of billions of dollars of losses which Merrill had suffered before the pivotal shareholder vote, as well as an undisclosed agreement allowing Merrill to pay up to $5.8 billion in bonuses before the acquisition closed, despite these losses. On September 28, 2012, the Parties announced a $2.425 billion case settlement with BoA to settle all claims asserted against all defendants in the action which has since received final approval from the Court. BoA also agreed to implement significant corporate governance improvements. The settlement, reached after almost four years of litigation with a trial set to begin on October 22, 2012, amounts to 1) the sixth largest securities class action lawsuit settlement ever; 2) the fourth largest securities class action settlement ever funded by a single corporate defendant; 3) the single largest settlement of a securities class action in which there was neither a financial restatement involved nor a criminal conviction related to the alleged misconduct; 4) the single largest securities class action settlement ever resolving a Section 14(a) claim (the federal securities provision designed to protect investors against misstatements in connection with a proxy solicitation); and 5) by far the largest securities class action settlement to come out of the subprime meltdown and credit crisis to date.

### *In re Tyco International, Ltd. Sec. Litig.*, **No. 02-1335-B (D.N.H. 2002):**

Kessler Topaz, which served as Co-Lead Counsel in this highly publicized securities fraud class action on behalf of a group of institutional investors, achieved a record $3.2 billion settlement with Tyco International, Ltd. ("Tyco") and their auditor PricewaterhouseCoopers ("PwC"). The $2.975 billion settlement with Tyco represents the single-largest securities class action recovery from a single corporate defendant in history. In addition, the $225 million settlement with PwC represents the largest payment PwC has ever paid to resolve a securities class action and is the second-largest auditor settlement in securities class action history.

The action asserted federal securities claims on behalf of all purchasers of Tyco securities between December 13, 1999 and June 7, 2002 ("Class Period") against Tyco, certain former officers and directors of Tyco and PwC. Tyco is alleged to have overstated its income during the Class Period by $5.8 billion through a multitude of accounting manipulations and shenanigans. The case also involved allegations of looting and self-dealing by the officers and directors of the Company. In that regard, Defendants L. Dennis Kozlowski, the former CEO and Mark H. Swartz, the former CFO have been sentenced to up to 25 years in prison after being convicted of grand larceny, falsification of business records and conspiracy for their roles in the alleged scheme to defraud investors.

As presiding Judge Paul Barbadoro aptly stated in his Order approving the final settlement, "[i]t is difficult to overstate the complexity of [the litigation]." Judge Barbadoro noted the extraordinary effort required to pursue the litigation towards its successful conclusion, which included the review of more than 82.5 million pages of documents, more than 220 depositions and over 700 hundred discovery requests and responses. In addition to the complexity of the litigation, Judge Barbadoro also highlighted the great risk undertaken by

Co-Lead Counsel in pursuit of the litigation, which he indicated was greater than in other multi-billion dollar securities cases and "put [Plaintiffs] at the cutting edge of a rapidly changing area of law."

In sum, the Tyco settlement is of historic proportions for the investors who suffered significant financial losses and it has sent a strong message to those who would try to engage in this type of misconduct in the future.

***In re Tenet Healthcare Corp. Sec. Litig.,* No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002):**
Kessler Topaz served as Co-Lead Counsel in this action. A partial settlement, approved on May 26, 2006, was comprised of three distinct elements: (i) a substantial monetary commitment of $215 million by the company; (ii) personal contributions totaling $1.5 million by two of the individual defendants; and (iii) the enactment and/or continuation of numerous changes to the company's corporate governance practices, which have led various institutional rating entities to rank Tenet among the best in the U.S. in regards to corporate governance. The significance of the partial settlement was heightened by Tenet's precarious financial condition. Faced with many financial pressures — including several pending civil actions and federal investigations, with total contingent liabilities in the hundreds of millions of dollars — there was real concern that Tenet would be unable to fund a settlement or satisfy a judgment of any greater amount in the near future. By reaching the partial settlement, we were able to avoid the risks associated with a long and costly litigation battle and provide a significant and immediate benefit to the class. Notably, this resolution represented a unique result in securities class action litigation — personal financial contributions from individual defendants. After taking the case through the summary judgment stage, we were able to secure an additional $65 million recovery from KPMG – Tenet's outside auditor during the relevant period – for the class, bringing the total recovery to $281.5 million.

***In re Wachovia Preferred Securities and Bond/Notes Litigation,* Master File No. 09 Civ. 6351 (RJS) (S.D.N.Y.):**
Kessler Topaz, as court-appointed Co-Lead Counsel, asserted class action claims for violations of the Securities Act of 1933 on behalf of all persons who purchased Wachovia Corporation ("Wachovia") preferred securities issued in thirty separate offerings (the "Offerings") between July 31, 2006 and May 29, 2008 (the "Offering Period"). Defendants in the action included Wachovia, various Wachovia related trusts, Wells Fargo as successor-in-interest to Wachovia, certain of Wachovia's officer and board members, numerous underwriters that underwrote the Offerings, and KPMG LLP ("KPMG"), Wachovia's former outside auditor. Plaintiffs alleged that the registration statements and prospectuses and prospectus supplements used to market the Offerings to Plaintiffs and other members of the class during the Offerings Period contained materially false and misleading statements and omitted material information. Specifically, the Complaint alleged that in connection with the Offerings, Wachovia: (i) failed to reveal the full extent to which its mortgage portfolio was increasingly impaired due to dangerously lax underwriting practices; (ii) materially misstated the true value of its mortgage-related assets; (iii) failed to disclose that its loan loss reserves were grossly inadequate; and (iv) failed to record write-downs and impairments to those assets as required by Generally Accepted Accounting Principles ("GAAP"). Even as Wachovia faced insolvency, the Offering Materials assured investors that Wachovia's capital and liquidity positions were "strong," and that it was so "well capitalized" that it was actually a "provider of liquidity" to the market. On August 5, 2011, the Parties announced a $590 million cash settlement with Wells Fargo (as successor-in-interest to Wachovia) and a $37 million cash settlement with KPMG, to settle all claims asserted against all defendants in the action. This settlement was approved by the Hon. Judge Richard J. Sullivan by order issued on January 3, 2012.

***In re Initial Public Offering Sec. Litig.,* Master File No. 21 MC 92(SAS):**
This action settled for $586 million on January 1, 2010, after years of litigation overseen by U.S. District Judge Shira Scheindlin. Kessler Topaz served on the plaintiffs' executive committee for the case, which was based upon the artificial inflation of stock prices during the dot-com boom of the late 1990s that led to

the collapse of the technology stock market in 2000 that was related to allegations of laddering and excess commissions being paid for IPO allocations.

***In re Longtop Financial Technologies Ltd. Securities Litigation,* No. 11-cv-3658 (S.D.N.Y.):**
Kessler Topaz, as Lead Counsel, brought an action on behalf of lead plaintiffs that asserted claims for violations of the federal securities laws against Longtop Financial Technologies Ltd. ("Longtop"), its Chief Executive Officer, Weizhou Lian, and its Chief Financial Officer, Derek Palaschuk. The claims against Longtop and these two individuals were based on a massive fraud that occurred at the company. As the CEO later confessed, the company had been a fraud since 2004. Specifically, Weizhou Lian confessed that the company's cash balances and revenues were overstated by hundreds of millions of dollars and it had millions of dollars in unrecorded bank loans. The CEO further admitted that, in 2011 alone, Longtop's revenues were overstated by about 40 percent. On November 14, 2013, after Weizhou Lian and Longtop failed to appear and defend the action, Judge Shira Scheindlin entered default judgment against these two defendants in the amount of $882.3 million plus 9 percent interest running from February 21, 2008 to the date of payment. The case then proceeded to trial against Longtop's CFO who claimed he did not know about the fraud - and was not reckless in not knowing – when he made false statements to investors about Longtop's financial results. On November 21, 2014, the jury returned a verdict on liability in favor of plaintiffs. Specifically, the jury found that the CFO was liable to the plaintiffs and the class for each of the eight challenged misstatements. Then, on November 24, 2014, the jury returned its damages verdict, ascribing a certain amount of inflation to each day of the class period and apportioning liability for those damages amongst the three named defendants. The Longtop trial was only the 14th securities class action to be tried to a verdict since the passage of the Private Securities Litigation Reform Act in 1995 and represents a historic victory for investors.

***Operative Plasterers and Cement Masons International Association Local 262 Annuity Fund v. Lehman Brothers Holdings, Inc.,* No. 1:08-cv-05523-LAK (S.D.N.Y.):**
Kessler Topaz, on behalf of lead plaintiffs, asserted claims against certain individual defendants and underwriters of Lehman securities arising from misstatements and omissions regarding Lehman's financial condition, and its exposure to the residential and commercial real estate markets in the period leading to Lehman's unprecedented bankruptcy filing on September 14, 2008. In July 2011, the Court sustained the majority of the amended Complaint finding that Lehman's use of Repo 105, while technically complying with GAAP, still rendered numerous statements relating to Lehman's purported Net Leverage Ration materially false and misleading. The Court also found that Defendants' statements related to Lehman's risk management policies were sufficient to state a claim. With respect to loss causation, the Court also failed to accept Defendants' contention that the financial condition of the economy led to the losses suffered by the Class. As the case was being prepared for trial, a $517 million settlement was reached on behalf of shareholders --- $426 million of which came from various underwriters of the Offerings, representing a significant recovery for investors in this now bankrupt entity. In addition, $90 million came from Lehman's former directors and officers, which is significant considering the diminishing assets available to pay any future judgment. Following these settlements, the litigation continued against Lehman's auditor, Ernst & Young LLP. A settlement for $99 million was subsequently reached with Ernst & Young LLP and was approved by the Court.

***Minneapolis Firefighters' Relief Association v. Medtronic, Inc. et al.* Case No. 0:08-cv-06324-PAM-AJB (D. Minn.):**
Kessler Topaz brought an action on behalf of lead plaintiffs that alleged that the company failed to disclose its reliance on illegal "off-label" marketing techniques to drive the sales of its INFUSE Bone Graft ("INFUSE") medical device. While physicians are allowed to prescribe a drug or medical device for any use they see fit, federal law prohibits medical device manufacturers from marketing devices for any uses not specifically approved by the United States Food and Drug Administration. The company's off-label marketing practices have resulted in the company becoming the target of a probe by the federal government

which was revealed on November 18, 2008, when the company's CEO reported that Medtronic received a subpoena from the United States Department of Justice which is "looking into off-label use of INFUSE." After hearing oral argument on Defendants' Motions to Dismiss, on February 3, 2010, the Court issued an order granting in part and denying in part Defendants' motions, allowing a large portion of the action to move forward. The Court held that Plaintiff successfully stated a claim against each Defendant for a majority of the misstatements alleged in the Complaint and that each of the Defendants knew or recklessly disregarded the falsity of these statements and that Defendants' fraud caused the losses experienced by members of the Class when the market learned the truth behind Defendants' INFUSE marketing efforts. While the case was in discovery, on April 2, 2012, Medtronic agreed to pay shareholders an $85 million settlement. The settlement was approved by the Court by order issued on November 8, 2012.

**In re Brocade Sec. Litig., Case No. 3:05-CV-02042 (N.D. Cal. 2005) (CRB):**
The complaint in this action alleges that Defendants engaged in repeated violations of federal securities laws by backdating options grants to top executives and falsified the date of stock option grants and other information regarding options grants to numerous employees from 2000 through 2004, which ultimately caused Brocade to restate all of its financial statements from 2000 through 2005. In addition, concurrent SEC civil and Department of Justice criminal actions against certain individual defendants were commenced. In August, 2007 the Court denied Defendant's motions to dismiss and in October, 2007 certified a class of Brocade investors who were damaged by the alleged fraud. Discovery is currently proceeding and the case is being prepared for trial. Furthermore, while litigating the securities class action Kessler Topaz and its co-counsel objected to a proposed settlement in the Brocade derivative action. On March 21, 2007, the parties in *In re Brocade Communications Systems, Inc. Derivative Litigation*, No. C05-02233 (N.D. Cal. 2005) (CRB) gave notice that they had obtained preliminary approval of their settlement. According to the notice, which was buried on the back pages of the Wall Street Journal, Brocade shareholders were given less than three weeks to evaluate the settlement and file any objection with the Court. Kessler Topaz client Puerto Rico Government Employees' Retirement System ("PRGERS") had a large investment in Brocade and, because the settlement was woefully inadequate, filed an objection. PRGERS, joined by fellow institutional investor Arkansas Public Employees Retirement System, challenged the settlement on two fundamental grounds. First, PRGERS criticized the derivative plaintiffs for failing to conduct any discovery before settling their claims. PRGERS also argued that derivative plaintiff's abject failure to investigate its own claims before providing the defendants with broad releases from liability made it impossible to weigh the merits of the settlement. The Court agreed, and strongly admonished derivative plaintiffs for their failure to perform this most basic act of service to their fellow Brocade shareholders. The settlement was rejected and later withdrawn. Second, and more significantly, PRGERS claimed that the presence of the well-respected law firm Wilson, Sonsini Goodrich and Rosati, in this case, created an incurable conflict of interest that corrupted the entire settlement process. The conflict stemmed from WSGR's dual role as counsel to Brocade and the Individual Settling Defendants, including WSGR Chairman and former Brocade Board Member Larry Sonsini. On this point, the Court also agreed and advised WSGR to remove itself from the case entirely. On May 25, 2007, WSGR complied and withdrew as counsel to Brocade. The case settled for $160 million and was approved by the Court.

**In re Satyam Computer Services, Ltd. Sec. Litig., No. 09 MD 02027 (BSJ) (S.D.N.Y.):**
Kessler Topaz served as Co-Lead Counsel in this securities fraud class action in the Southern District of New York. The action asserts claims by lead plaintiffs for violations of the federal securities laws against Satyam Computer Services Limited ("Satyam" or the "Company") and certain of Satyam's former officers and directors and its former auditor PricewaterhouseCoopers International Ltd. ("PwC") relating to the Company's January 7, 2009, disclosure admitting that B. Ramalinga Raju ("B. Raju"), the Company's former chairman, falsified Satyam's financial reports by, among other things, inflating its reported cash balances by more than $1 billion. The news caused the price of Satyam's common stock (traded on the National Stock Exchange of India and the Bombay Stock Exchange) and American Depository Shares ("ADSs") (traded on the New York Stock Exchange ("NYSE")) to collapse. From a closing price of $3.67

per share on January 6, 2009, Satyam's common stock closed at $0.82 per share on January 7, 2009. With respect to the ADSs, the news of B. Raju's letter was revealed overnight in the United States and, as a result, trading in Satyam ADSs was halted on the NYSE before the markets opened on January 7, 2009. When trading in Satyam ADSs resumed on January 12, 2009, Satyam ADSs opened at $1.14 per ADS, down steeply from a closing price of $9.35 on January 6, 2009. Lead Plaintiffs filed a consolidated complaint on July 17, 2009, on behalf of all persons or entities, who (a) purchased or otherwise acquired Satyam's ADSs in the United States; and (b) residents of the United States who purchased or otherwise acquired Satyam shares on the National Stock Exchange of India or the Bombay Stock Exchange between January 6, 2004 and January 6, 2009. Co-Lead Counsel secured a settlement for $125 million from Satyam on February 16, 2011. Additionally, Co-Lead Counsel was able to secure a $25.5 million settlement from PwC on April 29, 2011, who was alleged to have signed off on the misleading audit reports.

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*, **Case No. 07-CV-61542 (S.D. Fla. 2007):**
On November 18, 2010, a panel of nine Miami, Florida jurors returned the first securities fraud verdict to arise out of the financial crisis against BankAtlantic Bancorp. Inc., its chief executive officer and chief financial officer. This case was only the tenth securities class action to be tried to a verdict following the passage of the Private Securities Litigation Reform Act of 1995, which governs such suits. Following extensive post-trial motion practice, the District Court upheld all of the Jury's findings of fraud but vacated the damages award on a narrow legal issue and granted Defendant's motion for a judgment as a matter of law. Plaintiffs appealed to the U.S. Court of Appeals for the Eleventh Circuit. On July 23, 2012, a three-judge panel for the Appeals Court found the District Court erred in granting the Defendant's motion for a judgment as a matter of law based in part on the Jury's findings (perceived inconsistency of two of the Jury's answers to the special interrogatories) instead of focusing solely on the sufficiency of the evidence. However, upon its review of the record, the Appeals Court affirmed the District Court's decision as it determined the Plaintiffs did not introduce evidence sufficient to support a finding in its favor on the element of loss causation. The Appeals Court's decision in this case does not diminish the five years of hard work which Kessler Topaz expended to bring the matter to trial and secure an initial jury verdict in the Plaintiffs' favor. This case is an excellent example of the Firm's dedication to our clients and the lengths it will go to try to achieve the best possible results for institutional investors in shareholder litigation.

*In re AremisSoft Corp. Sec. Litig.,* **C.A. No. 01-CV-2486 (D.N.J. 2002):**
Kessler Topaz is particularly proud of the results achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, one of whom remains a fugitive. In settling the action, Kessler Topaz, as sole Lead Counsel, assisted in reorganizing AremisSoft as a new company to allow for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The approved Settlement enabled the class to receive the majority of the equity in the new Company, as well as their pro rata share of any amounts recovered by the litigation trust. During this litigation, actions have been initiated in the Isle of Man, Cyprus, as well as in the United States as we continue our efforts to recover assets stolen by corporate insiders and related entities.

*In re CVS Corporation Sec. Litig.,* **C.A. No. 01-11464 JLT (D.Mass. 2001):**
Kessler Topaz, serving as Co-Lead Counsel on behalf of a group of institutional investors, secured a cash recovery of $110 million for the class, a figure which represents the third-largest payout for a securities action in Boston federal court. Kessler Topaz successfully litigated the case through summary judgment before ultimately achieving this outstanding result for the class following several mediation sessions, and just prior to the commencement of trial.

*In re Marvell Technology, Group, Ltd. Sec. Lit., Master* **File No. 06-06286 RWM:**

Kessler Topaz served as Co-Lead Counsel in this securities class action brought against Marvell Technology Group Ltd. ("Marvell") and three of Marvell's executive officers. This case centered around an alleged options backdating scheme carried out by Defendants from June 2000 through June 2006, which enabled Marvell's executives and employees to receive options with favorable option exercise prices chosen with the benefit of hindsight, in direct violation of Marvell's stock option plan, as well as to avoid recording hundreds of millions of dollars in compensation expenses on the Marvell's books. In total, the restatement conceded that Marvell had understated the cumulative effect of its compensation expense by $327.3 million, and overstated net income by $309.4 million, for the period covered by the restatement. Following nearly three years of investigation and prosecution of the Class' claims as well as a protracted and contentious mediation process, Co-Lead Counsel secured a settlement for $72 million from defendants on June 9, 2009. This Settlement represents a substantial portion of the Class' maximum provable damages, and is among the largest settlements, in total dollar amount, reached in an option backdating securities class action.

*In re Delphi Corp. Sec. Litig.,* **Master File No. 1:05-MD-1725 (E.D. Mich. 2005):**

In early 2005, various securities class actions were filed against auto-parts manufacturer Delphi Corporation in the Southern District of New York. Kessler Topaz its client, Austria-based mutual fund manager Raiffeisen Kapitalanlage-Gesellschaft m.b.H. ("Raiffeisen"), were appointed as Co-Lead Counsel and Co-Lead Plaintiff, respectively. The Lead Plaintiffs alleged that (i) Delphi improperly treated financing transactions involving inventory as sales and disposition of inventory; (ii) improperly treated financing transactions involving "indirect materials" as sales of these materials; and (iii) improperly accounted for payments made to and credits received from General Motors as warranty settlements and obligations. As a result, Delphi's reported revenue, net income and financial results were materially overstated, prompting Delphi to restate its earnings for the five previous years. Complex litigation involving difficult bankruptcy issues has potentially resulted in an excellent recovery for the class. In addition, Co-Lead Plaintiffs also reached a settlement of claims against Delphi's outside auditor, Deloitte & Touche, LLP, for $38.25 million on behalf of Delphi investors.

*In re Royal Dutch Shell European Shareholder Litigation,* **No. 106.010.887, Gerechtshof Te Amsterdam (Amsterdam Court of Appeal):**

Kessler Topaz was instrumental in achieving a landmark $352 million settlement on behalf non-US investors with Royal Dutch Shell plc relating to Shell's 2004 restatement of oil reserves. This settlement of securities fraud claims on a class-wide basis under Dutch law was the first of its kind, and sought to resolve claims exclusively on behalf of European and other non-United States investors. Uncertainty over whether jurisdiction for non-United States investors existed in a 2004 class action filed in federal court in New Jersey prompted a significant number of prominent European institutional investors from nine countries, representing more than one billion shares of Shell, to actively pursue a potential resolution of their claims outside the United States. Among the European investors which actively sought and supported this settlement were Alecta pensionsförsäkring, ömsesidigt, PKA Pension Funds Administration Ltd., Swedbank Robur Fonder AB, AP7 and AFA Insurance, all of which were represented by Kessler Topaz.

*In re Computer Associates Sec. Litig.,* **No. 02-CV-1226 (E.D.N.Y. 2002):**

Kessler Topaz served as Co-Lead Counsel on behalf of plaintiffs, alleging that Computer Associates and certain of its officers misrepresented the health of the company's business, materially overstated the company's revenues, and engaged in illegal insider selling. After nearly two years of litigation, Kessler Topaz helped obtain a settlement of $150 million in cash and stock from the company.

*In re The Interpublic Group of Companies Sec. Litig.,* **No. 02 Civ. 6527 (S.D.N.Y. 2002):**

Kessler Topaz served as sole Lead Counsel in this action on behalf of an institutional investor and received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of the final hearing in the case, the stock had an approximate value of $87 million, resulting in a total

settlement value of approximately $107 million. In granting its approval, the Court praised Kessler Topaz for acting responsibly and noted the Firm's professionalism, competence and contribution to achieving such a favorable result.

***In re Digital Lightwave, Inc. Sec. Litig.,*** **Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):**
The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions in history measured by the percentage of damages recovered. After extensive litigation and negotiations, a settlement consisting primarily of stock was worth over $170 million at the time when it was distributed to the Class. Kessler Topaz took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses.

***In re Transkaryotic Therapies, Inc. Sec. Litig.,*** **Civil Action No.: 03-10165-RWZ (D. Mass. 2003):**
After five years of hard-fought, contentious litigation, Kessler Topaz as Lead Counsel on behalf of the Class, entered into one of largest settlements ever against a biotech company with regard to non-approval of one of its drugs by the U.S. Food and Drug Administration ("FDA"). Specifically, the Plaintiffs alleged that Transkaryotic Therapies, Inc. ("TKT") and its CEO, Richard Selden, engaged in a fraudulent scheme to artificially inflate the price of TKT common stock and to deceive Class Members by making misrepresentations and nondisclosures of material facts concerning TKT's prospects for FDA approval of Replagal, TKT's experimental enzyme replacement therapy for Fabry disease. With the assistance of the Honorable Daniel Weinstein, a retired state court judge from California, Kessler Topaz secured a $50 million settlement from the Defendants during a complex and arduous mediation.

***In re PNC Financial Services Group, Inc. Sec. Litig.,*** **Case No. 02-CV-271 (W.D. Pa. 2002):**
Kessler Topaz served as Co-Lead Counsel in a securities class action case brought against PNC bank, certain of its officers and directors, and its outside auditor, Ernst & Young, LLP ("E&Y"), relating to the conduct of Defendants in establishing, accounting for and making disclosures concerning three special purpose entities ("SPEs") in the second, third and fourth quarters of PNC's 2001 fiscal year. Plaintiffs alleged that these entities were created by Defendants for the sole purpose of allowing PNC to secretly transfer hundreds of millions of dollars worth of non-performing assets from its own books to the books of the SPEs without disclosing the transfers or consolidating the results and then making positive announcements to the public concerning the bank's performance with respect to its non-performing assets. Complex issues were presented with respect to all defendants, but particularly E&Y. Throughout the litigation E&Y contended that because it did not make any false and misleading statements itself, the Supreme Court's opinion in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1993) foreclosed securities liability for "aiding or abetting" securities fraud for purposes of Section 10(b) liability. Plaintiffs, in addition to contending that E&Y did make false statements, argued that Rule 10b-5's deceptive conduct prong stood on its own as an independent means of committing fraud and that so long as E&Y itself committed a deceptive act, it could be found liable under the securities laws for fraud. After several years of litigation and negotiations, PNC paid $30 million to settle the action, while also assigning any claims it may have had against E&Y and certain other entities that were involved in establishing and/or reporting on the SPEs. Armed with these claims, class counsel was able to secure an additional $6.6 million in settlement funds for the class from two law firms and a third party insurance company and $9.075 million from E&Y. Class counsel was also able to negotiate with the U.S. government, which had previously obtained a disgorgement fund of $90 million from PNC and $46 million from the third party insurance carrier, to combine all funds into a single settlement fund that exceeded $180 million and is currently in the process of being distributed to the entire class, with PNC paying all costs of notifying the Class of the settlement.

*In re SemGroup Energy Partners, L.P., Sec. Litig.*, No. 08-md-1989 (DC) (N.D. Okla.):
Kessler Topaz, which was appointed by the Court as sole Lead Counsel, litigated this matter, which ultimately settled for $28 million. The defense was led by 17 of the largest and best capitalized defense law firms in the world. On April 20, 2010, in a fifty-page published opinion, the United States District Court for the Northern District of Oklahoma largely denied defendants' ten separate motions to dismiss Lead Plaintiff's Consolidated Amended Complaint. The Complaint alleged that: (i) defendants concealed SemGroup's risky trading operations that eventually caused SemGroup to declare bankruptcy; and (ii) defendants made numerous false statements concerning SemGroup's ability to provide its publicly-traded Master Limited Partnership stable cash-flows. The case was aggressively litigated out of the Firm's San Francisco and Radnor offices and the significant recovery was obtained, not only from the Company's principals, but also from its underwriters and outside directors.

*In re Liberate Technologies Sec. Litig.*, No. C-02-5017 (MJJ) (N.D. Cal. 2005):
Kessler Topaz represented plaintiffs which alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earning. As sole Lead Counsel, Kessler Topaz successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

*In re Riverstone Networks, Inc. Sec. Litig.*, Case No. CV-02-3581 (N.D. Cal. 2002):
Kessler Topaz served as Lead Counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five months of extensive mediation, the parties reached a settlement of $18.5 million.

## Shareholder Derivative Actions

*In re Facebook, Inc. Class C Reclassification Litig.*, C.A. No. 12286-VCL (Del. Ch. Sept. 25, 2017):
Kessler Topaz served as co-lead counsel in this stockholder class action that challenged a proposed reclassification of Facebook's capital structure to accommodate the charitable giving goals of its founder and controlling stockholder Mark Zuckerberg. The Reclassification involved the creation of a new class of nonvoting Class C stock, which would be issued as a dividend to all Facebook Class A and Class B stockholders (including Zuckerberg) on a 2-for-1 basis. The purpose and effect of the Reclassification was that it would allow Zuckerberg to sell billions of dollars worth of nonvoting Class C shares without losing his voting control of Facebook. The litigation alleged that Zuckerberg and Facebook's board of directors breached their fiduciary duties in approving the Reclassification at the behest of Zuckerberg and for his personal benefit. At trial Kessler Topaz was seeking a permanent injunction to prevent the consummation of the Reclassification. The litigation was carefully followed in the business and corporate governance communities, due to the high-profile nature of Facebook, Zuckerberg, and the issues at stake. After almost a year and a half of hard fought litigation, just one business day before trial was set to commence, Facebook and Zuckerberg abandoned the Reclassification, granting Plaintiffs complete victory.

*In re CytRx Stockholder Derivative Litig.*, Consol. C.A. No. 9864-VCL (Del. Ch. Nov. 20, 2015):
Kessler Topaz served as co-lead counsel in a shareholder derivative action challenging 2.745 million "spring-loaded" stock options. On the day before CytRx announced the most important news in the Company's history concerning the positive trial results for one of its significant pipeline drugs, the Compensation Committee of CytRx's Board of Directors granted the stock options to themselves, their

fellow directors and several Company officers which immediately came "into the money" when CytRx's stock price shot up immediately following the announcement the next day.  Kessler Topaz negotiated a settlement recovering 100% of the excess compensation received by the directors and approximately 76% of the damages potentially obtainable from the officers. In addition, as part of the settlement, Kessler Topaz obtained the appointment of a new independent director to the Board of Directors and the implementation of significant reforms to the Company's stock option award processes.  The Court complimented the settlement, explaining that it "serves what Delaware views as the overall positive function of stockholder litigation, which is not just recovery in the individual case but also deterrence and norm enforcement."

*International Brotherhood of Electrical Workers Local 98 Pension Fund v. Black, et al.*, Case No. 37-2011-00097795-CU-SL-CTL (Sup. Ct. Cal., San Diego Feb. 5, 2016) ("*Encore Capital Group, Inc.*"):
Kessler Topaz, as co-lead counsel, represented International Brotherhood of Electrical Workers Local 98 Pension Fund in a shareholder derivative action challenging breaches of fiduciary duties and other violations of law in connection with Encore's debt collection practices, including robo-signing affidavits and improper use of the court system to collect alleged consumer debts.  Kessler Topaz negotiated a settlement in which the Company implemented industry-leading reforms to its risk management and corporate governance practices, including creating Chief Risk Officer and Chief Compliance Officer positions, various compliance committees, and procedures for consumer complaint monitoring.

*In re Southern Peru Copper Corp. Derivative Litigation,* Consol. CA No. 961-CS (Del. Ch. 2011):
Kessler Topaz served as co-lead counsel in this landmark $2 billion post-trial decision, believed to be the largest verdict in Delaware corporate law history.  In 2005, Southern Peru, a publicly-traded copper mining company, acquired Minera Mexico, a private mining company owned by Southern Peru's majority stockholder Grupo Mexico.  The acquisition required Southern Peru to pay Grupo Mexico more than $3 billion in Southern Peru stock.  We alleged that Grupo Mexico had caused Southern Peru to grossly overpay for the private company in deference to its majority shareholder's interests.  Discovery in the case spanned years and continents, with depositions in Peru and Mexico.  The trial court agreed and ordered Grupo Mexico to pay more than $2 billion in damages and interest.  The Delaware Supreme Court affirmed on appeal.

*Quinn v. Knight*, No. 3:16-cv-610 (E.D. Va. Mar. 16, 2017) ("*Apple REIT Ten*"):
This shareholder derivative action challenged a conflicted "roll up" REIT transaction orchestrated by Glade M. Knight and his son Justin Knight.  The proposed transaction paid the Knights millions of dollars while paying public stockholders less than they had invested in the company.  The case was brought under Virginia law, and settled just ten days before trial, with stockholders receiving an additional $32 million in merger consideration.

*Kastis v. Carter*, C.A. No. 8657-CB (Del. Ch. Sept. 19, 2016) ("*Hemispherx Biopharma, Inc.*"):
This derivative action challenged improper bonuses paid to two company executives of this small pharmaceutical company that had never turned a profit. In response to the complaint, Hemispherx's board first adopted a "fee-shifting" bylaw that would have required stockholder plaintiffs to pay the company's legal fees unless the plaintiffs achieved 100% of the relief they sought. This sort of bylaw, if adopted more broadly, could substantially curtail meritorious litigation by stockholders unwilling to risk losing millions of dollars if they bring an unsuccessful case. After Kessler Topaz presented its argument in court, Hemispherx withdrew the bylaw. Kessler Topaz ultimately negotiated a settlement requiring the two executives to forfeit several million dollars' worth of accrued but unpaid bonuses, future bonuses and director fees. The company also recovered $1.75 million from its insurance carriers, appointed a new independent director to the board, and revised its compensation program.

*Montgomery v. Erickson, Inc., et al.*, **C.A. No. 8784-VCL (Del. Ch. Sept. 12, 2016):**
Kessler Topaz represented an individual stockholder who asserted in the Delaware Court of Chancery class action and derivative claims challenging merger and recapitalization transactions that benefitted the company's controlling stockholders at the expense of the company and its minority stockholders.  Plaintiff alleged that the controlling stockholders of Erickson orchestrated a series of transactions with the intent and effect of using Erickson's money to bail themselves out of a failing investment.  Defendants filed a motion to dismiss the complaint, which Kessler Topaz defeated, and the case proceeded through more than a year of fact discovery.  Following an initially unsuccessful mediation and further litigation, Kessler Topaz ultimately achieved an $18.5 million cash settlement, 80% of which was distributed to members of the stockholder class to resolve their direct claims and 20% of which was paid to the company to resolve the derivative claims.  The settlement also instituted changes to the company's governing documents to prevent future self-dealing transactions like those that gave rise to the case.

*In re Helios Closed-End Funds Derivative Litig.*, **No. 2:11-cv-02935-SHM-TMP (W.D. Tenn.):**
Kessler Topaz represented stockholders of four closed-end mutual funds in a derivative action against the funds' former investment advisor, Morgan Asset Management. Plaintiffs alleged that the defendants mismanaged the funds by investing in riskier securities than permitted by the funds' governing documents and, after the values of these securities began to precipitously decline beginning in early 2007, cover up their wrongdoing by assigning phony values to the funds' investments and failing to disclose the extent of the decrease in value of the funds' assets.  In a rare occurrence in derivative litigation, the funds' Boards of Directors eventually hired Kessler Topaz to prosecute the claims against the defendants on behalf of the funds.  Our litigation efforts led to a settlement that recovered $6 million for the funds and ensured that the funds would not be responsible for making any payment to resolve claims asserted against them in a related multi-million dollar securities class action.  The fund's Boards fully supported and endorsed the settlement, which was negotiated independently of the parallel securities class action.

*In re Viacom, Inc. Shareholder Derivative Litig.*, **Index No. 602527/05 (New York County, NY 2005):**
Kessler Topaz represented the Public Employees' Retirement System of Mississippi and served as Lead Counsel in a derivative action alleging that the members of the Board of Directors of Viacom, Inc. paid excessive and unwarranted compensation to Viacom's Executive Chairman and CEO, Sumner M. Redstone, and co-COOs Thomas E. Freston and Leslie Moonves, in breach of their fiduciary duties. Specifically, we alleged that in fiscal year 2004, when Viacom reported a record net loss of $17.46 billion, the board improperly approved compensation payments to Redstone, Freston, and Moonves of approximately $56 million, $52 million, and $52 million, respectively. Judge Ramos of the New York Supreme Court denied Defendants' motion to dismiss the action as we overcame several complex arguments related to the failure to make a demand on Viacom's Board; Defendants then appealed that decision to the Appellate Division of the Supreme Court of New York. Prior to a decision by the appellate court, a settlement was reached in early 2007. Pursuant to the settlement, Sumner Redstone, the company's Executive Chairman and controlling shareholder, agreed to a new compensation package that, among other things, substantially reduces his annual salary and cash bonus, and ties the majority of his incentive compensation directly to shareholder returns.

*In re Family Dollar Stores, Inc. Derivative Litig.,* **Master File No. 06-CVS-16796 (Mecklenburg County, NC 2006):**
Kessler Topaz served as Lead Counsel, derivatively on behalf of Family Dollar Stores, Inc., and against certain of Family Dollar's current and former officers and directors. The actions were pending in Mecklenburg County Superior Court, Charlotte, North Carolina, and alleged that certain of the company's officers and directors had improperly backdated stock options to achieve favorable exercise prices in violation of shareholder-approved stock option plans. As a result of these shareholder derivative actions, Kessler Topaz was able to achieve substantial relief for Family Dollar and its shareholders. Through Kessler Topaz's litigation of this action, Family Dollar agreed to cancel hundreds of thousands of stock options

granted to certain current and former officers, resulting in a seven-figure net financial benefit for the company. In addition, Family Dollar has agreed to, among other things: implement internal controls and granting procedures that are designed to ensure that all stock options are properly dated and accounted for; appoint two new independent directors to the board of directors; maintain a board composition of at least 75 percent independent directors; and adopt stringent officer stock-ownership policies to further align the interests of officers with those of Family Dollar shareholders. The settlement was approved by Order of the Court on August 13, 2007.

*Carbon County Employees Retirement System, et al., Derivatively on Behalf of Nominal Defendant Southwest Airlines Co. v. Gary C. Kelly, et al.* **Cause No. 08-08692 (District Court of Dallas County, Texas):**
As lead counsel in this derivative action, we negotiated a settlement with far-reaching implications for the safety and security of airline passengers.

Our clients were shareholders of Southwest Airlines Co. (Southwest) who alleged that certain officers and directors had breached their fiduciary duties in connection with Southwest's violations of Federal Aviation Administration safety and maintenance regulations. Plaintiffs alleged that from June 2006 to March 2007, Southwest flew 46 Boeing 737 airplanes on nearly 60,000 flights without complying with a 2004 FAA Airworthiness Directive requiring fuselage fatigue inspections. As a result, Southwest was forced to pay a record $7.5 million fine. We negotiated numerous reforms to ensure that Southwest's Board is adequately apprised of safety and operations issues, and implementing significant measures to strengthen safety and maintenance processes and procedures.

*The South Financial Group, Inc. Shareholder Litigation,* **C.A. No. 2008-CP-23-8395 (S.C. C.C.P. 2009):**
Represented shareholders in derivative litigation challenging board's decision to accelerate "golden parachute" payments to South Financial Group's CEO as the company applied for emergency assistance in 2008 under the Troubled Asset Recovery Plan (TARP).

We sought injunctive relief to block the payments and protect the company's ability to receive the TARP funds. The litigation was settled with the CEO giving up part of his severance package and agreeing to leave the board, as well as the implementation of important corporate governance changes one commentator described as "unprecedented."

## Options Backdating

In 2006, the Wall Street Journal reported that three companies appeared to have "backdated" stock option grants to their senior executives, pretending that the options had been awarded when the stock price was at its lowest price of the quarter, or even year.  An executive who exercised the option thus paid the company an artificially low price, which stole money from the corporate coffers.  While stock options are designed to incentivize recipients to drive the company's stock price up, backdating options to artificially low prices undercut those incentives, overpaid executives, violated tax rules, and decreased shareholder value.

Kessler Topaz worked with a financial analyst to identify dozens of other companies that had engaged in similar practices, and filed more than 50 derivative suits challenging the practice.  These suits sought to force the executives to disgorge their improper compensation and to revamp the companies' executive compensation policies.  Ultimately, as lead counsel in these derivative actions, Kessler Topaz achieved significant monetary and non-monetary benefits at dozens of companies, including:

*Comverse Technology, Inc.*:  Settlement required Comverse's founder and CEO Kobi Alexander, who fled to Namibia after the backdating was revealed, to disgorge more than $62 million in excessive backdated option compensation.  The settlement also overhauled the company's corporate governance and internal controls, replacing a number of directors and corporate executives, splitting the Chairman and CEO positions, and instituting majority voting for directors.

*Monster Worldwide, Inc.*:  Settlement required recipients of backdated stock options to disgorge more than $32 million in unlawful gains back to the company, plus agreeing to significant corporate governance measures. These measures included (a) requiring Monster's founder Andrew McKelvey to reduce his voting control over Monster from 31% to 7%, by exchanging super-voting stock for common stock; and (b) implementing new equity granting practices that require greater accountability and transparency in the granting of stock options moving forward. In approving the settlement, the court noted "the good results, mainly the amount of money for the shareholders and also the change in governance of the company itself, and really the hard work that had to go into that to achieve the results…."

*Affiliated Computer Services, Inc.*:  Settlement required executives, including founder Darwin Deason, to give up $20 million in improper backdated options.  The litigation was also a catalyst for the company to replace its CEO and CFO and revamp its executive compensation policies.

## Mergers & Acquisitions Litigation

*City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al.*, C.A. No. 12481-VCL (Del. Ch.):
On September 12, 2017, the Delaware Chancery Court approved one of the largest class action M&A settlements in the history of the Delaware Chancery Court, a $86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.

The settlement caused ExamWorks stockholders to receive a 6% improvement on the $35.05 per share merger consideration negotiated by the defendants. This amount is unusual especially for litigation challenging a third-party merger. The settlement amount is also noteworthy because it includes a $46.5 million contribution from ExamWorks' outside legal counsel, Paul Hastings LLP.

*In re ArthroCare Corporation S'holder Litig., Consol.* C.A. No. 9313-VCL (Del. Ch. Nov. 13, 2014):
Kessler Topaz, as co-lead counsel, challenged the take-private of Arthrocare Corporation by private equity firm Smith & Nephew.  This class action litigation alleged, among other things, that Arthrocare's Board breached their fiduciary duties by failing to maximize stockholder value in the merger.  Plaintiffs also alleged that that the merger violated Section 203 of the Delaware General Corporation Law, which prohibits mergers with "interested stockholders," because Smith & Nephew had contracted with JP Morgan to provide financial advice and financing in the merger, while a subsidiary of JP Morgan owned more than 15% of Arthrocare's stock.  Plaintiffs also alleged that the agreement between Smith & Nephew and the JP Morgan subsidiary violated a "standstill" agreement between the JP Morgan subsidiary and Arthrocare. The court set these novel legal claims for an expedited trial prior to the closing of the merger.  The parties agreed to settle the action when Smith & Nephew agreed to increase the merger consideration paid to Arthrocare stockholders by $12 million, less than a month before trial.

*In re Safeway Inc. Stockholders Litig.*, C.A. No. 9445-VCL (Del. Ch. Sept. 17, 2014):
Kessler Topaz represented the Oklahoma Firefighters Pension and Retirement System in class action litigation challenging the acquisition of Safeway, Inc. by Albertson's grocery chain for $32.50 per share in cash and contingent value rights.  Kessler Topaz argued that the value of CVRs was illusory, and Safeway's shareholder rights plan had a prohibitive effect on potential bidders making superior offers to acquire

Safeway, which undermined the effectiveness of the post-signing "go shop." Plaintiffs sought to enjoin the transaction, but before the scheduled preliminary injunction hearing took place, Kessler Topaz negotiated (i) modifications to the terms of the CVRs and (ii) defendants' withdrawal of the shareholder rights plan. In approving the settlement, Vice Chancellor Laster of the Delaware Chancery Court stated that "the plaintiffs obtained significant changes to the transaction . . . that may well result in material increases in the compensation received by the class," including substantial benefits potentially in excess of $230 million.

*In re MPG Office Trust, Inc. Preferred Shareholder Litig.,* **Cons. Case No. 24-C-13-004097 (Md. Cir. Oct. 20, 2015):**
Kessler Topaz challenged a coercive tender offer whereby MPG preferred stockholders received preferred stock in Brookfield Office Properties, Inc. without receiving any compensation for their accrued and unpaid dividends. Kessler Topaz negotiated a settlement where MPG preferred stockholders received a dividend of $2.25 per share, worth approximately $21 million, which was the only payment of accrued dividends Brookfield DTLA Preferred Stockholders had received as of the time of the settlement.

*In re Globe Specialty Metals, Inc. Stockholders Litig.,* **C.A. 10865-VCG (Del. Ch. Feb. 15, 2016):**
Kessler Topaz served as co-lead counsel in class action litigation arising from Globe's acquisition by Grupo Atlantica to form Ferroglobe. Plaintiffs alleged that Globe's Board breached their fiduciary duties to Globe's public stockholders by agreeing to sell Globe for an unfair price, negotiating personal benefits for themselves at the expense of the public stockholders, failing to adequately inform themselves of material issues with Grupo Atlantica, and issuing a number of materially deficient disclosures in an attempt to mask issues with the negotiations. At oral argument on Plaintiffs' preliminary injunction motion, the Court held that Globe stockholders likely faced irreparable harm from the Board's conduct, but reserved ruling on the other preliminary injunction factors. Prior to the Court's final ruling, the parties agreed to settle the action for $32.5 million and various corporate governance reforms to protect Globe stockholders' rights in Ferroglobe.

*In re Dole Food Co., Inc. Stockholder Litig.,* **Consol. C.A. No. 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015):**
On August 27, 2015, Vice Chancellor J. Travis Laster issued his much-anticipated post-trial verdict in litigation by former stockholders of Dole Food Company against Dole's chairman and controlling stockholder David Murdock. In a 106-page ruling, Vice Chancellor Laster found that Murdock and his longtime lieutenant, Dole's former president and general counsel C. Michael Carter, unfairly manipulated Dole's financial projections and misled the market as part of Murdock's efforts to take the company private in a deal that closed in November 2013. Among other things, the Court concluded that Murdock and Carter "primed the market for the freeze-out by driving down Dole's stock price" and provided the company's outside directors with "knowingly false" information and intended to "mislead the board for Mr. Murdock's benefit."

Vice Chancellor Laster found that the $13.50 per share going-private deal underpaid stockholders, and awarded class damages of $2.74 per share, totaling $148 million. That award represents the largest post-trial class recovery in the merger context. The largest post-trial derivative recovery in a merger case remains Kessler Topaz's landmark 2011 $2 billion verdict in *In re Southern Peru*.

*In re Genentech, Inc. Shareholders Lit.,* **Cons. Civ. Action No. 3991-VCS (Del. Ch. 2008):**
Kessler Topaz served as Co-Lead Counsel in this shareholder class action brought against the directors of Genentech and Genentech's majority stockholder, Roche Holdings, Inc., in response to Roche's July 21, 2008 attempt to acquire Genentech for $89 per share. We sought to enforce provisions of an Affiliation Agreement between Roche and Genentech and to ensure that Roche fulfilled its fiduciary obligations to Genentech's shareholders through any buyout effort by Roche. After moving to enjoin the tender offer, Kessler Topaz negotiated with Roche and Genentech to amend the Affiliation Agreement to allow a

negotiated transaction between Roche and Genentech, which enabled Roche to acquire Genentech for $95 per share, approximately $3.9 billion more than Roche offered in its hostile tender offer. In approving the settlement, then-Vice Chancellor Leo Strine complimented plaintiffs' counsel, noting that this benefit was only achieved through "real hard-fought litigation in a complicated setting."

*In re GSI Commerce, Inc. Shareholder Litig.,* **Consol. C.A. No. 6346-VCN (Del. Ch. Nov. 15, 2011):**
On behalf of the Erie County Employees' Retirement System, we alleged that GSI's founder breached his fiduciary duties by negotiating a secret deal with eBay for him to buy several GSI subsidiaries at below market prices before selling the remainder of the company to eBay.  These side deals significantly reduced the acquisition price paid to GSI stockholders. Days before an injunction hearing, we negotiated an improvement in the deal price of $24 million.

*In re Amicas, Inc. Shareholder Litigation,* **10-0174-BLS2 (Suffolk County, MA 2010):**
Kessler Topaz served as lead counsel in class action litigation challenging a proposed private equity buyout of Amicas that would have paid Amicas shareholders $5.35 per share in cash while certain Amicas executives retained an equity stake in the surviving entity moving forward. Kessler Topaz prevailed in securing a preliminary injunction against the deal, which then allowed a superior bidder to purchase the Company for an additional $0.70 per share ($26 million). The court complimented Kessler Topaz attorneys for causing an "exceptionally favorable result for Amicas' shareholders" after "expend[ing] substantial resources."

*In re Harleysville Mutual,* **Nov. Term 2011, No. 02137 (C.C.P., Phila. Cnty.):**
Kessler Topaz served as co-lead counsel in expedited merger litigation challenging Harleysville's agreement to sell the company to Nationwide Insurance Company.  Plaintiffs alleged that policyholders were entitled to receive cash in exchange for their ownership interests in the company, not just new Nationwide policies. Plaintiffs also alleged that the merger was "fundamentally unfair" under Pennsylvania law. The defendants contested the allegations and contended that the claims could not be prosecuted directly by policyholders (as opposed to derivatively on the company's behalf). Following a two-day preliminary injunction hearing, we settled the case in exchange for a $26 million cash payment to policyholders.

## Consumer Protection and Fiduciary Litigation

*In re: J.P. Jeanneret Associates Inc., et al.,* **No. 09-cv-3907 (S.D.N.Y.):**
Kessler Topaz served as lead counsel for one of the plaintiff groups in an action against J.P. Jeanneret and Ivy Asset Management relating to an alleged breach of fiduciary and statutory duty in connection with the investment of retirement plan assets in Bernard Madoff-related entities.  By breaching their fiduciary duties, Defendants caused significant losses to the retirement plans.  Following extensive hard-fought litigation, the case settled for a total of $216.5 million.

*In re: National City Corp. Securities, Derivative and ERISA Litig,* **No. 08-nc-7000 (N.D. Ohio):**
Kessler Topaz served as a lead counsel in this complex action alleging that certain directors and officers of National City Corp. breached their fiduciary duties under the Employee Retirement Income Security Act of 1974. These breaches arose from an investment in National City stock during a time when defendants knew, or should have known, that the company stock was artificially inflated and an imprudent investment for the company's 401(k) plan. The case settled for $43 million on behalf of the plan, plaintiffs and a settlement class of plan participants.

*Alston, et al. v. Countrywide Financial Corp. et al.,* **No. 07-cv-03508 (E.D. Pa.):**
Kessler Topaz served as lead counsel in this novel and complex action which alleged that Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc. and Balboa Reinsurance Co. violated

the Real Estate Settlement Procedure Act ("RESPA") and ultimately cost borrowers millions of dollars. Specifically, the action alleged that Defendants engaged in a scheme related to private mortgage insurance involving kickbacks, which are prohibited under RESPA. After three and a half years of hard-fought litigation, the action settled for $34 million.

*Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund, et al. v. Wachovia Bank, N.A., et al.*, **No. 09-cv-00668 (DNJ):**
For more than 50 years, Wachovia and its predecessors acted as investment manager for the Local 464A UFCW Union Funds, exercising investment discretion consistent with certain investment guidelines and fiduciary obligations. Until mid-2007, Wachovia managed the fixed income assets of the funds safely and conservatively, and their returns closely tracked the Lehman Aggregate Bond Index (now known as the Barclay's Capital Aggregate Bond Index) to which the funds were benchmarked. However, beginning in mid-2007 Wachovia significantly changed the investment strategy, causing the funds' portfolio value to drop drastically below the benchmark. Specifically, Wachovia began to dramatically decrease the funds' holdings in short-term, high-quality, low-risk debt instruments and materially increase their holdings in high-risk mortgage-backed securities and collateralized mortgage obligations. We represented the funds' trustees in alleging that, among other things, Wachovia breached its fiduciary duty by: failing to invest the assets in accordance with the funds' conservative investment guidelines; failing to adequately monitor the funds' fixed income investments; and failing to provide complete and accurate information to plaintiffs concerning the change in investment strategy. The matter was resolved privately between the parties.

*In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, **No. 1:12-md-02335 (S.D.N.Y.):**
On behalf of the Southeastern Pennsylvania Transportation Authority Pension Fund and a class of similarly situated domestic custodial clients of BNY Mellon, we alleged that BNY Mellon secretly assigned a spread to the FX rates at which it transacted FX transactions on behalf of its clients who participated in the BNY Mellon's automated "Standing Instruction" FX service. BNY Mellon determining this spread by executing its clients' transactions at one rate and then, typically, at the end of the trading day, assigned a rate to its clients which approximated the worst possible rates of the trading day, pocketing the difference as riskless profit. This practice was despite BNY Mellon's contractual promises to its clients that its Standing Instruction service was designed to provide "best execution," was "free of charge" and provided the "best rates of the day." The case asserted claims for breach of contract and breach of fiduciary duty on behalf of BNY Mellon's custodial clients and sought to recover the unlawful profits that BNY Mellon earned from its unfair and unlawful FX practices. The case was litigated in collaboration with separate cases brought by state and federal agencies, with Kessler Topaz serving as lead counsel and a member of the executive committee overseeing the private litigation. After extensive discovery, including more than 100 depositions, over 25 million pages of fact discovery, and the submission of multiple expert reports, Plaintiffs reached a settlement with BNY Mellon of $335 million. Additionally, the settlement is being administered by Kessler Topaz along with separate recoveries by state and federal agencies which bring the total recovery for BNY Mellon's custodial customers to $504 million. The settlement was finally approved on September 24, 2015. In approving the settlement, Judge Lewis Kaplan praised counsel for a "wonderful job," recognizing that they were "fought tooth and nail at every step of the road." In further recognition of the efforts of counsel, Judge Kaplan noted that "[t]his was an outrageous wrong by the Bank of New York Mellon, and plaintiffs' counsel deserve a world of credit for taking it on, for running the risk, for financing it and doing a great job."

*CompSource Oklahoma v. BNY Mellon Bank, N.A.*, **No. CIV 08-469-KEW (E.D. Okla. October 25, 2012):**
Kessler Topaz served as Interim Class Counsel in this matter alleging that BNY Mellon Bank, N.A. and the Bank of New York Mellon (collectively, "BNYM") breached their statutory, common law and contractual duties in connection with the administration of their securities lending program. The Second Amended

Complaint alleged, among other things, that BNYM imprudently invested cash collateral obtained under its securities lending program in medium term notes issued by Sigma Finance, Inc. -- a foreign structured investment vehicle ("SIV") that is now in receivership -- and that such conduct constituted a breach of BNYM's fiduciary obligations under the Employee Retirement Income Security Act of 1974, a breach of its fiduciary duties under common law, and a breach of its contractual obligations under the securities lending agreements. The Complaint also asserted claims for negligence, gross negligence and willful misconduct. The case recently settled for $280 million.

*Transatlantic Holdings, Inc., et al. v. American International Group, Inc., et al.,* **American Arbitration Association Case No. 50 148 T 00376 10:**
Kessler Topaz served as counsel for Transatlantic Holdings, Inc., and its subsidiaries ("TRH"), alleging that American International Group, Inc. and its subsidiaries ("AIG") breached their fiduciary duties, contractual duties, and committed fraud in connection with the administration of its securities lending program. Until June 2009, AIG was TRH's majority shareholder and, at the same time, administered TRH's securities lending program. TRH's Statement of Claim alleged that, among other things, AIG breached its fiduciary obligations as investment advisor and majority shareholder by imprudently investing the majority of the cash collateral obtained under its securities lending program in mortgage backed securities, including Alt-A and subprime investments. The Statement of Claim further alleged that AIG concealed the extent of TRH's subprime exposure and that when the collateral pools began experiencing liquidity problems in 2007, AIG unilaterally carved TRH out of the pools so that it could provide funding to its wholly owned subsidiaries to the exclusion of TRH. The matter was litigated through a binding arbitration and TRH was awarded $75 million.

*Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.* **– Consolidated Action No. 09-cv-00686 (SAS) (S.D.N.Y.):**
On January 23, 2009, the firm filed a class action complaint on behalf of all entities that were participants in JPMorgan's securities lending program and that incurred losses on investments that JPMorgan, acting in its capacity as a discretionary investment manager, made in medium-term notes issue by Sigma Finance, Inc. – a now defunct structured investment vehicle. The losses of the Class exceeded $500 million. The complaint asserted claims for breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA), as well as common law breach of fiduciary duty, breach of contract and negligence. Over the course of discovery, the parties produced and reviewed over 500,000 pages of documents, took 40 depositions (domestic and foreign) and exchanged 21 expert reports. The case settled for $150 million. Trial was scheduled to commence on February 6, 2012.

*In re Global Crossing, Ltd. ERISA Litigation,* **No. 02 Civ. 7453 (S.D.N.Y. 2004):**
Kessler Topaz served as Co-Lead Counsel in this novel, complex and high-profile action which alleged that certain directors and officers of Global Crossing, a former high-flier of the late 1990's tech stock boom, breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") to certain company-provided 401(k) plans and their participants. These breaches arose from the plans' alleged imprudent investment in Global Crossing stock during a time when defendants knew, or should have known, that the company was facing imminent bankruptcy. A settlement of plaintiffs' claims restoring $79 million to the plans and their participants was approved in November 2004. At the time, this represented the largest recovery received in a company stock ERISA class action.

*In re AOL Time Warner ERISA Litigation,* **No. 02-CV-8853 (S.D.N.Y. 2006):**
Kessler Topaz, which served as Co-Lead Counsel in this highly-publicized ERISA fiduciary breach class action brought on behalf of the Company's 401(k) plans and their participants, achieved a record $100 million settlement with defendants. The $100 million restorative cash payment to the plans (and, concomitantly, their participants) represents the largest recovery from a single defendant in a breach of fiduciary action relating to mismanagement of plan assets held in the form of employer securities. The

action asserted claims for breach of fiduciary duties pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") on behalf of the participants in the AOL Time Warner Savings Plan, the AOL Time Warner Thrift Plan, and the Time Warner Cable Savings Plan (collectively, the "Plans") whose accounts purchased and/or held interests in the AOLTW Stock Fund at any time between January 27, 1999 and July 3, 2003. Named as defendants in the case were Time Warner (and its corporate predecessor, AOL Time Warner), several of the Plans' committees, as well as certain current and former officers and directors of the company. In March 2005, the Court largely denied defendants' motion to dismiss and the parties began the discovery phase of the case. In January 2006, Plaintiffs filed a motion for class certification, while at the same time defendants moved for partial summary judgment. These motions were pending before the Court when the settlement in principle was reached. Notably, an Independent Fiduciary retained by the Plans to review the settlement in accordance with Department of Labor regulations approved the settlement and filed a report with Court noting that the settlement, in addition to being "more than a reasonable recovery" for the Plans, is "one of the largest ERISA employer stock action settlements in history."

### *In re Honeywell International ERISA Litigation,* No. 03-1214 (DRD) (D.N.J. 2004):

Kessler Topaz served as Lead Counsel in a breach of fiduciary duty case under ERISA against Honeywell International, Inc. and certain fiduciaries of Honeywell defined contribution pension plans. The suit alleged that Honeywell and the individual fiduciary defendants, allowed Honeywell's 401(k) plans and their participants to imprudently invest significant assets in company stock, despite that defendants knew, or should have known, that Honeywell's stock was an imprudent investment due to undisclosed, wide-ranging problems stemming from a consummated merger with Allied Signal and a failed merger with General Electric. The settlement of plaintiffs' claims included a $14 million payment to the plans and their affected participants, and significant structural relief affording participants much greater leeway in diversifying their retirement savings portfolios.

### *Henry v. Sears, et. al.,* Case No. 98 C 4110 (N.D. Ill. 1999):

The Firm served as Co-Lead Counsel for one of the largest consumer class actions in history, consisting of approximately 11 million Sears credit card holders whose interest rates were improperly increased in connection with the transfer of the credit card accounts to a national bank. Kessler Topaz successfully negotiated a settlement representing approximately 66% of all class members' damages, thereby providing a total benefit exceeding $156 million. All $156 million was distributed automatically to the Class members, without the filing of a single proof of claim form. In approving the settlement, the District Court stated: ". . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance."

## Antitrust Litigation

### *In re: Flonase Antitrust Litigation,* No. 08-cv-3149 (E.D. Pa.):

Kessler Topaz served as a lead counsel on behalf of a class of direct purchaser plaintiffs in an antitrust action brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, alleging, among other things, that defendant GlaxoSmithKline (GSK) violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in "sham" petitioning of a government agency.  Specifically, the Direct Purchasers alleged that GSK unlawfully abused the citizen petition process contained in Section 505(j) of the Federal Food, Drug, and Cosmetic Act and thus delayed the introduction of less expensive generic versions of Flonase, a highly popular allergy drug, causing injury to the Direct Purchaser Class.  Throughout the course of the four year litigation, Plaintiffs defeated two motions for summary judgment, succeeded in having a class certified and conducted extensive discovery.  After lengthy negotiations and shortly before trial, the action settled for $150 million.

***In re: Wellbutrin SR Antitrust Litigation,*** **No. 04-cv-5898 (E.D. Pa.):**
Kessler Topaz was a lead counsel in an action which alleged, among other things, that defendant GlaxoSmithKline (GSK) violated the antitrust, consumer fraud, and consumer protection laws of various states. Specifically, Plaintiffs and the class of Third-Party Payors alleged that GSK manipulated patent filings and commenced baseless infringement lawsuits in connection wrongfully delaying generic versions of Wellbutrin SR and Zyban from entering the market, and that Plaintiffs and the Class of Third-Party Payors suffered antitrust injury and calculable damages as a result. After more than eight years of litigation, the action settled for $21.5 million.

***In re: Metoprolol Succinate End-Payor Antitrust Litigation,*** **No. 06-cv-71 (D. Del.):**
Kessler Topaz was co-lead counsel in a lawsuit which alleged that defendant AstraZeneca prevented generic versions of Toprol-XL from entering the market by, among other things, improperly manipulating patent filings and filing baseless patent infringement lawsuits. As a result, AstraZeneca unlawfully monopolized the domestic market for Toprol-XL and its generic bio-equivalents. After seven years of litigation, extensive discovery and motion practice, the case settled for $11 million.

***In re Remeron Antitrust Litigation,*** **No. 02-CV-2007 (D.N.J. 2004):**
Kessler Topaz was Co-Lead Counsel in an action which challenged Organon, Inc.'s filing of certain patents and patent infringement lawsuits as an abuse of the Hatch-Waxman Act, and an effort to unlawfully extend their monopoly in the market for Remeron. Specifically, the lawsuit alleged that defendants violated state and federal antitrust laws in their efforts to keep competing products from entering the market, and sought damages sustained by consumers and third-party payors. After lengthy litigation, including numerous motions and over 50 depositions, the matter settled for $36 million.


## OUR PROFESSIONALS

## PARTNERS

**JULES D. ALBERT,** a partner of the Firm, concentrates his practice in mergers and acquisition litigation and stockholder derivative litigation. Mr. Albert received his law degree from the University of Pennsylvania Law School, where he was a Senior Editor of the *University of Pennsylvania Journal of Labor and Employment Law* and recipient of the James Wilson Fellowship. Mr. Albert also received a Certificate of Study in Business and Public Policy from The Wharton School at the University of Pennsylvania. Mr. Albert graduated *magna cum laude* with a Bachelor of Arts in Political Science from Emory University. Mr. Albert is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Mr. Albert has litigated in state and federal courts across the country, and has represented stockholders in numerous actions that have resulted in significant monetary recoveries and corporate governance improvements, including: *In re Sunrise Senior Living, Inc. Deriv. Litig*., No. 07-00143 (D.D.C.); *Mercier v. Whittle, et al.*, No. 2008-CP-23-8395 (S.C. Ct. Com. Pl., 13th Jud. Cir.); *In re K-V Pharmaceutical Co. Deriv. Litig.*, No. 06-00384 (E.D. Mo.); *In re Progress Software Corp. Deriv. Litig.*, No. SUCV2007-01937-BLS2 (Mass. Super. Ct., Suffolk Cty.); *In re Quest Software, Inc. Deriv. Litig.* No 06CC00115 (Cal. Super. Ct., Orange Cty.); and *Quaco v. Balakrishnan, et al.,* No. 06-2811 (N.D. Cal.).

**NAUMON A. AMJED,** a partner of the Firm, concentrates his practice on new matter development with a focus on analyzing securities class action lawsuits, direct (or opt-out) actions, non-U.S. securities and shareholder litigation, SEC whistleblower actions, breach of fiduciary duty cases, antitrust matters, data

breach actions and oil and gas litigation. Mr. Amjed is a graduate of the Villanova University School of Law, *cum laude*, and holds an undergraduate degree in business administration from Temple University, *cum laude*. Mr. Amjed is a member of the Delaware State Bar, the Bar of the Commonwealth of Pennsylvania, the New York State Bar, and is admitted to practice before the United States Courts for the District of Delaware, the Eastern District of Pennsylvania and the Southern District of New York.

As a member of the Firm's lead plaintiff practice group, Mr. Amjed has represented clients serving as lead plaintiffs in several notable securities class action lawsuits including: *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09MDL2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (RJS) (S.D.N.Y.) ($627 million recovery); *In re Lehman Bros. Equity/Debt Securities Litigation*, No. 08-cv-5523 (LAK) (S.D.N.Y.) ($615 million recovery) and *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery). Additionally, Mr. Amjed served on the national Executive Committee representing financial institutions suffering losses from Target Corporation's 2013 data breach – one of the largest data breaches in history. The Target litigation team was responsible for a landmark data breach opinion that substantially denied Target's motion to dismiss and was also responsible for obtaining certification of a class of financial institutions. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304 (D. Minn. 2014); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522 PAM/JJK, 2015 WL 5432115 (D. Minn. Sept. 15, 2015). At the time of its issuance, the class certification order in Target was the first of its kind in data breach litigation by financial institutions.

Mr. Amjed also has significant experience conducting complex litigation in state and federal courts including federal securities class actions, shareholder derivative actions, suits by third-party insurers and other actions concerning corporate and alternative business entity disputes. Mr. Amjed has litigated in numerous state and federal courts across the country, including the Delaware Court of Chancery, and has represented shareholders in several high profile lawsuits, including: *LAMPERS v. CBOT Holdings, Inc. et al.*, C.A. No. 2803-VCN (Del. Ch.); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006); *In re Global Crossing Sec. Litig.,* 02— Civ. — 910 (S.D.N.Y.); *In re Enron Corp. Sec. Litig.*, 465 F. Supp. 2d 687 (S.D. Tex. 2006); and *In re Marsh McLennan Cos., Inc. Sec. Litig.* 501 F. Supp. 2d 452 (S.D.N.Y. 2006).

**ETHAN J. BARLIEB,** a partner of the Firm, concentrates his practice in the areas of ERISA, consumer protection and antitrust litigation. Mr. Barlieb received his law degree, *magna cum laude*, from the University of Miami School of Law in 2007 and his undergraduate degree from Cornell University in 2003. Mr. Barlieb is licensed to practice in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Mr. Barlieb was an associate with Pietragallo Gordon Alfano Bosick & Raspanti, LLP, where he worked on various commercial, securities and employment matters. Before that, Mr. Barlieb served as a law clerk for the Honorable Mitchell S. Goldberg in the U.S. District Court for the Eastern District of Pennsylvania.

**STUART L. BERMAN,** a partner of the Firm, concentrates his practice on securities class action litigation in federal courts throughout the country, with a particular emphasis on representing institutional investors active in litigation. Mr. Berman received his law degree from George Washington University National Law Center, and is an honors graduate from Brandeis University. Mr. Berman is licensed to practice in Pennsylvania and New Jersey.

Mr. Berman regularly counsels and educates institutional investors located around the world on emerging legal trends, new case ideas and the rights and obligations of institutional investors as they relate to securities fraud class actions and individual actions. In this respect, Mr. Berman has been instrumental in

courts appointing the Firm's institutional clients as lead plaintiffs in class actions as well as in representing institutions individually in direct actions. Mr. Berman is currently representing institutional investors in direct actions against Vivendi and Merck, and took a very active role in the precedent setting Shell settlement on behalf of many of the Firm's European institutional clients.

Mr. Berman is a frequent speaker on securities issues, especially as they relate to institutional investors, at events such as The European Pension Symposium in Florence, Italy; the Public Funds Symposium in Washington, D.C.; the Pennsylvania Public Employees Retirement (PAPERS) Summit in Harrisburg, Pennsylvania; the New England Pension Summit in Newport, Rhode Island; the Rights and Responsibilities for Institutional Investors in Amsterdam, Netherlands; and the European Investment Roundtable in Barcelona, Spain.

**DAVID A. BOCIAN**, a partner of the Firm, focuses his practice on whistleblower representation and False Claims Act litigation. Mr. Bocian received his law degree from the University of Virginia School of Law and graduated *cum laude* from Princeton University. He is licensed to practice law in the Commonwealth of Pennsylvania, New Jersey, New York and the District of Columbia.

Mr. Bocian began his legal career in Washington, D.C., as a litigation associate at Patton Boggs LLP, where his practice included internal corporate investigations, government contracts litigation and securities fraud matters. He spent more than ten years as a federal prosecutor in the U.S. Attorney's Office for the District of New Jersey, where he was appointed Senior Litigation Counsel and managed the Trenton U.S. Attorney's office. During his tenure, Mr. Bocian oversaw multifaceted investigations and prosecutions pertaining to government corruption and federal program fraud, commercial and public sector kickbacks, tax fraud, and other white collar and financial crimes. He tried numerous cases before federal juries, and was a recipient of the Justice Department's Director's Award for superior performance by an Assistant U.S. Attorney, as well as commendations from federal law enforcement agencies including the FBI and IRS.

Mr. Bocian has extensive experience in the health care field. As an adjunct professor of law, he has taught Healthcare Fraud and Abuse at Rutgers School of Law – Camden, and previously was employed in the health care industry, where he was responsible for implementing and overseeing a system-wide compliance program for a complex health system.

**GREGORY M. CASTALDO,** a partner of the Firm, concentrates his practice in the area of securities litigation. Mr. Castaldo received his law degree from Loyola Law School, where he received the American Jurisprudence award in legal writing. He received his undergraduate degree from the Wharton School of Business at the University of Pennsylvania. He is licensed to practice law in Pennsylvania and New Jersey.

Mr. Castaldo served as one of Kessler Topaz's lead litigation partners in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion). Mr. Castaldo also served as the lead litigation partner in *In re Tenet Healthcare Corp.*, No. 02-CV-8462 (C.D. Cal. 2002), securing an aggregate recovery of $281.5 million for the class, including $65 million from Tenet's auditor. Mr. Castaldo also played a primary litigation role in the following cases: *In re Liberate Technologies Sec. Litig.*, No. C-02-5017 (MJJ) (N.D. Cal. 2005) (settled — $13.8 million); *In re Sodexho Marriott Shareholders Litig.*, Consol. C.A. No. 18640-NC (Del. Ch. 1999) (settled — $166 million benefit); *In re Motive, Inc. Sec. Litig.*, 05-CV-923 (W.D.Tex. 2005) (settled — $7 million cash, 2.5 million shares); and *In re Wireless Facilities, Inc., Sec. Litig.*, 04-CV-1589 (S.D. Cal. 2004) (settled — $16.5 million). In addition, Mr. Castaldo served as one of the lead trial attorneys for shareholders in the historic *In re Longtop Financial Technologies Ltd. Securities Litigation*, No. 11-cv-3658 (S.D.N.Y.) trial, which resulted in a verdict in favor of investors on liability and damages.

**DARREN J. CHECK,** a partner of the Firm, concentrates his practice in the area of shareholder litigation and client relations. Mr. Check manages the Firm's Portfolio Monitoring Department and works closely with the Firm's Case Evaluation Department. Mr. Check received his law degree from Temple University School of Law and is a graduate of Franklin & Marshall College. Mr. Check is admitted to practice in numerous state and federal courts across the United States.

Currently, Mr. Check consults with institutional investors from around the world with regard to their investment rights and responsibilities. He currently works with clients in the United States, Canada, the Netherlands, Sweden, Denmark, Norway, Finland, United Kingdom, Italy, Germany, Austria, Switzerland, France, Australia and throughout Asia and the Middle East.

Mr. Check assists Firm clients in evaluating and analyzing opportunities to take an active role in shareholder litigation, arbitration, and other loss recovery methods. This includes U.S. based litigation and arbitration, as well as an increasing number of cases from jurisdictions around the globe. With an increasingly complex investment and legal landscape, Mr. Check has experience advising on traditional class actions, direct actions, non-U.S. opt-in actions, fiduciary actions, appraisal actions and arbitrations to name a few. Mr. Check is frequently called upon by his clients to help ensure they are taking an active role when their involvement can make a difference, and that they are not leaving money on the table.

Mr. Check regularly speaks on the subjects of shareholder litigation, corporate governance, investor activism, and recovery of investment losses at conferences around the world.

Mr. Check has also been actively involved in the precedent setting Shell and Fortis settlements in the Netherlands, the Olympus shareholder case in Japan, direct actions against Petrobras, BP, Vivendi, and Merck, and securities class actions against Bank of America, Lehman Brothers, Royal Bank of Scotland (U.K.), and Hewlett-Packard. Currently Mr. Check represents investors in numerous high profile actions in the United States, the Netherlands, Germany, Canada, France, Japan, and the United Kingdom.

**EMILY N. CHRISTIANSEN,** a partner of the Firm, focuses her practice in securities litigation and international actions, in particular. Ms. Christiansen received her Juris Doctor and Global Law certificate, *cum laude*, from Lewis and Clark Law School in 2012. Ms. Christiansen is a graduate of the University of Portland, where she received her Bachelor of Arts, *cum laude*, in Political Science and German Studies. Ms. Christiansen is currently licensed to practice law in New York and Pennsylvania.

While in law school, Ms. Christiansen worked as an intern in Trial Chambers III at the International Criminal Tribunal for the Former Yugoslavia. Ms. Christiansen also spent two months in India as foreign legal trainee with the corporate law firm of Fox Mandal. Ms. Christiansen is a 2007 recipient of a Fulbright Fellowship and is fluent in German.

Ms. Christiansen devotes her time to advising clients on the challenges and benefits of pursuing particular litigation opportunities in jurisdictions outside the U.S.  In those non-US actions where Kessler Topaz is actively involved, Emily liaises with local counsel, helps develop case strategy, reviews pleadings, and helps clients understand and successfully navigate the legal process. Her experience includes non-US opt-in actions, international law, and portfolio monitoring and claims administration. In her role, Ms. Christiansen has helped secure recoveries for institutional investors in litigation in Japan against *Olympus Corporation* (settled - ¥11 billion) and in the Netherlands against *Fortis Bank N.V.* (settled - €1.2 billion).

**JOSHUA E. D'ANCONA,** a partner of the Firm, concentrates his practice in the securities litigation and lead plaintiff departments of the Firm. Mr. D'Ancona received his J.D., *magna cum laude*, from the Temple University Beasley School of Law in 2007, where he served on the Temple Law Review and as president

of the Moot Court Honors Society, and graduated with honors from Wesleyan University. He is licensed to practice in Pennsylvania and New Jersey.

Before joining the Firm in 2009, he served as a law clerk to the Honorable Cynthia M. Rufe of the United States District Court for the Eastern District of Pennsylvania.

**JONATHAN R. DAVIDSON**, a partner of the Firm, concentrates his practice in the area of shareholder litigation.  Mr. Davidson currently consults with institutional investors from around the world, including public pension funds at the state, county and municipal level, as well as Taft-Hartley funds across all trades, with regard to their investment rights and responsibilities.  Mr. Davidson assists Firm clients in evaluating and analyzing opportunities to take an active role in shareholder litigation.  With an increasingly complex shareholder litigation landscape that includes traditional securities class actions, shareholder derivative actions and takeover actions, non-U.S. opt-in actions, and fiduciary actions to name a few, Mr. Davidson is frequently called upon by his clients to help ensure they are taking an active role when their involvement can make a difference, and to ensure they are not leaving money on the table.

Mr. Davidson has been involved in the following successfully concluded shareholder litigation matters: *City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc.*, C.A. No. 12481-VCL (Del. Ch.) ($86.5 million settlement, including $46.5 million funded by outside legal advisor); *In re MGM Mirage Securities Litigation*, Case No. 2:09-cv-01558-GMN-VCF (D. Nev.) ($75 million settlement); *In re Weatherford Int'l Securities Litigation*, No. 11-cv-01646-LAK-JCF (S.D.N.Y.) (settled -- $52.5 million); *Beaver County Employees' Retirement Fund, et al. v. Tile Shop Holdings, Inc., et al.,* No. 0:14-CV-00786-ADM/TNL (D. Minn.) ($9.5 million settlement); *Bucks County Employees Retirement Fund vs. Hillshire Brands Co*, No. 24-C-14-003492 (Md. Cir. Ct.) (Alternative deal struck paying a 71% premium to stockholders); and *City of Sunrise Firefighters' Retirement Fund v. Schaeffer*, No. 8703 (Del. Ch. Ct.) (Invalid bylaws repealed; board disclosed that it unlawfully adopted the bylaws).

Mr. Davidson is a frequent lecturer on shareholder litigation, corporate governance, fiduciary issues facing institutional investors, investor activism and the recovery of investment losses -- speaking on these subjects at conferences around the world each year, including the National Conference on Public Employee Retirement Systems' Annual Conference & Exhibition, the International Foundation of Employee Benefit Plans Annual Conference, the California Association of Public Retirement Systems Administrators Roundtable, the Florida Public Pension Trustees Association Trustee Schools and Wall Street Program, the Pennsylvania Association of Public Employees Retirement Systems Spring Forum, the Fiduciary Investors Symposium, the U.S. Markets' Institutional Investor Forum, and The Evolving Fiduciary Obligations of Pension Plans.  Mr. Davidson is also a member of numerous professional and educational organizations, including the National Association of Public Pension Attorneys.

Mr. Davidson is a graduate of The George Washington University where he received his Bachelor of Arts, *summa cum laude*, in Political Communication. Mr. Davidson received his Juris Doctor and Dispute Resolution Certificate from Pepperdine University School of Law and is licensed to practice law in Pennsylvania and California.

**RYAN T. DEGNAN,** a partner of the Firm, concentrates his practice on new matter development with a specific focus on analyzing securities class action lawsuits, antitrust actions, and complex consumer actions. Mr. Degnan received his law degree from Temple University Beasley School of Law, where he was a Notes and Comments Editor for the Temple Journal of Science, Technology & Environmental Law, and earned his undergraduate degree in Biology from The Johns Hopkins University. While a law student, Mr. Degnan served as a Judicial Intern to the Honorable Gene E.K. Pratter of the United States District Court for the Eastern District of Pennsylvania. Mr. Degnan is licensed to practice in Pennsylvania and New Jersey.

As a member of the Firm's lead plaintiff litigation practice group, Mr. Degnan has helped secure the Firm's clients' appointments as lead plaintiffs in: *In re HP Sec. Litig.*, No. 12-cv-5090, 2013 WL 792642 (N.D. Cal. Mar. 4, 2013); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery); *Freedman v. St. Jude Medical, Inc., et al.*, No. 12-cv-3070 (D. Minn.); *United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Ocwen Fin. Corp.*, No. 14 Civ. 81057 (WPD), 2014 WL 7236985 (S.D. Fla. Nov. 7, 2014); *Louisiana Municipal Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc., et al.*, No. 11-cv-289, 2012 U.S. Dist. LEXIS 89192 (D. Vt. Apr. 27, 2012); and *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11-cv-3658, 2011 U.S. Dist. LEXIS 112970 (S.D.N.Y. Oct. 4, 2011). Additional representative matters include: *In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, No. 12-md-02335 (S.D.N.Y.) ($335 million settlement); and *Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al.*, No. 12-cv-02865 (S.D.N.Y.) ($69 million settlement).

**ELI R. GREENSTEIN** is managing partner of the Firm's San Francisco office and a member of the Firm's federal securities litigation practice group. Mr. Greenstein concentrates his practice on federal securities law violations and white collar fraud, including violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Mr. Greenstein received his J.D. from Santa Clara University School of Law in 2001, and his M.B.A. from Santa Clara's Leavey School of Business in 2002. Mr. Greenstein received his B.A. in Business Administration from the University of San Diego in 1997 where he was awarded the Presidential Scholarship. He is licensed to practice in California.

Mr. Greenstein also was a judicial extern for the Honorable James Ware (Ret.), Chief Judge of the United States District Court for the Northern District of California. Prior to joining the Firm, Mr. Greenstein was a partner at Robbins Geller Rudman & Dowd LLP in its federal securities litigation practice group. His relevant background also includes consulting for PricewaterhouseCoopers LLP's International Tax and Legal Services division, and work on the trading floor of the Chicago Mercantile Exchange, S&P 500 futures and options division.

Mr. Greenstein has been involved in dozens of high-profile securities fraud actions resulting in more than $1 billion in recoveries for clients and investors, including: *Nieman v. Duke Energy Corp.*, 2013 U.S. Dist. LEXIS 110693 (W.D.N.C.) ($146 million recovery); *In re HP Secs. Litig.*, 2013 U.S. Dist. LEXIS 168292 (N.D. Cal.) ($100 million recovery); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (N.D. Cal) ($95 million recovery); *In re AOL Time Warner Sec. Litig. State Opt-Out Actions* (*Regents of the Univ. of Cal. v. Parsons* (Cal. Super. Ct.), *Ohio Pub. Emps. Ret. Sys. v. Parsons* (Franklin County Ct. of Common Pleas) ($618 million in total recoveries); *Minneapolis Firefighters' Relief Association v. Medtronic, Inc.*, No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $85 million); *In re MGM Mirage Securities Litigation*, Case No. 2:09-cv-01558-GMN-VCF (D. Nev.) ($75 million settlement); *In re Weatherford Int'l Securities Litigation*, No. 11-cv-01646-LAK-JCF (S.D.N.Y.) (settled -- $52.5 million); *In re Sunpower Secs. Litig.*, 2011 U.S. Dist. LEXIS 152920 (N.D. Cal.) ($19.7 million recovery); *In re Am. Serv. Group, Inc.*, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn.) ($15.1 million recovery); *In re Terayon Communs. Sys. Sec. Litig.*, 2002 U.S. Dist. LEXIS 5502 (N.D. Cal.) ($15 million recovery); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal.) ($8.9 million recovery); *In re Endocare, Inc. Sec. Litig.*, No. CV02-8429 DT (CTX) (C.D. Cal.) ($8.95 million recovery); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 U.S. Dist. LEXIS 12971 (N.D. Ill.) ($7.5 million recovery); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 U.S. Dist. LEXIS 6977 (C.D. Cal.) ($4.8 million recovery); *In re Purus* Sec. Litig. No. C-98-20449-JF(RS) (N.D. Cal) ($9.95 million recovery).

**SEAN M. HANDLER,** a partner of the Firm and member of Kessler Topaz's Management Committee, currently concentrates his practice on all aspects of new matter development for the Firm including securities, consumer and intellectual property. Mr. Handler earned his Juris Doctor, *cum laude*, from

Temple University School of Law, and received his Bachelor of Arts degree from Colby College, graduating *with distinction* in American Studies. Mr. Handler is licensed to practice in Pennsylvania, New Jersey and New York.

As part of his responsibilities, Mr. Handler also oversees the lead plaintiff appointment process in securities class actions for the Firm's clients. In this role, Mr. Handler has achieved numerous noteworthy appointments for clients in reported decisions including *Foley v. Transocean*, 272 F.R.D. 126 (S.D.N.Y. 2011); *In re Bank of America Corp. Sec., Derivative & Employment Ret. Income Sec. Act (ERISA) Litig.*, 258 F.R.D. 260 (S.D.N.Y. 2009) and *Tanne v. Autobytel, Inc.,* 226 F.R.D. 659 (C.D. Cal. 2005) and has argued before federal courts throughout the country.

Mr. Handler was also one of the principal attorneys in *In re Brocade Securities Litigation* (N.D. Cal. 2008)*,* where the team achieved a $160 million settlement on behalf of the class and two public pension fund class representatives. This settlement is believed to be one of the largest settlements in a securities fraud case in terms of the ratio of settlement amount to actual investor damages.

Mr. Handler also lectures and serves on discussion panels concerning securities litigation matters, most recently appearing at American Conference Institute's National Summit on the Future of Fiduciary Responsibility and Institutional Investor's The Rights & Responsibilities of Institutional Investors.

**GEOFFREY C. JARVIS**, a partner of the Firm, focuses on securities litigation for institutional investors. Mr. Jarvis graduated from Harvard Law School in 1984, and received his undergraduate degree from Cornell University in 1980.  He is licensed to practice in Pennsylvania, Delaware, New York and Washington, D.C.

Following law school, Mr. Jarvis served as a staff attorney with the Federal Communications Commission, participating in the development of new regulatory policies for the telecommunications industry.

Mr. Jarvis had a major role in *Oxford Health Plans Securities Litigation, DaimlerChrysler Securities Litigation*, and *Tyco Securities Litigation* all of which were among the top ten securities settlements in U.S. history at the time they were resolved, as well as a large number of other securities cases over the past 16 years. He has also been involved in a number of actions before the Delaware Chancery Court, including a Delaware appraisal case that resulted in a favorable decision for the firm's client after trial, and a Delaware appraisal case that was tried in October, argued in 2016, which is still awaiting a final decision.

Mr. Jarvis then became an associate in the Washington office of Rogers & Wells (subsequently merged into Clifford Chance), principally devoted to complex commercial litigation in the fields of antitrust and trade regulations, insurance, intellectual property, contracts and defamation issues, as well as counseling corporate clients in diverse industries on general legal and regulatory compliance matters. He was previously associated with a prominent Philadelphia litigation boutique and had first-chair assignments in cases commenced under the Pennsylvania Whistleblower Act and in major antitrust, First Amendment, civil rights, and complex commercial litigation, including several successful arguments before the U.S. Court of Appeals for the Third Circuit. From 2000 until early 2016, Mr. Jarvis was a Director (Senior Counsel through 2001) at Grant & Eisenhofer, P.A., where he engaged in a number of federal securities, and state fiduciary cases (primarily in Delaware), including several of the largest settlements of the past 15 years. He also was lead trial counsel and/or associate counsel in a number of cases that were tried to a verdict (or are pending final decision).

**JENNIFER L. JOOST,** a partner in the Firm's San Francisco office, focuses her practice on securities litigation.  Ms. Joost received her law degree, *cum laude*, from Temple University Beasley School of Law,

where she was the Special Projects Editor for the *Temple International and Comparative Law Journal.* Ms. Joost earned her undergraduate degree with honors from Washington University in St. Louis. She is licensed to practice in Pennsylvania and California and is admitted to practice before the United States Courts of Appeals for the Second, Fourth, Ninth, and Eleventh Circuits, and the United States District Courts for the Eastern District of Pennsylvania, the Northern District of California and the Southern District of California.

Ms. Joost has represented institutional investors in numerous securities fraud class actions including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Citigroup Bond Litigation*, No. 08-cv-09522-SHS (S.D.N.Y.) ($730 million recovery); *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D.Cal. 2012) (settled -- $500 million); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale *Litigation*") ($150 million recovery); *Minneapolis Firefighters' Relief Association v. Medtronic, Inc.,* No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $85 million); *In re MGM Mirage Securities Litigation,* Case No. 2:09-cv-01558-GMN-VCF (D. Nev.) ($75 million settlement); and *In re Weatherford Int'l Securities Litigation*, No. 11-cv-01646-LAK-JCF (S.D.N.Y.) (settled -- $52.5 million).

**STACEY KAPLAN**, a partner in the Firm's San Francisco office, concentrates her practice on prosecuting securities class actions. Ms. Kaplan received her J.D. from the University of California at Los Angeles School of Law in 2005, and received her Bachelor of Business Administration from the University of Notre Dame in 2002, with majors in Finance and Philosophy. Ms. Kaplan is admitted to the California Bar and is licensed to practice in all California state courts, as well as the United States District Courts for the Northern and Central Districts of California.

During law school, Ms. Kaplan served as a Judicial Extern to the Honorable Terry J. Hatter, Jr., United States District Court, Central District of California. Prior to joining the Firm, Ms. Kaplan was an associate with Robbins Geller Rudman & Dowd LLP in San Diego, California.

**DAVID KESSLER**, a partner of the Firm, manages the Firm's internationally recognized securities department. Mr. Kessler graduated with distinction from the Emory School of Law, after receiving his undergraduate B.S.B.A. degree from American University. Mr. Kessler is licensed to practice law in Pennsylvania, New Jersey and New York, and has been admitted to practice before numerous United States District Courts. Prior to practicing law, Mr. Kessler was a Certified Public Accountant in Pennsylvania.

Mr. Kessler has achieved or assisted in obtaining Court approval for the following outstanding results in federal securities class action cases: *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *In re Tyco International, Ltd. Sec. Lit.*, No. 02-1335-B (D.N.H. 2002) ($3.2 billion settlement); *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09-cv-6351 (RJS) (S.D.N.Y.) ($627 million recovery); *In re: Lehman Brothers Securities and ERISA Litigation*, Master File No. 09 MD 2017 (LAK) (S.D.N.Y) (settled - $516,218,000); *In re Satyam Computer Services Ltd. Sec. Litig.*, Master File No. 09 MD 02027 (BSJ) ($150.5 million settlement); *In re Tenet Healthcare Corp.*, 02-CV-8462 (C.D. Cal. 2002) (settled — $281.5 million); *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92(SAS) ($586 million settlement).

Mr. Kessler is also currently serving as one of the Firm's primary litigation partners in the Citigroup, JPMorgan, Hewlett Packard, Pfizer and Morgan Stanley securities litigation matters.

In addition, Mr. Kessler often lectures and writes on securities litigation related topics and has been recognized as "Litigator of the Week" by the American Lawyer magazine for his work in connection with the Lehman Brothers securities litigation matter in December of 2011 and was honored by Benchmark as

one of the preeminent plaintiffs practitioners in securities litigation throughout the country. Most recently Mr. Kessler co-authored *The FindWhat.com Case: Acknowledging Policy Considerations When Deciding Issues of Causation in Securities Class Actions* published in Securities Litigation Report.

**JAMES A. MARO, JR.,** a partner of the Firm, concentrates his practice in the Firm's case development department. He also has experience in the areas of consumer protection, ERISA, mergers and acquisitions, and shareholder derivative actions. Mr. Maro received his law degree from the Villanova University School of Law, and received a B.A. in Political Science from the Johns Hopkins University. Mr. Maro is licensed to practice law in Commonwealth of Pennsylvania and New Jersey. He is admitted to practice in the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

**JOSHUA A. MATERESE**, a partner of the Firm, concentrates his practice at Kessler Topaz in the areas of securities and consumer protection litigation. Mr. Materese received his Juris Doctor from Temple University Beasley School of Law in 2012, graduating with honors. He received his undergraduate degree from the Syracuse University Newhouse School of Communications. Mr. Materese is licensed to practice in Pennsylvania and admitted to practice before the United States Courts of Appeals for the Second and Third Circuits, and the United States District Courts for the Eastern District of Pennsylvania, the District of New Jersey and the District of Colorado.

**MARGARET E. MAZZEO,** a partner of the Firm, focuses her practice on securities litigation. Ms. Mazzeo received her law degree, *cum laude*, from Temple University Beasley School of Law, where she was a Beasley Scholar and a staff editor for the Temple Journal of Science, Technology, and Environmental Law. Ms. Mazzeo graduated with honors from Franklin and Marshall College. She is licensed to practice in Pennsylvania and New Jersey.

Ms. Mazzeo has been involved in several nationwide securities cases on behalf of investors, including *In re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery); and *David H. Luther, et al., v. Countrywide Financial Corp.*, *et. al.*, 2:12-cv-05125 (C.D. Cal. 2012) (settled -- $500 million). Ms. Mazzeo also was a member of the trial team who won a jury verdict in favor of investors in the *In re Longtop Financial Technologies Ltd. Securities Litigation*, No. 11-cv-3658 (S.D.N.Y.) action.

**JOSEPH H. MELTZER,** a partner of the Firm, concentrates his practice in the areas of ERISA, fiduciary and antitrust complex litigation. Mr. Meltzer received his law degree with honors from Temple University School of Law and is an honors graduate of the University of Maryland. Honors include being named a Pennsylvania Super Lawyer. Mr. Meltzer is licensed to practice in Pennsylvania, New Jersey, New York, the Supreme Court of the United States, and the U.S. Court of Federal Claims.

Mr. Meltzer leads the Firm's Fiduciary Litigation Group which has excelled in the highly specialized area of prosecuting cases involving breach of fiduciary duty claims. Mr. Meltzer has served as lead or co-lead counsel in numerous nationwide class actions brought under ERISA. Since founding the Fiduciary Litigation Group, Mr. Meltzer has helped recover hundreds of millions of dollars for clients and class members including some of the largest settlements in ERISA fiduciary breach actions. Mr. Meltzer represented the Board of Trustees of the Buffalo Laborers Security Fund in its action against J.P. Jeanneret Associates which involved a massive, fraudulent scheme orchestrated by Bernard L. Madoff, No. 09-3907 (S.D.N.Y.). Mr. Meltzer also represented an institutional client in a fiduciary breach action against Wells Fargo for large losses sustained while Wachovia Bank and its subsidiaries, including Evergreen Investments, were managing the client's investment portfolio.

As part of his fiduciary litigation practice, Mr. Meltzer was actively involved in actions related to losses sustained in securities lending programs, including *Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank,* No. 09-00686 (S.D.N.Y.) ($150 million settlement) and *CompSource Okla. v. BNY Mellon,* No. 08-469 (E.D. OK) ($280 million settlement). In addition, Mr. Meltzer represented a publicly traded company in a large arbitration against AIG, Inc. related to securities lending losses, *Transatlantic Holdings, Inc. v. AIG,* No. 50-148T0037610 (AAA) ($75million settlement).

A frequent lecturer on ERISA litigation, Mr. Meltzer is a member of the ABA and has been recognized by numerous courts for his ability and expertise in this complex area of the law. Mr. Meltzer is also a patron member of Public Justice and a member of the Class Action Preservation Committee.

Mr. Meltzer also manages the Firm's Antitrust and Pharmaceutical Pricing Groups. Here, Mr. Meltzer focuses on helping clients that have been injured by anticompetitive and unlawful business practices, including with respect to overcharges related to prescription drug and other health care expenditures. Mr. Meltzer served as co-lead counsel for direct purchasers in the *Flonase Antitrust Litigation,* No.08-3149 (E.D. PA) ($150 million settlement) and has served as lead or co-lead counsel in numerous nationwide actions. Mr. Meltzer also serves as a special assistant attorney general for the states of Montana, Utah and Alaska. Mr. Meltzer also lectures on issues related to antitrust litigation.

**MATTHEW L. MUSTOKOFF**, a partner of the Firm, is an experienced securities and corporate governance litigator. He has represented clients at the trial and appellate level in numerous high-profile shareholder class actions and other litigations involving a wide array of matters, including financial fraud, market manipulation, mergers and acquisitions, fiduciary mismanagement of investment portfolios, and patent infringement. Mr. Mustokoff received his law degree from the Temple University School of Law, and is a Phi Beta Kappa honors graduate of Wesleyan University. At law school, Mr. Mustokoff was the articles and commentary editor of the *Temple Political and Civil Rights Law Review* and the recipient of the Raynes, McCarty, Binder, Ross and Mundy Graduation Prize for scholarly achievement in the law. He is admitted to practice before the state courts of New York and Pennsylvania, the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Pennsylvania and the District of Colorado, and the United States Courts of Appeals for the Eleventh and Federal Circuits.

Mr. Mustokoff is currently prosecuting several nationwide securities cases on behalf of U.S. and overseas institutional investors, including *In re JPMorgan Chase Securities Litigation (*S.D.N.Y.), arising out of the "London Whale" derivatives trading scandal which led to over $6 billion in losses in the bank's proprietary trading portfolio. He serves as lead counsel for six public pension funds in the multi-district securities litigation against BP in Texas federal court stemming from the 2010 Deepwater Horizon disaster in the Gulf of Mexico. He successfully argued the opposition to BP's motion to dismiss, resulting in a landmark decision sustaining fraud claims under English law for purchasers of BP shares on the London Stock Exchange.

Mr. Mustokoff also played a major role in prosecuting *In re Citigroup Bond Litigation* (S.D.N.Y.), involving allegations that Citigroup concealed its exposure to subprime mortgage debt on the eve of the 2008 financial crisis. The $730 million settlement marks the second largest recovery under Section 11 of the Securities Act in the history of the statute. Mr. Mustokoff's significant courtroom experience includes serving as one of the lead trial lawyers for shareholders in the only securities fraud class action arising out of the financial crisis to be tried to jury verdict. In addition to his trial practice in federal courts, he has successfully tried cases before the Financial Industry Regulatory Authority (FINRA).

Prior to joining the Firm, Mr. Mustokoff practiced at Weil, Gotshal & Manges LLP in New York, where he represented public companies and financial institutions in SEC enforcement and white collar criminal matters, shareholder litigation and contested bankruptcy proceedings.

**SHARAN NIRMUL,** a partner of the Firm, concentrates his practice in the area of securities, consumer and fiduciary class litigation, principally representing the interests of plaintiffs in class action and complex commercial litigation. Mr. Nirmul has represented clients in federal and state courts and in alternative dispute resolution forums. Mr. Nirmul received his law degree from The George Washington University Law School (J.D. 2001) where he served as an articles editor for the *Environmental Lawyer Journal* and was a member of the Moot Court Board. He was awarded the school's Lewis Memorial Award for excellence in clinical practice. He received his undergraduate degree from Cornell University (B.S. 1996). Mr. Nirmul is admitted to practice law in the state courts of New York, New Jersey, Pennsylvania and Delaware, and in the U.S. District Courts for the Southern District of New York, District of New Jersey, and District of Delaware.

Mr. Nirmul has represented institutional investors in a number of notable securities class action cases. These include *In re Bank of America Securities Litigation*, a case which represents the sixth largest recovery for shareholders under the federal securities laws ($2.45 billion settlement) and which included significant corporate governance enhancements at Bank of America; *In re Global Crossing Securities Litigation* (recovery of over $450 million); *In re Delphi Securities Litigation* ($284 million settlement with Delphi, its former officers and directors and underwriters, and a separate $38.25 million settlement with the auditors); and *Satyam Computer Services Securities Litigation*, ($150.5 million settlement).

Mr. Nirmul has also been at the forefront of litigation on behalf of investors who suffered losses through fraud, breach of fiduciary and breach of contract by their custodians and investment fiduciaries. In a matter before the American Arbitration Association, Mr. Nirmul represented a publicly traded reinsurance company in a breach of contract and breach of fiduciary suit against its former controlling shareholder and fiduciary investment manager, arising out of its participation and losses through a securities lending program and securing a $70 million recovery. Mr. Nirmul is also presently litigating breach of contract and Trust Indenture Act claims against the trustees of mortgage backed securities issued by Washington Mutual (Washington State Investments Board et al v. Bank of America National Association et al) on behalf of several state public pension funds. In connection with a scheme to manipulate foreign exchange rates assigned to its custodial clients, Mr. Nirmul is a member of the team litigating a consumer class action asserting contractual and fiduciary duty claims against BNY Mellon in the Southern District of New York (In re BNY Mellon Forex Litigation).

Mr. Nirmul regularly speaks on matters affecting institutional investors at conferences and symposiums. He has been a speaker and/or panelist at the annual Rights and Responsibilities of Institutional Investors in Amsterdam, The Netherlands and annual Evolving Fiduciary Obligations of Pension Plans in Washington, D.C.

**JUSTIN O. RELIFORD,** a partner of the Firm, concentrates his practice on mergers and acquisition litigation and shareholder derivative litigation. Mr. Reliford graduated from the University of Pennsylvania Law School in 2007 and received his B.A. from Williams College in 2003, majoring in Psychology with a concentration in Leadership Studies. Mr. Reliford is a member of the Pennsylvania and New Jersey bars, and he is admitted to practice in the Third Circuit Court of Appeals, the Eastern District of Pennsylvania, and the District of New Jersey.

Mr. Reliford has extensive experience representing clients in connection with nationwide class and collective actions. Most notably, Mr. Reliford, was part of the trial team *In re Dole Food Co., Inc. Stockholder Litig.*, C.A. No. 8703-VCL, that won a trial verdict in favor of Dole stockholders for $148 million. Mr. Reliford also obtained a favorable recovery for an institutional investor in a securities class action *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 8:14-cv-02004 (C.D. Cal. 2018), which challenged a brazen insider trading scheme by Valeant Pharmaceuticals to tip Bill Ackman's hedge fund

Pershing Square Capital that it intended to launch a hostile takeover attempt to buy rival pharma company Allergan. After three years, the case settled weeks before trial for $250 million. He also litigated *In re GFI Group, Inc. Stockholder Litig.* Consol. C.A. No. 10136-VCL (Del. Ch.) ($10.75 million cash settlement); *In re Globe Specialty Metals, Inc. Stockholders Litig.*, Consol. C.A. No. 10865-VCG (Del. Ch.) ($32.5 million settlement); and *In re Harleysville Mutual* (CCP, Phila. Cnty. 2012) (an expedited merger litigation case challenging Harleysville's agreement to sell the company to Nationwide Insurance Company, which lead to a $26 million cash payment to policyholders). Prior to joining the Firm, Mr. Reliford was an associate in the labor and employment practice group of Morgan Lewis & Bockius, LLP. There, Mr. Reliford concentrated his practice on employee benefits, fiduciary, and workplace discrimination litigation.

**LEE D. RUDY**, a partner of the Firm, manages the Firm's mergers and acquisition and shareholder derivative litigation. Mr. Rudy received his law degree from Fordham University, and his undergraduate degree, *cum laude*, from the University of Pennsylvania. Mr. Rudy is licensed to practice in Pennsylvania and New York.

Representing both institutional and individual shareholders in these actions, he has helped cause significant monetary and corporate governance improvements for those companies and their shareholders. Mr. Rudy also co-chairs the Firm's qui tam and whistleblower practices, where he represents whistleblowers before administrative agencies and in court. Mr. Rudy regularly practices in the Delaware Court of Chancery, where he served as co-lead trial counsel in the landmark case of *In re S. Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-CS, a $2 billion trial verdict against Southern Peru's majority shareholder. He previously served as lead counsel in dozens of high profile derivative actions relating to the "backdating" of stock options. Mr. Rudy also obtained a favorable recovery for an institutional investor in a securities class action *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 8:14-cv-02004 (C.D. Cal. 2018), which challenged a brazen insider trading scheme by Valeant Pharmaceuticals to tip Bill Ackman's hedge fund Pershing Square Capital that it intended to launch a hostile takeover attempt to buy rival pharma company Allergan. After three years, the case settled weeks before trial for $250 million. In addition, Mr. Rudy represented stockholders in obtaining substantial recoveries in numerous shareholder derivative and class actions, many of which resulted in significant monetary relief, including: *In re Facebook, Inc. Class C Reclassification Litigation*, C.A. No. 12286-VCL (Del. Ch. Sept. 25, 2017) (KTMC challenged a proposed reclassification of Facebook's stock structure as harming the company's public stockholders. Facebook abandoned the proposal just one business day before trial was to commence; granting Plaintiffs complete victory); *City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al.*, C.A. No. 12481-VCL (Del. Ch. Sept. 12, 2017) ($86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.); *Quinn v. Knight*, No. 3:16-cv-610 (E.D. Va. Mar. 16, 2017) (class action settling just ten days before trial, with stockholders receiving an additional $32 million in merger consideration); *In re MPG Office Trust, Inc. Preferred Shareholder Litigation,* Cons. Case No. 24-C-13-004097 (Md. Cir. Oct. 20, 2015) (Kessler Topaz negotiated a settlement where MPG preferred stockholders received a dividend of $2.25 per share, worth approximately $21 million); *In re Harleysville Mutual* (CCP, Phila. Cnty. 2012) (an expedited merger litigation case challenging Harleysville's agreement to sell the company to Nationwide Insurance Company, which lead to a $26 million cash payment to policyholders); and *In re Amicas, Inc. Shareholder Litigation*, 10-0174-BLS2 (Suffolk County, MA 2010) (Kessler Topaz prevailed in securing a preliminary injunction against the deal, which allowed a superior bidder to purchase the Company for an additional $0.70 per share ($26 million)).

Prior to civil practice, Mr. Rudy served for several years as an Assistant District Attorney in the Manhattan (NY) District Attorney's Office, and as an Assistant United States Attorney in the US Attorney's Office (DNJ).

**RICHARD A. RUSSO, JR.**, a partner of the Firm, focuses his practice on securities litigation. Mr. Russo received his law degree from the Temple University Beasley School of Law, where he graduated *cum laude* and was a member of the Temple Law Review, and graduated *cum laude* from Villanova University, where he received a Bachelor of Science degree in Business Administration. Mr. Russo is licensed to practice in Pennsylvania and New Jersey.

Mr. Russo has represented individual and institutional investors in obtaining significant recoveries in numerous class actions arising under the federal securities laws, including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion), *In re Citigroup Bond Litigation*, No. 08-cv-09522-SHS (S.D.N.Y.) ($730 million recovery), *In re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery).

**MARC A. TOPAZ**, a partner of the Firm, oversees the Firm's derivative, transactional and case development departments. Mr. Topaz received his law degree from Temple University School of Law, where he was an editor of the *Temple Law Review* and a member of the Moot Court Honor Society. He also received his Master of Law (L.L.M.) in taxation from the New York University School of Law, where he served as an editor of the *New York University Tax Law Review*. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Mr. Topaz has been heavily involved in all of the Firm's cases related to the subprime mortgage crisis, including cases seeking recovery on behalf of shareholders in companies affected by the subprime crisis, as well as cases seeking recovery for 401K plan participants that have suffered losses in their retirement plans. Mr. Topaz has also played an instrumental role in the Firm's option backdating litigation. These cases, which are pled mainly as derivative claims or as securities law violations, have served as an important vehicle both for re-pricing erroneously issued options and providing for meaningful corporate governance changes. In his capacity as the Firm's department leader of case initiation and development, Mr. Topaz has been involved in many of the Firm's most prominent cases, including *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92(SAS) (S.D.N.Y. Dec. 12, 2002); *Wanstrath v. Doctor R. Crants, et al.*, No. 99-1719-111 (Tenn. Chan. Ct., 20th Judicial District, 1999); *In re Tyco International, Ltd. Sec. Lit.*, No. 02-1335-B (D.N.H. 2002) (settled — $3.2 billion); and virtually all of the 80 options backdating cases in which the Firm is serving as Lead or Co-Lead Counsel. Mr. Topaz has played an important role in the Firm's focus on remedying breaches of fiduciary duties by corporate officers and directors and improving corporate governance practices of corporate defendants.

**MELISSA L. TROUTNER,** a partner of the Firm, concentrates her practice on new matter development with a specific focus on analyzing securities class action lawsuits, antitrust actions, and complex consumer actions. Ms. Troutner is also a member of the Firm's Consumer Protection group. Ms. Troutner received her law degree, Order of the Coif, *cum laude*, from the University of Pennsylvania Law School in 2002 and her Bachelor of Arts, Phi Beta Kappa, *magna cum laude*, from Syracuse University in 1999. Ms. Troutner is licensed to practice law in Pennsylvania, New York and Delaware.

Prior to joining Kessler Topaz, Ms. Troutner practiced as a litigator with several large defense firms, focusing on complex commercial, products liability and patent litigation, and clerked for the Honorable Stanley S. Brotman, United States District Judge for the District of New Jersey.

**MICHAEL C. WAGNER**, a partner of the Firm, handles class-action merger litigation and shareholder derivative litigation for the Firm's individual and institutional clients. A graduate of the University of Pittsburgh School of Law and Franklin and Marshall College, Mr. Wagner has clerked for two appellate court judges and began his career at a Philadelphia-based commercial litigation firm, representing clients

in business and corporate disputes across the United States. Mr. Wagner is admitted to practice in the courts of Pennsylvania, the United States Court of Appeals for the Third Circuit, and the United States District Courts for the Eastern and Western Districts of Pennsylvania, the Eastern District of Michigan, and the District of Colorado.

Frequently appearing in the Delaware Court of Chancery, Mr. Wagner has helped to achieve substantial monetary recoveries for stockholders of public companies in cases arising from corporate mergers and acquisitions. Notably, Mr. Wagner served as co-lead trial counsel in *In re Dole Food Co., Inc. Stockholder Litig.*, C.A. No. 8703-VCL (Del. Ch. Aug. 27, 2015), which won a trial verdict in favor of Dole stockholders for $148 million.  In addition, Mr. Wagner served co-lead counsel in *In re Ebix, Inc. S'holder Litig.*, Consol. C.A. No. 8526-VCS (Del. Ch. Apr. 5, 2019), a case that challenged an improper executive bonus worth $825 million for the company's CEO.  After five years of hard fought litigation and a trial the case settled for corporate governance measures and an amendment to the CEO's stock appreciation rights agreement. He has also achieved significant monetary results in other cases such as: *In re GFI Group, Inc. Stockholder Litig.*, Consol. C.A. No. 10136-VCL (Del. Ch. Feb. 26, 2016) ($10.75 million settlement to resolve the claims surrounding the takeover broker-dealer GFI by CME Group); *In re Globe Specialty Metals, Inc. Stockholders Litig.*, Consol. C.A. No. 10865-VCG (Del. Ch. Feb. 15, 2016) ($32.5 million settlement and various corporate governance reforms to protect Globe stockholders' rights in Ferroglobe); *In re MPG Office Trust, Inc. Preferred Shareholder Litig.*, Cons. Case No. 24-C-13-004097 (Md. Cir. Oct. 20, 2015) (Kessler Topaz negotiated a settlement where MPG preferred stockholders received a dividend of $2.25 per share, worth approximately $21 million); *In re GSI Commerce, Inc. S'holders Litig.*, C.A. No. 6346-VCN (Del. Ch. Nov. 15, 2011) (settlement required additional $23.9 million to be paid to public stockholders as a part of the company's merger with eBay, Inc.); and *In re Genentech, Inc. S'holders Litig.*, Consol. C.A. No. 3911-VCS (Del. Ch. July 9, 2009) (litigation helped Genentech's stockholders to receive $3.9 billion in additional merger consideration from Roche).  Mr. Wagner was also a part of the team that prosecuted *In re S. Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-CS, which resulted in a $2 billion post-trial judgment.

**JOHNSTON de F. WHITMAN, JR**., a partner of the Firm, focuses his practice on securities litigation, primarily in federal court. Mr. Whitman received his law degree from Fordham University School of Law, where he was a member of the Fordham International Law Journal, and graduated *cum laude* from Colgate University. He is licensed to practice in Pennsylvania and New York., and is admitted to practice in courts around the country, including the United States Courts of Appeal for the Second, Third, and Fourth Circuits.

Mr. Whitman has represented institutional investors in obtaining substantial recoveries in numerous securities fraud class actions, including: (i) *In re Bank of America Securities Litigation*, a case which represents the sixth largest recovery for shareholders under the federal securities laws (settled --$2.425 billion); (ii) *In re Royal Ahold Sec. Litig.*, No. 03-md-01539 (D. Md. 2003) ($1.1 billion settlement); (iii) *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (D. Del. 2000) ($300 million settlement); (iv) *In re Dollar General, Inc. Sec. Litig.*, No. 01-cv-0388 (M.D. Tenn. 2001) ( $162 million settlement); and (v) *In re JPMorgan Chase & Co. Securities Litigation,* No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery). Mr. Whitman has also obtained favorable recoveries for institutional investors pursuing direct securities fraud claims, including cases against Merck & Co., Inc., Qwest Communications International, Inc. and Merrill Lynch & Co., Inc. In addition, Mr. Whitman  represented a publicly traded company in a large arbitration against AIG, Inc. related to securities lending losses, *Transatlantic Holdings, Inc. v. AIG,* No. 50-148T0037610 (AAA) ($75million settlement).

**ROBIN WINCHESTER,** a partner of the Firm, concentrated her practice in the areas of securities litigation and lead plaintiff litigation, when she joined the Firm. Presently, Ms. Winchester concentrates her practice in the area of shareholder derivative actions. Ms. Winchester earned her Juris Doctor degree from

Villanova University School of Law, and received her Bachelor of Science degree in Finance from St. Joseph's University. Ms. Winchester is licensed to practice law in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Ms. Winchester served as a law clerk to the Honorable Robert F. Kelly in the United States District Court for the Eastern District of Pennsylvania.

Ms. Winchester has served as lead counsel in numerous high-profile derivative actions relating to the backdating of stock options, including *In re Eclipsys Corp. Derivative Litigation*, Case No. 07-80611-Civ-MIDDLEBROOKS (S.D. Fla.); *In re Juniper Derivative Actions,* Case No. 5:06-cv-3396-JW (N.D. Cal.); *In re McAfee Derivative Litigation,* Master File No. 5:06-cv-03484-JF (N.D. Cal.); *In re Quest Software, Inc. Derivative Litigation,* Consolidated Case No. 06CC00115 (Cal. Super. Ct., Orange County); and *In re Sigma Designs, Inc. Derivative Litigation,* Master File No. C-06-4460-RMW (N.D. Cal.). Settlements of these, and similar, actions have resulted in significant monetary returns and corporate governance improvements for those companies, which, in turn, greatly benefits their public shareholders.

**ERIC L. ZAGAR,** a partner of the Firm, concentrates his practice in the area of shareholder derivative litigation. Mr. Zagar received his law degree from the University of Michigan Law School, *cum laude*, where he was an Associate Editor of the *Michigan Law Review*, and his undergraduate degree from Washington University in St. Louis. He is admitted to practice in Pennsylvania, California and New York. Mr. Zagar previously served as a law clerk to Justice Sandra Schultz Newman of the Pennsylvania Supreme Court.

Since 2001 Mr. Zagar has served as Lead or Co-Lead counsel in hundreds of derivative actions in courts throughout the nation. He was a member of the trial team in the landmark case of *In re S. Peru Copper Corp. S'holder Derivative Litig.*, C.A. No. 961-CS, a $2 billion trial verdict against Southern Peru's majority shareholder. Mr. Zagar has successfully achieved significant monetary and corporate governance relief for the benefit of shareholders, and has extensive experience litigating matters involving Special Litigation Committees.

**TERENCE S. ZIEGLER,** a partner of the Firm, concentrates a significant percentage of his practice to the investigation and prosecution of pharmaceutical antitrust actions, medical device litigation, and related anticompetitive and unfair business practice claims. Mr. Ziegler received his law degree from the Tulane University School of Law and received his undergraduate degree from Loyola University. Mr. Ziegler is licensed to practice law in Pennsylvania and the State of Louisiana, and has been admitted to practice before several courts including the United States Court of Appeals for the Third Circuit.

Mr. Ziegler has represented investors, consumers and other clients in obtaining substantial recoveries, including: *In re Flonase Antitrust Litigation; In re Wellbutrin SR Antitrust Litigation; In re Modafinil Antitrust Litigation; In re Guidant Corp. Implantable Defibrillators Products Liability Litigation* (against manufacturers of defective medical devices — pacemakers/implantable defibrillators — seeking costs of removal and replacement); and *In re Actiq Sales and Marketing Practices Litigation* (regarding drug manufacturer's unlawful marketing, sales and promotional activities for non-indicated and unapproved uses).

**ANDREW L. ZIVITZ**, a partner of the Firm, received his law degree from Duke University School of Law, and received a Bachelor of Arts degree, with distinction, from the University of Michigan, Ann Arbor. Mr. Zivitz is licensed to practice in Pennsylvania and New Jersey.

Drawing on two decades of litigation experience, Mr. Zivitz concentrates his practice in the area of securities litigation and is currently litigating several of the largest federal securities fraud class actions in the U.S. Andy is skilled in all aspects of complex litigation, from developing and implementing strategies,

to conducting merits and expert discovery, to negotiating resolutions. He has represented dozens of major institutional investors in securities class actions and has helped the firm recover more than $1 billion for damaged clients and class members in numerous securities fraud matters in which Kessler Topaz was Lead or Co-Lead Counsel, including *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D.Cal. 2012) (settled -- $500 million); *In re Pfizer Sec. Litig.*, 1:04-cv-09866 (S.D.N.Y. 2004) (settled -- $486 million); *In re Tenet Healthcare Corp.*, 02-CV-8462 (C.D. Cal. 2002) (settled — $281.5 million); *In re JPMorgan Chase & Co. Securities Litigation*, No. 12-3852-GBD ("London Whale Litigation") ($150 million recovery); *In re Computer Associates Sec. Litig.*, No. 02-CV-122 6 (E.D.N.Y. 2002) (settled — $150 million); *In re Hewlett-Packard Sec. Litig.*, 12-cv-05980 (N.D.Cal. 2012) (settled -- $100 million); and *In re Minneapolis Firefighters' Relief Association v. Medtronic, Inc.*, No. 08-cv-06324-PAM-AJB (D. Minn.) (settled -- $ 85 million).

Andy's extensive courtroom experience serves his clients well in trial situations, as well as pre-trial proceedings and settlement negotiations. He served as one of the lead plaintiffs' attorneys in the only securities fraud class action arising out of the financial crisis to be tried to a jury verdict, has handled a Daubert trial in the U.S. District Court for the Southern District of New York, and successfully argued back-to-back appeals before the Ninth Circuit Court of Appeals. Before joining Kessler Topaz, Andy worked at the international law firm Drinker Biddle and Reath, primarily representing defendants in large, complex litigation. His experience on the defense side of the bar provides a unique perspective in prosecuting complex plaintiffs' litigation.

## COUNSEL

**JENNIFER L. ENCK,** Counsel to the Firm, concentrates her practice in the area of securities litigation and settlement matters. Ms. Enck received her law degree, *cum laude*, from Syracuse University College of Law, where she was a member of the Syracuse Journal of International Law and Commerce, and her undergraduate degree in International Politics/International Studies from The Pennsylvania State University. Ms. Enck also received a Master's degree in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs. She is licensed to practice in Pennsylvania and has been admitted to practice before the United States Court of Appeals for the Third and Eleventh Circuits and the United States District Court for the Eastern District of Pennsylvania.

Ms. Enck has been involved in documenting and obtaining the required court approval for many of the firm's largest and most complex securities class action settlements, including *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* No. 09 MDL 2058 (S.D.N.Y.) (settled -- $2.425 billion); *David H. Luther, et al., v. Countrywide Financial Corp., et. al.*, 2:12-cv-05125 (C.D. Cal. 2012) (settled -- $500 million); *In re: Lehman Brothers Securities and ERISA Litigation*, Master File No. 09 MD 2017 (LAK) (S.D.N.Y) (settled - $516,218,000); and *In re Satyam Computer Services Ltd. Sec. Litig.*, Master File No. 09 MD 02027 (BSJ) ($150.5 million settlement).

**ERIC K. GERARD**, counsel to the Firm, is a former federal prosecutor and experienced trial lawyer whose practice focuses on securities fraud, antitrust, and consumer protection litigation. Eric received his law degree from the University of Virginia School of Law, earning Order of the Coif honors while completing a master's degree in international economics at the Johns Hopkins University.

Before joining Kessler Topaz, Eric served an Assistant District Attorney at the Manhattan District Attorney's Office, as a civil litigator at an international law firm in Houston and a prominent boutique in New Orleans, and as an Assistant U.S. Attorney in Florida. He has tried a range of complex cases to verdict, including international money laundering, wire fraud conspiracy, securities counterfeiting, identity theft,

obstruction of justice, extraterritorial child exploitation, civil healthcare liability claims, and murder-for-hire.

**LISA LAMB PORT**, Counsel to the Firm, concentrates her practice on consumer, antitrust, and securities fraud class actions.  Ms. Lamb Port received her law degree, Order of the Coif, summa cum laude, from the Villanova University School of Law in 2003 and her Bachelor of Arts, cum laude, from Princeton University in 2000.  Ms. Lamb Port is licensed to practice law in the Commonwealth Pennsylvania.

Prior to joining Kessler Topaz, Ms. Lamb Port was a partner at another class action firm, where she represented institutional and individual investors in securities fraud, breach of fiduciary duty, and shareholder derivative cases, as well as in litigation resulting from mergers and acquisitions.

**DONNA SIEGEL MOFFA,** Counsel to the Firm, concentrates her practice in the area of consumer protection litigation. Ms. Siegel Moffa received her law degree, with honors, from Georgetown University Law Center in May 1982 and a master's degree in Public Administration from Rutgers, the State University of New Jersey, Graduate School-Camden in January 2017. She received her undergraduate degree, *cum laude*, from Mount Holyoke College in Massachusetts. Ms. Siegel Moffa is admitted to practice before the Third Circuit Court of Appeals, the United States Courts for the District of New Jersey and the District of Columbia, as well as the Supreme Court of New Jersey and the District of Columbia Court of Appeals.

Prior to joining the Firm, Ms. Siegel Moffa was a member of the law firm of Trujillo, Rodriguez & Richards, LLC, where she litigated, and served as co-lead counsel, in complex class actions arising under federal and state consumer protection statutes, lending laws and laws governing contracts and employee compensation. Prior to entering private practice, Ms. Siegel Moffa worked at both the Federal Energy Regulatory Commission (FERC) and the Federal Trade Commission (FTC). At the FTC, she prosecuted cases involving allegations of deceptive and unsubstantiated advertising. In addition, both at FERC and the FTC, Ms. Siegel Moffa was involved in a wide range of administrative and regulatory issues including labeling and marketing claims, compliance, FOIA and disclosure obligations, employment matters, licensing and rulemaking proceedings.

Ms. Siegel Moffa served as co-lead counsel for the class in *Robinson v. Thorn Americas, Inc.*, L-03697-94 (Law Div. 1995), a case that resulted in a significant monetary recovery for consumers and changes to rent-to-own contracts in New Jersey. Ms. Siegel Moffa was also counsel in *Muhammad v. County Bank of Rehoboth Beach, Delaware,* 189 N.J. 1 (2006), U.S. Sup. Ct. cert. denied, 127 S. Ct. 2032(2007), in which the New Jersey Supreme Court struck a class action ban in a consumer arbitration contract. She has served as class counsel representing consumers pressing TILA claims, e.g. *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540 (D.N.J. 1999), and *Dal Ponte v. Am. Mortg. Express Corp.*, CV- 04-2152 (D.N.J. 2006), and has pursued a wide variety of claims that impact consumers and individuals including those involving predatory and sub-prime lending, mandatory arbitration clauses, price fixing, improper medical billing practices, the marketing of light cigarettes and employee compensation. Ms. Siegel Moffa's practice has involved significant appellate work representing individuals, classes, and non-profit organizations participating as amicus curiae, such as the National Consumer Law Center and the AARP. In addition, Ms. Siegel Moffa has regularly addressed consumer protection and litigation issues in presentations to organizations and professional associations.

**MICHELLE M. NEWCOMER**, Counsel to the Firm, concentrates her practice in the area of securities litigation. Ms. Newcomer earned her law degree from Villanova University School of Law in 2005, and earned her B.B.A. in Finance and Art History from Loyola University Maryland in 2002. Ms. Newcomer is licensed to practice law in the Commonwealth of Pennsylvania and the State of New Jersey and has been admitted to practice before the United States Supreme Court, the United States Court of Appeals for the

Second, Ninth and Tenth Circuits, and the United States District Court for the Districts of New Jersey and Colorado.

Ms. Newcomer has represented shareholders in numerous securities class actions in which the Firm has served as Lead or Co-Lead Counsel, through all aspects of pre-trial proceedings, including complaint drafting, litigating motions to dismiss and for summary judgment, conducting document, deposition and expert discovery, and appeal. Ms. Newcomer also has been involved in the Firm's securities class action trials, including most recently serving as part of the trial team in the Longtop Financial Technologies securities class action trial that resulted in a jury verdict on liability and damages in favor of investors. Ms. Newcomer began her legal career with the Firm in 2005. Prior to joining the Firm, she was a summer law clerk for the Hon. John T.J. Kelly, Jr. of the Pennsylvania Superior Court.

Ms. Newcomer's representative cases include: *In re Longtop Financial Technologies Ltd. Sec. Litig*. No. 11-cv-3658 (SAS) (S.D.N.Y.) – obtained on behalf of investors a jury verdict on liability and damages against the company's former CFO; *re Lehman Brothers Securities Litigation*, No. 1:09-md-02017-LAK (S.D.N.Y.) ($616 million recovery); *In re Pfizer, Inc. Sec. Litig*., No. 04-9866-LTS (S.D.N.Y.) – represents three of the court-appointed class representatives, and serves as additional counsel for the class in securities fraud class action based on alleged misrepresentations and omissions concerning cardiovascular risks associated with Celebrex® and Bextra®, which survived Defendants' motion for summary judgment; *Connecticut Retirement Plans & Trust Funds et al. v. BP p.l.c. et al*. (S.D. Tex.) – represents several public pension funds in direct action asserting claims under Section 10(b) and Rule 10b-5, for purchases of BP ADRs on the NYSE, and under English law for purchasers of BP ordinary shares on the London Stock Exchange, which recently survived Defendants' motion to dismiss; litigation is ongoing.

## ASSOCIATES & STAFF ATTORNEYS

**ASHER S. ALAVI,** an associate of the Firm, concentrates his practice in the area of qui tam litigation. Mr. Alavi received his law degree, cum laude, from Boston College Law School in 2011 where he served as Note Editor for the Boston College Journal of Law & Social Justice. He received his undergraduate degree in Communication Studies and Political Science from Northwestern University in 2007. Mr. Alavi is licensed to practice law in Pennsylvania and Maryland. Prior to joining Kessler Topaz, Mr. Alavi was an associate with Pietragallo Gordon Alfano Bosick & Raspanti LLP in Philadelphia, where he worked on a variety of whistleblower and healthcare matters.

**SARA A. ALSALEH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Alsaleh earned her Juris Doctor degree from Widener University School of Law in Wilmington, Delaware, and her undergraduate degree from Pennsylvania State University. Ms. Alsaleh is admitted to practice in Pennsylvania and New Jersey.

During law school, Ms. Alsaleh interned at the U.S. Food and Drug Administration and the Delaware Department of Justice in the Consumer Protection & Fraud Division where she was heavily involved in protecting consumers within a wide variety of subject areas. Prior to joining the Firm, Ms. Alsaleh practiced in the areas of pharmaceutical & health law litigation, and was an Associate at a general practice firm in Bensalem, Pennsylvania.

**DANIEL M. BAKER,** an associate of the Firm, concentrates his practice in the areas of merger and acquisition litigation and shareholder derivative actions. Through his practice, Mr. Baker helps institutional and individual shareholders obtain significant financial recoveries and corporate governance reforms.

While in law school, Mr. Baker interned at the Securities Exchange Commission and the Financial Industry Regulatory Authority. Mr. Baker was also a member of the Villanova Law Review, and served as Online Articles Editor.

**LaMARLON R. BARKSDALE,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Barksdale received his law degree from Temple University, James E. Beasley School of Law in 2005 and his undergraduate degree, cum laude, from the University of Delaware in 2001. He is licensed to practice law in Pennsylvania and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

Prior to joining Kessler Topaz, Mr. Barksdale worked in complex pharmaceutical litigation, commercial litigation, criminal law and bankruptcy law.

**ADRIENNE BELL,** an associate of the Firm, focuses her practice on case development and client relations. Ms. Bell received her law degree from Brooklyn Law School and her undergraduate degree in Music Theory and Composition from New York University, where she graduated *magna cum laude.* Ms. Bell is licensed to practice in Pennsylvania. Prior to joining the Firm, Ms. Bell practiced in the areas of entertainment law and commercial litigation.

**MATTHEW BENEDICT,** an associate of the Firm, concentrates his practice in the area of mergers and acquisitions litigation and shareholder derivative litigation. Mr. Benedict earned his law degree from Villanova University School of Law and his undergraduate degree from Haverford College. He is licensed to practice law in Pennsylvania and New Jersey.

**STACEY BERGER,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Widener University School of Law, and her undergraduate degree in Business Administration from George Washington University. Ms. Berger is licensed to practice in Pennsylvania.

While in law school, Ms. Berger was a law clerk for a general practice firm in Bucks County. Prior to joining Kessler Topaz, she worked as an associate for a Bucks County law firm.

**ELIZABETH WATSON CALHOUN,** a staff attorney of the Firm, focuses on securities litigation. She has represented investors in major securities fraud and has also represented shareholders in derivative and direct shareholder litigation. Ms. Calhoun received her law degree from Georgetown University Law Center (*cum laude*), where she served as Executive Editor of the Georgetown Journal of Gender and the Law. She received her undergraduate degree in Political Science from the University of Maine, Orono (*with high distinction*). Ms. Calhoun is admitted to practice before the state court of Pennsylvania and the U.S. District Court for the Eastern District of Pennsylvania. Prior to joining the Firm, Ms. Calhoun was employed with the Wilmington, Delaware law firm of Grant & Eisenhofer, P.A.

**QUIANA CHAPMAN-SMITH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Temple University Beasley School of Law in Pennsylvania and her Bachelor of Science in Management and Organizations from The Pennsylvania State University. Ms. Chapman-Smith is licensed to practice law in the Commonwealth of Pennsylvania. Prior to joining Kessler Topaz, she worked in pharmaceutical litigation.

**THERESA M. DEANGELIS,** an associate of the Firm, concentrates her practice in Whistleblower Litigation. Ms. DeAngelis received her law degree from Penn State Law in 2018 and her undergraduate degree from Penn State University in 2014. Ms. DeAngelis is licensed to practice in Pennsylvania.

**ELIZABETH DRAGOVICH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Dragovich received her law degree from the University of Pennsylvania Law School in 2002, and her undergraduate degree from Carnegie Mellon University in 1999. Ms. Dragovich is licensed to practice law in Pennsylvania. Prior to joining Kessler Topaz, Elizabeth was a staff attorney with the Wilmington, Delaware law firm of Grant & Eisenhofer, P.A.

**STEPHEN J. DUSKIN**, a staff attorney of the Firm, concentrates his practice in the area of antitrust litigation. Mr. Duskin received his law degree from Rutgers School of Law at Camden in 1985, and his undergraduate degree in Mathematics from the University of Rochester in 1976. Mr. Duskin is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Duskin practiced corporate and securities law in private practice and in corporate legal departments, and also worked for the U.S. Securities and Exchange Commission and the Resolution Trust Corporation.

**DONNA EAGLESON,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation discovery matters. She received her law degree from the University of Dayton School of Law in Dayton, Ohio. Ms. Eagleson is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Ms. Eagleson worked as an attorney in the law enforcement field, and practiced insurance defense law with the Philadelphia firm Margolis Edelstein.

**PATRICK J. EDDIS,** a staff attorney of the Firm, concentrates his practice in the area of corporate governance litigation.  Mr. Eddis received his law degree from Temple University School of Law in 2002 and his undergraduate degree from the University of Vermont in 1995. Mr. Eddis is licensed to practice in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Eddis was a Deputy Public Defender with the Bucks County Office of the Public Defender.  Before that, Mr. Eddis was an attorney with Pepper Hamilton LLP, where he worked on various pharmaceutical and commercial matters.

**MARK FRANEK**, an associate of the Firm, concentrates his practice on securities fraud, antitrust, and unfair business practices litigation. Mr. Franek received his law degree from Temple University Beasley School of Law, and graduated *with honors* from Duke University. He is licensed to practice in Pennsylvania and New Jersey.

Before joining the Firm, Mr. Franek was a Judicial Officer to the Honorable Annette M. Rizzo, Philadelphia Court of Common Pleas, and a Judicial Intern to the Honorable Gene E.K. Pratter, U.S. District Court for the Eastern District of Pennsylvania. In law school, Mr. Franek served on Temple's Law Review and was a member of Temple's Moot Court Honor Society.

Prior to law school, Mr. Franek worked for over 15 years in a variety of educational settings, including K-12 and higher education environments. Mr. Franek was the Dean of Students at the William Penn Charter School, a Quaker K-12 independent school in Philadelphia, and also taught at the University of Pennsylvania, in its Masters in School Leadership Program, and at Cabrini College and Philadelphia University, in their English departments.

**KIMBERLY V. GAMBLE**, a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Widener University, School of Law in Wilmington, DE. While in law school, she was a CASA/Youth Advocates volunteer and had internships with the Delaware County Public Defender's Office as well as The Honorable Judge Ann Osborne in Media, Pennsylvania. She

received her Bachelor of Arts degree in Sociology from The Pennsylvania State University. Ms. Gamble is licensed to practice law in the Commonwealth of Pennsylvania. Prior to joining Kessler Topaz, she worked in pharmaceutical litigation.

**GRANT D. GOODHART**, an associate of the Firm, concentrates his practice in the areas of mergers and acquisitions litigation and stockholder derivative actions. Mr. Goodhart received his law degree, cum laude, from Temple University Beasley School of Law and his undergraduate degree, magna cum laude, from the University of Pittsburgh. He is licensed to practice law in Pennsylvania and New Jersey.

**TYLER S. GRADEN,** an associate of the Firm, focuses his practice on consumer protection and whistleblower litigation. Mr. Graden received his Juris Doctor degree from Temple Law School and his undergraduate degrees in Economics and International Relations from American University. Mr. Graden is licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before numerous United States District Courts.

Prior to joining Kessler Topaz, Mr. Graden practiced with a Philadelphia law firm where he litigated various complex commercial matters, and also served as an investigator with the Chicago District Office of the Equal Employment Opportunity Commission.

Mr. Graden has represented individuals and institutional investors in obtaining substantial recoveries in numerous class actions, including *Board of Trustees of the Buffalo Laborers Security Fund v. J.P. Jeanneret Associates, Inc.,* Case No. 09 Civ. 8362 (S.D.N.Y.) (settled - $219 million); *Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, NA*., Case No. 09 Civ. 0686 (S.D.N.Y.) (settled - $150 million); *In re Merck & Co., Inc. Vytorin ERISA Litig*., Case No. 09 Civ. 197 4 (D.N.J.) (settled - $10.4 million); and *In re 2008 Fannie Mae ERISA Litigation*, Case No. 09-cv-1350 (S.D.N.Y.) (settled - $9 million). Mr. Graden has also obtained favorable recoveries on behalf of multiple, nationwide classes of borrowers whose insurance was force-placed by their mortgage servicers.

**STACEY A. GREENSPAN,** an associate of the Firm, concentrates her practice in the areas of merger and acquisition litigation and shareholder derivative actions. Ms. Greenspan received her law degree from Temple University in 2007 and her undergraduate degree from the University of Michigan in 2001, with honors. Ms. Greenspan is licensed to practice in Pennsylvania.

Prior to joining Kessler Topaz, Ms. Greenspan served as an Assistant Public Defender in Philadelphia for almost a decade, litigating hundreds of trials to verdict. Ms. Greenspan also worked at the Trial and Capital Habeas Units of the Federal Community Defender Office of the Eastern District of Pennsylvania throughout law school. At Kessler Topaz, she has assisted the Firm in obtaining a substantial recovery in a large class action on behalf of an institutional client in *City of Daytona Beach Police and Fire Pension Fund v. ExamWorks Group, Inc., et al.*, C.A. No. 12481-VCL (Del. Ch. Sept. 12, 2017) ($86.5 million settlement relating to the acquisition of ExamWorks Group, Inc. by private equity firm Leonard Green & Partners, LP.).  In addition, Ms. Greenspan served as co-lead counsel in *In re Ebix, Inc. S'holder Litig.*, Consol. C.A. No. 8526-VCS (Del. Ch. Apr. 5, 2019), a case that challenged an improper executive bonus worth $825 million for the company's CEO.  After five years of hard fought litigation and a trial the case settled for corporate governance measures and an amendment to the CEO's stock appreciation rights agreement.

**KEITH S. GREENWALD,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Greenwald received his law degree from Temple University, Beasley School of Law in 2013 and his undergraduate degree in History, summa cum laude, from Temple University in 2004. Mr. Greenwald is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Greenwald was a contract attorney on various projects in Philadelphia and was at the International Criminal Tribunal for the Former Yugoslavia, at The Hague in The Netherlands, working in international criminal law.

**JOHN J. GROSSI**, a staff attorney at the Firm, focuses his practice on securities litigation. Mr. Grossi received his law degree from Widener University Delaware School of Law and graduated *cum laude* from Curry College. He is licensed to practice law in Pennsylvania. Prior to joining the Firm as a Staff Attorney, Mr. Grossi was employed in the Firm's internship program as a Summer Law Clerk, where he was also a member of the securities fraud department.

During his time as a Summer Law Clerk, Mr. Grossi conducted legal research for several securities fraud class actions on behalf of shareholders, including Bank of America related to its acquisition of Merrill Lynch, Lehman Brothers, St. Jude Medical and NII Holdings.

**NATHAN A. HASIUK**, an associate of the Firm, concentrates his practice on securities litigation.  Mr. Hasiuk received his law degree from Temple University Beasley School of Law, and graduated *summa cum laude* from Temple University. He is licensed to practice in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the District of New Jersey. Prior to joining the Firm, Mr. Hasiuk was an Assistant Public Defender in Philadelphia.

**EVAN R. HOEY**, an associate of the Firm, focuses his practice on securities litigation.  Mr. Hoey received his law degree from Temple University Beasley School of Law, where he graduated *cum laude*, and graduated *summa cum laude* from Arizona State University.  He is licensed to practice in Pennsylvania and is admitted to practice before the United States District Court for the Eastern District of Pennsylvania.

**SUFEI HU,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her J.D. from Villanova University School of Law, where she was a member of the Moot Court Board. Ms. Hu received her undergraduate degree from Haverford College in Political Science, with honors. She is licensed to practice law in Pennsylvania and New Jersey, and is admitted to the United States District Court of the Eastern District of Pennsylvania. Prior to joining the Firm, Ms. Hu worked in pharmaceutical, anti-trust, and securities law.

**FARZANA ISLAM,** an associate of the Firm, concentrates her practice in securities litigation.  Ms. Islam received her Juris Doctorate from Villanova University Charles Widger School of Law in 2016, and is a graduate of Drexel University's LeBow College of Business, where she received a B.S. in Business Administration.  Ms. Islam is licensed to practice in Pennsylvania and New Jersey.

Following law school, Ms. Islam served as a judicial law clerk to the Hon. Robert Lougy, J.S.C, of the New Jersey Superior Court.  Prior to joining the firm in 2019, Ms. Islam was an Assistant District Attorney for the Philadelphia District Attorney's office, where she represented the Commonwealth in over fifty felony appeals before the Pennsylvania Superior Court and Pennsylvania Supreme Court.

**JORDAN JACOBSON**, an associate of the Firm, concentrates her practice in securities litigation. Ms. Jacobson received her law degree from Georgetown University in 2014 and her undergraduate degrees in history and political science from Arizona State University in 2011.  Prior to joining the Firm, Ms. Jacobson clerked for the honorable Deborah J. Saltzman, United States Bankruptcy Judge, in the Central District of California. Ms. Jacobson was also previously an associate at O'Melveny & Myers LLP, and an attorney in the General Counsel's office of the Pension Benefit Guaranty Corporation in Washington, D.C.  Ms. Jacobson is licensed to practice law in California and Virginia and will sit for the July 2020 Pennsylvania bar exam.

**RAPHAEL JANOVE,** an associate of the Firm represents investors and consumers in securities litigation and class actions. Mr. Janove started his career at Sullivan & Cromwell LLP in New York City, where he defended large financial institutions in antitrust class-actions, FINRA arbitrations, and government investigations. Most recently, he worked at a litigation boutique in Chicago, representing a major fossil-fuel refiner in nationwide global-warming nuisance lawsuits, defending one of the country's largest agricultural cooperatives in a billion dollar class action, and pursuing multimillion dollar claims on behalf of his clients in arbitrations before the International Chamber of Commerce and the London Maritime Arbitration Association.

In addition, Mr. Janove clerked for the Honorable Paul S. Diamond of the U.S. District Court of the Eastern District of Pennsylvania in Philadelphia, and for the Honorable Thomas L. Ambro of the U.S. Court of Appeals for the Third Circuit in Wilmington, Delaware.

During law school, Mr. Janove served as an Articles Editor on The University of Chicago Law Review and was a Kirkland & Ellis Scholar. At graduation, he received the Douglas Baird Prize in Commercial Law for his academic achievement in commercial and corporate law. Prior to law school, Mr. Janove taught English at a private school in Uijeongbu, South Korea.

**MARGARET E. JULIANO,** a staff attorney at the Firm, concentrates her practice in consumer fraud protection. She has a JD from Emory University School of Law, where she was Editor-in-Chief of the Emory Bankruptcy Developments Journal and a BA from Oberlin College. She is licensed to practice in Pennsylvania and New York, and previously practiced in the state and federal courts in Delaware.

Maggie has experience representing plaintiffs in consumer fraud cases concerning mold and other building envelop issues. She also represented manufacturers and distributors in mass tort and product liability cases. She clerked for Judge Walrath of the US Bankruptcy Court for the District of Delaware.

**NATALIE LESSER,** an associate of the Firm, concentrates her practice in the area of consumer protection. Ms. Lesser received her law degree from the University of Pittsburgh School of Law in 2010 and her undergraduate degree in English from the State University of New York at Albany in 2007. While attending Pitt Law, Ms. Lesser served as Editor in Chief of the University of Pittsburgh Law Review. Ms. Lesser is licensed to practice law in Pennsylvania and New Jersey.

Prior to Joining Kessler Topaz, Ms. Lesser was an associate with Akin Gump Strauss Hauer & Feld LLP, where she worked on a number of complex commercial litigation cases, including defending allegations of securities fraud and violations of ERISA for improper calculation and processing of insurance benefits.

**JOSHUA A. LEVIN,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Levin received his law degree from Widener University School of Law, and earned his undergraduate degree from The Pennsylvania State University. Mr. Levin is licensed to practice in Pennsylvania and New Jersey. Prior to joining Kessler Topaz, he worked in pharmaceutical litigation.

**JOHN J. McCULLOUGH,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. In 2012, Mr. McCullough passed the CPA Exam. Mr. McCullough earned his Juris Doctor degree from Temple University School of Law, and his undergraduate degree from Temple University. Mr. McCullough is licensed to practice in Pennsylvania.

**LAUREN M. McGINLEY,** an associate of the Firm, concentrates her practice in the areas of securities and consumer protection. Ms. McGinley received her undergraduate degree from Temple University in

2013 and her law degree from Drexel University, Thomas R. Kline School of Law in 2017. While at Drexel, Ms. McGinley received the Dean's Scholar for Excellence in Civil Procedure in 2015.

Prior to joining the Firm, Ms. McGinley clerked for the honorable Judge Alia Moses in the Western District of Texas from September 2017-August 2019.

**STEVEN D. McLAIN,** a staff attorney of the Firm, concentrates his practice in mergers and acquisition litigation and stockholder derivative litigation. He received his law degree from George Mason University School of Law, and his undergraduate degree from the University of Virginia. Mr. McLain is licensed to practice in Virginia. Prior to joining Kessler, Topaz, he practiced with an insurance defense firm in Virginia.

**STEFANIE J. MENZANO,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Menzano received her law degree from Drexel University School of Law in 2012 and her undergraduate degree in Political Science from Loyola University Maryland. Ms. Menzano is licensed to practice law in Pennsylvania and New Jersey.

Prior to joining Kessler Topaz, Ms. Menzano was a fact witness for the Institute for Justice. During law school, Ms. Menzano served as a case worker for the Pennsylvania Innocence Project and as a judicial intern under the Honorable Judge Mark Sandson in the Superior Court of New Jersey, Atlantic County.

**JONATHAN F. NEUMANN,** an associate of the Firm, concentrates his practice in the area of securities litigation and fiduciary matters. Mr. Neumann earned his Juris Doctor degree from Temple University Beasley School of Law, where he was an editor for the Temple International and Comparative Law Journal and a member of the Moot Court Honor Society. Mr. Neumann earned his undergraduate degree from the University of Delaware. Mr. Neumann is licensed to practice in Pennsylvania and New York. Prior to joining the Firm, Mr. Neumann served as a law clerk to the Honorable Douglas E. Arpert of the United States District Court for the District of New Jersey.

Mr. Neumann has represented institutional investors in obtaining substantial recoveries in numerous cases, including *In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litig.*, No. 12-md-02335 (S.D.N.Y.) ($335 million settlement); *Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al.*, No. 12-cv-02865 (S.D.N.Y.) ($69 million settlement); *In re NII Holdings Sec. Litig.*, No. 14-cv-227 (E.D. Va.) (settled $41.5 million).

**ELAINE M. OLDENETTEL,** a staff attorney of the Firm, concentrates her practice in consumer and ERISA litigation. She received her law degree from the University of Maryland School of Law and her undergraduate degree in International Studies from the University of Oregon. While attending law school, Ms. Oldenettel served as a law clerk for the Honorable Robert H. Hodges of the United States Court of Federal Claims and the Honorable Marcus Z. Shar of the Baltimore City Circuit Court. Ms. Oldenettel is licensed to practice in Pennsylvania and Virginia.

**MELANIE A. RADER**, an associate of the Firm, focuses her practice in securities litigation and consumer protection.

Prior to joining the Firm, Ms. Rader served as a judicial law clerk to the Hon. Linda K. Caracappa, United States Magistrate Judge for the Eastern District of Pennsylvania. Ms. Rader received her Juris Doctorate from Temple University Beasley School of Law in 2018, and is a graduate of Gettysburg College, where she received her Bachelor of Arts in Economics. While in law school, Ms. Rader was a judicial intern to the Hon. Petrese B. Tucker, United States District Court Judge for the Eastern District of Pennsylvania.

**ALLYSON M. ROSSEEL**, a staff attorney of the Firm, concentrates her practice at Kessler Topaz in the area of securities litigation. She received her law degree from Widener University School of Law, and earned her B.A. in Political Science from Widener University. Ms. Rosseel is licensed to practice law in Pennsylvania and New Jersey. Prior to joining the Firm, Ms. Rosseel was employed as general counsel for a boutique insurance consultancy/brokerage focused on life insurance sales, premium finance and structured settlements.

**KARRISA J. SAUDER,** an associate of the Firm, concentrates her practice on new matter development with a focus on analyzing securities, consumer, and antitrust class action lawsuits, as well as direct (or opt-out) actions.  Prior to joining the firm, Karissa was an associate with Berger Montague, where she litigated complex antitrust class action lawsuits, and served as a judicial law clerk to the Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania.  Karissa received her law degree from Harvard Law School in 2014 and her undergraduate degree from Eastern Mennonite University in 2010.  While in law school, Karissa served as Managing Editor of the Harvard Law Review.

**MICHAEL J. SECHRIST,** a staff attorney at the Firm, concentrates his practice in the area of securities litigation. Mr. Sechrist received his law degree from Widener University School of Law in 2005 and his undergraduate degree in Biology from Lycoming College in 1998. Mr. Sechrist is licensed to practice law in Pennsylvania. Prior to joining Kessler Topaz, Mr. Sechrist worked in pharmaceutical litigation.

**PENG SHAO,** an associate of the Firm, focuses his practice in complex securities litigation and consumer protection. Peng is a graduate of UC Davis School of Law. During law school, Mr. Shao served various leadership roles for UC Davis School of Law's Business Law Journal, Intellectual Property Law Association, and Immigration Law Clinic. Mr. Shao also represented UC Davis in various Moot Court competitions and brought a case before the Ninth Circuit Court of Appeals. Mr. Shao received his B.S. in Biology with honors from University of Kentucky, and is published in The Journal of BioChemistry.

**IGOR SIKAVICA**, a staff attorney of the Firm, practices in the area of corporate governance litigation, with a focus on transactional and derivative cases. Mr. Sikavica received his J.D. from the Loyola University Chicago School of Law and his LL.B. from the University of Belgrade Faculty Of Law. Mr. Sikavica is licensed to practice in Pennsylvania. Mr. Sikavica's licenses to practice law in Illinois and the former Yugoslavia are no longer active.

Prior to joining Kessler Topaz, Mr. Sikavica has represented clients in complex commercial, civil and criminal matters before trial and appellate courts in the United States and the former Yugoslavia. Also, Mr. Sikavica has represented clients before international courts and tribunals, including – the International Criminal Tribunal for the Former Yugoslavia (ICTY), European Court of Human Rights and the UN Committee Against Torture.

**MELISSA J. STARKS,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Starks earned her Juris Doctor degree from Temple University--Beasley School of Law, her LLM from Temple University--Beasley School of Law, and her undergraduate degree from Lincoln University. Ms. Starks is licensed to practice in Pennsylvania.

**MICHAEL P. STEINBRECHER,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Steinbrecher earned his Juris Doctor from Temple University James E. Beasley School of Law, and received his Bachelors of Arts in Marketing from Temple University. Mr. Steinbrecher is licensed to practice in Pennsylvania and New Jersey. Prior to joining Kessler Topaz, he worked in pharmaceutical litigation.

**JULIE SWERDLOFF,** a staff attorney of the Firm, concentrates her practice in the areas of consumer protection, antitrust, and whistleblower litigation. She received her law degree from Widener University School of Law, and her undergraduate degree in Real Estate and Business Law from The Pennsylvania State University. She is licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

While attending law school, Ms. Swerdloff interned as a judicial clerk for the Honorable James R. Melinson of the United States District Court for the Eastern District of Pennsylvania. Prior to joining Kessler Topaz, Ms. Swerdloff managed major environmental claims litigation for a Philadelphia-based insurance company, and was an associate at a general practice firm in Montgomery County, PA.  At Kessler Topaz, she has assisted the Firm in obtaining meaningful recoveries on behalf of clients in securities fraud litigation, including the historic Tyco case (*In re Tyco International, Ltd. Sec. Litig.*, No. 02-1335-B (D.N.H. 2002) (settled -- $3.2 billion)), federal and state wage and hour litigation (*In re FootLocker Inc. Fair Labor Standards Act (FLSA) and Wage and Hour Litig.,* No. 11-mdl-02235 (E.D. Pa. 2007) (settled – $7.15 million)), and numerous shareholder derivative actions relating to the backdating of stock options.

**BRIAN W. THOMER,** a staff attorney of the Firm, concentrates his practice in the area of securities litigation. Mr. Thomer received his Juris Doctor degree from Temple University Beasley School of Law, and his undergraduate degree from Widener University. Mr. Thomer is licensed to practice in Pennsylvania.

**ALEXANDRA H. TOMICH,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. She received her law degree from Temple Law School and her undergraduate degree from Columbia University with a B.A. in English. She is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, she worked as an associate at Trujillo, Rodriguez, and Richards, LLC in Philadelphia. Ms. Tomich volunteers as an advocate for children through the Support Center for Child Advocates in Philadelphia and at Philadelphia VIP.

**JACQUELINE A. TRIEBL,** a staff attorney of the Firm, concentrates her practice in the area of securities litigation. Ms. Triebl received her law degree, cum laude, from Widener University School of Law in 2007 and her undergraduate degree in English from The Pennsylvania State University in 1990. Ms. Triebl is licensed to practice law in Pennsylvania and New Jersey.

**KURT WEILER**, a staff attorney of the Firm, concentrates his practice in the area of securities litigation. He received his law degree from Duquesne University School of Law, where he was a member of the Moot Court Board and McArdle Wall Honoree, and received his undergraduate degree from the University of Pennsylvania. Mr. Weiler is licensed to practice law in Pennsylvania.

Prior to joining Kessler Topaz, Mr. Weiler was associate corporate counsel for a Philadelphia-based mortgage company, where he specialized in the area of foreclosures and bankruptcy.

**CHRISTOPHER M. WINDOVER,** an associate of the Firm, concentrates his practice in the areas of shareholder derivative actions and mergers and acquisitions litigation. Mr. Windover received his law degree from Rutgers University School of Law, *cum laude*, and received his undergraduate degree from Villanova University. He is licensed to practice in the Commonwealth of Pennsylvania and New Jersey. Prior to joining the Firm, Mr. Windover practiced litigation at a mid-sized law firm in Philadelphia.

**ANNE M. ZANESKI**\*, a staff attorney of the Firm, concentrates her practice in the area of securities litigation.  Ms. Zaneski received her J.D. from Brooklyn Law School where she was a recipient of the CALI

Award of Excellence, and her B.A. from Wellesley College.  She is licensed to practice law in New York and Pennsylvania.

Prior to joining the Firm, she was an associate with a boutique securities litigation law firm in New York City and served as a legal counsel with the New York City Economic Development Corporation in the areas of bond financing and complex litigation.

\* Admitted as Anne M. Zaniewski in Pennsylvania.

## PROFESSIONALS

**WILLIAM MONKS**, CPA, CFF, CVA, Director of Investigative Services at Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), brings nearly 30 years of white collar investigative experience as a Special Agent of the Federal Bureau of Investigation (FBI) and "Big Four" Forensic Accountant. As the Director, he leads the Firm's Investigative Services Department, a group of highly trained professionals dedicated to investigating fraud, misrepresentation and other acts of malfeasance resulting in harm to institutional and individual investors, as well as other stakeholders.

William's recent experience includes being the corporate investigations practice leader for a global forensic accounting firm, which involved widespread investigations into procurement fraud, asset misappropriation, financial statement misrepresentation, and violations of the Foreign Corrupt Practices Act (FCPA).

While at the FBI, William worked on sophisticated white collar forensic matters involving securities and other frauds, bribery, and corruption. He also initiated and managed fraud investigations of entities in the manufacturing, transportation, energy, and sanitation industries. During his 25 year FBI career, William also conducted dozens of construction company procurement fraud and commercial bribery investigations, which were recognized as a "Best Practice" to be modeled by FBI offices nationwide.

William also served as an Undercover Agent for the FBI on long term successful operations targeting organizations and individuals such as the KGB, Russian Organized Crime, Italian Organized Crime, and numerous federal, state and local politicians. Each matter ended successfully and resulted in commendations from the FBI and related agencies.

William has also been recognized by the FBI, DOJ, and IRS on numerous occasions for leading multi-agency teams charged with investigating high level fraud, bribery, and corruption investigations. His considerable experience includes the performance of over 10,000 interviews incident to white collar criminal and civil matters. His skills in interviewing and detecting deception in sensitive financial investigations have been a featured part of training for numerous law enforcement agencies (including the FBI), private sector companies, law firms and accounting firms.

Among the numerous government awards William has received over his distinguished career is a personal commendation from FBI Director Louis Freeh for outstanding work in the prosecution of the West New York Police Department, the largest police corruption investigation in New Jersey history.

William regards his work at Kessler Topaz as an opportunity to continue the public service that has been the focus of his professional life. Experience has shown and William believes, one person with conviction

Case 1:21-cv-10479-JLT   Document 189-17   Filed 09/10/25   Page 147 of 147

can make all the difference. William looks forward to providing assistance to any aggrieved party, investor, consumer, whistleblower, or other witness with information relative to a securities fraud, consumer protection, corporate governance, qui-tam, anti-trust, shareholder derivative, merger & acquisition or other matter.

Education
Pace University: Bachelor of Business Administration (cum laude)
Florida Atlantic University: Master's in Forensic Accounting (cum laude)

**BRAM HENDRIKS,** European Client Relations Manager at Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), guides European institutional investors through the intricacies of U.S. class action litigation as well as securities litigation in Europe and Asia. His experience with securities litigation allows him to translate complex document and discovery requirements into straightforward, practical action. For shareholders who want to effect change without litigation, Bram advises on corporate governance issues and strategies for active investment.

Bram has been involved in some of the highest-profile U.S. securities class actions of the last 20 years. Before joining Kessler Topaz, he handled securities litigation and policy development for NN Group N.V., a publicly-traded financial services company with approximately EUR 197 billion in assets under management. He previously oversaw corporate governance activities for a leading Amsterdam pension fund manager with a portfolio of more than 4,000 corporate holdings.

A globally-respected investor advocate, Bram has co-chaired the International Corporate Governance Network Shareholder Rights Committee since 2009. In that capacity, he works with investors from more than 50 countries to advance public policies that give institutional investors a voice in decision-making. He is a sought-after speaker, panelist and author on corporate governance and responsible investment policies. Based in the Netherlands, Bram is available to meet with clients personally and provide hands-on-assistance when needed.

Education
University of Amsterdam, MSc International Finance, specialization Law & Finance, 2010
Maastricht Graduate School of Governance, MSc in Public Policy and Human Development, specialization WTO law, 2006
Tilburg University, Public Administration and administrative law B.A., 2004