**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

NADIA SHASH and AMJAD KHAN,
Individually and On Behalf of All Others
Similarly Situated,

     Plaintiffs,

     v.

BIOGEN INC., MICHEL VOUNATSOS, and
ALFRED W. SANDROCK, JR,

     Defendants.

Civil Action No.: 1:21-cv-10479-IT

**Leave to File 35-Page Memorandum**
**Granted on 9/5/25**

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF RELEVANT FACTS ......................................................................6

LEGAL STANDARD...................................................................................................10

ARGUMENT.................................................................................................................11

I.      Defendants Have Rebutted the *Basic* Presumption of Reliance and Therefore Predominance Is Not Satisfied.................................................................................11

        A.    The Lack of Front-End Price Impact Rebuts the Presumption. ............................12

        B.    The Inflation Maintenance Theory Is Not Available Here. ..................................12

        C.    Even if the Inflation Maintenance Theory Is Viable, Class Certification Should Be Denied Under *Goldman.* ........................................................................15

            1.    There Is a Considerable Gap, or Mismatch, Between the Front- and Back-end Disclosures, Undermining Any Inference of Price Impact. .................................................................................................16

            2.    The "Truthful Substitute" Analysis Shows Lack of Price Impact. .............19

            3.    Additional Evidence of Pre- and Post-Disclosure Commentary Demonstrates Lack of Price Impact. ...........................................................20

        D.    There Is No Price Impact Because Any Price Decline in Biogen's Stock Price on November 5 and 9 Is Not Attributable to the Alleged Corrective Disclosure (Nor Is It a Proxy for Inflation from the July 22 Statement). ..............21

            1.    The November 5 Price Drop Does Not Demonstrate Price Impact. ..........22

            2.    Dr. Tabak's Analysis of November 5 Is Methodologically Unsound. ....................................................................................................26

            3.    The November 9 Price Drop Does Not Demonstrate Price Impact. ..........28

II.    Shash, Khan, and Aftoora Are Not Typical or Adequate Class Representatives. .............29

III.   Plaintiffs Do Not Prove That Damages Are Capable of Classwide Measurement............34

CONCLUSION..............................................................................................................35

CERTIFICATE OF SERVICE .....................................................................................37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alt. Sys. Concepts, Inc.* v. *Synopsys, Inc.*,
374 F.3d 23 (1st Cir. 2004)................................................................................13

*Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...........................................................................................31

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..................................................25, 27

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ......................................................................... *passim*

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988).........................................................................................2, 11

*Bosch* v. *Credit Suisse Grp. AG*,
2022 WL 4285377 (E.D.N.Y. Sept. 12, 2022) .....................................................33

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013).................................................................................10, 34, 35

*Elas* v. *Prince*,
2024 WL 278220 (D. Mass. Jan. 25, 2024).........................................................29

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015).......................................................................22

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)................................................24, 35

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)........................................................12

*In re Finisar Corp. Sec. Litig.*,
2019 WL 2247750 (N.D. Cal. May 24, 2019).......................................................13

*In re FirstEnergy Corp. Sec. Litig.*,
2025 WL 2331754 (6th Cir. Aug. 13, 2025).........................................................34

*Foley* v. *Buckley's Great Steaks, Inc.*,
2015 WL 1578881 (D.N.H. Apr. 9, 2015)......................................................29, 33

*George* v. *China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ................................................................30

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021) ............................................................................................ *passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .................................................................................................2, 11, 12

*IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*,
  818 F.3d 775 (8th Cir. 2016) ....................................................................................12

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .........................................................22

*Karth* v. *Keryx Biopharms., Inc.*,
  334 F.R.D. 7 (D. Mass. 2019) ...............................................................................29, 30

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .................................................15, 16, 17

*Lemm* v. *New York Cmty. Bancorp, Inc.*,
  733 F. Supp. 3d 107 (E.D.N.Y. 2024) .......................................................................30

*McCormack* v. *Dingdong (Cayman) Ltd.*,
  2022 WL 17336586 (S.D.N.Y. Nov. 30, 2022) .........................................................33

*In re One Bancorp Sec. Litig.*,
  136 F.R.D. 526 (D. Me. 1991) ...................................................................................30

*In re Petrobras Sec. Litig.*,
  104 F. Supp. 3d 618 (S.D.N.Y. 2015) .......................................................................31

*In re Qualcomm Inc. Sec. Litig.*,
  2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..........................................................18

*Ramirez* v. *Exxon Mobil Corp.*,
  2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .................................................22, 24, 29

*Rocco* v. *Nam Tai Elecs., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ...............................................................................30

*Semerenko* v. *Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ..................................................................................31, 32

*In re Sepracor Inc.*,
  233 F.R.D. 52 (D. Mass. 2005) .................................................................................29

*Shash* v. *Biogen, Inc.*,
   84 F.4th 1 (1st Cir. 2023) ..............................................................................2, 3, 8, 13

*Shiring* v. *Tier Techs., Inc.*,
   244 F.R.D. 307 (E.D. Va. 2007) ...................................................................................32

*Shupe* v. *Rocket Cos., Inc.*,
   752 F. Supp. 3d 735 (E.D. Mich. 2024)........................................................................18

*Taylor* v. *Moskow*,
   2013 WL 5508157 (D. Mass. Oct. 1, 2013)...................................................................30

*In re Vaxart, Inc. Sec. Litig.*,
   738 F. Supp. 3d 1259 (N.D. Cal. 2024) ........................................................................35

**Statutes**

15 U.S.C. § 78u-4 .............................................................................................................33

**Other Authorities**

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

Defendants Biogen Inc. ("Biogen" or the "Company"), Michel Vounatsos, and Alfred W. Sandrock, Jr., M.D., Ph.D. ("Defendants") respectfully oppose the motion by lead plaintiff Nadia Shash and additional plaintiffs Amjad Khan and Albert Aftoora ("Plaintiffs") to certify a class of all persons or entities who acquired Biogen stock from July 22, 2020 to November 6, 2020 (the "Class Period") and appoint class representatives and counsel (Doc. No. 173) (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs seek to certify a class of Biogen shareholders who allegedly were defrauded by the alleged misstatement in this case. While Plaintiffs survived the motion to dismiss stage after appeal, determination of whether to certify a class requires assessment of *evidence*, not mere allegations. Plaintiffs cannot satisfy the standard of Federal Rule of Civil Procedure 23.

On July 22, 2020, Dr. Sandrock (Biogen's then EVP, Research and Development) answered an analyst question about Biogen's October 22, 2019 filing with the FDA for approval of aducanumab, an Alzheimer's disease drug. Dr. Sandrock noted that different doses of aducanumab were tested in three clinical trials: a Phase 1B trial (PRIME), a Phase 3 trial that met its efficacy endpoints (EMERGE), and a Phase 3 trial that did not meet its efficacy endpoints (ENGAGE). Dr. Sandrock commented as follows on findings related to the higher and lower tested doses (in 2021, the FDA granted accelerated approval of the higher dose tested, 10mg/kg):

> I think -- look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. We believe that data from ENGAGE -- that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE. And then I'll say – and also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as [Clinical Dementia Rating Scale] sum of boxes. And again, very similar that the lower doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***

1

Second Amended Complaint, Doc. No. 58 at ¶ 191 ("SAC").[1]  Plaintiffs argue that the bolded language is misleading (Motion to Certify, Doc. No. 173 at 3); this is referred to as the "July 22 Statement" or "Statement" herein.  Although the First Circuit affirmed dismissal of every other alleged misstatement, it ruled that the SAC plausibly alleged that the Statement—which the court referred to as the "all data" statement—conveyed that "<u>all</u> of Biogen's data was consistent with needing to get to high dose aducanumab to benefit clinically," and that Plaintiffs had plausibly alleged that "not <u>all</u> of Biogen's data was consistent with needing to get to the higher dose." *Shash* v. *Biogen, Inc.*, 84 F.4th 1, 11–12, 22 (1st Cir. 2023) (emphases in original).  But the Supreme Court instructs that courts must consider "all probative evidence" relevant to the certification of a class, regardless of any overlap with the merits. *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman*").  The evidence here overwhelmingly shows that class certification should be denied, for three independent reasons:

**(1) No Price Impact.**  To establish classwide reliance, Plaintiffs rely on the presumption established by *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), that stock prices in an efficient market rapidly incorporate new information.  An investor can thus "rely" on a misrepresentation by relying on the integrity of the market price.  That presumption is rebutted, however, where defendants show the "alleged misrepresentation[s] did not actually affect the market price of the stock"—*i.e.*, lack of "price impact." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 264, 284 (2014).  Courts must assess "all" relevant evidence and "determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 594 U.S. at 126–27.  Where, as here, the defendants rebut the presumption of reliance, a class cannot be certified.

Plaintiffs' theory is that the July 22 Statement introduced "critical" new information into

---

[1] Unless otherwise noted, all emphases has been added and internal citations and quotation marks are omitted.

an efficient market. Doc No. 173, at 3. Plaintiffs persuaded the First Circuit that, based on the pleadings, the Statement "stands out from the rest" of the alleged misstatements. *Shash*, 84 F.4th at 11. In ruling on Plaintiffs' appeal of the motion to dismiss, the First Circuit held that Plaintiffs plausibly alleged that the July 22 Statement, unlike the other alleged misstatements, "conveyed" that "all of Biogen's data was consistent with needing to get to the high dose aducanumab to benefit clinically"—changing the total mix of information. *Id.* at 12–14 (emphasis in original).

Since an efficient market immediately processes new, value-relevant information, under Plaintiffs' theory, the July 22 Statement should immediately have caused a price increase. But both parties' experts agree that Biogen's stock price did ***not*** experience a statistically significant price increase following the Statement. And notwithstanding its purportedly "critical" significance, ***no*** analyst or market commentator ***ever*** quoted or commented on the Statement. In fact, the analyst who asked the question that generated the July 22 Statement "remain[ed] skeptical" afterwards of FDA approval because Biogen's data was "hardly unequivocal" and included "an increasing list of red flags." Doc. No. 189-1 at ¶ 59. This evidence shows lack of price impact from the Statement.

Faced with this defect, Plaintiffs pivot to the theory that the July 22 Statement "maintained" inflation in Biogen's stock price. Under the "inflation maintenance" theory—which the Supreme Court recently discussed without explicitly adopting as a valid theory—a "misrepresentation causes a stock price to remain inflated by preventing ***preexisting inflation*** from dissipating from the stock price." *Goldman*, 594 U.S. at 119–20. But an inflation maintenance theory makes sense only for statements that repeat, confirm, or reinforce existing market expectations. Here, even if the July 22 Statement conveyed that "all" data supported high-dose efficacy as Plaintiffs contend, there was no "preexisting inflation" in Biogen's stock price that the Statement "maintained"

because Biogen had not earlier represented—and the market did not previously understand—that "all" data supported high-dose efficacy. Inflation maintenance is irreconcilable with Plaintiffs' theory of fraud as sustained on the pleadings by the First Circuit and with the economic evidence.

But even if the inflation maintenance theory applies (it does not), the July 22 Statement did not have price impact under the standard assumed in *Goldman* for inflation maintenance cases. If there is a "gap" or "mismatch" between the alleged misstatement and corrective disclosure, it undermines the inference that the back-end price drop is a "proxy" for front-end inflation. *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 (2d Cir. 2023) ("*ATRS*"). A class thus cannot be certified where the alleged misstatement does not "match" the alleged corrective disclosure. Defendants' expert, Dr. Hubbard, demonstrates that is precisely the case here.

Here, the alleged corrective disclosure is contained in an appendix to an FDA briefing document released on November 4, 2020 (the "Briefing Book"). The Briefing Book contained (a) analyses and positive views of the FDA regarding efficacy of the high dose, and (b) statistical analyses by a dissenting FDA statistician Tristan Massie, who opined, *inter alia*, that certain subgroup data did not support high-dose efficacy, raised methodological critiques, and called for an additional study (the "Massie Appendix"). Plaintiffs allege that a portion of the Massie Appendix—his negative opinions on the subgroup data—revealed the falsity of the July 22 Statement. But there is a ***substantive mismatch*** in content between the front-end Statement and the back-end subgroup analyses: because the market did ***not*** interpret the July 22 Statement to convey that ***all*** data supported high-dose efficacy, the allegedly corrective subgroup analyses do not correct the Statement. Further, according to Plaintiffs' argument, there is also a considerable ***specificity mismatch*** between the high-level July 22 Statement and the negative Massie subgroup analyses—precisely the type of mismatch that caused the Second Circuit to decertify a class in

4

*Goldman*.  Each mismatch "severs the link" between the alleged misstatement and corrective disclosure, and additional economic evidence further supports this conclusion.  *Id.* at 118.

Price impact is separately disproven by evidence that Massie's subgroup analyses did not actually cause a statistically significant drop in Biogen's stock.  On November 4, the day the Briefing Book was released, Biogen's stock price ***increased*** by more than 40 percent.  In the face of that, Plaintiffs point to stock declines on November 5 and 9.  But in an efficient market—which Plaintiffs concede exists for Biogen's shares—the Massie Appendix was incorporated into Biogen's stock price the same day, along with the full Briefing Book.  And Plaintiffs' theory that the market absorbed the "good" statistical analyses in the first 245 pages of the 343-page Briefing Book on November 4, yet did not absorb the "bad" statistical analyses contained in the 97-page Massie Appendix until November 5, is belied by economic evidence, common sense, and Plaintiffs' own expert.  Plaintiffs' argument about November 9 is even more far-fetched.  The evidence shows that the declines cited by Plaintiffs on November 5 and 9 are not attributable to the alleged corrective disclosure.

**(2) Plaintiffs Are All Atypical and Inadequate.**  None of Shash, Khan, and Aftoora satisfy Rule 23(a)'s requirements that a class representative's claims or defenses be "typical" of the class and that the representative "adequately" protect the class's interests.  Fed. R. Civ. P. 23(a).  Each is subject to individualized defenses.  Discovery has shown that Shash, the only lead plaintiff, did not even purchase Biogen securities—an LLC of which she is President and CEO did.  Shash therefore suffered no damages and lacks standing to sue.  She also submitted a false PSLRA Certification.  Khan and Aftoora also demonstrated a litany of shortcomings revealing that they are atypical and inadequate class representatives:  both face individualized reliance defenses; both demonstrated a fundamental lack of knowledge about the case and a willingness to abdicate

complete control to their lawyers; and Aftoora has almost no purported damages.

**(3) No Classwide Damages Methodology.** Finally, Plaintiffs are required to establish a workable method for classwide determination of damages in a manner consistent with Plaintiffs' theory of liability. Plaintiffs' expert offers no such analysis—instead offering only five generic paragraphs about methodologies that he recycled from reports submitted in other securities cases.

**STATEMENT OF RELEVANT FACTS**

**Clinical Trials (2011 – 2019)**: In 2011, Biogen submitted an FDA application for investigation of aducanumab, an Alzheimer's disease therapy. Doc. No. 58 at ¶¶ 57, 61, 66. Biogen conducted the PRIME Phase 1b study (Study 103) in 2012, with a primary purpose of evaluating aducanumab's safety. *Id.* at ¶ 68. PRIME met its safety endpoint and also revealed that patients who received a high dose of aducanumab (10 mg/kg) saw a statistically significant reduction in amyloid beta aggregates in the brain and clinical decline. Briefing Book Excerpt, Doc. No. 62-1 at 87–89.

Following PRIME, in 2015, Biogen commenced two Phase 3 clinical trials to evaluate safety and efficacy: ENGAGE (Study 301) and EMERGE (Study 302). Doc. No. 58 at ¶¶ 4, 76–77; Doc. No. 62-1 at 11, 29. Approximately two-thirds of the patient population in both studies carried the gene ApoE4 ("carriers"), which coincides with an increased risk for the negative side effect of Amyloid Related Imaging Abnormalities ("ARIA"). Doc. No. 58 at ¶¶ 10, 79. The protocol initially restricted the dose that carriers could receive to 3 or 6 mg/kg, rather than the 10 mg/kg dose that non-carriers could receive, but protocol amendments eventually permitted the 10 mg/kg dosage to be tested in carriers. *Id.* at ¶¶ 94–100; Doc. No. 62-1 at 33–35, 64. Because EMERGE started after ENGAGE, these amendments resulted in more patients in EMERGE receiving the 10 mg/kg dose for a longer period. Doc. No. 58 at ¶ 11; Doc. No. 62-1 at 64.

In March 2019, Biogen halted aducanumab's Phase 3 trials after an independent committee

6

conducted a futility analysis and concluded that the studies, on a pooled basis, likely would not "show statistical significance in favor of aducanumab." Doc. No. 58 at ¶¶ 101–108. Biogen then conducted an internal review of the data. This review analyzed ENGAGE and EMERGE separately and included additional data collected after the futility analysis cutoff. *Id.* at ¶¶ 7, 118, 177. Biogen found that in EMERGE, a high-dose of aducanumab (10 mg/kg) reduced clinical decline, meeting the primary and secondary efficacy endpoints. *Id.* at ¶¶ 177, 181. By contrast, ENGAGE was a negative study, having failed to reach its endpoints. *Id.* However, a subset of high-dose patients in ENGAGE showed results similar to those found in EMERGE. *Id.*

**Biogen's Pre-Class Period Disclosures (October 2019 – July 2020)**: Biogen announced on October 22, 2019 that it would seek FDA approval of aducanumab. Q3 2019 Call Tr., Doc. No. 62-4 at 2, 9. That day, Biogen disclosed that the "primary learning from [the Phase 3 trial] data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints"—a finding that "was statistically significant in EMERGE" and supported by a subset of the data in ENGAGE and by PRIME. *Id.* at 5–6. The Company presented further details on its analysis at the Clinical Trials on Alzheimer's Disease ("CTAD") meeting in December 2019. Doc. No. 189-1 at ¶ 44. Biogen made clear, however, that it was not presenting subgroup analyses. *Id*. Analyst reports confirm that, following the October 22 announcement and the CTAD meeting, the market understood that certain data and analyses had not been made public, and all data did not necessarily support the overall findings from EMERGE. *Id.* at ¶¶ 43, 45.

**The Sole Remaining Alleged Misrepresentation (July 22, 2020)**: Against this backdrop, the sole remaining alleged misrepresentation was made during Biogen's July 22, 2020 earnings call. Dr. Sandrock explained in his statement quoted above that the aducanumab FDA filing was based on data from PRIME, EMERGE, and a subset of patients in ENGAGE, and said, "the lower

doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***" Doc. No. 58 at ¶ 191; FQ2 2020 Earnings Call Tr., Doc. No. 62-17 at 14. In addressing the sufficiency of the pleaded fraud claim, the First Circuit observed that the July 22 Statement "stands out from the rest" of the more than 20 misstatements alleged in the SAC, and that Plaintiffs had plausibly alleged that, unlike Biogen's earlier statements, the July 22 Statement "conveyed" that "all of Biogen's data was 'consistent with' needing to get to the high dose" to benefit clinically. *Shash*, 84 F.4th at 11–14 (emphasis in original).

Contradicting Plaintiffs' pleaded theory, however, there is no evidence that the market took any notice of the July 22 Statement. Both parties' experts agree that the July 22 Statement did ***not*** cause a statistically significant increase in Biogen's share price. Report of Plaintiffs' Expert Dr. David I. Tabak, Doc. No. 171-1 at ¶¶ 34 n.34, 65; Doc. No. 189-1 at ¶¶ 25–29. No market participants cited the July 22 Statement ***at all***. Doc. No. 189-1 at ¶¶ 25, 31, 35–38. Analysts also did not express the belief that "all" data, including subgroup data, supported efficacy at a high dose. *Id.* at ¶ 36. On the contrary, in the months following the Statement, analysts repeatedly acknowledged that subgroup data had not been released, expressed doubt about whether it would be supportive, observed that the data being presented to the FDA was not straightforward, and suggested that an FDA statistician might reach a negative conclusion. *Id.* at ¶¶ 49, 52, Ex. 5.

**FDA Briefing Book, Including the Massie Appendix (November 4, 2020)**: As part of aducanumab's review process, an advisory committee of scientists (the "AdCom") reviewed the clinical trial data and provided independent input to the FDA. Doc. No. 58 at ¶ 259. In advance of the AdCom meeting on November 6, 2020, on November 4, at around 10:10 am ET, the FDA issued the Briefing Book. Doc. No. 189-1 at ¶ 70. The Briefing Book set out, for the first time,

the FDA's favorable analyses and conclusions regarding Biogen's clinical trials about the efficacy of high-dose aducanumab.[2]  Doc. No. 62-1.  The Briefing Book also contained the Massie Appendix, including Dr. Massie's purportedly negative subgroup analyses and his disagreement with Biogen and the FDA's favorable views—concluding in his "Executive Summary" that "the totality of the data does not seem to support the efficacy of the high dose."  Massie's Stat. Rev. & Eval., Doc. No. 58-3 at 255.  Plaintiffs contend that the negative subgroup analyses contained in the Massie Appendix "revealed the data Defendants had concealed" and showed that the July 22 Statement was "false or misleading."  Doc. No. 58 at ¶ 151.

News outlets and analysts immediately reported on the Briefing Book, including the Massie Appendix, explicitly discussing both the FDA's positive conclusions and Massie's dissenting views.  As just a few examples:  at 11:15am ET one analyst observed that "[t]here is a statistician's review – which is NOT consistent [with] the main reviewer's key conclusions"; at 11:31am ET another referred to Massie's conclusion as "unsurprising"; and at 11:35am ET another remarked that "there are some discrepancies between FDA clinical and statistical teams."  Doc. No. 189-1 at ¶¶ 70–71.  Other market commentary during the trading day emphasized that uncertainty remained about how the AdCom would weigh these competing opinions.  Doc. No. 189-1 at ¶ 76.  That day, on November 4, Biogen's stock price rose approximately 44%.  *Id.* at ¶ 70.

**Plaintiffs' Alleged Stock Drop Losses (November 5 and 9, 2020)**:  Faced with positive price movement on November 4, Plaintiffs do not cite November 4 to show price impact.  Doc. No. 173 at 18.  Rather, Plaintiffs argue that the market had a delayed reaction, and began to absorb

---

[2] In the FDA's view, "the results of [EMERGE] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab"; PRIME gave "supportive evidence of the effectiveness of aducanumab"; and an examination of ENGAGE "indicates that patients with higher exposure to the 10 mg/kg dose . . . had similar responses to patients in [EMERGE]."  Doc. No. 62-1 at 58, 95.

the negative analyses in the Massie Appendix a day later, on November 5. *Id.* at 18. But at the market open on November 5, Biogen's stock price did not experience a statistically significant decline from the closing price on November 4. Doc. No. 189-1 at ¶¶ 84–85. Despite this, Plaintiffs contend that a decline of 7.5% during the November 5 trading day (*i.e.* from the November 4 close to the November 5 close) is a measurement of the market's assessment of the allegedly corrective information in the Massie Appendix. *See* Doc No. 173, at 4–5, 18–19; Doc. No. 58 at ¶ 279.

On November 6, 2020, two days after publication of the Massie Appendix, trading in Biogen shares was halted while the AdCom meeting occurred. Doc. No. 58 at ¶ 280. That evening, the AdCom cast largely negative votes on the questions presented. *Id.* at ¶ 281. The SAC claims that Plaintiffs were damaged by the subsequent 28% price decline when trading resumed on November 9. *Id.* at ¶¶ 2, 19, 294. This Court held, however, that, applying loss causation principles, Plaintiffs had not plausibly alleged that the AdCom vote was a corrective disclosure of the July 22 Statement. Mar. 27, 2025 Order, Doc. No. 163 at 16–18.

On June 7, 2021, the FDA granted accelerated approval of aducanumab for treatment of Alzheimer's disease at the high (10 mg/kg) dose. Doc. No. 58 at ¶ 20; Doc. No. 54-15.

## **LEGAL STANDARD**

Plaintiffs "must affirmatively demonstrate [their] compliance with Rule 23," and bear the burden of proof for each element of Rule 23(a)—numerosity, typicality, commonality, and adequacy—as well as the predominance requirement of Rule 23(b)(3). *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013). This is not a "mere pleading standard"; "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," and that Rule 23(b)(3)'s predominance criterion—which is "even more demanding than Rule 23(a)"—has been met. *Id.* at 33–34.

10

**ARGUMENT**

I.    **DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION OF RELIANCE AND THEREFORE PREDOMINANCE IS NOT SATISFIED.**

Reliance is an element of Plaintiffs' fraud claim.  But, as the Supreme Court recognized in *Basic*, "[r]equiring proof of individualized reliance" from every securities fraud plaintiff would "effectively . . . prevent plaintiffs from proceeding with a class action."  485 U.S. at 242 (cleaned up).  *Basic* thus established a rebuttable presumption of reliance based on the fraud-on-the-market theory, under which "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction."  *Halliburton*, 573 U.S. at 278.

Plaintiffs invoke this presumption of reliance.  But it is rebutted where, as here, the defendants show that the "alleged misrepresentation did not actually affect the market price of the stock"—*i.e.*, the misrepresentation lacks "price impact."  *Id.* at 264, 284.  "[A]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" is sufficient to rebut the presumption.  *Goldman*, 594 U.S. at 118.  In assessing price impact, courts must evaluate "all probative evidence" of price impact, "qualitative as well as quantitative—aided by a good dose of common sense."  *Id.* at 122.  That is true "regardless [of] whether that evidence overlaps with materiality or any other merits issue."  *Id.* at 124.  A defendant's burden to rebut the presumption is a preponderance of evidence, which "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise."  *Id.* at 126–27.  Where a defendant rebuts the *Basic* presumption, a class cannot be certified.  *Id.* at 119.

Defendants' burden is satisfied here because (1) the July 22 Statement did not cause a statistically significant increase in Biogen's share price (*infra* I.A); (2) the alternative inflation maintenance theory is unavailable here (*infra* I.B); (3) even assuming maintenance were available, Defendants rebut the presumption of reliance under *Goldman* (*infra* I.C); and (4) the back-end

11

price drops on November 5 and 9 do not reflect price impact of the July 22 Statement (*infra* I.D).

### A.    The Lack of Front-End Price Impact Rebuts the Presumption.

Both parties' experts agree that the July 22 Statement did not cause any increase in Biogen's stock price, *i.e.*, did not have any "front-end price impact."  Plaintiffs' expert performed an event study that tests whether, controlling for market- and industry-wide stock price fluctuations, there was any statistically significant increase in Biogen's stock following the July 22 Statement.  Doc. No. 171-1 at ¶¶ 31–45.  There was not.  *Id.* at ¶¶ 34 n.34, 65; Tabak Depo. Tr., Doc. No. 189-2 at 100:25–101:05.  Defendants' expert confirms the same.  Doc. No. 189-1 at ¶¶ 25–29.[3]  The lack of price reaction following the Statement demonstrates lack of price impact. *Id.*  And lack of price impact is further confirmed by Dr. Hubbard's systematic review of analyst reports: ***no*** analyst report issued after the July 22 Statement contains any mention of it or expressed the view that "all" data analyses support efficacy.  *Id.* at ¶¶ 25, 31–31, 35–38.  In short, the stock price did not react to, and the market took no notice of, the July 22 Statement—demonstrating lack of price impact.  *See, e.g.*, *IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no 'front-end' price impact rebutted the *Basic* presumption"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017) (*Basic* presumption rebutted by lack of front-end price impact).

### B.    The Inflation Maintenance Theory Is Not Available Here.

Plaintiffs attempt to circumvent the lack of front-end price impact by invoking the so-called "inflation maintenance" theory, arguing that the July 22 Statement "***maintained inflation***" "rather than adding new inflation."  Doc. No. 173 at 17.  This theory does not work, for several reasons.

*First*, as a threshold point, neither the Supreme Court nor the First Circuit has held that

---

[3] Event studies determine whether changes to "the market price of the defendant's stock" occur because of company-specific "discrete events" or unrelated market-wide events or random variation.  *Halliburton*, 573 U.S. at 280–81.

inflation maintenance is a valid theory. *See Goldman*, 594 U.S. at 120 n.1 (Supreme Court "expressed no view" on theory but accepted for purposes of argument). And the Second Circuit recently warned courts to be wary where, as here, a plaintiff tries to "(a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud" under an inflation maintenance theory. *ATRS*, 77 F.4th at 102. Plaintiffs' brief provides no authority for proceeding under this theory—which is not alleged in the SAC—and simply assumes that it is available. *See In re Finisar Corp. Sec. Litig.*, 2019 WL 2247750, at *5 (N.D. Cal. May 24, 2019) (rejecting plaintiff's pivot to unpleaded "maintenance theory").

*Second*, even assuming the inflation-maintenance theory is viable, the fraud claim here is not compatible with it. Under the inflation maintenance theory, a misrepresentation causes a stock price "to remain inflated by preventing *preexisting* inflation from dissipating from the stock price." *Goldman*, 594 U.S. at 119–20. That theory is fundamentally inconsistent with Plaintiffs' fraud theory that obtained a reversal in the First Circuit—that assuming the SAC's allegations are true, the July 22 Statement "stands out from the rest" and changed the total mix of information. *Shash*, 84 F.4th at 11–14. The First Circuit *expressly juxtaposed* Plaintiffs' allegations regarding (i) the period before the July 22 Statement, when Defendants "explained that they were . . . intentionally withholding carrier/noncarrier subgroup data"; *with* (ii) the July 22 Statement, when Dr. Sandrock supposedly changed the mix of information by conveying that "all" data supported efficacy at the high dose despite knowing "contradictory subgroup data existed." *Id.* at 10–14.[4] Plaintiffs cannot proceed on a "maintenance" theory when the crux of their claim is that the July 22 Statement

---

[4] The First Circuit's opinion reflects Plaintiffs' appellate briefing, in which Plaintiffs described the July 22 Statement as the "most striking[]" and urged the interpretation that "'*all*' of Biogen's data was consistent" with high-dose efficacy. Appellant Opening Br. at 13, *Shash*, 84 F.4th 1 (Doc. No. 16); *see also, e.g., id.* at 1–2; Reply Br. at 7, *Shash*, 84 F.4th 1 (Doc No. 27). To now suggest that the July 22 Statement repeated unspecified earlier disclosures is inconsistent with Plaintiffs' position on appeal. *See Alt. Sys. Concepts, Inc.* v. *Synopsys, Inc.*, 374 F.3d 23, 32–36 (1st Cir. 2004) (plaintiff judicially estopped from changing position after judicial acceptance of prior position).

conveyed critical, new information that differed from preexisting information.

*Third*, a maintenance theory is inconsistent with the economic evidence. As Dr. Hubbard explains, the contemporaneous evidence confirms that the July 22 Statement could not have prevented ***preexisting*** inflation from dissipating because there was no such preexisting inflation. Doc. No. 189-1 at ¶¶ 40–46. Dr. Hubbard could not locate ***any*** Biogen statement before July 22, 2020, that conveyed to investors that "all" data supported high-dose efficacy. *Id.* at ¶ 40. Further, prior to July 22, "Biogen repeatedly specified which data supported efficacy at a high dose," and market commentary did not "describe[] Biogen's data as showing uniform support for high-dose efficacy." *Id.* For instance, when Defendants were asked about the "carriers['] versus noncarriers[']" results on December 5, 2019, they made it clear they had not disclosed subgroup data yet, even though "typically, we do present a lot of things, subgroups included, in the past." *Id.* at ¶ 44. That same day, RBC Capital Markets noted that "efficacy data in ApoE4 non-carriers" had not been released, "***perhaps suggesting data from this population in ENGAGE does not necessarily support the hypothesis***." *Id.* at ¶ 45. And an Oppenheimer report from October 22, 2019, which predicted a "50% probability of success," similarly noted the absence of "APOE4 carriers vs. noncarriers" results. *Id.* at ¶ 43. This type of market response "is consistent with the economic literature showing that information withholding" is met with "extreme skepticism" from the market. *Id.* at ¶ 50. Plaintiffs' expert cites no evidence to the contrary. He concedes he did not investigate the market's views before the Statement, Doc. No. 189-2 at 117:12–118:04; cannot identify any statement that created the "preexisting expectation," *id.* at 112:07–12; and admitted that "the market will assume that if it's not given information that means the information is bad," *id.* at 140:13–19. Given this evidence, there was no "preexisting" expectation that "all" data supported the efficacy of high-dose aducanumab. The July 22 Statement thus could not have

14

confirmed preexisting market expectations.  Doc. No. 189-1 at ¶ 46.

*Finally*, Plaintiffs' invocation of inflation maintenance fails because, to the extent they point to any preexisting inflation at all, that inflation is not connected to the remaining fraud claim. Their Motion suggests vaguely that the July 22 Statement was cumulative of unspecified "earlier" statements that "misleadingly disclosed" trial data, Doc. No. 173 at 17–18, presumably referring to statements dismissed from this case.  Assuming Plaintiffs are referring to their original case, the SAC pleaded that Biogen's stock price increased on October 22, 2019, when Biogen announced that it intended to seek FDA approval.  Doc. No. 58 at ¶¶ 140–41; Stock Price History, Doc. No. 62-23.  But that announcement did not represent that "all" data supported high-dose efficacy. Plaintiffs cite no authority for the proposition that they can rely on earlier-injected inflation from a different statement that did not contain the same allegedly false information (much less a statement dismissed from the lawsuit).

### C.    Even if the Inflation Maintenance Theory Is Viable, Class Certification Should Be Denied Under *Goldman.*

Even if inflation maintenance were available here, the bar for class certification in such cases is high.  A plaintiff cannot manufacture an inflation maintenance case by "identify[ing] a specific back-end price-dropping event" and "find[ing] a front-end disclosure bearing on the same subject."  *ATRS,* 77 F.4th at 102.  Rather, a plaintiff must show "a basis to infer that the back-end price drop equals front-end inflation," that is, the decline following the corrective disclosure is a proxy for inflation maintained by the alleged misstatement.  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6, *11 (S.D.N.Y. Mar. 29, 2024).

 Following the analysis in *Goldman*, in inflation maintenance cases, courts examine:  (1) whether there is a "gap" or "mismatch" between the content of the front-end and back-end disclosures; (2) whether a "truthful substitute" for the alleged misstatement would impact the stock

15

price; and (3) contemporaneous evidence (or lack thereof) that the market relied on the alleged misstatement. *ATRS*, 77 F.4th at 102–03. Each factor here demonstrates lack of price impact.

### 1.    There Is a Considerable Gap, or Mismatch, Between the Front- and Back-end Disclosures, Undermining Any Inference of Price Impact.

In *Goldman*, the Supreme Court explained that the inference that the back-end price drop equals front-end inflation "starts to break down" when there is a "mismatch between the contents of the [alleged] misrepresentation and the corrective disclosure." 594 U.S. at 123. This may occur when there is a "substantive mismatch" between the alleged misrepresentation and corrective disclosure, *Kirkland*, 2024 WL 1342800, at *11, or "when the earlier misrepresentation is generic" and "the later corrective disclosure is specific," *Goldman*, 594 U.S. at 123.

Here, there is a ***substantive mismatch*** between the front- and back-end because the market did not interpret the July 22 Statement to convey anything at all about the subgroup analyses that the Massie Appendix later addressed. While the First Circuit ruled that Plaintiffs adequately alleged a misleading statement, Plaintiffs now need actual evidence. *See Goldman*, 594 U.S. at 124 (courts assessing price impact at class certification must evaluate "*all record evidence . . . regardless whether that evidence overlaps with materiality or any other merits issues*"). Here, no analyst ***ever*** cited the July 22 Statement ***at all***. Doc. No. 189-1 at ¶ 25, 31, 35–38. In fact, following the July 22 earnings call, several analysts stated that the call ***did not*** convey any additional or new quantitative evidence about aducanumab's efficacy. *See, e.g.*, *Id.* at ¶ 58 (Wolfe Research Report July 22, 2020 stating "no major new disclosures" in investor call and RBC Capital Markets Report July 22, 2020 stating "with careful language on the call we see little to increase or decrease confidence in [adu's approval] chances (we est. 30%)"). Even the analyst who asked the question that generated the July 22 Statement "remained skeptical" afterwards of FDA approval because Biogen's data was "hardly unequivocal" and included "an increasing list of red flags." *Id.*

16

at ¶ 59.  And, no analyst increased its rating or price target for Biogen stock or changed its views on aducanumab's FDA approval based on the Statement.  *Id.* at ¶ 60.

Moreover, in the months following the Statement, the evidence overwhelmingly shows that investors **understood** Biogen had not released subgroup data and **did not think** the unreleased data "all" supported high-dose efficacy.  *See* Doc. No. 189-1 at ¶¶ 49, 52, 61; *see also* Doc. No. 189-1 at Ex. 5 to the Hubbard Report (citing 13 reports).  To take just a few examples:

- On October 1, 2020, Cowen & Company opined "it's not clear that the totality of the data support approval."  Doc. No. 189-1 at Ex. 5.

- On October 19, 2020, RBC Capital Markets wrote that "our sense is that data not yet disclosed to date are unlikely to be overly positive."  *Id.*

- On October 22, 2020, Stifel described their "bearish" position on aducanumab because of, among other things, potential "biasing issues with an APOE4 carrier imbalance influencing the 10mg/kg data analysis/comparisons."  *Id.*

-  On October 22, 2020, BMO Capital Markets wrote "we do not believe current FDA precedent supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses."  *Id.*

Plaintiffs' expert has no answer for this overwhelming evidence that the market did not understand the Statement to convey that "all" data, much less subgroup data, supported high-dose efficacy.  Dr. Tabak performed **no investigation** into how the market interpreted the Statement or whether investors or analysts believed that "all" data supported high-dose efficacy.  Doc. No. 189-2 at 49:12–25; 117:07–119:17.

In *Kirkland*, the court relied on similar evidence to find a "substantive mismatch between" a front-end statement about future-looking acquisition criteria, and a back-end disclosure revealing a specific acquisition that did not yet meet the criteria.  2024 WL 1342800, at *11.  The court held that "the weight of the evidence" "support[ed] Defendants' interpretation" that the alleged misstatement conveyed "future targets, rather than rigid requirements at the time of acquisition"— creating "a mismatch in content between the statement and the corrective disclosure."  *Id.*  The

17

same result follows here: the evidence demonstrates that the market ***did not*** interpret the July 22 Statement to convey new information, much less that ***all*** data, including unreleased subgroup analyses, supported high-dose efficacy, and therefore there is no price impact due to the "mismatch in content between" the Statement and the Massie Appendix.  *Id.*; Doc. No. 189-1 at ¶ 62.

It appears that Plaintiffs are pivoting to the argument that the Statement was simply another "summar[y]" of trial data in a long line of "selectively and misleadingly disclosed" trial results. Doc. No. 173 at 3, 17.  The Court should reject this revision of Plaintiffs' theory, *supra* 13 n.4, 15, but even if accepted, it demonstrates a lack of price impact for the additional reason that it creates a mismatch between the ***specificity*** of the front- and back-end disclosures—the reason the Second Circuit decertified a class in *ATRS*.  Under Plaintiffs' alternative theory, there is a clear specificity mismatch between the extemporaneous July 22 Statement, which Plaintiffs say "summarize[d]" the data from the three trials and provided no subgroup analyses, *id.*, and the alleged corrective information contained in the Massie Appendix, which included "complicated biostatistical analyses" of negative subgroup data and "many analyses that ***did not bear on***" the Statement, *id.* at 4.  This mismatch in specificity is similar to several recent cases that denied class certification because the alleged misstatements and disclosures concerned the same general subject, but the back-end disclosures were far more detailed and specific than the misstatements:

- *ATRS*: statements about conflicts policies were "comfortabl[y] more generic than the back-end disclosures" about specific conflict-related misconduct.  77 F.4th at 81–84, 99.

- *In re Qualcomm Inc. Sec. Litig.*: disclosures that "Qualcomm licensed at the device level and not the chip level," was "far more specific" than "generic statements" that licensing model was "'broad,' 'fair,' [and] 'reasonable.'" 2023 WL 2583306, at *12 (S.D. Ca. Mar. 20, 2023).

- *Shupe* v. *Rocket Cos., Inc.*: "considerable mismatch" between statements that "direct-to-consumer and partner networks were generally growing" and disclosure of specific, disappointing projections of loans and sales.  752 F. Supp. 3d 735, 781–82 (E.D. Mich. 2024).

In these circumstances, "it is less likely that the specific disclosure actually corrected the generic

misrepresentation, which means that there is less reason to infer front-end inflation." *Goldman*, 594 U.S. at 123; *see also* Doc. No. 189-1 at ¶¶ 56, 64–68.

### 2.    The "Truthful Substitute" Analysis Shows Lack of Price Impact.

Under *Goldman*, the Court also should analyze whether a "truthful substitute" for the alleged misstatement, at same level of genericness, "would have impacted the stock price." *ATRS*, 77 F.4th at 98–99, 102. In other words, if the stock price would not have reacted to a "truthful" statement at the same level of generality as the July 22 Statement, then the Statement did not have "inflation-maintaining capacity." *Id.* at 102–03. This inquiry again requires consideration of "*all* evidence relevant to price impact," *Goldman*, 594 U.S. at 122, to assess the "price-dropping capacity of an *equally generic* corrective disclosure," *ATRS*, 77 F.4th at 102–05. Here, the Court need not analyze the reaction to a "truthful substitute" because the evidence shows that investors did not interpret the July 22 Statement to say that "all" data supported high-dose efficacy. *Supra* 14–17. But even if investors interpreted the Statement as Plaintiffs insist, overwhelming evidence confirms there would have been no stock price reaction to a "truthful substitute."

An equally generic "truthful substitute" for the July 22 Statement could be: Although portions of the data from PRIME, ENGAGE, and EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, "not all data" are consistent with that. *See* Doc. No. 189-2 at 142:11–20. Ample evidence shows this "truthful substitute" would have no price impact. Investors *did understand* Biogen had not released subgroup data and *did not think* the unreleased data "all" supported high-dose efficacy, as shown by at least 13 analyst reports. *Supra* 17. Given that understanding, the "truthful substitute" would have had no impact—and, as Dr. Hubbard shows, Biogen's stock price did not experience a statistically significant decline on any days when such reports were published. Doc. No. 189-1 at ¶ 51. This market commentary, and the corresponding lack of price reaction, demonstrates that the July 22 Statement was not "propping

19

up" the stock price, contrary to a maintenance theory. *ATRS*, 77 F.4th at 100, 102–05.

Plaintiffs and their expert dispute ***none of this***. Plaintiffs' expert did not conduct a "truthful substitute" analysis, Doc. No. 189-2 at 135:25–136:13, or examine this evidence, *id.* at 49:12–25; 118:05–119:17, 142:10–143:07, 149:08–25, 170:16–171:25, 174:04–175:11. Dr. Tabak admitted that the conclusion in the Massie Appendix's "Executive Summary" was "an awful lot like" a "truthful substitute," and the market could "quickly" make an "unbiased estimate" based on it. *Id.* at 250:18–252:24. But Biogen's share price *rose* on November 4 when that "truthful substitute" was released, further showing that a "truthful substitute" would not have caused a stock drop.

Lacking proper evidence supporting their theory, Plaintiffs instead analyzed "how the market would have reacted ***had the analysis in the Massie [Appendix] been made public earlier***." Doc. No. 171-1 ¶ 69. That is precisely the mistake the district court made in *ATRS*, causing the Second Circuit to reverse. 77 F.4th at 100–01. The question is ***not*** whether the market would have reacted had Massie's specific subgroup analyses been disclosed earlier, but rather how the market would react—if at all—to a "truthful" disclosure at the same level of generality as the July 22 Statement. *Id.* at 102. Plaintiffs did not analyze that question, and the evidence shows that the market was fully aware of, and did not react negatively to, "truthful substitutes" to the Statement.[5]

### 3.   Additional Evidence of Pre- and Post-Disclosure Commentary Demonstrates Lack of Price Impact.

*ATRS* explains that "pre- or post-disclosure discussion in the market" regarding the front-end misstatement can be a useful indicator of its inflation-maintaining capacity. *Id.* at 102–03. Here, this evidence shows that the July 22 Statement was not "propping up" Biogen's stock.

**No Pre-Massie Appendix Price Reaction or Discussion**. As in *ATRS*, the evidence shows

---

[5] The Massie Appendix was also a dissenting opinion attached to the larger, in Plaintiffs' words, "effusive" Briefing Book, Doc. No. 58 at ¶ 264, the simultaneous release of which caused a substantial stock *increase*. *Supra* 8–9.

20

that investors did not rely on the July 22 Statement "in the moment" when evaluating Biogen securities and making investment decisions. 77 F.4th at 100, 102–05. Not one analyst or news report referenced the Statement *at all* during the Class Period, or indicated that they believed "all data" supported high-dose efficacy, or suggested that Defendants held that view. Doc No. 189-1 at ¶¶ 35–37 and Exs. 1–3; *Shupe*, 752 F. Supp. 3d at 781-82 ("like in *Goldman*, Defendants have produced expert testimony suggesting that *no* analyst referenced [the alleged misrepresentation] . . . throughout the Class Period" which provides "proof that no analysts relied on" it). Nor did any analyst increase their Biogen stock rating or target based on the July 22 Statement. *Supra* 17.

**No Post-Massie Appendix Discussion**. Also like in *ATRS*, not one analyst report issued *after* the corrective disclosure referenced the July 22 Statement or connected the Massie analyses back to the July 22 Statement in any way. Doc No. 189-1 at ¶ 61. Nor did any market commentator suggest that Biogen had previously represented that "all" data supported efficacy of the higher dose. *Id.* This further confirms the "insufficient link" between the Statement and Massie Appendix to support inflation maintenance. *ATRS*, 77 F.4th at 104.

* * *

In sum, applying *Goldman*, Defendants have shown lack of price impact from: the gap in content and specificity of the front- and back-end statements, evidence that no investor interpreted the July 22 Statement to mean that "all" data supported high-dose efficacy, evidence that the market did not believe the unreleased data "all" supported efficacy and did not react to "truthful substitutes," lack of front-end price impact, and pre- and post-disclosure commentary showing that investors were not relying on the Statement and it was not "propping up" Biogen's stock price.

**D.    There Is No Price Impact Because Any Price Decline in Biogen's Stock Price on November 5 and 9 Is Not Attributable to the Alleged Corrective Disclosure (Nor Is It a Proxy for Inflation from the July 22 Statement).**

The lack of price impact is also proven because the stock declines identified by Plaintiffs

21

are not attributable to the alleged corrective disclosure.  Biogen's stock price rose 44% on November 4, 2020, following release of the Briefing Book including the Massie Appendix at approximately 10:10 a.m. ET, *supra* 8, and Plaintiffs do not seek to recover alleged losses that day.  Instead, Plaintiffs claim proof of price impact from stock declines on two ***later*** dates: November 5, 2020, when the share price dropped 7.5%; and November 9, 2020, when the share price dropped 28.2%.  Doc. No. 58 at ¶¶ 17, 19; Doc. No. 173 at 5, 18.  Plaintiffs contend that these declines measure the value of the allegedly corrective information contained in the Massie Appendix.  Plaintiffs' theory is inconsistent with efficient-market principles, as explained below.

### 1.    The November 5 Price Drop Does Not Demonstrate Price Impact.

Plaintiffs concede that the market for Biogen stock was efficient in 2020—in fact, their Motion hinges on Biogen shares trading in an efficient market.  Doc. No. 171-1 at ¶ 2; Doc. No. 173 at 12–14.  As Dr. Hubbard demonstrates, in an efficient market—and particularly contemporary markets like Biogen's, with extensive high-frequency trading and 80% of trading conducted by institutional investors—"new information is incorporated  into the stock price in minutes, if not faster."  Doc No. 189-1 at ¶ 72; Doc. No. 189-2 at 221:09–222:24; Doc. No. 171-1 at ¶¶ 22–24 (large institutional holdings expedite the incorporation of news).  Dr. Tabak agrees that "the bulk of the price movement occurs very quickly in most cases," and that a 15-minute price reaction is "fairly common."  Doc. No. 189-2 at 210:17–216:20.  Accordingly, the supposedly corrective information from the Massie Appendix was incorporated into Biogen's share price during the trading day on November 4, and Plaintiffs' invocation of a delayed second-day reaction fails.  Doc No. 189-1 at ¶¶ 74–78; *see Erica P. John Fund, Inc*. v. *Halliburton Co*., 309 F.R.D. 251, 269 (N.D. Tex. 2015) (rejecting two-day window in efficient market); *Ramirez* v. *Exxon Mobil Corp*., 2023 WL 5415315, at *13–14 (N.D. Tex. Aug. 21, 2023) (same); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016) (same).

22

Substantial contemporaneous evidence confirms that the alleged corrective disclosure was fully reflected in Biogen's stock price by market close on November 4:

*First*, the intraday price movement on November 4 reflects rapid price absorption of the allegedly corrective information. Between 10:10 a.m. ET, when the Briefing Book (including the Massie Appendix) was published, and 10:56 a.m. ET, when trading volume peaked for the day, Biogen's stock price rose sharply, with trading volume *3 times higher* than later in the day. Doc. No. 189-1 at ¶ 75. From 10:56 a.m. ET to market close, Biogen's stock oscillated with declining but still high volume. *Id.* at ¶ 76. Dr. Hubbard explains that this reflects "an immediate, positive reaction to the simultaneous release" of conflicting opinions in the Briefing Book and attached Appendix, followed by "continued price volatility reflecting market participants' uncertainty on how AdCom panelists may interpret and weigh these two opposing pieces of evidence." *Id.* at ¶ 77. This is consistent with Dr. Tabak's testimony that efficient markets "fully incorporate[] the [available] information" in a quick and unbiased manner, followed by "additional volatility as the market continues to react." Doc. No. 189-2 at 199:19–200:23, 210:18–211:5, 349:25–350:22.

*Second*, the trading volume in Biogen stock on November 4 was the *highest* of any day in the Class Period—more than *12 times* the average trading volume between July 22 and November 3, 2020. Doc No. 189-1 at ¶ 74; *see* Doc. No. 171-1 at ¶ 71. High trading volume on November 4 further supports rapid incorporation of value-relevant news on that date. Doc No. 189-1 at ¶ 74.

*Third*, analyst commentary confirms that the Massie Appendix was reflected in Biogen's stock price on November 4. Dr. Hubbard identified *15* analyst reports published during trading hours on November 4, 2020—most before 1 p.m. ET—that explicitly discussed the Briefing Book *including* Massie's review and "negative findings." *Id.* at ¶ 109 & n.174. *Six* discussed subgroup patterns in the Massie Appendix, including results among carriers and non-carriers, that

23

purportedly corrected the Statement. *Id.* at ¶ 71. Even Dr. Tabak identified several analysts who reported on Massie's analyses during trading hours on November 4, and due to Massie's findings, "took a less favorable view of Biogen's value." Doc. No. 171-1 at ¶¶ 67, 69 & Ex. 11. These reports confirm that the market incorporated the substance of the Massie Appendix into Biogen's stock price during trading hours on November 4. Doc No. 189-1 at ¶¶ 77–78; *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13–14 (N.D. Cal. Mar. 11, 2024) (that eight analysts reported on FDA briefing materials day materials were published indicated materials were "understood" by analysts and investors that day, before AdCom vote two days later).

*Fourth*, if, as Plaintiffs insist, the market continued to absorb the corrective information from the Massie Appendix after the close on November 4, it would be reflected in the ***opening*** price of Biogen stock on November 5. Doc No. 189-1 at ¶ 83. But Dr. Hubbard shows in an event study, applying Dr. Tabak's own model, that there was ***no statistically significant price movement*** from market-close on November 4 to market-open on November 5. *Id.* at ¶¶ 84–89. Plaintiffs therefore ask the Court not only to ignore the evidence that the market absorbed the corrective information before market close on November 4, but to further accept that the market ***still*** had not absorbed the information ***16 hours later*** when the market opened on November 5. The Court should reject that proposition. *See Ramirez*, 2023 WL 5415315, at *14, 16 (denying class certification for pre-market-open corrective disclosures that had no price impact at the open).

Plaintiffs ignore this overwhelming evidence and instead pursue the unsupported theory that "markets incorporated the good news first (the FDA supports the application) but took far longer to incorporate the bad news (the data is much worse than Biogen had let on)." Doc. No. 173 at 18–19. They cite no authority for this theory whatsoever—not even the report of their own expert, who admitted "[t]here is no such rule" that markets begin processing good news before bad

24

news, nor that good news and bad news released at the same time take different amounts of time to be incorporated into the market.  Doc. No. 189-2 at 227:16–20, 231:5–11.  Dr. Hubbard confirms that no economic theory supports the idea that an efficient market immediately incorporates "good news" but takes more than a day to incorporate "bad news."  Doc No. 189-1 at ¶ 79.

Plaintiffs also argue that the Massie Appendix was not immediately incorporated because it was "tucked away" and "dense and technical."  Doc. No. 173 at 4.   But the 97-page opinion offered by Dr. Massie was no more "dense and technical" than the rest of the 343-page Briefing Book, which similarly included detailed statistical analyses prepared by industry experts for review by the AdCom.  *See* Doc. No. 62-1.  In an efficient market, all of this information is incorporated simultaneously and rapidly.  Plaintiffs cannot rely on efficient market theory and then avoid its implications by claiming that the delayed second-day price reaction measured certain "bad news" in the Massie Appendix.[6]  *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *12 (S.D. Tex. Feb. 9, 2024) (argument that "the market was having a tough time reading through" document and determining its implications was not a "compelling" reason to extend event window).

Finally, Plaintiffs argue that two analysts "publish[ed] glowing articles during trading on November 4, then, after trading close[d] or on November 5, publish[ed] more sober reports that discussed Dr. Massie's analysis,"  Doc. No. 173 at 5, 18–19, "indicat[ing] that analysts were still processing—and the market was still receiving—information,"  Doc. No. 171-1 at ¶ 73.  Plaintiffs' portrayal of these reports is egregiously wrong: they omit that the supposedly "glowing" reports published during trading hours ***explicitly discussed*** the Massie Appendix and its negative take on

---

[6] Unlike the first section of the Briefing Book, the Massie Appendix included an Executive Summary that concluded in plain English that "the totality of the data does not seem to support the efficacy of the high dose."  Doc. No. 58-3 at 256.  Dr. Tabak admitted that this statement was "not tucked away," but was "readily apparent" and that the market could incorporate it quickly.  Doc. No. 189-2 at 251:3–252:24.  Aftoora agreed that the Executive Summary was easy to understand and inconsistent with the theory that "all" data supported high dose efficacy.  *See* Aftoora Depo. Tr., Doc. No. 189-5 at 158:01–20.

the trial data.[7]  Both analysts knew and informed the market of Massie's negative report within 95 minutes of the Briefing Book publication.  And, while both analysts published subsequent reports after market close on November 4, neither expressed new or updated views on Massie's findings.  Rather, both maintained their Biogen ratings and explained that remaining uncertainty concerned how AdCom panelists will vote given the conflicting opinions.  Doc No. 189-1 at ¶¶ 80–81.  These reports do not show that the market had a delayed reaction to the Massie Appendix.  *Id.* at ¶ 82.

### 2.    Dr. Tabak's Analysis of November 5 Is Methodologically Unsound.

Plaintiffs' expert, Dr. Tabak, also opines that his "independent analysis of November 5, 2020 demonstrates price impact on that day."  Doc. No. 171-1 at ¶ 75.  But his analyses are "flawed, unreliable, and fail to provide credible evidence of price impact."  Doc No. 189-1 at ¶ 96.

*First*, Dr. Tabak notes that "three analyst firms mentioned the Massie Report for the first time after the November 4, 2020 market close," suggesting that the market was "still processing" the report at that time.  Doc. No. 171-1 at ¶ 73.  But this analysis ignores the *15* analyst reports that *did* discuss Massie's opinion during trading hours on November 4, most within two hours of the report's publication.  *Supra* 23–24; Doc. No. 189-1 at ¶ 109 & n.174.  Dr. Tabak also assumes, without support, that an analyst's decision not to mention the Massie Appendix during trading hours means the analyst did not understand it (as opposed to its not meriting specific mention).  *Id.* at ¶ 103; Doc. No. 189-2 at 299:25–300:18.

*Second*, Dr. Tabak opines that "continued discussion of the Massie Report" after November 4 is evidence that the market was still processing it, citing that the percentage of Biogen analysts who mentioned "Massie" *or* "statistician" *or* "statistical review" rose from November 4 to 5 and

---

[7] The Raymond James report, published November 4 at 11:15 a.m. ET, viewed the Massie Appendix as "very negative" and wrote "FDA's statistician seemingly thinks the entire analysis is flawed"; and the JP Morgan report, published at 11:35 a.m. ET, specifically identified "discrepancies between FDA clinical and statistical teams on why '301 was negative" and that "there is a lack of efficacy in APOE4 non-carriers."  Doc No. 189-1 at ¶ 80.

remained above 40% "through at least November 11." Doc. No. 171-1 at ¶ 74. But Dr. Tabak does not show that the length of time a topic is discussed in the news is somehow equivalent to the length of time an efficient market needs to incorporate that news. *See* Doc. No. 189-2 at 323:20–325:10, 335:24–336:13, 338:6–25. And "a good dose of common sense," *Goldman*, 594 U.S. at 122, suggests that significant events remain in the news for days or weeks, but that is not a measurement for the time it takes an efficient market to price the information.

Dr. Tabak's methodology is also unsound. He did not actually read all of the referenced reports and admitted that the search terms were a "blunt instrument" that could turn up articles that did not discuss the Massie Appendix. Doc. No. 189-2 at 327:21–24, 329:14–331:8. Dr. Tabak also incorrectly attributes significance to a mere mention of the Massie Appendix, but disregards Plaintiffs' own theory that it "contained many analyses ***that did not bear on***" the Statement, Doc. No. 173 at 4, and fails to account for discussions of non-corrective information. Doc. No. 189-1 at ¶ 67. Nor does Dr. Tabak remove reports that merely repeat earlier reported information and assess its impact on regulatory approval. Doc. No. 189-2 at 339:05–340:05. And Dr. Hubbard found that ***none*** of the reports cited by Dr. Tabak "provided any new information about the known subgroup results," and instead "discussed the Massie Appendix in the context of . . . aducanumab's subsequent regulatory pathway prospects." Doc No. 189-1 at ¶ 113.

*Finally*, Dr. Tabak ascribes significance to a price drop during the November 5 trading day, as a proxy for the Massie Appendix's import. But as Dr. Hubbard's event study demonstrates, the price declines that occurred after market open on November 5 are "in line with the many price drops observed on November 4," and "best understood as part of the continued volatility from the price movements of the prior day . . . tied to uncertainty over how the AdCom panelists would weigh the various findings from the Briefing Book, including the Massie Appendix, in the

27

upcoming vote, and the subsequent prospect of FDA approval." Doc No. 189-1 at ¶¶ 86–88; Doc. No. 189-2 at 91:07–92:16. Analyst commentary on November 5 shows that, while the **substance** of the Massie Appendix was understood, its potential **impact** on the AdCom vote and FDA approval was under debate. Doc No. 189-1 at ¶ 81–82, 109; *see Apache*, 2024 WL 532315, at *10–11, 14 (*Basic* presumption rebutted as to disclosure of gas production deferral because "any decline in stock price was due to uncertainty about low gas prices generally"). The inference that the November 5 decline is attributable to supposedly corrective subgroup data, and thus serves as a proxy for inflation from the July 22 Statement, is further undermined by evidence that the market **expected** the subgroup data was "unlikely to be overly positive." *Supra* 17. Thus, the November 5 intra-day decline cannot serve as a proxy for inflation purportedly maintained by the Statement.

### 3.    The November 9 Price Drop Does Not Demonstrate Price Impact.

Plaintiffs suggest that the November 9 decline may be evidence of price impact from the Massie Appendix. Doc. No. 173 at 18–20. But Plaintiffs previously argued that the stock drop on November 9 was **due to the Advisory Committee vote**, which allegedly contained "new corrective information." Pls.' Opp'n to Judgment on the Pleadings, Doc. No. 122 at 16–18; Pls.' Opp'n to' Mot. to Dismiss, Doc. No. 63 at 33. Because the Court rejected this theory, *see* Doc. No. 163 at 18, Plaintiffs now pivot to an argument that the November 9 decline represents a five-day-delayed reaction to Massie's opinion. This switch of theories should be swiftly rejected.

There is no economic principle under which the drop on November 9 can be attributed to the market's absorption of the content of the Massie Appendix. Doc No. 189-1 at ¶ 90. Biogen stock traded in an efficient market, *supra* 22, and any price impact would have been absorbed during trading hours on November 4—and **certainly** before November 9. *Id.* at ¶ 91. Plaintiffs cite no authority supporting **three trading days** of price impact (trading was paused on November 6), and courts reject such arguments. *Supra* 22.

Furthermore, it is clear that the decline on November 9 was caused—as Plaintiffs originally argued—by the negative AdCom vote on November 6.  Doc No. 189-1 at ¶¶ 92–95.  In the days leading up to the AdCom vote, the market knew that the outcome of the vote was uncertain given available information.  *Id.* at ¶ 92.  **All reports** published on November 6 that Dr. Tabak identified as mentioning "Massie," "statistician," or "statistical review" included a discussion of the AdCom panel: analysts commented in anticipation of the panel prior to market open, provided midday updates as the panel met, and published summaries after the panel concluded.  *Id.* at ¶ 94.  The AdCom meeting provided insight into how FDA experts viewed competing assessments of the data, but, as this Court previously held, did not provide **new** information about the supposedly corrective subgroup data.  *Id.* at ¶ 95; Doc. No. 163 at 16–18.  Thus, the observed decline on November 9 reflects the materialization of the known risk of a negative AdCom vote, and **not** a correction of the July 22 Statement.  Doc. No. 189-1 at ¶ 95.[8]

## II.   SHASH, KHAN, AND AFTOORA ARE NOT TYPICAL OR ADEQUATE CLASS REPRESENTATIVES.

Rule 23(a) requires that a class representative's claims or defenses be "typical" of those of the class and that the representative "adequately" protect the class's interests.  Fed. R. Civ. P. 23(a)(3)-(4).  Rule 23 is more demanding than the standard for early appointment of a lead plaintiff.  *Elas* v. *Prince*, 2024 WL 278220, at *2 (D. Mass. Jan. 25, 2024) (Talwani, J.).

A class representative is not "typical" if she may be subject to "unique defenses that would divert attention from the common claims of the class."  *Karth* v. *Keryx Biopharms.*, *Inc.*, 334 F.R.D. 7, 16 (D. Mass. 2019), *aff'd,* 6 F.4th 123 (1st Cir. 2021).  Defendants "do not have to *prove*

---

[8] Plaintiffs admit that the AdCom vote "**may** [be] . . . an intervening fact unrelated to the fraud," but argue that disaggregating the Massie Appendix from the AdCom vote "is for summary judgment or trial."  Doc. No. 173 at 19. Not so.  Courts must consider all evidence of price impact, and do consider alternative explanations.  *See supra* 11; *see also Ramirez*, 2023 WL 5415315, at *17 (no price impact where analysts did not ascribe shortfall to alleged fraud).

a unique defense to defeat certification"; even an "arguable defense" particular to a class representative is sufficient. *Shupe*, 752 F. Supp. 3d at 792. As regards "adequacy," a class representative is inadequate if she shows a "lack of basic knowledge about" the case, *In re Sepracor Inc.*, 233 F.R.D. 52, 55 (D. Mass. 2005), or "abdicat[es] control over her case" to counsel, *Foley* v. *Buckley's Great Steaks, Inc.*, 2015 WL 1578881, at *6 (D.N.H. Apr. 9, 2015). In this case, each of the proposed class representatives is both atypical and inadequate under Rule 23(a).

***Nadia Shash.*** Shash plainly cannot serve as a class representative because she did not purchase Biogen stock. Although at all times known to Shash, Defendants recently discovered that the Biogen transactions Shash identified in her PSLRA Certification and lead plaintiff motion were not made by Shash, but rather, PolyCon Solutions LLC. PolyCon Account Statements, Doc. Nos. 189-6-7; Shash Depo. Tr., Doc. No. 189-3 at ███████████████████████; Shash Am. PSLRA Certification, Doc. No. 181. Shash lacks standing to assert a claim for the LLC's injuries, *Taylor* v. *Moskow*, 2013 WL 5508157, *3 (D. Mass. Oct. 1 , 2013), and is thus atypical, *see In re One Bancorp Sec. Litig.*, 136 F.R.D. 526, 529–30 (D. Me. 1991).[9] Plaintiffs moved yesterday to substitute PolyCon in Shash's place. Doc. No. 184. Defendants intend to oppose this motion and move to dismiss Shash for lack of standing, and reserve all rights to address PolyCon's adequacy and typicality under Rule 23 should substitution be granted.

***Amjad Khan.*** Khan is atypical because—again, looking at the evidence and not merely the pleadings—his Biogen trading subjects him to an individualized reliance defense. Khan did not purchase Biogen stock until November 5, a full day after the Massie Appendix was released to the public. Khan Depo. Tr., Doc. No. 189-4 at 113:21–22. Courts regularly reject class

---

[9] Shash also cannot, and does not, claim confusion about who made these trades. ████████████
████████████████████████████████████████████████████████████████████████████████████

representatives who purchased after the corrective disclosure.[10]   Indeed, Khan testified that he purchased Biogen shares on November 5 *because* the stock price was "trending down," "with the hope"—based on "guesswork"—"that it will go back up." Doc. No. 189-4 at 114:19–115:13.  That Khan purchased after the alleged fraud was revealed, and based on the downward trajectory of the stock, suggests that he purchased "on an actual belief that the market price was inaccurate," and would have done so "even with full knowledge of the misrepresentation," thus "[r]ebut[ting] the presumption of reliance." *Semerenko* v. *Cendant Corp.*, 223 F.3d 165, 179 n.7 (3d Cir. 2000).

Khan is also inadequate due to his egregious lack of understanding about, and participation in, this litigation.  Despite joining the case over *four* years ago, Khan had not spoken to his counsel until two weeks before his deposition, and not met his counsel until the day before his deposition. Doc. No. 189-4 at 153:21–25, 195:21–23.  Khan has only "skimmed" or "glanced at" key filings, including his sworn statements. *Id.* at 120:11–16, 186:19–187:4.  He could not recall the remaining defendants' names, *id.* at 85:3–9; what alleged misstatement(s) remain in the case, *id.* at 93:15–25; was unaware that the Massie Appendix is the alleged corrective disclosure, *id.* at 119:2–120:10; and *could not explain* why the July 22 Statement is allegedly false, *id.* at 104:14–105:6, 109:16–20.[11]   When asked his opinion about his sworn statement that the SAC is "meritorious," he said, "I will let my attorneys decide it." *Id.* at 90:15–91:10.  Khan was "not sure" if any briefs had ever been filed in the case; if there had been a mediation; or if he would be able to attend trial. *Id.* at 33:17–23, 154:25–155:7, 156:4–9.  Khan has never spoken to Shash or Aftoora. *Id.* at 37:4–

---

[10] *Karth*, 334 F.R.D. at 18 (plaintiff's post-disclosure purchase "makes his claims atypical"); *Lemm* v. *New York Cmty. Bancorp, Inc.*, 733 F. Supp. 3d 107, 118 (E.D.N.Y. 2024) (post-disclosure purchases rendered lead plaintiff applicant atypical because of "a *risk* of unique defenses"); *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6–7 (S.D.N.Y. July 3, 2013) (similar); *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135–36 (S.D.N.Y. 2007) (similar); *see Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 472–73 (2013) (plaintiff who did not trade "between the time the misrepresentation was made and the time the truth was revealed . . . would not be typical").
[11] Khan attempted to salvage this testimony later by reciting Plaintiffs' "all data" theory after reviewing his Declaration (Doc. No. 171-3) during a break in the deposition.  Doc. No. 189-4 at 160:24–163:17.

5, 37:19–20. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015) ("unrelated plaintiffs" must "demonstrate their ability to function as a cohesive and independent unit").

**Albert Aftoora.** Like Khan, Aftoora is atypical because he is subject to individualized reliance defenses. Aftoora testified that he had actual knowledge of the Massie Appendix during the two-day period between the publication of the appendix and the AdCom vote. Doc. No. 189-5 at 284:14–23, 285:16–19. Aftoora fully understood that the appendix reflected a negative view of aducanumab efficacy by an FDA statistician, which he considered the "most important piece" of the data review. *Id.* at 286:1–12, 298:18–299:6. Despite acknowledging that he could have sold his Biogen stock for a large profit during this period, Aftoora nonetheless affirmatively chose to hold his shares because he "really wanted [aducanumab] to work" and "hope[d]" the stock price would rise following the AdCom vote. *Id.* at 288:20–289:19, 294:16–21. Aftoora's decision to hold his shares rather than selling for profit—***despite being aware of the very information that he alleges was concealed from the market***—is powerful evidence that he would have purchased Biogen stock "even with full knowledge of the [alleged] misrepresentation," which "rebuts the presumption of reliance." *Semerenko*, 223 F.3d at 179 n.7. Aftoora also testified that he does not believe in the efficient market hypothesis and bought Biogen stock because he believed that aducanumab's promise was not yet reflected in the stock price, Doc. No. 189-5 at 261:20–262:4, 262:23–263:11, 269:11–270:9, confirming that he traded on "an actual belief that the market price was inaccurate" or "some factor other than the market price," which also rebuts the presumption, *Semerenko*, 223 F.3d at 179 n.7, raising unique defenses that render Aftoora atypical.

Aftoora is also inadequate. Defendants recently learned that he submitted an inaccurate PSLRA Certification purporting to identify personal Biogen transactions but, in fact, identifying trades made in an account belonging to a trust. Doc. No. 189-5 at 212:4–12; Aftoora Trust Account

Statement, Doc. No. 189-8. Aftoora acknowledged this error during his deposition, Doc. No. 189-5 at 215:4–219:25, but has not yet corrected the record or produced documents proving his standing to assert the trust's claims. *See Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 317 (E.D. Va. 2007) ("indifference to the PSLRA's certification requirements" renders plaintiff inadequate).

Aftoora's testimony also demonstrated that he, too, has entirely ceded control of the case to counsel. When confronted with his declaration in support of the Motion and asked, "if your attorneys put something in front of you that makes a factual statement," will you "sign something attesting to the veracity of that statement under penalty of perjury even if you personally do not have firsthand knowledge that it is true?" Aftoora replied simply, "Yes." Doc. No. 189-5 335:7–13. *See Foley*, 2015 WL 1578881, at *6 (plaintiff who "abdicat[es] control over [his] case" to counsel inadequate). He admitted that he was unaware of any mediation or Court hearings. Doc. No. 189-5 at 193:22–194:9, 196:9–11. Aftoora conceded that he had never spoken to the other plaintiffs and they have no plan to resolve conflicts or make decisions collectively. *Id.* at 65:22–66:3, 67:1–68:14. Aftoora also lacked basic knowledge about the case: initially, he testified that July 22 Statement drove a "significant" increase in Biogen's share price, and later conceded that he did not know "how it affected the market," *id.* at 119:16–120:20, 323:19–324:2; he expressed confusion about the First Circuit opinion and the number of remaining alleged misstatements, *id.* at 109:10–19, 190:11–193:11; he did not know that the SAC is the operative complaint, *id.* at 181:2–182:21, 186:16–19; and he mixed up the individual defendants, *id.* at 93:1–12, 97:22–98:3.

Aftoora is inadequate for the independent reason that his maximum stake in this case is only ***$479.21*** under the PSLRA's bounce back rule.[12] Courts routinely reject as inadequate class

---

[12] This cap is calculated based on the "mean trading price" of Biogen stock between November 4, 2020—when evidence shows the allegedly corrective information was "disseminated to the market," *supra* 22–26—and November 13, when Aftoora sold. 15 U.S.C. § 78u-4(e)(1). Even if the alleged corrective information were not "disseminated" until November 5, Aftoora's maximum stake of $1,191.25 would still renders him an inadequate class representative.

representatives plaintiffs who incurred similarly negligible losses. *E.g.*, *McCormack* v. *Dingdong (Cayman) Ltd.*, 2022 WL 17336586, at *5 (S.D.N.Y. Nov. 30, 2022) ($504.40 in losses); *Bosch* v. *Credit Suisse Grp. AG*, 2022 WL 4285377, at *5 (E.D.N.Y. Sept. 12, 2022) ($621 in losses).[13]

### III.    PLAINTIFFS DO NOT PROVE THAT DAMAGES ARE CAPABLE OF CLASSWIDE MEASUREMENT.

Plaintiffs fail to satisfy the predominance requirement of Rule 23(b) because they fail to prove that damages are "capable of measurement on a classwide basis" by identifying a methodology that measures only "damages attributable to [plaintiffs'] theory" and excludes "damages that are not the result of the wrong." *Comcast*, 569 U.S. at 34, 35, 37. *Comcast* requires "rigorous" analysis; indeed, the Sixth Circuit recently vacated a certification order for lack of rigor alone. *In re FirstEnergy Corp. Sec. Litig.*, 2025 WL 2331754, at *22 (6th Cir. Aug. 13, 2025).

Dr. Tabak offers only five paragraphs opining that classwide damages calculations "will be feasible," which he admits he largely cut-and-pasted from his prior reports in other cases with different facts. Doc. No. 171-1 at ¶¶ 58-62; Doc. No. 189-2 at 27:22–28:4, 357:7–361:24.[14] Dr. Tabak's utter failure to tie his damages model to the ***facts of this case*** is particularly notable because, as he admitted, he has never encountered a case with the unusual facts present here: the alleged corrective disclosure was released simultaneously with non-fraud-related information; the issuer's stock price ***rose*** after the alleged corrective disclosure; the market supposedly began to react the following day; and Plaintiffs seek to recover substantial losses days later after a major

---

[13] The Court previously held that Aftoora's nominal damages did not disqualify him from joining the case as a "named plaintiff" ***because*** he was not seeking appointment as a "lead plaintiff." Doc. No. 163 at 20–21. But the Rule 23 standard for appointing a class representative is more demanding than lead plaintiff appointment, *supra* 29.

[14] *Compare* Doc. No. 171-1 ¶¶ 58–62, *with Enovix* Report, Doc. No. 189-9 at ¶¶ 64–69; *Virgin Galactic* Report, Doc. No. 189-10 at ¶¶ 65–70; *Pampena* Report, Doc. No. 189-11 at ¶¶ 71–75; *Alibaba* Report, Doc. No. 189-12 at ¶¶ 57–62; *Kraft Heinz* Report, Doc. No. 189-13 at ¶¶ 73–78; *Oracle* Report, Doc. No. 189-14 at ¶¶ 57–62; *General Electric* Report, Doc. No. 189-15 at ¶¶ 55–60; *Teva* Report, Doc. No. 189-16 at ¶¶ 74–79; *Celgene* Report, Doc. No. 189-17 at ¶¶ 60–65; *PPG* Report, Doc. No. 189-18 at ¶¶ 67–72; *Vale* Report, Doc. No. 189-19 at ¶¶ 59–64.

intervening event.  *Id.* at 364:12–365:13.  Dr. Tabak offers no explanation for how he will disentangle alleged fraud-related losses from other confounding information in these unique circumstances, and Dr. Hubbard opines that isolating only alleged fraud-related damages cannot be done here "using any reliable or scientifically credible methodology."  Doc. No. 189-1 at ¶ 20.

*In re FibroGen Securities Litigation* is on point.  FibroGen's stock declined following ***both*** an adverse disclosure about clinical trial information, and again following a subsequent negative AdCom vote.  2024 WL 1064665, at *2–3.  Plaintiffs' expert offered no ***specifics*** on how he would "separate the portion of" stock price decline "attributable to any corrective disclosures from the portion . . . attributable to the AdCom's [negative] decision."  *Id.* at *16.  This failure was fatal under *Comcast*.  *Id.*  So too, here, where Dr. Tabak admitted he has not even "thought about how to apply" a methodology to disaggregate any confounding information in the Massie Appendix or the negative AdCom vote.  Doc. No. 189-2 at 354:4–24; *id.* at 91:07–92:16, 238:22–244:06.

*In re Vaxart, Inc. Securities Litigation* is also illustrative.  There, plaintiffs failed to explain "how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated" over time, precluding certification under *Comcast*.  738 F. Supp. 3d 1259, 1267 (N.D. Cal. 2024).  So too, here, Dr. Tabak fails to address the "waning effect of the fraud on [Biogen's] stock price" after the alleged corrective disclosure as putative class members were still purchasing Biogen stock.  Plaintiffs themselves exemplify this issue: the purported inflation in Biogen stock was greater when Aftoora purchased shares on August 27 than when Khan purchased shares on November 5, but Dr. Tabak offers no explanation for how he will account for this dissipation.  This also precludes certification under *Comcast*.

## CONCLUSION

Plaintiffs' Motion should be denied.  Defendants respectfully request an oral argument to address these matters further and address any questions the Court may have.

35

Dated:   September 10, 2025

Respectfully submitted,

 */s/ Audra J. Soloway*

Audra J. Soloway (*pro hac vice*)
Richard C. Tarlowe (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
rtarlowe@paulweiss.com
dsinnreich@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc.,*
*Michel Vounatsos, and Alfred W. Sandrock, Jr.*

36

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of September, 2025, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Audra J. Soloway*
Audra J. Soloway