# EXHIBIT 2

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

*****************************************************

NADIA SHASH and AMJAD KHAN,  )

individually and on behalf of)

all others similarly         )

situated,                    )

          Plaintiffs,        )

                             )

-vs-                         ) Case No.

BIOGEN INC., MICHEL          ) 1:21-cv-10479-IT

VOUNATSOS, ALFRED W.         )

SANDROCK, JR., and           )

SAMANTHA BUDD-HAEBERLEIN,     )

          Defendants.        )

*****************************************************

**********CONFIDENTIAL**********

VIDEOTAPED DEPOSITION OF NADIA SHASH

10:01 AM to 3:17 PM

August 20, 2025

**********CONFIDENTIAL**********


REPORTED BY:  Lisa Reinicke, Court Reporter (Zoom)

Jason Aqui, Videographer

CONFIDENTIAL

**Page 2**

**APPEARANCES OF COUNSEL:**

**For the Plaintiffs:**

        **Phillip Kim, Esquire**

        **Christie Buzzetti, Esquire**

        **THE ROSEN LAW FIRM, P.A.**

        **275 Madison Avenue, 40th Floor**

        **New York, New York  10016**

        **(215) 600-2817**

        **Pkim@rosenlegal.com**

        **cbuzzetti@rosenlegal.com**

**For the Defendants:**

        **Richard Tarlowe, Esquire**

        **Samuel Patterson, Esquire**

        **PAUL WEISS RIFKIND WHARTON & GARRISON, LLP**

        **1285 Avenue of the Americas**

        **New York, New York  10019**

        **(215) 600-2817**

        **Rtarlowe@paulweiss.com**

        **spatterson@paulweiss.com**

CONFIDENTIAL

Page 58

Q.    Do they represent you in any other matters?

A.    No.

Q.    How did you find the Rosen law firm?

A.    After the loss I think there was an announcement, so I reached out to them.

Q.    What kind of announcement?

A.    Related to, you know, potential litigation.

Q.    Why did you select the Rosen firm to be your counsel in this case?

A.    We had -- after reaching out to them, we had a couple of calls, Phil and I had a couple of calls.  I felt comfortable.  You know, and so I moved forward.

Q.    Do you recall when you first spoke with an attorney about your Biogen trading?

A.    I spoke to Phil.

Q.    Do you recall when?

A.    No.

Q.    Do you recall how close in time it was to when you had traded Biogen stock?

A.    I would say it was probably recent.  I mean, right after it took place.

Q.    Are you represented by any other lawyers in this case?

A.    Yes.

Q.    Other than --

CONFIDENTIAL

Page 59

A.    I mean --

Q.    Sorry, let me be clear.

Other than the Rosen law firm, are there any other lawyers representing you in this case?

A.    Retainer agreement with Molo for the appellate work.

Q.    Whose decision was it to bring MoloLamken in?

A.    It was their decision.

Q.    Who is their?

A.    Phil and Rose.

Q.    Do you know what, if any, role MoloLamken is playing today?

A.    I'm not aware of it.  But I'm aware that they played a role with appellate work.

Q.    Do you have a retainer agreement with MoloLamken?

A.    Yes.

Q.    And is that retainer agreement between you personally and MoloLamken or PolyCon Solutions and MoloLamken?

A.    Myself.

Q.    And what about the same question with respect to the agreement with the Rosen law firm?

A.    Myself.

Q.    Other than the Rosen law firm or MoloLamken,

CONFIDENTIAL

Page 67

different way.

At some point you agreed to serve as a lead plaintiff?

A.   Yes.

Q.   About how long did you speak with counsel before you agreed to serve as a lead plaintiff?

A.   I think there were multiple phone calls.  I don't recall the number of phone calls though.

Q.   Do you remember when you were appointed lead plaintiff?

A.   Maybe early February of 2021.

Q.   And are you familiar with the process that resulted in you being appointed lead plaintiff?

A.   I -- I don't know the exact process.  But I know there was motions filed.

Q.   Do you know whether there was any opposition to your being a lead plaintiff?

A.   I don't recall.

Q.   Are you aware that a first amended complaint was filed at some point?

A.   Yeah, I believe that was in 2021.

Q.   Do you know why the complaint was amended at that time?

A.   The first -- that was to include me as lead plaintiff.

CONFIDENTIAL

Page 68

Q.   Any other changes?

A.   I don't recall.

Q.   Did you read that first amended complaint before it was filed?

A.   I believe so.

Q.   Did you have any edits to it?

A.   No.

Q.   Did you have any questions about it?

A.   I mean, I trust them, so this is their day-to-day duties.

Q.   And when you say "their" you're referring to the Rosen law firm?

A.   Yeah.

Q.   And you're aware that a second amended complaint was filed?

A.   Yes.

Q.   Do you remember when that was filed?

A.   I don't recall when it was filed.

Q.   Why was there a second amended complaint?

A.   I believe they had additional information that wasn't part of the first amendment.

Q.   What information?

A.   I'm not particularly sure.  But I would lean on them for that advice.

Q.   Did you read the second -- second amended

CONFIDENTIAL

Page 69

complaint before it was filed?

A.    I don't recall, but I probably did.

Q.    Did you have any edits to it?

A.    No, I didn't make any edits.

Q.    Did you have any questions about it?

A.    I'm sure I did at that point in terms of process-wise, but I don't recall what those questions were.

Q.    Okay.  Process, not substance?

A.    I'm leaning on them for the substance portion of it because this is not my field.

Q.    How long do you think you spent reading the second amended complaint?

A.    I don't -- I don't recall.

Q.    And have you read a third amended complaint?

A.    I believe there wasn't much change outside of adding Mr. -- our favorite plaintiff.

Q.    Mr. Aftoora?

A.    Mr. -- yeah, Albert.

Q.    Okay.  Are you aware of any decisions that the district court has made in this case?

A.    Yes.

Q.    What decisions are you aware?

A.    I know it was dismissed.  And then it went up to appellate court.  And then some parts were reversed.

CONFIDENTIAL

Page 70

So the case is still alive.

Q.   What was dismissed in the -- by the district court?

A.   The case itself, I believe.  I'm not -- I'm not particularly sure.

Q.   Do you know on what grounds?

A.   I'm sorry, I don't recall.

Q.   Were you involved in the decision to appeal that position?

A.   I -- we had a call.

Q.   How long was that call?

A.   I don't recall.

Q.   Any other decisions by the district court that you're aware of?

A.   No.

Q.   What's your understanding of what the First Circuit Court of Appeals decided?

A.   I don't recall specific.  But the case is alive, so they reversed some aspect of the decision.

Q.   Do you know what aspect of the decision they reversed?

A.   Again, the case is alive, so I'm assuming it's regarding the misrepresentation of statements made by the CEO and chief medical exam -- officer.

Q.   Okay.  Any other specificity that you can

CONFIDENTIAL

Page 72

Q.    What is that understanding?

A.    That as part of an active litigation I need to make sure that I'm preserving any documents that are produced by me or that were part of this litigation.

Q.    Did you take any steps -- have you taken any steps to preserve potentially relevant documents?

A.    Sure.

Q.    What steps?

A.    I mean, I didn't delete anything.

Q.    Okay.  In 2020, what email addresses were you using?

A.    I was using Redacted .  I was using nadia.shash@polyconsolutions.com.

Q.    Have you produced any documents to the defendants in this case?

A.    I was provided such terms to look for.  And then I provided what I was able to find.

Q.    And do you recall what those search terms were?

A.    It was a list of search terms.  And I went through the list and then provided what I was able to find.

Q.    Do you remember any of the terms on the list?

A.    I mean, Biogen, B-I -- I mean, I don't remember honestly.

MR. KIM:  We'll represent to you they were the

Page 73

terms that you had provided to us, I guess to Mr. Horn. And, in turn, those were the terms that were searched.

THE WITNESS: Yeah.

BY MR. TARLOWE:

Q. And how did you go about searching?

A. I actually ended up searching both my PolyCon email, you know, search terms, all -- all, you know, any words related to that. I searched under my gmail account. And I also searched my phone as well.

Q. How did you search your phone?

A. You do a search.

Q. How?

A. My text messages. So on top it says -- I have an iPhone. So you put a search term and it pops up with whatever is on my phone.

Q. And other than communications with lawyers, did you identify any other documents?

A. No. I mean, I'm sorry, my statements.

Q. Where did you locate your statements?

A. In my PolyCon email.

Q. And you provided those statements to your counsel?

A. Yes.

Q. Okay. When did you do that? When did you

CONFIDENTIAL

Page 74

provide those statements to counsel?

A.    I know I initially provided them when we started the case.  And then I provided them again when I was asked to do -- conduct the search terms.

Q.    Did you do any search of hard copy documents?

A.    I don't have any hard -- hard copy documents.

Q.    Okay.  And the PolyCon email account, do you know whether emails are automatically preserved in that account or can they be deleted?

A.    I mean, it keeps pretty much all my junk. Junks are, I generally remove -- you know, delete those. But anything else is kept.  And then considering this was a litigation, I have a little folder.  Anything related to this effort I put in that little folder.

Q.    Okay.  Did you create that folder after the litigation was filed or before?

A.    After the -- once we realized there was going to be a litigation.

Q.    Do you -- did you maintain -- prior to the litigation did you maintain any file related to Biogen?

A.    No.

Q.    Do you typically have any files related to your stock investments?

A.    No.

Q.    Do you keep your account statements in hard

CONFIDENTIAL

Page 77

for growth in the future that I may have researched that triggered me when I'm reading an article or something like that.

Q.   Okay.  And we'll go through some of the specifics stocks because it may differ.  But in general did you do research, any type of research before you made a decision to buy stock in the 2020 time period?

A.   I can speak to just general.  I don't know if I could speak to 2020, but in general.  I would just read articles that are available, any sort of filings that were done through SEC.  I just kind of would -- you know, when I get time in the evenings I would just kind of monitor the stock to see kind of where the trends were.  Just kind of where, you know -- that would be the -- my general process.

Q.   And you mentioned reading articles.  What kind of articles?

A.   If I'm following a specific stock then there will be articles that mentioned a ticker.  So that would pop up in my feed.  I would read those.  Or if I am particularly interested in a specific topic I would search, you know, on my phone on the Yahoo website for articles that are available.

Q.   What did you mean when you said it would pop up in your feed?

CONFIDENTIAL

Page 78

A.    On my -- I have an iPhone.  And it has an app. So I follow certain stocks.  And then when you click on that specific ticker it will have articles under that.

Q.    You also mentioned SEC filings.

A.    Yes.

Q.    What SEC filings did you review?

A.    Any large stakeholders in the -- in the company, large sales that are taking place.  Things along that line.

Q.    What do you mean by large stakeholders?

A.    If any of the owners of a specific company own the specific stock, they would have to report it.  So I would find out who -- who may be owning it or who may be selling it.  Buying or selling.  I mean, those kind of filings.

Q.    Do you know the type of filings?  Do you know what they're called?

A.    I don't know.

Q.    Okay.  But it sounds like you were focused on filings about ownership or stock transactions by company insiders; is that --

A.    I would say that.  And then any sort of notices that may go out, I would -- you know, if there's any calls that I'm available for reportings.  I would join if there's something along that line for stakeholders.

CONFIDENTIAL

Page 79

So -- but it just depends on my -- my timeline and availability or whatnot.  So that's just general.

Q.   And I think you said you also monitor stocks for trends.

A.   Yeah.

Q.   What do you mean by that?

A.   I just kind of, you know, start watching a stock to see kind of where the market is going based off of, you know, the current market.

Q.   What kind of trends do you look for?

A.   I wouldn't say I'm looking for any sort of trends.  I'm saying like I would see where the market is going.  Right.  So if there's any political events or anything that's happening in the world that may impact it.  I just see kind of what -- what others are doing.

Q.   And when you invest do you have a short-term outlook, a long-term outlook?

A.   I think it just depends on the -- the specific stock.  But if I see that this is something that could be in the greater good, then I'm long.  And I wouldn't say, you know, short term, I wouldn't say I'm short term, so --

Q.   Okay.  What about in the 2020 time period, would you say you were a short-term investor in that time period?

CONFIDENTIAL

Page 89

A.    I put in the number of shares that I want to purchase.

Q.    Okay.  And when you put in a sell order, what type of order was that?

A.    I mean --

MR. KIM:  Objection to form.

A.    -- it depends if it's -- I don't know if I would put a limit because that's not how I operate.  But I probably -- something triggered me and just sold.

BY MR. TARLOWE:

Q.    Okay.  Got it.

And then -- you can put that aside for a moment.  We'll come back to that.

We're going to mark this as Exhibit 2.  And while we're getting that, the October 9th, 2020 transactions we just looked at.

(Exhibit 2, Statement, marked for identification.)

A.    Uh-huh.

Q.    Did you rely on an investment advisor?

A.    No.

Q.    Do you recall talking to anybody about Biogen before making the purchase on October 9th?

A.    No, I had not.

Q.    Do you recall doing any research of Biogen

CONFIDENTIAL

Page 90

before making that purchase on October 9th?

A.   Redacted

Redacted                                        So I -- I think

that's how I kind of ran into the stock.  And I just

kind of researched to see, they were doing some studies

or trials.  So I knew about that.

Q.   Okay.  When do you -- do you remember when you

became aware of Biogen, the company Biogen?

A.   Again, 20 -- 2020.

Q.   And do you remember how you first learned of

Biogen?

A.   Redacted                            So I just -- it was

something that triggered me to kind of look to see if

there's any stocks that addressed this issue.  And then

I realized that -- that Biogen was -- had some drugs

that they were testing.  And that was kind of how I was

aware of it.

Q.   Did you find any other companies that were

doing anything in the Alzheimer's field?

A.    I don't recall.  I think this was the one that

captured my attention.

Q.   Okay.  So what's in front of you now, do you

recognize that document?

A.   Yeah, it's my statement.

Q.   Okay.  And this is a statement, just to be

CONFIDENTIAL

Page 92

Q.   Why did you purchase Biogen on November 4th?

A.   I don't recall exactly why.  But I purchased it.

Q.   Okay.  Do you have any recollection of what led you to purchase 20,000 shares of Biogen on November 4th?

A.   I don't recall.

Q.   Were you aware that there was -- were you aware of any announcement that was made that day?

A.   I don't recall.  Maybe.  If there was a fee then I probably was aware that there was an announcement that was going to be made.

Q.   Do you remember what type of announcement?

A.   I know around that time there was FDA approval that they were seeking.  I -- I don't remember the exact date.  That's why I'm saying I don't recall.  But I know that the -- that the trials and then there was going to be some sort of ruling on the FDA.

Q.   And how, if at all, did that factor into your decision to purchase Biogen?

A.   A lot.

Q.   Explain.

A.   Well, considering the fact that there were a lot of positive news about the trial, the assumption was that it was going to be approved by the FDA.  So this was something that, you know, I thought was a good

CONFIDENTIAL

Page 93

impact to society and that could help a lot of folks. So this was something that I was interested in for long term.

Q.    What, if any, research did you do into Biogen before making that purchase on November 4th?

A.    Like I said, I researched, read articles.  Once I started kind of adding that to my watch list I read articles and realized there was again a trial that was taking place.  And then there was, you know, consistent result if the dosage was -- was high.  So it seemed pretty positive.  So those were the articles that I was reading and the, you know, reason why I -- I decided to clearly go in.

Q.    Do you remember any of the articles that you read?

A.    I don't recall.

Q.    Did you look at any SEC filings before purchasing Biogen stock on November 4th?

A.    I don't recall that.

Q.    Okay.  And what you just described in terms of consistent results, do you have a recollection sitting here today of knowing that on November 4th, 2020?

A.    I purchased it obviously assuming that the results were positive.  And so if they're going to go in to the FDA for approval, my assumption was that it was

CONFIDENTIAL

Page 102

Q.    Approximately how much money is in those bank accounts today?

A.    I have not looked at it in about a week-and-a-half, but I would say it was Redacted Redacted.    I'm not sure.

Q.    Let's take a look at -- well, let me ask you, what do you understand the allegations in this case to be?

A.    The allegations are that there was misleading information that was put out to the public which has impacted the -- the results of the -- which decreased the value of the stock at that time.

Q.    What misleading information do you allege was put out for the public?

A.    In terms of the actual testing and if consistently -- the results were consistent, if high dosage of the drug was used, which the FDA at a later time stated that it was inconsistent.

Q.    Okay.  So as best you can, what specifically do you allege the company said that was misleading?

MR. KIM:  Objection, asked and answered.

A.    They said that the results were consistent.  I don't remember the -- the head medical individual said that it was consistent, which was not true.

BY MR. TARLOWE:

CONFIDENTIAL

Page 103

Q.   Results were consistent in what way?

A.   Results were if high dosages of the drugs were taken then it was positive that -- if the results were consistent it was a positive result.

Q.   And why do you believe that to be false or misleading?

A.   Well, FDA said it wasn't.  And then Biogen didn't necessarily have the response for that.

Q.   What's your basis for saying that the FDA said it wasn't?

A.   There was, I believe, documentation that was put out.  And then the market reacted to those statements from the FDA.

Q.   What documentation was put out?

A.   I don't recall what document was put out.  But I -- obviously the market reacted and my stocks were sold.

Q.   In what -- what about the information that was put out by the FDA demonstrated that the company's prior statements were false or misleading?

MR. KIM:  Objection to form.

A.   The market reacted.  So at a certain point I -- you know, I didn't have a choice in what the market -- you know, what took place.  So the market reacted to the statements that were made by the FDA that it was

Page 112

A.    That's what the statement says.

Q.    What was the source of that Redacted ?

A.    Income from PolyCon.

Q.    Do you recall what the source of that income was?

MR. KIM:  Objection to form, asked and answered.

A.    I mean, income from PolyCon from business.

BY MR. TARLOWE:

Q.    Do you recall where PolyCon got that Redacted from?

A.    From our day-to-day activities.

Q.    Okay.  And do you remember was there like a lump sum that came in or was Redacted in accumulation?

A.    I don't recall.

Q.    If you could turn to the next page.

A.    Uh-huh.

Q.    And this shows the account positions, sort of in the middle of that page, it shows that as of the end of October you held just one stock, Twilio.  Do you see that?

A.    Yeah.

Q.    Okay.  And so although there had been, you know, about Redacted worth of purchases year-to-date, as of October 30 you only held one stock, correct?

CONFIDENTIAL

Page 158

I'm counting on them to be able to -- to be able to address that issue.

Q.   Do you know one way or the other whether the Court is aware today that the trading took place in an account belonging to PolyCon Solutions?

A.   I'm not aware.  I can't say -- I can't say that, what they're aware of or what they're not aware of.

Q.   And if your lawyers were arguing to the Court that one of the reasons you should be lead plaintiff is that other applicants had mistakes in their trading information, do you think it's important for the Court to know that your trading information also contained mistakes?

MR. KIM:  Objection to form.

A.   I'm not -- I'm not acting as an attorney, so I'm counting on them and then the Courts to decide.

BY MR. TARLOWE:

Q.   Okay.  So you don't have a view one way or the other as to whether that's important?

A.   I mean, I'm -- I'm counting on legal counsel to be able to argue that case and then go in front of the Court to be able to come to a decision.

Q.   Okay.  And so you have no independent judgment yourself as to whether it's important for the Court to

CONFIDENTIAL

Page 159

know that information submitted about your trading activity was incorrect?

A.    There's an amendment that's being placed, so that's why it's important.  And then in terms of the impact of that is up to the Judge to be able to decide one way or the other.  That's not my -- my call.

Q.    Okay.  Do you have any concern that the Judge made this decision over four years ago and wasn't told this information?

MR. KIM:  Objection to form.

A.    I -- you know, I can't say what the Judge is thinking or will do or what that looks like.

BY MR. TARLOWE:

Q.    Does it give you any pause about the ability of your lawyers to effectively represent you in this matter?

A.    No.  I mean, things happen, mistakes happen.  So they will rectify it to their best ability and then we can go from there.

Q.    Do you think that when a mistake is discovered in something that's being submitted to the Court it's important to rectify it promptly?

A.    I don't know the specific timelines of requirement.  So I'm leaving it up to counsel to be able to make sure that it's rectified.

CONFIDENTIAL

Page 160

Q.    But you're a lawyer.

A.    Yeah, but I'm not acting as an attorney in this case.

Q.    So aside from this case, just as a general proposition, do you think it's important upon discovering that inaccurate information has been supplied to a Court to correct that promptly?

A.    I don't know all the elements required, so I don't know the expectations of the Courts and what timeline or whatnot.  So I'm counting on counsel to be able to effectively represent me and provide that information to the Court.

Q.    Okay.  And the fact that this information hasn't been corrected in over four years, does that give you any concern at all about the ability of your lawyers to vigorously prosecute this case?

A.    I -- I -- based off of my interaction with them, I don't think so.

Q.    Okay.  And have you been overseeing counsel?

A.    I mean, like I said, we have meetings, calls numerous times.  They sent me memos to be able to review.  I review them.  If I have any questions, we -- we talk about it, so --

Q.    Other than the deposition and preparing for the deposition, how much time do you think you've spent on

CONFIDENTIAL

Page 161

this case?

A.    We've had several meetings throughout like -- I mean, it's been several years.  So we have several meetings when there's different milestones.  Phil would reach out to me and, you know, we'll communicate related to that.

Q.    So over the last four-plus years?

A.    Several.  So I can't say.

Q.    How many -- how much time overall do you think you've spent on this matter?

A.    Honestly, I can't say.  I know when there's been motions that are being filed or there's different milestones we would reach out.  Even, I think, probably contacted him to say, hey, what's the status on where things are?  He'll brief me on it.  And that's kind of where we --

Q.    Is Mr. Kim your principal point of contact at the Rosen law firm?

A.    Correct.

Q.    Is there anyone else at the Rosen law firm who you've been in contact with?

A.    I mean, more recently with Christie.

Q.    How many times -- prior to the other day when you prepared for your testimony, how many times have you met with Mr. Kim in person?

CONFIDENTIAL

Page 162

A.   We've done Zoom or Teams meetings.

Q.   So zero?

A.   In person, yes.

Q.   Have you met in person with anyone else from the Rosen law firm?

A.   No.

Q.   Okay.  Would you say that you've been overseeing their work on this case?

A.   I feel like it.

Q.   How so?

A.   I've been -- whenever memos are provided I would review it, I would ask for status, I would ask questions doing mediation or mitigation or whenever you guys met.  I was part of that.  So I've been actively involved in kind of the progress of the case.

Q.   How were you part of the mediation?

A.   I was --

THE WITNESS:  Should I --

MR. KIM:  Well, I mean, you don't -- don't disclose the stuff we talked about prior to the mediation.

THE WITNESS:  Yeah.

MR. KIM:  I think you can just describe it in a very general way without disclosing the substance of what we talked about.

CONFIDENTIAL

Page 163

A.    They told me the dates the team was meeting.  I was available during that time.  They called me in when they needed me.  And we talked through where things were and then I made decisions at that time.

BY MR. TARLOWE:

Q.    So is it your testimony that you were called by your counsel during the mediation?

A.    Was it mediation?  Or I don't know when you guys were -- you know, to settle the case.  I don't know the exact terms or what that was.  But I do recall meeting and making some decisions based off of the facts that were available.

Q.    Okay.  Do you -- do you know whether there was a mediation or not?

A.    I know there was an interaction between, you know, two counsels and -- and there were decisions that needed to be made.  I made myself available during that time, made some calls related to that based off of the facts that were available.  And so I don't know if it was mediation or -- I don't -- I don't know exactly what point it was, but I recall that.

Q.    What do you mean you made some calls?

A.    Decisions based off of how to move forward.

Q.    Okay.  And so your testimony is that your lawyers called you during the mediation?

CONFIDENTIAL

Page 173

before?

A.   I skimmed through this.

Q.   Okay.  You skimmed through it before it was filed?

A.   Yes.

Q.   Okay.  And then I think you said that this was one of the documents you also reviewed recently in preparation for the deposition?

A.   I reviewed it.  I mean, I skimmed through it. I don't -- I didn't read it page by page.

Q.   It is long.

A.   Yes.

THE WITNESS:  Good job.

MR. KIM:  Thank you.

THE WITNESS:  You read it page by page?

BY MR. TARLOWE:

Q.   I want to direct your attention to -- I want to direct your attention to page 61.  Well, on the top it says 61 of 124.

A.   Wait.

MR. KIM:  On the statement.

A.   Oh, okay.

BY MR. TARLOWE:

Q.   Go to 59 of 124.

A.   From the stamp?