# EXHIBIT 1

**Page 1**

FOR THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:21-cv-10479-IT

- - - - - - - - - - - - - - - - - - - - - x

NADIA SHASH and AMJAD KHAN
Individually and On Behalf of All
Others Similarly Situated,

                    Plaintiffs,

        - against -

BIOGEN INC., MICHEL VOUNATSOS,
ALFRED W. SANDROCK, JR., and
SAMANTHA BUDD-HAEBERLEIN,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - x

                    October 17, 2025
                    9:12 a.m.

        VIDEO RECORDED DEPOSITION of GLENN HUBBARD, Ph.D., an Expert Witness for the Defendants herein, taken by the Plaintiffs, held at the offices of The Rosen Law Firm, 275 Madison Avenue, New York, New York, before Sara K. Killian, a Registered Professional Reporter, Realtime Certified Reporter and Notary Public.

Page 2

A P P E A R A N C E S :

THE ROSEN LAW FIRM

Attorneys for Plaintiffs

275 Madison Avenue, 40th Floor

New York, New York  10016

BY: LAURENCE M. ROSEN, ESQ.

    BRIAN ALEXANDER, ESQ.

PAUL WEISS RIFKIND WHARTON & GARRISON, LLP

Attorneys for Defendants

1285 Avenue of the Americas

New York, New York  10019

BY: AUDRA SOLOWAY, ESQ.

    CHARLES THAU, ESQ.

Page 3

R. GLENN HUBBARD, P H. D., after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. ROSEN:

Q.    Would you like me to call you Dr. Hubbard?  Professor Hubbard?  Dean Hubbard?

A.    Anything you want.  They're all accurate.  Dean should be Dean Emeritus, but that's too long.  So anything.  Glenn works. Anything.

Q.    All right.  Dr. Hubbard.

How much time do you estimate you spent on this project through the submission of your expert report?

A.    Through the submission, probably around 80 hours, something like that.

Q.    In paragraph nine of your report --

MS. SOLOWAY:  Do you want to mark it?

Page 4

G. Hubbard, Ph.D.

MR. ROSEN:  Sure.

We'll mark it as Exhibit 1, Dr. Hubbard's expert report that he submitted in the case.

(Whereupon, Exhibit 1 was marked for identification.)

BY MR. ROSEN:

Q.    Paragraph nine, you mention an entity called Analysis Group Inc. that has provided research support under your direction or supervision.

How many people at Analysis Group worked on the matter?

A.    I don't know the exact answer. I worked with three people approximately. But there may well -- I'm sure there are -- others working with them.

Q.    Who are the three people you worked with?

A.    Lisa Pinheiro, P-I-N-H-E-I-R-O, Peter Chen, C-H-E-N, and Alden, A-L-D-E-N, Cowap, C-O-W-A-P.

Q.    What did Lisa do?

A.    All three of them jointly

Page 5

G. Hubbard, Ph.D.

worked in assembling the data and helping me with the analysis in the report. There were others on staff who helped in some of the very labor-intensive things of reading the analyst reports for particular statements.

Q.    Was the market for Biogen stock efficient during the class period alleged in the complaint?

A.    I am taking that as given for this purpose. The analysis there that Dr. Tabak did was of the relevant factors. I would accept that the market is efficient.

Q.    Did you or anyone at Analysis Group do any market efficiency tests?

A.    We replicated the tests that Dr. Tabak did, which are the standard tests for direct and indirect tests for market efficiency.

Q.    But no other different analyses than the ones Dr. Tabak did?

MS. SOLOWAY:  Objection.

A.    We did a number of sensitivity analyses about control periods and other things like that, but the results are

Page 6

G. Hubbard, Ph.D.

robust.

Q.    So if we go to paragraph five of your report --

A.    Okay.

Q.    There's a sentence that says -- it begins:  As I elaborate in Section 3 of this report, I understand that plaintiffs allege that the July 22nd statement was later corrected by certain subgroup patterns, henceforth allegedly corrected subgroup pattern.

What is a subgroup pattern?

A.    Well, in this case, subgroups refer to differences in carrier status, differences in doses.  There are a number of -- it's actually more than a matrix. Dr. Massie has a number of differences that he looks to for subgroups.

Q.    Okay.

Why do you use the term pattern?  Are these -- I mean, what makes these patterns?

A.    Oh, in other words, are there different results across subgroups that

Page 7

G. Hubbard, Ph.D.

market participants might have wanted to know?  I take that as part of your argument. You say as much in your complaint.

Q.    All right.

When you say patterns, you're referring to the statistical analyses that they did?

A.    Yes.  Yes, sir.

Q.    Okay.

Now, you refer to something called the July 22nd statement.

What understanding do you have of how it came to be that only the July 22nd statement remains in the case?

A.    I'm not a lawyer.  Just my reading from the court is that that's all that is there.  If you're alleging something else, you'll educate me but that's my reading and confirmation from counsel.

Q.    Are you aware of the basis that the First Circuit stated for not reinstating the other alleged misrepresentations in this action?

MS. SOLOWAY:  Objection.

G. Hubbard, Ph.D.

Calls for legal conclusion.

MR. ROSEN:  I asked him if he's aware.

A.      I don't recall.  I don't recall.  I did read it, but I don't recall. Not being a lawyer, I didn't spend a lot of time evaluating, since it's not for me to do.

Q.      Now, would it matter for the analyses in your report if the First Circuit had assumed that the other alleged misrepresentations which were not reinstated were not actually misleading versus if the First Circuit had assumed without deciding that those statements were misleading but said that they were not actual because of a lack of what is called slander?

MS. SOLOWAY:  Objection.

A.      Very big question.  Don't understand what it means, because it seems to be phrased legally.

If you're asking did I consider things other than what I was asked to do, I did not.  But I can't tell from your legally

Page 9

G. Hubbard, Ph.D.

worded question if that's the answer you're looking for.

Q.    Are you aware of the terminology that the First Circuit used to refer to the remaining alleged misrepresentation in this action?

A.    I don't recall.  Sorry.

Q.    It was -- the First Circuit called it the all data statement.

A.    They use all data, but it's not the answer to the question you just asked, but yes, they did use the term all data statement.  You asked about other statements.

Q.    I didn't mean to if I did.

A.    Okay.  Well, if I'm wrong, I'm sorry, but I believe you did.

Q.    Okay.

What is your understanding of what in the July -- what you refer to as the July 22nd statement is a potentially actionable misstatement?

A.    My understanding is the reference you just made about the reference

Page 10

G. Hubbard, Ph.D.

at the end to all data.  I'm just trying to find the statement.

If you look at page nine of my report where I repeat in paragraph 19 Dr. Sandrock's statement, I bold and italicize the last piece that I think you're referring to, which is "... and I think our data are all consistent with that."

Q.      And that is the only aspect of Dr. Sandrock's July 22nd statement that is allegedly false?

A.      That is my understanding, yes.

Q.      All right.

I'm going to give you a hypothetical.

Suppose that Biogen was aware of data that showed that patients receiving low doses of aducanumab did not show substantial progress and that patients receiving high doses of aducanumab did show substantial progress, but that a significant numbers of patients in both the low dose and high dose groups suffered severe health problems, that would almost certainly make

Page 11

G. Hubbard, Ph.D.

aducanumab unapprovable.

Do you understand that hypothesis so far?

A.      I do, yes.

Q.      Now, would the data in this hypothetical be inconsistent with what you have called the dosage thesis?

A.      You're asking a different question.

For what it's worth, I don't read all data the same as you.  If you want to take all data more elastically to correspond to your hypothetical, it doesn't help you with any of the statistical analyses I did, if that's where you're heading.

Q.      No.  No.  You're on a whole other plane than I am.  I'm on a very simple --

A.      You haven't taken off -- your hypothetical is --

Q.      I'm a simple thinking person.

So what I'm trying to get at is what it means to be consistent or

Page 12

G. Hubbard, Ph.D.

inconsistent.  The word inconsistent, right?

So in this hypothetical -- let's first start with the dosage thesis.  I think you used the term "dosage thesis."

A.      Yes, sir.

Q.      Is it fair to say -- and you can put it in your own words, if you'd like -- that the dosage thesis is this idea that Biogen had put forward publically that the reason the study -- the 301 ENGAGE study failed was because not enough patients received a sufficient amount of the high dose but in study 302, EMERGE, the study was successful because they did get a sufficient amount of the high dose and if you get a sufficient amount of high dose, the drug works.

Is that a fair attempt at the dosage thesis?

A.      That is roughly my understanding.  I'm not a doctor, but that's my understanding.

Q.      Just so we're on the same page, if you have a situation where from an

Page 13

G. Hubbard, Ph.D.

efficacy level the low dose is not working, but the high dose is working, but then you have a significant number of patients, call it a subgroup -- it doesn't matter, whatever -- a group of patients that are dying from this thing, would the data in that hypothetical where you have the drugs working but people are dying, would that be inconsistent with the dosage thesis?

A.    Well, you've introduced facts that aren't -- we're all dying.  So the question is whether aducanumab resolves Alzheimer's, which is a different proposition.

Are you asking me about something that relates to this case or is that a different --

Q.    It's a hypothetical.

If there was a subgroup -- let's say the data shows that low dose is not working, but high dose is working. Right?

But you have a significant subgroup where patients are having severe

Page 14

G. Hubbard, Ph.D.

problems.  Right?  So it becomes a safety issue.  Right?  There's a large subgroup with a safety issue.

Would the existence of this safety issue -- data showing a severe safety issue, would that be inconsistent with the dosage thesis?

A.      Well, probably because I'm not a doctor it's hard for me to answer that.  I think what you're referring to is brain bleeds that might accompany differences in medication.  Again, I'm not a doctor, so I don't know one way or the other.

Q.      Okay.  Fair enough.

Let's ask you a more direct question.

So can something be -- if something is consistent with the dosage thesis, what does that mean?  Does that mean it supports it or it just means it's not inconsistent?

What does it mean to be consistent in your mind?

A.      Well, if you're asking me how I

Page 15

G. Hubbard, Ph.D.

would use the term, it would be it's not inconsistent.  It could mean to somebody saying that it's supportive, but if I chose the word consistent, that's what I would mean.

Q.    So it doesn't necessarily mean it's supportive, but it means it's not inconsistent?  In other words, it doesn't contradict?  It means it doesn't contradict, but it doesn't necessarily support?

A.    It depends on who's using it. You asked me how I would typically use the word --

Q.    The average investor.  We're trying to figure out what the average investor thinks.

A.    I think the average investor, as reflected in the analyst reports I looked at pre and post July 22nd, already had the information that not everything is supportive or consistent.

Q.    Is it possible that you have data that is neither consistent or inconsistent?

Page 16

G. Hubbard, Ph.D.

If it's just neutral, right? If it's just neutral, if it's almost -- if it's irrelevant to the dosage thesis, is it necessarily consistent or is it simply neutral?

If you have -- if you have a subgroup pattern, as you call it, that has no bearing one way or the other on the dosage thesis. Right? No bearing one way or the other on the dosage thesis. Is that data consistent?

A.    I'm struggling with your question because the only reason subgroups are relevant -- and actually, this particular case is exactly whether they are or are not consistent, so I'm not sure what you're asking.

Q.    Right.

What does it mean to be consistent? Does it mean it has to be supportive or it just has to not contradict?

A.    Now you're asking a different question and one you've asked before.

I would think it depends on the

Page 17

G. Hubbard, Ph.D.

individual making or being asked.  I could see it meaning either one depending on the context in which it's said.

Q.      All right.

Let's talk about the context of what Dr. Alfred Sandrock said on July 22nd.

He said that consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose and I think our data are all consistent with that.

So what do you think, in your opinion, that statement told investors about the data?  Did it tell the investors that there is no data inconsistent with that or is it saying that all data -- all the data are supportive of that?

What exactly -- is he suggesting, in your mind, that all the data are supportive of the higher dose thesis?

MS. SOLOWAY:  Objection.

A.      I'll answer your question in two parts.

You first asked how would I read the paragraph as a person and hopefully

Page 18

G. Hubbard, Ph.D.

a reasonable investor.  I think our data are all consistent with that refers to the things he said when he said we believe that data from ENGAGE, the portions of the data from ENGAGE, a negative study, the portions of it do support the analysis that we did with EMERGE and PRIME dot, dot, dot.  So all the things he said.

I understand you read it differently.

From my perspective, it doesn't matter because I actually analyzed what people in the markets thought and even if I accepted for the sake of argument that it meant all data anywhere, everywhere, the analysis I did still stands.

So it doesn't matter.

Q.    The question isn't whether my question matters.  You just have to answer it with a clear answer.

A.    I just answered it.

Q.    You didn't.

A.    I very much did.  So let me repeat.  Maybe go slower.

Page 19

G. Hubbard, Ph.D.

I said -- you asked me how I read it. I told you. If you want to read it the way you read it, as you articulated in your complaint, so I'm not putting words in your mouth, I did the analysis based on that and found no evidence that any investor ever thought like that. So I answered your question.

Q. No evidence that any investor ever thought that all the data were supportive?

A. Correct.

Q. Okay.

That's why I'm trying to understand what the difference is between supportive and consistent. In my mind, supportive and consistent are two different words and not the same, not necessarily the same. Something can be consistent and supportive, but something can be consistent but not supportive.

Right?

A. I agree, but the fact that we've just both said that investors -- at

Page 20

G. Hubbard, Ph.D.

least through market participants --
believed it wasn't all supportive, which is
the stronger of the two, your question has
been asked and answered from a logical
perspective.

Q.      So the fact that the ENGAGE
Study 301, which I think is ENGAGE,
failed -- that was a failed study.

Right?

A.      That's my understanding.  It
was not successful.

Q.      So if a study fails, that's not
supportive of efficacy.

Correct?

A.      Well, again, you're asking me a
question.  It's hard for me because I'm not
a doctor.

Portions were supportive,
portions were not.  I don't know what you
mean by failed as an entire study.  To the
extent that any individual thing is a
failure, it's not supportive.  I think we
could agree on that.

Q.      I was trying to get you to

Page 21

G. Hubbard, Ph.D. concede that when you have a failed study, that's not supportive generally.

A.       Correct.

Q.       Okay.

But Sandrock and others at Biogen said portions of the failed study were supportive.

Right?

MS. SOLOWAY:  Objection.

Misstates the words.

A.       Well, he says portions of the data from ENGAGE -- that portions of it do support the analysis that we did with EMERGE.  That's what he said.

Q.       He refers to ENGAGE as a negative study.

Right?

A.       Yes.  He's very candid about that.

Q.       Okay.

So it's clear that everyone knew that there was -- that that study was not 100% supportive, right?  There's no misunderstanding, right?

Page 22

G. Hubbard, Ph.D.

A.      Whether everyone knew would mean you'd have to do the work of checking and of course I did.  If you look either before or after this time, market participants didn't think that.  But you would have to look.

Q.      I'm going to give you another hypothetical.

So suppose Biogen looked at the data from ENGAGE and broke out the study participants from the US.  That's the failed study, ENGAGE.  Right?

ENGAGE broke out the study participants in the US versus those in the rest of the world.  And suppose also that in the US, high dose participants achieved efficacy but low dose participants did not, while there was no sign of efficacy for either group in Europe.

Understand that?

A.      I understand the hypothetical, yes.

Q.      Looking at your quote in paragraph 19 of your report, would this

Page 23

G. Hubbard, Ph.D.

hypothetical be consistent with the statement that starts in the third line of your quote:  We believe that data from ENGAGE -- that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE?

A.    When you ask the hypothetical, that's obviously true because you said it was true for the US.

Q.    So are you saying that this would be consistent with this statement?

A.    We're doing exegesis on a statement that neither one of us made.  But he says portions of the data from ENGAGE, a negative study -- that portions of it do support.

So you gave an example of it where portions of it do support.  You're now asking me can I match the English.  Yes, I can match the English.

You're not asking me an expert question, but I'm happy to answer it.

Q.    Okay.

Page 24

G. Hubbard, Ph.D.

Now, looking at the last sentence of the quote in paragraph 19 of your report, do you see how it says, "So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose ..." and then the sentence continues?

A.     If that's a question, yes, I see that.  Yeah.

Q.     Do you understand that there's a difference between needing to get to a higher dose to show an effect and that getting a higher dose would be sufficient to show an effect?

MS. SOLOWAY:  Objection.

A.     Are you asking me is there a difference between something being necessary and something being sufficient?

Q.     Yes.  That's the question.

A.     As a general rule, that's true. I'm not a doctor, so I can't help you here.

Q.     Well, you are a doctor, you're just not a medical doctor.

A.     Right.  I can't prescribe you something, as much as I might wish.

Page 25

G. Hubbard, Ph.D.

Q.      You could prescribe an investment plan.

A.      Yeah.

Q.      In other words -- all right.

So you understand there's a difference between a necessary and sufficient condition.

Fair enough?

A.      Yes.

Q.      Now, is the all data statement, or what you call the July 22nd statement, a statement that a high dose is necessary to show an effect or that a high dose is sufficient to show an effect?

MS. SOLOWAY:  Objection.

A.      I don't know.  I'm not a scientist or a doctor.

I'm reading it as the data that he described before are consistent with what he's saying.  I'm not trying to make a determination necessary or sufficient.

Q.      Well, what about the high dose -- the dosage thesis that they are propounding, that Biogen has been

Page 26

G. Hubbard, Ph.D.
propounding?  Do you believe that investors are taking it to mean that the high dose is a necessary condition or is it a sufficient condition?

MS. SOLOWAY:  Objection.

A.      The analyst reports and the news stories that I look at really didn't parse it so much there.  It was really just that they were skeptical that all data would ultimately support it coming up.

Q.      You don't think the market necessarily parsed it to determine whether it was a necessary condition or a sufficient condition?

A.      The analyst reports that I reviewed and put in the report were really focused just more on the -- they didn't believe that all of the data would be supported.

Q.      Well, we know all of the data wasn't supportive because we have a failed study.  So I don't think there's any dispute there.

But the question is whether all

Page 27

G. Hubbard, Ph.D.

of the data that they're not disclosing is consistent.

Right?

A.      Well, again, it depends on --

Q.      It's contradictory.  Something can be consistent or neutral, but not contradictory.

Right?

A.      I think we could go further. The analysts do point out some skepticism about how subgroups will play out because those were not disclosed to them.  So there's a great deal of skepticism.

Unlike Dr. Tabak, I actually looked at them, so we can talk about them.

Q.      If you were going to test whether the market believed the all data statement to be false, would it be appropriate to examine statements about whether a high dose is sufficient to show an effect?

A.      I think you're asking me a medical question and I don't know.  I told you how I read the all data statement.  The

Page 28

G. Hubbard, Ph.D.
way you're describing it isn't how you described it in your complaint or how I read it.

Is this just a new hypothetical?

Q.    It's just a question.

A.    It would require medical views for me to answer it.

Q.    Well, the question is if you were going to test whether the market believed the all data statement was false -- so that's an economics question.

So if you were going to test whether the market believed the all data statement, would it be appropriate to examine statements about whether a high dose is sufficient to show an effect?

A.    I think it depends.  I did look at what market participants believed.  They really were very suspicious about the subgroup data, part of which is about dosage.

I'm not sure what else I could say.  You could also try to look for

Page 29

G. Hubbard, Ph.D.

curative statements, if that's where you're headed.

Q.    I just wanted a yes or no answer to the question.

A.    Well, I answered it the way an economist could.  The yes or no would be a doctor's answer and I can't give you that.

Q.    If on July 22nd, 2020 the market believed that a high dose did not cause an effect in some subgroups, would that mean that the market did not believe the all data statement?

A.    I think that would mean the market did not believe the all data statement.  That's one of the points I make.

Q.    So on November 4th, there was -- the FDA released some briefing materials publically on their website.

Do you recall?

A.    Yes, sir.

Q.    You read through those?

A.    Well, I did skim them, but I'm not a physician.  But yes, I did.

Q.    Okay.

Page 30

G. Hubbard, Ph.D.

Now, did you examine all of the news -- public news, including these briefing materials -- concerning Biogen to determine what new news -- you know what I mean by new news, right?

A.    Yes, sir.

Q.    All right.

-- what new news was released on November 4th?

A.    Well, I think there are two things on November 4th that roughly speaking, as a layman, I'm going to put them in clinician and statistician buckets.

From the clinician bucket, a fairly positive report about aducanumab and its potential.  The statistician was Dr. Tristan Massie, a statistician at the FDA, had a negative report with a number of characteristics.  His was an appendix to the briefing book.  It was about 97 pages.

Both the clinician "good news" and the statistician "mixed news," they're both highly technical, but they were released at exactly the same time.

Page 31

G. Hubbard, Ph.D.

Q.    Basically, you had -- so was there any positive news in Tristan Massie's report?

A.    I would say unbalanced -- again, I'm not a professional statistician. I read it as a negative unbalanced report. He really had layman terms, three categories. He was talking about his issues with the overall design of the test, some concern about unblinding in tests and placebos. This gets back to the brain bleed and other issues we talked about before. And then he had a question about confidence intervals when only one test was used. Those were his three. Each of those I would view as critical.

Q.    All right.

Now, when you say design, you're talking about the design that occurred after the post hoc statistical design or are you talking about the pre?

MS. SOLOWAY:  Objection to form.

A.    My recollection -- all analyses

Page 32

G. Hubbard, Ph.D.
the FDA does are post hoc by design.  I think it was the original test design that Dr. Massie had trouble with, but again, I'm not a professional statistician or a doctor.

Q.    Okay.

So other than Tristan Massie's statistical analyses, his report -- we'll call it the Massie report -- was there any negative news on November 4th concerning Biogen?

A.    I don't recall.  I mean, the principal things were the report and appendix.  It's all one report, but the Massie appendix and the report, that's what I recall.

Q.    All right.

What about on November 5th? Was there any negative news about Biogen on November 5th?

A.    I don't recall.

Q.    Okay.

So no negative news on November 5th?

A.    That's not what I just said, by

Page 33

G. Hubbard, Ph.D.

the way.  I said I don't recall.  Both statements are in the record.

Q.    Well, your memory is pretty good, I take it.

A.    When I say I don't recall, that's what I mean.

Q.    If you had identified any other negative news, confounding negative news that might have caused an effect on Biogen's stock price on November 5th, would you have identified that in your report?

A.    In all likelihood, yes. Although that's not the point I make on November 5th, but in all likelihood, yes.

Q.    Was there any confounding news on November 4th that you don't mention in your report?

MS. SOLOWAY:  Objection to form.

A.    You asked that question already, so same answer.  I don't recall.

Q.    All right.

So what, in your mind, is inflation when it comes to a securities

Page 34

G. Hubbard, Ph.D.

class action?

A.      That the price would be above its but-for value or true intrinsic value.

Q.      So any time a stock price is above -- above its true intrinsic value, there's inflation in the stock?

A.      You asked in a context of a securities case.  In general, transactions cost, bubbles, noise traders.  There are lots of theories.  That's just not the question you asked.  I answered the one you asked.

Q.      Okay.

So in the context of that?

A.      Yeah.

Q.      Could there be inflation in a stock that is inactionable under the securities laws?

Could the stock be trading above its intrinsic value because of a misunderstanding as to the true facts, but that misunderstanding is not caused by any actionable statements?  Maybe someone just had a typographical error in their annual

Page 35

                    G. Hubbard, Ph.D.

report and it's inactionable.

              MS. SOLOWAY:  Objection.

              Objection to form.

     A.       Up until that, I thought I
could answer it.  Now, it's easy.  It's now
a legal question.  I can't answer it one way
or another, whether a typographical error is
actionable.  Before I could have answered
it, but now I can't.

     Q.       I guess you're asking me to
rephrase the question.

              Could there be inflation in a
stock that is inactionable?  In other words,
could the stock be trading above its
intrinsic value because of a
misunderstanding as to the true facts but
that misunderstanding is not caused by any
actionable statements maybe?

              Is that possible?

              MS. SOLOWAY:  Objection.

              Calls for a legal conclusion.

     A.       If you're asking me
intuitively, it's hard to imagine that kind
of misunderstanding, but I suppose anything

Page 36

                    G. Hubbard, Ph.D.

is possible.  But as a legal matter, I don't

know one way or the other.

        Q.      All right.

                So suppose a company made the

same statement on two separate occasions,

say January 10th and January 20th.  Right?

And that when the company made the statement

on January 10th, it believed the statement

to be true.  Honestly held, reasonably held

a belief that the statement is true.

                But then on -- by the time of

January 20th, the company has learned that

the statement was false -- right? -- but

then repeats the statement anyway.

                Are you with me so far?

        A.      I am.

        Q.      All right.

                Now, assuming that the

statements on both days -- the 10th and

20th -- are identical and nothing else had

changed, would you expect to see any

increase in the company's stock price on

January 20th?

        A.      Let me say at the beginning

G. Hubbard, Ph.D.

that that's not the facts as I understand about this case.  I'm going to be answering your hypothetical.

No, I would not.

Q.        Now, do you understand that if the company actually believed in the statement on January 10th that the statement might not be actionable because they had an honestly held belief?

A.        That's a legal question.  I don't know one way or another.

Q.        Okay.

And do you understand that if on January 20th the company had learned that the information was false by repeating the statement it might become actionable on January 20th?

MS. SOLOWAY:  Objection.

A.        I can't really answer that question because it's a legal question and I can say as an economist and a board member they would have a duty to disclose that.  But again, it's not the fact pattern of this case, wrapping it up.  We could talk about

Page 38

G. Hubbard, Ph.D.

why, if you want, but ...

Q.        So would testing for a stock price increase on January 20th in this hypothetical be relevant to determining whether inflation entered the stock price on January 20th?

A.        Well, in your hypothetical, you wouldn't expect a stock price response, but you would expect -- you would need to do a maintenance analysis, if you're asking me an economic question, as opposed to a legal one.

Q.        How would you do a maintenance analysis in that situation?

A.        Well, you'd first look to what market participants had believed before or after the statement.  You could look at ex post statements that might appear curative and test whether they had an effect on the stock price.

That's a couple of ways you might approach it.  As you know, those are the two ways I did approach it.

Q.        Now, in this hypothetical,

Page 39

G. Hubbard, Ph.D.

would looking at whether market participants noted that the January 20th statement conveyed new information be relevant to determining whether inflation had entered the stock price on January 20th?

A.      I think this is more words with the same question you asked me before.  So substantively, the same question, so the answer is the same.  You wouldn't expect a stock price response, but if you're going to make a maintenance argument, you'd have more work to do.

So you asked the same question, same answer.

Q.      How would you define price impact in the context of a securities class action, class certification context?

A.      Well, it's a very broad question generally to an economist.  I can't speak to the law whether something is material.  There would need to be a statistically significant price effect traceable to a particular action as you need both loss causation and measurement.  That

Page 40

G. Hubbard, Ph.D. would be price impact.

Q.    And can you have -- can you have a situation where you're able to show, as an economist, that loss causation in a securities class action but you're unable to show price impact or are they inextricable?

MS. SOLOWAY:  Objection.

A.    Well, if I'm understanding your question, something is possible -- if the question is whether it's material to an economist, I can't speak to the law.  To an economist, material would be statistically significant, so that wouldn't be price impact.  It may or may not have loss causation.  You asked a very vague hypothetical.  I don't know one way or the other, but it wouldn't have price impact unless you could measure it.

Q.    So let's assume you are able to identify a statistically significant price impact as an economist.  So I guess that would mean you've identified a statement that had a statistically significant impact on the stock price.

Page 41

G. Hubbard, Ph.D.

Is that what we're talking about?

MS. SOLOWAY:  Objection.

A.    Yes.  You would need the identification of the statement and you could test whether it had a material impact, positive or negative, on the stock price.

Q.    Okay.

Now, is it possible to have identified the statistically significant impact on the price, but not be able to show loss causation, a situation where there's price impact but no loss causation?

MS. SOLOWAY:  Objection.

A.    If that's a legal question, I don't know.

Q.    As an economist.  This is all an economics question?

A.    No, no, no.  You have to do the work.  If there's no loss causation, price impact of what?  The fact that you find an abnormal return, but can't explain it, that's not a theory of anything.

Q.    You haven't gotten to loss

Page 42

G. Hubbard, Ph.D.
causation yet because we're still at class certification.  But at class certification, you find the price impact.  Right?  You found there's a price impact.

Does that mean you're also going to find loss causation or is there additional stuff on loss causation you're going to have to deal with?

MS. SOLOWAY:  Objection.

A.        If you're asking as an economics question, yes, there's additional work to do.

Q.        What additional work do you have to do?

A.        You have to show what you think it is led to that effect.  There are economics references manuals for securities cases that I cite.  I've done lots of these cases.  I don't think the law is too different from economics here.  You can't walk away from that.

Q.        Right.

So I'm just trying to understand what additional work you think

Page 43

G. Hubbard, Ph.D.
has to get done between price impact and loss causation.

A.    Well, it's a hypothetical because here there isn't even a price impact.  If there was price impact, you would still need to identify what it is, whether it's an event in realtime, if it's a maintenance argument, what statement before is being maintained and why.  You have to do that work, from an economic perspective.  I can't speak to the law.

Q.    Now, suppose you don't find price impact.  Right?  Suppose you can't identify a statistically significant change in price as a result of a statement.

That is how we define price impact, right?  A statistically significant change in price, based on a price, connected to --

A.    Yes.

MS. SOLOWAY:  Objection.

Objection.

Go on.

Page 44

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.      So if you have -- if you have a situation where there is -- there's no price impact, does that mean that it's impossible then to cause loss causation?

MS. SOLOWAY:  Objection.

A.      That's way too big a question. Let me get back to this case, because that helps me answer it.

So there's no estimated price impact from Dr. Tabak or myself on July 22nd.  And so the question is does that mean there can't be any loss causation.  Not necessarily.

You could try to put forth a maintenance argument, which I believe you are, but you need more than an argument. You have to say what is it that's being maintained, look at the record, what people thought about it.

So grounding it in this case may help answer the question.

Q.      Okay.

Now, what is your -- could you

Page 45

G. Hubbard, Ph.D.
explain your definition of the term price maintenance in the context of a securities class action?

A.    That's not a term of art.  I'm not sure -- I think Dr. Tabak invented that term.  You want to know how I define maintenance arguments as an non lawyer?

The price maintenance is new to me, as it came about in Dr. Tabak's deposition.

Q.    Have you ever come across that term?  You used it today and I thought you knew what it was.

A.    I don't think I did.

Q.    You did.

A.    I think I used the term maintenance argument.

Q.    Well, what did you mean by maintenance argument?

A.    Well, maintenance argument is going back to your hypothetical.  Well, maybe there was something in the past that had been said that inflated a stock's price and you're just -- by not saying anything,

Page 46

G. Hubbard, Ph.D.
you're allowing that to continue.  If that's your view, then you'd need to say well, what was it originally that was the false statement and find the inflation that's associated with that and then look at the record of what market participants actually believe.  So it's not that a maintenance idea is impossible.  It's just that it's not a free lunch.  You have to do the work.

Q.    Okay.  All right.

Here's another question for you:  Suppose you have a situation where a company is having a conference call with its investor group, its whatever analysts and so forth and there had just been a large bankruptcy at a big company and this is the issuer that's being -- having the conference call.  The CEO of the issuer having the conference call is being asked about whether his company has any exposure to this company that has the bankruptcy -- maybe it's a bank -- and they want to know whether they have any material exposure to a big loan or something like that.

Page 47

G. Hubbard, Ph.D.

They asked the CEO does the company have any exposure to -- or contingent liability, potential liability or loss as a result of bankruptcy of this large concern and the CEO says no, we have no exposure at all.  We're totally insulated and it turns out that that's a lie, that they have a $50 billion loan to the company and when they -- six months later, they disclose that they're taking a, you know, 50% write down on their $50 billion loan, they're taking a $25 billion loss and their stock price drops.

Isn't there inflation going into the stock price at the time the CEO is lying about the existence of a material liability to -- as a result of this bankruptcy?

A.        Possibly.  And then you'd need to do the work of figuring out well, what did market participants believe about that because that's what's determining the price impact of it.  But possibly would be the answer.

Page 48

G. Hubbard, Ph.D.

Q.      Right.

So in that situation, you acknowledge it's possible that there might be inflation coming into the stock price. But in that situation, the inflation didn't exist necessarily before the allegedly false statement.

Right?

MS. SOLOWAY:  Objection.

Q.      Is that --

A.      In your hypothetical.

Q.      In the hypothetical.

So in that situation, the CEO's statement is -- the lie is preventing a stock drop on that date.

Right?

A.      Maybe.  That's why I say possible.  It depends on what market participants -- the market participants may believe you know what, I think all banks have a lot more exposure and they're marking it down.  So that's why I say possibly.  We don't know.  You'd have to go look at what market participants are actually saying.

Page 49

G. Hubbard, Ph.D.

Yesterday, banks generally, insurance companies, big sell off. There's two regional banks that had credit exposure. In general, analysts are saying wait a minute, maybe all banks --

Q. So you'd want to look at -- in analyzing the question of whether inflation came into the stock price, you'd want to look at market participants?

A. See what the market is saying. If they're saying well, I know he said that, but I don't think so, that's different than oh yeah, great. So you could check.

Q. That's an interesting question.

So you have a situation -- you're saying you could have a situation where a CEO makes a statement and the market doesn't believe him or discounts his -- the veracity.

Is that what you're suggesting?

A. Sure. Let's take an example. COVID to the present, office real estate. So we know all these lenders are exposed to office real estate. I say well, my office

Page 50

G. Hubbard, Ph.D.

real is fine.  I know yours and yours and yours is not.  Market participants may well judge that it's not.  So you have to look at what people actually think.  Remember, those stock prices embedded people's actual expectations.

Q.    What if you look at -- you know, let's say there's -- I don't know -- 40 analysts covering the company and 20 of them are true believers in the CEO and the other 20 are skeptics.

How do you interpret that as far as the effect of the CEO's statements on the stock price?

A.    Well, let me first say that's not what happened here because all the analysts are essentially the same.  If your question is for your hypothetical, you would see that there's disagreement in a market.  Not always are all analysts the same.  I didn't find a single analyst who disagreed with the prospect that the not all data statement wasn't quite accurate.

Q.    I thought you said the analysts

Page 51

G. Hubbard, Ph.D.

didn't discuss the all data statement?

A.    No, I said they didn't ever express a belief that the all data statement was true, nor if you go to the -- even the call on which it was made, no one even followed up.  So if this were the value relevant news that you suppose, you'd think there might be a follow-up question.

Q.    A moment ago, I thought you said that analysts affirmatively stated that they didn't believe the all data statement?

MS. SOLOWAY:  Objection.

That's not what he said.

A.    It's not what I said.

They said that they were skeptical about all the subgroups, all the pieces necessarily supporting aducanumab. They felt that before July 22nd, they felt it after July 22nd with no exceptions, at least in all the reports I've read.

Q.    Well, did all the analysts agree on their expectations of the likelihood of approval of that aducanumab?

A.    No.  And that's a different

Page 52

G. Hubbard, Ph.D.

question.

Q.      Well, isn't it related?

A.      Related is not equal.  I'm sorry.  You don't have to be a statistician to observe that.

Q.      Well, you acknowledge that only one analyst actually referenced the all data statement following its issuance.

Correct?

A.      That's not true.  What I said was one analyst mentioned it and it's only in a transcript.  Even that analyst isn't acknowledged.  That analyst is printed in a transcript.  Just to be clear.

Q.      That analyst printed a transcript?  You're talking about Wolfe printed a transcript?

A.      Those words were quoted, but there's no analysis on it.

Q.      But he referenced it?

MS. SOLOWAY:  Objection.

Misstates the testimony.

A.      Printed it.

Q.      I don't understand what the

Page 53

G. Hubbard, Ph.D.
difference between reference and printing
is.  Honestly, I'm not sure what you mean by
printing it.  He referenced the statement.
He referenced the question and he referenced
the answer.

A.    I think we could agree on that.
That's not an analysis or a commentary.  He
did neither.  If you disagree, show it to me
and I'll walk you through it.

Q.    Well, we'll get to it.

Now, paragraph 21 of your
report, it says:  I understand that the
First Circuit found that plaintiffs
plausibly allege that the July 22nd
statement conveyed new material information
to investors.

A.    That's not what it says, unless
I didn't hear you.  I understand that the
First Circuit found that, if that's what
you're reading.

Q.    Yeah.  Plaintiffs plausibly
alleged the July 22nd statement conveyed new
material information to investors.

And do you disagree with the

Page 54

G. Hubbard, Ph.D.

First Circuit's finding?

A.      Well, I'm not a lawyer or a judge.  All they're saying is that plaintiffs plausibly allege something.  They're not saying that it's true.  It's simply to be investigated.  That's the way I interpreted it, but I'm not a lawyer.

Q.      And do you disagree that the July 22nd statement conveyed new material information to investors?

A.      That I do disagree because I looked, as did your expert.  We both concluded the same thing.

Q.      You disagree because the information is not new?

A.      We don't find -- we being Dr. Tabak and I -- do not find a price effect on that day.

Q.      Well, if -- so if there's no price effect, the information is neither new nor material?

A.      It's not material the way an economist would describe it and if market participants believed, as you seem to, that

Page 55

G. Hubbard, Ph.D.

the statement was connoting that all data are consistent, that is different than what the market felt since 2019 and value relevant, but we didn't find -- we, Dr. Tabak and I -- did not find a statistically significant effect.

Q.    Right.

Now, but suppose the effect is that it prevented a stock price decline. Right?  I mean, if he had told the truth and said oh, yeah, the truth is we have about 30 subgroup analyses that are -- that contradict this dosage thesis, that would have caused a stock price decline.

Right?

A.    I don't know that.  As I noted all the way back to 2019 and then certainly after July 22nd, market participants understand all of these differences, they understand that the data went out and they even refer to subgroups.  So there was never a view in the market to that.  It doesn't match your hypothetical.

Q.    Was the information in the

Page 56

G. Hubbard, Ph.D.

Massie report -- were the subgroup analyses in the Massie report available to the public on July 22nd?

A.      They were not, but the public investors inferred -- I think it said as much in their commentary -- that they can't all be positive because we're not seeing them.

Biogen didn't disclose them. They just said look, it's an FDA process, we're not disclosing them.  But I think market participants did not think positively about it.  That was clear in all of the analyst reports.

Q.      Did you make any efforts to determine what would have happened to Biogen's stock price if the Massie report subgroup analyses had been disclosed on July 22nd, 2020?

A.      There was no way I could do that because they weren't disclosed on July 22nd.  But what I do know is both before and after July 22nd, market participants pretty much thought that the

Page 57

G. Hubbard, Ph.D.

subgroup analyses were going to be mixed at best.  They said that over and over.  That was not a surprise.

Q.     And were the subgroup analyses that Massie did mixed or were they just pretty much negative across the board?

A.     Remember, Massie is a statistician, not a clinician, so I read him as a layperson for statistics.  He's basically saying I don't think these tests were constructed correctly, so as a statistics matter, I disagree with my clinician colleagues.  That's the way I read his appendix to the report.

Q.     So you think he's just concerned about tests being constructed correctly as opposed to the tests simply showing a lack of efficacy?

A.     He's saying that he doesn't read it the same way Biogen and some of the clinicians read it.  He doesn't think you can demonstrate as much based on those tests.  Market participants had already been suspicious of exactly that going back before

Page 58

G. Hubbard, Ph.D.

July 22nd.

Q.    Is there a difference between suspicious -- you said they were suspicious.

Did anyone say I've seen the subgroup analyses and they're bad?

A.    They couldn't have because they hadn't seen the subgroup analyses, but they were uniformly believed to be weaker than positive for sure.

Q.    Weaker than positive?

A.    For sure.

Q.    So weaker than positive could be neutral.

Right?

A.    Could be neutral, but that's not what analysts were saying they believed and actually the company had made reference to some being negative, so ...

Q.    When did the company say there were negative subgroup analyses?

A.    They didn't refer to negative subgroups, but negative parts of data.  So I think there was that suspicion --

Q.    When did they say there were

G. Hubbard, Ph.D.

negative parts of data?  Where?

A.     The July 22nd statement referring to the negative study elements in ENGAGE.

Q.     All right.

So other than knowing that the overall end point for the ENGAGE study was negative, the company never disclosed any negative analyses.

Right?

MS. SOLOWAY:  Objection.

A.     I would put it as the company didn't disclose negative subgroup analyses, one way or the other.

MR. ROSEN:  Why don't we take a short break?

THE WITNESS:  Okay.

(Time noted: 10:18 a.m.)

(Recess taken)

(Time noted: 10:35 a.m.

(Whereupon, Exhibit 2 was marked for Identification.)

BY MR. ROSEN:

Q.     Let's go to the next exhibit --

Page 60

G. Hubbard, Ph.D.

the transcript -- I marked as Exhibit 2 the July 22nd, 2020 conference call transcript of Biogen.

A.    Okay.  Yes, I'm there.

Q.    If we go to -- at the very end, the question and answers, there's a question by a guy named Meacham as I recall his name --

A.    You want me to go to the questions at the end?

Q.    Yes.

A.    Do you have a page number? That could be helpful, too.

Q.    Looks like it's page 11.

A.    I see.  I have Mr. Meacham, yes.

Q.    I want to put this July 22nd statement in context.

So as you recall, it was -- Dr. Sandrock's statement was in response to this question by an analyst named Chris -- Geoffrey Meacham, at Bank of America, B of A Merrill Lynch.

A.    Yes.  I reference the

Page 61

G. Hubbard, Ph.D.

statement, Mr. Meacham's lack of follow up, and his subsequent analyst report in my report.

Q.    So his question -- the question he posed was -- it says:  Geoff, I also want to say it's been great working with you -- this is page 11 of the transcript.

It's been great working with you.  Another one on aducanumab.  I know the next decision is -- the next step is a decision from FDA, but when you look at ENGAGE versus EMERGE, I just wondered if you can go into any detail of the analysis over, say, the past six to nine months that you guys have done with the FDA.

So what is he asking for there from Biogen?

A.    He's looking for detail that could be published.  He's given what is the statement at issue here.  He does not follow up and indeed writes a fairly lukewarm to negative analyst report as a result.  I cite all of that in my report.

Q.    Right.  You're way ahead of me

Page 62

G. Hubbard, Ph.D. here. Let's take it one step at a time. All right?

So his first question that ends with -- it says: I just wondered if you could go into any detail of the analysis over, say, the past six to nine months that you guys have done with the FDA.

Is it fair to say the analysis he's looking for are statistical analyses of various subgroups or any other statistical analyses related to the EMERGE and ENGAGE trials?

MS. SOLOWAY: Objection.

Calls for speculation.

A. I guess that would be a great question for him. What we do know is a couple things down where he appears again in the transcript, he says no, no, just the quality of the analysis and the details of the data analysis. So he's just looking for more information.

Q. And about analyses, data analyses.

Right?

Page 63

G. Hubbard, Ph.D.

A.      That's what he says, yes.

Q.      Okay.

So the next -- he then clarifies.  He says:  No, just the quality of the analyses and details of the data analysis for aducanumab in support of filings.

So he's looking for more detail about the data analyses.

Right?

A.      Yes, sir.

Q.      Then in response, Dr. Sandrock says:  I'm not sure I heard your question, Geoff, but I think -- look, the filing is based on these three studies:  EMERGE, ENGAGE and PRIME.  EMERGE is the first study to show in effect not only on the primary endpoint but all three pre-specified secondary endpoints.  We believe that data from ENGAGE -- that portions of the data from ENGAGE, a negative study -- that portions of it do support the analysis that we did with EMERGE.  And then I'll say in also PRIME, which was published, shows that

Page 64

G. Hubbard, Ph.D.

even though the clinical endpoints were exploratory endpoints on the highest dose, there was an effect on MMSE as well as CDR sum of boxes and again, very similar that the lower doses did not show much of an effect. So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose and I think our data are all consistent with that.

Now, so is it fair to say that this all data statement, I think all our data are consistent with that, is in response to a specific question for details of the data analysis that Biogen was going to give the FDA in support of filing?

MS. SOLOWAY: Objection.

A.       That's not the way I would put it. The whole answer is, I suppose, Dr. Sandrock's attempt to respond.

What I read all data as consistent is the data that he described. If you wanted to read it more elastically, that would be curious because nobody follows up. There's not a single follow-up question

Page 65

G. Hubbard, Ph.D.

here, so that would be odd.  If it were some value relevant all data everywhere consistent, how come no follow-up?

But I'm just telling you how I read it.  But either way, that's the answer.

MR. ROSEN:  Now, let's go to the next exhibit, Exhibit 3.

(Whereupon, Exhibit 3 was marked for identification.)

THE WITNESS:  Okay.  The Biogen aducanumab update?

MR. ROSEN:  Mm-hmm.

BY MR. ROSEN:

Q.    So these -- so on October 22nd, 2019, did Biogen announce that it was going to seek approval of aducanumab?

A.    Yes.

Q.    Did they explain -- is that when they first put forth a dosage thesis?

MS. SOLOWAY:  Objection.

A.    I don't recall that.  They do advance that.  I'm just trying to find my 2019 discussion in the report.

Yeah, it was a new analysis

Page 66

G. Hubbard, Ph.D.

that separated the results of ENGAGE and EMERGE, so that's what they did on that date.

Again, I'm not a doctor, so I can't be anymore granular, but that's what I have at paragraph 17.

Q.    All right.

So if you go to -- basically, this is the first slide with data, which is, I guess, the third in the PDF.

It says:  Number one, following discussions with the FDA, Biogen plans to submit a regulatory filing in early 2020 for aducanumab.  Then it says:  The results of the futility analysis was incorrect.

Do you see that?

A.    Yes, sir.

Q.    Then it says:  A new analysis of the larger data set showed that aducanumab reduced clinical decline in patients with early Alzheimer's, was measured by prespecified primary and secondary endpoints.

Then in four, it says:  The

Page 67

G. Hubbard, Ph.D.
positive results of this new analysis were driven primarily by greater exposure to high-dose aducanumab in the larger data set.

So that's pretty much the dosage thesis?

MS. SOLOWAY:  Objection.

A.    I don't know what pretty much means because that's colloquial.  They describe a dosage thesis.

Q.    Okay.

That's the sum and substance of the dosage thesis?

A.    Well, sum and substance would require me to be a doctor, which I'm not.  But these words refer to dosage thesis.

Q.    Okay.

And is it fair to say on October 22nd, there was a pretty significant stock price increase in Biogen's shares?

A.    That is true, yes.

Q.    What do you attribute that stock price increase to?

MS. SOLOWAY:  Objection.

A.    If I could always answer

Page 68

G. Hubbard, Ph.D.
questions like that I would be a billionaire
hedge fund investor and not sitting with you
today.

Q.    It's never too late.

A.    In my case, it probably it is.

I would attribute it to market
participants saying well, if they're
applying and Alzheimer's is a big market,
maybe there's an increased probability of
approval and profitability.

As I noted, the analysts at the
time in October of 2019 were still quite
skeptical about whether this is there.  I
quoted the reports.

Q.    The analysts were skeptical?
Why were they skeptical?

A.    Having to do with wondering
about whether breakdown would justify having
several analysts reports to that effect for
October and for December when you go to
CTAD.

Q.    What specifically did they say
that was -- it's in your report?

A.    It's in my report.

Page 69

G. Hubbard, Ph.D.

Q.      What paragraph?

A.      Paragraph 43 for the October presentation and then I go on at 44 and 45 for the December CTAD presentation.

Q.      Let's look at 43, Oppenheimer.

We put aducanumab back into our model, 50% chance of success.

A.      You stopped reading, but the rest is what's pertinent.

Q.      There's no conspiracy here.

Any additional -- pending additional -- so he was -- he was hoping to get additional details at the CTAD in December?

A.      Correct.  In other words, they say this is good news.  If they're applying, I take that as good news, but I'd kind of like to see this breakdown.

Q.      So he was interested in seeing a breakdown?

A.      Yes.

Q.      JP Morgan, what we don't know and major questions at the CTAD level exposure for each study and whether this

Page 70

G. Hubbard, Ph.D.

really drove the difference between ENGAGE and EMERGE -- what else may have driven the difference -- the impact was more severe placebo than EMERGE had on the results -- okay.

So they all -- the questions -- their wish list, they want to break down results.

So they want more detail.

Is that correct?

A.    Correct.

Q.    Similar to what Mr. Meacham wanted in July 22nd, 2020.

Right?

A.    That's correct.

Q.    It's fairly common for analysts to want more information from a company?

A.    I would say all the time.

Q.    So then they ultimately had this CTAD -- I don't know what CTAD stands for -- conference --

A.    It's about Alzheimer's designation.  I have it somewhere in here --

Q.    Maybe it was a Chinese

Page 71

G. Hubbard, Ph.D.

conference?  Is that possible?

MS. SOLOWAY:  It's defined on paragraph 42.

A.       Clinical Trials on Alzheimer's Disease.

Q.       All right.

So they go to CTAD and in paragraph 44, you quote a Q & A.  Okay?  Let's see if we could show you that Q & A.

A.       Shall I go to another exhibit?

MR. ROSEN:  I'm going to put one up right now.

(Whereupon, Exhibit 4 was marked for identification.)

(Whereupon, Exhibit 5 was marked for identification.)

BY MR. ROSEN:

Q.       So we're going to skip Exhibit 4 for the moment and go to Exhibit 5, which is the Q & A.

A.       I now have it.

Q.       All right.

So let's go to your -- to the quote you have in paragraph 44.  That

Page 72

G. Hubbard, Ph.D.

happens to be --

MS. SOLOWAY:  What page?

MR. ROSEN:  Sixty-seven.

THE WITNESS:  There we go.

A.       I'm at page six.

Q.       Okay.

So this is not part of your quote, but it looks like at the bottom of page six, this guy Terence Flynn asks for some additional information --

A.       There's no Terence Flynn --

Q.       Oh, I'm on the bottom of page five.

A.       Five.  Okay.  All right.

Q.       He's asking for information --

A.       That's not the bottom -- oh, I see.  Yes.

Q.       Samantha says:  We're limiting our responses today to the analysis that we have shared this morning.

Okay.  So I guess Umer is at the bottom of page six.

A.       Okay.

Q.       Umer Raffat says:  I have one

Page 73

G. Hubbard, Ph.D.

for Al and one for Samantha, if I may.

Al, I've tracked so many of your data presentations over the years and I felt like today it seemed like there was so much presented but also so much not presented perhaps and I couldn't tell why. So could you speak to what the carrier and noncarriers look like and should we assume that vast majority of the patients and the patients that had sufficient exposure were noncarriers?

That was one was for you, Al. We'll skip Samantha for now.

Alfred Sandrock responds: Umer, I mean, look, as we said at the very beginning of this call, we are not presenting any data that we didn't already present this morning. And you're right, I mean typically we do present a lot of things, subgroups included in the past. You're right, we did do that. There's a time and place for everything and look, this will soon be under review at regulatory authorities and so for that reason, we're

Page 74

G. Hubbard, Ph.D.

very sensitive about what we want to present now.

So he acknowledges that usually they do provide more data.

Is that correct?

A.      He says -- he just says typically we present a lot of things, subgroups included in the past.  I don't know -- I mean, I take him at his word.  I think I actually reference these statements in my report.

Q.      You say I take him at his word.

What do you mean by that?

A.      Well, I should -- more candidly, I just mean I'm reading English. We're doing exegesis on things neither one of us wrote.  So that's what he says is what I meant to say.

Q.      He says:  This will soon be under review at regulatory authorities.  For that reason, we're sensitive about what we want to present now.

So how do you read, as an economist, that explanation for not

Page 75

G. Hubbard, Ph.D.

providing additional data?

A.      As an economist, there's nothing much I can say other than market participants all noted that and indeed this gentleman that asked the question was the one who was the first question I believe after the all data statement and he doesn't even follow up.

So I think it's all something they understand.  That's what the company's position is.  I don't know what else I can say.  I'm not a doctor, so I don't know how typical or atypical it is.

Q.      Do you have any idea why they would be sensitive about having the information out publically while -- I mean, they already gave a fair amount of information about the data publically.

Right?

MS. SOLOWAY:  Sorry.

Are you asking if he knows why Biogen did or didn't?  I'm just not following.

MR. ROSEN:  Yes.

Page 76

G. Hubbard, Ph.D.

A.        How would I possibly know?  A,
I'm not in Biogen and B, I'm not a doctor or
scientist.

Q.        But you're an expert.

MS. SOLOWAY:  Objection.

A.        In economics.

Q.        Okay.

Now, the next thing he says is:
We have nothing to hide, but there's a time
and place for everything and in due time, I
look forward to presenting all the data that
make it important so that our physicians can
make the very best benefit/risk decisions as
the drug becomes approved.

So what does he mean by we have
nothing to hide?

A.        Great question for him.  It's
exegesis on words I didn't write.  I can
only read the words on the page.

Q.        What does that tell the
investors?  What should Mr. Umatt -- Umer
Raffat -- what should Mr. Umer Raffat -- how
do you think he and the other analysts
should interpret the statement "We have

Page 77

G. Hubbard, Ph.D.

nothing to hide"?

MS. SOLOWAY:  Objection.

A.      Unlike Dr. Tabak, I could answer that because I looked and if you looked, they all --

Q.      That's not fair.

A.      It's completely fair.  He did not.  I mean, we will talk about what limited work he did later, I assume.  I'm the only one who actually looked systematically at the analysts and they all think that the subgroup data would be interesting to have.  They know they don't have them.  They're speculating they may be negative.  So I don't know beyond reading that.  Otherwise, it's speculation.

Q.      So the analysts are speculating that this subgroup data they haven't provided could be negative?

A.      Correct.

Q.      But Mr. Sandrock says:  Don't worry, we have nothing to hide.

Doesn't that mean hey, don't worry, the data is not bad, they're not

Page 78

G. Hubbard, Ph.D.

hiding any bad data?

A.    Are you asking me an English question?  Because that's not an expert question.  If you're asking me an English question --

Q.    Well, you're interpreting what all these analysts mean.  You're looking at all these analyst reports and interpreting them for the court.

So here you have the analyst asking a question and the CEO giving a response.  How should that analyst interpret that response?

MS. SOLOWAY:  Objection. Calls for speculation.

A.    First of all, it's a very different exercise.  I'm pointing to specific things an analyst says related to the issues of this case.  You're asking me to interpret English that I did not write and I could read that many different ways.

If you go to trial, you could ask Dr. Sandrock that question, but I don't know what he meant.

Page 79

G. Hubbard, Ph.D.

Q.    I don't even have to wait for trial.  I could take his deposition.

A.    You can take his deposition.

Q.    But you don't know what he means by "We have nothing to hide"?

A.    I don't.  I could only read the words he says.

Q.    Isn't that a warranty to the analysts and the investors that the data they're not presenting is not negative?

MS. SOLOWAY:  Objection.

A.    It would be impossible to read it that way as better English.  Might he have meant that?  That's something you would have to ask him when you take that deposition.  I don't know.  As a matter of English, you can't conclude that.

Q.    As a matter of English --

A.    As plain reading --

Q.    What's your plain reading of that statement?

A.    You're asking me a non-expert question.  We're doing a lot of that today.

My plain reading is if you knew

Page 80

G. Hubbard, Ph.D.

everything I knew, you might come to the same conclusion.  That's how I read it.

But it doesn't really matter how I read it because I'm not Dr. Sandrock.

Q.    So let's go to paragraph 45.

A.    Of my report or --

Q.    Yes.

So you say in the middle of that paragraph:  More generally, market commentary reflecting subgroup data might be complex, subject to confounding factors and could be interpreted differently depending upon when it's applied.

Had any of the market participants seen any of the subgroup data?

A.    No, not to my knowledge.

Q.    So it's pure speculation.

Is that correct?

MS. SOLOWAY:  Objection.

A.    No, because I'm actually quoting them what they believe.  I don't know what you read --

Q.    But their belief is not based on them having seen the data.  It's just

Page 81

G. Hubbard, Ph.D.

based on their speculation of what the data might or might not be.

MS. SOLOWAY:  Objection.

A.       I don't know if you call it speculation, but whatever it is, it's theirs, not mine.  I'm saying what they said.

Q.       Okay.

So the first one, RBC Capital Markets, he mentions efficacy data and noncarriers were not presented and then it says:  Perhaps suggesting data from this population does not necessarily support the hypothesis.

So then he says -- he's pondering, right?  He's perhaps suggesting -- what does perhaps suggesting mean to you?  Is that a very strong position he's taking when he says perhaps suggesting?

A.       I'm glad both my parents were English teachers.  Maybe I am here as an expert on English, which appears to be the subject of your inquiry.

Perhaps suggesting means what

Page 82

G. Hubbard, Ph.D.

it says.  I don't have the data, but as I think of my questions, maybe they don't support the hypotheses.  That's what he says and I can only infer that.

Q.    So there's a possibility that -- well, it says does not necessarily support, but he doesn't even suggest that it negates the hypothesis.  Right?  He just suggests it may not support it.  Right?

A.    That's what he says.  I can't go any further than that.

Q.    Let's see what JP Morgan says.

No prespecified separate data was shown.  This may suggest that there were no major imbalances.

So that would be a good thing.  Right?  But it could just as easily suggest that there may have been a difference in the results between the two studies.

So he's not even suggesting that it's good or bad.  He's saying we don't know.

Is that fair to say?

A.    Well, he goes on to say what's

Page 83

G. Hubbard, Ph.D.

lingering for us is what role the subgroups play. We really want to know that. That's the way I read these.

Q.    So there's uncertainty in his mind?

A.    Yes.

Q.    But he doesn't assume it's good, he doesn't assume it's bad.

Fair enough?

A.    He's saying at this point. We're talking about 2019 at this point. We just would like to know more.

Q.    All right.

Then Stifel: Biogen has shown a few subgroup analyses so far which seems somewhat supportive of activity, though there are likely confounds and our sense is that if this ends up getting reviewed and going to panel, we've only seen a piece of the picture, relative to how closely these data would be scrutinized by FDA.

So what is -- why do you even mention Stifel? I'm trying to understand what the significance of the Stifel

Page 84

G. Hubbard, Ph.D.

statement is here.

A.        Again, an analyst believing that it's quite possible this is going to be negative.  We haven't seen the data that the FDA and the statisticians will.

Paragraph 46 sort of summarizes what's gleaned from these various analyst reports.

Q.        Stifel doesn't actually say anything negative, does he?

MS. SOLOWAY:  Objection.

Q.        What's negative in what you quote from Stifel?

A.        Our sense is if this ends up getting reviewed and going to panel, we've only seen a piece of the picture relative to how closely this data will be scrutinized by FDA.

He talks about likely confounds.  He's basically saying there may be a statistical problem at the FDA.

Q.        What do the confounds relate to?

A.        That sounds like a great

Page 85

G. Hubbard, Ph.D.
question when you take his deposition.  I
can only read it that he's referring to the
carrier/noncarrier distinction by APOE4, but
I didn't write it.  But that's what I assume
it is.

Q.      Couldn't one just look at this
and say the FDA is going to take a hard look
at this data?  I mean, does it mean anything
other than they're going to take a hard look
at this?

A.      I think --

MS. SOLOWAY:  Objection.

A.      I think it does and I've
already answered that.

Q.      And you say in paragraph 46:
This contemporaneous commentary makes sure
that analysts never assumed all subgroup
analyses supported the dosage thesis.

Has anyone in this case taken
the position that all subgroup analyses
supported the dosage thesis?

MS. SOLOWAY:  Objection.

A.      You mean other than you?

Q.      No, including me.

Page 86

G. Hubbard, Ph.D.

A.    Well, your -- I don't read all data the way you do.  I think it's impossible as a matter of English.  But you read it a different way and in your way, you definitely mean that as a matter of English.  And at trial, we'll talk about it.

Q.    Let's talk about it right now, since this is what the deposition is for.

Why do you take the position that the plaintiffs believe that -- so you're saying that plaintiffs have taken the position that all subgroup analyses supported the dosage thesis?

A.    I take that to be -- it doesn't matter for my analysis.  My plain English reading of it or your tortured English reading of it leads to the same analysis.  But that is your view.  That is the way I take it.  Otherwise --

Q.    From the complaint?  You're talking about the complaint?  What are you talking about?

A.    The complaint, your expert's report.  This is the information -- all the

Page 87

G. Hubbard, Ph.D.

other information is there.  It's the subgroup that's not there.  I'm not sure what else you would mean in your tortured English version of all data.  But it doesn't matter for the analysis.  You're wrong either way.  Your reading of it, I think, is tortured, to put it mildly.

Q.    My reading of what?

A.    All data.

Q.    Tell me what all data means.

A.    Asked and answered.

I told you my version, which is English.  He listed a few things and said all data are consistent, meaning all those things.

You meant all data, that's what you say in the complaint, which would necessarily include the subgroups as a matter of English.  I think that's poppycock.  But if you want to do that, you still need to do the analysis that I did. So that's why I say you're boxed either way.

Q.    So you're saying that when Sandrock made the all data statement that

Page 88

G. Hubbard, Ph.D.

all data are consistent with needing to get to the high dose, he wasn't referring to the subgroups?

MS. SOLOWAY:  Objection.

Misstates his statements.

A.      What I said is I read him as saying the data that I mentioned before are all consistent with.  You've taken a different view.  I take plaintiffs' accusations as true as an expert in the case.  It's a different reading than I would have, but I'll take yours as true.

Q.      Well, no --

A.      I don't think it's a reasonable reading.

Q.      I know what my reading is.  I want to understand your reading.

So let's go back --

A.      I don't think you do understand your reading as a matter of English.  I'll just put it out there.  That'll be for trial.  I'd love to have this conversation with a judge because you do not understand it.

Page 89

G. Hubbard, Ph.D.

MS. SOLOWAY:  Let's try to focus here, guys.

MR. ROSEN:  I appreciate your candor.

BY MR. ROSEN:

Q.    All right.  Let's go back to Exhibit 1.  Look at page 11.

A.    Okay.

MS. SOLOWAY:  So we're back to the report, page 11?

THE WITNESS:  Yes.

BY MR. ROSEN:

Q.    Okay.

So now, we're looking at page 11 and we'll go to the paragraph -- the first paragraph that begins with Alfred W. Sandrock -- right?  He says I'm not sure --

A.    That's a different page 11 than I am on.

MS. SOLOWAY:  Are you looking at paragraph 19?

THE WITNESS:  There's something at the top that says page 13, so maybe he means that --

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.      I'm looking at the -- I'm looking at the transcript of the July 22nd call.  This is Exhibit 1.

A.      Yes, but page 11 at the top, not the bottom.  I'm there.

MS. SOLOWAY:  That's not Exhibit 1.  Exhibit 1 is his report.  What exhibit are you looking at?

MR. ROSEN:  I'm sorry.  The July 22nd transcript.

MS. SOLOWAY:  Hang on.  His report is Exhibit 1.

MR. ROSEN:  So it's Exhibit 2 then.

MS. SOLOWAY:  So he's looking at the wrong thing then?

THE WITNESS:  Thanks for clarifying.

MR. ROSEN:  I called it Exhibit 1, but I didn't mean it.

MS. SOLOWAY:  Okay.  I want to make sure we're all on the same page.  Everyone is looking at Exhibit

Page 91

G. Hubbard, Ph.D.

2, which is the transcript from --

MR. ROSEN:  Page 11 and the fourth paragraph that begins with Alfred W. Sandrock.

THE WITNESS:  Okay.  I'm there.

BY MR. ROSEN:

Q.      All right.

Now, the last sentence of that paragraph says:  And I think our data are all consistent with that.

What data do you believe -- your plain English reading of this statement -- what data do you believe Alfred Sandrock is referring to?

A.      My English reading is what he said, which is we believe the data from ENGAGE, a negative study, that portions of it do support as we do with EMERGE -- he's referring to those studies.

For my analytical purposes, I take your reading, which is far more expansive than that.  But if you ask me how I read it, it's that.

Q.      So when he says the data, does

Page 92

G. Hubbard, Ph.D.

that include your reading -- forget my reading.

Does your reading of our data are all consistent -- does your reading of our data include the subgroup analyses in the Massie report?

A.        I read it as simply saying whatever data he's referring to above as a matter of antecedents in English, that's what he's talking about here.  But my analysis assumes your definition, which is far more elastic and apparently, to your surprise, includes the subgroups.

Q.        So if your reading is that it includes the data from EMERGE and ENGAGE, doesn't the data from EMERGE and ENGAGE include the subgroup data from EMERGE and ENGAGE?

A.        All data would, but I read him as saying whatever data he meant in that sentence is what he means by our data.

As I said, it doesn't really matter because I'm taking your definition for the purpose of my work.  You just asked

Page 93

G. Hubbard, Ph.D.

me how I read it.

Q.      Now, after December 5th, were there any additional analyses that Biogen provided to investors concerning the aducanumab trials?

A.      You're talking about December 5th, 2019, after CTAD?

Q.      Yeah.

A.      I don't think so.  I don't recall.  I don't think so.

Q.      I believe you have a statement in your report where you say that there was -- after December 5th, there was no new information?

A.      Okay.

MS. SOLOWAY:  What paragraph are you looking at?

MR. ROSEN:  I don't recall the exact paragraph.

THE WITNESS:  Yeah, I don't see it.  I'm sorry.

MR. ROSEN:  That's fine.

Let's go to -- let's go to paragraph 48.

Page 94

G. Hubbard, Ph.D.

THE WITNESS:  Okay.

BY MR. ROSEN:

Q.      Actually, you know what?  Let me ask you a question.  Let's go back to paragraph 25.

You talk about analyst commentary.

A.      Okay.

Q.      What is the significance of market commentary on a piece of news?

MS. SOLOWAY:  Objection.

Vague.

A.      Are you asking in general or what I mean in paragraph 25?

Q.      In general.

MS. SOLOWAY:  Same objection.

A.      Well, in general, market commentary, whether it's from business news press or from analysts, speaks to whether they find it important or value relevant.

Q.      So if many analysts note a statement that a company makes and comment it's a good thing, it's a bad thing for the company, does that indicate it had price

Page 95

G. Hubbard, Ph.D.

impact?

A.    No, not necessarily.  Indeed, that's the point here.  But no, not necessarily.

Q.    So if an analyst notes a statement that a company makes as being positive or negative, it could indicate price impact, but it doesn't necessarily indicate price impact?

A.    If I'm understanding your question, that's right.  The context I'm using is just that analysts don't note the July 22nd statement.  They don't describe it as containing any new information and of course it doesn't have a price impact.

Q.    What, at a minimum, would an analyst have to have said about the July 22nd statement for you to believe it had a price impact?

MS. SOLOWAY:  Objection.

A.    That's not the sense in which I am using analyst report, so we must misunderstand each other.  Would you like me to clarify?

Page 96

G. Hubbard, Ph.D.

Q.      Yeah.

A.      The purpose of the analyst reports is to say whether the analysts are even noting the statement at all or whether it had any new information.

If I were to look for a price impact, I would use statistics and then studies.  I'd do both of those things.

Q.      Okay.

Now, is it possible for a company's statement, whether it's a -- whether it's on a conference call or an annual report, is it possible for a company's statement to have a price impact and not have an analyst note it in a report?

A.      I'm sorry.  The company's statement?

Q.      Company makes a statement, whether it's an annual report or a conference call or anywhere.  Is it possible that such a statement has a price impact, but no analyst specifically references that statement?

A.      Whenever somebody asks me is

Page 97

G. Hubbard, Ph.D.

something possible, the answer, by construction, has to be almost anything is possible.  If it would be likely, not at all.  But possible, sure.

Q.    So you're not aware of a situation where a company makes a statement and it has a price impact, but an analyst doesn't reference it?

A.    Well, you have now compounded it, so the statement itself had the price impact, so if both of those are true and no analyst talks about it, I would say that's probably quite rare, but I wouldn't ever say anything isn't possible.

Q.    All right.

So let's go to paragraph 32 --

A.    Okay.

Q.    -- of your report.

The last sentence says -- well, I'll put it in context.

As I demonstrate in Section 4B of this report, prior to July 22nd, 2020, Biogen had repeatedly discussed which portions of its data it viewed as supportive

Page 98

G. Hubbard, Ph.D. of aducanumab's approval.  These prior statements consist of a focus on EMERGE, a positive study; portions of ENGAGE, a negative study; and PRIME, a Phase 1B study, while not presenting or implying conclusions about undisclosed subgroup results, such as the APOE4 noncarrier patient populations.

Now, you say while not presenting or implying conclusions about undisclosed subgroups.

So did you review all of the company's statements and determine that the company and none of its representatives ever presented or implied conclusions about undisclosed subgroups?

A.    I've found none of that in Biogen statements.

Q.    It is possible that the company did present or imply conclusions about undisclosed subgroups and you're just not aware of it?

MS. SOLOWAY:  Objection.

Misstates what he said.

A.    I'm not aware of it.  I think

Page 99

G. Hubbard, Ph.D.

if you're going to be so bold, show it to me. I looked and I didn't see it. But if you can prove me wrong, go for it.

Q.      So you did look? I thought you just said you didn't.

A.      No. I said I didn't find anything in my review.

MS. SOLOWAY:  I think you heard him different from what he said.

BY MR. ROSEN:

Q.      All right.

Well, what about the statement that Mr. Sandrock when Umer Raffat asked him on October 22nd, 2019 for details about subgroup analyses and he said:  We can't show that to you right now, but we have nothing to hide.

Doesn't that imply something about the undisclosed subgroups?

MS. SOLOWAY:  Objection.

Asked and answered.

A.      Literally you asked me that and I answered it, so if I have to do it again, it's a waste of time, but here it is in two

Page 100

G. Hubbard, Ph.D.

stops.  One, that's not at all how I would read that.  I told you I would read it in plain English that if you knew what I knew, we would think the same thing.  That's how I read it.

If in your world, you thought that was a very value relevant piece of information that I have now told you that all the subgroups are fine, I'd expect that analysts would pick it up, they don't.  The price would go up, it doesn't.

So both parts and I said them before.

Q.    Well, the price doesn't necessarily go up if all he's doing is assuring people that he's telling the truth?

MS. SOLOWAY:  Objection.

Misstates the testimony.

A.    Wrong.

Q.    So when people assure someone they're telling the truth, the price should go up?

MS. SOLOWAY:  Objection.

A.    No, but that's not the fact and

G. Hubbard, Ph.D.

you know it.  If I tell you -- they didn't believe the subgroup information before.  The subgroup --

Q.    There was no subgroup information.

A.    Correct.  So there's widespread skepticism.  If I now believe --

Q.    But you said they didn't believe it, but there was nothing to believe or not believe.  No one saw it.

A.    Is this a debate or a question and answer?  If it's a question and answer, may I answer?

Q.    Sure.

A.    Okay.  The answer is if I really believed, as I think most of the analysts did, that there's a lot of skepticism here and now I believe you that he's entirely supportive, that should A, trigger commentary and B, trigger a price response and I don't see either one of those.  So I think it's a problem for you.

Q.    So you're saying the analysts just ignored Mr. Sandrock when he made these

Page 102

G. Hubbard, Ph.D.

assurances that the data was not negative?

MS. SOLOWAY:  Objection.

A.      No.  I think they read it A, differently than you and B, remained with their skepticism.

Q.      So they didn't -- if they remained with their skepticism, that means they didn't believe him fully?

MS. SOLOWAY:  Objection.

Calls for speculation.

A.      I mean, who knows what they did or didn't believe.  I'm just saying they didn't appear.  If you're right and what he meant was all subgroups are right, that should have engendered commentary.  It didn't.  Or it should have engendering a price increase and it didn't.  So I don't think that's how they interpret it.  But it's a waste of time for me to keep talking about English because that's not why I'm here.

MS. SOLOWAY:  How are we doing on time?

MR. ROSEN:  They're going to

Page 103

G. Hubbard, Ph.D.

bring lunch around noon, so why don't we just go until noon?

MS. SOLOWAY:  Okay with you?

THE WITNESS:  I could go as long as you want.

MR. ROSEN:  When they bring the food, we could take a break.

THE WITNESS:  That's fine.

BY MR. ROSEN:

Q.    Okay.

Do you have an opinion about whether prior to July 22nd, 2020 the market understood that all data supported efficacy of high dose aducanumab?

A.    You asked that in a fairly complicated way, so if this answer is not responsive, come back at me.

I have an opinion of opposite, that the market did not understand that. Maybe I'm not following your question.

Q.    I said whether.

A.    Right.  So the market did not believe that.

Q.    Do you have an opinion as to

Page 104

G. Hubbard, Ph.D.

whether prior to the proposed class period the market understood that there was not substantial undisclosed data contradicting efficacy of high dose aducanumab?

A.    Complicated question, so if this isn't helpful, come back to me --

MS. SOLOWAY:  I'm going to object to the question.  Go ahead.

A.    The market understood that not -- they didn't have all data and there was skepticism that all data were supportive.  If that answer is not responsive, I'll need help with the question.

Q.    Well, there's a different between supportive and not contradicting.  Right?

MS. SOLOWAY:  Objection.

A.    I'll just answer the question.  Yes.

Q.    All right.

A.    I'll make you work at it.

Q.    So you take the position that the plaintiffs allege that the all data

Page 105

G. Hubbard, Ph.D.
statement meant that all data was supportive.  I could tell you that's not how I understand it.  I understand the all data statement to mean that there is no data contradicting the high dose thesis.

Right?  So my question is --

A.      We know that's false because the statement itself talked about data that contradicted --

Q.      Well, undisclosed data.  Undisclosed data.  Right.

So then the question is do you have an opinion as to whether prior to the proposed class period the market understood that there was not a substantial amount of undisclosed data contradicting the efficacy of high dose aducanumab?

MS. SOLOWAY:  Objection.

A.      That's a very complicated way to ask it.  The market hasn't seen some of the subgroup information.  I think there was skepticism.

I say in the report that it would all be support, but I don't know -- I

Page 106

G. Hubbard, Ph.D.

can't know what each person thought, if that's your question.

Q.      Well, in other words, the question is whether prior to the all data statement the market understood -- believed -- whether or not the market believed there was substantial contradictory data or data that contradicted the high dosage thesis.

A.      I think that's speculation, but I could tell you what I did, which is Exhibit 5.  So I looked for all statements to try to see if -- if you believe that -- that would be curative of that, you know, where people say well, it's not all data.

None of them was statistically significant, so it would be hard for me to hold two hypotheses simultaneously in my head that market participants were confused and get my Exhibit 5.

Q.      Do you believe that analysts interpreted the all data statement on July 22nd to mean that all the undisclosed data was supportive of the high dose thesis?

Page 107

G. Hubbard, Ph.D.

A.     I think that would have to be a stretch. There was no follow up to the statement. That would be news because people hadn't believed that in the past. If they believed that, that would be news. There was not a single follow up to that, nor was there a price reaction.

So this is where we can talk economics instead of English. It would be really hard to believe that.

Q.     Let's go to paragraph 35.

A.     Okay.

Q.     You state: If the July 22nd statement did, in fact, communicate that all data supported the thesis that a higher dose is needed for efficacy, I would expect market participants to view this statement as a strong indicator of aducanumab's potential FDA approval.

Do you see that?

A.     Yes. Remarkably, it's what I just said.

Q.     What is the basis for your expectation as you describe it here?

Page 108

G. Hubbard, Ph.D.

A.    Because that would be new. Prior to then, market participants did not believe that all data are supportive of that.  That was clear from the analyst reports.  This would be new.  I just told you a two-part reason why I think that's not true.  One, there's not a single follow up to this big piece of news in the call and there's no price reaction.

But this would definitely be new and, in fact, the next sentence, which you didn't read, Dr. Tabak himself said market participants would have regarded this as new.

Q.    Are you aware that the FDA normally requires two separate Phase 3 studies before approving drugs like aducanumab?

A.    I'm not a doctor, so I don't know.  I know there are multiple -- there's not just the phases.  There can be multiple rounds within a phase, but I'm not a doctor. Sorry.

Q.    Now, you remember that

G. Hubbard, Ph.D.

Dr. Sandrock on July 22nd referred to ENGAGE as a negative study?

A.    Yes.

Q.    What is your understanding of what a negative study is in this context?

A.    Again, not being a physician, I can only conclude more statistically that it's not leading to the efficacy results that had been hypothesized.  But I'm not a doctor.  I'm not sure if a physician would put it that way.

Q.    Assuming that it is true that the FDA normally requires two separate Phase 3 studies -- successful Phase 3 studies -- to approve a drug like aducanumab and given that Dr. Sandrock described ENGAGE as a negative study on July 22nd, 2020, why do you believe that the market would treat the July 22nd statement as "a strong indicator of aducanumab's potential FDA approval"?

MS. SOLOWAY:  Objection.

A.    Well, let's be clear what the sentence is trying to say.  It's if market participants believe that all data did

Page 110

G. Hubbard, Ph.D.

support, that would be what's news.  That isn't the case, if market participants did believe that.

In other words, if you're correct that the all data statement meant all data everywhere, that would be value relevant.

Q.    But when -- so let's see if we could narrow this down.

The all data statement can't possibly encompass the data that's already been disclosed, can it?

MS. SOLOWAY:  Objection.

A.    I don't see why not.

Q.    Well, because we know you have the study 301, the ENGAGE study.  That was a negative study.  In the same breath, Dr. Sandrock refers to it as a negative study, so he can't possibly be including that specific negative aspect.

Right?

A.    I see what you mean.  Now we're back to -- I'm trying to play on the field you're playing.

Page 111

G. Hubbard, Ph.D.

In my reading of English, no, it wouldn't.  It's only the three categories that he mentioned before.  You're the one who, I think, believes all data means something else.

Q.        Wouldn't the all data he's referring to be referring to all undisclosed data?

MS. SOLOWAY:  Objection.

Misstates.

A.        Possibly.  If that's true, then my sentence is doubly true.  It just means if the undisclosed data believes to be positive -- if I took that --

Q.        Why do you say it's positive? Where does he say it's positive?  Where does he say the undisclosed data is positive?

A.        You're the one who is just saying that that's the reading of his statement or the reading in the other transcript and I'm saying if you want to believe that, that would be value relevant. So people should talk about it, they should follow up, the stock price should go up.

Page 112

G. Hubbard, Ph.D.

But, of course, we know none of that happens.

Q.      Would you agree that there's a difference between saying aducanumab works and saying that aducanumab probably works?

MS. SOLOWAY:  Objection.

A.      First of all, depending on what the meaning of the word "works" is, but generally when you insert an additional word that's a qualifier, yes, the sentences aren't the same.  Now we're back to English.

Q.      Why does the word "probably" matter there?

A.      Well, because, again, it depends on what "works" means, but "probably" means, you know, it should work. It's more likely than not, but it's not guaranteed.  But again, this is English, not medicine, not economics.

Q.      All right.

So let's go to paragraph 36 of your report --

MS. SOLOWAY:  Thirty-six?

MR. ROSEN:  Mm-hmm.

Page 113

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.    It says:  I reviewed all the analyst reports relating to biogen stock from November 22nd, 2020.

Did you personally read all those reports?

A.    The team, under my direction, read all those reports following the protocol in footnote 40.  They were read by two different people.  If there was any disagreement between the two people reading it, it was refereed by a third person.

Q.    So if somebody else read them, why do you say you reviewed them?

A.    In general, it's common for a support team to do the analytical work, so the tables, the underlying review.  It's common practice.

Q.    So in paragraph 36, it says none, referring to no analyst reports, mentions the July 22nd statement or expressed the view that all possible analyses of available data supported the dosage thesis.

Page 114

G. Hubbard, Ph.D.

Is there a specific set of words that would be necessary for an analyst report to express that view?

A.    Yes and no.  So the first look, as it says in footnote 40, was for data are all consistent or something like that, but then I had the team just search on all these Alzheimer's words and then read every single one of those reports from start to finish and there was no mention.

Q.    Who are the specific reviewers for this assignment?

A.    Probably people other than the ones I named.  There's probably a team doing it because there's several analyst reviews in the report.  Each has two people reviewing everything and then one of the team members as the referee.

Q.    You don't know the name of the specific team member who reviewed these analyst reports?

A.    I do not.

Q.    Do you know their educational background or work experience?

Page 115

G. Hubbard, Ph.D.

A.    They would all be MBAs or PhDs.

Q.    MBAs or PhDs?

A.    Yes, sir.

Q.    Are those the only people that Analysis Group hires to work?

A.    Analysis Group has some others, but I know that this team has all MBAs and PhDs.

Q.    But you're not -- you don't know which person did what?

A.    No, sir.

Q.    All right.

All right.  Paragraph 37.

A.    Okay.

Q.    So why did you check to see if the July 22nd statement was referenced?

A.    Well, to the extent that it was important and new, I would expect it to be picked up.  You know, if it were, again, the way plaintiffs have alleged or Dr. Tabak had discussed, again, I didn't find it.

Q.    Why would you expect it to be picked up if it's important and new?

A.    I wouldn't because I don't

Page 116

G. Hubbard, Ph.D.

think it's -- you're the one who does.  If you wanted to make your argument that it's suddenly saying that all subgroup data are supportive, then yeah, that's news.  I would have expected that to be picked up.  It just wasn't anywhere any time.

Q.       So paragraph 41 --

A.       Okay.

Q.       -- starts out:  As I show in this section, in Biogen's October 22nd, 2019 announcement that it would seek regulatory approval for aducanumab onward, market participants consistently recognize that not all subgroup analyses had been made public or necessarily supported the overall findings from EMERGE.

Is there any allegation in this case that Biogen misrepresented whether all subgroup analyses had been made public?

A.       Not to my knowledge, but that's not the point.  The point is what you have alleged, I think, is pivot to a maintenance theory, although you haven't said what's being maintained.  If something is being

Page 117

G. Hubbard, Ph.D. maintained, what is it.  Because prior to this time, analysts were similarly skeptical.

Q.    Why can't it simply be inflation coming into the stock because Dr. Sandrock's misrepresentation about the data on July 22nd prevented a stock price decline?  So what do you need to maintain? Inflation goes into stock when he makes a false statement that props up the price?

MS. SOLOWAY:  Objection.

A.    Well, as you know, for what it's worth, I find that silly and the reason is two.  One is the preexisting analyst beliefs and second is the work in Exhibit 5. So you can't really believe that.  I don't think you're going to persuade somebody of it, with respect.

Q.    So Dr. Sandrock lies.  We know he lies -- right? -- on July 22nd?

MS. SOLOWAY:  Objection.

Q.    Was it a true statement?

MS. SOLOWAY:  Objection.

Q.    Was all the data consistent?

Page 118

G. Hubbard, Ph.D.

Were all the subgroup analyses consistent?

MS. SOLOWAY:  Objection.

A.        Well, A, I don't even read the statement that way, so I wouldn't come to that conclusion.  And it's not for me to determine whether he lied or not.  It's for a court.  All I can say is if you have the more elastic definition that you appear to, you haven't done the work to test it.

Q.        What do you mean by more elastic definition?

A.        In other words, you mean all data, including the subgroups.  If you believe that, that's testable, you could do some work.  I did, your expert didn't.  And you don't find it.

Q.        Don't find what?

A.        You don't find either qualitative or empirical evidence that supports that.

Q.        That supports what?

A.        What you seem to believe, that there's some value relevance if I had known that that really meant all subgroups.

Page 119

G. Hubbard, Ph.D.

Q.      So when Dr. Sandrock said in response to a request for information about subgroup analyses, when he said our high dose thesis is sound and all the data are consistent with it, he was just mumbling irrelevant words or was he assuring the Bank of America analysts that there were -- there was not contradictory data?

MS. SOLOWAY:  Objection to form.

A.      I believe, as I told you repeatedly this morning what the plain English is -- if you look at paragraph 59, you'll see that that very analyst wound up writing a negative report.  He came out very skeptical, too.  So I don't think anybody --

Q.      Skeptical because of subgroup analyses?  Or skeptical because of already disclosed information unrelated to --

A.      He's broadly skeptical that all the data are going to support.  If you believe all the data means all the subgroups, analysts don't buy that and you can test whether that had price --

Page 120

G. Hubbard, Ph.D.

Q.      So you're saying even if Dr. Sandrock lied on July 22nd, nobody believed him?  That's what you're saying.  Right?

A.      It's certainly the case -- the analysts did not believe all data.  If his intent was to "lie," to use your terms, when I looked at curative statements during the class period, they don't have the effect he would predict either.  So I don't think people walked away from that believing all subgroup data was supported.  They didn't believe that before, they didn't believe that after.

Q.      Did they believe all subgroup data were not contradictory?

A.      I think there's widespread skepticism of the subgroup data.  That's all I can say.  But there's no price impact on July 22nd and if you look at every single day during the class period that somebody makes a comment negatively about the all data statement, there's no curative impact either.  That pretty much means

Page 121

G. Hubbard, Ph.D.
statistically there's nothing there, to put it simply.

Q.    You just said if you look at every single date in the class period that somebody makes a comment negatively about the all data statement, there's no curative statement here.

So earlier, you said nobody mentioned the all data statement.  Now, you're saying a lot of people commented negatively about the all data statement.

MS. SOLOWAY:  Objection.

Q.    Either they referenced the all data statement or they didn't.

Which is it?

MS. SOLOWAY:  Objection.

A.    We're not saying the same thing.

Q.    I'm just quoting you.  I'm just quoting what you just said.

A.    Exhibit 5 is about whether or not all data are supportive.  Every time an analyst does say gosh, I don't think all data is supportive, that's Exhibit 5.

Page 122

G. Hubbard, Ph.D.

There's no statistical --

Q.      When did Dr. Sandrock say all data are supportive?

A.      Or even all data are consistent.  Either way.

Q.      Well, you recognize there's a difference?

MS. SOLOWAY:  Objection.

A.      Unlike you, I did the work.  It's Exhibit 5.  We could talk through it.

Q.      You don't know what work I did.  You have no idea what work I did.  So don't tell me what work I did --

A.      It's your expert.

MS. SOLOWAY:  Objection.

Objection.

MR. ROSEN:  Look, just answer the question.  Don't tell me about my work.  Just answer the questions.

MS. SOLOWAY:  What's the question, Larry?  Let's read it back.

BY MR. ROSEN:

Q.      The question is you will concede that Dr. Sandrock never said that

Page 123

G. Hubbard, Ph.D.

all data are supportive of the high dosage thesis.

Right?

MS. SOLOWAY:  Objection.

A.    Correct.  As a matter of English, correct.

Q.    So if he never said that, why do you think that analysts would interpret the all data statement to mean that?

MS. SOLOWAY:  Objection.

Objection.

A.    I don't think they do.  That's the whole point of my report.  I don't believe they do.  It's you who believes that.

Q.    So you don't think they interpret it to mean all data support efficacy, high dose efficacy.  So what do they interpret it to mean?

A.    I think they remain skeptical because they haven't seen the underlying data.  That's --

Q.    But how do they interpret Dr. Sandrock's statement?

Page 124

G. Hubbard, Ph.D.

A.    That would require your asking each and every analyst.  I could only say they say, which is what I'm able to review and do, that they're very skeptical because they're not told.

Q.    They're skeptical?

A.    That's what they say.

Q.    Okay.

So the lemon theory.  How does the lemon theory apply to their skepticism?

A.    Lemon theory is very useful because it's exactly my argument.  So I'm curious as to why Dr. Tabak raised it.

So the market for lemons argument, George Akerlof -- it's a Nobel prize winning contribution in economics -- says if there's asymmetric information about type in a market, then I may discount the average value of what's being sold in the market.

So the example Akerlof gave in his paper was used cars, which is why lemon is used for used cars.

So here, what Tabak is saying,

Page 125

G. Hubbard, Ph.D.

well, if you don't tell me something, I'm going to assume it's bad.  And I'm paraphrasing.  That's his argument.

That's perfectly fine with mine.  So in other words, that's sort of what I'm saying too.  Analysts say, look, if you are not telling me, I am skeptical.

So I'm happy to embrace Dr. Tabak's lemons.

Q.       How do sellers of used cars deal with this phenomenon, this economic phenomenon called the lemon theory?  Do how do they do it in practical terms in the marketplace?

A.       In practice, reputation is one way.  I'm not going to stay in business for very long.  The use of third-party monitors who may come in and check the car.  There's lots of ways markets try to cope.

Q.       What about warranties?  They give people warranties that provide assurance.

Right?

A.       You could also give a warranty.

Page 126

G. Hubbard, Ph.D.

Q.    All right.

They give people -- they try to reassure people, right?  That's how they deal with it, right?  Isn't that what Sandrock is doing when he says I have nothing to hide?

Right?

MS. SOLOWAY:  Objection.

Q.    Isn't that what he's doing whether he says all the data are consistent with the -- he's making a warranty, isn't he?

MS. SOLOWAY:  Objection.

A.    No.  That's not what he's --

Q.    What is he doing then?

A.    I think this is asked and answered --

Q.    Is that not reassurance?  Is that not reassurance?

MS. SOLOWAY:  Objection.

Asked and answered.

A.    No.  If you knew what I knew, you would come to the same conclusion.  That's how I read it.

Page 127

G. Hubbard, Ph.D.

If you want to explore it further, I suggest you sit down with Dr. Sandrock because I can't possibly know what he means.

Q.    If you knew what I knew, you would come to the same conclusion, which is that the high dose thesis works?

MS. SOLOWAY:  Objection.

A.    That's how I would read that as a matter of English.  But if you want to take it further, you'd have to go to him.  I didn't say it.  I don't know what he meant.

Q.    So earlier, we were talking about -- I gave you this hypothetical where the patients in the US took aducanumab and the low dose didn't work, but the high dose did, but in Europe, neither the low dose or the high dose worked.

Do you remember that?

A.    I remember your asking about it, yes.

Q.    Now, would those results for those two subgroups -- would those results from the European subgroup, would that be

Page 128

G. Hubbard, Ph.D.
inconsistent with the overall findings from EMERGE?

MS. SOLOWAY:  Objection.

A.    Are we going from a hypothetical to warranting those are the facts on the ground or --

Q.    We're still in a hypothetical.

A.    Hypothetical?  I think that requires a doctor to conclude.  I would agree they're different.  Whether they would be dispositive in a medical sense --

Q.    The term is inconsistent.  I asked whether they would be inconsistent.

A.    I don't know what else is being held constant in the study.  I don't know. But a doctor I'm sure could give you an answer.

Q.    Let's go to paragraph 48.

A.    Okay.

Q.    It says:  I understand from counsel that one way courts evaluate the inflation maintaining capacity of an alleged misstatement is to assess whether a truthful substitute at the same level of genericness

Page 129

G. Hubbard, Ph.D.
as the alleged misstatement would have caused a statistically significant price decline.

What is the significance of a truthful substitute analysis for price impact?

A.    Well, for me as an economist it's best to start in paragraph 47, the one that comes before then, as I'm saying look, investors understood that Biogen hadn't released the subgroup data.  So if the market participants had viewed July 22nd as all data, then you could be checking for statistical significance.

So when I ran an economic argument -- that's an economic argument. Counsel said it's like the truthful substitute argument and asked me to look at that, so I'm looking at whether there are statements that could have caused that, caused statements that might disabuse the market if it had had that belief and that's what I do in Exhibit 5.

Q.    You find truthful substitutes

Page 130

G. Hubbard, Ph.D.
in Exhibit 5?

A.        That is the goal, yes.

Q.        Okay.

To find truthful substitutes for the statement --

A.        For the statement -- yeah, essentially for your all data view of the all data statement, yes.

Q.        You keep saying our view is that he meant supportive when he said consistent?

A.        That's not what I said, but okay.  What I said was you had roped in the subgroups and all of these things, which I don't believe he meant, but that's fine.

Q.        You don't think he was referring to the subgroup analyses that he was being asked about?

A.        I don't think that's what he said, but it doesn't matter.  I assumed that's what you meant.

Q.        Okay.

But you use the term "support." He never used the term "support."

Page 131

G. Hubbard, Ph.D.

Dr. Sandrock never uses the term "support"?

MS. SOLOWAY:  Objection.

A.       It wouldn't matter for this analysis.

Q.       It wouldn't matter?

A.       Because I use the word "consistent" in the statement that I'm looking for.  You might want to read it.

MS. SOLOWAY:  He's pointing to paragraph 48.

Q.       Well, let's go to exhibit -- all right.  You paraphrase Exhibit 5 here and paragraph 49.

So you think what this RBC Capital Markets analyst said is a truthful substitute for Dr. Sandrock's misleading statement on July 22nd?

A.       Well, let me step back.  Yes, basically.  When you step back, what you're asking for is something that would disabuse the market of the belief they supposedly had that all these data are consistent.

Q.       So this would be a corrected disclosure then?

Page 132

G. Hubbard, Ph.D.

A.      Yes.  In 48, I preview what you're looking for.  You never find the exact words.  Something like although portions of the data, not all data are consistent with that.  That would be the "truthful substitute."

In each of the line items in Exhibit 5, I find analysts who "disabuse" that all data are not consistent.  And in none of the cases that I found -- and I think all of them are in Exhibit 5; I don't remember how many there are, but there are a lot -- and none has a statistically significant price range.

Q.      Okay.  All right.

So what in this RBC Capital Markets analyst report do you believe corrects the all data statement?

A.      Well, again, this is one that says data not disclosed, unlikely to be overly positive.  So I view this as, again, each of the -- maybe it's helpful to turn to Exhibit 5 for the presentation of it.  I could see in Exhibit 5 what I do with each

Page 133

G. Hubbard, Ph.D.

of these, it starts at page 124 of the document.  I don't know how you paginate it, but -- or it's Exhibit 5 at the end.

Each of these I find this statement -- this is reviewing all analyst reports during the period.  I find a statement that disabuses.

Q.    Okay.  But let's just look at the one you have in paragraph 49.

I assume you're leading with your best statements in your report, no?

A.    I think many of these are very good statements.  I'm not sure I'm putting an example --

Q.    So RBC says:  Our panelists would have liked to see additional stratified analyses.

Is that a corrective disclosure when they say we would have liked to see more data?  That's corrective of the Sandrock statement?

A.    Yes.

Q.    How?

A.    Because obviously you're not

Page 134

G. Hubbard, Ph.D.

believing that all data are supportive.  For example, look at number four from Callen & Co., not clear of the totality of data --

Q.    Again, you're using the term "supportive."

When did Sandrock use the term "all data are supportive"?

MS. SOLOWAY:  Objection.

Larry, ask the question, he'll give an answer.

A.    He used the term "consistent."

Q.    Right.

So wouldn't you expect a correction to be addressing what Sandrock said, not what he didn't say?

A.    Yes.  So let's play back the tape and go back to 48 again.

The sentence I would like, which you're never going to find, is although portions of the data from PRIME, ENGAGE and EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, not all data are consistent with that.

Page 135

G. Hubbard, Ph.D.

So I look through all the analyst reports and try to find the closest I can, if you have others, happy to look at those, but none of them is statistical significant.

Q.    But also none of them also address what Sandrock said, right?  They're saying something different.  They're not saying that there's nothing -- that there's something contradictory.  They're saying it may not be as supportive as we would like or as supportive as we'd hope or as supportive as, you know, whatever.  But they're talking about -- but none of them -- do any of them say we believe there's contradictory data out there?  Do any of them say that?  Do any of them say we believe there's contradictory data out there?

A.    I don't think that would be required.  I stand by the analysis.  If you could persuade a jury it means says what you say, godspeed.

Q.    Okay.

So let's talk about your

Page 136

G. Hubbard, Ph.D.

counsel's -- what counsel told you to use this truthful substantive?  Who gave you that?

MS. SOLOWAY:  Objection.

A.    Telling -- 47 sets up what I believe and do as an economist.  Counsel was also interested in the substitution of the same level of genericness, which I take -- I'm not a lawyer -- as called a truthful substitute.  So it's not an instruction other than a definition.

Q.    So who formulated this truthful substitute in paragraph 48?

A.    I did.

Q.    It was you?  You take responsibility for that?

A.    Yes.

Q.    One hundred percent?

A.    One hundred percent, as I do in every paragraph.

Q.    Okay.

Now, it says:  Although portions of the data from PRIME, ENGAGE and EMERGE are consistent with needing to get to

Page 137

G. Hubbard, Ph.D.

the higher dose of aducanumab.

Is that what Sandrock said?

MS. SOLOWAY:  Objection.

A.     No.  That's the whole point.

Q.     Why --

A.     You're looking for the truthful substitute.  It should be the opposite.  Right?

Q.     So -- okay.

But as I read his statement, he says -- he doesn't use -- he doesn't use the term consistent with needing to get to the higher dose.

Right?

A.     I'm sorry.  He definitely does, unless I can't read.

Q.     Although portions of the data from PRIME, ENGAGE and EMERGE are consistent with needing to get to the higher dose, where does he say that?

A.     So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose and I think our data are all consistent with that.

G. Hubbard, Ph.D.

Can I read it or did I read it incorrectly?

Q.    Well, what you read doesn't match what you wrote.  That's the problem.

A.    I don't agree with that.  So too bad.  I definitely --

Q.    I just want to understand why you -- why you did what you did --

A.    Of course you just misstated Dr. Sandrock.  Can we agree that he said what I said he said?  Can we start there?  You misstated him.

Q.    It says:  We believe that data from ENGAGE -- that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis we did with EMERGE.

A.    Okay.  So here we got the word "support" --

Q.    Yes.

A.    -- and then at the end --

Q.    He says -- he says portions of ENGAGE support EMERGE.

Right?

Page 139

G. Hubbard, Ph.D.

A.      I agree.  And then the consistent language --

Q.      And he says:  EMERGE is the first study to show in effect not only in the primary input, but also three prespecified -- so he's saying we got successful results with EMERGE and he said that many times in the past.

He said we met the prespecified endpoint, it works, EMERGE showed to a statistically significant result that it works.

Right?

So he's saying EMERGE worked, showed it works, portions of ENGAGE support this analysis from EMERGE.

Right?

So why do you then have this statement that portions from PRIME and ENGAGE and EMERGE are consistent with -- why is it just portions of ENGAGE and EMERGE are consistent with needing to get to the higher dose?

A.      Well, the portions may differ

Page 140

G. Hubbard, Ph.D.

across the studies.  I read it --

Q.      But where does --

MS. SOLOWAY:  Hang on.  Let him finish answering the question.

A.      I read it exactly that way.  I look at his last sentence.  I look at the word "support" and that's what I think it is.

If you have a different one, I'm happy to read where Dr. Tabak does that, but this is the only one we've got.

Q.      I'm just wondering where in the history of Biogen's public statements from October 22, 2019 through November 3rd, 2020 that Biogen ever -- anyone at Biogen said that portions of EMERGE are consistent with needing to get to the high dose, higher dose of aducanumab for efficacy?

A.      I'd be fine if you say EMERGE and portions of PRIME and ENGAGE.  To me, the portions are going to vary across the three.  That's what he said in his statement.

Q.      He said it met the prespecified

G. Hubbard, Ph.D.
endpoints, primary and secondary.  So I'm not sure where you're getting portions from.  And I'm not sure where you're getting consistent with.  He's saying it proves it, right?  Not just consistent, but proves.  So I'm just trying to understand --

A.    I'm sorry, sir.  You evidently can't read or I can't read.

The last sentence of the statement in 19:  So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose and I think all our data are consistent with that.

Did I read that correctly?  I think you know I did.

MS. SOLOWAY:  Is now a good time for a break?

THE WITNESS:  Probably.  This is wasting time.

MR. ROSEN:  What's wasting time?

MS. SOLOWAY:  Let's everybody just take a beat.  Is now a good time to take a lunch break?

Page 142

G. Hubbard, Ph.D.

MR. ROSEN:  Well, if we have food, yeah.  We could take a lunch break, sure.

THE WITNESS:  Thirty minutes?

MR. ROSEN:  Well, we could say 30 minutes, but no one will be back in 30 minutes.

MS. SOLOWAY:  We could go off the record.

(Time noted: 12:15 p.m.)

(Recess taken)

(Time noted: 12:58 p.m.)

BY MR. ROSEN:

Q.    Last we were discussing -- are you ready?

A.    Whenever you are.

Q.    So -- let's see.  We were in paragraph 48 of your report, looking at the truthful substitute.

A.    Okay.

Q.    I want to try an alternative truthful substitute on you.  Tell me what you think.

A.    Okay.

Page 143

G. Hubbard, Ph.D.

Q.    Here we go.

So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose; however, you should know that we and the FDA have identified a substantial number of subgroup analyses that are inconsistent with that.

A.    That's a statement.

Q.    Is that an adequate truthful substitute?

MS. SOLOWAY:  Objection.

Calls for a legal conclusion.

A.    Truthful substitute?  I like mine better, but if you'd like me to explore yours, I'm happy to do that.

Q.    As an economist, why do you like yours better than mine?

A.    Well, because I think it's consistent per the answers I gave before with the opposite of what Dr. Sandrock said.

Q.    Opposite of what -- but, I mean, wouldn't you only have to change the aspects of the statement that are false? You wouldn't change the statement to the

G. Hubbard, Ph.D.

extent it's not false, right?  Or allegedly false?

A.    I think that's what I did.

Q.    Well, I think my statement actually is verbatim with what Sandrock actually said.

A.    That sounds like a declarative sentence.  Do you have a question for me or --

Q.    Yeah.

So why wouldn't you just verbatim take what he said and then substitute the false part of what he said with the truth?

MS. SOLOWAY:  Objection.

A.    That's not what I would do. But if you want to do that, we could explore it.

Q.    But why wouldn't you do it? Why wouldn't you do it that way?

A.    Again, I think mine is a better truthful statement, but I'd be happy to take yours.

Q.    I know.  But I'm asking you

Page 145

G. Hubbard, Ph.D.

why.  I'm asking for an explanation for your belief of the superiority of your statement --

A.    Let's review how much all this matters.  You're never going to find in the analyst report an exact match for my statement or your statement.  What you're looking for in the analyst report is this general I'd say disabusing of the thrust of the Sandrock statement.  So I'd be doing the same analysis whether I used your statement or mine.

Q.    Okay.

But you shouldn't -- I mean, would you agree that you wouldn't draft your truthful substitute with the idea that you want it to somehow show up in the analyst reports that you reviewed or not show up, for that matter?

MS. SOLOWAY:  Objection to form.

A.    If I'm understanding your questions, it would.  What you're looking for in the analyst reports is this idea of

Page 146

G. Hubbard, Ph.D.

an inconsistency or lack of support.  I would be looking for very similar things whether I used yours or mine.  If Dr.  Tabak wants to do one, I would be happy to respond to his.  I don't see this being very different.

Q.       Okay.  All right.

But I -- I think the -- from my standpoint, the truthful substitute is more significant than just your analysis beginning in paragraph 48 or 49.  I think truthful substitute is -- you know, also goes to what happens on the back end.

Right?

MS. SOLOWAY:  Objection.

I don't understand that.

MR. ROSEN:  I'm sorry.

A.       I definitely don't understand it, but it also -- when we get to the back end, I'll show you why that's absolutely wet, but we're not there yet.

Q.       But you don't draft your truthful substitute with the idea that it should match or not match analyst reports or

Page 147

G. Hubbard, Ph.D.
corrective disclosure.

The truthful substitute, wouldn't you agree, should be drafted with the idea that I'm simply making the same statement and correcting falsity -- the false nature of the statement?

MS. SOLOWAY: Objection. Calls for a legal conclusion.

A.    That's a legal question. So what I can do as an economist is try to look for words, expressions in the analyst report that do contradict. When we get to the back end, I'll show you why you can't do what you're suggesting.

Q.    You're, again, focused on your analyst reports. Are you saying you drafted your truthful substitute with your analyst reports in mind?

MS. SOLOWAY: Objection.

A.    No.

Q.    Then the drafting of the analyst reports -- then the analyst reports have nothing to do with what the truthful substitute should be.

Page 148

G. Hubbard, Ph.D.

Fair enough?

MS. SOLOWAY: Objection.

A. No. Not fair enough. The word "truthful substitute" -- words "truthful substitute" may be a term of art in the law. They're not in economics. So I start in 47. So I'm looking for information in the analyst reports that contradicts. If you're saying it means something else as a matter of law in particular words, I'll defer to everybody in the room as a lawyer. I'm not a lawyer.

Q. You're not a lawyer, you're an economist. Let's talk economist speak.

Do they use the term "but-for world"?

A. Yes.

Q. Okay.

And is this but-for world analysis similar to the truthful substitute analysis?

MS. SOLOWAY: Objection.

A. If I'm understanding what a truthful substitute is, that's not how I

G. Hubbard, Ph.D.
would put it.  A but-for world is just
absent the stated conduct.  It's not a
negation.

Q.     But had they told this truth --
had they told the truth on July 22nd --
right? -- but for having made a
misrepresentation on the 22nd, had they told
the truth, what would have happened.  Right?
Isn't that a similar type of analysis?

MS. SOLOWAY:  Objection.

A.     If I'm understanding your
question, no.  Because I've already shown
you, I thought, that the market participants
didn't believe that before or after
July 22nd, so the but-for world wouldn't
have been disturbed one way or another --

Q.     Yeah, but before you make
that --

MS. SOLOWAY:  Let him finish
his answer, please.

A.     It's different from what I take
to be the legal definition of the truthful
substitute.

Q.     You're bringing your

Page 150

G. Hubbard, Ph.D.

analysis -- your after-the-fact analysis -- into the question.

I'm just trying to figure out how to set up the question.  Right?

The question is what is the proper truthful substitute?  What is the correct but-for world?

Certainly you want to decide that before you start looking at analyst reports and looking at corrective disclosures.

Right?

MS. SOLOWAY:  Objection.

A.    Correct.  That's what I did.

Q.    So if that's what you did, why did you change the statement -- change the aspects of the statement that were true and not false?

MS. SOLOWAY:  Objection.

A.    I don't believe I did.  And I certainly don't believe this has anything to do with the analysis I did.  But I don't accept your statement.

Q.    All right.

Page 151

G. Hubbard, Ph.D.

So the statement -- so consistent -- let's look at paragraph 19, what Sandrock said. He says: So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose.

Why do you excise that statement from your truthful substitute?

MS. SOLOWAY: Objection.

A.    I don't think it's a matter of excising it. I thought I was capturing it.

Q.    But you changed it. Why wouldn't you use it verbatim? Why did you need to change it?

A.    Well, I guess the question is what you think you're trying to countermand.

I thought the idea of your case is you're trying to countermand the idea that data are all consistent with that. As I told you, if you want to rearrange the PRIME, ENGAGE, EMERGE and portions of it, I'm happy with that too.

Q.    I'm not trying to make you happy and I'm not trying to rearrange anything.

Page 152

G. Hubbard, Ph.D.

I'm asking you why you didn't go with this existing aspect of the statement and decided to change it. So consistent with the finding from ENGAGE and EMERGE, you need to get to the higher dose.

Is that statement in your mind true or false, at least as far as the First Circuit is concerned?

A.    That's a legal question. I don't one way or the other.

Q.    Do you believe it's false?

MS. SOLOWAY: Objection.

Objection.

A.    I think it depends on the reading -- we've been through this many times. Whether I think it's false is irrelevant.

Q.    Well, no, it's not irrelevant. You're an economist testifying as an expert in this case on this particular statement, so whether you are assuming it to be true or false is very relevant to your opinion.

MS. SOLOWAY: There's no question there. There's no question.

Page 153

G. Hubbard, Ph.D.

Q.    So I would like to know whether or not you believe or assume that this statement is true or false:  So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose.

Are you assuming that statement is true or false for purposes of your opinion?

MS. SOLOWAY:  Objection.

A.    For purposes of my opinion, as I've said, I'm accepting your allegations as true, so I would think that is false.

Q.    You're accepting my -- you're saying I'm alleging that that statement is false?

MS. SOLOWAY:  Objection.

A.    Well, you're alleging with the I think our data are all consistent with that.

Q.    I'm talking about the part of that sentence, the clause -- you see that sentence has two clauses, before a comma and after the comma.

Right?

Page 154

G. Hubbard, Ph.D.

A.      Yes, but I don't think you can separate them.

Q.      Oh, you certainly can.

You don't think the statement: So consistent with the findings from ENGAGE and EMERGE you really need to get to the higher dose, you don't think that statement can stand alone?

MS. SOLOWAY:  Objection.

A.      It could, but it becomes a scientific question.

Q.      Right.  It's a scientific question and he's answering it for you.

My question is do you assume that statements is true or false for the purposes of your opinion?

MS. SOLOWAY:  Objection.

Q.      Do you not know whether it's true or false for the purposes of your opinion?

MS. SOLOWAY:  Objection.

Which question do you want him to answer?  Larry, really, we're going in circles here.

Page 155

G. Hubbard, Ph.D.

MR. ROSEN:  I just want an answer.  He's afraid to answer the question.  He's afraid to tell me whether he's assumed that statement to be true or false and it's a critical aspect of this case.  It's the statement at issue.  Right?  It goes directly to the truthful substitute, so he has to take a position.

MS. SOLOWAY:  Look, I don't want to extend the day and I definitely don't want to get into the business of offering speaking objections.

He just told you that he is assuming that the plaintiffs' theory of the case is the theory of the case and he is not making a liability judgment here.

MR. ROSEN:  That's not my question.  That's not my question.  I'm asking him whether he assumed that statement to be true or false.

MS. SOLOWAY:  Which words exactly?

Page 156

G. Hubbard, Ph.D.

MR. ROSEN: So consistent with the findings from ENGAGE and EMERGE you really need to get to the higher dose.

BY MR. ROSEN:

Q. Is that statement true or false for the purposes of your opinion?

MS. SOLOWAY: Objection to form.

A. For the purposes of my opinion and I think your allegations, it's really the all data are consistent that I am focused on. Whether ENGAGE and EMERGE and higher dose, that's all a medical question. The question that's at issue is whether the data are all consistent with that.

Q. Yeah, but what is that? Consistent with that, isn't that referring to the prior clause? You're not telling me whether you -- whether you are assuming that prior clause is true or false.

MS. SOLOWAY: Objection. That's not a question.

Q. I'd like to know are you assuming that that prior clause is true or

Page 157

G. Hubbard, Ph.D.

false?

MS. SOLOWAY:  Same objection.

Asked and answered.

A.      We talked about this before.  I
see as an English matter all consistent with
that, I'm referring back to the description
he had above.

You refer to something
different and I'm accepting yours.  That's
what I'm here for --

Q.      I'm not asking you to accept.
I want to know are you assuming this
statement is true or false.  And you're not
telling me what your opinion is based on.
You have to tell me what your opinion is
based on.

MS. SOLOWAY:  Objection.

Objection.

Asked and answered.

MR. ROSEN:  It's not asked and
answered.

MS. SOLOWAY:  Let's move on.

MR. ROSEN:  No, we're not going
to move on.  I want an answer to the

Page 158

G. Hubbard, Ph.D.
question.  It's a very simple question.
This is the critical false statement in
the case.  It's got two clauses.
One-half of one of the clauses we
allege is false and the First Circuit
has found to be false.

And I want to know --

MS. SOLOWAY:  Objection.

That isn't even true.

Larry, come on.

THE WITNESS:  That's not my
reading.

MS. SOLOWAY:  Like, really?
Can we move on?

They found that a false
statement was plausibly alleged --

MR. ROSEN:  Fair enough.

MS. SOLOWAY:  -- and you're
asking him about words in a vacuum
that are in a paragraph and he has
already told you that his own
interpretation of the paragraph is not
necessary for his analysis.

Do you want his interpretation?

Page 159

G. Hubbard, Ph.D.

MR. ROSEN:  I want his answer to the question.

BY MR. ROSEN:

Q.    Are you assuming that statement or are you assuming that statement is false?

MS. SOLOWAY:  Objection.

Asked and answered.

A.    I'll answer it in two parts. My reading of it is that all data are consistent, that refers to something else in the paragraph.

If your reading is that it's all data of any kind and that both parts of the sentence are false, I'll accept that and indeed have accepted it for the purposes of my analysis.  Whether I believe something is neither here nor there.

Q.    I'm not asking you to accept anything.  I'm asking for what your opinion is based on.

So you're saying that the second clause in that sentence and I think all are -- I think all data are all consistent with that doesn't refer to the

Page 160

G. Hubbard, Ph.D.

first clause in that sentence, so consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose, you're suggesting it refers to another sentence in the paragraph earlier on?

A.      I'm suggesting both.  As I've said repeatedly, what he's talking about are the findings from ENGAGE and EMERGE that he's described above.

But this is all irrelevant because I'm accepting your view.  I'm not here to say --

Q.      What's my view?

MS. SOLOWAY:  Objection.

Let him finish his answer.

A.      That all data are consistent, including the subgroups.  I've accepted that for the purposes of --

Q.      But that's not my question. I'm not focused on that clause.  I'm asking you about the first clause in that sentence: So consistent from the findings ENGAGE and EMERGE, you really need to get to the higher dose.  That's what I'm focused on.  You keep

Page 161

G. Hubbard, Ph.D.

telling me you agree with me.  I haven't taken a position on that sentence, that clause.

MS. SOLOWAY:  Same objection.

Asked and answered.

BY MR. ROSEN:

Q.    You have to take a position, either you believe it or don't believe it.

MS. SOLOWAY:  Wait.  There's no question pending.

What's the question?

BY MR. ROSEN:

Q.    I would like to know whether you assumed this first clause in that sentence -- so consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose -- for the purposes of your opinion, did you assume it was true or did you assume it was false?

A.    It's not something I assumed one way or the other for my opinion.  I took this case to be about whether all data are consistent with an observation.

The question you're asking me

Page 162

G. Hubbard, Ph.D.
would require a scientific conclusion, which I'm not capable --

Q.    You did not assume that that first clause is false?

MS. SOLOWAY:  Objection.

Misstatements the testimony.

Q.    Did I misstate your testimony? Did you assume it was false?

A.    I don't make an assumption one way or another.

Q.    I'm not misstating his testimony.  He's neither assuming it's true and he's neither assuming it's false.

You're taking it as neutral.

Is that correct?

You're making no assumptions.

Is that correct?

MS. SOLOWAY:  Objection.

A.    That's not the same as neutral, but I am not making an assumption.  I believe this case to be about the all data are consistent.  I've accepted your interpretation of that for my analysis.  The rest is about science, which I can't help

Page 163

G. Hubbard, Ph.D.

you with.

Q.      Okay.

So you're not assuming that that sentence so consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose is false.

Correct?

A.      I don't need to one way or another.

Q.      Okay.

But you don't, right?

MS. SOLOWAY:  Objection.

Asked and answered.

MR. ROSEN:  I'd just like a clear answer for once.

MS. SOLOWAY:  You're not getting a different answer just by asking the question 20 times, Larry.

A.      I don't need to assume it one way or another for the economic analysis.

BY MR. ROSEN:

Q.      I didn't ask what you needed to do.  I asked you what you did.

A.      What I needed to do is what I

Page 164

G. Hubbard, Ph.D.

did.

Q.    And that was make no assumption one way or the other.

Correct?

MS. SOLOWAY:  Objection.

A.    Because it's a scientific question.

Q.    Okay.  Okay.  Fine.

So if you're not assuming it's false and you're not assuming it's a false statement, why do you then excise it from your truthful substitute?

MS. SOLOWAY:  Objection.

A.    I don't believe I've done that in the analysis.

Q.    You've changed it, haven't you?

A.    No.

Q.    You haven't changed?  I don't see the words so consistent with the findings of ENGAGE and EMERGE -- I don't see that in your truthful substitute anywhere.

A.    I think we've been through this.  I'm starting to get annoyed again.

Page 165

G. Hubbard, Ph.D.

Although portions of the data from PRIME, ENGAGE and EMERGE are consistent with needing to get to the higher dose of aducanumab.  Not all data are consistent with that.

So one of us can't read.

Q.    What you wrote does not match what's in paragraph 19.

Correct?

A.    Doesn't have to.  I think this summarizes what I want to do.  I understand you don't like it, we could spend all afternoon on it.

Q.    You rewrote aspects of the statement that are not -- that are not false or not alleged to be false as part of your truthful substitute.

Is that correct?

MS. SOLOWAY:  Objection.

A.    I do not agree with that.

Q.    But you did rewrite it, right? You don't copy verbatim the statement, the sentence, right?

A.    I think we can agree with that.

Page 166

G. Hubbard, Ph.D.

Q.    So what then would be wrong with a truthful substitute that says:  So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose; however, you should know that we in the FDA have identified a substantial number of subgroup analyses that are inconsistent with that?

MS. SOLOWAY:  Objection.

Calls for a legal conclusion.

A.    Truthful substitute is a legal term.  I'm doing something that I think is consistent with the analysis that I need to do and I'm -- that's that.  I mean, we could talk about it all afternoon.

Q.    Why wouldn't you do your analysis with the truthful substitute I just read to you?

A.    Because I think the one I did matches what I understand the case to be about.  I know you may disagree.

Q.    Why wouldn't the correct truthful substitute be the actual subgroup analyses that Sandrock refused to disclose?

Page 167

G. Hubbard, Ph.D.

MS. SOLOWAY:  Objection to form.

A.      If I'm understanding your question, that's not contradicting this.  It's not -- I'm trying to get at disabusing what he actually said in paragraph 19, so I -- I do separate exhibits on subgroups, if you'd like to go to those.  But for this one, I stand by this.

Q.      What would -- why wouldn't that be a perfectly acceptable truthful substitute, the actual data that -- the actual subgroup data that Biogen had in its position and concealed for the investors?

MS. SOLOWAY:  Objection.
Calls for a legal conclusion.

A.      It's certainly a legal question, but it also doesn't match paragraph 19.  If you're interested, I also have a separate exhibit --

Q.      Why doesn't it match paragraph 19?

A.      Because I don't see that.  It says I think all our data are consistent

Page 168

G. Hubbard, Ph.D.

with that, so I'm trying to match that.  If you'd like to talk about subgroups, I analyzed those too.

(Whereupon, Exhibit 6 was marked for identification.)

Q.      All right.  Let's take a look at Exhibit 6.  Tell me if you've ever seen it before.

A.      I'm there.  So it's the First Circuit --

Q.      Yes.

A.      Yeah.

MS. SOLOWAY:  Is there a page of the exhibit you'd like him to turn to?

MR. ROSEN:  Page eight of the PDF.

THE WITNESS:  Okay.  I'm there.

BY MR. ROSEN:

Q.      Okay.

Let's go to the bottom of the first partial paragraph.

A.      Okay.

Q.      It says -- the last sentence of

Page 169

G. Hubbard, Ph.D.

that paragraph says:  Thus, by failing to disclose the subgroup data, which would have contextualized their all data claim, the complaint plausibly alleges that defendants' omission misled investors.

So what do you think the First Circuit is saying in that sentence?

A.    I'm not a lawyer.  I could only read the English.  I'm sorry.

Q.    What does the English tell you?

A.    Pretty much how the court wrote it.  It's not an unclear sentence.

Q.    Would you agree that the First Circuit's opinion that failing to disclose the subgroup data -- well, that disclosing the subgroup data was necessary to contextualize the all data claim?

MS. SOLOWAY:  Objection.

A.    I can't question the First Circuit.  What I can say is I tested that, so if you think the all data claim meant the subgroup data, that would have been value relevant, analysts didn't talk about it and it didn't move the price.

Page 170

G. Hubbard, Ph.D.

Q.    Analysts didn't talk about the subgroup data?

A.    No.  Analysts -- if people believed that all data meant that the subgroup data were actually backing up the results, that would have been talked about. No follow up in the earnings call, no mention in the analyst reports and no price movement.  So I can't agree or disagree with what the court said, but I could say you could study that, I did and it's not there.

Q.    So in your opinion, in your opinion, the disclosure of the subgroup data would not have been value relevant?

A.    No, just the opposite.  That's my point.  If as per the court's instruction it's disclosure of the subgroup data that's required, then if the market participants thought that all data meant the subgroup data were all in line, that would have been value relevant.  I agree with you.  But it got no commentary in the earnings call question, the analyst reports and didn't move the price.

Page 171

G. Hubbard, Ph.D.

So the court is simply asking a question and I'm trying to answer it.

Q.    So you're saying the market participants did not think that the all data statement meant that the subgroup data were all in line with the high dose thesis?

MS. SOLOWAY:  Objection. Form.

A.    Correct.  We know that because that would have been new.  We've already talked earlier today about how people didn't view that before, so that would have been new.  It gets no commentary, no questions on the earning call and doesn't move the price. So the court obviously should say whatever it wants to say, but I'm saying that's testable and I did.

Q.    So your opinion is that if the subgroup data had been disclosed on July 22nd, there would not have been any price movement?

A.    That's a different question and not the one the court is asking.  So what I'm saying is the failing to disclose the

Page 172

G. Hubbard, Ph.D.

subgroup data -- so basically, if the idea is that by not disclosing the subgroup data people assumed all data meant the subgroups, that's positive clearly and because it's new and it should have been reflected in pricing and commentary and it wasn't.  So that's what I did.

Q.    You acknowledge that the analysts were all eager to learn the subgroup data, right?

A.    Yes, sir.  Indeed.

Q.    And is it your opinion that they interpreted the all data statement -- that they did not interpret the all data statement to mean that all of the subgroup analyses were consistent with the high dose thesis?

A.    Yes, sir.

Q.    Why is that?  What's that based on?

A.    For the reasons we've discussed.  Had they believed that, there would have been both commentary and a price reaction because that's very new.  They

Page 173

G. Hubbard, Ph.D.

hadn't believed it before.

Q.      So at the end of paragraph 52 -- well, paragraph 52 says -- you reference your Exhibit 5 and you say:  After July 22nd, market participants were aware of the risk that the data package presented to the FDA was not straightforward.

What does it mean, the risk was not -- the risk -- that the data package was not straightforward?  What do you mean by that?

A.      Pretty much what the rest of it says.  It says the results aren't supportive.  Dr. Sandrock talks about what's positive, what's negative, so one might infer, as many of the analysts did in their reports, that a statistician may not concur.

Q.      Now, what results were unsupportive?

MS. SOLOWAY:  Objection.

A.      Well, in the statement, if you go back to paragraph 19, not all of the -- not all of EMERGE, ENGAGE and PRIME had pointed in the same direction, that only

Page 174

G. Hubbard, Ph.D.

portions of the data from ENGAGE, which were negative.

Q.    So we know that -- it doesn't say portions of ENGAGE -- strike that.

Portions of ENGAGE were negative.  It says that portions of ENGAGE were supportive.

A.    Yes.  I'm sorry.  You're correct.

Q.    But we know that ENGAGE itself was a negative study overall, right?

A.    Overall, yes.

Q.    But portions were supportive, right?

So this says that some results were unsupportive.  So we know that the results of ENGAGE were unsupportive, right, because it was a negative study?

A.    Yes, sir.

Q.    And that was disclosed.  But what other results were unsupportive that had been disclosed?

A.    In terms of what had been disclosed, I think those are the results

Page 175

G. Hubbard, Ph.D.

that are unsupportive.

Q.      Is there anything else other than the fact that ENGAGE overall was a negative study?  Was there anything else out in the market that people knew that indicated results that were unsupportive of the high dose thesis?

MS. SOLOWAY:  Sorry.

Objection.

MR. ROSEN:  It says after the July 22nd statement.

MS. SOLOWAY:  So after July 22nd and before --

A.      I would say -- if your question is knew there's nothing else, but market participants are talking about, again, not knowing the subgroups and I believe that perhaps the subgroups themselves may have other negative information, but that's not knowing.  So it's --

Q.      Right.  So you will concede that other than the overall top line result of ENGAGE being a negative study, you're not aware of any other results from these trials

Page 176

G. Hubbard, Ph.D.

that were unsupportive of the high dose thesis.

Is that right?

MS. SOLOWAY:  Objection.

Misstates the question.

A.      It's known, but the market participants were highly suspect, as we talked earlier about the subgroup analysis. But literally, as you asked it, I would agree.

Q.      So market participants were highly suspect?

A.      Of the subgroup -- that the subgroup analyses would be uniformly supportive.

Q.      Well, if ENGAGE was a negative study, is it possible that the subgroup analyses could be uniformily supportive? How is that possible that they be uniformly supportive?

MS. SOLOWAY:  Objection.

Calls for speculation.

A.      I don't think they are uniformly supportive.

Page 177

G. Hubbard, Ph.D.

Q.    But you're suggesting that they knew it was -- they would not be uniformly supportive, but how would it under any circumstances be possible for anyone to believe that the subgroup analyses would be uniformily supportive if you have a negative study in ENGAGE?

MS. SOLOWAY:  Objection.

A.    My reading of the analyst concerns is that they may be worried about subgroup analyses even in overall positive studies.  They're worried generally about subgroup analyses.

Q.    So the fact that they're worried generally about subgroup analyses means they didn't 100% believe Sandrock's all data statement.

Is that correct?

A.    Correct.

Q.    Now, why wouldn't they believe a man of Dr. Sandrock's standing and reputation, CEO of a big, very successful biotech company?

MS. SOLOWAY:  Objection.

Page 178

G. Hubbard, Ph.D.

A.        I don't know that he was the CEO --

MS. SOLOWAY:  Objection, objection, objection.

MR. ROSEN:  Okay.  Objection.

But he could answer the question.

MS. SOLOWAY:  Calls for a legal conclusion.

MR. ROSEN:  He's telling me they don't believe him.  I'd like to know why they don't believe him, why you take the position they didn't believe him.

MS. SOLOWAY:  Objection.

BY MR. ROSEN:

Q.        Did they say they didn't believe him?

MS. SOLOWAY:  Objection.  Objection.

A.        Which question do you want me to answer --

Q.        The last one.

Did they ever say they don't

Page 179

G. Hubbard, Ph.D.

believe Sandrock?

A.    They don't speculate, I'm not speculating.  I think what they're saying is reading between the lines, we analysts are not sure that the subgroup analyses back all this up.  We don't have this data, so we can't know one way or another.  I don't read this as we're trying to yes, no is Dr. Sandrock telling the truth.  That honestly depends on how you read paragraph 19.  It's really the question of whether they think the subgroup analyses are going to be supportive and I think they're quite skeptical of that.

Q.    You cite some of these analyst reports that cite some of the analyst data might not be supportive of approval.

What is the relevance of analysts suggesting the underlying data were not supportive of approval?

A.    It gets back to the economic question.  To the extent that analysts didn't believe it, it's not a statement that you would expect the study and find a price

Page 180

G. Hubbard, Ph.D.
correction.  If you thought that analysts really believed this, you should see a price movement because it's clearly value relevant.  That's what I'm looking at.

Q.    All right.

So let's look at the first analyst quote from RBC Capital Markets --

A.    I'm sorry.  Where are we?

MS. SOLOWAY:  What page?

A.    Paragraph 49?  Is that where you are?

Q.    Yes.  RBC Capital Markets, October 19th, 2020.

MS. SOLOWAY:  Larry, are you in paragraph 49?  Yes?  First bullet?

MR. ROSEN:  Yes.

BY MR. ROSEN:

Q.    So he says:  Though our sense is that they did not disclose to data are unlikely to be overly positive.

So what does it mean if data are unlikely to be overly positive?

A.    I read that as meaning they're not uniformly supportive.

Page 181

G. Hubbard, Ph.D.

Q.    Not uniformly supportive?

A.    And you can get a sense of that if you flip the page, the same RBC -- well, it's a different report, but same -- same authors, just saying, you know, again, sensitivity analyses not disclosed we believe are unlikely to be supportive as you present the data.  They're saying we're a little skeptical here.

Q.    Sounds like he's saying they've presented us the most positive data and that the data they're not presenting is unlikely to be as positive.

Right?

A.    Well, they didn't present any of the subgroup data.  It's not like they presented some and not others.  I think they're saying because they didn't see the subgroup data, their view is it's probably unlikely to be uniformly positive or we would have seen it.  That's the way I'm reading it.

Q.    Let's look at the quote from BMO Capital Markets.  It says that:  Given

Page 182

G. Hubbard, Ph.D.
the mixed results from EMERGE and ENGAGE, we do not believe current FDA precedent supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses.

What do you believe that the BMO analyst was referring to when he was discussing FDA precedent?

A.    The kind of information the FDA would typically -- obviously the FDA would want to see all the subgroup analyses and so on.  This analyst is saying look, we don't really have that, so given the way the FDA works, we're not sure.  We don't think this is necessarily positive, so if the FDA had that, it might not be a positive approval. That's the way I read it.

Q.    Let's look at the RBC Capital Markets 10/23/2020 5:00 a.m. bullet point, paragraph 49.  It reads "But there remain many cuts and sensitivity analyses across the studies not disclosed we believe are unlikely to be as supportive as the presented data."

Page 183

G.  Hubbard, Ph.D.

Are you interpreting unlikely to be as supportive to mean likely not supportive?

MS. SOLOWAY:  Objection.

A.    The English is what it is.  I'm interpreting it as it says.  You've been given these supportive pictures, we think the undisclosed data are not likely to match that, meaning they're mixed.

Q.    Unlikely to be as supportive you interpret to be mixed or negative?

A.    Yes.

Q.    Well, he doesn't say mixed or negative.  He says as supportive.  So I'm just wondering how you transmodify as supportive to mixed or negative?

A.    That's my view.

Q.    Suppose you took a set of data that showed certain results and divided the data into different subgroups.

Would you expect that some of the subgroups would show results stronger than those in the whole samples and some of the subgroups would show results weaker than

Page 184

G. Hubbard, Ph.D.

those in the whole sample?

MS. SOLOWAY:  Objection.

A.       Maybe.  As a matter of statistics, I wouldn't have a view one way or another.  It would depend on the distribution.  It's possible if that's your question.

Q.       So what is the new information in the RBC October '23 quote that you believe should have caused a change in Biogen's stock price?

A.       I think you misunderstand what I'm doing.  I don't believe it should be causing a change in the stock price.  It's a test for that.  So it's if you believed that the information about all data was conveying literally that all data, all the subgroups all are consistent, my view is each of these chinks in that armor that I'm testing in Exhibit 5 should have caused a drop in the stock price and they didn't.  So it's just the opposite of the way you phrased it.

Q.       So you think these three bullet points from analyst reports in Exhibit 49

Page 185

G. Hubbard, Ph.D.

are corrective disclosures of the all data statement?

A.      They're not general corrective disclosures, but they're chinks in that armor.  That's what Exhibit 5 is.

Q.      But they're not corrective disclosures?

A.      They would be corrective if you believed all data, yes.  If you believe that all data was correct --

Q.      How can they be corrective if it's pure speculation?  If they've never seen subgroups, they have no idea what the subgroups say, how can they be corrective of something if it's pure speculation without having ever seen the data?  How does it become corrective?

A.      Well, that's why I was pushing back on using the word "corrective" as opposed to "chinks in armor."

Q.      So you'll concede they're not corrective?

MS. SOLOWAY:  Objection.

A.      That's probably a legal term.

Page 186

G. Hubbard, Ph.D.

They're not literally designed to be corrective. They're simply saying if market participants had believed all data, each of these statements should have weakened that and it did not.

Q. Each of these statements should have weakened that belief?

A. Yes.

Q. How do you know it didn't weaken the belief?

A. There was no change in the stock price.

Q. It doesn't mean it didn't weaken the belief. It means the stock price didn't change. Maybe it's an incremental change. Maybe it's not enough, right? Can't someone read something and not necessarily act on it because it's not quite strong enough but it could still affect their belief?

A. Exhibit 5 has 13 such, which were all the ones I found and none of them has an effect.

Q. So you think that if anyone had

Page 187

G. Hubbard, Ph.D.
believed Sandrock's all data statement, those 13 statements would have corrected their misunderstanding, corrected that -- Sandrock's all data statement?

A.      They would have led to a material decline in the stock price in my estimation and they did not.

Q.      So the analyst statements in Exhibit 5, are they anything more than educated speculation?

A.      I think the point is they're getting at what market participants believe and conclude based on the information they have.  If they all believed that the all data statement are true, all subgroups, whatever, you wouldn't see this.  That's my point.

Q.      My question was is it anything more than educated speculation?

MS. SOLOWAY:  Objection.

Asked and answered.

A.      I don't even know what that means.  It's their view of the information they have in the marketplace.

Page 188

G. Hubbard, Ph.D.

Q.    Do they have any subgroup analyses?

A.    No.  That's the point.

Q.    Was the Massie report information that showed the all data statement to be inaccurate?

A.    Well, I think it depends on what you think the all data statement is. What Dr. Massie does is critique the design of tests.  He talks about unblinded and placebo and confidence intervals.  Reading all of his 97 pages, yes, you would not conclude that all data is supportive. Again, it's not clear that that was the statement at the beginning.  I'm accepting it because that's what you say.  It was never clear that market participants believed that.  In fact, it was clear they did not.

Q.    Okay.

You're saying if the market read the all data statement the way the First Circuit interpreted it, the Massie report would be corrective disclosures.

Page 189

G. Hubbard, Ph.D.

Right?

A.        I don't interpret that the First Circuit made that conclusion, although I'm not a lawyer.  That's not the English, so I can't offer you a legal conclusion.

Q.        I'm not asking for a legal on collusion.

A.        I just rejected your interpretation.

Q.        You're an economist.  You do loss causation all the time.

Right?

A.        I rejected your hypothesis of the First Circuit, what they said.

Q.        What was your rejection?

MS. SOLOWAY:  Objection.

A.        You didn't match the language that I'm reading here.  But I'm not a lawyer.  You could be right.  Maybe you could ask a question about economics instead of law and I maybe could try to help.

Q.        All right.  Well, you seem to be able to sidestep questions --

MS. SOLOWAY:  Let's ask actual

Page 190

G. Hubbard, Ph.D.

questions.  Let's turn to questions.

BY MR. ROSEN:

Q.      The question is not necessarily a legal question or an economics question. You're making a lot of statements about what truthful substitutes are -- right? -- and what price declines impact is.  Right?  So my question is pretty simple.

If you take at face value the First Circuit's opinion that the all data statement was false and misleading because it failed to disclose Massie's subgroup analysis, isn't it true that disclosure of the Massie subgroup analyses on November 4th is a corrective disclosure of that false statement?

A.      Okay.  Let me take that in parts.  I'm not a lawyer, but I know how to read.  That's not what the court said. You're talking about complaint plausibly alleges.  So let's put that aside.

The Massie report -- I think it's Massie, it may be Massie.  You could correct me if I'm wrong -- is about many

Page 191

G. Hubbard, Ph.D.
things way beyond the all data statement.  I mentioned the categories, many of which were a foghorn to what's -- if you wanted to have that view -- incorrectly, in my view -- looking at the legal statement, you'd have to disaggregate.

You'd have to say this part of Massie representing this piece of whatever effect you think Massie has contradicts that.  Massie is about a lot of things.

Q.    Did you do that analysis?

A.    That's actually not my job to do.

Q.    Okay.  All right.

So you have no basis to conclude that the Massie report did not contain subgroup analyses that corrected the all data statement.

Is that correct?

MS. SOLOWAY:  Objection.

Objection.

A.    As a matter of economics, that's not true.  As you know in the report, what I say is because there's no front end

Page 192

G. Hubbard, Ph.D.

impact, the back end question is irrelevant.

If you want to turn to Massie for the sake of argument, you may do so, but then you have to disaggregate the pieces of Massie that correct what I don't even think was there to be corrected because nobody believed it to begin with.

So I do think I have addressed that and I do think you have not.

Q.    I have not what?  I have not disaggregated the different aspects of the Massie report?

A.    Right.  To be fair, your expert.  Not you personally.

Q.    Is disaggregation necessary to show price impact?

A.    Yes.  Because you need to show the pieces of the Massie report that actually might have had price impact.

You've got multiple layers of disaggregation.  First of all, Massie is an appendix to a clinician report that's very positive.  So the price goes up.

So you've got to disaggregate

Page 193

G. Hubbard, Ph.D.

that and then you've got to disaggregate within Massie and your expert said he hadn't done either of those and couldn't suggest a methodology for doing so.

Q.    So what aspect of price impact as an economist do you believe requires disaggregation of the various aspects of the Massie report?

MS. SOLOWAY:  Objection.

A.    Depends on your hypothesis.  I don't think it's an exercise worth doing because I don't think there was any front-end impact.  I'm very clear on that in the report.  You could stop there.  I didn't because you likely would push further.

If you want to say something is corrective, you have to match the piece of Massie that you think is corrective with that.  If the worse news in Massie related to other things, you'd need to take that into account and you didn't.  That's my point.

Q.    Is it a plaintiffs' obligation to prove price impact?

Page 194

G. Hubbard, Ph.D.

MS. SOLOWAY:  Objection.

A.     I'm not here to say whose obligation --

Q.     You just told me I failed to do it, but is it my obligation to do it?

MS. SOLOWAY:  Objection.

The witness isn't stating a legal standard.

A.     I'm just saying if you're talking about something being corrective, one, I don't think you have to do it because you haven't shown front end.  If you believe you have, then in order to prove the back end, you'd have to segregate.

Whose burden that is is up to a judge.  I'm just saying nothing in Dr. Tabak -- in fact, he even says he hasn't done it, doesn't have a methodology to do it.

Q.     Okay.

Did you make -- but I'm correct in my understanding of your testimony that you did not go through the Massie report to determine whether any of the subgroup

Page 195

G. Hubbard, Ph.D.

analyses corrected the all data statement?

A.    I believe what I said and certainly intended to say is you don't even have to do that because there's no front end.  If you went through Massie -- again, this is a layman reading his report, you have three large buckets of criticisms and many of his criticisms are unrelated.

To the extent that the criticisms that are unrelated are viewed by market participants as being worse, you would need to disaggregate them.  You didn't.  I don't think you need to do anything because I think there's no front end, so I'm merely pointing it out.

Q.    I asked what you did.  Not what I did.  I know what I did.  Tell me what you did and what you didn't do.  And it's true you didn't make any effort to go through his report and determine whether anything was corrective of the all data statement.

Is that right?

MS. SOLOWAY:  Objection.

We're not at the loss causation

Page 196

G. Hubbard, Ph.D.

stage of this case.  What are we talking about here?

BY MR. ROSEN:

Q.    Did you determine that none of the Massie report was corrective of the all data statement?

MS. SOLOWAY:  Objection. Irrelevant.

A.    It's also irrelevant as a matter of economics.

What I'm telling you is because you didn't have front end, you don't have to do the back end.

Q.    That's not my question.  I asked what you did.  You either did it or you didn't do it.

A.    Again, are we debating or question and answer because I was in the middle of an answer --

Q.    Question and answer, but you've got to answer the question.  Don't tell me what I did --

A.    You interrupted me in the middle of an answer.

Page 197

G. Hubbard, Ph.D.

MS. SOLOWAY:  Hang on.  We're making the court reporter's life miserable.

Larry, please answer your question and then he'll answer it.  Please.

BY MR. ROSEN:

Q.       The question was did you make any effort to assess whether any of the subgroup analyses in the Massie report corrected the all data statement?

A.       I'll answer the same answer.  I don't even think you have to do that.  I argued if you wanted to do that, you'd have to parse the categories.  I was not asked to do that, so I didn't do it.  But I don't think it's necessary because you haven't shown any front end impact.

Q.       Okay.

So I believe you said you didn't do it.

Is that correct?

A.       I wasn't asked to do it.  I don't think you have to do it because of

G. Hubbard, Ph.D.

your failure on the front end.

Q.    Is it your economic opinion that in order to prove price impact on class certification, one has to show price impact on the front end?

A.    That's a legal question.  If you're asking me as an economist, absolutely.

Q.    You have to -- and you have to show it on the front end and on the back end?  That's your belief?

MS. SOLOWAY:  Objection.

A.    I can't give you a legal answer.  If you're asking me as an economist, the answer to that question is yes.

Q.    You believe that to show price impact, you have to show it on the front end and the back end?

MS. SOLOWAY:  Objection.

I think you two are talking past each other.

Q.    Just answer the question.

MS. SOLOWAY:  Objection.

Page 199

G. Hubbard, Ph.D.

A.    As an economist, you'd have to show either the initial inflation or what is being maintained on the front end.  If you have done neither of those, there's no back end to consider.  That's all I'm saying.

Q.    So now you're changing your answer.

A.    I think it's the same answer.

Q.    Either you need to show front end, back end or both.  Which is it?

MS. SOLOWAY:  Objection.

Misstates his testimony.

A.    Typically, in most securities cases I've done for more conventional plaintiffs' arguments, you would have front end and back end.

You've decided to go to a maintenance story.  Fine.  Then what you need to disclose is what was being maintained, but you still have to have some back end from an economic perspective.

Now, I can't -- the law I can't help you.  Obviously, you all know that better.

Page 200

G. Hubbard, Ph.D.

Q.    Am I right that you acknowledge that one can show price impact by just showing it on the back end and not showing it on the front end?

MS. SOLOWAY:  Objection.

A.    No, I do not.  If you're having a maintenance argument, you have to say what is being maintained and when that pre-original statement got made and what price impact was there.  There's never a free lunch here from an economic perspective.  Again, I can't speak to the law.

Q.    Well, if you had a situation like we have here where a false statement on July 22nd prevented a stock price to climb that otherwise would have happened absent the false statement, why do you have to show preexisting inflation before the false statement?

A.    Again, you're only asking me as an economist.

Q.    Yeah.

A.    There's nothing I could measure

Page 201

G. Hubbard, Ph.D.

unless you've shown me what was being maintained, when it came in and what was its value relevance.  You would have to have all of those from an economic perspective.  Whether you need them or why, I can't say.

Q.      Well, a false statement July 22nd prevents the stock price to climb.  That's the theory.  Right?  A false statement July 22nd that prevents otherwise a stock price to climb.

MS. SOLOWAY:  Is that the hypothetical?

MR. ROSEN:  That's the hypothetical.

BY MR. ROSEN:

Q.      So why do you have to prove that inflation existed before then if it doesn't start until the false statement is made?

A.      Well, you're asking from an economic perspective.  Since we're trying to measure something, you'd have to say what was being maintained -- what previous statement led to the inflation, otherwise

Page 202

G. Hubbard, Ph.D.

your statement is vacuous.  It couldn't have inflation if it didn't have something that originally caused the inflation.  And then you'd also have to measure some back end.  Again, from an economic perspective.  I'm not trying to give legal advice.

Q.    You're saying there had to be preexisting inflation.  What's wrong with the example I gave you earlier, which I thought you conceded, which was you have a situation where a CEO denies the existence of a significant liability, right?  Had he told the truth, he is now admitting to big liability, which could cause the stock price drop.  Right?  Why would there be any inflation prior to that false statement denying the liability?

A.    I don't think there would in that hypothetical.  That's not in this case at all for all the reasons I explained to you before lunch.  We could go over it again.

Q.    Well, you're denying the fact -- you're denying the allegation that

Page 203

G. Hubbard, Ph.D.
the all data statement had an effect that --
well, like the First Circuit suggested, had
he disclosed the subgroup analyses, do you
think that would have had no effect on the
stock price on July 22nd?

MS. SOLOWAY:  Objection.

A.    I don't know one way or the
other.

Q.    So it's possible --

MS. SOLOWAY:  Objection.

MR. ROSEN:  I'm not finished
with my question.

MS. SOLOWAY:  It's
incomprehensible.  I'm reading it.

MR. ROSEN:  You're reading a
rough transcript and if you don't like
the rough transcript, I'm sorry, but
that's not a basis for objection.

MS. SOLOWAY:  I'll hold until
you're done asking the question.

BY MR. ROSEN:

Q.    So let's suppose at some point
during the class period the subgroup
analyses and the Massie report had been

Page 204

G. Hubbard, Ph.D.

disclosed, but no other information from the Massie report or the briefing book was disclosed.

Okay?  Let's also suppose that some market participants had believed the all data statement before that disclosure.

Would the disclosure of the subgroup analyses and the Massie report have informed them that the all data statement was false?

A.    Boy, there's a lot in there.  I think it depends on what you thought the all data statement meant to begin with.  I don't think you can disentangle subgroup from all other in Massie because his criticisms are overlapping.

If this is a hypothetical unrelated to this case, I suppose I could answer it but it's not related to this case. So I don't know one way or the other.

Q.    So you're saying that it's impossible to disaggregate the information in the Massie report that was disclosed prior to the -- to November 4th from the

Page 205

G.  Hubbard,  Ph.D.

stuff  that  was  disclosed  on  December  4th?

MS.  SOLOWAY:    Objection.

December  4th?    What  are  we
talking  about?

MR.  ROSEN:    November  4th.

A.        If  I'm  understanding  your
question,  what  I'm  saying  is  Massie's
concerns  are  overlapping.    It's  not
subgroups  versus  other  things.    It's  also
design  of  tests,  design  of  subgroups
themselves,  statistical  things.    It's  not
like  there's  one  bucket  just  called
subgroups.

So  I  don't  know  that  you  could
do  that  thought  experiment  and  it  would  be
purely  speculative  to  know  what  the  effect
would  be  given  the  market  participants
didn't  believe  the  subgroups  were  positive.
So  I  don't  know.

You  certainly  couldn't  do  the
neat  disaggregation  as  you  suggest,  at  least
for  this  person's  understanding  of  Massie's
appendix.

Q.        Let's  go  to  Appendix  B  of  your

Page 206

G. Hubbard, Ph.D.

report.

A.    B?

Q.    Yes.

A.    Okay.  I'm there.

Q.    To the best of your knowledge, is Appendix B accurate and complete?

A.    For that time period.

Q.    All right.

Look at the last entry on the first page of Appendix B.  It mentions the Vale case.

Do you see that?

A.    Vale, yes.

Q.    Do you remember there was a hearing in the Vale case in the Eastern District of New York in Brooklyn last year in which you testified?

A.    Yes.

Q.    That was August 23rd, 2024.

Is that right?

A.    It was sometime late summer. That sounds right.

Q.    But you didn't include that?

A.    Oh, I'm sorry.  It was not a

Page 207

G. Hubbard, Ph.D.

hearing -- it was a hearing about -- actually, I believe whether the other side's expert had -- it was a Daubert hearing on him and I was there.

Q.      And you testified?

A.      Yes.  So apologies.

Q.      Okay.  Let's see.

So what did you testify about in Vale?

A.      You mean that day or what's the case about?

Q.      Well, that day.

A.      My recollection -- and it's only a recollection -- was a challenge to the methods used by their witness.  The judge wanted to hear my views, I gave them and I recall the Daubert challenge of him as being successful, things being excluded. That's just a memory.

                (Whereupon, Exhibit 7 was marked for identification.)

BY MR. ROSEN:

Q.      Let's see.  You should have now marked as Exhibit 7 a hearing transcript.

Page 208

G. Hubbard, Ph.D.

A.       Okay.  I'm there.

MS. SOLOWAY:  What page?

MR. ROSEN:  I think it's page 77.

BY MR. ROSEN:

Q.       But this is something dated August 5th, 2024.

Does that sound about --

A.       It was in the summer.

Okay.  So you want me to go to page 77?

Q.       Yes.

A.       Okay.  Okay.  I'm sorry.  I'm there now.  Yes.  I'm there.

Q.       All right.  Actually, I think it's page 81.

A.       Okay.  Okay, I'm there.

Q.       All right.

So you testified -- so the court asked you -- I think you're saying that Dr. Feinstein's damages calculation defies the state of the art and then you say it does in two important respects.

So do you recall why you

Page 209

G. Hubbard, Ph.D.
believed Dr. Feinstein's damages calculations was inadequate?

A.    I don't.  I'm sorry.

Q.    So let's read through this.  It says -- you say:

WITNESS:  Well, it does in two important respects.  From an economist's perspective, I can't speak to the law.  One is that it's not a but-for world, the way economists use that term, because when economists speak of a but-for world, we're talking about if you had knowledge of the actual or real value, that's literally the language of the document that both of us cite.  I cite a number of academic references as well.  So there's that.

So what are you referring to when you're talking about economists speaking of a but-for world and the actual or real value?

MS. SOLOWAY:  Objection.

A.    I really don't recall this case

Page 210

G. Hubbard, Ph.D.
at all, so it's hard to put it in context or what the document is and what a but-for world would be.  If you didn't have the challenged conduct, what the world would have looked like.  I don't remember enough of the facts.  I mean, I remember what happened in Vale, but I don't remember this colloquy with the court.

Q.    So if you wanted to remind yourself of what you meant, where would you go?  What document do you have that would remind you of what you --

A.    I'd have to look at my report and what the issues were.  This was a case really about a materialization of a known risk.  It was about a dam collapsing, so I don't remember what the argument is here.  I remember the day did not go well for Feinstein.  I remember that, but I don't remember what it's about.  Sorry.

Q.    All right.  Let's go back to page 77.  Actually, start at page 76.

A.    Seventy-six?  Okay.  I'm there.

Q.    You say sure -- the witness,

Page 211

G. Hubbard, Ph.D.

that's you, right?

A.      Yes.

Q.      Sure.  What the event study can't by itself answer your question.  So what is the event study going to do?  The event study says there's news, let's say on a given day and the stock price changes, it goes up or it goes down.  The first thing economists do is filter out the market or industry so we're not looking at this unrelated to this case.  And then what's important to financial economists is to sort out so-called confounding factors from the news.

And here are the principal confounding factors.  The one we've been talking about this morning is the fact that in the actual world, when a dam collapses, you lose a lot of money for fines and litigation and everything else.  So the event study alone can't do that for you. You then have to separate it and the way I would argue to separate it would be to ask yourself had you known the full set of

Page 212

G. Hubbard, Ph.D.

information, all of those things that were in the file drawers at Vale had the same analysts seeing that, what would they and the technical experts they hire have estimated the probability had been, so that's a calculation you're going to have to add.

Did you say that at that hearing?

A.    Yes.

Q.    So wouldn't the subgroup analyses, the Massie subgroup analyses been the full file drawer at Biogen that they should have shown the same analysts on July 22nd?

MS. SOLOWAY:  Objection.

Irrelevant.

A.    If I'm remembering this case, no.  This case was about whether the probability of a dam collapse was X or Y.

So let's suppose company Vale says our engineers think it's X and let's suppose they really believed it's Y.  I think that's sort of what the case was

Page 213

G. Hubbard, Ph.D.

about.

My point was that when a dam actually collapses, irrespective of whether the true probability was X or Y, there's a lot of costs to the firm and a lot of lost value. There's litigation. There's clean-up costs. There's death. So you would have to separate that out.

So I think the question I had there was just about how to sort out the probabilities, but again, I'm not -- it was a case about materialization of known risk. That's all Vale is. So it's a different --

Q. All right. Let's get this straight.

So in our case, analysts are wondering on July 2nd what's the likelihood that all of the data are consistent and what's the likelihood that all of the data are not consistent.

Right?

A. Correct.

Q. Not that much different from what's the likelihood the dam is going to

Page 214

G. Hubbard, Ph.D.

collapse and what's the likelihood the dam is not going to collapse, right?  In each case, the analysts have to estimate what they think is going to happen.

In one case, it's what's going to happen as far as the dam staying together or not staying together and in our case, whether there's going to be a successful FDA decision or unsuccessful one.

MS. SOLOWAY:  Objection.

BY MR. ROSEN:

Q.      In fact, the analysts were making those calculations.

Right?

MS. SOLOWAY:  Objection.

A.      Which case are we talking about?

Q.      In our case, they were making calculations about the likelihood of the FDA approving this thing.

MS. SOLOWAY:  Objection.

A.      Sure, which is a different question -- because even after the Massie report, there's a lot of heterogeneity on

Page 215

G. Hubbard, Ph.D.
probability of approval.

But if your question is about Vale, the issues are different. I think all the analysts believed that the probability of a dam collapse was extremely low. What was being alleged by plaintiffs was that Vale knew that there were more problems, you know, it was a different -- there wasn't any -- it wasn't sort of the heterogeneity of views and analysts. Everybody just thought Vale had this very tight system and then a dam collapses.

Well, a dam collapses, is that by chance or did they lie? I mean, that's sort of what the case was about.

Q.    Isn't that what's happening here? Was Sandrock lying? Was he not lying? Right?

A.    I don't think so.

Q.    Was the data consistent? Was the data not consistent?

A.    I don't think so.

MS. SOLOWAY: Objection.

Is there a question?

Page 216

G. Hubbard, Ph.D.

Q.    Yes.  The question is what did you mean by -- I would argue to separate it you would have to ask yourself that you -- had you known the full set of information, all those things that were in the file drawers at Vale, had the analysts -- what did you mean by that?

MS. SOLOWAY:  Objection.

In the Vale case?

MR. ROSEN:  Yes, in the Vale case.

BY MR. ROSEN:

Q.    What was in the file drawer that the analysts should have seen?

A.    There were two issues when you talk about probabilities.  I'm going to be over my skis because I'm not a mining engineer.

One is what is the true probability of a structural defect holding constant weather natural disasters.  Another is a probability that you have a natural disaster.  A hurricane happens, an earthquake.  It's really both of those.

Page 217

G. Hubbard, Ph.D.

Going from recollection from this hearing, the fight was over which one of those was more important, where was the information impacted. It's very different. That is just a dim memory of the case. It was on the jointness of that probability.

Q.    But isn't this having to do with the but-for world, you know, had they known the truth? Isn't that a question?

Aren't you suggesting that had they had known the truth, they would have had all the file drawers?

A.    No. I think what I was saying there -- again, this is from deep memory -- is that the event study itself isn't the answer to the question because when a dam collapses, that's massively bad news. You need a huge negative return.

The question is how much of that is just a dam collapsed and how much of that is a consequence. I think I suggested a methodology for parsing those. That's my memory. I don't know if the reports are public in this. You're welcome to read to

Page 218

G. Hubbard, Ph.D.

your heart's content.  That was my memory of the case.

Q.      If I were to take a look at the lawyers who you were working for in that case, their brief, would they have agreed with you in your description of what you think -- what you're telling us?

MS. SOLOWAY:  Objection.

A.      I did my best to teach them well.  I hope so.  You could read away.

Q.      You're denying this has anything to do with the truthful substitute?

MS. SOLOWAY:  Objection.

A.      Oh, for sure.  It's a different case.  If I'm remembering the facts of this case, it's a very different kind of case.

Q.      It's a mining case.  It's not a biotech case.  We understand that.

You're telling me you were not looking for a truthful substitute, you were not looking for a but-for disclosure?

MS. SOLOWAY:  Objection.

A.      Well, at the highest level, yes, but that's not what this discussion is

G. Hubbard, Ph.D.

about.  It's about the problems and using event studies.

Q.      At the highest level, it was a question of price impact of a truthful substitute and the but-for world disclosure.  Right?

MS. SOLOWAY:  Objection.  Compound.

A.      Maybe, but it has nothing to do with the case.  Here, you were talking about the joint probability problem and how hard that would be to separate and why the events that he doesn't measure, what you're trying to get at.  That's what this case is about.

Q.      If we allege that -- let's say someone were to allege that the November 9th Ad Comm committee vote was materialization of an undisclosed risk, wouldn't you want to go through that same analysis as the probability of --

A.      Well, yes --

Q.      -- of the Ad Comm --

A.      Sorry.

Q.      Right?  Don't you have the same

Page 220

G. Hubbard, Ph.D.

thing?  The dam collapse is no different than a negative Ad Comm decision.

Right?

MS. SOLOWAY:  Objection.

A.    If I'm understanding your question, I'm going to have to turn the table right back on you because what that means is that November 9th and going into November 9th is kind of irrelevant.

Obviously, if an Ad Comm votes no, that's bad news.  A dam collapsing is voting no.  So you certainly can't look at -- and I make this point in the report -- exactly your argument that you can't look at that as an indicator of anything.  It's the same argument I made in Vale.  So the November 9th price decline is completely uninformative for this problem.

Q.    It's uninformative for what problem?

A.    For a question of misrepresentation, the same as in Vale.  The way to get at Vale would be -- I'm making up numbers -- suppose you thought the

Page 221

G. Hubbard, Ph.D. probability of a dam collapse was one in 10 million, but the truth was it was three in 10 million.  You could model and discount a cash flow -- now I'm recalling what I did in the report.

You could model what that effect would be on value.  The actual decline you see in event study is the materialization of a known risk.

When an Ad Comm votes no, that's bad news.  But that's not the same thing anymore than it was in Vale.  So in that case, the cases are similar.

MS. SOLOWAY:  Is now a good time for a break?

MR. ROSEN:  Let me see if there's a follow up to that.

THE WITNESS:  Go ahead.

MR. ROSEN:  Yeah, let's take a break.

(Time noted: 2:28 p.m.)

(Recess taken)

(Time noted: 2:39 p.m.)

Page 222

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.    So paragraph 52, last sentence says:  Accordingly, even if the Massie appendix and the alleged corrective data on subgroup patterns were followed by price declines, those declines would reflect the materialization of a known risk, rather than the correction of the July 22nd misstatement.

Are you suggesting in that statement of yours that the data in the Massie appendix on subgroups was known to the public prior to November 4th?

A.    If I'm understanding your question, no.

Q.    So why is it the materialization of a known risk rather than a correction of the July 22nd statement if nobody had seen it before?

A.    So this is in the context of a paragraph about Exhibit 5, the discussion we've been having that there hasn't been this belief about subgroup data and supporting.  It's in this context.  It is a

Page 223

G. Hubbard, Ph.D.
materialization of a risk.

If you felt otherwise, if you were unpersuaded by Exhibit 5, you could consider the Massie appendix of this discussion we were having before the break, you would need to segregate the subgroup analysis from everything else.

Q. Okay.

So let's discuss whether Exhibit 5 is persuasive.

Does Exhibit 5 reference any specific data analyses?

A. If I'm understanding your -- sometimes it does refer to data analyses analysts would like to see, but that's not its intent, if that's your question.

Q. They don't actually refer to the existence of specific data analyses and their results, do they?

MS. SOLOWAY: Objection.

A. If I understand your question, they don't know the results. Sometimes they talk about particular sets of data that they're looking for, but they don't know the

Page 224

G. Hubbard, Ph.D.

results.

Q.    So is it your point then that while the analysts don't know what these subgroup analyses actually show, the analysts acknowledge there was some risk that they could be negative?  Is that correct?

A.    Yes, and in some cases actually a great risk, but yes, they believe that could happen.

Q.    Did you -- how many analysts were covering Biogen at that point in time?

A.    I don't recall, sir.  It's probably in the report, but I don't recall.

Q.    Would you say it's 50?  Forty?

A.    I don't recall.  It's a significant number.

Q.    What portion of the analysts expressed concern about the possibility that subgroup analyses might not be as supportive as the EMERGE study?

A.    The analysts that I cite are the ones that I found.

Q.    So there is a lot of analysts

Page 225

G. Hubbard, Ph.D.

that didn't express that view?

A.      If I'm understanding your question, that's true.

Q.      All right.  Let's take another hypothetical.

Suppose that the Massie report had started by saying Biogen's statement on July 22nd and its data are all consistent with the explanation of the failure of ENGAGE are simply false for the reasons I explain in this report and then it included everything actually included in the Massie report.

Would you still argue that this hypothetical expanded Massie report would not represent a correction of the July 22nd statement?

MS. SOLOWAY:  Objection.

A.      If I'm understanding your question, yes.  The question is what leads Dr. Massie to believe that?  Again, I'm going to get over my skis because I'm not a doctor, but his concerns were overlapping.  His concerns about subgroups had as much to

Page 226

G. Hubbard, Ph.D.
do about design and confidence intervals as it did about the literal original subgroups, so I don't know if it helps you.  But again, I'm not a doctor.

Q.      All right.  So suppose -- another hypothetical.

Suppose following July 22nd, 2020, analysts believe there was a 40% chance that the FDA statistician might provide an adverse position on aducanumab.

Understand?

A.      Okay.

Q.      Now suppose that the subgroup data was released and analysts shifted to there being a belief that there was a 75% chance that the FDA statistician would provide an adverse opinion on aducanumab.

All right?

Would that release of the subgroup data be a corrective disclosure in your view?

A.      If I'm understanding your question, no.  It's sort of like the Vale case.  There's joint probability.  It's not

Page 227

G. Hubbard, Ph.D.

a statistician that decides whether to approve a drug. It's a multistep process. There's clinician, statistician, Ad Comm, and the FDA itself. So it's a compound set of probabilities.

In general, my understanding is the statistician may be the -- I don't want to say the least consequential, but not chief part of that syllogism. So I don't know that you could make the inference that you're making just because of the way the approval process works. Even if that probability changes, it may or may not change the end probability, which is what would move value.

Q.     So on July 22nd, Sandrock makes the all data statement. Analysts believe there's a 40% chance that the FDA statistician will provide an adverse opinion. In other words, it's more likely than not that the FDA statistician agrees with Sandrock.

Right?

Then they release the subgroup

Page 228

G. Hubbard, Ph.D.

data and analysts suddenly increase the likelihood that the statistician is going to disagree and they say okay, it goes from 40% chance that the FDA statistician is going to provide an adverse opinion to a 75% chance of an adverse opinion from the statistician.

You're saying that that release of this adverse data is not correcting the July 22nd statement?

I'm trying -- I still don't understand how that could be possible.

A.      I am saying that.  It goes back to a couple things.  One is, again, my layperson's understanding of Dr. Massie's criticisms is that they're highly overlapping, so it could be that Dr. Sandrock has a view on statistical design that makes him absolutely correct in his view.

Dr. Massie may have a very different view on how this should have been done.  So that shift in probabilities may or may not affect the shift in probability of an ultimate Ad Comm vote or even more

Page 229

G. Hubbard, Ph.D.

importantly of the ultimate FDA vote.

That's my point.  It gets back to the overlapping nature of what Massie did.

Q.    Why are you bringing in the ultimate Ad Comm decision or the ultimate FDA decision?  The question is whether it's corrective of the July 22nd statement, which is not actually a statement about whether it will or will not be approved?

A.    Well, I'm only an economist, not a lawyer.  But to me, corrective is getting it value relevant, so to get its value is the end of the chain.  Is something I'm doing now going to affect the ultimate chance for approval?  That's where value lies.  That's what I'm saying.

Q.    So you're saying that even if they had disclosed the subgroup data earlier than they did, that would not have been a corrective disclosure because that would not necessarily have changed -- have influenced the ultimate approval?

A.    Now you're asking a wholly

Page 230

G. Hubbard, Ph.D.

different question.

Q.    I'm trying to understand how it could not be corrective of the July 22nd statement.

A.    Do we agree you just asked a different question than the question before?

Q.    Yes, I did ask a different question.

A.    All right.

Q.    I'm just trying to understand -- I still can't understand why it's not corrective of the July 22nd statement.  Right?

The July 22nd statement is all the data are consistent with the high dosage thesis and they disclose the subgroup data, which clearly shows that not all the data are consistent with the high dose thesis.

Are you with me so far?

A.    I'm with you so far.

Q.    And then in this hypothetical, the FDA -- the analysts change their view of what the FDA statistician is likely to do from a 40% chance of disagreement to a 75%

Page 231

G. Hubbard, Ph.D.

chance of disagreement. Right? And you're saying that the release of that subgroup data is still not corrective of the all data statement. I'm struggling to understand how that's possible.

A. In the context of your hypothetical, I think what I'm trying to say is it's a whole chain of probabilities. In the actual world, the actual case we're supposed to be talking about, Dr. Massie's report doesn't have something called subgroups that can be disaggregated and disclosed. It's a highly overlapping thing.

I'm going to take your hypothetical. Even in that hypothetical, the market already had a set of beliefs that may not have been that far from "the truth" and there's a whole series of probabilities that to the extent that the market, as many of the analysts felt, didn't put as much weight on the statistician anyway as opposed to the clinicians. It may or may not have moved.

So like with many of your

Page 232

G. Hubbard, Ph.D.

hypotheticals, something could happen, but it's certainly not necessarily the case.

Q.    So you're saying the statistician's view is not important?

MS. SOLOWAY:  Objection.

Misstates the testimony.

A.    That's not what I said.

Q.    You just said Dr. Massie's report --

A.    No.  Read it back.

Q.    You said there's a whole set of probabilities that many of the analysts felt didn't put as much weight on the statistician anyway as opposed to the clinician.

So you're saying that the statistician is not as important as the clinician?

A.    I'm not saying anything.  I'm saying analysts believed that as a group. That's one reason they were surprised by the Ad Comm vote.  I don't have a personal view one way or the other.

Q.    So let's just say the -- so is

Page 233

G. Hubbard, Ph.D.

it your -- new question.  Not a hypothetical.

If the specific subgroup analyses that are contradictory -- that are contradictory to the high dose thesis had been -- in the Massie report had been disclosed prior after the July 22nd statement and before November 4th, would that have been corrective of the July 22nd statement?

A.    First of all, I don't even know because I don't read the statement the same way that you do.  If you read it maybe the way I'm thinking that you read it, I don't think you can ask that in the context of the actual case because Dr. Massie's report doesn't offer you a neat segregation of subgroups.  His criticisms are all overlapping, so you can't pull it out.  And you have the fact that the market was already suspect, so it's not, like, news to the market that there's a problem here.  So I just don't see how you could do it.

Q.    You don't -- do what?  I'm not

Page 234

G. Hubbard, Ph.D.

asking anyone to do anything.  I'm asking if it would correct the misimpression that the market had.

MS. SOLOWAY:  You're asking him for a legal conclusion?

MR. ROSEN:  No.  As an economist.

BY MR. ROSEN:

Q.      If the subgroup analyses specifically had been released prior to November 4th, would that have informed the market that not all the data is consistent with the high dose thesis?

A.      Okay.  So that's a different question.

So let's go back to Massie first, considering I thought that's what your question was.

So in Massie, you can't do that because he doesn't offer you that desegregation.

If you're now asking if simply the subgroup analyses that had been available to Biogen July 22nd had been

Page 235

G. Hubbard, Ph.D.
disclosed, that's the whole purpose of the
other exercise we talked about.  The market
never really believed that anyway, so it
would be very hard for me to answer that
question as to whether it would be
corrective from an economic perspective.

Q.    So you're saying it's not
corrective -- the subgroup analyses wouldn't
be corrective because the market never
believed Sandrock to begin with?  Is that
what you're saying?

A.    It's not believed, not
believed.  The market had come to the --
analysts, when I say the market -- had come
to the conclusion that those subgroup
analyses were not likely to be so positive.
Dr. Tabak's lemon theory is an example.

Q.    Not likely to be so positive?
But that doesn't correct the all data
statement, does it?

MS. SOLOWAY:  Objection.

Q.    Not likely to be so positive,
does that correct the statement that
everything is consistent?

Page 236

G. Hubbard, Ph.D.

MS. SOLOWAY:  Objection.

This is beyond the scope of his expert opinion.  We're not talking loss causation right now.

A.    Yeah, I don't have a view one way or the other.  I think I've answered your question.

Q.    Let's go to paragraph 56.

A.    Okay.  I'm there.

Q.    You say:  For the back end price decline to be evidence of front end inflation, the alleged corrective information must, in fact, correct the alleged misrepresentation.

Okay.

So did you look to see if the alleged corrective information, in fact, corrected the alleged misrepresentation?

A.    As you know, I ruled it out because there is no front end maintenance or initial price inflation, so I could rule it out by construction.  I observed that if you were to go down that road anyway, you'd have to disaggregate the Massie report.  I don't

Page 237

G. Hubbard, Ph.D.

have to do that because I'm showing you there was no front end either initial inflation or maintenance.

Q.    So you didn't attempt to determine if there was any information in the Massie report that corrected the alleged misrepresentation on July 22nd?

A.    I argue you don't have to do that.  I described that it's difficult and how one might approach it, but that's not something I was asked to do.

Q.    Okay.  I'm glad we determined that.

So then you say:  I show there's a fundamental disconnect between the Massie appendix and the July 22nd statement for two reasons.  One, there's a mismatch between the content of the July 22nd statement and the alleged corrective contents of the Massie appendix because the market did not interpret the July 22nd statement to convey that all data supported the dosage thesis.

Let's try to unpack that a

Page 238

G. Hubbard, Ph.D.

little bit.

Let's start with the last part. The market did not interpret the July 22nd statement to convey that all the data supported the dosage thesis.

Why do you use the term "all data supported the dosage thesis" if what Sandrock said was "all data were consistent with the dosage thesis"?

A.    Well, if I'm understanding your question, I thought your view was that. If the analysis is going to be the same, when I look at the analysts' reports, they neither say consistent or support. So that doesn't really matter which it is. That's the discussion we've been having.

I do it first week after in July, I do the whole first class period and any way you cut it. News, analysts.

MR. ROSEN:  All right.  Let's look at the Wolfe research report.

THE WITNESS:  Is that a new exhibit?

MR. ROSEN:  It'll be a new

Page 239

G. Hubbard, Ph.D.

exhibit.

THE WITNESS:  It's not there yet.

MR. ROSEN:  No, it's not there yet.

(Whereupon, Exhibit 8 was marked for identification.)

BY MR. ROSEN:

Q.     So this Wolfe report is Exhibit 8.

A.     I don't have it.

Q.     You should now.

A.     Now I have it.  Thank you.

Q.     So this is a Wolfe research report dated July 22nd.  Now, the lead in title for this report is "They Just Said What?"

It says Biogen -- Highlights from the conference call that just ended. Biogen reported 2Q '20 financial results this morning.  This report summarizes key takeaways from the conference call that go above and beyond information provided in the press release.

Page 240

G. Hubbard, Ph.D.

Okay.

So if you go to the first paragraph, you go to the third sentence, third line down, fourth line down, it says: On its investor call, there were no major new disclosures above and beyond what was already in the press release and slide deck. Most questions naturally centered on aducanumab, which is arguably the driver of the stock.

A.    I don't see any of that, but that sounds good.

MS. SOLOWAY:  Wait a minute.

THE WITNESS:  Investor call.

Okay.  Sorry.  I'm there now. Apologies.

BY MR. ROSEN:

Q.    So Wolfe says that aducanumab is the key driver of the stock.

Do you disagree with that?

A.    I'm sorry.  I'm trying to --

MS. SOLOWAY:  Where are you looking?

A.    Where is that?  I don't see it.

Page 241

G. Hubbard, Ph.D.
I'm not doubting you -- yes, I see it.

Q.      Do you disagree with that analyst's statement?

MS. SOLOWAY:  Objection.

A.      That would require more than I could say.  I don't disagree that he said that.  Or she.

Q.      Let's go to the third page. There's a section on Alzheimer's aducanumab.

A.      Okay.

Q.      Then the third bullet point is a question.  It says Q:  Will there be any new information or publications on ENGAGE or EMERGE analyses?

Is that referring to Christopher Meacham from Bank of America's question concerning whether Biogen released any of the subgroup analyses detailed analyses?

MS. SOLOWAY:  Objection.

A.      I have no idea.

Q.      Well, will there be any new information or publications on ENGAGE or EMERGE?  Isn't that exactly the way

```
                                    Page 242
```

G. Hubbard, Ph.D.

Christopher Meacham started his question?

MS. SOLOWAY:  Objection.

A.    Yes.  But it doesn't say that, but yes, I'm happy to agree with you.

Q.    Well, you're under oath, so you're either going to testify truthfully or not.

MS. SOLOWAY:  Objection.

A.    It's English.  It's English.

MS. SOLOWAY:  Do you want him to compare the two exhibits word for word?

MR. ROSEN:  I guess we will. Maybe that will help.

BY MR. ROSEN:

Q.    So you compare that with the statement -- you could just look at the paragraph -- well no, you have to look to a prior exhibit --

A.    I think it may be in my report maybe.

Q.    It would be the July 22nd transcript, which is Exhibit 2.  It's page 11.

Page 243

G. Hubbard, Ph.D.

A.    Page 11.

Q.    He started out with:  I want to say it's been great working with you and then he says another one on aducanumab.

Right?

A.    Yeah, I agree.  That's the same subject.

MS. SOLOWAY:  Let him ask the question.  That's not the question.

So Larry, what's the question?

Q.    So here, in the July 22nd transcript of the conference call, Meacham asks:  When you look at ENGAGE versus EMERGE, I just wondered if you could go into any detail of the analysis over, say, the past six to nine months that you guys have done with the FDA.

And then the next question is whether that could be published or at a medical conference or anything that you could share with us in terms of what the developments have been over the past -- pretty much since the beginning of the year.

And if you compare that to what

Page 244

G. Hubbard, Ph.D.

the Wolfe analyst says on page three, question -- Q:  Will there be any new information or publications on ENGAGE or EMERGE analyses.

Right?  So he's acknowledging that Mr. Meacham's query to Sandrock.

Correct?

A.     I would agree with that.

Q.     And then it says BIIB, being Biogen, reminds that three studies -- PRIME, ENGAGE and EMERGE -- that's not exactly clear -- and then it says Biogen reiterated prior talking points on aducanumab, but did not mention any new publications.

So is it fair to say he's acknowledging that the question and answer with -- between Meacham and Sandrock on July 22nd and saying that Biogen simply reiterated its prior talking points but didn't mention any new publication, meaning any new analyses?

Is that fair to say?

A.     I think it's likely the same conversation.  I used this very quote in my

Page 245

G. Hubbard, Ph.D.

report to illustrate my point.  I think it's likely that conversation.

Q.      So in paragraph 58 of your report, you say:  In fact, several reports affirmatively stated that the earnings call during which the July 22nd statement was made did not convey any additional or new quantitative or statistical evidence concerning aducanumab's efficacy.

Could you explain how the Massie report could not correct -- could you explain how the subgroup analyses in the Massie report could not correct the all data statement because of the fact that the all data statement did not contain new quantitative evidence?

MS. SOLOWAY:  Where are you looking?

A.      I don't think that's what I said.

MS. SOLOWAY:  Where are you looking, Larry?

MR. ROSEN:  I'm looking at my questions.

Page 246

G. Hubbard, Ph.D.

A.      Maybe your question has nothing to do with what I said.  That's not my view.  I think what I said to you was it's hard for the Massie report to correct the subgroup analyses because that's not how Dr. Massie -- there are subgroup analyses, but they're intertwined with his other criticism.  I think that's the comment I made.

These points are actually favorable to me, not unfavorable.  These points are saying that the market didn't have the quantitative information, hence the skepticism.  So I'm not sure I follow your question.

Q.      Let's go to paragraph 63.

You say:  Moreover, after the July 22nd statement and prior to the release of the Massie appendix, market participants were on notice that the risk of a negative finding from the FDA statistician, an outcome outside of Biogen's control or ability to disclose.

Now, if I showed you a document

Page 247

G. Hubbard, Ph.D.
indicating that Biogen had the Massie
analyses prior to July 2nd, why would that
be outside of Biogen's ability to disclose?

A.      I assume you mean July 22nd.

Q.      Yeah.

A.      In general, even if they did,
that's not a statement about an ultimate
negative finding, so I don't know one way or
another or what's in that document or how
preliminary statistical analyses work at the
FDA.  So you could show me a document, we
could go over it, but it wouldn't mean much
to me in terms of this question.

Q.      Well, let's say the Massie
report subgroup analyses had been created
in, I don't know, September 2019 and Biogen
had had them since 2019 in their possession,
custody and control hypothetically or not so
hypothetically.

If that were the case, why
would it be outside of Biogen's ability to
disclose that information to the market?

MS. SOLOWAY:  Objection.

Outside the scope of his

Page 248

G. Hubbard, Ph.D.
report.

A.    All I'm saying is that what's outside the ability to disclose is the ultimate negative finding because it hasn't happened yet.  That's all I'm trying to say.  Couldn't have disclosed it.

Q.    Well, you say -- you don't say ultimate negative finding.  You say the risk of a negative finding.

So wouldn't the Massie subgroup analyses have informed the market -- better informed the market as to the risk of a negative finding from the FDA statistician?

A.    Well, again, maybe I'm not as artful as I am in writing.  What I meant to say is market participants are on notice -- that's the whole discussion we've been having -- and the ultimate finding is obviously not for Biogen to disclose, even if it may be similar to something Dr. Massie said earlier.

That's what I meant to say.

Q.    Okay.

So paragraph 64 and 65, you

Page 249

G. Hubbard, Ph.D.

talk about a mismatch between the specificity of the front end and back end disclosures.

And why -- so what is that mismatch?  How would you summarize that mismatch?

A.    Well, I would do it in two parts.  First, my true and undying belief is that there is no front end.  So there's no front end initial inflation or maintenance, gone.  So you don't really need to do this.

If you want to save front end as your allegation, the Massie appendix doesn't match that.  It's a set of three groupings highly overlapping.  It isn't some subgroup piece of that that could be pulled out, if by that you mean simply the subgroup's that Dr. Sandrock had in the beginning.

That's all I'm saying.  Doesn't match.

Q.    So you're saying that the subgroup analyses in the Massie report are not identical to the all data statement?  Is

Page 250

G. Hubbard, Ph.D.

that what you're saying?

A.      I don't think I'm saying more than that.  In other words, Dr. Massie is not simply saying I don't like your subgroup analyses.  He's saying I would have done the test differently.  I would have approached the statistics differently and I think you may have unblinding problems throughout what you've done.  That's my layperson's opinion.

Q.      The unblinding dealt with the subgroup analysis.

Right?

A.      Yes, but it's different.  Yes, but it's not a one-to-one match.  So I don't think you could -- well, I'm not a doctor.  Maybe you could find a doctor who could disaggregate what you want, but I haven't done that and Dr. Tabak hasn't done that.

Q.      And you haven't done that?

A.      I think that was the first part of my sentence, if you go back and read the tape.

(Discussion off the record)

Page 251

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.    So you read the First Circuit opinion and I assume you read some of the other briefs in this case that were discussing the possibility that -- or the allegation that it took several days for the market to digest the information in the FDA briefing materials, including the Massie report.

Right?

A.    I have seen that mainly in Dr. Tabak, but I don't recall.  If you say it's in the others -- the argument I'm familiar with.

Q.    Okay.

Do you disagree that it could have taken three days, three trading days for the market to incorporate fully all of the information in the Massie report along with the other information that was released on November 4th?

A.    I think that's most unlikely for all the reasons I've said in the report. I'll start with theory, then go to practice.

Page 252

G. Hubbard, Ph.D.

Theory, efficient markets hypothesis.  This report wasn't a lightening bolt.  People were ready.  They had staff, experts.  Everybody was ready to go through this.  Analysts reports were appearing.  They were fairly technical within a couple of hours of the market open.

I don't think you could imagine a theory where good news happens fast and bad news happens slowly, which is, I think, what you're trying to do.  I'm not aware of any such theory.  So I think it's bogus.

Q.    Didn't Woody Allen say good news travels fast in a movie once?  I'm pretty sure he said that.

A.    Well, he's not a statistician or an economist.  More important than both of those things, but ...

Q.    Pretty sure it was Love and Death.  Good news travels fast.

A.    Yeah.

Q.    Faster.

So okay.

What is the basis -- so have

Page 253

G. Hubbard, Ph.D.

you ever seen a situation where it took more than one trading day for news to be incorporated into a stock price?

A.    I don't recall that, no.  I could imagine it if it were something, depending on the timing of day of a release. But in a case like this, no, I don't recall it.  We know the analysts are writing about it very, very quickly, even highly technical reports.

Q.    So one of the things that's very striking about the FDA briefing materials is that you had a clinician report that was highly favorable and supportive of approval.

Correct?

A.    Correct.

Q.    Then you had a statistician's report that was highly critical and highly adverse to approval.

Right?

A.    That is my understanding of both parties.

Q.    Have you ever heard of such a

Page 254

G. Hubbard, Ph.D.

situation?

A.    I don't recall one way or another.  I'm not sure how I would compare such situations.

Q.    But you can't think of a situation where that's ever happened before?

MS. SOLOWAY:  Objection.

A.    Well, in general, it's just called confounding events.  In event studies, there's frequently confounding news, as an example of confounding problem where you have one event is positive and one event is negative.

Q.    Well, those are two different events typically?

A.    True, but I'm just saying the event of confounding is hardly a new --

Q.    Here, you have two people at the same government agency taking diametrically opposing views.

MS. SOLOWAY:  Objection.

Misstates what happened.

A.    I agree that there's a difference of opinion.  The question is

Page 255

G.  Hubbard, Ph.D.

whether that information is processed quickly or slowly.  I see no reason in theory or practice to suggest it's anything other than theory.

Q.      So the FDA briefing materials consisted of a number of videos.

Right?

A.      That's my recollection.

Q.      Did you watch the videos?

A.      I did not.  I'm not sure that I would have learned a great deal, given my lack of medical training.

Q.      They were pretty lengthy.

Right?

MS. SOLOWAY:  Objection.

BY MR. ROSEN:

Q.      Do you know how long they were?

A.      I have no idea.

Q.      So how long do you estimate it would have taken for one analyst to go through all of the FDA briefing materials?

A.      I don't know, but the answer to that question would be irrelevant to the problem at hand because the question is how

Page 256

G. Hubbard, Ph.D.

long does it take you to come to the actual conclusion and we know the reports are written very fast, peak and volume and volatility surge at about 11 o'clock in the morning.  It's very, very fast.

Q.    Well, it's not just the analysts, but also what about the people who are actually putting the money into the stock or taking the money out of the stock, the big investment funds, the big pension funds who are looking at the -- the guys who are actually trading the stocks.  Their opinion matters too, right?

A.    Yes, but let me unpack those, since you raised categories.  Chances are if I was a major active investor in the stock, I too would have had stock at the ready to go through the report.

For most pension funds or big investment advisors that are passive investors, there's not as much work to do. But yes, for active investors, they would have been at the ready.

Q.    Would they have wanted to read

Page 257

G. Hubbard, Ph.D.

all of the materials before pulling the trigger one way or the other?

A.      I rather doubt it.  That would not be what I would counsel them.

Q.      So they should make a decision before reading all the materials?

MS. SOLOWAY:  Objection.

A.      They should read the pertinent parts to make a probability weighted decision as quickly as they can.

I think you have a mountain to climb on this one for theory and practice, for what it's worth.

Q.      So other than the FDA Ad Comm briefing materials, was there any other new news on November 4th that you identified?

A.      I don't recall.  Sorry.

Q.      What about November -- when you say you don't recall, you're saying there could have been, but you don't remember?  Or you don't think there were any?  Which is it?

A.      Do we have to talk about English again?

Page 258

G. Hubbard, Ph.D.

Q.    Yes.  English is a very important thing.

A.    I don't recall speaks for itself.

Q.    What does it mean?

A.    It means I don't recall.  I might have seen something.  I don't recall. What about that is difficult for you?

Q.    If you had seen other new news that was material, would you have included it in your report?

A.    Probably would have, yeah, but I don't recall anything like that.  If you want to show me something, go for it.

Q.    I just want to understand what you did, what you read.

If you read some piece of new news, would you have listed in it your report as a material that you reviewed?

A.    If it's a -- sure.  It would be in the same reports, yes.

Q.    Okay.

What about November 5th?  Was there any new news about -- are you able

Page 259

G. Hubbard, Ph.D.

today, sitting here, able to identify any new news on November 5th relating to Biogen?

A.    No.  You asked me both these questions this morning, so same answer as this morning.  No.

Q.    I'm glad you're being consistent.

What about on November 6th? Was there any new news on November 6th?

A.    Well, November 6th is the vote, Ad Comm vote, if that's what you're asking.

Q.    I just asked you if there was any new news?

A.    That's a big one.

Q.    So the Ad Comm vote on November 6 was new news?

A.    Certainly the fact of a vote and the outcome of the vote, yes.

Q.    What about their discussions? They had a live transcript that people could -- actually people could join, listen in, there was a subsequent transcript.  So people were listening to their whole discussion.

Page 260

G. Hubbard, Ph.D.

Right?

A.    That's my understanding, yes.

Q.    And while you were listening to the discussion, all of that discussion is news for the investment community.

Right?

A.    Well, depends what you mean by news.  The inputs to their decision making are known and then they talk about it, but yes, their discussions are new information, if that's your question.

Q.    So anything else besides the Ad Comm committee discussions and Ad Comm committee vote that was new news on November 6th that you were aware of?

A.    I don't recall any, no.

Q.    What about November 7th?  Was there any new news?

A.    It's a weekend.

Q.    Well --

A.    I don't recall any news, but it was certainly no trading.

Q.    You're not aware of any new news on November 7th?

Page 261

                    G. Hubbard, Ph.D.

A.      I'm not.

Q.      Are you aware of any new news related to Biogen on November 8th?

A.      I'm not.  It's also a weekend, no trading.

Q.      Are you aware of any new news related to Biogen on November 9th?

A.      Not that I recall.

Q.      Okay.

Let's go to paragraph 69.

A.      Okay.  I'm there.

Q.      So it says here, last sentence: On each of the days that Dr. Tabak cites as possibly reflecting price impact in the Massie appendix, the observed price volatility was not attributable to the revelation of the subgroup statistics, but instead reflected broader uncertainty surrounding aducanumab's approval and ultimately the negative Ad Comm vote.

So when you say on each of the days, what specific days are you referring to?

A.      Well, I think principally for

Page 262

G. Hubbard, Ph.D.

him, it's November 5th.  He hints a little bit in his deposition about the 9th, but it's principally November 5th.

Q.    You're saying that the price movements on those days -- you use the term "observe the price volatility."

Does that refer to the price movement of Biogen shares?

A.    Well, first the volatility. The second moment, not the first.

Q.    Well, so this is what I'm trying to figure out.

So you start the sentence by saying:  On each of the days that Dr. Tabak cites as possibly reflecting price impact from the Massie appendix, the observed price volatility was not attributable to the revelation of the subgroup statistics.

So why are you saying -- you're saying the observed price volatility is not attributable to the revelation of the subgroup statistics.  Is the price volatility different than the price impact?

A.    I talk about both in the

Page 263

G. Hubbard, Ph.D.
report.  When you look at statistical significance close to open between November 4th and November 5th, it's not statistically significant.

Now you've given the market time from the morning of November 4th all the way to the morning of November 5th.  You know, you don't have -- you've had that much time, but close to open is not that significant.

The volatility that I look at is elevated on November 5th and I do a series of exercises comparing volatility on the 4th and 5th.  That's what all of this is referring to.

Q.     So you say that this volatility on the 5th had nothing to do with the subgroup statistics, but instead reflected broader uncertainty surrounding aducanumab's approval and ultimately the negative Ad Comm vote.  Uncertainty surrounding aducanumab's approval and the Ad Comm vote.

Was the market on November 4th concerned about aducanumab's approval and a

Page 264

G. Hubbard, Ph.D.

possible negative Ad Comm vote?

A.    Sure.  But all the information -- in my view, all the information is processed on the 4th.

How do I know that?  Because statistically close to open is not statistically significant.  When I look at 15-minute intervals on the 5th, those are also not statistically significant.

When I look open to 11:15 on the 5th, not statistically significant.  And when I look at the volatility, it mirrors in suddenness and severity the volatility of the 4th.  So that's why I can close the door.

Q.    So if the volatility on the 5th is similar to the volatility on the 4th, why isn't the same news continuing to create volatility in the stock?

A.    Well, theory tells you that can't happen.  When you look at the empirics, you also get the same message because the close to open is not statistically significant in each of those

Page 265

G. Hubbard, Ph.D.

15-minute intervals.

Q.    I didn't ask you about statistical significance.  I asked you about the volatility.

There's continued volatility -- it was volatile on the 4th, it was volatile on the 5th.

Right?

A.    Correct.

Q.    We know there was new news on the 4th?

A.    Correct.

Q.    There's no new news on the 5th.

So what created that volatility other than the news on the 4th?

A.    If I'm understanding your question, you need to be careful in terms of economics and statistics.  So take them in parts.

The economics, the impact has already happened.  What now we're struggling with is each of us now has different probability estimates.  We've now absorbed the news.  Again, I get what Massie said, I

Page 266

G. Hubbard, Ph.D.

get the good news, but we don't know what the ultimate news is going to be.  You feel one way, I feel another.  There's a lot of trading and volatility.  That's what I'm saying.  That's very different than the impact of the news, which happened immediately and once and for all.

Q.    So if it happened immediately, how fast did it happen?

A.    Well, the report, as you know, I'd say most of the impact was felt by 10:56 a.m.  But if you do the statistics, it's certainly not the case that it could bleed over to the 5th because the close to open, November 4th to November 5th, is statistically insignificant.

Q.    So you're saying for a piece of news to take more than one trading day to be incorporated, it would have to show a statistically significant stock price change between market close and market open the next day, notwithstanding there's no news in that interim time period?

A.    Yes.

Page 267

G. Hubbard, Ph.D.

Q.      What's the economic basis for that?

A.      Well, I wouldn't even think you would have to look, but since Dr. Tabak went there, I had to prove him wrong.  So even if you allow people to spend all night, even though evidence is to the contrary, there's still no statistical price impact at open, between open and 11:15.  There's not in 15-minute intervals throughout the day.  That dog won't hunt.

Q.      Well, there's a statistically significant difference between market open and market close.

Right?

A.      But that's not --

Q.      And there's a statistically significant difference between market close on the 4th and market close on the 5th.

Right?

A.      That's the one that's true, but that's neither here nor there.

Q.      Why is it -- isn't that the way you typically look at --

Page 268

G. Hubbard, Ph.D.

A.    No.

Q.    -- statistical significance?

A.    No.

Q.    You don't go from market open to --

A.    Not in this case.  I just explained -- I'm not going to repeat my answer because I've been doing it all day. I answered your question before.  I'm not going to answer it again.

Q.    All right.

Let's go to page 20 of your report.

A.    Okay.  I'm there.

Q.    So you acknowledge there was prolonged price volatility following release of the FDA briefing vote.

Right?

A.    Yes, sir.

Q.    Okay.

What was the cause of that prolonged price volatility?

A.    We've already had that conversation.  It's about still processing

Page 269

G. Hubbard, Ph.D.
the information about probabilities and the trading that is associated with that.  We know the news, but we still may have heterogeneous beliefs about probabilities and what it means.

Q.    So investors are processing how that news affects the Ad Comm vote or approvability?  Is that what you're saying?

A.    Yes, sir.

Q.    Okay.  All right.

So then in the subheader, little I, four paragraphs in, you say:  On November 4th, market participants reacted quickly and positively to the briefing above containing the Massie appendix and expressed uncertainty on how the different clinician and statistician views would be weighed by the Ad Comm panelists.

So when you say the different clinician and statistician views, the statistician views, you're referring to the Massie analysis.

Is that correct?

A.    Yes, sir.

Page 270

G. Hubbard, Ph.D.

Q.    So absent the Massie report, would there be any differing views?

A.    But there is a Massie report. So I'm not sure what you're asking. The clinicians are positive, if that's your question.

Q.    Right.

So the only differing view is Massie.

Is that fair to say?

A.    Correct. That's why it says differing clinician and statistician views. Clinician, statistician.

Q.    So if there is no additional news after November 4th, how is the Massie report in conjunction with the clinician views not the cause of the continuing price volatility on November 5th?

A.    That's already been processed by theory and practice. Theory because it's the efficient market's hypothesis. Dr. Tabak and I cited similar numbers of minutes for that to happen. Practice because the analysts have already written it up.

Page 271

G. Hubbard, Ph.D.

So what's happening is now we're trying to process in our mind's eye what's the ultimate probability here.  We could all disagree on that, even though we have the same news.

Q.    Well, prior to November 4th, everyone was trying to process the ultimate probability of success of this drug.

Right?

A.    Sure, but after November 4th, we now have some news, so we now have the clinician's view, we have the statistician's view and we sort it out, which one do we think is going to move the probabilities, how do we weight those.  Individual position holders can differ in that, even though we all have the same news about what the clinician said and what the statistician said.

Q.    So they started that process on November 4th.

Right?

A.    Who is they and what process?

Q.    Well, you said:  We now have

Page 272

G. Hubbard, Ph.D.

the clinician's view, we have the statistician's view and we sort it out --

A.    Yes.

Q.    -- which one is going to move the probabilities, how do we weight those. The individuals can vary even though we have -- so this process of sorting it out is beginning on November 4th.

Right?

A.    The price impact is in any view beginning and ending on November 4th. That's true in theory, but it's also true in the statistics I looked at.  The continued volatility remains.  That's a different question.

Q.    Okay.

So the continued volatility on November 5th certainly stems from the news that was released on November 4th.

Right?

A.    In part, yes, I would agree with that.

Q.    So when was -- when was it known that there would be an Ad Comm vote?

Page 273

G. Hubbard, Ph.D.

A.    I'm not sure what you mean. That there would be one at all or --

Q.    There would be one at all.

A.    I don't recall that.  Sorry.

Q.    Prior to November 4th.

Right?

A.    Obviously.

Q.    Okay.

And so the fact that there would be an upcoming Ad Comm vote was not new information on November 4th or November 5th.

Right?

A.    That is correct.

Q.    All right.

So if everybody knew that there was going to be an Ad Comm vote prior to November 4th, how could the upcoming Ad Comm vote be the cause of changes in Biogen's stock price on November 4th or 5th?

MS. SOLOWAY:  Objection.

Misstates the testimony.

A.    If I'm understanding your question, I'm not arguing that it is.  When

Page 274

G. Hubbard, Ph.D.

I'm saying move the price on November 4th it is the release of the clinician and statistician reports. I believe that's what I've said five, six, seven times.

Q.    All right.

What about on November 5th? Same question for November 5th.

A.    Price impact has already happened in my view.

Q.    So you're separating price impact from volatility?

A.    Yes, sir.

Q.    You're saying that price change on November 4th is price impact from the news and price change on November 5th is just volatility?

A.    It's volatility. I checked that statistically. I don't have to surmise it because I do the close to open, I do every 15 minute intervals. It's not just a guess.

Q.    Suppose the Massie report had been released on November 1st. Would the market still have weighed how it might

Page 275

G. Hubbard, Ph.D.
affect the future Ad Comm vote?

MS. SOLOWAY:  Objection.

A.      You mean by itself?

Q.      Yeah.

A.      I suppose it's possible.  I'm not sure that it corrects anything or fits the facts in this case, but I mean anything is possible, so I'm sure it's possible.

Q.      I didn't ask -- well, so is it likely that if the Massie report had been released on November 1st, the market would have, at that point, weighed how it might affect a future Ad Comm vote?

MS. SOLOWAY:  Objection.

A.      I don't know the answer to that.  What you're really needing to compare is the delta between true belief of market participants and what Massie said and the fact that Massie is talking about different things.  So maybe yes, maybe no.  I don't know.

Q.      So let's go to page 29 of your report, the fly-on-the-wall report on November 4 at 11:27 a.m.

Page 276

G. Hubbard, Ph.D.

It says -- it says:  The statistician's review is the first, and as far as we can tell, only -- as far as we can tell only piece of the application which is negative.

Let's go to paragraph 81.

A.    Eighty-one, you said?

Q.    Yes.

A.    I'm there.

Q.    You refer here to the JP Morgan and Raymond James reports after market -- after market hours on November 4th and say neither expressed novel or updated views on Massie appendix's main findings.

Do you see that?

A.    Yes, sir.

MR. ROSEN:  I'm going to mark this JP Morgan report.

(Whereupon, Exhibit 9 was marked for identification.)

(Discussion off the record)

MR. ROSEN:  This will be Exhibit 9.  So this is the JP Morgan report from November 4th that's

Page 277

G. Hubbard, Ph.D.

referenced.

THE WITNESS:  Okay.  I'm there.

BY MR. ROSEN:

Q.    Do you see how six lines into the text, JP Morgan says:  That said, our more thorough view was eyeopening in terms of the conflict of opinions between the FDA reviewers and their statisticians were far more negative?

A.    I see that.

Q.    Wouldn't you consider this to represent a novel or updated view on JP Morgan's part?

A.    No.  It didn't change their price target.  Next sentence says:  We doubt this makes a difference on Friday.

Q.    So even though it's eye opening, it doesn't make any difference?

A.    Well, I'm just an economist, so the difference would have to be change in price target or probabilities and they say neither.

Q.    Let's go to page five of the report, second bolded bullet point.

Page 278

G. Hubbard, Ph.D.

JP Morgan says:  On the contentious subject of APOE4 carriers/noncarriers, the stat's team provided a compelling analysis to show that the benefits seen in the PB4 group for APOE4 carriers was solely due to placebo worsening.

The question is do you think that JP Morgan calling this a compelling analysis does not count as a novel or updated view?

A.    They don't change their price target or probability per their openers. Not particularly.

But again, exegesis on stuff neither one of us wrote is kind of hard, but that's how I read it.

Q.    Let's go the next bullet point.

It says:  No benefit was shown at all for APOE4 noncarriers.  This surprising result conflicts with Biogen's hypothesis that high aducanumab dosing leads to a better benefit, as noncarriers were always able to dose up to 10 milligrams per

Page 279

G. Hubbard, Ph.D.
kilogram.

Do you see that?

A.       Yes.

Q.       Is Biogen's hypothesis that high aducanumab dosing leads to a better benefit one way that we've been describing the all data statement or the July 22nd statement?

MS. SOLOWAY:  Objection.

A.       That's certainly one way you could describe it, yes.

Q.       The JP Morgan report says that the Massie report contains a "surprising result that conflicts with the all data statement."

Right?

A.       It does.

Q.       All right.

So other than the fact that JP Morgan does not say that Biogen's hypothesis was stated on July 22nd, is there any way that this is not a statement by an analyst that the Massie report corrected the all data statement based on the subgroup data

Page 280

G. Hubbard, Ph.D.

involving APOE4 noncarriers?

MS. SOLOWAY:  Objection.

A.      I can't say that, no.

Q.      Were you aware of the statement by JP Morgan when you finalized your report?

A.      I read the report, yes.

Q.      And JP Morgan says that the Massie report contains a "surprising result that 'conflicts with the all data statement.'"

Right?

MS. SOLOWAY:  Objection.

A.      I don't think it says it conflicts with the all data statement.

Q.      It says it conflicts with -- it says conflicts with -- hang on.

Well, it says this surprising result conflicts with Biogen's hypothesis that high aducanumab dosing leads to a better benefit, as noncarriers were always able to dose up.

So they're saying that this -- we'll call it a subgroup analysis -- on the APOE4 noncarriers that this shows -- this is

Page 281

G. Hubbard, Ph.D.
a "surprising result that conflicts with this high dose thesis."

Right?

A.    Conflicts with the high dose thesis, yes.

Q.    And it's your opinion that that is not corrective of the July 22nd statement?

A.    I don't see it that way, no.

Q.    Let's go to paragraph 83.

A.    Okay.  I'm there.

Q.    You say:  While modern efficient financial markets incorporate value relevant news rapidly during the trading day, any information that arrives overnight is almost entirely reflected in the stock price at the market open.

What is the basis for that statement?

A.    Well, I cite a paper there.  I mean, most studies in efficient markets literature going back to FAMA would say it's a matter of minutes, but to the extent you want to push the envelope, studies show it's

Page 282

G. Hubbard, Ph.D.

about the open.  As you know, I went further than that and I tested every 15 minutes.

Q.    Now, this article that you cite, doesn't it say the majority of the price response is realized during the opening trade?

A.    Yes.

Q.    Not all of it?

A.    Yes.

Q.    But just 51% of it.

Right?

A.    Well, it says majority.  That's why I tested it until 11:15, every 15 minutes.

You are climbing a mountain with the efficient markets hypothesis with your world view.

Q.    Let's go to paragraph 86.

A.    I'm there.

Q.    So in the second sentence of that paragraph, you state:  Even if plaintiffs presume without basis and against all aforementioned evidence that the decline after market open on November 5th, 2020

Page 283

G. Hubbard, Ph.D.

reflect continued suggestion of the alleged corrective subgroup patterns, that decline was in line with many price drops observed on November 4th, 2020, during the period of heightened volatility that occurred following the publication of market absorption of the briefing book.

Do you see that?

A.    Yes, sir.

Q.    Did you perform any statistical test to see if there was a difference in Biogen's stock price volatility after the open on November 5th versus the price drops observed on November 4th?

A.    If I'm understanding your question, I used the volatility of November 4th in my tests of the intervals on November 5th.  Both of them are higher volatility than traditional Biogen.  The statistics that are behind the calculations here are about suddenness and severity, which I define in footnote 133.

Q.    I'm sorry.  Did you answer the question I asked?

Page 284

G. Hubbard, Ph.D.

A.    I did, yeah.  I could speak more slowly if it helps.

Q.    Maybe you should.

The question was did you perform any statistical test to see if there was a difference in Biogen stock price volatility after the open on November 5th versus the price drops observed on November 4th.

So the operative question is after the open on November 5th versus the price drops on November 4th.

A.    I think I answered that with the answer I gave, so I'll just stick to it.

Q.    Let's go to your Exhibit 8.

A.    Eight?  Okay.  I'm there.

Q.    All right.

Does this show graphically your analysis of declines on November 5th versus November 4th?

A.    These are the -- it's the same as the one we were talking about in the text.  It's the same picture, just blown up.  It's the one on page 40.  Just blown up.

Page 285

G. Hubbard, Ph.D.

Q.    Who came up with the methodology for what is shown in Exhibit 8?

A.    I did.

Q.    Now, you see the large box with the orange background on the right side of the page that shows Biogen stock price over three periods on November 5th?

A.    Yes, sir.

Q.    You see that each of those periods starts at the 9:30 open and then ends at a time that ends with a zero or a five, meaning 9:35 a.m., 9:40, 9:45?

A.    Yes.

Q.    Why did you look at those three time periods on November 5th?

A.    They're near the opening.  I don't know if that's a trick question.  I already told you I looked at the first 15 minutes.

Q.    Did you impose a restriction of only looking at time periods that ended in a zero or five for the periods highlighted in red for November 4th in Exhibit 8?

A.    I did a lot of -- you have to

Page 286

G. Hubbard, Ph.D.

be careful.  You can't just look minute by minute or you get a lot of false positives. So I don't remember, to be honest.  I'll stand ready when Dr. Tabak fires back.

Q.      So you're saying you did not impose a restriction of looking only at time periods that end in a zero or five for the periods highlighted in red for November 4th on Exhibit 8?

A.      I don't recall.  I recall looking at the first 15 minutes.  I have some sensitivities analyses, but when you're ready to do some work and send it my way, then I'm ready to talk to you again.

Q.      Well, we're not going to have a chance to talk again for quite some time I don't think.

A.      I look forward to seeing you at trial.  Believe that.

Q.      So is it fair to say that you did not impose the same restrictions for the time periods on November 4th?

A.      I think that's right.

Q.      Okay.

Page 287

G. Hubbard, Ph.D.

All right.

Now, what about using multiples of five-minute intervals on November 4th? There was no restriction of five-minute intervals on November 4th? Is that right?

A. I think that's right.

Q. Okay.

So let's look at the highlighted red periods for November 4th in Exhibit 8.

Is it correct that each starts at a local high point and ends at a local low point?

A. Pretty much, yes.

Q. Is it fair to compare three price declines on November 5th, 2020 where you restricted those declines to have to end on minutes that ends in a zero or five with declines on November 4th where you imposed no similar restriction?

MS. SOLOWAY: Objection to form.

A. I'm not sure I'm understanding your questions. I don't think that's a

Page 288

G. Hubbard, Ph.D.

problem.  No.

Q.    Is it an apples-to-apples comparison?

A.    I think it is.  You're drawing from the same volatility distribution. That's why I pointed you to footnote 133 as to what the exercise is about.

Q.    Here's an analogy for you.

Suppose I compared my speed in running a race to that of a speed of a friend of mine in the same race.  For my friend, I take their time over the first five, ten, 15 minutes of the race.  But for me, I look over any period, regardless of length of time, where I run as fast as they did over those three time periods.

Would you say that would be a fair time comparison, allowing me to say I ran as fast as my friend?

A.    I'm not sure if it would or wouldn't, but it has nothing to do with this.

Q.    So you're saying that it doesn't matter what time periods you use,

G. Hubbard, Ph.D.

even though the time periods are selected for different reasons, so long as you're using the same volatility distribution?

A.    Yes.

Q.    Suppose one were just to take the price changes you report in Exhibit 8 for November 4th and for November 5th and compare the two sets of times with a statistical test that compares the means of two groups.

Would you say, given the way that you calculated the data in Exhibit 8, that that would be a valid statistical test?

A.    It wouldn't tell you very much. The test that's meaningful is the one I did, which is I looked at every 15-minute interval on November 5th using the volatility of November 4th for the test.

Q.    Would you say that this test that I just proposed would be a valid statistical test?

A.    First of all, you haven't said of what.  But I can't imagine it would be very interesting for anything.

Page 290

G. Hubbard, Ph.D.

Q.    I'm saying you take the price change as reported in Exhibit 8 for November 4th and 5th and you compare November 4th to 5th with a statistical test that compares the means of the two groups. In other words, you're using the means of the changes, comparing the means of the changes.

A.    But that's not the exercise I'm trying to get at.  I'm not sure what that's a statistical test of, but it's not what I'm looking at here.

Q.    And why would looking at the means not be informative?

A.    Because it's not telling you about volatility.

So the question is are these things we're observing on November 5th, are they coming from similar volatility as November 4th.  I do that visually, I do that statistically.

I'm not trying to compare every 15 minutes of November 5th with the same 15 minutes of November 4th.  That is

Page 291

G. Hubbard, Ph.D.
meaningless.

Q.      Okay.

So based on your test, what have you determined about the volatility on each day that you think is meaningful?

A.      What I think is meaningful is that there -- as I would expect from theory -- no statistical significance anywhere, not close to open, not the first 15 minutes, not for 11:15, not every 15 minutes of the entire day.  That's really the economics.  The visual was to help. Maybe I distracted you, but the meat is the statistics.

Q.      All right.

So if you look at your Exhibit 8, you have 16 red highlights declines from November 4th in your Exhibit 8.

Is that right?

A.      Yes, sir.

Q.      Then given that the price changes you look at for November 5th are restricted to three time periods, can you tell me how many such red highlighted

Page 292

G. Hubbard, Ph.D.

declines you should expect on average if the average volatility on November 4th was the same as it was during the first 15 minutes of November 5th?

A.    I don't recall if I looked at that or not.

Q.    So you don't remember if you looked at it?

A.    Yes, sir.

Q.    And it would require you to do a calculation now that you're unable to do?

A.    Well, I haven't looked at it, to my knowledge.  You have my back ups, so if it's a thrilling question for you, we could calculate it.

Q.    Nothing would thrill me more.

Are you able to tell me whether there would be more or less than 16 such highlighted periods?

A.    I don't know.  I didn't do it to my knowledge.

Q.    Let's look at the box in Exhibit 8 that says 12.01.

A.    Okay.  I'm there.

Page 293

G. Hubbard, Ph.D.

Q.    All right.  So that seems to be it.  All right.

Now, if you look at the red highlight after that, it goes down and up briefly and back down.

Do you see that?

A.    Yes, sir.

Q.    What rule was used to determine that that should be a single red highlight for that whole period versus two highlights for the two downward portions of that period?

A.    The rule was described in 133 as to exceed the range of declines.  There's a severity measure and a suddenness measure. In other words, greater per minute dollar decline in first 15 minutes, that's sudden, and then severe is defined.  That's how I did it.

Q.    That's 133, you said?

A.    Footnote 133.  I'm sorry.

Q.    Okay.

But it's a decline and then the decline stops and it starts to go up, so why

Page 294

G. Hubbard, Ph.D.
is it not two declines instead of one decline?

A.     I'm not sure.  If I'm looking at the same thing as you are, the going up is kind of maybe a little sideways up and then back down, but it would have matched my filter.

I can now see using this as a helpful device wasn't helpful because this is statistics that I'm stressing.

Q.     So if we go to -- for 860, you sort of have the same issue, right?  The next one after that, you have this decline and then you have a period of a slight rise or the decline ends, but then it keeps going and then you have another increase and then it goes down again.

What rule -- so is it the same answer again as to what rule was used to determine that the whole time period covering the two red highlights and the period in between should be a single red highlight covering that entire period?

A.     Yes, sir.

Page 295

G. Hubbard, Ph.D.

Q.    Footnote 133?  Is that --

A.    Yes, sir.  Or note three in Exhibit 8.  Same thing.

Q.    So absent the information in the Massie report -- let me ask you do you think the Massie report had any effect on Biogen's stock price?

A.    It certainly is possible.  It's conflated with the clinician's view, so it would be hard to estimate, but I can't say it had no effect.

Q.    Okay.  Let's go to paragraph 90.

So you analyze November 9th, 2020 movement of Biogen stock price.

In your opinion, what were the causes of that stock price movement?

A.    You asked me that question earlier and I answered it.  Do I need to answer it again?

Q.    Yes.

A.    It's the Ad Comm vote.

Q.    Didn't you also agree that the Ad Comm discussion also would have an effect

Page 296

G. Hubbard, Ph.D.

on the stock price movement?

A.        It might, but the Massie report has been subsumed already.  What's happening is now a materialization of whether the Ad Comm says yes or no.

Q.        All right.  So let's go to paragraph 92.

Here, you're discussing what continued after market closing on November 5th.

Is that right?

A.        Yes, sir.

Q.        Halfway through this paragraph, you write:  Ahead of the Ad Comm meeting, JP Morgan, UBS and SVB Leerink all interviewed or surveyed experts to gain additional insights into how the Ad Comm panelists may be thinking about the briefing materials and gauged the risk of a positive or negative Ad Comm vote.  JP Morgan surveyed 26 physicians who treat Alzheimer's patients, UBS hosted a call with three ex-FDA experts and SVB Leerink spoke with an Alzheimer's specialist who had previously participated in FDA

Page 297

G. Hubbard, Ph.D.

advisory committees.

You describe these three investment banks as interviewing to gain insight as to how the Ad Comm panelists may be thinking about the briefing materials.

Is that right?

A.      Yes, that's what I meant earlier about people having experts at the ready.

Q.      These investment banks wouldn't have gotten all of the insights from these experts before the briefing materials were made public.

Correct?

A.      About the probabilities, yes, that's probably true.

Q.      Right.

Market participants could not have read the three analyst reports until they were published, correct?

That's an easy one.

A.      That's true, although no analyst I looked at this week mentioned anything like the all data statement, just

Page 298

G. Hubbard, Ph.D.

for what it's worth.

Q.      Is it fair to say that market participants would not have able to trade on the basis of these expert analyses of the briefing book until these reports were published?

A.      Solely on that basis, yes, that's trivially true.  It's not substantively true, because they could have traded on similar information from their own work, but the way you phrased it, it's trivially true.

Q.      Okay.

And so it's also true that one of the reports was published on November 6 according to your footnote 139?

A.      Yes, sir.

Q.      Now, even after the Ad Comm vote was released, was there still some uncertainty as to whether the FDA would approve aducanumab?

A.      Yes, Ad Comm votes aren't dispositive.  The FDA could do something different and I think indeed did.

Page 299

G. Hubbard, Ph.D.

Q.      Now, could some market participants have been relying on the information in these three analyst reports to assess the likelihood that FDA would approval aducanumab?

A.      I can't say that one way or another what an individual market participant might rely on.  It's possible.

Q.      Did the Ad Comm committee base its decision to reject aducanumab in large part based on the Massie report?

MS. SOLOWAY:  Objection.

Lacks foundation.

A.      I didn't review all of that.  That is the most negative information, so I'm sure it figured in the decision.

Q.      So the last sentence of paragraph 94, you say:  Importantly, neither the opinions of Dr. Massie, nor the views and decisions of the panelists were knowable or disclosed of to Biogen as of the time the July 22nd statement was made.

Now, this sentence that the opinion of Dr. Massie was not knowable or

Page 300

G. Hubbard, Ph.D.

discloseable by Biogen as of the time the July 22nd statement was made, what is that based on?

A.    That's asked and answered.  We talked about it.  It's that you couldn't possibly know his final views until he said what they were.  Any other interim views you claim they may or may not have had don't negate that statement.  That was the same answer I give you the last time you asked me.

Q.    Actually, I don't believe I asked you that.

A.    You did.  We could go through it on a break.

Q.    Let's unpack that a little by the.

You couldn't possibly know his final views?  If he had -- if that Massie appendix verbatim had been provided to Biogen on July 1st, 2020 -- well, do you know whether -- whether or not -- do you have any idea what aspect of the Massie analyses Biogen had in its possession as of

Page 301

G. Hubbard, Ph.D.

July 22nd, 2020?

A.      I do not.

Q.      How could you possibly make that statement?

A.      My statement is true as a matter of logic, so it doesn't need defense. Any possibility that Massie could have made a final change, which he obviously could have right up until the end, could not be known or knowable.

We had this conversation before.  This is what irritates me.  We had the very follow up that you just asked before.

MS. SOLOWAY:  Do you need a break?

THE WITNESS:  Probably do. Once we go on break --

MS. SOLOWAY:  Can we go off the record please?

(Time noted: 4:37 p.m.)

(Recess taken)

(Time noted: 4:45 p.m.)

Page 302

G. Hubbard, Ph.D.

BY MR. ROSEN:

Q.     So paragraph 94, it says:  On November 6, 2020, prior to and during the Ad Comm meeting, analysts were commenting in anticipation of the panel prior to market open and providing midday updates as the panel was occurring.

What is the significance of that?

A.     It's just a factual statement that market participants had information.

Q.     So providing midday updates to the panel, we discussed that.

After the conclusion of the Ad Comm meeting, analysts consistently described that the Ad Comm negative outcome was unanticipated as was the panelist's focus on Dr. Massie's opinions.

Now, why is that significant?

A.     Are you asking a statistical question?  Or significant to me in a colloquial sense?

Q.     In a colloquial sense.

A.     Basically, the import was that

Page 303

G. Hubbard, Ph.D.
in contrast to typical Ad Comm meetings where clinician views were dominant, that was not the case here.  Many analysts described that -- all the analyst reports I looked at also did not describe anything about an all data statement or contradicting, but they were definitely picking up on the fact this was new to them to see a statistician weighed more heavily.

Q.    Didn't one of the analyst reports say that only 35% of the time Ad Comm committee votes -- if there's a statistician that is rejecting and a clinician is recommending approval, that only 35% of the time they follow the statistician?

A.    I think it's 32 and it was the report you just showed me.

Q.    Thirty-two percent.

So two to one?

A.    Something like that.

Q.    And do you think that's what -- that's how the analysts were handy capping the Ad Comm vote, based on that two to

Page 304

G. Hubbard, Ph.D.

one --

A.      That would be purely speculative.  The analysts pretty much mentioned the surprise, but I think that was the only report that had that kind of odds and the two to one was really based on past Ad Comm.

Q.      When you say in:  No discussions of Dr. Massie or the Massie appendix did any analyst represent being surprised by the known unsupportive subgroup patterns, is that after November 6 or does that include November 4th and November 5th?

A.      November -- the search is highlighted there at 145.  That's what I told you before about analysts -- footnote 145 -- where analysts don't reference the all data statement in any way.  So that's described in footnote 145, the process I went through.

Q.      Between November 6 and November 11?

A.      Yes, sir.

Q.      So the analysts were not

Page 305

G. Hubbard, Ph.D.

surprised by the known unsupportive patterns in the Massie appendix, but this is only from November 6 on.  You're not excluding November 4th and November 5th.

Right?

A.    Well, yeah.  It's a paragraph about the vote.  So this whole discussion is about the vote.

Q.    So if -- if the Ad Comm committee members focused a lot of their discussion on Massie's statistical analysis -- well, did you -- did you check to see if that is true, that -- whether or not the Ad Comm committee members were focused on the Massie analyses?

A.    My recollection is it did come up in their discussion, yes.

Q.    If the Massie analyses did affect the Ad Comm committee vote, why cannot one conclude that the Massie analysis -- that that Ad Comm committee vote is then a materialization of the risk that was concealed by the Massie -- the concealment of the Massie analysis?

Page 306

G. Hubbard, Ph.D.

MS. SOLOWAY:  Objection.

A.      I think you asked me that.  I don't think that's reasonable.  I do view it as a materialization of a risk, knowing the possible findings of Dr. Massie, if that what you're asking.

In terms of the concealment, no analyst talks about the all data statement during this entire period.

Q.      Well, they may not reference the July 22nd statement as the July 22nd statement, but they certainly reference the same type of information.

MS. SOLOWAY:  Objection.

Q.      Right?

I mean, we showed you an analyst who referenced the same type of information that said that the Massie analysis pokes a hole in the high dose thesis.

Right?

MS. SOLOWAY:  Objection.

A.      I don't think that's -- okay.  That's fine.

Page 307

G. Hubbard, Ph.D.

Q.      All right.

So let's go to paragraph 99.

A.      Okay.

Q.      You criticize Dr. Tabak's analysis because it doesn't demonstrate statistical significance.

You say that the reason for the lack of statistical significance is due to the small sample size and large variability.

Can you explain what you mean there?

A.      Sure.  I mean, the big starting point problem for Dr. Tabak is he uses any reference to the Massie appendix and of course I've already said there's lots in the Massie appendix.  The whole exercise isn't worth doing.

The reason when you have a small number of data points and you have a lot of variability, it's going to be hard to find statistical significance.  I show that he omitted some reports -- I won't say strategically, but they go against them if he were to put them in -- and he omits all

Page 308

G. Hubbard, Ph.D.

reports that don't change price targets.  I do that exercise.

Probably the biggest criticism of him is that he relies, without reading any analyst reports, just simply on -- he keys on the word Massie without disaggregating.  That's probably the biggest concern.

Q.      All right.  Let's go to Exhibit 9 of your report.

Your last -- your column six, last price target update, what does that mean?

A.      That means when the price -- the last time a price target changed.

Q.      And how did you determine what date to put into column six for each analyst report?

A.      I'm not sure if that's a trick question.  I mean, these came out in November 4th or 5th, so I simply am looking for the most recent time before that that the price target has changed.

Q.      And how did you determine it?

Page 309

G. Hubbard, Ph.D.

Did you look at each analyst report?  What did you do?

A.    Yes, looked at each analyst report.

Q.    So you looked at every single Wells Fargo analyst report prior to November 4th?

A.    Yes, to go back.  Yes.

Q.    You started with November 3rd and went back until you found a price target change?

A.    Correct.

Q.    Okay.

So let's go to row seven of your Exhibit 9, the BOA global research report, 3:02 p.m.

Can you tell me the date of the last price target update in column six for that entry?

A.    It says October 21.

Q.    Right.  Then if you look at row two of your Exhibit 9, it has an earlier entry for B of A.  It says -- can you tell me why your entry at row seven for B of A

Page 310

G. Hubbard, Ph.D.
global research does not consider the entry at 11:00 a.m. to be the last price target update?

A.    It's the same number.  I don't really recall why.  It's the same $230.  It's an identical number.

Q.    So is it fair to say that you relied on the analysts themselves to tell you what their last price target was and B of A global research did not consider its 11:00 a.m. price target report to be a update?

A.    Yes, although the team would have checked.  That's why I'm not quite sure what happened there.  It's the same number, so it's irrelevant numerically, but I don't recall one way or the other.

Q.    Are you aware of whether there's any instance of analysts providing an update of their price target between the date you have listed in column six for an analyst and November 4th, 2020?

A.    I don't think so, no.

Q.    I will proffer to you this is

Page 311

G. Hubbard, Ph.D.
true and occurs for at least five of the analysts you list in your Exhibit 9.

Now, does that tell you anything about whether analysts consider what you were calling an affirmation of a price target to be an actual price target update?

A.     I don't know that I would accept the first part of your statement and the second part, I don't know what you mean. What I call -- it's actually printing a number I'm calling an affirmation as opposed to just not and you're looking back.  That's the test we do in a report.

Q.     What do you mean by as opposed to just not?

A.     Oh, in other words, if I don't say -- if I don't reiterate -- my price target yesterday was 230.  If I don't tell you something that's different than -- this is for another test in the report I look at whether you actually positively reaffirm today is 230.  That was one of the other tests.

Page 312

G. Hubbard, Ph.D.

Q.        Well, do they -- so they list a price, right?  Are you saying that they on top of that also say whether they're reaffirming it?

A.        By putting the number in.  That's my recollection.  I could go back in the footnotes, but that's my recollection.

Yes, I say in footnote 159 I only include those analyst reports that explicitly indicate they're choosing not to change the price target.

MR. ROSEN:  Okay.

I'm going to introduce the B of A October 30th report.

(Whereupon, Exhibit 10 was marked for identification.)

BY MR. ROSEN:

Q.        It's Exhibit 10.

A.        I have it.  Thank you.

Q.        All right.  Let's see what's fascinating about this.  So if you look at the price objective basis and risk section on page two of the October report --

A.        Yes, sir.

Page 313

G. Hubbard, Ph.D.

Q.      Would this count as a price target update in your view?

A.      I don't recall what their process is here.  This says the 230 is based on the sum of parts.  Whether that's current, I don't recall one way or the other.

MR. ROSEN:  This will be Exhibit 11.

THE WITNESS:  So get out of this one?

MR. ROSEN:  Yes.

(Whereupon, Exhibit 11 was marked for identification.)

BY MR. ROSEN:

Q.      So if you look at the price objective and risk on page two --

A.      Okay.

Q.      -- does this appear to be identical to the October 30, 2020 price objective and risk write up that we just looked at?

A.      Yes.

Q.      All right.

Page 314

G. Hubbard, Ph.D.

So you don't see any differences between the two?

A.    I don't recall.  If that's important to you, we'd have to go back and compare them.  I already told you the two numbers are the same.

MS. SOLOWAY:  Is there something you want to point him to, Larry?

BY MR. ROSEN:

Q.    Do you know where, if at all, aducanumab would appear in B of A's price objective and risk report?

A.    I don't recall.

MR. ROSEN:  Let's look at the next B of A report.  Give me a second.

MS. SOLOWAY:  New exhibit?

MR. ROSEN:  Yes.  This will be Exhibit 12.

(Whereupon, Exhibit 12 was marked for identification.)

THE WITNESS:  I have it.

BY MR. ROSEN:

Q.    Look at the price objective

Page 315

G. Hubbard, Ph.D.

basis and risk on section -- on page five.

Do you see how there's a now a new entry for aducanumab in the write up evaluated at $115 per share?

A.    Let me just get there.  I'm sorry.

Yes, sir.

Q.    Okay.

So if you compare the upside and downside risk sections in the two report, do you see how the November 4th report added in an entry for aducanumab in both of those sections that did not appear in the October 30th report?

A.    Yes, I see that.

Q.    So were you aware of the differences between B of A's October 30 and November 4 reports that we just discussed when you finalized your expert report?

A.    Yes, I noted they increased the price target.

Q.    All right.

So having gone through this discussion, do you still believe that

Page 316

G. Hubbard, Ph.D.

B of A's 11:00 a.m. report on November 4th counts as a price target update?

A.    Yes.

Q.    What is the basis for that answer?

A.    The procedure that I understand the team did in reviewing them.

Q.    Which is what?

A.    Asked and answered.

Q.    They looked at the -- so they looked at the October 30th one and it differed from October 30?

A.    They are requiring an affirmation of a price target, yes.  It's not requiring a difference.

Q.    Just an affirmation?

A.    Yes.  I pointed you to the footnote.  That's why it's asked and answered.

Q.    Okay.

Let's go to paragraph 107.

A.    Okay.  I'm there.

Q.    All right.

So you say -- Doctor, you

Page 317

G. Hubbard, Ph.D.

discuss the continued volatility in Biogen stock price and say that market participants continue to grapple with how the Ad Comm panelists might weigh Dr. Massie's negative views on the statistical aspects of the studies against the positive clinician assessments in the briefing book.

So just to confirm, is it your opinion that the continued volatility in Biogen stock price on November 5th and beyond are due, at least in part, to the analysts weighing Dr. Massie's views?

MS. SOLOWAY:  Objection.

A.      It certainly is possible, yes.

Q.      Okay.

A.      Put differently, not Dr. Massie's views, but the implication of those views and probability.  His views are known.

Q.      So let's go to paragraph 111.

You say in paragraph 111 that Dr. Tabak's premise that the length of time something is discussed, the number of times it is repeated is indicative of prolonged price impact is inconsistent with his claims

Page 318

G. Hubbard, Ph.D.
of market efficiency.

And you have a footnote attached to that sentence of your report.

Does that footnote relate to what you say is Dr. Tabak's premise in paragraph 111?

A.    Yes, that's his comeback.

Q.    Where specifically do you believe that Dr. Tabak claims that the length of time something is discussed or the number of times it is repeated is indicative of a prolonged price impact?

A.    He said it.  Is that a trick question?

Q.    He said it in his report?

A.    I believe so.  And at his deposition, which was why he was given this question.

Q.    All right.

Well, if I gave you his report, would you be able to find it?

A.    Probably not.  I have it right here, but I have no intention of looking through it.  If you want to point me to

Page 319

G. Hubbard, Ph.D.

something, go ahead.  I do recall that in his report and I do recall as it's stated here that he said it in his deposition.

Q.    When did the Massie report become old news exactly?

MS. SOLOWAY:  Objection.

I mean, vague.

A.    Well, I'm not quite sure what you're asking.  I think the price impact -- if you're asking about price impact of the Massie report, the day of November 4th, the analysts start writing around 11 o'clock.  Volume is peaking around 10:56 in the morning.  So early.  But this isn't something where you could say, like, it's this minute.

Q.    All right.

So paragraph 11, your last sentence is:  My earlier analysis of market commentary leads me to conclude that in the present case the reasons for repetition are disconnected from the allegedly corrected subloop patterns and therefore invalid evidence of continued price impact.

Page 320

G. Hubbard, Ph.D.

What specifically do you believe are the reasons for the reputation?

A.    That's also asked and answered. We talked about it now multiple times.

The repetition is really just people coming to their own judgments about the probabilities of Massie's information is now news, no analyst connects it back to the all data statement.  This is simply about whether the Ad Comm is going to be positive or negative.

Q.    So if people are coming to their own judgments about the probabilities of Massie's information, aren't they essentially processing his information?

MS. SOLOWAY:  Objection.

A.    Processing for what?  The price impact is there, the consensus is there, the price impact is there.  Each individual is going to be trying to come to a point of view about a probability.

We now all know the same news, but Audra, you, I, we may have different points of view about the probability.

Page 321

G. Hubbard, Ph.D.

That's why traders are --

Q.    Okay.

So -- but you trade once you've analyzed the probability, right?  You don't trade before you analyze the probability.  You trade after you analyze the probability.

Isn't that correct?

A.    Among other things, yes.

Q.    So paragraph 118 of your report says that Dr. Tabak has not thought about how to apply methodology to disaggregate confounding methodology in the case at all yet.  I'm going to read you the deposition transcript.

He says -- he's asked:  Do you have any methodologies that you would -- that you could point to that would help us do that?

Answer:  I think one of the things to do is bring an FDA expert who can say if, as I said before, probability of approval of 60% without Massie, 40% with Massie, maybe there's an intermediate point like 45% where

Page 322

G. Hubbard, Ph.D.

broken up into 15 and five, one of those is allegation related and one of those is not allegation related.

So did you read that in his transcript?

A.    I did, but it's nonsense.  I already told you you cannot -- the Massie report, as I understand it, has overlapping concerns, so you can't do the disaggregated -- it's a very facile answer, but it can't be done.  I'm quite familiar with it.

Q.    Did you try to do it?

A.    I wasn't asked to do it.  He was the one asked the question, he gave that answer.  I'm telling you his answer is nonsense from an economic perspective.

Q.    Did you make any effort to try to disaggregate the corrective information from the non-corrective information in the Massie report?

A.    A, I showed no front end, so it's a useless exercise for me and B, I wasn't asked to do it.

Page 323

G. Hubbard, Ph.D.

MR. ROSEN:  All right.  Let's --

MS. SOLOWAY:  No, no.  We're going to finish and we're going the leave at 5:30.

MR. ROSEN:  I'll let you leave at 5:30.

Go off the record for a second.

(Time noted: 5:19 p.m.)

(Recess taken)

(Time noted: 5:21 p.m.)

MR. ROSEN:  I'll say what a pleasure it's been.

THE WITNESS:  Thank you.

Thanks for your time.

MR. ROSEN:  See you next time.

(Time noted: 5:21 p.m.)

Page 324

CERTIFICATION

I, SARA K. KILLIAN, RPR, RCR, CCR, do hereby certify that GLENN HUBBARD, Ph.D., the witness whose examination under oath is hereinbefore set forth, was duly sworn, and that such deposition is a true record of the testimony given by such witness.

I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of October, 2025.

_____

SARA K. KILLIAN, RPR, RCR, CCR

Page 325

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Dr. Hubbard | Mr. Rosen | 3 |

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Glenn Hubbard, September 10, 2025 | 4 |
| Exhibit 2 | Transcript of Q2 2020 Biogen Inc Earnings Call - Final | 59 |
| Exhibit 3 | Biogen Aducanumab Update Slides dated October 22, 2019 | 65 |
| Exhibit 4 | CTAD presentation slides from December 5, 2019 | 71 |
| Exhibit 5 | Thomson Reuters StreetEvents Edited Transcript of the Biogen Inc. Investor Q & A Call on December 5, 2019 | 71 |
| Exhibit 6 | United States Court of Appeals, First Circuit opinion in re: Shash, et al, v. Biogen, Inc., et al | 168 |
| Exhibit 7 | Transcript from Bryan Rauch v. Vale, S.A., et al, August 5, 2024 | 207 |

Page 326

E X H I B I T S

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Wolfe Research Report entitled "They just said what?!  Highlights from the conference call that just ended," dated July 20, 2020 | 239 |
| Exhibit 9 | JP Morgan report entitled "Biogen:  A Closer Look at the Adu Briefing Docs and the Tale of Two FDAs," dated November 4, 2020 | 276 |
| Exhibit 10 | Bank of America Securities Global Research report entitled "Biogen Inc., Little read-throughs from EMA adu acceptance with CHMP opinion key," dated October 30, 2020 | 312 |
| Exhibit 11 | Bank of America Securities Global Research report entitled "Biogen Inc., FDA signals openness to adu but panel outcome still key," dated November 4, 2020 | 313 |
| Exhibit 12 | Bank of America Securities Global Research report entitled "Biogen Inc., Positive regulatory outlook shifts adu dynamics," dated November 4, 2020 | 314 |

Page 327

NADIA SHASH, et al. vs. BIOGEN INC., et al.

10/17/2025 - GLENN HUBBARD, Ph.D.

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

GLENN HUBBARD, Ph.D.        Date

Page 328

NADIA SHASH, et al. vs. BIOGEN INC., et al.

10/17/2025 - GLENN HUBBARD, Ph.D.

ACKNOWLEDGEMENT OF DEPONENT

I, GLENN HUBBARD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____
GLENN HUBBARD, Ph.D.          Date

*If notary is required


SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.



_____
NOTARY PUBLIC

**[& - 22nd]**

### &

**&** 2:17 71:9,10
71:21 134:3
325:18

### 1

**1** 4:3,6 89:8
90:5,9,9,14,22
325:9
**10** 221:3,4
278:25 312:16
312:19 325:9
326:11
**10/17/2025**
327:2 328:2
**10/23/2020**
182:20
**100** 21:24
177:17
**10016** 2:7
**10019** 2:20
**10479** 1:3
**107** 316:22
**10:18** 59:19
**10:35** 59:21
**10:56** 266:13
319:14
**10th** 36:7,9,20
37:8
**11** 60:15 61:8
89:8,11,16,19
90:6 91:3
242:25 243:2
256:5 304:23

313:10,14
319:13,19
326:15
**111** 317:20,21
318:7
**115** 315:5
**118** 321:10
**11:00** 310:3,12
316:2
**11:15** 264:11
267:10 282:14
291:11
**11:27** 275:25
**12** 314:20,21
326:19
**12.01.** 292:24
**124** 133:2
**1285** 2:19
**12:15** 142:11
**12:58** 142:13
**13** 89:24
186:22 187:3
**133** 283:23
288:7 293:14
293:21,22
295:2
**139** 298:17
**145** 304:16,18
304:20
**15** 264:9 265:2
267:11 274:21
282:3,14
285:19 286:12
288:14 289:17

290:24,24
291:11,11
292:4 293:18
322:2
**159** 312:9
**16** 291:18
292:19
**168** 325:19
**17** 1:13 66:7
**17th** 324:15
**19** 10:5 22:25
24:3 89:22
141:11 151:3
165:9 167:7,20
167:23 173:23
179:12
**19th** 180:14
**1:21** 1:3
**1b** 98:5
**1st** 274:24
275:12 300:22

### 2

**2** 59:22 60:2
90:15 91:2
242:24 325:11
**20** 50:10,12
163:19 239:21
268:13 326:6
328:17
**2019** 55:4,18
65:16,24 68:13
83:12 93:8
99:15 116:11

140:15 247:17
247:18 325:14
325:15,18
**2020** 29:9
56:20 60:3
66:14 70:14
97:23 103:13
109:18 113:5
140:15 180:14
226:9 282:25
283:5 287:17
295:16 300:22
301:2 302:4
310:23 313:21
325:11 326:6
326:10,14,18
326:22
**2024** 206:20
208:8 325:23
**2025** 1:13
324:16 325:10
**207** 325:22
**20th** 36:7,13,21
36:24 37:15,18
38:4,7 39:3,6
**21** 53:12
309:21
**22** 140:15
325:13
**22nd** 6:9 7:12
7:14 9:22
10:11 15:20
17:7 25:12
29:9 44:13

**[22nd - 4th]**

51:19,20 53:15
53:23 54:10
55:19 56:4,20
56:23,24 58:2
59:3 60:3,18
65:15 67:19
70:14 90:4,12
95:14,19 97:23
99:15 103:13
106:24 107:14
109:2,18,20
113:5,22
115:17 116:11
117:8,21 120:3
120:21 129:13
131:18 149:6,8
149:16 171:21
173:6 175:12
175:14 200:17
201:8,10 203:6
212:16 222:9
222:19 225:9
225:17 226:8
227:17 228:10
229:9 230:4,13
230:15 233:8
233:10 234:25
237:8,17,19,22
238:4 239:16
242:23 243:12
244:19 245:7
246:19 247:5
279:9,22 281:8
299:23 300:3

301:2 306:12
306:12
**23** 184:10
**230** 310:6
311:20,24
313:5
**239** 326:4
**23rd** 206:20
**25** 47:13 94:6
94:15
**26** 296:21
**275** 1:19 2:6
**276** 326:7
**29** 275:23
**2:28** 221:22
**2:39** 221:24
**2nd** 213:18
247:3
**2q** 239:21

**3**

**3** 6:7 65:8,9
108:17 109:15
109:15 325:5
325:13
**30** 55:12 142:7
142:8 313:21
315:18 316:13
326:14
**301** 12:11 20:8
110:17
**302** 12:14
**30th** 312:15
315:15 316:12

**312** 326:11
**313** 326:15
**314** 326:19
**32** 97:17
303:18
**35** 107:12
303:12,16
**36** 112:22
113:20
**37** 115:14
**3:02** 309:17
**3rd** 140:15
309:10

**4**

**4** 71:14,20
275:25 315:19
325:9,15 326:9
326:18,22
**40** 50:10
113:10 114:6
226:9 227:19
228:4 230:25
284:25 321:24
**40th** 2:6
**41** 116:8
**42** 71:4
**4268** 324:18
**43** 69:3,6
**44** 69:4 71:9,25
**45** 69:4 80:6
321:25
**46** 84:7 85:16

**47** 129:9 136:6
148:7
**48** 93:25
128:19 131:11
132:2 134:18
136:14 142:19
146:12
**49** 131:14
133:10 146:12
180:11,16
182:21 184:25
**4:37** 301:22
**4:45** 301:24
**4b** 97:22
**4th** 29:17 30:10
30:12 32:10
33:17 190:15
204:25 205:2,4
205:6 222:14
233:9 234:12
251:22 257:17
263:4,7,15,24
264:5,15,18
265:7,12,16
266:16 267:20
269:14 270:16
271:7,11,22
272:9,12,20
273:6,12,19,21
274:2,15
276:13,25
283:5,15,18
284:10,13,21
285:24 286:9

**[4th - able]**  Page 3

286:23 287:4,6 287:10,20 289:8,19 290:4 290:5,21,25 291:19 292:3 304:14 305:5 308:22 309:8 310:23 315:12 316:2 319:12

**5**

**5**  71:16,20 106:13,21 117:16 121:22 121:25 122:11 129:24 130:2 131:13 132:9 132:12,24,25 133:4 173:5 184:21 185:6 186:22 187:10 222:22 223:4 223:11,12 325:15,16,18 325:23
**50**  47:9,12,12 69:8 224:16
**51**  282:11
**52**  173:4,4 222:3
**56**  236:9
**58**  245:4
**59**  119:14 325:11

**5:00**  182:20
**5:19**  323:10
**5:21**  323:12,18
**5:30**  323:6,8
**5th**  32:18,20,24 33:11,15 93:3 93:8,14 208:8 258:24 259:3 262:2,4 263:4 263:8,13,15,18 264:9,12,17 265:8,14 266:15,16 267:20 270:19 272:19 273:13 273:21 274:7,8 274:16 282:25 283:14,19 284:8,12,20 285:8,16 287:17 289:8 289:18 290:4,5 290:19,24 291:23 292:5 296:11 304:14 305:5 308:22 317:11

**6**

**6**  168:5,8 259:17 298:16 302:4 304:13 304:22 305:4 325:19

**60**  321:23
**63**  246:17
**64**  248:25
**65**  248:25 325:13
**69**  261:11
**6th**  259:9,10,11 260:16

**7**

**7**  207:21,25 325:22
**71**  325:15,16
**75**  226:16 228:6 230:25
**76**  210:23
**77**  208:5,12 210:23
**7th**  260:18,25

**8**

**8**  239:7,11 284:16 285:3 285:24 286:10 287:11 289:7 289:13 290:3 291:18,19 292:24 295:4 326:4
**80**  3:20
**81**  208:17 276:7
**83**  281:11
**86**  282:19

**860**  294:12
**8th**  261:4

**9**

**9**  276:20,24 308:11 309:16 309:23 311:3 326:7
**90**  295:14
**92**  296:8
**94**  299:19 302:3
**97**  30:21 188:13
**99**  307:3
**9:12**  1:14
**9:30**  285:11
**9:35**  285:13
**9:40**  285:13
**9:45**  285:13
**9th**  219:17 220:9,10,18 261:8 262:3 295:15

**a**

**a.m.**  1:14 59:19 59:21 182:20 266:13 275:25 285:13 310:3 310:12 316:2
**ability**  246:24 247:4,22 248:4
**able**  40:4,20 41:12 124:4

189:24 258:25 259:2 278:25 280:22 292:18 298:4 318:22

**abnormal** 41:23

**above** 34:3,6,6 34:21 35:15 92:9 157:8 160:10 239:24 240:7 269:15

**absence** 182:5

**absent** 149:3 200:18 270:2 295:5

**absolutely** 146:21 198:9 228:19

**absorbed** 265:24

**absorption** 283:8

**academic** 209:18

**accept** 5:13 150:24 157:12 159:15,19 311:10

**acceptable** 167:12

**acceptance** 326:13

**accepted** 18:15 159:16 160:18

162:23

**accepting** 153:12,14 157:10 160:12 188:16

**accompany** 14:12

**account** 193:22

**accurate** 3:12 50:24 206:7

**accusations** 88:11

**achieved** 22:17

**acknowledge** 48:4 52:7 172:9 200:2 224:6 268:16

**acknowledged** 52:14

**acknowledge...** 328:3

**acknowledges** 74:4

**acknowledging** 244:6,17

**act** 186:19

**action** 7:24 9:7 34:2 39:18,24 40:6 45:4 324:11

**actionable** 9:23 34:24 35:9,19 37:9,17

**active** 256:17 256:23

**activity** 83:17

**actual** 8:17 50:6 166:24 167:13,14 189:25 209:15 209:22 211:19 221:8 231:10 231:10 233:17 256:2 311:7

**actually** 6:17 8:14 16:15 18:13 27:15 37:7 46:7 48:25 50:5 52:8 58:18 74:11 77:11 80:21 84:10 94:4 144:6,7 167:7 170:6 191:13 192:20 207:3 208:16 210:23 213:4 223:18 224:5,9 225:13 229:10 246:11 256:9 256:13 259:22 300:13 311:12 311:23

**ad** 219:18,23 220:3,11 221:11 227:4 228:25 229:7

232:23 257:15 259:12,16 260:13,14 261:21 263:21 263:23 264:2 269:8,19 272:25 273:11 273:18,19 275:2,14 295:23,25 296:5,15,18,20 297:5 298:19 298:23 299:10 302:4,15,17 303:2,12,25 304:8 305:10 305:15,20,22 317:4 320:11

**add** 212:8

**added** 315:13

**additional** 42:8 42:12,14,25 69:12,13,14 72:11 75:2 93:4 112:10 133:17 245:8 270:15 296:17

**additions** 328:6

**address** 135:8

**addressed** 192:9

**addressing** 134:15

**adequate**
143:10
**admitting**
202:14
**adu** 326:8,13
326:17,22
**aducanumab**
10:19,21 11:2
13:13 30:16
51:18,24 61:10
63:7 65:12,17
66:15,21 67:4
69:7 93:6
103:15 104:5
105:18 108:19
109:16 112:5,6
116:13 127:16
134:24 137:2
140:19 165:5
226:11,18
240:10,19
241:10 243:5
244:14 278:23
279:6 280:20
298:22 299:6
299:11 314:13
315:4,13
325:13
**aducanumab's**
98:2 107:19
109:21 245:10
261:20 263:20
263:22,25

**advance** 65:23
**adverse** 226:11
226:18 227:20
228:6,7,9
253:21
**advice** 202:7
**advisors**
256:21
**advisory** 297:2
**affect** 186:20
228:24 229:16
275:2,14
305:20
**affects** 269:8
**affirmation**
311:6,13
316:15,17
**affirmatively**
51:11 245:6
**aforemention...**
282:24
**afraid** 155:3,4
**afternoon**
165:14 166:16
**agency** 254:20
**ago** 51:10
**agree** 19:24
20:24 51:23
53:7 112:4
128:11 138:6
138:11 139:2
145:16 147:4
161:2 165:21
165:25 169:14

170:10,22
176:11 230:6
242:5 243:7
244:9 254:24
272:22 295:24
**agreed** 218:6
**agrees** 227:22
**ahead** 61:25
104:9 221:19
296:15 319:2
**akerlof** 124:16
124:22
**al** 73:2,3,13
325:21,21,23
327:1,1 328:1
328:1
**alden** 4:22
**alexander** 2:9
**alfred** 1:9 17:7
73:15 89:17
91:5,14
**allegation**
116:18 202:25
249:14 251:7
322:3,4
**allegations**
153:12 156:11
**allege** 6:9 53:15
54:5 104:25
158:6 219:16
219:17
**alleged** 5:8 7:23
8:12 9:6 53:23
115:21 116:23

128:23 129:2
158:17 165:17
215:7 222:5
236:13,15,18
236:19 237:7
237:20 283:2
**allegedly** 6:11
10:12 48:7
144:2 319:23
**alleges** 169:5
190:22
**alleging** 7:18
153:15,18
**allen** 252:14
**allow** 267:7
**allowing** 46:2
288:19
**alternative**
142:22
**alzheimer's**
13:14 66:22
68:9 70:23
71:5 114:9
241:10 296:22
296:24
**america** 60:23
119:8 326:11
326:15,19
**america's**
241:17
**americas** 2:19
**amjad** 1:4
**amount** 12:13
12:16,17 75:18

**[amount - analysts]**                                                      Page 6

105:16
**analogy**  288:9
**analyses**  5:20
5:24 7:7 8:11
11:16 31:25
32:8 55:13
56:2,19 57:2,5
58:6,8,21
59:10,14 62:10
62:12,23,24
63:6,10 83:16
85:19,21 86:13
92:6 93:4
99:16 113:24
116:15,20
118:2 119:4,19
130:18 133:18
143:7 166:8,25
172:17 176:15
176:19 177:6
177:12,14,16
179:6,13 181:7
182:6,12,22
188:3 190:15
191:18 195:2
197:11 203:4
203:25 204:9
212:13,13
223:13,15,19
224:5,21 233:5
234:10,24
235:9,17
241:15,19,20
244:5,22

245:13 246:6,7
247:3,11,16
248:12 249:24
250:6 286:13
298:5 300:25
305:16,19
**analysis**  4:10
4:13 5:3,11,14
18:7,17 19:6
21:14 23:7
38:11,15 52:20
53:8 61:14
62:6,9,20,21
63:7,23 64:15
65:25 66:16,19
67:2 72:20
86:16,18 87:6
87:22 92:12
115:6,7 129:6
131:5 135:21
138:17 139:17
145:12 146:11
148:21,22
149:10 150:2,2
150:23 158:24
159:17 162:24
163:21 164:16
166:14,18
176:9 190:14
191:12 219:20
223:8 238:13
243:16 250:12
269:23 278:5
278:11 280:24

284:20 305:13
305:22,25
306:20 307:6
319:20
**analyst**  5:6
15:19 26:7,16
50:22 52:8,12
52:13,14,16
56:15 60:22
61:3,23 78:9
78:11,13,19
84:3,8 94:7
95:6,18,23
96:3,16,23
97:8,13 108:5
113:4,21 114:3
114:16,22
117:15 119:15
121:24 124:3
131:16 132:18
133:6 135:3
145:7,9,18,25
146:25 147:12
147:17,18,23
147:23 148:9
150:10 170:9
170:24 177:10
179:16,17
180:8 182:8,13
184:25 187:9
244:2 255:21
279:23 297:20
297:24 299:4
303:5,11

304:11 306:9
306:18 308:6
308:18 309:2,4
309:7 310:23
312:10 320:9
**analyst's**  241:4
**analysts**  27:11
46:15 49:5
50:10,18,21,25
51:11,22 58:17
68:12,16,20
70:17 76:24
77:12,18 78:8
79:10 85:18
94:20,22 95:13
96:4 100:11
101:18,24
106:22 117:3
119:8,24 120:7
123:9 125:7
132:9 169:24
170:2,4 172:10
173:17 179:5
179:20,23
180:2 212:4,15
213:17 214:4
214:13 215:5
215:11 216:7
216:15 223:16
224:4,6,12,19
224:23,25
226:9,15
227:18 228:2
230:23 231:21

232:13,21
235:15 238:14
238:20 252:6
253:9 256:8
270:25 302:5
302:16 303:4
303:24 304:4
304:17,18,25
310:9,20 311:3
311:5 317:13
319:13
**analytical**
91:21 113:17
**analyze** 295:15
321:6,7
**analyzed** 18:13
168:4 321:5
**analyzing** 49:8
**announce**
65:16
**announcement**
116:12
**annoyed**
164:25
**annual** 34:25
96:14,20
**answer** 4:15
9:2,12 14:10
17:22 18:20,21
23:24 28:9
29:5,8 33:22
35:6,7 37:20
39:10,15 44:10
44:23 47:25

53:6 64:19
65:6 67:25
77:5 97:2
101:13,13,14
101:16 103:17
104:13,20
122:18,20
128:18 134:11
149:21 154:24
155:3,3 157:25
159:2,9 160:16
163:16,18
171:3 178:7,23
196:19,20,21
196:22,25
197:5,6,13,13
198:15,16,24
199:8,9 204:20
211:5 217:17
235:5 244:17
255:23 259:5
268:9,11
275:16 283:24
284:15 294:20
295:21 300:11
316:6 321:20
322:11,17,17
**answered**
18:22 19:8
20:5 29:6
34:12 35:9
85:15 87:12
99:22,24
126:18,22

157:4,20,22
159:8 161:6
163:14 187:22
236:7 268:10
284:14 295:20
300:5 316:10
316:20 320:4
**answering** 37:3
140:5 154:14
**answers** 60:7
143:20
**antecedents**
92:10
**anticipation**
302:6
**anybody**
119:17
**anymore** 66:6
221:13
**anyway** 36:15
231:22 232:15
235:4 236:24
**apoe4** 85:4
98:8 278:3,6
278:21 280:2
280:25
**apologies** 207:7
240:17
**apparently**
92:13
**appeals** 325:20
**appear** 38:19
102:14 118:9
313:20 314:13

315:14
**appearing**
252:6
**appears** 62:18
81:23
**appended**
328:8
**appendix** 30:20
32:14,15 57:15
192:23 205:24
205:25 206:7
206:11 222:5
222:13 223:5
237:17,21
246:20 249:14
261:16 262:17
269:16 300:21
304:11 305:3
307:15,17
**appendix's**
276:15
**apples** 288:3,3
**application**
276:5
**applied** 80:14
**apply** 124:11
321:12
**applying** 68:9
69:17
**appreciate** 89:4
**approach**
38:23,24
237:11

**approached** 250:7

**appropriate** 27:20 28:16

**approvability** 269:9

**approval** 51:24 65:17 68:11 98:2 107:20 109:21 116:13 179:18,21 182:4,17 215:2 227:13 229:17 229:24 253:16 253:21 261:20 263:21,23,25 299:6 303:15 321:23

**approve** 109:16 227:3 298:22

**approved** 76:15 229:11

**approving** 108:18 214:21

**approximately** 4:16

**arguably** 240:10

**argue** 211:24 216:3 225:15 237:9

**argued** 197:15

**arguing** 273:25

**argument** 7:3 18:15 39:12 43:9 44:17,18 45:18,20,21 116:3 124:13 124:16 125:4 129:17,17,19 192:4 200:8 210:18 220:15 220:17 251:14

**arguments** 45:8 199:16

**armor** 184:20 185:6,21

**arrives** 281:16

**art** 45:5 148:6 208:23

**artful** 248:16

**article** 282:4

**articulated** 19:4

**aside** 190:22

**asked** 8:3,24 9:12,14 15:13 16:24 17:2,24 19:2 20:5 33:21 34:8,12 34:13 39:8,14 40:16 46:20 47:2 75:6 87:12 92:25 99:14,22,23 103:16 126:17 126:22 128:14

129:19 130:19 157:4,20,21 159:8 161:6 163:14,24 176:10 187:22 195:17 196:16 197:16,24 208:21 230:6 237:12 259:4 259:13 265:4 283:25 295:19 300:5,11,14 301:14 306:3 316:10,19 320:4 321:16 322:15,16,25

**asking** 8:23 11:9 13:16 14:25 16:18,23 20:16 23:21,23 24:16 27:23 35:11,23 38:11 42:11 61:17 72:16 75:22 78:3,5,12,20 79:23 94:14 124:2 127:21 131:21 144:25 145:2 152:2 155:22 157:12 158:20 159:19 159:20 160:21 161:25 163:19 171:2,24 189:7

198:8,15 200:22 201:21 203:21 229:25 234:2,2,5,23 259:12 270:5 302:21 306:7 319:10,11

**asks** 72:10 96:25 243:14

**aspect** 10:10 110:21 152:3 155:7 193:6 300:24

**aspects** 143:24 150:18 165:15 192:12 193:8 317:6

**assembling** 5:2

**assess** 128:24 197:10 299:5

**assessments** 317:8

**assignment** 114:13

**associated** 46:6 269:3

**assume** 40:20 73:9 77:10 83:8,9 85:5 125:3 133:11 153:3 154:15 161:19,20 162:4,9 163:20 247:5 251:4

assumed  8:12 8:15 85:18 130:21 155:5 155:22 161:15 161:21 172:4

assumes  92:12

assuming  36:19 109:13 152:22 153:7 155:16 156:20,25 157:13 159:5,6 162:13,14 163:4 164:10 164:11

assumption 162:10,21 164:3

assumptions 162:17

assurance 125:23

assurances 102:2

assure  100:21

assuring 100:17 119:7

asymmetric 124:18

attached  318:4

attempt  12:19 64:20 237:5

attorneys  2:5 2:18

attributable 261:17 262:18 262:22

attribute  67:22 68:7

atypical  75:14

audra  2:21 320:24

august  206:20 208:8 325:23

authorities 73:25 74:21

authors  181:6

available  56:3 113:24 234:25

avenue  1:20 2:6 2:19

average  15:15 15:16,18 124:20 292:2,3

aware  7:21 8:4 9:4 10:17 97:6 98:22,25 108:16 173:6 175:25 252:12 260:16,24 261:3,7 280:5 310:19 315:17

**b**

b  3:2,2 60:23 76:3 101:21 102:5 205:25 206:3,7,11

309:24,25 310:10 312:14 314:13,17 315:18 316:2 322:24 325:7 326:2

back  31:12 44:9 45:22 55:18 57:25 69:7 88:19 89:7,10 94:5 103:18 104:7 110:24 112:12 122:22 131:19 131:20 134:17 134:18 142:7 146:14,20 147:13 157:7 173:23 179:6 179:22 185:20 192:2 194:14 196:14 198:11 198:20 199:5 199:11,17,22 200:4 202:5 210:22 220:8 228:13 229:3 232:11 234:17 236:11 249:3 250:22 281:23 286:5 292:14 293:6 294:7 309:9,11 311:14 312:7

314:5 320:9

background 114:25 285:6

backing  170:6

bad  58:6 77:25 78:2 82:22 83:9 94:24 125:3 138:7 217:18 220:12 221:12 252:11

bank  46:23 60:23 119:7 241:17 326:11 326:15,19

bankruptcy 46:17,22 47:5 47:19

banks  48:21 49:2,4,6 297:4 297:11

base  299:10

based  19:6 43:19 57:23 63:16 80:24 81:2 157:15,17 159:21 172:20 187:14 279:25 291:4 299:12 300:4 303:25 304:7 313:5

basically  31:2 57:11 66:9 84:21 131:20 172:2 302:25

**[basis - biogen]**

| basis 7:21 | 80:22 86:11 | 225:22 226:9 | better 79:14 |
|---|---|---|---|
| 107:24 191:16 | 91:12,14,17 | 227:18 274:4 | 143:15,18 |
| 203:19 252:25 | 93:12 95:19 | 286:20 300:13 | 144:22 199:25 |
| 267:2 281:19 | 101:3,8,10,10 | 315:25 318:10 | 248:12 278:24 |
| 282:23 298:5,8 | 101:11,19 | 318:17 320:3 | 279:7 280:21 |
| 312:23 315:2 | 102:9,13 | **believed** 20:3 | **beyond** 77:16 |
| 316:5 | 103:24 106:14 | 27:18 28:12,15 | 191:2 236:3 |
| **bearing** 16:9,10 | 106:22 107:11 | 28:20 29:10 | 239:24 240:7 |
| **beat** 141:24 | 108:4 109:19 | 36:9 37:7 | 317:12 |
| **beginning** | 109:25 110:4 | 38:17 54:25 | **big** 8:20 44:8 |
| 36:25 73:17 | 111:23 117:17 | 58:9,17 101:17 | 46:17,24 49:3 |
| 146:12 188:16 | 118:15,23 | 106:7,8 107:5 | 68:9 108:9 |
| 243:24 249:20 | 119:12,23 | 107:6 120:4 | 177:23 202:14 |
| 272:9,12 | 120:7,14,14,16 | 170:5 172:23 | 256:11,11,20 |
| **begins** 6:7 | 123:15 130:16 | 173:2 180:3 | 259:15 307:13 |
| 89:17 91:4 | 132:18 135:16 | 184:16 185:10 | **biggest** 308:4,8 |
| **behalf** 1:5 | 135:18 136:7 | 186:4 187:2,15 | **biib** 244:10 |
| **belief** 36:11 | 138:14 149:15 | 188:19 192:8 | **billion** 47:9,12 |
| 37:10 51:4 | 150:21,22 | 204:6 209:2 | 47:13 |
| 80:24 129:23 | 152:12 153:3 | 212:24 215:5 | **billionaire** 68:2 |
| 131:22 145:3 | 159:17 161:9,9 | 232:21 235:4 | **biogen** 1:8 5:7 |
| 186:8,11,15,21 | 162:22 164:15 | 235:11,13,14 | 10:17 12:10 |
| 198:12 222:24 | 175:18 177:6 | **believers** 50:11 | 21:7 22:10 |
| 226:16 249:9 | 177:17,21 | **believes** 111:5 | 25:25 30:4 |
| 275:18 | 178:12,13,15 | 111:14 123:15 | 32:11,19 56:10 |
| **beliefs** 117:16 | 178:19 179:2 | **believing** 84:3 | 57:21 60:4 |
| 231:17 269:5 | 179:24 181:8 | 120:12 134:2 | 61:18 64:15 |
| **believe** 9:18 | 182:3,7,23 | **benefit** 76:14 | 65:11,16 66:13 |
| 18:4 23:4 26:2 | 184:11,14 | 278:20,24 | 75:23 76:3 |
| 26:19 29:12,15 | 185:10 187:13 | 279:7 280:21 | 83:15 93:4 |
| 44:17 46:8 | 193:7 194:13 | **benefits** 278:6 | 97:24 98:18 |
| 47:22 48:21 | 195:3 197:21 | **best** 57:3 76:14 | 113:4 116:19 |
| 49:19 51:12 | 198:18 205:19 | 129:9 133:12 | 129:11 140:16 |
| 63:20 75:7 | 207:3 224:10 | 206:6 218:10 | 140:16 167:14 |

212:14 224:13 234:25 239:19 239:21 241:18 244:11,13,19 247:2,17 248:20 259:3 261:4,8 262:9 283:20 284:7 285:7 295:16 299:22 300:2 300:22,25 317:2,11 325:11,13,17 325:21 326:8 326:12,17,21 327:1 328:1

**biogen's** 33:10 56:18 67:20 116:11 140:14 184:12 225:8 246:23 247:4 247:22 273:20 278:22 279:5 279:21 280:19 283:13 295:8

**biotech** 177:24 218:19

**bit** 238:2 262:3

**bleed** 31:12 266:15

**bleeds** 14:12

**blood** 324:11

**blown** 284:24 284:25

**bmo** 181:25 182:8

**boa** 309:16

**board** 37:22 57:7

**bogus** 252:13

**bold** 10:6 99:2

**bolded** 277:25

**bolt** 252:4

**book** 30:21 204:3 283:8 298:6 317:8

**bottom** 72:9,13 72:17,23 90:7 168:22

**box** 285:5 292:23

**boxed** 87:23

**boxes** 64:5

**boy** 204:12

**brain** 14:11 31:12

**break** 59:17 70:8 103:8 141:18,25 142:4 221:16 221:21 223:6 300:16 301:17 301:19

**breakdown** 68:19 69:19,21

**breath** 110:18

**brian** 2:9

**brief** 218:6

**briefing** 29:18 30:4,21 204:3 251:9 253:13 255:6,22 257:16 268:18 269:15 283:8 296:19 297:6 297:13 298:6 317:8 326:8

**briefly** 293:6

**briefs** 251:5

**bring** 103:2,7 321:21

**bringing** 149:25 229:6

**broad** 39:19

**broader** 261:19 263:20

**broadly** 119:21

**broke** 22:11,14

**broken** 322:2

**brooklyn** 206:17

**bryan** 325:22

**bubbles** 34:10

**bucket** 30:15 205:13

**buckets** 30:14 195:8

**budd** 1:9

**bullet** 180:16 182:20 184:24 241:12 277:25

278:19

**burden** 194:16

**business** 94:19 125:17 155:13

**buy** 119:24

**c**

**c** 2:2 4:22,23

**calculate** 292:16

**calculated** 289:13

**calculation** 208:22 212:7 292:12

**calculations** 209:3 214:14 214:20 283:21

**call** 3:8 13:4 16:8 25:12 32:9 46:14,19 46:20 51:6 60:3 73:17 81:5 90:5 96:13,21 108:9 170:8,23 171:15 239:20 239:23 240:6 240:15 243:13 245:6 280:24 296:23 311:12 325:11,18 326:5

**called** 4:10 7:12 8:18 9:10 11:8 90:21 125:13 136:10 205:13 211:14 231:12 254:10

**callen** 134:3

**calling** 278:10 311:6,13

**calls** 8:2 35:22 62:15 78:16 102:11 143:13 147:9 166:11 167:17 176:23 178:9

**candid** 21:19

**candidly** 74:16

**candor** 89:5

**capable** 162:3

**capacity** 128:23

**capital** 81:10 131:16 132:17 180:8,13 181:25 182:19

**capping** 303:24

**capturing** 151:11

**car** 125:19

**careful** 265:18 286:2

**carrier** 6:15 73:8 85:4

**carriers** 278:4 278:7

**cars** 124:23,24 125:11

**case** 1:3 4:5 6:14 7:15 13:17 16:16 34:9 37:3,25 44:9,22 68:6 78:20 85:20 88:12 110:3 116:19 120:6 151:17 152:21 155:7,17,17 158:4 161:23 162:22 166:21 196:2 202:20 204:19,20 206:12,16 207:12 209:25 210:15 211:12 212:19,20,25 213:13,17 214:4,6,8,17,19 215:16 216:10 216:12 217:6 218:3,6,16,17 218:17,18,19 219:11,15 221:14 226:25 231:10 232:3 233:17 247:21 251:5 253:8 266:14 268:7

275:8 303:4 319:22 321:13

**cases** 42:19,20 132:11 199:15 221:14 224:9

**cash** 221:5

**categories** 31:9 111:3 191:3 197:16 256:16

**causation** 39:25 40:5,16 41:13,14,21 42:2,7,8 43:3 44:6,14 189:12 195:25 236:5

**cause** 29:11 44:6 202:15 268:22 270:18 273:20

**caused** 33:10 34:23 35:18 55:15 129:3,21 129:22 184:11 184:21 202:4

**causes** 295:18

**causing** 184:15

**ccr** 324:4,20

**cdr** 64:4

**centered** 240:9

**ceo** 46:19 47:2 47:6,16 49:18 50:11 78:12 177:23 178:3 202:12

**ceo's** 48:14 50:14

**certain** 6:10 183:20

**certainly** 10:25 55:18 120:6 150:9,22 154:4 167:18 195:4 205:21 220:13 232:3 259:18 260:23 266:14 272:19 279:11 295:9 306:13 317:15

**certification** 39:18 42:3,3 198:5 324:2

**certified** 1:22

**certify** 324:4,9

**chain** 229:15 231:9

**challenge** 207:15,18

**challenged** 210:5

**chance** 69:8 215:15 226:10 226:17 227:19 228:5,6 229:17 230:25 231:2 286:17

**chances** 256:16

**change** 43:15 43:19 143:23

143:25 150:17
150:17 151:14
152:4 184:11
184:15 186:12
186:16,17
227:15 230:23
266:21 274:14
274:16 277:15
277:21 278:13
290:3 301:9
308:2 309:12
312:12 327:4,7
327:10,13,16
327:19
**changed** 36:22
151:12 164:17
164:19 229:23
308:16,24
**changes** 211:8
227:14 273:20
289:7 290:8,9
291:23 328:7
**changing** 199:7
**characteristics**
30:20
**charles** 2:22
**check** 49:14
115:16 125:19
305:13
**checked** 274:18
310:15
**checking** 22:3
129:14

**chen** 4:22
**chief** 227:10
**chinese** 70:25
**chinks** 184:20
185:5,21
**chmp** 326:13
**choosing**
312:11
**chose** 15:4
**chris** 60:22
**christopher**
241:17 242:2
**circles** 154:25
**circuit** 7:22
8:11,15 9:5,9
53:14,20 152:9
158:6 168:11
169:8,21
188:24 189:4
189:15 203:3
251:3 325:20
**circuit's** 54:2
169:15 190:11
**circumstances**
177:5
**cite** 42:19 61:23
179:16,17
209:17,17
224:23 281:21
282:5
**cited** 270:23
**cites** 261:14
262:16

**claim** 169:4,18
169:22 300:9
**claims** 317:25
318:10
**clarifies** 63:5
**clarify** 95:25
**clarifying**
90:20
**class** 5:8 34:2
39:17,18 40:6
42:2,3 45:4
104:2 105:15
120:10,22
121:5 198:4
203:24 238:19
**clause** 153:22
156:19,21,25
159:23 160:2
160:21,22
161:4,15 162:5
**clauses** 153:23
158:4,5
**clean** 213:8
**clear** 18:21
21:22 52:15
56:14 108:5
109:23 134:4
163:16 188:15
188:18,19
193:14 244:13
**clearly** 172:5
180:4 230:18
**climb** 200:17
201:8,11

257:13
**climbing**
282:16
**clinical** 64:2
66:21 71:5
**clinician** 30:14
30:15,22 57:9
57:14 192:23
227:4 232:16
232:19 253:14
269:17,21
270:13,14,17
271:19 274:3
303:3,15 317:7
**clinician's**
271:13 272:2
295:10
**clinicians** 57:22
231:23 270:6
**close** 263:3,10
264:7,15,24
266:15,22
267:15,19,20
274:20 291:10
**closely** 83:21
84:18
**closer** 326:8
**closest** 135:3
**closing** 296:10
**collapse** 212:21
214:2,3 215:6
220:2 221:2
**collapsed**
217:21

**collapses** 211:19 213:4 215:13,14 217:18

**collapsing** 210:17 220:12

**colleagues** 57:14

**colloquial** 67:9 302:23,24

**colloquy** 210:9

**collusion** 189:8

**column** 308:12 308:18 309:19 310:22

**come** 45:12 65:4 80:2 103:18 104:7 118:5 125:19 126:24 127:7 158:11 235:14 235:15 256:2 305:17 320:21

**comeback** 318:8

**comes** 33:25 129:10

**coming** 26:11 48:5 117:6 290:20 320:7 320:13

**comm** 219:18 219:23 220:3 220:11 221:11

227:4 228:25 229:7 232:23 257:15 259:12 259:16 260:14 260:14 261:21 263:21,23 264:2 269:8,19 272:25 273:11 273:18,19 275:2,14 295:23,25 296:6,15,18,21 297:5 298:19 298:23 299:10 302:5,16,17 303:2,13,25 304:8 305:10 305:15,20,22 317:4 320:11

**comma** 153:23 153:24

**comment** 94:23 120:23 121:6 246:9

**commentary** 53:8 56:7 80:11 85:17 94:8,11,19 101:21 102:16 170:23 171:14 172:7,24 319:21

**commented** 121:11

**commenting** 302:5

**committee** 219:18 260:14 260:15 299:10 303:13 305:11 305:15,20,22

**committees** 297:2

**common** 70:17 113:16,19

**communicate** 107:15

**community** 260:6

**companies** 49:3

**company** 36:5 36:8,13 37:7 37:15 46:14,17 46:21,21 47:3 47:9 50:10 58:18,20 59:9 59:13 70:18 94:23,25 95:7 96:19 97:7 98:14,19 177:24 212:22

**company's** 36:23 75:11 96:12,15,17 98:13

**compare** 242:12,17 243:25 254:4

275:17 287:16 289:9 290:4,23 314:6 315:10

**compared** 288:10

**compares** 289:10 290:6

**comparing** 263:14 290:8

**comparison** 288:4,19

**compelling** 278:5,10

**complaint** 5:9 7:4 19:5 28:3 86:21,22,24 87:18 169:5 190:21

**complete** 206:7 328:9

**completely** 77:8 220:18

**complex** 80:12

**complicated** 103:17 104:6 105:20

**compound** 219:9 227:5

**compounded** 97:10

**concealed** 167:15 305:24

**concealment** 305:25 306:8

**[concede - consistently]**

**concede** 21:2
122:25 175:22
185:22
**conceded**
202:11
**concern** 31:11
47:6 224:20
308:9
**concerned**
57:17 152:9
263:25
**concerning**
30:4 32:10
93:5 241:18
245:10
**concerns**
177:11 205:9
225:24,25
322:10
**conclude** 79:18
109:8 128:10
187:14 188:14
191:17 305:21
319:21
**concluded**
54:14
**conclusion** 8:2
35:22 80:3
118:6 126:24
127:7 143:13
147:9 162:2
166:11 167:17
178:10 189:4,6
234:6 235:16

256:3 302:15
**conclusions**
98:6,10,15,20
**concur** 173:18
**condition** 25:8
26:4,5,14,15
**conduct** 149:3
210:5
**conference**
46:14,18,20
60:3 70:22
71:2 96:13,21
239:20,23
243:13,21
326:5
**confidence**
31:14 188:12
226:2
**confirm** 317:9
**confirmation**
7:20
**conflated**
295:10
**conflict** 277:8
**conflicts**
278:22 279:15
280:10,15,16
280:17,19
281:2,5
**confounding**
33:9,16 80:12
211:14,17
254:10,11,12
254:18 321:13

**confounds**
83:18 84:21,23
**confused**
106:20
**conjunction**
270:17
**connected**
43:19
**connects** 320:9
**connoting** 55:2
**consensus**
320:19
**consequence**
217:22
**consequential**
227:9
**consider** 8:23
199:6 223:5
277:12 310:2
310:11 311:5
**considering**
234:18
**consist** 98:3
**consisted** 255:7
**consistent** 10:9
11:25 14:19,24
15:5,22,24
16:5,12,17,21
17:8,11 18:3
19:17,18,20,21
23:2,13 24:5
25:20 27:3,7
55:3 64:7,10
64:13,22 65:4

87:15 88:2,9
91:11 92:5
114:7 117:25
118:2 119:6
122:6 126:11
130:12 131:8
131:23 132:6
132:10 134:12
134:22,25
136:25 137:13
137:19,22,25
139:3,21,23
140:17 141:5,6
141:11,14
143:3,20 151:3
151:4,19 152:5
153:4,19 154:6
156:2,12,16,18
157:6 159:11
159:25 160:2
160:17,23
161:16,24
162:23 163:5
164:20 165:3,5
166:4,14
167:25 172:17
184:19 213:19
213:21 215:21
215:22 225:9
230:16,19
234:13 235:25
238:9,15 259:8
**consistently**
116:14 302:16

**conspiracy**
69:11
**constant**
128:16 216:22
**constructed**
57:12,17
**construction**
97:3 236:23
**contain** 191:18
245:16
**containing**
95:15 269:16
**contains**
279:14 280:9
**contemporan...**
85:17
**content** 218:2
237:19
**contentious**
278:3
**contents**
237:21
**context** 17:4,6
34:8,15 39:17
39:18 45:3
60:19 95:12
97:21 109:6
210:2 222:21
222:25 231:7
233:16
**contextualize**
169:18
**contextualized**
169:4

**contingent** 47:4
**continue** 46:2
317:4
**continued**
265:6 272:14
272:18 283:2
296:10 317:2
317:10 319:25
**continues** 24:7
**continuing**
264:19 270:18
**contradict**
15:10,10 16:22
55:14 147:13
**contradicted**
105:10 106:9
**contradicting**
104:4,17 105:6
105:17 167:5
303:8
**contradictory**
27:6,8 106:8
119:9 120:17
135:11,16,18
233:5,6
**contradicts**
148:9 191:10
**contrary** 267:8
**contrast** 303:2
**contribution**
124:17
**control** 5:24
246:23 247:19

**conventional**
199:15
**conversation**
88:23 244:25
245:3 268:25
301:12
**convey** 237:23
238:5 245:8
**conveyed** 39:4
53:16,23 54:10
**conveying**
184:17
**cope** 125:20
**copy** 165:23
**correct** 19:13
20:15 21:4
52:10 69:16
70:11,12,16
74:6 77:21
80:19 101:7
110:6 123:6,7
150:8,15
162:16,18
163:8 164:5
165:10,19
166:23 171:10
174:10 177:19
177:20 185:11
190:25 191:20
192:6 194:22
197:23 213:23
224:8 228:19
234:3 235:20
235:24 236:14

244:8 245:12
245:14 246:5
253:17,18
265:10,13
269:24 270:12
273:15 287:12
297:15,21
309:13 321:8
328:9
**corrected** 6:10
6:11 131:24
187:3,4 191:18
192:7 195:2
197:12 236:19
237:7 279:24
319:23
**correcting**
147:6 228:9
**correction**
134:15 180:2
222:9,19
225:17
**corrections**
328:6
**corrective**
133:19,21
147:2 150:11
185:2,4,7,9,12
185:15,18,20
185:23 186:3
188:25 190:16
193:18,19
194:11 195:22
196:6 222:5

226:21 229:9 229:13,22 230:4,13 231:4 233:10 235:7,9 235:10 236:13 236:18 237:20 281:8 283:3 322:20,21

**correctly** 57:12 57:18 141:15

**corrects** 132:19 275:7

**correspond** 11:14

**cost** 34:10

**costs** 213:6,8

**counsel** 7:20 128:22 129:18 136:2,7 257:5

**counsel's** 136:2

**count** 278:11 313:2

**countermand** 151:16,18

**counts** 316:3

**couple** 38:22 62:18 228:14 252:7

**course** 22:4 95:16 112:2 138:10 307:16

**court** 1:2 7:17 78:10 118:8 169:12 170:11

171:2,16,24 190:20 197:3 208:21 210:9 325:19

**court's** 170:17

**courts** 128:22

**covering** 50:10 224:13 294:22 294:24

**covid** 49:23

**cowap** 4:23

**create** 264:19

**created** 247:16 265:15

**credit** 49:4

**critical** 31:17 155:6 158:3 253:20

**criticism** 246:9 308:4

**criticisms** 195:8,9,11 204:16 228:16 233:19

**criticize** 307:5

**critique** 188:10

**ctad** 68:22 69:5 69:14,24 70:21 70:21 71:8 93:8 325:15

**curative** 29:2 38:19 106:15 120:9,24 121:7

**curious** 64:24 124:14

**current** 182:3 313:7

**custody** 247:19

**cut** 238:20

**cuts** 182:22

**cv** 1:3

**d**

**d** 3:2,2 4:22 325:2

**dam** 210:17 211:19 212:21 213:3,25 214:2 214:7 215:6,13 215:14 217:17 217:21 220:2 220:12 221:2

**damages** 208:22 209:2

**data** 5:2 9:10 9:11,13 10:2,9 10:18 11:6,12 11:13 13:7,21 14:6 15:24 16:12 17:11,14 17:15,16,16,19 18:2,5,5,16 19:11 21:13 22:11 23:4,5 23:16 25:11,19 26:10,19,21 27:2,18,25

28:12,15,22 29:13,15 50:23 51:2,4,12 52:8 55:2,21 58:23 59:2 62:21,23 63:6,10,20,21 64:9,12,13,15 64:21,22 65:3 66:10,20 67:4 73:4,18 74:5 75:2,8,19 76:12 77:13,19 77:25 78:2 79:10 80:11,16 80:25 81:2,11 81:13 82:2,14 83:22 84:5,18 85:9 86:3 87:5 87:10,11,15,17 87:25 88:2,8 91:10,12,14,17 91:25 92:4,6,9 92:16,17,18,20 92:21,22 97:25 102:2 103:14 104:4,11,12,25 105:2,4,5,9,11 105:12,17 106:5,9,9,16,23 106:25 107:16 108:4 109:25 110:6,7,11,12 111:5,7,9,14,18 113:24 114:6

**[data - declines]**

| | | | |
|---|---|---|---|
| 116:4 117:8,25 | 179:17,20 | 320:10 | **debating** |
| 118:14 119:5,9 | 180:20,22 | **date**  48:16 66:4 | 196:18 |
| 119:22,23 | 181:9,12,13,17 | 121:5 308:18 | **december** |
| 120:7,13,17,19 | 181:20 182:25 | 309:18 310:22 | 68:21 69:5,15 |
| 120:24 121:7 | 183:9,19,21 | 327:24 328:13 | 93:3,8,14 |
| 121:10,12,15 | 184:17,18 | **dated**  208:7 | 205:2,4 325:15 |
| 121:23,25 | 185:2,10,11,17 | 239:16 325:13 | 325:18 |
| 122:4,5 123:2 | 186:4 187:2,5 | 326:6,9,14,18 | **decide**  150:9 |
| 123:10,18,23 | 187:16 188:6,9 | 326:22 | **decided**  152:4 |
| 126:11 129:12 | 188:14,23 | **daubert**  207:4 | 199:18 |
| 129:14 130:8,9 | 190:11 191:2 | 207:18 | **decides**  227:2 |
| 131:23 132:5,5 | 191:19 195:2 | **day**  54:19 | **deciding**  8:15 |
| 132:10,19,21 | 195:22 196:7 | 120:22 155:12 | **decision**  61:11 |
| 133:21 134:2,4 | 197:12 203:2 | 207:11,13 | 61:12 214:10 |
| 134:8,21,24 | 204:7,10,14 | 210:19 211:8 | 220:3 229:7,8 |
| 135:16,19 | 213:19,20 | 253:3,7 266:19 | 257:6,11 260:9 |
| 136:24 137:18 | 215:21,22 | 266:23 267:11 | 299:11,17 |
| 137:24 138:14 | 222:5,12,24 | 268:9 281:16 | **decisions**  76:14 |
| 138:15 141:14 | 223:13,15,19 | 291:6,12 | 299:21 |
| 151:19 153:19 | 223:24 225:9 | 319:12 324:15 | **deck**  240:8 |
| 156:12,16 | 226:15,21 | 328:17 | **declarative** |
| 159:10,14,24 | 227:18 228:2,9 | **days**  36:20 | 144:8 |
| 160:17 161:23 | 229:20 230:16 | 251:7,18,18 | **declare**  328:4 |
| 162:22 165:2,5 | 230:17,18 | 261:14,23,23 | **decline**  55:10 |
| 167:13,14,25 | 231:4,4 234:13 | 262:6,15 | 55:15 66:21 |
| 169:3,4,16,17 | 235:20 237:23 | **deal**  27:14 42:9 | 117:9 129:4 |
| 169:18,22,23 | 238:5,8,9 | 125:12 126:5 | 187:7 220:18 |
| 170:3,5,6,14,18 | 245:14,16 | 255:12 | 221:9 236:12 |
| 170:20,21 | 249:25 279:8 | **dealt**  250:11 | 282:24 283:3 |
| 171:5,6,20 | 279:15,25,25 | **dean**  3:9,12,12 | 293:18,24,25 |
| 172:2,3,4,11,14 | 280:10,15 | **death**  213:8 | 294:3,14,16 |
| 172:15 173:7 | 289:13 297:25 | 252:21 | **declines**  190:8 |
| 173:10 174:2 | 303:7 304:19 | **debate**  101:12 | 222:7,7 284:20 |
| 177:18 179:7 | 306:9 307:20 | | 287:17,18,20 |

**[declines - different]**

291:18 292:2 293:15 294:2

**deemed** 328:7

**deep** 217:15

**defect** 216:21

**defendants** 1:10,17 2:18 169:5

**defense** 301:7

**defer** 148:11

**defies** 208:23

**define** 39:16 43:17 45:7 283:23

**defined** 71:3 293:19

**definitely** 86:6 108:11 137:16 138:7 146:19 155:12 303:8

**definition** 45:2 92:12,24 118:9 118:12 136:12 149:23

**delta** 275:18

**demonstrate** 57:23 97:22 307:6

**denies** 202:12

**denying** 202:18 202:24,25 218:12

**depend** 184:6

**depending** 17:3 80:13 112:8 253:7

**depends** 15:12 16:25 27:5 28:19 48:19 112:16 152:15 179:11 188:8 193:11 204:13 260:8

**deponent** 328:3

**deposition** 1:16 45:11 79:3,4 79:17 85:2 86:9 262:3 318:18 319:4 321:14 324:7

**describe** 54:24 67:10 95:14 107:25 279:12 297:3 303:6

**described** 25:20 28:3 64:22 109:17 160:10 237:10 293:14 302:17 303:5 304:20

**describing** 28:2 279:8

**description** 157:7 218:7 325:8 326:3

**desegregation** 234:22

**design** 31:10,19 31:20,22 32:2 32:3 188:10 205:11,11 226:2 228:19

**designation** 70:24

**designed** 186:2

**detail** 61:14,19 62:6 63:9 70:10 243:16

**detailed** 241:19

**details** 62:20 63:6 64:14 69:14 99:15

**determination** 25:22

**determine** 26:13 30:5 56:17 98:13 118:7 194:25 195:21 196:5 237:6 293:9 294:21 308:17 308:25

**determined** 237:13 291:5

**determining** 38:5 39:5 47:23

**developments** 243:23

**device** 294:10

**diametrically** 254:21

**differ** 139:25 271:17

**differed** 316:13

**difference** 19:16 24:11,17 25:7 53:2 58:3 70:2,4 82:19 112:5 122:8 254:25 267:14 267:19 277:17 277:19,21 283:12 284:7 316:16

**differences** 6:15,16,18 14:12 55:20 314:3 315:18

**different** 5:20 6:25 11:9 13:14,18 16:23 19:18 42:21 49:13 51:25 55:3 78:18,22 86:5 88:10,12 89:19 99:10 104:16 113:11 128:11 135:9 140:10 146:7 149:22 157:10 163:18 171:23 181:5 183:21 192:12 213:14

**[different - dispute]**

213:24 214:23 215:4,9 217:5 218:15,17 220:2 228:22 230:2,7,8 234:15 250:14 254:16 262:24 265:23 266:6 269:17,20 272:15 275:20 289:3 298:25 311:21 320:24

**differently** 18:11 80:13 102:5 250:7,8 317:17

**differing** 270:3 270:9,13

**difficult** 237:10 258:9

**digest** 251:8

**dim** 217:6

**direct** 5:18 14:16

**direction** 4:12 113:8 173:25

**directly** 155:9

**disabuse** 129:22 131:21 132:9

**disabuses** 133:8

**disabusing** 145:10 167:6

**disaggregate** 191:7 192:5,25 193:2 195:13 204:23 236:25 250:18 321:12 322:20

**disaggregated** 192:12 231:13 322:11

**disaggregating** 308:8

**disaggregation** 192:16,22 193:8 205:22

**disagree** 53:9 53:25 54:9,12 54:15 57:13 166:22 170:10 228:4 240:21 241:3,7 251:17 271:5

**disagreed** 50:22

**disagreement** 50:20 113:12 230:25 231:2

**disaster** 216:24

**disasters** 216:22

**disclose** 37:23 47:11 56:10 59:14 166:25 169:3,15 171:25 180:20

190:13 199:20 230:17 246:24 247:4,23 248:4 248:20

**discloseable** 300:2

**disclosed** 27:13 56:19,22 59:9 110:13 119:20 132:21 171:20 174:21,23,25 181:7 182:23 203:4 204:2,4 204:24 205:2 229:20 231:14 233:8 235:2 248:7 299:22

**disclosing** 27:2 56:12 169:16 172:3

**disclosure** 131:25 133:19 147:2 170:14 170:18 182:6 190:14,16 204:7,8 218:22 219:6 226:21 229:22

**disclosures** 150:12 185:2,5 185:8 188:25 240:7 249:4

**disconnect** 237:16

**disconnected** 319:23

**discount** 124:19 221:4

**discounts** 49:19

**discuss** 51:2 223:10 317:2

**discussed** 97:24 115:22 172:23 302:14 315:19 317:23 318:11

**discussing** 142:15 182:9 251:6 296:9

**discussion** 65:24 218:25 222:22 223:6 238:17 248:18 250:24 259:25 260:5,5 276:22 295:25 305:8 305:12,18 315:25

**discussions** 66:13 259:20 260:11,14 304:10

**disease** 71:6

**disentangle** 204:15

**dispositive** 128:12 298:24

**dispute** 26:23

**distinction** 85:4

**distracted** 291:14

**distribution** 184:7 288:6 289:4

**district** 1:2,2 206:17

**disturbed** 149:17

**divided** 183:20

**docs** 326:8

**doctor** 12:22 14:10,13 20:18 24:21,22,23 25:18 32:5 66:5 67:15 75:13 76:3 108:20,23 109:11 128:10 128:17 225:24 226:5 250:16 250:17 316:25

**doctor's** 29:8

**document** 133:3 209:16 210:3,12 246:25 247:10 247:12

**dog** 267:12

**doing** 23:14 74:17 79:24 100:16 102:23 114:15 126:6

126:10,16 145:11 166:13 184:14 193:5 193:12 229:16 268:9 307:18

**dollar** 293:17

**dominant** 303:3

**door** 264:16

**dosage** 11:8 12:4,5,9,20 13:10 14:8,19 16:4,10,11 25:24 28:23 55:14 65:20 67:6,10,13,16 85:19,22 86:14 106:10 113:25 123:2 230:16 237:24 238:6,8 238:10

**dose** 10:23,24 12:14,16,17 13:2,3,21,22 17:10,20 22:17 22:18 24:7,12 24:13 25:13,14 25:24 26:3 27:21 28:17 29:10 64:3,9 67:4 88:3 103:15 104:5 105:6,18 106:25 107:16

119:5 123:19 127:8,17,17,18 127:19 134:23 137:2,14,20,24 139:24 140:18 140:18 141:13 143:5 151:6 152:6 153:6 154:8 156:4,14 160:4,25 161:18 163:7 165:4 166:6 171:7 172:17 175:8 176:2 230:19 233:6 234:14 278:25 280:22 281:3,5 306:20

**doses** 6:16 10:19,21 64:6

**dosing** 278:23 279:6 280:20

**dot** 18:8,8,8

**doubly** 111:13

**doubt** 257:4 277:16

**doubting** 241:2

**downside** 315:11

**downward** 293:12

**dr** 3:9,15 4:3 5:12,17,21 6:18 10:6,11

17:7 27:15 30:18 32:4 44:12 45:6,10 54:18 55:6 60:21 63:13 64:20 77:4 78:24 80:5 108:13 109:2 109:17 110:19 115:21 117:7 117:20 119:2 120:3 122:3,25 123:25 124:14 125:10 127:4 131:2,17 138:11 140:11 143:21 146:4 173:15 177:22 179:10 188:10 194:18 208:22 209:2 225:22 228:15,18,21 231:11 232:9 233:17 235:18 246:7 248:21 249:19 250:4 250:19 251:13 261:14 262:15 267:5 270:22 286:5 299:20 299:25 302:19 304:10 306:6 307:5,14 317:5 317:13,17,22

318:6,10
321:11 325:5

**draft** 145:16
146:23

**drafted** 147:4
147:17

**drafting** 147:22

**drawer** 212:14
216:14

**drawers** 212:3
216:7 217:13

**drawing** 288:5

**driven** 67:3
70:3

**driver** 240:10
240:20

**drop** 48:16
184:21 202:16

**drops** 47:14
283:4,14 284:9
284:13

**drove** 70:2

**drug** 12:17
76:15 109:16
227:3 271:9

**drugs** 13:8
108:18

**due** 76:11
278:7 307:9
317:12

**duly** 3:3 324:6

**duty** 37:23

**dying** 13:7,9,12

**dynamics**
326:22

**e**

**e** 2:2,2 3:2 4:21
4:22,22 325:2
325:7 326:2
327:3,3,3

**eager** 172:10

**earlier** 121:9
127:14 160:6
171:12 176:9
202:10 229:20
248:22 295:20
297:9 309:23
319:20

**early** 66:14,22
319:15

**earning** 171:15

**earnings** 170:8
170:23 245:6
325:11

**earthquake**
216:25

**easily** 82:18

**eastern** 206:16

**easy** 35:6
297:22

**economic** 38:12
43:11 125:12
129:16,17
163:21 179:22
198:3 199:22
200:12 201:5

201:22 202:6
235:7 267:2
322:18

**economics**
28:13 41:19
42:12,18,21
76:7 107:10
112:20 124:17
148:7 189:21
190:5 191:23
196:11 265:19
265:21 291:13

**economist** 29:7
37:22 39:20
40:5,12,13,22
41:18 54:24
74:25 75:3
129:8 136:7
143:17 147:11
148:15,15
152:20 189:11
193:7 198:8,16
199:2 200:23
229:12 234:8
252:18 277:20

**economist's**
209:9

**economists**
209:11,12,21
211:10,13

**edited** 325:17

**educate** 7:19

**educated**
187:11,20

**educational**
114:24

**effect** 24:12,14
25:14,15 27:22
28:18 29:11
33:10 38:20
39:23 42:17
50:14 54:19,21
55:7,9 63:18
64:4,7 68:20
120:10 139:5
186:24 191:10
203:2,5 205:17
221:8 295:7,12
295:25

**efficacy** 13:2
20:14 22:18,19
57:19 81:11
103:14 104:5
105:17 107:17
109:9 123:19
123:19 134:24
140:19 245:10

**efficiency** 5:15
5:19 318:2

**efficient** 5:8,13
252:2 270:22
281:14,22
282:17

**effort** 195:20
197:10 322:19

**efforts** 56:16

**eight** 168:17
284:17

**[eighty - entitled]**

| | | | |
|---|---|---|---|
| **eighty** 276:8 | 139:17,21,22 | 20:7,8 21:13 | **engendering** |
| **either** 17:3 22:4 | 140:17,20 | 21:16 22:11,13 | 102:17 |
| 22:20 65:6 | 141:12 143:4 | 22:14 23:5,6 | **engineer** |
| 87:7,23 101:22 | 151:5,21 152:6 | 23:16 24:5 | 216:19 |
| 118:19 120:11 | 153:5 154:7 | 59:5,8 61:13 | **engineers** |
| 120:25 121:14 | 156:3,13 160:3 | 62:12 63:17,21 | 212:23 |
| 122:6 161:9 | 160:9,24 | 63:22 64:8 | **english** 23:21 |
| 193:4 196:16 | 161:17 163:6 | 66:2 70:2 | 23:22 74:16 |
| 199:3,10 237:3 | 164:21 165:3 | 91:18 92:16,17 | 78:3,5,21 |
| 242:7 | 166:5 173:24 | 92:19 98:4 | 79:14,18,19 |
| **elaborate** 6:7 | 182:2 224:22 | 109:2,17 | 81:22,23 86:4 |
| **elastic** 92:13 | 241:15,25 | 110:17 134:22 | 86:6,16,17 |
| 118:9,12 | 243:15 244:5 | 136:24 137:19 | 87:5,14,20 |
| **elastically** | 244:12 | 137:23 138:15 | 88:21 91:13,16 |
| 11:13 64:23 | **emeritus** 3:12 | 138:16,24 | 92:10 100:4 |
| **elements** 59:4 | **empirical** | 139:16,21,22 | 102:21 107:10 |
| **elevated** 263:13 | 118:20 | 140:21 141:12 | 111:2 112:12 |
| **ema** 326:13 | **empirics** | 143:4 151:5,21 | 112:19 119:14 |
| **embedded** 50:6 | 264:23 | 152:5 153:5 | 123:7 127:11 |
| **embrace** 125:9 | **encompass** | 154:6 156:3,13 | 157:6 169:10 |
| **emerge** 12:14 | 110:12 | 160:3,9,23 | 169:11 183:6 |
| 17:9 18:8 | **ended** 239:20 | 161:17 163:6 | 189:5 242:10 |
| 21:15 23:8 | 285:22 326:6 | 164:21 165:3 | 242:10 257:25 |
| 24:6 61:13 | **endpoint** 63:19 | 166:4 173:24 | 258:2 |
| 62:12 63:16,17 | 139:11 | 174:2,5,6,7,11 | **entered** 38:6 |
| 63:24 64:8 | **endpoints** | 174:18 175:4 | 39:5 |
| 66:3 70:3,5 | 63:20 64:2,3 | 175:24 176:17 | **entire** 20:21 |
| 91:19 92:16,17 | 66:24 141:2 | 177:8 182:2 | 291:12 294:24 |
| 92:18 98:3 | **ends** 62:4 83:19 | 225:11 241:14 | 306:10 |
| 116:17 128:3 | 84:15 285:12 | 241:24 243:14 | **entirely** 101:20 |
| 134:22 136:25 | 285:12 287:13 | 244:4,12 | 281:17 |
| 137:19,23 | 287:19 294:16 | **engendered** | **entitled** 326:4,7 |
| 138:18,24 | **engage** 12:11 | 102:16 | 326:12,16,20 |
| 139:4,8,11,15 | 17:9 18:5,6 | | |

entity 4:10

entry 206:10 309:20,24,25 310:2 315:4,13

envelope 281:25

equal 52:4

errata 328:8

error 34:25 35:8

especially 182:5

esq 2:8,9,21,22

essentially 50:18 130:8 320:16

estate 49:23,25

estimate 3:16 214:4 255:20 295:11

estimated 44:11 212:6

estimates 265:24

estimation 187:8

et 325:20,21,23 327:1,1 328:1 328:1

europe 22:20 127:18

european 127:25

evaluate 128:22

evaluated 315:5

evaluating 8:8

event 43:8 211:4,6,7,22 217:16 219:3 221:9 254:10 254:13,14,18

events 219:13 254:10,16

everybody 141:23 148:12 215:11 252:5 273:17

evidence 19:7 19:10 118:20 236:12 245:9 245:17 267:8 282:24 319:25

evidently 141:8

ex 38:18 296:23

exact 4:15 93:20 132:4 145:7

exactly 16:16 17:18 30:25 57:25 124:13 140:6 155:25 220:15 241:25 244:12 319:6

examination 3:6 324:5

325:4

examine 27:20 28:17 30:2

examined 3:5

example 23:19 49:22 124:22 133:15 134:3 202:10 235:18 254:12

exceed 293:15

exceptions 51:20

excise 151:7 164:12

excising 151:11

excluded 207:19

excluding 305:4

exegesis 23:14 74:17 76:19 278:16

exercise 78:18 193:12 235:3 288:8 290:10 307:17 308:3 322:24

exercises 263:14

exhibit 4:3,6 59:22,25 60:2 65:8,8,9 71:11 71:14,16,19,20 89:8 90:5,9,9

90:10,14,15,21 90:25 106:13 106:21 117:16 121:22,25 122:11 129:24 130:2 131:12 131:13 132:9 132:12,24,25 133:4 167:21 168:5,8,15 173:5 184:21 184:25 185:6 186:22 187:10 207:21,25 222:22 223:4 223:11,12 238:24 239:2,7 239:10 242:20 242:24 276:20 276:24 284:16 285:3,24 286:10 287:11 289:7,13 290:3 291:17,19 292:24 295:4 308:11 309:16 309:23 311:3 312:16,19 313:10,14 314:18,20,21 325:9,11,13,15 325:16,19,22 326:4,7,11,15 326:19

**exhibits** 167:8 242:12 325:8 326:3

**exist** 48:7

**existed** 201:18

**existence** 14:5 47:17 202:12 223:19

**existing** 152:3

**expanded** 225:16

**expansive** 91:23

**expect** 36:22 38:9,10 39:10 100:10 107:17 115:19,23 134:14 179:25 183:22 291:8 292:2

**expectation** 107:25

**expectations** 50:7 51:23

**expected** 116:6

**experience** 114:25

**experiment** 205:16

**expert** 1:17 3:18 4:4 23:23 54:13 76:5 78:4 79:23 81:23 88:11

118:16 122:15 152:20 192:15 193:3 207:4 236:4 298:5 315:20 321:21 325:9

**expert's** 86:24

**experts** 212:5 252:5 296:17 296:23 297:9 297:13

**explain** 41:23 45:2 65:19 225:12 245:11 245:13 307:11

**explained** 202:21 268:8

**explanation** 74:25 145:2 225:10

**explicitly** 312:11

**exploratory** 64:3

**explore** 127:2 143:15 144:18

**exposed** 49:24

**exposure** 46:21 46:24 47:3,7 48:22 49:4 67:3 69:25 73:11

**express** 51:4 114:4 225:2

**expressed** 113:23 224:20 269:16 276:14

**expressions** 147:12

**extend** 155:12

**extent** 20:22 115:18 144:2 179:23 195:10 231:20 281:24

**extremely** 215:6

**eye** 271:3 277:18

**eyeopening** 277:7

**f**

**face** 190:10

**facile** 322:11

**fact** 19:24 20:7 37:24 41:22 100:25 107:15 108:12 150:2 175:4 177:15 188:19 194:18 202:25 211:18 214:13 233:21 236:14,18 245:5,15 259:18 273:10 275:20 279:20 303:9

**factors** 5:12 80:12 211:14 211:17

**facts** 13:11 34:22 35:17 37:2 128:7 210:7 218:16 275:8

**factual** 302:11

**failed** 12:12 20:9,9,21 21:2 21:7 22:12 26:22 190:13 194:5

**failing** 169:2,15 171:25

**fails** 20:13

**failure** 20:23 198:2 225:10

**fair** 12:7,19 14:15 25:9 62:9 64:11 67:18 75:18 77:7,8 82:24 83:10 148:2,4 158:18 192:14 244:16,23 270:11 286:21 287:16 288:19 298:3 310:8

**fairly** 30:16 61:22 70:17 103:16 252:7

**false** 10:12 27:19 28:12 36:14 37:16 46:4 48:7 105:8 117:11 143:24 144:2,3 144:14 147:7 150:19 152:8 152:12,17,23 153:4,8,13,16 154:16,20 155:6,23 156:6 156:21 157:2 157:14 158:3,6 158:7,16 159:6 159:15 161:20 162:5,9,14 163:7 164:11 164:11 165:16 165:17 190:12 190:16 200:16 200:19,20 201:7,9,19 202:17 204:11 225:11 286:3

**falsity** 147:6

**fama** 281:23

**familiar** 251:15 322:12

**far** 11:4 36:16 50:14 83:16 91:22 92:13 152:8 214:7 230:20,21

231:18 276:4,4 277:9

**fargo** 309:7

**fascinating** 312:22

**fast** 252:10,15 252:21 256:4,6 266:10 288:16 288:20

**faster** 252:23

**favorable** 246:12 253:15

**fda** 29:18 30:19 32:2 56:11 61:12,16 62:8 64:16 66:13 83:22 84:6,19 84:22 85:8 107:20 108:16 109:14,21 143:6 166:7 173:8 182:3,9 182:10,11,14 182:16 214:9 214:20 226:10 226:17 227:5 227:19,22 228:5 229:2,8 230:23,24 243:18 246:22 247:12 248:14 251:8 253:13 255:6,22 257:15 268:18

277:8 296:23 296:25 298:21 298:24 299:5 321:21 326:17

**fdas** 326:9

**feel** 266:3,4

**feinstein** 210:20

**feinstein's** 208:22 209:2

**felt** 51:19,19 55:4 73:5 223:3 231:21 232:13 266:12

**field** 110:24

**fight** 217:3

**figure** 15:16 150:4 262:13

**figured** 299:17

**figuring** 47:21

**file** 212:3,14 216:6,14 217:13

**filing** 63:15 64:16 66:14

**filings** 63:8

**filter** 211:10 294:8

**final** 300:7,20 301:9 325:12

**finalized** 280:6 315:20

**financial** 211:13 239:21

281:14

**find** 10:3 41:22 42:4,7 43:13 46:5 50:22 54:17,18 55:5 55:6 65:23 94:21 99:7 115:22 117:14 118:17,18,19 129:25 130:5 132:3,9 133:5 133:7 134:20 135:3 145:6 179:25 250:17 307:22 318:22

**finding** 54:2 152:5 246:22 247:9 248:5,9 248:10,14,19

**findings** 17:9 24:5 64:7 116:17 128:2 137:22 141:12 143:3 151:5 153:5 154:6 156:3 160:3,9 160:23 161:16 163:6 164:21 166:4 276:15 306:6

**fine** 50:2 93:23 100:10 103:9 125:5 130:16 140:20 164:9

199:19 306:25
**fines** 211:20
**finish** 114:10
140:5 149:20
160:16 323:5
**finished** 203:12
**fires** 286:5
**firm** 1:19 2:4
213:6
**first** 3:3 7:22
8:11,15 9:5,9
12:4 17:24
38:16 50:16
53:14,20 54:2
62:4 63:17
65:20 66:10
75:7 78:17
81:10 89:17
112:8 114:5
139:5 152:8
158:6 160:2,22
161:15 162:5
168:10,23
169:7,14,20
180:7,16
188:24 189:4
189:15 190:11
192:22 203:3
206:11 211:9
233:12 234:18
238:18,19
240:3 249:9
250:21 251:3
262:10,11

276:3 285:19
286:12 288:13
289:23 291:10
292:4 293:18
311:10 325:20
**fits** 275:7
**five** 6:3 72:14
72:15 274:5
277:24 285:13
285:23 286:8
287:4,5,19
288:14 311:2
315:2 322:2
**flip** 181:4
**floor** 2:6
**flow** 221:5
**fly** 275:24
**flynn** 72:10,12
**focus** 89:3 98:3
302:19
**focused** 26:18
147:16 156:13
160:21,25
305:11,16
**foghorn** 191:4
**follow** 51:9
61:2,21 64:25
65:4 75:9
107:3,7 108:8
111:25 170:8
221:18 246:15
301:14 303:16
**followed** 51:7
222:6

**following** 52:9
66:12 75:24
103:21 113:9
226:8 268:17
283:7
**follows** 3:5
64:24
**food** 103:8
142:3
**footnote** 113:10
114:6 283:23
288:7 293:22
295:2 298:17
304:17,20
312:9 316:19
318:3,5
**footnotes** 312:8
**foregoing**
328:5
**forget** 92:2
**form** 31:24
33:20 35:4
119:11 145:22
156:9 167:3
171:9 287:23
**formulated**
136:13
**forth** 44:16
46:16 65:20
324:6
**forty** 224:16
**forward** 12:10
76:12 286:19

**found** 19:7
42:5 53:14,20
98:17 132:11
158:7,16
186:23 224:24
309:11
**foundation**
299:14
**four** 66:25
134:3 269:13
**fourth** 91:4
240:5
**free** 46:10
200:12
**frequently**
254:11
**friday** 277:17
**friend** 288:12
288:13,20
**front** 191:25
193:14 194:13
195:5,15
196:13 197:19
198:2,6,11,19
199:4,10,16
200:5 236:12
236:21 237:3
249:3,10,11,13
322:23
**full** 211:25
212:14 216:5
**fully** 102:9
251:19

**fund** 68:3

**fundamental** 237:16

**funds** 256:11 256:12,20

**further** 27:10 82:12 127:3,12 193:16 282:2 324:9

**futility** 66:16

**future** 275:2,14

**g**

**g** 3:2 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1

282:1 283:1
284:1 285:1
286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
**gain**  296:17
   297:4
**garrison**  2:17
**gauged**  296:20
**general**  24:20
   34:9 49:5
   94:14,16,18
   113:16 145:10
   185:4 227:7
   247:7 254:9
**generally**  21:3
   39:20 49:2
   80:10 112:10

177:13,16
**genericness**
   128:25 136:9
**gentleman**  75:6
**geoff**  61:6
   63:15
**geoffrey**  60:23
**george**  124:16
**getting**  24:13
   83:19 84:16
   141:3,4 163:18
   187:13 229:14
**give**  10:15 22:8
   29:8 64:16
   125:22,25
   126:3 128:17
   134:11 198:14
   202:7 300:11
   314:17
**given**  5:10
   61:20 109:16
   181:25 182:5
   182:14 183:8
   205:18 211:8
   255:12 263:6
   289:12 291:22
   318:18 324:8
   328:10
**giving**  78:12
**glad**  81:21
   237:13 259:7
**gleaned**  84:8
**glenn**  1:16 3:13
   324:4 325:9

327:2,24 328:2
   328:4,13
**global**  309:16
   310:2,11
   326:11,16,20
**go**  6:3 18:25
   27:10 43:24
   48:24 51:5
   59:25 60:6,10
   61:14 62:6
   65:7 66:9
   68:21 69:4
   71:8,11,20,24
   72:5 78:23
   80:6 82:12
   88:19 89:7,16
   93:24,24 94:5
   97:17 99:4
   100:12,16,23
   103:3,5 104:9
   107:12 111:25
   112:22 127:12
   128:19 131:12
   134:18 142:9
   143:2 152:3
   167:9 168:22
   173:23 194:24
   195:20 199:18
   202:22 205:25
   208:11 210:12
   210:19,22
   219:20 221:19
   234:17 236:9
   236:24 239:23

240:3,4 241:9
   243:15 246:17
   247:13 250:22
   251:25 252:5
   255:21 256:19
   258:15 261:11
   268:5,13
   275:23 276:7
   277:24 278:19
   281:11 282:19
   284:16 293:25
   294:12 295:13
   296:7 300:15
   301:19,20
   307:3,24
   308:10 309:9
   309:15 312:7
   314:5 316:22
   317:20 319:2
   323:9
**goal**  130:3
**godspeed**
   135:23
**goes**  82:25
   117:10 146:14
   155:8 192:24
   211:9,9 228:4
   228:13 293:5
   294:18
**going**  10:15
   22:8 27:17
   28:11,14 30:13
   37:3 39:11
   42:7,9 45:22

47:15 57:2,25 64:15 65:16 71:12,19 83:20 84:4,16 85:8 85:10 99:2 102:25 104:8 117:18 119:22 125:3,17 128:5 134:20 140:22 145:6 154:24 157:24 179:13 211:6 212:7 213:25 214:3,5 214:6,9 216:17 217:2 220:7,9 225:23 228:3,5 229:16 231:15 238:13 242:7 266:3 268:8,11 271:15 272:5 273:18 276:18 281:23 286:16 294:5,16 307:21 312:14 320:11,21 321:14 323:5,5

**good** 30:22 33:5 69:17,18 82:17,22 83:9 94:24 133:14 141:17,24 221:15 240:13 252:10,14,21 266:2

**gosh** 121:24
**gotten** 41:25 297:12
**government** 254:20
**granular** 66:6
**graphically** 284:19
**grapple** 317:4
**great** 27:14 49:14 61:7,9 62:16 76:18 84:25 224:10 243:4 255:12
**greater** 67:3 293:17
**ground** 128:7
**grounding** 44:22
**group** 4:10,14 5:15 13:6 22:20 46:15 115:6,7 232:21 278:6
**groupings** 249:16
**groups** 10:24 289:11 290:6
**guaranteed** 112:19
**guess** 35:11 40:22 62:16 66:11 72:22 151:15 242:14

274:22
**guy** 60:8 72:10
**guys** 61:16 62:8 89:3 243:17 256:12

**h**

**h** 3:2,2 4:21,22 325:7 326:2 327:3
**haeberlein** 1:9
**half** 158:5
**halfway** 296:14
**hand** 255:25 324:15
**handy** 303:24
**hang** 90:13 140:4 197:2 280:17
**happen** 214:5,7 224:11 232:2 264:22 266:10 270:24
**happened** 50:17 56:17 149:9 200:18 210:8 248:6 254:7,23 265:22 266:7,9 274:10 310:16
**happening** 215:17 271:2 296:4

**happens** 72:2 112:3 146:14 216:24 252:10 252:11
**happy** 23:24 125:9 135:4 140:11 143:16 144:23 146:5 151:22,24 242:5
**hard** 14:10 20:17 35:24 85:8,10 106:18 107:11 210:2 219:12 235:5 246:4 278:17 295:11 307:21
**he'll** 134:10 197:6
**head** 106:20
**headed** 29:3
**heading** 11:17
**health** 10:24
**hear** 53:19 207:17
**heard** 63:14 99:9 253:25
**hearing** 206:16 207:2,2,4,25 212:10 217:3
**heart's** 218:2
**heavily** 303:10
**hedge** 68:3

**[heightened - hubbard]**

**heightened** 283:6

**held** 1:18 36:10 36:10 37:10 128:16

**help** 11:15 24:21 44:23 104:14 162:25 189:22 199:24 242:15 291:13 321:18

**helped** 5:4

**helpful** 60:14 104:7 132:23 294:10,10

**helping** 5:2

**helps** 44:10 226:4 284:3

**henceforth** 6:11

**hereinbefore** 324:6

**hereto** 328:8

**hereunto** 324:15

**heterogeneity** 214:25 215:10

**heterogeneous** 269:5

**hey** 77:24

**hide** 76:10,17 77:2,23 79:6 99:18 126:7

**hiding** 78:2

**high** 10:21,24 12:13,16,17 13:3,22 22:17 25:13,14,23 26:3 27:21 28:17 29:10 67:4 88:3 103:15 104:5 105:6,18 106:9 106:25 119:4 123:2,19 127:8 127:17,19 140:18 171:7 172:17 175:8 176:2 230:16 230:19 233:6 234:14 278:23 279:6 280:20 281:3,5 287:13 306:20

**higher** 17:10,20 24:6,12,13 64:9 107:16 134:23 137:2 137:14,20,24 139:23 140:18 141:13 143:5 151:6 152:6 153:6 154:8 156:4,14 160:4 160:24 161:18 163:7 165:4 166:5 283:19

**highest** 64:3 218:24 219:4

**highlight** 293:5 293:10 294:24

**highlighted** 285:23 286:9 287:10 291:25 292:20 304:16

**highlights** 239:19 291:18 293:11 294:22 326:5

**highly** 30:24 176:8,13 228:16 231:14 249:16 253:10 253:15,20,20

**hints** 262:2

**hire** 212:5

**hires** 115:6

**history** 140:14

**hmm** 65:13 112:25

**hoc** 31:21 32:2

**hold** 106:19 203:20

**holders** 271:17

**holding** 216:21

**hole** 306:20

**honest** 286:4

**honestly** 36:10 37:10 53:3 179:11

**hope** 135:13 218:11

**hopefully** 17:25

**hoping** 69:13

**hosted** 296:22

**hours** 3:20 252:8 276:13

**hubbard** 1:16 3:9,9,10,15 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1

**[hubbard - hypothesis]**                                                          Page 32

| | | | |
|---|---|---|---|
| 81:1 82:1 83:1 | 155:1 156:1 | 223:1 224:1 | 291:1 292:1 |
| 84:1 85:1 86:1 | 157:1 158:1 | 225:1 226:1 | 293:1 294:1 |
| 87:1 88:1 89:1 | 159:1 160:1 | 227:1 228:1 | 295:1 296:1 |
| 90:1 91:1 92:1 | 161:1 162:1 | 229:1 230:1 | 297:1 298:1 |
| 93:1 94:1 95:1 | 163:1 164:1 | 231:1 232:1 | 299:1 300:1 |
| 96:1 97:1 98:1 | 165:1 166:1 | 233:1 234:1 | 301:1 302:1 |
| 99:1 100:1 | 167:1 168:1 | 235:1 236:1 | 303:1 304:1 |
| 101:1 102:1 | 169:1 170:1 | 237:1 238:1 | 305:1 306:1 |
| 103:1 104:1 | 171:1 172:1 | 239:1 240:1 | 307:1 308:1 |
| 105:1 106:1 | 173:1 174:1 | 241:1 242:1 | 309:1 310:1 |
| 107:1 108:1 | 175:1 176:1 | 243:1 244:1 | 311:1 312:1 |
| 109:1 110:1 | 177:1 178:1 | 245:1 246:1 | 313:1 314:1 |
| 111:1 112:1 | 179:1 180:1 | 247:1 248:1 | 315:1 316:1 |
| 113:1 114:1 | 181:1 182:1 | 249:1 250:1 | 317:1 318:1 |
| 115:1 116:1 | 183:1 184:1 | 251:1 252:1 | 319:1 320:1 |
| 117:1 118:1 | 185:1 186:1 | 253:1 254:1 | 321:1 322:1 |
| 119:1 120:1 | 187:1 188:1 | 255:1 256:1 | 323:1 324:4 |
| 121:1 122:1 | 189:1 190:1 | 257:1 258:1 | 325:5,9 327:2 |
| 123:1 124:1 | 191:1 192:1 | 259:1 260:1 | 327:24 328:2,4 |
| 125:1 126:1 | 193:1 194:1 | 261:1 262:1 | 328:13 |
| 127:1 128:1 | 195:1 196:1 | 263:1 264:1 | **hubbard's** 4:4 |
| 129:1 130:1 | 197:1 198:1 | 265:1 266:1 | **huge** 217:19 |
| 131:1 132:1 | 199:1 200:1 | 267:1 268:1 | **hundred** |
| 133:1 134:1 | 201:1 202:1 | 269:1 270:1 | 136:19,20 |
| 135:1 136:1 | 203:1 204:1 | 271:1 272:1 | **hunt** 267:12 |
| 137:1 138:1 | 205:1 206:1 | 273:1 274:1 | **hurricane** |
| 139:1 140:1 | 207:1 208:1 | 275:1 276:1 | 216:24 |
| 141:1 142:1 | 209:1 210:1 | 277:1 278:1 | **hypotheses** |
| 143:1 144:1 | 211:1 212:1 | 279:1 280:1 | 82:4 106:19 |
| 145:1 146:1 | 213:1 214:1 | 281:1 282:1 | **hypothesis** 11:4 |
| 147:1 148:1 | 215:1 216:1 | 283:1 284:1 | 81:15 82:9 |
| 149:1 150:1 | 217:1 218:1 | 285:1 286:1 | 189:14 193:11 |
| 151:1 152:1 | 219:1 220:1 | 287:1 288:1 | 252:3 270:22 |
| 153:1 154:1 | 221:1 222:1 | 289:1 290:1 | 278:23 279:5 |

279:21 280:19 282:17

**hypothesized** 109:10

**hypothetical** 10:16 11:7,14 11:22 12:3 13:8,19 22:9 22:22 23:2,9 28:6 37:4 38:5 38:8,25 40:17 43:4 45:22 48:12,13 50:19 55:24 127:15 128:6,8,9 201:13,15 202:20 204:18 225:6,16 226:7 230:22 231:8 231:16,16 233:3

**hypothetically** 247:19,20

**hypotheticals** 232:2

**i**

**idea** 12:9 46:9 75:15 122:13 145:17,25 146:24 147:5 151:17,18 172:2 185:14 241:22 255:19

300:24

**identical** 36:21 249:25 310:7 313:21

**identification** 4:7 41:6 59:23 65:10 71:15,17 168:6 207:22 239:8 276:21 312:17 313:15 314:22

**identified** 33:8 33:12 40:23 41:11 143:6 166:7 257:17

**identify** 40:21 43:7,15 259:2

**ignored** 101:25

**illustrate** 245:2

**imagine** 35:24 252:9 253:6 289:24

**imbalances** 82:16

**immediately** 266:8,9

**impact** 39:17 40:2,7,15,18,22 40:24 41:7,12 41:14,22 42:4 42:5 43:2,6,6 43:14,18 44:5 44:12 47:24 70:4 95:2,9,10

95:16,20 96:8 96:15,22 97:8 97:12 120:20 120:24 129:7 190:8 192:2,17 192:20 193:6 193:14,25 197:19 198:4,5 198:19 200:3 200:11 219:5 261:15 262:16 262:24 265:21 266:7,12 267:9 272:11 274:9 274:12,15 317:25 318:13 319:10,11,25 320:19,20

**impacted** 217:5

**implication** 317:18

**implied** 98:15

**imply** 98:20 99:19

**implying** 98:6 98:10

**import** 302:25

**important** 76:13 94:21 115:19,24 208:24 209:8 211:13 217:4 232:5,18 252:18 258:3

314:5

**importantly** 229:2 299:19

**impose** 285:21 286:7,22

**imposed** 287:20

**impossible** 44:5 46:9 79:13 86:4 204:23

**inaccurate** 188:7

**inactionable** 34:18 35:2,14

**inadequate** 209:3

**include** 87:19 92:2,6,18 206:24 304:14 312:10

**included** 73:21 74:9 225:12,13 258:11

**includes** 92:14 92:16

**including** 30:3 85:25 110:20 118:14 160:18 251:9

**incomprehen...** 203:15

**inconsistency** 146:2

**inconsistent** 11:7 12:2,2 13:10 14:7,22 15:3,9,25 17:15 128:2,13 128:14 143:8 166:8 317:25

**incorporate** 251:19 281:14

**incorporated** 253:4 266:20

**incorrect** 66:16

**incorrectly** 138:3 191:5

**increase** 36:23 38:4 67:20,23 102:18 228:2 294:17

**increased** 68:10 315:21

**incremental** 186:16

**indicate** 94:25 95:8,10 312:11

**indicated** 175:7

**indicating** 247:2

**indicative** 317:24 318:12

**indicator** 107:19 109:20 220:16

**indirect** 5:18

**individual** 17:2 20:22 271:16 299:8 320:20

**individually** 1:5

**individuals** 272:7

**industry** 211:11

**inextricable** 40:7

**infer** 82:5 173:17

**inference** 227:11

**inferred** 56:6

**inflated** 45:24

**inflation** 33:25 34:7,17 35:13 38:6 39:5 46:5 47:15 48:5,6 49:8 117:6,10 128:23 199:3 200:20 201:18 201:25 202:3,4 202:9,17 236:13,22 237:4 249:11

**influenced** 229:23

**information** 15:21 37:16 39:4 53:16,24 54:11,16,21

55:25 62:22 70:18 72:11,16 75:17,19 86:25 87:2 93:15 95:15 96:6 100:9 101:3,6 105:22 119:3 119:20 124:18 148:8 175:20 182:10 184:9 184:17 187:14 187:24 188:6 204:2,23 212:2 216:5 217:5 236:14,18 237:6 239:24 241:14,24 244:4 246:14 247:23 251:8 251:20,21 255:2 260:11 264:4,5 269:2 273:12 281:16 295:5 298:11 299:4,16 302:12 306:14 306:19 320:8 320:15,16 322:20,21

**informative** 290:15

**informed** 204:10 234:12 248:12,13

**initial** 199:3 236:22 237:3 249:11

**input** 139:6

**inputs** 260:9

**inquiry** 81:24

**insert** 112:10

**insight** 297:5

**insights** 296:18 297:12

**insignificant** 266:17

**instance** 310:20

**instruction** 136:11 170:17

**insulated** 47:7

**insurance** 49:3

**intended** 195:4

**intensive** 5:5

**intent** 120:8 223:17

**intention** 318:24

**interested** 69:20 136:8 167:20 324:12

**interesting** 49:15 77:14 289:25

**interim** 266:24 300:8

**intermediate** 321:25

interpret 50:13 76:25 78:13,21 102:19 123:9 123:18,20,24 172:15 183:12 189:3 237:22 238:4

interpretation 158:23,25 162:24 189:10

interpreted 54:8 80:13 106:23 172:14 188:24

interpreting 78:7,9 183:2,7

interrupted 196:24

intertwined 246:8

interval 289:18

intervals 31:15 188:12 226:2 264:9 265:2 267:11 274:21 283:18 287:4,6

interviewed 296:16

interviewing 297:4

intrinsic 34:4,6 34:21 35:16

introduce 312:14

introduced 13:11

intuitively 35:24

invalid 319:24

invented 45:6

investigated 54:7

investment 25:3 256:11,21 260:6 297:4,11

investor 15:15 15:17,18 18:2 19:7,10 46:15 68:3 240:6,15 256:17 325:18

investors 17:13 17:14 19:25 26:2 53:17,24 54:11 56:6 76:22 79:10 93:5 129:11 167:15 169:6 256:22,23 269:7

involving 280:2

irrelevant 16:4 119:7 152:18 152:19 160:11 192:2 196:9,10 212:18 220:10 255:24 310:17

irrespective 213:4

irritates 301:13

issuance 52:9

issue 14:3,4,6,7 61:21 155:8 156:15 294:13

issuer 46:18,19

issues 31:9,13 78:20 210:15 215:4 216:16

it'll 238:25

italicize 10:7

items 132:8

**j**

james 276:12

january 36:7,7 36:9,13,24 37:8,15,18 38:4,7 39:3,6

job 191:13

join 259:22

joint 219:12 226:25

jointly 4:25

jointness 217:7

jp 69:23 82:13 276:11,19,24 277:6,13 278:2 278:10 279:13 279:20 280:6,8 296:15,21 326:7

jr 1:9

judge 50:4 54:4 88:24 194:17 207:17

judgment 155:18

judgments 320:7,14

july 6:9 7:12,14 9:21,22 10:11 15:20 17:7 25:12 29:9 44:13 51:19,20 53:15,23 54:10 55:19 56:4,20 56:23,24 58:2 59:3 60:3,18 70:14 90:4,12 95:14,19 97:23 103:13 106:24 107:14 109:2 109:18,20 113:22 115:17 117:8,21 120:3 120:21 129:13 131:18 149:6 149:16 171:21 173:6 175:12 175:14 200:17 201:8,10 203:6 212:16 213:18 222:9,19 225:9 225:17 226:8 227:17 228:10 229:9 230:4,13

**[july - large]**                                                    Page 36

230:15 233:8
233:10 234:25
237:8,17,19,22
238:4,19
239:16 242:23
243:12 244:19
245:7 246:19
247:3,5 279:9
279:22 281:8
299:23 300:3
300:22 301:2
306:12,12
326:6

**jury**  135:22
**justify**  68:19

### k

**k**  1:20 324:3,20
**keep**  102:20
  130:10 160:25
**keeps**  294:16
**key**  182:6
  239:22 240:20
  326:14,18
**keys**  308:7
**khan**  1:4
**killian**  1:21
  324:3,20
**kilogram**  279:2
**kind**  35:24
  69:18 159:14
  182:10 218:17
  220:10 278:17
  294:6 304:6

**knew**  21:23
  22:2 45:14
  79:25 80:2
  100:4,4 126:23
  126:23 127:6,6
  175:6,16 177:3
  215:8 273:17
**know**  4:15 7:3
  14:14 20:20
  25:17 26:21
  27:24 30:5
  36:3 37:12
  38:23 40:17
  41:17 45:7
  46:23 47:11
  48:21,24 49:12
  49:24 50:2,9,9
  55:17 56:23
  61:10 62:17
  67:8 69:23
  70:21 74:10
  75:12,13 76:2
  77:14,16 78:25
  79:5,17 80:23
  81:5 82:23
  83:3,13 88:17
  94:4 101:2
  105:8,25 106:2
  106:15 108:21
  108:21 110:16
  112:2,17
  114:20,24
  115:8,11,20
  117:13,20

122:12 127:4
127:13 128:15
128:16 133:3
135:14 141:16
143:6 144:25
146:13 153:2
154:19 156:24
157:13 158:8
161:14 166:6
166:22 171:10
174:4,11,17
178:2,13 179:8
181:6 186:10
187:23 190:19
191:24 195:18
199:24 203:8
204:21 205:15
205:17,20
215:9 217:9,24
223:23,25
224:4 226:4
227:11 233:12
236:20 247:9
247:17 253:9
255:18,23
256:3 263:9
264:6 265:11
266:2,11 269:4
275:16,22
282:2 285:18
292:21 300:7
300:19,23
311:9,11
314:12 320:23

**knowable**
  299:21,25
  301:11
**knowing**  59:7
  175:18,21
  306:5
**knowledge**
  80:17 116:21
  206:6 209:14
  292:14,22
**known**  118:24
  176:7 210:16
  211:25 213:13
  216:5 217:10
  217:12 221:10
  222:8,13,18
  260:10 272:25
  301:11 304:12
  305:2 317:19
**knows**  75:22
  102:12

### l

**l**  3:2 4:22
**labor**  5:5
**lack**  8:18 57:19
  61:2 146:2
  255:13 307:9
**lacks**  299:14
**language**  139:3
  189:18 209:16
**large**  14:3
  46:16 47:5
  195:8 285:5

299:11 307:10

**larger** 66:20 67:4

**larry** 122:22 134:10 154:24 158:11 163:19 180:15 197:5 243:11 245:23 314:10

**late** 68:5 206:22

**laurence** 2:8

**law** 1:19 2:4 39:21 40:12 42:20 43:12 148:6,11 189:22 199:23 200:14 209:10

**laws** 34:19

**lawyer** 7:16 8:7 45:8 54:3,8 136:10 148:12 148:13,14 169:9 189:5,20 190:19 229:13

**lawyers** 218:5

**layers** 192:21

**layman** 30:13 31:8 195:7

**layperson** 57:10

**layperson's** 228:15 250:10

**lead** 239:16

**leading** 109:9 133:11

**leads** 86:18 225:21 278:23 279:6 280:20 319:21

**learn** 172:10

**learned** 36:13 37:15 255:12

**leave** 323:6,7

**led** 42:17 187:6 201:25

**leerink** 296:16 296:24

**legal** 8:2 35:7 35:22 36:2 37:11,21 38:12 41:16 143:13 147:9,10 149:23 152:10 166:11,12 167:17,18 178:9 185:25 189:6,7 190:5 191:6 194:9 198:7,14 202:7 234:6

**legally** 8:22,25

**lemon** 124:10 124:11,12,23 125:13 235:18

**lemons** 124:15 125:10

**lenders** 49:24

**length** 288:16 317:22 318:11

**lengthy** 255:14

**level** 13:2 69:24 128:25 136:9 218:24 219:4

**liability** 47:4,4 47:18 155:18 202:13,15,18

**lie** 47:8 48:15 120:8 215:15

**lied** 118:7 120:3

**lies** 117:20,21 229:18

**life** 197:3

**lightening** 252:3

**liked** 133:17,20

**likelihood** 33:13,15 51:24 213:18,20,25 214:2,20 228:3 299:5

**likely** 83:18 84:20 97:4 112:18 183:3,9 193:16 227:21 230:24 235:17 235:19,23 244:24 245:3 275:11

**lenders** 49:24

**limited** 77:10

**limiting** 72:19

**line** 23:3 132:8 170:21 171:7 175:23 240:5,5 283:4 327:4,7 327:10,13,16 327:19

**lines** 179:5 277:5

**lingering** 83:2

**lisa** 4:21,24

**list** 70:8 311:3 312:2

**listed** 87:14 258:19 310:22

**listen** 259:22

**listening** 259:24 260:4

**literal** 226:3

**literally** 99:23 176:10 184:18 186:2 209:15

**literature** 281:23

**litigation** 211:21 213:7

**little** 181:10 238:2 262:2 269:13 294:6 300:17 326:12

**live** 259:21

**llp** 2:17

**[loan - made]**

**loan** 46:24 47:9 47:12
**local** 287:13,13
**logic** 301:7
**logical** 20:5
**long** 3:13 103:6 125:18 255:18 255:20 256:2 289:3
**look** 10:4 22:4 22:7 26:8 28:19,25 38:16 38:18 44:20 46:6 48:24 49:7,10 50:4,8 56:11 61:12 63:15 69:6 73:9,16,23 76:12 85:7,8 85:10 89:8 96:7 99:5 114:5 119:14 120:21 121:4 122:18 125:7 129:10,19 133:9 134:3 135:2,4 140:7 140:7 147:11 151:3 155:11 168:7 180:7 181:24 182:13 182:19 206:10 210:14 218:4 220:13,15

236:17 238:14 238:22 242:18 242:19 243:14 263:2,12 264:8 264:11,13,22 267:5,25 285:15 286:2 286:19 287:9 288:15 291:17 291:23 292:23 293:4 309:2,22 311:22 312:22 313:17 314:16 314:25 326:8
**looked** 15:19 22:10 27:16 54:13 77:5,6 77:11 99:3 106:13 120:9 210:6 272:14 285:19 289:17 292:6,9,13 297:24 303:6 309:4,6 313:23 316:11,12
**looking** 9:3 22:24 24:2 39:2 61:19 62:10,21 63:9 78:8 89:15,21 90:3,4,10,17,25 93:18 129:20 131:9 132:3 137:7 142:19

145:9,24 146:3 148:8 150:10 150:11 180:5 191:6 211:11 218:21,22 223:25 240:24 245:19,23,24 256:12 285:22 286:7,12 290:13,14 294:4 308:22 311:14 318:24
**looks** 6:19 60:15 72:9
**lose** 211:20
**loss** 39:25 40:5 40:15 41:13,14 41:21,25 42:7 42:8 43:3 44:6 44:14 47:5,13 189:12 195:25 236:4
**lost** 213:6
**lot** 8:7 48:22 73:20 74:8 79:24 101:18 121:11 132:14 190:6 191:11 204:12 211:20 213:6,6 214:25 224:25 266:4 285:25 286:3 305:11 307:21

**lots** 34:11 42:19 125:20 307:16
**love** 88:23 252:20
**low** 10:19,23 13:2,21 22:18 127:17,18 215:6 287:14
**lower** 64:6
**lukewarm** 61:22
**lunch** 46:10 103:2 141:25 142:3 200:12 202:22
**lying** 47:17 215:18,19
**lynch** 60:24

**m**

**m** 2:8
**mab** 182:4
**made** 9:25 23:15 36:5,8 51:6 58:18 87:25 101:25 116:15,20 149:7 189:4 200:10 201:20 220:17 245:8 246:10 297:14 299:23 300:3 301:8 328:6

**[madison - massie]** Page 39

| | | | |
|---|---|---|---|
| **madison** 1:19 2:6 | 257:6,10 277:19 301:4 322:19 | 38:17 39:2 46:7 47:22 48:19,20,25 | 247:23 248:12 248:13,17 251:8,19 252:8 |
| **main** 276:15 | **makes** 6:22 | 49:10,11,18 | 263:6,24 |
| **maintain** 117:9 | 49:18 85:17 | 50:3,20 54:24 | 266:22,22 |
| **maintained** | 94:23 95:7 | 55:4,19,23 | 267:14,15,19 |
| 43:10 44:20 | 96:19 97:7 | 56:13,24 57:24 | 267:20 268:5 |
| 116:25 117:2 | 117:10 120:23 | 68:7,9 75:4 | 269:14 274:25 |
| 199:4,21 200:9 | 121:6 227:17 | 80:10,15 94:11 | 275:12,18 |
| 201:3,24 | 228:19 277:17 | 94:18 103:13 | 276:12,13 |
| **maintaining** | **making** 17:2 | 103:20,23 | 281:18 282:25 |
| 128:23 | 126:12 147:5 | 104:3,10 | 283:7 296:10 |
| **maintenance** | 155:18 162:17 | 105:15,21 | 297:19 298:3 |
| 38:11,14 39:12 | 162:21 190:6 | 106:6,7,20 | 299:2,8 302:6 |
| 43:9 44:17 | 197:3 214:14 | 107:18 108:3 | 302:12 317:3 |
| 45:3,8,9,18,20 | 214:19 220:24 | 108:14 109:19 | 318:2 319:20 |
| 45:21 46:8 | 227:12 260:9 | 109:24 110:3 | **market's** |
| 116:23 199:19 | **man** 177:22 | 116:13 124:15 | 270:22 |
| 200:8 236:21 | **manuals** 42:18 | 124:19,21 | **marketplace** |
| 237:4 249:11 | **mark** 3:25 4:3 | 129:13,23 | 125:15 187:25 |
| **major** 69:24 | 276:18 | 131:22 149:14 | **markets** 18:14 |
| 82:16 240:6 | **marked** 4:7 | 170:19 171:4 | 81:11 125:20 |
| 256:17 | 59:23 60:2 | 173:6 175:6,16 | 131:16 132:18 |
| **majority** 73:10 | 65:10 71:15,17 | 176:7,12 186:3 | 180:8,13 |
| 282:5,13 | 168:6 207:22 | 187:13 188:18 | 181:25 182:20 |
| **make** 10:25 | 207:25 239:8 | 188:22 195:12 | 252:2 281:14 |
| 25:21 29:16 | 276:21 312:17 | 204:6 205:18 | 281:22 282:17 |
| 33:14 39:12 | 313:15 314:22 | 211:10 231:17 | **marking** 48:22 |
| 56:16 76:13,14 | **market** 5:7,13 | 231:20 233:21 | **marriage** |
| 90:24 104:23 | 5:15,18 7:2 | 233:23 234:4 | 324:11 |
| 116:3 149:18 | 20:2 22:5 | 234:13 235:3 | **massachusetts** |
| 151:23 162:10 | 26:12 27:18 | 235:10,14,15 | 1:2 |
| 164:3 194:22 | 28:11,15,20 | 237:22 238:4 | **massie** 6:18 |
| 195:20 197:9 | 29:10,12,15 | 246:13,20 | 30:18 32:4,9 |
| 220:14 227:11 | | | |

32:15 56:2,3
56:18 57:6,8
92:7 188:5,10
188:24 190:15
190:23,24,24
191:9,10,11,17
192:3,6,13,19
192:22 193:3,9
193:19,20
194:24 195:6
196:6 197:11
203:25 204:3,9
204:16,24
212:13 214:24
222:4,13 223:5
225:7,13,16,22
228:21 229:4
233:7 234:17
234:20 236:25
237:7,17,21
245:12,14
246:5,7,20
247:2,15
248:11,21
249:14,24
250:4 251:9,20
261:16 262:17
265:25 269:16
269:23 270:2,4
270:10,16
274:23 275:11
275:19,20
276:15 279:14
279:24 280:9

295:6,7 296:3
299:12,20,25
300:20,24
301:8 304:10
304:10 305:3
305:16,19,21
305:24,25
306:6,19
307:15,17
308:7 319:5,12
321:24,24
322:8,22
**massie's** 31:3
32:7 190:13
205:8,23
228:15 231:11
232:9 233:17
302:19 305:12
317:5,13,18
320:8,15
**massively**
217:18
**match** 23:21,22
55:24 138:5
145:7 146:25
146:25 165:8
167:19,22
168:2 183:9
189:18 193:18
249:15,22
250:15
**matched** 294:7
**matches** 166:21

**material** 39:22
40:11,13 41:7
46:24 47:17
53:16,24 54:10
54:22,23 187:7
258:11,20
**materialization**
210:16 213:13
219:18 221:10
222:8,18 223:2
296:5 305:23
306:5
**materials** 29:19
30:4 251:9
253:14 255:6
255:22 257:2,7
257:16 296:19
297:6,13
**matrix** 6:17
**matter** 4:14
8:10 13:5
18:13,18 36:2
57:13 79:17,19
80:4 86:4,6,16
87:6,20 88:21
92:10,24
112:14 123:6
127:11 130:21
131:4,6 145:20
148:10 151:10
157:6 184:4
191:23 196:11
238:16 281:24
288:25 301:7

324:13
**matters** 18:20
145:6 256:14
**mbas** 115:2,3,8
**meacham** 60:8
60:16,23 70:13
241:17 242:2
243:13 244:18
**meacham's**
61:2 244:7
**mean** 6:22 9:16
14:20,20,23
15:3,6,7 16:20
16:21 20:21
22:3 26:3
29:12,14 30:6
32:12 33:7
40:23 42:6
44:5,14 45:19
53:3 55:11
73:16,20 74:10
74:14,16 75:17
76:16 77:9,24
78:8 81:19
85:9,9,24 86:6
87:4 90:22
94:15 102:12
105:5 106:24
110:23 118:11
118:13 123:10
123:18,20
143:23 145:15
166:15 172:16
173:9,11

180:22 183:3 186:14 207:11 210:7 215:15 216:3,8 247:5 247:13 249:18 258:6 260:8 273:2 275:4,8 281:22 306:17 307:11,13 308:14,21 311:11,16 319:8

**meaning** 17:3 87:15 112:9 180:24 183:10 244:21 285:13

**meaningful** 289:16 291:6,7

**meaningless** 291:2

**means** 8:21 11:25 14:21 15:8,10 67:9 79:6 81:25 87:11 89:25 92:22 102:8 111:5,13 112:16,17 119:23 120:25 127:5 135:22 148:10 177:17 186:15 187:24 220:9 258:7 269:6 289:10

290:6,7,8,15 308:15

**meant** 18:16 74:19 78:25 79:15 87:17 92:21 102:15 105:2 110:6 118:25 127:13 130:11,16,22 169:22 170:5 170:20 171:6 172:4 204:14 210:11 248:16 248:23 297:8

**measure** 40:19 200:25 201:23 202:5 219:14 293:16,16

**measured** 66:23

**measurement** 39:25

**meat** 291:14

**medical** 24:23 27:24 28:8 128:12 156:14 243:21 255:13

**medication** 14:13

**medicine** 112:20

**meeting** 296:15 302:5,16

**meetings** 303:2

**member** 37:22 114:21

**members** 114:19 305:11 305:15

**memory** 33:4 207:20 217:6 217:15,24 218:2

**mention** 4:9 33:17 83:24 114:11 170:9 244:15,21

**mentioned** 52:12 88:8 111:4 121:10 191:3 297:24 304:5

**mentions** 81:11 113:22 206:11

**merely** 195:16

**merrill** 60:24

**message** 264:23

**met** 139:10 140:25

**methodologies** 321:17

**methodology** 193:5 194:19 217:23 285:3 321:12,13

**methods** 207:16

**michel** 1:8

**midday** 302:7 302:13

**middle** 80:9 196:20,25

**mildly** 87:8

**milligrams** 278:25

**million** 221:3,4

**mind** 14:24 17:19 19:17 33:24 83:6 147:19 152:7

**mind's** 271:3

**mine** 81:7 125:6 143:15 143:18 144:22 145:13 146:4 288:12

**minimum** 95:17

**mining** 216:18 218:18

**minute** 49:6 240:14 264:9 265:2 267:11 274:21 286:2,3 287:4,5 289:17 293:17 319:17

**minutes** 142:5 142:7,8 270:23 281:24 282:3 282:15 285:20 286:12 287:19

**[minutes - necessarily]** Page 42

288:14 290:24 290:25 291:11 291:12 292:4 293:18

**mirrors** 264:13

**miserable** 197:4

**misimpression** 234:3

**misleading** 8:14,16 131:17 190:12

**misled** 169:6

**mismatch** 237:18 249:2,6 249:7

**misrepresent...** 9:7 117:7 149:8 220:23 236:15,19 237:8

**misrepresent...** 7:23 8:13

**misrepresented** 116:19

**misstate** 162:8

**misstated** 138:10,13

**misstatement** 9:23 128:24 129:2 222:10

**misstatements** 162:7

**misstates** 21:11 52:23 88:6 98:24 100:19 111:11 176:6 199:13 232:7 254:23 273:23

**misstating** 162:12

**misunderstand** 95:24 184:13

**misunderstan...** 21:25 34:22,23 35:17,18,25 187:4

**mixed** 30:23 57:2,6 182:2 183:10,12,14 183:17

**mm** 65:13 112:25

**mmse** 64:4

**model** 69:8 221:4,7

**modern** 281:13

**moment** 51:10 71:20 262:11

**money** 211:20 256:9,10

**monitors** 125:18

**months** 47:10 61:15 62:7 243:17

**morgan** 69:23 82:13 276:11 276:19,24 277:6 278:2,10 279:13,21 280:6,8 296:16 296:21 326:7

**morgan's** 277:14

**morning** 72:21 73:19 119:13 211:18 239:22 256:6 259:5,6 263:7,8 319:15

**mountain** 257:12 282:16

**mouth** 19:6

**move** 157:23,25 158:15 169:25 170:25 171:15 227:16 271:15 272:5 274:2

**moved** 231:24

**movement** 170:10 171:22 180:4 262:9 295:16,18 296:2

**movements** 262:6

**movie** 252:15

**multiple** 108:21,22 192:21 320:5

**multiples** 287:3

**multistep** 227:3

**mumbling** 119:6

---

n

---

**n** 2:2 3:2,2 4:21 4:22,22 325:2

**nadia** 1:4 327:1 328:1

**name** 60:9 114:20

**named** 60:8,22 114:15

**narrow** 110:10

**natural** 216:22 216:23

**naturally** 240:9

**nature** 147:7 229:4

**near** 285:17

**neat** 205:22 233:18

**necessarily** 15:7,11 16:5 19:19 26:13 44:15 48:7 51:18 81:14 82:7 87:19 95:3,5,9 100:16 116:16 182:16 186:19 190:4 229:23 232:3

| | | | |
|---|---|---|---|
| **necessary** | 275:17 | 320:12 | 96:6 108:2,6 |
| 24:17 25:7,13 | **negate** 300:10 | **negatively** | 108:12,15 |
| 25:22 26:4,14 | **negates** 82:9 | 120:23 121:6 | 115:19,24 |
| 114:3 158:24 | **negation** 149:4 | 121:12 | 171:11,14 |
| 169:17 192:16 | **negative** 18:6 | **neither** 15:24 | 172:5,25 184:9 |
| 197:18 328:7 | 21:17 23:6,17 | 23:15 53:9 | 206:17 233:2 |
| **need** 17:10 24:6 | 30:19 31:7 | 54:21 74:17 | 238:23,25 |
| 38:10 39:22,24 | 32:10,19,23 | 127:18 159:18 | 240:7 241:14 |
| 41:5 43:7 | 33:9,9 41:8 | 162:13,14 | 241:23 244:3 |
| 44:18 46:3 | 57:7 58:19,21 | 199:5 238:14 | 244:15,21,22 |
| 47:20 64:8 | 58:22,23 59:2 | 267:23 276:14 | 245:8,16 |
| 87:22 104:14 | 59:4,9,10,14 | 277:23 278:17 | 254:18 257:16 |
| 117:9 137:23 | 61:23 63:22 | 299:19 | 258:10,18,25 |
| 141:13 143:4 | 77:16,20 79:11 | **neutral** 16:2,3 | 259:3,10,14,17 |
| 151:6,14 152:6 | 84:5,11,13 | 16:6 27:7 | 260:11,15,19 |
| 153:6 154:7 | 91:18 95:8 | 58:14,16 | 260:24 261:3,7 |
| 156:4 160:4,24 | 98:5 102:2 | 162:15,20 | 265:11,14 |
| 161:17 163:7,9 | 109:3,6,18 | **never** 55:22 | 273:12 303:9 |
| 163:20 166:5 | 110:18,19,21 | 59:9 68:5 | 314:18 315:4 |
| 166:14 192:18 | 119:16 138:16 | 85:18 122:25 | **news** 26:8 30:3 |
| 193:21 195:13 | 173:16 174:3,7 | 123:8 130:25 | 30:3,5,6,9,22 |
| 195:14 199:10 | 174:12,19 | 131:2 132:3 | 30:23 31:3 |
| 199:20 201:6 | 175:5,20,24 | 134:20 145:6 | 32:10,19,23 |
| 217:19 223:7 | 176:17 177:7 | 185:13 188:18 | 33:9,9,16 51:8 |
| 249:12 265:18 | 183:12,15,17 | 200:11 235:4 | 69:17,18 94:11 |
| 295:20 301:7 | 217:19 220:3 | 235:10 | 94:19 107:4,6 |
| 301:16 | 224:7 246:21 | **new** 1:20,20 2:7 | 108:9 110:2 |
| **needed** 107:17 | 247:9 248:5,9 | 2:7,20,20 3:4 | 116:5 193:20 |
| 163:23,25 | 248:10,14 | 28:5 30:5,6,9 | 211:7,15 |
| **needing** 24:11 | 254:14 261:21 | 39:4 45:9 | 217:18 220:12 |
| 88:2 134:23 | 263:21 264:2 | 53:16,23 54:10 | 221:12 233:22 |
| 136:25 137:13 | 276:6 277:10 | 54:16,21 65:25 | 238:20 252:10 |
| 137:20 139:23 | 296:20 299:16 | 66:19 67:2 | 252:11,15,21 |
| 140:18 165:4 | 302:17 317:5 | 93:14 95:15 | 253:3 254:12 |

257:17 258:10
258:19,25
259:3,10,14,17
260:6,9,15,19
260:22,25
261:3,7 264:19
265:11,14,16
265:25 266:2,3
266:7,19,23
269:4,8 270:16
271:6,12,18
272:19 274:16
281:15 319:6
320:9,23
**night**  267:7
**nine**  3:22 4:9
  10:4 61:15
  62:7 243:17
**nobel**  124:16
**noise**  34:10
**non**  45:8 79:23
  322:21
**noncarrier**
  85:4 98:8
**noncarriers**
  73:9,12 81:12
  278:4,21,24
  280:2,21,25
**nonsense**  322:7
  322:18
**noon**  103:2,3
**normally**
  108:17 109:14

**notary**  1:22 3:3
  328:14,21
**note**  94:22
  95:13 96:16
  295:3
**noted**  39:3
  55:17 59:19,21
  68:12 75:5
  142:11,13
  221:22,24
  301:22,24
  315:21 323:10
  323:12,18
  328:7
**notes**  95:6
**notice**  246:21
  248:17
**noting**  96:5
**notwithstandi...**
  266:23
**novel**  276:14
  277:13 278:11
**november**
  29:17 30:10,12
  32:10,18,20,24
  33:11,15,17
  113:5 140:15
  190:15 204:25
  205:6 219:17
  220:9,10,18
  222:14 233:9
  234:12 251:22
  257:17,19
  258:24 259:3,9

259:10,11,17
260:16,18,25
261:4,8 262:2
262:4 263:4,4
263:7,8,13,24
266:16,16
269:14 270:16
270:19 271:7
271:11,22
272:9,12,19,20
273:6,12,13,19
273:21 274:2,7
274:8,15,16,24
275:12,25
276:13,25
282:25 283:5
283:14,15,18
283:19 284:8
284:10,12,13
284:20,21
285:8,16,24
286:9,23 287:4
287:6,10,17,20
289:8,8,18,19
290:4,5,19,21
290:24,25
291:19,23
292:3,5 295:15
296:11 298:16
302:4 304:13
304:14,14,15
304:22,23
305:4,5,5
308:22 309:8

309:10 310:23
315:12,19
316:2 317:11
319:12 326:9
326:18,22
**number**  5:23
  6:16,18 13:4
  30:19 60:13
  66:12 134:3
  143:7 166:7
  209:17 224:18
  255:7 307:20
  310:5,7,16
  311:13 312:6
  317:23 318:12
**numbers**  10:23
  220:25 270:23
  314:7
**numerically**
  310:17

**o**

**o**  4:21,23
**o'clock**  256:5
  319:13
**oath**  242:6
  324:5
**object**  104:9
**objection**  5:22
  7:25 8:19
  17:21 21:10
  24:15 25:16
  26:6 31:23
  33:19 35:3,4

| | | | |
|---|---|---|---|
| 35:21 37:19 | 152:14 153:10 | 236:2 241:5,21 | 301:9 |
| 40:8 41:4,15 | 153:17 154:10 | 242:3,9 247:24 | **occasions**  36:6 |
| 42:10 43:22,23 | 154:18,22 | 254:8,22 | **occurred**  31:21 |
| 44:7 48:10 | 156:8,22 157:3 | 255:16 257:8 | 283:6 |
| 51:13 52:22 | 157:18,19 | 273:22 275:3 | **occurring** |
| 59:12 62:14 | 158:9 159:7 | 275:15 279:10 | 302:8 |
| 64:17 65:21 | 160:15 161:5 | 280:3,13 | **occurs**  311:2 |
| 67:7,24 76:6 | 162:6,19 | 287:22 299:13 | **october**  1:13 |
| 77:3 78:15 | 163:13 164:6 | 306:2,15,23 | 65:15 67:19 |
| 79:12 80:20 | 164:14 165:20 | 317:14 319:7 | 68:13,21 69:3 |
| 81:4 84:12 | 166:10 167:2 | 320:17 | 99:15 116:11 |
| 85:13,23 88:5 | 167:16 169:19 | **objections** | 140:15 180:14 |
| 94:12,17 95:21 | 171:8 173:21 | 155:14 | 184:10 309:21 |
| 98:23 99:21 | 175:10 176:5 | **objective** | 312:15,24 |
| 100:18,24 | 176:22 177:9 | 312:23 313:18 | 313:21 315:15 |
| 102:3,10 | 177:25 178:4,5 | 313:22 314:14 | 315:18 316:12 |
| 104:19 105:19 | 178:5,6,16,20 | 314:25 | 316:13 324:16 |
| 109:22 110:14 | 178:21 183:5 | **obligation** | 325:13 326:14 |
| 111:10 112:7 | 184:3 185:24 | 193:24 194:4,6 | **odd**  65:2 |
| 117:12,22,24 | 187:21 189:17 | **observation** | **odds**  304:6 |
| 118:3 119:10 | 191:21,22 | 161:24 | **offer**  189:6 |
| 121:13,17 | 193:10 194:2,7 | **observe**  52:6 | 233:18 234:21 |
| 122:9,16,17 | 195:24 196:8 | 262:7 | **offering**  155:14 |
| 123:5,11,12 | 198:13,21,25 | **observed** | **office**  49:23,25 |
| 126:9,14,21 | 199:12 200:6 | 236:23 261:16 | 49:25 |
| 127:9 128:4 | 203:7,11,19 | 262:17,21 | **offices**  1:19 |
| 131:3 134:9 | 205:3 209:24 | 283:4,15 284:9 | **oh**  6:24 49:14 |
| 136:5 137:4 | 212:17 214:11 | **observing** | 55:12 72:13,17 |
| 143:12 144:16 | 214:16,22 | 290:19 | 154:4 206:25 |
| 145:21 146:16 | 215:24 216:9 | **obviously** | 218:15 311:18 |
| 147:8,20 148:3 | 218:9,14,23 | 23:10 133:25 | **okay**  6:5,20 |
| 148:23 149:11 | 219:8 220:5 | 171:16 182:11 | 7:10 9:17,19 |
| 150:14,20 | 223:21 225:19 | 199:24 220:11 | 14:15 19:14 |
| 151:9 152:13 | 232:6 235:22 | 248:20 273:8 | 21:5,21 23:25 |

**[okay - overall]**                                                    Page 46

29:25 32:6,22 34:14 37:13 41:9 44:24 46:11 59:18 60:5 63:3 65:11 67:11,17 70:6 71:9 72:7 72:15,22,24 76:8 81:9 89:9 89:14 90:23 91:6 93:16 94:2,9 96:10 97:18 101:16 103:4,11 107:13 115:15 116:9 124:9 128:20 130:4 130:14,23 132:16 133:9 135:24 136:22 137:10 138:19 142:21,25 145:14 146:8 148:19 163:3 163:11 164:9,9 168:19,21,24 178:6 188:21 190:18 191:15 194:21 197:20 204:5 206:5 207:8 208:2,11 208:14,14,18 208:18 210:24 223:9 226:13

228:4 234:15 236:10,16 237:13 240:2 240:16 241:11 248:24 251:16 252:24 258:23 261:10,12 268:15,21 269:11 272:17 273:9 277:3 281:12 284:17 286:25 287:8 291:3 292:25 293:23 295:13 298:14 306:24 307:4 309:14 312:13 313:19 315:9 316:21 316:23 317:16 321:3

**old** 319:6
**omission** 169:6
**omits** 307:25
**omitted** 307:23
**once** 163:16 252:15 266:8 301:19 321:4
**ones** 5:21 114:15 186:23 224:24
**onward** 116:13
**open** 252:8 263:3,10 264:7 264:11,24

266:16,22 267:9,10,14 268:5 274:20 281:18 282:2 282:25 283:14 284:8,12 285:11 291:10 302:7
**openers** 278:14
**opening** 277:19 282:7 285:17
**openness** 326:17
**operative** 284:11
**opinion** 17:13 103:12,19,25 105:14 152:23 153:9,11 154:17,21 156:7,10 157:15,16 159:20 161:19 161:22 169:15 170:13,14 171:19 172:13 190:11 198:3 226:18 227:21 228:6,7 236:4 250:10 251:4 254:25 256:14 281:7 295:17 299:25 317:10 325:20 326:14

**opinions** 277:8 299:20 302:19
**oppenheimer** 69:6
**opposed** 38:12 57:18 185:21 231:22 232:15 311:13,16
**opposing** 254:21
**opposite** 103:19 137:8 143:21,22 170:16 184:23
**orange** 285:6
**order** 194:14 198:4
**original** 32:3 200:10 226:3
**originally** 46:4 202:4
**outcome** 246:23 259:19 302:17 324:13 326:18
**outlook** 326:21
**outside** 246:23 247:4,22,25 248:4
**overall** 31:10 59:8 116:16 128:2 174:12 174:13 175:4 175:23 177:12

**overlapping**
204:17 205:9
225:24 228:17
229:4 231:14
233:20 249:16
322:9
**overly** 132:22
180:21,23
**overnight**
281:17
**own** 12:8
158:22 298:11
320:7,14

**p**

**p** 2:2,2 3:2 4:21
4:23
**p.m.** 142:11,13
221:22,24
301:22,24
309:17 323:10
323:12,18
**package** 173:7
173:10
**page** 10:4
12:24 60:13,15
61:8 72:3,6,10
72:13,23 76:20
89:8,11,15,19
89:24 90:6,24
91:3 133:2
168:14,17
180:10 181:4
206:11 208:3,4

208:12,17
210:23,23
241:9 242:24
243:2 244:2
268:13 275:23
277:24 284:25
285:7 312:24
313:18 315:2
325:4,8 326:3
327:4,7,10,13
327:16,19
**pages** 30:21
188:13
**paginate** 133:3
**panel** 83:20
84:16 302:6,8
302:14 326:17
**panelist's**
302:18
**panelists**
133:16 269:19
296:18 297:5
299:21 317:5
**paper** 124:23
281:21
**paragraph**
3:22 4:9 6:3
10:5 17:25
22:25 24:3
53:12 66:7
69:2,3 71:4,9
71:25 80:6,10
84:7 85:16
89:16,17,22

91:4,10 93:17
93:20,25 94:6
94:15 97:17
107:12 112:22
113:20 115:14
116:8 119:14
128:19 129:9
131:11,14
133:10 136:14
136:21 142:19
146:12 151:3
158:21,23
159:12 160:6
165:9 167:7,20
167:22 168:23
169:2 173:3,4
173:23 179:11
180:11,16
182:21 222:3
222:22 236:9
240:4 242:19
245:4 246:17
248:25 261:11
276:7 281:11
282:19,22
295:13 296:8
296:14 299:19
302:3 305:7
307:3 316:22
317:20,21
318:7 319:19
321:10
**paragraphs**
269:13

**paraphrase**
131:13
**paraphrasing**
125:4
**parents** 81:21
**parse** 26:9
197:16
**parsed** 26:13
**parsing** 217:23
**part** 7:3 28:22
72:8 108:7
144:14 153:21
165:17 191:8
227:10 238:3
250:21 272:22
277:14 299:12
311:10,11
317:12
**partial** 168:23
**participant**
299:9
**participants**
7:2 20:2 22:6
22:12,15,17,18
28:20 38:17
39:2 46:7
47:22 48:20,20
48:25 49:10
50:3 54:25
55:19 56:13,25
57:24 68:8
75:5 80:16
106:20 107:18
108:3,14

109:25 110:3 116:14 129:13 149:14 170:19 171:5 173:6 175:17 176:8 176:12 186:4 187:13 188:18 195:12 204:6 205:18 246:20 248:17 269:14 275:19 297:19 298:4 299:3 302:12 317:3

**participated** 296:25

**particular** 5:6 16:16 39:24 148:11 152:21 223:24

**particularly** 278:15

**parties** 253:24 324:10

**parts** 17:23 58:23 59:2 100:13 159:9 159:14 190:19 249:9 257:10 265:20 313:6

**party** 125:18

**passive** 256:21

**past** 45:23 61:15 62:7 73:21 74:9

107:5 139:9 198:23 243:17 243:23 304:7

**patient** 98:8

**patients** 10:18 10:20,23 12:12 13:4,6,25 66:22 73:10,11 127:16 296:22

**pattern** 6:12,13 6:22 16:8 37:24

**patterns** 6:11 6:23 7:6 222:6 283:3 304:13 305:2 319:24

**paul** 2:17

**pb4** 278:6

**pdf** 66:11 168:18

**peak** 256:4

**peaking** 319:14

**pending** 69:12 161:11

**pension** 256:11 256:20

**people** 4:13,16 4:19 13:9 18:14 44:20 50:5 100:17,21 106:16 107:5 111:24 113:11 113:12 114:14 114:17 115:5

120:12 121:11 125:22 126:3,4 170:4 171:12 172:4 175:6 252:4 254:19 256:8 259:21 259:22,24 267:7 297:9 320:7,13

**people's** 50:6

**percent** 136:19 136:20 303:20

**perfectly** 125:5 167:12

**perform** 283:11 284:6

**period** 5:8 104:2 105:15 120:10,22 121:5 133:7 203:24 206:8 238:19 266:24 283:5 288:15 293:11,13 294:15,21,23 294:24 306:10

**periods** 5:24 285:8,11,16,22 285:23 286:8,9 286:23 287:10 288:17,25 289:2 291:24 292:20

**person** 11:23 17:25 106:2 113:13 115:11

**person's** 205:23

**personal** 232:23

**personally** 113:6 192:15

**perspective** 18:12 20:6 43:11 199:22 200:13 201:5 201:22 202:6 209:9 235:7 322:18

**persuade** 117:18 135:22

**persuasive** 223:11

**pertinent** 69:10 257:9

**peter** 4:22

**ph.d.** 1:17 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1

**[ph.d. - ph.d.]**

| | | | |
|---|---|---|---|
| 36:1 37:1 38:1 | 125:1 126:1 | 193:1 194:1 | 261:1 262:1 |
| 39:1 40:1 41:1 | 127:1 128:1 | 195:1 196:1 | 263:1 264:1 |
| 42:1 43:1 44:1 | 129:1 130:1 | 197:1 198:1 | 265:1 266:1 |
| 45:1 46:1 47:1 | 131:1 132:1 | 199:1 200:1 | 267:1 268:1 |
| 48:1 49:1 50:1 | 133:1 134:1 | 201:1 202:1 | 269:1 270:1 |
| 51:1 52:1 53:1 | 135:1 136:1 | 203:1 204:1 | 271:1 272:1 |
| 54:1 55:1 56:1 | 137:1 138:1 | 205:1 206:1 | 273:1 274:1 |
| 57:1 58:1 59:1 | 139:1 140:1 | 207:1 208:1 | 275:1 276:1 |
| 60:1 61:1 62:1 | 141:1 142:1 | 209:1 210:1 | 277:1 278:1 |
| 63:1 64:1 65:1 | 143:1 144:1 | 211:1 212:1 | 279:1 280:1 |
| 66:1 67:1 68:1 | 145:1 146:1 | 213:1 214:1 | 281:1 282:1 |
| 69:1 70:1 71:1 | 147:1 148:1 | 215:1 216:1 | 283:1 284:1 |
| 72:1 73:1 74:1 | 149:1 150:1 | 217:1 218:1 | 285:1 286:1 |
| 75:1 76:1 77:1 | 151:1 152:1 | 219:1 220:1 | 287:1 288:1 |
| 78:1 79:1 80:1 | 153:1 154:1 | 221:1 222:1 | 289:1 290:1 |
| 81:1 82:1 83:1 | 155:1 156:1 | 223:1 224:1 | 291:1 292:1 |
| 84:1 85:1 86:1 | 157:1 158:1 | 225:1 226:1 | 293:1 294:1 |
| 87:1 88:1 89:1 | 159:1 160:1 | 227:1 228:1 | 295:1 296:1 |
| 90:1 91:1 92:1 | 161:1 162:1 | 229:1 230:1 | 297:1 298:1 |
| 93:1 94:1 95:1 | 163:1 164:1 | 231:1 232:1 | 299:1 300:1 |
| 96:1 97:1 98:1 | 165:1 166:1 | 233:1 234:1 | 301:1 302:1 |
| 99:1 100:1 | 167:1 168:1 | 235:1 236:1 | 303:1 304:1 |
| 101:1 102:1 | 169:1 170:1 | 237:1 238:1 | 305:1 306:1 |
| 103:1 104:1 | 171:1 172:1 | 239:1 240:1 | 307:1 308:1 |
| 105:1 106:1 | 173:1 174:1 | 241:1 242:1 | 309:1 310:1 |
| 107:1 108:1 | 175:1 176:1 | 243:1 244:1 | 311:1 312:1 |
| 109:1 110:1 | 177:1 178:1 | 245:1 246:1 | 313:1 314:1 |
| 111:1 112:1 | 179:1 180:1 | 247:1 248:1 | 315:1 316:1 |
| 113:1 114:1 | 181:1 182:1 | 249:1 250:1 | 317:1 318:1 |
| 115:1 116:1 | 183:1 184:1 | 251:1 252:1 | 319:1 320:1 |
| 117:1 118:1 | 185:1 186:1 | 253:1 254:1 | 321:1 322:1 |
| 119:1 120:1 | 187:1 188:1 | 255:1 256:1 | 323:1 324:5 |
| 121:1 122:1 | 189:1 190:1 | 257:1 258:1 | 327:2,24 328:2 |
| 123:1 124:1 | 191:1 192:1 | 259:1 260:1 | 328:13 |

**[phase - positive]**

| | | | |
|---|---|---|---|
| **phase** 98:5 108:17,23 109:14,15 | **placebo** 70:5 188:12 278:7 | 170:17 182:20 187:12,18 188:4 193:23 | 21:12,13 23:5 23:6,16,17,20 63:21,23 91:18 |
| **phases** 108:22 | **placebos** 31:12 | 203:23 213:3 | 97:25 98:4 |
| **phds** 115:2,3,9 | **plain** 79:20,21 79:25 86:16 | 220:14 224:3 224:13 229:3 | 132:5 134:21 136:24 137:18 |
| **phenomenon** 125:12,13 | 91:13 100:4 119:13 | 241:12 245:2 275:13 277:25 | 138:15,16,23 139:16,20,22 |
| **phrased** 8:22 184:23 298:12 | **plaintiffs** 1:6 1:18 2:5 6:8 | 278:19 287:13 287:14 307:14 | 139:25 140:17 140:21,22 |
| **physician** 29:24 109:7,11 | 53:14,22 54:5 86:11,12 88:10 | 314:9 318:25 320:21 321:18 | 141:3 151:21 165:2 174:2,5 |
| **physicians** 76:13 296:21 | 104:25 115:21 155:16 193:24 | 321:25 | 174:6,7,14 293:12 |
| **pick** 100:11 | 199:16 215:7 | **pointed** 173:25 288:7 316:18 | **posed** 61:6 |
| **picked** 115:20 115:24 116:6 | 282:23 | **pointing** 78:18 131:10 195:16 | **position** 75:12 81:19 85:21 |
| **picking** 303:9 | **plan** 25:3 | **points** 29:16 | 86:10,13 |
| **picture** 83:21 84:17 284:24 | **plane** 11:19 | 184:25 244:14 244:20 246:11 | 104:24 155:10 161:3,8 167:15 |
| **pictures** 183:8 | **plans** 66:13 | 246:13 307:20 | 178:14 226:11 |
| **piece** 10:7 83:20 84:17 | **plausibly** 53:15 53:22 54:5 | 320:25 | 271:16 |
| 94:11 100:8 108:9 191:9 | 158:17 169:5 190:21 | **pokes** 306:20 | **positive** 30:16 31:3 41:8 56:8 |
| 193:18 249:17 258:18 266:18 | **play** 27:12 83:3 110:24 134:17 | **pondering** 81:17 | 58:10,11,13 67:2 95:8 98:4 |
| 276:5 | **playing** 110:25 | **poppycock** 87:21 | 111:15,16,17 111:18 132:22 |
| **pieces** 51:18 192:5,19 | **please** 149:21 197:5,7 301:21 | **population** 81:14 | 172:5 173:16 177:12 180:21 |
| **pinheiro** 4:21 | **pleasure** 323:14 | **populations** 98:8 | 180:23 181:12 181:14,21 |
| **pivot** 116:23 | **point** 27:11 33:14 59:8 | **portion** 224:19 | 182:16,17 |
| **place** 73:23 76:11 | 83:11,12 95:4 116:22,22 123:14 137:5 | **portions** 18:5,6 20:19,20 21:7 | 192:24 205:19 |

**[positive - price]**

235:17,19,23 254:13 270:6 296:20 317:7 320:11 326:21

**positively** 56:13 269:15 311:23

**positives** 286:3

**possession** 247:18 300:25

**possibility** 82:6 224:20 251:6 301:8

**possible** 15:23 35:20 36:2 40:10 41:10 48:4,19 71:2 84:4 96:11,14 96:21 97:2,4,5 97:15 98:19 113:23 176:18 176:20 177:5 184:7 203:10 228:12 231:6 264:2 275:6,9 275:9 295:9 299:9 306:6 317:15

**possibly** 47:20 47:24 48:23 76:2 110:12,20 111:12 127:4 261:15 262:16 300:7,19 301:4

**post** 15:20 31:21 32:2 38:19

**potential** 30:17 47:4 107:20 109:21

**potentially** 9:22

**practical** 125:14

**practice** 113:19 125:16 251:25 255:4 257:13 270:21,24

**pre** 15:20 31:22 63:19 200:10

**precedent** 182:3,9

**predict** 120:11

**preexisting** 117:15 200:20 202:9

**preliminary** 247:11

**premise** 317:22 318:6

**prescribe** 24:24 25:2

**present** 49:23 73:19,20 74:2 74:8,23 98:20 181:9,16 319:22

**presentation** 69:4,5 132:24 325:15

**presentations** 73:4

**presented** 73:6 73:7 81:12 98:15 173:7 181:12,18 182:25

**presenting** 73:18 76:12 79:11 98:6,10 181:13

**prespecified** 66:23 82:14 139:7,10 140:25

**press** 94:20 239:25 240:8

**presume** 282:23

**pretty** 33:4 56:25 57:7 67:5,8,19 120:25 169:12 173:13 190:9 243:24 252:16 252:20 255:14 287:15 304:4

**prevented** 55:10 117:8 200:17

**preventing** 48:15

**prevents** 201:8 201:10

**preview** 132:2

**previous** 201:24

**previously** 296:25

**price** 33:11 34:3,5 36:23 38:4,6,9,21 39:6,11,16,23 40:2,7,14,18,21 40:25 41:8,12 41:14,21 42:4 42:5 43:2,5,6 43:14,16,17,19 43:19 44:4,11 45:2,9,24 47:14,16,23 48:5 49:9 50:15 54:18,21 55:10,15 56:18 67:20,23 94:25 95:9,10,16,20 96:7,15,22 97:8,11 100:12 100:15,22 101:21 102:18 107:8 108:10 111:25 117:8 117:11 119:25 120:20 129:3,6

132:15 169:25
170:9,25
171:15,22
172:24 179:25
180:3 184:12
184:15,22
186:13,15
187:7 190:8
192:17,20,24
193:6,25 198:4
198:5,18 200:3
200:11,17
201:8,11
202:15 203:6
211:8 219:5
220:18 222:6
236:12,22
253:4 261:15
261:16 262:5,7
262:8,16,17,21
262:23,24
266:21 267:9
268:17,23
270:18 272:11
273:21 274:2,9
274:11,14,15
274:16 277:16
277:22 278:13
281:18 282:6
283:4,13,14
284:7,9,13
285:7 287:17
289:7 290:2
291:22 295:8

295:16,18
296:2 308:2,13
308:15,16,24
309:11,19
310:3,10,12,21
311:7,7,19
312:3,12,23
313:2,17,21
314:13,25
315:22 316:3
316:15 317:3
317:11,25
318:13 319:10
319:11,25
320:18,20
**prices** 50:6
**pricing** 172:6
**primarily** 67:3
**primary** 63:18
66:23 139:6
141:2
**prime** 18:8
63:17,25 98:5
134:21 136:24
137:19 139:20
140:21 151:21
165:3 173:24
244:11
**principal** 32:13
211:16
**principally**
261:25 262:4
**printed** 52:14
52:16,18,24

**printing** 53:2,4
311:12
**prior** 97:23
98:2 103:13
104:2 105:14
106:5 108:3
117:2 156:19
156:21,25
202:17 204:25
222:14 233:8
234:11 242:20
244:14,20
246:19 247:3
271:7 273:6,18
302:4,6 309:7
**prize** 124:17
**probabilities**
213:12 216:17
227:6 228:23
231:9,19
232:13 269:2,5
271:15 272:6
277:22 297:16
320:8,14
**probability**
68:10 212:6,21
213:5 215:2,5
216:21,23
217:7 219:12
219:21 221:2
226:25 227:14
227:15 228:24
257:10 265:24
271:4,9 278:14

317:19 320:22
320:25 321:5,6
321:7,23
**probably** 3:20
14:9 68:6
97:14 112:6,13
112:17 114:14
114:15 141:19
181:20 185:25
224:15 258:13
297:17 301:18
308:4,8 318:23
**problem** 84:22
101:23 138:5
219:12 220:19
220:21 233:23
254:12 255:25
288:2 307:14
**problems** 10:25
14:2 215:8
219:2 250:9
**procedure**
316:7
**process** 56:11
227:3,13 271:3
271:8,21,24
272:8 304:20
313:5
**processed**
255:2 264:5
270:20
**processing**
268:25 269:7
320:16,18

| | | | |
|---|---|---|---|
| **professional** 1:21 31:6 32:5 | 239:24 278:5 300:21 | **purposes** 91:21 153:8,11 154:17,20 156:7,10 159:16 160:19 161:18 | **quantitative** 245:9,17 246:14 |
| **professor** 3:9 | **providing** 75:2 302:7,13 310:20 | | **query** 244:7 |
| **proffer** 310:25 | | | **question** 8:20 9:2,12 11:10 13:13 14:17 16:14,24 17:22 18:19,20 19:9 20:4,17 23:24 24:8,19 26:25 27:24 28:7,10 28:13 29:5 31:14 33:21 34:12 35:7,12 37:11,21,21 38:12 39:8,9 39:14,20 40:10 40:11 41:16,19 42:12 44:8,13 44:23 46:12 49:8,15 50:19 51:9 52:2 53:5 60:7,7,22 61:5 61:5 62:4,17 63:14 64:14,25 75:6,7 76:18 78:4,5,6,12,24 79:24 85:2 94:5 95:12 101:12,13 103:21 104:6,9 104:15,20 105:7,13 106:3 |
| **profitability** 68:11 | **public** 1:22 3:4 30:3 56:3,5 116:15,20 140:14 182:5 217:25 222:14 297:14 328:21 | **push** 193:16 281:25 | |
| **progress** 10:20 10:22 | | **pushing** 185:19 | |
| **project** 3:17 | | **put** 12:8,10 26:17 30:13 44:16 59:13 60:18 64:18 65:20 69:7 71:12 87:8 88:22 97:21 109:12 121:2 149:2 190:22 210:2 231:21 232:14 307:25 308:18 317:17 | |
| **prolonged** 268:17,23 317:24 318:13 | | | |
| **proper** 150:7 | **publically** 12:10 29:19 75:17,19 | | |
| **proposed** 104:2 105:15 289:21 | **publication** 244:21 283:7 | | |
| **proposition** 13:15 | **publications** 241:14,24 244:4,15 | | |
| **propounding** 25:25 26:2 | | **putting** 19:5 133:14 256:9 312:6 | |
| **props** 117:11 | **published** 61:20 63:25 243:20 297:21 298:7,16 | | |
| **prospect** 50:23 | | | |
| **protocol** 113:10 | **pull** 233:20 | **q** | |
| **prove** 99:4 193:25 194:14 198:4 201:17 267:6 | **pulled** 249:17 | **q2** 325:11 | |
| | **pulling** 257:2 | **qualifier** 112:11 | |
| | **pure** 80:18 185:13,16 | **qualitative** 118:20 | |
| **proves** 141:5,6 | | | |
| **provide** 74:5 125:22 226:11 226:18 227:20 228:6 | **purely** 205:17 304:3 | **quality** 62:20 63:5 | |
| | **purpose** 5:11 92:25 96:3 235:2 | | |
| **provided** 4:11 77:20 93:5 | | | |

**[question - read]**                                                    Page 54

106:5 122:19 122:22,24 134:10 140:5 144:9 147:10 149:13 150:3,5 150:6 151:15 152:10,25,25 154:12,14,15 154:23 155:4 155:21,21 156:14,15,23 158:2,2 159:3 160:20 161:11 161:12,25 163:19 164:8 167:5,19 169:20 170:24 171:3,23 175:15 176:6 178:8,22 179:12,23 184:8 187:19 189:21 190:4,5 190:5,9 192:2 196:15,19,21 196:22 197:6,9 198:7,16,24 203:13,21 205:8 211:5 213:10 214:24 215:3,25 216:2 217:10,17,20 219:5 220:7,22 222:16 223:17

223:22 225:4 225:21,21 226:24 229:8 230:2,7,7,9 233:2 234:16 234:19 235:6 236:8 238:12 241:13,18 242:2 243:10 243:10,11,19 244:3,17 246:2 246:16 247:14 254:25 255:24 255:25 260:12 265:18 268:10 270:7 272:16 273:25 274:8 278:9 283:17 283:25 284:5 284:11 285:18 290:18 292:15 295:19 302:22 308:21 318:15 318:19 322:16

**questions** 60:11 68:2 69:24 70:7 82:3 122:20 145:24 171:14 189:24 190:2,2 240:9 245:25 259:5 287:25

**quickly** 253:10 255:3 257:11

269:15

**quite** 50:24 68:13 84:4 97:14 179:14 186:19 286:17 310:15 319:9 322:12

**quote** 22:24 23:4 24:3 71:9 71:25 72:9 84:14 180:8 181:24 184:10 244:25

**quoted** 52:19 68:15

**quoting** 80:22 121:20,21

**r**

**r** 2:2 3:2,2 4:21 327:3,3

**race** 288:11,12 288:14

**raffat** 72:25 76:23,23 99:14

**raised** 124:14 256:16

**ran** 129:16 288:20

**range** 132:15 293:15

**rapidly** 281:15

**rare** 97:14

**rather** 222:8,18 257:4

**rauch** 325:23

**raymond** 276:12

**rbc** 81:10 131:15 132:17 133:16 180:8 180:13 181:4 182:19 184:10

**rcr** 324:3,20

**reacted** 269:14

**reaction** 107:8 108:10 172:25

**read** 8:6 11:12 17:25 18:10 19:3,3,4 27:25 28:3 29:22 31:7 51:21 57:9,14,21,22 64:21,23 65:6 74:24 76:20 78:22 79:7,13 80:3,5,23 83:4 85:3 86:2,5 88:7 91:24 92:8,20 93:2 100:3,3,6 102:4 108:13 113:6,9,10,14 114:9 118:4 122:22 126:25 127:10 131:9 137:11,17

138:2,2,4
140:2,6,11
141:9,9,15
165:7 166:19
169:10 179:8
179:11 180:24
182:18 186:18
188:23 190:20
209:5 217:25
218:11 232:11
233:13,14,15
250:22 251:3,4
256:25 257:9
258:17,18
278:18 280:7
297:20 321:14
322:5 326:13
328:5
**reading** 5:5
7:17,20 25:19
53:21 69:9
74:16 77:16
79:20,21,25
86:17,18 87:7
87:9 88:12,16
88:17,18,21
91:13,16,22
92:2,3,4,5,15
111:2,20,21
113:12 152:16
158:13 159:10
159:13 177:10
179:5 181:23
188:12 189:19

195:7 203:15
203:16 257:7
308:5
**reads** 182:21
**ready** 142:16
252:4,5 256:18
256:24 286:5
286:14,15
297:10
**reaffirm**
311:23
**reaffirming**
312:5
**real** 49:23,25
50:2 209:15,23
**realized** 282:6
**really** 17:10
24:6 26:8,9,17
28:21 31:8
37:20 64:8
70:2 80:4 83:3
92:23 101:17
107:11 117:17
118:25 137:23
141:12 143:4
151:6 153:6
154:7,24 156:4
156:11 158:14
160:4,24
161:17 163:6
166:5 179:12
180:3 182:14
209:25 210:16
212:24 216:25

235:4 238:16
249:12 275:17
291:12 304:7
310:6 320:6
**realtime** 1:22
43:8
**rearrange**
151:20,24
**reason** 12:11
16:14 73:25
74:22 108:7
117:14 232:22
255:3 307:8,19
327:6,9,12,15
327:18,21
**reasonable**
18:2 88:15
306:4
**reasonably**
36:10
**reasons** 172:22
202:21 225:11
237:18 251:24
289:3 319:22
320:3
**reassurance**
126:19,20
**reassure** 126:4
**recall** 8:5,6,6
9:8 29:20
32:12,16,21
33:2,6,22 60:8
60:20 65:22
93:11,19

207:18 208:25
209:25 224:14
224:15,17
251:13 253:5,8
254:3 257:18
257:20 258:4,7
258:8,14
260:17,22
261:9 273:5
286:11,11
292:6 310:6,18
313:4,7 314:4
314:15 319:2,3
**recalling** 221:5
**received** 12:13
**receiving** 10:18
10:21
**recent** 308:23
**recess** 59:20
142:12 221:23
301:23 323:11
**recognize**
116:14 122:7
**recollection**
31:25 207:14
207:15 217:2
255:9 305:17
312:7,8
**recommending**
303:15
**record** 33:3
44:20 46:7
142:10 250:24
276:22 301:21

**[record - remember]**                                                Page 56

323:9 324:7
**recorded**  1:16
**red**  285:24
286:9 287:10
291:18,25
293:4,10
294:22,23
**reduced**  66:21
**refer**  6:15 7:11
9:6,21 55:22
58:22 67:16
157:9 159:25
223:15,18
262:8 276:11
**referee**  114:19
**refereed**  113:13
**reference**  9:25
9:25 53:2
58:18 60:25
74:11 97:9
173:5 223:12
304:18 306:11
306:13 307:15
**referenced**  52:8
52:21 53:4,5,5
115:17 121:14
277:2 306:18
**references**
42:18 96:23
209:18
**referred**  109:2
**referring**  7:7
10:8 14:11
59:4 85:3 88:3

91:15,20 92:9
111:8,8 113:21
130:18 156:18
157:7 182:8
209:20 241:16
261:23 263:16
269:22
**refers**  18:3
21:16 110:19
159:11 160:5
**reflect**  222:7
283:2
**reflected**  15:19
172:6 261:19
263:19 281:17
**reflecting**
80:11 261:15
262:16
**refused**  166:25
**regarded**
108:14
**regardless**
288:15
**regional**  49:4
**registered**  1:21
**regulatory**
66:14 73:24
74:21 116:12
326:21
**reinstated**  8:13
**reinstating**
7:22
**reiterate**
311:19

**reiterated**
244:13,20
**reject**  299:11
**rejected**  189:9
189:14
**rejecting**
303:14
**rejection**
189:16
**relate**  84:23
318:5
**related**  52:3,4
62:12 78:19
193:20 204:20
261:4,8 322:3
322:4 324:10
**relates**  13:17
**relating**  113:4
259:3
**relative**  83:21
84:17
**release**  226:20
227:25 228:8
231:3 239:25
240:8 246:19
253:7 268:17
274:3
**released**  29:18
30:9,25 129:12
226:15 234:11
241:18 251:21
272:20 274:24
275:12 298:20

**relevance**
118:24 179:19
201:4
**relevant**  5:12
16:15 38:5
39:4 51:8 55:5
65:3 94:21
100:8 110:8
111:23 152:23
169:24 170:15
170:22 180:5
229:14 281:15
**relied**  310:9
**relies**  308:5
**rely**  299:9
**relying**  299:3
**remain**  123:21
182:21
**remained**  102:5
102:8
**remaining**  9:6
**remains**  7:15
272:15
**remarkably**
107:22
**remember**  50:5
57:8 108:25
127:20,21
132:13 206:15
210:6,7,8,18,19
210:20,21
257:21 286:4
292:8

Page 57

**remembering** 212:19 218:16
**remind** 210:10 210:13
**reminds** 244:11
**repeat** 10:5 18:25 268:8
**repeated** 317:24 318:12
**repeatedly** 97:24 119:13 160:8
**repeating** 37:16
**repeats** 36:15
**repetition** 319:22 320:6
**rephrase** 35:12
**replicated** 5:16
**report** 3:18,23 4:4 5:3 6:4,8 8:11 10:5 22:25 24:4 26:17 30:16,19 31:4,7 32:8,9 32:13,14,15 33:12,18 35:2 53:13 56:2,3 56:18 57:15 61:3,4,23,24 65:24 68:24,25 74:12 80:7 86:25 89:11 90:9,14 92:7

93:13 95:23 96:14,16,20 97:19,23 105:24 112:23 114:4,17 119:16 123:14 132:18 133:12 142:19 145:7,9 147:12 181:5 188:5,25 190:23 191:17 191:24 192:13 192:19,23 193:9,15 194:24 195:7 195:21 196:6 197:11 203:25 204:3,9,24 206:2 210:14 214:25 220:14 221:6 224:15 225:7,12,14,16 231:12 232:10 233:7,17 236:25 237:7 238:22 239:10 239:16,17,22 242:21 245:2,5 245:12,14 246:5 247:16 248:2 249:24 251:10,20,24 252:3 253:14 253:20 256:19

258:12,20 263:2 266:11 268:14 270:2,4 270:17 274:23 275:11,24,24 276:19,25 277:25 279:13 279:14,24 280:6,7,9 289:7 295:6,7 296:3 299:12 303:19 304:6 308:11,19 309:2,5,7,17 310:12 311:15 311:22 312:15 312:24 314:14 314:17 315:12 315:13,15,20 316:2 318:4,16 318:21 319:3,5 319:12 321:10 322:9,22 325:9 326:4,7,12,16 326:20
**reported** 239:21 290:3
**reporter** 1:21 1:22
**reporter's** 197:3
**reports** 5:6 15:19 26:7,16 51:21 56:15

68:15,20 78:9 84:9 96:4 108:6 113:4,7 113:9,21 114:10,22 133:7 135:3 145:19,25 146:25 147:17 147:19,23,23 148:9 150:11 170:9,24 173:18 179:17 184:25 217:24 238:14 245:5 252:6 253:11 256:3 258:22 274:4 276:12 297:20 298:6 298:16 299:4 303:5,12 307:23 308:2,6 312:10 315:19
**represent** 225:17 277:13 304:11
**representatives** 98:14
**representing** 191:9
**reputation** 125:16 177:23 320:3
**request** 119:3

| | | | |
|---|---|---|---|
| **require** 28:8 67:15 124:2 162:2 241:6 292:11 | **responsive** 103:18 104:14 | **revelation** 261:18 262:19 262:22 | 42:23 43:14,18 46:11 48:2,9 48:17 55:8,11 |
| **required** 135:21 170:19 328:14 | **rest** 22:16 69:10 162:25 173:13 | **review** 73:24 74:21 98:12 99:8 113:18 | 55:16 58:15 59:6,11 61:25 62:3,25 63:11 |
| **requires** 108:17 109:14 128:10 193:7 | **restricted** 287:18 291:24 | 124:4 145:5 276:3 299:15 | 66:8 70:15 71:7,13,23 |
| **requiring** 316:14,16 | **restriction** 285:21 286:7 287:5,21 | **reviewed** 26:17 83:19 84:16 113:3,15 | 72:15 73:19,22 75:20 81:17 82:9,10,18 |
| **research** 4:11 238:22 239:15 309:16 310:2 310:11 326:4 326:12,16,20 | **restrictions** 286:22 | 114:21 145:19 258:20 | 83:14 86:8 89:7,18 91:8 95:12 97:16 99:12,17 |
| **resolves** 13:13 | **result** 43:16 47:5,18 61:23 139:12 175:23 278:22 279:15 280:9,19 281:2 | **reviewers** 114:12 277:9 | 102:14,15 103:23 104:18 104:22 105:7 |
| **respect** 117:19 | | **reviewing** 114:18 133:6 316:8 | 105:12 110:22 112:21 115:13 |
| **respects** 208:24 209:8 | **results** 5:25 6:25 66:2,15 67:2 70:5,9 82:20 98:7 109:9 127:23 127:24 139:8 170:7 173:14 173:19 174:16 174:18,22,25 175:7,25 182:2 183:20,23,25 223:20,23 224:2 239:21 | **reviews** 114:16 | 115:14 117:21 120:5 123:4 |
| **respond** 64:20 146:5 | | **rewrite** 165:22 | 125:24 126:2,4 126:5,8 131:13 |
| **responds** 73:15 | | **rewrote** 165:15 | 132:16 134:13 135:8 137:9,15 |
| **response** 38:9 39:11 60:21 63:13 64:14 78:13,14 101:22 119:3 282:6 | | **rifkind** 2:17 | 138:25 139:14 139:18 141:6 |
| | | **right** 3:15 7:5 10:14 12:2 13:23 14:2,3 16:2,10,19 17:5 19:23 20:10 21:9,18 21:24,25 22:13 24:24 25:5 27:4,9 30:6,8 31:18 32:17 33:23 36:4,7 36:14,18 42:4 | 144:2 146:8,15 149:7,9 150:5 150:13,25 153:25 154:13 155:8 163:12 165:22,24 |
| **responses** 72:20 | **return** 41:23 217:19 | | |
| **responsibility** 136:17 | **reuters** 325:16 | | |

168:7 172:11
174:12,15,18
175:22 176:4
180:6 181:15
186:17 189:2
189:13,20,23
190:7,8 191:15
192:14 195:23
200:2 201:9
202:13,16
206:9,21,23
208:16,19
210:22 211:2
213:15,22
214:3,15
215:19 219:7
219:25 220:4,8
225:5 226:6,19
227:24 230:10
230:14 231:2
236:5 238:21
243:6 244:6
250:13 251:11
253:22 255:8
255:15 256:14
260:2,7 265:9
267:16,21
268:12,19
269:11 270:8
271:10,23
272:10,21
273:7,14,16
274:6 279:17
279:19 280:12

281:4 282:12
284:18 285:6
286:24 287:2,6
287:7 291:16
291:20 293:2,3
294:13 296:7
296:12 297:7
297:18 301:10
305:6 306:16
306:22 307:2
308:10 309:22
312:3,21
313:25 315:23
316:24 318:20
318:23 319:18
321:5 323:2

**rise** 294:15

**risk** 76:14
173:7,9,10
210:17 213:13
219:19 221:10
222:8,18 223:2
224:6,10
246:21 248:9
248:13 296:20
305:23 306:5
312:23 313:18
313:22 314:14
315:2,11

**road** 236:24

**robust** 6:2

**role** 83:2

**room** 148:12

**roped** 130:14

**rosen** 1:19 2:4
2:8 3:7 4:2,8
8:3 44:2 59:16
59:24 65:7,13
65:14 71:12,18
72:4 75:25
89:4,6,13 90:2
90:11,15,21
91:3,7 93:19
93:23 94:3
99:11 102:25
103:7,10
112:25 113:2
122:18,23
141:21 142:2,6
142:14 146:18
155:2,20 156:2
156:5 157:21
157:24 158:18
159:2,4 161:7
161:13 163:15
163:22 168:17
168:20 175:11
178:6,11,17
180:17,18
190:3 196:4
197:8 201:14
201:16 203:12
203:16,22
205:6 207:23
208:4,6 214:12
216:11,13
221:17,20

222:2 234:7,9
238:21,25
239:5,9 240:18
242:14,16
245:24 251:2
255:17 276:18
276:23 277:4
302:2 312:13
312:18 313:9
313:13,16
314:11,16,19
314:24 323:2,7
323:13,17
325:5

**rough** 203:17
203:18

**roughly** 12:21
30:12

**rounds** 108:23

**row** 309:15,22
309:25

**rpr** 324:3,20

**rule** 24:20
236:22 293:9
293:14 294:19
294:20

**ruled** 236:20

**run** 288:16

**running** 288:11

**s**

**s** 2:2 325:7
326:2 327:3

**[s.a. - says]** Page 60

**s.a.** 325:23

**safety** 14:2,4,6
14:6

**sake** 18:15
192:4

**samantha** 1:9
72:19 73:2,14

**sample** 184:2
307:10

**samples** 183:24

**sandrock** 1:9
17:7 21:6
63:13 73:15
77:22 78:24
80:5 87:25
89:18 91:5,15
99:14 101:25
109:2,17
110:19 117:20
119:2 120:3
122:3,25 126:6
127:4 131:2
133:22 134:7
134:15 135:8
137:3 138:11
143:21 144:6
145:11 151:4
166:25 173:15
179:2,10
215:18 227:17
227:23 228:18
235:11 238:9
244:7,18
249:19

**sandrock's**
10:6,11 60:21
64:20 117:7
123:25 131:17
177:17,22
187:2,5

**sara** 1:20 324:3
324:20

**save** 249:13

**saw** 101:11

**saying** 15:4
17:16 23:12
25:21 45:25
48:25 49:5,11
49:12,17 54:4
54:6 57:11,20
58:17 68:8
81:7 82:22
83:11 84:21
86:12 87:24
88:8 92:8,21
101:24 102:13
111:20,22
112:5,6 116:4
120:2,4 121:11
121:18 124:25
125:7 129:10
130:10 135:9
135:10,11
139:7,15 141:5
147:17 148:10
153:15 159:22
169:8 171:4,17
171:25 179:4

181:6,9,11,19
182:13 186:3
188:22 194:10
194:17 199:6
202:8 204:22
205:8 208:21
217:14 225:8
228:8,13
229:18,19
231:3 232:4,17
232:20,21
235:8,12
244:19 246:13
248:3 249:21
249:23 250:2,3
250:5,6 254:17
257:20 262:5
262:15,20,21
266:6,18 269:9
274:2,14
280:23 286:6
288:24 290:2
312:3

**says** 6:6 21:12
23:16 24:4
47:6 53:13,18
61:6 62:5,19
63:2,5,14
66:12,15,19,25
72:19,25 74:7
74:7,18,20
76:9 77:22
78:19 79:8
81:13,16,20

82:2,4,7,11,13
89:18,24 91:10
91:25 97:20
113:3,20 114:6
124:18 126:6
126:11 128:21
132:21 133:16
135:22 136:23
137:12 138:14
138:23,23
139:4 151:4
166:3 167:25
168:25 169:2
173:4,14,14
174:7,16
175:11 180:19
181:25 183:7
183:15 194:18
209:6 211:7
212:23 222:4
239:19 240:5
240:19 241:13
243:5 244:2,10
244:13 261:13
270:12 276:2,2
277:6,16 278:2
278:20 279:13
280:8,14,16,17
280:18 282:13
292:24 296:6
302:3 309:21
309:24 313:5
321:11,16

**[science - series]**

| | | | |
|---|---|---|---|
| **science** 162:25 | 66:17 69:19 | **seem** 54:25 | **sentence** 6:6 |
| **scientific** | 71:10 72:18 | 118:23 189:23 | 24:3,7 91:9 |
| 154:12,13 | 82:13 93:21 | **seemed** 73:5 | 92:22 97:20 |
| 162:2 164:7 | 99:3 101:22 | **seems** 8:21 | 108:12 109:24 |
| **scientist** 25:18 | 106:14 107:21 | 83:16 293:2 | 111:13 134:19 |
| 76:4 | 110:9,15,23 | **seen** 58:5,8 | 140:7 141:10 |
| **scope** 236:3 | 115:16 119:15 | 80:16,25 83:20 | 144:9 153:22 |
| 247:25 | 132:25 133:17 | 84:5,17 105:21 | 153:23 159:15 |
| **scrutinized** | 133:20 142:18 | 123:22 168:8 | 159:23 160:2,6 |
| 83:22 84:18 | 146:6 153:22 | 181:22 185:14 | 160:22 161:3 |
| **search** 114:8 | 157:6 164:20 | 185:17 216:15 | 161:16 163:5 |
| 304:15 | 164:22 167:24 | 222:20 251:12 | 165:24 168:25 |
| **second** 117:16 | 180:3 181:19 | 253:2 258:8,10 | 169:8,13 222:3 |
| 159:23 262:11 | 182:12 187:17 | 278:6 | 240:4 250:22 |
| 277:25 282:21 | 206:13 207:8 | **segregate** | 261:13 262:14 |
| 311:11 314:17 | 207:24 221:9 | 194:15 223:7 | 277:16 282:21 |
| 323:9 | 221:17 223:16 | **segregation** | 299:18,24 |
| **secondary** | 233:24 236:17 | 233:18 | 318:4 319:20 |
| 63:20 66:24 | 240:12,25 | **selected** 289:2 | **sentences** |
| 141:2 | 241:2 255:3 | **sell** 49:3 | 112:11 |
| **section** 6:7 | 276:16 277:5 | **sellers** 125:11 | **separate** 36:6 |
| 97:22 116:11 | 277:11 279:3 | **send** 286:14 | 82:14 108:17 |
| 241:10 312:23 | 281:10 283:9 | **sense** 83:18 | 109:14 154:3 |
| 315:2 | 283:12 284:6 | 84:15 95:22 | 167:8,21 |
| **sections** 315:11 | 285:5,10 293:7 | 128:12 180:19 | 211:23,24 |
| 315:14 | 294:9 303:10 | 181:3 302:23 | 213:9 216:3 |
| **securities** 33:25 | 305:14 312:21 | 302:24 | 219:13 |
| 34:9,19 39:17 | 314:2 315:3,12 | **sensitive** 74:2 | **separated** 66:2 |
| 40:6 42:18 | 315:16 323:17 | 74:22 75:16 | **separating** |
| 45:3 199:14 | **seeing** 56:8 | **sensitivities** | 274:11 |
| 326:11,16,20 | 69:20 212:4 | 286:13 | **september** |
| **see** 17:3 24:4,9 | 286:19 | **sensitivity** 5:23 | 247:17 325:9 |
| 36:22 49:11 | **seek** 65:17 | 181:7 182:22 | **series** 231:19 |
| 50:20 60:16 | 116:12 | | 263:14 |

**[set - sir]** Page 62

set 66:20 67:4
  114:2 150:5
  183:19 211:25
  216:5 227:5
  231:17 232:12
  249:15 324:6
  324:15
sets 136:6
  223:24 289:9
seven 72:4
  274:5 309:15
  309:25
seventy 210:24
several 68:20
  114:16 245:5
  251:7
severe 10:24
  13:25 14:6
  70:4 293:19
severity 264:14
  283:22 293:16
share 243:22
  315:5
shared 72:21
shares 67:20
  262:9
shash 1:4
  325:20 327:1
  328:1
shift 228:23,24
shifted 226:15
shifts 326:21
short 59:17

show 10:19,21
  24:12,14 25:14
  25:15 27:21
  28:18 40:4,7
  41:12 42:16
  53:9 63:18
  64:6 71:10
  99:2,17 116:10
  139:5 145:18
  145:19 146:21
  147:14 183:23
  183:25 192:17
  192:18 198:5
  198:11,18,19
  199:3,10 200:3
  200:19 224:5
  237:15 247:12
  258:15 266:20
  278:5 281:25
  284:19 307:22
showed 10:18
  66:20 139:11
  139:16 183:20
  188:6 246:25
  303:19 306:17
  322:23
showing 14:6
  57:19 200:4,4
  237:2
shown 82:15
  83:15 149:13
  194:13 197:19
  201:2 212:15
  278:20 285:3

shows 13:21
  63:25 230:18
  280:25 285:7
side 285:6
side's 207:3
sidestep 189:24
sideways 294:6
sign 22:19
signals 326:17
signature
  324:18
significance
  83:25 94:10
  129:5,15 263:3
  265:4 268:3
  291:9 302:9
  307:7,9,22
significant
  10:22 13:4,24
  39:23 40:14,21
  40:24 41:11
  43:15,18 55:7
  67:19 106:18
  129:3 132:15
  135:6 139:12
  146:11 202:13
  224:18 263:5
  263:11 264:8
  264:10,12,25
  266:21 267:14
  267:19 302:20
  302:22
silly 117:14

similar 64:5
  70:13 146:3
  148:21 149:10
  221:14 248:21
  264:18 270:23
  287:21 290:20
  298:11
similarly 1:5
  117:3
simple 11:20,23
  158:2 190:9
simply 16:5
  54:7 57:18
  92:8 117:5
  121:3 147:5
  171:2 186:3
  225:11 234:23
  244:19 249:18
  250:5 308:6,22
  320:10
simultaneously
  106:19
single 50:22
  64:25 107:7
  108:8 114:9
  120:21 121:5
  293:10 294:23
  309:6
sir 7:9 12:6
  29:21 30:7
  63:12 66:18
  115:4,12 141:8
  172:12,19
  174:20 224:14

268:20 269:10
269:25 274:13
276:17 283:10
285:9 291:21
292:10 293:8
294:25 295:3
296:13 298:18
304:24 312:25
315:8
**sit** 127:3
**sitting** 68:3
259:2
**situated** 1:5
**situation** 12:25
38:15 40:4
41:13 44:4
46:13 48:3,6
48:14 49:16,17
97:7 200:15
202:12 253:2
254:2,7
**situations**
254:5
**six** 47:10 61:15
62:7 72:6,10
72:23 112:24
210:24 243:17
274:5 277:5
308:12,18
309:19 310:22
**sixty** 72:4
**size** 307:10
**skeptical** 26:10
51:17 68:14,16

68:17 117:4
119:17,18,19
119:21 123:21
124:5,7 125:8
179:15 181:10
**skepticism**
27:11,14 101:8
101:19 102:6,8
104:12 105:23
120:19 124:11
246:15
**skeptics** 50:12
**skim** 29:23
**skip** 71:19
73:14
**skis** 216:18
225:23
**slander** 8:18
**slide** 66:10
240:8
**slides** 325:13
325:15
**slight** 294:15
**slower** 18:25
**slowly** 252:11
255:3 284:3
**small** 307:10,20
**sold** 124:20
**solely** 278:7
298:8
**soloway** 2:21
3:24 5:22 7:25
8:19 17:21
21:10 24:15

25:16 26:6
31:23 33:19
35:3,21 37:19
40:8 41:4,15
42:10 43:22
44:7 48:10
51:13 52:22
59:12 62:14
64:17 65:21
67:7,24 71:3
72:3 75:21
76:6 77:3
78:15 79:12
80:20 81:4
84:12 85:13,23
88:5 89:2,10
89:21 90:8,13
90:17,23 93:17
94:12,17 95:21
98:23 99:9,21
100:18,24
102:3,10,23
103:4 104:8,19
105:19 109:22
110:14 111:10
112:7,24
117:12,22,24
118:3 119:10
121:13,17
122:9,16,21
123:5,11 126:9
126:14,21
127:9 128:4
131:3,10 134:9

136:5 137:4
140:4 141:17
141:23 142:9
143:12 144:16
145:21 146:16
147:8,20 148:3
148:23 149:11
149:20 150:14
150:20 151:9
152:13,24
153:10,17
154:10,18,22
155:11,24
156:8,22 157:3
157:18,23
158:9,14,19
159:7 160:15
161:5,10 162:6
162:19 163:13
163:17 164:6
164:14 165:20
166:10 167:2
167:16 168:14
169:19 171:8
173:21 175:9
175:13 176:5
176:22 177:9
177:25 178:4,9
178:16,20
180:10,15
183:5 184:3
185:24 187:21
189:17,25
191:21 193:10

194:2,7 195:24 196:8 197:2 198:13,21,25 199:12 200:6 201:12 203:7 203:11,14,20 205:3 208:3 209:24 212:17 214:11,16,22 215:24 216:9 218:9,14,23 219:8 220:5 221:15 223:21 225:19 232:6 234:5 235:22 236:2 240:14 240:23 241:5 241:21 242:3,9 242:11 243:9 245:18,22 247:24 254:8 254:22 255:16 257:8 273:22 275:3,15 279:10 280:3 280:13 287:22 299:13 301:16 301:20 306:2 306:15,23 314:8,18 317:14 319:7 320:17 323:4

**somebody** 15:3 96:25 113:14

117:18 120:22 121:6

**somewhat** 83:17

**soon** 73:24 74:20

**sorry** 9:8,18 52:5 75:21 90:11 93:22 96:17 108:24 137:16 141:8 146:18 169:10 174:9 175:9 180:9 203:18 206:25 208:14 209:4 210:21 219:24 240:16 240:22 257:18 273:5 283:24 293:22 315:7

**sort** 84:7 125:6 211:13 212:25 213:11 215:10 215:16 226:24 271:14 272:3 294:13

**sorting** 272:8

**sound** 119:5 208:9

**sounds** 84:25 144:8 181:11 206:23 240:13

**speak** 39:21 40:12 43:12

73:8 148:15 200:13 209:9 209:13 284:2

**speaking** 30:13 155:14 209:22

**speaks** 94:20 258:4

**specialist** 296:24

**specific** 64:14 78:19 110:21 114:2,12,21 223:13,19 233:4 261:23

**specifically** 68:23 96:23 234:11 318:9 320:2

**specificity** 249:3

**specified** 63:19

**speculate** 179:3

**speculating** 77:15,18 179:4

**speculation** 62:15 77:17 78:16 80:18 81:2,6 102:11 106:11 176:23 185:13,16 187:11,20

**speculative** 205:17 304:4

**speed** 288:10 288:11

**spend** 8:7 165:13 267:7

**spent** 3:17

**spoke** 296:24

**staff** 5:4 252:4

**stage** 196:2

**stand** 135:21 154:9 167:10 286:5

**standard** 5:17 194:9

**standing** 177:22

**standpoint** 146:10

**stands** 18:17 70:21

**start** 12:4 114:10 129:9 138:12 148:7 150:10 201:19 210:23 238:3 251:25 262:14 319:13

**started** 225:8 242:2 243:3 271:21 309:10

**starting** 164:25 307:13

**starts** 23:3 116:10 133:2 285:11 287:12

| | | | |
|---|---|---|---|
| 293:25 | 96:5,12,15,18 | 173:22 175:12 | 306:9,12,13 |
| **stat's** 278:4 | 96:19,22,24 | 177:18 179:24 | 311:10 320:10 |
| **state** 3:4 | 97:7,11 99:13 | 185:3 187:2,5 | **statements** 5:6 |
| 107:14 208:23 | 105:2,5,9 | 187:16 188:7,9 | 8:16 9:15 |
| 282:22 | 106:6,23 107:4 | 188:16,23 | 27:20 28:17 |
| **stated** 7:22 | 107:15,18 | 190:12,17 | 29:2 33:3 |
| 51:11 149:3 | 109:20 110:6 | 191:2,6,19 | 34:24 35:19 |
| 245:6 279:22 | 110:11 111:21 | 195:2,22 196:7 | 36:20 38:19 |
| 319:3 | 113:22 115:17 | 197:12 200:10 | 50:14 74:11 |
| **statement** 6:9 | 117:11,23 | 200:16,19,21 | 88:6 98:3,13 |
| 7:12,15 9:10 | 118:5 120:24 | 201:7,10,19,25 | 98:18 106:13 |
| 9:14,22 10:3,6 | 121:7,8,10,12 | 202:2,17 203:2 | 120:9 129:21 |
| 10:11 17:13 | 121:15 123:10 | 204:7,10,14 | 129:22 133:12 |
| 23:3,13,15 | 123:25 130:6,7 | 222:12,19 | 133:14 140:14 |
| 25:11,12,13 | 130:9 131:8,18 | 225:8,18 | 154:16 186:5,7 |
| 27:19,25 28:12 | 132:19 133:6,8 | 227:18 228:10 | 187:3,9 190:6 |
| 28:16 29:13,16 | 133:22 137:11 | 229:9,10 230:5 | **states** 1:2 |
| 36:6,8,9,11,14 | 139:20 140:24 | 230:14,15 | 325:19 |
| 36:15 37:8,8 | 141:11 143:9 | 231:5 233:9,11 | **stating** 194:8 |
| 37:17 38:18 | 143:24,25 | 233:13 235:21 | **statistical** 7:7 |
| 39:3 40:23 | 144:5,23 145:4 | 235:24 237:17 | 11:15 31:21 |
| 41:6 43:9,16 | 145:8,8,11,12 | 237:20,23 | 32:8 62:10,11 |
| 46:5 48:8,15 | 147:6,7 150:17 | 238:5 241:4 | 84:22 122:2 |
| 49:18 50:24 | 150:18,24 | 242:18 245:7 | 129:15 135:5 |
| 51:2,4,12 52:9 | 151:2,8 152:4 | 245:15,16 | 205:12 228:18 |
| 53:4,16,23 | 152:7,21 153:4 | 246:19 247:8 | 245:9 247:11 |
| 54:10 55:2 | 153:7,15 154:5 | 249:25 279:8,9 | 263:2 265:4 |
| 59:3 60:19,21 | 154:8 155:5,8 | 279:16,23,25 | 267:9 268:3 |
| 61:2,21 64:12 | 155:23 156:6 | 280:5,11,15 | 283:11 284:6 |
| 75:8 76:25 | 157:14 158:3 | 281:9,20 | 289:10,14,22 |
| 79:22 84:2 | 158:17 159:5,6 | 297:25 299:23 | 290:5,12 291:9 |
| 87:25 91:14 | 164:12 165:16 | 300:3,10 301:5 | 302:21 305:12 |
| 93:12 94:23 | 165:23 171:6 | 301:6 302:11 | 307:7,9,22 |
| 95:7,14,19 | 172:14,16 | 303:7 304:19 | 317:6 |

**[statistically - study]**

**statistically** 39:23 40:13,21 40:24 41:11 43:15,18 55:7 106:17 109:8 121:2 129:3 132:14 139:12 263:5 264:7,8 264:10,12,25 266:17,21 267:13,18 274:19 290:22

**statistician** 30:14,17,18,23 31:6 32:5 52:5 57:9 173:18 226:10,17 227:2,4,8,20,22 228:3,5,7 230:24 231:22 232:15,18 246:22 248:14 252:17 269:18 269:21,22 270:13,14 271:19 274:4 303:10,14,17

**statistician's** 232:5 253:19 271:13 272:3 276:3

**statisticians** 84:6 277:9

**statistics** 57:10 57:13 96:8 184:5 250:8 261:18 262:19 262:23 263:19 265:19 266:13 272:14 283:21 291:15 294:11

**status** 6:15

**stay** 125:17

**staying** 214:7,8

**stems** 272:19

**step** 61:11 62:2 131:19,20

**stick** 284:15

**stifel** 83:15,24 83:25 84:10,14

**stock** 5:7 33:11 34:5,7,18,20 35:14,15 36:23 38:3,6,9,21 39:6,11 40:25 41:8 47:14,16 48:5,16 49:9 50:6,15 55:10 55:15 56:18 67:20,23 111:25 113:4 117:6,8,10 184:12,15,22 186:13,15 187:7 200:17 201:8,11 202:15 203:6

211:8 240:11 240:20 253:4 256:10,10,17 256:18 264:20 266:21 273:21 281:18 283:13 284:7 285:7 295:8,16,18 296:2 317:3,11

**stock's** 45:24

**stocks** 256:13

**stop** 193:15

**stopped** 69:9

**stops** 100:2 293:25

**stories** 26:8

**story** 199:19

**straight** 213:16

**straightforward** 173:8,11

**strategically** 307:24

**stratified** 133:18

**streetevents** 325:17

**stressing** 294:11

**stretch** 107:3

**strike** 174:5

**striking** 253:13

**strong** 81:19 107:19 109:20 186:20

**stronger** 20:4 183:23

**structural** 216:21

**struggling** 16:13 231:5 265:22

**studies** 63:16 82:20 91:20 96:9 108:18 109:15,15 140:2 177:13 182:23 219:3 244:11 254:11 281:22,25 317:7

**study** 12:11,11 12:14,14 18:6 20:8,9,13,21 21:2,7,17,23 22:11,13,14 23:6,17 26:23 59:4,8 63:17 63:22 69:25 91:18 98:4,5,5 109:3,6,18 110:17,17,18 110:20 128:16 138:16 139:5 170:12 174:12 174:19 175:5 175:24 176:18 177:8 179:25 211:4,6,7,22

**[study - successful]**

217:16 221:9 224:22

**stuff** 42:8 205:2 278:16

**subgroup** 6:10 6:12,13 13:5 13:20,25 14:3 16:8 28:22 55:13 56:2,19 57:2,5 58:6,8 58:21 59:14 77:13,19 80:11 80:16 83:16 85:18,21 86:13 87:3 92:6,18 98:7 99:16 101:3,4,5 105:22 116:4 116:15,20 118:2 119:4,18 120:13,16,19 127:25 129:12 130:18 143:7 166:8,24 167:14 169:3 169:16,17,23 170:3,6,14,18 170:20 171:6 171:20 172:2,3 172:11,16 176:9,14,15,18 177:6,12,14,16 179:6,13 181:17,20

182:6,12 188:2 190:13,15 191:18 194:25 197:11 203:4 203:24 204:9 204:15 212:12 212:13 222:6 222:24 223:7 224:5,21 226:14,21 227:25 229:20 230:17 231:3 233:4 234:10 234:24 235:9 235:16 241:19 245:13 246:5,7 247:16 248:11 249:17,24 250:5,12 261:18 262:19 262:23 263:19 279:25 280:24 283:3 304:12

**subgroup's** 249:19

**subgroups** 6:14 6:19,25 16:14 27:12 29:11 51:17 55:22 58:23 62:11 73:21 74:9 83:2 87:19 88:4 92:14 98:11,16,21

99:20 100:10 102:15 118:14 118:25 119:24 127:24 130:15 160:18 167:8 168:3 172:4 175:18,19 183:21,23,25 184:18 185:14 185:15 187:16 205:10,11,14 205:19 222:13 225:25 226:3 231:13 233:19

**subheader** 269:12

**subject** 80:12 81:24 243:8 278:3

**subloop** 319:24

**submission** 3:18,19

**submit** 66:14

**submitted** 4:5

**subscribed** 328:16

**subsequent** 61:3 259:23

**substance** 67:12,14

**substantial** 10:20,22 104:4 105:16 106:8 143:7 166:7

**substantive** 136:3

**substantively** 39:9 298:10

**substitute** 128:25 129:6 129:19 131:17 132:7 136:11 136:14 137:8 142:20,23 143:11,14 144:14 145:17 146:10,13,24 147:3,18,25 148:5,6,21,25 149:24 150:7 151:8 155:9 164:13,22 165:18 166:3 166:12,18,24 167:13 218:13 218:21 219:6

**substitutes** 129:25 130:5 190:7

**substitution** 136:8

**subsumed** 296:4

**success** 69:8 271:9

**successful** 12:15 20:12 109:15 139:8

177:23 207:19 214:9

**sudden**  293:18

**suddenly**  116:4 228:2

**suddenness** 264:14 283:22 293:16

**suffered**  10:24

**sufficient**  12:13 12:15,17 24:13 24:18 25:8,15 25:22 26:4,14 27:21 28:18 73:11

**suggest**  82:8,15 82:18 127:3 193:4 205:22 255:4

**suggested** 203:3 217:22

**suggesting** 17:19 49:21 81:13,18,18,20 81:25 82:21 147:15 160:5,7 177:2 179:20 217:11 222:11

**suggestion** 283:2

**suggests**  82:10

**sum**  64:5 67:12 67:14 313:6

**summarize** 249:6

**summarizes** 84:7 165:12 239:22

**summer**  206:22 208:10

**superiority** 145:3

**supervision** 4:12

**support**  4:11 15:11 18:7 21:14 23:7,18 23:20 26:11 63:7,23 64:16 81:14 82:4,8 82:10 91:19 105:25 110:2 113:17 119:22 123:18 130:24 130:25 131:2 138:17,20,24 139:16 140:8 146:2 238:15

**supported** 26:20 85:19,22 86:14 103:14 107:16 113:24 116:16 120:13 237:23 238:6,8

**supporting** 51:18 222:25

**supportive** 15:4,8,22 16:22 17:17,20 19:12,17,18,21 19:22 20:3,14 20:19,23 21:3 21:8,24 26:22 83:17 97:25 101:20 104:13 104:17 105:3 106:25 108:4 116:5 121:23 121:25 122:4 123:2 130:11 134:2,6,8 135:12,13,13 173:15 174:8 174:14 176:16 176:19,21,25 177:4,7 179:14 179:18,21 180:25 181:2,8 182:24 183:3,4 183:8,11,15,17 188:14 224:21 253:15

**supports**  14:21 118:21,22 182:4

**suppose**  10:17 22:10,16 35:25 36:5 43:13,14 46:13 51:8 55:9 64:19

183:19 203:23 204:5,19 212:22,24 220:25 225:7 226:6,8,14 274:23 275:6 288:10 289:6

**supposed** 231:11

**supposedly** 131:22

**sure**  4:2,17 16:17 28:24 45:6 49:22 53:3 58:10,12 63:14 85:17 87:3 89:18 90:24 97:5 101:15 109:11 128:17 133:14 141:3,4 142:4 179:6 182:15 210:25 211:4 214:23 218:15 246:15 252:16 252:20 254:4 255:11 258:21 264:3 270:5 271:11 273:2 275:7,9 287:24 288:21 290:11 294:4 299:17 307:13 308:20 310:15 319:9

**[surge - teachers]**

**surge** 256:5
**surmise** 274:19
**surprise** 57:4
  92:14 304:5
**surprised**
  232:22 304:12
  305:2
**surprising**
  278:22 279:14
  280:9,18 281:2
**surrounding**
  261:20 263:20
  263:22
**surveyed**
  296:17,21
**suspect** 176:8
  176:13 233:22
**suspicion** 58:24
**suspicious**
  28:21 57:25
  58:4,4
**svb** 296:16,23
**sworn** 3:3
  324:6 328:16
**syllogism**
  227:10
**system** 215:12
**systematically**
  77:12

**t**

**t** 325:7 326:2
  327:3,3

**tabak** 5:12,17
  5:21 27:15
  44:12 45:6
  54:18 55:6
  77:4 108:13
  115:21 124:14
  124:25 140:11
  146:4 194:18
  250:19 251:13
  261:14 262:15
  267:5 270:23
  286:5 307:14
  318:10 321:11
**tabak's** 45:10
  125:10 235:18
  307:5 317:22
  318:6
**table** 220:8
**tables** 113:18
**take** 7:3 11:13
  33:5 49:22
  59:16 62:2
  69:18 74:10,13
  79:3,4,16 85:2
  85:8,10 86:10
  86:15,20 88:10
  88:13 91:22
  103:8 104:24
  127:12 136:9
  136:16 141:24
  141:25 142:3
  144:13,23
  149:22 155:10
  161:8 168:7

  178:14 190:10
  190:18 193:21
  218:4 221:20
  225:5 231:15
  256:2 265:19
  266:19 288:13
  289:6 290:2
**takeaways**
  239:23
**taken** 1:18
  11:21 59:20
  85:20 86:12
  88:9 142:12
  161:3 221:23
  251:18 255:21
  301:23 323:11
**tale** 326:9
**talk** 17:6 27:16
  37:25 77:9
  86:7,8 94:7
  107:9 111:24
  122:11 135:25
  148:15 166:16
  168:3 169:24
  170:2 216:17
  223:24 249:2
  257:24 260:10
  262:25 286:15
  286:17
**talked** 31:13
  105:9 157:5
  170:7 171:12
  176:9 235:3
  300:6 320:5

**talking** 31:9,20
  31:22 41:2
  52:17 83:12
  86:22,23 92:11
  93:7 102:20
  127:14 135:14
  153:21 160:8
  175:17 190:21
  194:11 196:3
  198:22 205:5
  209:13,21
  211:18 214:17
  219:11 231:11
  236:4 244:14
  244:20 275:20
  284:23
**talks** 84:20
  97:13 173:15
  188:11 306:9
**tape** 134:18
  250:23
**target** 277:16
  277:22 278:14
  308:13,16,24
  309:11,19
  310:3,10,12,21
  311:7,7,20
  312:12 313:3
  315:22 316:3
  316:15
**targets** 308:2
**teach** 218:10
**teachers** 81:22

**[team - things]**

**team** 113:8,17 114:8,15,19,21 115:8 278:4 310:14 316:8

**technical** 30:24 212:5 252:7 253:10

**tell** 8:25 17:14 73:7 76:21 87:11 101:2 105:3 106:12 122:14,19 125:2 142:23 155:4 157:16 168:8 169:11 195:18 196:22 276:4,5 289:15 291:25 292:18 309:18,24 310:9 311:4,20

**telling** 65:5 100:17,22 125:8 136:6 156:19 157:15 161:2 178:11 179:10 196:12 218:8,20 290:16 322:17

**tells** 264:21

**ten** 288:14

**terence** 72:10 72:12

**term** 6:21 9:13 12:5 15:2 45:2

45:5,7,13,17 128:13 130:24 130:25 131:2 134:5,7,12 137:13 148:6 148:16 166:13 185:25 209:12 238:7 262:6

**terminology** 9:5

**terms** 31:8 120:8 125:14 174:24 243:22 247:14 265:18 277:7 306:8

**test** 27:17 28:11,14 31:10 31:15 32:3 38:20 41:7 118:10 119:25 184:16 250:7 283:12 284:6 289:10,14,16 289:19,20,22 290:5,12 291:4 311:15,22

**testable** 118:15 171:18

**tested** 169:21 282:3,14

**testified** 3:5 206:18 207:6 208:20

**testify** 207:9 242:7

**testifying** 152:20

**testimony** 52:23 100:19 162:7,8,13 194:23 199:13 232:7 273:23 324:8 328:10

**testing** 38:3 184:20

**tests** 5:15,16,17 5:18 31:11 57:11,17,18,24 188:11 205:11 283:18 311:25

**text** 277:6 284:24

**thank** 239:14 312:20 323:15

**thanks** 90:19 323:16

**thau** 2:22

**theirs** 81:7

**theories** 34:11

**theory** 41:24 116:24 124:10 124:11,12 125:13 155:16 155:17 201:9 235:18 251:25 252:2,10,13 255:4,5 257:13

264:21 270:21 270:21 272:13 291:9

**thesis** 11:8 12:4 12:5,9,20 13:10 14:8,20 16:4,10,11 17:20 25:24 55:14 65:20 67:6,10,13,16 85:19,22 86:14 105:6 106:10 106:25 107:16 113:25 119:5 123:3 127:8 171:7 172:18 175:8 176:3 230:17,19 233:6 234:14 237:24 238:6,8 238:10 281:3,6 306:21

**thing** 13:7 20:22 54:14 76:9 82:17 90:18 94:24,24 100:5 121:19 211:9 214:21 220:2 221:13 231:14 258:3 294:5 295:4

**things** 5:5,25 8:24 18:4,9 30:12 32:13

**[things - three]**                                                    Page 71

62:18 73:21
74:8,17 78:19
87:14,16 96:9
130:15 146:3
191:2,11
193:21 205:10
205:12 207:19
212:2 216:6
228:14 252:19
253:12 275:21
290:19 321:9
321:21
**think**  10:7,8
12:5 14:11
15:18 16:25
17:11,12 18:2
20:8,23 22:6
26:12,23 27:10
27:23 28:19
29:14 30:11
32:3 39:7
42:16,20,25
45:6,15,17
48:21 49:13
50:5 51:8 53:7
56:6,12,13
57:11,16,22
58:24 63:15
64:9,12 74:11
75:10 76:24
77:13 82:3
85:12,14 86:3
87:7,20 88:15
88:20 91:10

93:10,11 98:25
99:9 100:5
101:17,23
102:4,19
105:22 106:11
107:2 108:7
111:5 116:2,23
117:18 119:17
120:11,18
121:24 123:9
123:13,17,21
126:17 128:9
130:17,20
131:15 132:12
133:13 135:20
137:24 140:8
141:13,16
142:24 143:19
144:4,5,22
146:9,12
151:10,16
152:15,17
153:13,19
154:2,5,8
156:11 159:23
159:24 164:24
165:11,25
166:13,20
167:25 169:7
169:22 171:5
174:25 176:24
179:4,13,14
181:18 182:15
183:8 184:13

184:24 186:25
187:12 188:8,9
190:23 191:10
192:6,9,10
193:12,13,19
194:12 195:14
195:15 197:14
197:18,25
198:22 199:9
202:19 203:5
204:13,15
208:4,16,21
212:23,25
213:10 214:5
215:4,20,23
217:14,22
218:8 231:8
233:16 236:7
242:21 244:24
245:2,20 246:4
246:9 250:3,8
250:16,21
251:23 252:9
252:11,13
254:6 257:12
257:22 261:25
267:4 271:15
278:9 280:14
284:14 286:18
286:24 287:7
287:25 288:5
291:6,7 295:7
298:25 303:18
303:23 304:5

306:3,4,24
310:24 319:10
321:20
**thinking**  11:23
233:15 296:19
297:6
**thinks**  15:17
**third**  23:3
66:11 113:13
125:18 240:4,5
241:9,12
**thirty**  112:24
142:5 303:20
**thomson**
325:16
**thorough**  277:7
**thought**  18:14
19:8,11 35:5
44:21 45:13
50:25 51:10
56:25 99:5
100:7 106:2
149:14 151:11
151:17 170:20
180:2 202:11
204:13 205:16
215:12 220:25
234:18 238:12
321:11
**three**  4:16,19
4:25 31:8,16
63:16,19 111:3
139:6 140:23
184:24 195:8

**[three - true]** Page 72

| | | | |
|---|---|---|---|
| 221:3 244:2,11 | 289:2 291:24 | **took** 111:15 | 203:17,18 |
| 249:15 251:18 | 294:21 299:22 | 127:16 161:22 | 207:25 242:24 |
| 251:18 285:8 | 300:2,11 | 183:19 251:7 | 243:13 259:21 |
| 285:15 287:16 | 301:22,24 | 253:2 | 259:23 321:15 |
| 288:17 291:24 | 303:12,16 | **top** 89:24 90:6 | 322:6 325:11 |
| 295:3 296:23 | 308:16,23 | 175:23 312:4 | 325:17,22 |
| 297:3,20 299:4 | 317:22 318:11 | **tortured** 86:17 | 328:5,10 |
| **thrill** 292:17 | 323:10,12,16 | 87:4,8 | **transmodify** |
| **thrilling** 292:15 | 323:17,18 | **totality** 134:4 | 183:16 |
| **throughs** | **times** 139:9 | **totally** 47:7 | **travels** 252:15 |
| 326:13 | 152:17 163:19 | **traceable** 39:24 | 252:21 |
| **thrust** 145:10 | 274:5 289:9 | **tracked** 73:3 | **treat** 109:19 |
| **tight** 215:12 | 317:23 318:12 | **trade** 282:7 | 296:22 |
| **time** 3:16 8:8 | 320:5 | 298:4 321:4,6 | **trial** 78:23 79:3 |
| 22:5 30:25 | **timing** 253:7 | 321:7 | 86:7 88:23 |
| 34:5 36:12 | **title** 239:17 | **traded** 298:11 | 286:20 |
| 47:16 59:19,21 | **today** 45:13 | **traders** 34:10 | **trials** 62:13 |
| 62:2 68:13 | 68:4 72:20 | 321:2 | 71:5 93:6 |
| 70:19 73:23 | 73:5 79:24 | **trading** 34:20 | 175:25 |
| 76:10,11 99:25 | 171:12 259:2 | 35:15 251:18 | **trick** 285:18 |
| 102:20,24 | 311:24 | 253:3 256:13 | 308:20 318:14 |
| 116:7 117:3 | **together** 214:7 | 260:23 261:6 | **trigger** 101:21 |
| 121:23 141:18 | 214:8 | 266:5,19 269:3 | 101:21 257:3 |
| 141:20,22,24 | **told** 17:13 19:3 | 281:16 | **tristan** 30:18 |
| 142:11,13 | 27:24 55:11 | **traditional** | 31:3 32:7 |
| 182:4 189:12 | 87:13 100:3,9 | 283:20 | **trivially** 298:9 |
| 206:8 221:16 | 108:6 119:12 | **training** 255:13 | 298:13 |
| 221:22,24 | 124:6 136:2 | **transactions** | **trouble** 32:4 |
| 224:13 263:7 | 149:5,6,8 | 34:9 | **true** 23:10,11 |
| 263:10 266:24 | 151:20 155:15 | **transcript** | 24:20 34:4,6 |
| 285:12,16,22 | 158:22 194:5 | 52:13,15,17,18 | 34:22 35:17 |
| 286:7,17,23 | 202:14 285:19 | 60:2,3 61:8 | 36:10,11 50:11 |
| 288:13,16,17 | 304:17 314:6 | 62:19 90:4,12 | 51:5 52:11 |
| 288:19,25 | 322:8 | 91:2 111:22 | 54:6 67:21 |

88:11,13 97:12
108:8 109:13
111:12,13
117:23 150:18
152:8,22 153:4
153:8,13
154:16,20
155:6,23 156:6
156:21,25
157:14 158:10
161:19 162:13
187:16 190:14
191:24 195:19
213:5 216:20
225:4 249:9
254:17 267:22
272:13,13
275:18 297:17
297:23 298:9
298:10,13,15
301:6 305:14
311:2 324:7
328:9
**truth** 55:11,12
100:17,22
144:15 149:5,6
149:9 179:10
202:14 217:10
217:12 221:3
231:18
**truthful** 128:24
129:6,18,25
130:5 131:16
132:7 136:3,10

136:13 137:7
142:20,23
143:10,14
144:23 145:17
146:10,13,24
147:3,18,24
148:5,5,21,25
149:23 150:7
151:8 155:9
164:13,22
165:18 166:3
166:12,18,24
167:12 190:7
218:13,21
219:5
**truthfully**
242:7
**try** 28:25 44:16
89:2 106:14
125:20 126:3
135:3 142:22
147:11 189:22
237:25 322:14
322:19
**trying** 10:2
11:24 15:16
19:15 20:25
25:21 42:24
65:23 83:24
109:24 110:24
141:7 150:4
151:16,18,23
151:24 167:6
168:2 171:3

179:9 201:22
202:7 219:14
228:11 230:3
230:11 231:8
240:22 248:6
252:12 262:13
271:3,8 290:11
290:23 320:21
**turn** 132:23
168:15 190:2
192:3 220:7
**turns** 47:8
**two** 17:23
19:18 20:4
30:11 36:6
38:24 49:4
82:20 99:25
106:19 108:7
108:17 109:14
113:11,12
114:17 117:15
127:24 153:23
158:4 159:9
198:22 208:24
209:7 216:16
237:18 242:12
249:8 254:15
254:19 289:9
289:11 290:6
293:11,12
294:2,22
303:20,21,25
304:7 309:23
312:24 313:18

314:3,6 315:11
326:9
**type** 124:19
149:10 306:14
306:18
**typical** 75:14
303:2
**typically** 15:13
73:20 74:8
182:11 199:14
254:16 267:25
**typographical**
34:25 35:8

**u**

**u** 3:2
**ubs** 296:16,22
**ultimate**
228:25 229:2,7
229:7,16,24
247:8 248:5,9
248:19 266:3
271:4,8
**ultimately**
26:11 70:20
261:21 263:21
**umatt** 76:22
**umer** 72:22,25
73:16 76:22,23
99:14
**unable** 40:6
292:12
**unanticipated**
302:18

**[unapprovable - using]** Page 74

| | | | |
|---|---|---|---|
| **unapprovable** 11:2 | 165:12 166:21 218:19 223:22 | **undying** 249:9 | 316:3 325:13 |
| **unbalanced** 31:5,7 | 226:12 228:12 230:3,12,12 | **unfavorable** 246:12 | **updated** 276:14 277:13 278:12 |
| **unblinded** 188:11 | 231:5 258:16 316:7 322:9 | **uniformily** 176:19 177:7 | **updates** 302:7 302:13 |
| **unblinding** 31:11 250:9,11 | **understanding** 7:13 9:20,24 | **uniformly** 58:9 176:15,20,25 | **ups** 292:14 **upside** 315:10 |
| **uncertainty** 83:5 261:19 | 10:13 12:22,23 20:11 40:9 | 177:3 180:25 181:2,21 | **use** 6:21 9:11 9:13 15:2,13 |
| 263:20,22 269:17 298:21 | 95:11 109:5 145:23 148:24 | **uninformative** 220:19,20 | 96:8 120:8 125:18 130:24 |
| **unclear** 169:13 | 149:12 167:4 | **united** 1:2 325:19 | 131:7 134:7 136:2 137:12 |
| **under** 4:11 34:18 73:24 | 194:23 205:7 205:23 220:6 | **unpack** 237:25 256:15 300:17 | 137:12 148:16 151:13 209:11 |
| 74:21 113:8 177:4 242:6 | 222:15 223:14 225:3,20 | **unpersuaded** 223:4 | 238:7 262:6 288:25 |
| 324:5 | 226:23 227:7 228:15 238:11 | **unrelated** 119:20 195:9 | **used** 9:5 12:5 31:15 45:13,17 |
| **underlying** 113:18 123:22 | 253:23 260:3 265:17 273:24 | 195:11 204:19 211:12 | 124:23,24,24 125:11 130:25 |
| 179:20 | 283:16 287:24 | **unsuccessful** 214:10 | 134:12 145:12 146:4 207:16 |
| **understand** 6:8 8:21 11:3 | **understood** 103:14 104:3 | **unsupportive** 173:20 174:17 | 244:25 283:17 293:9 294:20 |
| 18:10 19:16 22:21,22 24:10 | 104:10 105:15 106:6 129:11 | 174:18,22 175:2,7 176:2 | **useful** 124:12 **useless** 322:24 |
| 25:6 37:2,6,14 42:25 52:25 | **undisclosed** 98:7,11,16,21 | 304:12 305:2 | **uses** 131:2 307:14 |
| 53:13,19 55:20 55:21 75:11 | 99:20 104:4 105:11,12,17 | **upcoming** 273:11,19 | **using** 15:12 95:13,23 134:5 |
| 83:24 88:18,20 88:24 103:20 | 106:24 111:8 111:14,18 | **update** 65:12 308:13 309:19 | 185:20 219:2 287:3 289:4,18 |
| 105:4,4 128:21 138:8 141:7 | 183:9 219:19 | 310:4,13,21 311:8 313:3 | 290:7 294:9 |
| 146:17,19 | | | |

**usually** 74:4

**v**

**v** 325:21,23
**vacuous** 202:2
**vacuum** 158:20
**vague** 40:16
  94:13 319:8
**vale** 206:12,14
  206:16 207:10
  210:8 212:3,22
  213:14 215:4,8
  215:12 216:7
  216:10,11
  220:17,23,24
  221:13 226:24
  325:23
**valid** 289:14,21
**value** 34:4,4,6
  34:21 35:16
  51:7 55:4 65:3
  94:21 100:8
  110:7 111:23
  118:24 124:20
  169:23 170:15
  170:22 180:4
  190:10 201:4
  209:15,23
  213:7 221:8
  227:16 229:14
  229:15,17
  281:15
**variability**
  307:10,21

**various** 62:11
  84:8 193:8
**vary** 140:22
  272:7
**vast** 73:10
**veracity** 49:20
**verbatim** 144:6
  144:13 151:13
  165:23 300:21
**version** 87:5,13
**versus** 8:14
  22:15 61:13
  205:10 243:14
  283:14 284:9
  284:12,20
  293:11
**video** 1:16
**videos** 255:7,10
**view** 31:17 46:3
  55:23 86:19
  88:10 107:18
  113:23 114:4
  130:8,10
  132:22 160:12
  160:14 171:13
  181:20 183:18
  184:5,19
  187:24 191:5,5
  225:2 226:22
  228:18,20,22
  230:23 232:5
  232:23 236:6
  238:12 246:3
  264:4 270:9

  271:13,14
  272:2,3,11
  274:10 277:7
  277:13 278:12
  282:18 295:10
  306:4 313:3
  320:22,25
**viewed** 97:25
  129:13 195:11
**views** 28:8
  207:17 215:11
  254:21 269:18
  269:21,22
  270:3,13,18
  276:14 299:20
  300:7,8,20
  303:3 317:6,13
  317:18,19,19
**visual** 291:13
**visually** 290:21
**volatile** 265:7,7
**volatility** 256:5
  261:17 262:7
  262:10,18,21
  262:24 263:12
  263:14,17
  264:13,14,17
  264:18,20
  265:5,6,15
  266:5 268:17
  268:23 270:19
  272:15,18
  274:12,17,18
  283:6,13,17,20

  284:8 288:6
  289:4,19
  290:17,20
  291:5 292:3
  317:2,10
**volume** 256:4
  319:14
**vote** 219:18
  228:25 229:2
  232:23 259:11
  259:12,16,18
  259:19 260:15
  261:21 263:22
  263:23 264:2
  268:18 269:8
  272:25 273:11
  273:18,20
  275:2,14
  295:23 296:21
  298:20 303:25
  305:8,9,20,22
**votes** 220:11
  221:11 298:23
  303:13
**voting** 220:13
**vounatsos** 1:8
**vs** 327:1 328:1

**w**

**w** 1:9 4:23
  89:17 91:5
**wait** 49:5 79:2
  161:10 240:14

**[walk - wholly]** Page 76

**walk** 42:22 53:10
**walked** 120:12
**wall** 275:24
**want** 3:11,24 11:12 19:3 38:2 45:7 46:23 49:7,9 60:10,18 61:6 70:8,10,18 74:2,23 83:3 87:21 88:18 90:23 103:6 111:22 127:2 127:11 131:9 138:8 142:22 144:18 145:18 150:9 151:20 154:23 155:2 155:12,13 157:13,25 158:8,25 159:2 165:12 178:22 182:12 192:3 193:17 208:11 219:19 227:8 242:11 243:3 249:13 250:18 258:15,16 281:25 314:9 318:25
**wanted** 7:2 29:4 64:23 70:14 116:3

191:4 197:15 207:17 210:10 256:25
**wants** 146:5 171:17
**warranties** 125:21,22
**warranting** 128:6
**warranty** 79:9 125:25 126:12
**waste** 99:25 102:20
**wasting** 141:20 141:21
**watch** 255:10
**way** 14:14 16:9 16:10 19:4 28:2 29:6 33:2 35:7 36:3 37:12 40:17 44:8 54:7,23 55:18 56:21 57:14,21 59:15 61:25 64:18 65:6 79:14 83:4 86:3,5,5 86:19 87:7,23 103:17 105:20 109:12 115:21 118:5 122:6 125:17 128:22 140:6 144:21 149:17 152:11

161:22 162:11 163:9,21 164:4 179:8 181:22 182:14,18 184:5,23 188:23 191:2 203:8 204:21 209:11 211:23 220:24 227:12 232:24 233:14 233:15 236:7 238:20 241:25 247:9 254:3 257:3 263:8 266:4 267:24 279:7,11,22 281:10 286:14 289:12 298:12 299:7 304:19 310:18 313:7 324:12
**ways** 38:22,24 78:22 125:20
**we've** 19:25 83:20 84:16 140:12 152:16 164:24 171:11 172:22 211:17 222:23 238:17 248:18 265:24 268:24 279:7
**weaken** 186:11 186:15

**weakened** 186:5,8
**weaker** 58:9,11 58:13 183:25
**weather** 216:22
**website** 29:19
**week** 238:18 297:24
**weekend** 260:20 261:5
**weigh** 317:5
**weighed** 269:18 274:25 275:13 303:10
**weighing** 317:13
**weight** 231:22 232:14 271:16 272:6
**weighted** 257:10
**weiss** 2:17
**welcome** 217:25
**wells** 309:7
**went** 55:21 195:6 267:5 282:2 304:21 309:11
**wet** 146:22
**wharton** 2:17
**whereof** 324:14
**wholly** 229:25

**[widespread - yeah]**

**widespread**
101:7 120:18
**winning** 124:17
**wish** 24:25 70:8
**witness** 1:17
59:18 65:11
72:5 89:12,23
90:19 91:6
93:21 94:2
103:5,9 141:19
142:5 158:12
168:19 194:8
207:16 209:7
210:25 221:19
238:23 239:3
240:15 277:3
301:18 313:11
314:23 323:15
324:5,8,14
325:4
**wolfe** 52:17
238:22 239:10
239:15 240:19
244:2 326:4
**wondered**
61:13 62:5
243:15
**wondering**
68:18 140:13
183:16 213:18
**woody** 252:14
**word** 12:2 15:5
15:14 74:10,13
112:9,10,13

131:7 138:19
140:8 148:4
185:20 242:12
242:13 308:7
**worded** 9:2
**words** 6:24
12:8 15:9 19:5
19:19 21:11
25:5 35:14
39:7 52:19
67:16 69:16
76:19,20 79:8
106:4 110:5
114:3,9 118:13
119:7 125:6
132:4 147:12
148:5,11
155:24 158:20
164:20 227:21
250:4 290:7
293:17 311:18
**work** 22:3
39:13 41:21
42:13,14,25
43:11 46:10
47:21 77:10
92:25 104:23
112:17 113:17
114:25 115:6
117:16 118:10
118:16 122:10
122:12,13,14
122:20 127:17
247:11 256:22

286:14 298:12
**worked** 4:14,16
4:20 5:2
127:19 139:15
**working** 4:18
13:2,3,9,22,22
61:7,9 218:5
243:4
**works** 3:13
12:18 112:5,6
112:9,16 127:8
139:11,13,16
182:15 227:13
**world** 22:16
100:7 148:17
148:20 149:2
149:16 150:8
209:11,13,22
210:4,5 211:19
217:9 219:6
231:10 282:18
**worried** 177:11
177:13,16
**worry** 77:23,25
**worse** 193:20
195:12
**worsening**
278:8
**worth** 11:11
117:14 193:12
257:14 298:2
307:18
**wound** 119:15

**wrapping**
37:25
**write** 47:12
76:19 78:21
85:5 296:15
313:22 315:4
**writes** 61:22
**writing** 119:16
248:16 253:9
319:13
**written** 256:4
270:25
**wrong** 9:17
87:6 90:18
99:4 100:20
166:2 190:25
202:9 267:6
**wrote** 74:18
138:5 165:8
169:12 278:17

| **x** |
| --- |

**x** 1:4,11 212:21
212:23 213:5
325:2,7 326:2

| **y** |
| --- |

**y** 212:21,24
213:5
**yeah** 24:9 25:4
34:16 49:14
53:22 55:12
65:25 93:9,21
96:2 116:5
130:7 142:3

**[yeah - zero]**                                                                 Page 78

144:11 149:18
156:17 168:13
200:24 221:20
236:6 243:7
247:6 252:22
258:13 275:5
284:2 305:7
**year**  206:17
243:24
**years**  73:4
**yesterday**  49:2
311:20
**york**  1:20,20
2:7,7,20,20 3:4
206:17

**z**

**zero**  285:12,23
286:8 287:19

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.