# EXHIBIT 3

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN, <br><br> Defendants. | CASE No.: 1:21-cv-10479-IT |

# EXPERT REPLY REPORT OF DAVID I. TABAK, PH.D.

## I.    SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   This report concerns a federal securities class action involving Biogen Inc. ("Biogen").  On June 25, 2025, I submitted a report ("Tabak Report") in this matter.  I was deposed on July 29, 2015 ("Tabak Depo.").  On September 10, 2025, Glenn Hubbard submitted a report in response ("Hubbard Report").  Dr. Hubbard was deposed on October 17, 2025 ("Hubbard Depo.").

2.   Counsel for Plaintiffs in this matter have asked me to respond to the Hubbard Report.  My analysis here incorporates the Tabak Report, and any terms defined in that report may be used here with the same meaning.  My conclusions are summarized below and discussed in more detail in the remainder of this report.

3.   As a general overview, Dr. Hubbard provides illogical and contradictory views for the four main areas of his opinion that render the bulk of his analyses irrelevant to this case.  I define those four areas as: (a) the nature of the allegations, (b) front-end price impact, (c) back-end price impact, and (d) the ability to calculate damages using a class-wide methodology.

   a. With respect to ***the nature of the allegations***, the First Circuit Opinion stated, "Thus, by failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the complaint plausibly alleges that Defendants' omission misled investors."[1]  However, in his deposition, Dr. Hubbard repeatedly argued that the allegations did not relate to all data or to subgroup data, but merely to the material that Dr. Sandrock mentioned in the sentences leading up to the All Data Statement. For example: "I told you my version, which is English.  He listed a few things and said all data are consistent, meaning all those things.  You meant all data, that's what you say in the complaint, which would necessarily include the subgroups as a matter of English.  I think that's poppycock."[2]

   b. Then, turning to ***front-end price impact***, even though Dr. Hubbard claims to sometimes test Plaintiffs' view (i.e., that the All Data Statement included subgroup analyses), he again misses the mark, arguing that Plaintiffs' view is that all data "supported efficacy ***or approval***[.]"[3]  Dr. Hubbard then argues that analysts did not believe this version of the All Data Statement (i.e., there was no front-end price impact because the statement was not accepted by the market when made).  Thus, Hubbard Exhibit 5 ("Analysts' Commentary After the July 22 Statement and Prior to the Release of the Massie Appendix that Not All Data Supported Efficacy or Approval") includes an entry for an analyst-report quote

---

[1] First Circuit Opinion, p. 19.

[2] Hubbard Depo, 87:13-21.  See also 88:7-10.

[3] Hubbard Exhibit 5 title. Emphasis added. Capitalization altered.

that reads in full: "Recall the phase 3 data in March 2019 was questionable at best, in our view; while there were positive signals in efficacy, dosing schedule and safety concerns were raised."[4]  Since this analyst says that there were "positive signals in efficacy," the Hubbard Report appears to be arguing that the phrase "dosing schedule and safety concerns were raised" reveals a lack of analyst belief in the All Data Statement.  While dosing-schedule and safety concerns may indeed indicate that "not all data supported … *approval*," those issues are simply irrelevant to the allegations in this case concerning the All Data Statement regarding the efficacy of aducanumab.

c. With regard to *back-end impact*, Dr. Hubbard tries to argue that even though the Massie Report may have caused continuing movements in Biogen's stock price on November 5 and beyond, there is no price impact from the Massie Report at that time.  Consider the following exchange in Dr. Hubbard's deposition: "[Q.]  So just to confirm, is it your opinion that the continued volatility in Biogen stock price on November 5th and beyond are due, at least in part, to the analysts weighing Dr. Massie's views?  [Objection.]  A.  It certainly is possible, yes."[5]  See also "Q.  So you're separating price impact from volatility?  A.  Yes, sir."[6]  In other words, Dr. Hubbard argues that the price volatility, or the movements in Biogen's stock price on November 5th and beyond, may be due to the market reacting to the Massie Report, but claims that these movements in Biogen's stock price do not represent an impact on Biogen's stock price, or price impact.  I disagree with Dr. Hubbard's view that certain price movements caused by the Massie Report do not count as price impact from the Massie Report.

---

[4] Hubbard Exhibit 5, Row 2.

[5] Hubbard Depo., 317:9-15.

[6] Hubbard Depo., 274:11-13.

d. Finally, with respect to ***the ability to calculate damages using a class-wide methodology***, Dr. Hubbard's main critique (other than his claim that there is no price impact at all) appears to be that one would have to disaggregate the corrective part of the Massie Report from any non-corrective part.  I testified in deposition: "I think one of the things to do is bring in an FDA expert who can say -- if, I said before, probability of approval is 60% without Massie, 40% with Massie, maybe there's an intermediate point like 45% where when broken up into fifteen and five[,] one of those is allegation related, one of those is not allegation related."[7]  When asked about disaggregation in a general context, Dr. Hubbard volunteered that "a doctor" may be able to perform at least some disaggregation analysis. ("Q.  The unblinding dealt with the subgroup analysis.  Right?  A.  Yes, but it's different.  Yes, but it's not a one-to-one match.  So I don't think you could -- well, I'm not a doctor.  Maybe you could find a doctor who could disaggregate what you want, but I haven't done that and Dr. Tabak hasn't done that.")[8]  While, as discussed below, Dr. Hubbard took a different tack when confronted with my deposition testimony, I agree with his original testimony that "a doctor" or an FDA expert may be able to "disaggregate what you want."

4.  Many of my more specific critiques of the Hubbard Report are summarized as follows and are discussed in more detail in this report:

a.  Dr. Hubbard misstates the theory of this case.

b.  The All Data Statement maintained Biogen's stock price, preventing it from falling to the level it would have reached had there been a truthful disclosure.  If liability is found for the All Data Statement, then that statement converted a portion of Biogen's stock price into legally actionable artificial inflation.

---

[7] Tabak Depo., 244:10-17.

[8] Hubbard Depo., 250:11-19.

c. One would not expect market participants to comment on the All Data Statement. Nevertheless, statements by analysts about the topic of the All Data Statement provide evidence as to its economic importance to the market.

d. Any mismatch between the All Data Statement and the alleged corrective disclosure would only help demonstrate the economic importance of the All Data Statement.

e. The Hubbard Report's claim that prolonged price volatility following the release of the FDA briefing book relates to uncertainty regarding the AdCom vote and FDA approval is a distinction without a difference, since the corrective information in the Briefing Book was the new negative information that contributed to that prolonged price volatility.

f. Once corrected to remove illogical data points that it added, the Hubbard Report's review of the price-impact analysis in the Tabak Report demonstrates the reliability of the Tabak Report's price-impact analysis.

g. There is a reliable method for calculating class-wide damages in this matter.

## II.    QUALIFICATIONS AND REMUNERATION

5. My qualifications and renumeration are set out in the Tabak Report. Exhibit 1 to this report lists my testimony since the Tabak Report.

## III.    MATERIALS CONSIDERED

6. For purposes of this report, I have considered the Tabak Report, the Hubbard Report, the Hubbard Depo., and all materials referenced or cited in those reports or deposition. Any additional materials that I have considered are listed in Exhibit 2.

## IV.    DR. HUBBARD MISSTATES THE THEORY OF THIS CASE

7.    As noted above, the First Circuit Opinion stated, "Thus, by failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the complaint plausibly alleges that Defendants' omission misled investors."[9]  However, in his deposition, Dr. Hubbard repeatedly argued that the allegations did not relate to all data or to subgroup data, but merely to the material that Dr. Sandrock mentioned in the sentences leading up to the All Data Statement.

8.    For example, Dr. Hubbard testified, "You first asked how would I read the paragraph as a person and hopefully a reasonable investor.  I think our data are all consistent with that refers to the things he said when he said we believe that data from ENGAGE, the portions of the data from ENGAGE, a negative study, the portions of it do support the analysis that we did with EMERGE and PRIME, dot, dot, dot.  So all the things he said. I understand you read it differently."[10]  In addition, Dr. Hubbard testified, "I told you my version, which is English.  He *listed a few things and said all data are consistent, meaning all those things*.  *You meant all data, that's what you say in the complaint, which would necessarily include the subgroups, as a matter of English.  I think that's poppycock.*"[11]

---

[9] First Circuit Opinion, p. 19.  See also the following in the First Circuit Opinion: "Having concluded, supra, that Sandrock's 'all data' statement was misleading given the nature of the statement and the existence of at least some contradictory subgroup data[]" (p. 22); "Here, investors sufficiently alleged facts from which we can infer that Defendants were aware of the contradictory subgroup data and that their failure to disclose said data was 'a highly unreasonable omission,' giving rise to a strong inference of scienter" (p. 22); and "Given Defendants' awareness of the inconsistent subgroup data, it follows that Defendants must have known that their failure to disclose said data risked misleading investors precisely because of what the 'all data' statement represented -- that their 'data [was] all consistent with' 'need[ing] to get to the higher dose' of aducanumab" (p. 23, emphasis in original).

[10] Hubbard Depo., 17:24-18:11.

[11] Hubbard Depo., 87:13-21.  See also 88:7-10 and also 227:17-228:13 (Dr. Hubbard agreeing that his view is that a hypothetical "release [of] the subgroup data" that would
(continued)

9. While I offer no legal opinion, counsel for Plaintiffs has told me that Dr. Hubbard's statements do not correspond with their view of the case. Again, while not offering a legal opinion, it appears that Dr. Hubbard's view that Dr. Sandrock's statement is limited to "those things" that Dr. Sandrock "listed" is different from what the First Circuit wrote: "[T]he 'all data' statement plausibly conveyed three facts: that Sandrock genuinely believed **_all of Biogen's data_** was 'consistent with' needing to get to high dose aducanumab to benefit clinically;…"[12]

10. Dr. Hubbard does claim with respect to this disagreement, "[E]ven if I accepted for the sake of argument that it meant all data anywhere, everywhere, the analysis I did still stands. So it doesn't matter."[13] However, there are (at least) two flaws in the view of the case that Dr. Hubbard analyzes. *First*, Dr. Hubbard frequently does not analyze whether all data are consistent with the Dosage Thesis (i.e., the thesis that a high dose of aducanumab is necessary to achieve **_efficacy_**), but analyzes whether all data are supportive of **_approval of aducanumab._** *Second*, Dr. Hubbard confuses necessary and sufficient conditions. These two issues are discussed in the following section.

11. More importantly, Dr. Hubbard has not proven a complete lack of price impact because he admitted in his deposition that he does not know whether the disclosure of the subgroup data would have had an effect on Biogen's stock price on July 22, 2020. This

---

have caused analysts to change their view of the probability of an adverse opinion from the FDA statistician from 40% to 75% would not be a corrective disclosure.).

[12] First Circuit Opinion, p. 18. Bolding and italicization added; underlining in original. See also p. 19 ("Taking these allegations as true … the complaint plausible alleges that not all of Biogen's data was 'consistent with' 'need[ing] to get to the higher dose' of aducanumab[.]" Emphasis in original) and p. 20 ("It logically follows then that whether all of Biogen's data supported high dose aducanumab, or only some, was 'a significant part of the mix of information [a reasonable investor would have] considered in evaluating [Biogen] as an investment,' given that FDA approval of aducanumab had not yet occurred when the statement was made." Emphases and bracketed material in original).

[13] Hubbard Depo., 18:14-18.

can be seen in the following exchange in Dr. Hubbard's deposition: "Q.  Well, you're denying the fact -- you're denying the allegation that the all data statement had an effect that -- well, like the First Circuit suggested, had he disclosed the subgroup analyses, do you think that would have had no effect on the stock price on July 22nd?  [Objection.]  A. I don't know one way or the other."[14]

12. If Dr. Hubbard does not know one way or the other whether a disclosure of the subgroup data would have affected Biogen's stock price, and if the First Circuit Opinion is read to indicate that the failure to disclose the subgroup data is the basis for this action, then it logically follows that Dr. Hubbard has not shown a complete lack of price impact from Defendants' failure to disclose the subgroup data that is the basis for this action.[15]

13. Similarly, Dr. Hubbard's testimony includes the following: "[Q.]  [L]et me ask you do you think the Massie report had any effect on Biogen's stock price?  A.  It certainly is possible.  It's conflated with the clinician's view, so it would be hard to estimate, but I can't say it had no effect."[16]  Notably, Dr. Hubbard did not disaggregate the price effect from the Massie Report from that of the clinician's report, nor did he disaggregate the price effects of any portions of the Massie Report.[17]  Thus, Dr. Hubbard presents no back-end evidence that the release of the subgroup data in the Massie Report did not have price impact, but merely relies on his view that that is not necessary given his belief in a lack of front-end price impact.

---

[14] Hubbard Depo., 202:24-203:9.

[15] Though I offer no legal opinion, it is my understanding that if this conclusion is accepted, Defendants' argument regarding a lack of price impact fails and there is no need to continue.  Nevertheless, I continue this report to further support this conclusion and to demonstrate other reasons why there may be price impact from the alleged misrepresentation.

[16] Hubbard Depo., 295:6-12.

[17] See, for example, Hubbard Depo., 322:19-25. ("Q.  Did you make any effort to try to disaggregate the corrective information from the non-corrective information in the Massie report?  A.  A, I showed no front end, so it's a useless exercise for me and B, I wasn't asked to do it.")

## V.    THE ALL DATA STATEMENT PREVENTED BIOGEN'S STOCK PRICE FROM FALLING

14. Section IV of the Hubbard Report argues that the All Data Statement neither introduced new inflation nor maintained existing inflation in Biogen's stock price. To support its argument that the All Data Statement did not introduce new inflation, the Hubbard Report argues that Biogen's stock price did not rise after the All Data Statement was made. And to support its argument that the All Data Statement did not maintain inflation, the Hubbard Report makes two points: "There Was No Preexisting Price Inflation Prior to the July 22 Statement, as Market Participants Consistently Noted That Not All Results Had Been Disclosed and That These Results May Not Support the Dosage Thesis" and "Public Statements That Not All Data Supported the Dosage Thesis Did Not Cause Price Declines."[18]

### A.    *The Hubbard Report's Analysis of Its Claim that "The July 22 Statement Did Not Introduce New Inflation" Is Flawed*

15. The first prong of the Hubbard Report's analysis of whether the All Data Statement (or what it calls the July 22 Statement) introduced new inflation into Biogen's stock price is to examine whether Biogen's stock price rose by a statistically significant amount following that statement.

16. To begin, the Hubbard Report ignores why the alleged misstatements other than the All Data Statement were not upheld by the First Circuit. The First Circuit Order stated, "Because the remainder of Defendants' allegedly misleading statements fail to clear the PSLRA's heightened pleading standard for scienter, we simply assume, without deciding, that those statements are materially misleading before proceeding to our scienter analysis." That is, prior alleged statements by Biogen may have been false and misled the market, but because they were not made with scienter, they are not actionable.

---

[18] Hubbard Report, Section IV.B.i and IV.B.ii headers.

Then, if the All Data Statement presented information that was similar to the prior statements, we would not expect to see a price increase. In this case, the first prong of the Hubbard Report's analysis (i.e., arguing that there is a lack of a price increase following the All Data Statement) is irrelevant.

17. Notably, Dr. Hubbard's testimony in this matter includes the following: "Q. Are you aware of the basis that the First Circuit stated for not reinstating the other alleged misrepresentations in this action? [Objection and counsel response] A. I don't recall. I don't recall. I did read it, but I don't recall."[19] Dr. Hubbard was later asked, "Now, would it matter for the analyses in your report if the First Circuit had assumed that the other alleged misrepresentations which were not reinstated were not actually misleading versus if the First Circuit had assumed without deciding that those statements were misleading but said that they were not actual because of a lack of what is called slander [sic]? [Objection] A. Very big question. Don't understand what it means, because it seems to be phrased legally."[20] Even if Dr. Hubbard did not understand the term "scienter" when reading the First Circuit Opinion, he could have asked counsel for Defendants for clarification and learned how that should have affected his front-end price-impact analysis.[21]

18. The second prong of the Hubbard Report's analysis of whether the All Data Statement introduced new inflation into Biogen's stock price is described as "Market Participants Did Not Note the July 22 Statement nor Describe It as Conveying New Information[.]" Again, if the All Data Statement generally confirmed prior market beliefs, one would not expect it to be noted by analysts, much less to be described as conveying new information. In fact, proof of the second prong (i.e., that market

[19] Hubbard Depo., 7:21-8:6.

[20] Hubbard Depo., 8:10-22.

[21] Dr. Hubbard also testified that if a company made the same statement twice, once while believing it and once after not believing it, he would not expect to see a change in the stock price. Hubbard Depo., 36:5-37:5.

participants did not view the All Data Statement as providing new information) would provide the basis for inflation as the same information moved from inactionable (due to a lack of scienter) to actionable.

19. Furthermore, the Hubbard Report itself provides evidence of the economic importance of the subgroup analyses. After ending its trials of aducanumab, on October 22, 2019, Biogen announced that it planned to file for regulatory approval of aducanumab. As the Hubbard Report notes, "After the October 22, 2019 presentation, analysts' contemporaneous commentary shows that the market recognized the absence of subgroup efficacy data and identified this gap as an area of uncertainty that had yet to be resolved."[22] Thus, the Hubbard Report's own analysis confirms the importance of subgroup efficacy data for aducanumab to the market.

20. The Hubbard Report concludes this prong by stating, "This contemporaneous commentary makes clear that analysts never assumed all subgroup analyses supported the Dosage Thesis."[23] But, as discussed below, this misrepresents what Biogen said about the Dosage Thesis.

21. The All Data Statement came as part of the Q&A in Biogen's Q2 2020 analyst call. The answer including the All Data Statement included the following: "We believe the data from ENGAGE, that *portions of the data* from ENGAGE, a negative study, that *portions of it do support the analysis* that we did with EMERGE."[24] There is an obvious difference between "portions of the data" and "the data are all[.]" So, how do we reconcile these two statements? The answer is in what is attributed to "portions" of the data and what is attributed to "all" the data. The full answer including the All Data Statement is as follows, with emphases added:

> Well, I'm not sure I heard your question, Geoff, but I think -- look, the filing is based on these three studies, EMERGE, ENGAGE and

---

[22] Hubbard Report, ¶43.

[23] Hubbard Report, ¶46.

[24] Q2 2020 Biogen Earnings Call. Emphases added.

PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all three prespecified secondary endpoints. We believe the data from ENGAGE, *that portions of the data* from ENGAGE, a negative study, that *portions of it do support the analysis* that we did with EMERGE. And also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as CDR Sum of Boxes. And again, very similar that the lower doses did not show much of an effect. So *consistent* with the findings from ENGAGE and EMERGE, you really *need to get to the higher dose. And I think our data are all consistent with that*.

22. What Mr. Sandrock said is that there are "portions" of the data that support the Dosage Thesis but that no data are inconsistent with the Dosage Thesis. For example, there can be some data that simply irrelevant to the Dosage Thesis, in that they do not support it and also are not inconsistent with it. One obvious example would be data showing that aducanumab was safe. Such data would be not be inconsistent with the Dosage Thesis in the sense that it does not contradict it (and thus would not negate a statement that all data are consistent with the Dosage Thesis), but such data would not be considered supportive of the Dosage Thesis.

23. In fact, Dr. Hubbard testified that he would not use the word "consistent" to mean "supportive" but would instead use it to mean "not inconsistent."[25] I agree with that aspect of Dr. Hubbard's testimony.

24. Dr. Hubbard's testimony on this continued: "[Q.] In my mind, supportive and consistent are two different words and not the same, not necessarily the same. Something can be consistent and supportive, but something can be consistent but not supportive. Right? A. I agree, but the fact that we've just both said that investors -- at least through

---

[25] Hubbard Depo., 14:23-15:6. ("[Q.] What does it mean to be consistent in your mind? A. Well, if you're asking me how I would use the term, it would be it's not inconsistent. It could mean to somebody saying that it's supportive, but if I chose the word consistent, that's what I would mean.") See also 104:16-21. ("Q. Well, there's a different [sic] between supportive and not contradicting. Right? [Objection.] A. I'll just answer the question. Yes.")

market participants -- believed it wasn't all supportive, which is the stronger of the two, your question has been asked and answered from a logical perspective."[26]  This illustrates the flaw in Dr. Hubbard's analysis.  Dr. Hubbard "agree[d]" that "something can be consistent but not supportive."  Thus, finding something that is "not supportive" is not necessarily finding something that is not consistent.  And Dr. Sandrock used the word "consistent" in the All Data Statement, meaning that any time that Dr. Hubbard claims that analysts did not find something "not supportive" of the Dosage Thesis, that does not mean that the analysts were not misled by the All Data Statement, which, again, uses the word "consistent" and not the word "supportive."  Put simply, all of Dr. Hubbard's analyses of whether something is "supportive" of the Dosage Thesis are not relevant.

25. While Dr. Hubbard's analyses are not even relevant, he claims them to be "the whole point of [his] report":[27]

> Q. The question is will you concede that Dr. Sandrock never said all data are supportive of the high dosage thesis.  Right?
>
> MS. SOLOWAY: Objection.
>
> A.  Correct.  As a matter of English, correct.
>
> Q, So if he never said that, why do you think that analysts would interpret the all data statement to mean that?
>
> MS. SOLOWAY: Objection. Objection.
>
> A. I don't think they do.  That's the whole point of my report.  I don't believe they do.  It's you who believes that.

---

[26] Hubbard Depo., 19:17-20:6.  See also p. 122:3-11. ("Q.  When did Dr. Sandrock say all data are supportive?  A.  Or even all data are consistent.  Either way.  Q.  Well, you recognize there's a difference? [Objection.]  A.  Unlike you, I did the work.  It's Exhibit 5.  We could talk through it.")  However, Hubbard Exhibit 5 is titled "Analysts' Commentary After the July 22 Statement and Prior to the Release of the Massie Appendix that Not All Data Supported Efficacy or Approval[.]"  The analysis is thus not applicable to examining market reactions to Dr. Sandrock's statement that "our data are all consistent[,]" as it considers analysts discussing whether all data are "supportive," and further considers analysts discussing whether the data are supportive not just of the Dosage Thesis, but of overall approval of aducanumab.

[27] Hubbard Depo., 122:24-123:16.

26. In other words, Dr. Hubbard agrees that Dr. Sandrock never said that all data are supportive of the Dosage Thesis, and the whole point of his report is apparently to show that analysts were not misled into believing something that Dr. Sandrock never said (i.e., Dr. Hubbard's claim of no front-end price impact is based on assessing whether analysts did or did not believe something that is not the actual allegation in this matter).

27. Next, the All Data Statement allows for there to be subgroup analyses that are consistent with the Dosage Thesis, even if they do not support it.  To see this, imagine that aducanumab in high doses was effective for women but not for men.  If there were both men and women in ENGAGE and in EMERGE, then, if the Dosage Thesis were true, it could explain the different results in the two studies.  (See Exhibit 3, a demonstrative showing how this would work.)  Yet, in this hypothetical one subgroup analysis (i.e., men) would not be "supportive of efficacy at a high dose."  This result would not be inconsistent with a claim that one "need[s] to get to the higher dose" to achieve efficiency.  The Hubbard Report makes the basic error of conflating a statement about what is necessary (i.e., "you really *need* to get to the higher dose" (emphasis added)) for efficacy with what is sufficient (e.g., "any subgroup that gets the higher dose will see results") for efficacy.

28. Notably, Dr. Hubbard testified that as "a general rule," there is a difference between a necessary and a sufficient condition.[28]  Incredibly, Dr. Hubbard testified that he could not determine whether the All Data Statement was "a statement that a high dose is necessary to show an effect or that a high dose is sufficient to show an effect" even though the statement is "So consistent with the findings from ENGAGE and EMERGE, you really *need* to get to the higher dose.  And I think our data are all consistent with that."[29]

---

[28] Hubbard Depo., 24:16-21 and 26:6-10.

[29] Hubbard Depo., 25:11-18 and Second Amended Class Action Complaint for Violation of the Federal Securities Laws filed on August 4, 2021 ("Complaint"), ¶191. Emphasis added to the All Data Statement.

29. Thus, by confusing "consistent" and "supportive" and also confusing "necessary" and "sufficient," the Hubbard Report's conclusion ("This contemporaneous commentary makes clear that analysts never assumed all subgroup analyses supported the Dosage Thesis."[30]) is not a proper examination of the All Data Statement or the Dosage Thesis.[31]

30. This also helps explain why there was not a statistically significant price reaction to the All Data Statement. Stating that all data are "consistent" rather than "supportive" of the Dosage Thesis essentially means that there are no inconsistent data, or data that one would expect to sink Biogen's bid for approval of aducanumab by contradicting the Dosage Thesis. Given that Biogen was going ahead with seeking approval for aducanumab, the market may have assumed that there were indeed likely no meaningful, problematic data. In contrast, a truthful statement that there were inconsistent data would have been seen as a substantial negative indication.

31. The Hubbard Report then argues "Public Statements That Not All Data Supported the Dosage Thesis Did Not Cause Price Declines[.]" Again, this is not what the All Data Statement said. The Hubbard Report takes its misrepresentation of the All Data Statement even further, arguing, "Even assuming, contrary to this evidence, that market participants had understood the July 22 Statement to imply that *all possible data* supported the Dosage Thesis, then subsequent public statements or commentary indicating that some data were not supportive would have been corrective and produced a

---

[30] Hubbard Report, ¶46.

[31] In looser contexts, others have used "consistent" and "sufficient" interchangeably, including me, in Tabak Depo: 137:11-14, in which I misstated the All Data Statement as "Not all of our data support that." However, I would hope that everyone could agree that hypothetical data that indicated that aducanumab caused serious health issues at any dose does not support the All Data Statement but also does not contradict it. Thus, any considered analysis of market views of the All Data Statement should concern only those market views that actually correspond to Dr. Sandrock's statement that "our data are all consistent" with the need to have a higher dose of aducanumab in order to achieve efficacy.

statistically significant price decline."[32]  Now, the Hubbard Report apparently considers not only all the data that Biogen had as of July 22, 2020, but "all possible data" as being embraced by the All Data Statement.

32. Notably, the view of whether data are "supportive of" as opposed to "consistent with" the All Data Statement is not even consistent with the "truthful substitute" that the Hubbard Report claims to address at the request of counsel for Defendants.[33]  In particular, the Hubbard Report states, "At Counsel's request, I conducted such an analysis considering whether statements that conveyed the following would have caused a statistically significant price decline: 'Although portions of the data from PRIME, ENGAGE, and EMERGE are *consistent* with needing to get to the higher dose of aducanumab for efficacy, not all data are *consistent* with that.' My analysis below reveals that no such decline occurred following statements that not all data *supported* the Dosage Thesis."[34]  Here, the Hubbard Report essentially admits a difference between its analysis and its "truthful substitute" statement.

33. This is followed, in ¶49, where the Hubbard Report states, "In several instances, analysts *explicitly suggested* that the unrevealed data were likely not supportive of approval. For example:"[35]  Notably, the Hubbard Report does not even reference the Dosage Thesis in its search for these statements.  The Hubbard Report then lists three examples:

a. "… Though our sense is that data not yet disclosed to date are unlikely to be overly positive …"  The Hubbard Report never explains how "unlikely to be overly positive" maps into "likely not supportive of approval."  To state what

---

[32] Hubbard Report, ¶47. Emphasis added.

[33] Hubbard Report, ¶48.

[34] Hubbard Report, ¶48. Emphases added.

[35] Emphasis added.

should be obvious, even somewhat *positive* data should support approval somewhat and certainly are not inconsistent with the Dosage Thesis.

b.  "'As we have detailed before, given the mixed outcomes from EMERGE and ENGAGE Phase 3 trials, we do not believe current FDA precedent supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses.'"[36]  This does not "explicitly suggest that the unrevealed data were likely not supportive of approval" or were inconsistent with the Dosage Thesis, but, rather, suggests that "at this time" the absence of public disclosure of certain data is an issue combined with "current FDA precedent[,]" something I discuss below.

c.  "'[B]ut there remain many cuts and sensitivity analyses across the studies not disclosed we believe are unlikely to be as supportive as the presented data.'"[37]  Here, the Hubbard Report transforms "unlikely to be as supportive" into "were not likely to be supportive[.]"  Again, data can be somewhat supportive without being unsupportive.[38]  And, again, data may not be supportive for reasons other than the Dosage Thesis.

34.  Moreover, the Hubbard Report repeatedly characterizes the All Data Statement as one that all data *supported* rather than were *consistent with* the Dosage Thesis or even that all data were approval of aducanumab.  See, for example, Hubbard Report ¶¶11, 35, 36, 39, 40, 46, 47, 51, 57, 59 ("the July 22 Statement did not convey that 'all' data were supportive of approval"), 60, 61, 62 ("the July 22 Statement did not convey to market

---

[36] Closing footnote omitted.

[37] Closing footnote omitted.

[38] Moreover, what this analyst says is almost a truism.  If there were an average effect of, say, 80 on some scale, if the data were cut into different subgroups that summed to the whole, one would expect some of those subgroups would have an average effect below 80 and some above 80, even if only due to randomness.  The Hubbard Report attempts to turn this anodyne observation into some sort of major piece of evidence.

participants that *all data* were supportive of approval on the front end" (emphasis in original)), and 63.

35. In addition, the title of Hubbard Exhibit 5 is "Analysts' Commentary After the July 22 Statement and Prior to the Release of the Massie Appendix that Not All Data Supported Efficacy or Approval[.]"  The reason for this exhibit is that Dr. Hubbard apparently believes that Plaintiffs' allegation is that the All Data Statement indicated that all data *supported* not just the efficacy of aducanumab at a high dose, but *approval of aducanumab*.  Thus, we have the following entry in full as the "Relevant Statement or Commentary" in Row 2 of Hubbard Exhibit 5: "Recall the phase 3 data in March 2019 was questionable at best, in our view; while there were positive signals in efficacy, dosing schedule and safety concerns were raised."  The "positive signals in efficacy" cannot support this statement's inclusion in Hubbard Exhibit 5, which, again, is meant to provide evidence that analysts did not believe that all data supported efficacy or approval. Instead, the Hubbard Report is apparently arguing that the fact that the analyst wrote that "dosing schedule and safety concerns were raised" is relevant to its analysis.  But this is only because the Hubbard Report has transformed the All Data statement from one that is about whether data are consistent with the Dosage Thesis to one where all data— including dosing schedule and safety concerns—are consistent with or supportive of approval.  This is simply not what this case is about.

36. The discussion above shows that Dr. Hubbard's error in interpreting the All Data Statement is not a one-off issue, but is one of the bases for many of the analyses in the Hubbard Report, causing many of those analyses to be irrelevant to the actual issues in this litigation.

> **B.  The Hubbard Report's Analysis of Its Claim that "There Was No Preexisting Price Inflation Prior to the July 22 Statement, as Market Participants Consistently Noted That Not All Results Had Been Disclosed and That These Results May Not Support the Dosage Thesis" Is Flawed**

37. In its first two sentences examining the first prong of its analysis of whether the All Data Statement maintained any inflation in Biogen's stock price, the Hubbard Report

states, "As I show in this section, from Biogen's October 22, 2019 announcement that it would seek regulatory approval for aducanumab onward, market participants consistently recognized that not all subgroup analyses had been made public or necessarily supported the overall findings from EMERGE. Accordingly, the July 22 Statement could not have 'maintained' a preexisting false belief."[39]

38. To begin, there is no suggestion that the All Data Statement meant that all subgroup analyses had been made public.  Part of the question that led to the answer including the All Data Statement was "I just wondered if could you go into any detail of the analysis over, say, the past 6 to 9 months that you guys have done with FDA? Whether that could be published or at a medical conference or anything that you can share with us in terms of what the developments have been over the past pretty much 6 – or since the beginning of this year?"[40]  Clearly, the question recognized that not all data had yet been shared in detail or published, and I am aware of no allegation that the market was misled into thinking otherwise.

39. As noted above, when considering market commentary, the Hubbard Report vastly expands the meaning of the All Data Statement and the Dosage Thesis.  For example, it argues that certain commentary "underscores that the July 22 Statement did not convey that 'all' data were supportive of approval."[41]  Of course, the All Data Statement (what the Hubbard Report calls the July 22 Statement) did not suggest that all data were supportive of approval; it merely suggested that the negative data from ENGAGE could be explained away by arguing that too few participants received the higher dose in ENGAGE to show meaningful results.

---

[39] Hubbard Report, ¶41.

[40] Q2 2020 Biogen Earnings Call.

[41] Hubbard Report, ¶59.  See also Hubbard Report, ¶62: "The above evidence demonstrates that the July 22 Statement did not convey to market participants that all data were supportive of approval[.]"

40. One way to understand this is through an analogy. The All Data Statement said that a low dose of aducanumab was ineffective, as patients "need to get to the higher dose" for aducanumab to be effective. The argument that Biogen was making was that very few patients in ENGAGE received the higher dose. Imagine, then, if Biogen had instead said that all patients in ENGAGE accidentally received the placebo rather than any ENGAGE patients receiving aducanumab. That would explain the negative results from ENGAGE (i.e., that the purported treatment group did not perform better than the placebo group). But that would merely be a reason to ignore ENGAGE, not to think of it as a study that, properly considered, was "supportive of approval[,]" as ¶59 of the Hubbard Report suggests.

41. In other words, the All Data Statement argued that ENGAGE was essentially a meaningless study that could be ignored. A meaningless study would not be "supportive of approval" but would merely not count against approval. Notably, the FDA typically requires two independent Phase 3 trials for approval of a drug like aducanumab.[42] Thus, even if ENGAGE were ignored, there would still be only one positive Phase 3 trial

---

[42] See, for example, the following analyst reports in Dr. Hubbard's backup materials: "Negative view on aducanuamb's [sic] approvability but asymmetric risk at these levels - Neutral," *UBS*, October 22, 2020 ("The FDA could be pressured to approve aducanumab based on AdCom's recommendation and forgoes its usual requirement of two positive RCT trials."); "A Skeptic's Guide to Aducanumab Regulatory Review Redux," *Baird*, October 28, 2020 ("Here, there is not a single positive Phase 3 study, much less the two that are normally required."); and "R$_x$ Pulse - Alzheimer's disease," *R$_x$ Securities*, November 4, 2019 ("Furthermore, it has long been accepted that the FDA would require two large Phase III studies to support a full approval (though guidance does not specifically state this)").

Despite his or Analysis Group's staff's review of analyst reports, Dr. Hubbard was not aware of the guidance for typically having two Phase 3 studies. See Hubbard Depo. 108:16-21. ("Q. Are you aware that the FDA normally requires two separate phase three studies before approving drugs like aducanumab? A. I'm not a doctor, so I don't know.") See also Hubbard Depo 181:24-182:18, in which Dr. Hubbard does not recognize that BMO's reference to "FDA precedent" in the context of one positive and one negative study may refer to the precedent of requiring two positive Phase 3 studies.

(EMERGE), which could lead analysts to wonder whether the FDA would approve aducanumab.

42. This is not the only time that the Hubbard Report conflates what the All Data Statement says about the data being *consistent* with the Dosage Thesis with its claim that every possible analysis would be *supportive* of the Dosage Thesis. For example, in ¶46, the Hubbard Report states, "The July 22 Statement therefore could not have 'maintained' a false belief that all possible analyses of available data – including the subgroup analyses – were supportive of efficacy at a high dose." But, again, that is not what the Dosage Thesis states.

43. Similarly, in ¶47, the Hubbard Report states, "Even assuming, contrary to this evidence, that market participants had understood the July 22 Statement to imply that all possible data supported the Dosage Thesis, then subsequent public statements or commentary indicating that some data were not supportive would have been corrective and produced a statistically significant price decline." This is simply false. As just discussed, some data (e.g., men in the hypothetical above) might not support the Dosage Thesis but also would not provide evidence against the Dosage Thesis (i.e., the Dosage Thesis could still explain the different results in ENGAGE and EMERGE due to the effect of a high dosage on women, even if no dosage had any effect on men).

44. In ¶64, the Hubbard Report states, "Further, even accepting Plaintiffs' characterization of the July 22 Statement as a summary of trial data that conveyed that *all data* are supportive of the Dosage Thesis,"[43] and then cites in a footnote to pp. 3, 17-18 of Plaintiffs' brief on class certification. The apparent reference in p. 3 of that Brief is "Sandrock's All Data statement was critical because it explained away the poor Study 301 results." Explaining away a specific set of negative results is not the same as saying that all data support the Dosage Thesis. Moreover, I find nothing on pp. 17-18 of that

---

[43] Emphasis in original.

brief to support the Hubbard Report's statement regarding Plaintiffs' characterization of the July 22 Statement / All Data Statement.

45. Moreover, the Hubbard Report's use of "supportive" is, at best, sloppy here. Safety data, for example, would likely neither support nor contradict the Dosage Thesis. Thus, it could certainly be true that "some data were not supportive" of the Dosage Thesis. While I assume that the Hubbard Report meant its statements to relate to relevant data, by ignoring that some data are simply irrelevant to the Dosage Thesis and then insisting that all data must be "supportive" of the Dosage Thesis, it allows for sloppy thinking and analyses that make it improperly easy to claim that the market did not believe that all data supported the Dosage Thesis.

46. Moving in another direction, in ¶35, the Hubbard Report states, "if the July 22 Statement did, in fact, communicate that *all data* supported the thesis that a higher dose is needed for efficacy, I would expect market participants to view this statement as a strong indicator of aducanumab's potential FDA approval."[44] The Hubbard Report provides no evidence for this claim. As discussed above, the FDA normally requires two positive Phase 3 trials to approve a drug like aducanumab.[45] Biogen had one positive trial (EMERGE) and one negative trial (ENGAGE) for aducanumab. Even if the Dosage Thesis were true, Biogen would be left with one positive trial and one trial that could, arguably, be ignored as meaningless. The Hubbard Report presents no reason to think that this would be viewed "as a strong indicator of aducanumab's potential [for] FDA approval." This unsupported argument then serves as part of the basis for the Hubbard Report's review of analyst reports—i.e., when reviewing analyst reports, the Hubbard Report appears to be relying on an unsupported view of what analysts should think, thereby infecting the entirety of that review.[46]

---

[44] Emphasis in original.

[45] See footnote 42.

[46] Based on Dr. Hubbard's deposition testimony, he relied on "staff who helped in some of the very labor-intensive things of reading the analyst reports for particular statements." (continued)

47. Finally, it should be noted that Dr. Hubbard, Defendants' expert on price impact, provided incorrect testimony about one of the standard terms used in analyses of price impact. In particular, the following occurred in Dr. Hubbard's deposition: "Now, what is your -- could you explain your definition of the term price maintenance in the context of a securities class action? A. That's not a term of art. I'm not sure -- I think Dr. Tabak invented that term. You want to know how I define maintenance arguments as an [sic] non lawyer? The price maintenance is new to me, as it came about in Dr. Tabak's deposition."[47]

48. Much as I might like to take credit for inventing the term "price maintenance" in my deposition this year, that is not the case. The term "price maintenance" is found in court opinions in securities-litigation cases at least as far back as the year 2000,[48] in a well-known Circuit Court opinion that was one of the early successes for defendants in this area,[49] in an opinion that cites Dr. Hubbard as an expert in that case,[50] and various

(Hubbard Depo., 5:4-6.) Dr. Hubbard did not know how many people at Analysis Group worked on this matter. (Hubbard Depo., 4:13-18.) See also Hubbard Depo., 113:3-10. ("Q. It says [in ¶36 of the Hubbard Report]: I reviewed all the analyst reports relating to biogen stock from November 22nd 2020. Did you personally read all those reports? A. The team under my direction read all the reports following the protocol in footnote 40." Note that ¶36 of the Hubbard Report refers to July 22, 2020 and not November 22, 2020.)

[47] Hubbard Depo., 44:25-45:11.

[48] *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000). ("Testimony of a hypothetical nature must be evaluated especially carefully to ensure that conclusions concerning price 'maintenance' rule out causes for that maintenance other than the defendants' purported failure to disclose certain information.")

[49] *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775 (8th Cir. 2016). ("IBEW has relied in this case on a 'price maintenance' theory. It contends that Best Buy disclosed 'confirmatory information' on September 14 which fraudulently maintained its stock at a constant price and counteracted expected price declines.")

[50] *In re Advance Auto Parts, Inc., Sec. Litig.*, No. CV 18-212-RGA, 2020 WL 6544637 (D. Del. Nov. 6, 2020). ("Lead Plaintiff's complaint alleges price maintenance" and "According to Defendants' expert, Dr. Glenn Hubbard, the alleged misrepresentations instead either caused a decrease in Advance Auto's stock price or no change at all." Closing footnote omitted.)

other cases, some of which are listed and quoted in Exhibit 4a to this report.  Also, see Exhibit 4b for a list of selected academic literature discussing the term "price maintenance" with respect to securities litigation.[51]

49. Dr. Hubbard's lack of familiarity with a price-maintenance theory may have helped lead to the following portion of his testimony:[52]

> [A.] The point is what you have alleged, I think, is pivot to a maintenance theory, although you haven't said what's being maintained.  If something is being maintained, what is it.  Because prior to this time, analysts were similarly skeptical.
>
> Q. Why can't it simply be inflation coming into the stock because Dr. Sandrock's misrepresentation about the data on July 22nd prevented a stock price decline?  So what do you need to maintain? Inflation goes into stock when he makes a false statement that props up the price?
>
> MS. SOLOWAY: Objection.
>
> A. Well, as you know, for what it's worth, I find that silly and the reason is two.  One is the preexisting analyst beliefs and second is the work in Exhibit 5. So you can't really believe that.  I don't think you're going to persuade somebody of it, with respect.

50. In fact, what is being maintained is both Biogen's stock price, under the price-maintenance theory, and the market's view that there are no serious challenges to the Dosage Thesis (as prior statements by Defendants to the contrary may still have provided that view to the market, but I understand are not actionable due to the First Circuit's finding of a lack of a sufficient allegation of scienter).  Dr. Hubbard seems to completely miss the concept of price maintenance here.  Further, Dr. Hubbard's dismissal of the application to that theory to this case as "silly" relies on an argument about "preexisting

---

[51] These lists are merely meant to demonstrate the widespread use of the term "price maintenance."  The inclusion of any opinion, article, or quotation is not meant to imply that I agree with any argument made in that document or quotation.

[52] Hubbard Depo., 116:22-117:19.

analyst beliefs" that is incorrect because it ignores the reason that prior statements putting forth arguments in favor of the Dosage Thesis are not in this case.

51. Similarly, as discussed above, Hubbard Exhibit 5 conflates "consistent with" with "supports" and even includes statements questioning the likely FDA approval of aducanumab rather than its efficacy, making Hubbard Exhibit 5 a reason to find the theory of the case "silly" to also be problematic.  Moreover, many of the statements that Dr. Hubbard finds to represent a view by analysts that "not all data supported efficiency or approval" are, at best, interpretations by Dr. Hubbard.  For example, one of the entries, for RBC in Row 11 of Hubbard Exhibit 5, includes the quote, "[B]ut there remain many cuts and sensitivity analyses across the studies not disclosed we believe are unlikely to be as supportive as the presented data."[53]  This same quote appears in ¶49 of the Hubbard Report as an example of where "analysts explicitly suggested that the unrevealed data were likely not supportive of approval."  Dr. Hubbard was asked about this quote in his deposition:[54]

> Q. Let's look at the RBC Capital Markets 10/23/2020 5:00 a.m. bullet point, paragraph 49.  It reads "But there remain many cuts and sensitivity analyses across the studies not disclosed we believe are unlikely to be as supportive as the presented data."
>
> Are you interpreting unlikely to be as supportive to mean likely not supportive?
>
> MS. SOLOWAY: Objection.
>
> A. The English is what it is.  I'm interpreting it as it says.  You've been given these supportive pictures, we think the undisclosed data are not likely to match that, meaning they're mixed.
>
> Q. Unlikely to be as supportive you interpret to be mixed or negative?
>
> A. Yes.

---

[53] Bracketed first letter in Hubbard Report.

[54] Hubbard Depo., 182:19-183:18.

Q, Well, he doesn't say mixed or negative. He says as supportive. So I'm just wondering how you transmodify as supportive to mixed or negative?

A. That's my view.

52. It is not at all clear what the basis is for Dr. Hubbard's "view" that "unlikely to be as supportive" should be interpreted as "mixed or negative[.]" In my opinion and experience, an analyst saying "unlikely to be as supportive" is better interpreted as "somewhat or slightly positive" than as "mixed or negative[.]" Ultimately, anyone reviewing the Hubbard Report and Dr. Hubbard's testimony should bear in mind that Dr. Hubbard interprets "unlikely to be as supportive" to mean "mixed or negative" and his basis for that is simply, "That's my view."

## VI. ONE WOULD NOT EXPECT THE MARKET PARTICIPANTS TO COMMENT ON THE ALL DATA STATEMENT; NEVERTHELESS, STATEMENTS BY ANALYSTS ABOUT THE TOPIC OF THE ALL DATA STATEMENT PROVIDE EVIDENCE AS TO ITS ECONOMIC IMPORTANCE TO THE MARKET

53. In ¶31, the Hubbard Report states, "In my review of the public statements by Biogen around the July 22 Statement, as well as contemporaneous analysts' commentary, I find that market participants did not specifically note the July 22 Statement or describe it as conveying new information." Of course, the All Data Statement (or the July 22 Statement) was generally consistent with the idea that Biogen would not attempt to proceed with an application for approval of aducanumab if there was meaningful evidence contrary to the Dosage Thesis. Again, the FDA normally requires two positive Phase 3 trials to approve a drug like aducanumab.[55] If there were one positive trial (EMERGE) and one meaningless trial (ENGAGE), there would likely be questions about whether the FDA would approve aducanumab, while if there were one positive and one negative trial, the likelihood of approval would be even lower.

[55] See footnote 42.

54. The Hubbard Report even resorts to mischaracterizing my deposition testimony to try to support its arguments. In ¶35, it states:

> Dr. Tabak himself agreed in his deposition that market participants would have regarded this information as "new."[37]
>
> [37] Tabak Deposition, 159:13-160:2 ("Q: So just to wrap this point up, you would agree with me that it would be a new piece of information for the chief medical officer of a company for the first time to say I believe that all of Biogen's data is consistent with needing to get to high dose aducanumab to benefit clinically? That would be significant, correct? A: First you said new, then you said significant. Q: Let's do new first. That would be new, correct? A: Probably new, yes.").

55. The Hubbard Report quotes my answer of "Probably new, yes" as simply "new." It is not clear why Dr. Hubbard, whose report deals in part with probability and statistics, treats "probably new" as meaning the same thing as "new," particularly when he effectively stated the opposite in his deposition.[56] Moreover, the question I was asked is a hypothetical that did not describe *when* that statement was made relative to other statements by the company. And, finally, even if I had accepted that the information was new, the Hubbard Report leaves out the following discussion about whether that information was significant.

---

[56] Hubbard Depo, 112:4-20. ("Q. Would you agree that there's a difference between saying aducanumab works and saying that aducanumab probably works? [Objection.] A. First of all, depending on what the meaning of the word 'works' is, but generally when you insert an additional word that's a qualifier, yes, the sentences aren't the same. Now we're back to English. Q. Why does the word 'probably' matter there? A. Well, because, again, depends on what 'works' means, but 'probably' means, you know, it should work. It's more likely than not, but it's not guaranteed. But again, this is English, not medicine, not economics.")

## VII.   ANY MISMATCH BETWEEN THE ALL DATA STATEMENT AND THE ALLEGED CORRECTIVE DISCLOSURE WOULD ONLY HELP DEMONSTRATE THE ECONOMIC IMPORTANCE OF THE ALL DATA STATEMENT

56. In Section V.A, the Hubbard Report argues, "There is a Mismatch Between the Massie Appendix and the July 22 Statement[.]"  There are two prongs to the Hubbard Report's claim.

57. *First*, the Hubbard Report argues, "The Massie Appendix Did Not Correct the July 22 Statement as Analysts Explicitly Noted That the July 22 Earnings Call Did Not Convey New Quantitative Evidence Supporting the Dosage Thesis[.]"[57]  This argument makes no sense.  The All Data Statement was that all data were consistent with the Dosage Thesis.  If any newly disclosed data were inconsistent with that thesis, that would contradict the All Data Statement.  Put differently, the Hubbard Report is arguing that pointing out specific quantitative data (i.e., material in the Massie Report) that were inconsistent with the Dosage Thesis would not correct the claim that all data supported the Dosage Thesis.  This makes no sense.[58]

58. The Hubbard Report's discussion here further demonstrates its repeated conflation of the All Data Statement regarding high dosages of aducanumab with everything and anything relating to approval.  The Hubbard Report states, "I would expect that, if anyone listened to and incorporated the July 22 Statement into their report, it would be the analyst for whom the July 22 Statement was the answer to his question. Yet that analyst's continued skepticism about aducanumab trial data and likelihood of approval underscores that the July 22 Statement did not convey that 'all' data were supportive of approval."[59]

---

[57] Hubbard Report, Section V.A.i header.

[58] Consider a situation where a teacher stated that all students achieved a passing score on an exam.  Under the framework of the Hubbard Report, a revelation that one student got a 12 out of 100 on the exam would not contradict the teacher's statement because the teacher's statement did not convey any quantitative evidence.

[59] Hubbard Report, ¶59.

Once again, at best, the All Data Statement turned ENGAGE from a negative study to one that could be ignored; it did not eliminate the fact that there was still only one positive Phase 3 trial in favor of aducanumab while the FDA normally requires two such trials.[60]  It would be perfectly sensible for anyone who believed the All Data Statement to have "continued skepticism about aducanumab trial data and the likelihood of approval" because the trial data (i.e., a positive study in EMERGE and a potentially ignorable study in ENGAGE) might have been insufficient for approval under the two-trial standard.

59. It is also worth noting further mischaracterizations here in the Hubbard Report. The Hubbard Report says the following: "Even the analyst who asked the question that spurred the July 22 Statement, Geoff Meacham for Bank of America, noted afterward that Biogen's aducanumab data was 'hardly unequivocal,' that the filing included 'an increasing list of red flags,' and that they therefore 'remain[ed] skeptical of broad, first cycle approval.'"[61]  What the report actually said was, "Given the data are hardly unequivocal and an increasing list of red flags—which also includes the filing delay, pre-BLA meeting, previous FDA commentary, growing prescriber concerns—we remain skeptical of broad, first cycle approval."[62]  So, while the Hubbard Report claims that Mr. Meacham noted that "the *filing included* 'an increasing list of red flags,'"[63] in actuality, that list of red flags was material entirely *outside* of the filing.  By falsely placing these "red flags" inside the filing, and relying on its false premise that the All Data Statement meant that all data were supportive of approval,[64] rather than consistent with the All Data Statement, the Hubbard Report manages to turn *any* concern with whether aducanumab

---

[60] See footnote 42.

[61] Hubbard Report, ¶59. Closing footnote omitted.

[62] "Our Thoughts Post the 2Q Call," *BofA Global Research*, July 22, 2020.

[63] Emphasis added.

[64] See, for example, Hubbard Report, ¶62, shortly after the quoted discussion in ¶59: "The above evidence demonstrates that the July 22 Statement did not convey to market participants that all data were supportive of approval on the front end."

would be approved into supposed evidence against the market believing in the All Data Statement.

60. The second prong of the argument here by the Hubbard Report is that "There is a Mismatch in the Level of Detail Between the Massie Appendix and the July 22 Statement[.]"[65]  The Hubbard Report first argues, "The Massie Appendix was far more detailed than the summary July 22 Statement. … Dr. Sandrock did not reference any data or analyses or subgroups. The Massie Appendix, however, was a 97-page report prepared by an FDA statistician for the AdCom that included extensive subgroup analyses, critiques of the trial methodology, assessments of unblinding and placebo declines, and multiple statistical modeling approaches."[66]

61. While this is true, the Hubbard Report fails to discuss here that it agrees with me that a generic disclosure such as "The data are not all consistent with there being a need to have a high dosage of aducanumab in order for it to be effective" would presumably have had a *more negative* effect on Biogen's stock price than a detailed disclosure.  As the Hubbard Report states:[67]

---

[65] Hubbard Report, Section V.A.ii header.

[66] Hubbard Report, ¶65. Closing footnote omitted.

[67] Hubbard Report, ¶50.  Internal footnote citing my deposition and closing footnote citing academic articles supporting my statement omitted.  While there is a large degree of formal mathematics behind it, a key insight of the "lemon theory" is that undisclosed information will tend not just to be bad, but extremely bad.  For example, suppose that the only information a college applicant can, but need not, provide is the result of a test that rates them on a scale of 0 (bad) to 100 (great) and further suppose that the scores are evenly distributed across applicants.  The average score is then 50.  At a first pass, one might expect any student with a score above 50 to voluntarily provide that information, as it exceeds the average (remembering again that the test is the only information that a student may provide).  But, if all the students with a score above 50 provide their scores, then the remaining students have scores in the range of 0 to 50, with an average of 25.  A student with a score above 25 would then want to provide their score to colleges.  The cycle continues until any student with a score above 0 voluntarily discloses their score.  Of course, in the real world, there are other relevant pieces of information that may interact with the unknown information, and not everyone acts rationally, but the "lemon
(continued)

> Under the "lemon theory" suggested by Dr. Tabak in his deposition, if market participants believed some of the data could be unsupportive, they would have assumed it was "among the worst possible outcomes" and the stock price would have reacted negatively. Dr. Tabak's "lemon theory" is consistent with the economic literature showing that information withholding would be interpreted with "extreme skepticism."

62. Had the market assumed that the trial data were "among the worst possible outcomes[,]" it would have been expected to have reacted very negatively, and likely more negatively than it did to the actual disclosures regarding the data in the Massie Report. Thus, to the extent that there is a mismatch between the All Data Statement and the Massie Report, the conclusion is not that one cannot use the stock-price response to the Massie Report to show price impact, but, rather, that the stock-price response to the Massie Report **understates** the degree of price impact that would have occurred from a generic statement that not all data support the Dosage Thesis.

63. The Hubbard Report also argues that the Massie Report contains additional material beyond that which would correct the All Data Statement.[68] In my deposition, I was asked, "Have you considered as part of your expert opinion whether the information in the Massie report that was released on November 4th was available to Biogen as of July 22nd?"[69] This led to the question of disaggregation, and I testified, "One possibility, for example, is to get, I'll call it broadly an FDA expert or FDA approval expert who can say look, here's the probability of approval given what was, you know, stated publicly, what was in the Massie report and what should have been stated publically [sic]. If you're saying what should have been stated publically [sic] may[ ]be at different levels or something different, that expert may say okay, here is the effect of stating that

---

theory" still posits that when a party voluntarily withholds information, it is likely because that information is not just below average, but among the worst possible values consistent with any known information.

[68] Hubbard Report, ¶66.

[69] Tabak Depo., 130:25-131:5.

information, being, you know, whatever you say Biogen could have disclosed at an earlier point in time."[70]

64. Despite quoting frequently from my deposition, the Hubbard Report does not address this aspect of my testimony. It was, however, brought up in Dr. Hubbard's deposition. First, however, when asked about disaggregation in a general context, Dr. Hubbard volunteered that "a doctor" may be able to perform at least some disaggregation analysis. ("Q. The unblinding dealt with the subgroup analysis. Right? A. Yes, but it's different. Yes, but it's not a one-to-one match. I don't think you could -- well, I'm not a doctor. Maybe you could find a doctor who could disaggregate what you want, but I haven't done that and Dr. Tabak hasn't done that."[71]) However, when read my deposition transcript with the quote above, Dr. Hubbard provided a different answer, saying, "[I]t's nonsense. I already told you you cannot -- the Massie report, as I understand it, has overlapping concerns, so you can't do the disaggregated -- it's a very facile answer, but it can't be done. I'm quite familiar with it. … I'm telling you his answer is nonsense from an economic perspective."[72]

65. Here, I agree with Dr. Hubbard's earlier testimony when discussing the aspects of the Massie Report generally that there may be a doctor, or an FDA expert, "who could disaggregate what you want" rather than his contradictory answer when asked about that same topic in the context of my disaggregation proposal (i.e., that my answer is "nonsense[,]" "facile[,]" or "nonsense from an economic perspective"). To be clear, the disaggregation of the probability of approval of aducanumab based on the allegation-related and any non-allegation-related information isn't an economic disaggregation, but would be done by an FDA or other medical expert, with the results applied to the decline in Biogen's stock price caused by the Massie Report.

---

[70] Tabak Depo., 132:6-19.

[71] Hubbard Depo., 250:11-19.

[72] Hubbard Depo., 322:7-18.

66. One example of this is in *Univ. of Tennessee Rsch. Found. v. Caelum Biosciences, Inc.*, No. 3:19-CV-508, 2024 WL 4101911 (E.D. Tenn. Aug. 7, 2024) ("Caelum Order") in which there was a challenge to an expert's "opinion regarding the probability that 11-1F4 will receive FDA approval[.]"[73]  The opinion discusses the debate on the expert's explanation of "how [he] came up with the number[.]"[74]  The ruling holds, "The Court therefore declines to exclude [the expert's] opinion regarding the probability of FDA approval."[75]  While I cannot say how an expert would approach the instant matter, there appears to be precedent for allowing an expert (using an appropriate methodology) to opine on the probability of FDA approval.  Here, I could base a disaggregation on an expert's opinion on the effect of the subgroup data on the probability of FDA approval.

67. I reaffirm that this can be one appropriate methodology to disaggregate the corrective information in the Massie Report from any information in the Massie Report that would not be considered corrective of the All Data Statement.  For example, suppose the probability or likelihood of approval of aducanumab was believed to be 50% without the Massie Report, but would be 30% given all the information in the Massie Report, and would be 35% if only the allegedly corrective information in the Massie Report were considered.  Then, the Massie Report lowered the probability of approval by 20 percentage points (50% less 30%), of which 15 percentage points (50% less 35%) was due to the corrective information.  Thus, 75% (15/20) of the effect of the Massie Report on Biogen's stock price would be attributable to the corrective information.

68. If necessary, I would be able to use the results of such an expert analysis (or any other analysis that determines the effect of the allegedly corrective portions of the Massie Report) to adjust the price effect of the Massie Report as a whole.  Notably, any such adjustment would apply on a class-wide basis.

---

[73] Caelum Order, p. 7.

[74] Caelum Order, p. 19. The quote is from the expert's deposition testimony with the bracketed "he" used in the Caelum Order.

[75] Caelum Order, p. 21.

**VIII.    THE HUBBARD REPORT'S CLAIM THAT PROLONGED PRICE VOLATILITY FOLLOWING THE RELEASE OF THE FDA BRIEFING BOOK RELATES TO UNCERTAINTY REGARDING THE ADCOM VOTE AND FDA APPROVAL IS A DISTINCTION WITHOUT A DIFFERENCE SINCE THE CORRECTIVE INFORMATION IN THE BRIEFING BOOK WAS THE NEW NEGATIVE INFORMATION THAT CONTRIBUTED TO THAT PROLONGED PRICE VOLATILITY**

69. The Hubbard Report next argues: "Prolonged Price Volatility Following the Release of the Briefing Book is Not Tied to the Allegedly Corrective Subgroup Patterns, but Relates More Broadly to the Continued Uncertainty of the AdCom Vote and FDA Approval, as well as the Eventual Negative AdCom Vote[.]"[76] This is a distinction without a difference. The proper question to ask is what caused that prolonged price volatility.

70. One reason for price volatility is that the market is weighing news with different implications, such as positive and negative news.  Commentators were clear that the bulk of the Briefing Book was positive, and only the Massie Report was negative.[77]  Even if the market was still simply reacting to the totality of the information in the Briefing Book, the Massie Report was a portion of that information and would still be expected to contribute to some portion of any later price movements.

71. The Hubbard Report argues, "On each of the days that Dr. Tabak cites as possibly reflecting price impact from the Massie Appendix, the observed price volatility was not attributable to the revelation of the subgroup statistics but instead reflected broader

---

[76] Hubbard Report, Section V.B header.

[77] See, for example, "Aducanumab briefing documents 'a landslide win' for Biogen, says..," *Theflyonthewall.com*, November 4, 2020.  ("The FDA draft questions, efficacy reviewer presentation and safety reviewer presentation are all positive for Biogen, said [Raymond James analyst Steven] Seedhouse, who only calls out the statistician's review as 'the first (and only as far as we can tell) piece of the application which is negative.'")

uncertainty surrounding aducanumab's approval and ultimately the negative AdCom vote."[78]  Again, the question is what was causing uncertainty surrounding aducanumab's approval.  The answer is the Massie Report.

72. Amazingly, the Hubbard Report then quotes analysts as saying "There is a statistician's review – which is NOT consistent [with] the main reviewer's key conclusions";[79] "The FDA draft questions, efficacy reviewer presentation and safety reviewer presentation are all positive for Biogen, said Seedhouse, who only calls out the statistician's review as 'the first (and only as far as we can tell) piece of the application which is negative.'";[80]  "There is one discrepant data point, unsurprisingly, from the statistical reviewer:";[81] and "That said, it's not all positive… there are some discrepancies between FDA clinical and statistical teams on why '301 was negative, and there is a lack of efficacy in APOE4 non-carriers."[82]

73. Nowhere does the Hubbard Report explain how the "prolonged" price volatility to the "continued" uncertainty that it recognizes is unrelated to what it quotes numerous analysts as saying is the singular piece of negative information.  The Hubbard Report's analysis fails for at least two reasons.  First, failing to tie the prolonged price volatility to the whole set of news (including the Massie Report) that caused the initial price movement is baseless.  That is like hitting a pendulum and then arguing that the continued movement of the pendulum after being hit was simply "prolonged" volatility somehow divorced from the initial hit.  Second, given that there is no dispute that Biogen's stock price fell by a statistically significant amount on November 5, one must at least consider that the market was reacting to the negative portion of the news on November 4 (i.e., the Massie Report).  The Hubbard Report never even considers this

---

[78] Hubbard Report, ¶69.

[79] Hubbard Report, ¶70. Material in brackets in Hubbard Report.

[80] Hubbard Report, ¶70.

[81] Hubbard Report, ¶71.

[82] Hubbard Report, ¶71.

obvious explanation for the price impact on November and certainly does not prove a complete lack of price impact from the Massie Report on November 5 or November 9.

74. In ¶¶73-74, the Hubbard Report notes that it agrees with me that the market *began* to incorporate news, including the Massie Report, on November 4. Of course, that says nothing about how long it took the market to fully incorporate that news.

75. In ¶¶75-76, the Hubbard Report makes the uncontroversial claim that much of the price movement occurred shortly after the release of the Briefing Book and then experienced "continued volatility." Again, the real question is whether the corrective information contributed to what the Hubbard Report admits are continued movements, or volatility, in Biogen's stock price. Interestingly, the Hubbard Report then states, "Some analysts further noted that while the substance of the Massie Appendix's findings was understood, there remained uncertainty regarding how these opinions will be weighed by the AdCom panelists[.]"[83] In other words, the "continued volatility" in Biogen's stock price was due, at least in part, to "uncertainty regarding how [the Massie Report] will be weighed by the AdCom panelists[,]" yet the Hubbard Report somehow concludes that the Massie Report had no price impact.

76. In his deposition, Dr. Hubbard had the following exchange: "[Q.] So just to confirm, is it your opinion that the continued volatility in Biogen stock price on November 5th and beyond are due, at least in part, to the analysts weighing Dr. Massie's views? [Objection.] A. It certainly is possible, yes."[84] However, see also Dr. Hubbard's earlier testimony where Dr. Hubbard contradicts these statements: "Q. So if the volatility on the 5th is similar to the volatility on the 4th, why isn't the same news continuing to create volatility in the stock? A. Well, theory tells you that can't happen."[85] In other words, after arguing that the factors that caused volatility in Biogen's stock price on

---

[83] Hubbard Report, ¶76.

[84] Hubbard Depo., 317:9-15.

[85] Hubbard Depo., 264:17-22.

November 4 could not be causing volatility in Biogen's stock price on November 5, Dr. Hubbard later effectively recanted that position and agreed "that the continued volatility in Biogen stock price on November 5th and beyond [was] due, at least in part, to the analysts weighing Dr. Massie's views[,]" which was information that was released on November 4.

77. However, see the testimony beginning on 270:15 of Dr. Hubbard's deposition, where Dr. Hubbard then argues that the Massie Report is not part of the cause of the continuing price volatility on November 5th, before finally agreeing at 272:18-23: "[Q.] So the continued volatility on November 5th certainly stems from the news that was released on November 4th.  Right?  A.  In part, yes, I would agree with that."

78. The analysis of the "continued volatility" in the Hubbard Report should be read in the light of Dr. Hubbard's fluctuating opinion on the potential source of that continued volatility over the course of his deposition (e.g., moving from arguing that theory tells us that it is not the case that "the same news" was continuing to create volatility on November 4 and 5 to agreeing, at least in part, that the volatility on November 5 "certainly stems from the same news that was released on November 4th.").

79. The Hubbard Report then credits my citing "the fact that two firms, J.P. Morgan and Raymond James, published additional reports describing a 'closer' or 'deeper' look [at the Massie Report] after the market close on November 4, 2020."[86]  The Hubbard Report states, that "while both analysts elaborated on the Massie Appendix's analyses after market closing on November 4, 2020, neither expressed novel or updated views on the Massie Appendix's main findings. Instead, both analysts maintained their ratings from the morning and emphasized uncertainty regarding the degree to which the Massie Appendix's findings may impact AdCom panelists' views, and ultimately aducanumab's approval[.]"[87]

---

[86] Hubbard Report, ¶80. Closing footnote omitted.

[87] Hubbard Report, ¶81. Internal footnote omitted.

80. Given that the Hubbard Report has just admitted that the analysts "elaborated on the Massie Appendix's analyses[,]" there is a direct path from the Massie Report through these analysts to further movements in Biogen's stock price. The fact that the analysts did not change their recommendations or price targets is of little to no import. As discussed later in this report, many analysts did not change their recommendations or price targets immediately, given the large amount of information they had to digest. Perhaps most importantly, the Hubbard Report provides no alternative explanation for Biogen's stock-price movement on November 5, much less any alternative explanation that can account for all of that price movement, other than the meaningless explanation that the market was reacting to uncertainty, an explanation that is meaningless in this context because much or all of that uncertainty was caused by the Massie Report.

81. In ¶82, the Hubbard Report states, "In other words, the price movement on November 5, 2020 and thereafter does not reflect any price impact of the allegedly corrective subgroup patterns themselves; rather, it reflects uncertainty related to factors that Biogen cannot control nor disclose." Again, the Hubbard Report fails to come to grips with the fact that much of the uncertainty was due to the release of the corrective subgroup patterns.[88] Nor does the Hubbard Report ever consider whether one would expect the same type of price movements had the allegedly corrective information been disclosed at the time of the All Data Statement.

82. The Hubbard Report then goes on to perform statistical analyses of Biogen's stock-price movement on November 5, 2020. Of course, once it has admitted that there was "continued volatility" or movements in the stock price due to "uncertainty," there is no point in performing statistical tests to see if there were indeed movements in the stock price. Nevertheless, I address the Hubbard Report's analyses.

---

[88] For another analogy, consider a gunshot victim whose vital signs are fluctuating. Surely one would not say that the shooter was not the proximate cause of those vital signs fluctuating since the continued fluctuations are due to factors such as exactly how the bullet hit various arteries, veins, and organs, information that the shooter "cannot control or disclose."

83. First, the Hubbard Report argues:[89]

> While modern, efficient financial markets incorporate value-relevant news rapidly during the trading day, any information that arrives overnight is ***almost entirely*** reflected in the stock price at the market open. Academic research shows that opening prices already embed news released outside regular trading hours.[128]
>
> > [128] *See*, *e.g.*, Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1), 1996, pp. 19-42, at pp. 19-20 ("In particular, on both exchanges [NYSE and NASDAQ], ***the majority*** of the price response to nontrading-hours earnings announcements is realized during the opening trade.").

84. Even if we credit the Hubbard Report's chosen academic article, there is a difference between "almost entirely" and "the majority[,]" meaning that the Hubbard Report's reasoning for limiting one of its analyses to the opening trade is problematic in that it would not be expected to capture all of the relevant price movement.[90]

85. Next, the Hubbard Report purports to perform an analysis in its Exhibit 8 purporting to show "Intraday Stock Price Declines on November 4, 2020 Comparable to Declines Following the Market Open on November 5, 2020[.]" The purported analysis in Hubbard Exhibit 8 is a textbook example of the type of apples-to-oranges analysis that is wholly inappropriate. As shown in Hubbard Exhibit 8, the November 5, 2020 price declines considered all start at the 9:30 open of trading and end at 9:35, 9:40, or 9:45, making them all exact multiples of five minutes that both start and stop at a minute ending in 0 or in 5. Yet, when looking for "comparable" declines on November 4, the Hubbard Report does not impose this restriction.[91] In fact, of the eight examples of price

---

[89] Hubbard Report, ¶83. Emphases added.

[90] In addition, the academic article citation is about earnings announcements, which are repeated events, meaning that analysts and the market are familiar with what is likely to be said and often need only plug new quantitative figures (e.g., the quarterly earnings figure) into a pre-existing model.

[91] See Hubbard Depo., 285:21-286:15. ("Q. Did you impose a restriction of looking at time periods that ended in a zero or five for the time periods highlighted in red for
(continued)

declines on November 4, 2020 listed in ¶¶86-87 of the Hubbard Report, only one would satisfy this criterion. Looking at the electronic backup to the Hubbard Report, only one out of sixteen identified "comparable" declines on November 4, 2020 would satisfy one of the criteria that the Hubbard Report imposes on the declines identified on November 5, 2020 (i.e., starting and ending on a minute ending in 0 or in 5).

86. Put simply, what the Hubbard Report does in its Exhibit 8 is a completely invalid analysis because it imposes additional restrictions on the November 5, 2020 declines that it does not impose on the November 4, 2020 declines. This may also explain why the Hubbard Report makes its claim about a comparison of the similarity of the volatility in Biogen's stock price on November 4 and November 5 without performing a single statistical test. Given the different manners in which the periods for which price movements were chosen on the two dates, any statistical test would be invalid. Notably, while Dr. Hubbard is comfortable drawing conclusions between these two sets of data (i.e., Biogen stock-price movements on November 4 and on November 5) without a statistical test, as discussed below, the Hubbard Report criticizes me for not performing a statistical test on other data (which, as I discuss below in Section IX, is due to the small number of observations of those data).

87. It is worth noting that Dr. Hubbard testified that he did not think that imposing restrictions on the periods chosen for price movements on November 5 but not on

November 4th in Exhibit 8? A. I did a lot of -- you have to be careful. You can't just look minute by minute or you get a lot of false positives. So I don't remember, to be honest. I'll stand ready when Dr. Tabak fires back. Q. So you're saying you did not impose a restriction of looking only at time periods that end in a zero or five for the periods highlighted in red for November 4th on Exhibit 8? A. I don't recall. I recall looking at the first 15 minutes. I have some sensitivities analyses, but when you're ready to do some work and send it my way, then I'm ready to talk to you again." Dr. Hubbard ultimately testified: "Q. So is it fair to say that you did not impose the same restrictions for the time periods on November 4th? A. I think that's right." (Hubbard Depo., 286:21-24.) In fact, Dr. Hubbard did not impose any such restriction on the November 4 periods, while he looked at only three periods that met that criterion on November 5, a classic apples-to-oranges comparison.

November 4 was a problem and that he thought that it was an apples-to-apples comparison.[92]  Dr. Hubbard even found no problem with comparing the speeds of two racers, one whose time is measured over the first five, ten, and fifteen minutes of a race and the other "over any period, regardless of the length of time, where I run as fast as they did over those three time periods."[93]  Such a comparison should be clearly invalid.  If I could sprint for thirty seconds as fast as the average speed of a marathon runner over the first fifteen minutes of a race, that would not make me as fast a runner as the marathoner.

88. Moreover, the three average price movements per minute for Biogen on November 5 that Hubbard Exhibit 8 considers for November 5 are $1.66, $0.34, and $0.49 per minute for the opening five, ten, and fifteen minutes, respectively.  However, looking at the opening three minutes would have yielded an average decline of $3.32 per minute while looking at the opening two minutes would have yielded an average decline of $4.77 per minute.  Notably, *both* of these are greater than the average decline of *every example* listed in ¶86 of the Hubbard Report.  Thus, even if there were a point to the Hubbard Report's argument that Biogen's price volatility on November 5 was similar to that on November 4 (a meaningless argument if both are caused, at least in part, by reactions to the Massie Report), that argument itself is based on an inappropriate comparison of price movements.

89. Dr. Hubbard was also not aware of what happens when two potentially identifiable declines are found near each other.[94]  For example, suppose the stock price

---

[92] Hubbard Depo., 287:16-288:8.  Dr. Hubbard's explanation for why this might not be an issue is "[y]ou're drawing from the same volatility distribution."  This explanation makes no sense.  First, the whole question is whether the volatility distributions on November 4 and 5 are the same.  Second, whether or not one believes that two distributions are the same, it would still be incorrect to make comparisons by drawing observations from the two distributions using different rules for which observations are drawn from each distribution.

[93] Hubbard Depo., 288:10-289:5.

[94] Hubbard Depo., 293:24-294:8.

goes from $340 to $330, then briefly up to $332 and then falls to $320. This could be counted as two declines ($340 to $330 and also from $332 to $320) or as one single decline (from $340 to $320). In fact, after reviewing Dr. Hubbard's electronic backup, I am still not aware of the rule used (if any such rule was used), as the starting and ending points of the identified declines are hard-pasted into the Excel sheet rather than being the result of any shown calculation. At least one decline, from 11:20 AM to 11:30 AM, could, in fact, be split into two separate declines that would satisfy the Hubbard Report's criteria. Thus, even putting aside all of the other infirmities with Hubbard Exhibit 8, there are no identifiable rules about how to replicate the analysis other than to accept what might be subjective decisions on the part of Dr. Hubbard's staff at Analysis Group.

90. Finally, with respect to the price movement on November 9, the Hubbard Report states, "What continued after market closing on November 5, 2020 was the uncertainty regarding the way in which the AdCom panel would weigh the information made available in the Briefing Book."[95] I agree with the Hubbard Report, that the market could still be processing the information in the Briefing Book, including the Massie Report, which could have an effect after the closing on November 5, 2020. The point is, however, that had Biogen released that information earlier, such as on July 22, the market would also have taken a presumably similar amount of time to process the corrective information. Stating the market isn't responding to the corrective information but rather to how questions of how the corrective information would affect the AdCom panel is meaningless, as the market would still have had similar questions had the corrective information been released earlier.

---

[95] Hubbard Report, ¶92.

### IX. ONCE CORRECTED TO REMOVE ILLOGICAL DATA POINTS THAT IT ADDED, THE HUBBARD REPORT'S REVIEW OF THE PRICE-IMPACT ANALYSIS IN THE TABAK REPORT DEMONSTRATES THE RELIABILITY OF THE TABAK REPORT'S PRICE-IMPACT ANALYSIS.

91. In the Tabak Report, I showed that analysts who reference the Massey Report increased their price targets less on November 4 and 5, 2020 than those who did not. This demonstrates the negative effect of the Massie Report on analysts, and, by extension, on the market.

92. The Hubbard Report does not appear to challenge the general framework used for this analysis in the Tabak Report other than to argue that it captures the entire effect of the Massie Report rather than just the part related to corrective information, an issue I address in Section X of this report.[96]  Instead, it (1) argues that the results are not statistically significant due to the small number of data points and (2) argues for changing the analyst reports used.  I address each of these issues in turn.

93. With respect to statistical significance, the Hubbard Report admits that the small sample size is a driving factor in the lack of statistical significance.  In other words, with my data, the results go in the right direction, but there simply aren't enough observations to achieve a statistically significant result.  Nevertheless, my result is still what is known as the "best estimate" (a statistical term of art) given the data.[97]  In addition, when there are few data points, one often does not consider statistical significance.  For example, I/B/E/S, a data vendor, puts out data on earnings surprises, meaning the difference between the actual earnings announced and the prior analyst estimate for those earnings, and that difference is accepted even though, due to the small number of analysts, in most

---

[96] Hubbard Report, ¶103.

[97] See, for example, Bluman, Allan G., *Elementary Statistics: A Step By Step Approach,* Eighth Edition, p. 392. ("An important aspect of inferential statistics is estimation. Estimations of parameters of populations are accomplished by selecting a random sample from that population and choosing and computing a statistic that is the best estimator of the parameter. A good estimator must be unbiased, consistent, and relatively efficient. The best estimate of $\mu$ is $\overline{X}$.")

cases, the surprise would not be statistically significantly different from the analyst average. The academic literature often studies the effects of earnings surprises (i.e., differences between reported earnings and the prior average analyst estimate) without accounting for whether the earnings surprise is statistically significantly different from zero.[98] And, as noted earlier, Dr. Hubbard attempts to compare price volatility on November 4 and 5 without any analysis of statistical significance.

94. With respect to the choice of analyst reports, for simplicity, I will focus on just one category of dispute with the Hubbard Report, its inclusion of three analysts who did not change their price targets, but purportedly "explicitly maintained"[99] those price targets on November 4. Exhibit 5 to this report shows all of the analyst report price targets used by Dr. Hubbard, with the three that "explicitly maintained" their price targets shown in red. As is readily apparent in Exhibit 5, those three analysts are outliers, having their "maintained" price targets below Biogen's stock price at the time of their report. This alone should allow us to reject the idea that these "maintained" price targets are meaningful or representative of any influences on Biogen's stock price. Notably, all but

---

[98] See, for example, Keung, Edmund, Zhi-Xing Lin, and Michael Shih, "Does the Stock Market See a Zero or Small Positive Surprise as a Red Flag?," *Journal of Accounting Research*, March 2010. This article uses "consensus earnings forecasts from I/B/E/S (p. 112), which, again, are just averages of analyst estimates. Nowhere does the article test to see whether any of the earnings surprises it uses is statistically significantly different from zero. Nevertheless, it draws conclusions about the market responses to earnings surprises of different magnitudes.

[99] Hubbard Report, ¶101. Dr. Hubbard seemed to contradict this in deposition, testifying that "it's actually printing a number I'm calling an affirmation as opposed to just not and you're looking back." (Hubbard Depo., 311:12-14.) To the extent that Dr. Hubbard is arguing that an affirmation is "actually printing a number[,]" that does not correspond to his report, in which he says that he includes analyst reports that "explicitly discussed keeping their price target the same." (Hubbard Report, ¶102.) Footnote 159 of the Hubbard Report explicitly rejects Dr. Hubbard's testimony just quoted, saying, "As Dr. Tabak noted in his deposition, some analysts may be slower to update their price targets than to publish reports. To ensure I am not including those that are simply "slow to update," I only include those analysts' reports that explicitly indicate they are choosing not to change their price target. *See* Tabak Deposition, 297:25-299:6."

one of the other analysts had a price target above Biogen's stock price at the time of their report (with the one exception being a report posted outside of regular market trading hours), which makes sense because target prices are estimates of future prices, and one would generally expect stock prices to rise over time.[100]

95. Next, it is almost impossible to believe that these three prior targets, one from August and two from October, were completely unaffected by new information since those price targets were set, including the Briefing Book.  The idea that these analysts set the exact same price target as a result of a considered analysis of new information, rather than just repeating their prior price target as a placeholder, would require believing that each of these analysts thought that the Briefing Book and all other information since the last time they set their target price had a net effect of exactly zero.  The Hubbard Report provides no basis for such a claim.

96. In addition, even Hubbard Exhibit 9 shows that analysts did not think the way that it does.  Note that Row 7 shows a BofA Global Research report on November 4, 2020 at 3:02 PM with an entry of "10/21/2020" in the column titled "Last Price Target Update[.]" According to Hubbard Exhibit 9, it appears that Dr. Hubbard did not even bother to look at prior analyst reports to try to find or verify the prior target price update, but simply relied on what analysts said, including when "some reports only contained the month of the previous price target."[101]

_____

[100] If the market as a whole thought that a company's stock price would decline, then sell orders should outweigh buy orders and the stock price should move to a lower level nearly instantaneously.

[101] Despite saying "some reports[,]" this footnote only applies to a single report in Hubbard Exhibit 9, from Wolfe Research.  In fact, that report did not "contain[] the month of the previous price target[,]" but instead contained a chart illustrating Wolfe Research's price targets over time from which one could estimate a month and date. Moreover, a simple review of the list of analyst reports considered by Dr. Hubbard would have found a single Wolfe Research report in the estimated month (August 2020), and a simple review of that report, dated August 20, 2020, would have confirmed that Wolfe Research changed its price target in that report.  See "Tecfidera the first of two shoes to drop?," *Wolfe Research*, August 20, 2020.

97. Next, we can turn to Row 2 of Hubbard Exhibit 9, which shows a BofA Global Research report on November 4, 2020 at 11:00 AM.  Clearly, the later BofA report in Row 7 did not consider the BofA report in Row 2 to be a "price target update," because it states that the last price target update was on October 21, 2020.  The Hubbard Report is arguing that one should consider certain purported cases of an analyst "explicitly maintain[ing]" its price target as a new data point, when the analysts (which he relied on to determine when the last price-target update was) themselves do not behave as if that were true.[102]

98. Two of the supposed zero-change price-target updates also make no sense given the ratings assigned in those reports.  The HC Wainwright report "maintains" its price target of $318 when Biogen's stock price was approximately $344, yet assigns a "Buy" rating and Wolfe Research "maintains" its price target of $275 when Biogen's stock price was approximately $352 and assigns a "Peer Perform" rating.[103]  HC Wainwright's suggestion to buy a stock that it purportedly expects to lose value is completely nonsensical while Wolfe Research's "Peer Perform" rating only makes sense if the analyst is expecting the peers to decline by approximately 20% in price, an expectation of a bear market that Wolfe Research notably does not mention.  It is much more reasonable

---

[102] The BofA Global Research Report in Row 2 of Hubbard Exhibit 9 stated, "Maintain U/P and $230 PO."  In his deposition, 308:17-24, Dr. Hubbard misstated his procedure for determining the date of the last price target update: "Q.  And how did you determine what date to put into column six for each analyst report?  A.  I'm not sure if that's a trick question.  I mean, these came out in November 4th or 5th, so I simply am looking for the most recent time before that that the price target has changed."  But this was not the case for the latter of the two BofA Global Research Reports.  Dr. Hubbard also claimed that he looked back at prior analyst reports to find a price-target change (Hubbard Depo., 308:17-30913), but this too was incorrect, as he or his staff simply looked at what analysts described as the last price-target change.  See ¶96 of this report.  Ultimately, questioned on the two BofA Global Research Reports, Dr. Hubbard testified, "Yes, although the team would have checked. That's why I'm not quite sure what happened here." (Hubbard Depo., 310:8-16.)

[103] Biogen's stock prices are the volume-weighted average prices from the minute before the publication of each of the analyst reports.

to believe that these are old price targets (and old ratings) rather that any purported maintaining of these price targets is meaningful.

99. Moreover, if one were to consider situations where analysts explicitly maintained their price targets as relevant, then many of the analyst reports listed in Hubbard Exhibit 9 should have a different entry in column (6), "Last Price Target Update[.]"  As shown in Exhibit 6 to this report, many of those analysts "explicitly maintained" their price targets after the dates shown in column (6) to Hubbard Exhibit 9.  The issue here appears to be that (1) Dr. Hubbard simply relied on when analysts stated that they updated their price targets, rather than doing the work of checking the analyst reports to see if there were any that met his rule for a price-target update and (2) the analysts themselves did not follow Dr. Hubbard's rule.  Put differently, the Hubbard Report has come up with its own rule for what constitutes a price-target update that does not match what analysts themselves do, and without this new rule, it would not be able to include the three reports that maintained their prior price targets on November 4, 2020.

100.    Even the "maintained" price targets that the Hubbard Report relies upon are not nearly as clean as the Hubbard Report suggests.  First, BofA Global Research merely copied and pasted its entire section on "Price objective & risk" from its October 21, 2020 report and its October 30, 2020 report without even mentioning the Briefing Book.[104]

---

[104] "Our Thoughts Post the 3Q20 Call: Biogen Calls, Raises, and Goes All In," *BofA Global Research*, October 21, 2020 and "Little read-throughs from EMA adu acceptance with CHMP opinion key," *BofA Global Research,* October 30, 2020.  Dr. Hubbard was shown the BofA Global Research Report in his deposition: "[Q.] So if you look at the price objective basis and risk section on page two of the October report --  A.  Yes, sir. Q. Would this count as a price target update in your view?  A.  I don't recall what their process is here.  This says the 230 is based on the sum of parts.  Whether that's current, I don't recall one way or the other." (Hubbard Depo. 312:22-313:8.)  Based on Dr. Hubbard's testimony that a price target analysis must be "current," the first BofA Global Research Report on November 4, 2020 would not count as an update, since it repeated its prior analysis verbatim without ever mentioning the Briefing Book.  Notably, even when Dr. Hubbard was made aware of this, he stated that BofA Global Research's 11 a.m. report on November 4 counted as a price-target update based on the "procedure that [he] understand[s] the team did in reviewing them." (Hubbard Depo., 316:7-8.)

Next, H.C. Wainwright wrote, "Our model and price target are planned to be reviewed pending the outcome of Friday's AdCom. In the interim, we reiterate our Buy rating and $318/share price target. Our price target of $318/ share is based on a discounted cash flow analysis using a 12% discount rate and 1% growth rate, in line with the expected discount and growth parameters of a commercial multiproduct biotechnology company."[105]  So, H.C. Wainwright only "reiterate[d]" its target price based on cash flows it estimated in an analyst report before the Briefing Book was released, and told the market that it planned to review the target price after the AdCom vote.  Finally, Wolfe Research wrote, "**We rate BIIB as Peer Perform (and ROG as Outperform; and LLY as Peer Perform)** – no change to our model or price target at this time. Naturally, aducanumab still has to clear the AdCom, then clear FDA approval, before knowing if aducanumab will become a reality. Approval could in principle happen by year-end. We **currently carry NO revenue forecasts for ANY Alzheimer's disease products** in any of our company models, BIIB, ROG, LLY or otherwise."[106]  Wolfe Research explicitly warned its readers that it had a conservative approach to aducanumab, "carry[ing] NO revenue forecasts for ANY Alzheimer's disease products[.]"  Because Wolfe Research apparently had an approach of assigning no value to such products until they reached some further, unspecified milestone, it is not surprising that its price target did not react to any perception that Wolfe Research may have had of the Briefing Book.

101.    Finally, in Exhibit 7 to this report, I provide statistical comparisons of the three analyst reports with no change in their price target to the other ten analyst reports in Hubbard Exhibit 9, using the type of analysis found in Figure 5 to the Hubbard Report (located between ¶99 and ¶100 of the Hubbard Report).  *First*, the "Average ( PT )" analyses in Exhibit 7 show that while the analysts that did not change their price target

---

[105] "Positive Brief Considerations on AdCom Briefing Documents Release, Ahead of Friday," *H.C. Wainwright*, November 4, 2020.

[106] "FDA leans favorably on adu; ROG & LLY will start to come into play," *Wolfe Research*, November 4, 2020. Emphases in original.

had an average price target of $274.33, those that did change their price target had an average updated price target of $391.00. Notably, this difference fails to be statistically significant despite the large difference in the price targets and even though the three unchanged price targets of $230, $275, and $318 were all at least $25 below the smallest of the new price targets, at $343, of the other ten reports. This is an indication that with such small sample sizes, even what would generally be considered a clear difference (each of the three unchanged price targets is below every single one of the changed price targets) need not generate a statistically significant result. *Second*, the "Average ( PT - Prior PT )[,]" or the average change in price targets, is statistically significantly different, with the unchanged price targets having a change of $0.00 (by definition) and the average change in the price target for those analysts that did change their price target being an increase of $81.30. Thus, even with the high bar for achieving statistical significance with only 13 observations, the three analyst reports with no change in their price target are not only inappropriate for the reasons outlined above, but they are also statistically different from, and unrepresentative of, analysts that took the time to calculate a new price target.

102.   Another useful observation comes from ¶71 of the Hubbard Report, which lists four analyst reports in which "there were specific discussion on the Massie Appendix's allegedly corrective subgroup patterns during trading hours on November 4, 2020[.]" Only one of those four reports appears in Hubbard Exhibit 9 (i.e., the other three did not have price-target updates). That report, a 3:25 PM report on November 4, 2020 by Oppenheimer, appears in row [8] of Hubbard Exhibit 9 and, after excluding the three analyst reports that did not actually change their price targets, has the *smallest increase in its price target* of the remaining analyst reports. In other words, the one analyst report in Hubbard Exhibit 9 that the Hubbard Report counts as among those that had a discussion of the corrective subgroup data was the most negative, in terms of increasing its price target, of all the analyst reports that reported a new price target. This is additional evidence that when market participants paid attention to the corrective data

-49-

in the Massie Report, they had more negative views of the likelihood of approval of aducanumab.

103.    As noted above, the Hubbard Report considered only analyst reports in which "there were specific discussion on the Massie Appendix's allegedly corrective subgroup patterns during trading hours on November 4, 2020[.]"  Looking at the three analyst reports after the end of trading hours on November 4 in Hubbard Exhibit 9 that mentioned the statistical report, only the Wells Fargo report at 9:32 PM mentioned the corrective subgroup analysis.  Notably, the price-target increase of $47 for this Wells Fargo analyst report was well below the average price-target increase of $85.75 for the analyst reports that mentioned the Massie Report but not the subgroup analyses.  Averaging that $47 with the $30 from the Oppenheimer report (the only other analyst to mention the corrective subgroup analyses) gives an average of $38.50 for those two reports.  To summarize (and using results from Exhibit 8 to this report):

- Mentions Massie and subgroup analyses:        $38.50 average PT increase

- Mentions Massie but not subgroup analyses:    $85.75 average PT increase

- Does not mention Massie:                      $98.25 average PT increase

104.    Exhibit 8 to this report shows what happens if we remove those three analyst reports that purportedly "explicitly maintained" their price targets: the results again show results in the same direction as those shown in the Tabak Report.  That is, analyst reports that mentioned the Massie Report increased their price targets by approximately $22 to $28 *less* than those that did not mention the Massie Report (compared to the Tabak Report's comparable calculation of increases of approximately $20 to $27 less than those of analysts that did not mention the Massie Report).

105.    The Hubbard Report then returns to the question of the continued volatility in Biogen's stock price, stating, that "elevated trading volume on November 5, 2020 is not evidence that the market is still trying to understand the negative findings in the Massie Appendix. As Dr. Tabak himself admitted at his deposition, the Massie Appendix was not tucked away and the market was capable of incorporating the executive summary

quickly. Instead, as I demonstrated in earlier sections of this report, ***market participants continued to grapple with how the AdCom panelists might weigh Dr. Massie's negative views on the statistical aspects of the studies*** against the positive clinician assessments in the Briefing Book[.]"[107]   Once again, the Hubbard Report makes the meaningless distinction between the market reacting to the Massie Report and the market reacting to how the Massie Report might affect the AdCom vote.  To be clear, had the corrective information been disclosed earlier, the market would have similarly grappled with how that information might affect the ultimate decision of the FDA to grant or deny approval of aducanumab.  The Hubbard Report has not even tried to argue that that would not be the case or that the ultimate effects, after all the grappling was done, would not be expected to be the same.

106.    The Hubbard Report goes on to argue, "Dr. Tabak's premise – that the length of time something is discussed or the number of times it is repeated is indicative of prolonged price impact – is inconsistent with his claims of market efficiency."[108]  Notably, I never made that claim.  In his deposition, Dr. Hubbard could not point to anywhere where I did make that claim.[109]  What I noted was that there was a continuing

---

[107] Hubbard Report, ¶107. Emphasis added. Internal footnote omitted.

[108] Hubbard Report, ¶111. Closing footnote omitted.

[109] Hubbard Depo., 318:9-19. ("Q.  Where specifically do you believe that Dr. Tabak claims that the length of time something is discussed or the number of times it is repeated is indicative of prolonged price impact?  A.  He said it. Is that a trick question?  Q.  He said it in his report?  A.  I believe so. And at his deposition, which was why he was given this question.") To be clear, in ¶73 of the Tabak Report, I stated that "three analyst firms mentioned the Massie Report for the first time after the November 4, 2020 close" (Closing footnote omitted) and mentioned that "two firms put out analyst reports with titles explicitly describing a 'Closer Look' or a 'Deeper Look' into the split in FDA analyses." (Closing footnote omitted.)  Those were evidence of ***new*** thoughts by analyses after the market close on November 4, 2020.  Then, in ¶74, I stated that "reviews of the percentage of analyst reports and news stories that referenced Dr. Massie and/or the Massie Report demonstrate a continued discussion of the Massie Report."  In other words, ***given that there was continued volatility in Biogen's stock price***, I pointed out that that corresponded with continued discussion of the Massie Report, not that the continued discussion meant that there was necessarily continued price impact.

price movement after the Briefing Book, that news stories continued to refer to the Massie Report, and that the share of news stories referring to the Massie Report was roughly constant over time. In other words, I did not present evidence that the news stories caused or reflected the length of time over which the market was "grappl[ing]" with information, but, rather that given the acknowledged volatility in Biogen's stock price, the information that the market was grappling with might be assessed by considering the information reflected in news stories, and that the news stories continued referring to the Massie Report. Ultimately, the Hubbard Report does not even really disagree with my actual conclusion, as, again, it itself admits that "market participants continued to grapple with how the AdCom panelists might weigh Dr. Massie's negative views on the statistical aspects of the studies against the positive clinician assessments in the Briefing Book[.]"[110] The only difference between my views and Dr. Hubbard's here appears to be that I believe that if market participants are grappling with information in the Massie Report, that shows a price impact from that report, while Dr. Hubbard appears to believe that if market participants are grappling with information in the Massie Report, that shows that the Massie Report somehow did not have any continuing price impact.

## X. THERE IS A RELIABLE METHOD FOR CALCULATING CLASS-WIDE DAMAGES IN THIS MATTER

107. The final section of the Hubbard Report argues that I have not demonstrated a reliable method for calculating class-wide damages in this matter. To begin, the Hubbard Report does not dispute the general applicability of the out-of-pocket damages model that I discussed in ¶¶58-62 of the Tabak Report. In short, in the Tabak Report, I explained how one could take a measurement of inflation and use that to determine damages for any member of the Class. The only thing that the Hubbard Report argues is that Dr. Hubbard does not agree with my approach to measuring inflation. I address that below but first

---

[110] Hubbard Report, ¶107. Internal footnote omitted.

point out that whatever measure of inflation that I employ would apply on a Class-wide basis.

108.   The Hubbard Report first argues that I have not shown how to separate out the allegedly corrective information in the Massie Report from allegedly non-corrective information in that report.  It even claims, "In fact, at his deposition he stated that he has not 'thought about how to apply' a methodology to disaggregate the confounding information in this case at all yet[,]"[111] and then cites in a footnote to a section of my deposition dealing with questions about November 9, rather than the whole period.  That footnote also includes a cite to my deposition testimony in which I discuss disaggregation and say, "I think the way I've done it, by looking at analyst reports that mention Massie versus those that don't and comparing the changes in their price targets is one way to do it, may not be the only way, because I'm not here to give a damages analysis at this point, but I think that is certainly one possibility."[112]

109.   As for dealing specifically with the allegedly corrective and non-corrective parts of the Massie Report, my deposition testimony immediately following the end of the material that the Hubbard Report cites is a question with the following answer: "I think one of the things to do is bring in an FDA expert who can say -- if, I said before, probability of approval is 60% without Massie, 40% with Massie, maybe there's an intermediate point like 45% where when broken up into fifteen and five one of those is allegation related, one of those is not allegation related."[113]  These quotes from my deposition read very differently from ¶188 of the Hubbard Report, which misleadingly suggests that I have not provided any indication as to how one might disaggregate confounding news on November 4, 2020.

---

[111] Hubbard Report, ¶118. Closing footnote omitted.

[112] Tabak Depo., 238:2-9.

[113] Tabak Depo., 244:10-17.

110.    As noted earlier, when asked about disaggregation in a general context, Dr. Hubbard volunteered that "a doctor" may be able to perform at least some disaggregation analysis. ("Q.  The unblinding dealt with the subgroup analysis.  Right?  A.  Yes, but it's different.  Yes, but it's not a one-to-one match.  I don't think you could -- well, I'm not a doctor.  Maybe you could find a doctor who could disaggregate what you want, but I haven't done that and Dr. Tabak hasn't done that."[114]  However, when read my deposition transcript with the quote above, Dr. Hubbard provided a different answer, saying, "[I]t's nonsense.  I already told you you cannot -- the Massie report, as I understand it, has overlapping concerns, so you can't do the disaggregated -- it's a very facile answer, but it can't be done.  I'm quite familiar with it. … I'm telling you his answer is nonsense from an economic perspective."[115]

111.    It is not clear what basis Dr. Hubbard has for claiming that a doctor or FDA expert could not provide reliable estimates of the three relevant probabilities I mentioned in my deposition testimony (i.e., the probability of approval of aducanumab based on publicly known information immediately before the release of the Briefing Book, that probability had only the subgroup data been made public, and that probability after the Briefing Book was made public).  Notably, before this comment in his deposition, Dr. Hubbard repeatedly qualified or refused to provide answers on certain matters because he was "not a doctor" or for a similar reason.  See, for example, Hubbard Depo., 12:19-23 (on the meaning of the Dosage Thesis), 13:20-14:14 (on whether a safety issue would be inconsistent with the Dosage  Thesis), 20:7-18 (on whether a failed study was not supportive of efficacy), 24:10-21 (on whether there is a difference between something being necessary and being sufficient), 25:11-18 (on whether the All Data Statement is a "necessary" or a "sufficient" statement), 27:17-29:8 (on whether in "test[ing] whether the market believed the all data statement to be false, would it be appropriate to examine statements about whether a high dose is sufficient to show an effect"), 31:19-32:5 (on

---

[114] Hubbard Depo, 250:11-19.

[115] Hubbard Depo., 322:7-18.

whether when talking about the design of the aducanumab study, a concept Dr. Hubbard brought up in his deposition, he was talking about post-hoc or pre study design); 65:19-66:7 (on when defendants first put forth a dosage thesis), 66:19-67:16 (on whether a certain statement represented in sum and substance the Dosage Thesis), 74:20-75:14 (on whether it is typical for companies to not disclose certain data), 108:16-24 (on whether the FDA normally requires two separate Phase 3 studies before approving drugs like aducanumab), 109:5-12 (on what a negative study means), 127:14-128:12 (on whether a hypothetical subgroup result would be inconsistent with the All Data Statement), and 225:7-226:5 (on whether a hypothetical reframing of the Massie Report would count as a corrective disclosure).

112.    To be clear, I do not fault Dr. Hubbard for qualifying or not providing an answer when he believed that a proper answer required medical knowledge that he did not possess.  My issue is that after repeatedly doing so, even on basic issues such as what is a "necessary" or a "sufficient" statement, Dr. Hubbard then says "I'm quite familiar with it" when discussing the analysis of the probability of FDA approval given certain real or hypothetical information, even going as far as to say that such an analysis would be "nonsense."[116]  Alternatively, to the extent that Dr. Hubbard is testifying that such probabilities could not be used to disaggregate the stock-price decline in November 2020 "from an economic perspective[,]" I fundamentally disagree and have explained my position in my deposition testimony quoted above.  In contrast, Dr. Hubbard has provided no reason, other than his bald assertion, that such a disaggregation would be inappropriate.

113.    In any event, because my deposition occurred before Dr. Hubbard submitted his report (and, indeed, his report frequently quotes from my deposition), he could have chosen to address my disaggregation argument in a considered manner in his report.  He

---

[116] Again, an expert was allowed to opine on the probability of FDA approval of a drug in the Caelum Order.

did not do so.  Defendants could also have put in a report from another expert had they wished to challenge my disaggregation argument but chose not to do so.

114.    Ultimately, I reiterate that an analysis of price-target changes among analysts that did and did not discuss the Massie Report is a reliable method to disaggregate the effects of the Massie Report from other news and that, if necessary, a qualified industry and/or FDA expert can distinguish the effects of the allegedly corrective and allegedly non-corrective parts of the Massie Report to further disaggregate the portion of the price reaction due to the corrective parts of the Massie Report.  This, combined with the unchallenged out-of-pocket measure of damages, and the limitation on damages in the 1995 Private Securities Litigation Reform Act, would then be applied in a Class-wide manner to determine damages for any individual Class member.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, NY on November 5, 2025.

_____
David I. Tabak
November 5, 2025



**David I. Tabak**
Senior Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 2176
david.tabak@nera.com
www.nera.com.

# EXHIBIT 1
# DAVID I. TABAK
## SENIOR MANAGING DIRECTOR

Dr. Tabak earned his Ph.D. and M.A. degrees in Economics from Harvard University and his B.S. in Economics and B.S. in Physics from the Massachusetts Institute of Technology.  While at Harvard, Dr. Tabak participated in teaching courses in micro- and macroeconomics and American economic policy at the undergraduate and graduate levels and in the creation of an undergraduate textbook and accompanying software package.

Dr. Tabak has appeared as an expert in state, federal, Delaware Chancery, and bankruptcy courts, and before arbitration panels, including the National Association of Securities Dealers, the American Arbitration Association, the International Dispute Resolution Centre, and the International Chamber of Commerce International Court of Arbitration.  He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in *Litigation Economics Review* and the *Journal of Forensic Economics*.  Dr. Tabak is also the author of book chapters and has served as a member of *BV Q&A Update's* expert author panel and as a referee for peer-reviewed journals.  His publications have covered topics such as commercial disputes, economic analysis of market efficiency, valuation discounts for lack of marketability, and the application of statistics in litigation analyses.  Dr. Tabak has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing legal education credits or continuing professional education credits for accountants and valuation professionals.

Dr. Tabak has been retained as an expert to address issues including allegations of valuations, contract disputes, commercial damages, and disputes between brokers and customers. His non-litigation work has included developing a risk-scoring model for a reinsurance company, assisting financial institutions in new product development, analysis of potential insider trading for a financial institution, and interpretation of statistical analyses of treatment effectiveness for a program for at-risk youth.

David I. Tabak

## Education

**Harvard University**
Ph.D., Economics, 1996
M.A., Economics, 1992

**Massachusetts Institute of Technology**
B.S., Economics, 1990
B.S., Physics, 1990

## Professional Experience

**NERA Economic Consulting**

2005-    *Senior Managing Director (f/k/a Managing Director, f/k/a Senior Vice President)*
Provide written and oral testimony. Conduct and supervise economic analyses, with a focus on securities litigation and valuation cases.

2001-2005    *Vice President*

1998-2001    *Senior Consultant*

1996-1998    *Senior Analyst*

**Harvard University**

1991-1996    *Teaching Fellow in Economics*
Participated in teaching various courses from introductory principles of economics to graduate macroeconomics. Ran coursewide tutorial program for the largest class at Harvard for two academic years, with a staff of over fifty part-time employees.

**Worth Publishers**

1991, 1993    *Research Assistant/Independent Contractor*
Worked on data collection, software analysis, and creation of a problem bank for an educational economics software package.

**National Bureau of Economic Research**

1991    *Research Assistant*
Performed data collection and econometric analysis for a project on comparisons of international growth rates.

## Honors and Professional Activities

Member, American Economic Association, 1993-present

Referee, *Journal of Forensic Economics*, 2005, 2006, 2008, 2009, 2011, 2012, 2015

David I. Tabak

Referee, *Litigation Economics Review*, 2002, 2003, 2004

William M. Mercer Securities Corporation, Registered Representative, Series 7 and 63, 2000 - 2002

Marsh & McLennan Securities Corporation, Registered Representative, Series 7 and 63, 1998 - 2000

Adjunct Member, Committee on International Trade, Association of the Bar of the City of New York, 1998 – 2001

Harvard University Scholarship, 1990-1992

Derek Bok Teaching Award, 1993, 1994, 1995, and 1996

Allyn Young Teaching Award, 1996

## Expert Reports and Testimony

Expert Report of David I. Tabak, Ph.D. before the Federal Court of Australia, District Registry: Victoria, Division: General in *Edmund How Fen Yong v. Westpac Banking Corporation*, September 18, 2025

Deposition Testimony before the United States District Court for the Northern District of California in *Guiseppe Pampena*, et al., *v. Elon Musk*, August 1, 2025.

Deposition Testimony before the United States District Court for the District of Massachusetts in *Nadia Shash* et al. v. *Biogen Inc.* et al., July 29, 2025.

Supplemental Expert Report before the United States District Court for the Northern District of California in *Guiseppe Pampena*, et al., *v. Elon Musk*, July 18, 2025.

Deposition Testimony before the United States District Court for the Northern District of California in *Guiseppe Pampena*, et al., *v. Elon Musk*, July 16, 2025.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *Nadia Shash* et al. v. *Biogen Inc.* et al., June 25, 2025.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *In re The Boeing Company Aircraft Securities Litigation*, June 6, 2025.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *Ohio Public Employees Retirement System*, et al., *v. David L. Calhoun*, et al., June 4, 2025.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re the Enovix Corporation Securities Litigation*, May 22, 2025.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *Guiseppe Pampena*, et al., *v. Elon Musk*, May 2, 2025.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *Ohio Public Employees Retirement System*, et al., *v. David L. Calhoun*, et al., April 23, 2025.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *In re The Boeing Company Aircraft Securities Litigation*, April 7, 2025.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Srinivasan Venkataraman v. Kandi Technology Group, Inc.* et al., March 24, 2025.

David I. Tabak

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *In re The Boeing Company Aircraft Securities Litigation*, February 7, 2025.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of New York in *Employees Retirement System for the City of Providence v. Urs Rohner, et al.*, December 13, 2024.

Deposition Testimony before the Eastern District of New York in *Shane Lavin v. Virgin Galactic Holdings, Inc. et al.*, November 20, 2024.

Expert Report of David I. Tabak, Ph.D. before the Eastern District of New York in *Shane Lavin v. Virgin Galactic Holdings, Inc. et al.*, October 11, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the Northern District of California in *Guiseppe Pampena v. Elon Musk*, September 16, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the Eastern District of Pennsylvania in *In re Chester Vanguard Funds Litigation*, September 5, 2024.

Deposition Testimony before the Northern District of California in *Guiseppe Pampena v. Elon Musk*, August 9, 2024.

Deposition Testimony before the Eastern District of Pennsylvania in *In re Chester Vanguard Funds Litigation*, June 17, 2024.

Expert Report of David I. Tabak, Ph.D. before the Eastern District of Pennsylvania in *In re Chester Vanguard Funds Litigation*, May 29, 2024.

Expert Report of David I. Tabak, Ph.D. before the Northern District of California in *Guiseppe Pampena v. Elon Musk*, May 22, 2024.

Deposition Testimony before the Southern District of New York in *Daniel Lee v. Richard Golaszewski and Stephen Swentzel*, May 9, 2024.

Expert Sur-Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *Charles Larry Crews et al. v. Rivian Automotive, Inc et al.*, April 26, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Ltd. Securities Litigation*, April 19, 2024.

Deposition Testimony before the United States District Court for the Central District of California in *Charles Larry Crews et al. v. Rivian Automotive, Inc et al.*, April 11, 2024.

David I. Tabak

Expert Rebuttal Report of David I. Tabak, Ph.D. before the Southern District of New York in *Daniel Lee v. Richard Golaszewski and Stephen Swentzel*, April 10, 2024.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, February 29, 2024.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *Charles Larry Crews et al. v. Rivian Automotive, Inc et al.*, February 27, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, February 2, 2024.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, February 2, 2024.

Deposition Testimony before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, December 20, 2023.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, November 20, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of Ohio in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, November 16, 2023.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Vale S.A. Securities Litigation*, November 8, 2023.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Ltd. Securities Litigation*, November 2, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of New York in *In re Vale S.A. Securities Litigation*, October 17, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Ltd. Securities Litigation*, October 5, 2023.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, September 12, 2023.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, November 9, 2022.

Expert Reply Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, October 12, 2022.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, September 23, 2022.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, August 22, 2022.

Reply Expert Report of David I. Tabak, Ph.D. before the Northern District of Illinois in *In re Kraft Heinz Securities Litigation*, July 19, 2022.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, July 8, 2022.

Deposition Testimony before the Southern District of New York in *Sjunde AP-Fonden* et al. *v. General Electric Company* et al., July 1, 2022.

Reply Expert Report of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden* et al. *v. General Electric Company* et al., June 9, 2022.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, May 25, 2022.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Qualcomm Incorporated Securities Litigation*, May 19, 2022.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, May 11, 2022.

Deposition Testimony before the Northern District of Illinois in *In re Kraft Heinz Securities Litigation*, May 5, 2022.

Supplement to Expert Report of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden* et al. *v. General Electric Company* et al., April 29, 2022.

Expert Report of David I. Tabak, Ph.D. before the Northern District of Illinois in *In re Kraft Heinz Securities Litigation*, March 28, 2022.

Expert Report of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden* et al. *v. General Electric Company* et al., March 11, 2022.

Testimony before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* January 13, 2022.

Updated Expert Report of David. I Tabak, Ph.D. before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* January 12, 2022.

Updated Expert Report of David. I Tabak, Ph.D. before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* January 8, 2022.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Arizona in *David G. Lowthorp v. Mesa Air Group Incorporated, et al.*, January 3, 2022.

Deposition Testimony before the United States District Court for the Northern District of California in *In re Oracle Securities Litigation*, November 23, 2021.

Deposition Testimonh before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* October 28, 2021.

Expert Report of David. I Tabak, Ph.D. before the American Arbitration Association Commercial Panel in *Honeywell International, Inc. v. Rheem Sales Company, Inc.,* October 15, 2021.

Expert Report of David. I Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Oracle Securities Litigation*, October 6, 2021.

Reply Report of David I. Tabak, Ph.D. (on damages) before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 20, 2021.

Rebuttal Report of David I. Tabak, Ph.D. (on negative causation) before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 20, 2021.

Deposition Testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, September 1, 2021.

Reply Expert Report of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden v. General Electric Company*, August 16, 2021.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, August 4, 2021.

Testimony before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, July 27, 2021.

Deposition Testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, June 22, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, June 17, 2021.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, May 28, 2021.

David I. Tabak

Expert Reports of David I. Tabak, Ph.D. before the Southern District of New York in *Sjunde AP-Fonden v. General Electric Company*, May 21, 2021.  (Two reports submitted simultaneously.)

Expert Report of David I. Tabak , Ph.D. before the Court of Chancery of the State of Delaware in *In re CVR Refining, LP Unitholder Litigation*, March 16, 2021.

Deposition Testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, December 14, 2020.

Rebuttal Expert Report before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, December 2, 2020.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, August 7, 2020.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, August 5, 2020.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, July 30, 2020.

Deposition Testimony before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, July 28, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Connecticut in *In re Teva Securities Litigation*, June 18, 2020.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, June 11, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia, Alexandria Division, in *In re Willis Towers Watson Proxy Litigation*, June 9, 2020.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, May 13, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Celgene Securities Litigation*, April 30, 2020.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, April 28, 2020.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Grupo Televisa Securities Litigation*, April 25, 2020.

Deposition Testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., January 17, 2020.

Expert Report of David I. Tabak, Ph.D. in the United States Bankruptcy Court for the District of Delaware in *In re: Paragon Offshore PLC, Debtor* and *Paragon Litigation Trust v. Noble Corporation PLC, et al.*, January 15, 2020.

Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, October 18, 2019.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., September 23, 2019.

Supplemental Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, August 21, 2019.

Deposition Testimony before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, July 11, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Illinois, Eastern Division in *In re Akorn, Inc. Data Integrity Securities Litigation*, June 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Northern District of Georgia in *In re HD Supply Holdings, Inc. Securities Litigation*, June 17, 2019.

Expert Affidavit of David I. Tabak before the United States District Court for the Northern District of Illinois in *George Hedick Jr. v. The Kraft Heinz Company, et al.* and in *Iron Workers District Council (Philadelphia and vicinity) Retirement and Pension Plan v. The Kraft Heinz Company, et al.*, May 15, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, April 8, 2019.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 29, 2019.

Deposition Testimony before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 27, 2019.

Deposition Testimony before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, March 20, 2019.

Expert Report of David I. Tabak before the United States District Court for the Central District of California in *Trevor Mild v. PPG Industries et al.*, March 8, 2019.

Rebuttal Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 7, 2019.

Expert Declaration of David I. Tabak before the United States District Court for the District of Puerto Rico in *The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico et al.*, February 25, 2019.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, February 11, 2019.

Testimony before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., June 12, 2018.

Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., June 4-5, 2018.

Deposition Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., May 14, 2018.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, April 6, 2018.

Deposition Testimony before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., March 23, 2018.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Alibaba Group Holding Limited Securities Litigation*, March 9, 2018.

Expert Report of David I. Tabak, Ph.D. before JAMS Arbitration in *John Mariani, Jr.* et al. *v. James Mariani* et al., February 21, 2018.

Expert Report of David I. Tabak, Ph.D. before the Court of Chancery of the State of Delaware in *A. Schulman, Inc.,* et al. *v. Citadel Plastics Holdings, LLC,* et al., February 16, 2018.

Rebuttal Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, November 17, 2017.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, October 26, 2017.

Report of David I. Tabak, PhD in *Babscay Pty Ltd v. Slater & Gordon Limited*, Federal Court Proceeding VID 659 / 2017, Australia, October 26, 2017.

Deposition Testimony before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 28, 2017.

David I. Tabak

Rebuttal Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, September 20, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Vale S.A. Securities Litigation*, September 14, 2017.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, County of Westchester, in *Paraco Gas Corporation v. Ferrellgas, L.P.*, August 24, 2017.

Supplement to Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 9, 2017.

Deposition Testimony before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., August 1, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., June 15, 2017.

Sur-Reply Expert report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., May 31, 2017.

Reply Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., May 26, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., May 8, 2017.

Deposition Testimony before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., April 21, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., April 13, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Bing Li* et al. v. *Aeterna Zentaris* et al., March 23, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of South Carolina in *Edna Selan Epstein* et al. *vs. World Acceptance Corporation* et al., March 16, 2017.

David I. Tabak

Supplement to Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, February 21, 2017.

Deposition Testimony before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, February 8, 2017.

Expert Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, January 17, 2017.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Middle District of Florida, Jackson Division in *In re Rayonier Inc. Securities Litigation*, December 12, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the District of Vermont in *Louisiana Municipal Police Employees' Retirement System* et al. *v. Green Mountain Coffee Roasters, Inc.* et al., December 9, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re Rocket Fuel, Inc. Securities Litigation*, December 8, 2016.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, November 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Salix Pharmaceuticals*, October 7, 2016.

Rebuttal Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, May 6, 2016.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, February 11, 2016.

Deposition Testimony before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 9, 2016.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, February 3, 2016.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, January 29, 2016.

Expert Report of David Tabak, Ph.D. before the Securities and Exchange Commission in *In the Matter of Arthur F. Jacob, CPA and Innovative Business Solutions, LLC,* January 29, 2016.

Deposition Testimony before the United States District Court for the Eastern District of New York in *In re Symbol Technologies, Inc. Securities Litigation*, January 28, 2016.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, December 23, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Symbol Technologies, Inc. Securities Litigation*, December 11, 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Virginia in *In re Genworth Securities Litigation*, December 2, 2015.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, November 16, 2015.

Expert Report of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, November 12, 2015.

Deposition Testimony before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, September 2, 2015.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, July 20, 2015.

Rebuttal Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 15, 2015.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Bridgepoint Securities Litigation*, June 1, 2015.

Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 30, 2015.

Declaration of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *George Byrun et al. v. Salix Pharmaceuticals et al.*, 30 January 2015.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Minnesota in *Första AP-Fonden and Danke Invest Management A/S et al. v. St. Jude Medical, Inc. et al.*, January 13, 2015.

Expert Report of David Tabak before the Securities and Exchange Commission in the matter of *Airtouch Communications, Inc., Hideyuki Kanakubo, and Jerome Kaiser, CPA*, December 16, 2014.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Puda Coal Securities et al. Litigation*, November 13, 2014.

Deposition Testimony before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, July 2, 2014.

Testimony before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 16, 2014.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of Ohio, Western Division (at Dayton) in *Antioch Litigation Trust, W. Timothy Miller, Trustee,* against *McDermott Will & Emery LLP*, June 11, 2014.

Supplemental Expert Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, June 3, 2014.

Deposition before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. against *AriZona Beverages USA LLC et al.*, March 31, 2014.

Cross Examination in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation et al. before the Ontario Superior Court of Justice (Commercial List), March 19, 2014.

Report of David I. Tabak, Ph.D. before the Supreme Court of the State of New York, Nassau County, in *John M. Ferolito* et al. *against AriZona Beverages USA LLC et al.*, March 11, 2014.

Report of David I. Tabak in the Matter of the Companies' Creditors Arrangement Act and in the Matter of a Plan of Compromise or arrangement of Nortel Networks Corporation *et al.* before the Ontario Superior Court of Justice (Commercial List), February 28, 2014.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2013.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, September 4, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2013.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, June 27, 2013.

Deposition Testimony before the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, May 10, 2013.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, April 11, 2013.

Declaration of David I. Tabak, Ph.D. in the United States District Court for the Western District of Texas in *KB Partners I v. Pain Therapeutics, Inc. et al.*, March 21, 2013.

Reply Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, November 8, 2012.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation*, November 6, 2012.

Deposition Testimony before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, July 12, 2012.

Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, May 3, 2012.

Written Direct Testimony of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, April 17, 2012.

Declaration of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *In re Merck & Co, Inc. Securities, Derivative & "ERISA" Litigation*, April 10, 2012.

Rebuttal Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, January 30, 2012.

Expert Report before the Supreme Court of Victoria at Melbourne in *Pathway Investments Pty Ltd and Doystoy Pty Ltd vs. National Australia Bank Limited*, December 5, 2011.   (Affidavits testifying to the report executed on December 9, 2011 and December 20, 2011.)

Deposition Testimony before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, August 1, 2011.

Expert Report of David Tabak, Ph.D. before the United States Bankruptcy Court for the Southern District of New York in *In re: Adelphia Communications Corp.* and *Adelphia Recovery Trust vs. FPL Group*, July 8, 2011.

Deposition Testimony before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, February 3, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *In re Novatel Wireless Securities Litigation*, January 11, 2011.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of New Jersey in *Securities and Exchange Commission v. Alfred S. Teo, et al.*, November 4, 2010.

David I. Tabak

Declaration of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 29, 2010.

Deposition Testimony before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, October 7, 2010.

Expert Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, September 16, 2010.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of Massachusetts in *In re Smith and Wesson Holding Corp. Securities Litigation*, August 30, 2010.

Rebuttal Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., April 25, 2010.

Declaration of David Tabak, Ph.D. before the United States District Court for the Southern District of California in *Maureen Bakke,* et al. *vs. Novatel Wireless,* et al., March 12, 2010.

Testimony before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., November 6, 2009.

Expert Rebuttal Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., October 19, 2009.

Expert Report of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, September 17, 2009.

Expert Report of David Tabak, Ph.D., before the International Dispute Resolution Centre *in the matter of an arbitration and in the matter of the Arbitration Acts 1950-1979 between Motorola, Inc. and Ace Bermuda Insurance, Ltd*., September 10, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, July 16, 2009.

Declaration of David Tabak before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, July 13, 2009.

Rebuttal Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, June 26, 2009.

Deposition Testimony before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, June 16, 2009.

David I. Tabak

Declaration and Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Georgia in *In re NetBank Securities Litigation*, May 29, 2009.

Deposition Testimony before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, May 6, 2009.

Expert Report of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, April 15, 2009.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, February 17, 2009.

Declaration of David Tabak, Ph.D., before the United States District Court for the Central District of California in *Donald Johnson v. James D. Aljian, Kirk Kerkorian, and Tracinda Corporation*, January 5, 2009.

Expert Report of David Tabak, Ph.D., before the Supreme Court of the State of New York, County of New York, in *Herbert Feinberg against Jerome S. Boros; Robinson, Silverman, Pearce, Aronsohn & Berman and Bryan Cave*, December 15, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Northern District of Texas in *Fluor Corporation v. Citadel Equity Fund Ltd.*, November 7, 2008.

Deposition Testimony before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* October 31, 2008.

Declaration of David Tabak, Ph.D., before the District Court for the Southern District of New York in *In Re American International Group Inc. Securities Litigation,* September 23, 2008.

Cross-Examination before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, June 23, 2008.

Surrebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, January 11, 2008.

Affidavit of David I. Tabak before the Superior Court of Justice, Ontario, in *Peter McCann v. CP Ships Limited, Raymond Miles, Frank Halliwell, and Ian Weber*, December 19, 2007.

Rebuttal Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 19, 2007.

Report of David Tabak before the New York Stock Exchange in *Ronald G. Pettengill, et al. v. Robertson Stephens, Inc. et al.*, December 3, 2007.

Deposition Testimony before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund, et al. vs. The Coca-Cola Company*, August 23, 2007.

David I. Tabak

Deposition Testimony before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, June 13, 2007.

Expert Report of David Tabak before the District Court for the Northern District of Georgia in *Carpenters Health & Welfare Fund,* et al. *vs. The Coca-Cola Company*, May 30, 2007.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, April 27, 2007.

Expert Report of David Tabak before the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada in *Holmes Lundt et al. v. Fenwick & West, LLP and Robert A. Freedman*, April 4, 2007.  (Amended report, June 25, 2007.)

Rebuttal Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, January 18, 2007.

Expert Report of David Tabak before the United States District Court for the Southern District of New York in *In re Omnicom Group Inc. Securities Litigation*, December 18, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, November 9, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 13, 2006.

Affidavit of David I. Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, October 11, 2006.

Rebuttal Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, October 4, 2006.

Expert Report before the United States District Court for the District of Colorado in *Genesis Insurance Company v. Daniel D. Crowley, Arlin M. Adams, National Union Fire Insurance Company of Pittsburgh PA*, October 4, 2006.

Deposition Testimony before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, September 15, 2006.

Expert Report before the United States District Court for the Eastern District of Michigan in *In re CMS Energy Securities Litigation*, August 25, 2006.

Deposition Testimony before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, July 20, 2006.

Deposition Testimony before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, May 25, 2006.

David I. Tabak

Affidavit before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, April 14, 2006.

Deposition Testimony before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 24, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Southern District of Texas in *In re Enron Corporation Securities Litigation*, March 17, 2006.

Rebuttal Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, March 9, 2006.

Expert Report of David Tabak before the United States District Court for the District of Colorado in *In re Rhythms Securities Litigation*, February 13, 2006.

Expert Report of David Tabak before the United States District Court for the Northern District of Oklahoma in *In re Williams Securities Litigation (WCG Subclass)*, February 1, 2006.

Rebuttal Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 30, 2005.

Deposition Testimony before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, November 9, 2005.

Expert Report of David Tabak, Ph.D. before the American Arbitration Association in *Warren N. Lieberfarb v. Warner Home Video Inc.*, October 3, 2005.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Eastern District of Pennsylvania in *Sean Fitzpatrick v. Michael Queen, Thomas McGreal, Joseph W. Luter, IV, Michael H. Cole, Smithfield Foods, Inc., Showcase Foods, Inc., and Pennexx Foods, Inc.*, March 25, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 24, 2005.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, February 18, 2005.

Affidavit of David Tabak, Ph.D. and Stephanie Plancich, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Doug Sutton and Prescott Nottingham v. Robert F. Bernard, Robert T. Clarkson, and Bert B. Young*, January 11, 2005.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, January 5, 2005.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Phoenician Trading Partners, L.P. v. Blue Water Fund Ltd., et al.*, January 3, 2005.

Affidavit of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, December 14, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *In re CryoLife, Inc. Securities Litigation*, December 10, 2004.

Deposition Testimony before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, October 4, 2004.

Rebuttal Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, September 22, 2004.

Deposition Testimony before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, September 9, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Illinois, Eastern Division in *Richard C. Snyder, et al. v. Thomas and Betts Corporation*, August 20, 2004.

Further Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, July 30, 2004.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Northern District of Georgia, Atlanta Division in *David Jones and Susan Jones v. InfoCure Corporation, et al.*, June 30, 2004.

Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 7, 2004.

Deposition Testimony before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, April 2, 2004.

Expert Report of David Tabak before the United States Bankruptcy Court for the District of Delaware in *In Re Coram Healthcare Corp. and Coram, Inc.*, March 31, 2004.

Statement of David Tabak, Ph.D. before the United States District Court for the Southern District of New York in *United States of America v. Morris Weissman*, February 10, 2004.

Additional Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, December 17, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the Southern District of Ohio Eastern District (at Columbus) in *Barry F. Bovee, et al. v. Coopers & Lybrand, et al.*, December 16, 2003.

David I. Tabak

Deposition Testimony before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation* and in *In Re Safety-Kleen Rollins Shareholders Litigation*, October 23, 2003.

Statement of David Tabak before the New York Stock Exchange in *Robert Belau et al. v. FleetBoston Financial Corporation et al.*, October 1, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Stockholders Litigation*, August 28, 2003.

Expert Report of David Tabak, Ph.D. before the United States District Court for the District of South Carolina in *In Re Safety-Kleen Rollins Shareholders Litigation*, August 28, 2003.

Testimony before the NASD in *Ralph Rubenstein, JANT Foundation, et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* June 19, 2003.

Affidavit of David Tabak, Ph.D. and Ramzi Zein, Ph.D. in Support of Norwegian Cruise Line's Opposition to Proposed Rule before the Federal Maritime Commission, May 30, 2003.

Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, March 11 and 12, 2003.

Declaration of David I. Tabak in Support of Defendant's Motion in Opposition to Appointment of Additional Lead Plaintiffs and Class Certification before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, June 21, 2002.

Affidavit before the United States District Court for the District of Rhode Island in *George Kinney et al. v. Metro Global Media, Inc., et al.* May 15, 2002.

Testimony before the American Arbitration Association in *Beth Kaplan v. Rite Aid Corporation; Rite Aid Corporation v. Beth Kaplan and Bruce Sholk*, May 2-3, 2002.

Expert Report of David I. Tabak before the United States District Court for the District of Idaho in *Pippin v. ICF Kaiser International, et. Al, Wood v. Edwards et al.*, February 11, 2002.

Deposition Testimony before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, February 7, 2002.

Deposition Testimony before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Securities, Inc. Litigation*, January 17, 2002.

Affidavit before the United States District Court for the District of Columbia in *In Re Baan Company Securities Litigation*, January 10, 2002.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of Pennsylvania in *In Re Equimed Inc. Securities Litigation*, December 28, 2001.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Castle Creek Technology Partners LLC against Cellpoint Inc.*, December 13, 2001.

Deposition Testimony before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, October 11, 2001.

Deposition Testimony before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the Circuit Court of Maryland for Baltimore City in *Carnegie International Corporation, et al. vs. Grant Thornton, LLP., et al.*, September 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *Morgens, Waterfall, Vintiadis & Co., Inc. et al. against Donaldson, Lufkin & Jenrette Securities Corporation et al.*, September 6, 2001.

Testimony before the United States District Court for the Eastern District of New York in *United States of America against Harry Shuster*, July 30, 2001.

Declaration before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, July 23, 2001.

Testimony before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, May 29, 2001.

Opinion Letter before the United States District Court for the Eastern District of New York in *United States of America against Roy Ageloff, et al.*, May 24, 2001.

Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, May 22, 2001.

Testimony before the Supreme Court of the State of New York, County of New York in *Robert Klein against 5B Technologies Corporation f/k/a Paramount Financial Corporation and Deltaforce Personnel Services, Inc.*, May 17, 2001.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *In the Matter of the Arbitration Between Michael A. Brownlee, M.D. against Marc Keller, Schroder & Co., Inc. and Sanfrey Securities, Inc.*, April 25, 2001.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Central District of California in *In Re Imperial Credit Industries, Inc. Securities Litigation*, April 5, 2001.

Affidavit before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, February 8, 2001.

Deposition Testimony before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 19, 2001.

Expert Report of David I. Tabak before the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida in *U.S. Diagnostic, Inc. and Diversified Therapy Corporation vs. Bachner, Tally, Polevoy & Misher, LLP and Michael Karsch*, January 11, 2001.

Supplemental Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, September 13, 2000.

Expert Report of David I. Tabak before the United States District Court for the Eastern District of New York in *Martin R. Lautman v. The Loewen Group Inc., et al.*, September 6, 2000.

Supplemental Affidavit of David I. Tabak before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 25, 2000.

Affidavit of David I. Tabak and Christoph Muelbert before the Circuit Court of Franklin County, Alabama in *James Taff, individually and on behalf of all others similarly situated, vs. CareMark Rx, Inc and PNC Bank, Kentucky Inc.,* May 23, 2000.

Expert Report of David I. Tabak before the State of Minnesota, County of Hennepin District Court, Fourth Judicial District in *Irving P. Knelman v. Investment Advisers, Inc.*, April 28, 2000.

Testimony before the American Arbitration Association in *Roderick Covlin against C.S. Block New York, LLC, Dr. Sharaif Amanat, Omar Amanat*, March 30, 2000.

Expert Report of David I. Tabak before the National Association of Securities Dealers Office of Dispute Resolution in *Brooks, Houghton & Company, Inc. Private Corporate Advisors, Inc., and Brooks, Houghton Securities, Inc. against BIG Entertainment, Inc.*, March 17, 2000.

Declaration of David I. Tabak before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* February 21, 2000.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *The Klass Report LLC and Christopher M. Klass against Telemation, Inc.*, December 15, 1999.

Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Southern District of New York in *GST Telecommunications, Inc., GST USA, Inc., and GST Telecom Inc. v. Stephen Irwin, David Adler, and Olshan Grundman Frome & Rosenzweig LLP,* November 26, 1999.

Expert Report of David I. Tabak, Ph.D. before the National Association of Securities Dealers in *A.R. DiGima, Inc. vs. A.G. Edwards & Sons, Inc. and Eugene Damico*, November 5, 1999.

David I. Tabak

Deposition Testimony before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, October 22, 1999.

Expert Report of David I. Tabak before the United States District Court for the Southern District of New York in *Oscar Gruss & Son, Inc. against Yossie Hollander*, September 16, 1999.

Expert Report of Frederick C. Dunbar and David I. Tabak before the United States District Court for the Northern District of Alabama, Southern Division in *MedPartners, Inc. v. Dun & Bradstreet, Inc*, July 28, 1999.

Testimony before the International Chamber of Commerce International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, April 13, 1998.

Expert Witness Statement of David I. Tabak before the International Chamber of Commerce, International Court of Arbitration in *Hanbo Engineering and Construction Co., Ltd. and Hanbo Corporation v. CE Casecnan Water and Energy Company, Inc.*, March 13, 1998.

## Publications

"*p*-Hacking and Event Studies in Securities Litigation," *NERA Working Paper*, April 12, 2023.

"How COVID-19 Impact Analysis May Shape MAE Disputes," (with Edward Flores), *Law360*, June 29, 2020.

COVID-19-related NERA webpages: (1) "S&P 500 Index: Daily Price Movements" (with Edward Flores), May 1, 2020 with updates; (2) "COVID-19, MAEs, and Preliminary Evidence of Disproportionate Impacts Within Industries" (with Edward Flores), June 9, 2020;  (3) "How COVID-19 Impact Analysis May Shape MAE Disputes") (with Edward Flores) reprint of article on Law360, June 29, 2020.

"Economic and Financial Analyses in Australian Securities Litigation in the Wake of *TPT Patrol Pty Limited as trustee for Amies Superannuation Fund v Myer Holdings Limited*," (with William S. Taylor), NERA Working Paper, January 2020.

"Testing Securities Market Efficiency With Cammer Factors," *Law360.com*, February 5, 2019.

"Securities Class Actions Appear to Be Largely 'Price-Maintenance' and Omissions Cases," *NERA Working Paper*, April 10, 2017.

"Further Insight into 'What Should We Expect When Testing for Price Response to News in Securities Litigation?'," *Oxford Business Law Blog*, September 27, 2016.

"Gauging Share-Price Response to News in Securities Litigation," *The CLS Blue Sky Blog, Columbia Law School's Blog on Corporations and the Capital Markets*, September 8, 2016.

"What Should We Expect When Testing for Price Response to News in Securities Litigation?" *NERA Working Paper*, August 11, 2016.

"Should Solvency Tests Give the Same Answer?"  *NERA Working Paper*, July 28, 2015

"Implications for Market Efficiency and Damages Analysis of Plaintiff Interpretations of *Halliburton II's* Statement that 'market efficiency is a matter of degree,'" *Loyola University Chicago Law Journal*, Spring 2015.

"The Solvency Two-Step," Guest Post on the Weil Bankruptcy Blog.  March 2013.

"Do Courts Count *Cammer* Factors?" NERA Working Paper, republished in the Harvard Law School Forum on Corporate Governance and Financial Regulation.  Also published in modified form as "Counting Cammer Factors – A Review of Case Law" at Law360.com, August 2012.

"Settlement reasonableness from negotiations to coverage disputes," *Litigation and Dispute Resolution 2012 Global Reference* Guide.  A prior version of this was published as a NERA Working Paper, February 2012.

"Guesstimating Loss for Sentencing," published in Law360.com, February 2012. (Originally published with the title "Estimating Loss For Sentencing Purposes." Retitled by Law360.com after initial publication on its website.)

"Economic Analysis of Loss in the United States Sentencing Commission's Proposed Methodologies," NERA Working Paper, February 2012.

"Guideline Companies in Valuation: A Careful View of the Market Approach," *Journal of Business Valuation*, 2011 Volume 1. (A previous version appeared as a NERA working paper entitled "Guideline Companies in Valuation: The Economist's View of the Market Approach" in October 2008.)

"The Matrixx of Materiality and Statistical Significance in Securities Fraud Cases," (co-authored with Frederick Lee of Boies, Schiller & Flexner) NERA Working Paper, December 2010.

"Materiality and Statistical Significance Explained" (co-authored with Frederick Lee of Boies, Schiller & Flexner), published in Law360.com, December 2010.

"Satisfying Fiduciary Duty Under ERISA," *Employment Law Strategist*, June 2010.

"Use and Misuse of Event Studies to Examine Market Efficiency," NERA Working Paper, April 2010. (A previous version appeared in September 2009, and a condensed version appeared as a Guest Column, "On the Misuse of Event Studies to Examine Market Efficiency," in May 2010 on www.securitiesdocket.com.)

"Comment: 'A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, December 2009.

Book Review of *Business Valuation: In Integrated Theory (Second Edition)* in *Valuation Strategies,* November/December 2008.

Guest Author/Respondent, *BVUpdate*, published by Business Valuation Resources, LLC, *Special Report:* What Will the Wall Street Meltdown Mean to the BV Profession? (with Raymund Wong), November 2008.

"Inflation and Damages in a Post-*Dura* World," NERA Working Paper, September 2007.

"Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics,"* Volume XIX, Number 2, published March 2007.

"Making Assessments About Materiality Less Subjective Through The Use of Content Analysis," NERA Working Paper, March 2007.

"Risk Disclosures and Damages Measurement in Securities Fraud Cases," published in the *Securities Reform Act Litigation Reporter*, April 2006. (Previously published as a NERA Working Paper.)

Guest Author/Respondent, *BV Q&A Update*, published by Business Valuation Resources, LLC., January, March, June, and July 2004; February, May, August, and September 2005.

David I. Tabak

"Loss Causation and Damages in Shareholder Class Actions: When it Takes Two Steps to Tango," in *Securities Litigation & Enforcement Institute 2004,* published by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases" (with Paul A. Ferrillo and Frederick C. Dunbar), *St. John's Law Review,* Winter 2004.  (Previously published as a working paper by NERA and Weil, Gotshal & Manges, LLP.)

"Determination of the Appropriate Event Window Length in Individual Stock Event Studies" (with Dmitry Krivin, Robert Patton, and Erica Rose), NERA Working Paper, November 4, 2003.

"Inflation Methodologies in Securities Fraud Cases: Theory and Practice" (with Chudozie Okongwu), published in *Securities Litigation & Enforcement Institute 2003,* by the Practising Law Institute.  (Previously published as a NERA Working Paper.)

"Hedging and the Estimation of Marketability Discounts," in *Shannon Pratt's Business Valuation Update*, published by Business Valuation Resources, LLC, August 2003.  (Also reprinted in *BVR's Guide to Discounts for Lack of Marketability*, 2007.)

 "Shareholders' Suit against Corporation," in *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, edited by Jack P. Friedman and Roman L. Weil, published by John Wiley & Sons, Inc., 2003.

"A CAPM-Based Approach to Calculating Illiquidity Discounts," NERA Working Paper, November 2002.

"A Proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud" (with Svetlana Starykh and Marc Shotland), *Litigation Economics Review*, Vol. 5, No. 2, Winter 2001 (printed July 2002).

"Intraday Trading Rates in Shareholder Class Actions," *NERA Securities and Finance Insights*, June 2002.

"Materiality and Magnitude: Event Studies in the Courtroom" (with Frederick C. Dunbar), *Litigation Services Handbook: The Role of the Financial Expert, Third Edition, 2001*, edited by Roman L. Weil, Michael J. Wagner and Peter B. Frank, published by John Wiley & Sons, Inc. (Previous versions appeared in the 2000 Supplement to the *Litigation Services Handbook* and as a NERA Working Paper.)

"Are Investors Signalling You About Your Y2K Risk?" (with Vinita M. Juneja and Denise N. Martin), *Y2K Marketwatch*, December 1999.

"What Does the Market Think About Your Y2K Exposure?" (with Vinita M. Juneja and Denise N. Martin), *Viewpoint*, Issue No. 2, November 1999.

"Economic Analysis and Identification of Class Conflicts in Securities Fraud Litigation," NERA Working Paper, June 1998.

**Exhibit 2**
**Biogen Inc.**
**Materials Considered Beyond Those Considered in the Tabak Report**

*Academic Literature*

Bluman, Allan G., *Elementary Statistics: A Step By Step Approach*, Eighth Edition, 2012.

Coffee, John C., Jr. and Lahav, Alexandra D., "Class Actions in the Era of Trump: Trends and Developments in Class Certification and Related Issues," *Annual American Bar Association National Institute,* September 2017.

Fox, Merritt B. and Mitts, Joshua, "Event-Driven Suits and the Rethinking of Securities Litigation," *The Business Lawyer*, 2022.

Greenberg, Roger B. and Wolfe, Zach, "Halliburton II: Supreme Court Clarifies Longstanding Securities Fraud Class Certification Issue," *Texas Journal of Business Law*, Fall 2014.

Kang, Min-woo, "Theories of Causal Nexus in Rule 10b-5 Claims: A Critical Reassessment," *Sciendo*, 2022.

Keung, Edmund, Zhi-Xing Lin, and Michael Shih, "Does the Stock Market See a Zero or Small Positive Surprise as a Red Flag?," *Journal of Accounting Research*, March 2010.

Langevoort, Donald C., "Disasters and Disclosures: Securities Fraud Liability in the Shadow of a Corporate Catastrophe," *Georgetown Law Journal,* April 2019.

Morrissey, Daniel J., "Guardians of the Galaxy: How Shareholder Lawyers Won Big for Their Clients and Vindicated the Integrity of Our Economy," *Loyola of Los Angeles Law Review,* 2018.

Mustokoff, Matthew L. and Mazzeo, Margaret E., "Loss Causation on Trial in Rule 10b-5 Litigation a Decade After Dura," *Rutgers University Law Review,* 2017.

Sale, Hillary A. and Thompson, Robert B., "Market Intermediation, Publicness, and Securities Class Actions," *Washington University Law Review,* 2015.

Schneider, Matthew B., "Coming Up Short: Using Short- Seller Reports to Plead Loss Causation in Securities Class Actions," *Columbia Law Review,* June 2024.

Turk, Matthew C., "The Securities Fraud Class Action after Goldman Sachs," *American Business Law Journal,* 2022.

Weingarten, Noah, "Halliburton II at Four: Has It Changed the Outcome of Class Certification Decisions?," *Fordham Journal of Corporate and Financial Law,* 2020.

*Case Law*

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,* 955 F.3d 254 (2d Cir. 2020), vacated and remanded, 594 U.S. 113, 141 S. Ct. 1951, 210 L. Ed. 2d 347 (2021).

**Exhibit 2**

**Biogen Inc.**

**Materials Considered Beyond Those Considered in the Tabak Report**

*Case Law (cont.)*

*Baker v. SeaWorld Ent., Inc.,* No. 14CV2129-MMA (AGS), 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017).

*Bond v. Clover Health Invs., Corp.,* No. 3:21-CV-00096, 2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023).

*Grae v. Corr. Corp. of Am.,* No. 3:16-CV-2267, 2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021).

*Homyk v. ChemoCentryx, Inc.,* No. 21-CV-03343-JST, 2025 WL 1547625 (N.D. Cal. May 30, 2025).

*IBEW Loc. 98 Pension Fund v. Best Buy Co.,* 818 F.3d 775 (8th Cir. 2016).

*In re Advance Auto Parts, Inc., Sec. Litig.,* No. CV 18-212-RGA, 2020 WL 6544637 (D. Del. Nov. 6, 2020).

*In re Allergan PLC Sec. Litig.,* No. 18CIV12089CMGWG, 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021).

*In re Celgene Corp. Sec. Litig.,* No. CV 18-4772, 2020 WL 8870665 (D.N.J. Nov. 29, 2020).

*In re CenturyLink Sales Pracs. & Sec. Litig.,* 337 F.R.D. 193 (D. Minn. 2020).

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 CIV. 1580 (LGS), 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).

*In re N. Telecom Ltd. Sec. Litig.,* 116 F. Supp. 2d 446 (S.D.N.Y. 2000).

*In re Virtus Inv. Partners, Inc. Sec. Litig.,* No. 15CV1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017).

*In re Waste Mgmt. Sec. Litig.,* 775 F. Supp. 3d 742 (S.D.N.Y. 2025).

*Lako v. Loandepot, Inc.,* No. 24-3932, 2025 WL 2389432 (9th Cir. Aug. 18, 2025).

*Pirnik v. Fiat Chrysler Automobiles, N.V.,* 327 F.R.D. 38 (S.D.N.Y. 2018).

*Univ. of Tennessee Rsch. Found. v. Caelum Biosciences, Inc.,* No. 3:19-CV-508, 2024 WL 4101911 (E.D. Tenn. Aug. 7, 2024).

*Waggoner v. Barclays PLC,* 875 F.3d 79 (2d Cir. 2017).

*Willis v. Big Lots, Inc.,* 242 F. Supp. 3d 634 (S.D. Ohio 2017).

**Exhibit 2**
**Biogen Inc.**
**Materials Considered Beyond Those Considered in the Tabak Report**

*Depositions in this Matter*

Deposition of David I. Tabak, Ph.D., dated July 29, 2025.

Deposition of Glenn Hubbard, Ph.D., dated October 17, 2025.

*Expert Reports*

Expert Report of David I. Tabak, Ph.D., dated June 25, 2025.

Expert Report of Glenn Hubbard, Ph.D., dated September 10, 2025, and all backup materials.

**Exhibit 3**
**Biogen Inc.**
**Subgroup and Average Effects Demonstrative**

| Group | Study | Dosage Distribution: | | Percent Affected |
| | | Low | High | |
| (1) | (2) | (3) | (4) | (5) |
| I | EMERGE | 10 % | 90 % | 90 % [1] |
| | ENGAGE | 50 % | 50 % | 50 % [1] |
| II | EMERGE | 10 % | 90 % | 0 % [2] |
| | ENGAGE | 50 % | 50 % | 0 % [2] |
| Average | EMERGE | 10 % | 90 % | 45 % |
| | ENGAGE | 50 % | 50 % | 25 % |

**Notes and Sources:**

[1] For Group I, high dose subgroup is assumed to be fully effective and the low dose subgroup is assumed to not be effective.

[2] Neither dosage is assumed to be effective for Group II.

**Exhibit 4a**
**Biogen Inc.**
**Case Law with "Price Maintenance" Quotes**

| Filed Date (1) | Source (2) | Quote(s) (3) |
|---|---|---|
| 9/28/2000 | *In re N. Telecom Ltd. Sec. Litig.,* 116 F. Supp. 2d 446 (S.D.N.Y. 2000). | "Testimony of a hypothetical nature must be evaluated especially carefully to ensure that conclusions concerning *price 'maintenance'* rule out causes for that maintenance other than the defendants' purported failure to disclose certain information." |
| 4/12/2016 | *IBEW Loc. 98 Pension Fund v. Best Buy Co.,* 818 F.3d 775 (8th Cir. 2016). | "The reason a misrepresentation in a *price maintenance* suit is presumed to be reflected in the market price of the stock is because the stock's price was fraudulently prevented from declining. See e.g., FindWhat, 658 F.3d at 1313–15."<br><br>"The majority has thus not joined the circuit courts that have recognized *price maintenance* theories to be cognizable under the Securities Exchange Act." |
| 3/17/2017 | *Willis v. Big Lots, Inc.,* 242 F. Supp. 3d 634 (S.D. Ohio 2017). | "Rather, the *price maintenance* theory-the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price-is consistent with the Supreme Court's discussion of price impact."<br><br>"Yet, Dr. Gompers failed to conduct such analyses to affirmatively determine whether there was price impact under the *price maintenance* theory."<br><br>"It appears the United States Court of Appeals for the Sixth Circuit has not considered the *price maintenance* theory of price impact. However, the *price maintenance* theory has been accepted as cognizable by at least three circuits. See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 258 (2nd Cir. 2016) ('lt is hardly illogical or inconsistent with precedent to find that a statement may cause inflation not simply by adding it to a stock, but by maintaining it.'); FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1314 (11th Cir. 2011) ('Confirmatory information that wrongfully prolongs a period of inflation-even without increasing the level of inflation-may be actionable under the securities laws.'); Schleicher, 618 F.3d at 683-84.<br>Moreover, at least one district court in this circuit has accepted the *price maintenance* theory. See Burges v. BancorpSouth, Inc., 2016 U.S. Dist. LEXIS 56802, at *8-9 (M.D. Tenn. Apr. 28, 2016) ('Halliburton says only that defendants may present evidence that the misrepresentation did not in fact affect the stock price, not that the price impact is determined only at the time of the alleged misrepresentations.'), vacated on other grounds, In re BancorpSouth, Inc., 2016 U.S. App. LEXIS 16936 (6th Cir. 2016).<br>This Court agrees with the reasoning of those courts that have recognized the *price* |

**Exhibit 4a**
**Biogen Inc.**
**Case Law with "Price Maintenance" Quotes**

| Filed Date (1) | Source (2) | Quote(s) (3) |
|---|---|---|
| 5/15/2017 | *In re Virtus Inv. Partners, Inc. Sec. Litig.,* No. 15CV1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017). | "Because the back-tested information was contained in registration statements that pre-date the class period, Lead Plaintiff advances a ***price-maintenance*** theory, focusing on backend impact." |
| 11/6/2017 | *Waggoner v. Barclays PLC,* 875 F.3d 79 (2d Cir. 2017). | "As the district court concluded, it is unsurprising that the price of Barclays' ADS did not move in a statistically significant manner on the dates that the purported misstatements regarding LX and Liquidity Profiling were made; the Plaintiffs proceeded on a ***price maintenance*** theory. That theory, which we have previously accepted, recognizes 'that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price.'" |
| 11/29/2017 | *Baker v. SeaWorld Ent., Inc.,* No. 14CV2129-MMA (AGS), 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017). | "This is known as the ***price maintenance*** theory." |
| 6/26/2018 | *Pirnik v. Fiat Chrysler Automobiles, N.V.,* 327 F.R.D. 38 (S.D.N.Y. 2018). | "But because Plaintiffs rely on a '***price maintenance*** theory,' under which 'a material misstatement can impact a stock's value by improperly maintaining the existing stock price[.]'"<br><br>"[N]oting also that a ***price maintenance*** theory does not require plaintiffs to identify when inflation entered the stock[.]" |
| 3/23/2020 | *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 CIV. 1580 (LGS), 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020). | "Defendants' objection is overruled because Plaintiffs properly rely on a ***price-maintenance*** theory as to the misrepresentation in question." |
| 4/7/2020 | *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.,* 955 F.3d 254 (2d Cir. 2020), vacated and remanded, 594 U.S. 113, 141 S. Ct. 1951, 210 L. Ed. 2d 347 (2021). | "This theory is sometimes referred to as the '***price-maintenance*** theory,' and what we term 'inflation-maintaining statements' are sometimes called 'price-maintaining statements.' We use the 'inflation' language because it is more precise and the phrase '***price-maintenance***' also has currency in antitrust law. See also Vivendi, 838 F.3d at 258 (dubbing this doctrine the 'inflation-maintenance theory')." |

**Exhibit 4a**
**Biogen Inc.**
**Case Law with "Price Maintenance" Quotes**

| Filed Date | Source | Quote(s) |
|---|---|---|
| (1) | (2) | (3) |
| 9/14/2020 | *In re CenturyLink Sales Pracs. & Sec. Litig.,* 337 F.R.D. 193 (D. Minn. 2020). | "The Court concludes that the fact that CenturyLink shares did not show a statistically significant increase on the majority of the dates of the alleged misstatements or omissions does not rebut the Basic presumption at this stage, where Plaintiffs are relying on a *price maintenance* theory." <br><br> "The underlying theory in Haliburton II was *price maintenance*, and the Supreme Court cited, with approval, Schleicher v. Wendt, which endorsed *price maintenance*." <br><br> "After Halliburton II, 70% of securities plaintiffs in federal district court cases involving a defendant's attempt to rebut the Basic presumption proceeded on a *price maintenance* theory, and in every one of those cases, the district courts held that the defendants failed to rebut the presumption." |
| 11/6/2020 | *In re Advance Auto Parts, Inc., Sec. Litig.,* No. CV 18-212-RGA, 2020 WL 6544637 (D. Del. Nov. 6, 2020). | "Lead Plaintiff's complaint alleges *price maintenance*. (See, e.g., D.I. 46 ¶ 265 (alleging that 'Advance Auto and the Individual Defendants intended to and did, as alleged herein artificially inflate and maintain the prices of Advance Auto's common stock'))." |
| 11/25/2020 | *In re Celgene Corp. Sec. Litig.,* No. CV 18-4772, 2020 WL 8870665 (D.N.J. Nov. 29, 2020). | "Under the *price maintenance* theory 'statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price.'" <br><br> "District courts within the Third Circuit have also recognized that a plaintiff can proceed on a *price maintenance* theory." <br><br> "Accordingly, the weight of authority and the persuasiveness of the reasoning demonstrate that Plaintiff can also proceed through a *price maintenance* theory." <br><br> "The Second and Seventh Circuits recently reaffirmed the validity of the *price maintenance* theory." |

**Exhibit 4a**
**Biogen Inc.**
**Case Law with "Price Maintenance" Quotes**

| Filed Date<br>(1) | Source<br>(2) | Quote(s)<br>(3) |
|---|---|---|
| 3/23/2021 | *Grae v. Corr. Corp. of Am.,* No. 3:16-CV-2267, 2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021). | "[F]or securities fraud could be premised on the theory that the defendants' false or misleading public statements artificially maintained the high value of CoreCivic stock, a 'fraud-on-the-market' theory alleging '*price maintenance*,' in the parlance of securities law. The court held that such a theory was an appropriate basis for liability under federal securities laws. (Doc. No. 165 at 25.) CoreCivic pursued an interlocutory appeal on that issue, which the Sixth Circuit denied, writing that its 'case law supports the legal standard that the district court applied.'"<br><br>"('The *price maintenance* theory is the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price.'). In a *price maintenance* case, price impact may be established, not via 'evidence that a stock's price rose in a statistically significant manner after a misrepresentation[.]'" |
| 9/8/2021 | *In re Allergan PLC Sec. Litig.,* No. 18CIV12089CMGWG, 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021). | "At bottom, it does not matter one bit for the *price maintenance* theory whether the alleged misstatements were directly correlated with an increase in Allergan's share price, evidence of Allergan's fraud was apparent once the stock plummeted following the ANSM recall — the event 'correcting' Allergan's previous misrepresentations."<br><br>"Therefore, Professor Skinner's analysis on front-end price correlation does not disprove DeKalb's theory at all. In fact, Professor Skinner acknowledged in his deposition that it was 'possible' that the lack of any statistically significant price reaction immediately following the alleged misrepresentations was explainable by the *price maintenance* theory." |
| 2/14/2023 | *Bond v. Clover Health Invs., Corp.,* No. 3:21-CV-00096, 2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023). | "For example, courts recognize the so-called '*price maintenance*' theory of securities fraud, which is premised on the common-sense—if not outright undeniable—fact that 'a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already inflated price.'"<br><br>"The Sixth Circuit has held, on more than one occasion, that *price maintenance* is a permissible theory of price impact in the securities fraud setting."<br><br>"*Price maintenance* is merely one example of how the impact of a statement on a stock's price can be hidden below the surface of the net changes that the market sees." |
| 3/31/2025 | *In re Waste Mgmt. Sec. Litig.,* 775 F. Supp. 3d 742 (S.D.N.Y. 2025). | "Plaintiffs allege a *price maintenance* theory, meaning that Defendants allegedly withheld negative news once they discovered it to keep the price of the Notes from dropping." |

**Exhibit 4a**
**Biogen Inc.**
**Case Law with "Price Maintenance" Quotes**

| Filed Date | Source | Quote(s) |
|---|---|---|
| (1) | (2) | (3) |
| 5/30/2025 | *Homyk v. ChemoCentryx, Inc.,* No. 21-CV-03343-JST, 2025 WL 1547625 (N.D. Cal. May 30, 2025). | "Cain has sufficiently established a basis for his *price maintenance* methodology for proving loss causation." |
| 8/18/2025 | *Lako v. Loandepot, Inc.,* No. 24-3932, 2025 WL 2389432 (9th Cir. Aug. 18, 2025). | "Lako's remaining arguments—including about the $5,000 service award to Plaintiff Doban, Doban's alleged in-and-out trader status, *price maintenance* theory under Comcast Corp. v. Behrend, 569 U.S. 27 (2013), and absent class member declarations—have little merit[.]" |

**Notes and Sources:**

Citations may have been omitted and quotations may have been "cleaned up" to adjust capitalization and punctuation. All emphasis in quotes has been removed.

All mentions of "*price maintenance*" have been **bolded** and *italicized.*

**Exhibit 4b**
**Biogen Inc.**
**Academic Literature with "Price Maintenance" Quotes**

| Publication Year (1) | Source (2) | Quote(s) (3) |
|---|---|---|
| 2014 | Greenberg, Roger B. and Wolfe, Zach, "Halliburton II: Supreme Court Clarifies Longstanding Securities Fraud Class Certification Issue," *Texas Journal of Business Law,* Fall 2014. | "In '*price maintenance*' cases, the plaintiff will argue that the defendant's misrepresentation or omission was 'confirmatory information' that helped to maintain the price of the company's stock, rather than causing a price increase." <br><br> "The Eleventh Circuit touched on the interaction between the Halliburton II ruling and the *price maintenance* theory in Local 703 v. Regions." <br><br> "The Eleventh Circuit seems to be signaling that evidence of *price maintenance* may be sufficient for the plaintiff to show a price impact and to obtain class certification." |
| 2015 | Sale, Hillary A. and Thompson, Robert B., "Market Intermediation, Publicness, and Securities Class Actions," *Washington University Law Review,* 2015. | "Simply put, the fact that a price does not move does not mean that there was no price distortion or impact. Instead, the lack of movement may be price impact in the form of *price maintenance*." <br><br> "Yet, in the prototypical fraud case where, for example, misstatements continue a trend of positive news, the price impact can be *price maintenance* with little to no movement." |
| 2017 | Coffee, John C., Jr. and Lahav, Alexandra D., "Class Actions in the Era of Trump: Trends and Developments in Class Certification and Related Issues," *Annual American Bar Association National Institute,* September 2017. | "The Goldman Sachs case (and other cases) will also likely test what is known as '*price maintenance*' theory." |
| 2017 | Mustokoff, Matthew L. and Mazzeo, Margaret E., "Loss Causation on Trial in Rule 10b-5 Litigation a Decade After Dura," *Rutgers University Law Review,* 2017. | "First, we trace the '*price maintenance*' theory, premised on the idea that a material misrepresentation can artificially inflate a security's price by propping up, or 'maintaining,' the existing stock price without increasing it, and look at how the theory was litigated in three Rule 10b-5 trials." <br><br> "A significant development in the law of loss causation since Dura is the acceptance of the *price maintenance* theory of inflation." |

**Exhibit 4b**
**Biogen Inc.**
**Academic Literature with "Price Maintenance" Quotes**

| Publication Year (1) | Source (2) | Quote(s) (3) |
|---|---|---|
| 2018 | Morrissey, Daniel J., "Guardians of the Galaxy: How Shareholder Lawyers Won Big for Their Clients and Vindicated the Integrity of Our Economy," *Loyola of Los Angeles Law Review,* 2018. | "'How the stock became inflated in the first place is irrelevant because each subsequent false statement prevented the price from falling to its true value and therefore caused the price to remain elevated.'[275] <br><br>[275] Id. at 418; see also Mustokoff, supra note 33, at 194 (This has been called the '*price maintenance*' theory of loss causation, i.e. the plaintiff does not have to show how each new misrepresentation skewed the price of the stock)." |
| 2019 | Langevoort, Donald C., "Disasters and Disclosures: Securities Fraud Liability in the Shadow of a Corporate Catastrophe," *Georgetown Law Journal,* April 2019. | "The fraud-on-the-market theory is focused on price distortion, which includes *price maintenance* [.]" |
| 2020 | Weingarten, Noah, "Halliburton II at Four: Has It Changed the Outcome of Class Certification Decisions?," *Fordham Journal of Corporate and Financial Law,* 2020. | "The post-Halliburton II courts have arrived at this standard by application of the *price maintenance* theory. Under the *price maintenance* theory, front-end price impact is unreliable for determining whether a misrepresentation affected a stock's price because the alleged fraud could be artificially maintaining the stock's price where there might otherwise be a loss." <br><br>"Courts have arrived at this paradigm by both rejecting front-end price impact as unreliable, under the *price maintenance* theory, and refusing to consider alternative dates for the back-end date." <br><br>"The majority of the post-Halliburton II courts have accepted the *price maintenance* theory[.]" <br><br>"In other words, the *price maintenance* theory posits that misrepresentations may cause stocks to 'maintain' their artificially inflated price where there otherwise would have been demonstrable price impact." <br><br>"The widespread adoption of the *price maintenance* theory has had a significant impact on the outcome of class certification decisions." |
| 2022 | Fox, Merritt B. and Mitts, Joshua, "Event-Driven Suits and the Rethinking of Securities Litigation," *The Business Lawyer,* 2022. | "The U.S. Supreme Court recently articulated this theory well in the context of discussing the '*price maintenance*' theory for finding price inflation when a misstatement prevents a price from falling rather making the price higher than it was before." |

**Exhibit 4b**
**Biogen Inc.**
**Academic Literature with "Price Maintenance" Quotes**

| Publication Year (1) | Source (2) | Quote(s) (3) |
|---|---|---|
| 2022 | Kang, Min-woo, "Theories of Causal Nexus in Rule 10b-5 Claims: A Critical Reassessment," *Sciendo,* 2022. | "First, a notable development is the adoption of the ***price maintenance*** theory, which posits that a fraudulent misrepresentation 'may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase at the time that statement is made'." |
| 2022 | Turk, Matthew C., "The Securities Fraud Class Action after Goldman Sachs," *American Business Law Journal,* 2022. | "A second factor affecting the high rate of class certification after Halliburton II has been plaintiffs' frequent reliance on the '***price maintenance***' theory of corporate misrepresentations when bringing securities fraud claims." <br><br> "Securities ***price maintenance*** claims involve a scenario in which the price impact from an allegedly false disclosure occurs on a somewhat different timeline. With ***price maintenance*** claims, the relevant misrepresentation is a corporate disclosure that omits or suppresses bad news for example, the failure of a pending patent application that was previously announced." <br><br> "The ***price maintenance*** theory of securities fraud is uncontroversial in certain respects." <br><br> "The use of ***price maintenance*** claims by private securities plaintiffs is relevant to class certification under Halliburton II[.]" |
| 2024 | Schneider, Matthew B., "Coming Up Short: Using Short-Seller Reports to Plead Loss Causation in Securities Class Actions," *Columbia Law Review,* June 2024. | "Second, plaintiffs in event-driven securities litigation often use the so-called ***price maintenance*** theory in alleging that the affected stock's price was inflated." <br><br> "See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 256 (2d Cir. 2016) (stating that the ***price maintenance*** theory 'posits that statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price')." |

**Notes and Sources:**

Citations may have been omitted and quotations may have been "cleaned up" to adjust capitalization and punctuation. All emphasis in quotes has been removed.

All mentions of "***price maintenance***" have been **bolded** and *italicized.*

**Exhibit 5**
**Biogen Inc.**
**Biogen Intraday Stock Price and Analyst Price Target Changes Related to the FDA's November 4, 2020**
**Aducanumab Briefing Documents[1,2]**
**November 4, 2020 - November 5, 2020**



**Notes and Sources:**

Intraday price data obtained from Tick Data, LLC, and excludes all records marked with "Exclude Record Flag." For more information, see Exhibit 9 in the Expert Report of Glenn Hubbard dated September 10, 2025 ("Hubbard Report").

[1] Biogen intraday common stock price is calculated for each minute. Intraday stock prices shown above are representative of the price of the first executed trade recorded in each one-minute interval during the trading day.

[2] Analyst price targets are grouped into 3 categories: "Yes", "No w/ Change", and "No w/o Change":

"Yes" represents analysts that mentioned the Massie statistical report. All "Yes" reports updated price targets.

"No w/ Change" represents analysts that did not mention the Massie statistical report but still updated price targets.

"No w/o Change" represents analysts that did not mention the Massie statistical report and did not update price targets.

[3] Intraday price data is available from 4:00 AM to 8:00 PM. The *Wells Fargo* report titled "BIIB: Increasing Target and Scenario Analysis Into AdCom" was published on November 4, 2020 at 9:32 PM.

**Exhibit 6**
**Biogen Inc.**
**Analyst Report Quotes Reiterating Price Target Between "Last Price Target Update"[1]**
**and the Release of Adu Briefing Documents on November 4, 2020**
*Adapted from Exhibit 9 of the Hubbard Report*

| Analyst Report Title | Analyst | Report Date | Last Price Target Update[1] | Quote(s) |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| Little read-throughs from EMA adu acceptance with CHMP opinion key | BofA Global Research | 10/30/2020 | 10/21/2020 | "To just meet the average CAGR of large-cap Biotech peers, ~6%, Biogen would need to add ~$10B in 2024e sales (~$6.4B to cons). But while adu sales could conceivably address this gap under the most bullish scenario, it would require unrestricted global access unlikely given the ongoing questions over the data. We little else in the pipeline to drive significant upside, we maintain U/P and $230 PO." |
| BIIB 2Q20 preview: Adu filing color, product defense and biz dev; reiterate BUY, $350PT | Canaccord Genuity | 7/20/2020 | 4/24/2020 | "Our BUY thesis on BIIB remains the same in that we believe there is upside as investors will be forced to look at BIIB ahead of its upcoming aducanumab regulatory approval saga...Our price target remains at $350...<br><br>**Not changing our model or $350 PT prior to 2Q earnings** We are not changing our estimates or DCF-based price target of $350 going into BIIB's 2Q20 earnings." |
| Much ado about adu continues amidst new intrigue on management change; maintain BUY, $350 PT | Canaccord Genuity | 7/26/2020 | 4/24/2020 | "**We now assume generic Tecfidera in 2022E vs. 2025E; PT at $350** The key change to our model is that we now assume US generics on Tecfidera (BIIB's largest product) entering in 2022E vs. 2025E...We also made several other tweaks including a lower share count and rolling forward our DCF-period to mid-21E vs. end-20. These changes result in our DCF-based price target remaining at $350." |

**Exhibit 6**
**Biogen Inc.**
**Analyst Report Quotes Reiterating Price Target Between "Last Price Target Update"[1]**
**and the Release of Adu Briefing Documents on November 4, 2020**
*Adapted from Exhibit 9 of the Hubbard Report*

| Analyst Report Title | Analyst | Report Date | Last Price Target Update[1] | Quote(s) |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| Get set FOMO as FDA grants priority review for aducanumab; reiterate BUY, $350P | Canaccord Genuity | 8/7/2020 | 4/24/2020 | "This morning (8/7), BIIB/Eisai announced that the FDA accepted the biologics license application (BLA) and granted priority review for aducanumab (Alzheimer's disease).<br><br>**No change to our PT of $350, for now**<br>Given the freshness of the news, we are not making any model changes and our price target remains at $350." |
| Adu gets an AdCom on 11/6; reiterate BUY, $350 PT | Canaccord Genuity | 9/28/2020 | 4/24/2020 | "So, we continue to believe investors will be forced to look at BIIB and the stock will drift upward as the adu regulatory saga continues, and we are reiterating our BUY rating and $350 price target." |
| BIIB 3Q20 preview: Intense focus on adu, but don't forget about earnings | Canaccord Genuity | 10/20/2020 | 4/24/2020 | "**No change to model or $350PT going into 3Q20 earnings**<br>We are not changing our estimates or $350 price target going into the 3Q call tomorrow." |
| It's all about adu now as we head into the 11/6 AdCom; maintain BUY, $350PT | Canaccord Genuity | 10/22/2020 | 4/24/2020 | "**Several model changes; expense base going forward is a key question**<br>The key change we are making to our model is that we now assume significant generic erosion to Tecfidera with the main "hit" coming in 4Q20/2021E vs. 2022E earlier...[W]e cannot see how such a large SG&A base can continue at the same absolute dollar rate, even with the additional spend required on aducanumab, if it is approved...These offsetting changes result in our DCF-based price target remaining at $350." |
| Have You Read This Article? Thoughts Heading Into an AdCom | HC Wainwright | 11/3/2020 | 10/22/2020 | "**Valuation and risks.** We reiterate our Buy rating and $318/share price target." |

**Exhibit 6**
**Biogen Inc.**
**Analyst Report Quotes Reiterating Price Target Between "Last Price Target Update"[1]**
**and the Release of Adu Briefing Documents on November 4, 2020**
*Adapted from Exhibit 9 of the Hubbard Report*

| Analyst Report Title | Analyst | Report Date | Last Price Target Update[1] | Quote(s) |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| Thinking About Aducanumab Ahead of the November FDA AdCom | SVB Leerink | 10/13/2020 | 8/19/2020 | "In this report we review the key debates that we expect to be discussed at the AdCom with the supporting data that have been discussed significantly by the investment community since the data disclosure by the company at the CTAD meeting last December. We still like the risk/reward for this event and reiterate our Outperform and $342 PT, which assumes a 50% POS for aducanumab, so approval would add another $95, while a negative FDA response would take our PT to $247 but we admit the stock would probably drop further, we believe, into the $220-240 range." |
| Biogen Is All In on Adu | SVB Leerink | 10/21/2020 | 8/19/2020 | "[I]t's really all about Adu and the upcoming AdCom. And our positive view on that outcome considerably outweighs these concerns mentioned above[.]...So significant change probably only occurs if the AdCom goes the wrong way and Adu eventually is not approved...We maintain our Outperform rating with a $342 PT." |
| 3Q20: Decent quarter; we continue to think "CRL" for adu (almost regardless of how the AdCom rules) | Wolfe Research, LLC | 10/21/2020 | August, 2020 | "Our base case model continues to have NO aducanumab in it (the same approach we've taken with other biopharma names over the years who have also been pursuing disease-modifying Alzheimer's disease therapies). Our price target remains unchanged at $275 befor[e] which represents a 13x multiple on our new 2021 EPS estimate." |

**Notes and Sources:**
Exhibit is adapted from Exhibit 9 of the Expert Report of Glenn Hubbard dated September 10, 2025 ("Hubbard Report").
Analyst reports obtained from the backup to the Hubbard Report.
Only reports published between the "Last Price Target Update Date" and November 4, 2020 that explicitly mentioned reiterating or maintaining their price targets are included in this analysis.
Emphases in original.

[1] The term "Last Price Target Update" corresponds to column (6) in Exhibit 9 of the Hubbard Report and indicates the most recent report in which the analyst revised their price target before the report dated November 4, 2020 or November 5, 2020.

**Exhibit 7**
**Biogen Inc.**
**Change in Price Targets Using Dr. Hubbard's Exhibit 9 Analyst Reports**

| | Change PT? | # of Reports | Mean | Two-Sample $t$-test | |
| | | | | $t$-statistic | $p$-value |
|---|---|---|---|---|---|
| **All Dr. Hubbard Exhibit 9 Analysts' Reports** | | | | | |
| **Average ( PT )** | Yes | 10 | $391.00 | -4.255 | 0.051 |
| | No | 3 | $274.33 | | |
| | Difference | | **-$116.67** | | |
| **Average ( PT - Prior PT )** | Yes | 10 | $81.30 | -6.239 | 0.000 |
| | No | 3 | $0.00 | | |
| | Difference | | **-$81.30** | | |
| **Only Reports with Price Target Updates On or After July 22, 2020** | | | | | |
| **Average ( PT )** | Yes | 9 | $390.78 | -4.173 | 0.053 |
| | No | 3 | $274.33 | | |
| | Difference | | **-$116.44** | | |
| **Average ( PT - Prior PT )** | Yes | 9 | $85.56 | -6.213 | 0.000 |
| | No | 3 | $0.00 | | |
| | Difference | | **-$85.56** | | |

**Notes and Sources:**

Exhibit adapted from Figure 5 from the backup to the Hubbard Report.

**Exhibit 8**
**Biogen Inc.**
**Analysts' Report Review Summary**
**Price Target Changes Related to the FDA's November 4, 2020 Aducanumab Briefing Documents**
**Removing Analysts That Did Not Change Price Targets[1]**
**November 4, 2020 – November 5, 2020**

| Report Date (1) | Analyst (2) | Report Title (3) | Report Time (4) | Mentions Statistical Report?[2] (5) | Previous Price Target Date (6) | Price Target[1] Previous (7) | Price Target[1] Current (8) | Change (9) (8) - (7) |
|---|---|---|---|---|---|---|---|---|
| 11/4/2020 | Wells Fargo | BIIB: Upgrading on Positive Risk-Reward Into Aducanumab Panel | 10:56 AM | No | 7/22/2020 | $ 324.00 | $ 390.00 | $ 66.00 |
| 11/4/2020 | Jefferies | Biogen Inc. Upgrade to Buy—Hot Debate but FDA Clearly Reads Positive on Efficacy, Safety | 1:06 PM | No | 10/21/2020 | 300.00 | 450.00 | 150.00 |
| 11/4/2020 | Canaccord Genuity | FDAducanumab and BIIB set stage for key AdCom on 11/6; reiterate BUY, PT up to $393 | 2:53 PM | Yes | 4/24/2020 | 350.00 | 393.00 | 43.00 |
| 11/4/2020 | BofA Global Research | Positive regulatory outlook shifts adu dynamics | 3:02 PM | Yes | 10/21/2020 | 230.00 | 360.00 | 130.00 |
| 11/4/2020 | Oppenheimer | Briefing Documents Provide Encouraging Insights | 3:25 PM | Yes | 10/21/2020 | 340.00 | 370.00 | 30.00 |
| 11/4/2020 | CFRA Equity Research | CFRA Reiterates Hold Opinion on Shares of Biogen Incorporated | 4:41 PM | No | 10/21/2020 | 271.00 | 385.00 | 114.00 |
| 11/4/2020 | SVB Leerink | Best Case Scenario in Briefing Docs; Adu AdCom Appears De-Risked; PT to $402 | 4:48 PM | Yes | 8/19/2020 | 342.00 | 402.00 | 60.00 |
| 11/4/2020 | Wells Fargo | BIIB: Increasing Target and Scenario Analysis Into AdCom | 9:32 PM | Yes | 11/4/2020 | 390.00 | 437.00 | 47.00 |
| 11/5/2020 | Atlantic Equities | Adu briefing docs suggest favourable FDA view | 4:19 AM | Yes | 10/22/2020 | 270.00 | 380.00 | 110.00 |
| 11/5/2020 | BMO Capital Markets | A-mab Ad-com Documents Read Positive | 4:30 AM | No | 7/22/2020 | 280.00 | 343.00 | 63.00 |

|  |  |  |
|---|---|---|
| **Average if Mentions Statistical Report:** | $ 320.33 | $ 390.33 | $ 70.00 |
| **Average if Does Not Mention Statistical Report:** | 293.75 | 392.00 | 98.25 |
| **Difference:** | $ (26.58) | $ 1.67 | $ 28.25 |
| **Average if Mentions Statistical Report (Previous PT On or After July 22, 2020)[3]:** | $ 314.40 | $ 389.80 | $ 75.40 |
| **Average if Does Not Mention Statistical Report (Previous PT On or After July 22, 2020)[3]:** | 293.75 | 392.00 | 98.25 |
| **Difference:** | $ (20.65) | $ 2.20 | $ 22.85 |

**Notes and Sources:**

Exhibit is adapted from Exhibit 9 of the Expert Report of Glenn Hubbard dated September 10, 2025 ("Hubbard Report").

Analysts' reports as listed in Appendix C of the Hubbard Report published between November 4, 2020 and November 5, 2020.

[1] Analysts who did not change their price targets from the Previous Price Target Date in column (6) are removed from this analysis.

[2] This column indicates whether the analyst report refers to the Massie Appendix, which was contained in the FDA briefing documents released on November 4, 2020.

[3] These rows' calculations are limited to reports whose previous price target was updated on or after July 22, 2020.