**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN, <br><br> Defendants. | CASE No.: 1:21-cv-10479-IT <br><br> LEAVE TO FILE 25-PAGE REPLY GRANTED SEPTEMBER 5, 2025 |

### PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     DEFENDANTS DO NOT CARRY THEIR BURDEN TO PROVE NO PRICE
        IMPACT ............................................................................................................ 2

        A.      Biogen's Misrepresentation had a Price Impact Because it Prevented a Stock Price
                Decline ................................................................................................... 2

                1.      There is no Mismatch Between the All Data Statement and the Massie
                        Analyses ..................................................................................... 3

                2.      The Materiality of Biogen's Misstatement Supports a Finding of Price
                        Impact ........................................................................................ 6

                3.      A Truthful Substitute Would Have Caused a Decline in Biogen's Stock
                        Price ........................................................................................... 6

                4.      The Purportedly Unrelated Portions of the Massie Report Do Not Negate
                        Price Impact ............................................................................... 9

                5.      The Analyst Reports After July 22, 2020 Did Not Disclose the Sub-
                        Group Analyses ......................................................................... 9

        B.      Market Commentary Confirms the Subgroup Data's Materiality and  Supports
                Price Impact ..........................................................................................11

                1.      The Complexity of the Briefing Materials Required Multiple Days to
                        Process Fully ............................................................................ 13

                2.      There is Strong Evidence of Price Impact on Nov. 9 .......................... 17

III.    DR. TABAK'S PRELIMINARY DAMAGES MODEL SATISFIES *COMCAST*'S
        MODEST REQUIREMENTS ................................................................................ 21

IV.     SHASH, KHAN AND AFFOORA ARE TYPICAL AND ADEQUATE CLASS
        REPRESENTATIVES ......................................................................................... 22

V.      CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) ........................................................................... 13, 14, 15

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................................ passim

*Baker v. Equity Residential Mgmt., L.L.C.*,
390 F. Supp. 3d 246 (D. Mass. 2019) ...................................................................................... 21

*Corcoran v. CVS Health*,
2019 WL 6250972 (N.D. Cal. Nov. 22, 2019) ........................................................................ 23

*Cross v. 21st Century Holding Co.*,
2002 WL 31158901 (S.D.N.Y. Sept. 27, 2002) ...................................................................... 14

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) ......................................................................... 5

*Ferris v. Wynn Resorts Ltd.*,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) .............................................................................. 5

*Fogarazzo v. Lehman Bros.*,
263 F.R.D. 90 (S.D.N.Y. 2009) .............................................................................................. 14

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .................................................................................................. 3, 4, 6, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258, (2014) .......................................................................................................... 2, 24

*Homyk v. ChemoCentryx, Inc.*,
No. 21-CV-03343-JST, 2025 WL 1547625 (N.D. Cal. May 30, 2025) .............................. 19, 20

*In re Allstate Corp. Sec. Litig.*,
2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) ........................................................................... 9

*In re AVEO Pharms., Inc. Sec. Litig.*,
2017 WL 5484672 (D. Mass. Nov. 14, 2017) ......................................................................... 19

*In re Concho Res., Inc.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ........................................................................... 13

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008) ........................................................................................ 25

*In re EQT Corp. Sec. Litig.*,
  2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) .......................................................... 17

*In re FibroGen Sec. Litig.*,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) .......................................................... 20

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ............................................................ 5

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) .......................................................................................... 14

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
  No. CIV.A.08-CV-2177, 2009 WL 2855601 (D.N.J. Sept. 2, 2009) ......................... 14

*In re Qualcomm Inc. Sec. Litig.*,
  2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ............................................................. 6

*In re Sepracor Inc.*,
  233 F.R.D. 52 (D. Mass. 2005) ...................................................................................... 24

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) .............................................................. 21

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
  2007 WL 1703067 (D.N.H. June 12, 2007) ................................................................. 23

*In re Vivendi S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ....................................................................................... 5, 7

*In re Waste Mgmt. Sec. Litig.*,
  775 F. Supp. 3d 742 (S.D.N.Y. 2025) ............................................................................. 2

*Kinney v. Metro Glob. Media, Inc.*,
  2002 WL 31015604 (D.R.I. Aug. 22, 2002) ................................................................. 24

*Kirby v. Cullinet Software, Inc.*,
  116 F.R.D. 303 (D. Mass. 1987) .................................................................................... 23

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2014 WL 6661918 (N.D. Ala. Nov. 19, 2014) .......................................................... 5, 13

*Luna v. Carbonite, Inc.*,
  2023 WL 4539855 (D. Mass. July 14, 2023) ........................................................... 21, 24

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ............................................................................... 17

*Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*,
  348 F.R.D. 268 (D. Mass. 2025) ................................................................................. 2

*Pardi v. Tricida, Inc.*,
  2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) ......................................................... 13

*Pelletier v. Endo Int'l PLC*,
  338 F.R.D. 446 (E.D. Pa. 2021) ............................................................................... 19

*Ramirez v. Exxon Mobil Corp.*,
  2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)........................................................... 16

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ..................................................................................... 21

*San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*,
  2025 WL 2176586 (3d Cir. July 30, 2025) ............................................................5, 11

*Schaffer v. Timberland Co.*,
  1996 WL 35072672 (D.N.H. Mar. 19, 1996)............................................................ 23

*Shash v. Biogen, Inc.*,
  84 F.4th 1 (1st Cir. 2023) .................................................................................. passim

*Shupe v. Rocket Cos.,Inc.*,
  752 F. Supp. 3d 735 (E.D. Mich. 2024) ..................................................................... 6

Similarly, *New England Carpenters v. DeCarlo*,
  122 F.4th 28 (2d Cir. 2023)........................................................................................ 5

Sjunde AP-Fonden v. Gen. Elec. Co.,
  2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ......................................................... 14

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025) ...........................................6, 9, 11, 21

*Swack v. Credit Suisse First Bos.*,
  230 F.R.D. 250 (D. Mass. 2005)............................................................................... 22

*Tolan v. Computervision Corp.*,
  696 F. Supp. 771 (D. Mass. 1988) ........................................................................... 23

*Waggoner v. Barclays*,
  875 F.3d 79 (2d Cir. 2017) ................................................................................... 5, 21

iv

## I.    INTRODUCTION[1]

Sandrock falsely told investors that all data from three specified clinical trials were all consistent with the Dosage Thesis. When the Massie Report revealed the data inconsistent with Sandrock's statement, Biogen's stock price fell. Defendants argue that, somehow, Sandrock's statement was too generic to be linked to the stock drop that occurred upon revelation of its falsity in the Massie Report. Their argument fails for four independent reasons. First, Sandrock's statement is plainly not generic. Second, the argument violates the First Circuit's mandate. Third, Defendants' principal case, *Goldman*, poses a hypothetical materially identical to this case, and states that there the match is clean. Fourth, Defendants propose a nominally anodyne "truthful substitute" for Sandrock's misstatement, but even this substitute, if uttered, would have caused Biogen's stock price to collapse. Defendants' sandcastles in the sky collapse for any number of reasons, but each of these four is sufficient.

Moving on. Defendants argue that the efficient market would have understood, weighed, and priced 343 pages of statistical analysis and hours of video within about 5 minutes following its release on November 4, 2020. But their expert disagrees: he testified that stock price decreases on November 5 and 9 may well have arisen from disclosure in the Massie Report and AdCom. Moreover, the efficient market cannot grasp facts more quickly than any trader or human could.

On to damages. Defendants claim that Plaintiffs have not shown they will be able to prove damages on a classwide basis. They cite 3 cases but ignore the 95 that went Plaintiffs' way.

Finally, the Plaintiffs themselves. Defendants recycle arguments that class representatives cannot be typical if they bought shares after the Massie Report's publication. The Court already rejected the argument and should do so again.

---

[1] Citations to "Horne Dec. Ex. _" are to the Reply Declaration of Jonathan Horne, Doc. No. 209. Unless otherwise noted, all emphases are added and all quotations omitted.

## II.   DEFENDANTS DO NOT CARRY THEIR BURDEN TO PROVE NO PRICE IMPACT

Plaintiff's opening brief showed that they are entitled to a *Basic* fraud on the market presumption of reliance. Op. Br., Doc. No. 173, at 15. Defendants concede that the market for Biogen stock was efficient. Def. Opp., Doc. No. 190, at 27; Hubbard Dep., Horne Dec. Ex. 1, Doc. No. 209-1, at 6 (5:7-13). To rebut the presumption, Defendants must prove the misrepresentation had no impact at all on Biogen's share price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279, (2014); *Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*, 348 F.R.D. 268, 285–86 (D. Mass. 2025) (noting that defendants face a daunting burden). Defendants' expert concedes that the Massie Report had a price impact on Biogen's share price "on November 5 and beyond." Doc. No. 209-1 at 318 (317:9-15). So Plaintiffs are entitled to the fraud on the market presumption.

### A. Biogen's Misrepresentation had a Price Impact Because it Prevented a Stock Price Decline

Plaintiffs allege a price maintenance theory, that Defendants withheld negative news to keep the price of Biogen stock from dropping. *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 762 (S.D.N.Y. 2025). On October 22, 2019, Biogen announced that it would seek FDA approval based on its post-hoc analyses showing the high dose proved effective in Study 302 (EMERGE) and portions of Study 301 (ENGAGE) were supportive. Oct 22 PR, Horne Dec. Ex. 2, Doc. No. 209-2. Defendants claimed that ENGAGE failed because not enough patients received the high dose, while EMERGE was successful because enough patients did receive the high dose ("Dosage Thesis"). *Id.* The Dosage Thesis was crucial because the FDA would not approve Aducanumab without a cogent explanation for Study 301's failure. Biogen carried the explanation through to the July 22, 2020 All Data Statement that starts the Class Period. Tabak Reply, Horne Dec. Ex. 3, Doc. No. 209-3 at 25-26, ¶50.

2

The All Data Statement was Sandrock's response to an analyst's question "can [you] go into any detail of the analysis over, say, the past 6 to 9 months that you guys have done with FDA? … the quality of the analysis and the details of the data analysis for aducanumab in support of the filing." July 22 T'scripts, Horne Dec. Ex. 5, Doc. No. 209-4, at 11-12.   Sandrock reassured investors: "So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that." *Id*. at 12. Had Sandrock told the truth, investors would have learned that Biogen's explanation for the failure of study 301 and the basis for FDA approval was contradicted by all of the sub-group analyses that FDA statistician Massie had shared with Biogen and its stock price would have immediately declined. Massie Emails, Horne Dec. Exs. 7, 8, Doc. No. 209-7, Doc. No. 209-8. Price impact is "the amount that the stock's price would have fallen 'without the false statement.'" *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys*., 594 U.S. 113, 123 (2021) ("*Goldman I*").   So Sandrock's assurances would not cause Biogen's stock price to increase. Doc. No. 209-3 at 10-27, ¶¶14-52.   Rather, the price decline would only occur on November 5 and 9 when the data contradicting the Dosage Thesis, whose existence the All Data statement denied, was released through the Massie Report and Advisory Committee ("AdCom") discussions and votes. Tabak Initial Report, Doc. No. 171-1 at 31-38 (¶¶63-76)

1.  ***There is no Mismatch Between the All Data Statement and the Massie Analyses***

Citing *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp*., 77 F.4th 74 (2d Cir. 2023) ("*Goldman II*"), Defendants purport to find a mismatch between the All Data statement and the Massie Report. In *Goldman*, plaintiffs alleged that generic platitudes like "[w]e have extensive procedures and controls to identify and address conflicts," "[o]ur clients' interests always come first," and "[i]ntegrity and honesty are at the heart of our business" maintained price inflation.

*Goldman I*, 594 U.S. at 120. The corrective disclosures revealed conflicts in two specific debt securities where Goldman bet against its clients. *Goldman II*, 77 F.4th at 83–84. The Supreme Court held that the court should have examined whether the mismatch between the generic statements and narrow disclosures defeated price impact. *Goldman I*, 594 U.S. at 126-27. And Goldman's 40,000 employees and billions of transactions made its generic statements immaterial to disclosures about two securities.

That generic/specific divide is absent here. Sandrock falsely stated that ENGAGE, EMERGE and PRIME were all consistent with the Dosage Thesis. The Massie Report showed the data that contradicted the Dosage Thesis, revealing the exact subgroup results analysts had requested on July 22, 2020. Indeed, the First Circuit made clear there is no mismatch: "[B]y failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the complaint plausibly alleges that Defendants' omission misled investors." *Shash v. Biogen, Inc.*, 84 F.4th 1, 12–13 (1st Cir. 2023). Under the First Circuit's reasoning, the Massie Report is a clean match: it disclosed the precise subgroup data whose omission rendered Sandrock's statement misleading.

The *Goldman* panel raised and resolved an indistinguishable hypothetical from this case:

> Consider two examples. In the first, an automobile manufacturer's earlier statement to the market that its best-selling vehicle passed all safety tests is followed by later news that, in fact, the car failed several crash tests. A price drop follows. There, the earlier statement is precisely negated, or rendered false, by the later news—***a clean match***.

*Goldman II*, 77 F.4th at 80 (emphasis added).  Biogen told investors "All Data" supported the Dosage Thesis. The Massie Report revealed the subgroup data did not support it. Biogen's stock price fell—"a clean match." In any case, price maintenance does not require a perfect match. "It may frequently be the case that what[] is corrective about a 'corrective disclosure' is situated

among details which, in the aggregate, make for a somewhat more specific back-end disclosure." *Goldman*, 77 F.4th at 98.[2]

Further, after the Massie Report was issued, analysts stated that it directly contradicted (*i.e.* corrected) Biogen's Dosage Thesis. JPMorgan Rep., Horne Dec. Ex. 9, Doc. No. 209-9 at 5 ("**This surprising result conflicts with BIIB's hypothesis that high aducanumab dosing leads to a better benefit**."). The analyst commentary linking the price drop to the misrepresented facts demonstrates price impact. *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *10 (D. Nev. Mar. 1, 2023) (media commentary connecting disclosure to subject of the false statement supported price impact); *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *10 (S.D. Tex. Sept. 27, 2023); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *7 (N.D. Ala. Nov. 19, 2014) (analyst commentary noting corrective disclosure is evidence of price impact).

The cases Defendants cite are inapposite. In *Kirkland*, the alleged misrepresentations were "fairly broad and generic statements about the company's growth strategy," while the corrective disclosure was a specific business acquisition—an obvious generic/specific disparity. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024). Likewise, *Qualcomm* involved generic assertions that the company "broadly licenses [its technology]" on "fair, reasonable, and non-discriminatory" terms. The court found such statements unlikely to

---

[2] Similarly, *New England Carpenters v. DeCarlo*, 122 F.4th 28, 54 (2d Cir. 2023), found disclosure of "the specific deficiencies that rendered the audit opinion misleading" was a clean match. See also *San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at *4 (3d Cir. July 30, 2025) (no mismatch where corrective disclosure showed falsity). A stronger match exists when disclosures directly contradict the misstatements themselves. In *Waggoner v. Barclays,* 875 F.3d 79 (2d Cir. 2017), a regulatory enforcement action *directly* refuted false assurances that a specific trading platform protected investors; a notable distinction from *Goldman II*, 7 F.4th at 97. Likewise, in *Vivendi*, misleading statements hiding liquidity problems were contradicted by debt downgrades and asset fire sales, creating a "strong link" between misrepresentation and correction. *Id.* at 98, *citing In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

mislead the market or sustain price inflation and noted that Qualcomm's licensing practices had already been publicly reported and acknowledged before the alleged corrective disclosure. *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at 12–13 (S.D. Cal. Mar. 20, 2023). In *Shupe v. Rocket Cos., Inc.*, the defendants expressed similar vague optimism: "We're seeing strong consumer demand," "interest rates … [won't] impact our business," and "we take [rising rates] as an opportunity to grow." 752 F. Supp. 3d 735, 781–82 (E.D. Mich. 2024). Those vague statements were allegedly corrected when Rocket later reported a decline in a ***specific category of loans***. This is the paradigmatic generic/specific mismatch *Goldman* raised. *Goldman I*, 594 U.S. at 123 (citing as an example a generic misstatement "we have faith in our business model" and correction "our fourth quarter earnings did not meet expectations").

### 2. The Materiality of Biogen's Misstatement Supports a Finding of Price Impact

*Goldman II* instructs courts evaluating generic statements to consult precedent on materiality. 77 F.4th at 102. Its holding turned on finding that the statements at issue were immaterial: "While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." *Id.* at 104. Here, the First Circuit already held that Plaintiffs sufficiently alleged the All Data statement's material falsity. *Shash*, 84 F.4th at 13. It was an easy call; it took two sentences. To gain approval, Biogen needed to explain ENGAGE's failure, which it did through the Dosage Thesis. Thus, the First Circuit's conclusion that the All Data statement is material confirms it is not the vague, wishy-washy statement seen in *Goldman*.

### 3. A Truthful Substitute Would Have Caused a Decline in Biogen's Stock Price

"Where there is an imprecise match between an alleged misstatement and the corrective disclosure, courts should ask whether the market would have reacted 'if the company had spoken

truthfully' on the same topic as the misstatement 'at an equally generic level.'" *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at *8 (S.D.N.Y. Sept. 4, 2025) (*quoting Goldman II*, 77 F.4th at 99). Where no mismatch exists, no "truthful substitute" analysis is required. Nevertheless, even under that test, Biogen's stock price would have immediately collapsed after a truthful statement.  On October 22, 2019, Biogen announced that it was reviving aducanumab, citing support from the Dosage Thesis. The stock surged 38.7%. Stock Chart, Horne Dec. Ex. 10, Doc. No. 209-10. Thus, Biogen's promotion of the Dosage Thesis drove a substantial price increase. The All Data Statement responded to analysts' questioning the Dosage Thesis's validity. Doc. No. 209-5 at 11-12. The data contradicting the All Data statement were not minor or peripheral. As Budd Haeberlein put it in internal correspondence, "the difference between [ENGAGE] and [EMERGE] is not a 'home run' and it becomes glaringly apparent when we have made it appear as if there is a simple 'dose' explanation." May 31, 2020 email, Doc. No. 209-11.

The First Circuit's opinion suggests that the truthful substitute is disclosure of the actual subgroup data because it was its omission that made the All Data Statement misleading. *Shash*, 84 F.4th at 12–13. Likewise, in *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), the truthful substitute for the company's "rosy picture of its liquidity state" was "the misgivings its executives were sharing behind the scenes." *Goldman II*, 77 F.4th at 98–99 (quoting *Vivendi*, 838 F.3d 223, 258). In another case, Dr. Hubbard agreed: he recently testified that the truthful substitute is disclosure of all contradictory information in management's possession: "had you known the full set of information, all those things that were in the file drawers at Vale, had the same analysts seen that." Vale Tr., Horne Dec. Ex. 12, Doc. No. 209-12 at 78 (77:5–9).

Dr. Hubbard's proposed substitute is neither truthful nor a substitute. Hubbard Rep., Doc. No. 189-1, at 22, ¶48: He proposes: "Although portions of the data from PRIME, ENGAGE, and

EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, not all data are consistent with that." *Id.* He rewrites the Dosage Thesis. Biogen always insisted EMERGE ***proved*** the Dosage Thesis, meeting all primary and secondary endpoints, while portions of ENGAGE and PRIME ***supported*** it. Doc. No. 209-6 at 3-4. The First Circuit did ***not*** fault Plaintiffs' falsity allegations as to either the Dosage Thesis itself or Biogen's statements that ENGAGE and PRIME provided supporting evidence. *Shash*, 84 F.4th at 13. Hubbard's version improperly omits that EMERGE ***proved*** and ENGAGE/PRIME ***supported*** the Dosage Thesis. Moreover, the assertion that "not all data are consistent" does not quantify the extent of contradiction, because Sandrock had claimed *all* data were consistent. Hubbard's version conceals the huge scope of contradictory data.

The Court should adopt one of two truthful substitutes: (i) "So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. However, the following subgroup analyses contradict that" (*i.e.*, the full data later published in the *Massie Report*); or (ii) "Consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose; however, there are undisclosed subgroup analyses inconsistent with that." As to alternative (i), disclosure of the Massie Report on Nov. 5 -9 caused a share price decline and would have done the same on July 22. Doc. No. 171-1, at 31-38, ¶¶63-76. As to alternative (ii), Hubbard opines that an even more generic statement—"not all data are consistent"—would have caused a *greater* price decline than the Massie Report, consistent with the "Lemon Theory," under which investors assume undisclosed data are "among the worst possible outcomes." Doc. No. 189-1 at 23 ¶50; Doc. No. 209-3 at 32, ¶62. Sandrock made the All Data Statement to provide investors a warranty of the Dosage Thesis—a commercial practice to overcome buyers' fear of lemons. Akerloff Article, Horne Dec. Ex. 4, Doc. No. 209-4 at 15-16. Had Sandrock told the truth on July 22 (that

undisclosed sub-group analyses contradicted the Dosage Thesis) instead of misrepresenting that all the data was ***consistent*** with the Dosage Thesis, analysts would have known the Dosage Thesis was a "lemon" and Biogen's stock price would have collapsed.

### 4. *The Purportedly Unrelated Portions of the Massie Report Do Not Negate Price Impact*

Dr. Hubbard asserts that the Massie Report contained non-fraud-related information but admits he made no effort to determine whether any of it had been publicly disclosed previously. Thus, there is no evidence the information was new, nor does Hubbard explain why it was negative or capable of affecting price. Doc. No. 209-1 at 191-192 (190:4–191:14).) Hubbard also never assessed whether the subgroup analyses in the Massie Report corrected the All Data statement. Doc. No. 209-1 at 198-199 (197:9–198:2). His failure to do anything to disaggregate non-fraud-related "news" that contributed to the Nov. 5 price decline is fatal to this argument because it is Defendants' burden. *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at 5 (N.D. Ill. Dec. 21, 2020).

Even if portions of the Massie Report contained new, unrelated negative information, Defendants must show that ***none*** of the November 5 or 9 share-price decline resulted from the All Data Statement. "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Sjunde AP-Fonden*, 2025 WL 2554474, at 28 (*quoting Amgen*, 568 U.S. at 483). Having failed to conduct basic price-impact analysis, Hubbard's opinions bear no weight.

### 5. *The Analyst Reports After July 22, 2020 Did Not Disclose the Sub-Group Analyses*

Hubbard claims there was no price impact because analysts had been speculating that Biogen's undisclosed subgroup analyses might not fully support the Dosage Thesis. He concludes that since Biogen's share price did not decline when analysts made such observations, the All Data

9

Statement could not have inflated the stock price. Doc. No. 189-1 at 18-24, ¶¶41-53 This reasoning is flawed. First, Hubbard focuses on the wrong question. The misstatement at issue was Sandrock's assertion that the undisclosed data "are all ***consistent***" with the Dosage Thesis—not that "all the unreleased subgroup data ***supported*** high-dose efficacy." Hubbard admits that data can be "consistent' with but not "supportive" of a hypothesis. Doc. No. 189-1 at 20 (19:15-24). Thus, his conclusion—that analysts believed the undisclosed data were not "overly positive" or "as supportive" as released data—is consistent with the Dosage Thesis, not corrective. Doc. No. 209-3 at 13-15, ¶¶22–27. This also explains the lack of an immediate price reaction. "Consistent" implies there were no contradictory data that would threaten FDA approval.

Second, Hubbard misinterprets analysts' statements. Though analysts wrote that the undisclosed data were "unlikely to be as supportive," Hubbard interpreted them as saying the data were "mixed or negative." When asked to justify the leap from less supportive to negative, he replied only, "that's my view." Doc. No. 209-1 at 183-184 (182:19–183:18); see also Doc. No. 209-3 at 26-27 ¶¶51–52. This speculative reading undermines his conclusion.

Third, the analyst reports Hubbard cites—both before and after July 22, 2020—contain only conjecture. For example:"[O]ur panelists would have liked to see additional stratified analyses of ApoE+/- carriers across both treatment and placebo arms … Though our sense is that data not yet disclosed to date are unlikely to be overly positive, it is possible FDA finds supportive data the public has not yet been made aware of." RBC report, Horne Dec. Ex. 12, Doc. No. 209-12 at 5-6. These statements are pure speculation; none of the analysts had access to the undisclosed subgroup data. Doc. No. 209-1 at 223 (222:11–16). Indeed, one analyst wrote after the *Massie Report*: "The statistician raises lots of serious data points we have not seen before." Evercore Rep.,

Horne Dec. Ex. 14, Doc. No. 209-14, at 2. Speculation cannot reveal falsity. *Sjunde AP-Fonden*, 2025 WL 2554474, at *9 (reports of possible wrongdoing do not disclose actual wrongdoing).

Hubbard's analysis mirrors the expert's erroneous logic the Second Circuit rejected in *Goldman II*. There, the defendants' expert identified 36 pre-disclosure news reports mentioning conflicts of interest and argued that the lack of price reaction disproved price impact. The Second Circuit disagreed, holding that those reports lacked (1) the detailed, documented evidence in the SEC's complaint; (2) the credibility and "gravitas" of an official source; and (3) the clarity that comes from unqualified, corroborated disclosure. *Goldman II*, 77 F.4th at 92. *See also San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at 3 (3d Cir. July 30, 2025) ("Re-publication of information by a more credible source to a broader audience may convey to the market that the information is particularly significant or worthy of monitoring."). Unlike *Goldman* where the news reports were based on facts gathered from Goldman employees, the Biogen analysts had never seen the subgroup data before November 4, 2020. Their commentary, before the Massie Report, was guesswork, not a "truthful substitute." *See Sjunde AP-Fonden*, 2025 WL 2554474, at *9. The Massie Report, authored by the FDA statistician, and the subsequent AdCom discussions, were the first definitive, data-backed disclosure, and were more credible than analyst speculation *Goldman II*, 77 F.4th at 92. Knowing nothing, the analysts could not reveal anything, so the lack of a price drop when their reports were published is not surprising.

**B. Market Commentary Confirms the Subgroup Data's Materiality and Supports Price Impact**

From October 22, 2019, through November 4, 2020, analysts repeatedly questioned Biogen about the subgroup analyses, emphasizing their importance for FDA approval. After November 4, those same analysts focused on how the Massie Report's subgroup findings would influence the AdCom and the FDA—strong indirect evidence of price impact. *See Goldman II*, 77 F.4th at 104

("Market commentary can provide insight into the kind of information investors would rely upon … and therefore can serve as indirect evidence of price impact."). Biogen's December 5, 2019 investor presentation and call illustrate this. Defendants told investors that Biogen presented the particular PV4 subgroups because "ApoE4 carriage was balanced." Doc. No. 209-6 at 7-8. In truth, internal correspondence showed it was because including Noncarriers helped conceal that in EMERGE, "post-PV4 is similar to pre-PV4." Email to Budd Haeberlein, Horne Dec. Ex. 15, Doc. No. 209-15. But, having presented this misleading detail, Sandrock and Budd Haeberlein both demurred on providing the subgroup analysis that would prove the Dosage Thesis false. Indeed, Sandrock added "[w]e have nothing to hide," Doc. No. 209-6 at 7-8, which Dr. Hubbard interpreted as "[i]f you knew what I knew, you would come to the same conclusion." Doc. No. 209-1 at 127 (126:3-25). So this exchange shows (i) analysts viewed the subgroup data as material and potentially damaging, and (ii) Biogen's reassurances maintained investor confidence.

After the July 22, 2020 All Data Statement, analysts continued highlighting Biogen's refusal to disclose subgroup results. Wolfe Research summarized Sandrock's exchange with the analyst, emphasizing the continued lack of data transparency. Wolfe Rep., Horne Dec. Ex. 16, Doc. No. 209-16 at 2. Another analyst observed, "The company continued its policy of providing limited visibility … The lack of full disclosure and caginess around the aducanumab results and filing remain perplexing." William Blair Rep., Horne Dec. Ex. 17, Doc. No. 209-17. Wells Fargo similarly noted that Biogen reaffirmed its Dosage Thesis: "BIIB noting that both ENGAGE and the phase 1 support the conclusion from EMERGE that a high dose administered for sufficient length of time is required." Wells Fargo Rep., Horne Dec. Ex. 18, Doc. No. 209-18 at 4.

That not all analysts explicitly cited the All Data Statement is immaterial. "As a general proposition … there is little incentive for an analyst to reference an alleged misrepresentation if

the alleged misrepresentations were supposedly intended to maintain the status quo." *In re Concho Res., Inc.*, 2025 WL 1040379, at 14 (S.D. Tex. Apr. 7, 2025). Sandrock's statement directly addressed analysts' core concern—whether the subgroup data contradicted the Dosage Thesis—and was designed to prevent a stock decline. That it succeeded is its price impact. That, some analysts later recognized that the Massie Report contradicted the Dosage Thesis and jeopardized FDA approval provides direct evidence of price impact. *See Pardi v. Tricida, Inc.*, 2024 WL 4336627, at 11–12 (N.D. Cal. Sept. 27, 2024) (analyst reaction to new facts confirms value relevance and price impact); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 508 (E.D. Pa. 2022) (quoting *Loc. 703 I.B. of T. v. Regions Fin. Corp.*, 2014 WL 6661918, at *7 (N.D. Ala. Nov. 19, 2014)) ("Analyst commentary highlighting negative news is … evidence of price impact.").

### 1. *The Complexity of the Briefing Materials Required Multiple Days to Process Fully*

The First Circuit, and many others, hold that it may take more than one trading day to fully incorporate news into a stock price. *Shash v. Biogen, Inc.*, 84 F.4th 1, 21 (1st Cir. 2023) (*citing* the Fourth, Fifth, Ninth, & Tenth Circuits). That's because "[t]he efficient price is not set by an invisible hand that instantly reflects new information in a security's price, but through the dynamic, high-volume exchange of a security over an appropriate window of time." *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 487 (E.D. Pa. 2022). *Energy Transfer* explained when and why information might take longer to be incorporated. Much of the academic literature about the efficient market—including articles Hubbard cites—examines the impact of earnings announcements. Earnings are a simple quantitative metric revealed by the company, with guidance and analyst estimates having already established expectations, so they are quickly incorporated. *Id. see also* Doc. No 209-3 at 40, ¶84 n. 90. The efficient market works more

slowly when the information to be incorporated is more complex. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005) (holding need for basic mathematical calculations did not warrant two month delay between disclosure and stock price decline, but recognizing that a complex enough analysis could warrant a delayed price response). Indeed, courts recognize that complex disputed news might plausibly take as much as five days to be incorporated. [3]

The AdCom Materials ran to 343 pages, but it did not take much effort to discern that the FDA wanted to approve aducanumab. Everything other than the Massie Report, from the FDA's claim that EMERGE provides "robust and exceptionally persuasive" evidence, to its decision to file a joint briefing book with Biogen and its choice of questions for the advisory committee, pointed in that direction. Had investors learned just that the FDA intended to approve aducanumab, they likely would have raised their likelihood of approval to practically certain. Massie's Report was 93 pages long, consisted of dense statistical analyses whose impact on the Dosage Thesis could not easily be quantified, did not come from the company, and was a dissent from the main report. More, it bore signs that it was unreliable, including a "draft" watermark. This is not a trivial issue; in a later submission to the FDA, Biogen used the watermark to cast doubt on the Massie Report's credibility. Budd Haeberlein email, Horne Dec. Ex. 20, Doc. No. 209-20. It could not be read and analyzed with all the materials in the 6 hours remaining in the trading day. The analysts showed as much. They quickly noted the FDA's vote of confidence in aducanumab but commented

---

[3] *See In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. CIV.A.08-CV-2177, 2009 WL 2855601 (D.N.J. Sept. 2, 2009) (delayed reaction of three and five days); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sept. 28, 2023) (use of three-day window permissible); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (accepting event study with three-day event window); *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 486 (E.D. Pa. 2022) (collecting cases); *Cross v. 21st Century Holding Co.*, 2002 WL 31158901, at *7 (S.D.N.Y. Sept. 27, 2002) (rejecting defendants' argument that "a fraud-on-the-market theory must fail where a relatively brief period of price stability follows a public disclosure, especially where the few days of price stability is followed by a relatively steady decline in share price").

it would take a full day to read and analyze the materials.[4]  The analysts also arranged meetings with biostatistics and FDA experts that day to understand the extensive briefing materials. November 4 Analyst Reports, Horne Dec. Exs. 21, 22 (Doc. No. 209-21, 209-22).

Dr. Tabak identified the Massie Report as the only negative news and determined that the market was continuing to weigh the overwhelming positive briefing materials against the negative news in the Massie Report on November 4 and 5. Doc. No. 171-1 at 35, ¶ 70. Dr. Tabak analyzed Biogen's share price on November 5 and found a statistically significant decline, showing that "the market was still incorporating information released on November 4." *Id.* at 36, ¶72. Likewise, Hubbard could not identify any negative news other than the Massie Report that could have caused the decline on Nov. 5, Doc. No. 209-1 at 259-62 (258:23-261:9), leaving the Massie Report as the only possible cause of the price decline. *Energy Transfer,* 623 F. Supp. 3d at 497-98.

Dr. Tabak also found that "analysts who did not reference the Massie Report increased their target price by $27.25 per share more than those that did mention the Massie Report." Doc. No.171-1 at 34-35, ¶68. This, with the fact that Biogen's November 5 share price decline was nearly the same amount ($27.73), shows demonstrates price impact on Nov. 4 and/or 5.[5] *Id*. at 34-35, ¶68-¶69. Analyst reports similarly show that Biogen's stock was incorporating the Massie Report. Three analyst firms mentioned it after trading closed and two analysts published reports explicitly describing a "Closer Look" or a "Deeper Look" into the split in the FDA analyses. The market was continuing to process the divergent views after the November 4 close. *Id.* at 36, ¶73.

---

[4] CGSCIMB Rep., Horne Dec. Ex. 19, Doc. No. 209-19 (report published on November 4 at 11:15 am noting "[i]t's going to take us most of the day to go through it all").

[5] Dr. Hubbard criticizes Dr. Tabak's analysis of the analyst reports because there is no evidence of statistical significance. Doc. No. 189-1 at 47, ¶99. Dr. Tabak's analysis is known  as the "best estimate"  given the data and is an accepted method of scientific inference when the sample size is small. Doc. No. 209-3 at 44, ¶93. Dr. Hubbard's inclusion of an additional three analyst reports that do not match the analysts description of a price-target update is improper and results in a biased and meaningless result. *Id.* at 48, ¶99. Removing those improper reports from Hubbard's analysis provides a result very similar to Dr. Tabak's showing lower price targets of between $22-$28 for analysts that mention the Massie Report from those who don't. *Id.* at 51, ¶104.

And it continued: analyst reports and news stories about Biogen continued to discuss the importance of the Massie Report Nov. 5 through Nov. 11. *Id.* at 37, ¶74, Figures 14a-14c.

Dr. Hubbard admits that the continued stock price volatility (*i.e.* price movements) on November 5 resulted, at least in part, from the market's evaluation of how the negative views in the Massie Report might affect the AdCom panelists' views of the clinical trials. Doc. No. 209-1 at 317-18 (316:24-317:15). But the distinction between the Massie Report's findings and their impact on the AdCom is meaningless. Had the Massie Report been disclosed earlier, the market would have similarly grappled with how that information might have affected the AdCom vote and FDA approval. Doc. No. 209-3 at 51, ¶104.  Hubbard's "failing to tie the prolonged continued volatility to the whole set of news (including the Massie Report) … is like hitting a pendulum and then arguing that the continued movement of the pendulum after being hit was simply 'prolonged' volatility somehow divorced from the initial hit." *Id.* at 36-37, ¶73.

Hubbard's conclusion is based on academic research showing that a ***majority*** of value-relevant news released ***after trading hours*** is reflected in a stock's price at the market open.[6] Doc. No. 189-1 at 40, ¶84; Doc. No. 209-3 at 39-40, ¶¶81-84. But Defendants must show the complete absence of price impact, and incorporating 51% of the price impact at opening still leaves 49% to be incorporated. And Biogen's share price ***did*** decline from close on Nov. 4 to the open on Nov. 5 by 2.56%. Doc. No. 189-1 at 40, ¶84. Hubbard's "price impact arguments rely on a statistical fallacy …the existence of non-statistically-significant stock price declines does not prove the absence of price impact." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393-396

---

[6] Defendants reliance on *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023) demonstrates the fallacy of their argument. The court agreed with the defense expert that the "close-to-open event window is best for analyzing the market reaction to alleged Corrective Disclosures ***made while the market was closed***." (emphasis added)  Here, the corrective disclosure was issued during trading hours, making Hubbard's entire analysis irrelevant.

(N.D. Ga. 2019) (citing cases). Finally, once again, Hubbard relies on an article about earnings releases, with their simple straightforward data, which says nothing about how quickly markets incorporate more complex information like the Massie Report. Doc. No. 209-3 at 40, ¶84, n. 90. *See In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *18 (W.D. Pa. Aug. 11, 2022) (using a two-day window for a disclosure that "involved the filing of voluminous proxy materials after the market closed on June 17 and also an eventual press release … and a denial by EQT").

Dr. Hubbard also analyzes Biogen's stock price volatility on Nov. 4 and 5 and finds that there are stock price declines on Nov. 4 that are similar to declines on Nov. 5. He opines that this "pattern" shows the declines on Nov. 5 are "best understood as continued volatility from the price movements of" Nov. 4. Doc. No. 189-1 at 42-43, ¶88. Hubbard thus admits that the price declines on Nov. 5 resulted from the news on Nov. 4. Hubbard does not explain why, and there is no reason to believe, that intra-day price declines on Nov. 4 negate the substantial price declines (evidencing price impact) on November 5. Moreover, Dr. Hubbard's comparison of November 4 and November 5 price declines relies on data mining.[7] Doc. No. 209-3 at 40-43, ¶¶85-89.

## 2. *There is Strong Evidence of Price Impact on Nov. 9*[8]

The First Circuit did not limit Plaintiffs' loss causation theory to Nov. 4 and/or 5, but acknowledged Plaintiffs adequately pled that the market had a delayed reaction to the Massie

---

[7]The Nov. 5 price declines Hubbard studies "all start at the 9:30 open and end at 9:35, 9:40, or 9:45, making them all exact multiples of five minutes that both start and stop at a minute ending in 0 or in 5. Yet, when looking for 'comparable' declines on November 4, the Hubbard Report does not impose this restriction. In fact, of the eight examples of price declines on November 4, 2020 listed at 41-42, ¶¶86-87 of the Hubbard Report, only one would satisfy this criterion. Looking at the electronic backup to the Hubbard Report, only one out of sixteen identified 'comparable' declines on November 4, 2020 would satisfy one of the criteria that the Hubbard Report imposes on the declines identified on November 5, 2020 (i.e., starting and ending on a minute ending in 0 or in 5). Put simply, what the Hubbard Report does in its Exhibit 8 is a completely invalid analysis because it imposes additional restrictions on the November 5, 2020 declines that it does not impose on the November 4, 2020 declines." Doc. No. 209-3 at 40-41, ¶¶85-6.

[8]Plaintiffs have no obligation to plead evidence of price impact in the complaint. "In assessing price impact at class certification, courts " 'should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" *Goldman I*, 594 U.S. at 122. Plaintiffs pled the fraud on the market presumption of reliance and an efficient market. Nothing more was required in the Complaint.

Report that continued through Nov. 9. *Shash v. Biogen, Inc.,* 84 F.4th 1, 20-21 (1st Cir. 2023). The extreme price volatility set into motion by disclosure of the FDA briefing materials on Nov. 4 continued throughout the trading day on Nov. 5.

The AdCom marked the continuation of the incorporation of the information from the Massie Report. Advisory committees exist to advise the FDA "whether adequate data support approval." Complaint, Doc. No. 58, ¶217.[9] Hubbard himself opines that Biogen's share price decline on Nov. 5 resulted from *"continued* volatility tied to uncertainty over how the AdCom panelists would weigh the various findings from the Briefing Book, including the Massie Appendix." Doc. No. 189-1 at 40, ¶88. While the AdCom vote was not binding on the FDA, Doc. No. 209-1 at 299 (298:19-25), its views were critical information about the strength of the evidence in support of the Dosage Thesis and ultimately the chances of FDA approval.

Hubbard admits that the AdCom's negative vote was based on the Massie Report. Doc. No. 209-1 at 300 (299:10-17). So does Biogen. Budd Haeberlein email, Horne Dec. Ex. 20, Doc. No. 209-20. Hubbard also admitted that the negative AdCom vote was a materialization of the undisclosed risk of the findings in the Massie Report. Doc. No. 209-1 at 306-07 (305:10-306:25). Hubbard denied analysts referenced the All Data Statement but acknowledged analysts commented that the Massie Report undermined the Dosage Thesis. *Id.* He also admitted that AdCom ***discussions*** on Nov. 6 were "new news" to the market. Hubbard Depo. *Id.* at 260-61 (259:20-260:12).

Trading was halted on Friday Nov. 6, the day of the AdCom meeting. The entire AdCom's members' discussion of the strength of the clinical trial evidence, based on the briefing materials

---

[9]Citing https://www.fda.gov/drugs/information-consumers-and-patients-drugs/advisory-committees-critical-fdas-product-review-process.

including the statistics, was broadcast publicly on Nov. 6.  When trading resumed on Nov. 9, Biogen's share price declined 25% on volume of 9.3 million shares. Doc. No. 209-10.

The Nov. 9 price decline shows price impact for four independent reasons. First, the AdCom discussions were new news. *See In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *7 (D. Mass. Nov. 14, 2017) (AdCom members' responses to FDA briefing materials is new news). Here, as in *Aveo*, the AdCom members reviewed the Massie Report and provided new analyses of the significance of the previously undisclosed subgroup data.  Dr. Hubbard's admission and Dr. Tabak's further analysis distinguish this motion from the Court's earlier decision on Defendants' motion for judgment on the pleadings. Doc. No. 163 at 17-19.  Second, the AdCom discussions were "successive clarifying information" to the Nov. 4 briefing materials. *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 486 (E.D. Pa. 2021) (finding price impact from subsequent day's news that clarified and contextualized earlier disclosure).  Third, AdCom members' negative views and negative votes were the materialization of the undisclosed risk concealed by Defendants. In *Homyk*, the court found that an advisory committee's negative discussions and vote were foreseeable based on the defendants' knowledge of the FDA's undisclosed analyses of the clinical data, and thus the AdCom's discussion and vote were corrective for purposes of a price impact analysis. *Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at *18 (N.D. Cal. May 30, 2025)). Here, too, Biogen had known Massie's statistical analyses since August 2019. Doc. No. 209-7, Doc No. 209-8.  By making the All Data Statement denying the existence of data contradicting the Dosage Thesis, despite knowing this contradictory data, Biogen concealed the risk that the AdCom would identify and highlight the subgroup analyses to vote against approval.

Defendants' citation of *FibroGen* is inapposite because FibroGen's stock price did not decline on disclosure of the FDA briefing materials, so the information had no price impact. *In re*

*FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024).  Indeed, the *Homyk* court distinguished FibroGen in part because "none of the other information discussed at the [AdCom] meeting [in *Fibrogen*] was new to investors." *Homyk*, 2025 WL 1547625, at *17.  Here, Biogen admits the briefing materials contained new information that caused price volatility on Nov. 4 and 5. And Hubbard admits the Nov. 6 AdCom discussions revealed new information to investors. Hubbard Depo. Doc. No. 209-1 at 260-61 (259:20-260:12).

Finally, apart from the AdCom meeting, Dr. Hubbard testified that the "continued volatility in Biogen stock price on November 5th **and beyond** are due, at least in part, to the analysts weighing Dr. Massie's views". Doc. No. 209-1 at 318 (317:9-19). Thus, a portion of the stock price reaction on Nov. 9 was due to the market's delayed evaluation of the implications of the Massie Report. In any case, *Homyk* also distinguished the case precisely because the *FibroGen* plaintiffs had not advanced a theory that the advisory committee was a materialization of the risk concealed by Defendants' false statements.

That analysts continued to discuss the Massie Report's significance on November 6-12 confirms this price impact. Doc. No. 171-1 at 37 ¶74. This alone is sufficient evidence of price impact because even if the Court were to find that the AdCom vote and/or the AdCom discussions are an intervening event, the market's continued assessment of the Massie Report affected Biogen's stock price on November 9. *Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017) ("[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security."); *accord Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *10 (D. Mass. July 14, 2023). *See also Sjunde AP-Fonden*, 2025 WL 2554474, at *15 ("[I]n the absence of any compelling analysis disaggregating

20

the price impact of the [non-fraud related disclosure] and the corrective disclosure" defendants failed to carry their burden of proving no price impact).

### III.   DR. TABAK'S PRELIMINARY DAMAGES MODEL SATISFIES *COMCAST*'S MODEST REQUIREMENTS

To comply with *Comcast*, at class certification, plaintiffs do not have to measure damages or provide a damages model that eliminates non-fraud factors: *Baker v. Equity Residential Mgmt., L.L.C.*, 390 F. Supp. 3d 246, 263 (D. Mass. 2019), *citing Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). At class certification, Plaintiffs need only "propose a methodology for calculating damages that corresponds to [their] theory of liability." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019). Dr. Tabak describes a damages model that uses an event study to measure the decline in Biogen stock following corrective disclosures on November 5 and 9, 2020. Defendants cite only three outlier cases that have found such a showing insufficient at class certification.[10] Exhibit 23 hereto cites 95 cases that have accepted the use of an event study similar to Dr. Tabak's. Doc. No. 209-23.

Dr. Tabak explains that he will disaggregate any non-fraud related news using two methods. First, he can isolate the impact of the Massie Report from other news by analyzing the difference in changes in analysts' price targets for those analysts that mentioned the Massie Report and those who didn't. Doc. No. 171-1 at 34-35, ¶68. (finding $27.25 per share lower price target change for analysts mentioning Massie Report).  This closely matches the actual share price decline on Nov. 5. *Id.*

---

[10]  In two, the denial was without prejudice, and in one the court subsequently granted class certification. *In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1268 (N.D. Cal. 2024) (certification denied without prejudice); *In re Vaxart, Inc. Sec. Litig.*, 759 F. Supp. 3d 1015, 1018 (N.D. Cal. 2024) (class certified on subsequent motion); *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 623 (6th Cir. 2025) (remanded so the district court could conduct a damages analysis under the proper standard and is still pending).

Second, though Dr. Hubbard did not even attempt to identify any non-fraud related news in the Massie Report,[11] disaggregation poses no more problem here than any time a corrective disclosure comes packaged with other news, such as in an annual report. Dr. Tabak can disaggregate the price impact of any such non-fraud related adverse news with the assistance of a clinical trial and FDA approval expert. Before the Advisory Committee materials' release, analysts provided estimates of both the likelihood of aducanumab's FDA approval and the likely size of the market. Biogen Slide Deck, Horne Dec. Ex. 24, Doc. No. 209-24. The subject matter expert can estimate the impact of the fraud-related disclosures on the likelihood of success. Dr. Tabak can then use the calculation to disaggregate the portion of the November 5 and November 9 decline attributable to the fraud-related disclosures.

## IV.  SHASH, KHAN AND AFFOORA ARE TYPICAL AND ADEQUATE CLASS REPRESENTATIVES

A unique defense must "threaten to become the focus of litigation" before it warrants disqualifying a putative class representative. *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 264 (D. Mass. 2005). There is no indication that unique defenses will become the focus of this litigation or prejudice the absent class members.  First, Defendants argue that investors who purchased after publication of the Massie Report (like Khan and Shash's LLC Polycon) are atypical. Doc No. 190 at 35-36; Op. to Rule 17 Mot., Doc. No. 195 at 25. Interpreting the First Circuit's order, the Court has already held that the Complaint sufficiently alleged loss causation and reliance for investors who purchased stock after the Massie Report's publication. Doc No. 163 at 11-13. Defendants do not cite any new facts or law to call the Court's decision into doubt. Moreover, a proposed class representative is not atypical because "some class members will have stronger loss causation arguments than others." *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2007 WL

---

[11]Doc. No. 209-1 at 191-192 (190:4-191:4).

1703067, at \*3 (D.N.H. June 12, 2007). Finally, the volume on November 4 and 5 was equivalent to 20 trading days of the Class Period. Doc. No. 189-1 at 34-35, ¶¶74, 76 n.114 . The defense Khan and Polycon face is not unique because it is shared by many other class members. *Corcoran v. CVS Health*, 2019 WL 6250972, at \*5 (N.D. Cal. Nov. 22, 2019) (plaintiffs were not atypical where some other class members are subjected to the same defense).

Defendants also argue that Khan and Aftoora are atypical because of their trading strategy. Courts in this Circuit have repeatedly rejected this argument, holding that plaintiffs "rel[y] on the price of…stock to reflect accurately information disseminated in the market" regardless of their trading strategy. *Kirby v. Cullinet Software, Inc*., 116 F.R.D. 303, 308 (D. Mass. 1987) ("investment strategy is of little importance to ... suitability as a class representative."); *Schaffer v. Timberland Co*., 1996 WL 35072672, at \*5 (D.N.H. Mar. 19, 1996) (plaintiff not atypical though he was a "day trader who sought to realize a gain from fractional increases and who acted on subjective impulses"); *Tolan v. Computervision Corp*., 696 F. Supp. 771, 779-80 (D. Mass. 1988) (momentum traders not atypical). Moreover, Defendants' argument is wrong on the facts. Khan testified 3 times that he did not remember why he bought Biogen; his testimony that he may have bought Biogen stock because of trends is little more than speculation. *See* Khan Dep. Tr.,  Doc No. 189-4 at 18 (65:13-25), 31 (114:1-22), 36 (136:6-19). The Supreme Court has rejected Defendants' argument that Aftoora "actual belief that the market price was inaccurate" renders him atypical because he "implicitly relies on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur?" *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 273 (2014). Defendants' speculation from Aftoora's failure to sell when he could have made a profit that he would have purchased the stock had he known of the misrepresentation ignores that investors need not sell to sue.

23

"[I]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance ... are rarely appropriate." *Kinney v. Metro Glob. Media, Inc.*, 2002 WL 31015604, at *5 (D.R.I. Aug. 22, 2002). In the First Circuit, "class representatives need not have expert knowledge of the subject matter of the suit, may rely on class counsel for guidance, and need not be subjectively interested in the case, as long as the representatives have not virtually abdicated control of the case to counsel." *Luna*, 2023 WL 4539855, at *6. Defendants argue that Plaintiffs' purported lack of knowledge of the case is disqualifying. They cite just one securities case, and there, the plaintiff did not know the name of the defendant company or the drug at issue. *In re Sepracor Inc.*, 233 F.R.D. 52, 55 (D. Mass. 2005).

Plaintiffs easily clear the low bar set by the First Circuit. Although Defendants conflate named plaintiffs with a Lead Plaintiff group, Shash has been serving as the sole lead plaintiff. In that role, Shash has closely monitored the case by, among other things, reviewing both the First and Second Amended Complaints before filing and communicating with counsel during the mediation. Shash Dep. Tr., Doc No. 189-3 at  68:3-5, 68:25-69:8, 160:19-23, 163:24-164:5; Doc. No. 203 at 14-15. She also explained the case's theory in detail during her deposition. Doc No. 189-3 at 102:19-103:13; Doc No 203 at 15.

Nevertheless, named Plaintiffs Khan and Aftoora have also monitored the case and have demonstrated their adequacy to serve as class representatives. Khan testified he understood counsel was paid by contingency (Doc. No. 189-4 at 10 (32:17-24)), authorized the filing of the First and Second Amended Complaints on his behalf (*id.* at 25 (90:6-11), 32 (120:11-121:4)), knew that the First Circuit overturned the initial motion to dismiss decision (*id.* at 40 (150:8-17)), and confirmed that he regularly emailed counsel (*id.* at 40 (152:21-153:1)). Khan knew that Defendant Sandrock made the misstatement (*id.* at 26 (94:1-2)) and identified the misstatement and its misleading

24

portion. (*Id.* at 27 (100:13-101:23), 28 (104:17-23), 42 (160:20-161:15)). Having only joined the case when the Court granted his motion to intervene on March 27, 2025, Aftoora still read the Second Amended Complaint and the First Circuit's opinion more than once (Aftoora Dep. Tr., Doc No. 189-5 at 48 (185:12-17), 50 (191:11-23)) and sent 15 emails to counsel (*id* at 24 (87:22-88:3)). Aftoora also explained the theory of the case and misstatement at issue. *Id.* at 25 (91:19-92:9), 27 (100:5-22). Even serious substantive errors in in PSLRA certifications are not generally enough to disqualify a representative plaintiff. *See In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23-24 (D. Mass. 2008) (error in certification that obscured the fact that plaintiff was a net seller of stock during Class Period was not enough for inadequacy). So Defendants' argument that Aftoora is inadequate merely because his PSLRA certification did not disclose that he made his Biogen stock purchase through a trust, despite conceding that he was the trust's sole trustee and beneficiary and not challenging his standing to bring a claim, lacks merit. [12]

## V.    CONCLUSION

For the foregoing reasons, and those set out in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion.

---

[12]Defendants also repeat their argument from their opposition to the Motion to Additional Plaintiffs that Aftoora did not have a large enough loss (citing the exact same outlier cases), but cite no authority showing the result on class certification should be any different than the Court's earlier decision

Dated: November 5, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Horne*
Jonathan Horne, Esq. (*pro hac vice*)
Laurence M. Rosen, Esq. (*pro hac vice*)
Brian B. Alexander, Esq. (*pro hac vice*)
Joshua Baker, Esq. (BBO #695561)
Sara Fuks, Esq. (*pro hac vice)*

275 Madison Avenue, 40th Floor
New York, NY 100016
Tel: (212) 686-1060
Fax: (212) 202-3827

lrosen@rosenlegal.com
jhorne@rosenlegal.com
balexander@rosenlegal.com
jbaker@rosenlegal.com
sfuks@rosenlegal.com
*Counsel for Plaintiffs*

26

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2025, a true and correct copy of the foregoing **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION** was served by CM/ECF to parties registered to the Court's CM/ECF system.


*/s/ Jonathan Horne*