# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, and ALFRED W. SANDROCK, JR.,<br><br>Defendants. | Civil Action No.: 1:21-cv-10479-IT |

**DECLARATION OF AUDRA J. SOLOWAY**
**IN SUPPORT OF DEFENDANTS' SUR-REPLY IN FURTHER OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, AUDRA J. SOLOWAY, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, an international law firm with its principal office at 1285 Avenue of the Americas, New York, New York 10019-6064, and represent defendants Biogen Inc., Michel Vounatsos, and Alfred W. Sandrock, Jr., M.D., Ph.D. (together, "Defendants") in the above-captioned action.  I respectfully submit this declaration in support of Defendants' Sur-reply in Further Opposition to Plaintiffs' Motion for Class Certification.  The information set forth below is based on my personal knowledge.

2.      Attached hereto as Exhibit T is a true and correct copy of the Expert Rebuttal Report of Glenn Hubbard, Ph.D.

I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on November 25, 2025, in New York, New York.


/s/ *Audra J. Soloway*
Audra J. Soloway

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of November 2025, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Audra J. Soloway*
Audra J. Soloway

# Exhibit T

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR.,<br><br>Defendants. | **Case No.: 1:21-cv-10479-IT** |

**REBUTTAL REPORT OF**

**GLENN HUBBARD**

**November 25, 2025**

**TABLE OF CONTENTS**

I.    Introduction ............................................................................................................. 2

II.   Summary of Opinions ............................................................................................. 2

III.  The July 22 Statement Did Not Introduce New Inflation and Dr. Tabak Does Not
      Conclude Otherwise.............................................................................................. 4

IV.   The July 22 Statement Did Not Maintain Preexisting Inflation and Dr. Tabak Has Not
      Shown Economic Evidence to Refute This Finding ....................................................... 5

V.    Back-End Price Movement Does Not Indicate or Measure Front-End Inflation ........... 9

      A.    Market Participants Did Not View the Subgroup Analyses in the Massie Appendix as
            Corrective of the July 22 Statement and Dr. Tabak Ignores This Evidence................ 9

      B.    Market Participants Reacted Quickly to the Massie Appendix on November 4, 2020
            and Any Reaction Ended by the Close of November 4, 2020 .................................. 11

            i.    Dr. Tabak Agrees That Market Participants Reacted Quickly to the Massie
                  Appendix on November 4, 2020....................................................................... 11

            ii.   Economic Theory, Market Commentary, and Empirical Analysis All
                  Demonstrate That Any Reaction Ended by the Close of November 4, 2020 at
                  the Latest; Dr. Tabak Provides No Reliable Evidence to the Contrary ........ 12

      C.    Price Volatility on November 5, 2020 Is Driven by Uncertainty of AdCom Vote; Dr.
            Tabak Agrees But Incorrectly Equates Volatility with Evidence of Price Impact .... 14

            i.    Prolonged Price Volatility Reflecting the Uncertainty of AdCom Vote Is Not
                  Evidence or Measure of Any Inflation Attributable to the July 22 Statement 15

            ii.   Dr. Tabak's Critiques of the Hubbard Report's Volatility Analyses Are
                  Arbitrary and Ignore Relevant Evidence ........................................................ 17

      D.    Price Movement on November 9, 2020 Reflects the Negative Resolution of
            Uncertainty Unrelated to Any Correction of the July 22 Statement.......................... 20

VI.   Dr. Tabak's Price-Impact Analysis Remains Flawed and Unreliable........................... 22

      A.    Dr. Tabak's Analysis Does Not Show Evidence of Price Impact ............................. 22

      B.    Dr. Tabak's "Best Estimate" Does Not Constitute Reliable Evidence of Price Impact
            24

      C.    Analysts' Reports That Maintained Their Price Targets Should Be Included .......... 26

VII.  Dr. Tabak Makes Additional Errors in the Tabak Reply................................................ 29

      A.    The Tabak Reply's Section VI Is Incomplete........................................................... 29

      B.    Dr. Tabak and Plaintiffs Repeatedly Misconstrue My Deposition Testimony.......... 29

            i.    Dr. Tabak's Claim That I Misstated the Theory of the Case Misconstrues My
                  Testimony.......................................................................................................... 29

            ii.   Dr. Tabak Takes My Testimony Out of Context Concerning Price Impact... 30

## I.    Introduction

1.    I submitted a report in this matter on September 10, 2025 (the "Hubbard Report").[1] Any defined terms in the Hubbard Report that appear here maintain the same meaning. On November 5, 2025, Dr. Tabak submitted a reply report (the "Tabak Reply").[2] Counsel has asked me to respond to the Tabak Reply. This Rebuttal Report sets out my responses. My professional background, qualifications, and compensation are unchanged from those described in the Hubbard Report.

2.    My updated testimony list is attached as **Appendix A**. A list of materials I incrementally considered in addition to those listed in Appendix C of the Hubbard Report is attached as **Appendix B.** The errata sheet to my deposition testimony, dated November 19, 2025, is attached as **Appendix C**.

3.    My work on this matter is ongoing. I may review additional materials or conduct further analyses after issuing this report. I reserve the right to update or revise my opinions, or form additional opinions, in response to statements by opposing experts and to any additional information I may receive.

## II.    Summary of Opinions

4.    After my review of the Tabak Reply, my opinions presented in the Hubbard Report remain unchanged.

- **The July 22 Statement did not introduce new inflation**. In the Hubbard Report, I showed that there was no price reaction to the July 22 Statement and that market participants did not take note of the July 22 Statement, let alone describe it as conveying new, value-relevant information. Dr. Tabak does not provide any contrary evidence or offer a contrary conclusion.

- **The July 22 Statement did not maintain preexisting inflation**. In the Hubbard Report, I showed that market participants never expressed the misbelief—either before or after

---

[1]    Expert Report of Glenn Hubbard, Ph.D., *Nadia Shash, et al. v. Biogen Inc., et al.,* Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, September 10, 2025, ("Hubbard Report").

[2]    Expert Reply Report of David I. Tabak, Ph.D., *Nadia Shash, et al. v. Biogen Inc., et al.*, Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, November 5, 2025 ("Tabak Reply").

the July 22 Statement—that *all data*, including the subgroup analysis, would be supportive of or consistent with the Dosage Thesis. Dr. Tabak does not present any economic evidence or market commentary that contradicts this finding.

- **Back-end price movements do not indicate or measure front-end inflation.** In the Hubbard Report, I showed the following:

  - Market participants did not view the subgroup analyses in the Massie Appendix as corrective of the July 22 Statement. Dr. Tabak does not refute this evidence.

  - Consistent with efficient market principles, market participants reacted quickly to the Briefing Book (which included the Massie Appendix) on November 4, 2020 and any price reaction was complete by the market close on that day, at the latest. The lack of a statistically significant price movement at the market open on November 5, 2020 confirms this finding. Dr. Tabak provides no reliable source or evidence to make the contrary claim.

  - Volatility on November 5, 2020 is driven by the uncertainty of the AdCom vote. Dr. Tabak agrees but incorrectly equates volatility with price impact. Dr. Tabak's critiques of my volatility analyses are also arbitrary and ignore relevant evidence.

  - Price movement on November 9, 2020 reflects the negative resolution of uncertainty of the AdCom vote. Dr. Tabak is incorrect in claiming that had there been any uncertainty that persisted after the AdCom vote, that uncertainty would be evidence of price impact of the July 22 Statement.

- **Dr. Tabak's price impact analysis remains flawed and unreliable**. In the Hubbard Report, I stated fundamental issues with Dr. Tabak's price target analysis, including that it is conceptually flawed, lacks statistical rigor, and excludes certain data points that, when included, reverse Dr. Tabak's results. Dr. Tabak does not address the conceptual flaws, concedes the lack of statistical rigor, and continues to exclude data points based upon unsystematic and ad hoc criteria. His own critiques underscore that his price-target analysis is subjective and unreliable as evidence of price impact.

5.    The Tabak Reply also contains other errors. Of note, the Tabak Reply appears to offer an opinion in Section VI, but that Section is incomplete, and the title of the Section is not

supported by the three body paragraphs contained within. Also, Dr. Tabak and Plaintiffs repeatedly misconstrue my deposition testimony.

6.      For these reasons, as discussed further below, the Tabak Reply does not provide evidence undermining my opinions offered in the Hubbard Report.

**III.    The July 22 Statement Did Not Introduce New Inflation and Dr. Tabak Does Not Conclude Otherwise**

7.      In the Hubbard Report, I assessed whether there was any stock price inflation attributable to the sole remaining alleged misstatement, the July 22 Statement, and whether market participants interpreted this statement as new or different information than what they previously understood.[3]

8.      To determine if the July 22 Statement introduced inflation, I assessed: (1) whether the statement caused a statistically significant price increase. It did not.[4] Plaintiffs and Dr. Tabak did not refute this;[5] (2) whether any analyst or market participant took note of, commented on, or cited the July 22 Statement. They did not.[6] Dr. Tabak provides no evidence to the contrary;[7] and (3) whether from July 22, 2020 to November 6, 2020 any analyst expressed the view that *all data*, including the subgroup data, were supportive of or consistent with Biogen's earlier-expressed interpretation of the clinical trial data (*i.e.*, the Dosage Thesis), and thus supportive of

---

[3]    Hubbard Report, Section IV.A.

[4]    Hubbard Report, ¶¶ 27-29, Figure 1.

[5]    Tabak Reply, ¶ 30; Plaintiffs' Reply in Further Support of Motion for Class Certification, *Nadia Shash, et al. v. Biogen Inc., et al.*, Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, November 5, 2025 ("Plaintiffs' Reply Brief"), p. 3.

[6]    Hubbard Report, ¶¶ 36-37, Exhibit 1.

[7]    While Dr. Tabak presents no evidence that analysts commented on the July 22 Statement, I note that in Plaintiffs' Reply Brief, Plaintiffs identify three July 22, 2020 analysts' reports they claim provide evidence of price impact of the July 22 Statement. Plaintiffs' Reply Brief, pp. 12-13. None of these reports cite the July 22 Statement or indicate that Biogen provided any new information about aducanumab. Wolfe Research said that Biogen "reiterated prior talking points on aducanumab" and that "no new information was provided" on the July 22, 2020 earnings call. William Blair said that "[t]he lack of full disclosure and caginess around the aducanumab results and filing remain perplexing" and that they felt "it is hard to be confident in the program." Wells Fargo discussed the Dosage Thesis at large, but not the July 22 Statement: "BIIB not[ed] that both ENGAGE and the phase 1 support the conclusion from EMERGE that a high dose administered for sufficient length of time is required." These reports and quotations do not discuss the July 22 Statement and demonstrate that the July 22 Statement did not convey to analysts that *all data* including the subgroup data were consistent with or supportive of the Dosage Thesis. Wolfe Research, LLC., "2Q20 full postview: A strong quarter in spite of COVID, but questions about adu and CFO departure linger," July 22, 2020; William Blair, "Model Update After Second Quarter; All Eyes on Aducanumab Filing Acceptance," July 22, 2020; Wells Fargo, "BIIB: Increasing Target On 2Q20 Results, Aducanumab Remains Key," July 22, 2020.

FDA approval. They did not.[8] Dr. Tabak provides no evidence to the contrary. In fact, in Plaintiffs' Reply Brief, Plaintiffs admit that analysts understood that Biogen had not disclosed the subgroup data and viewed the data as "potentially damaging."[9]

9.        Based on my review of contemporaneous news articles, analysts' commentary, and Biogen's stock price behavior, I find that no inflation was introduced on July 22, 2020, and that the July 22 Statement was not interpreted to convey any new information to the market.[10] Dr. Tabak does not provide any evidence to the contrary or conclude otherwise.[11] Thus, this finding remains undisputed by Dr. Tabak and Plaintiffs.[12]

### IV.    The July 22 Statement Did Not Maintain Preexisting Inflation and Dr. Tabak Has Not Shown Economic Evidence to Refute This Finding

10.        Dr. Tabak posits that, based on his understanding of the First Circuit's Ruling, certain (or all) dismissed statements are still materially false.[13] According to Dr. Tabak, this means that the July 22 Statement could be maintaining a false perception first introduced by these (dismissed) misstatements.[14] Because I am not a lawyer, I do not address Dr. Tabak's legal

---

[8]    Hubbard Report, ¶ 36.

[9]    Plaintiffs' Reply Brief, p. 12.

[10]    Hubbard Report, Section IV.A.

[11]    In his deposition, Dr. Tabak testified that a statement like the July 22 Statement would be "[p]robably new" information to the market. In the Tabak Reply, Dr. Tabak appears to retreat from this admission by claiming that it was an answer to a hypothetical question. Nonetheless, Dr. Tabak does not offer a conclusion to the contrary. Tabak Deposition, 159:13-160:2; Tabak Reply, ¶¶ 54-55.

[12]    I note that in Plaintiffs' Reply Brief, Plaintiffs confirm they are alleging a maintenance theory and believe that Dr. Sandrock's statement "would not cause Biogen's stock price to increase." Plaintiffs' Reply Brief, pp. 2-3. Dr. Tabak also explains that "there was not a statistically significant price reaction to the All Data Statement" because: "[s]tating that all data are 'consistent' rather than 'supportive' of the Dosage Thesis essentially means that there are no inconsistent data, or data that one would expect to sink Biogen's bid for approval of aducanumab by contradicting the Dosage Thesis. Given that Biogen was going ahead with seeking approval for aducanumab, the market may have assumed that there were indeed likely no meaningful, problematic data. In contrast, a truthful statement that there were inconsistent data would have been seen as a substantial negative indication." Tabak Reply, ¶ 30. Dr. Tabak does not provide any evidence for this claim. Based on the analysts' commentary I reviewed, I do not find Dr. Tabak's theory about what "the market *may* have assumed" (emphasis added) to be convincing.

[13]    Tabak Reply, ¶ 16 ("[P]rior alleged statements by Biogen may have been false and misled the market, but because they were not made with scienter, they are not actionable.").

[14]    Tabak Reply, ¶ 50 ("[W]hat is being maintained is both Biogen's stock price, under the price maintenance theory, and the market's view that there are no serious challenges to the Dosage Thesis (as prior statements by Defendants to the contrary may still have provided that view to the market, but I understand are not actionable due to the First Circuit's finding of a lack of a sufficient allegation of scienter)."). This quotation shows that Dr. Tabak's "price maintenance" theory rests on his legal understanding and his assumption that a false belief was being maintained. I therefore evaluate whether analysts expressed the misbelief that *all data*, including the

assertions regarding the First Circuit's ruling.[15] However, regarding the economic issues, I previously assessed whether there was any stock price inflation maintained by the July 22 Statement.[16] As an economist, my review examined whether the July 22 Statement maintained a belief that *all data*, including the subgroup data, were supportive of or consistent with the Dosage Thesis. I found that it did not.[17]

11.     To establish inflation maintenance, Dr. Tabak would have needed to identify evidence that the July 22 Statement maintained a false belief held by the market prior to July 22, 2020. But, Dr. Tabak has not provided ***any evidence*** that prior to the July 22 Statement, the market believed that the unreleased subgroup data would be consistent with Biogen's thesis about high-dose aducanumab, or that this belief was maintained by the July 22 Statement.[18]

---

subgroup data, were supportive of or consistent with the Dosage Thesis before or after the July 22 Statement. I found no such evidence. Hubbard Report, Section IV. Dr. Tabak likewise provided no such evidence, but instead falsely claims that "Dr. Hubbard seems to completely miss the concept of price maintenance here" by taking portions of my testimony out of context. Tabak Reply, ¶¶ 47-50. Specifically, while I understand the substance of Dr. Tabak's arguments, I cannot reconcile his "price maintenance" theory with the evidence that analysts never expressed the false belief that *all data*, including the subgroup data, were supportive of or consistent with the Dosage Thesis.

[15]    Dr. Tabak mischaracterizes my position on this issue to render some of my analyses "irrelevant" by quoting from my deposition testimony to say I "did not understand the term 'scienter'." However, he misrepresents my testimony, in which I am actually expressing my confusion about and discomfort in answering a legally worded question by Plaintiffs' counsel, not the term "scienter": "Q. Now, would it matter for the analyses in your report if the First Circuit had assumed that the other alleged misrepresentations which were not reinstated were not actually misleading versus if the First Circuit had assumed without deciding that those statements were misleading but said that they were not actual because of a lack of what is called slander [sic]? [...] A. Very big question. Don't understand what it means, because it seems to be phrased legally. If you're asking did I consider things other than what I was asked to do, I did not. But I can't tell from your legally worded question if that's the answer you're looking for." Deposition of Glenn Hubbard, Ph.D., October 17, 2025 ("Hubbard Deposition"), 8:10-9:3; Tabak Reply, ¶¶ 16-17.

[16]    Hubbard Report, Section IV.B.

[17]    Hubbard Report, Section IV.B. Dr. Tabak and Plaintiffs misconstrue my review of analysts' reports to suggest that I extracted meaning not supported by the text, describing my findings as "at best, interpretations." In doing so, they overlook that my analysis was limited to an objective review of the reports, for which I present the analysts' commentary verbatim in the Hubbard Report—without additional inference or subjective framing. Any conclusions I reach regarding the market's beliefs are therefore directly supported by the actual analysts' commentary, not my "interpretations" or "view[s]". Tabak Reply, ¶¶ 51-52; Plaintiffs' Reply Brief, p. 10.

[18]    In the Tabak Reply, Dr. Tabak theorizes that "[g]iven that Biogen was going ahead with seeking approval for aducanumab, the market may have assumed that there were indeed likely no meaningful, problematic data" without providing any evidence for this claim. *See* Tabak Reply, ¶ 30. Based on the analysts' commentary I reviewed, I did not find Dr. Tabak's statement to be true.

12.     Instead, he focuses on the use of the words "supportive" versus "consistent" in the Hubbard Report.[19] While the two words may differ in general meaning, in this context the concepts are linked: analysts' commentary questioning whether the subgroup data were "supportive" of approval necessarily reflects doubt that *all data* were "consistent" with high dose efficacy. Accordingly, Dr. Tabak's semantic distinction does not alter the substance or conclusions of the Hubbard Report.[20]

13.     In any event, the analysts' commentary reflects both concepts of "supportive" and "consistent." In other words, the analysts' reports reflect doubt, both before and after the July 22 Statement, about whether unreleased subgroup results were supportive of the Dosage Thesis, but also about whether the unreleased subgroup results were consistent with the Dosage Thesis, and by implication, whether they would be supportive of FDA approval. This is illustrated among analysts' reports I referenced in the Hubbard Report.[21] For example:

- RBC Capital Markets (2019.12.05): "[E]fficacy data in ApoE4 non-carriers – who would be less susceptible to protocol amendments and whose lower ARIA rates could enable an improved benefit/risk profile (and perhaps facilitate initial approval in this group) – **were not presented, perhaps suggesting data from this population in ENGAGE does not necessarily support the hypothesis**." (emphasis added).[22]

---

[19]   Tabak Reply, ¶¶ 20-24. Dr. Tabak draws this distinction despite his own interchangeable usage of supportive and consistent. Tabak Deposition, 43:19-44:3 ("Plaintiffs allege that defendants knew that there were issues in the data *supporting* adu[.]") (emphasis added), Tabak Deposition, 137:5-14 ("Q. […] What is your understanding […] as an economist -- of what a truthful but equally but generic substitute for the July 22nd statement would be? A. It could be that not all data *support* that. That, again, is the last word in the phrase there. Not all of our data *support* that.") (emphasis added). *See also* Tabak Deposition, 90:14-21, 138:17-141:13, 158:4-160:21, 254:14-25, 266:7-12; Tabak Reply, ¶ 62. I also note that the First Circuit uses both the words "consistent" and "support." *Shash* v. *Biogen, Inc.*, 84 F.4th 1, p. 20 (1st Cir. 2023), ("It logically follows then that whether all of Biogen's data *supported* high dose aducanumab, or only some, was 'a significant part of the mix of information [a reasonable investor would have] considered in evaluating [Biogen] as an investment,' given that FDA approval of aducanumab had not yet occurred when the [July 22] statement was made.") (emphasis added); *Shash* v. *Biogen, Inc.*, 84 F.4th 1, p. 23 (1st Cir. 2023) ("[Biogen] therefore knew that at least some data did not *support* high dose aducanumab.") (emphasis changed).

[20]   This is consistent with my deposition testimony: "the average investor, as reflected in analysts' reports I looked at pre and post July 22nd, already had information that not everything is supportive *or* consistent." (emphasis added). Hubbard Deposition, 15:18-22.

[21]   Hubbard Report, ¶¶ 45, 49, Exhibit 5, Appendix C.

[22]   Hubbard Report, ¶ 45; RBC Capital Markets, "BIIB Makes Case for Adu Activity, as Docs Pine for Any Effective AD Drug," December 5, 2019.

- Evercore ISI (2020.04.22): "From my perspective, there are a few data issues which could be slowing things down[:] […] • Apo E4 carriers • **Whether ENGAGE is 'supportive' when corrected for 'exposure**.'" (emphasis added).[23]

- BMO Capital Markets (2020.10.21): "As we have detailed before, given the mixed outcomes from EMERGE and ENGAGE Phase 3 trials, we do not believe current FDA precedent **supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses**." (emphasis added).[24]

- UBS Equities (2020.10.27): "Q: Is aducanumab approvable with the current data package? No, our in-depth review of the data and UBS Evidence Lab expert survey informs our view that there is a very low probability of approval (we model 5%) and thus we expect a complete response letter (CRL) from the FDA. […] **critical details on proportions of subpopulations (ApoE4 carriers vs. non) have not been disclosed and could have a meaningful impact on the interpretation of the results**." (emphasis added).[25]

- Wells Fargo (2020.11.03): "Nevertheless, we note that **certain aspects of ENGAGE data may not be entirely consistent with the proposed explanation on exposure alone**." (emphasis added).[26]

---

[23] Hubbard Report, Appendix C. Evercore ISI, "adu filing delay (i spoke to mgmt after call)," April 22, 2020.

[24] Hubbard Report, Exhibit 5 Row 9; BMO Capital Markets, "3Q/20: Tecfidera Revenue Erodes; A-mab AdCom November 6," October 21, 2020. In the Tabak Reply, Dr. Tabak reads the quote above as: "'at this time' the absence of public disclosure of certain data is an issue combined with 'current FDA precedent[,]'" where "BMO's reference to 'FDA precedent' in the context of one positive and one negative study may refer to the precedent of requiring two positive Phase 3 studies." *See* Tabak Reply, ¶¶ 33, 41, n. 42. I read it differently, as in the analyst is concerned about whether the results of the subgroup data are positive or consistent with FDA approval or precedent. However, I provide the quote in full for the court's evaluation. Dr. Tabak references my interpretation of the BMO quote and my refusal to opine on the FDA approval standards during my deposition as evidence that I am "not aware of the guidance for typically having two Phase 3 studies," when in fact, my testimony reflects my reading of the BMO reference and my reluctance to comment on FDA practices as an economist. Tabak Reply, n. 42; Hubbard Deposition, 108:16-109:12, 181:24-182:18. In any event, FDA requirements do not bear on my analysis showing that market participants did not take note of the July 22 Statement nor describe it to convey that *all data*, including the subgroup data, were supportive of or consistent with the Dosage Thesis.

[25] Hubbard Report, Exhibit 5 Row 12; UBS Securities, "Negative view on aducanuamb's approvability but asymmetric risk at these levels - Neutral," October 27, 2020.

[26] Hubbard Report, Exhibit 5 Row 13; Wells Fargo, "BIIB: Considering Aducanumab Risk-Reward Ahead of FDA Briefing Docs," November 3, 2020.

14. Moreover, none of the analysts' reports cited in Hubbard Report Exhibit 5 that expressed a view that would have "disabused" the market was accompanied by a statistically significant stock price decline, indicating that the market did not hold a misbelief that *all data*, including the subgroup results, were supportive of or consistent with the Dosage Thesis.[27] Therefore, there was no inflation for the July 22 Statement to maintain. Dr. Tabak has not provided any evidence to the contrary. His focus on terminology reflects a linguistic distinction rather than an economic one, and does not bear on the empirical evidence of the Hubbard Report.

## V. Back-End Price Movement Does Not Indicate or Measure Front-End Inflation

### A. Market Participants Did Not View the Subgroup Analyses in the Massie Appendix as Corrective of the July 22 Statement and Dr. Tabak Ignores This Evidence

15. In order for the allegedly corrective subgroup patterns contained in the Massie Appendix to be corrective of the July 22 Statement, the market needed to have held a misperception that could then be corrected.[28] The Hubbard Report demonstrated that market participants did not state the belief that *all data*, including the subgroup data, were supportive of or consistent with the Dosage Thesis.[29] Therefore, there is a fundamental substantive mismatch between the alleged front-end statement and the alleged back-end correction. Dr. Tabak ignores this argument and provides no evidence to the contrary.

---

[27] Hubbard Report, Exhibit 5. Related to this evidence, in Plaintiffs' Reply Brief, Plaintiffs note that the "truthful substitute" I listed in Hubbard Report ¶ 48 "rewrites the Dosage Thesis" because it "improperly omits that EMERGE ***proved*** and ENGAGE/PRIME ***supported*** the Dosage Thesis" and that "'not all data are consistent' does not quantify the extent of contradiction, because Sandrock had claimed *all* data were consistent. Hubbard's version conceals the huge scope of contradictory data." Plaintiffs' Reply Brief, pp. 7-8. The "truthful substitute" and related analysis I presented in Hubbard Report Exhibit 5 capture the economically relevant belief, as what the analysts said in Exhibit 5 would have "disabused" the market of the alleged misbelief. Therefore, Plaintiffs' critiques to the wording of the statement in Hubbard Report ¶ 48 are irrelevant to my main economic finding: no statistically significant declines occurred following statements that would have "disabused" the belief that *all data*, including the subgroup data, would be supportive of or consistent with the Dosage Thesis.

[28] In Plaintiffs' Reply Brief, Plaintiffs say that I "never assessed whether the subgroup analyses in the Massie Report corrected the All Data statement." Plaintiffs' Reply Brief, p. 9. My report, however, is not focused on loss causation. Rather, I assessed whether there was price impact from the July 22 Statement, and finding none, there necessarily was no back-end drop that could measure the price impact of the alleged correction of the July 22 Statement. Consistent with that finding, no analyst connected the Massie Appendix or the allegedly corrective subgroup patterns to the July 22 Statement. Hubbard Report, Section V, ¶ 61.

[29] Hubbard Report, Section IV.

16.     Moreover, in the Hubbard Report, I found that no analysts ever connected the allegedly corrective subgroup patterns in the Massie Appendix to the July 22 Statement.[30] Dr. Tabak presents no evidence to the contrary. While Plaintiffs claim that one analyst "link[s] the price drop to the misrepresented facts,"[31] this claim is not true. The report that Plaintiffs cite indicates that subgroup analyses contradicted the Dosage Thesis,[32] *not* the July 22 Statement or any preexisting belief that *all data* were supportive of or consistent with the Dosage Thesis.[33]

17.     Dr. Tabak also agrees with my opinion in the Hubbard Report that there is a significant difference in the level of detail between the July 22 Statement and the Massie Appendix.[34] The July 22 Statement was an extemporaneous remark during an earnings call, whereas the Massie Appendix was a formal report prepared by an FDA statistician that included extensive subgroup analyses, critiques of the trial methodology, assessments of unblinding and placebo declines, and multiple statistical modeling approaches.[35, 36]

18.     However, Dr. Tabak advances a purely hypothetical application of the "lemon theory," asserting that a broad, generic disclosure about potential inconsistencies in subgroup

---

[30]   Hubbard Report, ¶ 61.

[31]   Plaintiffs' Reply Brief, p. 5.

[32]   *See* J.P. Morgan, "A Closer Look at the Adu Briefing Docs and the Tale of Two FDAs," November 4, 2020, p. 5 ("This surprising result conflicts with BIIB's hypothesis that high aducanumab dosing leads to a better benefit.").

[33]   Plaintiffs' Reply Brief later makes a similar incorrect argument: "Hubbard denied analysts referenced the All Data Statement but acknowledged analysts commented that the Massie Report undermined the Dosage Thesis." Plaintiffs' Reply Brief, p. 18. As I noted, the Massie Appendix "undermining" the July 22 Statement, not the Dosage Thesis, is the relevant metric in this case. No analysts indicated that the Massie Appendix undermined the July 22 Statement.

[34]   Tabak Reply, ¶¶ 60-61.

[35]   In Plaintiffs' Reply Brief, Plaintiffs say that I: "did not even attempt to identify any non-fraud related news in the Massie Report." Plaintiffs' Reply Brief, p. 22. But I discussed the non-fraud related information in the Massie Appendix both in the Hubbard Report and several times during my deposition. Hubbard Report, ¶¶ 65-66; Hubbard Deposition, 250:3-10, 31:5-17, 188:8-20 ("Dr. Massie is not simply saying I don't like your subgroup analyses. He's saying I would have done the test differently. I would have approached the statistics differently and I think you may have unblinding problems throughout what you've done.").

[36]   The Briefing Book is a multi-component disclosure, and isolating the allegedly corrective subgroup analyses from the rest of the Massie Appendix would require separating an analysis from other overlapping and broader critiques that reflect a critical tone, multiple methodological concerns, extensive analyses, and recommendations for an additional clinical trial. Dr. Tabak relies on selected excerpts from my deposition testimony to suggest that I agreed an FDA or medical expert would be able to compute aducanumab's probability of approval, with and without the allegedly corrective information contained within the Massie Appendix. This characterization is incorrect. When presented with the question of whether I believe an FDA expert or doctor would be able to calculate the probabilities of approval with and without the allegedly corrective subgroup data, I stated that I did not think that was possible, in part for the reasons described above. Hubbard Deposition, 205:7-24, 225:20-226:5, 321:10-322:13. *See also* Tabak Reply, ¶¶ 64-65, 110.

data would have had a greater price impact than the specific subgroup analyses themselves.[37] Dr. Tabak asserts that the Hubbard Report: "fails to discuss […] that it agrees with me that a generic disclosure […] would presumably have had a more negative effect on Biogen's stock price than a detailed disclosure."[38]

19.     This claim has two fundamental flaws. First, it is unsupported by empirical or market evidence and rests solely on an abstract application of the lemons theory. Second, even taking the theory as stated, the claim is inconsistent with the empirical evidence presented in the Hubbard Report. If the market's expectation had been that *all data* were consistent with (or supportive of) the Dosage Thesis, then the statements I identified in Hubbard Report Exhibit 5, which would have "disabused" the market of this expectation, should have caused a statistically significant price decline. They did not, and Dr. Tabak does not refute that evidence.

20.     Accordingly, even under Dr. Tabak's theoretical framing, the evidence shows no price impact and provides no evidence contrary to my opinion that there is a mismatch between the alleged front-end statement and the alleged back-end correction.

### B.  Market Participants Reacted Quickly to the Massie Appendix on November 4, 2020 and Any Reaction Ended by the Close of November 4, 2020

    *i.     Dr. Tabak Agrees That Market Participants Reacted Quickly to the Massie Appendix on November 4, 2020*

21.     Dr. Tabak agrees that under the efficient market hypothesis, the market will begin to react to public information by "either instantaneously or near instantaneously"[39] incorporating

---

[37]    Tabak Reply, ¶¶ 61-62. Plaintiffs also make a similar argument, and it is false for the same reasons I outlined in this section. Plaintiffs' Reply Brief, p. 8.

[38]    Tabak Reply, ¶ 61 (emphasis in original removed). In Plaintiffs' Reply Brief, Plaintiffs say: "In [Vale], Dr. Hubbard agreed: he recently testified that the truthful substitute is disclosure of all contradictory information in management's possession: 'had you known the full set of information, all those things that were in the file drawers at Vale, had the same analysts seen that.'" Plaintiffs' Reply Brief, p. 7. This is incorrect. The referenced testimony pertains to my rebuttal of the opposing expert's loss causation analysis in the Vale matter.

[39]    Tabak Deposition, 349:25-350:20. ("Q. Okay. So I hear you saying that there's nothing wrong with it, but you would agree that – I think we had this conversation earlier, that in most cases information is incorporated quickly into stock prices, correct? […] A. And by incorporated, you mean begin to be incorporated, fully – Q. I think we agreed that begin happens instantaneously – A. We agree either instantaneously or near instantaneously, yes. Q. And then full incorporation, in most cases happens within minutes, correct? […] A. If by full you mean that we're talking about an unbiased estimate of the future, yes.").

it into the stock price "in an unbiased manner, […] giving its best estimate of all of the information at that point in time."[40]

22.     Dr. Tabak further admits that after the Massie Appendix was released early on November 4, 2020, "the market would have begun processing it."[41] He also agreed that the market "was able to make an unbiased estimate based on the executive summary" of the Massie Appendix, which was three pages and, Dr. Tabak admitted, not tucked away from the market.[42] He also notes as uncontroversial: "much of the price movement occurred shortly after the release of the Briefing Book and then [the stock price] experienced 'continued volatility.'"[43] Dr. Tabak and I come to the same conclusion that the market reacted to the Massie Appendix quickly and in an unbiased way.

> ii.     *Economic Theory, Market Commentary, and Empirical Analysis All Demonstrate That Any Reaction Ended by the Close of November 4, 2020 at the Latest; Dr. Tabak Provides No Reliable Evidence to the Contrary*

23.     Where Dr. Tabak and I disagree is whether there is any price reaction after the close of November 4, 2020. Dr. Tabak contends that: "the Hubbard Report's reasoning for limiting [its close-to-open event study of November 5, 2020 returns] to the opening trade is problematic in that it would not be expected to capture all of the relevant price movement."[44] As an initial matter, it is important to reiterate that the Massie Appendix was made public during the morning of November 4, 2020[45] and that its conclusions were summarized prominently and not tucked away, and analysts wrote about it almost immediately in their reports.[46] In addition, as discussed above, Dr. Tabak agrees that in an efficient market, information is incorporated into the stock price "either instantaneously or near instantaneously."[47] Therefore, in an efficient

---

[40]    Tabak Deposition, 200:24-201:15. ("Q. So I just want to make sure – forgive me, but I'm not sure I understand what you're saying. Are you saying that yes, the market fully incorporates information quickly, but that then you can continue to have price reactions or volatility after the information is fully incorporated? Is that what you're saying? A. Yes, by fully incorporated, it means that the market is giving its best estimate of all of the information at that point in time. It's not just taking some of the information that can be incorporated and ignoring other information that can be incorporated that quickly.").

[41]    Tabak Deposition, 225:5-10.

[42]    Tabak Deposition, 251:8-252:4.

[43]    Tabak Reply, ¶ 75.

[44]    Tabak Reply, ¶ 84.

[45]    Hubbard Report, ¶ 70 ("On November 4, 2020, the Briefing Book, which contained the Massie Appendix, was released around 10:10 AM ET").

[46]    Hubbard Report, ¶¶ 70-71.

[47]    Tabak Deposition, 349:25-350:20.

market, the price impact of the Massie Appendix (if any) would have been reflected in Biogen's share price by the close of November 4, 2020, at the latest.[48]

24.    Plaintiffs and Dr. Tabak contest this conclusion and (incorrectly) note that the academic articles I relied upon study price reaction to earnings announcements and argue that earnings announcements are easier to digest than the Massie Appendix.[49] However, they ignore evidence from Busse and Green (2002)[50]—a paper relied upon in the Hubbard Report and referenced by Dr. Tabak at his deposition.[51] The authors study the response of stock prices to coverage in the CNBC Morning Call and Midday Call segments, which feature equity analyst opinions.[52] Unlike earnings releases, these opinions are not readily quantifiable and may require interpretation. The authors find that despite this complexity, stock prices respond within 15 minutes.[53] Plaintiffs and Dr. Tabak likewise ignore evidence from Chordia, *et al.* (2018) and Von Beschwitz, *et al.* (2020), both of which were cited in the Hubbard Report.[54] Both studies find that stock prices react quickly to non-earnings events: Chordia, *et al.* (2018) show that prices respond to macroeconomic announcements within seconds,[55] and Von Beschwitz, *et al.* (2020) argue that the market reacts to news articles and news analytics within minutes.[56]

25.    Even if, for the sake of argument, one accepts Plaintiffs' theory that market participants did not fully process the Massie Appendix until after market close on November 4, 2020,[57] prices should still have fully adjusted by market open on November 5, 2020, more than 17 hours later. Yet, as I show in the Hubbard Report, the close-to-open abnormal return on

---

[48]    Hubbard Report, ¶ 72. *See* Hubbard Report, nn. 101-102 for citations.

[49]    *See* Tabak Reply, n. 90. *See also* Plaintiffs' Reply Brief, pp. 13-14, 17.

[50]    Busse, Jeffrey A. and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics*, 65(3), 2002, pp. 415-437 ("Busse and Green (2002)").

[51]    *See, e.g.*, Hubbard Report, ¶ 79, n. 121; Tabak Deposition, 185:16-192:5, 228:16-229:8.

[52]    Busse and Green (2002), p. 416.

[53]    Busse and Green (2002), pp. 416-417.

[54]    Hubbard Report, n. 101.

[55]    Chordia, Tarun, T. Clifton Green, and Badrinath Kottimukkalur, "Rent Seeking by Low-Latency Traders: Evidence from Trading on Macroeconomic Announcements," *The Review of Financial Studies*, 31(12), 2018, pp. 4650-4687, at pp. 4657, 4660 ("Prices respond significantly to announcement surprises within the first 100 milliseconds […] The average price reaction over the first two seconds of 5.4 (4.3) basis points for SPY (ES) accounts for 78% (84%) of the 10-second price reaction.").

[56]    Von Beschwitz, Bastian, Donald B. Keim, and Massimo Massa, "First to 'Read' the News: News Analytics and Algorithmic Trading," *The Review of Asset Pricing Studies*, 10(1), 2020, pp. 122-178, at pp. 132-133. The authors state that five seconds is "long enough to capture the full reaction of algorithmic traders" and two minutes "permits enough time to read an article and trade on it."

[57]    SAC, ¶¶ 17, 278-279.

November 5, 2020 was not statistically significantly different from zero[58]—a result that Dr. Tabak does not dispute—ruling out any possibility of price impact beyond the close of November 4, 2020.[59, 60]

26.    This conclusion is especially true for a NASDAQ-listed stock like Biogen. Plaintiffs and Dr. Tabak refer to my quotation of an academic article that states "the majority" of price response to nontrading-hour announcement is realized during the opening trade to suggest that some portion of the price response might extend beyond market opening.[61] However, the same article explicitly notes that for a NASDAQ stock (such as Biogen), the overnight period accounts for "essentially 100%" of the price response of a nontrading-hour announcement.[62]

### C. Price Volatility on November 5, 2020 Is Driven by Uncertainty of AdCom Vote; Dr. Tabak Agrees But Incorrectly Equates Volatility with Evidence of Price Impact

27.    In the section above, I discussed that price reaction occurred shortly after the release of the Briefing Book on November 4, 2020. In the aftermath of that release, Dr. Tabak and I agree that there is "continued volatility."[63] Where Dr. Tabak and I disagree is whether continued volatility on November 5, 2020 constitutes evidence of price impact. As an initial

---

[58]    Hubbard Report, ¶¶ 84-85, Figure 3.

[59]    In Plaintiffs' Reply Brief, Plaintiffs note that Biogen's stock price declined from the market close on November 4, 2020 to the market open on November 5, 2020. Plaintiffs' Reply Brief, p. 16. However, an abnormal return that is not statistically different from zero—such as the close-to-open abnormal return on November 5, 2020—is indistinguishable from random fluctuations and cannot serve as reliable evidence of price impact. *See* Hubbard Report, ¶ 85, n. 130.

[60]    Dr. Tabak points to the reports of two analysts, Raymond James and J.P. Morgan, published after market close on November 4, 2020 but before market open on November 5, 2020 as evidence of a "direct path from the Massie Report through these analysts to further movements in Biogen's stock price." Tabak Reply, ¶¶ 79-80. Plaintiffs' Reply Brief additionally points to an earlier Raymond James Report, published at 11:15 AM on November 4, 2020, that indicated "it would take a full day to read and analyze the materials" as evidence that analysts needed time to read the entirety of the Briefing Book. Plaintiffs' Reply Brief, pp. 14-15, n. 4. The fact that the stock price return from the close on November 4, 2020 to the open on November 5, 2020, after the two more detailed reports were published, is not statistically significantly different from zero indicates that Dr. Tabak and Plaintiffs' hypothesis is incorrect: market participants had already analyzed and reacted to the new information in the Briefing Book prior to market close on November 4, 2020, and no additional new information was revealed to market participants overnight through these two analysts' reports. I provide additional discussion and commentary on these two particular analysts' reports in Hubbard Report ¶¶ 80-82.

[61]    Tabak Reply, ¶¶ 83-84. *See also* Plaintiffs' Reply Brief, p. 16.

[62]    Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1), 1996, ("Greene and Watts (1996)") pp. 19-42, at p. 34. In fact, the authors find that there may actually be a slight overreaction at the open that then reverts within the next hour and half. *See* Greene and Watts 1996, p. 33, Table 5.

[63]    Tabak Reply, ¶ 75 ("[T]he Hubbard Report makes the uncontroversial claim that much of the price movement occurred shortly after the release of the Briefing Book and experienced 'continued volatility.'").

matter, I found that the July 22 Statement neither introduced nor maintained a belief that *all data*, including the subgroup data, were supportive of or consistent with the Dosage Thesis, therefore no price movements on November 5, 2020 can be attributed to its correction.[64]

> i.    *Prolonged Price Volatility Reflecting the Uncertainty of AdCom Vote Is Not Evidence or Measure of Any Inflation Attributable to the July 22 Statement*

28.    Dr. Tabak argues that the prolonged volatility following the publication of the Briefing Book was caused, in part, by the Massie Appendix, and therefore, is evidence of price impact.[65] However, Dr. Tabak confuses two distinct economic concepts: stock price returns and stock price volatility. While stock price returns can serve as evidence of price impact, stock price volatility cannot for the following reasons.

29.    ***First***, stock price *returns*—a standard economic measure of price reaction— measure the directional price response to new, value-relevant information. In contrast, *volatility* measures the degree to which prices fluctuate in an unpredictable manner, reflecting uncertainty and market noise,[66] and cannot serve as evidence of price impact attributable to a singular factor, such as the alleged correction of the July 22 Statement. Importantly, volatility provides a measure of variance in price movements during a given period, against which the magnitude of specific price changes can be evaluated to determine their statistical significance. In this way,

---

[64]    Hubbard Report, Section IV.

[65]    Tabak Reply, ¶ 73. Plaintiffs also make a similar argument and falsely claim that I conceded that the Massie Appendix had price impact on November 5, 2020 and beyond. *See* Plaintiffs' Reply Brief, p. 1 ("[T]heir expert disagrees: he testified that stock price decreases on November 5 and 9 may well have arisen from disclosure in the Massie Report and AdCom."); Plaintiffs' Reply Brief, p. 2 ("Defendants' expert concedes that the Massie Report had a price impact on Biogen's share price 'on November 5 and beyond.'"); Plaintiffs' Reply Brief, p. 18 ("Hubbard himself opines that Biogen's share price decline on Nov. 5 resulted from 'continued volatility tied to uncertainty over how the AdCom panelists would weigh the various findings from the Briefing Book, including the Massie Appendix.' […] Hubbard admits that the AdCom's negative vote was based on the Massie Report."). These false statements refer to and inaccurately extend beyond my testimony that the AdCom panelists would consider the Massie Appendix in their vote. Hubbard Deposition, 299:10-17. For all the reasons that I provide in this section and in the Hubbard Report, including the finding that the July 22 Statement neither introduced nor maintained preexisting inflation, the continued volatility reflecting the uncertainty of the AdCom vote is not evidence of price impact attributable to the July 22 Statement.

[66]    *See, e.g.*, Hu, Grace Xing, Jun Pan, and Jiang Wang, "Early Peek Advantage? Efficient Price Discovery With Tiered Information Disclosure," *Journal of Financial Economics*, 126(2), 2017, pp. 399-421, at p. 416 ("Returns and volatility help reflect two separate aspects of the market behavior […] [V]olatility reflects the precision or quality of the price discovery process. […] In a price discovery process that is relatively precise, price movements would be driven more by the underlying information and less by noise. […] [T]his implies a faster resolution in uncertainty.").

volatility serves as a benchmark for distinguishing directional price responses to new, value-relevant information from random fluctuations unattributable to a specific disclosure.

30.     Dr. Tabak acknowledges this distinction at his deposition, noting that unlike immediate price reaction, continued volatility does not have a predictable direction.[67, 68] This distinction applies to the current matter as follows. As I discussed in the Hubbard Report, upon the release of the Briefing Book, Biogen's stock price sharply increased to reflect that on net, the materials were positive.[69] This means that the market quickly reached the conclusion that, despite the statistician's negative views, the Briefing Book, on balance, boded well for Biogen and the forthcoming AdCom vote. In line with Dr. Tabak's description, after that point, market participants could no longer predict whether the stock price would increase further or revert some of its gains, but the stock price continued to bounce around to reflect the differing views of market participants regarding how the Briefing Book would affect the AdCom vote and regulatory approval. This is consistent with the market commentary I showed in the Hubbard Report, where analysts expressed uncertainty on how positively AdCom panelists may weigh the Briefing Book.[70]

---

[67]  Tabak Deposition, 200:9-202:14 ("So when economists would talk about fully reflecting all the information, it would mean that we can't say that the information would have in the future a positive or negative effect. It is fully incorporated now, but there still can be additional volatility as the market continues to react. […] What they're saying is that the market will make its best estimate and therefore it has fully incorporated that information at that point, but there could be additional movements as long as you cannot predict in advance which way those additional movements will go.").

[68]  In making the claim that the prolonged volatility is evidence of price impact, Dr. Tabak asserts that the volatility after the release of the Briefing Book can be interpreted as the continuing motion of a pendulum following an initial hit. *See* Tabak Reply, ¶ 73. As an economist, I do not find this analogy apt for the very same reason that Dr. Tabak articulated at his deposition, *see* n. 67: one cannot predict the direction of volatility, unlike the rhythmic and directional swings of a pendulum, where the subsequent movements are dictated by the initial impact and the laws of physics. As I discussed in the preceding paragraph, unlike pendulum swings, volatility in financial markets constitutes random, unpredictable movements in a stock price, and one cannot statistically isolate a subset of these movements to attribute to a specific disclosure as evidence of price impact. Tabak Deposition, 200:9-202:14.

[69]  Hubbard Report, ¶ 75.

[70]  Hubbard Report, ¶¶ 76, 81-82. Importantly, as I noted during my deposition, what analysts remained uncertain about was "*not Dr. Massie's views*, but the implication of those views and probability. *His views are known*." Hubbard Deposition, 316:24-317:19 (emphasis added). As explained in the Hubbard Report, the remaining uncertainty lies in how the AdCom panelists would weigh the known findings in the Massie Appendix as well as other information in the Briefing Book. Hubbard Report, ¶¶ 79-89. Plaintiffs ignore this testimony and the relevant discussions in the Hubbard Report to falsely claim I agreed that price volatility on November 5, 2020 and beyond was "'[…] due, at least in part, to the *analysts weighing Dr. Massie's views*.'" Plaintiffs' Reply Brief, p. 20 (emphasis added).

31.     To reemphasize, this continued up and down movement (the period of high volatility) is distinct from the market's immediate assessment that, on net, the Briefing Book is positive for Biogen. And unlike the sharp price increase upon the release of the Briefing Book on November 4, 2020, the Hubbard Report demonstrates that the price movement at market open on November 5, 2020 and the intraday declines throughout November 5, 2020 are not statistically significant, meaning that they are part of this continued volatility. Dr. Tabak agrees with me that the price movement on November 5, 2020 is continued volatility.[71] However, I disagree with him from an economic perspective that the continued volatility on November 5, 2020 can be evidence of price impact for all the reasons above. November 5, 2020 volatility, in short, does not measure the value of the new (and allegedly corrective) information released on the morning of November 4, 2020.

32.     ***Second***, on the facts here, the continued volatility observed after the release of the Briefing Book cannot be attributed to any alleged correction of the July 22 Statement and therefore cannot serve as a proxy for the amount of inflation introduced or maintained by the July 22 Statement. This is because market participants never interpreted the July 22 Statement as implying that *all data,* including the subgroup data, supported or were consistent with the Dosage Thesis.[72] Indeed, market participants never connected the allegedly corrective subgroup patterns described in the Massie Appendix with the July 22 Statement at all.[73] Rather, as described in the Hubbard Report, the November 5, 2020 stock movement reflects volatility, which stems from uncertainty regarding how AdCom panelists would weigh the conflicting perspectives presented in the Briefing Book;[74] these factors were outside of Biogen's control or ability to disclose.

> ii.     *Dr. Tabak's Critiques of the Hubbard Report's Volatility Analyses Are Arbitrary and Ignore Relevant Evidence*

33.     The Hubbard Report presented the following analysis of the continued volatility in the aftermath of the release of the Briefing Book: (1) the price declines observed on the opening of November 5, 2020 are not different from those that occurred throughout the day on

---

[71]    Tabak Reply, ¶ 75.
[72]    *See* Hubbard Report, Section IV.
[73]    Hubbard Report, ¶ 61.
[74]    *See* Hubbard Report, Section V.B.

November 4, 2020, and are therefore the result of volatility rather than price impact; and (2) in the context of this heightened volatility following the release of the Briefing Book, the 15-minute returns on November 5, 2020 are not statistically significant.[75]

34.    I illustrate the first point through Hubbard Report Exhibit 8, which systematically identifies declines on November 4, 2020 comparable (as defined by suddenness and severity metrics) to the decline in the first 5, 10, and 15 minutes on November 5, 2020.[76] My analysis identifies several of such comparable declines, illustrating that the decline observed following the market open on November 5, 2020 is best understood as part of the continued volatility from the price movements of the prior day. Dr. Tabak raises several critiques regarding this analysis, which I will address in the next paragraph. The second analysis, detailed in Hubbard Report, n. 136, applies a statistical test to the returns on November 5, 2020, demonstrating that they are not statistically significantly different from zero once the heightened volatility following the market's absorption of the Briefing Book is taken into account. Dr. Tabak does not refute this evidence.

35.    Dr. Tabak offers three critiques regarding the Hubbard Report Exhibit 8 volatility analyses: (1) that Exhibit 8 of the Hubbard Report applies different selection criteria for the November 4, 2020 and November 5, 2020 declines, (2) that the initial two- and three-minute declines on November 5, 2020 are steeper than those on November 4, 2020 that were noted in the Hubbard Report, and (3) that the conclusion of Exhibit 8 is not supported by any statistical analysis. Each of these critiques reflects a misunderstanding of the analytic approach used and overlooks relevant evidence already presented in the Hubbard Report. I address each in turn.

36.    *First*, Dr. Tabak claims that Exhibit 8 of the Hubbard Report: "is a textbook example of the type of apples-to-oranges analysis" because "the November 5, 2020 price declines [are] all exact multiples of five minutes that both start and stop at a minute ending in 0 or in 5. Yet, when looking for 'comparable' declines on November 4, the Hubbard Report does not impose this restriction."[77] This critique introduces an arbitrary constraint, and Dr. Tabak

---

[75]    Hubbard Report, ¶¶ 86-89, n. 136.
[76]    I defined comparable stock price declines to the market opening on November 5, 2020 as intraday stock price declines that (1) fall within or exceed the range of declines from November 5, 2020 market open to 9:35 AM, 9:40 AM, or 9:45 AM (*i.e.*, as severe) and (2) have a greater per-minute dollar decline than the first fifteen minutes of trading on November 5, 2020 (*i.e.*, more sudden). Hubbard Report, n. 133.
[77]    Tabak Reply, ¶ 85.

provides no evidence that intervals beginning or ending on those specific minutes differ systematically from any others within the same trading period.

37.    Contrary to Dr. Tabak's "apples-to-oranges" claim, I systematically identified comparable intervals on November 4, 2020 based on economically-relevant characteristics—namely, the severity and suddenness of the price declines.[78, 79] Moreover, the reason the November 5, 2020 intervals begin at minute 0 is straightforward: I focused on the opening of the trading day. As I explained earlier, there was no economic rationale to analyze periods beyond November 4, 2020, as an efficient market would have already incorporated all value-relevant information by then. However, in an abundance of caution, I also examined the close-to-open return, which was not statistically significantly different from zero, confirming that all value-relevant information had already been processed.[80] I nevertheless analyzed movements in the morning of November 5, 2020 to further check if any abnormal reaction occurred at the start of trading—which it did not. I considered multiple horizons (*i.e.*, opening 5 minutes, 10 minutes, and 15 minutes) as yet another sensitivity analysis to ensure that the comparison captured potential short-term reactions across relevant intraday intervals.[81] The time stamps beginning at 0 therefore reflect the intentional and appropriate focus on the market open, not any methodological constraint.

38.    ***Second****,* Dr. Tabak claims that "looking at the opening three minutes [on November 5, 2020] would have yielded an average decline of $3.32 per minute while looking at the opening two minutes would have yielded an average decline of $4.77 per minute. Notably, both of these are greater than the average decline of every example listed in ¶ 86 of the Hubbard Report."[82]

---

[78]    Hubbard Report, ¶ 86, n. 133.

[79]    Dr. Tabak claims that "[a]t least one decline, from 11:20 AM to 11:30 AM, could, in fact, be split into two separate declines that would satisfy the Hubbard Report's criteria," and "there are no identifiable rules about how to replicate the analysis." Tabak Reply, ¶ 89. All intervals in the Hubbard Report Exhibit 8 are selected to satisfy the criteria described in the Hubbard Report, n. 133. These criteria do not rule out periods of temporary price increases. This approach is consistent with November 5, 2020 intervals, which include periods of temporary price increases during the first 5, 10, and 15 minutes. My conclusions would remain the same if the interval from 11:20 AM to 11:30 AM in Hubbard Report Exhibit 8 was split into two intervals.

[80]    Hubbard Report, ¶¶ 84-85, Figure 3.

[81]    Hubbard Report, Exhibit 8.

[82]    Tabak Reply, ¶ 88 (emphasis in original removed).

39.     This claim is wrong and overlooks the evidence presented in Exhibit 8 of the Hubbard Report. Intervals identified in Hubbard Report Exhibit 8 contain two non-overlapping three-minute subintervals with greater price declines than the first three minutes on November 5, 2020.[83] Similarly, the Exhibit 8 intervals also contain two non-overlapping two-minute subintervals with greater price declines than the first two minutes on November 5, 2020.[84]

40.     ***Third***, Dr. Tabak claims that the Hubbard Report: "draw[s] conclusions between […] Biogen stock-price movements on November 4 and on November 5 […] without a statistical test."[85] Dr. Tabak does not acknowledge that I did, in fact, demonstrate that the 15-minute intraday returns on November 5, 2020 were not statistically significantly different from zero as compared to the volatility observed on November 4, 2020 after the Briefing Book had been made public and trading volume had peaked.[86]

### D. Price Movement on November 9, 2020 Reflects the Negative Resolution of Uncertainty Unrelated to Any Correction of the July 22 Statement

41.     In the Hubbard Report, I showed that the November 9, 2020 price decline reflects the materialization of the known risk of a negative AdCom vote.[87] Specifically, the sharp stock price decline (a $98.08 decline from the prior closing price of $328.90 to $230.82) upon market re-opening on November 9, 2020 is consistent with the market reacting to the negative AdCom vote on the prior business day as opposed to any continued impact of the Massie Appendix.[88]

---

[83]   These subintervals are: (1) 10:27 AM – 10:30 AM with per-minute price decline of $3.81 (calculated as ($324.20 - $312.77) / 3 = $3.81), and (2) 2:29 PM – 2:32 PM with per-minute price decline of $4.40 (calculated as ($353.82 - $340.63) / 3 = $4.40). In addition, intervals 10:25 AM – 10:28 AM and 10:26 AM – 10:29 AM also exhibit per-minute price declines of $3.45 and $3.74, respectively (calculated as ($326.84 - $316.49) / 3 = $3.45 and ($325.01 - $313.78) / 3 = $3.74), which are greater than the first three minutes on November 5, 2020, but overlap with interval (1). *See* Hubbard Report backup materials for Exhibit 8.

[84]   These subintervals are: (1) 10:27 AM – 10:29 AM with per-minute price decline of $5.21 (calculated as ($324.20 - $313.78) / 2 = $5.21), and (2) 2:30 PM – 2:32 PM with per-minute price decline of $6.77 (calculated as ($354.17 - $340.63) / 2 = $6.77). *See* Hubbard Report backup materials for Exhibit 8.

[85]   Tabak Reply, ¶ 86.

[86]   Hubbard Report, ¶ 88, n.136. In addition to providing formal statistical tests of November 5, 2020 intraday returns, this analysis also addresses Dr. Tabak's arbitrary concern about the "apples-to-oranges" comparison: all November 4, 2020 and November 5, 2020 intervals in this analysis have the same length (15 minutes) and all intervals start and stop at a minute ending in 0 or in 5.

[87]   Hubbard Report, ¶¶ 90-95. In Plaintiffs' Reply Brief, Plaintiffs say I "admitted that the negative AdCom vote was a materialization of the undisclosed risk of the findings in the Massie Report." Plaintiffs' Reply Brief, p. 18. I specifically state that it is the materialization of a *known* risk, not an *undisclosed* risk. ("I do view it as a materialization of a risk, knowing the possible findings of Dr. Massie, if that['s] what you're asking.") Hubbard Deposition, 306:3-7. *See also* Hubbard Report, ¶¶ 52-53, 63.

[88]   Hubbard Report, ¶ 93.

20

Indeed, I showed in the Hubbard Report that while the outcome of the AdCom vote was a known risk, analysts nonetheless described the negative AdCom vote as a surprise given the Briefing Book. In contrast, no analyst represented being surprised by the allegedly corrective subgroup patterns in their discussions of the Massie Appendix after November 5, 2020.[89] Consistent with my earlier finding that any price reaction would have ceased by the close of November 4, 2020, this evidence on November 9, 2020—which is uncontested by Dr. Tabak—further confirms my opinion that none of the decline on that day can be evidence of price impact attributable to the alleged correction of the July 22 Statement. Instead, the decline on November 9, 2020 reflects the negative resolution of the uncertainty related to the AdCom vote.

42.    To reiterate, Dr. Tabak does not address any of the Hubbard Report's evidence on November 9, 2020. Instead, Dr. Tabak states: "Finally, with respect to the price movement on November 9, the Hubbard Report states, 'What continued after market closing on November 5, 2020 was the uncertainty regarding the way in which the AdCom panel would weigh the information made available in the Briefing Book.' I agree with the Hubbard Report, that the market could still be processing the information in the Briefing Book, including the Massie Report, which could have an effect after the closing on November 5, 2020."[90] Dr. Tabak appears to rely on my discussion of continued volatility in advance of the AdCom vote as his basis for claiming plausible price impact on November 9, 2020. This is incorrect for three reasons. First, as I discussed earlier in this report, price volatility cannot serve as evidence of price impact. Second, as the quote above from the Tabak Reply shows, Dr. Tabak misrepresents my opinion. I did not say that *the market* was still processing the information, just that there was uncertainty as to how the AdCom panel would weigh that information. Third, Dr. Tabak fails to realize that the uncertainty associated with the AdCom vote was resolved on November 6, 2020.[91] Thus, the

---

[89]    Hubbard Report, ¶ 94. In Plaintiffs' Reply Brief, Plaintiffs state I: "admitted that AdCom discussions on Nov. 6 were 'new news' to the market." Plaintiffs' Reply Brief, p. 18; *see also* Plaintiffs' Reply Brief, p. 20. In my deposition, I stated that "the fact of a vote and the outcome of the vote" were news, as well as: "the inputs to their decision making are known and they talk about it, but yes, their discussions are new information." Hubbard Deposition, 259:16-260:12. In other words, although the specific discussions that took place during the AdCom meeting and the vote itself were new news, the information that the AdCom considered was already known. Further, whether the AdCom discussions or vote constituted new news is irrelevant. What matters is whether any new information was revealed that was corrective of the July 22 Statement. It was not.

[90]    Tabak Reply, ¶ 90. Plaintiffs make a similar argument, which is false for all of the reasons I outlined in this section. Plaintiffs' Reply Brief, pp. 18, 20.

[91]    Hubbard Report, ¶ 93.

"continued volatility" had ceased by November 9, 2020; Dr. Tabak again conflates "continued volatility" with the sharp price reaction right at market re-opening—a $98.08 decline from the prior closing price of $328.90 to the opening price of $230.82.[92]

43.    The Hubbard Report's evidence on November 9, 2020 is unchallenged by Dr. Tabak. I maintain the opinion that none of the price decline on November 9, 2020 can be attributable to the alleged correction of the July 22 Statement.

## VI.    Dr. Tabak's Price-Impact Analysis Remains Flawed and Unreliable

44.    Dr. Tabak posits that: "[t]he Hubbard Report does not appear to challenge the general framework used for this [price impact] analysis."[93] I disagree. In the Hubbard Report, I stated fundamental issues with Dr. Tabak's price impact analysis, which compares the average price target of analysts' reports that did mention the Massie Appendix versus those that did not. These issues included that: (1) it is conceptually flawed,[94] (2) it lacks statistical rigor,[95] and (3) it excludes certain data points, which, when included, reverse the findings in Dr. Tabak's analysis, emphasizing its unreliability.[96] In the Tabak Reply, Dr. Tabak (1) ignores the conceptual flaws, (2) concedes the lack of statistical rigor, and (3) excludes certain reports based on unsystematic and ad hoc criteria.[97] I address each in more detail below.

### A.    Dr. Tabak's Analysis Does Not Show Evidence of Price Impact

45.    As I explained in the Hubbard Report, Dr. Tabak's "price impact" analysis is conceptually flawed and does not identify any potential price impact attributable to any alleged correction of the July 22 Statement.

46.    *First*, even if Dr. Tabak's analysis did reliably show that analysts who read and/or considered the Massie Appendix had a more negative view on the efficacy (and therefore potential approval) of aducanumab (it did not), this would not constitute evidence of price impact of the July 22 Statement. Dr. Tabak presents no evidence contradicting the Hubbard Report's

---

[92]    Hubbard Report, ¶ 93.
[93]    Tabak Reply, ¶ 92.
[94]    Hubbard Report, ¶¶ 96, 103.
[95]    Hubbard Report, ¶ 99.
[96]    Hubbard Report, ¶¶ 100-102.
[97]    Tabak Reply, Section IX.

finding that the July 22 Statement neither introduced nor maintained a belief that all subgroup data were supportive of or consistent with the Dosage Thesis.[98] Without any new or maintained price inflation caused by the July 22 Statement, any potential impact of the Massie Appendix on analysts' opinions about aducanumab's efficacy and/or approval cannot be interpreted as evidence or a measure of price impact attributable to the July 22 Statement. Analysts simply never drew a connection between the July 22 Statement and the Massie Appendix.

47.    ***Second***, as I mentioned in the Hubbard Report, in his opening report, Dr. Tabak contradicts his own analysis, a flaw that the Tabak Reply does not address.[99] Specifically, Wells Fargo released two reports on November 4, 2020. In the first report, Wells Fargo did not mention the Massie Appendix and increased its price target by $66.[100] Later in the day, Wells Fargo wrote a second report and did mention the Massie Appendix. In this report, Wells Fargo increased its price target *again* by an additional $47, for a day's total increase of $113.[101] Dr. Tabak posits a theory that when analysts mentioned the Massie Appendix in their report, they did not increase their price target by as much as those who did not mention the Massie Appendix, which he argues shows "analysts who reviewed the Massie Report took a less favorable view of Biogen's value."[102] However, this theory is contradicted by the fact that Wells Fargo, after mentioning both the Massie Appendix and the specific alleged corrective subgroup analyses, ***increased*** its price target (and, implicitly, its view of Biogen's value).[103] Dr. Tabak ignores this point. This fact also directly contradicts Dr. Tabak's and Plaintiffs' theory that market participants needed

---

[98]    Hubbard Report, Section IV.

[99]    Hubbard Report, ¶ 100.

[100]   Wells Fargo, "BIIB: Upgrading on Positive Risk-Reward Into Aducanumab Panel," November 4, 2020. ("We are upgrading our rating on shares of Biogen (BIIB) to Overweight and increasing our price target to $390 […] ahead of Friday's FDA PCNS AdCom review of Aducanumab.")

[101]   Wells Fargo, "BIIB: Increasing Target and Scenario Analysis Into AdCom," November 4, 2020. ("We are maintaining our OVERWEIGHT rating on shares of Biogen (BIIB) and increasing our price target to $437 […] following further review of FDA briefing documents for Aducanumab.")

[102]   Tabak Report, ¶ 69. *See also* Tabak Reply ¶¶ 91, 104.

[103]   Wells Fargo, "BIIB: Increasing Target and Scenario Analysis Into AdCom," November 4, 2020. The Tabak Reply argues that: "the Wells Fargo report at 9:32 PM mentioned the corrective subgroup analysis. Notably, the price-target increase of $47 for this Wells Fargo analyst report was well below the average price-target increase of $85.75 for the analyst reports that mentioned the Massie Report but not the subgroup analyses." Tabak Reply, ¶ 103. However, Dr. Tabak should have included the prior increase of $66, making the total Wells Fargo increase, after mentioning the allegedly corrective subgroup patterns, $113, and above the average price target increase of those that mentioned the Massie Appendix but not the subgroup analyses.

more time to digest the Briefing Book.[104] Wells Fargo, after spending more time with the Massie Appendix, was ***more positive*** about Biogen's value.

48.      ***Third***, Dr. Tabak only focuses on the ***change*** in price targets, rather than the analysts' price targets after the Briefing Book was released on November 4, 2020.[105] Tabak Reply Exhibit 8 shows that reports that mentioned the Massie Appendix on average changed their price target $23 - $28 less than those that did not mention the Massie Appendix.[106] However, he ignores his own finding that there is minimal difference in the updated price targets between analysts who mentioned the Massie Appendix and those that do not.[107] Said another way, analysts—regardless of whether they mentioned the Massie Appendix or not—on average came to the same consensus about their valuation of Biogen's stock price. Taken together, these findings indicate that the discussion of the Massie Appendix in analysts' reports had no discernible economic impact and therefore does not provide a reliable basis for measuring any alleged price impact of the July 22 Statement.

## B. Dr. Tabak's "Best Estimate" Does Not Constitute Reliable Evidence of Price Impact

49.      Dr. Tabak agrees that his analysis is based on too few observations to make any claims about statistical significance.[108] The absence of a more robust alternative does not make his "best estimate" reliable evidence of price impact.[109]

---

[104]    Tabak Reply, ¶¶ 80, 90. *See also* SAC, ¶¶ 17, 278-279. Plaintiffs' Reply Brief argues that "it did not take much effort to discern that the FDA wanted to approve aducanumab" but that the Massie Appendix "could not be read and analyzed with all the materials in the 6 hours remaining in the trading day." Plaintiffs' Reply Brief, p. 14. As I showed in Hubbard Report, ¶¶ 71-74, analysts reacted quickly to the Massie Appendix and began commenting on both the Massie Appendix and the allegedly corrective subgroup results in the morning on November 4, 2020. To the extent Plaintiffs are alleging that the market participants reacted to good news faster than they reacted to bad news, there is no economic theory to support the proposition that reaction to bad news would be delayed until the next trading day. *See* Hubbard Report, ¶ 79.

[105]    Tabak Reply, ¶ 104.

[106]    Tabak Reply, ¶ 104, Exhibit 8.

[107]    Tabak Reply, Exhibit 8. Under the "Current" Price Target field, *i.e.*, column (8), the difference between "Average if Mentions Statistical Report" and "Average if Does Not Mention Statistical Report" is $1.67. Similarly, the difference between "Average if Mentions Statistical Report (Previous PT On or After July 22, 2020)" and "Average if Does Not Mention Statistical Report (Previous PT On or After July 22, 2020)" is $2.20. These dollar differences represent less than 1 percent difference across the respective group averages.

[108]    Tabak Reply, ¶ 93.

[109]    The textbook cited by Dr. Tabak cautions about generalizing results from small samples in a section titled "Suspect Samples": "The first thing to consider is the sample that was used in the research study. Sometimes researchers use very small samples to obtain information. Several years ago, advertisements contained such

24

50.    Dr. Tabak says that: "the Hubbard Report admits that the small sample size is a driving factor in the lack of statistical significance. In other words, with my data, the results go in the right direction, but there simply aren't enough observations to achieve a statistically significant result."[110] Leaving aside the fact that his dataset from the opening report omits analysts' reports that actively changed their price targets,[111] Dr. Tabak ignores that the Hubbard Report attributed the lack of statistically significant results to two factors: "the small sample size and the *large variability*" (emphasis added).[112] Dr. Tabak's characterization ignores that the data points in his "best estimate" are not all pointing in the same direction and exhibit substantial dispersion. For example, in Tabak Reply Exhibit 8, while the report with the highest current price target is a report that did not mention the Massie Appendix, the next *three* highest price targets are all from reports that ***did mention*** the Massie Appendix. Additionally, the report with the lowest price target did ***not*** mention the Massie Appendix.[113]

51.    In the case of this analysis, the lack of statistical significance is not merely a symptom of too few data points; it is also an indication that the underlying analysis is economically unreliable.

---

statements as 'Three out of four doctors surveyed recommend brand such and such.' If only 4 doctors were surveyed, the results could have been obtained by chance alone; however, if 100 doctors were surveyed, the results might be quite different. […] When results are interpreted from studies using small samples, […] care should be used in generalizing the results to the entire population." Bluman, Allan G., *Elementary Statistics: A Step By Step Approach*, 8th Ed. (2012), McGraw-Hill, p. 17. *See* Tabak Reply, ¶ 93, n. 97.

[110]    Tabak Reply, ¶ 93.
[111]    Hubbard Report, ¶ 100.
[112]    Hubbard Report, ¶ 99.
[113]    Tabak Reply, Exhibit 8.

### C. Analysts' Reports That Maintained Their Price Targets Should Be Included

52.    Tabak Reply Exhibit 8 excludes the analysts' reports added in the Hubbard Report that explicitly maintained their price targets.[114, 115] These three reports remain analytically relevant and should be included. I address Dr. Tabak's specific critiques below in turn.[116]

53.    *First*, Dr. Tabak plots the price targets in Tabak Reply Exhibit 5 and then posits that the reports that explicitly maintained their price target were "outliers."[117] This approach introduces subjectivity and bias into the analysis. In fact, Dr. Tabak retains reports that published price targets that differ more substantially from the contemporaneous stock price than those he omits.[118] He argues that it makes sense for analysts to publish price targets above the current stock price "because target prices are estimates of future prices, and one would generally expect stock prices to rise over time[,]"[119] disregarding the fact that market participants were well aware of the risk of a potential negative AdCom vote—a risk that ultimately materialized and drove Biogen's stock price lower. Accordingly, reports with lower price targets plausibly reflected analysts' more conservative views regarding aducanumab relative to those with higher price

---

[114]    Hubbard Report, ¶¶ 101-102; Tabak Reply, Exhibit 8.

[115]    Dr. Tabak argues that I "seemed to contradict" my definition of analysts explicitly maintaining their price target by taking my deposition out of context to suggest that I considered an analyst affirming their price target as just "printing a number." Tabak Reply, ¶ 94, n. 99. Dr. Tabak ignores my answer to a clarifying question by Plaintiffs' counsel that what I considered in the Hubbard Report is: "Oh, in other words, […] my price target yesterday was 230. […] I look at whether you actually positively reaffirm today is 230." Hubbard Deposition, 311:16-25.

[116]    Dr. Tabak misunderstands the meaning of column "Last Price Target Update" in Hubbard Report Exhibit 9. Tabak Reply, ¶ 99. This column reflects the date of the last update to a different price target and was identified by relying on the analyst's report at hand, which sometimes printed the prior price target date in a graph at the end of the report. This column does not weigh on my inclusion of reports that maintained their price target, does not change any of my conclusions, and was included to match my analysis more closely to the one performed by Dr. Tabak.

[117]    Tabak Reply, ¶ 94. Later in the Tabak Reply, Dr. Tabak claims that these reports are "statistically different from, and unrepresentative of, analysts that took the time to calculate a new price target" because there is a statistically significant difference between the three reports that had a change in price target of $0 and an average change in the price target of the 10 reports that did change their price target. Tabak Reply, ¶ 101. Dr. Tabak's statistical comparison is meaningless because he compares two groups of analysts based on the very characteristic he uses to define these groups. A proper statistical analysis to show any statistical difference or potential unrepresentativeness would require comparing other features of the two groups of analysts—features that are not explicitly used to allocate analysts to the two groups.

[118]    *See* Tabak Reply, Exhibit 5. Dr. Tabak omits "outliers" that have differences of: $126, $77, and $26, respectively, between their price target and the stock price at the time of the report's publication. Dr. Tabak keeps reports that have differences of: $104, $84, $48, $47, $44, $28, $26, $23, $15, and $13, respectively, between their price target and the stock price at the time of the report's publication. Biogen's stock price at the time of the report's publication is the volume-weighted average price from the last minute with trading data before the publication of each analyst's report. *See* Hubbard Report backup materials.

[119]    Tabak Reply, ¶ 94.

targets.[120] Therefore, by excluding these reports with lower price targets, Dr. Tabak introduces further selection bias into his already limited sample.[121, 122]

54.    *Second*, Dr. Tabak does not believe that the unchanged analysts' price targets "were completely unaffected by new information since those price targets were set, including the Briefing Book" and that including them would "require believing" the new information had "net effect of exactly zero."[123] I disagree. Analysts who expressly chose to maintain their price target reveal that the new information did not, with sufficient certainty, change the analysts' expectations regarding the future prospects of the company.

55.    Dr. Tabak argues that I should not have included the BofA Global Research report that maintained its rating because: "BofA Global Research merely copied and pasted its entire section on 'Price objective & risk' from its October 21, 2020 report and its October 30, 2020 report without even mentioning the briefing book."[124] Dr. Tabak fails to note that the "Briefing Documents" are mentioned in the opening sentence of this report.[125] He also omits the entire second paragraph of the report, which ends with the following three sentences: "Still, we continue to believe the panel is likely to base its ruling on the objective criteria, which does not

---

[120]   *See, e.g.*, BofA Global Research, "FDA signals openness to adu but panel outcome still key," November 4, 2020, p. 1 ("[W]e continue to believe the panel is likely to base its ruling on the objective criteria, which does not support approval. With FDA likely to weigh this outcome critically, we continue to see long-term commercial challenges for Biogen.").

[121]   Dr. Tabak also argues that I should have excluded the HC Wainwright report because it maintained a price target of $318 and a rating of "buy" while Biogen's stock price was $344 around the time of publication, at 12:25 PM. Tabak Reply, ¶ 98. This critique ignores the fact that Biogen's stock price was changing rapidly on the morning of November 4, 2020. At the time of composing the report, the analyst could not have predicted what the price at the time publication would be, especially given that Biogen's stock opened at $253 on that day and was still only at $265 at the time that the Briefing Book was released. HC Wainwright, "Positive Brief Considerations on AdCom Briefing Documents Release, Ahead of Friday," November 4, 2020.

[122]   Dr. Tabak also argues that I should have excluded the Wolfe Research report because it maintained a price target of $275 while also maintaining a rating of "Peer Perform." Dr. Tabak hypothesizes that the price target and the rating would only be internally consistent if the analyst expects "peers to decline by approximately 20%." Tabak Reply, ¶ 98. However, Dr. Tabak failed to recognize that price target reflects the analyst's expectation at "YE '20", while the rating reflects the analyst's expectation of Biogen's stock performance against peers "over the next 12 months." Therefore, these two projections by the analyst are not inconsistent, but merely reflect the analyst's expectations over different time horizons. Wolfe Research, LLC., "FDA leans favorably on adu; ROG & LLY will start to come into play," November 4, 2020, pp. 1, 3 ("Peer Perform (PP): The security is projected to perform approximately in line with analyst's industry coverage universe over the next 12 months.")

[123]   Tabak Reply, ¶ 95.

[124]   Tabak Reply, ¶ 100.

[125]   BofA Global Research, "FDA signals openness to adu but panel outcome still key," November 4, 2020, p. 1 ("BIIB shares are trading with strength after FDA reviewers adopted a generally positive tone in the Briefing Documents […]").

support approval. With FDA likely to weigh this outcome critically, we continue to see long-term commercial challenges for Biogen. Maintain U/P and $230 PO."[126] This report not only mentions the Briefing Book but also explains why they continue to rate the stock as "U/P" (underperform).[127]

56.    Dr. Tabak believes I should have excluded the HC Wainwright report because HC Wainwright "told the market that it planned to review the target price after the AdCom vote."[128] As I noted above, Dr. Tabak fails to recognize that an analyst's decision not to update their price target after the Briefing Book but plans to wait until the uncertainty resolves *is* informative. This decision reiterates that the new information in the Briefing Book, in and of itself, did not lead to an immediate reaction from this analyst to update their price target. Rather, the analyst's stated plan to revisit their price target after the AdCom vote indicates the importance of the vote and the analyst's uncertainty regarding how the panel might weigh the various information contained in the Briefing Book.

57.    Finally, Dr. Tabak believes I should have excluded the Wolfe Research report because it did not carry revenue forecasts for any Alzheimer's disease products.[129] Dr. Tabak, however, does not recognize that just because Wolfe Research did not carry a revenue forecast for Alzheimer's does not mean its price target did not consider aducanumab. In fact, in the Wolfe Research report, the analyst specifically lists aducanumab as a risk (both on upside and downside) to the price target: "Risks That May Impede Achievement of the Recommendation, Rating or Target Price: **Upside Risks to PT: Biogen receives a first pass approval for aducanumab**; Written off pipeline assets, like opicinumab or BIIB093, are successful. **Downside Risks to PT: Aducanumab and other late-stage products fail to make it to market**; IPR appeal on Tecfidera reverses earlier decision; Zolgensma and risdiplam supplant Spinraza in SMA" (emphasis added).[130]

58.    Therefore, all three of these reports: (1) did consider aducanumab in their price target and (2) actively chose not to update their price target after accounting for the new

---

[126]    BofA Global Research, "FDA signals openness to adu but panel outcome still key," November 4, 2020, p. 1.

[127]    BofA Global Research, "FDA signals openness to adu but panel outcome still key," November 4, 2020, p. 1.

[128]    Tabak Reply, ¶ 100.

[129]    Tabak Reply, ¶ 100.

[130]    Wolfe Research, LLC., "FDA leans favorably on adu; ROG & LLY will start to come into play," November 4, 2020, p. 3.

information contained in the Briefing Book. The removal of these reports is therefore not warranted, and further weakens Dr. Tabak's already unreliable analysis.

## VII.    Dr. Tabak Makes Additional Errors in the Tabak Reply

### A.    The Tabak Reply's Section VI Is Incomplete

59.    The Tabak Reply's Section VI, based on the section title, purports to show that: "statements by Analysts about the Topic of the All Data Statement Provide Evidence as to its Economic Importance to the Market."[131] However, in this section, Dr. Tabak does not mention a single analyst's statement, let alone explain how they provided evidence for the July 22 Statement's "economic importance."[132] Dr. Tabak's section is incomplete, leaving out the arguments alleged to be made by the section's title. Instead, this section shifts focus to a semantic discussion of whether Dr. Tabak had claimed that the July 22 Statement was "new" or "probably new," without connecting that distinction to any evidence of market behavior or analysts' commentary.[133] As a result, Section VI offers no information substantiating the supposed economic importance of the July 22 Statement.

### B.    Dr. Tabak and Plaintiffs Repeatedly Misconstrue My Deposition Testimony

*i.    Dr. Tabak's Claim That I Misstated the Theory of the Case Misconstrues My Testimony*

60.    Dr. Tabak inaccurately claims that in my deposition, I: "repeatedly argued that the allegations did not relate to all data or to subgroup data, but merely to the material that Dr. Sandrock mentioned in the sentences leading up to the All Data Statement."[134] In my deposition, when asked for my own understanding of the July 22 Statement, I explained, purely as a matter of reading English, that I interpreted the July 22 Statement to be referring to the material that Dr.

---

[131]    Tabak Reply, p. 26.

[132]    Tabak Reply, Section VI.

[133]    Tabak Reply, ¶¶ 54-55. If I adjusted the relevant sentence in the Hubbard Report to instead read "Dr. Tabak himself agreed in his deposition that market participants would have [more likely than not] regarded this information as 'new.' […]," the opinions and supporting evidence in the Hubbard Report would not be changed. Additionally, I presented the entire quote, including "Probably new, yes" in the Hubbard Report, allowing for the reader to understand the full context of the testimony. *See* Hubbard Report, ¶ 35, n. 37.

[134]    Tabak Reply, ¶¶ 3, 7.

Sandrock mentioned in the sentences immediately preceding it.[135] That interpretation reflected my own personal reading of the language. It did not reflect my understanding of the allegations, and is unrelated to the economic analyses or conclusions presented in the Hubbard Report.

61.     In the Hubbard Report, I articulated my understanding of Plaintiffs' allegations as: "Plaintiffs allege that the July 22 Statement was later corrected by the Massie Appendix's discussion of certain subgroup patterns on November 4, 2020 […] Specifically, according to Plaintiffs, the July 22 Statement was inconsistent with the following subgroup patterns that were discussed in the Massie Appendix: (1) that carriers achieved better clinical outcomes in EMERGE than non-carriers; (2) that non-carriers performed only negligibly better than those on a placebo; and (3) that clinical outcomes did not improve for carriers who received the high dose in EMERGE after Biogen amended its dosing protocol for carriers."[136] Similarly, in my deposition, I explicitly acknowledged that Plaintiffs are alleging a different interpretation of the July 22 Statement than the way I interpret the statement.[137]

62.     As I reiterated throughout my deposition, my analysis in the Hubbard Report is based on Plaintiffs' allegations, rather than my own reading of the statement.[138]

ii.     *Dr. Tabak Takes My Testimony Out of Context Concerning Price Impact*

63.     Dr. Tabak argued that I have "not proven a complete lack of price impact" because I testified that I "[do] not know" whether the disclosure of the subgroup data would have affected Biogen's stock price on July 22, 2020.[139]

---

[135]  Hubbard Deposition, 92:4-22 ("Q: Does your reading of [']our data are all consistent['] -- does your reading of [']our data['] include the subgroup analyses in the Massie report? A. I read it as simply saying whatever data he's referring to above as a matter of antecedents in English, that's what he's talking about here. But my analysis assumes your definition, which is far more elastic and apparently, to your surprise, includes the subgroups. Q. So if your reading is that it includes the data from EMERGE and ENGAGE, doesn't the data from EMERGE and ENGAGE include the subgroup data from EMERGE and ENGAGE? A. All data would, but I read him as saying whatever data he meant in that sentence is what he means by our data.").

[136]  Hubbard Report, ¶ 20.

[137]  Hubbard Deposition, 11:6-17 ("For what it's worth, I don't read all data the same as you."), 17:24-18:18 ("I understand you read it differently."), 87:12-23 ("You meant all data, that's what you say in the complaint, which would necessarily include the subgroups as a matter of English.").

[138]  Hubard Deposition, 11:6-17 ("If you want to take all data more elastically to correspond to your hypothetical, it doesn't help you with any of the statistical analyses I did[.]"), 19:2-9 ("If you want to read it the way you read it, as you articulated in your complaint, so I'm not putting words in your mouth, I did the analysis based on that and found no evidence that any investor ever thought like that."), 88:7-13 ("You've taken a different view. I take plaintiffs' accusations as true as an expert in the case.").

[139]  Tabak Reply, ¶¶ 11-12.

64.    First, this characterization oversimplifies my deposition testimony and takes it out of context. In my deposition, I was responding to a hypothetical question about whether disclosure of the subgroup analyses, if it occurred on July 22, 2020, would have affected Biogen's stock price.[140] I stated that I did not know one way or another because I had not conducted that specific analysis, which was not necessary to demonstrate the lack of price impact of the July 22 Statement.

65.    The Hubbard Report presented extensive evidence that led to the conclusion that the July 22 Statement did not introduce or maintain a misperception in the market that all subgroup data were supportive of or consistent with the Dosage Thesis.[141] Because this statement did not introduce or maintain such misperception, any later price movements cannot be economically linked to the July 22 Statement.

66.    More precisely, I showed in the Hubbard Report that market participants expressed ongoing uncertainty about whether the subgroup data would be supportive of or consistent with the Dosage Thesis, both before and after the July 22 Statement.[142] Speculation as to how the market might have reacted to a hypothetical disclosure of subgroup data is therefore moot, as the contemporaneous evidence shows that the July 22 Statement did not introduce nor maintain any price-relevant misperception regarding these data.[143]

67.    The above instances are not the only times Dr. Tabak and Plaintiffs misconstrue my deposition testimony. Throughout my report, I mention several instances where Dr. Tabak and Plaintiffs take my deposition testimony out of context or misconstrue it to fit their points. These instances are discussed in nn. 15, 17, 35-36, 38, 65, 87, 89-90, 115.

---

[140]  Hubbard Deposition, 202:24-203:9 ("Q. […] well, like the First Circuit suggested, had he disclosed the subgroup analyses, do you think that would have had no effect on the stock price on July 22nd? […] A. I don't know one way or the other.").
[141]  Hubbard Report, Section IV.
[142]  Hubbard Report, ¶¶ 43, 45, 49, Exhibit 5.
[143]  Hubbard Report, Section IV.

Glenn Hubbard

November 25, 2025

32

## APPENDIX A

## ROBERT GLENN HUBBARD

### *Testimony as an expert witness 2004 – 2025*

*Daniel Borteanu, et al. v. Nikola Corporation, et al.,* Case No. CV-20-01797-PHX-SPL, United States District Court, District of Arizona.  Provided deposition testimony 2025.

*Nadia Shash and Amjad Khan, Individually and On Behalf of All Others Similarly  Situated v. Biogen Inc., Michel Vounatsos, Alfred W. Sandrock, Jr., and Samantha Budd-Haeberlein,* Case No.: 1:21-cv-10479-IT, United States District Court, District of Massachusetts. Provided deposition testimony 2025.

*In Re: Orbit/FR Inc. Stockholders Litigation,* C.A. No. 2018-0340-JTL, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2025.

*National ATM Council, Inc., et al. v. Visa Inc., et al.,* Case No. 1:11-cv-01803 in the United States District Court, District of Columbia. Provided deposition testimony 2020 and 2025.

*Richard F. Burkhart, et al. v. Genworth Financial, Inc., et al.* C.A. No. 2018-0691, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2025.

*Target Corporation, et al. v. Visa, Inc., et al.,* No. 13 Civ. 3477 (AKH), United States District Court Southern District of New York; *7-Eleven, Inc., et al. v. Visa, Inc., et al.,* No. 13 Civ. 4442 (AKH), United States District Court Southern District of New York.  Provided supplemental deposition testimony in 2024.

*In re: LIBOR-Based Financial Instruments Antitrust Litigation,* MDL No. 2262, Master File No. 1:11-md-02262 (No. 13-cv-03952; No. 14-cv-01757; No. 13-cv-07720; No. 13-cv-06013; No. 13-cv-06014), United States District Court Southern District of New York.  Provided deposition testimony in 2024.

*Amgen Inc. & Subsidiaries v. Commissioner of Internal Revenue.* Docket Nos. 16017-21 and 15631-22, United States Tax Court. Provided deposition testimony in 2024. Provided trial testimony 2025.

*Novolex Holdings, LLC v. Illinois Union Insurance Company Lloyd's Syndicate 4000, Barbican Transaction Liability Consortium 9804, and Arch Reinsurance (Bermuda) Ltd.,* Index No. 655514/2019, In the Supreme Court of the State of New York, County of New York.  Provided deposition testimony in 2024.

*In re: Alibaba Group Holding Ltd. Securities Litigation*, No. 1:20-CV-09568-GBD-JW, In the United States District Court for the Southern District of New York.  Provided deposition testimony in 2024.

*Sjunde AP-Fonden individually and on behalf of all others similarly situated, Plaintiff, v. The Goldman Sachs Group, Inc., et al., Defendants,* Case No. 18-cv-12084 (VSB) (KHP), In the United States District Court, Southern District of New York.  Provided deposition testimony 2024.

*In Re: Vale S.A. Securities, Litigation,* Case No. 19-cv-526-RJD-SJB, In the United States District Court, Eastern District of New York. Provided deposition testimony 2023. Provided hearing testimony 2024.

*Richard J. Tornetta v. Gregory B. Maffei, et al.,* C.A. No. 2019-0649, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2023. Provided trial testimony 2023.

*The City of Philadelphia, et al., v. Bank of America Corporation, et al.,* Case No.: 19-cv-1608, In the United States District Court, Southern District of New York.  Provided deposition testimony 2023.

*Aurelius Capital Master, LTD., et al. v. The Republic of Argentina,* No. 19 Civ. 351, In the United States District Court, Southern District of New York. Provided deposition testimony 2023.

*Palladian Partners, L.P. and others v. The Republic of Argentina and another*, Case Number FL-2019-000010, in the Commercial Court, Queen's Bench Division of the High Court of Justice of England and Wales.  Provided trial testimony 2022.

*The Successor Agency to the Former Emeryville Redevelopment Agency and the City of Emeryville v. Swagelok Company, et al.*, Case No. 17-cv-00308-WHO, In the United States District Court, Northern District of California. Provided deposition testimony 2022.  Provided trial testimony in 2023.

*In Re Dell Technologies Inc. Class V Stockholders Litigation,* Consol. C.A. No. 2018-0816-JTL, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2022.

*In the Matter of: Certain Laptops, Desktops, Servers, Mobile Phones, Tablets, and Components Thereof*, Investigation No. 337-TA-1280, United States International Trade Commission, Washington, D.C. Provided deposition testimony 2022.

*Rebecca J. Scott, et al. v. Steven R. Scott, et al., American Arbitration Association Case No. 01-20-0000-1588.* Provided arbitration testimony 2022.

*Preston Hollow Capital LLC v. Nuveen LLC, et al,* C.A. No. N19C-10-107-MMJ-CCLD, in the Superior Court of the State of Delaware.  Provided deposition testimony 2022.

*Novolex Holdings, LLC v. Newell Brands Inc.,* C.A. No. N19C-10-223-PRW-CCLD, in the Superior Court of the State of Delaware. Provided deposition testimony 2021.

*In the Matter of the Otto Bremer Trust,* Court File No. 62-C9-61-315222, in the State of Minnesota District Court, County of Ramsey, Second Judicial District.  Provided trial testimony 2021.

*Rebecca J. Scott, et al. v. Carl S. Rosen, Esq., et al.,* Case No. 20-000868 CACE, in the District Court of the 17th Judicial Circuit of Florida in and for Broward County. Provided deposition testimony 2021.

*Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue,* Docket No. 6944-11, in the United States Tax Court.  Provided trial testimony 2021.

*Huntsman International, LLC v. Albemarle Corporation, et al.,* American Arbitration Association, AAA Case No. 01-17-001-4588.  Provided deposition testimony 2021. Provided trial testimony 2021.

*In Re: WeWork Litigation,* C.A. No. 2020-0258, in the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2021.

*In Re: BGC Partners, Inc. Derivative Litigation,* C.A. No. 2018-0722-AGB, in the Court of Chancery of the State of Delaware. Provided deposition testimony 2021.  Provided trial testimony 2021.

*BCIM Strategic Value Master Fund, LP v. HFF, Inc., a Delaware Corporation,* C.A. No. 2019-0558-JTL, in the Court of Chancery of the State of Delaware. Provided deposition testimony 2021.  Provided trial testimony 2021.

*Bandera Master Fund LP, et al. v. Boardwalk Pipeline Partners, LP, et al.,* C.A. No. 2018-0372-JTL, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2020. Provided trial testimony 2021.

*In Re:  Advance Auto Parts, Inc. Securities Litigation,* Civil Action No. 1:18-cv-00212-RGA, In the United States District Court, District of Delaware.  Provided deposition testimony 2020 and 2021.

*National ATM Council, Inc., et al. v. Visa Inc., et al.,* Case No. 1:11-cv-01803 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Lynne Bartron, et al. v. Visa Inc., et al.,* Case No. 1:11-cv-1831, Case No. 1:11-cv-1882 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Peter Burke, et al. v. Visa Inc., et al.,* Case No. 1:11-cv-1882 in the United States District Court, District of Columbia. Provided deposition testimony 2020.

*Securities and Exchange Commission v. Rio Tinto PLC,* Case No. 1:17-cv-07994 in the United States District Court, Southern District of New York.  Provided deposition testimony 2020.

*Forescout Technologies, Inc. v. Ferrari Group Holdings, L.P. and Ferrari Merger Sub, Inc.,* Case No. 2020-0385-SG, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2020.

*Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue,* Docket No. 6944-11, in the United States Tax Court.  Provided deposition testimony 2020.

*Brach Family Foundation Inc. v. AXA Equitable Life Insurance Company,* Case no. 16-CV-740 (JMF), in the United States District Court, Southern District of New York.  Provided deposition testimony 2019.

*In Re:  Appraisal of Capital Bank Financial Corp.,* C.A. No. 2018-0226-TMR, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2019.

*In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 05-md-1720, in the United States District Court, Eastern District of New York. Provided deposition testimony 2019.

*Jeffrey Laydon, on behalf of himself and all others similarly situated v. The Bank of Tokyo-Mitsubishi UFJ, Ltd., et al.,* Case No. 12-cv-3419, in the United States District Court, for the Southern District of New York. Provided deposition testimony 2019.

*Oaktree Principal Fund V, LP, et al. v. Warburg Pincus LLC; et al.,* Case No. 2:15-cv-08574-PSG-MRW, in the United States District Court, Central District of California, Western Division.  Provided deposition testimony 2019.

*In re: Appraisal of Panera Bread Company,* Case No. 2017-0593-MTZ, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2019. Provided trial testimony 2019.

*City of Pontiac General Employees' Retirement System v. Dell, et al.,* Case No. 1:15-c-00374-LY, in the United States District Court, Western District of Texas, Austin Division. Provided deposition testimony 2018.

*Loreley Financing (Jersey) No 28, Limited v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,* Index No. 652732/2011, in the Superior Court of the State of New York, County of New York, Commercial Division.  Provided deposition testimony 2018.

*South Carolina Electric & Gas Company v. Swain E. Whitfield, et al.,* Case No. 3:18-cv-01795-JMC, In the United States District Court for the District of South Carolina, Columbia Division.  Provided testimony 2018.

*In re: Friends of the Earth and Sierra Club v. South Carolina Electric & Gas Company (SCE&G); In re: Request of the Office of Regulatory Staff for Rate Relief to SCE&G's Rates; In re: Joint Application and Petition of SCE&G and Dominion Energy, Inc.,* Docket Nos. 2017-

207-E, 2017-305-E, and 2017-370-E, Before the Public Service Commission of South Carolina. Provided testimony in 2018.

*American Vanguard Corporation v. United States of America*, Civil Action No.: 16-694 C, in the United States Court of Federal Claims.  Provided deposition testimony 2018.

*Joan Obeslo, et al. v. Great-West Capital Management, LLC, et al.,* Civil Action No. 16-cv-230-CMA-MJW consolidated with No. 16-cv-01215 and No. 16-cv-03162, in the United States District Court, District of Colorado.  Provided deposition testimony 2018. Provided trial testimony 2020.

*In re:  Appraisal of Jarden Corporation,* Case No. 12456-VCS, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2018.  Provided trial testimony 2018.

*Kortright Capital Partners LP, et al. v. Investcorp Investment Advisors Limited,* Case No. 16cv7619, United States District Court, Southern District of New York.  Provided deposition testimony 2018.  Provided trial testimony 2019.

*Syncora Guarantee Inc. v. Alinda Capital Partners LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi,* Index No. 651258/2012, In the Supreme Court of the State of New York. Provided deposition testimony 2018.

*Saul Chill and Sylvia Chill, for the use and benefit of the Calamos Growth Fund v. Calamos Advisors LLC and Calamos Financial Services LLC,* Case No. 15 Civ:  1014 (ER), United States District Court, Southern District of New York.  Provided deposition testimony 2017.  Provided trial testimony 2018.

*Broadway Gate Master Fund, Ltd., Pennant Master Fund LP, and Pennant Windward Master Fund, LP v. Ocwen Financial Corporation, et al.,* Civil Case 9:16-cv-80056, United States District Court, Southern District of Florida.  Provided deposition testimony 2017.

*In re:  Allergan, Inc. Proxy Violation Securities Litigation,* Case No. 8:14-cv-2004-DOC (KES), United States District Court, Central District of California, Southern District - Santa Ana. Provided deposition testimony 2017.

*In the Matter of: Certain Integrated Circuits with Voltage Regulators and Products Containing Same,* Investigation No. 337-TA-1024, United States International Trade Commission, Washington, D.C.  Provided deposition testimony 2017.

*In re:  Appraisal of Solera Holdings, Inc.,* Case No. 12080-CB, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2017.  Provided trial testimony 2017.

*In re:  Good Technology Corporation Stockholder Litigation,* C.A. No. 11580-VCL, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2017.

*Mylan Inc. & Subsidiaries, et al. v. Commissioner of Internal Revenue,* Docket No. 16145-14, 27086-14, United States Tax Court, Washington, D.C. Provided deposition testimony 2017.

*Abbott Laboratories v. Alere, Inc.,* C.A. No. 12963-VCG, In the Court of Chancery of the State of Delaware.  Provided deposition testimony 2017.

*In re: LIBOR-Based Financial Instruments Antitrust Litigation,* MDL No. 2262, 11 Civ. 2613, United States District Court Southern District of New York.  Provided deposition testimony 2017.

*In the Matter of:  Determination of Rates and Terms for Making and Distributing Phonorecords (Phonorecords III),* Docket No. 16-CRB-0003-PR (2018-2022), Before the Copyright Royalty Board Library of Congress, Washington, D.C.  Provided deposition testimony 2017.  Provided trial testimony 2017.

*Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A., et al.,* Case No. 09-00504, United States Bankruptcy Court, Southern District of New York.  Provided deposition testimony 2017.  Provided trial testimony 2017.

*Great Hill Equity Partners IV, LLP, et al. v. SIG Growth Equity Fund I, LLP, et al,* Civil Action No. 7906, In the Court of Chancery for the State of Delaware.  Provided deposition testimony 2016.  Provided trial testimony 2017.

*Jennifer L. Kasilag, et al. v. Hartford Investment Financial Services, LLC,* Civil No. 1:2011cv01083, In the United States District Court, District of New Jersey, Camden Vicinage. Provided trial testimony 2016.

*In re: Ocwen Financial Corporation Securities Litigation*, Case No. 14-81057 CIV-WPD, United Stated District Court, Southern District of Florida.  Provided deposition testimony 2016. Provided deposition testimony 2017.

*In the Matter of Lynn Tilton; Patriarch Partners, LLC, et al.*  Administrative Proceeding No. 3-16462, United States of America before the Securities and Exchange Commission.  Provided testimony 2016.

*Carlyle Capital Corporation Limited, Alan John Roberts, Neil Mather, Christopher Morris, Adrian John, Denis Rabet, solely in their capacity as Joint Liquidators of Carlyle Capital Corporation Limited (In Liquidation) v. William Elias Conway, Jr., James H. Hance, Jr., et al,* Court File No. 1510, In the Royal Court of Guernsey, Ordinary Court.  Provided testimony 2016.

*Illinois Tool Works, Inc. & Subsidiaries v. Commissioner of Internal Revenue,* United States Tax Court, Docket No. 10418-14.  Provided trial testimony 2016.

*General Electric Company v. United States of America,* Case No. 3:14-cv-190-JAM, United States District Court, District of Connecticut. Provided deposition testimony in 2016.

*Symbol Technologies, Inc., Securities Litigation,* Consolidated C.A. No. 05-cv-3923-DRH, United States District Court, Eastern District of New York.  Provided deposition testimony 2015.

*American Chemicals & Equipment, Inc. 401(K) Retirement Plan v.  Principal Management Corporation and Principal Global Investors , LLC.*, 4:14-cv-00044-JAJ-HCA, United States District Court, Southern District of Iowa.  Provided deposition testimony 2015.

*Appraisal of Dell Inc.,* Consol. C.A. No. 9322-VCL, In the Court of the Chancery of the State of Delaware.  Provided deposition testimony 2015.  Provided trial testimony 2015.

*Jacqueline Coffin and Sandra Lowry v. Atlantic Power Corporation, et al.,* Court File No. CV-13-480939-00CP, Ontario Superior Court of Justice.  Provided deposition testimony 2015.

*Peter J. Rush, et al. v. Walter Energy, Inc., et al.,* Master File No. 2:12-cv-00281-VEH, United States District Court Northern District of Alabama, Southern Division.  Provided deposition testimony 2014.

*Basis Pac-Rim Opportunity Fund & Basis Yield Alpha Fund v. TCW Asset Management Company, Index No. 654033/2012,* Supreme Court of the State of New York, County of New York.  Provided deposition testimony 2014.

*Postova Bank, A.S. and Istrokapital SE v. The Hellenic Republic,* case no. ARB/13/8, International Centre for Settlement of Investment Disputes.  Provided arbitration testimony 2014.

*Sue Ann Hamm v. Harold G. Hamm*, case no. FD-2012-2048, In the District Court of Oklahoma County, State of Oklahoma.  Provided deposition testimony 2014.

*GE Dandong, et al. v. Pinnacle Performance Limited, et al*, court file no. 10-civ-8086, In the United States District Court Southern District of New York.  Provided deposition testimony 2014.

*Commonwealth REIT, Barry M. Portnoy, Adam D. Portnoy, Joseph L. Morea, William A.Lamkin, Frederick N. Zeytoonjian and REIT Management & Research LLC v. Corvex Management LP and Related Fund Management, LLC,* case no. 11-512-Y-276-13, In the United States District Court of Massachusetts.  Provided arbitration testimony 2013.

*Tullett Prebon PLC, Tullett Prebon Financial Services LLC f/k/a Tullett Liberty Securities LLC and Tullett Prebon Americas Corp. v. BCG Partners, Inc.,* docket no. HUD-L-3796-11, In the Superior Court of New Jersey.  Provided deposition testimony 2013.  Provided trial testimony 2014.

*Donald P. Fewer v. GFI Group Inc. and Jersey Partners Inc.,* 601099/08, Supreme Court of the State of New York, County of New York. Provided deposition testimony 2013.

*The Board of Trustees of and on behalf of the General Retirement System of the City of Detroit, et al. v. BNY Mellon, N.A., and The Bank of New York Mellon,* Case No.: 11-cv-6345 (RJS), in

the United States District Court, Southern District of New York.  Provided deposition testimony 2013.

*United States of America v. Countrywide Financial Corporation; Countrywide Home Loans, Inc.; Countrywide Bank, FSB; Bank of America Corporation; Bank of America, N.A.; and Rebecca Mairone*, Index No. 12 Civ. 1422, In United States District Court Southern District of New York.  Provided deposition testimony 2013.

*Judith Curran and Michael Earp v. Principal Management Corporation and Principal Funds Distributor, Inc.*, case no. 4:09-cv-00433-RP-CFB, in United States District Court Southern District of Iowa Central Division. Provided deposition testimony 2013.

*The State Treasurer of the State of South Carolina v. The Bank of New York Mellon and The Bank of New York Mellon*, Civil Action No. 2011-CP-40-00533, State of South Carolina, Court of Common Pleas for the Fifth Judicial Circuit. Provided deposition testimony 2012.

*MBIA Insurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., Countrywide Home Loans Servicing, LP and Bank of America Corp.,* 08/602825, Supreme Court of the State of New York, County of New York. Provided deposition testimony 2012.

*City of St. Petersburg, Florida v. Wells Fargo Bank, N.A.,* 8:10-CV-00693-JSM-TBM, United States District Court, Middle District of Florida.  Provided deposition testimony in 2011 and trial testimony 2012.

*Pacific Select Fund v. The Bank of New York Mellon*, CV 10-00198 JST, United States District Court, Central District of California.  Provided deposition testimony 2011.

*Securities and Exchange Commission against Ralph Cioffi and Matthew Tannin,* 08 Civ. 2457 (FB), United States District Court, Eastern District of New York.  Provided deposition testimony 2011.

*Chemtech Royalty Associates, L.P., by Dow Europe, S.A., as Tax Matters Partner v. United States of America*, 06-258-BAJ-DLD, United States District Court, Middle District of Louisiana. Provided deposition testimony in 2009 and trial testimony 2011.

*The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. The Bank of New York Mellon Corporation, et al.*, Civil Action No. 09-cv-06273 (RMB)(AJP), United States District Court, Southern District of New York.  Provided deposition testimony 2011.

*SCF Arizona v. Wachovia Bank, N.A.*, 09 Civ. 9513 (WHP), United States District Court, Southern District of New York.  Provided deposition testimony 2011.

*Novell, Inc. v. Microsoft Corporation*, Case No. 2:04-CV-1045 JFM, United States District Court, Central Division of Utah.  Provided trial testimony 2011.

*Air Products and Chemicals, Inc. v. Airgas, Inc., Peter McCausland, et al.*, Civil Action No. 5249-CC, Court of Chancery of the State of Delaware.  Provided deposition testimony 2010. Provided trial testimony 2010.

*Intel Corporation v. Nvidia Corporation*, C.A. No. 4373-VCS, Court of Chancery of the State of Delaware. Provided deposition testimony 2010.

*Charles Fisher, et al. v. ABB, Inc., et al.*, 2:06-CV-04305 (NKL), United States District Court, Western District of Missouri. Provided deposition testimony in 2009.  Provided trial testimony 2010.

*United States of America against Ralph Cioffi and Matthew Tannin,* 08-CR-415(FB), United States District Court, Eastern District of New York.  Provided trial testimony 2009.

*In Re American Mutual Funds Fee Litigation*, 2:04-cv-05593-GAF-RNB, United States District Court, Central District of California, Western Division. Provided deposition testimony 2010. Provided trial testimony 2009.

*Convolve, Inc., and Massachusetts Institute of Technology v. Compaq Computer Corporation and Seagate Technology, LLC,* 00-CIV-5141, United States District Court for the Southern District of New York.  Provided deposition testimony 2008.

*Cynthia A. Bennett, et al. v. Fidelity Management & Research Company and FMR Co., Inc.*, 04-CV-11756-MLW, United States District Court, District of Massachusetts. Provided deposition testimony 2008.

*Pro-Sys Consultants Ltd. and Neil Godfrey, Plaintiffs against Microsoft Corporation and Microsoft Canada Co./Microsoft Canada CIE Defendants*, No. L043175, Vancouver Registry, Supreme Court of British Columbia.  Provided deposition testimony 2008.

*United States of America vs. Frederick S. Schiff and Richard J. Lane*, Criminal No. 06-406, United States District Court, District of New Jersey.  Provided trial testimony 2008.

*Discover Financial Services, et al. v. Visa U.S.A. Inc., et al.*, 04-CV-7844, United States District Court, Southern District of New York. Provided deposition testimony 2007.

*In re: Oracle Securities Litigation,* C01-0988-MJJ, United States District Court, Northern District of California. Provided deposition testimony 2007.

*Susan Strigliabotti, et al. v. Franklin Resources, Inc., et al.*, C-04-0883, United States District Court, Northern District of California. Provided deposition testimony 2007.

*Joe Comes and Comes Vending, Inc. v. Microsoft Corporation,* CL 82311, Iowa District Court for Polk County. Provided deposition testimony 2006.

*Robert L. Baker v. American Century Investment Management, Inc,* 04-4039-CV-C-ODS, United States District Court, Western District of Missouri. Provided deposition testimony 2006.

*Merrill Lynch Fundamental Growth Fund, Inc. and Merrill Lynch Global Value Fund, Inc. v. McKesson HBOC, et al.,* CGC-02-405792, San Francisco Superior Court.  Provided deposition testimony 2005.

*Florida State Board of Administration v. Alliance Capital Management L.P.*, 2002 CA 001104, Circuit Court for Leon County, Florida.  Provided deposition testimony in 2004.  Provided trial testimony in 2005.

**APPENDIX B**
**Materials Considered Beyond Those Considered in the Hubbard Report**

**A. Legal Documents and Produced Materials**

Deposition of Glenn Hubbard, Ph.D., October 17, 2025, and exhibits thereto.

Expert Reply Report of David I. Tabak, Ph.D., *Nadia Shash, et al. v. Biogen Inc., et al.* , Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, November 5, 2025, and the materials cited or referenced therein, and the materials produced in connection therewith.

Expert Report of Glenn Hubbard, Ph.D., *Nadia Shash, et al. v. Biogen Inc., et al.* , Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, September 10, 2025, and the materials cited or referenced therein, and the materials produced in connection therewith.

Plaintiffs' Reply in Further Support of Motion for Class Certification, *Nadia Shash, et al. v. Biogen Inc., et al.* , Case No: 1:21-cv-10479-IT, United States District Court for the District of Massachusetts, November 5, 2025.

APPENDIX C







