# Exhibit 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NADIA SHASH and AMJAD KHAN,
Individually and On Behalf of All Others
Similarly Situated,

      Plaintiffs,

      v.

BIOGEN INC., MICHEL VOUNATSOS, and
ALFRED W. SANDROCK, JR.,

      Defendants.

Civil Action No.: 1:21-cv-10479-IT

## SUR-REPLY IN FURTHER OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT..........................................................................................................................1

I.      The Lack of Front-End Impact Rebuts the *Basic* Presumption. ........................................2

II.     The Inflation Maintenance Theory Is Not Available Here. ................................................2

III.    Even if the Inflation Maintenance Theory Were Available, Class Certification
        Should Be Denied Under *Goldman*. ................................................................................3

        A.      There Is a Mismatch Between the Front- and Back-End Disclosures. ....................4

        B.      The "Truthful Substitute" Analysis Also Shows Lack of Price Impact...................6

        C.      Additional Evidence Demonstrates Lack of Price Impact. ....................................8

IV.     Any Declines on November 5 and 9 Are Not Attributable to the Massie Appendix
        (or to the July 22 Statement). ..........................................................................................10

CONCLUSION.....................................................................................................................15

CERTIFICATE OF SERVICE ..............................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny County Employees' Retirement System* v. *Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ......................................................................11

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..............................................................14

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
    11 F.4th 138 (2d Cir. 2021) .......................................................................................3

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ................................................................................ *passim*

*In re Concho Resources, Inc.*,
    2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ..............................................................9

*Cross* v. *21st Century Holding Co.*,
    2002 WL 31158901 (S.D.N.Y. Sept. 27, 2002).......................................................11

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) .............................................................................13

*Ferris* v. *Wynn Resorts Ltd.*,
    2023 WL 2337364 (D. Nev. Mar. 1, 2023) ................................................................9

*Fogarazzo* v. *Lehman Brothers*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ................................................................................11

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)....................................................................................................5

*IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*,
    818 F.3d 775 (8th Cir. 2016) ......................................................................................2

*In re Kirkland Gold Ltd. Sec. Litig*,
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ...................................................4, 8, 14

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)......................................................................................12

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
    2009 WL 2855601 (D.N.J. Sept. 2, 2009) ...............................................................11

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ..................................................................................13

*Naser Jewelers, Inc.* v. *City of Concord*,
538 F.3d 17 (1st Cir. 2008) ...........................................................................................5

*New England Carpenters* v. *DeCarlo*,
122 F.4th 28 (2d Cir. 2024) ..........................................................................................5

*Ramirez* v. *Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .....................................................12, 14

*San Diego Cnty. Emps. Ret. Assn* v. *Johnson & Johnson*,
2025 WL 2176586 (3d Cir. July 30, 2025) ...................................................................5

*Shash* v. *Biogen et. al*,
84 F.4th 1 (1st Cir. 2023) .........................................................................................3, 11

*Shupe* v. *Rocket Companies., Inc.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024) ....................................................................5, 8

*Sjunde AP-Fonden* v. *General Electric Co.*,
2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ............................................................11

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ..........................................................................................5

*Waggoner* v. *Barclays*,
875 F.3d 79 (2d Cir. 2017) ............................................................................................5

*In re Waste Mgmt. Sec. Litig.*,
775 F. Supp. 3d 742 (S.D.N.Y. 2025) ...........................................................................3

**Statutes**

The Private Securities Litigation Reform Act of 1995 ......................................................3

## PRELIMINARY STATEMENT

Plaintiffs' reply largely does not engage with the key issue before the Court: Did the July 22 Statement,[1] the *only* alleged false statement left in this case, impact Biogen's stock price? The answer is no. Plaintiffs fail to rebut Defendants' proof establishing lack of price impact of the July 22 Statement and therefore cannot rely on the presumption of reliance to obtain class certification.

Plaintiffs' reply leaves unrefuted Defendants' evidence establishing that: (1) no analyst or market commentator ever relied on or cited the July 22 Statement—it was *entirely ignored* by the market; (2) the July 22 Statement caused no stock price reaction at all; (3) analysts understood, both before and after July 22, that Biogen had *not* disclosed subgroup data and that the undisclosed data was likely negative—contrary to Plaintiffs' position that the July 22 Statement was "propping up" the stock; and (4) even after the so-called "truth" was revealed by Massie's subgroup analyses, no analyst ever said that the July 22 Statement was false or misleading (or mentioned it at all).

Faced with these facts, Plaintiffs attempt to re-engineer their fraud theory. The reply sidesteps the evidence by arguing that the July 22 Statement was no different than Defendants' earlier, *dismissed* statements. But that cannot be squared with Plaintiffs' arguments to the First Circuit or the First Circuit's decision, which reinstated *only* the July 22 Statement based on Plaintiffs' argument that it alone conveyed that "all" data supported high-dose efficacy. Plaintiffs' remaining reply arguments misstate the law and evidence, and focus on other irrelevancies.

The bottom line is that there is no evidence that anyone ever noticed the July 22 Statement. Plaintiffs' fraud theory was manufactured for litigation, and now fails in the face of actual evidence. Class certification should be denied for lack of price impact.

## ARGUMENT

---

[1] Capitalized terms have the meanings ascribed to them in Defendants' opposition (Doc. No. 190). Unless otherwise noted, all emphases are added and citations and quotation marks are omitted.

1

## I.    THE LACK OF FRONT-END IMPACT REBUTS THE *BASIC* PRESUMPTION.

Plaintiffs concede that Biogen's stock price did not increase following the July 22 Statement, Reply Br., Doc. No. 210 at 3, and do not identify any analyst or market commentary that discussed the allegedly false Statement or suggested it was false, either before or after the supposed "fraud" was revealed. *Infra* pp. 8–9. That is because there was none. Doc. No. 190 at 12, 20–21. As a matter of law and economic theory, in an efficient market, new and value-relevant information—such as that supposedly conveyed in the July 22 Statement—should cause a stock price increase. *Id.* at 12–14. Neither Plaintiffs nor Dr. Tabak respond to that argument. *IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no front-end price impact rebutted the *Basic* presumption").

## II.    THE INFLATION MAINTENANCE THEORY IS NOT AVAILABLE HERE.

Plaintiffs also do not respond to Defendants' showing that the inflation maintenance theory is (i) irreconcilable with the First Circuit's opinion, and (ii) refuted by evidence showing that there was no "preexisting inflation" to maintain because the market did not think "all" data supported high-dose efficacy. Doc. No. 190 at 12–15. To the contrary, Plaintiffs admit in their reply that analysts knew, both before and after the July 22 Statement, that Biogen had not disclosed subgroup data and viewed that data as "potentially damaging." Doc. No. 210 at 12.

Plaintiffs instead argue that the July 22 Statement merely repeated Defendants' earlier statements—making it unremarkable that analysts ignored it. Plaintiffs posit that, starting in late 2019, Defendants misleadingly said that EMERGE and portions of ENGAGE showed that high-dose aducanumab was effective, but ENGAGE "failed" because too few patients received the high dose (*i.e.* the "Dosage Thesis"). *Id.* at 2–3. Plaintiffs argue that the July 22 Statement repeated these earlier misrepresentations and "reassured investors" about the Dosage Thesis. *Id.*

This argument is wholly inconsistent with Plaintiffs' argument to the First Circuit: that the

July 22 Statement was the "most striking" misstatement because it alone allegedly said that "*all*" of Biogen's data was consistent with high-dose efficacy.  Doc. No. 190 at 13 & n.4.  The First Circuit then reinstated *only* the July 22 Statement, juxtaposing it with earlier alleged misstatements, and holding that it "stands out from the rest" because it allegedly changed the mix of information by conveying that "all of Biogen's data was 'consistent with' needing to get to high dose."  *Shash* v. *Biogen et. al*, 84 F.4th 1, 10–14 (1st Cir. 2023).  But Plaintiffs now say the Statement conveyed nothing new.

Plaintiffs' re-engineered theory—that Defendants falsely conveyed their belief that high-dose aducanumab was efficacious—was rejected by this Court and again on appeal.  This Court dismissed every alleged misstatement because "the proper statistical method for analyzing the topline results is one of genuine scientific debate and therefore not actionable under the PSLRA." Doc. No. 76 at 25.  The First Circuit affirmed dismissal of every statement that "pertain[ed] to aducanumab's general efficacy"—that is, every statement *except* the July 22 Statement—because "even if Defendants were aware of the [allegedly contradictory] subgroup data, it is not evident or inferable from the complaint that Defendants knew or believed that said data undermined their statements about aducanumab's general efficacy."  *Shash*, 84 F.4th at 15.[2]  Now, having premised their remaining claim on the argument that the July 22 Statement conveyed new and different information about "all" data, Plaintiffs are left with no explanation for the lack of front-end price impact for the Statement.  Class certification should be denied for lack of price impact.

**III.    EVEN IF THE INFLATION MAINTENANCE THEORY WERE AVAILABLE,**

---

[2] Plaintiffs' own cited cases highlight why inflation maintenance does not apply here.  Doc. No. 210 at 2–3.  In *In re Waste Mgmt. Sec. Litig.*, the allegedly false statements reinforced the market's *pre-existing belief* that the issuer would complete a previously-announced merger by a set date. 775 F. Supp. 3d 742, 750, 762–63 (S.D.N.Y. 2025).  Likewise, in *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, the alleged misstatements about conflicts were *identical* to statements defendants made for years before the class period.  11 F.4th 138, 140–41 (2d Cir. 2021).

**CLASS CERTIFICATION SHOULD BE DENIED UNDER *GOLDMAN*.**

Even if a maintenance theory were available, Defendants have established that the July 22 Statement did not "prop up" Biogen's stock price, and the back-end drop cannot serve as a proxy for preexisting inflation "maintained" by the front-end July 22 Statement.  Doc. No. 190 at 15–21. Plaintiffs offer no *evidence* to the contrary, thus failing to rebut Defendants' showing, and therefore cannot establish the *Basic* presumption of reliance.

**A.      There Is a Mismatch Between the Front- and Back-End Disclosures.**

Defendants' opposition showed that there is a *substantive* mismatch between the July 22 Statement and the allegedly corrective analyses in the Massie Appendix.  Doc. No. 190 at 16–18. That is because the market did not interpret the Statement to mean "all data," including subgroup analyses, was consistent with high dose efficacy:  to the contrary, many analysts stated that the July 22 earnings call (on which the Statement was uttered) did not convey any new information about aducanumab's efficacy.  *Id.*  And market commentary after July 22 shows that investors knew Biogen had not released the subgroup data and did not think it "all" supported high-dose efficacy.  *Id.*  Plaintiffs do not engage with this argument or evidence, and they do not distinguish *In re Kirkland Gold Ltd. Sec. Litig*, 2024 WL 1342800, at *11–12 (S.D.N.Y. Mar. 29, 2024), which denied class certification because of a similar substantive mismatch.

Plaintiffs instead argue only that there is no *specificity* mismatch here.  Doc. No. 210 at 3–6.  The Court need not reach this issue because there is a *substantive* mismatch, which alone is dispositive.  But even if the Court were to reach this argument, Plaintiffs fail to rebut Defendants' showing of a specificity mismatch between (i) the alleged misstatement, which "summarized" data from three trials—including EMERGE, ENGAGE, "a negative study," and PRIME, which had "exploratory endpoints"—and provided no subgroup analyses, and (ii) the back-end disclosure, which provided detailed and specific subgroup analyses and, as Plaintiffs admit, "many analyses

4

that did not bear on" the July 22 Statement. Doc. No. 190 at 1, 18–19. Plaintiffs' expert *concedes* this point. Tabak Reply Report, Doc. No. 209-3 at ¶¶ 60–61 ("[T]his is true."). The Supreme Court has explained that this type of specificity mismatch undermines the inference that the back-end drop equals front-end inflation, and "there is less reason to infer front-end price inflation." *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) ("*Goldman*").

Plaintiffs insist that a "generic/specific divide is absent here" because there is a "clean match" between the disclosures, analogizing to an example where the front-end statement was that a car had passed all safety tests and the back-end disclosure was that the car had failed several crash tests. Doc. No. 210 at 4. But unlike here, those statements are made at the same level of specificity. Plaintiffs also argue that the challenged statements in Defendants' cases were more generic than here. *Id.* at 5–6. However, those cases—*ATRS*, *Qualcomm*, and *Shupe*—reflect a range of specificity mismatches, and *Goldman* instructs that the wider the mismatch, the lower the inference that "the back-end price drop equals front-end inflation." *Goldman*, 594 U.S. at 123.[3] Finally, Plaintiffs argue that the July 22 Statement cannot be "generic" because the First Circuit held that Plaintiffs sufficiently *alleged* that the Statement is material. Doc. No. 210 at 6. We're now at the evidence stage, and the evidence shows that the Statement wasn't material because no

---

[3] Plaintiffs' cases are inapposite. Doc. No. 210 at 5 n.2. *New England Carpenters* v. *DeCarlo*, considered loss causation at the motion to dismiss stage and is irrelevant. 122 F.4th 28, 54 (2d Cir. 2024). In both *Waggoner* and *Vivendi*, the corrective disclosures either expressly or directly addressed the front-end statements. *See Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 97–99 (2d Cir. 2023) ("*ATRS*"). Plaintiffs also wrongly claim that the First Circuit "made clear there is no mismatch" because the Massie Appendix "rendered Sandrock's statement misleading." Doc. No. 210 at 4. The First Circuit was not assessing price impact or any evidence—it was assessing Plaintiffs' falsity theory on the pleadings. A mismatch analysis for price impact requires a "closer fit" than determining whether certain information corrected an alleged misstatement. *ATRS*, 77 F.4th at 99 n.11. Likewise, Plaintiffs cite *San Diego Cnty. Emps. Ret. Assn* v. *Johnson & Johnson*, to say there is "no mismatch where corrective disclosure showed falsity," again conflating falsity with price impact.

investor *ever* commented on it. *Infra* pp. 8–9. Plaintiffs cite no evidence to the contrary.

In any event, Defendants have proven, and Plaintiffs do not dispute, a *substantive* mismatch between the front-end Statement, which no one understood to mean "all" data supported high-dose efficacy, and the back-end disclosure, which no one thought contradicted the Statement. Doc. No. 190 at 16–18. This proves a lack of price impact and requires denial of class certification.

**B.        The "Truthful Substitute" Analysis Also Shows Lack of Price Impact.**

Courts determining the "inflation-maintaining capacity" of an alleged misstatement analyze whether a "truthful substitute" at "an equally generic level" would impact the stock price. *ATRS*, 77 F.4th at 102–03. Defendants' proposed "truthful substitute" is: "Although portions of the data from PRIME, ENGAGE, and EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, not all data are consistent with that." Doc. No. 190 at 19. Defendants' economic evidence confirms that this statement would not have caused a price drop because (i) investors knew that Biogen had not released the subgroup data and did not think that "all" the unreleased data supported high-dose efficacy, and (ii) when analysts repeatedly made this observation after July 22, Biogen's stock did not drop. *Id.* at 19–20. In reply, Plaintiffs *concede* that analysts "viewed the subgroup data as . . . potentially damaging" and "continued highlighting Biogen's refusal to disclose subgroup results," Doc. No. 210 at 12, which confirms that the market did not think that "all" data supported high-dose efficacy. And Dr. Tabak provides no evidence that the market believed that the unreleased subgroup data would support Biogen's view that high-dose aducanumab is efficacious. Hubbard Rebuttal Report, Ex. T to Doc. No. 217-1 at ¶ 11.

Instead, Plaintiffs propose two faulty "truthful substitutes." The first assumes that the "truthful substitute" is the "disclosure of the actual subgroup data." Doc. No. 210 at 7–8. That argument was directly rejected in *ATRS*, which reversed the district court for making *exactly* this mistake by analyzing the earlier release of the back-end disclosure. Doc. No. 190 at 20; *ATRS*, 77

F.4th at 100–01.  And Plaintiffs' second proposed "truthful substitute" rewrites Dr. Sandrock's statement to say "there are undisclosed subgroup analyses inconsistent" with high-dose efficacy. Doc. No. 210 at 8.  This is also more specific than the July 22 Statement—which made no reference to subgroup analyses—and thus is not made *at the same level of generality*.[4]

However the "truthful substitute" is constructed, the economic evidence demonstrates that, both before and after July 22, the market expressed doubt about whether the unreleased subgroup data would support aducanumab's efficacy.  Plaintiffs concede this point, *supra* p. 6, but attempt to evade its implications.  They focus on supposed differences between the phrases "supportive of" and "consistent with," and how analysts used these words.  Doc. No. 210 at 10.  This supposed distinction is purely semantic because "analysts' commentary questioning whether the subgroup data were 'supportive' of approval necessarily reflects doubt that 'all' data were 'consistent' with high dose efficacy."  Ex. T to Doc. No. 217-1 at ¶ 12.  The bottom line:  after the July 22 Statement, numerous analysts made clear that they had concerns about undisclosed subgroup data and did not think that all data "supported," or was "consistent with," efficacy or regulatory approval, *e.g.*,:

- On October 21, 2020, BMO wrote that "we do not believe current FDA precedent supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses."  *Id.* at ¶ 13.

- On October 27, 2020, UBS observed that "critical details on proportions of subpopulations (ApoE4 carriers vs. non) have not been disclosed and could have a meaningful impact on the interpretation of the results."  *Id.*

- On November 3, 2020, Wells Fargo opined  that "certain aspects of ENGAGE data may not be entirely ***consistent with*** the proposed explanation on exposure alone."  *Id.*

The stock did not drop when these reports were released, even though Dr. Sandrock supposedly

---

[4] Plaintiffs wrongly say that the First Circuit identified the subgroup data as a "truthful substitute." Doc. No. 210 at 7.  The First Circuit identified the subgroup data as the corrective information in its falsity analysis; it did not engage in a fact-based price impact analysis.  *Supra* p. 5 n.3.

told investors on July 22 that "all" data was consistent with high-dose efficacy. Doc. No. 189-1 at ¶ 51. This undermines any notion that the July 22 Statement was propping up the stock price.

Plaintiffs also say that these analysts were merely offering "conjecture" because they did not know the actual data. Doc. No. 210 at 11–12. Plaintiffs again misunderstand the inquiry, which predicts the market's reaction based on then-current expectations. Analysts' expectations were *not* that "all" data supported high-dose efficacy. Thus, a "truthful substitute" conveying that information would not—and did not—change the market's expectations or cause a price reaction. Dr. Tabak does not rebut this economic evidence.[5]

## C.    Additional Evidence Demonstrates Lack of Price Impact.

No analyst *ever* referenced the July 22 Statement, either before or after November 4, 2020, proving that the Statement was not "propping up" Biogen's stock price. Doc. No. 190 at 20–21. Plaintiffs don't refute this, which is fatal to their inflation maintenance theory under *Goldman*. *ATRS*, 77 F.4th at 102–04 (rejecting maintenance theory where no analysts referenced the alleged misstatements during or after the class period); *Shupe* v. *Rocket Companies., Inc.*, 752 F. Supp. 3d 735, 781–82 (E.D. Mich. 2024); *Kirkland*, 2024 WL 1342800, at *9 (S.D.N.Y. Mar. 29, 2024).

Plaintiffs identify three analyst reports that purportedly discussed the July 22 earnings call and imply that the reports "cited" the July 22 Statement. Doc. No. 210 at 12. *But none does*:

- Wolfe Research said that, during the July 22 call, Biogen "reiterated prior talking points on aducanumab," and provided "no new information." Ex. T to Doc. No. 217-1 at ¶ 8 n.7.

- William Blair opined that "[t]he lack of full disclosure and caginess around the aducanumab results and filing remain perplexing," and noted "it is hard to be confident in the program." *Id.*

---

[5] Plaintiffs argue that Defendants' analysis mirrors the "rejected" analysis in *ATRS*, pointing to the 36 pre-disclosure news reports identified by defendants in that case. Doc. No. 210 at 11. But those reports were offered as alternative corrective disclosures to show the truth was revealed before the end of the class period, not as "truthful substitutes" to show lack of price impact. *ATRS*, 77 F.4th at 91. And the Second Circuit did not "reject" the evidence—the panel simply disagreed about its persuasiveness taken in isolation. *Id.* at 91–93, 107.

- Wells Fargo discussed Biogen's view on high-dose efficacy, which had been public since October 2019, not the July 22 Statement. *Id.*

Even Plaintiffs' own expert *does not opine* that these analysts cited the July 22 Statement. *Id.* To support price impact, analyst commentary must concern the alleged misstatement itself, not merely "the same subject." *ATRS*, 77 F.4th at 104.

Plaintiffs also cite a lone analyst who, according to Plaintiffs' characterization, "stated" that the "Massie [Appendix] . . . directly contradicted (*i.e.*, corrected) Biogen's Dosage Thesis." Doc. No. 210 at 5. Plaintiffs omit that the analyst's "overarching takeaway" was that the FDA "wants to approve this product" and Massie's views would not "make[] a difference" or "dissuade the FDA on approval." Doc. No. 209-9 at 2. In any event, the analyst merely referenced Massie's opinion that the supposed lack of benefit for non-carriers in EMERGE "conflicts with [Biogen's] hypothesis that high aducanumab dosing leads to a better benefit." *Id.* at 6. That's irrelevant. The question for price impact is whether analysts commented on the *July 22 Statement*. None did. Ex. T to Doc. No. 217-1 at ¶ 16 & n. 33. Plaintiffs' own cases demonstrate the defect in their argument. In *Ferris* v. *Wynn Resorts Ltd.*, market participants "immediately made the connection between" the corrective disclosure corroborating sexual assault allegations and the alleged misrepresentations denying the accusations. 2023 WL 2337364, at *1, 10–11 (D. Nev. Mar. 1, 2023). In *In re Concho Resources, Inc.*, the court observed that a lack of analyst discussion is "some evidence" against price impact, and found no price impact for several alleged misstatements based in part on lack of analyst commentary. 2025 WL 1040379, at *14 (S.D. Tex. Apr. 7, 2025).

Finally, Plaintiffs cite emails produced by Defendants discussing aducanumab's trial data and regulatory pathway. Reply Exs. 7, 8, 11, 15, 20, Doc. Nos. 209-7, -8, -11, -15, -20. These internal documents have no bearing on price impact because they show nothing about *the market's* views of the July 22 Statement or its price-propping-up capacity. Moreover, none of the emails

9

contradict Defendants' stated belief that high-dose aducanumab was efficacious—a view shared by the FDA, which granted accelerated approval of aducanumab. Doc. No. 190 at 8–10 & n.2.

## IV. ANY DECLINES ON NOVEMBER 5 AND 9 ARE NOT ATTRIBUTABLE TO THE MASSIE APPENDIX (OR TO THE JULY 22 STATEMENT).

Defendants showed that, in an efficient market, the November 5 stock price decline cannot be attributed to the supposedly corrective subgroup analyses in the Massie Appendix, released the morning of November 4. Doc. No. 190 at 22–26. The Briefing Book (including the Massie Appendix) caused an immediate stock price reaction: the price rose sharply in the first hour on November 4, on very high trading volume, reflecting rapid market absorption of the new information. *Id.* at 23. At least 15 analysts published reports during the trading day on November 4, most before 1 p.m. ET, that discussed Massie's "negative findings"—several discussed the allegedly corrective subgroup patterns. *Id.* at 23–24. And the lack of statistically significant price movement at market open on November 5—more than 17 hours later—confirms that the allegedly corrective information was absorbed on November 4. *Id.* at 24. Dr. Tabak refutes none of this evidence, which shows that price declines on November 5 and 9 do not measure the value of Massie's subgroup analyses, much less inflation "maintained" by the July 22 Statement.

Plaintiffs offer arguments that ignore modern studies showing that "new information is incorporated into the stock price in minutes, if not faster" in an efficient market—particularly where, as here, a stock is heavily traded by institutional and high-frequency investors. *Id.* at 22.

*First*, Plaintiffs try to dismiss the "academic literature about the efficient market" as focused on "simple" earnings announcements. Doc. No. 210 at 13. But neither Plaintiffs nor Dr. Tabak cite any literature supporting the proposition that earnings are absorbed faster than other information. Doc. No. 209-3 at ¶ 84 n.90. And contrary to Plaintiffs' argument, the studies Dr. Hubbard cites—including one Dr. Tabak relies on—show price adjustments in an efficient market

10

take minutes or less, not only for earnings announcements, but also for complex analyst opinions offered during live programs, macroeconomic announcements, and other news articles and analytics. Ex. G to Doc. No. 217-1 at ¶ 24. Having chosen to proceed under the efficient market theory, Plaintiffs cannot evade modern studies showing price reactions are nearly instantaneous.

*Second*, citing the complexity of the Briefing Book, Plaintiffs argue that "[t]he First Circuit, and many others, hold that it may take more than one trading day to fully incorporate news." Doc. No. 210 at 13. But this is not a legal question—it is an economic question that must be assessed on the facts and evidence of each case. That is precisely what the First Circuit instructed here, when it held that Plaintiffs had plausibly *alleged* loss causation because "the issue of when Biogen's stock price actually dropped is a question of fact." *Shash*, 84 F.4th 1, 21–22. That means Plaintiffs must now adduce *evidence*, but Plaintiffs fail to cite academic literature to support their argument for a multi-day price reaction, and the cases they cite are distinguishable.[6]

Plaintiffs also insist that analysts "commented it would take a full day to read and analyze the materials." Doc. No. 210 at 14–15 & n.4. But they cite only a single report, issued the morning of November 4, that *discussed* the "very negative" Massie Appendix, which "seemingly th[ought] the entire analysis is flawed and aducanumab doesn't work." Doc. No. 209-19. Plaintiffs also ignore the numerous other analysts who reported on Massie during trading hours on November 4.

---

[6] Plaintiffs cite two motion to dismiss opinions (*Cross* and *Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*) that are irrelevant because they didn't consider evidence. Plaintiffs' other cases involved different facts or issues. *Sjunde AP-Fonden* v. *General Electric Co.* declined to exclude an expert opinion that a three-day window was proper based on the facts there. 2023 WL 6314939, *16 (S.D.N.Y. Sept. 28, 2023). *Allegheny County Employees' Retirement System* v. *Energy Transfer LP* held that a multi-day window was appropriate when a disclosure on the first day created "confusion" that "required additional clarifying information," which was conveyed by analysts the next day. 623 F. Supp. 3d 470, 494–97 (E.D. Pa. 2022). In *Fogarazzo* v. *Lehman Brothers*, the court accepted a three-day window for assessing front-end impact that included the day *before* the alleged false statements. 263 F.R.D. 90, 102–06 (S.D.N.Y. 2009).

Additionally, Plaintiffs rehash their argument that the market needed days to digest the Massie Appendix but that "it did not take much effort to discern" the rest of the 343-page Briefing Book. Doc. No. 210 at 14. But they still offer no economic evidence, including from their own expert, for their novel theory that the market absorbed the supposedly "good news" first and "bad news" days later, and cite no case endorsing such a theory. Their own cited case says the opposite. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270–71 (3d Cir. 2005) (rejecting argument that "the market understood all the good things that Merck said about its revenue but was not smart enough to understand the co-payment disclosure," because "[a]n efficient market for good news is an efficient market for bad news"). And Plaintiffs ignore that the Massie Appendix is no more complex than the rest of the Briefing Book. Doc. No. 190 at 24–25 & n.6.

*Third*, Plaintiffs try to explain away the lack of statistically significant price movement from market-close on November 4 to market-open on November 5. Doc. No. 210 at 16. They do not dispute that new information disclosed before market-open is reflected in a stock's opening price, but misleadingly state that the academic research shows only a "majority" (*i.e.*, "51%") of information is reflected at market-open. *Id.*; Doc. No. 209-3 at ¶¶ 83–84. But the article they cite says the overnight period "accounts for 'essentially 100%'" of the price response of a nontrading-hour announcement for a "NASDAQ stock" like Biogen. Ex. T to Doc. No. 217-1 at ¶ 26.[7]

Plaintiffs also say the lack of statistical significance does not matter because there was a small raw price movement at market-open on November 5. Doc. No. 210 at 16. But price

---

[7] Plaintiffs' discussion of *Ramirez* is also wrong. Doc. No. 210 at 16 n.6. The court there held that a lack of statistically significant price movement at market-open proved a lack of price impact for information revealed *overnight*—only a few hours before market open. *Ramirez* v. *Exxon Mobil Corp.*, 2023 WL 5415315, at *16, 21 (N.D. Tex. Aug. 21, 2023). The case here is *more compelling* because the allegedly corrective information was released during the prior trading day, more than *22 hours* before market open on November 5, and there was *still* no price movement.

movement without statistical significance is "indistinguishable from random price fluctuations" and "cannot be attributed to company-specific information announced on the event date." *ATRS*, 77 F.4th at 86 n.5.  In other words, a non-statistically-significant price movement shows nothing.[8]

*Fourth*, Plaintiffs argue that Dr. Hubbard "admits that the price declines on Nov. 5 resulted from the news on Nov. 4."  Doc. No. 210 at 17.  That is wrong.  Plaintiffs confuse stock price returns and volatility.  "[S]tock price *returns*—a standard economic measure of price reaction— measure the directional price response to new, value-relevant information."  Ex. T to Doc. No. 217-1 at ¶ 29.  "In contrast, *volatility* measures the degree to which prices fluctuate in an unpredictable manner, reflecting uncertainty and market noise, and cannot serve as evidence of price impact attributable to a singular factor."  *Id.* at ¶¶ 29, 42.  Here, the market understood and quickly absorbed new information disclosed in the Briefing Book and Massie Appendix and determined that "on net, the materials were positive," as shown in the steep rise in price on high trading volume before 10:56 a.m. ET.  *Id.* at ¶ 30.  That represents price returns.  After that point, "the stock price continued to bounce around to reflect the differing views of market participants regarding how the Briefing Book would affect the AdCom vote and regulatory approval."  *Id.*  That represents volatility.  This period of high volatility "is distinct from the market's immediate assessment" of the Briefing Book and Massie Appendix.  *Id.* at ¶ 31.  Even Dr. Tabak admitted that it is "uncontroversial" that "much of the price movement occurred shortly after the release of the Briefing Book and then experienced continued volatility."  Doc. No. 209-3 at ¶ 75.  Plaintiffs'

---

[8] *See, e.g.*, *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 270 (N.D. Tex. 2015) (no price impact where plaintiffs' expert "found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (no price impact where "there is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price").

arguments about November 5 wrongly rely on volatility, not price impact.

*Fifth*, Plaintiffs criticize Dr. Hubbard for failing to disaggregate "non-fraud-related information" from the Massie Appendix. Doc. No. 210 at 9. But *Goldman* does not require defendants to allocate specific percentages to various pieces of back-end information; indeed, the Second Circuit in *Goldman* decertified the class without quantifying the causes of three back-end drops because the front-end statements did not inject or maintain inflation. *ATRS*, 77 4th at 83, 103–05. The same is true here.[9]

*Finally*, Plaintiffs argue that the stock movement on November 9 also supports price impact—a position their own expert does not support. Doc. No. 209-3 at ¶¶ 73, 90. Plaintiffs cite several supposed "admissions" from Dr. Hubbard in support of this argument but repeatedly mischaracterize his testimony. Doc. No. 210 at 18–20. Plaintiffs claim that Dr. Hubbard testified that price movement on November 5 and beyond was "due, at least in part, to the analysts weighing Dr. Massie's views." *Id.* at 20. But what Dr. Hubbard *actually* said was that Dr. Massie's "views [were] known" by November 4, and the market was "not [weighing] Dr. Massie's views, but the *implication* of those views," which reflects volatility and not price impact. Ex. T to Doc. No. 217-1 at ¶ 30 n.70. Plaintiffs insist that Dr. Hubbard "admitted" that the AdCom vote itself was "new news"—an innocuous truth—but ignore Dr. Hubbard's salient point that "the *inputs* to [the AdCom's] decision making," like the Massie Appendix, were already "known." *Id.* at ¶ 41 n.89. Plaintiffs also say that Dr. Hubbard "admitted that the negative AdCom vote was a materialization

---

[9] Plaintiffs argue Defendants failed to "identify any negative news" that caused the stock drop on November 5. Doc. No. 210 at 15. That misstates Defendants' burden, which is to prove by a preponderance that there was no price impact from the front-end July 22 Statement. In any event, Dr. Hubbard identified volatility and uncertainty about the AdCom vote to explain price movement on November 5, which supports a lack of front-end price impact. *See, e.g.*, *Kirkland*, 2024 WL 1342800, at *9; *Ramirez*, 2023 WL 5415315, at *17; *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *10, 14 (S.D. Tex. Feb. 9, 2024).

of the *undisclosed* risk of the findings in the Massie Report." Doc. No. 210 at 18. This is a misrepresentation of Dr. Hubbard's opinion that the AdCom vote was the "materialization of a *known* risk." Ex. T to Doc. No. 217-1 at ¶ 41 n.87.[10]

Plaintiffs' remaining arguments seek to recover for declines from the AdCom discussion and vote themselves, which Plaintiffs repeatedly argue "revealed new information" to investors. Doc. No. 210 at 18–20. But the question is whether they corrected the July 22 Statement and demonstrated price impact. The Court already answered that question—and rejected Plaintiffs' argument—in its earlier ruling, where it applied loss causation principles and held that market reaction to the AdCom was not alleged to be causally related to the July 22 Statement. Mar. 27, 2025 Order, Doc. No. 163 at 17–18. That ruling is the law of the case and forecloses Plaintiffs' argument. *See Naser Jewelers, Inc.* v. *City of Concord*, 538 F.3d 17, 20 (1st Cir. 2008).

Plaintiffs claim that "Dr. Hubbard's admission and Dr. Tabak's further analysis" somehow "distinguish this motion" from the earlier ruling, but they *cite nothing* for this proposition. Doc. No. 210 at 19. Dr. Hubbard made no such "admission." *Supra* p. 14. And Dr. Tabak *does not opine* that price movement on November 9 is attributable to the July 22 Statement. Doc. No. 209-3 at ¶ 90. Nothing has changed and the Court should not revisit its prior ruling.[11]

### CONCLUSION

For these reasons, and those in Defendants' opposition, Plaintiffs' motion should be denied.

---

[10] Plaintiffs cite disaggregation cases and argue that if the AdCom vote was an "intervening event," "the market's continued assessment of the Massie Report" would have to be disaggregated from it. Doc. No. 210 at 20–21. Those cases are irrelevant because the market absorbed the allegedly corrective information on November 4 and there is nothing to disaggregate. *Supra* pp. 10–14.

[11] *Homyk* v. *ChemoCentryx, Inc*. is distinguishable because there, unlike here, defendants allegedly misled investors about a drug's "prospects for approval," and a negative AdCom vote "was corrective of those misstatements." 2025 WL 1547625, at *18 (N.D. Cal. May 30, 2025).

Dated:  November 25, 2025

Respectfully submitted,

 /s/ *Audra J. Soloway*

Audra J. Soloway (*pro hac vice*)
Richard C. Tarlowe (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
rtarlowe@paulweiss.com
dsinnreich@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc.,*
*Michel Vounatsos, and Alfred W. Sandrock, Jr.*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of November, 2025, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

<u>*/s/ Audra J. Soloway*</u>
Audra J. Soloway

17