UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

NADIA SHASH and AMJAD KHAN,              )
Individually and On Behalf of All        )
Others Similarly Situated,               )
                                         )
            Plaintiffs,                   )
                                         )     Civil Action No.
       v.                                )     1:21-cv-10479-IT
                                         )
BIOGEN INC., MICHAEL VOUNATSOS, and      )
ALFRED W. SANDROCK, JR.,                 )
                                         )
            Defendants.                   )
                                         )

_____


BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


CASE MANAGEMENT VIDEOCONFERENCE



Wednesday, December 17, 2025
3:03 p.m.




John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**


On behalf of the Plaintiffs:

    THE ROSEN LAW FIRM, PA
    BY:  LAURENCE ROSEN
        JONATHAN R. HORNE
        BRIAN BURKONS ALEXANDER
    275 Madison Avenue
    40th Floor
    New York, NY  10016
    (212) 686-1060
    lrosen@rosenlegal.com
    jhorne@rosenlegal.com
    balexander@rosenlegal.com


On behalf of the Defendants:

    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    BY:  AUDRA J. SOLOWAY
        RICHARD TARLOWE
    1285 Avenue of the Americas
    New York, NY  10019
    (212) 373-3000
    asoloway@paulweiss.com
    rtarlowe@paulweiss.com

**P R O C E E D I N G S**

(In open court at 3:03 p.m.)

THE DEPUTY CLERK:  United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 21-cv-10479, Shash, et al., v. Biogen, Inc., et al.  Will counsel please identify themselves for the record.

MR. HORNE:  Good afternoon, Your Honor.  Jonathan Horne from The Rosen Law Firm for plaintiffs.  With me are my colleagues Laurence Rosen and Brian Alexander.

THE COURT:  Good afternoon.

MR. ROSEN:  Good afternoon.

MS. SOLOWAY:  Good afternoon, Your Honor.  Audra Soloway from Paul Weiss for the defendants.  And with me but just off the screen for -- over here is my colleague Rich Tarlowe.

THE COURT:  Good afternoon.

So we are having a discovery dispute; is that correct?

MS. SOLOWAY:  That's correct, Your Honor.

THE COURT:  What's going on?

MS. SOLOWAY:  So, Your Honor, there are two discovery issues we wanted to raise today.  The first concerns the timing of depositions, including a couple of nonparty depositions that the plaintiffs have noticed for

early January; and the second concerned some document requests that we have served on both plaintiff Nadia Shash as well as nonparty PolyCon and nonparty Argentum.

I'm going to be handling the first issue, and my colleague Mr. Tarlowe will be handling the second one.

THE COURT: Okay.

MS. SOLOWAY: Would you like me to jump in, Your Honor?

THE COURT: Sure.

MS. SOLOWAY: So on the deposition issue, Your Honor, the issue really has to do with the timing of these depositions. The plaintiffs have noticed these depositions for Dr. Massie on January 5th and for Dr. Fleming on January 14th. But plaintiffs have also told us that they are planning to move for leave to amend the complaint.

And defendants, I think, will be opposing that amendment, and then the Court held in your order last week, Your Honor, that the plaintiffs will have to meet the good cause standard. But the relief that we're seeking right now, Your Honor, is to briefly postpone those depositions at least until the defendants have had the opportunity to review the proposed amended complaint.

This is hardly unreasonable. Both of these outside third parties are doctors who addressed complicated statistical analyses. The defendants are going to want to

cross-examine them.  And we're essentially being forced to take depositions without the benefit of seeing the proposed amendment and being able to prepare.

And, you know, what we're really asking for is a short adjournment of these dates so that we can review the proposed amended pleading, discuss it with our client, understand any issues of, you know, clinical trial result interpretation, including statistical issues that are raised. None of that, Your Honor, is going to happen over the Christmas and New Year's holidays when Biogen is effectively shut down.

There's also another issue, Your Honor, that just came to my attention a few hours ago, which is that with respect to Dr. Massie, who is a former FDA statistician, we understand that the FDA has asked the plaintiffs to postpone that deposition.  As a former FDA employee, Dr. Massie's testimony, as the FDA explained it to me, is subject to various regulations, including potential deliberative process issues and confidentiality protections.

And so I just learned a couple of hours ago, Your Honor, that the FDA has asked the plaintiffs, having not -- apparently, the plaintiffs did not advise the FDA that they had noticed this deposition or asked the agency for -- under the *Touhy* regulations to take this testimony. Apparently, the plaintiffs have now been asked by the FDA to

postpone this deposition as well.

So I think, Your Honor, again, our ask is to temporarily postpone these, both of them, until we have an opportunity to review the amended pleading.  The plaintiffs' response to this has been, "We're not postponing.  If you want to take these" --

THE COURT:  Well, let me let the plaintiffs --

MS. SOLOWAY:  Sure.

THE COURT:  What's your response?

MR. HORNE:  Our response is we -- we worked very hard with defendants to schedule these depositions.  We ran, I believe, four dates for Massie's deposition, Dr. Massie's deposition, six dates for Dr. Fleming's deposition.  These were the only dates that defendants could make.  We have gone out of our way to accommodate the defendants.

As to timing, the Court has been very clear that nothing is stayed while plaintiffs are drafting their amended complaint and proposing to file their amended complaint. Defendants took the opposite position with respect to class cert.  I don't know why the Court would reach a different result.

THE COURT:  So -- so let me ask this question: Where are Dr. Massie and Dr. Fleming located?

MR. HORNE:  Dr. Fleming is in Seattle.  Dr. Massie is close to Seattle, a couple hours.

THE COURT:  The reason I ask is I just had a somewhat miserable trial, miserable for the jurors, where everything came in via video depositions.  And I would assume, if these people are not in state, then we're not just defending a deposition, but we are potentially having whatever will or will not be trial testimony; is that right --

MS. SOLOWAY:  That's correct, Your Honor.

THE COURT:  -- since they're not in state, right?  They wouldn't be subject to subpoena.  I mean, you couldn't get them here if they didn't want to come.

MR. HORNE:  They wouldn't be subject to trial subpoena, Your Honor.

THE COURT:  Right.  So when you're taking their deposition, you're not just taking a discovery deposition, but you're potentially taking a deposition that would be used at trial?

MR. HORNE:  That is correct.

MS. SOLOWAY:  Correct, Your Honor.

THE COURT:  Okay.  So here's the question.  I have no idea what it is you're planning to do with your proposed amended complaint, but you are very late in the day, as my somewhat annoyed order made clear.  I'm not really sure I understand why you would think it won't weigh against you in asking to have a new complaint come in if you're completing

these depositions first and then asking to amend a complaint.

So maybe the amended complaint has nothing to do with anything -- I don't know -- with what's going on here, but it would seem like they should have a copy of what it is you're asking to file as an amended complaint before they walk into these depositions, no?

MR. HORNE:  So I appreciate the Court.  I do want to note that we have 2 million pages of relevant documents to review, most of them were produced -- or about a third of which were produced after the deadline for substantial completion.

We're going through those documents.  We're going through them as quickly as we can, and we're drafting the complaint as quickly as we can.  And we don't want to come to the Court twice, so we want to make sure we get it right the first time.

As to the deposition, you know, quite frankly, we don't want to bother these people twice, but their testimony may be relevant to the amended complaint.

THE COURT:  Relevant to what?  Relevant to the current complaint or relevant to the complaint that you haven't told the other side about yet?

MR. HORNE:  With respect, Your Honor, we have disclosed that we will be filing a complaint.

THE COURT:  Right.  But what -- I mean, how can you

ask to take discovery and ask to be allowed to amend a complaint after the discovery takes place when it's all right now in front of you?  I don't understand.

MR. HORNE:  We have documents.  The defendants have not completed their production.  They won't tell us when the production will be completed.

THE COURT:  But, Mr. Horne, let's put it this way: If this deposition takes place, why should I not say, when you want to amend your complaint -- I mean, I may say it's too late anyway and you haven't shown good cause.  But let's assume you could have those hurdles.

Why don't they now have prejudice because you have deposed -- the depositions have taken place and they are only getting the amended complaint after the depositions?  Why isn't that prejudice?

MR. HORNE:  They are free to take the depositions of the witnesses themselves.

THE COURT:  I'm sorry?  You're free to have a second deposition of these witnesses?  Under what rule are they free to have a second deposition of them?

MR. HORNE:  They have served notices of deposition for --

THE COURT:  Yes.  You don't take people's deposition more than once.  Are you saying to me that, under the Rules of Civil Procedure, everybody gets a potshot at a

third party?

MR. HORNE:  I'm telling you that's defendants' position, Your Honor.

MS. SOLOWAY:  No, Your Honor.  What we said to the plaintiffs is we should not disturb third parties in this case by deposing them twice.  And we asked the plaintiffs to agree to adjourn the date.

The only reason we served our own notices, Your Honor, is to protect our right to conduct a cross-examination.  We agree that there should be one deposition and everyone should be permitted to prepare appropriately for it.

MR. HORNE:  Your Honor --

THE COURT:  Are you really saying to these third-party witnesses, "We are going to depose you now, and you will be deposed a second time"?  That's the plan?

MR. HORNE:  We're happy to deal with it by reducing the number of hours and reducing the burden on the witnesses, Your Honor, but this is discovery that is potentially relevant to the amended complaint.

THE COURT:  Wait.  Okay.  So what you're saying is you first want to take the discovery deposition and then amend the complaint?  Is that what's going on here?

MR. HORNE:  We are struggling to -- we are working as fast as we can to put together the amended complaint.  The

amended complaint will include the documents.  If we are able to include matter from the depositions, then, yes, we will include that in the amended complaint, Your Honor.

THE COURT:  Can you -- can you tell me as you sit here today what the good cause is to justify an amended pleading?  Because I don't see it.  I think your chance right now of getting me to grant you leave to amend your pleading is pretty close to zero.  So what is it that makes you think there is a reason in this -- what year is this case from?

MR. HORNE:  Your Honor --

THE COURT:  '21 -- that there is a reason and we've had a deadline that's been passed by more than a year, what -- there's a reason for why we're now going to -- you didn't come back to me and say we need to move that deadline because we don't have information we need.  What's the cause for a late filing?

MR. HORNE:  The cause is we -- the cause is we didn't actually get any documents, any relevant documents until September 2025, which is just shy of the substantial completion deadline.

We have since received approximately 1.8 million pages of documents.  These documents show that defendants were subjectively aware that they were providing information to investors that was misleading, that they were subjectively concerned with it, that they subjectively decided not to

present information because it would, quote, "show data mining."

These documents show scienter for the earlier part of the class period, and there's absolutely no way we could have pled an amended complaint without these documents that defendants are producing, are continuing to produce.  The latest production was about two weeks ago, which included several relevant documents.  We were not able -- we have good cause because we were simply not able to plead the complaint until now.

MS. SOLOWAY:  Your Honor, the schedule that is in place, Your Honor, in this case has substantial completion September 26th and the -- and the fact discovery cut off for all fact discovery as May 15th.

Defendants produced substantial completion on deadline.  We have continued to produce additional documents because plaintiffs have asked us to add additional custodians.  And we have told them that we expect to be -- I would say with the exception of finishing up some privilege logs and some cleanup, we will be done this month.

So there is no -- the defendants have not deviated from the case management order.  We have produced documents at exactly the time that we told the plaintiffs we were going to.

What I hear the plaintiffs saying is that they

would like to discover their way into an amended complaint, and not only through documents, which we are producing on time, but they want to now take depositions to pad their amended complaint that they want to put in without showing it to us before they take the depositions.

I mean, the PSLRA which governs securities cases says -- has a lot to say about this.  You do not discover your way into these claims.  But this is just prejudicial.  This is exactly what the PSLRA is designed to prevent.

We should not be reading, you know, documents and an amended complaint, you know, at this late juncture with an effort to, as we understand it, resuscitate claims that Your Honor dismissed and the First Circuit affirmed dismissal of.

So, again, our request here, I think, is very modest, Your Honor.  It sounds like the FDA has already asked the plaintiffs to put off Dr. Massie's deposition.  I haven't heard from them on that request.

But as to -- as to the other depositions that the plaintiffs have asked for, I think what we're asking for is: Serve your proposed amended complaint.  Give us an opportunity to look at it.  Let's regroup in mid-January. And we can talk about what schedule, if any, makes sense after we've had the opportunity to review what you're proposing to file.

And that is, in our view, the only way to protect the defendants from prejudice that this is otherwise going to cause.

MR. HORNE:  Your Honor, if I may briefly respond to Ms. Soloway, there are several inaccuracies in what she said. They're continuing to produce documents from the initial custodians.  They have not told us that they have completed production from the initial custodians, which include defendants.

THE COURT:  Can I say something on the production of documents?  Maybe I need to start saying this in my initial -- in my initial scheduling conferences.  Lawyers seem to think that the way we do things are rolling productions.  That's not what the rules say.  The rules say you have to give a date for when you're going to have production.

So I think part of this might help if you at some point can now let them know when you're going to have all the documents done.  And any further discovery that happens -- and I would suggest that you do this in all of your cases. If you read the Rules of Civil Procedure, that response that's due in 30 days is supposed to say when the production will happen, not that it's going to start happening on a rolling date.

Because in every single case, what happens is that

people have different expectations of what that means.  But the rules provide that you should have something firm.  And if you don't like what they say, if they say, well, it's going to take us six months to get it, then you can come to me and say that's not fast enough or we need to adjust other dates, or whatever.

But -- at any rate, so at this point, for defendants, you need to let them know when you're going to be done with getting these documents out.

MS. SOLOWAY:  Your Honor, we will --

THE COURT:  If they don't like your answer, they can come back to me, but you need to give them a date.

MS. SOLOWAY:  We will do that, Your Honor.

THE COURT:  You haven't given me a plausible reason for not moving these depositions right now.  Whether there's an amended complaint in the lurch, I am not having you move forward with a third-party deposition so that you can then get the material that you then want to make into an amended complaint.

We have complaints at the beginning of discovery.  We allow for, as the course of discovery is going on, a little bit of changing it around.  We don't say do your whole discovery, and at the end of discovery, give the defendant a whole new set -- new complaint.  That's not the way it works, right?

So if your complaint is close to the end of fact discovery, that's a problem.  And you've got to recognize that, right?  They have the same right to have discovery on the complaint that you think you have to be able to flesh out your complaint.

So you have a discovery period.  If you wanted to amend it based on what you were going to get on discovery, maybe you should have pushed hard to get it earlier; and if you didn't like their pace, you should have come to me earlier.

But I can't see you going now, taking these depositions, asking me to give -- let you have an amended complaint, and then they have two weeks left for discovery in the fact discovery period.  That doesn't work that way.

MR. HORNE:  We understand the Court's ruling, Your Honor.

THE COURT:  Okay.  So these depositions are on hold until we resolve the question of the amended complaint.

MR. HORNE:  Your Honor, if I may clarify, the request from defendants was that the depositions be on hold until we serve an amended complaint.

MS. SOLOWAY:  No.

MR. HORNE:  Is that the Court's ruling?

MS. SOLOWAY:  No.  Just to be clear, our request was that we put the depositions on hold until we have an

opportunity to evaluate the proposed amended pleading.  And then we should meet and confer and talk about what makes sense at that point.  That was our request, Your Honor.

THE COURT:  I think that makes sense.

MS. SOLOWAY:  Thank you, Your Honor.

THE COURT:  So they're on hold.  Serve the proposed amended complaint along with your motion.  File your motion, and as they review it, then decide whether you're going to go ahead and do the depositions, schedule the deposition now, or wait until I allow leave to amend or not.

If the amended complaint has not too much to do with these individuals, then there's no reason to wait for my decision.  But if the amended complaint is straight on what you think these people are going to say, then I think they are probably going to be entitled to know whether this is coming in in an amended complaint or not.

MS. SOLOWAY:  Precisely, Your Honor.

MR. HORNE:  Your Honor, our concern is that there is a May 15th discovery cutoff.

THE COURT:  There sure is.  Yes, there is.  I don't -- I do not know why I got in -- what was the date? This sort of casual, "Oh, by the way, we're thinking that we're going to get around to amending the complaint."  I was flabbergasted by that.

MR. HORNE:  Understood, Your Honor.

THE COURT:  It's a 2021 case.  We set a discovery date.  I'm -- I don't really understand how you think this is supposed to go, that you get to do the entire discovery period, then you amend your complaint?

MR. HORNE:  Your Honor, the proposal was to file the amended complaint as soon as possible.  We understand good cause requires us to account for the time that we spent, and we intend to do that.  But we did not receive any relevant document until September 2025.  We have not had -- this case was on hold.

THE COURT:  Mr. Horne, here's the problem for me:  The fact that you were okay with how -- whatever pace they were going, I'm not sure why that should mean that now I have to -- I don't know that they were right or wrong.  They may well have been slow-walking everything.

But I don't understand why I'm supposed to say, because you didn't move for them to go faster, I now have to suggest that now we're going to go and reopen discovery or extend discovery?  I mean --

MR. HORNE:  Just a point of clarification:  Discovery did not start in 2021.  Discovery started in --

THE COURT:  I understand that.

MR. HORNE:  -- mid-2025.

THE COURT:  Not mid-2025, '24.

MR. HORNE:  2025, Your Honor.

THE COURT:  Are you saying that we've had less than a year of discovery?

MR. HORNE:  That's correct, Your Honor.

THE COURT:  April 4th.  April 8th.

MR. HORNE:  We have had less than a year of discovery, Your Honor.  And that's why we're coming to the Court now.  You know, we -- we were working with defendants to ensure that the production was timely.  We didn't wait a year.  You know, we moved as quickly as we could.  We didn't think it warranted a motion for -- to compel.

THE COURT:  So the part that I'm not -- the part that I'm not sympathetic here, Mr. Horne, is that, as I understand the discovery rules in this case, you don't get discovery in order to have a complaint that states a claim. You have to do that in the first instance.

And so you filed a complaint.  I dismissed it.  You didn't say at that time, "Oh, no, we want to wait it," I don't think, did you?

MR. HORNE:  We did not, Your Honor, because we didn't have --

THE COURT:  Okay.  You could have asked me to amend it.  Instead you said, "No, no.  We're going to appeal."  You came back down on one statement, right?  Everything else I was affirmed on.  And now you're saying, "Okay.  That one statement buys us discovery so that we can now get a case."

I mean, as I see it right now, frankly, I mean, the defendants didn't ask for this, but it seems to me there was a motion for judgment on the pleadings.  There was a request to stay discovery.  I thought initially, oh, no, you can't. And then I went and looked at the rules, and it said nope, you've got to treat it the same.  And so we stayed discovery, right?

MR. HORNE:  That's correct, Your Honor.

THE COURT:  There's a new motion for judgment on the pleadings pending.  The defendants could have walked in and said, "Let's stay discovery."  They haven't, but they could have.

So the idea that you're going to just wait on all your discovery so you can get your correct amended complaint, I don't really see that.

MR. HORNE:  And I don't -- I don't think that's what we're doing, Your Honor.  When we got the documents, we reviewed them.  There are just a lot of documents.  And we are building the complaint as we review the documents.

THE COURT:  I know.  But the point is you're not supposed to be building your complaint from your discovery.

MR. HORNE:  Your Honor --

THE COURT:  I typically set that date, that Rule 15/Rule 16 date a month or two after initial disclosures.  The point is you bring in your complaint.  It

turns out you were some -- really wrong on some of the initial facts that come out.  You amend your complaint.  Now we go forward, go to the races.

The facts come out.  The facts come out.  You know, you're going to say, "No, I want to build my case based on the facts that are coming out"?

MR. HORNE:  Your Honor, I respectfully disagree with the Court's understanding of the law.  The point of the PSLRA is to ensure that there is a case to proceed.  And the First Circuit held that there is a case here.  There's --

THE COURT:  As to one of 25 statements --

MR. HORNE:  There are several --

THE COURT:  -- as to one of them.

MR. HORNE:  There are several appellate court opinions that hold that there's nothing wrong with using discovery, facts learned in discovery, to amend the complaint to bring back portions of it.  I'm happy to -- I don't have the citations off the top of my head --

THE COURT:  Well, you will need to put them in your brief.  I just -- I am telling you I am not -- I am not seeing this as a case that we should be having a new complaint at the end of fact discovery.

And if the defendants were moving too slowly during fact discovery, there was nothing to come back in and say -- I mean, frankly, you didn't even -- the date for moving the

amended complaint has been set, right?  You didn't -- you didn't come back and say, "You know what?  We want discovery.  Oh, and by the way, we're planning to amend the complaint, so I don't know why we have that deadline there.  There hasn't been any discovery.  We think we get discovery before we amend the complaint.  We don't want that deadline."  You didn't come and say that.

MR. HORNE:  We did talk to defendants about it, Your Honor, and they agreed it was a scrivener's error.  We should have gone to the Court, but we did not just sit and do nothing.

THE COURT:  Okay.  That was the deposition issue.  The depositions are stayed for now.  You're going to serve your proposed amended complaint.  You're going to confer.  And then you're going to ask for another discovery conference if you can't reach an agreement about what to do about the depositions.

MS. SOLOWAY:  Thank you, Your Honor.

MR. HORNE:  Yes.

THE COURT:  Okay.  What's the issue about the documents?  Mr. Tarlowe, what's the --

MR. TARLOWE:  I'm sorry, Your Honor.  I was just trying to have the camera fixed so you can actually see my head.

So the document dispute relates to document demands

that the defendants have served on the lead plaintiff, Nadia Shash; a limited liability company called PolyCon Solutions, which is closely affiliated with Ms. Shash, and is the subject of a pending substitution motion where the plaintiffs seek to substitute PolyCon in the place of Ms. Shash; and then a subpoena on nonparty Argentum, which is a company that we understand provides some consulting services to PolyCon Solutions.

The documents that we are seeking through the three sets of demands relate to questions that Ms. Shash herself has put at issue in this case, including representations that have been made to the Court that we believe we are entitled to test through documents; and the requested documents go to the plaintiffs' credibility and adequacy to serve as a fiduciary for the class.

If Your Honor will bear with me, I think it's helpful just to have some context on sort of the impetus for these requests and how we got to where we are today.  This really goes back to the beginning of the case.

In January of 2021, Ms. Shash filed a motion to be appointed lead plaintiff.  As part of that motion, she filed a PSLR certification, a sworn fist certification, in which she purported to identify all of her trading in Biogen during the class period.

There was a contested lead plaintiff process, and

the Court appointed Ms. Shash as lead plaintiff at the conclusion of that process based, in part, obviously, on the PSLR certification that she submitted.

The case then proceeded for 4 years, 4½ years, with everyone being under the understanding -- or at least the Court and the defendants -- on the understanding that Ms. Shash had purchased Biogen stock, had sold Biogen stock, and had incurred losses.

We then -- and as the Court is aware, a lot happened in that 4½-year time period.  There were multiple -- two complaints filed, multiple rounds of briefing. Obviously --

THE COURT:  The whole case moved here from California.  All kinds of things happened.

MR. TARLOWE:  Exactly.  And then in July of this year, 2025, so 4½ years into the case, we learned for the first time that Ms. Shash actually never purchased or sold Biogen stock.  Ms. Shash did not incur any losses.  In fact, this limited liability company, PolyCon Solutions, PolyCon Solutions was the account holder, the entity that traded Biogen stock.

We learn that in July, a few weeks before Ms. Shash's deposition, when the plaintiffs produced her brokerage account statements, which very clearly on their face said "PolyCon Solutions" all over them.

We then took Ms. Shash's deposition. And I should also mention, Judge, that the PSLR certification, in addition to saying that Ms. Shash had traded, which was not true, also omitted entirely Biogen trading during the class period. There was trading on a day in October of 2020. That was entirely omitted, even though the certification stated that it included all of her trades during the class period.

And there were errors in the number of shares, the price. There were multiple errors. But the most significant inaccuracy, in our view, was the failure to disclose that PolyCon Solutions is actually the entity that traded, not Ms. Shash.

So when we learn this in July of this year for the first time, we, not surprisingly, asked questions of Ms. Shash about it during her deposition to try to understand how a false PSLR certification could have been filed.

Ms. Shash was very clear in her deposition testimony that the errors and inaccuracies in the certification, according to her, were entirely attributable to counsel.

She testified during the deposition that the same account statements that we received in discovery that had PolyCon Solutions, she testified in the deposition that she provided those statements to her counsel at the outset of the case, that they created the PSLR certification and the

schedule listing the trades, and that she relied on them to get it right.

After the deposition -- and the Court still -- the plaintiffs at this time still had not notified the Court that Ms. Shash was actually not the party that traded.  But after the deposition, the plaintiffs filed the substitution motion, conceding that Ms. Shash lacked standing.  And they moved to substitute PolyCon in Ms. Shash's place, and that motion is before the Court.

In connection with that motion, plaintiffs made a number of assertions about the PSLR certification, the circumstances underlying it, and how it was that a false PSLR certification came about.  Those -- and just to give the Court a few examples, plaintiffs said in the brief, the substitution brief, PolyCon should have moved for appointment, not Ms. Shash; but due to a miscommunication between Ms. Shash and lead counsel, the error was not caught.

Later in the motion, they write, "Because of a miscommunication between Ms. Shash and counsel, her PSLR certification did not identify PolyCon as the legal entity which purchased Biogen stock.  And counsel did not at the time obtain her account statements."

They go on to say, "The failure to identify PolyCon as the real party in interest was a mere oversight resulting from miscommunication."  So there are a number of assertions

made purporting to explain the reason that an inaccurate and false PSLR certification was filed, but it's not supported by any documentation.  It's not supported by a declaration from plaintiff's counsel and --

THE COURT:  So right now I have this all briefed. I haven't, obviously, gotten myself in a position where I can make a decision on it, but it's all briefed.  And so why do we need more discovery?  Why is it not good enough for me to review this on the papers?

MR. TARLOWE:  Well, a couple of reasons.  One, Judge, the plaintiffs have made these assertions without any supporting documentation.  And we should be -- I think we're entitled to test those.  So one of the categories of documents --

THE COURT:  Well, I assume you've argued in your opposition that they can't just come in and make that without any --

MR. TARLOWE:  Yeah.

THE COURT:  -- supporting it; and I, therefore, should reject it.

MR. TARLOWE:  We have --

THE COURT:  I mean, the fact that I've been slow on getting to resolve the motion isn't really an invitation for more discovery, is it?

MR. TARLOWE:  Well, Judge, a couple of things.

One, we made these requests.  We served these back in October, I believe.

But, also, we think that these are not -- even if we didn't have the substitution motion -- the substitution motion contains the assertions that sort of put these questions at issue; but even absent that, we think these go to important questions about Ms. Shash's credibility and the adequacy of either Ms. Shash or PolyCon to serve as a fiduciary for this class.

And, Judge, I just -- in Ms. Shash's declaration, because there is a declaration from her, there's not one from counsel, but there's one from her, in which she, quite remarkably, just after a couple of weeks of her deposition, expressly contradicted her own deposition testimony.  And her declaration seems to describe specific documents but doesn't attach the documents.  So one of the things we're asking for is those documents.

So she says in the declaration, "I testify that I provided account statements reflecting PolyCon's class period transactions in Biogen stock to counsel at or before the time I moved for appointment as lead plaintiff.  I was mistaken. At or before the time I moved for appointment as lead plaintiff, I provided a listing of Biogen transactions to counsel.  The listing did not indicate that those transactions were made in PolyCon's account."

So we said to plaintiffs we want to see the listing that she provided.  There must have been something that triggered this new recollection just weeks after the deposition testimony where she said something very -- very different from that.  And they've refused.

The other thing we've asked for, the other category of documents is, in the substitution motion, plaintiffs also make an argument that PolyCon is a, quote/unquote, "pass-through entity," that there's no --

THE COURT:  I'm sorry?  A what entity?

MR. TARLOWE:  Pass-through, p-a-s-s-through, a pass-through entity.  And they try to argue there's no real difference between Ms. Shash and PolyCon.  It's the same thing.

But at her deposition, Ms. Shash testified that she intentionally, very deliberately, segregates her assets from the assets of PolyCon.  The reason is to maintain eligibility under the Small Business Administration programs, like the economically disadvantaged business program.  So she testified -- her testimony is inconsistent with the assertions being made in the substitution motion.

And, again, we think we're entitled to test that, not just because it goes to her credibility and adequacy, but because it goes to the financial -- the source of the funds used to make the Biogen trades at issue.  It goes to the

party that actually suffered -- actually incurred loss due to the Biogen trading.

So the financial circumstances of PolyCon and Ms. Shash and the financial relationship between them is relevant to issues that are at the core of the case in addition to her credibility.

We've tried to tailor the request pretty narrowly to get at those issues. We think we've done that. And that's what we're trying to discover. We just don't think that this is particularly burdensome or intrusive. And, you know, she is the plaintiff; and we're entitled to, you know, probe her credibility.

And these -- these are not credibility questions that come out of left field. These are issues that she's put at issue through representations to the Court and defendants. And they're issues that are relevant to core issues in this case, including the party that did the trading and the party that incurred losses.

And, finally, Judge, the last category -- there are sort of three buckets of documents that we're seeking. One -- the first bucket goes directly to the misrepresentations in the PSLR certification and how those came about. The second category goes to -- are these questions of financial relationships between Ms. Shash and PolyCon.

And then the third category, I think, really goes to credibility and adequacy questions. And that category of document demands relates to the Small Business Administration eligibility requirements and certifications that Ms. Shash has made in connection with those eligibility requirements.

And the basis for this is really two main reasons for: This one is credibility and adequacy to serve as a fiduciary for the class; and two is that Ms. Shash, in seeking appointment as lead plaintiff, Ms. Shash sort of touted to the Court that one of her qualifications was she owns this economically disadvantaged business.

Through facts that we've learned at the deposition and in document discovery and, frankly, from the public record mostly, there is very good reason to question -- to have questions about her eligibility and whether she is exploiting the program and --

THE COURT: Let me ask this question: If I grant their motion so substitute, then she isn't the person whose qualifications matter. It's the company. If I deny the motion to substitute, you have a pending motion to -- for judgment on the pleadings because she isn't the appropriate person? Is that right?

MR. TARLOWE: That's right, Judge, yeah.

THE COURT: So aren't you a little bit on a further hunt than -- I mean --

MR. TARLOWE:  Well, I don't think so.

THE COURT:  -- collateral -- people -- I understand when you're sort of close to "What are the representations she made to me?"  But once you start saying, "Well, someone said something in a deposition, and I want to hunt that down because, if there's a credibility issue" -- I mean, you only get so far in that.

MR. TARLOWE:  Yeah.  So two things, Judge.  One, on that, because I think some of the facts are critical here because this is not sort of hunting down, what we're dealing with here is there are very specific requirements that she's aware of.  And, essentially, your income and your net worth have to be below certain levels.

And the requirements are --

THE COURT:  For the small business?  Is that what you're saying?

MR. TARLOWE:  Small business and I think it's economically disadvantaged.  And so, for example, I believe that you have to certify every year that you have a personal net worth of $850,000 or less and a fair market value of all assets of 6½ million or less.  So personal net worth of 850,000 or less, but the business is excluded.

And so the concern we have here is she has been certifying, presumably, that her personal net worth is less than 850,000, but we've determined that she has three -- she

has a Bentley, a Mercedes, a BMW.  She --

THE COURT:  I'm sorry.  It feels a little far afield to me, but let me let plaintiffs respond to this.

MR. TARLOWE:  And, Judge, just let me finish this sentence.  And she just bought a $7.2 million house.

And just to answer your other question, even regardless of how the substitution motion is decided, even if PolyCon were to come in, PolyCon has the same credibility issues and would have to demonstrate adequacy as well.  But I'll stop there.

MR. HORNE:  Your Honor, the problem with Mr. Tarlowe's initial request is we've already agreed to provide anything he's entitled to.  He's asking for --

THE COURT:  I'm sorry; you've agreed to give him anything he's entitled to.  So are you saying what he's asking for he's not entitled to or --

MR. HORNE:  So he wants attorney communications with the client.  We're not going to give him the attorney communications with the client.  We have agreed to give --

THE COURT:  Okay.  Are you giving him -- are you agreeing to give him the stock printouts that happen to be handed from her to you, the --

MR. HORNE:  We've already given him that.

THE COURT:  You are?

MR. HORNE:  We're not giving him the email in which

she sent it to us because --

THE COURT:  Because it was an attachment to an attorney communication?  Is that why?

MR. HORNE:  We've produced the account statements, Your Honor.  We're not --

THE COURT:  You have.  The statement that she attached to the -- to you, you've produced that?  You're just not producing the email?

MR. HORNE:  They've had it since July.  Yes, Your Honor.

MR. TARLOWE:  No, that's not correct.  That's not correct.  We were given an account statement that she says and you guys say in the papers, the plaintiffs say in the papers, is not what plaintiffs' counsel received at the outset of the case.  Nobody has produced to us an email or an attachment to an email that purports to be the communication that Ms. Shash supposedly made to --

MR. HORNE:  If I may, Your Honor, that is an attorney communication to a client.  She submitted trades to us.  We have agreed to provide a privilege log that would list that communication, notwithstanding that it's a communication with litigation counsel.  But that is an attorney-client privileged communication.  Um --

THE COURT:  Did you include -- hold on a second here.  I'm not sure where I would look.

In this account -- in this description from -- that Mr. Soloway -- sorry -- Mr. Tarlowe described of your opposition to their -- or your response to their motion and you said this isn't what happened, this was a mistake of counsel, mistake of communication, did you put those communications at issue?

MR. HORNE:  We don't think we have.  We haven't seen an argument from defendants; we haven't seen any case law from defendants stating that we have.

What we have was a statement at a deposition that was incorrect.  Any correction of that statement, that's -- that doesn't open the door to --

THE COURT:  Okay.  So I can't -- this isn't one I can do here on the fly.  I -- if -- have you served a privilege log?

MR. HORNE:  We have agreed to serve one.  We are negotiating the terms of the privilege log, what exactly to include in it and the timeline for producing it.  We're happy to produce it, you know, promptly.

THE COURT:  So another problem I have with how people do discovery, besides the not giving firm dates of when they're turning things over, the other is not responding as to what you are and are not giving.

So you get a request, and then the person says, "We object because of this, this, and this; notwithstanding these

objections, we're giving you X."  And that leaves the other side not really knowing what it is you're agreeing to give and what is not being agreed to, which makes it sometimes hard to tee up the dispute.

So have you responded yet to these requests for production?

MR. HORNE:  Yes, Your Honor.  We told defendants that all the documents are privileged and so we will not be --

THE COURT:  So you're not giving them anything?

MR. HORNE:  We will be producing a privilege log, but these are attorney communications to clients.

THE COURT:  Okay.  So you're saying everything that they've asked for now, that there's nothing they've asked for now that you're giving them at this point?

MR. HORNE:  That's not correct.  The specific documents Mr. Tarlowe is referencing, those are attorney communications to clients.

THE COURT:  Right.  My question is he says he served this document request on you.  You've just said, "We told him we're not giving him anything."  My question is have you said you're giving him something?

MR. HORNE:  We have said we're giving him something.  We told him we are going to give him documents sufficient to show the ownership of PolyCon Solutions and all

shareholders at all times.

THE COURT:  Okay.  So that's not -- what I think you need to do here -- I haven't seen their document request, but so let me give you an example:  Somebody wants three years of records.  You say, "That's overbroad, but I'll give you these 20 records."  That leaves the other side not knowing.

So if you're saying, "I'm going to just give you the things that prove a certain point," that's not the way discovery works.  I'm assuming that's not what you're saying.

But if you're saying, "I'm giving you everything that isn't covered by the attorney-client or attorney work product privilege from the time period X to Y," then at least he knows what it is you're giving him or what it is you're not giving him.  So that might be helpful to tee this up.

Because if you're giving him -- the question isn't giving him what could prove the version of this that you want.  The question is giving him what he's entitled to that's not privileged and to make him understand what it is that he did get or didn't get.  And then as to what he didn't get, you need to do a privilege log.

MR. HORNE:  I understand, Your Honor.  And when we say we're going to produce documents sufficient to show the ownership at all times, you know, we know what those documents say, but we're going to produce documents that

would contradict it if there were a contradiction.

THE COURT:  When you say -- I guess you're -- I guess you're confusing me.  Did he ask you for the documents sufficient to show ownership?

MR. HORNE:  Well --

THE COURT:  Is that the request?

MR. HORNE:  I mean, one problem we're having is he asked for a lot of things.  He asked for four years' worth of tax returns.  He asked for every communication she's ever had with --

THE COURT:  Okay.  So my point is that maybe we can avoid some of this fight if you are clear in what it is you are giving him and what it is you are not.  And I haven't seen what your response is.  I'm just going from what people typically do.

What people typically do is they say, "We're objecting on X grounds, and we're handing you Y."  And that doesn't allow the person to understand what the parameters are and is it something that we need to fight about or not.

So there may be disagreement about what they're giving you, but there may not be a disagreement worth having a fight or there may.  But you need to be clear what it is you're giving and not giving.  And to say, "I'm giving you what is needed to prove ownership," that sure isn't an answer.

MR. TARLOWE:  Thus far, that's the only thing that they have agreed to provide us.

MR. HORNE:  Your Honor, they're asking for specific documents.

THE COURT:  Okay.

MR. HORNE:  They're asking for four years' worth of tax returns.

THE COURT:  Okay.  And what's your -- let me just stop you for a minute.  What's your answer on four years' worth of tax returns.

MR. HORNE:  Completely irrelevant.  They have no --

THE COURT:  Okay.  "We're not giving you any.  It doesn't matter that it's four years or one year or two months.  We're not giving you any," is your answer.  So that's very clear.

MR. HORNE:  That's what we told them, Your Honor.

THE COURT:  And you're saying that based on relevance grounds?

MR. HORNE:  We're saying that based on relevance and burden grounds, Your Honor.

THE COURT:  Okay.

MR. HORNE:  They didn't even ask for the one document, the one year of tax returns that would actually be relevant to their case.  Ms. Shash made the statement in January 2021.  The latest tax returns available were 2019.

They didn't even ask for those.  They said 2020 to 2024, which were not covered by her statement.

THE COURT:  Because she didn't know that she hadn't filed tax returns?  Is that why?

MR. HORNE:  No.

THE COURT:  They didn't ask for the right ones?

MR. HORNE:  She made the statement.  The statement they're complaining of is a statement that she made in January 2021.  She hasn't filed the 2020 through 2024 tax returns.

THE COURT:  All right.  So this is a level of detail I can't get into right now.  But I am just begging you to tee this up in a way that isn't just "How do I help my position?" but is actually "What do the rules of discovery require?"

And I believe, maybe I'm the only person in the world who believes this, but I believe when someone asks you something, you need to explain to them what you're giving them and what you're not giving them so they understand where the fight is.  So if you're doing that, then we can at least have a teed-up fight.

If you haven't done that, if your answer doesn't meet them 100 percent everything they've asked for, you either need to say:  "I'm giving it to you" or "I'm not giving it to you; and if I'm not giving it to you, here's why

I'm not giving it to you."  That's what you need to do.  You can't just say, "I'm not giving you everything, but here are three pieces of paper."  You can't do it.

MR. HORNE:  Your Honor, we have provided that information.

THE COURT:  Okay.  Then I expect I'll probably see a motion to compel, and we'll figure out whether it's there or not.  I can't decide this as it stands.

I -- I don't appreciate defendants, if they're going on a far-off witch hunt, you know, any person because they're in litigation has their entire life turned upside down, I don't really appreciate that; on the other hand, the closer it is to all of this, the more likely they're going to get it.

MR. HORNE:  We understand, Your Honor.

THE COURT:  Okay.  I don't think I've helped too much other than the upcoming depositions are off the calendar and -- for right now.  And on this document issue, I don't think I can help you except to say I don't think I'm able to help you resolve it.  It maybe needs to be teed up with a motion.

MR. TARLOWE:  Understood.  Thank you, Your Honor.

MR. HORNE:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else?

MR. TARLOWE:  No, Judge.

THE COURT:  Okay.

MR. HORNE:  I did want to clarify --

THE COURT:  Sure.

MR. HORNE:  -- has the Court instructed defendants to provide a date certain by which they will complete production?

THE COURT:  I've instructed the defendants to give you a date certain.  I haven't told them -- asked them to tell me what it is.  I've asked them to give you a date certain.  And once they give you a date certain, if it's a date that's a problem, then I anticipate you're going to be complaining about it.

But I think, in all discovery -- and same thing for you, the plaintiffs, on this document request that they have to you.  If there's anything you have said you're giving them, it isn't enough to just say, "I'm going to give it to you."  There has to be a date.  That's the way I read the rules, and I may be wrong, but that's the way I see them.

MR. HORNE:  Thank you, Your Honor.

THE COURT:  Okay.  We're in recess.

(Court in recess at 3:54 p.m.)

43

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 21st day of December, 2025.


/s/ Robert W. Paschal
_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter