**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br>    v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN,<br><br>          Defendants. | CASE No.: **1:21-cv-10479-IT**<br><br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** |

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................... 1

II.     FACTS ......................................................................................................................... 1

III.    ARGUMENT ................................................................................................................ 4

   A.    The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23 ....... 4

      1.    The Rule 23(a) Requirements are Satisfied .............................................................. 4

         a.    The Proposed Class is So Numerous that Joinder is Impracticable ..................... 4

         b.    There Are Common Questions of Law and Fact .................................................. 4

         c.    Plaintiffs' Claims Are Typical of the Class .......................................................... 5

         d.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ............. 7

   B.    The Requirements of Rule 23(b)(3) Are Satisfied ...................................................... 10

      1.    Common Questions of Law and Fact Predominate ................................................. 10

IV.    PLAINTIFFS DEMONSTRATE PRICE IMPACT ..................................................... 10

   A.    The Supreme Court Has Set a High Bar for Proving Absence of Price Impact ....... 10

   B.    The All Data Statement had Front-end Price Impact Because it Prevented a Stock
         Price Decline ............................................................................................................. 11

      1.    The All Data Statement Need Not Have Caused an Immediate Price Increase for it
            to have had a Price Impact ....................................................................................... 11

      2.    Biogen's Share Price Increased on October 22, 2019 When Biogen Disclosed it
            Would Seek FDA Approval Based on the High Dose Thesis. ................................. 12

      3.    The All Data Statement Prevented a Stock Price Decline ....................................... 12

      4.    The Materiality of Biogen's Misstatement Supports a Finding of Price Impact ... 13

      5.    Market Commentary Confirms the Subgroup Data's Materiality and Supports
            Price Impact ............................................................................................................. 14

      6.    A Truthful Substitute Would Have Caused a Decline in Biogen's Stock Price. .... 15

7.    The Analyst Reports between July 22, 2020 and Nov. 4, 2020 Did Not Disclose the Sub-Group Analyses Were Inconsistent with the Dosage Thesis ............................ 18

C.    The Massie Report Shows Backend Price Impact ........................................................ 20

1.    There is No Mismatch Between the All Data Statement and the Massie Analyses 20

2.    The Complexity of the Briefing Materials Required Multiple Days to Process Fully ................................................................................................................................ 23

3.    Dr. Tabak Provides Strong Evidence of Price Impact on November 4-5 ............... 25

4.    Dr. Hubbard's Opinion that the Nov. 5 Stock Price Declines are Volatility Caused by the Massie Report but are Not Evidence of Price Impact Mischaracterizes What "Volatility" Is ........................................................................................................... 26

5.    The Purportedly Unrelated Portions of the Massie Report Do Not Negate Price Impact ..................................................................................................................... 28

6.    There is Strong Evidence of Price Impact on Nov. 9 ................................................. 29

V.    DR. TABAK'S PRELIMINARY DAMAGES MODEL SATISFIES *COMCAST*'S MODEST REQUIREMENTS ........................................................................................... 34

VI.    CONCLUSION .............................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ................................................................... 23, 24, 25, 27

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................................................ 10

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
    568 U.S. 455 (2013) ............................................................................................................. 4, 29

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) .................................................................................................... 7

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ............................................................................................... passim

*Baker v. Equity Residential Mgmt., L.L.C.*,
    390 F. Supp. 3d 246 (D. Mass. 2019) ................................................................................... 34

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................................... 10

*Corcoran v. CVS Health*,
    2019 WL 6250972 (N.D. Cal. Nov. 22, 2019) ........................................................................ 6

*Cross v. 21st Century Holding Co.*,
    2002 WL 31158901 (S.D.N.Y. Sept. 27, 2002) .................................................................... 24

*Dahhan v. OvaScience, Inc.*,
    2020 WL 2602138 (D. Mass. May 8, 2020) ..................................................................... 7, 10

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) ..................................................................... 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804, 807 (2011) ...................................................................................................... 35

*Ferris v. Wynn Resorts Ltd.*,
    2023 WL 2337364 (D. Nev. Mar. 1, 2023) .......................................................................... 22

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ............................................................................................. 12

*Fogarazzo v. Lehman Bros.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ................................................................. 23

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ..................................................................... 19

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ............................................................. 13, 20, 23, 30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ..................................................................... 7, 10, 30

*Homyk v. ChemoCentryx, Inc.*,
2025 WL 1547625 (N.D. Cal. May 30, 2025) .................................... 31, 32

*In re Acadia Healthcare Co., Inc.*,
2023 WL 3620955 (6th Cir. May 23, 2023) ............................................ 27

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) .................................................................... 11

*In re Allstate Corp. Sec. Litig.*,
2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) .......................................... 29

*In re AVEO Pharms., Inc. Sec. Litig.*,
2017 WL 5484672 (D. Mass. Nov. 14, 2017) .................................. 4, 5, 30

*In re Bos. Sci. Corp. Sec. Litig.*,
604 F. Supp. 2d 275 (D. Mass. 2009) ................................................... 4, 5

*In re Concho Res., Inc.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ........................................... 15

*In re EQT Corp. Sec. Litig.*,
2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ......................................... 27

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ......................................... 31

*In Re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) .................................................................. 34

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .......................................... 22

*In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*,
    2009 WL 2855601 (D.N.J. Sept. 2, 2009) ................................................................ 23

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023)........................................................... 22

*In re Sepracor Inc.*,
    233 F.R.D. 52 (D. Mass. 2005) ........................................................................... 6, 9

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019)............................................................ 34

*In re Solar City Corp. Sec. Litig.*,
    2017 WL 363274 (N.D. Cal. Jan. 25, 2017) .............................................................. 8

*In re Vaxart, Inc. Sec. Litig.*,
    738 F. Supp. 3d 1259 (N.D. Cal. 2024) .................................................................. 34

*In re Vaxart, Inc. Sec. Litig.*,
    759 F. Supp. 3d 1015 (N.D. Cal. 2024) .................................................................. 34

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ................................................................... 11, 16, 21

*In re Waste Mgmt. Sec. Litig.*,
    775 F. Supp. 3d 742 (S.D.N.Y. 2025) ..................................................................... 11

*Jaeger v. Zillow Grp., Inc.*,
    2025 WL 2741642 (9th Cir. Sept. 26, 2025).......................................................... 21

*Kirby v. Cullinet Software, Inc.*,
    116 F.R.D. 303 (D. Mass. 1987) ............................................................................. 7

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................. 31

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    2014 WL 6661918 (N.D. Ala. Nov. 19, 2014) ......................................................... 22

*Luna v. Carbonite, Inc.*,
    2023 WL 4539855 (D. Mass. July 14, 2023).................................................... 33, 35

*Massachusetts Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013) ................................................................................. 21

*Mauss v. NuVasive, Inc.*,
  2017 WL 1080654 (S.D. Cal. Mar. 22, 2017)............................................................ 10

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019)............................................................................... 27

*New England Carpenters v. DeCarlo*,
  122 F.4th 28 (2d Cir. 2023)....................................................................................... 21

*Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*,
  348 F.R.D. 268 (D. Mass. 2025)............................................................................10, 11

*Pelletier v. Endo Int'l PLC*,
  338 F.R.D. 446 (E.D. Pa. 2021)................................................................................. 31

*Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020)........................................................... 35

*Ramirez v. Exxon Mobil Corp.*,
  2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)........................................................... 27

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)....................................................................................... 34

*Roller v. Collins*,
  373 So. 3d 35 (Fla. Dist. Ct. App. 2023) .................................................................... 9

*S. Ferry LP No. 2 v. Killinger*,
  271 F.R.D. 653 (W.D. Wash. 2011)............................................................................. 9

*San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*,
  2025 WL 2176586 (3d Cir. July 30, 2025) ..................................................... 19, 21, 32, 33

*Shash v. Biogen, Inc.*,
  84 F.4th 1(1st Cir. 2023) ..................................................................................... passim

*Shupe v. Rocket Cos.,Inc.*,
  752 F. Supp. 3d 735 (E.D. Mich. 2024) ..................................................................... 23

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ........................................................... 23

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  2025 WL 2554474 (S.D.N.Y. Sept. 4, 2025) ..................................................... 15, 19, 29, 33

*Tutor Perini Corp. v. Banc of Am. Sec. LLC,*
   2013 WL 5376023 (D. Mass. Sept. 24, 2013) ........................................................................ 31

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown*
   *Caliber Serial No. LW001804,*
   822 F.3d 136 (3d Cir. 2016) ....................................................................................................... 9

*Vrakas v. United States Steel Corp.,*
   2019 WL 7372041 (W.D. Pa. Dec. 31, 2019) ......................................................................... 10

*Waggoner v. Barclays PLC,*
   875 F.3d 79 (2d Cir. 2017) ...................................................................................................... 33

*Water Island Event-Driven Fund v. MaxLinear, Inc.,*
   2023 WL 8812875 (S.D. Cal. Dec. 20, 2023)........................................................................... 6

*Willis v. Big Lots, Inc.,*
   242 F. Supp. 3d 634 (S.D. Ohio 2017)....................................................................................11

*Willis v. Big Lots, Inc.,*
   2017 WL 1734224 (S.D. Ohio May 4, 2017) ......................................................................... 12

## <u>Rules</u>

Federal Rule of Civil Procedure 23 ................................................................................. 4, 5, 7, 8

## <u>Other Authorities</u>

76 Am. Jur. 2d Trusts § 3 ................................................................................................................. 9

Restatement (Third) of Trusts § 2 (2003) ....................................................................................... 9

## I.    <u>INTRODUCTION</u>[1]

Courts, including the Supreme Court and First Circuit, acknowledge that securities cases are ideally suited for class treatment. Here, common evidence proves falsity, scienter, and loss causation, while the fraud-on-the-market presumption establishes common reliance. The Court should certify a Class consisting of:

> All persons and entities, other than Defendants and their affiliates, who purchased publicly traded Biogen Inc. securities between July 22, 2020 and November 6, 2020, inclusive.[2]

The Court should also appoint PolyCon Solutions LLC and Nadia Shash, its sole managing member, Amjad Khan, and Albert Aftoora as Class Representatives, and appoint "Lead Attorneys" Laurence M. Rosen, Jonathan Horne, Brian B. Alexander, Joshua Baker, and Sara Fuks of The Rosen Law Firm, P.A. as Class Counsel. Having diligently navigated four years of litigation—including three complaints, an appeal, remand, and discovery—Plaintiffs and Counsel meet all certification requirements.

## II.    <u>FACTS</u>

Biogen, Inc. ("Biogen") staked its future on aducanumab, a drug intended to slow Alzheimer's progression. ¶3. Biogen's dual Phase 3 trials, Study 301 (ENGAGE) and Study 302 (EMERGE) were declared futile in March 2019 because they were unlikely to succeed, based on patient data as of December 2018. ¶¶4-5. Following the futility declaration, Biogen analyzed the data—including results accumulated after it declared futility—and claimed Study 302 showed a statistically significant reduction in disease progression, proving efficacy. ¶¶ 118, 141, 150, 341.

---

[1] Citations to "¶_" are to paragraphs of the [Proposed] Third Amended Complaint, Doc. No. 140-3. For all citations, unless otherwise noted, ***all bold and italicized emphases are added.***

[2] Excluded from the class are Defendants, all officers and directors of Biogen, their immediate family members and any entity over which an excluded person exercises control or owns more than 10%.

They admitted Study 301 failed but attributed this to a mid-trial protocol modification increasing the maximum dose for "Carriers" (patients with a gene predisposing them to side effects) from 6mg/kg to 10mg/kg. ¶149. Biogen explained Study 301 recruited faster than Study 302, leaving fewer Study 301 patients with the opportunity to receive the full 10mg/kg regimen. ¶¶99-100, 150.

On October 22 and December 5, 2019, Defendants presented these findings, asserting Study 302 was successful and claiming the high-dose subgroup in failed Study 301 also showed statistically significant benefits and asserting a direct correlation between higher doses, plaque removal, and positive clinical outcomes. ¶¶140-42, 150, 199. Ordinarily FDA will not approve a drug if one of two Phase III trials fail. Biogen explained away the poor Study 301 results by positing that 6mg/kg was an insufficient dose. Biogen claimed Study 302 patients received enough aducanumab and thus saw good results, while Study 301 patients did not, resulting in poor results. Biogen claimed this "Dosage Thesis" demonstrated Aducanumab worked. ¶¶141, 173-83; Hubbard Depo. Tr., Doc. No. 209-1 at 66-68 (65:15-67:11). This caused an immediate increase in Biogen's share price. Stock Chart, Horne Decl. Ex. 10, Doc. No. 209-10. Then, on a July 22, 2020 conference call, in response to an analysts' question as to the quality of the data analyses supporting the Dosage Thesis, Defendant Sandrock stated:

> We believe that data from ENGAGE – that ***portions*** of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE. And then I'll say in also PRIME, … on the highest dose, there was an effect on MMSE as well as CDR sum of boxes. And again, very similar that the lower doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***

July 22 T'script, Horne Dec. Ex. 5, Doc. No. 209-5 at 14. ("All Data" statement).

The "All Data" statement was critical because it reinforced and validated the "Dosage Thesis" on which FDA approval hinged. But Sandrock's claim that All Data were consistent with

the Dosage Thesis was contradicted by facts he knew but did not disclose: (1) In Study 302, Carriers treated *before* the switch from 6mg/kg to 10mg/kg showed **better** results than those who received 10mg/kg, ¶¶159-60; (2) Non-Carriers, who received 10mg/kg from inception, saw **no benefit** in either trial, ¶¶152-53; (3) There was **no meaningful correlation** between plaque removal and clinical results. ¶207. Thus, Sandrock falsely validated the Dosage Thesis.

The FDA scheduled an external Advisory Committee ("AdCom") meeting for aducanumab on Nov. 6, 2020. ¶¶259-61. On Nov. 4, 2020, the FDA publicly released briefing materials. ¶¶265-71. The materials were almost entirely favorable; a joint Biogen-FDA brief and a clinical review claimed Study 302 provided "highly persuasive" evidence of effectiveness. ¶266, ¶271. Biogen's stock price immediately soared to $355.63. ¶278. An analyst noted, "[f]irst pass of briefing docs suggest FDA has constructive view – this changes everything." ¶277. Yet, the briefing package appended a dense, technical report from FDA statistical reviewer Tristan Massie. ¶273. The Massie Report found the "totality of the data does not seem to support efficacy of the high dose" citing the discrepancy between Study 301 and Study 302 6mg/kg subgroups, the lack of benefit for patients who always received 10mg/kg, and the absence of any correlation between plaque removal and positive clinical results. ¶¶277-78.

While the market quickly absorbed the FDA's positive commentary, the Massie Report's technical complexity and a prominent "DRAFT" watermark undercut its perceived reliability and delayed its market assessment. Initial analyst reports either ignored or gave little credit to the report. ¶273. One analyst initially called the materials a "landslide win" but a day later published a second report observing that the statistician "essentially annihilated the pro-aducanumab position." ¶277(b). Another analyst first published a report titled "To Be Brief … the FDA Wants to Approve Adu," but later published a second report noting the "eye opening" conflict of opinions

3

between FDA reviewers and their statisticians, specifically pointing out that the statistician's report conflicted with Biogen's hypothesis about the necessity of high dosing. ¶277(a), ¶234(b). As market participants slowly began to incorporate the Massie Report's analysis, Biogen's stock price fell to $328.90 on November 5. ¶279. The AdCom met on November 6, halting Biogen stock trading. In a public discussion, experts found the Massie Report reliable and persuasive, leading to a nearly unanimous vote that Biogen had not demonstrated aducanumab's efficacy. When trading resumed on November 9, Biogen's stock price plummeted, closing at $236.26. ¶294.

## III.   ARGUMENT

### A.   The Class Should Be Certified Pursuant to Federal Rule of Civil Procedure 23

To obtain class certification, Plaintiffs must satisfy Rule 23(a)'s four prerequisites—numerosity, commonality, typicality, and adequacy—plus one of Rule 23(b)'s categories. *In re Bos. Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 279-80 (D. Mass. 2009). Merits issues may be considered only to the extent they bear on whether Rule 23 is satisfied. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013).

#### 1.   The Rule 23(a) Requirements are Satisfied

##### a.   The Proposed Class is So Numerous that Joinder is Impracticable

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Numerosity may be inferred where millions of shares are outstanding and transactions number in the millions during the class period. *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *3 (D. Mass. Nov. 14, 2017). Biogen shares traded on NASDAQ during the Class Period, with more than 2.5 million shares traded weekly. Doc. No. 171-1 at ¶¶16-17, 86. Joinder of all class members is therefore impracticable.

##### b.   There Are Common Questions of Law and Fact

Commonality exists where there are "questions of law or fact common to the class." *AVEO*,

2017 WL 5484672, at *4. In securities class actions, commonality is satisfied when the allegedly misleading statements were made to all class members. *Id.* The core issues here—whether Defendants made a false statement, with scienter, and caused investors' losses—are common to the Class and readily satisfy Rule 23(a)(2).

### c.    Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) requires that the representatives' injuries arise from the same course of conduct and rest on the same legal theories as the class. *Boston Scientific*, 604 F. Supp. 2d at 281–82. Typicality is satisfied here because all class members purchased stock inflated by the All Data statement and were harmed when later disclosures corrected the misstatement and Biogen's share price declined. *AVEO*, 2017 WL 5484672, at *4.

Defendants recycle the argument this Court previously rejected that Ms. Shash's purchases on Nov. 4 and Mr. Khan's[3] on Nov. 5 were made *after* the corrective disclosure. The Massie Report continued to be incorporated into Biogen's share price on Nov. 5 and beyond. Hubbard Depo. Tr., Ex. 1, Doc. No. 209-1 at 318 (317:9-15); Report of Plaintiff's Expert David Tabak, Ex. 1, Doc. No. 171-1, 36-37 ¶¶71-74; Tabak Reply Report, Ex. 3, Doc. No. 209-3 at 43 ¶90. The Court previously held that Mr. Khan was entitled to a presumption of reliance for shares purchased on Nov. 5 because he purchased the shares during the Class Period as the Complaint "'plausibly established that Biogen's stock price dropped after Massie's report revealed the company's misstatements' despite the 'gap in time separat[ing] the price drop from the corrective disclosure.'" Order, Doc. No. 163 at 11 (*quoting  Shash v. Biogen, Inc.*, 84 F.4th 1, 21-22(1st Cir. 2023)). Dr. Tabak opined that Biogen's share price declined statistically significantly during the Nov. 5 trading day as a result of the Massie Report. Doc. No. 171-1 at 36 ¶¶71-72. Biogen's trading volume on

---

[3] Mr. Khan sold his shares on Nov. 9 for a loss of $92.49 per share. PSLRA Certification, Ex. 2, Doc. No. 42-2. Thus, Mr. Khan suffered damages just as every other class member did.

November 4 and 5 was extraordinarily large, equivalent to 20 trading days of the Class Period, showing thousands of class members purchased on those days. Report of Defendants' Expert Dr. Glenn Hubbard, Doc. No. 189-1 at 34-35, ¶¶74, 76 n.114. This is not an individualized reliance defense. All class members purchasing on Nov. 5 are in the same position and must prove the same facts showing they were damaged. *Water Island Event-Driven Fund v. MaxLinear, Inc*., 2023 WL 8812875, at *6 (S.D. Cal. Dec. 20, 2023) (purchasers on last day of class period are not atypical, particularly given high trading volume that day). *See Corcoran v. CVS Health*, 2019 WL 6250972, at *5 (N.D. Cal. Nov. 22, 2019) (plaintiffs not atypical where some other class members are subject to the same defense).

Defendants also attack Khan's typicality, claiming he purchased shares because the price was "trending down" and he thought it might go back up. First, Defendants are wrong on the facts. Khan testified 3 times that he did not remember why he bought Biogen; his testimony that he may have bought Biogen stock because of its price trend is speculation. See Khan Dep. Tr., Doc. No. 189-4 at 18 (65:13-25), at 31 (114:1-22), at 36 (136:6-19). Second, that he may have purchased shares in the hope their price would increase is not atypical of class members. That's the main reason shareholders buy stock. *Corcoran*, 2019 WL 6250972, at *5 (plaintiffs not atypical where some other class members are subjected to same defense).

Defendants attack Mr. Aftoora's typicality since he didn't sell his Biogen shares as soon as learned of the Massie Report because he "really wanted [aducanumab] to work" and "hope[d]" the stock price would rise following the AdCom vote. Aftoora Depo. Tr., Doc. No. 189-5 at 74 (288:20–289:19), at 76 (294:16–21). Again, this argument would apply to every shareholder that didn't sell their shares on Nov. 5 and doesn't defeat typicality. *In re Sepracor Inc.*, 233 F.R.D. 52, 56 (D. Mass. 2005) (maintaining position in stock after corrective disclosure doesn't render

plaintiff inadequate). Defendants' argument underscores that market participants had not yet fully appreciated the negative implications of the Massie Report and it wasn't until the AdCom discussion and vote did the market fully incorporate its significance.  Defendants also fault Mr. Aftoora for doing stock research to find undervalued stocks. Doc. No. 189-5 at 67-68 (261:20–262:4), at 68 (262:23–263:11), at 69-70 (269:11–270:9). But every value investor is looking for undervalued stocks.  That doesn't make an investor atypical. *See Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 273 (2014) ("Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information."). Courts in this Circuit have repeatedly held that plaintiffs "rel[y] on the price of…stock to reflect accurately information disseminated in the market" regardless of their trading strategy. *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 308 (D. Mass. 1987) ("investment strategy is of little importance to ... suitability as a class representative.").

### d.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Adequacy under Rule 23(a)(4) requires that the representatives' interests do not conflict with the Class and that chosen counsel is well qualified.[4] *Dahhan v. OvaScience, Inc.*, 2020 WL 2602138, at *4 (D. Mass. May 8, 2020) (*quoting Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985)). Plaintiffs' interests align with the Class because they recover only if the Class's claims are proven. Plaintiffs also have submitted declarations affirming their understanding of the complaint's allegations, their fiduciary duties to the class, and their willingness to fulfill those duties, including being deposed and attending trial. Plaintiffs' Declarations, Exs. 2-4, Doc. Nos. 171-2 at 4-5 ¶¶15-22, 171-3 at 4 ¶¶13-20, and 171-4 at 3-4 ¶¶12-19. Adequacy is thus satisfied.

---

[4] Lead Attorneys are experienced in securities class actions. See Declarations of Counsel, Exs. 5-9, Doc. No. Nos. 171-5, 171-6 at 3 ¶¶4-6, 171-7 at 3 ¶¶3-5, 171-8 at 3 ¶¶3-5, 171-9 at 3 ¶¶3-5.

Defendants assert that Ms. Shash and PolyCon Solutions LLC ("PolyCon") are inadequate because: (i) she purchased her shares through PolyCon, her wholly owned limited liability company, and thus her PSLRA certification form should have been signed by PolyCon instead of her, (ii) she understated her losses in Biogen stock by $640,885 by omitting the purchase of 6,134 shares on Nov. 5 and their later sale, and (iii) omitted the purchase and sale of 981 shares on October 9, 2020 resulting in a $773 profit. Memorandum of Law, Doc. No. 195 at 12. First, PolyCon is a limited liability company wholly owned by Ms. Shash and she is the sole managing member. Shash Depo. Tr., Ex. B, Doc. No. 189-3 at 31 (30:1-25). It is a pass-through entity for which all of the profits and losses are passed through and attributed to Ms. Shash.[5] Thus, Ms. Shash ultimately suffered the losses from these stock purchases. Moreover, she made the decision to purchase the shares and executed the transactions. 189-3 at 49-50 (48:17-49:3). As its sole managing member, Ms. Shash is the only person who can act for PolyCon. She appeared at deposition and Defendants obtained a full day of testimony. Substituting PolyCon for Ms. Shash doesn't alter the conduct of the litigation. Its purely a formality.

Second, there is no evidence that Ms. Shash's mistake was anything but innocent. She had no motive to conceal that her purchases were made in PolyCon's name. Nor would Ms. Shash have any motive to understate her losses as that would reduce her chances of being appointed lead plaintiff and reduce the amount of any damage award. *See In re Solar City Corp. Sec. Litig.*, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) (finding no motive to understate losses and "[m]ultiple district courts have held that 'minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement.'"). As soon as the errors were detected, Ms.

---

[5] https://www.irs.gov/businesses/small-businesses-self-employed/single-member-limited-liability-companies

Shash filed an amended PSLRA certification (Doc. No. 181) and filed a motion to substitute PolyCon as the plaintiff (Doc. No. 184). *See In re Sepracor Inc.*, 233 F.R.D. at 56 (omission of trades in PSLRA Certification and omission of prior lawsuits did not show inadequacy). The Court should disregard these harmless errors. *S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 660 (W.D. Wash. 2011) (PSLRA certification errors were harmless and do not render plaintiff inadequate).

Defendants similarly attack Mr. Aftoora's adequacy because he purchased his shares through the Albert Aftoora Living Trust,[6] for which he is the sole trustee and beneficiary. Under the law, "a trust is not an entity distinct from its trustees, nor is it capable of legal action on its own behalf." *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 140 (3d Cir. 2016) (citing 76 Am. Jur. 2d Trusts § 3 (citing Restatement (Third) of Trusts § 2 (2003))). "Florida law has long recognized that it is generally the trustee, and not a beneficiary, who is the real party in interest with authority to bring an action on behalf of the trust." *Roller v. Collins*, 373 So. 3d 35, 40 (Fla. Dist. Ct. App. 2023).[7] Mr. Aftoora is the appropriate and necessary person to serve as plaintiff on behalf of the trust.[8] Last, Defendants fault Mr. Aftoora for signing his declaration that stated "The FAC was amended because lead counsel discovered new evidence" without having "firsthand knowledge" of the specific amendments. Doc. No. 189-5 at 86 (335:6–16). Defendants are absurd to suggest that a plaintiff needs to review a redline of the complaint. He testified he reviewed the amended complaint before it was filed. Doc. No. 171-4. That is sufficient.

---

[6] Mr. Aftoora lives, and the trust situs is, in Florida. Doc. No. 189-5 at 5 (10:9-12), at 87 (339:12-14).

[7] See https://www.floridabar.org/public/consumer/pamphlet028/ for a description of Florida trust.

[8] Defendants also repeat their argument from the Motion to add Additional Plaintiffs that Aftoora's loss is not large enough (citing the same outlier cases) but cite no authority showing the result on class certification should be any different than the Court's earlier decision. Doc. No. 163 at 20-21.

Defendants assert that plaintiffs have ceded control of the case to their counsel. Not true. Plaintiffs filed declarations attesting that they reviewed the amended Complaints and understand the nature of the securities claims and their factual basis and their roles and duties as class representatives, and that they are willing to monitor and work with counsel to achieve an optimal result for class members. Doc. No. 171-2 to 171-4. "The identical declarations of [plaintiffs], prepared by counsel, establish their competency to serve as class representatives. *Mauss v. NuVasive, Inc.*, 2017 WL 1080654, at *3 (S.D. Cal. Mar. 22, 2017). *See also Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *6 (W.D. Pa. Dec. 31, 2019) (similar plaintiff declarations corroborated by deposition testimony proved adequacy).

## B.    The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires predominance and superiority, both of which are met.

### 1.    Common Questions of Law and Fact Predominate

Predominance is "readily met" in securities fraud cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Reliance may be proven on a class-wide basis through the fraud-on-the-market presumption recognized in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988). *OvaScience*, 2020 WL 2602138, at *5. Defendants' expert Dr. Hubbard admits the market for Biogen shares was efficient. Doc. No. 209-1 at 6-7 (5:7-6:1). He replicated Dr. Tabak's market efficiency analysis (Doc. No. 171-1 at 7-30 ¶¶12-57) and reached the same results—entitling plaintiffs to the fraud on the market presumption of reliance. *Halliburton II*, 573 U.S. at 268.

## IV.    <u>PLAINTIFFS DEMONSTRATE PRICE IMPACT</u>

### A.    The Supreme Court Has Set a High Bar for Proving Absence of Price Impact

To rebut the presumption of reliance, Defendants must prove the misrepresentation had ***no impact at all*** on Biogen's share price. *Halliburton II*, 573 U.S. at 279. *See Oklahoma Firefighters Pension & Ret. Sys. v. Biogen Inc.*, 348 F.R.D. 268, 285–86 (D. Mass. 2025) (noting defendants

face a daunting burden). Price impact can be shown at *either* the time of the misstatement or the time of a corrective disclosure. *Oklahoma Firefighters*, 348 F.R.D. at 285 (analyzing price impact at the front-end and back-end). Sandrock's misstatement had a price impact both on July 22, 2020 when he made it, and on November 4-9 when the Massie Report was issued and the AdCom Committee publicly discussed its merits. Dr. Hubbard concedes that the Massie Report had a price impact on Biogen's share price "on November 5 and beyond." Doc. No. 209-1 at 318 (317:9-15). He further concedes that he cannot say whether a disclosure of the subgroup data—data that the First Circuit held was improperly withheld from the market—"would have no effect on the stock price on July 22nd." Doc. No. 209-1 at 203-204 (202:24-203:9). When even Defendants' price-impact expert admits that there may be both back-end and front-end impact, Plaintiffs are entitled to the fraud on the market presumption of reliance.

**B.    The All Data Statement had Front-end Price Impact Because it Prevented a Stock Price Decline**

**1.    The All Data Statement Need Not Have Caused an Immediate Price Increase for it to have had a Price Impact.**

Plaintiffs allege a price maintenance theory that Defendants withheld negative news on July 22, 2020 to keep the price of the Biogen stock from dropping. *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 762 (S.D.N.Y. 2025) *citing, In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257-59 (2d Cir. 2016). Plaintiffs need not show the share price increased when defendants made the July 22 misstatement. *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 658 (S.D. Ohio 2017). "Sustaining an inflation maintenance theory requires plaintiffs 'to prove ... that the defendants' false statements caused the stock price to remain higher than it would have been had the statements been truthful,' even if the price itself does not change by a single cent." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020). "Fraudulent statements that prevent a stock price from falling can cause harm by prolonging the period during which the stock is traded at inflated prices."

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011). Because the All Data Statement confirmed the Dosage Thesis, it would not cause a price increase. Doc. No. 209-3 at 11 ¶18. *Willis v. Big Lots, Inc*., 2017 WL 1734224, at *2 (S.D. Ohio May 4, 2017), *adopted* 2017 WL 2493142 (S.D. Ohio June 8, 2017) (citing cases).

2.    **Biogen's Share Price Increased on October 22, 2019 When Biogen Disclosed it Would Seek FDA Approval Based on the High Dose Thesis.**

On October 22, 2019, Biogen announced that it would seek FDA approval based on its post-hoc analyses showing the high dose proved effective in Study 302 (EMERGE) and portions of Study 301 (ENGAGE) were supportive. Oct 22 PR, Horne Dec. Ex. 2, Doc. No. 209-2. Defendants claimed that ENGAGE failed because not enough patients received the high dose, while EMERGE was successful because enough patients did receive the high dose ("Dosage Thesis"). *Id.* Biogen's stock price increased 38.7%. Doc. No. 209-10. Biogen frequently reiterated the thesis to investors, culminating in the All Data Statement that opens the Class Period. Doc. No. 209-3 at 25 ¶50. It was crucial because the FDA would not approve Aducanumab without an explanation for ENGAGE's failure. The statements prior to July 22, 2020 promoting the Dosage Thesis raised and maintained Biogen's stock price but the First Circuit deemed them inactionable due to insufficient evidence of scienter. *Shash,* 84 F.4th at 11. Notably, the First Circuit did not reach whether those statements were misleading.

3.    **The All Data Statement Prevented a Stock Price Decline**

The All Data Statement was Sandrock's response to an analyst's question "can [you] go into any detail of the analysis over, say, the past 6 to 9 months that you guys have done with FDA? … the quality of the analysis and the details of the data analysis for aducanumab in support of the filing." Doc. No. 209-5 at 14.  Sandrock reassured investors: "So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all

consistent with that." *Id*. at 14. Had Sandrock told the truth, investors would have learned that Biogen's explanation for the failure of ENGAGE and the basis for FDA approval was contradicted by the subgroup analyses that FDA statistician Massie had shared with Biogen. Massie Emails, Horne Dec. Exs. 7, 8, Doc. No. 209-7, Doc. No. 209-8. Biogen's stock price would have immediately fallen.

Price impact is "the amount that the stock's price would have fallen 'without the false statement.'" *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys*., 594 U.S. 113, 123 (2021) ("*Goldman I*"). Sandrock's assurances would not cause Biogen's stock price to increase. Doc. No. 209-3 at 10-27 ¶¶14-52. Rather, the price decline only occurred on November 4, 5, and 9 when the data contradicting the Dosage Thesis, whose existence the All Data statement denied, was released through the Massie Report and AdCom discussion and votes. Doc. No. 171-1 at 32-37 ¶¶63-76.

### 4. The Materiality of Biogen's Misstatement Supports a Finding of Price Impact

In assessing price impact, courts should consider the generic nature of the misstatement, even if that analysis overlaps with materiality. *Goldman I*, 594 U.S. at 127. "[C]ase law bearing on materiality can help guide courts in considering, as a factual matter, the generic nature of the alleged misrepresentation." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*"). *Goldman II's* holding turned on finding that the statements at issue were immaterial: "While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." *Id.* at 104. Here, the First Circuit already held that Plaintiffs sufficiently alleged the All Data statement's material falsity. *Shash*, 84 F.4th at 13. To gain approval, Biogen needed to explain ENGAGE's failure, which it did through the Dosage Thesis. The First Circuit highlighted the materiality of the All Data Statement noting that it "stands out from the rest." *Id.* at 11. The First Circuit's conclusion that the All Data statement is material confirms it is not like the generic, wishy-washy statements in *Goldman*.

13

5.    **Market Commentary Confirms the Subgroup Data's Materiality and Supports Price Impact**

From Oct. 22, 2019, through Nov. 4, 2020, analysts repeatedly questioned Biogen about the subgroup analyses, emphasizing their importance for FDA approval. Starting Nov. 4, those same analysts focused on how the Massie Report's subgroup findings would influence the AdCom and the FDA—strong indirect evidence of price impact. *See Goldman II*, 77 F.4th at 104 ("Market commentary can provide insight into the kind of information investors would rely upon … and therefore can serve as indirect evidence of price impact."). Biogen's December 5, 2019 investor call illustrates this. Defendants told investors that Biogen presented the particular PV4 subgroups because "ApoE4 carriage was balanced." Biogen Dec. 5 Tr., Doc. No. 209-6 at 7-8. In truth, internal correspondence showed it was because including Noncarriers helped conceal that in EMERGE, "post-PV4 is similar to pre-PV4." Email to Budd Haeberlein, Horne Decl., Doc. No. 209-15. But, having presented this misleading detail, Sandrock and Budd Haeberlein both demurred on providing the subgroup analyses that would prove the Dosage Thesis false. Indeed, Sandrock added "[w]e have nothing to hide," Doc. No. 209-6 at 7-8, which Dr. Hubbard interpreted as "[i]f you knew what I knew, you would come to the same conclusion." Doc. No. 209-1 at 127 (126:2-25). This exchange shows (i) analysts viewed the subgroup data as material and potentially damaging, and (ii) Biogen's reassurances maintained investor confidence. Dr. Hubbard acknowledges the materiality of the subgroup data, Biogen's refusal to disclose it, and the importance analysts attached to it. Doc. No. 189-1 at 19-20 ¶¶42-44.

After the July 22, 2020 All Data Statement, analysts continued highlighting Biogen's refusal to disclose subgroup results. Wolfe Research summarized Sandrock's exchange with the analyst, emphasizing the continued lack of data transparency. Horne Dec. Ex. 16, Doc. No. 209-16 at 5. A William Blair analyst observed that "[t]he company continued its policy of providing

14

limited visibility … The lack of full disclosure and caginess around the aducanumab results and filing remain perplexing." Horne Dec. Ex. 17, Doc. No. 209-17 at 2. Wells Fargo similarly noted that Biogen reaffirmed its Dosage Thesis: "BIIB noting that both ENGAGE and the phase 1 support the conclusion from EMERGE that a high dose administered for sufficient length of time is required." Wells Fargo Rep., Horne Dec. Ex. 18, Doc. No. 209-18 at 4.

That not all analysts explicitly cited the All Data Statement is immaterial. "As a general proposition … there is little incentive for an analyst to reference an alleged misrepresentation if the alleged misrepresentations were supposedly intended to maintain the status quo." *In re Concho Res., Inc.*, 2025 WL 1040379, at 14 (S.D. Tex. Apr. 7, 2025). Sandrock's statement directly addressed analysts' core concern—whether the subgroup data contradicted the Dosage Thesis— and was designed to prevent a stock decline. That it succeeded is its price impact.

### 6.    A Truthful Substitute Would Have Caused a Decline in Biogen's Stock Price.

"Where there is an imprecise match between an alleged misstatement and the corrective disclosure, courts should ask whether the market would have reacted 'if the company had spoken truthfully' on the same topic as the misstatement 'at an equally generic level.'" *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2025 WL 2554474, at *8 (S.D.N.Y. Sept. 4, 2025) (*quoting Goldman II*, 77 F.4th at 99). No mismatch exists here as the corrective disclosure (Massie analyses) directly contradicted the All Data Statement. Nevertheless, applying that test, Biogen's stock price would have immediately collapsed after a truthful statement. On October 22, 2019, Biogen announced that it was reviving aducanumab, citing support from the Dosage Thesis. The stock surged 38.7%. Doc. No. 209-10. Thus, Biogen's promotion of the Dosage Thesis drove a substantial price increase. The All Data Statement responded to analysts' questioning the Dosage Thesis's validity. Doc. No. 209-5 at 14. The data contradicting the All Data statement were not minor. As Budd Haeberlein put it in internal correspondence, "the difference between [ENGAGE] and [EMERGE]

is not a 'home run' and it becomes glaringly apparent when we have made it appear as if there is a simple 'dose' explanation." May 31, 2020 email, Doc. No. 209-11.

The First Circuit's opinion suggests that the truthful substitute is disclosure of the actual subgroup data because it was its omission that made the All Data Statement misleading. *Shash*, 84 F.4th at 12–13. Likewise, in a case cited in *Goldman II*, the truthful substitute for the company's "rosy picture of its liquidity state" was "the misgivings its executives were sharing behind the scenes." 77 F.4th at 98-99 (*quoting In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). In another case, Dr. Hubbard agreed: he recently testified that the truthful substitute is disclosure of all contradictory information in management's possession: "had you known the full set of information, all those things that were in the file drawers at Vale, had the same analysts seen that." Vale Tr., Horne Dec. Ex. 12, Doc. No. 209-12 at 78 (77:5–9).

Dr. Hubbard's alternative proposed substitute is neither truthful nor a substitute. Doc. No. 189-1, at 22, ¶48. He proposes: "Although portions of the data from PRIME, ENGAGE, and EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, not all data are consistent with that." *Id.* Hubbard's proposed substitute that "not all data are consistent" does not quantify the extent the undisclosed data contradicted the Dosage Thesis. Sandrock had claimed *all* data (100%) were consistent. Hubbard's version is the equivalent of stating that the truthful alternative to a false statement that earnings were $2 per share is that earnings were "not $2" per share rather than revealing the actual earnings per share. Hubbard's truthful alternative conceals the huge scope of contradictory data that the First Circuit said was necessary to disclose to make the statement not misleading. *Shash*, 84 F.4th at 12.

The Court should adopt one of two truthful substitutes: (i) "So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. However, the following

subgroup analyses contradict that" (*i.e.*, the full data later published in the *Massie Report*); or (ii) "Consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose; however, there are undisclosed subgroup analyses inconsistent with that."  As to alternative (i), disclosure of the Massie Report caused a share price decline on November 4-9 and would have done the same on July 22. Doc. No. 171-1, at 32-38, ¶¶63-76.  As to alternative (ii), Hubbard and Tabak agree that an even more generic statement—"not all data are consistent"—would have caused a *greater* price decline than the Massie Report, consistent with the "Lemon Theory," under which investors assume deliberately undisclosed data that are not vouched for as all being good or "consistent" with some result are "among the worst possible outcomes." Doc. No. 189-1 at 23 ¶50; 209-1 at 125-126 (124:10-125:10); Doc. No. 209-3 at 32 ¶62. Thus, whether the more generic alternative (ii) was about "undisclosed subgroup analyses" or simply "data," Biogen's stock price would have declined substantially.

Sandrock made the All Data statement to provide investors a warranty of the Dosage Thesis—a commercial practice to overcome buyers' fear of lemons. Akerloff Article, Horne Dec. Ex. 4, Doc. No. 209-4 at 14-15. Had Sandrock told the truth on July 22 (that undisclosed sub-group analyses contradicted the Dosage Thesis) instead of misrepresenting that all the data was **consistent** with the Dosage Thesis, analysts would have known the Dosage Thesis was a "lemon" and Biogen's stock price would have collapsed.  Doc. No. 189-2, at 36-37 (137:15-139:11) Doc. No. 209-3, at 31-32 ¶¶61-62 & n.7. Dr. Hubbard testified that he "doesn't know one way or the other" whether disclosure of the subgroup analyses "would have had no effect on the stock price on July 22." Doc. No. 209-1 at 203-204 (202:24-203:9). Defendants have failed to meet their burden of proving no price impact. Doc. No. 209-3 at 8-9 ¶¶11-13.

7.     **The Analyst Reports between July 22, 2020 and Nov. 4, 2020 Did Not Disclose the Sub-Group Analyses Were Inconsistent with the Dosage Thesis**

Hubbard claims there was no price impact because analysts had speculated that Biogen's undisclosed subgroup analyses might not fully support the Dosage Thesis. He concludes that since Biogen's share price did not decline when analysts made such guesses, the All Data Statement could not have inflated the stock price. Doc. No. 189-1 at 18-24, ¶¶41-53. First, Dr. Hubbard did not analyze whether his proposed truthful substitute, "not all data are consistent", would have caused a price decline, but whether all data *support* the Dosage Thesis. Doc. No. 189-1 at 22 ¶48; Doc. No. 209-3 at 17 ¶32. Sandrock's misstatement was that the undisclosed data "***are all consistent***" with the Dosage Thesis. Dr. Hubbard admits that data can be "consistent with" a hypothesis without being "supportive." Doc. No. 209-1 at 20 (19:15-24). Thus, Hubbard's conclusion—that analysts believed the undisclosed data *may* not be "as supportive" does not address whether the undisclosed data were inconsistent with the Dosage Thesis. Doc. No. 209-3 at 13-15 ¶¶22–27. So the analyst reports did not correct the All Data statement. This also explains the lack of price reaction to the analyst reports. "Consistent" means there were no *contradictory* data that would threaten FDA approval.

Second, Hubbard misinterprets analysts' statements. For example, though analysts wrote that the undisclosed data were "unlikely to be as supportive," Hubbard interpreted them as saying the data were "mixed or negative." When asked to justify the leap from less supportive to negative, he replied only, "that's my view." Doc. No. 209-1 at 183-184 (182:19–183:18); see also Doc. No. 209-3 at 26-27 ¶¶51–52. This speculative reading undermines his conclusion.

Third, the analyst reports Hubbard cites—both before and after July 22, 2020—contain only conjecture. For example: "[O]ur panelists would have liked to see additional stratified analyses of ApoE+/- carriers across both treatment and placebo arms … Though our sense is that

data not yet disclosed to date are unlikely to be overly positive, it is possible FDA finds supportive data the public has not yet been made aware of." RBC report, Horne Dec. Ex. 13, Doc. No. 209-13 at 5-6. These statements are pure speculation; none of the analysts had access to the undisclosed subgroup data. Doc. No. 209-1 at 223 (222:11–16).[9] Indeed, one analyst wrote after the *Massie Report*: "The statistician raises lots of serious data points we have not seen before." Evercore Rep., Horne Dec. Ex. 14, Doc. No. 209-14, at 2. Speculation cannot reveal falsity. *Sjunde AP-Fonden*, 2025 WL 2554474, at *9 (reports of possible wrongdoing do not disclose actual wrongdoing).

Hubbard's analysis is even *less* plausible than the expert's erroneous logic the Second Circuit rejected in *Goldman II*. There, the defendants' expert identified 36 pre-disclosure news reports mentioning conflicts of interest and argued that the lack of price reaction disproved price impact. The Second Circuit disagreed, holding that those reports lacked (1) the detailed, documented evidence in the SEC's complaint; (2) the credibility and "gravitas" of an official source; and (3) the clarity that comes from unqualified, corroborated disclosure. *Goldman II*, 77 F.4th at 92. *See also San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at 3 (3d Cir. July 30, 2025) ("a disclosure will not 'correct' the market price unless it is 'conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information.'") (*quoting Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). Unlike *Goldman* where the news reports were based on facts gathered from Goldman employees with first-hand knowledge, *the Biogen analysts had never seen the subgroup data before November 4, 2020*. Their commentary, before the Massie Report, was guesswork, not a "truthful substitute." *See Sjunde AP-Fonden*, 2025 WL 2554474, at *9 (Speculation is not a truthful

---

[9]  Moreover, Hubbard interprets "unlikely to be overly positive" as threatening aducanumab's approval rather than adding little to the likelihood of approval, as positive, but not overly positive, data would.

substitute). The Massie Report, authored by the FDA statistician, and the subsequent AdCom discussions, were the first data-backed disclosure, and were more credible than analyst speculation *Goldman II*, 77 F.4th at 92. Knowing nothing, the analysts could not reveal anything but speculation, so the lack of a price drop when their reports were published proves nothing.

### C.    The Massie Report Shows Backend Price Impact

#### 1.    There is No Mismatch Between the All Data Statement and the Massie Analyses

The inference that "back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 594 U.S. at 123. Defendants purport to find a mismatch between the All Data statement and the analyses in the Massie Report. In *Goldman*, plaintiffs alleged that generic platitudes like "[w]e have extensive procedures and controls to identify and address conflicts," "[o]ur clients' interests always come first," and "[i]ntegrity and honesty are at the heart of our business" maintained price inflation. *Goldman I*, 594 U.S. at 120. The corrective disclosures revealed conflicts in two specific debt securities where Goldman bet against its clients. *Goldman II*, 77 F.4th at 83–84. The Supreme Court held that the court should have examined whether the mismatch between the generic statements and narrow disclosures defeated price impact. *Goldman I*, 594 U.S. at 126-27. Goldman's 40,000 employees and billions of transactions made its generic statements immaterial to specific disclosures about two securities.

There is no generic/specific divide here. Sandrock falsely stated that the data analyses in ENGAGE, EMERGE and PRIME were all consistent with the Dosage Thesis. The Massie Report showed the data that contradicted the Dosage Thesis, revealing the exact subgroup results analysts had requested on July 22, 2020. Indeed, the First Circuit made clear there is no mismatch: "[B]y failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the

complaint plausibly alleges that Defendants' omission misled investors." *Shash*, 84 F.4th at 12–13. Under the First Circuit's reasoning, the Massie Report is a clean match: it disclosed the precise subgroup data whose omission rendered Sandrock's statement misleading. The *Goldman* panel raised and resolved an indistinguishable hypothetical from this case:

> Consider two examples. In the first, an automobile manufacturer's earlier statement to the market that its best-selling vehicle passed all safety tests is followed by later news that, in fact, the car failed several crash tests. A price drop follows. There, the earlier statement is precisely negated, or rendered false, by the later news—***a clean match***.

*Goldman II*, 77 F.4th at 80 (emphasis added). Biogen told investors "All Data" were consistent with the Dosage Thesis. The Massie Report revealed the subgroup data contradicted it. Biogen's stock price fell—"a clean match." In any case, "a corrective disclosure need not be a "mirror-image" disclosure." *Massachusetts Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013). Often ,"what[] is corrective about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure." *Goldman*, 77 F.4th at 98.[10] *See also New England Carpenters v. DeCarlo*, 122 F.4th 28, 54 (2d Cir. 2023) (disclosure of "the specific deficiencies that rendered the audit opinion misleading" was a clean match); *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *2 (9th Cir. Sept. 26, 2025) (perfect match not required to prove price impact. "It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading.") (citations omitted). And even if it were enough for Biogen to disclose that "not all data" were consistent with the Dosage Thesis, both Dr. Hubbard and Dr. Tabak agree that this would have caused an even larger decline in

---

[10] *See also Johnson & Johnson*, 2025 WL 2176586, at *4 (no mismatch where corrective disclosure showed falsity). In *Vivendi*, misleading statements hiding liquidity problems were contradicted by debt downgrades and asset fire sales, creating a "strong link" between misrepresentation and correction. *Vivendi,* 838 F.3d at 258.

Biogen's stock price. Doc. No. 189-2 at 36-37 (137:15-139:11); Doc. No. 209-3 at 31-32 (¶¶61-62 & n.67); Doc. No. 209-1 at 125-126 (124:10-125:10).

Further, after the Massie Report was issued, analysts observed that it directly contradicted (*i.e.* corrected) Biogen's Dosage Thesis. JPMorgan Rep., Horne Dec. Ex. 9, Doc. No. 209-9 at 5 ("**This surprising result conflicts with BIIB's hypothesis that high aducanumab dosing leads to a better benefit**."). The analyst commentary linking the price drop to the misrepresented facts demonstrates price impact. *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *10 (D. Nev. Mar. 1, 2023) (media commentary connecting disclosure to subject of the false statement supported price impact); *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp*., 2023 WL 6300569, at *10 (S.D. Tex. Sept. 27, 2023); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp*., 2014 WL 6661918, at *7 (N.D. Ala. Nov. 19, 2014) (analyst commentary noting corrective disclosure is evidence of price impact).

The cases Defendants have cited are inapposite. In *Kirkland*, the alleged misrepresentations were "fairly broad and generic statements about the company's growth strategy," while the corrective disclosure was a specific business acquisition—an obvious generic/specific disparity. *In re Kirkland Lake Gold Ltd. Sec. Litig*., 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024). Likewise, in *Qualcomm*, defendants made generic assertions that the company "broadly licenses [its technology]" on "fair, reasonable, and non-discriminatory" terms. The court found such statements unlikely to mislead the market or sustain price inflation and noted that Qualcomm's licensing practices had already been publicly reported and acknowledged before the alleged corrective disclosure. *In re Qualcomm Inc. Sec. Litig*., 2023 WL 2583306, at 12–13 (S.D. Cal. Mar. 20, 2023). In *Shupe v. Rocket Cos., Inc.*, the defendants expressed similar vague optimism: "We're seeing strong consumer demand," "interest rates … [won't] impact our business," and "we take

22

[rising rates] as an opportunity to grow." 752 F. Supp. 3d 735, 781–82 (E.D. Mich. 2024). Those vague statements were allegedly corrected when Rocket later reported a decline in a ***specific category of loans***. This is the paradigmatic generic/specific mismatch *Goldman* raised. *Goldman I*, 594 U.S. at 123 (citing as an example a generic misstatement "we have faith in our business model" and correction "our fourth quarter earnings did not meet expectations").

### 2. The Complexity of the Briefing Materials Required Multiple Days to Process Fully

The First Circuit, and many others, hold that it may take more than one trading day to fully incorporate news into a stock price. *Shash*, 84 F.4th at 21 (citing cases from the Fourth, Fifth, Ninth, and Tenth Circuits). That's because "[t]he efficient price is not set by an invisible hand that instantly reflects new information in a security's price, but through the dynamic, high-volume exchange of a security over an appropriate window of time." *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 487 (E.D. Pa. 2022). *Energy Transfer* explained when and why information might take longer to be incorporated. Much of the academic literature about the efficient market—including articles Hubbard cites—examines the impact of earnings announcements. Earnings are a simple quantitative metric revealed by the company, with guidance and analyst estimates having already established expectations, so they are quickly incorporated. *Id. see also* Doc. No. 209-3 at 40 (¶84 n. 90). The efficient market works more slowly when the information to be incorporated is more complex. Indeed, courts recognize that complex disputed news might take as much as five days to be incorporated. *See In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, 2009 WL 2855601 (D.N.J. Sept. 2, 2009) (delayed reaction of three and five days); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sept. 28, 2023) (use of three-day window permissible); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009)

(accepting event study with three-day event window); *Energy Transfer*, 623 F. Supp. 3d at 486 (E.D. Pa. 2022) (similar, and collecting cases).[11]

The AdCom Materials ran to 343 pages, but it did not take much effort to discern that the FDA wanted to approve aducanumab. Everything other than the Massie Report—from the FDA's claim that EMERGE provides "robust and exceptionally persuasive" evidence, to its decision to file a joint briefing book with Biogen and its choice of questions for the AdCom—pointed in that direction. Had investors learned just that FDA wanted to approve aducanumab, they likely would have raised their likelihood of approval to practically certain. Massie's Report was 93 pages long, consisted of dense statistical analyses whose impact on the Dosage Thesis could not easily be quantified, did not come from the company, and was a dissent from the main report. More, it bore signs that it was unreliable, including a "draft" watermark. This is not a trivial issue; in a later submission to the FDA, Biogen used the watermark to cast doubt on the Massie Report's credibility. Budd Haeberlein email, Horne Dec. Ex. 20, Doc. No. 209-20. It could not be read and analyzed with all the materials in the 6 hours remaining in the trading day.

The analysts showed as much. They quickly noted the FDA's vote of confidence in aducanumab but commented it would take a full day to read and analyze the materials.[12] They also arranged meetings with biostatistics and FDA experts that day to understand the extensive briefing materials. November 4 Analyst Reports, Horne Dec. Exs. 21, 22, Doc. Nos. 209-21, 209-22.

---

[11] *Cross v. 21st Century Holding Co.*, 2002 WL 31158901, at *7 (S.D.N.Y. Sept. 27, 2002) (rejecting defendants' argument that "a fraud-on-the-market theory must fail where a relatively brief period of price stability follows a public disclosure, especially where the few days of price stability is followed by a relatively steady decline in share price").

[12] CGSCIMB Rep., Horne Dec. Ex. 19, Doc. No. 209-19 (report published on November 4 at 11:15 am noting "[i]t's going to take us most of the day to go through it all").

**3.      Dr. Tabak Provides Strong Evidence of Price Impact on November 4-5**

Dr. Tabak identified the Massie Report as the only negative news and determined that the market was continuing to weigh the overwhelming positive briefing materials against the negative news in the Massie Report on November 4 and 5. Doc. No. 171-1 at 35-36 (¶ 70). Dr. Tabak analyzed Biogen's share price on November 5 and found a statistically significant decline, showing that "the market was still incorporating information released on November 4." *Id.* at 36 (¶72). Likewise, Dr. Hubbard could not identify any negative news other than the Massie Report that could have caused the decline on Nov. 5, Doc. No. 209-1 at 259-262 (258:23-261:9), leaving the Massie Report as the only possible cause of the price decline. *Energy Transfer,* 623 F. Supp. 3d at 497-98.

Dr. Tabak's analysis demonstrated price impact. He found that "analysts who did not reference the Massie Report increased their target price by $27.25 per share more than those that did mention the Massie Report." Doc. No.171-1 at 34-35 (¶68). The Massie Report tempered the overall positive effect of the Briefing Book. This, with the fact that Biogen's November 5 share price decline was nearly the same amount ($27.73), demonstrates price impact.[13] *Id.* at 34-35 (¶68-¶69).

The market was continuing to process the divergent views after the November 4 close. *Id.* at 36 (¶73). Three analyst firms mentioned it after trading closed and two analysts published reports

---

[13]Dr. Hubbard criticizes Dr. Tabak's analysis of the analyst reports because there is no evidence of statistical significance. Doc. No. 189-1 at 47 (¶99). Dr. Tabak's analysis is known as the "best estimate" given the data and is an accepted method of scientific inference when the sample size is small. Doc. No. 209-3 at 44 (¶93). Dr. Hubbard's inclusion of an additional three analyst reports with no change in their price target (i.e., that repeat stale price targets at the same time that Biogen's stock price had risen dramatically) is improper and not reflective of the market and leads to a biased and meaningless result. *Id.* at 48 (¶99). Removing those improper reports from Hubbard's analysis provides a result very similar to Dr. Tabak's showing lower price targets of between $22-$28 for analysts that mention the Massie Report from those who don't. *Id.* at 51 (¶104).

describing a "Closer Look" or a "Deeper Look" into the split in the FDA analyses.. And it continued: analyst reports and news stories about Biogen continued to discuss the importance of the Massie Report Nov. 5 through Nov. 11. *Id.* at 37, 106-108 (¶74, Figures 14a-14c).

### 4. Dr. Hubbard's Opinion that the Nov. 5 Stock Price Declines are Volatility Caused by the Massie Report but are Not Evidence of Price Impact Mischaracterizes What "Volatility" Is

When asked if "the Massie Report had any effect on Biogen's stock price", Dr. Hubbard responded "it would be hard to estimate, but I can't say it had no effect." Doc. No. 209-1 at 296 (295:6-12). Dr. Hubbard admits that there was "continued price volatility" on November 5 caused by the November 4 release of the Briefing Book. Dr. Hubbard accepts that the price volatility on November 5 stems, at least in part, from the release of the Briefing Book on November 4: "[Q.] So the continued volatility on November 5th certainly stems from the news that was released on November 4th. Right? A. In part, yes, I would agree with that." Doc. No. 209-1 at 273 (272:18-23). "Volatility" is just stock price movements. If a movement in a stock's price is caused by some factor, then that factor had an impact on the price. Whether called "price volatility" or "price movements," Dr. Hubbard admits the price declines were caused, at least in part, by the Massie Report. *Id*.

Dr. Hubbard similarly admits that the continued stock price volatility (*i.e.,* price movements) on November 5 resulted, at least in part, from the market's evaluation of how the negative findings in the Massie Report might affect the AdCom panelists' views of the clinical trials. Doc. No. 209-1 at 317-18 (316:24-317:15); Doc. No. 189-1 at 52-53 (¶107). But the distinction between the market assessing the Massie Report's findings and the market assessing the findings' impact on the AdCom is meaningless. Had the Massie Report been disclosed earlier, the market would have similarly grappled with how that information might have affected the AdCom vote and FDA approval. Doc. No. 209-3 at 51 (¶104). Hubbard's "failing to tie the

prolonged continued volatility to the whole set of news (including the Massie Report) … is like hitting a pendulum and then arguing that the continued movement of the pendulum after being hit was simply 'prolonged' volatility somehow divorced from the initial hit." *Id.* at 36-37 (¶73).

Hubbard's conclusion of no price impact on Nov. 5 is based on academic research showing that a ***majority*** of value-relevant news released ***after trading hours*** is reflected in a stock's price at the market open.[14] Doc. No. 189-1 at 40 (¶84); Doc. No. 209-3 at 39-40 (¶¶81-84). But Defendants must show the complete absence of price impact, and incorporating 51% of the price impact at opening still leaves 49% to be incorporated. And Biogen's share price ***did*** decline by 2.56% from close on Nov. 4 to open on Nov. 5. Doc. No. 189-1 at 40 (¶84). That's enough to show price impact. *See In re Acadia Healthcare Co., Inc.*, 2023 WL 3620955, at *3 (6th Cir. May 23, 2023) (1% price decline following disclosure sufficient to show price impact). Dr. Hubbard's opinions that the price decline was not statistically significant "rely on a statistical fallacy …the existence of non-statistically-significant stock price declines does not prove the absence of price impact." *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 393-396 (N.D. Ga. 2019) (citing cases). Finally, Dr. Hubbard again relies on an article about earnings releases, with their simple straightforward data, which says nothing about how quickly markets incorporate more complex information like the Massie Report. Doc. No. 209-3 at 40 (¶84, n. 90). *Energy Transfer*, 623 F. Supp. 3d at 487 (discounting academic literature based on earnings releases where news released was more complicated); *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *18 (W.D. Pa.

---

[14] Defendants reliance on *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023) demonstrates the fallacy of their argument. The court agreed with the defense expert that the "close-to-open event window is best for analyzing the market reaction to alleged Corrective Disclosures ***made while the market was closed***." (emphasis added) Here, the corrective disclosure was issued during trading hours, making Hubbard's entire analysis irrelevant.

Aug. 11, 2022) (using a two-day window for a disclosure that "involved the filing of voluminous proxy materials after the market closed on June 17 and also an eventual press release … and a denial by EQT").

Dr. Hubbard also analyzes Biogen's stock price volatility on Nov. 4 and 5 and finds intraday stock price declines on Nov. 4 that are similar to declines on Nov. 5. He opines that this "pattern" shows the declines on Nov. 5 are "best understood as continued volatility from the price movements of" Nov. 4. Doc. No. 189-1 at 42-43 (¶88). Hubbard thus admits that the price declines on Nov. 5 resulted from the news on Nov. 4. Hubbard does not explain why, and there is no reason to believe, that intra-day price declines on Nov. 4 negate the substantial price declines on Nov. 5, as all of those price declines followed from the release of the Massie Report. Moreover, Dr. Hubbard's comparison of November 4 and November 5 price declines relies on data mining.[15] Doc. No. 209-3 at 40-43 (¶¶85-89).

### 5.    The Purportedly Unrelated Portions of the Massie Report Do Not Negate Price Impact

Dr. Hubbard asserts that the Massie Report contained non-fraud-related information but admits he did not try to determine whether any of it had been publicly disclosed previously. Thus, there is no evidence the non-fraud related information was new. Nor does Dr. Hubbard explain why non-fraud related information was negative or could affect price. Doc. No. 209-1 at 191-192

---

[15]The Nov. 5 price declines Hubbard studies "all start at the 9:30 open and end at 9:35, 9:40, or 9:45, making them all exact multiples of five minutes that both start and stop at a minute ending in 0 or in 5. Yet, when looking for 'comparable' declines on November 4, the Hubbard Report does not impose this restriction. In fact, of the eight examples of price declines on November 4, 2020 listed at 41-42 (¶¶86-87) of the Hubbard Report, only one would satisfy this criterion. Looking at the electronic backup to the Hubbard Report, only one out of sixteen identified 'comparable' declines on November 4, 2020 would satisfy one of the criteria that the Hubbard Report imposes on the declines identified on November 5, 2020 (i.e., starting and ending on a minute ending in 0 or in 5). Put simply, what the Hubbard Report does in its Exhibit 8 is a completely invalid analysis because it imposes additional restrictions on the November 5, 2020 declines that it does not impose on the November 4, 2020 declines." Doc. No. 209-3 at 40-41 (¶¶85-86).

(190:4–191:14). Dr. Hubbard also never assessed whether the subgroup analyses in the Massie Report corrected the All Data statement. Doc. No. 209-1 at 198-199 (197:9–198:2). His failure to disaggregate non-fraud-related "news" that contributed to the Nov. 5 price decline is fatal to this argument because it is Defendants' burden. *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at 5 (N.D. Ill. Dec. 21, 2020).

Even if portions of the Massie Report had contained new, non-fraud related negative information, Defendants must show that ***none*** of the November 5 or 9 share-price decline resulted from the All Data Statement. "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Sjunde AP-Fonden*, 2025 WL 2554474, at 28 (*quoting Amgen*, 568 U.S. at 483). Having failed to conduct basic price-impact analysis, Dr. Hubbard's opinions carry no weight.

### 6.    There is Strong Evidence of Price Impact on Nov. 9

The First Circuit did not limit Plaintiffs' loss causation theory to Nov. 4 and/or 5, but acknowledged Plaintiffs adequately pled that the market had a delayed reaction to the Massie Report that continued through Nov. 9. *Shash,* 84 F.4th at 20-21. The extreme price volatility set into motion by disclosure of the FDA briefing materials on Nov. 4 continued throughout the trading day on Nov. 9.

The AdCom marked the market's continued incorporation of the information from the Massie Report. Advisory committees exist to advise the FDA "whether adequate data support approval." Complaint, Doc. No. 58 at 70 (¶217). Hubbard himself opines that Biogen's share price decline on Nov. 5 resulted from *"*continued volatility tied to uncertainty over how the AdCom panelists would weigh the various findings from the Briefing Book, including the Massie

Appendix." Doc. No. 189-1 at 42-43 (¶88). While the AdCom vote was not binding on the FDA, Doc. No. 209-1 at 299 (298:19-25), its views were critical information about the strength of the evidence in support of the Dosage Thesis.

Dr. Hubbard admits that the AdCom's negative vote was based on the Massie Report. Doc. No. 209-1 at 300 (299:10-17). So does Biogen. Budd Haeberlein email, Horne Dec. Ex. 20, Doc. No. 209-20. Hubbard also admitted that the negative AdCom vote was a materialization of the risk of the findings in the Massie Report. Doc. No. 209-1 at 306-07 (305:10-306:25). Hubbard denied analysts referenced the All Data Statement but acknowledged analysts commented that the Massie Report undermined the Dosage Thesis. *Id.* He also admitted that AdCom **discussions** that were broadcast live on Nov. 6 were "new news" to the market. *Id.* at 260-61 (259:20-260:12). Trading was halted on Friday Nov. 6, the day of the AdCom meeting. When trading resumed on Nov. 9, Biogen's share price declined 25% on volume of 9.3 million shares. Doc. No. 209-10.

Biogen's Nov. 9 price decline shows price impact for four independent reasons. First, the AdCom discussions were new news. *See AVEO*, 2017 WL 5484672, at *7 (AdCom members' responses to FDA briefing materials is new news). Here, as in *Aveo*, the AdCom members reviewed the Massie Report and provided to the market new analyses of the significance of the previously undisclosed subgroup data. The Court's earlier decision on Defendants' motion for judgment that the Complaint did not specially plead the AdCom was a corrective disclosure does not preclude a finding that it had a price impact. That decision interpreted the PSLRA's 90-day lookback provision, not whether defendants have proved a complete lack of price impact at class certification. Doc. No. 163 at 17-19. Importantly, a "court cannot make that [Rule 23] finding in a securities-fraud class action without considering all evidence relevant to price impact." *See Goldman I*, 594 U.S. at 114, *citing Halliburton II*, 573 U.S. at 284. Evidence of price impact is not

limited to the Complaint. Dr. Hubbard's admissions and Dr. Tabak's further analyses provide the necessary evidence for the Court to find price impact from the AdCom discussions and vote.

Second, the publicly broadcast AdCom discussions were "successive clarifying information" to the Nov. 4 briefing materials. *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 486 (E.D. Pa. 2021) (finding price impact from subsequent day's news that clarified and contextualized earlier disclosure). Third, AdCom members' negative views and negative votes were the materialization of the undisclosed risk concealed by Defendants. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (finding loss causation upon materialization of foreseeable risk concealed by false statement); *accord Tutor Perini Corp. v. Banc of Am. Sec. LLC,* 2013 WL 5376023, at *21 (D. Mass. Sept. 24, 2013). Here, it is foreseeable that the concealed subgroup analyses contradicting the Dosage Thesis could cause the AdCom to vote against approving Aducanumab, as the Dosage Thesis was necessary to explain the failed Study 301.

In *Homyk*, the court found that an advisory committee's negative discussions and vote were foreseeable based on the defendants' knowledge of the FDA's undisclosed analyses of the clinical data, and thus the AdCom's discussion and vote were corrective for purposes of a price impact analysis. *Homyk v. ChemoCentryx, Inc.*, 2025 WL 1547625, at *18 (N.D. Cal. May 30, 2025)). Here, too, Biogen had known Massie's statistical analyses since August 2019. Doc. No. 209-7, Doc. No. 209-8. By making the All Data Statement denying the existence of data contradicting the Dosage Thesis, despite knowing this contradictory data, Biogen concealed the risk that the AdCom would identify and highlight the subgroup analyses to vote against approval.

While the court in *FibroGen* ruled that an AdCom vote did not have a price impact, that ruling is inapposite because FibroGen's stock price did not decline on disclosure of the FDA briefing materials, so the information had no price impact. *In re FibroGen Sec. Litig.*, 2024 WL

1064665, at *12 (N.D. Cal. Mar. 11, 2024). Indeed, *Homyk* distinguished FibroGen in part because "none of the other information discussed at the [AdCom] meeting [in *Fibrogen*] was new to investors." *Homyk*, 2025 WL 1547625, at *17. Here, Biogen admits the briefing materials contained new information that caused price volatility on Nov. 4 and 5. And Hubbard admits the Nov. 6 AdCom discussions revealed new information to investors. Doc. No. 209-1 at 260-61 (259:20-260:12). In any case, *Homyk* also distinguished *FibroGen* precisely because the *FibroGen* plaintiffs had not advanced a theory that the advisory committee was a materialization of the risk concealed by Defendants' false statements. *Homyk*, 2025 WL 1547625, at *17-18.

That the Massie analyses relied on by the AdCom in voting was publicly available two days earlier, does not preclude a finding of price impact. "Disclosures based on public information may nevertheless communicate a new signal to the market in certain situations. *Johnson & Johnson*, 2025 WL 2176586, at *3. In *Johnson & Johnson*, the Third Circuit found price impact based on share price declines following, among other disclosures, a jury verdict because "[e]ach disclosure could have communicated new, value-relevant information to investors and was followed by a stock price decline for which there was no other explanation but the disclosure itself." *Id*. at *4. The AdCom vote is closely analogous to the jury verdict in *Johnson & Johnson*. While "the evidence adduced and arguments made at trial were technically public, the jury's conclusion expressed in the verdict—*i.e.*, that J&J's products caused harm—would have provided new information suggesting the falsity of the alleged misrepresentations … ." *Id.* Similarly, here, the AdCom's negative vote was based in large part on its interpretation of the significance of the Massie Report's analyses, analyses that the AdCom members had much more time to analyze than did investors or market analysts. Doc. No. 209-1 at 306 (305:10-18); Complaint, Doc. No. 58 at 93-94 (¶¶282-292). The AdCom's vote provided new information confirming the importance and

reliability of the Massie Report's analyses that had been shunted to an appendix in the FDA Briefing Materials and labeled denigratingly as a "Draft" indicating it was incomplete and tentative. "[R]e-publication of information by a more credible source to a broader audience may convey to the market that the information is particularly significant or worthy of monitoring." *Johnson & Johnson*, 2025 WL 2176586, at *3. The AdCom was a more credible source that validated Massie's analyses, and indeed, was much more scientifically credible than a jury of twelve laypeople.

Finally, apart from the AdCom meeting, Dr. Hubbard testified that the "continued volatility in Biogen's stock price on November 5th ***and beyond*** are due, at least in part, to the analysts weighing Dr. Massie's views". Doc. No. 209-1 at 318 (317:9-19). Thus, a portion of the stock price reaction on Nov. 9 was due to the market's continued evaluation of the Massie Report. That analysts continued to discuss the Massie Report's significance on November 6-12 confirms this price impact. Doc. No. 171-1 at 37 (¶74). This alone is sufficient evidence of price impact because irrespective of the AdCom vote and/or the AdCom discussions, the market's continued assessment of the Massie Report affected Biogen's stock price on November 9. *Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017) ("[M]erely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security."); *accord Luna v. Carbonite, Inc.*, 2023 WL 4539855, at *10 (D. Mass. July 14, 2023). *See also Sjunde AP-Fonden*, 2025 WL 2554474, at *15 ("[I]n the absence of any compelling analysis disaggregating the price impact of the [non-fraud related disclosure] and the corrective disclosure" defendants failed to carry their burden of proving no price impact).

## V.    DR. TABAK'S PRELIMINARY DAMAGES MODEL SATISFIES *COMCAST*'S MODEST REQUIREMENTS

At class certification, *Comcast* does not require plaintiff to actually measure damages or provide a damages model that eliminates non-fraud factors. *Baker v. Equity Residential Mgmt., L.L.C.*, 390 F. Supp. 3d 246, 263 (D. Mass. 2019) (*citing Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015)). Plaintiffs need only "propose a methodology for calculating damages that corresponds to [their] theory of liability." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019). Dr. Tabak describes an out-of-pocket damages model that uses an event study to measure the decline in Biogen stock on November 5 and 9, 2020, following corrective disclosures to calculate damages for each member of the class. Doc. No. 209-3 at 29-32 (¶¶58-62). Defendants cite only three outlier cases that have found such a showing insufficient at class certification.[16] In an exhibit, Plaintiffs have cited 95 cases that have accepted the use of an event study similar to Dr. Tabak's. Doc. No. 209-23.

Dr. Tabak explains that he will disaggregate any non-fraud related news using two methods. First, he can isolate the impact of the Massie Report from other news by analyzing the difference in changes in analysts' price targets for those analysts that mentioned the Massie Report and those who didn't. Doc. No. 171-1 at 34-35 (¶68). (finding $27.25 per share lower price target change for analysts mentioning Massie Report). This closely matches the actual share price decline on Nov. 5. *Id.* This methodology is tailored to the specific facts of this case.

---

[16]    In two, the denial was without prejudice, and in one the court subsequently granted class certification. *In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1268 (N.D. Cal. 2024) (certification denied without prejudice); *In re Vaxart, Inc. Sec. Litig.*, 759 F. Supp. 3d 1015, 1018 (N.D. Cal. 2024) (class certified on subsequent motion); *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 623 (6th Cir. 2025) (remanded so the district court could conduct a damages analysis under the proper standard and is still pending).

Second, though Dr. Hubbard did not even attempt to identify any non-fraud related news in the Massie Report,[17] disaggregation poses no more problem here than any time a corrective disclosure comes packaged with other news, such as in an annual report. Dr. Tabak can disaggregate the price impact of any non-fraud related adverse news with the assistance of a clinical trial and/or FDA approval expert. Before the Advisory Committee materials' release, analysts provided estimates of both the likelihood of aducanumab's FDA approval and the likely size of the market. Biogen Slide Deck, Horne Dec. Ex. 24, Doc. No. 209-24. The subject matter expert can estimate the impact of the fraud-related disclosures on the likelihood of success, *i.e.,* estimating the probability of success without the Massie Report and the changed probability after taking into account the corrective disclosures in the Massie Report. Dr. Tabak can then use the calculations to disaggregate the portion of the November 4, 5 and 9 price movements attributable to the fraud-related disclosures. Doc. No. 209-3 at 55-57 (¶¶110-114). In any event, "disaggregating confounding information is a loss causation analysis for the merits stage— securities fraud plaintiffs need not prove loss causation in order to obtain class certification." *Luna v. Carbonite, Inc.,* 2023 WL 4539855, at *10 (*citing Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 807 (2011); *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2020 WL 5757695, at *14 (D. Minn. Sept. 28, 2020)).

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Class Certification.

---

[17]Doc. No. 209-1 at 191-192 (190:4-191:4).

Dated: January 5, 2026                    Respectfully submitted,

                                          **THE ROSEN LAW FIRM, P.A.**

                                          */s/ Laurence M. Rosen*
                                          Laurence M. Rosen, Esq. (*pro hac vice*)
                                          Jonathan Horne, Esq. (*pro hac vice*)
                                          Brian B. Alexander, Esq. (*pro hac vice*)
                                          Joshua Baker, Esq. (BBO #695561)
                                          Sara Fuks, Esq. (*pro hac vice*)
                                          275 Madison Avenue, 40th Floor
                                          New York, NY 100016
                                          Tel: (212) 686-1060
                                          Fax: (212) 202-3827
                                          lrosen@rosenlegal.com
                                          jhorne@rosenlegal.com
                                          balexander@rosenlegal.com
                                          jbaker@rosenlegal.com
                                          sfuks@rosenlegal.com
                                          *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2026, a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL** was served by CM/ECF to parties registered to the Court's CM/ECF system.

/s/Laurence Rosen