**THE ROSEN LAW FIRM, P.A.**
Joshua Baker, Esq. (BBO #695561)
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jbaker@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH, AMJAD KHAN, and ALBERT AFTOORA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD HAEBERLEIN,<br><br>Defendants. | **CASE No.: 1:21-cv-10479-IT**<br><br>**[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................... 1

II.   JURISDICTION AND VENUE .................................................................................. 11

III.  PARTIES .................................................................................................................... 12

IV.   MEETINGS AND PRESENTATIONS ...................................................................... 13

V.    BACKGROUND ......................................................................................................... 14

   A.    The Amyloid Hypothesis ................................................................................. 14

   B.    How Aducanumab Works ................................................................................. 16

   C.    Aducanumab's Clinical Trials End in Failure ................................................. 17

      i.    Aducanumab Fails a Pre-Specified Futility Test .................................... 17

         (1)   Clinical endpoints ......................................................................... 20

            (a)   CDR-SB .............................................................................. 20

            (b)   MMSE ................................................................................. 21

            (c)   ADAS-Cog13 ...................................................................... 21

            (d)   ADCS-ADL-MCI ............................................................... 21

            (e)   NPI-10 ................................................................................. 22

         (2)   Biomarkers .................................................................................... 22

         (3)   Doses Studied ................................................................................ 22

         (4)   Amendments .................................................................................. 23

         (5)   Timing of Protocol Version 3 and Protocol Version 4 ................. 23

            (a)   Protocol Version 3 .............................................................. 23

            (b)   Protocol Version 4 .............................................................. 24

         (6)   Futility Analysis ............................................................................ 24

**D.     Defendants Made False Statements About Dose Response and Study 301** ............... 28

   *i.     Defendants Could Not Secure Aducanumab's Approval Without Disarming the Negative Study 301 Results* ..................................................................................... 28

   *ii.     Defendants Made False Statements of Fact About 10mg/kg Dosing and Study 301 that Were Contradicted By Study 302 Data Defendants Concealed* ..................................... 29

**E.     Defendants' Statements Were False and Made With Scienter** .................................. 32

   *i.     Biogen Concludes that There Is No Relationship Between the Number of 10mg/kg Doses and Clinical Outcomes* .................................................................................... 32

   *ii.     Biogen Convenes A Group of Outside Experts Whose Statisticians Tell Biogen That It Should Not Proceed with Approval Without Another Study* ........................................... 38

   *iii.     Biogen Uses Informal Communications To Persuade Billy Dunn to Push Aducanumab Through To Approval* ........................................................................................... 40

   *iv.     FDA Statistician Tristan Massie Explains Why Biogen's Data Does Not Support Approval, so Biogen and the FDA Exclude Him From Further Meetings* .................... 42

   *v.     The Working Group Kicks Out the Statisticians and Then Accelerates Data Mining* ... 46

   *vi.     Defendants subjectively doubt the Dosage Thesis* ........................................................ 49

      (1)     Non-Carriers ........................................................................................................ 50

         (a)     Biogen internally attempts to explain discordant results for Non-Carriers ............. 50

         (b)     Biogen Conceals Carrier/Non-Carrier Subgroup Analyses .................................... 54

      (2)     In Study 302, Pre-PV4 Did Better than Post-PV4 ....................................................... 57

   *vii.     Biogen's Statisticians Warn Defendants that the Aducanumab Analysis Is Unreliable.... ............................................................................................................................... 58

   *viii.     Internal Communications, Defendants State that the Dosage Thesis is False and Express Concern that They Have Made Misleading Statements* ................................. 59

   *ix.     Defendants' Deceptive Acts* ............................................................................... 61

      (1)     Defendants Present Misleading Data ............................................................................ 61

      (2)     Biogen Attempts to Mislead Japanese Regulators but Decides To Delay Its Japanese Application When the Regulators Catch On .............................................................. 63

(3)    Biogen Misleads Japanese and European Regulators, and the Advisory Committee, Concerning Outliers ............................................................................... 65

VI.    DEFENDANTS' FALSE STATEMENTS ..................................................... 69

VII.    LOSS CAUSATION ............................................................................... 78

A.    The FDA empanels an advisory committee ................................................ 78

B.    The FDA Releases Effusive Briefing Materials and Buries the Massie Report ........ 79

C.    The Draft Massie Report's Complex Conclusions .................................... 87

D.    The Advisory Committee Votes 10-0 Against Approval ........................... 100

VIII.    THE FDA APPROVES ADUCANUMAB BASED ON AN UNVALIDATED ENDPOINT ........................................................................................... 108

A.    The FDA Tells Biogen At the June 2019 Meeting that FDA Might Be Willing To Approve Aducanumab Based On Surrogate Endpoints ........................... 108

B.    The FDA and Biogen Assure the Advisory Committee They Are Not Considering Accelerated Approval Based On A Surrogate Endpoint Thereby Preventing the Committee From Advising That Such Approval Would Not Be Warranted .......... 109

C.    The FDA Grants Accelerated Approval of Aducanumab Based On A Surrogate Endpoint ................................................................................................ 112

D.    The Aducanumab Approval Decision Sparks Three Resignations, Two Congressional Investigations, a Call From A Senator To Replace the FDA Head, and Calls From A Former HHS and Current FDA Head For An Investigation .... 118

IX.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ........................... 126

i.    "We have nothing to hide" ............................................................ 126

ii.    Defendants Told Investors They Had Taken Exceptional Care In Reviewing and Analyzing the Aducanumab Phase III Clinical Trial Data ........................... 127

iii.    Defendant Budd Haeberlein told Biogen not to claim that Study 301 analysis "supports" EMERGE even as she told investors the opposite ................................... 128

PLAINTIFFS' CLASS ACTION ALLEGATIONS ......................................................... 128

NO SAFE HARBOR .................................................................................................. 131

iii

**COUNT I**............................................................................................................ 131

**COUNT II**........................................................................................................... 134

**PRAYER FOR RELIEF**................................................................................... 135

**DEMAND FOR TRIAL BY JURY** ................................................................. 136

Lead Plaintiff PolyCon Solutions LLC and Nadia Shash, its sole managing member, and Named Plaintiffs Amjad Khan and Albert Aftoora, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.  INTRODUCTION[1]

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded Biogen Inc. securities between October 22, 2019, and November 6, 2020, inclusive.[2]

2.      In October 2019, Biogen announced that a reanalysis of data from its abandoned aducanumab clinical trial showed sufficient evidence of efficacy to support an FDA application and approval. It did not. In fact, Biogen had a chance at approval because it had captured individual regulators at the FDA. Because they could not disclose the true basis for their optimism, Defendants engaged in a systematic campaign to conceal the contradictions in the data it would use to support approval. Defendants worked with the captured regulators but excluded the FDA's own statistical experts so they could not object to Biogen's outrageous data mining. Defendants then presented the resulting data in a manner designed to mislead, while making false statements about what the data they omitted showed. All the while, Defendants admitted internally what they vehemently denied in public: the data did not support the explanation they had given to investors.

---

[1] Unless otherwise noted, all emphases are added. All documents cited by bates-stamp are incorporated by reference.

[2] Excluded from the class are Defendants, all officers and directors of Biogen, their immediate family members and any entity over which an excluded person exercises control or owns more than 10%.

On November 4, 2020, the FDA released several hundred pages of dense statistical and clinical materials for an upcoming session of a committee designed to provide advice on whether to approve aducanumab. The materials revealed both the FDA's enthusiasm for aducanumab and, in a dense review report the rest of the materials downplayed, some serious statistical concerns. Biogen's stock price fell on November 5 as investors began to read, understand, and weigh the statistical review. But it took a public discussion by world-class experts on the advisory committee, who had had a week with the material instead of the day-and-a-half provided to investors, coupled with a key admission by Biogen, to finally allow the market to correctly appreciate the statistical review. Biogen's stock was halted during the advisory committee; its price collapsed when it resumed trading on November 9, the next trading day.

3. Billed as the first treatment that could slow down the mental and physical decline following from Alzheimer's Disease, aducanumab was supposed to be Biogen's most commercially promising treatment in a generation. While aducanumab's impact, if any could be shown, would be modest, there were millions of patients desperate to try anything to stave off a terrible disease.

4. But in March 2019, Biogen abruptly abandoned aducanumab's clinical trials because a pre-planned futility analysis based on data as of December 2018 revealed that the clinical trials were unlikely to be successful. Biogen had no choice but to stop the trials after it failed to clear the futility threshold. The discontinuation was catastrophic for Biogen; its stock price fell 29% in one day.

5. Unable to continue the clinical trials, Biogen got to work analyzing the results using additional data that had accumulated between December and March. Biogen noticed that with the additional data, one clinical trial, Study 302, had scraped out a statistically significant

result for patients who had been randomized into the high dose group. But in the other Study, Study 301, patients who received the high aducanumab dose did worse than placebo.

6.      Biogen tried to determine whether a mid-trial change in the clinical trial protocol was to blame. Biogen believed that the highest dose administered, 10mg/kg, would be the most effective. But when the trial began, there was not sufficient data to show that aducanumab posed an acceptable risk at that dose (even in a clinical trial setting) to patients who carried a particular gene, APOE4 ("APOE4 Carriers," or just "Carriers"). So Carriers only titrated to 6mg/kg. By 2017, the evidence showed that the risk was acceptable, so Biogen amended the protocol (Protocol Version 4, or "PV4") to permit Carriers to be titrated to 10mg/kg. Biogen theorized that, perhaps, Study 301 failed because not enough patients received the 10mg/kg dose. More generally, Biogen hypothesized that patients needed to receive a sufficient number of 10mg/kg doses to see benefits ("Dosage Thesis").

7.      Biogen's first attempts to test the Dosage Thesis resulted in its rejection. As Biogen concluded in slides presented to Biogen senior executives Defendants Alfred Sandrock and Samantha Budd Haeberlein at an April 11, 2019 meeting:

> Dose response of 6mg/kg, 1-6 doses of 10mg/kg, 7-14 doses of 10mg/kg vs. placebo showed ***no clear dose response to show that 14 doses of 10mg/kg works better***. This is not surprising given that the high dose ***did not in aggregate perform better than the low dose***.

8.      This answer did not satisfy Sandrock and Budd Haeberlein, so Biogen continued to slice the data to prove the Dosage Thesis. Biogen's new attempt failed. It explained in an April 29, 2019 slide that Study 301 patients who received seven to fourteen aducanumab doses did worse than placebo. Not only that, but in Study 302, more 10mg/kg doses was associated with worse results. The data seemed to show nothing but confusion; Biogen concluded that "changes in dosing is unlikely to have influenced differences between cohorts [i.e., pre- and post-PV4]."

Then Biogen tried to see whether cumulative dose could explain the differences and found that "a linear relationship with mean cum[ulative] dose does not explain much variation in response." Might Study 301 patients have experienced less plaque reduction, aducanumab's mechanism of action? No. There was "[n]o observable difference in [a metric of amyloid plaque] over time between Engage (221 AD-301) and Emerge (221 AD-302)." Thus, no matter how hard it tried, Biogen could not make the data fit its narrative that aducanumab was effective.

9.      Biogen convened a group of outside experts to advise it on how to proceed. After a day-long session attended by both Sandrock and Budd Haeberlein, the statisticians among these experts told Biogen it needed to conduct another clinical trial before seeking approval.

10.      In the meantime, Biogen met with the FDA. At a June 14, 2019 meeting, the FDA's response was much better than expected. The FDA's senior clinicians, Billy Dunn and Kevin Krudys, were already convinced that they wanted to approve aducanumab based on Study 302 regardless of Study 301's results.

11.      But the FDA's statisticians, led by Tristan Massie, with a firmer grasp of the subject matter, were not impressed. Notwithstanding the inconsistencies, Biogen, Dunn, and Krudys agreed to develop a working group that would "analyze" the data to "understand" it. They initially included Massie and other FDA statisticians. But the statisticians continued to point out that Biogen's statistical analyses were invalid and the data did not support approval. So in September 2019, Massie and the other FDA statisticians were excluded from the working group.

12.      With no FDA statisticians to object, Biogen and the FDA ran a series of complicated and dubious analyses designed to show that aducanumab was effective, despite what

4

the data showed. Eventually, they found that if they excluded the results of just enough participants as "outliers" and used just the right cut-off for the number of 10mg/kg doses, they could generate results that could explain away Study 301's failure. Biogen identified these levels by trying out thousands of different combinations of thresholds—in other words, through pure data mining.

13.    Biogen went public with these results on an investor call on October 22, 2019, the first day of the Class Period. In that call, Defendants Sandrock and Budd Haeberlein told investors that the data showed that Study 301 failed because not enough patients received the 10mg/kg dose. They promised more results on December 5, 2019, at an annual industry conference, CTAD (Clinical Trials on Alzheimer's Disease).

14.    Biogen's attempt to impose artificial order on the data left loose threads. For instance, take patients who did not have the APOE4 gene ("APOE Non-Carriers" or just "Non-Carriers"). Non-Carriers did not face heightened risks of side effects. So from the start of the clinical trials, Non-Carriers could titrate up to 10mg/kg. They should have achieved good results throughout the study, and PV4 should not have had an impact on their results. But instead, they saw hardly any benefit overall in CDR-SB at week 78, and the post-PV4 group (both low and high dose groups) inexplicably did better than the pre-PV4 group. Or take the impact of PV4 on Study 302. If the number of 10mg/kg doses mattered in Study 301, then it should matter in Study 302, but it didn't. In Study 302, pre-PV4 patients achieved better results.

15.    Defendants were aware of, and concerned about, these inconsistencies. On a Sunday in August 2019, Budd Haeberlein pounced on an email which appeared to suggest an explanation for PV4's lack of impact in Study 302. The sender responded the next morning to state that Biogen had already tried out the explanation, and it was not consistent with the data.

5

Within 40 minutes, Budd Haeberlein pushed again, explaining that the issue was regularly discussed at the level of Biogen's Board of Directors.

16.     Many of the aducanumab team were scandalized by Biogen's conduct. In October 2019, ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████

17.     Thus, Defendants knew the Dosage Thesis had little support and was inconsistent with much of the data from aducanumab's clinical trials. But the doubts did not affect Biogen's external data presentation. Instead, Biogen developed a strategy to conceal the defects in the data. Because Dunn already wanted to approve aducanumab, Biogen would work with him to push aducanumab through to approval. To avoid generating external pushback, Biogen's public presentations would selectively disclose results that seemed to support the interpretation it was advancing—while withholding the data that would show it to be a mere statistical artifact. Biogen would rely on the FDA's approval not only to draw enormous profits from desperate patients hoping for anything that would slow down the scourge of Alzheimer's but also to lean on other more scrupulous regulators, hoping they would defer to the FDA.

18.     In early November 2019, Biogen decided not to present Carrier/Non-Carrier subgroup analyses at CTAD. Biogen noted that it had implicitly agreed to present the analysis in October and anticipated pushback; a document created to prepare for the CTAD presentation anticipated five key questions, one of which was why Biogen had backed away from presenting

Carrier/Non-Carrier subgroups. But Biogen believed that it was worth taking the heat from going back on its word, or otherwise investors would discover that Biogen's presentation (in the words of one executive) was just "data mining." Biogen decided to present data for Pre-PV4 and Post-PV4 groups, but lumped Non-Carriers in with Carriers to conceal that the former saw little benefit and, somehow, did better after PV4 though it did not affect their dosing.

19.     Just before the CTAD presentation, Biogen received more bad data. Biogen was engaged in data cleanup until late November, when it received the final, cleaned-up data from Studies 301 and 302. On November 26, the aducanumab project's lead statistician emailed Budd Haeberlein to report alarming news: the new data showed unambiguously that in Study 302, Pre-PV4 performed significantly better than Post-PV4 and low dose patients performed better than high-dose patients. The lead statistician added that the result was difficult to explain. The lead statistician proposed that at CTAD, Budd Haeberlein present the old data, state that Biogen had just received the final data, and claim that the finalized data was similar to the old data. Budd Haeberlein agreed and did just that.

20.     As the Class Period continued, Biogen employees became more and more worried that they would be found out. An outside statistical expert Biogen hired pointed out the various inconsistencies with Biogen's explanation, stated that dosage explained, at best, a small portion of the difference between Study 301 and Study 302, and called Biogen's statements to the contrary "misleading." In response, senior Biogen group members, including Budd Haeberlein, internally commented that they agreed with the criticism. Budd Haeberlein herself commented that while Biogen had "made it appear as if there is a simple 'dose' explanation," that explanation was false because it was no "home run" and its defects were "glaringly apparent" to those with access to the data Biogen concealed from investors.

21.    Defendants also backed away from regulators who seemed likely to uncover the problems with the data. Biogen identified three main markets for aducanumab: the U.S., the EU, and Japan. Presented with non-public information, Japanese regulators "asked all the tough main questions that we tried to avoid" (according to a senior Biogen statistician) and in particular questioned why PV4 had an impact on Non-Carriers. Spooked that the Japanese regulators were "sharp[] cookies" (in Budd Haeberlein's words), Biogen decided that it would only apply for Japanese approval after it had strong public of FDA endorsement, trusting that the Japanese would defer to the FDA.

22.    In controversial cases like aducanumab's, the FDA will convene an outside group of experts, called an Advisory Committee, to advise on whether to approve the product (as well as other related questions). To solicit advice, the FDA and the entity seeking approval, called a "sponsor" (here, Biogen) will each submit reports. Various FDA bodies, typically including a clinical and statistical reviewer, will also produce separate reports reviewing questions within their domain of expertise. For the first time in any case where the FDA was not unanimous, the FDA and the sponsor (Biogen) produced a single joint report arguing for approval. Krudys, who worked with Biogen to develop the selective analyses that supported approval, was somehow allowed to serve as clinical reviewer. That left the statistical reviewer, Tristan Massie, whose report was produced to Biogen on October 7, 2020.

23.    Massie wrote little that was new to Biogen. One Biogen executive commented the next day that "90%" of the analyses in the reviewer's report were among those he had shared with Biogen way back in August 2019. Nonetheless, Biogen expressed outrage that the statistician had failed to toe the party line. Budd Haeberlein sought "Billy's" assistance in quashing the report and asked internally for advice on "how to complain!" to the FDA about its issuance.

24.    The materials were released on November 4, 2020. Analysts and investors immediately focused on the most obvious fact: Billy Dunn *really* wanted to approve aducanumab. Analysts pointed out that the FDA had issued a joint report saying as much, that Krudys's review report seemed to simply echo the main report, and that the questions presented to the advisory committee appeared designed to lead it to approve aducanumab. The FDA rarely tips its hand so obviously, so Biogen's stock price soared.

25.    The briefing materials included, but buried, a report by Tristan Massie, PhD, the FDA's statistical reviewer on aducanumab's application. Massie relied on the raw data denied to the public and researchers. He ran the analyses and presented the data Biogen had concealed from investors. And his report provided data calling into doubt Defendants' statements: there was no difference between patients who received 6mg/kg or 10mg/kg in Study 302 and a full third of patients who always received the full number of 10mg/kg doses, the Non-Carriers, saw no benefit in either Study. The report also provided additional evidence that suggested problems with the Dosage Thesis. Massie's report was harder to digest, because it was dense, was not tethered to Biogen's previous statements, bore a prominent "DRAFT" watermark on every page, and was filled with spelling mistakes, inconsistent formatting, and unexplained font changes.

26.    Biogen's stock price fell by 7.5% on November 5 as investors digested the complex report.

27.    The Advisory Committee met on November 6, 2020. The Advisory Committee voted 10-0 against approving aducanumab. Their decision was based principally on the analyses Massie ran in his report showing that Biogen had not met its burden of showing substantial evidence of a clinical benefit to Alzheimer's patients, with which they agreed. And in response

9

to sharp questions, Biogen admitted that Non-Carriers achieved better outcomes after PV4 than before.

28.    Biogen's stock was halted all day on November 6. When it resumed trading on November 9, the price of Biogen's stock fell from its previous close of $328.90 to fall to $236.26, down 28.2%.

29.    Then, on June 7, 2021, the FDA approved aducanumab.

30.    The decision caused an immediate uproar. And so, three weeks later, did the revelation by an investigative report of a secret meeting between Sandrock and Dunn at the American Academy of Neurology 2019 Annual Meeting in Philadelphia, as well as other eyebrow-raising contacts both between Biogen and the FDA and inside the FDA itself.

31.    Three of nine permanent advisory committee members resigned, with one calling approval "probably the worst drug approval decision in recent U.S. history."

32.    The American Neurological Association published a statement that aducanumab should not have been approved.

33.    A respected third-party advisory panel with influence over third-party payor decisions found that there is no evidence aducanumab has any benefit whatsoever.

34.    Mt. Sinai Health System, the Cleveland Clinic, and a network that operates 52 hospitals and more than 1,000 outpatient clinics announced they would not administer aducanumab.

35.    Senator Joe Manchin called for the FDA's acting commissioner's replacement over the aducanumab approval decision.

36.    Two House Committees launched investigations into Biogen's relations with the FDA.

10

37.    The longest-serving Secretary of Health and Human Services called for the Department of Health and Human Service's Office of the Inspector General to investigate contacts between high-level FDA staff and Biogen. Days later, the FDA's acting commissioner joined the request.

38.    A July 2021 survey of neurologists reported that 80% had lost confidence in the FDA in the previous year.

39.    By 2025, even Biogen's paid consultants were saying that the aducanumab approval resulted from "misconduct and self-interests."

40.    Investors bought Biogen's stock after Defendants made claims about aducanumab's clinical trials that simply weren't true. They lost money when those claims were shown to be false. That Defendants could count on Dunn to do his utmost to push aducanumab through to approval no matter what the data showed is not a defense to securities fraud.

## II.    JURISDICTION AND VENUE

41.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

42.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and §27 of the Exchange Act.

43.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

44.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

45.    Lead Plaintiff PolyCon Solutions, Inc., and its sole member Nadia Shash, and named Plaintiffs Amjad Khan and Albert Aftoora, as set forth in their PSLRA Certifications which were previously filed and are incorporated by reference, purchased Biogen securities at artificially inflated prices during the Class Period and were damaged thereby.

46.    Defendant Biogen Inc. is a Delaware company headquartered in Cambridge, Massachusetts. Biogen discovers, develops, and manufactures products to treat neurological and neurodegenerative diseases, as well as autoimmune and hematologic disorders. Biogen's principal product is aducanumab, which during the Class Period was an investigational biologic studied for the treatment of Alzheimer's disease. Biogen's securities trade on the NASDAQ Exchange under the ticker symbol "BIIB".

47.    Defendant Michel Vounatsos served as Biogen's CEO and Director from January 2017 through May 2022.

48.    Defendant Alfred W. Sandrock, Jr., served as Biogen's Chief Medical Officer from October 2015. He served as Executive Vice President – Neurology Discovery and Development from October 2015 to October 2019, when he was promoted to the position of Executive Vice President – Research & Development. Sandrock left Biogen effective December 31, 2021.

49.    Defendant Samantha Budd Haeberlein served as Biogen's Vice President of Clinical Development from February 2015 through March 2020 and then as its Senior Vice President – Head of Neurodegeneration Development Unit. She left Biogen in March 2023.

50.    Defendants Vounatsos, Sandrock, and Budd-Haeberlein are the "Individual Defendants."

12

51.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

52.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

53.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.    MEETINGS AND PRESENTATIONS

54.    Defendants and the FDA held at least seven meetings concerning aducanumab that are relevant to this Complaint, which are identified here:

| Meeting | Attendees (among others) |
|---------|--------------------------|
| December 16, 2014 Type B meeting ("December 2014 Meeting") | Dunn |
| Mid-May 2019 off-the-books meeting in Philadelphia ("Off-the-Books Meeting") | Dunn, Defendants Sandrock and Budd Haeberlein |
| June 14, 2019 Type C meeting ("June 2019 Meeting") | Dunn, Defendants Sandrock and Budd Haeberlein |
| October 21, 2019 Type C meeting ("October 2019 Meeting") | Dunn, Defendants Sandrock and Budd Haeberlein |
| February 26, 2020 Type C meeting ("February 2020 Meeting") | Dunn, Defendant Budd Haeberlein |
| June 17, 2020 Type C meeting ("June 2020 Meeting") | Dunn, Defendant Budd Haeberlein |
| November 6, 2020 Advisory Committee Meeting ("Advisory Committee Meeting") | Dunn, Defendant Budd Haeberlein |

13

55.     The Defendants made numerous presentations to investors in which they made false statements, which are identified here:

a.     October 22, 2019 call to discuss Biogen's Q3 2019 earnings and aducanumab's revival ("Q3 2019 Call");

b.     December 5, 2019 presentation at the Clinical trials on Alzheimer's Disease conference to present aducanumab's Phase III topline results ("December 2019 Results Presentation");

c.     December 5, 2019 Q&A call to discuss aducanumab's Phase III topline results ("December 2019 Q&A");

d.     April 2, 2020 encore presentation of aducanumab Phase III topline results ("April 2020 Results Presentation"); and

e.     July 22, 2020 call to discuss Biogen's Q2 2020 earnings ("Q2 2020 Call").

## V.     BACKGROUND

### A.     The Amyloid Hypothesis

56.     In patients suffering from Alzheimer's disease, brain cells that process, store and retrieve information degenerate and die. Yet while Alzheimer's progression is reasonably well understood, its causes remain unclear.

57.     First proposed in 1991, the amyloid hypothesis attributes the disease to build-up of a protein called amyloid beta.

58.     Amyloid beta is a fragment of a larger protein, amyloid precursor protein, commonly known as APP. APP is produced in large quantities in neurons. When it functions normally, it is quickly cleaved into various proteins and metabolized.

59.     One form of cleavage results in the production of single amyloid-beta molecules (monomers). Single amyloid beta molecules are easily metabolized because they are water

soluble. But in some circumstances, the amyloid-beta producing cleavage is sufficiently regular to produce amyloid beta at high concentrations. The amyloid beta form into toxic amyloid groups, called oligomers. At very high concentrations, the amyloid beta can also form into larger insoluble chains, which eventually accumulate into amyloid plaque.

60.     The amyloid hypothesis posits that either the oligomers or the plaque are responsible for Alzheimer's disease. Certain researchers believe that the amyloid plaque causes surrounding neurons to develop intercellular tangles of a protein called tau. The tangles block the neurons' transport system, harming synaptic connections (the junctions between two nerve cells). More recently, researchers who support the amyloid hypothesis have come to believe that the oligomers may cause Alzheimer's by diffusing into synapses and destroying them. Under either version of the theory, the deterioration of synaptic connections caused by amyloid beta oligomers or plaque causes loss of cognition and the other symptoms observed in Alzheimer patients.

61.     In the decades after its formulation, the amyloid hypothesis displaced older theories, becoming the leading theory explaining Alzheimer's. Billions of dollars were spent researching potential cures based on the amyloid hypothesis. According to a 2017 review, more than a hundred products were tried or advanced to clinical trials.[3] These products targeted nearly every molecule the amyloid hypothesis suggests may assist in treating or preventing Alzheimer's disease, from molecules that inhibit the gamma secretase and BACE-1 molecules that drive production of amyloid beta, through monoclonal antibodies that inhibit the formation of amyloid

---

[3] Dev Mehta et al, *Why do trials for Alzheimer's disease drugs keep failing? A discontinued drug perspective for 2010-2015*, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5576861/

plaque or break it up, to drugs that inhibit other molecules with which amyloid beta interacts. Yet as of the end of the Class Period, none had succeeded.

62.    These failures have taken a toll on the amyloid hypothesis itself. A growing minority of researchers and practitioners dispute the theory.

63.    Many more researchers changed their minds about the amyloid hypothesis when, after the Class Period, it was revealed that the foundational journal articles supporting the theory were based on scientific fraud and doctored images.[4] The articles were retracted and the researcher responsible left a tenured position after the university employing him reported that a 2.5 year investigation had resulted in a "data integrity concerns" and recommended that the articles be retracted.[5]

### B.    How Aducanumab Works

64.    Aducanumab is a monoclonal antibody, which is a laboratory-made clone of naturally-occurring antibodies.

65.    Antibodies are proteins that circulate through the body until they find, and attach to, other proteins known as antigens. The antibody thereby draws the immune system cells' attention to the protein, which these cells then destroy.

66.    According to Defendants, what the decades of failed amyloid-based treatments showed was that the human body could not safely tolerate the high doses of antibodies necessary if the antibodies targeted *all* forms of amyloid beta. Defendants claimed that Biogen had learned the lesson of these failures. Aducanumab does not target all amyloid beta. Instead, it selectively

---

[4] Charles Piller, Blots on a Field, Science, volume 377, Issue 6604, July 22, 2022, available at https://www.science.org/toc/science/377/6604.
[5] Charles Piller, Alzheimer's scientist resigns after university finds 'data integrity concerns' in papers, Science, July 21, 2022, available at https://www.science.org/content/article/alzheimer-s-scientist-resigns-after-university-finds-data-integrity-concerns-papers.

targets *aggregated* amyloid beta, with little or no unproductive binding to amyloid beta monomers. By more precisely targeting aggregated amyloid beta, Defendants claimed, aducanumab can be given in doses high enough to be clinically effective.

67.     Amyloid beta aggregates in two principal different forms, soluble oligomers or the insoluble fibrils which make up plaque. Of these, aducanumab preferentially targets fibrils.

68.     Studies have not shown that removing amyloid plaque has any impact on Alzheimer's disease sufferers' clinical outcomes.

### C.     Aducanumab's Clinical Trials End in Failure

*"It's make-or-break for the company. I can't think of more of a defining event for a large-cap company."*

-Brian Skorney, Robert W. Baird & Co. analyst, concerning the Aducanumab Advisory Committee Meeting

*"So is there any product in any pipeline from any company that can be at par with aducanumab and can compensate for potential failure of such a major product? So I don't think so."*

-Defendant Vounatsos at the J.P. Morgan Healthcare Conference, shortly before futility was declared

*"[Biogen] is basically a declining business. In the case of an aducanumab non-approval, it just becomes a very difficult investment story."*

Mohit Bansal, Citigroup analyst, as reported in a February 5, 2021 *Reuters* article

### i.     *Aducanumab Fails a Pre-Specified Futility Test*

69.     Biogen submitted an Investigational New Drug (IND) Application to the FDA for Aducanumab in 2011 and began Phase I trials shortly thereafter.[6]

---

[6] Because aducanumab is a biologic, Biogen must file a Biologics License Application (BLA) for its approval. But the clinical trials that lead to a BLA are the same as those that lead to a New Drug Application.

70.     Biogen's first study, Study 101, was a Phase I ascending dose study of 53 subjects. Single doses ranging from 0.3 to 60 mg/kg of aducanumab, or placebo, were administered to patients with mild to moderate Alzheimer's disease on a randomized and blinded basis.

71.     Biogen used the safety data from Study 101 to inform Study 103 (also called PRIME), the Phase Ib/2 study that began in 2012 and yielded results beginning in 2014.

72.     Study 103 included a 12-month randomized, double-blind, placebo-controlled period, followed by a dose-blinded long term exposure period.  A total of 196 participants at 27 clinical locations across the United States were randomized and dosed.

73.     The subjects were 50 to 90 years old and had early symptomatic Alzheimer's disease and PET-confirmed brain amyloid pathology.

74.     A particular form (or allele) of a gene that codes for the production of apolipoprotein E (ApoE), a protein, is associated with higher rates of Alzheimer's. Each person inherits two forms of ApoE, one from each parent. Having one ApoE ε4 gene (APOE4) (25% of the population) increases the risk of Alzheimer's disease; having two (2-3%) increases the risk even further.

75.     Not every APOE4 carrier ("Carrier" or "APOE4 Carrier") develops Alzheimer's disease, and not everyone who develops Alzheimer's disease is a Carrier. Still, APOE4 is a potent risk factor. Even though only about one quarter of the population are Carriers, almost half of all Alzheimer's disease patients are.

76.     Carriers are also at increased risk of brain hemorrhage, referred to as amyloid-related amyloid imaging abnormalities (ARIA), including the very serious ARIA-E. Because ARIA is a known side effect of anti-amyloid beta monoclonal antibodies like aducanumab, Carriers risk getting ARIA, particularly with higher aducanumab doses.

18

77.    Study 103 included both Carriers and Non-Carriers. One cohort, which consisted solely of Carriers, was designed to assess whether the incidence of ARIA could be mitigated through titration.[7]

78.    Study 103's primary endpoint was the safety and tolerability of aducanumab. Secondary endpoints were (1) the effect of aducanumab on brain amyloid content; (2) the pharmacokinetics of aducanumab; and (3) the immunogenicity of aducanumab. Exploratory endpoints included measures of clinical efficacy, such as change from baseline on the Clinical Dementia Rating – Sum of Boxes ("CDR-SB") and Mini-Mental State Examination ("MMSE") tests.  Biogen later used both CDR-SB and MMSE as endpoints in aducanumab's Phase III trials.

79.    According to Biogen, four major findings from Study 103 influenced the design of the two Phase III trials that would begin in 2015: (1) Biogen identified 10 mg/kg as the most effective dose of aducanumab; (2) Biogen found the CDR-SB scale to be sensitive enough to detect changes among early symptomatic Alzheimer's patients; (3) Biogen observed greater variability on the CDR-SB among patients with more advanced disease at baseline; and (4) in 2016, Biogen concluded that titration did lower the incidence of ARIA in Carriers as compared to fixed dosing.

80.    Study 301 (i.e., ENGAGE) and Study 302 (EMERGE) were identical global randomized double-blind, placebo-controlled parallel Phase III studies designed to show aducanumab's safety and efficacy. These two Phase III trials included an 18-month double-blind placebo-controlled period, followed by a dose-blinded long term extension period.

---

[7] Drug titration is the process of adjusting the dose of a medication for the maximum benefit without adverse effects. It is especially important when the range between the dose at which a drug is effective and the dose at which side effects occur is small.

19

81.    Together, Studies 301 and 302 enrolled 3,285 patients at 348 sites across 20 countries.  Participants were between 50 and 85 years old, with early symptomatic Alzheimer's disease, and positive for brain amyloid pathology as assessed by positron emission tomography (PET).  Approximately 80% of participants in each Study would have a baseline clinical diagnosis of mild cognitive impairment, and approximately 20% would have a diagnosis of mild Alzheimer's disease dementia, the latter of which denotes patients whose Alzheimer's disease substantially interfered with daily life.

82.    Both Carriers and Non-Carriers were enrolled, with Carriers by design accounting for approximately two-thirds of each study population.

83.    Clinical measures were evaluated at baseline, 6 months, 1 year, and 18 months.

84.    While Studies 301 and 302 were identical in design, they started one month apart, with Study 301 beginning first and remaining ahead in enrollment.

(1)    Clinical endpoints

85.    Once symptoms become noticeable, patients with Alzheimer's disease experience progressive decline in cognition and brain function.  Biogen selected five clinical efficacy scales to measure the range of symptoms experienced by patients with Alzheimer's disease. Assessments on these five scales rely on information provided by the patient, the caregiver, and independent clinical assessors. On each of these five scales, the total measures disease severity, with changes over time reflecting the clinical progression.

(a)    CDR-SB

86.    The studies' primary endpoint was the change from baseline in CDR-SB at Week 78. The CDR-SB scale integrates assessments from three domains of cognition (memory, orientation, and judgment/problem-solving) and three domains of function (community affairs, home/hobbies, and personal care).

20

87.     After interviewing the caregiver and examining the patient, the rater assigns a score that best describes the patient's current level in each of these six domains.  The "sum of boxes" scoring methodology adds up the scores for each of the six domains, and provides a value ranging from 0 to 18 that can change in increments of 0.5.  Higher scores indicate greater severity of Alzheimer's disease.

(b)    MMSE

88.     The first-ranked secondary efficacy endpoint was the change from baseline in MMSE at Week 78. MMSE is a performance-based test of global cognitive status.  The test consists of 11 tasks to assess orientation, word recall, attention and calculation, language abilities, and geospatial functions. The 11 tasks produce scores that are combined to obtain a total score, which ranges from 0 to 30.  Lower scores indicate higher cognitive impairment.

(c)    ADAS-Cog13

89.     The second-ranked secondary efficacy endpoint was the change from baseline in ADS-Cog13[8] at Week 78. ADAS-Cog13 includes both cognitive tasks and clinical ratings of cognitive performance. The test focuses on, among other things, word recall, ability to follow directions, ability to copy or draw an image, ability to interact with everyday objects, naming, word recognition, memory and concentration. The total scores range from 0 to 85, with a higher score indicating higher cognitive impairment.

(d)    ADCS-ADL-MCI

90.     The third-ranked secondary efficacy endpoint was the change from baseline in ADCS-ADL-MCI[9] at Week 78. In the ADCS-ADL-MCI test, caregivers rate patients' actual

---

[8] Which stands for Alzheimer's Disease Assessment Scale - Cognitive 13-Item Scale.

[9] Which stands for Alzheimer's disease co-operative study ADL scale for mild cognitive impairment.

functioning over the previous month on a series of 18 items (ranging from shopping, preparing meals to getting dressed), and assess changes in the functional state of the patients over time. The score ranges from 0 to 53, with lower scores reflecting functional deterioration.

(e)  NPI-10

91.  The studies' tertiary efficacy endpoint was the change from baseline on NPI-10[10] at Week 78. In NPI-10, an interviewer compiles an index of the presence, frequency and severity of 10 neuropsychiatric symptoms, including delusions, hallucinations, depression, anxiety and euphoria. The score ranges from 0 to 120, with higher scores indicating more serious symptoms.

(2)  Biomarkers

92.  In addition to the clinical measures, various biomarkers were assessed to study the effects of aducanumab on brain pathology. PET scans were conducted on a subset of patients to determine whether patients receiving aducanumab showed greater reduction in amyloid plaque in their brains than patients receiving placebo. In turn, Biogen could determine whether removal of amyloid plaque correlated with better clinical outcomes—i.e., whether aducanumab worked as intended.

(3)  Doses Studied

93.  The Phase III studies compared the effects of two dosing regimens of aducanumab versus placebo over the 18-month placebo-controlled period.  Participants were randomized 1:1:1 to aducanumab high dose, aducanumab low dose, or placebo.  The randomization was stratified by APOE4 status.

94.  Initially, due to concerns about Carriers' risks of developing ARIA, both the low and high doses of aducanumab differed based on the participant's APOE4 status.

---

[10] Which stands for 10-item Neuropsychiatric index.

95.    Carriers assigned to the low dose received 3 mg/kg after titration over 8 weeks, while Non-Carriers assigned to the low dose received 6 mg/kg after titration over 24 weeks.

96.    Similarly, at the beginning of the studies, Carriers assigned to the high dose received 6 mg/kg after titration over 24 weeks, while Non-Carriers assigned to the high dose group received 10 mg/kg after titration over 24 weeks.

(4)    Amendments

97.    Biogen implemented two important amendments to the protocol during the course of the studies, both due to diminishing concern surrounding ARIA as a side-effect of aducanumab.



(5)    Timing of Protocol Version 3 and Protocol Version 4

(a)    Protocol Version 3

98.    The first amendment, documented in Protocol Version 3 ("PV3"), took place in July of 2016 and related to ARIA management.

99.    The Phase III trials began with an ARIA management program that resembled the one that had been used in Study 103. This protocol mandated suspending dosing under certain circumstances, for example when ARIA was accompanied by mild or moderate symptoms, or

23

when ARIA-E was radiographically moderate or severe. After ARIA was resolved (i.e., disappeared), dosing could be resumed at the next lower dose. These participants were required to remain at that dose for the duration of the trial.  For other participants, for example those with more severe symptoms, dosing was discontinued permanently.

100.    PV3 made several changes to the protocol. Under PV3, participants who had suspended dosing due to ARIA that was later resolved could resume dosing at the same dose (rather than the lower dose) and could continue titration to the target dose. In addition, participants with certain severe symptoms could suspend dosing (rather than discontinuing permanently).

101.    PV3 therefore enabled participants who had experienced ARIA to continue on aducanumab and reach their assigned target dose of aducanumab.

(b)    Protocol Version 4

102.    Protocol Version 4 ("PV4") was adopted in March 2017 based on ARIA data from the final enrolled cohort of Study 103 which showed that 10mg/kg doses could be safely administered to APOE4 Carriers. With this data in hand, PV4 increased the high dose for Carriers from 6 mg/kg to 10 mg/kg. The low dose did not change, nor did the high dose for Non-Carriers.

103.    Thus, after PV4, the high dose of aducanumab, after titration over 24 weeks, was 10 mg/kg for all participants regardless of APOE4 status.

(6)    Futility Analysis

104.    An interim analysis for futility was included in the Phase III study protocol to terminate the studies early if the analysis showed that aducanumab was unlikely to prove effective.

105.    The protocol specified that the interim futility analysis would be performed after approximately 50% of participants in the studies had the opportunity to complete the Week 78

primary efficacy assessment. The data cutoff date for the prespecified futility analysis was December 26, 2018.

106.    An independent group, external to Biogen and not involved in the conduct of the studies, performed the futility analysis.

107.    The prespecified criteria for futility was based on conditional power for CDR-SB, which is the probability calculated on the data at the interim date that the final data would show statistical significance in favor of aducanumab.

108.    The studies would be considered futile if the trials had less than a 20% chance of meeting primary endpoints, pooling the data across both trials (called conditional power). This meant that if there were less than a 20% likelihood that final study results would be statistically significant in both the low and high dose arms of Studies 301 and 302, the studies would be terminated. The conditional power for each study was calculated on a future estimate based on pooled data from Studies 301 and 302.

109.    Biogen decided to use pooled data because of the statistical notion that pooling approach is better than examining the trials separately so long as the trials are relatively homogeneous. Because the two Phase III trials were identically designed, Biogen did not expect significant heterogeneity between the trials.

110.    The futility analysis showed that the estimated conditional power values for CDR-SB in the high dose group were 12% for Study 302, and 0% for Study 301.  The probability of a statistically significant difference at the end of the Study was therefore well below the prespecified cutoff of 20%.

111.    Because the futility criteria had been met, Biogen terminated aducanumab's Phase III trials.  In a press release issued on March 21, 2019 announcing the termination, Biogen

explained that "[t]he decision to stop the trials is based on results of a futility analysis conducted by an independent data monitoring committee, which indicated the trials were unlikely to meet their primary endpoint upon completion."

112. On this news, the price of Biogen stock fell from its previous close of $320.59 to $226.88, or by over 29%, on March 21, 2019.

113. The analysts who covered Biogen immediately slashed their price targets in response:

| Analyst | Price target reduction | Source |
|---|---|---|
| SVB Leerink | From $341 to $247 | March 22, 2019 report titled *Post-Aducanumab Future Uncertain; Changes Needed But How & When?* |
| RBC Capital Markets | From $318 to $236 | March 22, 2019 report titled *[Biogen] Without Alzheimer's: What's Next and Where Do They Go From Here?* |
| Morgan Stanley | From $401 to $210 | March 22, 2019 report titled *Base Business Risks No Longer Offset By Significant Upside Optionality* |
| BMO Capital Markets | From $322 to $250 | March 22, 2019 report titled *Little Right Now to Cling to* |
| Wells Fargo Securities | From $455 to $270 | March 21, 2019 report titled *Downgrading to Market Perform on Alzheimer's Failure* |
| UBS | From $395 to $242 | March 21, 2019 report titled *The Day After – Where to From Here?* |
| Oppenheimer | From $375 to $290 | March 21, 2019 report titled *Post-Aducanumab, Attention Shifts to Cash Flows* |
| J.P. Morgan | From $436 to $244 | March 21, 2019 report titled *Much Adu About Everything: Failed Phase 3 Futility Analysis Delivers Big Blow to [Biogen]* |
| Cantor Fitzgerald | From $400 to $250 | March 21, 2019 report titled *Increased Risk after [Alzheimer's Disease] Failure* |
| Canaccord Genuity | From $396 to $275 | March 21, 2019 report titled *Aducanumab failure means [Biogen] at a strategic crossroads* |

26

| Barclays | From $340 to $250 | March 21, 2019 report titled *More Optionality Needed* |

114. Investors made clear to Biogen that it had to come up with a game-changing new drug or they would head for the exits. As a Jefferies analyst wrote in an April 24, 2019 report:

Key Takeaway
Management addressed three issues on the Q1 call: Tec IPR, Spinraza competition, and BD/M&A. Yet the most common investor question we receive relates to the potential for a near-term catalyst to get excited about. Investors who thought there might be near-term "value creation" or "strategic alternatives" were left with nothing to cling to as comments focused on continued [stock] buybacks and long-term pipeline diversification.

115. Many analysts feared aducanumab's failure left Biogen dead. J.P. Morgan made Biogen the first profile in its *The Excavator* series of reports on companies that seemed to be heading to extinction. J.P. Morgan's report spanned more than 100 pages and began:

So what does the future hold [for Biogen]? First and foremost (and maybe most obvious), the outlook for top-line growth appears challenged, with MS, SMA, and royalty revenue all at risk and a lack of exciting, de-risked pipeline candidates ready to step up. Secondly, it's clear from our conversations that investors are waiting for Biogen to bring in some late-stage assets with tangible value; however, for a number of reasons (willingness, cost / availability of targets, etc.), this could be an uphill battle and may never even materialize (sometimes you just have to trust what you see). Further complicating matters – at least for the short term – is the lingering uncertainty around Tecfidera IP. With all of this on the horizon, we struggle to get constructive on the name and believe that the onus is on management to change this dynamic.

116. During the Class Period, investors were laser-focused on aducanumab. In a note sent to clients on or about April 21, 2020, an analyst employed by Jefferies wrote that "[f]or every question related to fundamentals, we get 10 questions on Alzheimer's status."

117. In a report dated July 8, 2020, a J.P. Morgan analyst wrote that "with mounting pressures on the core MS/SMA franchises lowering [Biogen]'s perceived floor valuation, everything appears to be riding on this single, controversial asset [aducanumab]."

118. And in a November 3, 2020 article, a Wolfe Research analyst wrote: "By our modeling at least, [Biogen] lives and dies by how aducanumab plays out. This is because

[Biogen]'s underlying revenue base is like quicksand due to patent expiries and competitive threats."

### D. Defendants Made False Statements About Dose Response and Study 301

#### i. Defendants Could Not Secure Aducanumab's Approval Without Disarming the Negative Study 301 Results

119. Of the aducanumab clinical trials, one (Study 302) was potentially positive, while the other (Study 301) was clearly negative.

120. As further set out below, at a June 2019 Meeting, Biogen and the FDA discussed how they would secure approval of aducanumab. Biogen and the FDA office decided that Biogen would seek, and the FDA office push for, regular approval.

121. The June 2019 Meeting's minutes set out two options under which the FDA could grant regular approval to aducanumab. Both options required that Biogen at least explain away the results of Study 301:

> [Collective discussion of Options] 2 and 3 – The submission of a marketing application for aducanumab based primarily on the results of Study 302 as a single positive efficacy study may also be considered. It is possible that the results of Study 301 may have a role in supporting the results of Study 302 or may be understood well enough to be dismissible (i.e., to not represent evidence that the drug is ineffective), assuming that further analyses do not lead to a conclusion that Study 301 is clearly negative. However, currently available data do not suggest the future use of Study 301 as an efficacy study providing independent evidence of effectiveness supporting the approval of aducanumab for the treatment of Alzheimer's disease. ***For both options 2 and 3, the results of further detailed analyses [of Study 301] would be expected to be critical supportive components that establish or contribute to the interpretability of the efficacy results.***

122. The market, likewise, understood that aducanumab's only pathway to approval was to explain away Study 301's results. There is no precedent for the FDA to approve a drug where one arm of Phase III trials was positive, and the other was negative, unless there is a reasonable explanation for the failure. As an October 29, 2019 report by an analyst employed by RBC noted:

3 key things need to happen for adu approval.

      \*            \*            \*            \*            \*

2. FDA/EMA would need to buy into rationale for ENGAGE failure and be convinced EMERGE reflects adu's real activity.

> ii.     *Defendants Made False Statements of Fact About 10mg/kg Dosing and Study 301 that Were Contradicted By Study 302 Data Defendants Concealed*

123.     To convince investors that aducanumab could receive regular approval, Defendants built a narrative, largely out of false and misleading statements, that patients in Study 301 who had received treatment similar to patients in Study 302 did experience improved clinical outcomes. Defendants concealed the data showing their false and misleading statements, and their narrative, were false.

124.     On October 22, 2019, Defendants held a call to discuss Biogen's Q3 2019 earnings and aducanumab's apparent rebirth (i.e., the Q3 2019 Call). Then, on December 5, 2019, Defendants (a) presented aducanumab Phase III clinical trial results at the Clinical Trials on Alzheimer's Disease conference; and separately (b) held a call to answer investors' questions about aducanumab. Defendants supported their claims with 58 slides of carefully selected data and specific statements.

125.     In the Q3 2019 Call and December 2019 Results Presentation, Defendants presented selected data and made statements of fact designed to give the false impression that aducanumab clinical trials' outcome was favorable.

29

126.    First, Defendants claimed that more patients in Study 302 were treated after PV4[11] than those in Study 301. Thus, more patients in Study 302 received a full complement of 10mg/kg doses rather than the reduced 6mg/kg pre-PV4 dose.

127.    Then, Defendants claimed that the reason Study 302 *was* positive and Study 301 *was not* was that there were more post-PV4 patients in Study 302. Defendants claimed that Study 301's post-PV4 population achieved clinical outcomes similar to those achieved by patients in Study 302. Thus, Defendants claimed, aducanumab was effective when patients received sufficient doses of 10mg/kg; it was not effective when patients received a lower dose or fewer 10mg/kg doses ("Dosage Thesis"). Defendants claimed patients experienced a dose-dependent response to aducanumab.

128.    When Defendants claimed that PV4 was responsible for the changes without disclosing the underlying data that would have shown their claim to be false, they actually misled investors, as shown by stock analyst reports:

a.    In a December 6, 2019 report, a BMO analyst concluded that "[n]ew analyses of both EMERGE and ENGAGE demonstrated how the timing of [PV4] resulted in too few patients in the failed ENGAGE trial to ever achieve sufficient drug exposure. *As shown on page 3, a[ducanu]mab treatment appears to result in the desired efficacy hurdle in the 'post-PV4' treated population of both studies*[.]"

b.    In a December 5, 2019 report, a Cantor Fitzgerald analyst concluded that:

> *When we look at ENGAGE data (the failed trial), we think that the argument of patients getting lower exposure to high dose does make sense.* Biogen presented patient data post

---

[11] Patients who consented to PV4 before week 16 of their treatment had the opportunity to be titrated to 14 doses of 10mg/kg. Thus, pre- and post-PV4 refers to those patients who adopted PV4 on or before their week 16.

the protocol 4 amendment, and the outcomes were consistent between EMERGE and ENGAGE studies[.]"

c.      In a December 5, 2019 report, a Morningstar analyst concluded that:

One of the key questions going into the Dec. 5 presentation was whether the one-month difference in trial start dates for Engage and Emerge was big enough that the protocol amendment (allowing patients carrying that ApoE4 genetic risk to take the 10mg/kg high dose) could have prevented the more advanced Engage study from meeting its endpoints. Biogen disclosed that when this amendment was made in March 2017, Engage had 200 more patients enrolled than Emerge. As a result, fewer carrier patients received the high dose, resulting in 22% of patients receiving all possible 10mg/kg treatments in the Engage study, versus 29% in the Emerge study.

***Perhaps most importantly, Biogen provided a helpful analysis of only patients enrolled after the amendment, comparing patients in high-dose and low-dose arms of both studies to placebo patients. Among these high-dose patients, 51% in Emerge and 47% in Engage received all possible 10mg/ml [sic] doses, creating less difference in total dosing. This analysis revealed a 30% reduction in decline in CDR-SB in Emerge and a 27% reduction in decline in CDR-SB in Engage for high-dose patients, which we think shows consistency between the trials and could be enough to support approval.***

d.      In a December 5, 2019 report, an RBC analyst concluded:

A few notably new datapoints which we believe were incrementally favorable. ***The most interesting new analysis, in our view, looked at patients post the Protocol 4 amendment [], in which the subgroup of [patients] eligible to potentially receive 14 doses of high-dose (10mg/kg) adu (and who consequently had 32% higher cumulative adu exposure) showed similar favorable CDR-SB benefits (27-30%) and benefits on other endpoints across the EMERGE and ENGAGE studies – helping build BIIB's case that ENGAGE's failure was actually due to the enrollment timing differences relative to the protocol amendments.***

e.      In a December 5, 2019 report, a Guggenheim analyst concluded that:

***[A]nalysis indicated that continuous exposure to high dose aducanumab provided consistent benefits to patients*** [in EMERGE] (this phenomenon was also present in ENGAGE (see figures below). In this vein, one [Key Opinion Leader] on the panel noted that based on the current dataset, he believed that more consistent exposure to higher doses over a sufficient duration of time could lead to more favorable patient responses.

f.      In a February 3, 2020 report, an SVB Leerink analyst concluded:

**Our View**: We believe aducanumab could be the 1st [disease modifying therapy] approved for treating Alzheimer's, and it would be a significant product in AD.

*          *          *          *          *

31

- *The high dose arms data are more impressive in the post-PV4 cohort when considering the enhanced treatment effect of [Placebo]-adjusted CDR-SB reductions (EMERGE moved from -23% in ITT to -30% for post-PV4, and ENGAGE moved from 2% in ITT to -27% for post-PV4)*

The SVB Leerink analyst concluded that higher doses after PV4 caused Carriers' clinical outcomes to improve:

- *Initially, a suboptimal 6mg dose was applied in ApoE4 carriers due to ARIA safety concerns*
- *After PV4, ApE4 [sic] carriers were titrated up to the 10mg dose to ensure enough exposure, as Biogen figured out that ARIA could be managed via careful dose titration; therefore, the data readouts were complicated by the modified clinical design*

129. Other analysts noted that the Carrier/Non-Carrier subgroup analysis was material to aducanumab's prospects for approval and use:

a. In a December 5, 2019 report, a Cowen analyst noted that "[Biogen] did present a couple of new supportive efficacy analyses, but other subgroup analyses (e.g. APOE) were not disclosed."

b. In a December 5, 2019 report, a Credit Suisse analyst noted that "the lack of insight into how carriers (e.g. post-PV4) perform at high doses could prevent some physicians from prescribing without carrier testing[.]"

### E. Defendants' Statements Were False and Made With Scienter

#### i. Biogen Concludes that There Is No Relationship Between the Number of 10mg/kg Doses and Clinical Outcomes

130. The futility analysis was based on the data that was available as of December 26, 2018. Biogen continued to collect data between the futility cut-off and its futility declaration on March 21, 2019. Just after declaring futility, Biogen created a new dataset that included the new data ("April Dataset").

32

131. The new data, Biogen quickly concluded, showed that Study 302 by itself would have passed the futility test, but that Study 301 would not.

132. Biogen statisticians then got to work analyzing the April Dataset. The Dosage Thesis was one of the first theories Biogen tested. Biogen started the aducanumab clinical trials with the assumption that 10mg/kg was the most effective dose, but until PV4, two-thirds of the patients in the high-dose group only received 6mg/kg. So, naturally, Biogen tested the theory that patients who received more 10mg/kg doses achieved better results.

133. But Biogen found that the Dosage Thesis was not consistent with the data. Biogen statisticians created a PowerPoint slide deck titled *Aducanumab Engage/Emerge Additional Results*, summarizing early analyses. The slide deck was presented to Defendants Budd Haberlein and Sandrock at an April 11, 2019 meeting. The slide deck's first few slides summarized the conclusions under header "Craig's [Mallinckrodt, a senior Biogen biostatistician] omnibus conclusions." One of the conclusions was:

> Dose response of 6mg/kg, 1-6 doses of 10mg/kg, 7-14 doses of 10mg/kg vs. placebo showed ***no clear dose response to show that 14 doses of 10mg/kg works better***. This is not surprising given that the high dose ***did not in aggregate perform better than the low dose***.

BIOGEN_0002472479

134. The deck also contained the slides that informed the omnibus conclusions. One of these slides showed that in Study 301, patients who had the opportunity to receive fourteen doses of 10mg/kg performed worse than placebo:

33



135.    At the same time, Biogen was preparing another slide deck titled Exploratory analyses on ITT, which provided more detailed information on results by number of doses. The slide deck provided the results of patients who had received 1-6 10mg/kg doses and those who had received 7-14 10mg/kg doses in both Studies 301 and 302. The analysis was run in two different populations: ITT, meaning patients who began the treatment, and OTC (referred therein as "cplt"), meaning patients who had the opportunity to complete the treatment. In the slide deck, Biogen called out that: (a) in Study 301, in both ITT and OTC, though patients who received more doses did better than patients who received fewer, both doses did worse than placebo; (b) in Study 302, patients who received more doses did worse than placebo; and (c) pooling data from Studies 301 and 302, in ITT, patients who received more doses did better, but in OTC, patients who received fewer doses did better. Defendants presented these results over three slides (highlighting in original):

34





Source: BIOGEN_0002456782

136.    Disappointed in the results, at the request of a senior Biogen employee, Biogen tried aggregating the data differently by "matching" patients. Biogen reached the same results. In an email attaching a slide deck containing the analysis on all three populations (ITT, OTC, and matched), a Biogen employee wrote "[t]he trends are exactly the same as what we have seen using the old data. The conclusion is still 301 shows a dose response but 302 does not, and the combined showed opposite direction in the completer vs ITT, hence no clear dose response." BIOGEN_0003604691. The employee copied Ying Tian, the lead statistician on the aducanumab project.

137.    In a slide summarizing the team's conclusions, Biogen concluded, again, that "[w]e evaluated dose response of 6mg/kg, 1-6 doses of 10mg/kg, 7-14 doses of 10mg/kg vs. placebo. No clear dose response to show that 14 doses of 10mg/kg works better. Therefore, *changes in dosing is unlikely to have influenced differences between cohorts*." BIOGEN_0004039666

36

138.    The slides were shown to Defendant Budd Haeberlein. She provided extensive comments.

139.    Biogen attempted to show that Study 302 patients had lost more amyloid plaque. If they had lost more plaque, then maybe it made sense that they achieved better results. Again, the conclusion was negative. As Biogen stated in a PowerPoint presentation, there was "[n]o observable difference in [PET SUVR, a metric of amyloid plaque buildup] over time between Engage (221 AD-301) and Emerge (221 AD-302)." BIOGEN_0004053535.

140.    Biogen then tried to determine whether amyloid plaque reduction could explain the results. There was no relationship in Study 301:



BIOGEN_0002539427

141.    Biogen also tried to determine whether average dose explained the results. There was no relationship in Study 301:



BIOGEN_0002347006

142.    Thus, no matter how many ways it evaluated the study data, Biogen could not make the data show a dose response.

        *ii.    Biogen Convenes A Group of Outside Experts Whose Statisticians Tell Biogen That It Should Not Proceed with Approval Without Another Study*

143.    In May 2019, Biogen convened a group of experts to advise it on how to proceed. The group included two clinicians and two statisticians. Biogen's first choice of statistician was Dr. Thomas Fleming, a world-renowned expert in clinical biostatistics. As Craig Mallinckrodt, stated in an April 26, 2019 email, "it would be a shame not to get [Fleming]." BIOGEN_0003671592. Biogen did secure Dr. Fleming's appearance.

144.    Biogen prepared a set of slides to present to the experts. In initial drafts of the slides, Biogen stated that PV4 "resulted in apoe4+ patients in the late cohort receiving higher doses than in the early cohort. Given the confounding of the dose regimen change with the small changes in illness characteristics, concomitant medication usage, and the BSSR [a statistical

38

technique], it is not surprising that ***none of these factors was shown to have an individually important influence*** on the difference between cohorts." BIOGEN_0002515588.

145. The statement was deleted on instructions from Defendant Budd Haeberlein. Without the deleted material, the slide (which was presented to the experts) now stated only "The protocol amendment V4 (24Mar2017) resulted in ApoE ε4+ patients in the late cohort receiving higher doses than in the early cohort." BIOGEN_0002457206.

146. Biogen presented results to the experts in a nine-hour session on May 18, 2019. Defendants Sandrock and Budd Haeberlein attended the session. BIOGEN_0002583929.

147. While the experts found some of the analyses interesting, the statisticians did not believe the Studies supported approval. Rather, according to Biogen employee Xiaopeng Miao's notes of the meeting:

> [The advisors] think the data warrant future development (e.g, confirmation in a subsequent study with high dose under the PV5 dosing regimen for 24 months) and regulators should weigh in on this. Regulatory interaction should occur prior to presentation to the scientific community. After that public should be informed in a time sensitive manner. RP [a clinician] mentioned conditional approval followed by a phase 4 given reducing amyloid in brain is intriguing while [Fleming] didn't see the basis for that.

BIOGEN_0003604466

148. Fleming later confirmed in written notes to Biogen that he told them at the May 18, 2019 session that aducanumab approval could only be justified through an additional clinical trial. BIOGEN_0003394067.

149. The experts also concluded that dose did not explain the results. On May 20, 2019, Budd Haeberlein emailed then-Executive Vice President Michael Ehlers to provide an update on the expert committee. Budd Haeberlein reported that there were "[m]any small influences, none above 20%." BIOGEN_0003663535

150.    The clinicians did give one piece of advice that Biogen welcomed. According to Biogen's official notes of the meeting:

When asked if they will prescribe aducanumab if conditional approval were given, RP and NF responded that that they will give patients the option and tell them that perhaps there will not be too much benefit apparent for the first 18 months. They also indicated patients will be receptive to that.

BIOGEN_0002484017

    iii.    *Biogen Uses Informal Communications To Persuade Billy Dunn to Push Aducanumab Through To Approval*

151.    Even as it pursued advice from its outside experts, Biogen was attempting to seek informal assistance from the FDA.

152.    On April 30, 2019, Defendant Budd Haeberlein met with Billy Dunn, the head of the FDA's Office of Neurology, in an informal one-on-one meeting. Summarizing the interaction to Biogen's senior statisticians and Defendants Sandrock and Vounatsos, Budd Haeberlein explained:

I met with Billy Dunn this morning in DC and raised with him that we had continued to analyze the Aducanumab data which are complex. I informed him that the scientific community would expect us to present the data at AAIC in July and that prior to that we would be discussing this quite complex data set with external statistical and clinical advisors. In the spirit of partnership I suggested that pending external input we may wish to discuss the data with DNP. I emphasized that if this was a possibility we would appreciate such a discussion in June.

Billy said

                    *        *        *        *        *

    ▪    [He] [w]ould make an effort to accommodate informal discussion or formal

    ▪    If we wanted really informal [he] suggested that I email him directly to request."

BIOGEN_0002581460

40

153. Biogen employees and Sandrock were enthused by Dunn's response, particularly his offer of informal contact.

154. On May 8, 2019, Budd Haeberlein and Sandrock held a second informal, off-the-books meeting with Dunn. An internal document setting out Biogen's goals for the meeting stated that Budd Haeberlein and Sandrock would tell Dunn:

> The protocol amendment V4 (24Mar2017) that changed target dose from 6mg/kg to 10mg/kg in the high dose arm for APoE carriers resulted in ApoE ε4+ patients in the late cohort receiving higher doses than in the early cohort in the high dose arm.

BIOGEN_0002515051

155. Biogen did not explain that it had made many attempts to show a dose response and that none of these attempts had been successful.

156. Shortly after the meeting, on May 15, 2019, Biogen submitted a request to the FDA seeking a meeting. The meeting request did not mention the two prior off-the-books informal meetings with Dunn. BIOGEN_0003611316.

157. The next day, an FDA employee replied that after consultation with Dunn, the FDA had set the meeting for June 14, 2019. BIOGEN_0003611334.

158. The meeting was held on June 14, 2019. Sandrock, Budd Haeberlein, and other Biogen employees attended the meeting, as did Dunn, his colleague Kevin Krudys, and members of the FDA's statistical team, led by Tristan Massie. According to internal Biogen summaries, Dunn dominated the meeting, making his position clear that he believed aducanumab deserved approval. BIOGEN_0003600041.

159. At the June 14 meeting, Biogen and the FDA agreed to create a working group to further analyze the data.

160. Biogen and Dunn agreed to hold a call to kick off the working group on June 26, 2019. On June 25, Dunn told Biogen that Massie had prescheduled leave on June 26. Dunn told

Biogen that the FDA and Biogen should still hold an executive-level meeting, which they did. BIOGEN_0003125373.

161.    After the meeting, Dunn sent an email to Budd Haeberlein. No one from either the FDA or Biogen was copied. Dunn attached to his email detailed notes of the meeting which made clear that the participants had agreed on a detailed plan for the working group. BIOGEN_0003662090. Among the notes, Dunn noted that the working group should be "informal so no official record," and that Biogen (and not the FDA) should keep records. Dunn added that Biogen should plan to officially paper the work retroactively. BIOGEN_0003662091.

> Record of work - informal so no official record - but useful to have record - can Biogen coordinate this - as work evolves want to plan for how informal work product turns into official representation of analyses/conclusions

162.    Dunn told Budd Haeberlein that he did not intend to share the notes with a wider group. Instead, he asked her to draft a more general document to share more widely. *Id.*

163.    Between June 26 and July 1, Dunn and Budd Haeberlein exchanged a series of one-on-one emails that set out the parameters and structure of the working group. BIOGEN_0003669681.

> iv.    *FDA Statistician Tristan Massie Explains Why Biogen's Data Does Not Support Approval, so Biogen and the FDA Exclude Him From Further Meetings*

164.    The FDA lead statistician on the aducanumab project was Dr. Tristan Massie. From the beginning, Biogen was concerned that Massie was not willing to simply accept Biogen's analyses. For instance, in a July 5, 2019 email thread, Budd Haeberlein complained that Massie was "not so creative" and noted happily that other statisticians in the group were taking more prominent positions than he was. After another Biogen employee opined that another FDA employee was "taking more leadership in the FDA stats team," Budd added that she "s[aw] it as a good thing." BIOGEN_0003096554

165.    Massie repeatedly identified data showing that Biogen's explanation of its results was inconsistent with its data. For example, in a July 15, 2019 email, Massie wrote:

> Another question which the group will need to answer ultimately is whether there is an interaction of any treatment effect with APOE. Overall, in study 302 **_there doesn't seem to be an effect of the high dose (or the low dose) in the [Non-Carrier] subgroup_**.

BIOGEN_0003050287

166.    Budd Haeberlein specifically acknowledged the question, writing in a July 15, 2019 internal email:

> Sounds like another subgroup 'control' question from Tristan.
>
> So yes will need to be considered but I don't think this is a swing in direction. Remember we need to look at this subgroup in the PA4 [Protocol Amendment 4, i.e. PV4] Group 😄

BIOGEN_0003096508

167.    Then, in a July 24, 2019 email, which was forwarded to Defendant Budd Haeberlein that same day, Massie pointed out that Biogen's explanation of Study 301 made no sense if applied to Study 302:

> [I]t seems to me that if I'm not mistaken a placebo worsening may be driving the significance in study 302 rather than the high dose increase from protocol amendment 4. The Red bars in the following figure are for patients who consented to Protocol 4 by Week 16 and the blue are for those who did not. Placebo is on the left and the high dose is on the right. A similar pattern is seen if I break it down by dose change due to ARIA (late high dose seems numerically worse than early high dose at Week 78). It's true that high dose without dose reduction is better than high dose with dose reduction, but not better than the early high dose without dose reduction who did not have the benefit of a dose increase from protocol amendment 4. These are exploratory analyses but may cast doubt on the importance of protocol amendment 4 for the high dose if I'm not mistaken.

BIOGEN_0003422483

168.    Massie also included a graph in his email proving the point (the same graph he would later include in the Massie Report):

43



BIOGEN_0003422483

169.    Defendants put together a slide deck to respond to Massie. They acknowledged his point, and stated, only, that the performance "maybe due to less dose and/or something else." BIOGEN_000284412. The slide deck did not identify dose differences or the "something else."

170.    Then, in a July 30, 2019 email copying Defendant Budd Haeberlein, Massie further stated that:

> Here are some of the subgroup analyses I alluded to yesterday. It's seems as if there is an interaction between Early vs. Late status and Dose Reduction due to ARIA (Yes or No) status which is in the wrong direction in the Late group to support the effectiveness of Protocol amendment 4.

> BIOGEN_0003049930

171.    Biogen ultimately agreed with more of Massie's criticisms. In an August 4, 2019 email, Ying Tian wrote:

> I added slides 1-6 (Tristan's plots and our 3-panel and 4-panel plots). The format of the plots was changed per your suggestion (Thanks to Tianle).

> Here are some thoughts on the flow and points:

44

*First, acknowledge Tristan's outputs. His key points: 1) "Late non-dose-reduced high dose subgroup" has more exposure but worse efficacy than "Late dose-reduced high dose subgroup" in both 301 and 302; 2) In 302, "Late non-dose-reduced high dose subgroup" is worse than "Early non-dose-reduced high dose group".

*_Agree with Tristan's observation 1)._ …

*_Agree with Tristan's observation 2)_

BIOGEN_0003615128

172.    The slides were discussed at an August 5, 2019 meeting Defendant Budd Haeberlein attended. BIOGEN_0003834782

173.    In an August 14, 2019, email, Massie told Biogen that its data showed that the trend of the 6mg/kg dose doing better than the 10mg/kg dose also occurred with other endpoints:

> I don't expect you will have time to review this before today's meeting, but it is extending my earlier analyses along the same lines for the other key endpoints.
>
> The trend I observed for the late High dose with dose change due to ARIA having numerically better LS Mean Change at Week 78 than late High dose without dose reduction is not limited to the CDRSB endpoint. In addition to it holding for CDRSB in both study 301 and 302, it holds for MMSE in 302, and for ADCS-ADL-MCI in both study 301 and 302.
>
> While the sample sizes in the dose change subgroups are small at Week 78 in the late subgroup, the number of cases in which the dose reduced subgroup LS Mean is numerically better than the non-dose-reduced subgroup is striking, especially when all endpoints are considered.

BIOGEN_0003049773

174.    Likewise, as Biogen admitted to the FDA:

> You are right that the actual average dose received was very similar in the two studies; however, we think that the mean may not be the best way to look at these data. A point we also would like to discuss with you further.

BIOGEN_0003403402

175.    Biogen's exploratory analyses quickly proved Massie correct. Biogen's notes of a September 19, 2019 working group meeting, circulated to Budd Haeberlein, stated that Biogen and the FDA had concluded:

45

Initial hypothesis (puzzle pieces) that no one factor, including timing of pv3 and pv4 and the resultant dose changes, would explain why 301 and 302 had different outcomes. ***The current view is that dosing differences between studies was smaller than previously understood.***

BIOGEN_0002483354

176.    Biogen had planned to include Massie and the FDA's statisticians in the second round of analyses. Indeed, Biogen said so in response to Massie's August 14 email:

As agreed by the team, these are important scientific questions that Wave 2 work ***will address more comprehensively from statistical***, clinical and biomarker ***perspectives***.

BIOGEN_0003049792

177.    But Massie's comments had proven too difficult to answer. So when Biogen and Dunn began the next round of data mining (which they referred to as Wave 2), they excluded Massie and all other FDA statisticians. Biogen's statisticians continued to attend.

178.    The points Massie made in July-August 2019 are exactly the points he would later make in the Massie report. Indeed, after receiving the Draft Massie Report, on October 8, 2020, the aducanumab project's lead statistician Ying Tian wrote in an email that:

From my first look, >90% of his [Massie's] points are repeat from the past (PV4, placebo decline, ApoE subgroup, country interaction, ARIA unblinding, 103 sensitivity, post-randomization grouping).

BIOGEN_0004060034

> v.    *The Working Group Kicks Out the Statisticians and Then Accelerates Data Mining*

179.    The FDA and Biogen's purpose in Wave 2 was to explain Study 301's failure. In informal documentation, Biogen and Dunn characterized their goal as, first, "identifying if a subset of patients exist in the high dose regimen of 301 that have similar responses to high dose patients in 302." BIOGEN_0003957073.  The document was emailed to Budd Haeberlein. BIOGEN_0002915030.

180.    Conducted correctly, post hoc analyses are not necessarily illegitimate. As Biogen, acknowledged in a version of the Aducanumab Engage/Emerge Topline Results slide deck, there are guidelines which govern post hoc analyses designed to prevent them from turning into free-for-alls:



BIOGEN_0002456826

181.    Thus, to properly conduct post hoc analyses, Biogen should have specified at the start of Wave 2 what analyses it would run. Defining what "similar responses" meant—e.g. by precisely specifying number of doses, outliers, continuity of dose—would have meant the post hoc analyses could be legitimate.

182.    But instead, even by the end of Wave 2, Biogen and the FDA were agnostic as to what "look like" meant, as set out in the summary of a September 20, 2019 working group meeting that included Budd Haeberlein and Dunn:

> As wave 2 coming to a close, the main question for Wave 2 is to find patients in 301 that "look like" 302 but [Dunn] acknowledged that "look like" has not been clearly defined

BIOGEN_0004113782

47

183. Failing to define what "look like" meant Biogen was just looking for patients who did well. Biogen would then backfill an explanation for the patients' performance based on whatever common characteristics they identified. As Budd Haeberlein later explained in a July 15, 2020, the purpose of Wave 2 "really is to select 'the best' of the individuals in the high dose arm, and not fair a 'representation' of what could happen with Aducanumab." BIOGEN_0004065076.

184. Because they were looking at every conceivable variable, each with numerous possible values, it was nearly certain that Biogen would find such a group.

185. Indeed, because Biogen plucked "look like" from the air, it was unable to define what a "sufficient" dose was, as set out in a purported statistical analysis plan attached to a November 7, 2019 email from Craig Mallinckrodt:

> Sustained exposure to lower doses can be included. ***I doubt we will uncover a single exposure metric / parameter that is sufficient.*** We can, however, identify a single metric that is usefully explanatory and a combination of metrics that have greater combined explanatory power.

> BIOGEN_0003137785

186. As a Biogen employee put it bluntly in comments on a November 5, 2019, presentation, "[t]he goal is to claim 10 mg/kg as the target dose." To meet its goal, Biogen must "[s]lice and dice on subjects who never received 10 mg/kg in high dose group." BIOGEN_0002471258

187. As a result, as Defendants understood, they could not attribute the result in Study 301 to aducanumab. As Budd Haeberlein explained in her July 15 email:

> Just to reiterate as a presentation of value calculations for our external audiences for me there is a high degree of discomfort in representing the subgroup you selected ($>/= 8$ steady state uninterrupted doses of 10mg/kg) of the high dose group as a "possible outcome of Aducanumab". This subgroup was selected for the purposes of expressly understanding Study 301. It is not a prespecified analysis, and to the point of "possible"

lacks a normal distribution of possibilities due to aducanumab (including dose suspensions due to ARIA, other reasons for interruption).

BIOGEN_0004065076

> ### vi.    Defendants subjectively doubt the Dosage Thesis

188.    Biogen created the data for the Dosage Thesis by creating an artificial group of patients in Study 301 whose only commonality was that they performed well. So the critical question for the Dosage Thesis was whether it was consistent with Biogen's other data. If the Dosage Thesis was not consistent with Biogen's other data, then there was no reason to think it was correct.

189.    Biogen and the FDA initially started Wave 2 with the goal of arriving at an explanation of Study 301's failure that was consistent with Study 302. According to the notes of a September 6, 2019 Working Group meeting, Wave 2's goals included "find[ing] patients in 302 and 301 who do / do not respond and for the rationale for the distinction to make scientific sense." BIOGEN_0003049471

190.    Thus, as Defendants implicitly acknowledged, the trends Biogen identified in Study 301 should also apply to Study 302.

191.    Yet the Dosage Thesis was not consistent with any of Biogen's data except Carriers in the high-dose group in Study 301:

a.    In the Study 302 high dose group, pre-PV4 Carriers did better than post-PV4 Carriers. This should not have happened if the 6mg/kg dose is insufficient.

b.    Non-Carriers could always receive 10mg/kg. Thus, by any metric, they received a "sufficient dose." Yet, overall, they saw almost no benefit from aducanumab. Moreover, though PV4 did not affect their dosing, they performed better after PV4 than before.

192.    As set out below, Defendants were subjectively aware of, and concerned with, these inconsistencies. They tried to explain away the inconsistencies, but their attempts were not successful. With no explanation, in their public presentations, Defendants selectively presented the data to conceal the inconsistencies. This included disclosing data for subgroups that aggregated dissimilar groups in order to cancel out inconsistencies that would otherwise be apparent without aggregation.

(1)    Non-Carriers

(a)    Biogen internally attempts to explain discordant results for Non-Carriers

193.    When conducting clinical trials, sponsors must pre-specify statistical analysis plans. Statistical analysis plans prevent sponsors from manufacturing positive results by analyzing the data in numerous different ways and only report the metrics that show a benefit. Sponsors conduct the analyses in their statistical analysis plans, and place significant weight on them.

194.    Biogen had always planned to analyze results by Carrier/Non-Carrier subgroups. The Statistical Analysis Plans for Studies 301 and 302 "prespecified *subgroup analyses by ApoE carrier status.*" BIOGEN_0002521483. As a result, Biogen was bound to, and did, conduct subgroup analyses separately analyzing Carriers and Non-Carriers.

195.    Non-Carriers could always titrate to 10mg/kg. Further, because they were less prone to ARIA than Carriers, they were more likely to receive uninterrupted treatment. Non-Carriers should thus outperform Carriers.

196.    Biogen first conducted the analyses in April 2019. They "revealed a trend toward superiority for … *ApoE carriers over noncarriers.*" BIOGEN_0002521483. Biogen immediately identified two problems with the results. First, Non-Carriers' results were essentially the same as those of the placebo control group in either study. This was set out in (among other sources) a

chart that was repeatedly emailed to Budd Haeberlein starting in May 2019, including on November 25, 2019, just before she presented detailed results to investors:



BIOGEN_0002471809

197.    Biogen was subjectively concerned with Non-Carriers' poor results. For instance, in a Clinical Study Report for Study 301 (a document prepared to summarize Biogen's overall conclusions about Study 301), a senior Biogen employee wrote of a paragraph that set out the Dosage Thesis:

> I feel this paragraph emphasizes PV4 a little too much. Without enough analysis support, people can easily challenge why ApoeE non-carriers who have always been on 10mg/kg also do not perform well (see subgroup panalysis).

198.    Tian commented "I agree." BIOGEN_0002625375.

199.    Second, PV4 had no impact on Non-Carriers' treatment, so PV4 should not have had an impact on Non-Carriers' outcomes. Yet Non-Carriers saw better results after PV4 in both Studies 301 and Studies 302.

| CDR-SB Declines (lower is better) (patients who had the opportunity to complete the trials) | | | |
|---|---|---|---|
| | | Pre-PV4 | Post-PV4 |
| Study 301 | Carriers | 1.71 | 0.93 |
| | **Non-Carriers** | **1.58** | **1.18** |
| Study 302 | Carriers | 1.31 | 1.29 |
| | **Non-Carriers** | **1.3** | **0.56** |

Source: BIOGEN_0003547606

200.    Defendants understood that they needed to explain away the improvement in Non-Carriers' results after PV4. So they turned to PV3 instead. Before PV3, if a patient experienced ARIA, the patient could not be titrated to 10mg/kg. Instead, the patient's maximum dose would be the dose below the level at which the patient experienced ARIA. Beginning with PV3, patients who experienced ARIA would temporarily receive a lower dose but could ultimately titrate up to 10mg/kg. Defendants theorized that the apparent improvement after PV4 may actually reflect improvement after PV3.

201.    In a June 11, 2019 email, Biogen statistician Ying Zhu explained that Biogen needed to conduct analyses based on PV3 to explain away the apparent impact of PV4 on Non-Carriers (referred to in the email as "NC"):

It becomes more clearly to me that Protocol amendment 3 has huge impact on the study results, especially for Study 301 because it has more ARIA and more advanced at protocol amendment. So the analysis for subjects that have had opportunity to receive 14 doses of 10 mg/kg, if combining carriers and NC, *may have results looking not so good as for carriers, because all NC are counted but a lot of them who were enrolled earlier actually did not receive targeted doses as they supposed to due to ARIA.* In order to avoid that, we need to do exploratory analysis in addition to combining carriers and NC as follows:

 1. By Carrier and NC
2. Using the same algorithm for NC as for C to be included in the analysis.

Jie: Can you do that? I do think this analysis is important because it *assess the treatment effect in the ideal scenario*.

BIOGEN_0002585487

202. Biogen proceeded with the analysis. In a June 21, 2019 email setting out her notes from a June 19 internal meeting, a Biogen statistician noted that Biogen had decided to run the analyses to "[t]ease out the impact of PV3 and PV4 on exposure." BIOGEN_0003549674.

203. The analysis showed that the PV3 explanation was wrong. In fact, Pre-PV3 Non-Carriers did better than Post-PV3 Non-Carriers in both Studies 301 and 302:

**Treatment difference in CDR-sb at Wk78 (High – Placebo) by APOE status and cohort (pre/post PV4 for carriers, pre/post PV3 for non-carriers), censoring post ARIA observation, in studies 301 and 302 (OTC population)**

| Study | ApoE status | Cohort | N* | Efficacy | | Dose** | | |
| | | | | CDR-SB diff vs pbo | SDTERR | Median cumulative dose at Wk78 | Mean cumulative dose at Wk78 | Mean number of 10 mg/kg |
|---|---|---|---|---|---|---|---|---|
| 301 | C | Pre PV4 | 188 | 0.41 | 0.2523 | 106 | 95.4 | 4.9 |
| | | Post PV4 | 54 | -0.16 | 0.4731 | 150 | 128.1 | 10.5 |
| | N | Pre PV3 | 42 | -0.95 | 0.4991 | 155 | 127.9 | 10.5 |
| | | Post PV3 | 61 | -0.31 | 0.4131 | 160 | 129.5 | 11 |
| 302 | C | Pre PV4 | 165 | -0.73 | 0.2861 | 108 | 98.4 | 5.5 |
| | | Post PV4 | 60 | -0.66 | 0.4738 | 151.5 | 125.4 | 10.3 |
| | N | Pre PV3 | 38 | -0.57 | 0.6008 | 160 | 128.7 | 10.6 |
| | | Post PV3 | 77 | -0.41 | 0.3852 | 160 | 133.9 | 11.2 |

\* N represents number of subjects in high dose group.
\*\* Post-ARIA doses were included.

Biogen

204. The chart was forwarded to Budd Haeberlein on September 9, 2019. BIOGEN_0003382269.

205. The two non-U.S. regulators Biogen approached questioned why Non-Carriers' results improved after PV4. In a February 23, 2020 email chain copying Budd Haeberlein about responding to queries from European regulators, Mallinckrodt asked whether Biogen could conduct an analysis based on pre and post-PV3 results. Lead statistician Ying Tian responded that:

We have previously explored different designation of PV4 and PV3 for the April data, and didn't find it helpful.

BIOGEN_0003612919

206. And as Biogen later told a Japanese regulator:

Since protocol version 3 had an impact on dosing through changes in ARIA management (drug disposition rules), it initially seemed to be a plausible reason [for differences between pre-PV4 and post-PV4 in Non-Carriers]; however, due to the low proportion of subjects with ARIA events that impacted dosing in high dose non-carrier group, *the impact of PV3 on dosing was very small* and does not fully explain the difference.

BIOGEN_0003810136

       (b)      Biogen Conceals Carrier/Non-Carrier Subgroup Analyses

207. Defendants understood that they needed to explain the discrepant Non-Carrier data. For example, in an October 7, 2019 email commenting on a briefing book to be presented to the FDA at an October 21, 2019 meeting, Budd Haeberlein wrote:

There's nothing on ApoE4. *I do believe we need a position on ApoE4.* Is anyone currently looking at this? Perhaps we should look at the dataset which is the proposed data?

BIOGEN_0002592916

208. Then, on October 8, 2019, Ying Tian sent Budd Haeberlein an email with subject line "ApoE subgroup analysis." It began "[a]ttached please find the analyses we have done for ApoE." BIOGEN_0003048760. The attachment was a PowerPoint file with 23 slides.

209. Three weeks later, on the October 22, 2019 call, Defendant Budd Haeberlein falsely denied that Biogen had conducted any Carrier/Non-Carrier analysis:

Q: Hey, good morning guys. Thanks for taking my question. I guess first just to ask Phil's question more directly, can you tell us yet how many patients got the 14 doses of 10 mg per kg in each study in the full dataset. And then as a follow-up. *Did you see any difference in ApoE4 carriers versus non-carriers, especially in the patients who completed after the futility cohort and would have had more exposure to the higher dose. Thanks.*

DEFENDANT BUDD HAEBERLEIN: *So your question regarding ApoE4 carriers versus non-carriers, the analysis that we've conducted to date has been on the entire studies.*

54

210. In the rest of her response, Budd Haeberlein promised that Biogen would present more data at CTAD:

And as we've mentioned for EMERGE, we have a positive but we met the primary endpoint for the entire patient population and details of subgroups is something that will come to later. And we'll have details at CTAD.

211. Biogen understood that Budd Haeberlein had thereby inadvertently promised to disclose Carrier/Non-Carrier subgroup results at CTAD (Clinical Trials in Alzheimer's Disease), an annual industry conference, on December 5, 2019. On October 28, 2019, a Biogen investor relations employee circulated a list of questions investors would like discussed at CTAD, including: "Subgroup level data, especially efficacy in APOE4 carriers vs non-carriers (Samantha noted in Q&A that more detail would be at CTAD)." BIOGEN_0003141467.

212. Analysts told Biogen they were focused on Carrier/Non-Carrier subgroup analyses:

a. In a summary of 27 analyst notes published after October 22, 2019, concerning "What analysts would like to see at CTAD," emailed to Budd Haeberlein, Biogen included "Subgroup analysis by ApoE on efficacy, safety, exposure, dose discontinuation/interruption." BIOGEN_0002482119.

b. In a November 20, 2019 email, an analyst employed by Oppenheimer wrote to Biogen's Head of Investor Relations that "I've been on the road and pitching BIIB as one of my favorite names going into CTAD. I think many investors are still confused about what to expect at CTAD. I've been telling them that subset analyses, such as APOE4 carriers vs non-carriers, will be important to characterize the efficacy of aducanumab." BIOGEN_0003881476.

213. Internally, Biogen also understood that explaining Carrier/Non-Carrier discrepancies was critical. For example, on November 7, 2019, in creating a new statistical

analysis plan to analyze final data, a Biogen statistician referred to the analysis as a "subgroup of special interest." BIOGEN_0002355857.

214.    Though Biogen understood that Carrier/Non-Carrier analysis was critical and that it had promised to provide it at CTAD, Biogen internally decided not to. On November 7, 2019, Biogen held a meeting to discuss what data to present at CTAD. In attendance were Biogen's Head of Investor Relations as well as its Global Head of Medical Alzheimer's Disease. The PowerPoint deck for the November 7, 2019 presentation, which was emailed to Budd Haeberlein, included a slide which stated that (a) a Carrier/Non-Carrier analysis was an "[a]rea of interest for investors"; and that (b) "[o]n the Q3 earnings call [in October], we implied these data would be presented at CTAD." But in the same slide, Biogen cited a problem: the Carrier/Non-Carrier data "[m]ay detract focus from core topline data and could imply data mining."



BIOGEN_0004057934

215.    At the November 7 meeting, Biogen decided not to present Carrier/Non-Carrier subgroup analyses. Meeting attendees understood that Biogen would pay a price. That afternoon, a senior investor relations employee circulated to the group a list of *Key Questions Anticipated from Investors* which were discussed at the meeting. There were only five questions; one was "[b]ased on comments in the Q&A from the call, I assumed you would show efficacy data for APOE4 carriers vs. non-carriers. Is there a reason you didn't show this analysis at CTAD?" BIOGEN_0003881183. The slide deck was then presented to the Executive Committee, which included Vounatsos, Sandrock, and Budd Haeberlein. BIOGEN_0003881182.

56

216.    Similarly, on December 2, 2019, Vounatsos received an analyst report published by Mizuho Securities stating that "one of the key things for which we will look is potential carrier imbalance i.e. (1) are the 116 ENGAGE patients that received at least 10 'uninterrupted' 10mg/kg doses at 'steady-state' driven by APOE4 carrier status? (2) is there a carrier imbalance between pbo and drug arms?" (emphasis withdrawn). Vounatsos forwarded the report to Budd Haeberlein with note "just in case." BIOGEN_0003724988.

217.    When it presented data to investors at CTAD, Biogen combined Non-Carrier with Carriers. By combining results, Biogen concealed that Non-Carriers had different performance before and after PV4 and concealed that the overall benefit to Non-Carriers was almost non-existent.

(2)    In Study 302, Pre-PV4 Did Better than Post-PV4

218.    If the 6mg/kg dose was insufficient in Study 301, then it also should have been insufficient in Study 302. But Defendants knew that in Study 301, the pre-PV4 high-dose group performed worse than the post-PV4 high dose group. The problem, as Defendants put it in an internal document to prepare for a February 27, 2020, meeting with the FDA, was:

Theory of "higher dose/exposure, better response" seems to work only 301, not for 302. 302 works well for lower cumulative dose/number of 10mg.

BIOGEN_0003235120

219.    Biogen's response was to discount the Dosage Thesis, explaining that dose response and other factors "only explain about 20% variability in the disease progression." *Id.*

220.    Defendants also believed this result was "difficult to understand." In an email sent on Sunday August 4, 2019, at 8:35 PM, Defendant Budd Haeberlein wrote:

In your question below – similar to what I just sent to Craig, *that 302 HD pre-PV4 is doing better. This is difficult to understand.* You ask if this is due to patients perception at the beginning of the trial being more negative – actually that if it were true would have the opposite effect. For me I really wonder where those sites are that were in early 302

57

and how the PIs communicated what ARIA could mean. Maybe in the beginning PIs who were themselves worried would try to reassure the patient that ARIA was a sign of potential efficacy. And perhaps over time PIs stopped doing this 1 because they also got more comfortable as ARIA became less of an issue or 2 the PIs we rehearing messages about blinding??? Will we ever know? ***Can you consider if looking at pre and post PV3 could help us with impact of ARIA?***

BIOGEN_0003050037

221.    At 10:06 AM the next morning, a senior Biogen statistician confirmed that Biogen had no explanation:

Hi Samantha: Just let you know that the stats team (Kim) tried to find any batch effect long time ago and did not find anything.

BIOGEN_0003050114

222.    Within 40 minutes, Budd Haeberlein had confirmed that even Biogen's Board of Directors was concerned with the discrepancy:

If this has been done in depth then I would appreciate the read out to be presented or sent to the team – ***this is a question that is raised at the board multiple times.***

BIOGEN_0003050114

vii.    *Biogen's Statisticians Warn Defendants that the Aducanumab Analysis Is Unreliable*





225.    Sandrock separately spoke to all four of the team members.

        *viii.    Internal Communications, Defendants State that the Dosage Thesis is False and Express Concern that They Have Made Misleading Statements*

226.    Throughout the Class Period, even as they touted the Dosage Thesis to investors, Defendants continued to admit internally that it was false. For example, when Biogen's lead consulting statistician Dr. Fleming advised Biogen that its conclusions were statistically unfounded, Biogen employees emailed each other to note that they agreed with him.

227.    In May 2020, Biogen retained Dr. Fleming again to comment on a briefing book it planned to present to the FDA. BIOGEN_0003393725 Dr. Fleming provided extensive comments.

228.    Dr. Fleming directly rejected the Dosage Thesis. He explained that, statistically, the impact of PV4 explained only a "modest" fraction of the interaction between the trials. Likewise, Fleming called Biogen's statement that "the two main factors in determining why the high dose arm of Study 301 was not positive were the influence of fast progressors and lower dosing" outright "misleading."

229.    Dr. Fleming also specifically called out some of the findings that had troubled Biogen. Among Dr. Fleming's comments, he observed that the 6mg/kg results in Study 302 "is not consistent with a supposition that differences in dosing is the reason for inconsistency between trials." BIOGEN_0003394067.

230.    As Dr. Fleming explained, he was only repeating what he had told Biogen before, stating, in his topline comments, that:

> A concise topline summary of my current conclusions, from an independent and regulatory perspective, is that these data are suggestive of a favorable effect of Aducanumab, yet there are significant concerns about whether the level of benefit is clinically meaningful and statistically robust. Hence, indicated in our interactions on 5/18/19 and 11/25/19, I continue to believe a confirmatory placebo-controlled randomized trial of the 10mg/kg regimen is needed in this clinical setting to adequately reliably understand the effect of this dose of Aducanumab on 78-week change in CDR-SB.

BIOGEN_0003399355

231.    Biogen agreed with Fleming. As Christian von Hehn wrote in a follow-up email to, among others, Defendant Budd Haeberlein (but not Dr. Fleming), "from a purely statistical point of view we agree with all [Fleming's] points." BIOGEN_0002521141.

232.    Budd Haeberlein, similarly, wrote that "I agree with [Fleming] that the difference between 301 and 302 is not a 'home run' *and it becomes glaringly apparent when we have made it appear as if there is a simple 'dose' explanation*." BIOGEN_0002484797.

233.    On July 13, 2020, in comments to a draft of responses to Japanese regulators, Biogen struck out a sentence providing:

> The larger treatment effect of this high dose group seen in the April transfer data analysis compared with the futility analysis is possibly due to the anticipated impact from protocol amendment 4 that gave later subjects the opportunity to receive higher doses of aducanumab.

234. In marginal comments attributed to Budd Haeberlein, a Biogen employee wrote: "(From Samantha) Suggest to remove this. ***We have not done this detail analysis, and any statement we make would require that.***" BIOGEN_0002781858.

235. The Japanese regulators also asked "why was the greater efficacy observed in the post-PV4 low dose subgroups in 301 study despite the fact that the PV4 amendment did not change the dose in the low group?" BIOGEN_0002781858.

236. Biogen provided an explanation. But Chen acknowledged both that the explanation was not consistent with PV4 and that Study 302 was unavoidably implicated in any explanation of Study 301:

> This is true for 301. However, 302 PV4 still stands out and I don't have a good explanation to it. The question was for 301 but I don't think we can avoid 302...

*Id.*

### ix.    *Defendants' Deceptive Acts*

#### (1)    Defendants Present Misleading Data

237. Defendants received more bad news just before the CTAD presentation.

238. Until November 2019, Biogen had been using preliminary data. Biogen was working to finalize the data, for example by verifying that the data had been entered correctly. If numbers changes between the preliminary and final data, that's because the preliminary data was wrong.

239. On November 18, 2019 Biogen received the final data from the aducanumab clinical trials.

240.    In a November 26, 2019 email to Budd Haeberlein, Ying Tian, Biogen's lead statistician on the aducanumab project, stated that in the final data:

> However, as I mentioned to you, my concern is the interpretation of PV4 results re. dose-response. ***In 302 PV4 results*** (slide 2 in the first attachment), ***low dose is numerically better than high dose, and post-PV4 is similar to pre-PV4. It's not straightforward to explain this by # of 10mg/kg or cum doses.***

> BIOGEN_0002517478

241.    The slide 2 referenced in Tian's email showed that the numerical results were as follows:

| "post-PV4 is similar to pre-PV4" | | Pre-PV4 patients CDR-SB increase | Post-PV4 patients CDR-SB increase |
|---|---|---|---|
| Numerically | Study 301 | 1.7 | 1.35 |
| | **Study 302** | *__1.16__* | *__1.37__* |
| Against placebo | Study 301 | 0.29 | -0.49 |
| | **Study 302** | *__-0.35__* | *__-0.38__* |

| "low dose is numerically better than high dose" | Post-PV4 low dose | Post-PV4 high dose |
|---|---|---|
| Study 302 | 1.25 | 1.37 |

242.    Thus, numerically, in Study 302, Pre-PV4 patients performed better than the low dose, who in turn performed better than the high dose.

243.    The data Tian cited were material. On the October 22, 2019 call, Sandrock had explained that the ordering of the doses was important evidence of consistency.

> [T]he low dose is consistent across ENGAGE and EMERGE, and that's because the—particularly the second protocol amendment [PV4], really affected the high dose arm of—in the carriers. So in the low dose arm or in—the protocol amendments had less of an effect and I think that's one of the main reasons for the consistency in the results across the two studies.

244.    Tian stated in her email Biogen should not disclose final data results at CTAD because of the discrepancies that she was citing. She raised three possibilities to Budd Haeberlein, each of which involved presenting data in a manner that would mislead investors. Of these, the

first was to "keep the April data for the main deck, and add primary results of final data (ITT only) at the end (voice out that we just received these final results and they are consistent with April data)." BIOGEN_0002517478.

245.    Budd Haeberlein responded that she wanted to use the first option. BIOGEN_0003647754.

246.    At the December 5 CTAD presentation, Budd Haeberlein stated:

As I mentioned, we now have the final dataset. And I'm going to show you the same table with that final dataset [the table did not include pre-PV4 and post-PV4 subgroups] with that final dataset, which has the full QC and the full data included. And essentially, as you can see, there are very small changes between that larger dataset and the final dataset.

247.    Budd Haeberlein also presented the following slide:

## CDR-SB for ITT population compared with Post-PV4 population for EMERGE and ENGAGE at Week 78

| | | ITT | | | Post-PV4[a,b] | |
|---|---|---|---|---|---|---|
| **EMERGE** | Placebo decline (n=548) | Low dose (n=543) diff vs. placebo, 95% CI (%)[c] | High dose (n=547) diff vs. placebo 95% CI (%)[c] | Placebo decline (n=304) | Low dose (n=295) diff vs. placebo 95% CI (%)[c] | High dose (n=288) diff vs. placebo 95% CI (%)[c] |
| **CDR-SB** | 1.74 | -0.25 -0.55, 0.06 (-14%) | -0.40 -0.71, -0.10 (-23%) | 1.76 | -0.42 -0.94, 0.10 (-24%) | -0.53 -1.05, -0.02 (-30%) |
| **ENGAGE** | Placebo decline (n=545) | Low dose (n=547) | High dose (n=555) | Placebo decline (n=247) | Low dose (n=261) | High dose (n=282) |
| **CDR-SB** | 1.55 | -0.18 -0.47, 0.12 (-12%) | 0.03 -0.26, 0.33 (2%) | 1.79 | -0.35 -0.88, 0.18 (-20%) | -0.48 -1.02, 0.06 (-27%) |

248.    The data Biogen presented implied that in Study 302, Post-PV4 high dose performed better than pre-PV4 high dose, which then performed better than the low dose.

(2)    Biogen Attempts to Mislead Japanese Regulators but Decides To Delay Its Japanese Application When the Regulators Catch On

249.    Biogen prioritized three markets for the aducanumab launch: the U.S., the EU, and Japan.

250.    Biogen believed Japan was a huge market for aducanumab. So it agreed to share data with Japanese regulators (the PMDA) in connection with a May 22, 2020 informal meeting.

251.    At the May 22, 2020 meeting, the PMDA focused on Biogen's inability to explain non-carrier results, asking "As the non-carrier group could receive 10 mg administration from the start of the study, should the efficacy be seen in this group?"  BIOGEN_0004006882. As Tian wrote in her notes of the meeting: "Yes, PMDA has a lot questions related to PV4. Their interest in ApoE4 non carriers is also a reflection of it (they think non-carriers are not subject to the PV4)." BIOGEN_0002698959.

252.    As Budd Haeberlein deplored in a May 22, 2020 email titled "PV4 Bashing," Japanese regulators were "sharp[] cookies."  So Biogen needed to "pull [the data] out and have a good dig around in it" to find data that could sway them and "avoid the rampant PV4 bashing." BIOGEN_0002994882.

253.    Following the meeting, Biogen grew "concerned" about what the data it was sharing with regulators, but not the public, demonstrated. For instance, in a June 4, 2020 email, Tianle Chen wrote that:

> I start to have concerns on the 16 group analysis after the PMDA meeting. We know PV4 should only impacts high dose carrier, not non-carrier or low dose. We did the 16 group analysis, and then people can see the treatment effect of each group, and start to ask us why pre and post PV4 effect is different in those groups that we should not expect a difference.

254.    That's because, as Tianle Chen noted in a June 10, 2020 email, "[f]rom what I feel and also other people's feedback, PMDA [the Japanese regulator] is sharper than EMA … ***They asked all the tough main questions that we tried to avoid***." (ellipses in original). BIOGEN_0003801145.

255.    Biogen was not confident that it could persuade the PMDA to approve aducanumab. So Biogen adopted a strategy that would avoid directly posing the question: it would

64

delay submitting an application to Japan until after the FDA had a change to publicly express enthusiasm for aducanumab. As the aducanumab project manager wrote in a June 4, 2020 email, "[t]he JNDA [Japanese New Drug Application] timeline was agreed to with Eisai [Biogen's partner] to strategically gate the filing after the Ad Com since we know the PMDA will be greatly influenced by this."  BIOGEN_0003907918.

(3)    Biogen Misleads Japanese and European Regulators, and the Advisory Committee, Concerning Outliers

256.    From April to May 2019, Biogen's statisticians had tried to explore whether they could reach better results by arguing that some patients in Study 301 had an outsize impact on the analysis. Biogen tried several commonly-employed statistical methods, but they had no or minimal impact. For example, Biogen tried log transforming the data. The log transformation adjusts right-skewed data distributions by making it more symmetric and reduces the impact of extreme results. It did not help. Without the log transformation, placebo did 2% better than high dose; with the transformation, placebo did 1% better. Biogen also ran four other "non-parametric analyses [which] further confirm[ed] 301 shows minimal / no treatment effect." BIOGEN_0002514334. As set out in a slide sent to Budd Haeberlein, none of the methods Biogen employed could explain Study 301's results.

Analyses on robustness of results on CDR-SB – April ITT

Biogen | Confidential and Proprietary

| CDR-SB | 301 | | | 302 | | |
|---|---|---|---|---|---|---|
| | Placebo decline | diff vs. placebo a (%) | | Placebo decline | diff vs. placebo a (%) | |
| | | Low dose | High dose | | Low dose | High dose |
| Primary analysis (MMRM) | 1.55 | -0.18 (-12%) | 0.03 (2%) | 1.74 | -0.25* (-14%) | -0.40* (-23%) |
| SAP pre-specified sensitivity analysis | | | | | | |
| Control-based imputation a | 1.57 | -0.11 (-7%) | 0.03 (2%) | 1.70 | -0.28† (-16%) | -0.37* (-22%) |
| Censoring intercurrent events b | 1.46 | -0.19 (-13%) | 0.06 (4%) | 1.62 | -0.18 (-11%) | -0.42** (-26%) |
| Post-hoc sensitivity analysis | | | | | | |
| Log-transformation to correct skewness c | 1.20 | -0.13 (-11%) | 0.01 (1%) | 1.44 | -0.30* (-21%) | -0.46*** (-32%) |
| Hodges-Lehmann Median Difference d | n/a | -0.04 | 0 | n/a | -0.21† | -0.48** |
| Excluding high influential data e | 1.55 | -0.19 (-12%) | -0.05 (-3%) | 1.71 | -0.26† (-15%) | -0.42** (-25%) |
| Excluding subjects with symptomatic ARIA | 1.55 | -0.17 (-11%) | -0.02 (-1%) | 1.73 | -0.24 (-14%) | -0.41* (-24%) |
| Excluding data <= 90 days after ARIA onset | 1.53 | -0.16 (-10%) | 0.09 (6%) | 1.73 | -0.27† (-16%) | -0.45** (-26%) |

a Missing data for subjects in active drug groups were imputed using the copy increment from reference method, except that missing data for subjects still active in PC period on 20Mar2019 were imputed using the missing at random method.
b Data collected after premature discontinuation of treatment and any change to concomitant AD symptomatic medication were excluded.
c A log transformation is picked for each study to best correct the skewness, MMRM model is fitted based on log-transformed data and the results are then transformed back to the original scale.
d Hodges-Lehmann estimator of median difference (actual difference not percentage) at week 78 (from multiple imputation with nimpute=100) and p-values (based on normal approximation not exact p-value). The p-values from ANCOVA analysis of ranks are similar.
e 9 subjects in both studies (301: 1 in low dose and 3 in high dose; 302: 1 in placebo, 2 in low dose and 2 in high dose) were statistically identified as extreme outliers based on the criteria of change from baseline at week 78 > 10, as defined by Q3+3*IQR, which is the default option in SAS.

- Results from sensitivity analyses confirm the robustness of primary analysis.

Biogen

Nominal p values: † 0.05<=P<0.10; * P<0.05; **P<0.01; ***P<0.001 vs placebo.

BIOGEN_0002533491

257. At a loss, Biogen's statisticians decided to exclude certain data, calling them "outliers." Biogen initially used a commonly-employed definition of outlier based on interquartile range. BIOGEN_0002347065. Based on this definition, Biogen threw out the results of patients who had experienced a 10-point or greater increase in CDR-SB scores during the study period, arguing that these individuals were rapid progressors. The removal of these individuals had little impact. As Biogen told the May 18, 2019 committee of experts, it "altered the treatment contrast … from unfavorable vs placebo to slightly favorable in Study 301," leaving "the treatment effect in Study 301 after removing extreme outliers [] still relatively small." BIOGEN_0002514334.

258. Presented with the data, Fleming recommended that Biogen "identify[] outliers based on clinical judgement. It would be helpful to have clinician predict how these people would do without letting them see the CDR-SB change." BIOGEN_0002484017.

259. Biogen did not follow Fleming's advice. Instead, beginning in early September 2019, in communications that excluded everyone from the FDA's Office of Biostatistics, Biogen simply ran the numbers looking for an outlier threshold that did lead to better results.

66

260.    For example, in a September 6, 2019 email to, among others, Mallinckrodt and Tian, a Biogen statistician wrote that:

> Here are the current results I have for the 301 prepv4 negative effect exploration. Ying, I *did all the combinations I can think about*, please see the updated analysis plan first part.
>
> *        *        *        *        *
>
> 3. The best result is on the last page --- removing outliers using cutoff of 8 and also removing patients with dose change due to ARIA. The high dose has a effect of 0.09 (anchor result is 0.41) but still in the wrong direction.

BIOGEN_0002593322

261.    The attachment to the email listed the results of *210* different permutations.

262.    The result, and the data mining, was presented in a slide shown to Budd Haeberlein.

Investigate pre pv4 carriers in 301 High in mITT – why is the result inconsistent

| Subjects included | #Obs and N | Placebo decline | CDR-SB diff vs pbo | % decline |
|---|---|---|---|---|
| | | | **Efficacy** | |
| Primary | (#Obs=2261, N=602) | 1.31 | 0.41 | 31 |
| Remove post-ARIA obs | (#Obs=1904, N=602) | 1.29 | 0.40 | 31 |
| Exclude pts with dose change due to ARIA | (#Obs=1864, N=489) | 1.28 | 0.30 | 23 |
| Exclude pts with dose discontinuation | (#Obs=1980, N=500) | 1.32 | 0.32 | 24 |
| Exclude outliers (chg>10) | (#Obs=2249, N=599) | 1.32 | 0.28 | 21 |
| Exclude outliers (chg>9.5) | (#Obs=2241, N=597) | 1.28 | 0.27 | 21 |
| Exclude outliers (chg>9) | (#Obs=2237, N=596) | 1.28 | 0.27 | 21 |
| Exclude outliers (chg>8.5) | (#Obs=2225, N=593) | 1.29 | 0.13 | 10 |
| Exclude outliers (chg>8) | (#Obs=2221, N=592) | 1.27 | 0.13 | 10 |
| Exclude outliers (chg>8) & remove post-ARIA obs | (#Obs=1869, N=592) | 1.25 | 0.10 | 8 |
| Exclude outliers (chg>8) or pts with dose change due to ARIA | (#Obs=1836, N=482) | 1.24 | 0.09 | 7 |
| Exclude outliers (chg>8) or pts with dose discontinuation | (#Obs=1940, N=490) | 1.27 | -0.02 | -2 |

Biogen

BIOGEN_0003400221

263.    Having run so many combinations, Biogen was bound to find a favorable one.

264.    Defendant Budd Haeberlein was concerned about the outliers. So in a September 23, 2019 email, she asked how Biogen defined outliers. A Biogen statistician responded:

The fast and slow progressors are defined by the pkpd model. No details was provided on the exact definition, but Ivan and Kumar explained that the current way to define fast/slow progressors allows the best fit of the model, i.e. *the most contribution of the fast/slow progressor component in explaining the variation of the disease progression model.*

BIOGEN_0003049392

265.    Biogen ultimately misled certain regulators and the Advisory Committee about how it had reached the 8-point cut-off. Though the reason Biogen went with 8 points was pure data mining, it backfilled a theoretical basis.

266.    In comments to slides to be presented to the PMDA, Budd Haeberlein commented that "[m]ust explain the origin of the 8 point cut off – ie was not random…" (ellipses in original). Responding to Budd Haeberlein's comment, Biogen then falsely told the PMDA that it had selected the cut off because it was a "4-fold the upper range of the typical decline."

267.    The minutes of a March 9, 2020 meeting show that Biogen made a similar claim to European regulators:

Outliers are considered patients with extremely rapid progression, *the company has used a change of 8 on the CDR-SB as a cut-off, which is a four-fold increase of the expected progression in the  study population in the 78-week period of the clinical trials*. Using this definition 31 outliers were identified. Outliers were present in each study and across all treatment arms including placebo.  No predictors have been identified and these have been extensively investigated, including in terms of dose, baseline characteristics, concomitant medication or ARIA.  Alzheimer's patients with this degree of decline have been documented in the literature, and equally do not appear to have any clinical basis. The agency asked if the company had looked at excluding outliers with a different threshold. *It was confirmed that in response to the agency questions, the analyses had been performed with different cut-offs and that these results were consistent.*  A lower threshold of 4 and 5 was provided in the response document but not included in the presentation since these were not considered outliers and were within the normal distribution of the placebo patients in these studies

BIOGEN_0003645375

268.    Similarly, Biogen told the Advisory Committee:

*There is no precedent* in clinical trials for defining rapid progressors. A cut-off of change > 8 points on CDR-SB was chosen as the primary definition of rapid progression. This is 4-fold the upper limit of the anticipated mean decline in this study population and,

68

therefore, is an extreme change compared to typical progression. Additionally, a >8 point change on the CDR-SB is consistent with the definition for statistical outliers [citation].

## VI.    DEFENDANTS' FALSE STATEMENTS

269.    On the October 22, 2019 call to discuss Biogen's Q3 2019 earnings and aducanumab's revival, Defendant Sandrock told investors:

*Our primary learning from these data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints. This reduction in clinical decline was statistically significant in EMERGE, and we believe that patients – that the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE.* After consultation with the FDA, we believe that the totality of these data support a regulatory filing. Importantly, patients included in the futility analysis were those who had enrolled early in the trials and those early enrolling patients had a lower average exposure to aducanumab in large part due to two protocol amendments that occurred sometime after the start of the trials. These two protocol amendments were put in place precisely to enable more patients to reach high dose aducanumab, and for a longer duration. As a consequence, the larger dataset available after trial cessation included more patients with sufficient exposure to high dose aducanumab.

270.    On the same call, Defendant Sandrock stated:

*So in other words, what I'm saying is that there is a very sort of sharp dose response, if you will, you have to get to high dose of aducanumab and intermediate dosing at least in an 18-month trial is not enough.*

271.    Defendant Sandrock likewise stated on the call:

I think that dose suspension in the context of an 18-month study was – it could be problematic, *because they didn't achieve enough of the high dose*. But in clinical practice, we don't do 18-month treatment periods. We're going to treat patients for longer periods of time. And in that situation I think dose suspension may be acceptable in some patients.

272.    On the same call, Defendant Budd Haeberlein stated:

Aducanumab also demonstrated an impact on CSF biomarkers of tau pathology. A statistically significant reduction on CSF phospho-Tau levels was observed in EMERGE and ENGAGE with a dose proportional response in EMERGE. Aducanumab produced a numeric reduction in CSF total-Tau levels in EMERGE and ENGAGE with a dose proportional response in EMERGE. *Although the primary and secondary endpoints were not met in ENGAGE in post analysis, the subset of patients who received sufficient exposure to 10 milligram per kilogram*

69

*aducanumab in this case, at least 10 doses of 10 milligram per kilogram showed similar results to the comparable population from EMERGE, in terms of both amyloid plaque reduction and reduced clinical decline on CDR-SB.*

273. On the same call, Defendant Budd Haeberlein stated:

*I think what we have learned clearly is that dose is very important, but that if individuals do receive 10 milligrams per kilogram then they do have an efficacious response.*

274. Defendants' emphasized statements that the ENGAGE data "support" the findings of EMERGE, that "sufficient exposure to high dose aducanumab reduced clinical decline," that "data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE," and that the "subset of patients who received sufficient exposure to 10 milligram per kilogram aducanumab in this case, at least 10 doses of 10 milligram per kilogram showed similar results to the comparable population from EMERGE," were false and misleading because:

a. (1) Biogen's explanation of ENGAGE's failure was that patients could not achieve results unless they received a sufficient number of 10mg/kg dose, but in Study 302, patients who received the sufficient number of 10mg/kg doses performed worse than patients who did not receive the sufficient number of 10mg/kg doses; (2) at a minimum, to "support" EMERGE, the subset of ENGAGE data must be consistent with EMERGE; and (3) therefore, because the subset of ENGAGE data was not consistent with EMERGE, it did not support EMERGE. *See, e.g.,* ¶¶218-222.

b. Defendants knew and were subjectively concerned that in the Study 302 high-dose group, the pre-PV4 population performed better or at least as well as the post-PV4 population. *See, e.g.,* ¶¶218-222.

c. (1) The concept of "sufficient" exposure was tautological because Biogen had set out to find patients in Study 301 with good outcomes, and only retrospectively described whatever

characteristics they happened to have as sufficient; thus, (2) because "sufficient" exposure was tautological, all Biogen could say was that it was possible to define a group of patients in Study 301 who achieved good outcomes; and, therefore (3) Biogen's reference to "sufficient" exposure gave investors the misleading impression that sufficient exposure was a real existing thing rather than a statistical construct. *See, e.g.*, ¶¶179-87.

d.      Defendants knew and were subjectively concerned that Non-Carriers' results were not consistent with the Dosage Thesis and concealed those results. *See, e.g.*, ¶¶193-207.

275.    Defendants' statement that "you have to get to high dose of aducanumab and intermediate dosing at least in an 18-month trial is not enough" was false because in Study 302, not only was the intermediate (6mg/kg) dose sufficient, but high dose pre-PV4 patients performed better than post-PV4 patients.

276.    Defendants' emphasized statements that there was "a sharp dose response" was false because:

a.      Biogen only saw a dose response in Study 301 and, in fact, there was no dose response in Study 302. *See, e.g.*, ¶¶ 130-42, 218-22.

b.      In Study 302, pre-PV4 Carriers (who received intermediate dosing) performed better than post-PV4 Carriers (who received 10mg/kg). *See, e.g.*, ¶¶218-22.

c.      Non-Carriers overall saw no improvement over placebo and achieved better outcomes after PV4 though their treatment did not change. *See, e.g.*, ¶¶193-207.

277.    Defendants' statement that "if individuals do receive 10 milligrams per kilogram then they do have an efficacious response," were false because:

a.      (1) Non-Carriers who received 10 milligrams per kilogram did not have an efficacious response; and (2) Defendants knew, and were concerned by, this fact. *See, e.g.*, ¶¶193-

71

207.

b.      Defendants had repeatedly concluded that "[d]ose response of 6mg/kg, 1-6 doses of 10mg/kg, 7-14 doses of 10mg/kg vs. placebo showed *no clear dose response to show that 14 doses of 10mg/kg works better*. This is not surprising given that the high dose *did not in aggregate perform better than the low dose*." It was only by using precise specifications on the number of 10mg/kg doses that Defendants were able to "show" better outcomes. *See, e.g.*, ¶¶130-42.

278.    Also on the October 22, 2019 call, Biogen presented the following slide:



**Summary of Phase 3 aducanumab data**

- Across multiple clinical endpoints, the larger aducanumab dataset demonstrated a **statistically significant reduction of clinical decline in early AD patients in EMERGE**, and Biogen believes data from a subset of ENGAGE support these findings

- **Exposure to high dose** aducanumab was important for efficacy

- Differences in exposure to high dose aducanumab largely explain the different results between the futility analysis and the new analysis of this larger dataset, as well as the different results between the two studies

- Following consultation with the FDA, Biogen believes it is reasonable to submit **a regulatory filing for aducanumab based on these data**

279.    In presenting the slide, Defendant Budd Haeberlein stated that:

Second, exposure to high dose aducanumab was important for efficacy and *differences and exposure to high dose aducanumab largely explain* the different result of futility analysis and the new analysis of this larger dataset as well as *the different results between the two studies.*

280.    Defendants' statement that dosing differences "largely explain" the different results were false because:

a.      Biogen had concluded, as of May 18, 2019, that the differences between Study 301 and Study 302 resulted from "[m]any small influences, none above 20%." Biogen's understanding

did not change; in February 2020, Biogen once again wrote that the small influences explained no more than 20% of the results. *See, e.g.*, ¶¶130-49, 219.

b.      Biogen had concluded that there was "no clear dose response to show that 14 doses of 10mg/kg works better. This is not surprising given that the high dose did not in aggregate perform better than the low dose." *See, e.g.*, ¶¶130-42.

c.      Biogen had also concluded that "a linear relationship with mean cum[ulative] dose does not explain much variation in response." *Id.*

d.      Defendant Budd Haeberlein admitted internally that "the difference between 301 and 302 is not a 'home run' and it becomes glaringly apparent when we have made it appear as if there is a simple 'dose' explanation." *See, e.g.*, ¶¶ 226-232.

e.      Defendants did not subjectively believe that dosing differences explained the different results, but instead were resorting to throwing out so-called "outliers." *See, e.g.*, ¶¶256-67.

f.      Defendants tied the dose response to "sufficient" exposure, but (1) the concept of "sufficient" exposure was tautological because Biogen had set out to find patients in Study 301 with good outcomes, and only retrospectively described whatever characteristics they happened to have as sufficient; thus, (2) because "sufficient" exposure was tautological, all Biogen could say was that it was possible to define a group of patients in Study 301 who achieved good outcomes; and, therefore (3) Biogen's reference to "sufficient" exposure gave investors the misleading impression that sufficient exposure was a real existing thing rather than a statistical construct. *See, e.g.*, ¶¶179-87.

281.    Announcing aducanumab's Phase III Topline Results on December 5, 2019, Defendant Budd-Haeberlein stated:

To summarize, the aducanumab Phase III top line results. Following early termination based on futility, we analyzed a larger dataset. And this showed that in EMERGE, the high dose reduced clinical decline as measured by the primary and secondary endpoints. In ENGAGE, aducanumab did not reduce the clinical decline. *In a post-hoc analysis, data from a subset of patients exposed to the high dose of aducanumab support the positive findings of EMERGE.*

282.     On an investor call later the same day, December 5, 2019, Defendant Budd-Haeberlein reiterated:

*Today, though, we shared a new post hoc analysis, which is what we've called those – that subgroup of individuals who were able to have the opportunity for the intended dosing regimen, the so-called Protocol Version 4 group. And in that subset of patients, aducanumab did support the positive findings of EMERGE and ENGAGE.*

283.     Defendants' statements that the ENGAGE data "support" the findings of EMERGE were false and misleading because:

a.     (1) Biogen's explanation of ENGAGE's failure was that patients could not achieve results unless they received a sufficient number of 10mg/kg dose, but in Study 302, patients who received the sufficient number of 10mg/kg doses performed worse than patients who did not receive the sufficient number of 10mg/kg doses; (2) at a minimum, to "support" EMERGE, the subset of ENGAGE data must be consistent with EMERGE; and (3) therefore, because the subset of ENGAGE data was not consistent with EMERGE, it did not support EMERGE. *See, e.g.*, ¶¶218-222.

b.     Defendants knew, and were subjectively concerned, that in the Study 302 high-dose group, the pre-PV4 population performed better or at least as well as the post-PV4 population. *See, e.g.*, ¶¶193-207.

c.     (1) The concept of "sufficient" exposure was tautological because Biogen had set out to find patients in Study 301 with good outcomes, and only retrospectively described whatever characteristics they happened to have as sufficient; thus, (2) because "sufficient" exposure was

74

tautological, all Biogen could say was that it was possible to define a group of patients in Study 301 who achieved good outcomes; and, therefore (3) Biogen's reference to "sufficient" exposure gave investors the misleading impression that sufficient exposure was a real existing thing rather than a statistical construct. *See, e.g.*, ¶¶179-87.

284. Also at the CTAD December 5 presentation, Defendant Budd Haeberlein stated:

As I mentioned, we now have the final dataset. And I'm going to show you the same table with that final dataset [the table did not include pre-PV4 and post-PV4 subgroups] with that final dataset, which has the full QC and the full data included. And essentially, as you can see, there are very small changes between that larger dataset and the final dataset.

285. Later in the presentation, Budd Haeberlein presented the following slide:

### CDR-SB for ITT population compared with Post-PV4 population for EMERGE and ENGAGE at Week 78

| | ITT | | | Post-PV4[a,b] | | |
|---|---|---|---|---|---|---|
| EMERGE | Placebo decline (n=548) | Low dose (n=543) diff vs. placebo, 95% CI (%)[c] | High dose (n=547) diff vs. placebo 95% CI (%)[c] | Placebo decline (n=304) | Low dose (n=295) diff vs. placebo 95% CI (%)[c] | High dose (n=288) diff vs. placebo 95% CI (%)[c] |
| CDR-SB | 1.74 | -0.25 -0.55, 0.06 (-14%) | -0.40 -0.71, -0.10 (-23%) | 1.76 | -0.42 -0.94, 0.10 (-24%) | -0.53 -1.05, -0.02 (-30%) |
| ENGAGE | Placebo decline (n=545) | Low dose (n=547) | High dose (n=555) | Placebo decline (n=247) | Low dose (n=261) | High dose (n=282) |
| CDR-SB | 1.55 | -0.18 -0.47, 0.12 (-12%) | 0.03 -0.26, 0.33 (2%) | 1.79 | -0.35 -0.88, 0.18 (-20%) | -0.48 -1.02, 0.06 (-27%) |

286. Defendant Budd Haeberlein's statement was misleading because:

a. (1) The final data showed that in Study 301, Pre-PV4 high dose patients did better than post-PV4 high dose patients; (2) the final data was more reliable than the earlier data Biogen had relied upon because it was corrected for mistakes; and (3) as Budd Haeberlein had been told, "[i]n 302 PV4 results …low dose is numerically better than high dose, and post-PV4 is similar to pre-PV4. It's not straightforward to explain this by # of 10mg/kg or cum doses"; (4) Budd Haeberlein had no reason to dispute the aducanumab project lead statistician's statement; and,

75

therefore, (5) it was not the case that there were "very small changes" between the early and final data. *See, e.g.*, ¶¶237-248.

b.      By placing Carriers with Non-Carriers, Budd Haeberlein further concealed that in Study 302, pre-PV4 patients did better than post-PV4 Study 302 patients. *Id.*

287.    On Biogen's Aducanumab Phase III Topline Results call, held on April 2, 2020, Defendant Budd Haeberlein stated:

> When we now look at these charts, the top is the pre PV4 population and the bottom is the post-PV4 population. We can see the impact of that protocol amendment. In the pre-PV4 patients, only 21% in EMERGE and 15% in ENGAGE actually had that dark blue, the full possible 14 doses of 10 milligram per kilogram, whereas post that protocol amendment, there is much less heterogeneity and a much larger proportion of subjects, 51% in EMERGE and 47% in ENGAGE, received those full profitable 14 doses.
>
> If we then look at the impact of the population who did have the opportunity to receive the full 14 doses, we should compare the original outcome for both studies, and here, I'm showing the primary endpoint CDR-Sum of boxes for both EMERGE and ENGAGE at Week 78, and you will recall that there was a 23% and a 2% difference in those two studies. And if we now look at the patients who had the opportunity for the full 14 doses, in EMERGE, they now have in the high dose a 30% difference versus placebo, and in ENGAGE, where we did not have an outcome in the overall analysis in the PV4 population, the high dose has a 27% difference from placebo. ***And so in these populations a much more similar outcome can be observed.***
>
>       \*           \*           \*           \*           \*
>
> So with that, I would like to summarize the aducanumab Phase III top line results. Following study termination based on futility analysis of the larger data set showed that in EMERGE high dose aducanumab did reduce clinical decline as measured by both primary and secondary endpoints. In ENGAGE, however, aducanumab did not reduce clinical de[cline].
>
> ***In a post hoc analysis, data from subs[ets] of patients, the PV4 population who had the opportunity to be exposed to high dose did support the positive findings of EMERGE.*** In sub-studies, aducanumab showed an effect on disease related biomarkers both in CSF and in PET imaging studies[.]

288.    Defendants' statements that the ENGAGE data "support" the findings of EMERGE were false and misleading because:

a.      (1) Biogen's explanation of ENGAGE's failure was that patients could not achieve results unless they received a sufficient number of 10mg/kg dose, but in Study 302, patients who received the sufficient number of 10mg/kg doses performed worse than patients who did not receive the sufficient number of 10mg/kg doses; (2) at a minimum, for the ENGAGE population to be "much more similar" to or "support" EMERGE, the subset of ENGAGE data must be consistent with EMERGE; and (3) therefore, because the subset of ENGAGE data was not consistent with EMERGE, it did not support EMERGE. *See, e.g.*, ¶¶218-222.

b.      Defendants knew, and were subjectively concerned, that in the Study 302 high-dose group, the pre-PV4 population performed better or at least as well as the post-PV4 population.

289.    On Biogen's earnings call for the second quarter of 2020, held on July 22, 2020, Defendant Sandrock stated:

> I think – look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. *We believe that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE.* And then I'll say in also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as CDR sum of boxes. *And again, very similar that the lower doses did not show much of an effect. So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.*

290.    The All Data Statement was false because "not <u>all</u> of Biogen's data was 'consistent with' 'need[ing] to get to the higher dose' of aducanumab -- some patients did better on a lower dose and others experienced the same lack of clinical benefit whether they were on the higher dose or not. Thus, by failing to disclose the subgroup data, which would have contextualized their 'all data' claim, the complaint plausibly alleges that Defendants' omission misled investors."

## VII.    LOSS CAUSATION

### A.    The FDA empanels an advisory committee

291.    "When a scientific, technical, or policy question arises, such as whether an unapproved product is safe and effective, FDA often relies on Advisory Committees to provide independent advice." "Committees typically are asked to comment on whether adequate data support approval, clearance, or licensing of a medical product for marketing." "The primary role of an advisory committee is to provide independent advice that will contribute to the quality of the agency's regulatory decision-making and lend credibility to the product review process." "*Advisory committee meetings often receive considerable media attention, and the agency welcomes such scrutiny because it helps provide public assurance of a responsible process*." [12]

292.    It was inevitable that aducanumab would face an advisory committee because the FDA's process badly needed credibility:

a.    The potential consequences were immense. If aducanumab were approved, it would be prescribed to hundreds of thousands, perhaps millions, of patients. It would become the only disease modifying therapy for Alzheimer's Disease. It would cost tens of billions of dollars each year and overwhelm the country's PET and MRI scan capacity.

b.    The data are controversial. Aducanumab had two Phase III trials. One partially succeeded; the other failed. In any other case, the FDA would have instructed the sponsor to conduct another Phase III trial, but here, the FDA sought to approve aducanumab without any further trials.

---

[12] U.S. Food & Drug Administration, Advisory Committees: Critical to the FDA's Product Review Process, available at https://www.fda.gov/drugs/information-consumers-and-patients-drugs/advisory-committees-critical-fdas-product-review-process

c.     The history is controversial. Biogen declared futility as to the aducanumab trial. It then declared that it erred in declaring futility.

d.     There is significant pushback from physicians. A large number of physicians believe aducanumab should not be approved.

293.     Indeed, Biogen started planning for an advisory committee in early 2020. Biogen's preparation included regularly attending advisory committees. Biogen also counted on the FDA's convening an advisory committee. For instance, Biogen intended that the advisory committee's positive outcome would convince Japanese regulators to approve aducanumab.

**B.     The FDA Releases Effusive Briefing Materials and Buries the Massie Report**

294.     On November 4, during trading hours, the FDA released briefing materials ("Briefing Materials") for the Aducanumab Advisory Committee meeting.

295.     The Briefing Materials included:

a.     A report from the FDA and Biogen which, together with Appendices 1 and 2 thereto, ran to 343 pages;

b.     More than 90 minutes of pre-recorded presentations by Biogen;

c.     A 50-minute pre-recorded presentation by the FDA's efficacy reviewer;

d.     A 7-minute pre-recorded presentation by the FDA's safety reviewer; and

e.     A 45-minute pre-recorded presentation by Massie.

296.     On the whole, the Briefing Materials were effusive.

297.     The Dunn's office and Biogen submitted a joint report ("Joint Report"). That in itself had only occurred a handful of times in the FDA's history. The Joint Report joint report set out Biogen's position; Dunn's office inserted short, paragraph-long comments, the majority of which simply said the FDA agreed with Biogen's position.

298.    Dunn's office characterized EMERGE as "highly persuasive" evidence of aducanumab's efficacy.

299.    Dunn's office stated that EMERGE was a positive study and set about trying to find reasons why ENGAGE was wrong rather than evidence that aducanumab was ineffective:

> A guiding principle of the hypothesis was that if aducanumab is effective and the effect is dose-related as in Study 302, it follows that patients in Study 301 with adequate and consistent dosing should also demonstrate an effect on clinical endpoints.

300.    Dunn's office agreed that Biogen could use a Phase Ib study, Study 103, as a supporting study to approve aducanumab, even though it was an exploratory study.

301.    Dunn's office concluded that "[t]he effect of aducanumab in Study 302 is *robust and exceptionally persuasive* on *several* of the instruments used to evaluate efficacy."

302.    Appendix 1 in the 343-page report was a clinical review report by Dr. Kevin Krudys. Dr. Krudys, who had recently moved to the Office of Neurology, reports to Dunn.

303.    The Clinical Review Report concluded that "the applicant has provided substantial evidence of effectiveness to support approval."

304.    The Advisory Committee was asked to vote on and discuss certain questions. As Advisory Committee Members themselves would note, the questions were heavily biased in favor of approval. The first voting question required the Advisory Committee to simply ignore ENGAGE. The second asked the Advisory Committee to state whether the Phase Ib study provided support. The third asked the Advisory Committee to state whether Biogen had shown evidence that aducanumab removed amyloid plaque – regardless of whether the removal did anything to reduce cognitive decline in Alzheimer's patients. The fourth asked whether Study 103 and Study 302 supported approval in light of the post hoc analysis of Study 301. Analysts noted that these were leading questions designed to support approval:

a.      In a November 4, 2020 report, a J.P. Morgan analyst wrote that "[w]e see the FDA position as highly supportive of approval and believe the questions presented to the panel are structured to reinforce the FDA position."

b.      In a November 5, 2020 report, an RBC analyst wrote that the "[d]raft questions [are] clearly designed to steer AdComm panelists favorably."

305.    Appendix 2 to the Joint Report, beginning on page 247 of the Briefing Materials, was the Draft Massie Report.[13] Where the Joint Report was polished, the Draft Massie Report was rough and appeared unreliable. First, the Draft Massie Report bore a prominent DRAFT watermark. To Plaintiffs' knowledge, no statistical review presented to an FDA advisory committee has ever been identified as a draft. Second, the Draft Massie Report looked like a draft. Though the Joint/FDA Report was an electronic document with live hyperlinks and references, the Draft Massie Report was clearly a scan of a document that had been printed out and had no citations. The Draft Massie Report contained numerous spelling and grammatical mistakes, and included random changes in font, spacing, and margins, which showed that the author had not had the opportunity to polish the report. In fact, it was. Massie had been provided with the Joint Report two days before his review report was due.

306.    The Draft Massie Report also made statements that suggested the writer simply did not have access to information or data. For instance, Massie wrote in his executive summary:

> In the original "final" data presented to the Agency in June 2019, in Study 302 the MMSE *had a p-value for the high dose of 0.062* which would mean that no secondary endpoints in 302 would be significant following the prespecified hierarchy and multiplicity adjustment plan.

---

[13] The Draft Massie Report is attached as Exhibit 1 hereto and is incorporated by reference.

307. The Joint Report, however, stated without explanation that in Study 302, MMSE's p-value was 0.0493, below the 0.05 threshold. Readers would be left wondering whether Massie had simply not been included in conversations where Biogen and Dunn's office had corrected results, which would create credibility concerns as to the entire report.

308. Thus, the Massie Report did not look persuasive; it looked like an early draft that had inexplicably never been updated or checked for errors.

309. This is what a UBS analyst concluded in a November 5, 2020 report which stated that the Draft Massie Report was "buried at the end of the documents and seemed superseded by FDA's prior commentary."

310. Even investors who consulted the Draft Massie Report would not know what to make of it. The Draft Massie Report was written for the world-renowned experts who sat on the Advisory Committee, not investors. It was dense to the point of being impenetrable. It contained almost one hundred pages of statistical analyses, including 32 figures and 22 tables, analyzing everything from country-by-country results to age and sex differences, and the interactions between each of these variables as well as plaque removal and four separate clinical endpoints. The analyses were organized by Study rather than topic, so finding the same analysis of Studies 301 and 302 requires sifting through dozens of pages. It was particularly difficult for investors to interpret the Draft Massie Report because the data it reported was different than the data Biogen had previously presented at CTAD; there, Biogen had presented outdated data while representing that final data was similar. For instance, at CTAD, Biogen presented data showing that post-PV4 high dose was substantially better than low dose. The Draft Massie Report stated that "[n]otice also in the figure below that in 302 the late APOE+ low dose LS Mean which has the plotting

symbol X is essentially the same as the late APOE+ high dose with plotting symbol X." While

Massie included a chart, it was extraordinarily difficult to interpret (entire chart included):



**Figure 15. Assessment of Correlation between Dose Achieved and Week 78 CDRSB across Low and High Doses (not placebo subtracted)**

311.    Thus, determining whether the Draft Massie Report undercut or even related to the

information Biogen had already presented to investors at CTAD presented a huge challenge.

312.    The disagreement between the Joint Report and the Draft Massie Report ensured

that it would take more time for the market to incorporate the Draft Massie Report. Moreover, it

left residual uncertainty, which could only be resolved by the analysis of the world-class experts on the Advisory Committee.

313. The Draft Massie Report's bottom-line conclusion that data from the aducanumab clinical trials was inconsistent was not enlightening. The Joint Report took the opposite position. There was no way to weigh the claims except by thoroughly reviewing all the information released and comparing them to each other.

314. Analysts focused on the laudatory position Dunn's and Krudys's office took in the Briefing Materials. Further, several analysts did not mention the Massie Report at all but had noticed the FDA's clear bias in favor of approval:

a. In a November 4 article which did not mention the Draft Massie Report, a Cantor Fitzgerald analyst reported that "[s]imply put if you look at the documents and see how many times in the FDA position box that they say 'we agree' it suggests that Biogen's key arguments are now well positioned into Friday's AdCom";

b. On November 4, a Guggenheim analyst published a report titled *Adu Briefing Docs Are Out, Draft Questions Sets Up For A Positive Vote; Approval More Likely Than Not*; it did not mention the Draft Massie Report;

c. On November 4, an H.C. Wainwright analyst published a report which did not mention the Draft Massie Report and stated that "[b]riefing documents augur well for Friday's AdCom[.]";

d. On November 4, a Jefferies analyst published a report which did not mention the Draft Massie Report titled *Hot Debate but FDA Clearly Reads Positive on Efficacy, Safety*, which stated that "FDA tea-leaves read much more positive than consensus.";

84

e.      On November 4, an RBC analyst published a report titled *FDA Drinks the Adu Kool-Aid, Showing Surprising Openness to Approval Despite Mixed Data; Friday's AdCom Still Key*, which provided "we believe the briefing documents read more amenably than even Street bulls would have expected."; and

f.      On November 4, a Barclays analyst published an article titled *Adu Briefing Documents Highlight Supportive FDA Stance*, which provided "outside of the statistical review team portion (which was buried deep in the Briefing Documents, raised much of the same issues brought up by the Street, and whose conclusions were largely ignored otherwise), this represents the near-best case scenario for [Biogen] shares."

g.      A February 5, 2021 article quoted Marc Goodman, an SVB Leerink analyst, as saying:

> There was a special relationship. You could crystal-clearly see it. The briefing documents were unprecedented. I've been doing this job over 20 years and I've talked to people who have been doing it longer, and we've never really seen anything like that before, where the FDA is just working that closely with a company. They went to the [advisory committee] basically saying, "This drug's getting approved."

315.    Other analysts published initial reports that noted the laudatory language and ignored or downplayed the Draft Massie Report, but published later reports that reported showing the data it revealed were devastating.

a.      In a mid-day November 4 report, a J.P. Morgan analyst published a report titled *To Be Brief … the FDA Wants to Approve Adu*. The report mentioned the Draft Massie Report's bottom-line conclusion in passing. In a second report issued that evening after close of trading titled *A Closer Look at the Adu Briefing Docs and The Tale of Two FDAs* noted that "[o]ur more thorough review was eye opening in terms of conflict of opinions between the FDA reviewers and their statisticians, who are far more negative." The second report sarcastically noted in

85

response to one of the FDA's more egregious analyses "Data mine much?" The J.P. Morgan analyst then wrote that it was "surprising" that Non-Carriers did not achieve any benefit and that it "conflicts with [Biogen]'s hypothesis that high aducanumab dosing leads to a better benefit as non-carriers were always able to dose up to 10mg/kg." Thus, though the analyst's initial review was favorable for aducanumab and its approval, the analyst's more thorough review showed that the data presented in the Draft Massie Report undermined the case for approval;

b. On November 4, a Raymond James analyst published a report titled *Briefing Documents: "Do Stats Matter?"*, which provided that "[t]he briefing documents for aducanumab are a landslide win for [Biogen] and increase the likelihood of aducanumab approval substantially." The Raymond James analyst noted that there was a Draft Massie Report which disagreed, but noted that "[i]t's going to take us most of the day to go through it all[.]" On November 5, the same analyst published a second report which provided:

> The effusive briefing documents indicate adu *may* be approved[] [h]owever, we were not persuaded by any new data/analysis that aducanumab actually works. In fact, our conviction that the drug probably doesn't work is increased. Put differently, we completely agree with the statistician who essentially annihilated the pro-aducanumab position put forth by the clinical efficacy reviewer ("***unscientific, statistically inappropriate, and misleading***").
>
> \*       \*       \*       \*       \*
>
> ***Weak correlation between plaque reduction and CDR-SB. The correlation between plaque reduction [] and the primary endpoint [] has an $R^2$ value of just 0.13 [sic], which calls into question the amyloid hypothesis entirely if it wasn't questioned enough already.***

c. On November 4, 2020, a UBS analyst published an article titled *First pass of briefing docs suggest FDA has constructive view – this changes everything*. On November 5, the same analyst published a second report providing:

> ***Clinical Review vs. statistical review – clinical clearly prevails here***
>
> The experts [consulted by the analyst] noted the stark dichotomy in opinion between the clinical review (favoring approval) and the statistical review (against approval,

recommending additional trial. The experts noted that prior to publishing the briefing doc, sign-off at the director office level is required[14] and so the overall conclusion of the docs (stating [Biogen]'s trial results provide evidence of efficacy and support approval) essentially implies the FDA is willing to overcome the statistical shortcoming in light of the positive clinical review.

d.     The Director in Chemical Biology & Research in the Novartis Institute for Biomedical Research published an article which provided that:[15]

The fact that Biogen stock jumped on the release of this document tells you most of what you need to know about the stock market (and about investing in biotech stocks in particular). You wonder how many people even got as far as the statistical review section before hitting the big green Buy button.

316.    Because the FDA made it clear it wanted to approve aducanumab and investors did not have enough time to fully evaluate the Draft Massie Report, or understand its findings, Biogen's stock price increased to close at $355.63 on November 4, 2020.

317.    Yet on November 5, some investors began to digest and give credence to the information that had been made public, though buried, in the Draft Massie Report. On November 5, Biogen's stock fell to close at $328.90, down 7.5%.

### C.     The Draft Massie Report's Complex Conclusions

318.    Careful review of the Draft Massie Report could reveal that it alleged that: (a) aducanumab's effects on Non-Carriers was essentially nil; (b) in Study 302, Carriers did better before PV4 than after; (c) the number of 10mg/kg doses had no impact on Carriers in Study 302; (d) in Study 302, the post-PV4 low dose and high dose groups performed essentially the same. The Massie Report also provided further evidence against the Dosage Thesis, including: (e) in

---

[14] While director sign-off is sometimes required as a matter of office policy, in practice, the directors typically delegate the decision to the heads of offices – here, Billy Dunn, who favors approval.

[15] The report was published on November 9, 2020, but was written before the Advisory Committee meeting.

both Studies 301 and 302, Carriers whose titration was interrupted by ARIA experienced better clinical outcomes than Carriers whose titration was not interrupted and so received more 10mg/kg doses; (f) there was no correlation between the amount of amyloid plaque removed and clinical outcomes; (g) there was wide variation in treatment effect between countries and the U.S. performed poorly; (h) younger patients and those whose Alzheimer's disease was less advanced achieved worse outcomes; and (i) the multiple endpoints were closely correlated.

319. First, the Draft Massie Report revealed that the difference in clinical outcomes between high dose Non-Carriers and the placebo group was not only statistically insignificant, it was virtually nil. On average, Non-Carriers' clinical outcomes were better than placebo by only 0.066 points on the 18-point CDR-SB scale. This was a negligible difference that did not even suggest an aducanumab effect, let alone show one with statistical significance:

| Group | Study | Estimated CDR-SB point difference vs. placebo |
|---|---|---|
| Non-carriers | 301 | 0.067 |
| | 302 | 0.065 |
| | *Pooled* | *0.066* |
| Carriers | 301 | -0.07 |
| | 302 | 0.54 |
| | *Pooled* | *0.23* |

320. Indeed, in Study 302, Carriers achieved better clinical outcomes than Non-Carriers on all endpoints.



321.    Further, the Draft Massie Report showed that the fact that Non-Carriers did not see improvements in Studies 301 and 302 is inconsistent with Study 103. There, the difference in CDR-SB scores between placebo and high dose for Non-Carriers (1.63) was nearly twice as high as the same difference for Carriers (0.88). Thus, though Defendants claimed Study 103 supported Study 302 results, the trials are not even consistent.

322.    *Second*, Defendants maintain that Study 302 was positive, and Study 301 negative, because more Carriers in Study 302 were dosed after PV4. If Defendants' statements were true, then in Study 302, Carriers who were dosed after PV4 should achieve much better clinical outcomes those who were dosed before.

323.    Yet the Draft Massie Report revealed that in Study 302, Carriers did not experience better clinical outcomes after PV4:



324.    In fact, in Study 302, Carriers experienced slightly higher increases (worsening) in CDR-SB scores after PV4. In Study 302, before PV4, the mean CDR-SB increase in APOE4 carriers was 1.17 points. After PV4, the mean increase rose to 1.25.

325.    Further, in Study 302, Carriers achieved statistically significant improvements in clinical outcomes *before* PV4.

326.    Thus, the Draft Massie Report revealed that breakdown of clinical outcomes by PV4 status in Study 302 shows that, among other things: (a) patients did not achieve a dose-dependent clinical improvement from aducanumab; (b) Carriers who were dosed after PV4 did

90

not achieve outcomes similar to Carriers in Study 302 because in Study 302 all Carriers achieved similar outcomes regardless of dose.

327.    *Third*, Defendants had not presented the breakdown of patient results based on whether their treatment was interrupted. As part of the Dosage Thesis, Defendants maintained that interrupting treatment, most commonly because of ARIA, worsened patient outcomes. Because the cumulative dose is critical under Defendants' telling, these patients with dose interruptions should experience worse clinical outcomes on average than patients whose dose was not interrupted. Yet the Draft Massie Report revealed that in both Studies 301 and 302, patients whose high-dose treatment was interrupted by ARIA and so received *fewer* high doses achieved numerically better outcomes than those whose treatment was not interrupted and received more high doses:



Note: Earl= Pre-PV4; Late= Post-PV4; dc= dose titration slowing or reduction due to ARIA

328.    The Draft Massie Report theorized that *unblinding*, rather than aducanumab, accounted for the majority of the effect. Patients who experience ARIA will know it because they will be told as much by their doctors and their titration will be interrupted. ARIA is a side-effect of aducanumab, so these patients will also know that they are receiving aducanumab rather than a placebo, as will their caregivers. Knowing the patient received aducanumab rather than placebo may influence patient and caregivers' answers to interview questions, either by causing them to believe the patient performed better or by causing them to answer questions about how the patient functions in the world more favorably. Further, ARIA events may preselect patients willing to remain in the study because they are doing well. Because aducanumab's effect would be minimal even if aducanumab were effective, a significant unblinding effect would easily overwhelm any purported treatment effect.

329.    *Fourth*, Defendants had not revealed the breakdown of clinical outcomes by the number of doses received. The Draft Massie Report revealed that in Study 302, the number of 10 mg/kg doses the patients received and the total dose did not matter at all:



Figure 13 Bar plot of CDR Sum of Boxes Adjusted Mean Change from Baseline Percent Difference from Placebo at Week 78 by Number of 10 mg/kg Doses, with Placebo Selected by Propensity Score Matching - ITT Population that have had Opportunity to Complete Week 78 by 20Mar2019: Placebo-controlled Period Excluding Data after 20Mar2019 – Nested Categories

Number of Doses  ☐ >=6  ■ >=8  ■ >=10  ■ >=12  ■ =14 (full dose)

Number of subjects and Adjusted mean at Week 78

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Placebo | 202 | 185 | 157 | 129 | 77 | 220 | 201 | 177 | 144 | 98 |
| | 1.42 | 1.36 | 1.49 | 1.54 | 1.58 | 1.56 | 1.45 | 1.54 | 1.38 | 1.41 |
| BIIB037 | 202 | 185 | 157 | 129 | 77 | 220 | 201 | 177 | 144 | 98 |
| | 1.45 | 1.43 | 1.21 | 1.14 | 1.08 | 1.07 | 1.02 | 0.97 | 0.89 | 0.87 |

NOTE 1: Covariates in propensity score model include laboratory ApoE status, age, sex, baseline clinical stage, baseline scores of CDR-SB, MMSE, ADAS-Cog 13, ADCS-ADL-MCI, years of education, years since first AD symptom, AD symptomatic medication use at baseline, US/non-US and enrollment window of every 200 subjects. Placebo and treated subjects matched exactly on laboratory ApoE status. Subjects with undetermined laboratory ApoE status are grouped in the randomized ApoE subgroup.

NOTE 2: Results for each threshold were based on an MMRM (mixed model for repeated measures) model, with change from baseline in CDR-SB as dependent variable and with fixed effects of treatment group, categorical visit, treatment-by-visit interaction, baseline CDR-SB, baseline CDR-SB by visit interaction, baseline MMSE, AD symptomatic medication use at baseline, region, and laboratory ApoE status.

330.    The Draft Massie Report also showed that there was no correlation between plaque removal and CDR-SB scores. The correlation coefficient is the principal measure of the relationship between two variables. The coefficient is a number between -1 and 1. A correlation coefficient of 1 means that for every positive increase in one variable, there is an increase of a fixed proportion in the other. A correlation coefficient of -1 means that for every positive increased in one variable, there is a decrease of a fixed proportion in the other. A correlation coefficient of 0 means there is no relationship between the two.

331.    Statisticians use the square of the correlation coefficient ($R^2$) to measure the proportion of the change in one variable that is explained by the other. Technically, $R^2$ measures the proportion of the variance explained by one variable.

332.    The Draft Massie Report revealed that in the high dose group, neither the correlation coefficient nor $R^2$ showed a meaningful relationship between amyloid beta levels and positive clinical outcomes. In fact, the correlation coefficient in Study 302—the successful study—showed that patients who lost more amyloid plaque did slightly worse:

|  | Study 301 | Study 302 | Pooled (approximately) |
|---|---|---|---|
| Correlation coefficient between amyloid beta levels and CDR-SB | 0.135 | -0.036 | 0.084 |
| Proportion of variation in clinical outcomes explained by changes in biomarkers ($R^2$) | 1.82% | 0.13% | 0.71% |

333.    The Draft Massie Report included a graph comparing patients' amyloid PET SUVR against their CDR-SB scores shows no relationships:

94



Figure 18. Assessing Correlation of Amyloid Pet and CDRSB in High Dose at Week 78

334.    Limiting the analysis to patients who received the full fourteen 10mg/kg doses only increases the negative correlation:





Lack of Correlation between Week 78 CDRSB changes and cerebellum PET Aβ SUVR Week 78 changes for High Dose

301 and 302 High Dose Week 78 CDRSB (y) vs. Week 78 SUVR (x)    302 full 10 mg/kg doses subgroup

Note: Lower is better on both CDRSB and SUVR: Positive slope required for biologic linkage
In the absence of such a correlation worse placebo explanation for 302 seems more likely
There is very little to support disease slowing (only one + timepoint, no correlation with SUVR, no delayed start design, second failed study)

95

335.    As Massie noted in the Draft Massie Report:

Why don't high dose non-carriers show a clinical effect in Study 302 if they got 10mg/kg earlier, have less ARIA dose reductions and *if they showed a bigger effect on cerebellum SUVR AB uptake? This seems to call into question whether AB PET SUVR in cerebellum is a surrogate. In fact, within the high dose group, there is actually no correlation between Week 78 change in cerebellum SUVR AB and Week 78 change in CDRSM [sic]. This seems to call into question a disease slowing claim.*

336.    The Draft Massie Report also revealed country-by-country and region-by-region discrepancies. Aducanumab's Phase III clinical trials took place in 20 countries. There were statistically significant differences between countries in the effect of aducanumab in both Study 301 (p-value <0.0001) and Study 302 (p-value <0.0001).

337.    Further, the data showed the U.S. performed significantly worse than average. The U.S. accounted for 46.3% and 39.8% of the patient population of Study 301 and Study 302, respectively.

338.    In Study 301, U.S. patients who received a high dose did worse than placebo before PV4 and nearly identically thereafter:

96



339.    The treatment effect in Study 302 was marginal both before and after PV4:



340.    In the United States, on average, clinical outcomes for patients with the high dose were 0.19 CDR-SB points better than placebo (or about 20% less than the global average result).

341.    Because results vary by country, U.S. patients' poor response was a serious cause for concern.

342.    Similarly, though aducanumab is meant to be used early in Alzheimer's progression, the only age group whose performance was statistically significantly better than placebo were the over 75 (0.4521 points on the CDR-SB scale). The clinical outcomes for the subgroup of patients aged 65 or younger who received high doses of aducanumab were worse than placebo (-0.05546 points). In Study 302, the effect on clinical outcomes for prodromal (early stage) patients were worse (0.303 points) than those on patients who had more advanced mild dementia (1.013 points).

343.    Finally, the Draft Massie Report showed that scores on all the endpoints are closely correlated. In Study 302, patients who experienced good clinical outcomes as measured by CDR-SB also experienced good clinical outcomes as measured by MMSE, ADAS-Cog 13, and ADCS-ADL-MCI:

| Correlation Coefficients | | | | |
|---|---|---|---|---|
| | CDRSB | MMSE | ADAS-cog | ADCS-ADL-MCI |
| CDRSB | 1.00000 | -0.55312 | 0.49447 | -0.64083 |
| MMSE | -0.55312 | 1.00000 | -0.58233 | 0.44297 |
| ADAS-cog | 0.49447 | -0.58233 | 1.00000 | -0.39773 |
| ADCS-ADL-MCI | -0.64083 | 0.44297 | -0.39773 | 1.00000 |

344.    Statisticians also use a technique called principal component analysis to determine how many dependent variables are necessary to interpret the results, which they can then plot on scree plots. Here, as the Draft Massie Report noted, "because [the scree plot] levels off very quickly [], it suggests that, rather than four independent factors, one or at most two are needed to explain the variation among the four key endpoints. Therefore, again, the four key endpoints do not measure very distinct efficacy information, i.e. one or at most 2 captures the key information."

**Figure 32 Scree Plot of Principal Components of Primary and Key Secondary Endpoints**



345.    Thus, that aducanumab had statistically significant results on all four endpoints in Study 302 says nothing about whether it was effective. Rather, the concealed data shows that Study 302 did well on all endpoints because they measure the same thing.

### D.    The Advisory Committee Votes 10-0 Against Approval

346.    The Advisory Committee meeting was scheduled to begin early morning Friday November 6 and continue until after trading closed. That day, trading in Biogen's shares was halted and would only resume on Monday November 9.

347.    Late Friday, the Advisory Committee discussed and voted on the FDA's questions. The panel's votes were:

Question 2: Does Study 302, viewed independently and without regard for Study 301, provide strong evidence that supports the effectiveness of aducanumab for the treatment of Alzheimer's Disease?

100

Yes: 1                    Uncertain: 2                    *No:  8*

Question 4: Does Study 103 provide supportive evidence of the effectiveness of aducanumab for the treatment of Alzheimer's Disease?

Yes: 0                    Uncertain: 4                    *No:  7*

Question 6: Has the Applicant presented strong evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology [i.e., does aducanumab reduce amyloid plaque]?

Yes: 5                    Uncertain: 6                    No:  0

Question 8: In light of the understanding provided by the exploratory analyses of Study 301 and Study 302, along with the results of Study 103 and evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology, is it reasonable to consider Study 302 as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease?

Yes: 0                    Uncertain: 1                    *No:  10*

348.    The cause of the panel's dissatisfaction was the facts revealed in the Draft Massie Report.

349.    A panelist, Dr. Caleb Alexander, objected to treating EMERGE as a positive study, because:

I think even with study 302 there are some reasons for question. One is that there's no correlation between plaque reduction and week 78 outcomes.[]

Then the last that I'd say is that, once again as pointed out by the FDA's own [statistical] reviewer, there's no consistent effect across [APOE4] subgroups in 302, yet one would hope to see this with a strong efficacy signal.

350.    Dr. Aaron Kesselheim, another panelist, raised the same objection:

I would have loved to see also a mediator analysis on whether the changes in plaque explain much of the differences in the cognitive endpoints, which is of course the burden of proof. The burden of proof is we targeted the oligomers of the amyloid hoping that that

101

would have an impact clinically, and our question is does that bear up; if it's a strong enough effect? I must say I care more about the clinical aspects [i.e., clinical outcomes] than I do about the pathology.

351.    As did a third, Dr. Joel Perlmutter:

I think we see a lack of correlation between the A-beta change and the clinical endpoint CDR-SB. I think that's a concern.

352.    A fourth, Dr. Madhav Thambisetty:

I would point to slide 20 of the FDA statistical reviewer's presentation, where you examine the relationship between change in global brain amyloid burden at week 78 in individuals exposed to high-dose aducanumab and change in the CDR sum of box scores. There really appears to be no relationship either in Study 302 or 301, and this appears to be the case even when the analysis is restricted to only individuals exposed to the 10mg/kg dose.

I think there are some larger implications of these findings which we are not tasked with discussing today. One of the larger questions relevant to these observations is whether lowering brain amyloid burden is in fact the correct target in Alzheimer's disease, but like I said, I think that's beyond the remit of the discussion today.

353.    Perlmutter, an expert on PET imaging, stated that "the disconnect or the lack of correlation with the clinical benefit is a real problem."

354.    Asked whether Study 103 supported approval, Alexander pointed out that the fact that "contrary to 302, the effect was larger in non-carriers than carriers" "gave [him] pause."

355.    Summing up, Dr. John Duda, a panelist, stated:

But I think, all in all, the main -- I think  several of us have said it already. Dr. Massie's criticisms just were never addressed in the clinical overview, and there seemed to be a disconnect between different aspects of the FDA reporting that are very difficult for us to draw conclusions from. So in light of that, I think it makes it much more difficult to get where the FDA maybe thought we would go today.

356.    Dr. Scott Emerson:

I'm highly critical of the fact that the FDA presentation today was so heavily weighted to just giving the same conclusions that the sponsor did, and that there was no[] presentation by the statistician who'd done a careful analysis and made many points that I was very glad to see that the committee read.

357.    Kesselheim:

I also wanted to echo what others have said, to thank the FDA, and the sponsor, and Dr. Massie in particular, for their thorough reviews of the material and very helpful presentations.

358.    Thambisetty:

I voted no as well for all of the reasons discussed throughout the day, and I'd also like to take the opportunity to thank both the applicant and the FDA for the privilege of reviewing this hugely important work. I'd also add a special note of thanks to Dr. Tristan Massie for a really thorough statistical analysis that was very, very useful.

359.    The closely-watched advisory committee publicized, and showed the significance of, the data set out in the Draft Massie Report.  Further, the Advisory Committee was made up of world-renowned experts.

360.    Moreover, the Advisory Committee presentation revealed new information. In response to a Committee Member's question, Biogen commented that:

In the non-carriers, we see that when placebo decline went down post-PV4, *actually the treatment effect went up.*

361.    Biogen also provided enough information to show that the decrease was very large:

| | Information disclosed by Biogen | | Calculated numerical values |
|---|---|---|---|
| | Placebo increase in CDR-SB | Difference between Placebo and Non-Carriers | |
| Pre-PV4 | 1.47 | -0.4 | **1.07** |
| Post-PV4 | 1.11 | -0.48 | **0.63** |

362.    Thus, the data Biogen disclosed showed that there was a 0.44 CDR-SB score difference between Pre- and Post-PV4 in Non-Carriers.

363. As set out in ¶¶199-207 above, this was a significant inconsistency in Biogen's explanation. Biogen was itself concerned that post-PV4, Non-Carriers reached better outcomes than Pre-PV4 because PV4 had no impact on Non-Carriers' treatment. So were both Japanese and European regulators. Thus, that Non-Carriers had better outcomes after PV4 was new negative information first revealed at the Advisory Committee meeting.

364. Thus: (a) the Advisory Committee's deliberations were new news; (b) in the course of the Advisory Committee meeting, Biogen revealed that Non-Carriers' outcomes had improved after PV4, though their treatment had not changed; and (c) the Advisory Committee's vote was the materialization of the risk concealed by Defendants' false statements. Moreover, (d) in the days following the Advisory Committee report, analysts continued to publish reports discussing the Massie Report, showing that it had continued relevance to aducanumab approval.

365. Trading was halted on November 6. On November 9, the next trading day, Biogen's stock opened at $230.82 per share, and closed at $236.26 per share, down 28.2% from the November 5 close.

366. Dunn's office compromised its statistical rigor to push approval of an Alzheimer's Disease treatment. The November 6, 2020 Advisory Committee Members said as much. At that meeting, Advisory Committee Member Dr. Scott Emerson would accuse the FDA of "complicity" with Biogen in putting forth unacceptable statistical analyses and add that he was "very, very, very disturbed by some of the analyses that were considered" by the FDA. Dr. Caleb Alexander, another, would observe that the FDA does "an extraordinary amount of explaining around the contrary findings." Alexander would also add that "*I have a very hard time understanding*, after carefully reviewing what I thought was a very well done and well-articulated [FDA] biostatistical review, which convincingly argued the evidence was 'at best compellingly conflicted,' *how the*

104

***FDA could conclude that there are substantial evidence of effectiveness[.]***" Nearly all Advisory Committee members would complain that the FDA "foisted" "biased" leading questions on them designed to support approval of aducanumab.

367.    Stock analysts whose job is to evaluate and comment on Biogen as an investment were also struck by the FDA's loose standards:

a.      Baird: In a November 2020 note quoted in a November 7, 2020 Biopharma Dive article, Baird analyst Brian Skorney wrote that "[i]t is abundantly clear that whatever relationship FDA [Office] Director Dr. Billy Dunn has with aducanumab, his objectivity is completely lost."

b.      BMO: In a November 9, 2020 report, a BMO analyst wrote "Rather than seeking ad-com advice as would be customary, it seemed to us that FDA was instead seeking validation for its unorthodox interpretation of a-mab clinical data. However, the committee would have none of it. Because the two Phase III studies [] were identical and impeccably conducted at the same time, it would be negligent to regard EMERGE as a stand-alone trial while using only favorable retrospectively-derived elements from ENGAGE to support the EMERGE outcome."

c.      J.P. Morgan: After the Advisory Committee vote, a J.P. Morgan analyst wrote in a November 8, 2020 report that "we don't at all understand why [the FDA] were so pro-adu in the first place".

d.      Morgan Stanley: In a November 6, 2020 report, a Morgan Stanley analyst wrote that "[w]e are frankly perplexed why the FDA held the advisory committee, given it knew its position would be controversial."

e.      Piper Sandler: In a November 8, 2020 report, an analyst employed by Piper Sandler wrote that "with Billy Dunn [] running point, FDA went to great lengths – including in

the structure and positioning of the questions – to set the stage for a positive review[]" adding that

"it's our opinion that a CRL [a rejection] is the right thing to do."

      f.      Wedbush: A Wedbush analyst wrote in a November 8, 2020 article wearily titled

*We Repeat, Does the Aducanumab AdCom Really Matter? [Hint: No, Don't Think So]*:

> [] Ultimately, the AdCom voted 10-0 (uncertain = 1) the EMERGE ("302") study does not serve as primary evidence of effectiveness of aducanumab in Alzheimer's disease (AD). Since this was the only "successful" study, approval would seem to be at risk. Panelists rightfully objected (in our view) to a range of statistical and clinical trial analyses/conclusions. However, we still pose the question: does this vote even matter? In our view, FDA intertwined itself with [Biogen] and appears set to approve the drug regardless. In a year where we've seen other not-ready-for-prime-time approvals (e.g. hydroxychloroquine), we would not be surprised if the agency diverges from the AdCom's recommendations and approves aducanumab.

      368.      In December 2020, good government advocacy group Public Citizen published an

open letter calling for an investigation of the FDA's collaboration with Biogen concerning

aducanumab, which observed:

> It seems likely that, but for the statistical review provided by Dr. Massie and the intervention of the FDA's [] Advisory Committee — whose members had not been subject to the apparent regulatory capture that compromised the independence and objectivity of the senior staff and clinical reviewers in CDER's Office of Neuroscience — the FDA was prepared to rush to the U.S. market a drug for Alzheimer's disease that lacks substantial evidence of effectiveness, despite these potentially catastrophic impacts.

      369.      In a November 9, 2020 note, the Director in Chemical Biology & Research in the

Novartis Institute for Biomedical Research explained Biogen's rationale in pursuing aducanumab

approval:

> [Biogen] have enough of a hint to run a better confirmatory trial, should they so desire, but they do not. They desire to go to the FDA, get the drug approved, and begin printing money.
>
> And I would be all for a drug company printing money if they had a drug that could really alter the course of Alzheimer's disease, but (once again) Biogen has not, in my opinion, demonstrated that they have anything like that. And I am definitely not all for a drug company printing money for something that really doesn't do anyone any good. Because everyone knows what's going to happen if aducanumab is approved: the pent-up demand

for something, anything to treat Alzheimer's is immense. Has been immense forever. There are a lot of people who have a family member with the disease, and they will demand treatment with the new drug that the FDA has approved to fight the disease. Who could blame them?

\*          \*          \*          \*          \*

And if [the FDA approves aducanumab], we'll find out how many physicians will prescribe it, and how many insurance companies will pay for it. It would be something to see both of these groups hold the line, but I fear that the pressures will be just too great. Biogen is counting on just that, and I'm not happy about it.

370.    Extraordinarily, after publication of Massie's report showed Defendants' statements were false, even investment analysts who covered Biogen opined that approving aducanumab on the basis of the data Biogen presented is not only unlikely, but scientifically and morally wrong:

a.    In a November 6, 2020 report, an analyst employed by Raymond James noted:

Honestly, the panel was a disaster for aducanumab. And it is completely justified. There is no serious scientific argument in favor of anything other than a new prospective study of aducanumab and we can't explain FDA's effusive stance on aducanumab 1) pre-submission, 2) in the briefing documents, and who knows maybe 3) going forward, if they ultimately approve aducanumab.
If [aducanumab] is approved, 1) futility analyses don't matter, 2) statistics don't matter, 3) AdCom panel votes don't matter, 4) FDA's own guidance/statutes don't matter, and we're left wondering what actually matters in determining what drugs make it to market.[] One coherent bull case may be: FDA's credibility is seriously in question already given the irreconcilable interface of the briefing documents and the panel's views, so there is limited credibility left to destroy by approving aducanumab.
**Lastly, FDA should COUNT THE VOTE!**

b.    In a November 9, 2020 report, a BMO analyst castigated the FDA on grounds that "[r]ather than seeking ad-com advice as would be customary, it seemed to us that FDA was instead seeking validation for its unorthodox interpretation of a[ducanu]mab clinical data." The analyst called on Biogen to withdraw its BLA outright on moral and scientific grounds, *regardless of whether it still might be approved*, and start a new Phase III trial.

107

371.    Today, even Biogen's own paid consultants agree that the data did not support approval. For instance, in March 2025, Dr. Jason Karlawish opined that it was not true that "a cabal of self-interested researchers, government accomplices, and corporate greed … has produced harmful and ineffective Alzheimer's drugs."[16] But Dr. Karlawish—who discloses in the conflict-of-interest portion of the article that he is a paid Biogen consultant—also pointed out instances where "misconduct and self-interest" had caused the FDA to make misguided decisions. His main example was the FDA approval of aducanumab.

## VIII.  THE FDA APPROVES ADUCANUMAB BASED ON AN UNVALIDATED ENDPOINT

### A.    The FDA Tells Biogen At the June 2019 Meeting that FDA Might Be Willing To Approve Aducanumab Based On Surrogate Endpoints

372.    At the June 2019 Meeting, the FDA told aducanumab may be approved through a pathway that had never been used before for Alzheimer's drugs: accelerated approval. Accelerated approval does not mean the FDA approves a drug more quickly. Rather, it means the FDA approves a drug even though the sponsor has not shown that it is effective. To be eligible for accelerated approval, the applicant must show, among other things, that the clinical trials have an impact on a surrogate endpoint, which is a marker that is used as a substitute for a direct clinical measure. To be used, surrogate endpoints must be validated, meaning that there must be "extensive evidence [] including evidence from epidemiological studies and clinical trials" showing that the endpoint is "reasonably likely to predict clinical benefit".

---

[16] Jason Karlawish, MD, How a Book Is Undermining Progress Against Alzheimer's, MedPage Today, March 5, 2025, available at https://www.medpagetoday.com/opinion/second-opinions/114503.

373.    The FDA's openness was surprising. The FDA had declared as late as 2018 that there were no surrogate endpoints for Alzheimer's Disease. In its 2018 Guidance for Industry titled *Early Alzheimer's Disease: Developing Drugs for Treatment*, the FDA stated:

> Although the issues and approaches discussed above for Stage 2 patients [those who have begun to see subtle impairments] are relevant for Stage 1 [asymptomatic] patients, there is unfortunately at present no sufficiently reliable evidence that any observed treatment effect on such biomarker measures would be reasonably likely to predict clinical benefit (the standard for accelerated approval), despite a great deal of research interest in understanding the role of biomarkers in [Alzheimer's disease].

374.    Nothing had happened since and the FDA has never announced anything that would provide grounds to change the FDA's mind.

375.    Further, the minutes of the December 2014 Meeting show that the FDA had told Biogen there was no current appropriate biomarker, nor would there be absent "expert consensus":

> Given the lack of a scientific consensus as to which biomarker outcome measure (or set of measures) might be most appropriate for helping confirm that a compound is [redacted] in Alzheimer's disease, the inclusion of the analysis of a specific biomarker-derived measure [] is premature. Instead, [a pre-specified detailed statistical analysis plan] will allow for the possibility that if an expert consensus is later reached that a specific biomarker-derived outcome measure [] is the most appropriate for supporting a claim that a compound is [redacted] in Alzheimer's Disease, a pre-specified detailed plan will already exist for its analysis.

376.    Yet the June 2019 Meeting's minutes provided: "A further possibility that the sponsor may give consideration to, depending on what further analyses demonstrate, is to seek accelerated approval of Aduhelm based on its effect on reducing brain amyloid." The minutes continued: "[s]uch an approval would be predicated on the conclusion that an effect of Aduhelm in reducing brain amyloid would be reasonably likely to predict clinical benefit."

**B.    The FDA and Biogen Assure the Advisory Committee They Are Not Considering Accelerated Approval Based On A Surrogate Endpoint Thereby Preventing the Committee From Advising That Such Approval Would Not Be Warranted**

109

377.    At the Advisory Committee meeting, the FDA represented that the FDA would not approve aducanumab on the basis of a surrogate endpoint:

Perlmutter: [The question is] for the sponsor. It could be answered by either one, actually, two related questions.

One is, in 301, if the high-dose response – the lack of response was due to a lower dose, but yet the lower dose in 301 provided [a] benefit, was the lower dose in a high dose lower than the lower dose? Does that fit on the dose-response curve?

Then the second part of my question is if we're using the PET A-beta measurements as a biomarker of efficacy, wasn't there a lack of correlation between the response in the PET findings with the CDR-SB, and how do you explain that if that biomarker is relevant for their clinical benefit?

Dunn: This is Dr. Dunn. I can speak to the second one. ***We're not using the amyloid as a surrogate for efficacy.***

\*            \*            \*            \*            \*

Fountain: I think we have the opportunity now to ask the FDA a question about the correlation of amyloid with clinical change in Study 302. I'm not sure who's Dr. Dunn, Dr. Krudys, or someone else is going to address that.

Krudys: [] And second, I'll just say that ***it's not like change in beta-amyloid are being used as a surrogate here.*** It's a biomarker of what the drug is doing, and there is some correlation between the changes and changes of clinical outcomes.

378.    As set out above, the FDA's Question 6 asked the Advisory Committee to vote on whether aducanumab reduced amyloid plaque. After the Advisory Committee voiced objections that biomarker data was not correlated with clinical outcomes, Dunn interjected to accuse the panel of intentionally preventing him from clarifying that the FDA was not interested in the panel's views about the correlation between biomarkers and clinical outcomes:

Thambisetty: If I think that there's good biomarker evidence for brain pathology but not good biomarker evidence for clinical efficacy, how would I vote on this question?

Fountain: You'll have to decide for yourself if that constitutes strong evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology.

Thambisetty: Got you. So you think the term "pathophysiology" would also include treatment effects and therapeutic efficacy?

Dunn: Dr. Fountain, you may intentionally be not wanting me to clarify –

Fountain: No –

Dunn: -- in order to –

Fountain: -- that would be great if you'd clarify.

Dunn: Okay. It's always interesting to work on questions hard and then see how people read them. This question was absolutely intended to represent the biomarker-based assessment of the pathology of Alzheimer's. Really, we're talking about amyloid and tau, and there was also obviously some downstream effects, not specifically. But that's what we're talking about here, mainly amyloid. ***But it's not a clinical meaningful question. It's about what effect has been demonstrated using the biomarkers that we have on the pathophysiological findings.***

379.    Expressly relying on the FDA's assurances, Advisory Committee voted "yes" or

"uncertain" to the question posed, rather than "no":

Kesselheim: I voted uncertain because while it is very clear that the drug provides substantial impact on  the biomarkers that it measured, ***because the effect of the changes in those biomarkers on the clinical impact of the drug is unclear, that left me uncertain as to whether or not it had an impact on Alzheimer's disease pathophysiology.*** Thank you.

\*          \*          \*          \*          \*

Onyike: Yes. This is Chiadi Onyike. I voted yes. I viewed the question narrowly. ***This  is a treatment designed to basically [indiscernible] out amyloid pathology, so I view the question as did it actually do that***. There's clear evidence that it did that in a dose-related fashion.

\*          \*          \*          \*          \*

Duda: This is John Duda. I voted yes because I do believe ***there's strong evidence of a pharmacodynamic effect on Alzheimer disease pathology, specifically amyloid pathology, and in my mind that justified a yes.*** Thanks.

\*          \*          \*          \*          \*

Dr. Richard Hoffman: Yes. I voted yes, but ***primarily because it was mentioned that we were just talking about amyloid beta and tau.*** But again I'd like to point out that I think there are a number of other proteins that are misfolded that could be involved in Alzheimer's that we really don't understand yet. I think that's the reason why you didn't see super excellent results with this drug because if it was targeting all the toxic species, I think we would have seen much better efficacy results. Thank you.

\*          \*          \*          \*          \*

Dawndra Jones, DNP, RN, NEA-BC: Yes. This is Dawndra Jones. I voted yes because I believed *it clearly demonstrated positive impact on the biomarkers, especially concerning the amyloid pathology*. Thank you.

\*          \*          \*          \*          \*

Perlmutter: Well, I said uncertain, and I agree with everybody actually. *I think there's no question it demonstrates engagement with the A-beta amyloid. I think the tau is very uncertain. The question in my mind is whether that's the correct biomarker to use for the relevant clinical effect.*

\*          \*          \*          \*          \*

Alexander: I voted uncertain. [] Regarding this question at hand, I think it is, as was noted, important to note that the absence of correlation between the reduction in amyloid and clinical efficacy, at least among the high-dose group, *I do think there's very good evidence that the product reduces amyloid. But as was noted, the impact on tau was more difficult to understand the meaning of that because it was among what I understand to be a selected or non-random subset.* Thank you.

\*          \*          \*          \*          \*

Emerson: I tended to answer this narrowly as did Dr. Onyike. *The pathophysiology of Alzheimer's include signs of amyloid deposits. I think this has affected that. Whether it has affected symptoms or clinical sequelae that matter more is unclear, but in the sense that something has changed, I said yes.*

**C.      The FDA Grants Accelerated Approval of Aducanumab Based On A Surrogate Endpoint**

380.    Even before the Advisory Committee Meeting, Defendants understood that Dunn was an asset that they could use to push approval.

381.    Defendants understood that the FDA was so biased in favor of approval that they sought to narrow aducanumab's label.

382.    According to an article published on STAT after the Class Period, from then on, Biogen focused on providing ammunition to Dunn to support his efforts to make the FDA approve aducanumab regardless of the clinical data.[17] As one former Biogen employee told STAT, "[i]t was clear that Billy Dunn was an ally, so the job for Biogen became figuring out how to support

---

[17] STAT news is a biotech specialist publication sponsored by Boston Globe Media, the same company that publishes the Boston Globe.

his efforts within the FDA." Another former employee with knowledge of Biogen's interaction with Dunn and other FDA officials told STAT that "I knew from the interest levels within FDA that the agency was always going to find a way to approve Aduhelm."

383.    Biogen relied on Dunn to influence other regulators. In an email sent to Budd Haeberlein on July 18, 2019, Biogen proposed a strategy of "utiliz[ing] DR. Dunn/FDA" to influence European and Japanese regulators. BIOGEN_0003615137

384.    Dunn helped Biogen with European regulators. Dunn attended a data-sharing meeting in November 2019 and another in March 2020. BIOGEN_0003122236, BIOGEN_0003646178. Budd Haeberlein and Dunn held an impromptu one-on-one strategy call to prepare for the November meeting. BIOGEN_0003122237. At both meetings, Dunn stated that Study 302 was exceptional evidence in support of approval.

385.    Biogen understood that Dunn wanted to approve aducanumab regardless of what the data showed. So when non-U.S. these regulators raised difficult questions, Biogen developed a strategy to leverage positive regulatory developments in the U.S. to obtain approval in countries where it did not have a pliant regulator. Biogen had particular problems with Japanese regulators.

386.    In July 2020, Biogen held a meeting with the FDA at which Dunn stated that he sought to approve aducanumab "for the treatment of patients with Alzheimer's disease." Biogen was startled by this development because the label was far too broad. It scrambled to negotiate with the FDA to limit the label to Mild Cognitive Impairment and Mild Alzheimer's Disease, the populations studied in Studies 301 and 302. It also created contingency plans to "mitigate" the impact of the overbroad label by informing doctors that aducanumab should not be prescribed to advanced patients, notwithstanding what the label said. BIOGEN_0003976586. The FDA's

113

eagerness to approve a broad label created such an emergency that Biogen employees brought Vounatsos into the conversation even though he was on vacation.

387.    But Defendants also used Dunn to address internal FDA criticism. On October 8, 2020, after Biogen received Massie' Budd Haeberlein sought advice on "how to complain!" to Dunn about Massie. Then, on November 5, 2020, commenting on the Draft Massie Report, Sandrock stated that "thankfully … we have Billy Dunn at FDA." BIOGEN_0003681437

388.    Following the advisory committee meeting, Biogen adopted a strategy: "[P]rovide Billy with anything he needs … basically helping him" (ellipses in original). BIOGEN_0002934710.

389.    Biogen could not have found a better partner than Dr. Billy Dunn. Dr. Jarrow, who worked closely with Dunn, describes him as "stubborn": "I've had a lot of experience within Medical Policy and Program Review Council meetings, and [Dunn] gets to a conclusion, and then after you bat down the reasons to support his conclusion, he just finds new ones."[18]

390.    Biogen's efforts were effective. In comments on a November 29, 2020 weekly Clinical/Regulatory Alignment Meeting, Biogen Senior Medical Director Dr. Carmen Castrillo-Viguera stated:



391.    Dr. Castrillo-Viguera's description of her colleague continued:



---

[18] UBS analyst report dated December 4, 2020.

[19] "Barb" is Barbara Kolb, Biogen's Head, US Regulatory Sciences and Global Regulator Policy.

BIOGEN_0004024821

392.    According to a July 20, 2021 *New York Times* article, on March 31 and April 7, 2021, the FDA's influential Medical Policy and Program Review Council met to discuss aducanumab.

393.    The Medical Policy and Program Review Council is an internal FDA group that meets weekly to discuss pressing policy and regulatory issues. Its members include some of the most senior employees of the Center for Drug Evaluation & Research and the Center for Biologics Evaluation & Research. It is staffed with a variety of the FDA's most renowned experts. Its function is to advise on policy and program issues, including novel, challenging and potentially unresolved medical issues.

394.    The July 20, 2021 *New York Times* article recounts that the "vast majority" of the Medical Policy and Program Review Council's 15 members voted against approving aducanumab. According to the meetings' minutes, one member said approval could "result in millions of patients taking aducanumab without any indication of actually receiving any benefit, or worse, cause harm."

395.    With no good answers to the correct criticisms leveled by Massie, the Advisory Committee, on June 7, 2021, Dunn and his colleagues sidestepped them.

396.    According to the *New York Times*, the head of the FDA's Office of Oncology, Dr. Rick Pazdur, briefly raised the idea of accelerated approval. Cancer is lethal and develops quickly, and many cancers are rare so that patients are difficult to recruit for clinical trials, while there is general agreement in the literature that certain markers like progression-free survival accurately predict overall survival. Thus, accelerated approval is used frequently in oncology.

397.    Dr. Patrizia Cavazzoni, the head of the FDA's Center for Drug Evaluation and Research, convened an April 26 meeting to determine whether to approve aducanumab. Cavazzoni invited Pazdur and the head of the FDA's vaccine program, Dr. Peter Marks, to the meeting, even though neither office has anything to do with Alzheimer's disease.[20] She allowed them to vote on whether aducanumab should be approved.

398.    A majority of the attendees voted to approve aducanumab using the accelerated approval pathway because it reduced amyloid plaque.

399.    The FDA approved aducanumab *despite* the fact that its clinical trials did not show efficacy, not because they did:

a.    The approval was supported by a concurring memorandum from Dr. Peter Stein, the director of the FDA's Office of New Drugs. Stein concluded in his memorandum that "*the evidence is not sufficiently compelling or persuasive to meet the substantial evidence standard for standard approval*." Stein added that "[t]he statistical review by Dr. Massie provides a detailed assessment of all three studies, raising numerous concerns, only some of which are noted above. I refer the reader to this review."

b.    On July 13, 2021 the *Journal of the American Medical Association* published an opinion article written by Dunn, Stein, and Cavazzoni, who wrote the primary approval memorandum. The article was titled *Approval of Aducanumab for Alzheimer Disease – the FDA's Perspective*, showing that the article recounted the FDA's perspective rather than that of the individual authors. In the article, the authors, on behalf of the FDA, made clear that "*residual*

---

[20] A summary memo prepared and published by the FDA confirms that Pazdur and Marks attended the April 26, 2021 meeting and voted in favor of approval.

***uncertainty remains about aducanumab's clinical benefit*** [so] as a component of accelerated approval Biogen Inc is required to conduct a postapproval trial to verify benefit."

400.    Observers immediately grasped that the FDA decision approving aducanumab was not an application of existing FDA standards but instead a dramatic loosening of these standards:

a.    Biogen's stock price immediately shot up, but so did the stock prices of competitors who were developing their own Alzheimer's therapies, including Eli Lilly and Prothena;

b.    Eli Lilly had previously contemplated Phase III trials for its own Alzheimer's drug, donanemab, but within weeks of the aducanumab decision, it announced that it would forgo the trials and seek accelerated approval within the year;

c.    *Endpoint News*, a biotech industry publication, polled 1,400 industry professionals, and reported on June 9 that 80% disagreed with the FDA's decision to approve aducanumab. One commenter noted that "Aducanumab priced at $56k with the efficacy of a sugar pill is taking advantage of patients, the healthcare system and is ruthless";

d.    The American Neurological Association's executive committee notified its members that "**based on the clinical evidence, ADUHELM should not have been approved at this time.**"[21]

e.    Dr. Vissia Viglietta, a former Biogen senior medical director who helped design aducanumab's Phase III trials, was quoted in the July 20, 2021 *New York Times* article as saying

---

[21] American Neurological Association, *ANA Executive Committee Commentary on the FDA Approval of ADUHELM*, available at https://myana.org/publications/news/ana-executive-committee-commentary-fda-approval-aduhelm (emphasis in original).

that "[t]his approval shouldn't have happened. It defeats everything I believe in scientifically and it lowers the rigor of regulatory bodies."

401.    The FDA required Biogen to conduct a confirmatory Phase IV trial to prove that aducanumab is safe and effective. Until the FDA takes action upon the confirmatory trial's results, Biogen will be able to sell aducanumab, at a substantial profit.

402.    The FDA obligingly agreed to give Biogen until 2030 to complete the trial, thus giving it seven more years to conduct the confirmatory trial than it had taken to conduct the Phase III trials whose results it was purportedly confirming. Hours after approval, Biogen also announced that it would price aducanumab at $56,000 per patient per year. The combination of price and time on the market ensured Biogen could make tens of billions of dollars selling aducanumab – even if it doesn't work.

403.    As Dr. Annette Langer-Gould, a Kaiser Permanente neurologist, pointed out at a July 15, 2021 meeting of the California Technology Assessment Forum, a respected independent organization relied upon by insurance to make coverage and payment decisions, "[w]e're talking about reverse Robin Hood. We're taking little bits of money and transferring it to the company."

   **D.    The Aducanumab Approval Decision Sparks Three Resignations, Two Congressional Investigations, a Call From A Senator To Replace the FDA Head, and Calls From A Former HHS and Current FDA Head For An Investigation**

404.    The aducanumab approval sparked immediate outrage.

405.    Three of the Advisory Committee's nine permanent members resigned because of the FDA's decision to approve aducanumab:

   a.    Kesselheim resigned, calling the approval "probably the worst drug approval decision in recent U.S. history[.]";

b.      Knopman told the Washington Post that he did not "wish to be part of a sham process." In an email to FDA officials, he called Aducanumab approval "foreordained" and a "mockery"; and

c.      Emerson resigned, noting that "[t]his was the first time that nobody voted for approval of this drug — nobody — and they went against that.".

406.    Public Citizen, an influential good government non-governmental organization founded by Ralph Nader, called for the immediate termination of Cavazzoni, Dunn, and acting FDA Commissioner Janet Woodcock.

407.    Senator Manchin called for President Biden to replace acting FDA commissioner Janet Woodcock:

> While the approval of a drug provides hope for the millions of Alzheimer's patients and their families, many scientists have second-guessed the scientific benefit of this approval. The FDA's, and in particular Dr. Woodcock's, decision to go against its advisory committee's decision yet again has resulted in at least three scientists resigning from the committee. In his resignation letter, Dr. Aaron Kesselheim noted that this approval was "probably the worst drug approval decision in recent U.S. history."[citation] This brings into question the current interim leadership of Dr. Woodcock, at a time when strong, trusted leadership at our health agencies is most important. At a minimum, the agency should provide an explanation as to why it chose to go against its advisory committee's recommendations. Having a permanent agency head in charge to answer patients and doctors questions on this approval, as well as assure the general public of the FDA's commitment to public health, is imperative, and Dr. Woodcock is not the right person to lead the FDA.[22]

408.    The House Committees on Oversight and Reform and Energy and Commerce both launched investigations ("House Investigations") of the aducanumab approval decision, stating:

---

[22] Letter from Senator Joe Manchin to President Joseph R. Manchin, Jr., dated June 17, 2021, available at
https://www.manchin.senate.gov/imo/media/doc/letter_to_white_house_regarding_fda.pdf?cb

"We have serious concerns about the steep price of Biogen's new Alzheimer's drug Aduhelm and the process that led to its approval despite questions about the drug's clinical benefit.

"We strongly support innovative treatments to help the millions of Americans who suffer from Alzheimer's disease, but Aduhelm's approval and its $56,000 annual price tag will have broader implications for seniors, providers, and taxpayers that warrant close examination.

"Our Committees will be investigating this matter so Congress and the American people can better understand why this drug was approved, how Biogen set its price and what impact this will have on research for future Alzheimer's treatments and federal health care programs."[23]

409.    Member of Congress Katie Porter also called for HHS to investigate Biogen's contacts with the FDA in connection with aducanumab:

It appears very clear that Biogen had an inside route to FDA officials and had undue influence over their decision making and the evidence presented in various settings. While I respect the FDA's scientific expertise, it has become clear through various cases, including Rick Bright's whistleblower suit last year and the recent approval of Aduhelm, that too many pharmaceutical executives, lobbyists, and other stakeholders have long had inappropriate access to officials throughout the Department of Health and Human Services.[24]

410.    Concerns intensified after the STAT article's revelations. Hearing of the off-the-books meeting between Dunn and Sandrock, the Hon. Donna Shalala, the longest-serving Secretary of Health and Human Services in history, told a STAT reporter that its Office of Inspector General *must* investigate:

*When you see a report like [the Stat report], you have to investigate it. You cannot hesitate and you can't do it with your general counsel. You've got to send in the Office of Inspector General. I mean, you shouldn't hesitate for one second.*

---

[23]House Committee on Oversight & Reform, *Chairs Maloney and Pallone Announce Investigation of Biogen's Alzheimer's Drug Aduhelm*, available at https://oversight.house.gov/news/press-releases/chairs-maloney-and-pallone-announce-investigation-of-biogen-s-alzheimer-s-drug

[24] https://twitter.com/RepKatiePorter/status/1412534817749602314

411.  Notably, Shalala did not rule out supporting the termination of Woodcock, Cavazzoni, and Dunn himself over their inappropriate involvement in aducanumab approval if internal "law enforcement" found improper conduct. Asked whether they should be fired, Shalala stated:

*You've gotta get the facts first. And your law enforcement in the department is the OIG.*

412.  The House Investigations likewise intensified after publication of the STAT article. On July 12, 2021, representatives Maloney and Pallone sent Defendant Vounatsos wide-ranging document requests including for "[t]he dates, times, locations, attendees, and any notes or minutes taken of all calls and informal and formal meetings or discussions among FDA officials or personnel and representatives of Biogen related to aducanumab, and all related communications[.]" In an accompanying letter, representatives Maloney and Pallone linked their request to the STAT article's allegations of an improper relationship between Biogen and the FDA and, in particular, Dunn and Sandrock's secret meeting.

413.  Indeed, the revelations in the STAT article were so jaw-dropping that the FDA even called for an investigation of itself, as set out in a July 9, 2021 letter from FDA head Janet Woodcock to HHS Acting Inspector General Christi A. Grimm:

> [T]here has been significant attention and controversy surrounding the process for review of Biogen's biologics license application (BLA) for Aduhelm (aducanumab) for the treatment of Alzheimer's disease. This includes an ongoing focus on interactions between Biogen and Food and Drug Administration (FDA) staff during the review process. I write, therefore, to request an independent review and assessment of interactions between representatives of Biogen and the FDA during the process leading to the decision to approve the BLA to determine whether any of those interactions were inconsistent with FDA policies and procedures.

414.  On July 11, 2021, six Blue Cross/Blue Shield state-level affiliates declined to cover aducanumab. Blue Cross and Blue Shield of North Carolina stated regarding its decision

not to cover aducanumab, "[c]linical studies failed to demonstrate the effectiveness of Aduhelm [.] while documenting significant risks, like brain swelling and bleeding."

415. On July 15, the Cleveland Clinic and Mt. Sinai Health System, the seventh and eighth largest in the Nation, respectively, announced that they would neither stock aducanumab nor administer aducanumab infusions. Mt. Sinai in particular stated that it would wait for the investigation of interactions between the FDA and Biogen. A Mt. Sinai spokesperson noted that as far as the hospital was concerned, the "integrity of the F.D.A.-Biogen relationship" was in question. Within hours, they were joined by the Providence Health Care System based in Renton, WA, whose system includes 52 hospitals and more than 1,000 outpatient clinics. Because of Medicare Part B's cost-plus repayment structure, these entities are acting against their own financial interests.

416. Also on July 15, 2021, a 15-member panel of experts from the California Technology Assessment Forum unanimously concluded that Biogen had not shown that aducanumab is safe and effective. As Dr. Sarah Kremen, who heads the Center for Alzheimer's and Memory Disorders at Cedars-Sinai Medical Center and was an investigator in one of aducanumab's clinical trials pointed out that, at best, "[t]here may be some small number of people who will benefit, but it's hard to know from the study who that will be[.]"

417. A July 2021 survey by Spherix Global Insights revealed that 80% of neurologists had lost confidence in the FDA in the past year. One respondent added:

> The erosion [of my confidence] is based on the disastrously bad decision to approve aducanumab, which seems like a poorly developed and even possibly corrupt decision. I cannot remember a similar situation in which there was so much dismay and disbelief created by an FDA decision. We do not plan to use aducanumab at this time and we no longer know what to think about and how much to trust any future FDA decisions.

418.    In sum, in a June 10, 2021 editorial, Bloomberg editors pointed to aducanumab as the poster boy for the failures of the healthcare system which should prompt "[t]he U.S. [] to take a good hard look at its system for approving and pricing medicines."

419.    Dr. David Knopman, a standing Advisory Committee member who was recused from the meeting because he had served as an ENGAGE clinical trial site investigator, submitted a comment urging the Advisory Committee not to recommend approval. Knopman explained that "the evidence shows [if aducanumab is approved] it will offer improvement to none, it will harm some of those exposed, and it will consume enormous resources."

> I am a behavioral neurologist who has cared for patients with Alzheimer's disease (AD) for nearly 40 years. I care deeply for patients and their families. I desperately wish for a genuine therapy that substantially slows or reverses the disease. Yet the evidence that aducanumab is that therapy and has any benefits in persons with AD is terribly weak. An objective view of the data presented publicly by the sponsor Biogen in December 2019 fails on several key points to prove that aducanumab is efficacious.
> []
> Further, the most optimistic efficacy signal from EMERGE for aducanumab provides no support for a claim of improvement while the magnitude of the slowing of clinical progression is exceedingly small. We acknowledge an inability to extrapolate the effects of aducanumab beyond 18 months, but based on 18 month data, the benefit is of questionable clinical benefit.
> []
> These are extraordinary times for so many reasons, but for the Alzheimer world, a decision by the FDA on November 6 would be transformative - in my view more unfavorable than otherwise. Perfection may be the enemy of the good, but for aducanumab, the evidence doesn't even rise to "good." Contrary to the hope that aducanumab will help Alzheimer patients, the evidence shows it will offer improvement to none, it will harm some of those exposed, and it will consume enormous resources.
>
> The straightforward solution is this: Biogen needs to do a third trial with high dose aducanumab. If the drug's benefits are truly substantial, such a trial could recruit quickly and only several hundred patients would need to be randomized.

420.    As revealed at the July 15 California Technology Assessment Forum, the Alzheimer's Association estimates that the U.S. will spend about $28 billion per year on

123

aducanumab, or more than it spends on NASA. Analysts' estimate range between $25 billion and $35 billion per year.

421.    To qualify for aducanumab, patients must receive an amyloid PET, a procedure which costs $5,000-$7,000.[25] Moreover, the entire U.S. PET scan capacity is insufficient to aducanumab's needs.[26]

422.    Aducanumab is administered through a one-hour infusion every 4 weeks, with no preplanned stopping point. A caregiver must accompany the patient to the infusion.

423.    Aducanumab's side effects include ARIA for Carriers, which may cause death. As Biogen admitted in its Advisory Committee presentation, patients will likely need to undergo routine MRIs to screen for a brain hemorrhage. In aducanumab's Phase III clinical trials, each patient received 7 MRI scans during the 78-week treatment. These scans are time-consuming and expensive. Moreover, unless they are interpreted by specialists like those who worked on the aducanumab Phase III trials, the scans may miss cases of ARIA that could kill patients.

424.    The clinical benefit of aducanumab, even if it existed, would be miniscule. As it reported on October 27, 2020, analyst firm UBS had asked five Alzheimer's Disease professionals to report the minimum clinically meaningful reduction. Three of five experts said 1 point on the CDR-SB scale; the two others said 0.5 points. According to an August 2019 article published in Alzheimer's & Dementia, a journal published by the Alzheimer's Association, the minimum clinically meaningful improvement is 1 point on the CDR-SB scale. Yet even in EMERGE, the reduction in decline against placebo was 0.4 points on the 18-point CDR-SB scale.

---

[25] *Comment of the American Academy of Neurology to aducanumab Advisory Committee* available for download at https://www.regulations.gov/comment/FDA-2018-N-0410-0029

[26] Defendant Vounatsos told investors at the January 14, 2020 JP Morgan Healthcare Conference that "[t]here is a clear bottleneck in diagnosis capacity."

425.    Aducanumab's approval imposes other costs. It will at a minimum slow recruitment for clinical trials of other Alzheimer's Disease treatments. Sponsors will have to convince patients to forego aducanumab, an FDA-approved treatment, in favor of a clinical trial where they would receive either an untried treatment or a placebo. Further, later treatments will have to show they are at least as effective as aducanumab. Aducanumab's results varied both in toto and by subgroup between all of its clinical trials. Even if Biogen's evidence for aducanumab's efficacy were sufficient, the evidence would not show how effective aducanumab is and for which patients. Companies trying to bring effective drugs to market may not be able to show non-inferiority to aducanumab because of the morass of its clinical trial results.

426.    Aducanumab's approval also leaves biotech companies with perverse incentives. Biotech companies can put hundreds of millions of dollars at risk developing novel Alzheimer's therapies and putting them through clinical trials. Or they can earn billions of dollars by developing pointless products like aducanumab that reduce amyloid plaque without benefiting patients.

427.    In December 2022, the House Committee on Oversight and Reform and Committee on Energy and Commerce released a report titled *The High Price of Aduhelm's Approval: An Investigation into FDA's Atypical Review Process and Biogen's Aggressive Launch Plans* ("House Report"). The House Report concluded that:

a.    Biogen and the FDA had engaged in a slew of improper, atypical, and undocumented contacts;

b.    The FDA failed to keep a clear record of meetings and contacts with Biogen, in violation of its own internal rules;2z

c.     The FDA's office of biostatistics was presented with a draft of the Joint Biogen/FDA report two to three days before its response was due;

d.     The FDA's decision to create the Joint Biogen/FDA report where there was internal FDA dissention was unprecedented.

428.    Biogen reported 2021 revenues from Aduhelm of approximately $3 million. It did not report 2022 aducanumab revenues, instead including it in an "Other product revenue" category that totaled $13 million. Aducanumab was also listed in "Other product revenue" in 2023, which that year amounted to $12 million. Biogen discontinued aducanumab in November 2024.

## IX.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### i.     *"We have nothing to hide"*

429.    When Biogen presents clinical trial results, it usually provides much more information than it did when it announced aducanumab Phase III results.

430.    Defendants themselves acknowledged that the Phase III results they presented were less thorough than usual. For example, in the December 5, 2019 Q&A, an analyst commented that:

> **Q:** I have one for [Sandrock] and one for [Budd-Haeberlein], if I may. [Sandrock]*, I've tracked so many of your data presentations over the years. And I felt like today, it seemed like there was so much presented but also so much not presented perhaps. And I couldn't tell why.* So could you speak to what the carrier and noncarriers look like*? And should we assume that vast majority of the patients and the patients that had "sufficient exposure" were noncarriers?* That was one for you, [Sandrock].
>
> And [Budd-Haeberlein], from your perspective, it seemed like everything we're looking at is a function of 2 things: one is the real data, which is the completers; and one is assumed data, which is the noncompleters. So from your perspective, how – like what was the thought process in getting comfortable assuming that the effect size in noncompleters should mirror the effect size in completers? And is there regulatory feedback and/or sensitivity analyses that support that?

**Defendant Sandrock:** So I guess I'll start with the first question. And [analyst], I mean, look, as we said at the very beginning of this call, we're not presenting any data that we didn't already present this morning. ***And you're right, I mean, typically, we do present a lot of things, subgroups included, in the past. You're right, we did do that. There's a time and a place for everything.*** And look, this will soon be under review at regulatory authorities. And so for that reason, we're very sensitive about what we want to present now. ***We have nothing to hide.*** But there's a time and a place for everything. And in due time, I look forward to presenting all the data that make it important for – so that physicians can make the very best benefit/risk decisions if the drug becomes approved.

**Defendant Budd-Haeberlein:** Yes. Thanks, [Sandrock]. I'll just add a comment to that. I'm not sure if I was clear this morning. And that is that the ApoE4 carrier status was well balanced over the arms of each study, was similar in both studies. And this is in the ITT population. But also in that Protocol Version 4 population, ApoE4 carriage was balanced. And that was why we used that particular methodology or one of the reasons. ***So while subgroups are really important***, there's a time and place for us to disclose much more data. I ***think everybody is looking to hear that we have that balance in the studies.***

[Analyst], to your comment on real data completers versus noncompleters, the analysis method and the data set that we use. So the ITT and the MMRM are in fact the preferred method, as outlined in regulatory guidance on Alzheimer's disease therapeutics. And that was our primary statistical analysis. And so having a prespecified primary statistical analysis plan is what we – one would want to apply when a data set first comes in. However, as we've discussed, given that we had differences between the studies, we went further to do sensitivity analyses, including looking at the completers, to ensure that it wasn't an aspect of early termination that was making the data look the way it was. And as we showed in October, both the ITT and the OTC data sets are equivalent.

431.    Indeed, when Biogen presented the Study 103 results, it made the raw data available to researchers.

432.    Sandrock was dissembling. For example, Defendants had decided not to show a Carrier/Non-Carrier subgroup because it would show "data mining."

> ii.    *Defendants Told Investors They Had Taken Exceptional Care In Reviewing and Analyzing the Aducanumab Phase III Clinical Trial Data*

433.    In response to analyst questions, Defendant Sandrock stated:

We don't file [for FDA approval] willy-nilly. I mean we only go to filing when we believe that there's a benefit/risk argument based on science, based on data. And look, I mean, if you look at our history, we haven't done filings right and left without good reason. And so – and look, it's a lot of work to do a filing. And it's also a lot of work for FDA or other regulators that have to review a filing. So these are not things that we just do lightly.

      *iii.     Defendant Budd Haeberlein told Biogen not to claim that Study 301 analysis "supports" EMERGE even as she told investors the opposite*

434.    As to statements that Biogen's Study 301 analysis "supports" aducanumab, in November 11, 2019 comments to a document responding to EMA questions, Budd Haeberlein told Biogen to take out the phrase that "supportive treatment effect in sub-population with opportunity to receive higher drug exposure at 10mg/kg" because, she stated in a comment, it was "too strong." BIOGEN_0002518265.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

435.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Biogen during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, Biogen's officers and directors, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

436.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Biogen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

128

437.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

438.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

439.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Biogen;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused Biogen to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of Biogen's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

440.    Common questions of law and fact predominate over any questions affecting only individual Class members. Because the common stock of Biogen traded in an efficient market and Defendants' false and misleading statements had impacted the price of Biogen common stock, Plaintiffs will establish reliance for himself and the Class through the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in an efficient market;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NASDAQ, and was covered by many analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

441.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market, establishing predominance.

130

442.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

443.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

444.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5

## Against All Defendants

445.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131

446.    Plaintiffs assert this claim against all Defendants, basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

447.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

448.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Biogen's securities and directly impacted the price of Biogen's common stock during the Class Period.

449.    The Company and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in Biogen's name were materially false and misleading and omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the

Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that Biogen, by and through the Individual Defendants, and other senior Biogen officers and employees, acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

450.    The Individual Defendants knew or recklessly disregarded the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Biogen personnel to members of the investing public, including Plaintiffs and the Class.

451.    As a direct and proximate result of the scheme or artifice to defraud that lead directly to Biogen's disclosing materially false and misleading information, the market price of Biogen's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements at issue, Plaintiffs and the other members of the Class relied on the statements described above and/or on the integrity of the market price of Biogen's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Biogen's false and misleading statements and omissions.

452.    Had Plaintiffs and the other members of the Class been aware that the market price of Biogen's securities had been artificially and falsely inflated by the fraudulent scheme that caused Biogen to issue misleading financial statements, and by the material adverse information which the Company did not disclose, causing artificial inflation in Biogen's stock price, they would not have purchased Biogen's securities at the artificially inflated prices that they did, or at all.

453.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

454.    By reason of the foregoing, Defendants Biogen and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Biogen's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### <u>Against the Individual Defendants</u>

455.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

456.    During the Class Period, Biogen, by and through its officers and directors, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

457.    The Individual Defendants participated in the operation and management of Biogen and its operating units, and conducted and participated, directly and indirectly, in the conduct of Biogen's business affairs. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Biogen's financial condition and results of operations, and to correct promptly any public statements issued by Biogen which had become materially false or misleading.

458.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Biogen disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority over Biogen. The Individual Defendants, therefore, were "controlling persons" of Biogen within the meaning of

134

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Biogen's securities.

459.    Each of the Individual Defendants, therefore, acted as a controlling person of Biogen. By reason of their senior management positions and/or being directors of Biogen, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Biogen to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Biogen and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

460.    By reason of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act and are jointly and severally liable to the Plaintiffs and the other members of the Class for substantial damages that they suffered in connection with their purchases of Biogen's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class representative, and approving Lead Counsel and Local Counsel as counsel to the Class;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.


Dated: January 9, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>*/s/Laurence M. Rosen*</u>
Laurence M. Rosen, Esq. (pro hac vice)
Joshua Baker, Esq. (BBO #695561)
Jonathan Horne, Esq. (pro hac vice)
Sara Fuks (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 100016
Tel: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
jhorne@rosenlegal.com
jbaker@rosenlegal.com
sfuks@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

136