**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*
*and the Putative Class*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, ALFRED W. SANDROCK, JR., and SAMANTHA BUDD-HAEBERLEIN,<br><br>Defendants. | CASE No.: 1:21-cv-10479-IT<br><br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT** |

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   PROCEDURAL HISTORY ...................................................................................... 2

  A.    Discovery Is Stayed Until April 2025 .............................................................. 2

  B.    Discovery Begins .............................................................................................. 4

  C.    Nature of the amendments ................................................................................ 5

III.  PLAINTIFFS ALLEGING SECURITIES FRAUD CLAIMS MAY AMEND THEIR
     COMPLAINT TO REVIVE PREVIOUSLY DISMISSED CLAIMS ........................... 5

IV.   THE COURT SHOULD PERMIT AMENDMENT .................................................. 6

  A.    Standard ............................................................................................................ 6

  B.    Amendment Would Not Be Futile and There Is Good Cause to Permit Amendment ..
     ......................................................................................................................... 7

    1.    Amendment Would Not Be Futile Because the PTAC Addresses the Deficiencies
       Identified in the SAC ................................................................................... 7

      a)    The SAC's Allegations ....................................................................... 8

      b)    The Dismissal Decisions .................................................................... 9

      c)    The PTAC Sufficiently Alleges that the Remaining Statements Were Made with
        Scienter ............................................................................................ 10

    2.    There Is Good Cause To Permit Amendment ............................................. 15

  C.    Defendants will not be prejudiced .................................................................. 17

  D.    There Is No Undue Delay In Filing the Motion, Bad Faith, Dilatory Motive, or
     Repeated Failure to Cure Deficiencies ......................................................... 20

V.    CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Astellas Inst. for Regenerative Med. v. ImStem Biotechnology, Inc.*,
2019 WL 9096049 (D. Mass. Aug. 21, 2019) ................................................................. 17, 18

*Barnia v. Kaur*,
2024 WL 914780 (D. Mass. Feb. 1, 2024) ........................................................................ 15

*Carreiro v. Toter, LLC*,
2021 WL 3726939 (D. Mass. Aug. 23, 2021) ................................................................. 16, 19

*Cortes-Ramos v. Martin-Morales*,
956 F.3d 36 (1st Cir. 2020) ............................................................................................... 8

*Drachman v. Bos. Sci. Corp.*,
258 F. Supp. 3d 207 (D. Mass. 2017) ................................................................................ 7

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ........................................................................................... 17

*F.L. Roberts & Co., Inc. v. Land-Air Express of New England, Ltd*,
2019 WL 11624581 (D. Mass. Feb. 4, 2019) ..................................................................... 16

*Fed. Ins. Co. v. Bos. Water & Sewer Comm'n*,
551 F. Supp. 2d 117 (D. Mass. 2008) ................................................................................ 17

*Fed. Ins. Co. v. Fire Sprinkler Tech., Inc.*,
2021 WL 1857403 (D. Mass. May 10, 2021) ..................................................................... 18

*Foman v. Davis*,
371 U.S. 178 (1962) ...................................................................................................... 6, 7

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ............................................................................................. 6

*Hatch v. Dep't for Child., Youth & Their*,
*Fams.*, 274 F.3d 12 (1st Cir. 2001) ..................................................................................... 7

*In re TelexFree Sec. Litig.*,
2021 WL 5771730 (D. Mass. Dec. 6, 2021) ....................................................................... 6

*Klunder v. Brown Univ.*,
778 F.3d 24 (1st Cir. 2015) ........................................................................................... 17, 19

*Lennar Ne. Props., Inc. v. Barton Partners Architects Planners Inc.*,
    2021 WL 1195629 (D. Mass. Mar. 30, 2021) ............................................................. 7, 15, 18

*Mark Breiner DDS, LLC v. BTL Indus., Inc.*,
    2025 WL 1104618 (D. Mass. Apr. 14, 2025) ............................................................. 20

*Miceli v. JetBlue Airways Corp.*,
    914 F.3d 73 (1st Cir. 2019) ............................................................. 15

*Myers v. Integra LifeSciences Corp.*,
    788 F. Supp. 3d 161 (D. Mass. 2025) ............................................................. 20

*O'Leary v. New Hampshire Boring, Inc.*,
    323 F.R.D. 122 (D. Mass. 2018) ............................................................. 7, 15

*Parker Waichman LLP v. Salas LC*,
    332 F.R.D. 11 (D.P.R. 2019) ............................................................. 16

*Petrie v. Elec. Game Card, Inc.*,
    761 F.3d 959 (9th Cir. 2014) ............................................................. 5, 6

*Quaak v. Dexia, S.A.*,
    445 F. Supp. 2d 130 (D. Mass. 2006) ............................................................. 6

*Sargent v. NorDx*,
    2022 WL 17738711 (D. Me. Dec. 16, 2022) ............................................................. 15, 16

*Shash v. Biogen Inc.*,
    627 F. Supp. 3d 84 (D. Mass. 2022) ............................................................. 9, 10

*Shash v. Biogen, Inc.*,
    84 F.4th 1 (1st Cir. 2023) ............................................................. 10

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
    305 F. Supp. 3d 337 (D.R.I. 2018) ............................................................. 16, 17

*State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*,
    152 F.4th 1 (1st Cir. 2025) ............................................................. 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................. 5

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
    2022 WL 104911 (D. Mass. Jan. 11, 2022) ............................................................. 17

*U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Leo*,
    2024 WL 1701637 (D. Me. Apr. 19, 2024) ................................................................. 7

*Werner v. Werner*,
    267 F.3d 288 (3d Cir. 2001) ....................................................................................... 6

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ................................................................................ 5, 6

## **Rules**

Fed. R. Civ. P. 23(c)(1)(C) ..................................................................................... 19

## I.    INTRODUCTION

After dramatically abandoning aducanumab's clinical trials in March 2019, Defendants announced on October 22, 2019, that they intended to apply for aducanumab's FDA approval. From October 22, 2019, through November 4, 2020, Defendants provided investors the same explanation for the trial's failure. Because of safety concerns, patients who carried a particular gene ("Carriers") could not be titrated to the maximum dose of 10mg/kg until a mid-trial amendment ("PV4"). But the pre-PV4 dose of 6mg/kg was not effective; to see positive results, patients needed to receive a sufficient number of 10mg/kg doses ("Dosage Thesis").

In fact, various subgroup analyses whose results were disclosed on November 4, 2020 cast doubt on the Dosage Thesis. Defendants could not explain why in one of the two clinical trials, patients who received sufficient 10mg/kg doses did worse than those who did not. Nor could they explain why Non-Carriers, who could always titrate to 10mg/kg, saw virtually no improvement. Because of these inconsistencies, the Second Amended Complaint ("SAC") (Doc No. 68) alleged, Defendants' statements were false.

The First Circuit found that Plaintiffs had sufficiently alleged claims based on the July 22, 2020 statement that all of Biogen's data was consistent with the Dosage Thesis ("All Data Statement"), because it denied the existence of contrary evidence. But it found that Plaintiffs had not sufficiently alleged scienter for other statements in which Defendants propounded the Dosage Thesis. Plaintiffs needed to allege some internal disagreement, concern, or disbelief.

Discovery has supplied the missing element. Internal documents show that Defendants were aware of the same subgroup analyses which the SAC alleged made their statements false. Not only that, but the documents also show that Defendants concluded that these subgroup analyses showed the Dosage Thesis was false or at least misleadingly incomplete. Instead, Defendants manipulated the data to create "evidence" in its favor. Defendants pushed aside or ignored statisticians who told them the Dosage Thesis was false. In one instance, a Defendant deplored that "we have made it appear as if there is a simple 'dose' explanation."

1

The Court should grant leave to file the Proposed Third Amended Complaint ("PTAC"), Ex. 1, Doc No. 229-2.[1] First, through the combination of a discovery stay and uniquely high pleading thresholds, the Private Securities Litigation Reform Act ("PSLRA") ensures that plaintiffs can only get discovery if they have a meritorious case. But the PSLRA also aims to preserve plaintiffs' ability to pursue meritorious claims. So the Third, Fifth, and Ninth Circuits have held that if plaintiffs sufficiently plead that at least one statement is actionable, nothing prevents them from using validly-obtained discovery to revive claims that did not initially clear the PSLRA's unique hurdles.

Second, Plaintiffs because the amendment is based on newly discovered evidence, they meet the good cause standard and amendment is not futile. The First Circuit found scienter for the All Data Statement but was clear that Plaintiffs needed internal correspondence to establish that the Defendants' other statements that touted the Dosage Thesis were false. That evidence was not available without discovery. Discovery was stayed until after the deadline to amend pleadings. In discovery, Plaintiffs obtained documents that made the showing this Court and the First Circuit required and promptly moved to file an amended complaint. There is good cause because Plaintiffs moved to amend as soon as they reasonably could.

Third, Defendants will not be prejudiced. The All Data Statement is a more emphatic formulation of the Dosage Thesis, so discovery has already included the bases of the Dosage Thesis. No additional document discovery will be required. Nor will the Parties need additional depositions, because neither Plaintiffs nor Defendants have taken a fact deposition.

Before discovery, Defendants were able to conceal the scope of their fraud. The Court should grant leave to file the PTAC.

## II.    PROCEDURAL HISTORY

### A.    Discovery Is Stayed Until April 2025

This is a securities class action. The Private Securities Litigation Reform Act ("PSLRA") stays discovery during the pendency of a motion to dismiss. Lead Plaintiff Nadia Shash and Named

---

[1] A redline of the PTAC against the SAC is attached as Doc No. 229-3.

Plaintiff Amjad Khan filed their First and Second Amended Complaints in April and August 2021. Doc No. 42, Doc No. 58. The Court granted Defendants' motion to dismiss in September 2022. Doc No. 76. The First Circuit affirmed in part and reversed in part in October 2023. Doc No. 83.

Defendants then filed a motion for judgment on the pleadings. Defendants had argued to this Court that Plaintiffs could not show reliance. At oral argument, they urged the Court not to rule on reliance.[2] On appeal, they waived reliance. Back before this Court, Defendants sought to file a motion to dismiss based on reliance and later filed a motion for judgment on the pleadings based on reliance. The Court found that Defendants' motion for judgment on the pleadings stayed discovery. Doc No. 141. Then in March 2025, the Court largely denied Defendants' motion for judgment on the pleadings. Doc No. 163.

Because of overlapping stays, Plaintiffs had no opportunity for discovery until April 2025:

- November 2020 through September 2022: discovery is stayed pursuant to the PLSRA discovery stay

- September 2022 through November 2023: No discovery because the case is on appeal

- November 2023 through April 2024: Discovery is stayed because Defendants initially refuse to produce documents because they intend to file a motion to dismiss, and because they then file a motion for judgment on the pleadings.

- April 2024 through March 27, 2025: Discovery is stayed while the Court adjudicates Defendants' motion for judgment on the pleadings.

After the Court largely denied Defendants' motion for Judgment on the pleadings, the Parties submitted a proposed a new schedule, which the Court adopted *in toto* on April 8, 2025, resetting discovery deadlines. Doc No. 166 ("2025 Scheduling Order"). The 2025 Scheduling Order reset the amendment deadline to January 9, 2025, three months earlier.

---

[2] ECF No 81 at 59 (Defense counsel: "as matter of efficiency, if Your Honor -- if Your Honor is going to resolve this case on ground one, two, or three, there's really no need to get to four," the reliance and standing issues.

B.    **Discovery Begins**

The Scheduling Order required that Defendants' production of documents in response to Plaintiffs' First Requests for Production be substantially complete by September 26, 2025, and fully complete by December 5, 2025. Doc. No. 166 at 2 (5.b.). Plaintiffs served requests for production in October 2023. Defendants did not substantively respond, but served amended responses in April 2025.

Defendants began producing custodial documents on September 12, 2025. To date, Defendants' production has consisted of the following (with bates-range in parentheses):

- September 12, 2025: 229,601 pages (2,339,880-2,569,481)[3]

- September 26, 2025: 1,163,779 pages (2,569,482-3,520,690)

- October 31, 2025: 203,571 pages (3,529,690-3,733,261)

- November 25, 2025: 246,480 pages 3,733,262-3,979,742

- December 5, 2025: 177,519 pages (3,979,743-4,157,262)

- January 5, 2026: 161,546 pages (4,157,263-4,318,809)

Notwithstanding the December 5, 2025 deadline, Defendants' document production is not complete. No fact depositions have been taken. Discovery is still open. The parties may serve requests for production, interrogatories, and requests for admission through April 17, 2026, and non-expert depositions and fact discovery continue through May 15, 2026. Doc. No. 166 at 2. Expert designations and disclosures under Rule 26(a)(2) are not due until April 2026 and expert discovery will continue through November 2026. Dispositive motions are not due until January 2027. No trial date has been set. *Id.* at 3.

---

[3] Defendants produced approximately 2.3 million pages of non-custodial documents in August 2025. These were primarily individual patient records and organizational charts, which were used to identify custodians.

### C.    Nature of the amendments

The largest difference between the SAC and the PTAC, by far, is a new section in the PTAC that establishes that Defendants made statements about the Dosage Thesis with scienter. That section is based on the documents Defendants produced in discovery.

The PTAC also makes other changes:

- The PTAC removes certain statements that the SAC alleged were actionable, but which were dismissed by the First Circuit, and which Plaintiffs no longer allege are actionable. This includes all statements that on their face only concern correlation between plaque removal and clinical outcomes and that deny geographic diversity.

- The PTAC alleges that new information was disclosed at the November 6, 2020 Advisory Committee meeting. The relevance of the additional information was not clear until Defendants' production. The amendments also clarify Plaintiffs' theory of loss causation.

- The PTAC adds two new actionable statements. It was not clear that the statements were false, or that Defendants knew they were false, before Defendants' production. These new statements are similar to the previously pled statements.

## III.    PLAINTIFFS ALLEGING SECURITIES FRAUD CLAIMS MAY AMEND THEIR COMPLAINT TO REVIVE PREVIOUSLY DISMISSED CLAIMS

The PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The first goal is served by uniquely high pleading thresholds and a discovery stay until the court has sustained the sufficiency of the complaint, thus "prevent[ing] discovery abuses such as the 'unnecessary imposition of discovery costs on defendants,' particularly as a means to coerce settlement.'" *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 969 (9th Cir. 2014).

But the PSLRA was not enacted to permit defendants to escape liability if they are able to conceal their part in a fraud or to cabin defendants' liability for a fraudulent scheme if they conceal its scope. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), *abrogated by Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019) (allowing amendment "would be appropriate should discovery reveal evidence indicating that previously dismissed Defendants were in fact involved in the alleged fraudulent conduct."). So the Courts of Appeal are unanimous that the PSLRA lets a plaintiff rely on discovery to revive previously dismissed claims.

"The mere reliance on validly-obtained materials is not an abusive practice, nor does it impose unnecessary discovery costs on defendants." *Petrie*, 761 F.3d at 970 (reversing order striking allegations based on documents obtained in discovery and denying motion to dismiss). Indeed, the PSLRA weighs in favor of allowing amendment if discovery unearths evidence supporting the claims. *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) ("Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered" documents); *WPP Luxembourg*, 655 F.3d at 1059 ("To some extent, the ability of a district court to revive dismissed claims should evidence come to light tempers the heightened pleading standards of the PSLRA in securities actions where claims survive against co-defendants."); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 258 n. 7 (5th Cir. 2003) ("We are unaware of any circuit endorsing a blanket rule disallowing the consideration of newly discovered evidence in the context of a PSLRA case. To the contrary, two circuits have authorized the granting of a Rule 60(b)(2) motion based on newly discovered evidence in these circumstances.").

Courts in this District also recognize that amending a complaint subject to the PSLRA to revive additional claims is "a common practice in securities litigation." *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 137 (D. Mass. 2006) ("As Plaintiffs learned new information concerning that scheme through discovery, they added those findings to an amended complaint, a common practice in securities litigation."); *In re TelexFree Sec. Litig.*, 2021 WL 5771730, at *5 (D. Mass. Dec. 6, 2021) (permitting amendment based on newly-obtained discovery in securities action).

The PTAC relies on documents Plaintiffs validly obtained after the Court denied Defendants' two dispositive motions. The PSLRA does not shield Defendants just because they were able to conceal the scope of their fraud

## IV.    THE COURT SHOULD PERMIT AMENDMENT

### A.    Standard

Courts liberally grant leave to amend under Rule 15. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v.*

*Davis*, 371 U.S. 178, 182 (1962). Thus, when only Rule 15 applies, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.*

Plaintiffs seeking to amend after the deadline to do so set out in a scheduling order must also meet the more demanding "good cause" standard set out in Rule 16(b). *Lennar Ne. Props., Inc. v. Barton Partners Architects Planners Inc.*, 2021 WL 1195629, at *3 (D. Mass. Mar. 30, 2021). "This standard focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Leo*, 2024 WL 1701637, at *2 (D. Me. Apr. 19, 2024). "To show good cause, a party must demonstrate that despite their diligence the deadline in the scheduling order could not be reasonably met." *O'Leary v. New Hampshire Boring, Inc.*, 323 F.R.D. 122, 125 (D. Mass. 2018). "The heightened good cause standard is...meant to preserve the integrity and effectiveness of Rule 16(b) scheduling orders." *Id.*

## B.    Amendment Would Not Be Futile and There Is Good Cause to Permit Amendment

In this case, futility and good cause are intertwined. Amendment is not futile because internal communications fill the gaps identified in the Court's and First Circuit's dismissal orders. See 12-17, below. There is good cause to grant leave to amend because Plaintiffs did not begin to obtain documents until September 2025, well after the January 2025 deadline to file amended pleadings, and Plaintiffs moved expeditiously once they could take discovery. See 18-21, below.

### 1.    Amendment Would Not Be Futile Because the PTAC Addresses the Deficiencies Identified in the SAC

"If leave to amend is sought before discovery is complete and neither party has moved for summary judgment," as here, the standard of review for futility is equivalent to that of a 12(b)(6) motion. *Drachman v. Bos. Sci. Corp.*, 258 F. Supp. 3d 207, 210 (D. Mass. 2017) (*quoting Hatch v. Dep't for Child., Youth & Their Fams.*, 274 F.3d 12, 19 (1st Cir. 2001)). That is, amendment is not

futile if "construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Cortes-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (citation omitted).

### a)    The SAC's Allegations

Aducanumab is Biogen's proposed treatment for Alzheimer's disease. SAC, Doc No. 58 at 6 (¶3). In March 2019, Biogen announced that aducanumab's twin Phase 3 clinical trials, Study 301 and Study 302, had failed a pre-set futility analysis. *Id.* (¶5). But Biogen had continued to collect data after the database was locked for the futility analysis. *Id.* at 7 (¶7). The additional data showed that one of the trials, Study 302, reached statistically significant results on the aducanumab high dose. *Id.* The other, Study 301, was still a failure. *Id.* (¶8).

Biogen continued to analyze the clinical trial results to explain away Study 301's failure. *Id.* (¶9).  After an off-the-books meeting with FDA Division of Neurology head Billy Dunn, Biogen brought the Study 301 and 302 data to the FDA for evaluation in a June 2019 meeting. *Id.* at 11 (¶21). After conducting additional statistical analyses, on October 22, 2019, Defendants announced that they would seek FDA approval of aducanumab. *Id.* at 36 (¶140).

To obtain approval, Defendants had to explain the failure of Study 301. *Id.* at 39 (¶¶146-47). Patients who carry a particular gene ("Carriers") are prone to aducanumab-related side-effects. *Id.* at 27 (¶¶99-100). At the start of the clinical trials, there was not enough evidence that these risks were tolerable. So even in the high-dose group, Carriers could only titrate to 6mg/kg. *Id.* After more evidence accrued, it was determined that the risk to Carriers was tolerable. *Id.* So Biogen amended the study protocol to permit Carriers in the high dose group to titrate to 10mg/kg ("PV4"). *Id.* Defendants told investors that to achieve success, patients needed to receive enough 10mg/kg doses ("Dosage Thesis"). *Id.* Study 301 started earlier and recruited more quickly, so fewer patients in Study 301 consented to PV4 early enough to receive enough doses. *E.g. id.* at 51 (¶173). As proof, in statements throughout the Class Period, Defendants cited a subgroup of Study 301 patients who consented early enough to PV4 to receive the requisite number of doses, who saw an improvement. *Id.* at 55 (¶183). Then, on July 22, 2020, Defendant Sandrock claimed that

all of Biogen's data was consistent with the Dosage Thesis ("All Data Statement"). *Id.* at 58-59 (¶191).

But there were plenty of subgroups that were not consistent with the Dosage Thesis. First, in Study 302, patients who did not consent to PV4 early enough performed better than post-PV4 patients. *Id.* at 42-43 (¶¶157-58). Second, patients who could always receive 10mg/kg doses because they were Non-Carriers saw almost no benefit. *Id.* at 41 (¶153). Thus, the Dosage Thesis described a group in Study 301 that did well, but it was inconsistent with much of Biogen's data.

The FDA convened a meeting of a committee to advise it on aducanumab approval ("Advisory Committee"). The subgroup data were revealed with the November 4, 2020, publication of Advisory Committee Materials. *Id.* at 85 (¶262). All the materials were glowing except a report by the FDA statistician Dr. Massie ("Draft Massie Report"). *Id.* at 85-87 (¶¶263-73). The Draft Massie Report, buried as Appendix 2 to the primary report, seemed unreliable—for example, it bore a prominent DRAFT watermark—but set out the subgroup analyses that disputed the Dosage Thesis. *Id.* at 87-88 (¶273-74). As markets incorporated the Draft Massie Report—both through its publication itself and as it took center stage at the advisory committee meeting—Biogen's stock price fell, damaging investors. *Id.* at 92-95 (¶¶279-95).

        *b)*    *The Dismissal Decisions*

The Court granted Defendants' motion to dismiss, finding that Defendants' statements were neither false nor made with scienter. The Court interpreted the SAC as challenging "how Biogen conducted its post hoc review of the aducanumab trial data and the validity of the conclusions about aducanumab's efficacy that Biogen drew from it." *Shash v. Biogen Inc.*, 627 F. Supp. 3d 84, 101 (D. Mass. 2022). Interpreting the statements *in toto* as opinions because they derived from post hoc analyses, the Court found that Plaintiffs did not sufficiently allege Defendants' "[in]sincerity" or that their statements "concerning aducanumab did not align with the facts known to Defendants when the statements were made or [that they] failed to conduct the type of inquiry a reasonable investor would have expected under the circumstances before making the challenged statements." *Id.* The Court found that Defendants' statements were not misleading because "the

topline results of Biogen's post hoc analysis—which revealed patients who received sufficient exposure to the 10mg/kg dose of aducanumab had better clinical outcomes as compared to patients in the control group—were not themselves unreliable." *Id.* at 104. As to scienter, the Court found that the SAC did not sufficiently allege that Defendants did not intentionally or recklessly risk misleading investors by failing to disclose the subgroup analyses. *Id.* at 110-111.

On appeal, the First Circuit found that the SAC stated a claim as to the All Data Statement. *Shash v. Biogen, Inc.*, 84 F.4th 1, 11 (1st Cir. 2023). But, assuming Plaintiffs had sufficiently alleged falsity, the First Circuit found that the SAC did not allege that the remaining statements were made with scienter. *Id.*

The First Circuit found that it was not enough to show that Defendants were aware of Massie's analyses. *Id.* at 16 ("[E]ven if the Defendants were on notice of Massie's analyses at the time of their public statements, the complaint lacks any allegation that the Defendants honestly believed Massie's interpretation of the data over their own."). The First Circuit ruled that the SAC did not allege scienter because it "contains no allegation that Defendants knew the subgroup data undermined their efficacy statements; that they were warned that this was so prior to making said statements; that, even if Defendants were aware of Massie's analyses, they credited his conclusion as to aducanumab's clinical effect over their own; or that the inconsistency between the subgroup data and Defendants' efficacy statements was glaringly obvious to Defendants." *Id.* at 9.

The PTAC cites facts establishing each of these points.

        c)     *The PTAC Sufficiently Alleges that the Remaining Statements Were Made with Scienter*

The PTAC shows that Defendants: (a) initially concluded that the Dosage Thesis was false; (b) only reached the opposite conclusion by precisely manipulating several variables to define a "successful" population in Study 301, ignoring employee and consulting statisticians, and excluding FDA's statisticians from participation; (c) subjectively believed that Biogen had no explanation for the contrary subgroup data; (d) knowingly decided to omit contradictory subgroup data from public presentations to conceal that Biogen had, in their words, engaged in "data mining";

(e) subjectively believed that their public statements about the Dosage Thesis were misleading;  (f) misled non-U.S. regulators; and (g) relied on a pliable and supportive FDA administrator, Billy Dunn, rather than the data, to support approval.

Even as they declared futility in March 2019, Defendants were well aware that PV4 might have had an impact on the results. So the Dosage Thesis was one of the first things they tested after the futility declaration. But their multiple analyses in April and May 2019 all concluded that there was "no clear dose response to show that 14 doses of 10mg/kg works better." They also found that the cumulative dose did not matter. They concluded that "no one factor, including timing of pv3 and pv4 and the resultant dose changes, would explain why 301 and 302 had different outcomes." Thus, Defendants did not believe that sufficient exposure was sufficient; they understood that "sufficient exposure" had a minimal impact and looked to other factors to explain the data. PTAC, Doc No. 229-2 at 37-43 (¶¶130-42).

Defendants took the data to a committee of expert advisers. The experts advised them to run another trial. *Id.* at 43-45 (¶¶143-150). They then took the data to the FDA. The FDA and Biogen created a joint working group to analyze the results. The FDA's statisticians, led by Dr. Massie, explained to Biogen that the data did not support the Dosage Thesis or approval. In August 2019, Massie shared nearly all the analyses he would later publish in the Draft Massie Report with Biogen. In September 2019, the FDA's statisticians were excluded from the working group. Id. at 45-51 (¶¶151-178). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 53-64 (¶¶223-25). Thus, statisticians all-but-universally panned the Dosage Thesis; Defendants ignored their internal and consulting statisticians and sidelined the FDA's statisticians.

After April and May 2019, Defendants knew that 10mg/kg doses did not lead to good patient outcomes. They manipulated the data until they created a group that did well. If researchers are allowed to split data post hoc any number of ways, they can always find a population that did "well." That's what Biogen did. After the statisticians' exclusion, Biogen and the remaining FDA

team set themselves a goal: to identify groups in Study 301, however defined, that achieved good results. *Id.* at 51-54 (¶¶179-87). Defendants manipulated several variables, ultimately running thousands of permutations until they had created a group in Study 301 with precisely defined numbers of doses and outlier thresholds that saw good results. *Id.* at 70-74 (¶¶256-68). Defendants internally circulated guidelines on post hoc analyses; the analyses Defendants ran violated the guidelines because they intended to identify patients who did well and then backfill an explanation based on whatever characteristics these patients happened to have. Thus, while the SAC alleged that Defendants went looking for characteristics that might explain good results, the PTAC shows they went looking for patients who did well, which is much worse.

Defendants took their explanation to investors. They said that results from the successful defined group "supported" Study 302 and explained Study 301's failure. And they told investors the Dosage Thesis explained the variation. *Id.* at 34-35 (¶¶123-27).

Defendants were concerned about precisely the same subgroup analyses that were discussed in the Draft Massie Report. By September 2019, that Pre-PV4 patients did better than Post-PV4 patients had already been repeatedly raised at Biogen's Board of Directors level. When she saw a potential explanation, Budd Haeberlein pounced on it on a Sunday night—only to be told the next morning that Biogen had already tried out the explanation she suggested, and it failed. *Id.* at 62-63 (¶¶218-22). Thus, at the highest levels of its organization, Biogen was subjectively concerned that the Study 302 subgroup data was inconsistent with the Dosage Thesis.

The PTAC alleges that Defendants did not just mislead by omission; they made affirmatively false statements. The Study 301 and 302 Statistical Analyses Plans mandated a Carrier/Non-Carrier analysis. Biogen conducted the analysis and found that in the aggregate, Non-Carriers had seen almost no benefit—and, inexplicably, in both Studies, Non-Carriers did better after PV4 than before, though PV4 had no impact on their treatment. Defendants were concerned by these data, sought to explain them away, but could not. *Id.* at 55-59, 62-63 (¶¶193-206, 218-22). In early October 2019, the lead statistician on the aducanumab project emailed Budd Haeberlein the Carrier/Non-Carrier analyses Biogen had spent the previous six months conducting;

there were 23 pages of them. When Biogen went public with aducanumab's revival in late October 2019, analysts asked Budd Haeberlein for Carrier/Non-Carrier subgroup analyses; she falsely answered that Biogen had not conducted the analyses. *Id.* at 59 (¶¶207-09). Budd Haeberlein implied that Biogen would present Carrier/Non-Carrier analysis at a formal data presentation in December 2019, but Biogen then deliberately decided not to present Carrier/Non-Carrier analyses at their public data presentation because it would show the Dosage Thesis was "data mining." Biogen anticipated that analysts would be suspicious about the omission, but thought the tradeoff was advisable because the results were so damning. *Id.* at 60-62 (¶¶210-217). Defendants' careful decision to falsely state data was not available and then fail to present it because it would undercut their claims supports scienter. *State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*, 152 F.4th 1, 13 (1st Cir. 2025) (finding that "careful phrasing smacks of a 'cleverly crafted' way of leading investors astray.").

Defendants also presented outright false data. Defendants' analyses were initially based on the data that was available as of April 2019. But Biogen had to clean up the data (e.g., check for data entry errors). Defendants received the final data in November 2019, and the lead statistician promptly emailed Budd Haeberlein to tell her that in Study 302, the low dose group performed numerically better than the high-dose group. In her email, the lead statisticians also stated that in the Study 302 high dose group, pre-PV4 patients performed numerically far better than post-PV4, and the two groups were about even compared to their respective placebo groups. The statistician and Budd Haeberlein agreed that they would instead present the old data and falsely tell investors that the new data was similar. Doc. No 229-2 at 66-68 (¶¶237-48).

The PTAC shows that Defendants lied to investors and regulators about the data. Defendants regretted that Japanese regulators were "sharp[] cookies" who "asked all the tough main questions that we tried to avoid." So Defendants shied away from explaining the results: they developed a strategic plan to seek Japanese approval only after they achieved positive regulatory results from the FDA, hoping that the Japanese regulators would defer to the U.S. *Id.* at 68-74 (¶¶249-68).

Defendants understood that their statements were misleading. In response to a consulting statistician's criticisms, in May 2020, Budd Haeberlein deplored that "we [Biogen] have made it appear as if there is a simple 'dose' explanation." Biogen's public statements were now inconvenient because regulators, who were provided with the non-public data, became suspicious. *Id.* at 64-66 (¶¶226-36).

Defendants had a motive to mislead investors. Biogen had a strategy for approval, but the strategy was not based on the data. Instead, back in late April through June 2019, Biogen had convinced a pliable FDA official, Billy Dunn, head of the Office of Neurology, that aducanumab merited approval. From then on, Biogen saw its job as providing Dunn ammunition to use in internal battles to force approval. Biogen and Dunn planned their strategy in emails on which no other FDA employees were copied, and one-on-one phone calls and meetings between Dunn and Budd Haeberlein or Sandrock to which no other FDA employees were invited. A Biogen statistician remarked ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 45-47, 51, 117-120 (¶¶151-63, 176-77, 380-95).

Biogen expected Dunn to pave the way to approval. When Biogen received the Draft Massie Report, employees immediately exchanged a series of emails seeking to determine "how to complain!" to Dunn. After the Advisory Committee meeting, Biogen senior executives prepared a detailed plan explicitly intending to supply Dunn with ammunition to push aducanumab through to approval. Biogen also encouraged Dunn to attend meetings with non-U.S. regulators where he advocated for Biogen's position. *Id.* at 117-20 (¶¶380-95).

Thus, the PTAC shows, among other things, that Defendants subjectively doubted the Dosage Thesis, deliberately concealed the data that undercut the Dosage Thesis, attempted to mislead regulators about the Dosage Thesis, and commented internally that the Dosage Thesis was misleading. It provides exactly the facts this Court and the First Circuit said were missing. The Court should permit amendment.

14

### 2.    There Is Good Cause To Permit Amendment

While the good cause standard focuses on both the conduct of the moving party and the prejudice, if any, to the nonmovant, the movant's conduct is dominant. *Lennar Ne. Props., Inc. v. Barton Partners Architects Planners Inc.*, 2021 WL 1195629, at *3 (D. Mass. Mar. 30, 2021) (*citing Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 86 (1st Cir. 2019)). To show good cause for leave to amend, a party must show that despite their diligence the deadline in the scheduling order could not be reasonably met. *O'Leary,* 323 F.R.D. 122 (D. Mass. 2018).

"Deadlines for amending the complaint are often set prior to the end of discovery to encourage parties to file amendments as soon as possible. When a party discovers materials that were not and could not have been found prior to formal discovery, they will usually meet the good cause standard." *Barnia v. Kaur*, 2024 WL 914780, at *4 (D. Mass. Feb. 1, 2024). "[I]f during the authorized discovery period, new information were discovered that justified a new claim or a new defense, so long as the information was in fact new, a court would normally find good cause for an amended pleading." *Sargent v. NorDx*, 2022 WL 17738711, at *5 (D. Me. Dec. 16, 2022).

Plaintiffs could not have amended the complaint based on the newly discovered evidence before the deadline set out in the scheduling order (January 9, 2025) had passed. This Court and the First Circuit found that what the SAC lacked was internal communications calling into question the Dosage Thesis. Plaintiffs had no access to internal communications in January 2025 because discovery only started in April 2025. Thus, Plaintiffs could not have alleged the PTAC before the January 2025 deadline passed.

Plaintiffs took discovery expeditiously once they were allowed to. Defendants served their Responses and Objections to Plaintiffs' First Requests for Production in April 2025. The Parties then spent more than 6 hours between April and September 2025 conferring to agree on the initial scope of productions, as well as search terms and custodians that would be used to collect potentially responsive documents for review.

Then, when Plaintiffs started receiving documents, Plaintiffs promptly evaluated whether to amend and the underlying facts they would allege and drafted the PTAC. Between September

12, 2025 and January 5, 2026. Defendants produced almost 2.0 million pages of dense, technical documents. Plaintiffs notified Defendants and the Court that they intended to move to amend less than three months after production began. This motion is filed within four months of Defendants' first production.

Courts do not want plaintiffs to run to court the minute they have some probative evidence for a claim. *Sargent*, 2022 WL 17738711, at \*8 (finding good cause for plaintiff to wait seven months for confirmatory evidence even after learning facts supporting claim); *Parker Waichman LLP v. Salas LC*, 332 F.R.D. 11, 13 (D.P.R. 2019) (although plaintiff was provided with template engagement agreement supporting claims before deadline, plaintiff was entitled to review actual engagement agreements to ensure they conformed to template). Courts hesitate to deny leave to amend when an attorney makes an honest judgment that more evidence is needed, even if the court disagrees. *F.L. Roberts & Co., Inc. v. Land-Air Express of New England, Ltd*, 2019 WL 11624581, at \*3 (D. Mass. Feb. 4, 2019) (finding that plaintiff had enough evidence to add defendant before scheduling order deadline but nonetheless allowing amendment when plaintiff waited to take defendant's deposition).

Instead, courts expect attorneys take time to examine and analyze the evidence, and ensure that they comply with Rule 11. So courts will grant plaintiffs a reasonable amount of time to analyze facts before moving for leave to amend. In *Carreiro v. Toter, LLC*, 2021 WL 3726939, at \*3 (D. Mass. Aug. 23, 2021), a products liability action, the plaintiff learned in a deposition that the product had not been manufactured by the defendant. Though the plaintiff waited a month and a half to substitute the actual manufacturer, this Court nonetheless found good cause.

Courts allow more time when there is substantial information to incorporate. In *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 344 (D.R.I. 2018), the plaintiffs moved to amend five months after the defendants began a production that ultimately amounted to mere hundreds of thousands of pages. The court found good cause even though the amendment was based on a cache of 40 documents produced at the very beginning of production. Here, though the volume of documents is significantly higher, and the PTAC relies

16

on documents from all of Defendants' productions, Plaintiffs indicated that they intended to move for leave to within three months of Defendants first producing custodial documents and this motion is filed within four months thereof.

Moreover, courts grant greater leeway to investigate claims when the plaintiff must meet a heightened pleading standard. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 2022 WL 104911, at *8 (D. Mass. Jan. 11, 2022). And here, the key element is scienter. Plaintiffs must plead enough detailed facts that holistically support a strong inference of scienter. It is often difficult to determine when there are enough facts. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)("[H]ow much detail is *enough* detail? When is an inference of deliberate recklessness *sufficiently* strong? There is no bright-line rule.") (emphasis in original).

The amended complaint does not rely on a single smoking gun document. Instead, Plaintiffs rely on the accretion of facts from documents drawn throughout Defendants' production. For instance, Defendants produced both the document ██████████████████████████ ████████████████████████ and the email in which Defendants admitted that the Draft Massie Report contained few new analyses on December 5, 2025. Because Defendants were continuing to produce documents throughout the period—indeed, they are still producing documents—Plaintiffs should not be faulted for trying to ensure they comfortably clear the scienter hurdle before seeking leave to amend. Attempting to gather enough evidence to meet the necessary threshold is not tardiness; it is good faith.

## C.  Defendants will not be prejudiced

Prejudice usually "takes the form of additional, prolonged discovery and a postponement of trial." *Klunder v. Brown Univ.*, 778 F.3d 24, 34 (1st Cir. 2015). When assessing potential prejudice, courts look to the stage of litigation, the length of the delay, the need for additional discovery, and whether amendment raises new theories. *Sheet Metal Workers*, 305 F. Supp. 3d 337, 344 (D.R.I. 2018). These are factors, not requirements. Courts allow amendment even when propounded after the close of discovery. *Fed. Ins. Co. v. Bos. Water & Sewer Comm'n*, 551 F. Supp. 2d 117, 120 (D. Mass. 2008); *Astellas Inst. for Regenerative Med. v. ImStem Biotechnology,*

*Inc.*, 2019 WL 9096049, at *4 (D. Mass. Aug. 21, 2019). Courts also allow amendment when additional discovery is required. *Fed. Ins. Co. v. Fire Sprinkler Tech., Inc.*, 2021 WL 1857403, at *5 (D. Mass. May 10, 2021); *Astellas*, 2019 WL 9096049, at *4. *A fortiori*, where, as here, a pleading does not raise new theories, requires little additional discovery, and comes during discovery, courts do not find prejudice. *Lennar*, 2021 WL 1195629, at *4. Allowing amendment will not prejudice defendants.

First, the amendment does not introduce new legal theories. The All Data statement and the statements Plaintiffs seek to revive are tightly connected. The statements are all false because of subgroup data that contradicted the Dosage Thesis. The only difference is that the revived statements, because they are less categorical, require more evidence of scienter. Thus, Defendants cannot claim surprise. *See Lennar*, 2021 WL 1195629, at *4 (allowing amendment because "Lennar now seeks to amend its operative complaint to make it better align with the legal theories that Lennar has been advancing all along and that Archer has been responding to throughout this litigation."). The two additional statements are of a piece with the All Data Statement. One is Defendants' claim that differences between dosing "largely explain" differences in results between Study 301 and Study 302, and the other is Defendants' presentation of data to conceal that in Study 302, pre-PV4 did better than post-PV4.

Second, amendment will not require any additional document discovery. Because the All Data statement and the statements Plaintiffs seek to revive are so tightly connected, Defendants have already been obligated to produce the documents Plaintiffs will use to prove that the additional statements are false and made with scienter. Amendment will not necessitate additional document discovery. *Lennar*, 2021 WL 1195629, at *4 (D. Mass. Mar. 30, 2021) (finding no prejudice because "allowing Lennar's proposed amendments will not, as far as the Court can tell, necessitate additional discovery").

Third, amendment will not require any additional deposition discovery. To date, only Plaintiffs and the Parties' experts have been deposed. Plaintiffs have not taken any fact discovery

depositions. Amendment would have no impact on depositions, except to the extent it would affect class certification.

Fourth, even if amendment did have a minor impact, discovery is still open. The parties may serve requests for production, interrogatories, and requests for admission through April 17, 2026, and non-expert depositions and fact discovery continue through May 15, 2026. In addition, expert discovery has not yet commenced. Expert designations and disclosures under Rule 26(a)(2) will not begin until April 2026 and will continue through November 2026. Dispositive motions are not due until January 2027. No trial date has been set yet. *See e.g., Klunder v. Brown Univ.*, 778 F.3d 24, 34 (1st Cir. 2015) ("At the time the motion to amend was filed, discovery was ongoing. Klunder had only taken two depositions, and subsequently took others, and thus had ample opportunity—almost two months—to explore the statute of limitations question."); *Carreiro*, 2021 WL 3726939, at *4 ("While Otto will now have to respond to Plaintiffs' discovery requests, this also does not demonstrate Otto is prejudiced.").

Fifth, this case is old but not advanced. The entire period of November 2020 through April 2025 was taken up with pleading-stage maneuvers. The Parties lost a whole year because Defendants waived lack of reliance on appeal and instead left the issue for a subsequent motion for judgment on the pleadings.

While allowing amendment would have an impact on class certification briefing, the impact is limited. Amendment has no impact on any of the 23(a) factors—numerosity, commonality, typicality, and adequacy. Defendants did not dispute that Biogen's stock traded on an efficient market, and it is hard to imagine why Biogen's stock would trade on an efficient market from July 22, 2020 through November 6, 2020, but not from October 22, 2019 through July 22, 2020. Nor does amendment have any bearing on whether Plaintiffs will be able to prove damages in accordance with their legal theory.

The only argument affected is Defendants' argument that the All Data Statement did not cause price impact because, by that point, the Dosage Thesis had already been impounded into the stock price. Yet even if the Court had issued a ruling, class certification is provisional. Fed. R. Civ.

P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). And Defendants themselves are trying to lay the groundwork to alter any decision the Court might reach. After class discovery closed, Defendants served four document subpoenas, one deposition subpoena, and one additional set of requests for production, all related to documents that are only relevant to typicality and adequacy. Defendants can hardly be heard complaining that amendment might have an impact on class certification if they are deliberately trying to expand discovery to affect class certification.

Regardless, the impact is unavoidable. Defendants had not produced any documents when Plaintiffs filed their motion for class certification, and Defendants first produced custodial documents after filing an opposition. When Defendants began producing documents, the only outstanding brief on Plaintiffs' motion for class certification was Plaintiffs' reply. Defendants will not be prejudiced.

### D. There Is No Undue Delay In Filing the Motion, Bad Faith, Dilatory Motive, or Repeated Failure to Cure Deficiencies

Courts rarely deny leave to amend based on bad faith, dilatory motive, or repeated failure to cure deficiencies absent clear evidence supporting such findings. *See e.g. Myers v. Integra LifeSciences Corp.*, 788 F. Supp. 3d 161, 165 (D. Mass. 2025); *Mark Breiner DDS, LLC v. BTL Indus., Inc.*, 2025 WL 1104618, at *1 (D. Mass. Apr. 14, 2025)). Here, Plaintiffs are seeking in good faith to revive claims they had previously pled, have filed as soon as they reasonably could, and this is Plaintiffs' first time attempting to replead the dismissed claims.

## V. CONCLUSION

For the foregoing reasons, the Court should grant leave to file the PTAC.

Dated: January 9, 2026                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>*/s/ Laurence M. Rosen*</u>
Laurence M. Rosen, Esq. (*pro hac vice*)
Jonathan Horne, Esq. (*pro hac vice*)
Brian B. Alexander, Esq. (*pro hac vice*)
Joshua Baker, Esq. (BBO #695561)
Sara Fuks, Esq. (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 100016
Tel: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
jhorne@rosenlegal.com
balexander@rosenlegal.com
jbaker@rosenlegal.com
sfuks@rosenlegal.com
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2026, a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT** was served by CM/ECF to parties registered to the Court's CM/ECF system.

<u>/s/Laurence Rosen</u>