**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NADIA SHASH and AMJAD KHAN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> BIOGEN INC., MICHEL VOUNATSOS, and ALFRED W. SANDROCK, JR, <br><br> Defendants. | Civil Action No.: 1:21-cv-10479-IT |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF RELEVANT FACTS .....................................................................................5

LEGAL STANDARD...................................................................................................................10

ARGUMENT ................................................................................................................................10

I.      Defendants Have Rebutted the *Basic* Presumption of Reliance and Therefore
        Predominance Is Not Satisfied..........................................................................................10

        A.      The Lack of Front-End Price Impact Rebuts the Presumption. ...........................11

        B.      The Inflation Maintenance Theory Is Not Available Here. ..................................12

        C.      Even if the Inflation Maintenance Theory Is Viable, Class Certification
                Should Be Denied Under *Goldman.* ...................................................................15

                1.      There Is a Considerable Gap, or Mismatch, Between the Front- and
                        Back-End Disclosures, Undermining Any Inference of Price
                        Impact. ......................................................................................................16

                2.      The "Truthful Substitute" Analysis Shows Lack of Price Impact. .............19

                3.      Additional Evidence of Pre- and Post-Disclosure Commentary
                        Demonstrates Lack of Price Impact............................................................21

        D.      The November 5 and 9 Price Movements Do Not Establish Price Impact
                of the July 22 Statement.......................................................................................23

                1.      The November 5 Price Movement Does Not Establish Price
                        Impact. ......................................................................................................24

                2.      Dr. Tabak's Analysis of November 5 Is Methodologically
                        Unsound. ...................................................................................................28

                3.      The November 9 Price Movement Does Not Establish Price
                        Impact. ......................................................................................................31

II.     Shash, Khan, and Aftoora Are Not Typical or Adequate Class Representatives. .............34

III.    Plaintiffs Do Not Prove That Damages Are Capable of Classwide Measurement............39

CONCLUSION..............................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emps.' Ret. Sys.* v. *Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) ........................................................................25

*Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................................................................................................36

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..........................................................28, 31

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................*passim*

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)..............................................................................................2, 10

*Bosch* v. *Credit Suisse Grp. AG*,
2022 WL 4285377 (E.D.N.Y. Sept. 12, 2022) ..........................................................39

*Bousso* v. *Spire Glob., Inc.*,
2024 WL 4873311 (E.D. Va. Nov. 21, 2024)..............................................................35

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
752 F. Supp. 3d 34 (D.D.C. 2024)..............................................................................31

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)................................................................................................10, 39

*In re Concho Resources, Inc.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025) ..............................................................22

*Elas* v. *Prince*,
2024 WL 278220 (D. Mass. Jan. 25, 2024) (Talwani, J.)...........................................34

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015)..........................................................................24, 27

*Ferris* v. *Wynn Resorts Ltd.*,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) ................................................................22

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)........................................................26, 40

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)..................................................................12

*In re Finisar Corp. Sec. Litig.*,
2019 WL 2247750 (N.D. Cal. May 24, 2019).................................................................12

*Fogarazzo* v. *Lehman Brothers*,
263 F.R.D. 90 (S.D.N.Y. 2009) ......................................................................................25

*Foley* v. *Buckley's Great Steaks, Inc.*,
2015 WL 1578881 (D.N.H. Apr. 9, 2015).......................................................................34

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013)....................................................................36

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)..................................................................................................*passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)........................................................................................................10

*Homyk* v. *ChemoCentryx, Inc.*,
2025 WL 1547625 (N.D. Cal. May 30, 2025).................................................................33

*IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*,
818 F.3d 775 (8th Cir. 2016) ..........................................................................................11

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).................................................................24

*Jaeger* v. *Zillow Grp., Inc.*,
2025 WL 2741642 (9th Cir. Sept. 26, 2025) ..................................................................19

*Karth* v. *Keryx Biopharms., Inc.*,
334 F.R.D. 7 (D. Mass. 2019), *aff'd,* 6 F.4th 123 (1st Cir. 2021) ...............................34, 36

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024).............................................15, 16, 22, 31

*McCormack* v. *Dingdong (Cayman) Ltd.*,
2022 WL 17336586 (S.D.N.Y. Nov. 30, 2022)...............................................................38

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)............................................................................................28

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ....................................................................................27

*Naser Jewelers, Inc.* v. *City of Concord*,
538 F.3d 17 (1st Cir. 2008)..................................................................................33

*New England Carpenters* v. *DeCarlo*,
122 F.4th 28 (2d Cir. 2024) ................................................................................19

*One World, LLC* v. *Manolakos*,
2025 WL 2784990 (D. Mass. Sept. 30, 2025) .....................................................35

*In re Petrobras Sec. Litig.*,
104 F. Supp. 3d 618 (S.D.N.Y. 2015) .................................................................37

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .....................................................18

*Ramirez* v. *Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)........................................24, 27, 31

*San Diego Cnty. Emps. Ret. Assn* v. *Johnson & Johnson*
2025 WL 2176586 (3d Cir. July 30, 2025)......................................................19, 34

*Semerenko* v. *Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)............................................................................36, 38

*In re Sepracor Inc.*,
233 F.R.D. 52 (D. Mass. 2005)........................................................................34, 38

*Shash* v. *Biogen, Inc.*,
84 F.4th 1 (1st Cir. 2023)................................................................................*passim*

*Shiring* v. *Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ..........................................................................34

*Shupe* v. *Rocket Cos., Inc.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024).....................................................18, 21, 34

*Sjunde AP-Fonden* v. *Gen. Elec. Co.*,
2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023).....................................................25

*In re Sonus Networks, Inc. Sec. Litig.*,
229 F.R.D. 339 (D. Mass. 2005)..........................................................................35

*In re Vaxart, Inc. Securities Litigation*,
738 F. Supp. 3d 1259 (N.D. Cal. 2024) ...............................................................40

*In re Waste Mgmt. Sec. Litig.*,
775 F. Supp. 3d 742 (S.D.N.Y. 2025) .................................................................15

iv

**Statutes**

15 U.S.C. § 78u-4 ...............................................................................................................*passim*

**Other Authorities**

Federal Rule of Civil Procedure 23 .....................................................................................*passim*

Defendants Biogen Inc. ("Biogen" or the "Company"), Michel Vounatsos, and Alfred W. Sandrock, Jr., M.D., Ph.D. ("Defendants") respectfully oppose Plaintiffs' motion to certify a class of all persons or entities who acquired Biogen stock from July 22, 2020 to November 6, 2020 (the "Class Period") and appoint class representatives and counsel (Doc. No. 228) (the "Motion").

## PRELIMINARY STATEMENT

At class certification, Plaintiffs are required to adduce *evidence* of price impact, not mere allegations or supposition. But here, the actual evidence defeats class certification: there is no evidence that the sole remaining alleged misstatement in this case—which Plaintiffs claim artificially inflated Biogen's stock price by representing that "all" data supported the efficacy of high-dose aducanumab—had *any* impact on Biogen's stock price. To the contrary, that statement was utterly ignored by the market, as Plaintiffs and their expert are unable to refute.

On July 22, 2020, Dr. Sandrock (Biogen's then-EVP, Research and Development) answered an analyst's question about Biogen's October 22, 2019 filing with the FDA for approval of aducanumab, an Alzheimer's disease drug. Dr. Sandrock noted that different doses of aducanumab were tested in three clinical trials: a Phase 1B trial (PRIME), a Phase 3 trial that met its efficacy endpoints (EMERGE), and a Phase 3 trial that did not meet its efficacy endpoints (ENGAGE). Dr. Sandrock commented as follows on findings related to the higher and lower tested doses (in 2021, the FDA granted accelerated approval of the higher dose tested, 10mg/kg):

> I think – look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. We believe that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE. And then I'll say – and also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as [Clinical Dementia Rating Scale] sum of boxes. And again, very similar that the lower doses did not show much of an effect. ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***

Second Amended Complaint, Doc. No. 58 ¶ 191 ("SAC").[1]  Plaintiffs argue that the bolded language is misleading, Doc. No. 228 at 2; this is referred to as the "July 22 Statement" or "Statement" herein.  Although the First Circuit affirmed dismissal of every other alleged misstatement, it ruled that the SAC plausibly alleged that the Statement conveyed that "all of Biogen's data was consistent with needing to get to high dose aducanumab to benefit clinically," when in fact "not all of Biogen's data was consistent with need[ing] to get to the higher dose of aducanumab."  *Shash* v. *Biogen, Inc.*, 84 F.4th 1, 11-12, 22 (1st Cir. 2023) (emphases in original).

At class certification, the Supreme Court instructs that courts must consider "all probative evidence" relevant to certification, regardless of any overlap with the merits.  *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman*").  The evidence here overwhelmingly shows that class certification should be denied, for three independent reasons:

**(1) No Price Impact.**  To establish classwide reliance, Plaintiffs rely on the presumption established by *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), that stock prices in an efficient market rapidly incorporate new information.  That presumption is rebutted, however, where defendants show the alleged misrepresentations did not actually affect the market price of the stock, *i.e.*, lack of "price impact."  Courts must assess "all" relevant evidence and "determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Goldman*, 594 U.S. at 126-27.  Where, as here, defendants rebut the presumption of reliance, a class cannot be certified.

In ruling on Plaintiffs' appeal of the motion to dismiss, the First Circuit held that Plaintiffs plausibly alleged that the July 22 Statement "stands out from the rest" because, unlike the other alleged misstatements, it "conveyed" that "all of Biogen's data was consistent with needing to get

---

[1] Unless otherwise noted, emphases are added and internal citations and quotation marks omitted. Pincites correspond to PDF pagination.

2

to high dose aducanumab to benefit clinically"—changing the total mix of information. *Shash*, 84 F.4th at 12-14 (emphasis in original). Since an efficient market immediately processes new, value-relevant information, under Plaintiffs' theory, the Statement should immediately have caused a price increase. But both experts agree the Statement did not cause such an increase. And notwithstanding its purportedly "critical" significance, **no** market commentator **ever** quoted or commented on the Statement. In fact, the analyst who asked the question that generated the Statement "remain[ed] skeptical" of FDA approval because Biogen's data was "hardly unequivocal" and included "an increasing list of red flags." Report of Defendants' Expert Dr. Hubbard, Doc. No. 189-1 ¶ 59. The July 22 Statement had no price impact.

To explain this lack of price reaction, Plaintiffs pivot to a theory that the July 22 Statement "maintained" inflation in Biogen's stock price by *repeating* the same information contained in Defendants' earlier, dismissed statements. This argument, however, flatly contradicts the argument Plaintiffs presented to the First Circuit, which the First Circuit accepted, that the July 22 Statement "stands out from the rest" by conveying that "all" data supports high-dose efficacy. *Shash*, 84 F.4th at 11-14. Further, under an "inflation maintenance" theory, a "misrepresentation causes a stock price to remain inflated by preventing *preexisting inflation* from dissipating." *Goldman*, 594 U.S. at 119-20. The theory makes sense only for statements that repeat or reinforce existing market expectations. Here, the evidence shows the opposite: there was no "preexisting inflation" in Biogen's stock price that the Statement "maintained" because Biogen had not earlier represented—and the market did not previously understand—that "all" data supported high-dose efficacy. Plaintiffs' new maintenance theory cannot be reconciled with the fraud theory they presented to the First Circuit, the First Circuit's opinion, or the economic evidence.

But even if the inflation maintenance theory applies (it does not), the July 22 Statement did

3

not have price impact under the *Goldman* standard for inflation maintenance cases. If there is a "gap" or "mismatch" between the alleged misstatement and corrective disclosure, it undermines the inference that the back-end price drop is a "proxy" for front-end inflation. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99-100 (2d Cir. 2023) ("*ATRS*").

Here, the alleged corrective disclosure is contained in an appendix to an FDA briefing document released on November 4, 2020 (the "Briefing Book"). The Briefing Book contained (a) analyses and positive views of the FDA regarding efficacy of the high dose, and (b) statistical analyses by dissenting FDA statistician Tristan Massie, who *inter alia*, opined that certain subgroup data did not support high-dose efficacy, raised methodological critiques, and called for an additional study (the "Massie Appendix"). Plaintiffs allege that a portion of the Massie Appendix—his negative opinions on the subgroup data—revealed the falsity of the July 22 Statement. But there is a *substantive mismatch* in content between the front-end Statement and the back-end disclosure: because the market did *not* interpret the Statement to convey that *all* data supported high-dose efficacy, the allegedly corrective subgroup analyses do not correct it. There is also a *specificity mismatch* between the high-level July 22 Statement and the negative Massie subgroup analyses—precisely the type of mismatch that caused the Second Circuit to decertify a class in *Goldman*. Each mismatch severs the link between the alleged misstatement and corrective disclosure, and additional economic evidence further supports this conclusion.

Price impact is separately disproven by evidence that Massie's analyses did not actually cause a statistically significant drop in Biogen's stock. On November 4, when the Briefing Book was released, Biogen's stock price *increased* by more than 40 percent. In the face of that, Plaintiffs point to stock declines on November 5 and 9. But in an efficient market—which Plaintiffs concede exists for Biogen's shares—the Massie Appendix was incorporated into Biogen's stock price

4

immediately following its release, along with the full Briefing Book.  Plaintiffs theorize that the market absorbed the favorable statistical analyses in the first 245 pages of the 343-page Briefing Book on November 4, yet did not absorb the negative statistical analyses contained in the 97-page Massie Appendix until November 5.  That theory is belied by the economic evidence and common sense.  Plaintiffs' argument about November 9 is even more far-fetched:  Plaintiffs cite no authority supporting *three trading days* of price impact, and Plaintiffs themselves previously attributed the November 9 stock drop to the AdCom vote, an intervening event this Court already held was not a corrective disclosure.  The evidence fatally undermines Plaintiffs' proposed inference that the November 5 and 9 declines measure inflation purportedly from the July 22 Statement.

**(2) Plaintiffs Are Atypical and Inadequate.**  None of the proposed class representatives satisfy Rule 23(a)'s adequacy and typicality requirements.  Shash, the only lead plaintiff, did not purchase Biogen securities—an LLC of which she is President and CEO did—and lacks standing.  She also submitted a false PSLRA Certification.  Plaintiffs also face individualized reliance defenses: Shash and Khan purchased *after* the alleged corrective disclosure, and Aftoora admits that he declined to sell his stock at a profit after learning about the alleged corrective disclosure.  And all of the proposed class representatives present other defects, including a fundamental lack of knowledge about the case and/or a willingness to abdicate complete control to their lawyers.

**(3) No Classwide Damages Methodology.** Finally, Plaintiffs are required to establish a workable method for classwide determination of damages in a manner consistent with Plaintiffs' theory of liability.  Plaintiffs' expert's proposed method is not workable and is incomplete.

STATEMENT OF RELEVANT FACTS

**Clinical Trials (2011 to 2019)**:  In 2011, Biogen submitted an FDA application for investigation of aducanumab, a therapy for Alzheimer's disease.  Doc. No. 58 ¶¶ 66.  Biogen conducted the PRIME Phase 1b study (Study 103) in 2012, with a primary purpose of evaluating

5

aducanumab's safety. *Id.* ¶ 68. PRIME met its safety endpoint and also revealed that patients who received a high dose of aducanumab (10 mg/kg) saw a statistically significant reduction in amyloid beta aggregates in the brain and clinical decline. Briefing Book Excerpt, Doc. No. 62-1 at 87-89.

Following PRIME, in 2015, Biogen commenced two Phase 3 clinical trials to evaluate safety and efficacy: ENGAGE (Study 301) and EMERGE (Study 302). Doc. No. 58 ¶¶ 4, 76-77; Doc. No. 62-1 at 11, 29. Approximately two-thirds of the patient population in both studies carried the gene ApoE4 ("carriers"), which coincides with an increased risk for the negative side effect of Amyloid Related Imaging Abnormalities. Doc. No. 58 ¶¶ 10, 79. The protocol initially restricted the dose that carriers could receive to 3 or 6 mg/kg, rather than the 10 mg/kg dose that non-carriers could receive, but protocol amendments eventually permitted the 10 mg/kg dosage to be tested in carriers. *Id.* ¶¶ 94-100; Doc. No. 62-1 at 33-35, 64. Because EMERGE started after ENGAGE, these amendments resulted in more patients in EMERGE receiving the 10 mg/kg dose for a longer period. Doc. No. 58 ¶ 11; Doc. No. 62-1 at 64.

In March 2019, Biogen halted aducanumab's Phase 3 trials after an independent committee conducted a futility analysis and concluded that the studies, on a pooled basis, likely would not "show statistical significance in favor of aducanumab." Doc. No. 58 ¶¶ 101-108. Biogen then conducted an internal review of the data. This review analyzed ENGAGE and EMERGE separately and included additional data collected after the futility analysis cutoff. *Id.* ¶¶ 7, 118, 177. Biogen found that in EMERGE, a high-dose of aducanumab (10 mg/kg) reduced clinical decline, meeting the primary and secondary efficacy endpoints. *Id.* ¶¶ 177, 181. By contrast, ENGAGE was a negative study, having failed to reach its endpoints. *Id.* However, a subset of high-dose patients in ENGAGE showed results similar to those found in EMERGE. *Id.*

**Biogen's Pre-Class Period Disclosures (October 2019 to July 2020)**: Biogen announced

on October 22, 2019 that it would seek FDA approval of aducanumab.  Q3 2019 Call Tr., Doc. No. 62-4 at 2.  That day, Biogen disclosed that the "primary learning from [the Phase 3 trial] data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints"—a finding that "was statistically significant in EMERGE" and supported by a subset of the data in ENGAGE and by PRIME.  *Id.* at 6.  The Company presented further details on its analysis at the Clinical Trials on Alzheimer's Disease ("CTAD") meeting in December 2019, but made clear that it was not presenting subgroup analyses.  Doc. No. 189-1 ¶ 44.  Analyst reports confirm that, following the October 22 announcement and the CTAD meeting, the market understood that certain data and analyses had not been made public, and that all data did not necessarily support the overall findings from EMERGE.  *Id.* ¶¶ 43, 45-46.

**The Sole Remaining Alleged Misrepresentation (July 22, 2020)**:  Against this backdrop, the sole remaining alleged misrepresentation was made during Biogen's July 22, 2020 earnings call.  Dr. Sandrock explained that the aducanumab FDA filing was based on data from PRIME, EMERGE, and a subset of patients in ENGAGE, and said, "the lower doses did not show much of an effect.  ***So consistent with the findings from ENGAGE and EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that.***"  Q2 2020 Call Tr., Doc. No. 62-17 at 15.  In addressing the sufficiency of the pleaded fraud claim, the First Circuit observed that this Statement "stands out from the rest" of the more than 20 misstatements alleged in the SAC, and that Plaintiffs had plausibly alleged that, unlike Biogen's earlier statements, the July 22 Statement "conveyed" that "all of Biogen's data was consistent with needing to get to [the] high dose" to benefit clinically.  *Shash*, 84 F.4th at 11-14 (emphasis in original).

There is no evidence, however, that the market took ***any notice*** of the July 22 Statement.  Both parties' experts agree that the July 22 Statement did not cause a statistically significant

7

increase in Biogen's share price.  Report of Pls.' Expert Dr. Tabak, Doc. No. 171-1 ¶¶ 34 n.34, 65; Tabak Depo. Tr., Doc. No. 189-2 at 100:25-101:5; Doc. No. 189-1 ¶¶ 25-29.  No market participants cited the July 22 Statement *at all*.  Doc. No. 189-1 ¶¶ 25, 31, 35-38.  Analysts also did not express the belief that "all" data, including subgroup data, supported efficacy at a high dose. *Id.* ¶¶ 36, 40.  On the contrary, following the Statement, analysts repeatedly acknowledged that subgroup data had not been released, expressed doubt about whether it would be supportive, observed that the data being presented to the FDA was not straightforward, and suggested that an FDA statistician might reach a negative conclusion.  *Id.* ¶¶ 49, 52, Ex. 5.  Plaintiffs concede that "analysts viewed the subgroup data as material *and potentially damaging*."  Doc. No. 228 at 22.

**FDA Briefing Book, Including the Massie Appendix (November 4, 2020)**:  As part of aducanumab's review process, an advisory committee of scientists (the "AdCom") reviewed the clinical trial data and provided independent input to the FDA.  Doc. No. 58 ¶ 259.  In advance of the AdCom meeting on November 6, 2020, on November 4, at around 10:10am ET, the FDA issued the Briefing Book, which set out, for the first time, the FDA's favorable analyses and conclusions regarding Biogen's clinical trials about the efficacy of high-dose aducanumab.[2]  Doc. No. 189-1 ¶ 70; Doc. No. 62-1.  It also contained the Massie Appendix, including Massie's purportedly negative subgroup analyses and his disagreement with Biogen and the FDA's favorable views—concluding in his "Executive Summary" that "the totality of the data does not seem to support the efficacy of the high dose."  Massie's Stat. Rev. & Eval., Doc. No. 58-3 at 11. Plaintiffs contend that Massie's negative subgroup analyses "revealed the data Defendants had

---

[2] In the FDA's view, "the results of [EMERGE] are highly persuasive and the study is capable of providing the primary contribution to a demonstration of substantial evidence of effectiveness of aducanumab;" PRIME gave "supportive evidence of the effectiveness of aducanumab;" and an examination of ENGAGE "indicates that patients with higher exposure to the 10 mg/kg dose . . . had similar responses to patients in [EMERGE]."  Doc. No. 62-1 at 58, 95.

concealed" and showed that the July 22 Statement was "false or misleading." Doc. No. 58 ¶ 151.

News outlets and analysts immediately reported on the Briefing Book, including the Massie Appendix, explicitly discussing both the FDA's positive conclusions and Massie's dissenting views. As just a few examples: at 11:15am ET one analyst observed that "[t]here is a statistician's review – which is NOT consistent [with] the main reviewer's key conclusions"; at 11:31am ET another referred to Massie's conclusion as "unsurprising[]"; and at 11:35am ET another remarked that "there are some discrepancies between FDA clinical and statistical teams." Doc. No. 189-1 ¶¶ 70-71. Other market commentary during the trading day emphasized that uncertainty remained about how the AdCom would weigh these competing opinions. Doc. No. 189-1 ¶ 76. That day, on November 4, Biogen's stock price rose approximately 44%. *Id.* ¶ 70.

**Plaintiffs' Alleged Stock Drop Losses (November 5 and 9, 2020)**: Faced with positive price movement on November 4, Plaintiffs focus their price impact analysis on November 5 and 9. *E.g.*, Doc. No. 228 at 4 (arguing that "[a]s market participants slowly began to incorporate the Massie Report's analysis, Biogen's stock price fell . . . on November 5."). But at the market open on November 5, Biogen's stock price did not experience a statistically significant decline from the closing price on November 4. Doc. No. 189-1 ¶¶ 84-85. Despite this, Plaintiffs contend that a decline of 7.5% during the November 5 trading day (*i.e.* from the November 4 close to the November 5 close) is a measurement of the market's assessment of the allegedly corrective information in the Massie Appendix. Doc No. 228 at 13, 33; Doc. No. 58 ¶ 279.

On November 6, 2020, two days after publication of the Massie Appendix, trading in Biogen shares was halted while the AdCom meeting occurred. Doc. No. 58 ¶ 280. That evening, the AdCom cast negative votes on the questions presented. *Id.* ¶ 281. The SAC claims that Plaintiffs were damaged by the subsequent 28% price decline when trading resumed on November

9

9. *Id.* ¶¶ 2, 19, 294.  This Court held, however, that, applying loss causation principles, Plaintiffs had not plausibly alleged that the AdCom vote was a corrective disclosure of the July 22 Statement. Mar. 27, 2025 Order, Doc. No. 163 at 16-18.

On June 7, 2021, the FDA granted accelerated approval of aducanumab for treatment of Alzheimer's disease at the high (10 mg/kg) dose.  Prescribing Info., Doc. No. 54-15 at 2.

## LEGAL STANDARD

Plaintiffs "must affirmatively demonstrate [their] compliance with Rule 23," and bear the burden of proof for each element of Rule 23(a)—numerosity, typicality, commonality, and adequacy—as well as the predominance requirement of Rule 23(b)(3).  *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).  "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," and that Rule 23(b)(3)'s predominance criterion—which is "even more demanding"—has been met.  *Id.* at 33-34.

## ARGUMENT

**I.    DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION OF RELIANCE AND THEREFORE PREDOMINANCE IS NOT SATISFIED.**

Reliance is an element of Plaintiffs' fraud claim.  But, as the Supreme Court recognized in *Basic*, "[r]equiring proof of individualized reliance" from every securities fraud plaintiff would "effectively . . . [prevent plaintiffs] from proceeding with a class action."  485 U.S. at 242.  *Basic* thus established a rebuttable presumption of reliance based on the fraud-on-the-market theory, under which "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction."  *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014).

Plaintiffs invoke this presumption of reliance.  But it is rebutted where, as here, the defendants show that the "alleged misrepresentation did not actually affect the market price of the

10

stock"—*i.e.*, the misrepresentation lacks "price impact." *Id.* at 284. "[A]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" is sufficient to rebut the presumption. *Goldman*, 594 U.S. at 118. In assessing price impact, courts must evaluate "all probative evidence" of price impact, "qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122. That is true "regardless [of] whether that evidence overlaps with materiality or any other merits issue." *Id.* at 124. A defendant's burden to rebut the presumption is a preponderance of evidence, which "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Id.* at 126-27. Where a defendant rebuts the *Basic* presumption, a class cannot be certified. *Id.* at 119.

Defendants' burden is satisfied here because (1) the July 22 Statement did not cause a statistically significant increase in Biogen's share price (*infra* I.A); (2) the alternative inflation maintenance theory is unavailable here (*infra* I.B); (3) even assuming maintenance were available, Defendants rebut the presumption of reliance under *Goldman* (*infra* I.C); and (4) the back-end price drops on November 5 and 9 do not reflect price impact of the July 22 Statement (*infra* I.D).

### A. The Lack of Front-End Price Impact Rebuts the Presumption.

Both parties' agree that the July 22 Statement did not cause any increase in Biogen's stock price, *i.e.*, did not have any "front-end price impact." Doc. No. 228 at 19-20. The lack of price reaction following the Statement demonstrates lack of price impact. Doc. No. 189-1 ¶¶ 25-29. Lack of price impact is further confirmed by Dr. Hubbard's systematic review of analyst reports: *no* analyst report issued after the Statement mentioned the Statement or expressed the view that "all" data analyses support efficacy. *Id.* ¶¶ 25, 30-31, 35-38. In short, the stock price did not react to, and the market took no notice of, the Statement. *See, e.g.*, *IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no 'front-end' price impact rebutted the *Basic* presumption"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *9

11

(N.D. Cal. Dec. 5, 2017) (*Basic* presumption rebutted by lack of front-end price impact).

## B.    The Inflation Maintenance Theory Is Not Available Here.

Plaintiffs try to circumvent the lack of front-end price impact by invoking the so-called "inflation maintenance theory," arguing that the July 22 Statement merely repeated Defendants' earlier statements that high-dose aducanumab was efficacious and thus "ke[pt] the price of the Biogen stock from dropping." Doc. No. 228 at 19-21, 23. This theory does not work.

*First*, neither the Supreme Court nor the First Circuit has held that inflation maintenance is a valid theory. *See Goldman*, 594 U.S. at 120 n.1 (taking "no view" on theory but accepting for purposes of argument). And the Second Circuit recently warned courts to be wary where, as here, plaintiffs try to "(a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud" under an inflation maintenance theory. *ATRS*, 77 F.4th at 102. Plaintiffs simply assume that this theory—which is not pleaded—is available. *See In re Finisar Corp. Sec. Litig.*, 2019 WL 2247750, at *5 (N.D. Cal. May 24, 2019) (rejecting pivot to unpleaded "maintenance theory" at class certification stage).

*Second*, even assuming the inflation maintenance theory is viable, the fraud claim here is not compatible with it. Under that theory, a misrepresentation causes a stock price "to remain inflated by preventing *preexisting* inflation from dissipating from the stock price." *Goldman*, 594 U.S. at 119-20. Plaintiffs argue that happened here only by fundamentally re-engineering their fraud theory and ignoring decisions from the First Circuit and this Court. Plaintiffs argue that, starting in October 2019, Defendants misleadingly said EMERGE and portions of ENGAGE showed that high-dose aducanumab was effective, but ENGAGE "failed" because too few patients received the high dose. Doc. No. 228 at 19-21. They posit that the July 22 Statement prevented a stock price decline because it merely confirmed this earlier statement. *Id.*

Plaintiffs' new theory is wholly inconsistent with their argument to the First Circuit, where

12

they described the Statement as the "most striking[]" because it urged the interpretation that "'**all**' of Biogen's data was consistent" with high-dose efficacy.  Appellant Opening Br. at 13, *Shash*, 84 F.4th 1 (Doc. No. 16).  It is also wholly inconsistent with the First Circuit's opinion, which reinstated *only* the July 22 Statement because it found that the Statement, as pleaded, "stands out from the rest."  *Shash*, 84 F.4th at 11-14.  The First Circuit expressly *juxtaposed* Plaintiffs' allegations regarding (i) the period before the Statement, when Defendants "explained that they were . . . intentionally withholding carrier/noncarrier subgroup data"; *with* (ii) the Statement, when Dr. Sandrock supposedly changed the mix of information by conveying that "all" data supported high-dose efficacy despite knowing "contradictory subgroup data existed." *Id.* at 10-14.  Plaintiffs cannot proceed on a "maintenance" theory when the crux of their claim is that the Statement conveyed critical, new information that differed from preexisting information—meaning Plaintiffs have no explanation for the lack of front-end price impact for the Statement.

Plaintiffs' reasoning—*i.e.* that the Statement falsely conveyed that high-dose aducanumab was efficacious—was also rejected by this Court and on appeal.  This Court dismissed every alleged misstatement because "the proper statistical method for analyzing the topline results is one of genuine scientific debate and therefore not actionable under the PSLRA."  MTD Opinion, Doc. No. 76 at 25.  The First Circuit affirmed dismissal of every statement that "pertain[ed] to aducanumab's general efficacy"—*i.e.*, all statements *except* the July 22 Statement—because "even if Defendants were aware of the [allegedly contradictory] subgroup data, it is not evident or inferable from the complaint that Defendants knew or believed that said data undermined their statements about aducanumab's general efficacy." *Shash*, 84 F.4th at 15.  The First Circuit would have dismissed the Statement if it was just a statement "about aducanumab's general efficacy."

*Third*, a maintenance theory is inconsistent with the evidence.  As Dr. Hubbard explains,

13

the contemporaneous evidence confirms that the July 22 Statement could not have prevented *preexisting* inflation from dissipating because there was no preexisting inflation.  Doc. No. 189-1 ¶¶ 40-46.  Plaintiffs claim that earlier statements injected inflation by falsely representing the efficacy of high-dose aducanumab.  Doc. No. 228 at 20.  But this Court dismissed those statements, and that decision was later affirmed.  More importantly, none of those statements represented that "all" data supported high-dose efficacy.  Dr. Hubbard did not locate *any* Biogen statement before July 22, 2020 that made such a representation.  Doc. No. 189-1 ¶ 40.  Dr. Tabak similarly provides *no evidence* that investors believed unreleased subgroup data supported high-dose efficacy.  Doc. No. 217-1, Ex. T ¶ 11.  He concedes he did not investigate the market's views before the Statement, Doc. No. 189-2 at 117:12-118:04, and identifies no statement that created the "preexisting expectation," *id.* at 112:07-12.  Plaintiffs cite no authority for the proposition that they can rely on purported inflation from different statements that did not contain the same allegedly false information, much less statements already dismissed from the lawsuit.

Further, prior to July 22, 2020, "Biogen repeatedly specified which data supported efficacy at a high dose," and as Plaintiffs admit, analysts knew Biogen had not disclosed subgroup data and viewed that data as "potentially damaging."  Doc. No. 189-1 ¶ 40; Doc. No. 228 at 22.  For instance, when Defendants were asked about the "carrier[s'] versus noncarrier[s']" results on December 5, 2019, they made it clear they had not disclosed subgroup data yet, even though "typically, we do present a lot of things, subgroups included, in the past."  Doc. No. 189-1 ¶ 44.  That same day, RBC Capital Markets noted that "efficacy data in ApoE4 non-carriers" had not been released, "*perhaps suggesting data from this population in ENGAGE does not necessarily support the hypothesis.*"  *Id.* ¶ 45.  And an Oppenheimer Report from October 22, 2019 predicting a "50% probability of success," also noted the absence of "APOE4 carriers['] vs. noncarriers[']"

14

results.  *Id.* ¶ 43.  This response "is consistent with the economic literature showing that information withholding" is met with "extreme skepticism" from the market.  *Id.* ¶ 50.  Dr. Tabak agrees that "the market will assume that if it's not given information that means the information is bad."  Doc. No. 189-2 at 140:13-19.

Given there was no "preexisting" expectation that "all" data supported the efficacy of high-dose aducanumab, the July 22 Statement could not have confirmed preexisting market expectations.  Doc. No. 189-1 ¶ 46.[3]

### C.    Even if the Inflation Maintenance Theory Is Viable, Class Certification Should Be Denied Under *Goldman.*

Even if inflation maintenance were available here, the bar for class certification in such cases is high.  A plaintiff cannot manufacture an inflation maintenance case by "identify[ing] a specific back-end price-dropping event" and "find[ing] a front-end disclosure bearing on the same subject."  *ATRS,* 77 F.4th at 102.  Rather, a plaintiff must show "a basis to infer" that the decline following the corrective disclosure is a proxy for inflation maintained by the alleged misstatement. *In re Kirkland Lake Gold Ltd. Sec. Litig*., 2024 WL 1342800, at *6, *11 (S.D.N.Y. Mar. 29, 2024).

Following the analysis in *Goldman*, in inflation maintenance cases, courts examine:  (1) whether there is a "gap" or "mismatch" between the content of the front- and back-end disclosures; (2) whether a "truthful substitute" for the alleged misstatement would impact the stock price; and (3) contemporaneous evidence (or lack thereof) that the market relied on the alleged misstatement. *ATRS*, 77 F.4th at 102-03.  Each factor here demonstrates lack of price impact.

---

[3] Plaintiffs' own cases highlight why maintenance does not apply.  Doc. No. 228 at 19-21.  In *In re Waste Mgmt. Sec. Litig*., the allegedly false statements reinforced the *pre-existing belief* that the issuer would complete a previously-announced merger by a set date.  775 F. Supp. 3d 742, 750, 762-63 (S.D.N.Y. 2025).  Likewise, in *ATRS*, the alleged misstatements about conflicts were *identical* to statements defendants made for years before the class period.  11 F.4th at 82, 94 n.7.

### 1.    There Is a Considerable Gap, or Mismatch, Between the Front- and Back-End Disclosures, Undermining Any Inference of Price Impact.

In *Goldman*, the Supreme Court explained that the inference that the back-end price drop equals front-end inflation "starts to break down" when there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." 594 U.S. at 123. There are two ways this may occur: when there is a "substantive mismatch" between the alleged misrepresentation and corrective disclosure, *Kirkland*, 2024 WL 1342800, at *11, or "when the earlier misrepresentation is generic" and "the later corrective disclosure is specific," *Goldman*, 594 U.S. at 123.

Substantive mismatch. Remarkably, Plaintiffs' brief ignores the *substantive* mismatch analysis and focuses instead on the alternative *specificity* mismatch analysis. Doc. No. 228 at 28-31. The glaring substantive mismatch here is dispositive.

A substantive mismatch occurs when the evidence shows a "mismatch in content" between the subjects of the alleged misstatement and corrective disclosure. In *Kirkland*, for example, the court denied class certification based on a "substantive mismatch between" a front-end statement about future-looking acquisition criteria, and a back-end disclosure revealing a specific acquisition that did not meet the criteria. 2024 WL 1342800, at *11. The court held that evidence "support[ed] Defendants' interpretation" that the statement conveyed "targets, rather than rigid requirements," creating "a mismatch in content between the statement and the corrective disclosure." *Id.*

There is a substantially similar substantive mismatch between the front- and back-end disclosures here because the market did not interpret the July 22 Statement to convey anything about the subgroup analyses that the Massie Appendix later addressed. While the First Circuit ruled Plaintiffs adequately *alleged* a misleading statement, Plaintiffs now need actual evidence. Here, no analyst *ever* cited the July 22 Statement *at all*. Doc. No. 189-1 ¶¶ 25, 30-31, 35-38. In fact, following the July 22 earnings call, several analysts stated the call did not convey any new

16

quantitative evidence about aducanumab's efficacy. *E.g.*, *id.* ¶ 58 (on July 22, Wolfe Research stating "no major new disclosures" on investor call; RBC Capital Markets stating "with careful language on the call we see little to increase or decrease confidence in its [approval] chances (we est. 30%)"). Even the analyst who asked the question that generated the Statement "remained skeptical" of FDA approval because Biogen's data was "hardly unequivocal" and included "an increasing list of red flags." *Id.* ¶ 59. And, no analyst increased its rating or price target for Biogen stock or changed its views on aducanumab's FDA approval based on the Statement. *Id.* ¶¶ 60-61.

Moreover, in the months following the Statement, the evidence overwhelmingly shows that investors *understood* Biogen had not released subgroup data and *did not think* the unreleased data "all" supported high-dose efficacy. *See id.* ¶¶ 49, 52, 61 & Ex. 5 (citing 13 reports); Doc. No. 217-1, Ex. T ¶ 13. To take a few examples:

- On October 19, 2020, RBC Capital Markets wrote that "our sense is that data not yet disclosed to date are unlikely to be overly positive." Doc. No. 189-1 ¶ 49.

- On October 21, 2020, BMO wrote that "we do not believe current FDA precedent supports a-mab approval at this time, especially given the absence of public disclosure of key subgroup analyses." *Id.*; Doc. No. 217-1, Ex. T ¶ 13.

- On October 27, 2020, UBS observed that "critical details on proportions of subpopulations (ApoE4 carriers vs. non) have not been disclosed and could have a meaningful impact on the interpretation of the results." Doc. No. 217-1, Ex. T ¶ 13.

- On November 3, 2020, Wells Fargo opined that "certain aspects of ENGAGE data may not be entirely *consistent with* the proposed explanation on exposure alone." *Id.*

Plaintiffs concede this point but attempt to evade its implications, focusing on supposed differences between the phrases "supportive of" and "consistent with," and how analysts used these words. Doc. No. 228 at 22, 26-27. But analysts used both phrases, and in any event, this supposed distinction is purely semantic because "analysts' commentary questioning whether the subgroup data were supportive of approval necessarily reflects doubt that all data were consistent with high dose efficacy." Doc. No. 217-1, Ex. T ¶ 12. The bottom line: after the July 22

17

Statement, many analysts expressed concerns about the undisclosed subgroup data and that they did not think that all data "supported," or was "consistent with," efficacy or regulatory approval.

Plaintiffs also argue these analysts offered "only conjecture" because they did not know the actual data. Doc. No. 228 at 26-27. But the question is whether analysts relied on the Statement to form a belief that "all" data supported high-dose efficacy. Plaintiffs offer no such evidence. Dr. Tabak performed *no investigation* into how the market interpreted the Statement or whether it believed that "all" data supported high-dose efficacy. Doc. No. 189-2 at 49:12-25; 117:07-119:17.

Specificity mismatch. The Court need not address the specificity mismatch because the substantive mismatch alone is dispositive. But if the Court reaches the issue, there is also a specificity mismatch between (i) the Statement, which summarized three trials and provided no subgroup analyses; and (ii) the alleged corrective information in the Massie Appendix, a "technical report" that included "dense statistical analyses" of subgroup data, Doc. No. 228 at 11, 32, and as Dr. Hubbard explains, "many analyses that did not bear on the All Data Statement," Doc. No. 189-1 ¶¶ 64-68, n.83. Dr. Tabak *concedes* "this is true." Tabak Reply Report, Doc. No. 209-3 ¶¶ 60-61. This specificity mismatch is similar to several recent cases that denied class certification:

- *ATRS*: statements about conflicts policies were "comfortabl[y] more generic than the back-end disclosures" about specific conflict-related misconduct. 77 F.4th at 99.

- *In re Qualcomm Inc. Sec. Litig.*: disclosures that "Qualcomm licensed at the device level and not the chip level," was "far more specific" than "generic statements" that licensing model was "broad, fair, [and] reasonable." 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023).

- *Shupe* v. *Rocket Cos., Inc.*: "considerable mismatch" between statements that "direct-to-consumer and partner networks were generally growing" and disclosure of specific, disappointing projections of loans and sales. 752 F. Supp. 3d 735, 781-82 (E.D. Mich. 2024).

Plaintiffs argue that the challenged statements in these cases were more generic than here. Doc. No. 228 at 30-31. However, those cases reflect a range of mismatches, and *Goldman* instructs that the wider the mismatch, the lower the inference that "the back-end price drop equals front-end

inflation." *Goldman*, 594 U.S. at 123.[4]  The wide mismatch here means any inference is low.

Plaintiffs also insist there is a "clean match" between the disclosures here, analogizing to a hypothetical from *Goldman* where the front-end statement was that a car passed all safety tests and the back-end disclosure was that the car had failed several crash tests.  Doc. No. 228 at 29. But unlike here, the back- and front-end statements there convey the same level of specificity. Finally, Plaintiffs argue the July 22 Statement cannot be "generic" because the First Circuit held Plaintiffs sufficiently *alleged* that the Statement is material.  Doc. No. 228 at 21.  We're now at the evidence stage, and the evidence shows that the Statement was not material because no investor *ever* commented on it and it did not move Biogen's stock price.  *Supra* 11, 14; *infra* 21-33 .

### 2.    The "Truthful Substitute" Analysis Shows Lack of Price Impact.

Under *Goldman*, the Court also should analyze whether a "truthful substitute" for the Statement, at same level of genericness, "would have impacted the stock price."  *ATRS*, 77 F.4th at 98-99, 102-03.  This requires considering "*all* record evidence relevant to price impact" to assess the "price-dropping capacity of an *equally generic* corrective disclosure,"  *Id.* at 102-05 & n.15. Here, even if investors interpreted the Statement to say that "all" data supported high-dose efficacy (they did not), evidence confirms there would have been no price reaction to a "truthful substitute."

---

[4] Plaintiffs' cases are inapposite. Doc. No. 228 at 29 n.10.  *New England Carpenters* v. *DeCarlo*, considered loss causation at the pleading stage and is irrelevant. 122 F.4th 28, 54 (2d Cir. 2024). In *Vivendi*, the corrective disclosures directly addressed the front-end statements.  *See ATRS*, 77 F.4th at 97-99.  And *Jaeger* v. *Zillow Grp., Inc.* involved a substantive mismatch, not a genericness one.  2025 WL 2741642, *1-2 (9th Cir. Sept. 26, 2025).  Plaintiffs also wrongly claim that the First Circuit "made clear there is no mismatch" because the Massie Appendix "rendered Sandrock's statement misleading."  Doc. No. 228 at 28-29.  But the First Circuit was not assessing price impact or any evidence—it was assessing Plaintiffs' falsity theory on the pleadings.  A mismatch analysis for price impact requires a "closer fit" than determining whether certain information corrected an alleged misstatement.  *ATRS*, 77 F.4th at 99 n.11.  Likewise, Plaintiffs cite *San Diego Cnty. Emps. Ret. Assn* v. *Johnson & Johnson*, to say there is "no mismatch where corrective disclosure showed falsity," again conflating falsity with price impact.  Doc. No. 228 at 29 n.10.

An equally generic "truthful substitute" for the July 22 Statement could be: Although portions of the data from PRIME, ENGAGE, and EMERGE are consistent with needing to get to the higher dose of aducanumab for efficacy, "not all data" are consistent with that. *See* Doc. No. 189-2 at 142:11-20. Ample evidence shows this "truthful substitute" would have no price impact. Plaintiffs concede analysts "viewed the subgroup data as . . . potentially damaging" and "continued highlighting Biogen's refusal to disclose subgroup results," Doc. No. 228 at 22, and Dr. Hubbard highlights at least 13 analysts reports demonstrating that investors knew Biogen had not released subgroup data and *did not think* that "all" data supported high-dose efficacy, *supra* 17. And, as Dr. Hubbard also shows, Biogen's stock price did not experience a statistically significant decline on dates when such reports were published. Doc. No. 189-1 ¶ 51. This shows that the Statement was not "propping up" or "maintaining" the stock price. *ATRS*, 77 F.4th at 100, 102-05.[5]

Plaintiffs and their expert dispute *none of this*. Plaintiffs' expert did not conduct a "truthful substitute" analysis, Doc. No. 189-2 at 135:25-136:13, or examine this evidence, *id.* at 49:12-25, 118:5-119:17, 142:10-143:7, 149:08-25, 170:16-171:25, 174:4-175:11. Dr. Tabak admitted the conclusion in the Massie Appendix's "Executive Summary" was "an awful lot like" a "truthful substitute," and the market could "quickly" make an "unbiased estimate" based on it. *Id.* at 250:18-252:24. Yet Biogen's share price *rose* on November 4 when that "truthful substitute" was released, further showing that a "truthful substitute" would not have caused a stock drop.

Lacking evidence supporting their theory, Plaintiffs propose two faulty "truthful substitutes." The first assumes the "truthful substitute" is the "disclosure of the actual subgroup

---

[5] Plaintiffs argue that Defendants' analysis mirrors the "rejected" analysis in *ATRS*, where defendants pointed to 36 pre-disclosure news reports. Doc. No. 228 at 27. But those reports were offered as alternative corrective disclosures to show the truth was revealed before the end of the class period, not as "truthful substitute[s]" to show lack of price impact. *ATRS*, 77 F.4th at 91.

20

data." Doc. No. 228 at 24-25. That argument was directly rejected in *ATRS*, which reversed the district court for making *exactly* this mistake. *ATRS*, 77 F.4th at 100-01. The question is not whether the market would have reacted had Massie's specific subgroup analyses been disclosed earlier, but rather how the market would react (if at all) to a "truthful" disclosure at the *same level of generality* as the Statement. *Id.* at 102.[6] Plaintiffs' second "truthful substitute" is also more specific than the Statement, rewriting it to say "there are undisclosed subgroup analyses inconsistent" with high-dose efficacy. Doc. No. 210 at 13. But the July 22 Statement made no reference to subgroup analyses. In any case, however the "truthful substitute" is constructed, the economic evidence shows that, both before and after July 22, the market expressed doubt about whether the unreleased subgroup data would support aducanumab's efficacy. *Supra* 13-15, 17-18.

> ### 3.    Additional Evidence of Pre- and Post-Disclosure Commentary Demonstrates Lack of Price Impact.

*ATRS* explains that "pre- or post-disclosure discussion in the market" regarding the front-end misstatement can be a useful indicator of its inflation-maintaining capacity. *Id.* at 102-03. Here, as in *ATRS*, the evidence shows that no analyst or news report *ever* referenced the July 22 Statement at all during or after the Class Period, or otherwise indicated that they believed (or that Biogen represented) that "all" data supported high-dose efficacy. Doc. No. 189-1 ¶¶ 35-37, 61, Exs. 1-3. This confirms the "insufficient link" between the Statement and Massie analyses to support inflation maintenance. *ATRS*, 77 F.4th at 102-04 (rejecting maintenance theory where no analysts referenced the alleged misstatements during or after the class period); *see also Shupe*, 752 F. Supp. 3d at 781-82 (same); *Kirkland*, 2024 WL 1342800, at *9 (same).

---

[6] Plaintiffs wrongly say that the First Circuit identified the subgroup data as a "truthful substitute." Doc. No. 228 at 24. The First Circuit said the subgroup data was plausibly alleged to be a *corrective disclosure*, *i.e.*, that it corrected the Statement; it did not consider evidence or analyze the price impact of the Statement based on a "*truthful substitute*" at the same level of specificity.

Plaintiffs identify three analyst reports that purportedly discussed the July 22 earnings call and imply that the reports "cited" the July 22 Statement.  Doc. No. 228 at 22-23.  But none did:

- Wolfe Research said that, during the July 22 call, Biogen "reiterated prior talking points on aducanumab," and provided "no new information."  Doc. No. 217-1, Ex. T ¶ 8 n.7.

- William Blair opined that "[t]he lack of full disclosure and caginess around the aducanumab results and filing remain perplexing," and noted "it is hard to be confident in the program."  *Id.*

- Wells Fargo discussed Biogen's view on high-dose efficacy, which had been public since October 2019, not the July 22 Statement.  *Id.*

Even Plaintiffs' own expert *does not* opine that these analysts cited the July 22 Statement.  *Id.*  To support price impact, analyst commentary must concern the alleged misstatement itself, not merely "the same subject."  *ATRS*, 77 F.4th at 104.

Plaintiffs also cite a lone analyst who purportedly "observed" that the Massie Appendix "directly contradicted (*i.e.*, corrected) Biogen's Dosage Thesis."  Doc. No. 228 at 30.  Plaintiffs omit that the analyst's "overarching takeaway" was that the FDA "wants to approve this product" and Massie's views would not "make[] a difference" or "dissuade the FDA on approval."  Doc. JPM Report, No. 209-9 at 2.  In any event, the analyst merely referenced Massie's opinion that the supposed lack of benefit for non-carriers in EMERGE "conflicts with [Biogen's] hypothesis that high aducanumab dosing leads to a better benefit."  *Id.* at 6.  That's irrelevant.  The question for price impact is whether analysts commented on the *July 22 Statement*.  None did.  *Supra* 11, 21.[7]

Finally, Plaintiffs cite emails produced by Defendants discussing aducanumab's trial data and regulatory pathway.  Doc. Nos. 209-7, -8, -11, -15 & -20.  These internal documents have no

---

[7] Plaintiffs' own cases demonstrate the defect in their argument.  In *Ferris* v. *Wynn Resorts Ltd.*, market participants "immediately made the connection between" the corrective disclosure corroborating sexual assault allegations and the alleged misrepresentations denying the accusations.  2023 WL 2337364, at *1, 10-11 (D. Nev. Mar. 1, 2023).  In *In re Concho Resources, Inc.*, the court found no price impact for several alleged misstatements based in part on lack of analyst commentary.  2025 WL 1040379, at *14 (S.D. Tex. Apr. 7, 2025).

bearing on price impact because they show nothing about the market's views of the July 22 Statement or its price-propping-up capacity. Moreover, none of the emails contradict Defendants' stated belief that high-dose aducanumab was efficacious—a view shared by the FDA, which granted accelerated approval of aducanumab. *Supra* 10.

* * *

In sum, applying *Goldman*, Defendants have demonstrated lack of price impact from: the mismatch in content and specificity of the front- and back-end statements; evidence that no investors interpreted the Statement to mean "all" data supported efficacy; evidence that the market did not react to "truthful substitutes"; the lack of front-end price impact; and the lack of pre- and post-disclosure commentary, which show the Statement was not "propping up" the stock price.

### D.     The November 5 and 9 Price Movements Do Not Establish Price Impact of the July 22 Statement.

The lack of price impact is also proven by the economic evidence surrounding the back-end stock declines identified by Plaintiffs. Biogen's stock price rose 44% on November 4, 2020, following release of the Briefing Book including the Massie Appendix at approximately 10:10am ET. *Supra* 8-9. Plaintiffs instead claim price impact from stock declines on two ***later*** dates: November 5, 2020, when the price dropped 7.5%; and November 9, 2020, when the price dropped 28.2%. Doc. No. 58 at ¶¶ 17, 19; Doc. No. 228 at 33-41.[8] Plaintiffs contend that these declines serve as a proxy for inflation "maintained" by the July 22 Statement. Plaintiffs' theory is inconsistent with efficient-market principles, as explained below.

---

[8] Plaintiffs previously argued that the market began to absorb the negative analyses in the Massie Appendix on November 5. *See, e.g.*, Pls.' Mot. to Add Pls., Doc. No. 139 at 12; SAC ¶ 279. Plaintiffs' Motion, for the first time, suggests that there was also price impact "on November 4"— the day Biogen's share price *rose* 44%. *See* Doc. No. 228 at 25. But the SAC does not plead price impact on November 4; Plaintiffs cite no evidence of price impact on November 4; and Dr. Tabak does not opine that there was price impact on November 4.

23

1.      **The November 5 Price Movement Does Not Establish Price Impact.**

Plaintiffs' Motion hinges on Biogen shares trading in an efficient market.  Doc. No. 171-1 ¶ 2; Doc. No. 228 at 18.  As Dr. Hubbard demonstrates, in an efficient market—and particularly contemporary markets like Biogen's, with extensive high-frequency trading and 80% of trading conducted by institutional investors—"new information is incorporated into the stock price in minutes, if not faster."  Doc. No. 189-1 ¶ 72; Doc. No. 189-2 at 221:9-222:24; Doc. No. 171-1 ¶¶ 22-24 (large institutional holdings expedite the incorporation of news).  Dr. Tabak concedes that "the bulk of the price movement occurs very quickly in most cases," and that a 15-minute price reaction is "fairly common."  Doc. No. 189-2 at 210:17-216:20.  Applying these economic principles, the supposedly corrective information in the Massie Appendix was incorporated into Biogen's share price during the trading day on November 4—and Plaintiffs' invocation of a delayed reaction fails.  Doc. No. 189-1 ¶¶ 74-78; *see Erica P. John Fund, Inc*. v. *Halliburton Co*., 309 F.R.D. 251, 269 (N.D. Tex. 2015) (rejecting two-day window in efficient market); *Ramirez* v. *Exxon Mobil Corp*., 2023 WL 5415315, at *13-14 (N.D. Tex. Aug. 21, 2023) (same); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016) (same).

Plaintiffs try to dismiss the "academic literature about the efficient market" as focused on "simple" earnings announcements.  Doc. No. 228 at 31.  But they cite no literature for the proposition that earnings are absorbed faster than other information.  Doc. No. 209-3 ¶ 84 n.90. And Dr. Hubbard cites studies showing efficient market price changes take minutes or less, not only for earnings announcements, but for complex analyst opinions offered during live programs, macroeconomic announcements, news articles, and analytics.  Doc. No. 217-1, Ex. T ¶ 24.

Plaintiffs further argue that "[t]he First Circuit, and many others, hold that it *may* take more than one trading day to fully incorporate news."  Doc. No. 228 at 31.  But this is not a legal question—it is an economic question that must be assessed on the facts and evidence of each case.

24

That is precisely what the First Circuit instructed here when it held that Plaintiffs had plausibly *alleged* loss causation because "the issue of when Biogen's stock price actually dropped is a question of fact." *Shash*, 84 F.4th at 21-22. That means Plaintiffs must now adduce *evidence*. But Plaintiffs fail to cite academic literature to support their argument for a multi-day price reaction, and the cases they cite are distinguishable.[9]

Substantial contemporaneous evidence confirms that the alleged corrective disclosure was fully reflected in Biogen's stock price by market close on November 4:

*First*, the intraday price movement on November 4 reflects rapid price absorption of the allegedly corrective information. Between 10:10am ET, when the Briefing Book (including the Massie Appendix) was published, and 10:56am ET, when trading volume peaked for the day, Biogen's stock price rose sharply, with trading volume *3 times higher* than later in the day. Doc. No. 189-1 ¶ 75. From 10:56am ET to market close, Biogen's stock oscillated with declining but still high volume. *Id.* ¶ 76. Dr. Hubbard explains that this reflects "an immediate, positive reaction" to the Briefing Book (including the attached Appendix), followed by "continued price volatility reflecting market participants' uncertainty on how AdCom panelists may interpret and weigh these two opposing pieces of evidence." *Id.* ¶ 77. This is consistent with Dr. Tabak's testimony that efficient markets "fully incorporate[] the [available] information" in a quick and unbiased manner, followed by "additional volatility as the market continues to react." Doc. No.

---

[9] Plaintiffs cite two motion to dismiss opinions (*Cross* and *Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*) that are irrelevant because they didn't consider evidence. Plaintiffs' other cases involved different facts. *Sjunde AP-Fonden* v. *Gen. Elec. Co.* declined to exclude an expert opinion that a three-day window was proper based on the facts there. 2023 WL 6314939, *16 (S.D.N.Y. Sept. 28, 2023). *Allegheny Cnty. Emps.' Ret. Sys.* v. *Energy Transfer LP* involved a disclosure on the first day that created "confusion" and "required additional clarifying information," which was conveyed by analysts the next day. 623 F. Supp. 3d 470, 494-97 (E.D. Pa. 2022). In *Fogarazzo* v. *Lehman Brothers*, the court accepted a three-day window for assessing front-end impact that included the day *before* the alleged false statements. 263 F.R.D. 90, 102-06 (S.D.N.Y. 2009).

189-2 at 199:19-200:23, 210:18-211:5, 349:25-350:22.

*Second*, the trading volume in Biogen stock on November 4 was the *highest* of any day in the Class Period—*12 times* the average trading volume between July 22 and November 3, 2020—further supporting rapid incorporation of value-relevant news on that date. Doc. No. 189-1 ¶ 74.

*Third*, analyst commentary confirms that the Massie Appendix was reflected in Biogen's stock price on November 4. At least *15* analysts published reports during trading hours on November 4 that explicitly discussed the Briefing Book, *including* Massie's "negative findings." *Id.* ¶ 109 & n.174. *Six* discussed the allegedly corrective subgroup patterns in the Massie Appendix. *Id.*; *id.* ¶ 71. Even Dr. Tabak identified several analysts who reported on Massie's analyses during trading hours on November 4 and "took a less favorable view of Biogen's value." Doc. No. 171-1 ¶¶ 67, 69, Ex. 11. These reports confirm the market incorporated the substance of the Massie Appendix into Biogen's stock price during trading hours on November 4. Doc. No. 189-1 ¶¶ 77-78; *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12-14 (N.D. Cal. Mar. 11, 2024) (that eight analysts reported on FDA briefing materials on publication date indicated materials were "understood" by market that day, before AdCom vote two days later). Plaintiffs ignore these reports and claim analysts "commented it would take a full day to read and analyze the materials." Doc. No. 228 at 32 & n.12. But they cite only a single report, issued the morning of November 4, which explicitly discussed Massie's "very negative" views that "the entire analysis is flawed and aducanumab doesn't work." Raymond James Report, Doc. No. 209-19 at 2.

*Fourth*, if the market truly continued to absorb the corrective information from the Massie Appendix after the close on November 4, it would be reflected in the *opening* price of Biogen stock on November 5, 16 hours later. Doc. No. 189-1 ¶ 83. But there was no statistically significant price movement from market-close on November 4 to market-open on November 5.

26

*Id.* ¶¶ 84-89. Plaintiffs concede this. Doc. No. 228 at 35. They cite an article purportedly saying that only a "majority" (*i.e.*, "51%") of information is reflected at market-open. *Id.*; Doc. No. 209-3 ¶¶ 83-84. However, the article *actually* says the overnight period "accounts for essentially 100%" of the price response of a non-trading-hour announcement for a "NASDAQ stock" like Biogen. Doc. No. 217-1, Ex. T ¶ 26. Plaintiffs also say the lack of statistical significance does not matter because there was a small *raw* price movement at market-open on November 5. Doc. No. 228 at 35. But price movement without statistical significance is "indistinguishable from random price fluctuations" and "cannot be attributed to company-specific information announced on the event date." *ATRS*, 77 F.4th at 86 n.5.[10] Plaintiffs thus offer no economic explanation for the undisputed lack of price movement at market-open on November 5, which is damning of their price impact argument for November 5. *See Ramirez*, 2023 WL 5415315, at \*14, \*16.[11]

Rather than supplying economic evidence, Plaintiffs pursue the unsupported theory that the market needed days to digest the negative 97-page Massie Appendix because it was "dense" and "technical" but that "it did not take much effort to discern" the positive analyses in the 343-page Briefing Book. Doc. No. 228 at 11, 32. But, as both experts agree, there is "no such rule" that markets process good news before bad news, nor that good news and bad news released at the same time take different amounts of time to be incorporated. Doc. No. 189-2 at 227:16-20, 231:5-11; Doc. No. 189-1 ¶ 79; *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 270-71 (3d Cir. 2005)

---

[10] *See Halliburton*, 309 F.R.D. at 270 (no price impact where expert "found an intraday statistically significant price reaction on Day 1 only at a 90% confidence level"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (no price impact absent evidence showing "statistically significant" price movement following alleged misrepresentation or disclosure).

[11] Plaintiffs try to distinguish *Ramirez* because it held that a lack of statistically significant price movement at market-open proved a lack of price impact for information revealed overnight—a few hours before market open. *Ramirez*, 2023 WL 5415315, at \*16, 21. But the case here is *more compelling* because the allegedly corrective information was released during the prior trading day, more than 22 hours before market open on November 5, and there was still no price movement.

(rejecting argument that "market understood all the good things that Merck said about its revenue but was not smart enough to understand the co-payment disclosure," because "[a]n efficient market for good news is an efficient market for bad news"). And Dr. Massie's opinion was no more "dense" and "technical" than the rest of the Briefing Book, which similarly included detailed statistical analyses prepared by industry experts for review by the AdCom. *See* Doc. No. 62-1; *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *12 (S.D. Tex. Feb. 9, 2024) (argument that "the market was having a tough time reading through" document and determining implications was not a "compelling" reason to extend event window). And, unlike the first section of the Briefing Book, the Massie Appendix included an "Executive Summary" that concluded in plain English that "the totality of the data does not seem to support the efficacy of the high dose." Doc. No. 58-3 at 11.

For these reasons, Plaintiffs cannot rely on efficient market theory and then avoid its implications by claiming a delayed price reaction for "bad news" in the Massie Appendix.

### 2. Dr. Tabak's Analysis of November 5 Is Methodologically Unsound.

Plaintiffs' expert, Dr. Tabak, also opines that his "independent analysis of November 5, 2020 demonstrates price impact on that day." Doc. No. 171-1 ¶ 75. But his analyses are "flawed, unreliable, and fail to provide credible evidence of price impact." Doc. No. 189-1 ¶ 96.

Dr. Tabak posits that "continued discussion of the Massie Report" after the close of trading on November 4 is evidence that the market was still processing it. Doc. No. 171-1 ¶ 74; Doc. No. 228 at 33-34, 41. But Dr. Tabak does not show that the length of time a topic is discussed in the news is somehow equivalent to the length of time an efficient market needs to incorporate that news. *See* Doc. No. 189-2 at 323:20-325:10, 335:24-336:13, 338:6-25. And "a good dose of common sense," *Goldman*, 594 U.S. at 122, suggests that significant events remain in the news for days or weeks, but that is not a measurement for the time it takes an efficient market to price the information. In any event, Plaintiffs' and Dr. Tabak's methodology is unsound:

*First*, they point to three analyst firms that mentioned the Massie Report for the first time after trading closed on November 4, but ignore that at least *15* analyst reports discussed Massie's opinion during trading hours on November 4. *Supra* 26; Doc. No. 189-1 ¶ 109 & n.174.

*Second*, Plaintiffs argue that two analysts published reports after market close on November 4 "describing a 'Closer Look' or a 'Deeper Look' into the split in the FDA analyses." Doc. No. 228 at 25-26. But Plaintiffs omit that the authors of those reports also published reports before 12 p.m. ET on November 4 *explicitly discussing* the Massie Appendix and its negative findings.[12] And, while both analysts also published reports after market close, neither expressed new views on Massie's findings or changed their Biogen ratings. Doc. No. 189-1 ¶¶ 80-81.

*Third*, Dr. Tabak notes that the percentage of Biogen analysts who mentioned "Massie" *or* "statistician" *or* "statistical review" rose from November 4 to 5 and remained above 40% "through at least November 11." Doc. No. 171-1 ¶ 74. But Dr. Tabak did not read all of the referenced reports and admitted the search terms were a "blunt instrument" that could turn up articles that did not discuss the Massie Appendix. Doc. No. 189-2 at 327:21-24, 329:14-331:8. He also incorrectly attributes significance to a mere mention of the Massie Appendix and fails to account for discussions of non-corrective information or reports that merely repeat earlier reported information and assess its impact on regulatory approval. Doc. No. 189-1 ¶ 67; Doc. No. 189-2 at 339:5-340:5. As Dr. Hubbard found, *none* of the reports cited by Dr. Tabak "provided any new information about the known subgroup results," and instead "discussed the Massie Appendix in the context of . . . aducanumab's subsequent regulatory pathway prospects." Doc. No. 189-1 ¶ 113.

---

[12] The Raymond James report, published November 4 at 11:15am ET, viewed the Massie Appendix as "very negative" and wrote "FDA's statistician seemingly thinks the entire analysis is flawed"; and the JP Morgan report, published at 11:35am ET, specifically identified "discrepancies between FDA clinical and statistical teams on why 301 was negative" and that "there is a lack of efficacy in APOE4 non-carriers." Doc. No. 189-1 ¶ 80.

For these reasons, Plaintiffs have failed to adduce evidence that the market did not rapidly and efficiently process the alleged corrective information on November 4.

Dr. Tabak also wrongly ascribes significance to a price drop during the November 5 trading day, as a proxy for the alleged corrective information. As Dr. Hubbard's event study demonstrates, Biogen's stock price experienced significant volatility after the Briefing Book was released. The stock movement cited by Plaintiffs, which occurred during trading on November 5, is "in line with the many price drops observed on November 4." Doc. No. 189-1 at ¶¶ 86-88; *see* Doc. No. 189-2 at 91:7-92:16. The November 5 stock movement is thus "best understood as part of the continued volatility from the price movements of the prior day . . . tied to uncertainty over how the AdCom panelists would weigh the various findings from the Briefing Book, including the Massie Appendix, in the upcoming vote, and the subsequent prospect of FDA approval." *Id.*

Plaintiffs misconstrue Dr. Hubbard's opinion on this topic and argue that Dr. Hubbard "admits that the price declines on Nov. 5 resulted from the news on Nov. 4." Doc. No. 228 at 36. Plaintiffs wrongly conflate price returns and price volatility, *id.* at 34, which are different concepts. "[S]tock price returns—a standard economic measure of price reaction—measure the directional price response to new, value-relevant information." Doc. No. 217-1, Ex. T ¶ 29. "In contrast, volatility measures the degree to which prices fluctuate in an unpredictable manner, reflecting uncertainty and market noise, and cannot serve as evidence of price impact attributable to a singular factor." *Id.* ¶¶ 29, 42. Here, the market quickly absorbed the new information disclosed in the Briefing Book (including the Massie Appendix) and determined that "on net, the materials were positive," as shown in the steep rise in price on high trading volume before 10:56am ET. *Id.* ¶ 30. That represents price returns. After that point, "the stock price continued to bounce around to reflect the differing views of market participants regarding how the Briefing Book would affect

30

the AdCom vote and regulatory approval." *Id.* That represents volatility. This period of high volatility "is distinct from the market's immediate assessment" of the Briefing Book. *Id.* ¶ 31; *see Bratya SPRL v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34, 58, 64 (D.D.C. 2024) (finding no price impact where price movement reflected high "volatility of [issuer's] stock"). Even Dr. Tabak admitted it is "uncontroversial" that "much of the price movement occurred shortly after the release of the Briefing Book and then experienced continued volatility." Doc. No. 209-3 ¶ 75. Plaintiffs' arguments about November 5 wrongly rely on volatility, not price impact.

Finally, Plaintiffs criticize Dr. Hubbard for failing to disaggregate "non-fraud-related information" from the Massie Appendix. Doc. No. 228 at 36-37. But *Goldman* imposes no such requirement on defendants; indeed, the Second Circuit in *Goldman* decertified the class without quantifying the causes of three back-end drops because the front-end statements did not inject or maintain inflation. *ATRS*, 77 4th at 83, 103-05. The same is true here.[13]

### 3. The November 9 Price Movement Does Not Establish Price Impact.

Plaintiffs argue that the stock movement on November 9 also supports price impact—a position their own expert does not even support. Doc. No. 209-3 ¶¶ 73, 90. They argue that the November 9 decline represents a five-day-delayed reaction to Massie's opinion. Doc. No. 228 at 38-39, 41. But Plaintiffs previously argued that the stock drop on November 9 was *due to the AdCom vote*, which allegedly contained "new corrective information." Pls.' Opp. to J. on the Pleadings, Doc. No. 122 at 16-18; Pls.' Opp. to MTD, Doc. No. 63 at 41. Because the Court rejected this theory, Plaintiffs now pivot, but their new theory should also be rejected.

---

[13] Plaintiffs argue Defendants failed to "identify any negative news" that caused the stock drop on November 5. Doc. No. 228 at 33. That misstates Defendants' burden, which is to prove by a preponderance that there was no price impact from the front-end July 22 Statement. In any event, Dr. Hubbard identified volatility and uncertainty about the AdCom vote to explain price movement on November 5, which supports a lack of front-end price impact. *See, e.g., Kirkland*, 2024 WL 1342800, at *9; *Ramirez*, 2023 WL 5415315, at *17; *Apache*, 2024 WL 532315, at *10-11, 14.

31

There is no economic principle under which the drop on November 9 can be attributed to the market's absorption of the Massie Appendix. Doc. No. 189-1 ¶ 90. Biogen stock traded in an efficient market, and any price impact would have been absorbed during trading hours on November 4—and *certainly* before November 9. Doc. No. 189-1 ¶ 91. Plaintiffs cite no authority supporting *three trading days* of price impact and courts reject such arguments. *Supra* 24.

It is clear that the decline on November 9 was caused—as Plaintiffs originally argued—by the negative AdCom vote on November 6. Doc. No. 189-1 ¶¶ 92-95. In the days leading up to the vote, the market knew that the outcome was uncertain given available information. *Id.* ¶ 92. *All reports* published on November 6 that Dr. Tabak identified as mentioning "Massie," "statistician," or "statistical review" included a discussion of the AdCom panel: analysts commented in anticipation of the panel prior to market open, provided midday updates as the panel met, and published summaries after it concluded. *Id.* ¶ 94. The AdCom meeting provided insight into how FDA experts viewed competing assessments of the data, but, as this Court held, did not provide *new* information about the supposedly corrective subgroup data. *Id.* ¶ 95; Doc. No. 163 at 16-18. Thus, the observed decline on November 9 reflects the materialization of the known risk of a negative AdCom vote, and *not* a correction of the July 22 Statement. Doc. No. 189-1 ¶ 95.

Plaintiffs cite several supposed "admissions" from Dr. Hubbard in support of their argument that the November 9 stock drop supports price impact, but repeatedly mischaracterize his testimony. Doc. No. 228 at 38-41. They claim Dr. Hubbard testified that price movement on November 5 and beyond was "due, at least in part, to the analysts weighing Dr. Massie's views." *Id.* at 41. But what Dr. Hubbard actually said was that Dr. Massie's "views [were] known" by November 4, and the market was "not [weighing] Dr. Massie's views, but the implication of those views," which reflects volatility and not price impact. Doc. No. 217-1, Ex. T ¶ 30 n.70. Plaintiffs

insist Dr. Hubbard "admitted" that the AdCom discussions were "new news," Doc. No. 228 at 38, 32, but ignore his salient point that "the inputs to [the AdCom's] decision making," like the Massie Appendix, were already "known," Doc. No. 217-1, Ex. T ¶ 41 n.89. Plaintiffs also say Dr. Hubbard "admitted that the negative AdCom vote was a materialization of the risk of the findings in the Massie Report," Doc. No. 228 at 38, omitting Dr. Hubbard's opinion that the AdCom vote was the "materialization of a *known* risk," Doc. No. 217-1, Ex. T ¶ 41 n.87.[14]

Plaintiffs' remaining arguments seek to recover for declines from the AdCom discussion and vote themselves, which Plaintiffs repeatedly argue "revealed new information" to investors. Doc. No. 228 at 38-41. But the proper question is whether they *corrected* the July 22 Statement and demonstrated price impact. The Court already answered that question—and rejected Plaintiffs' argument—in its earlier ruling, where it held that market reaction to the AdCom was not alleged to be causally related to the July 22 Statement. Doc. No. 163 at 17-18. That ruling is the law of the case and forecloses Plaintiffs' argument. *See Naser Jewelers, Inc*. v. *City of Concord*, 538 F.3d 17, 20 (1st Cir. 2008). Plaintiffs argue that this Court's earlier ruling that the AdCom was not a corrective disclosure "does not preclude a finding that it had price impact," Doc. No. 228 at 38, but it does: if the AdCom vote did not reveal the supposedly falsity of the July 22 Statement, then it cannot show that the Statement had price impact.[15]

---

[14] Plaintiffs also cite disaggregation cases, Doc. No. 228 at 41, but those are irrelevant because the market absorbed the allegedly corrective information on November 4 and there is nothing to disaggregate. *Supra* 23-31.

[15] *Homyk* v. *ChemoCentryx, Inc*. is distinguishable. There, defendants allegedly misrepresented a drug's "prospects for approval" and concealed the "grave concerns" the FDA communicated to them, making a negative AdCom vote "foreseeable" and the vote "corrective of those misstatements." 2025 WL 1547625, at *18 (N.D. Cal. May 30, 2025). Here, the FDA's view of aducanumab was favorable, *supra* 8-10, and the market was "on notice of the risk of a negative AdCom vote," Doc. No. 189-1 ¶¶ 90-95. Similarly, unlike here, *Johnson & Johnson*, involved a "match" between statements that the issuer's products were "asbestos-free" and a jury verdict that the products contained asbestos. 2025 WL 2176586, at *1, 2 & n.3, n.11 (3d Cir. July 30,

## II.    SHASH, KHAN, AND AFTOORA ARE NOT TYPICAL OR ADEQUATE CLASS REPRESENTATIVES.

Rule 23(a) requires that a class representative's claims or defenses be "typical" of those of the class and that the representative "adequately" protect the class's interests.  Fed. R. Civ. P. 23(a)(3)-(4).  This standard is more demanding at class certification than the early appointment of a lead plaintiff.  *Elas* v. *Prince*, 2024 WL 278220, at *2 (D. Mass. Jan. 25, 2024) (Talwani, J.).  A class representative is not "typical" if she may be subject to "unique defenses that would divert attention from the common claims of the class." *Karth* v. *Keryx Biopharms.*, *Inc.*, 334 F.R.D. 7, 16 (D. Mass. 2019) (denying class certification where timing of proposed representative's purchases made him atypical), *aff'd*, 6 F.4th 123 (1st Cir. 2021).  Defendants "do not have to *prove* a unique defense to defeat certification"; even an "arguable defense" particular to a class representative is sufficient.  *Shupe*, 752 F. Supp. 3d at 789; *Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007).  A class representative is not "adequate" if she shows a "lack of basic knowledge about" the case, *In re Sepracor Inc.*, 233 F.R.D. 52, 55 (D. Mass. 2005) (rejecting proposed class representative due to "lack of familiarity with the case"), or "abdicat[es] control over her case" to counsel, *Foley* v. *Buckley's Great Steaks, Inc.*, 2015 WL 1578881, at *6 (D.N.H. Apr. 9, 2015).  Each proposed class representative is both atypical and inadequate.

***Nadia Shash and PolyCon*.**  Plaintiffs' Motion seeks to appoint "PolyCon Solutions LLC and Nadia Shash, its sole managing member," as a class representative.  Doc. No. 228 at 9.  But neither PolyCon Solutions LLC ("PolyCon") or  Shash can serve as a class representative.  Shash cannot serve as a class representative because she did not purchase Biogen stock.  Pls.' Mot. for

---

2025).  Further, Plaintiffs here allege the corrective disclosure occurred, and price impact began, *before* the AdCom vote, meaning the AdCom revealed nothing *new* about the July 22 Statement.  By contrast, in *Johnson & Johnson*, the plaintiffs alleged the jury verdict *was* the corrective disclosure, and did not allege the "evidence adduced and arguments made at trial" before the verdict were corrective information.  *Id.*

Sub., Doc. No. 187 at 1, 5-6 .  She lacks both Article III standing, *see One World, LLC* v. *Manolakos*, 2025 WL 2784990, at \*5 (D. Mass. Sept. 30, 2025), and as Plaintiffs concede, prudential standing, Pls.' Reply to Mot. for Sub., Doc. No. 203 at 7.  Plaintiffs have moved to substitute Shash out of this case, and Defendants have moved for her dismissal.  *See* Defs.' Opp. to Sub. and MTD, Doc. No. 195; Defs.' Reply to MTD, Doc. No. 206.

Nor can PolyCon serve as class representative, as it is not, and has never been, a party to this lawsuit.  Thus, the Court need not evaluate PolyCon's typicality and adequacy under Rule 23. If the Court were to grant Plaintiffs' substitution motion, it should decline to appoint PolyCon class representative because it is atypical and inadequate under Rule 23, as set forth in Defendants' brief opposing substitution.  Doc. No. 195 at 21-26.[16]  Moreover, none of Plaintiffs' arguments or evidence that purport to establish *other* Plaintiffs' adequacy—such as their participation in this case and declarations attesting to their suitability, Doc. No. 228 at 18—applies to PolyCon.

***Amjad Khan.***  Khan is atypical because his trading subjects him to an individualized reliance defense that will divert attention from common classwide issues.  He did not purchase Biogen stock until November 5, Doc. No. 228 at 13, a full day after the Massie Appendix supposedly revealed the "truth," Doc. No. 122 at 13, 16, making any purported reliance on the alleged misstatement unreasonable.  Courts regularly reject post-disclosure purchasers as atypical.

---

[16] Plaintiffs' Motion responds to one of Defendants' several arguments from the substitution briefing—that PolyCon is inadequate because it submitted a false PSLRA Certification—and asks the Court to overlook this "innocent . . . mistake."  Doc. No. 228 at 16-17.  But courts routinely hold that plaintiffs who submit inaccurate PSLRA Certifications are inadequate under Rule 23. *See, e.g.*, *Bousso* v. *Spire Glob., Inc.*, 2024 WL 4873311, at \*5 (E.D. Va. Nov. 21, 2024) (plaintiff inadequate even where "innocent" error in certification understated losses); *In re Sonus Networks, Inc. Sec. Litig.*, 229 F.R.D. 339, 343 (D. Mass. 2005) ("[A] person who would verify the accuracy of an incomplete document[] was not an appropriate class representative"); Doc. No. 195 at 22 (collecting cases).  Shash argued *in this case* that a "typo in one transaction price" listed in a PSLRA certification, or the incorrect spelling of an attorney's name, "render[s] [a plaintiff] inadequate."  Shash Lead Pl. Opp., Doc. No. 19 at 14-15; Shash Lead Pl. Reply, Doc. No. 28 at 8.

*See Karth*, 334 F.R.D. at 21; *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *6-7 (S.D.N.Y. July 3, 2013); *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 472-73 (2013) (plaintiff who did not trade "between the time the misrepresentation was made and the time the truth was revealed . . . would not be 'typical'"). Indeed, Khan testified that he purchased on November 5 because the price was "trending down," "with the hope"—based on his unique "guesswork"—"that it will go back up." Kahn Dep. Tr., Doc. No. 189-4 at 114:19-115:13. That he purchased after the alleged fraud was revealed, and based on the stock's downward trajectory, suggests that he did so "on an actual belief that the market price was inaccurate," and would have "even with full knowledge of the misrepresentation," "[r]ebut[ting] the presumption of reliance." *Semerenko* v. *Cendant Corp.*, 223 F.3d 165, 179 n.7 (3d Cir. 2000).

Plaintiffs argue that this Court "rejected" this argument when it previously ruled, applying Rule 12(c), that Khan "was entitled to a *presumption* of reliance for shares purchased on November 5." Doc. No. 228 at 13. While the Court was required to "assum[e] the truth of Plaintiffs' allegations" in resolving that motion, Doc. No. 163 at 12, Defendants have now provided evidence rebutting the presumption of reliance. *Supra* 10-33. Plaintiffs' authorities are inapposite. *Water Island Event-Driven Fund* is not a class certification decision applying Rule 23(a)'s exacting standard, and involved investors who purchased stock *before* any corrective disclosure. And *Corcoran* is not a securities class action and addressed only limitations defenses.

Khan is also inadequate due to his egregious lack of understanding of, and participation in, this case. Despite joining the case more than four years ago, he had not spoken to his counsel until two weeks before his deposition. Doc. No. 189-4 at 153:21-25, 195:21-23. He only "skimmed" or "glanced at" key filings, including his sworn statements. *Id.* at 120:11-16, 186:19-187:4. He could not recall the defendants' names, *id.* at 85:3-9; what alleged misstatement(s) remain, *id.* at

36

93:15-25; was unaware that the Massie Appendix is the alleged corrective disclosure, *id.* at 119:21-20:10; and could not explain why the July 22 Statement is allegedly false, *id.* at 104:14-105:6, 109:16-20. He was "not sure" if any briefs had been filed; if there had been a mediation; or if he would be able to attend trial. *Id.* at 33:17-23, 154:25-155:7, 156:4-9. He has never spoken to Shash or Aftoora. *Id.* at 37:4-5, 37:19-20; *see In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 622 (S.D.N.Y. 2015). When asked his opinion about his sworn statement that the SAC is "meritorious," he said, "I will let my attorneys decide it." Doc. No. 189-4 at 90:15-91:10.

Ignoring this evidence that Khan has abdicated control to his lawyers, Plaintiffs cite his boilerplate declaration drafted by counsel, Khan Decl., Doc. No. 171-3, to establish his adequacy. Doc. No. 228 at 18. When asked about this barebones declaration, however, Khan admitted that he merely "glance[d]" at it, and "kind of" understood before he "just signed it." Doc. No. 189-4 at 184:2-185:16. Khan plainly cannot serve as a fiduciary for absent class members.

***Albert Aftoora.*** Aftoora is atypical because he is subject to individualized reliance defenses. Aftoora offered the extraordinary testimony that he had actual knowledge of the Massie Appendix during the two-day period between its publication and the AdCom vote. Aftoora Dep. Tr., Doc. No. 189-5 at 284:14-23, 285:16-19. He understood that it reflected a negative view of aducanumab efficacy by an FDA statistician, which he considered the "most important piece" of the data review. *Id.* at 286:1-12, 298:18-299:6. Despite acknowledging he could have sold his Biogen stock for a large profit during this period, he affirmatively chose to hold his shares because he "really wanted [aducanumab] to work" and "hope[d]" the stock price would rise following the AdCom vote. *Id.* at 288:20-289:19, 294:16-21. His decision to hold rather than sell for profit—*while being aware of the very information he alleges was concealed from the market*—is powerful

37

evidence that he would have purchased Biogen stock "even with full knowledge of the [alleged] misrepresentation," which "rebuts the presumption of reliance." *Semerenko*, 223 F.3d at 179 n.7.[17]

Aftoora is also inadequate because his testimony demonstrates that he, too, has ceded control of the case to counsel. He was unaware of any mediation or Court hearings, Doc. No. 189-5 at 193:22-194:9, 196:9-11; he has never spoken to the other plaintiffs, and admitted they have no plan to resolve conflicts or make decisions collectively, *id.* at 65:22-66:3, 67:1-68:14. He also expressed confusion about the First Circuit opinion and the remaining alleged misstatement, *id.* at 109:10-19, 190:11-193:11; he did not know that the SAC is the operative complaint, *id.* at 181:2-182:21, 186:16-19; and he mixed up the individual defendants, *id.* at 93:1-12, 97:22-98:3.

Plaintiffs again argue that the declaration submitted for Aftoora, which is substantively identical to those submitted for Khan and Shash, somehow transforms him into an adequate representative. Doc. No. 228 at 18. It does not. In fact, when shown his declaration and asked, "if your attorneys put something in front of you that makes a factual statement," will you "sign something attesting to the veracity of that statement under penalty of perjury even if you personally do not have firsthand knowledge that it is true?" he replied, "Yes." Doc. No. 189-5 at 335:7-13.

Aftoora is inadequate for the additional reason that his maximum stake in this case is only $479.21 under the PSLRA's bounce back rule.[18] *See, e.g.*, *McCormack* v. *Dingdong (Cayman) Ltd.*, 2022 WL 17336586, at *5 (S.D.N.Y. Nov. 30, 2022) (plaintiff with $504 in losses

---

[17] Plaintiffs cite *In re Sepracor Inc.* for the proposition that "maintaining position in stock after [a] corrective disclosure doesn't render [a] plaintiff inadequate," Doc. No. 228 at 14-15, but the plaintiff there was engaged in an option rollover strategy designed to mitigate losses. 233 F.R.D. at 56. Unlike Aftoora, there was no indication that the plaintiff would have purchased the defendant's securities with knowledge of the alleged fraud.

[18] This cap is calculated based on the "mean trading price" of Biogen stock between November 4, 2020—when the allegedly corrective information was "disseminated to the market," *supra* 8-9—and November 13, when Aftoora sold. 15 U.S.C. § 78u-4(e)(1). Even if the period began November 5, Aftoora's maximum stake of $1,191.25 would still render him inadequate.

inadequate); *Bosch* v. *Credit Suisse Grp. AG*, 2022 WL 4285377, at \*5 (E.D.N.Y. Sept. 12, 2022) ($621 in losses).  Plaintiffs provide no contrary authority.  Doc. No. 228 at 17 n.8.  And although the Court previously held that Aftoora's nominal damages did not disqualify him from joining the case as a "named plaintiff" because he was not seeking appointment as a "lead plaintiff," Doc. No. 163 at 20-21, the Rule 23 standard for a class representative is more demanding, *supra* 34.[19]

### III.    PLAINTIFFS DO NOT PROVE THAT DAMAGES ARE CAPABLE OF CLASSWIDE MEASUREMENT.

Plaintiffs fail to satisfy the predominance requirement of Rule 23(b) because they fail to prove that damages are "capable of measurement on a classwide basis" by identifying a methodology that measures only "damages attributable to [plaintiffs'] theory" and excludes "damages that are not the result of the wrong." *Comcast*, 569 U.S. at 34-35, 37.

Dr. Tabak's opening report opined, in five paragraphs he concedes he largely cut-and-pasted from prior reports in cases with different facts, that classwide damages calculations "will be feasible."  Doc. No. 171-1 ¶¶ 58-62; Doc. No. 189-2 at 27:22-28:4, 357:7-361:24.  Dr. Tabak's reply report opines that he can disaggregate the allegedly corrective information in the Massie Appendix from the non-corrective information using two methods: (i) "an analysis of price-target changes among analysts that did and did not discuss" the Massie Appendix, and (ii) an FDA expert. Doc. No. 209-3 ¶¶ 107-114; Doc. No. 228 at 42-43.  Neither method works.  Dr. Tabak's analysis of price-target changes is "fundamentally flawed" because it is based on only seven reports and lacks statistical significance; it omits numerous reports discussing Massie; and it attributes significance to the mere mention of "Massie" rather than discussion of information that allegedly

---

[19] Aftoora is also inadequate because, as he conceded at his deposition, he submitted an inaccurate PSLRA certification purporting to identify personal Biogen transactions that were actually made in an account belonging to a trust.  Doc. No. 189-5 at 212:4-12; Acct. Stmt., Doc. No. 189-8.

corrected the July 22 Statement.  Doc. No. 189-1 ¶¶ 97-105.  And Dr. Hubbard opines that isolating only alleged fraud-related damages cannot be done here "using any reliable or scientifically credible methodology."  *Id.* ¶ 120; Doc. No. 217-1 ¶ 17 n.36.  That is particularly true given the unusual facts present in this case, which Dr. Tabak admits he has never encountered:  the alleged corrective disclosure was released simultaneously with non-fraud-related information; the issuer's stock price *rose* after the alleged corrective disclosure; and Plaintiffs seek to recover substantial losses days later after a major intervening event.  Doc. No. 189-2 at 364:12-365:13.

In re FibroGen Securities Litigation* is on point.  FibroGen's stock declined following *both* an adverse disclosure about clinical trial information, and again following a subsequent negative AdCom vote.  2024 WL 1064665, at *2-3.  Plaintiffs' expert offered no *specifics* on how he would "separate the portion of" stock price decline "attributable to any corrective disclosures from the portion . . . attributable to the AdCom's [negative] decision," which required denial of class certification.  *Id.* at *16.  So too, here, where Dr. Tabak has not even "thought about how to apply" a methodology to disaggregate the negative AdCom vote.  Doc. No. 189-2 at 354:4-24.

In re Vaxart, Inc. Securities Litigation* is also illustrative.  There, plaintiffs failed to explain "how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated" over time, precluding certification under *Comcast*.  738 F. Supp. 3d 1259, 1267 (N.D. Cal. 2024).  Dr. Tabak similarly fails to address the "waning effect of the fraud on [Biogen's] stock price" after the alleged corrective disclosure as putative class members, including Plaintiff Khan, were still purchasing Biogen stock.  *Id.*

**CONCLUSION**

Plaintiffs' Motion should be denied.  Defendants respectfully request an oral argument to address these matters further and address any questions the Court may have.

40

Dated:  February 2, 2026

Respectfully submitted,

 /s/ *Audra J. Soloway*
Audra J. Soloway (*pro hac vice*)
Richard C. Tarlowe (*pro hac vice*)
Daniel S. Sinnreich (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
rtarlowe@paulweiss.com
dsinnreich@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants Biogen Inc.,*
*Michel Vounatsos, and Alfred W. Sandrock, Jr.*

41

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of February, 2026, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

_/s/ Audra J. Soloway_
Audra J. Soloway