# Exhibit 14

**S&P Global**
Market Intelligence

# Biogen Inc. NasdaqGS:BIIB

# Special Call

## Thursday, December 05, 2019 4:00 PM GMT

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants ....................................................................................... 3

Presentation ....................................................................................... 4

Question and Answer ....................................................................................... 12

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Samantha Budd Haeberlein**
*Vice President of Clinical*
*Development*

**ATTENDEES**

**Paul Aisen**

**Ron Petersen**

**Sharon Cohen**

**Stephen Salloway**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

BIOGEN INC. SPECIAL CALL | DEC 05, 2019

# Presentation

**Ron Petersen**

Well, good morning, everyone. Thank you so much for coming out to hear what I think is going to be a very enlightening presentation this morning and subsequent discussion. My name is Ron Petersen, and I'm a neurologist and Director of the Alzheimer's Disease Research Center at the Mayo Clinic in Rochester, Minnesota. I am accompanied by an esteemed panel, whom I will introduce in just a moment.

First of all, I'd like to thank the CTAD Leadership Committee for allowing us this presentation this morning. So Paul, Bruno, Jacques and Mike, thanks very much for this because I think this is a pivotal time for us in the field. And I think what we're going to discuss this morning is going to be very, very important. I'd like to introduce our panelists. First, we have Samantha Budd Haeberlein, who's the Vice President for Clinical Development at Biogen, and she will be presenting the data; next is Paul Aisen, who's the Director of the Alzheimer's Treatment Research Institute of University of Southern California, here in San Diego; Sharon Cohen, a behavioral neurologist from Toronto, who is a principal investigator in the studies we will be discussing; and Steve Salloway, who is professor of neurology and psychiatry at Brown University, also a principal investigator at the -- in the studies. So those are our shots. Those are who we are.

Here are our disclosures. And I'll leave those up for you to read yourself. I think this is a pivotal time in the field. Certainly, with regard to the development of Alzheimer's therapeutics, there've been a lot of ups and downs in recent months and years, unfortunately more downs than ups. And in many senses, the aducanumab data, which we will be discussing today sort of characterizes as almost a caricature of the course that we've had in the field. As you know, these studies were motivated based on the Phase Ib study published 5 years ago on the potential efficacy of this compound. Two international studies were launched, very exciting, going along well. And then, in March of this year, both studies were stopped because of a futility analysis. They met futility criteria. Subsequent data were collected, however, in a blinded fashion. And those data were reanalyzed and perhaps a different interpretation of the results of these studies arose. Consequently, the Food and Drug Administration agreed to allow in October of this year, made the statement that Biogen could, in fact, file for possible regulatory approval.

So where we are today is, then how do we get there? What do these data show? And Samantha is going to share with us these data in just a moment. So the flow of this morning is going to be -- I'm going to turn it over to Samantha in just a moment. And you'll see up there that -- and you saw this when you came in, we're going to invite questions from you. So please register your questions on your phone, and we will collate them and try to put them together over the next hour or so to present them to the panel in terms of the ones that are most salient, most relevant to the discussion.

So Samantha will present the data. Then I'll ask our panelists to give their brief impressions of the data, and then we'll open it for questions through the phone. So I think this is going to be very interesting, very exciting, and we really appreciate your opinion and interpretation of these data. Let me turn it over to Samantha.

**Samantha Budd Haeberlein**
*Vice President of Clinical Development*

Thank you, Ron, and good morning, everybody. So as you've heard, my name is Samantha Budd Haeberlein, and I work at Biogen, and I'm going to report this morning the top line data from EMERGE and ENGAGE, which were 2 identically designed studies to evaluate aducanumab in patients with early Alzheimer's disease. And I'm doing this on behalf a passionate and talented team of clinicians and scientists who conducted and led the analysis of these studies, and my co-authors are listed here.

Now I know many of you will be interested to take pictures of the slides. That's much appreciated. But we -- just to let you know that we will post these slides at the end of the presentation on biogen.com. So this will be accessible for you.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**4**

Just to say that I may be making forward-looking statements and that these are subject to certain risks. And I would suggest that if you want details on those, that you look at our SEC filings. One last disclaimer goes without saying that aducanumab is an investigational compound and is not yet approved.

So starting with the design then. As I mentioned, these were 2 identically designed trials. They were 18 months in treatment duration. They enrolled 3,285 patients over the 2 studies in 348 sites in 20 countries, which are listed to the right. The population in these studies, by design, was approximately 80% MCI due to AD and approximately 20% mild Alzheimer's disease dementia. We investigated 2 dosing regimens in these studies, a low and a high dose, and these were randomized 1:1:1 with placebo. The primary endpoint was the mean change from baseline in the CDR sum of boxes at week 78. The prespecified secondaries were MMSE, ADAS-Cog 13 and ADCS-ADL-MCI. And there were some studies that evaluated the effect of aducanumab on disease-related biomarkers.

Now at the time we started these studies, we had learned from the Phase Ib that ARIA was -- the incidence of ARIA was higher in ApoE4 carriers and increased at higher doses, and so the 2 dosing regimens that we studied in this study were stratified by ApoE4 carriage and had a titration phase prior to reaching the dose. I'm showing here the low dose regimen, where ApoE4 carriers were titrated up to 3 milligrams per kilogram and noncarriers were titrated up to 6 milligrams per kilogram. In the low dose, this regimen was maintained throughout the duration of the study.

In the high dose regimen, initially the noncarriers were titrated up to 10-milligram per kilogram, that's the purple line here, and the carriers were titrated up to the lower 6-milligram per kilogram. However, after we learn more about ARIA in our Phase Ib study in the titration cohort that titration could reduce the incidence and severity of ARIA, we amended the protocols such that ApoE4 carriers would also receive 10 milligrams per kilogram in the high dose group. The amendment that I'm going to refer to and is important to understand the context of these results was in Protocol Version #4. And if you were in the high dose group, the maximum number of doses of 10 milligrams that you would receive were 14.

Now I'm going to talk a little bit about the implementation of that amendment because it is important for the interpretation of the data that I'll speak to subsequently. Here are the enrollment curves for the 2 studies, ENGAGE and EMERGE. We started recruitment of ENGAGE 1 month ahead of EMERGE, and ENGAGE remained slightly ahead in enrollment throughout the study. I'm going to build this. We recruited 1,643 subjects in EMERGE and 1,653 subjects in ENGAGE, and there were 2 protocol amendments that had an impact on dose in these 2 studies. First of all, Protocol Version 3, which went into effect in July of 2016, was to enable some subjects who had been dose-suspended due to ARIA to restart their treatment at the same dose or to titrate up to the originally assigned dose. At the time we implemented that amendment, ENGAGE was already 100 patients ahead in enrollment. And then the second protocol amendment, and I've just mentioned it, was Protocol Version #4. That was implemented in March of 2017. And that was to take the ApoE4 carriers up to 10-milligram per kilogram. And at the time that this was implemented, ENGAGE was now ahead by 200 patients in the enrollment.

The population that we included in the futility analysis by design were the approximately first 50% of patients who had the opportunity to complete the week 78 visit, and that cohort of individuals were fully enrolled by June of 2017. You can see the vertical line here, reflecting that. Of note, that is quite close to the initiation of the implementation of Protocol Version 4. The 2 studies completed their enrollment in July of 2018, and it took 35 months to recruit these studies.

I want to go a little bit further into the implementation of the Protocol Version 4. This is a different type of chart that you may not have seen before. What we're looking at is the individual patient consent to Protocol Version 4 in the 20 countries and 348 sites. The countries are listed on the left. And each vertical line is an individual patient timing of consent to Protocol Version #4. You can see that it's a very large undertaking and, overall, it took 18 months for the complete implementation of this protocol version.

You can also see, if you look at the time line at the bottom, that by the time the futility cohort had been -- completed their enrollment, very few subjects will have had the opportunity to consent to Protocol Version 4. Protocol Version 4 had a real impact on the dosing in these dosing regimens, in particular in the high dose group, where the change occurred. I want to draw your attention to the right here, where we are showing the median cumulative dose at week 78. In individuals after the implementation of Protocol

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Version 4, in the purple box, the median cumulative dose -- the actual median cumulative dose was 153 milligrams per kilogram. The target median cumulative dose for those who did receive 10 milligrams would have been 160 milligrams per kilogram, so you can see that it's quite close. However, for the pre-protocol version 4 population, that median cumulative dose was only 116-milligram per kilogram. So let's have a look at the impact of that on individual patient dosing.

I appreciate this plot is really quite complicated. What I'm showing you for every individual in the high-dose regimens for EMERGE and ENGAGE, both their individual dose pattern and each dose that they took. Let me orient you a little bit. The dark blue are doses of 10-milligram per kilogram. The yellow are no-doses. And on the left here, the vertical gray or lilac bars, those are the titration doses through 1-, 3- and 6-milligram per kilogram. Or, indeed, if you see lighter colors to the right, those are individuals who did not receive 10 milligrams or had a dosing interruption.

Generally, looking at this, what you want to have is more solid blue. And in fact, if you look at the numbers at the top here, the reality is that only 29% of patients in EMERGE and 22% of patients in ENGAGE received the full possible 14 doses of 10-milligram per kilogram. The majority of the population had a very heterogeneous dosing image with either not achieving 10-milligram per kilogram or having dose interruptions and suspensions.

Okay. So with that backdrop, where dose is important and a complexity in this study, I'd like to take you through the top line results. First of all, I would like to walk you through the data sets that I'm going to refer to in this -- in the following presentation. First of all, the futility, and which I've already mentioned, is when approximately 50% and -- precisely 49% and 57% of patients had the opportunity to complete the week 78 visit by December 26, 2018. After the futility analysis, a larger dataset became available. And that larger dataset showed a different outcome from futility and formed the basis for the subsequent analysis that we have conducted to understand the difference from futility and the difference between the 2 studies. And in that larger dataset, those additional analysis have been conducted in close consultation with external advisers and with the neurology division of the FDA.

In the larger dataset, we have conducted analysis on the primary analysis, which is the intent-to-treat population and also the opportunity to complete population. I want to point out that in that data set, data after the March 21 announcement of futility were censored to remove the potential of bias introduced by that futility announcement. The p-values for the larger dataset should be considered nominal. Most recently, really very recently, we have had database lock on EMERGE and ENGAGE, and we now have the final dataset. And we have run the prespecified primary and secondary analysis on the final dataset, and today, I will be sharing those data with you. The final dataset is the basis for statistical inference for future regulatory submission, and these are actual rather than nominal p-values.

Last but not least, I mentioned that there were sub-studies, and those are listed here for the disease-related biomarkers. Of note, final dataset and larger dataset, both have the same number of individuals. But the larger dataset has small administrative alterations due to data cleaning, central review and QC. And both data sets, as I mentioned, are censored for the after March 20 announcement.

Okay. So for the remainder of this presentation, the majority of the data I'm going to present are from that larger dataset. There are just 2 slides that I'm going to show from the final dataset, given that these are very recent.

Okay. First then, I would like to present the futility analysis that we announced in March. The futility announced -- the futility assessment was based on conditional power, which is a probability calculation that the primary efficacy endpoint would be statistically significant at final analysis. We had prespecified criteria for the futility analysis and that was that both dose arms of both studies would have a less than 20% conditional power to meet the primary endpoint at final analysis. This prespecified methodology, given that the 2 studies were identical in design, was based on the calculated pooled data from both studies to predict the future behavior of each study. Pooling was used because pooling is believed to be a more powerful statistical methodology on the assumption of homogeneity. Using this methodology, the futility criteria were met and as you've heard, we discontinued the studies. However, at the time of the futility analysis, EMERGE was trending positive, while ENGAGE was not. As I mentioned, subsequently,

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

additional data became available, and we assess this additional data using the prespecfied endpoints that were prespecified prior to the futility analysis.

First, looking at the baseline demographics -- I'm going to take you through each study one by one and I'm going to start with EMERGE. Here are the baseline demographics for EMERGE that are generally balanced across age, gender, and you can see that their age here is, on average, 71 years, which is consistent with that earlier patient population. The studies have approximately 2/3 of patients who have an ApoE4 gene and that is consistent with what we anticipate from the Alzheimer's disease population. As I mentioned, by design, the baseline clinical stage was approximately 80% MCI due to AD and 20% mild Alzheimer's disease dementia. The amyloid PET SUVR baseline in the subgroup were consistent across each of the arms of the study.

Moving then to the baseline disease characteristics, and these were generally well balanced across each of the arms of the study and consistent with the protocol for inclusion. The average baseline MMSC is around 26, again reflective of the intended patient population.

Here's the patient disposition for EMERGE. 1,643 patients were randomized and 1,638 patients were dosed. Between 15% to 24% of patients discontinued treatment across the arms, and while individuals may discontinue treatment, we made great efforts to encourage these individuals to stay in the study and to continue their assessments post discontinuation despite not having treatment, and those additional visits are included in the primary analysis. The number of individuals who withdrew from the study completely were between 7% and 12%, which is a relatively low level of withdrawal from the studies.

I'm showing here then the primary and secondary endpoints from EMERGE and ENGAGE. These were analyzed on the intent-to-treat [ as ] demand, which are all patients, all data. The method was the mixed model for repeated measures. And starting with the high dose then, on the primary endpoint, there was an advantage of aducanumab over placebo of minus 0.40. That's a 23% change from baseline with a p-value nominal of 0.01. On the MMSE, there was a minus 15%; on ADAS-Cog, minus 27%; and on the ADCS-ADL-MCI scale, there was a minus 40% difference from placebo at week 78.

In the low dose group, we can see a numerical advantage of aducanumab over placebo. And this is lower than that seen in the high dose group and did not achieve statistical significance. As I mentioned, we now have the final dataset, and I'm going to show you the same table with that final dataset, which has the full QC and the full data included. And essentially, as you can see, there are very small changes between that larger dataset and the final dataset. Two numerical differences are that the CDR sum of boxes has moved from 23% to 22%. And the MMSE p-value has moved from 0.06 to approximately 0.05. So very, very little difference between those 2 tables.

I'd like now to show you the longitudinal plots of each of these endpoints, starting with the change from baseline in CDR sum of boxes. And each of these charts is going to have exactly the same schema, so I'm going to take you through it a little bit. In gray, what we have are the placebo, which in EMERGE, declines by 1.74 units over the 18 months of the study, which is within the range that we anticipate from this patient population. And then in the blue line, you have the low dose; and in the purple line or magenta, you have the high dose. And you can see that these diverge from placebo over time. At the bottom on each of these plots, you can see the patient numbers that were included in the analysis. And given that we had an early termination of the study, at week 50, we have about 80% of the data that we would have had; and at week 78, we have about 55% of the data. And you're going to see that trend in each of the plots that I'm going to present.

Next is the longitudinal change in MMSE, similar format as before. Here, I'm showing the longitudinal change from baseline in ADAS-Cog 13. And here, the last secondary, I'm showing the longitudinal change from baseline in the ADCS-ADL-MCI.

Moving then to amyloid plaque reduction as measured by a cortical composite in amyloid PET SUVR. This you've seen similarly the -- previously and the colors are similar to the scheme I showed you before. Gray is placebo, blue is low dose, Magenta is high dose. And essentially, you can see a dose and time-dependent reduction in amyloid plaque in EMERGE. And the change from baseline in the high dose group is minus 0.272 units. This is quite similar to what we have seen previously in our PRIME study.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

BIOGEN INC. SPECIAL CALL |  DEC 05, 2019

Additional biomarkers of disease and neurodegeneration, i.e. phospho tau and total tau were measured in the CSF. I want to point out that the sample sizes are at the bottom here, and this sub-study was smaller than we would have liked and quite small for this methodology. But nonetheless, what we're looking at here is in the phospho tau in EMERGE, you see a dose-dependent and statistically significant change in phospho tau. And in total tau, while this is dose proportionate, the reduction from placebo, it did not reach statistical significance. Okay. So that was EMERGE.

Now I'm going to take you through the same set of analysis with ENGAGE. Starting with the baseline demographics, which were well balanced within groups in ENGAGE and across the 2 studies, perhaps with 1 distinction that the baseline disease medications in ENGAGE were slightly higher. Here are the baseline disease characteristics, also well balanced across arms and between the 2 studies. And in fact, the baseline demographics and disease characteristics, while there may be small changes between the 2 studies, those changes are not significant enough to be the basis for the difference between the 2 studies. Here's the patient disposition for ENGAGE -- excuse me a second. It's hot up here.

Here's the patient disposition. 1,653 patients were randomized and 1,647 patients were dosed. Those who discontinued were between 17% to 27%, very similar to EMERGE. And those who withdrew were between 10% and 14%, also quite low, adding to the robustness of the data that we have in the primary analysis and not different from EMERGE.

Going to the primary and secondary endpoints, which were prespecified. In the high-dose group, we do not see an advantage of aducanumab in -- over placebo in CDR sum of boxes. In fact, there was a 2% -- plus 2% change; in MMSE, a plus 3% change; in ADAS-Cog, a minus 12% change, so an advantage over placebo; and in ADCS-ADL-MCI, a minus 18% advantage. In the low-dose group, we do see a small advantage over placebo of a magnitude very similar to the low-dose in EMERGE; however, this also did not achieve statistical significance. So ENGAGE has a different outcome than EMERGE.

Here's the primary data, for completeness, for ENGAGE. And once again, you see very minimal differences between that larger dataset and the final dataset. Here are the longitudinal profiles for each of those endpoints in ENGAGE, starting with CDR sum of boxes, the MMSE, ADAS-Cog 13 and the ADCS-ADL-MCI.

Here is the amyloid PET reduction in ENGAGE, and it looks very similar to what I showed you in EMERGE with a dose and time-dependent reduction in amyloid plaque. However, I would like to point out that in the high-dose group, the delta from placebo was smaller than that we had in EMERGE. And I'm showing that here on the right for comparison. And indeed, in our Phase Ib PRIME study, we have observed and learned that amyloid PET is quite reflective of the dose that somebody achieves. And so with that understanding, we looked at the difference in dosing of these 2 cohorts. And what you can see is that reduction in amyloid PET difference between the 2 studies is also associated with the difference in dose, with ENGAGE having a median cumulative dose at week 78 in this cohort of 126-milligram per kilogram compared to the higher 140-milligram per kilogram in EMERGE. CSF biomarkers were also assessed and we see a statistically significant reduction in phospho tau, but which is not dose proportionate in ENGAGE and has a magnitude very similar to the low dose that we saw in EMERGE. In total tau, there's a numerical difference in low dose, but neither of these had any significance.

We, as I mentioned, did conduct a tau PET sub-study in EMERGE and ENGAGE. I am going to put up this image, which does not come from the study. This is from a previous publication on MK6240, which is the tau PET ligand that we used in this sub-study. The sub-study was conducted at 14 sites in the U.S. and was at the end of the 2 studies and so it's a small sub-study with 36 patients. And we have pooled patients across the 2 studies for the analysis that I'm about to show you. We used MK6240 as a second-generation tau PET ligand, which has a high affinity for neurofibrillary tangles and low off-target binding. We looked at 3 composite regions. I'm going to just build this in the tau PET sub-study and these were prespecified and loosely follow the stages of tau disposition in Alzheimer's disease.

On the left is the medial temporal composite where we see both low and high dose having a statistically significant reduction compared to placebo; and then in the middle, the temporal composite; and on the right, the frontal composite. In both of these, the high dose showed a statistically significant reduction, and the regions comprising those composites are listed below the graph.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

BIOGEN INC. SPECIAL CALL | DEC 05, 2019

I wanted to show something in relation to the medial temporal composite reduction in tau PET. The graph on the right is now showing for those individual patients, the reduction in tau in that composite, and its association with the cumulative dose received by that individual at week 78. And so what we're looking at in gray, placebo; blue, low; magenta, high, is a correlation between the degree of reduction in tau and the dose received.

And finally, on the tau sub-study, I do believe that it's fair to say that we are still learning how best to analyze tau PET. We know that there are regions that will increase over time and then those spread and how best to capture this is not necessarily a set science. So we wanted to show you some representative images from patients. On the left are 3 patients who were in the placebo arm of the studies. And on the right are 3 representative patients, who were in the high dose group in the PET sub-study. And essentially, on the left, what you can see here is that from baseline to follow-up, there is an increase in the tau PET signal in the amygdala hippocampus and some of the temporal regions in these individuals. And on the right, in contrast, from baseline to follow-up you have a reduction in the tau signal, particularly in those temporal regions. I forgot to mention that because this study was terminated, the time duration between baseline and follow-up was actually an average of 14 months for these 36 individuals and ranged from 9 to 20 months.

Going to take you now through the top line safety results from these studies. First of all, a summary of the adverse and serious adverse events, which were well balanced across arms and across studies. I'm now showing you both studies at one time. The AEs that were reported were consistent with those in Alzheimer's disease, with the exception of ARIA. And ARIA was one of the reasons that patients could or would discontinue treatment in the study. And indeed, our protocol under certain conditions mandated that discontinuation. There were 16 deaths across the 2 studies. 1/3 of these were in the placebo arms and none of these deaths were related to an event of ARIA.

If we look at the adverse events with an incidence greater than 10%, ARIA-E is the highest incidence. And the average incidence of ARIA was 25% in the low dose and 35% in the high dose. And the next most common being headache, ARIA-H, microhemorrhage and nasopharyngitis.

Taking a closer look at our adverse event of interest, which is ARIA. What we do see is that ARIA is dose-dependent, particularly in the high -- in the ApoE4 carriers. If you look at EMERGE here, you compare the 29.8% with the 42.5%. And as we've previously reported, ARIA is greater in ApoE4 carriers than it is in noncarriers. You can compare in the high dose the 42.5% versus the 17.9%. The incidence of ARIA in each studies is consistent across the 2 studies. The majority of ARIA was asymptomatic. On average, 75% of patients did not report symptoms during their ARIA event. When patients did report symptoms, those were generally mild, and they're listed here, such as headache, dizziness, visual disturbances, nausea and vomiting. ARIA, as measured by MRI, was transient, and generally resolved within 4 to 16 weeks. And most patients who experienced ARIA were able to continue their investigational treatment. The characteristics of ARIA in EMERGE and ENGAGE are very consistent with what we have reported from the PRIME study.

So last, I have a couple of slides directed at addressing the key question, which is what is different between EMERGE and ENGAGE. Why was the high-dose group in ENGAGE not positive? Well, we have -- on the basis of believing that having consistent high dose as an important factor, we have been looking at trying to understand if there are subjects in ENGAGE who did have a response. And I'm going to put up the definition of the population I referred to earlier, which is, you can define a population based on their having consented to Protocol Version 4. And the advantage of looking at those patients selected by consent to Protocol Version 4 is that in that population then, since everybody is titrated to 10-milligram per kilogram, we would be assessing the treatment effect under the intended dosing regimen and the intended ARIA management. This then would also preserve the representative population, which is the balance of ApoE4 carriers across the placebo and the Protocol Version 4 population. It would also preserve randomization in this population.

And at the bottom here, I've got a graphic describing who's included in each of those populations. And again, if you look at the right, importantly, in the post Protocol Version 4 population, this population did have a higher median cumulative dose of 153-milligram per kilogram. And we've defined them by not just

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**BIOGEN INC. SPECIAL CALL | DEC 05, 2019**

that they have consented to Protocol Version 4, but they did so early enough, early enough such that they then had the opportunity for the full 14 doses of 10 milligrams. That means that the pre-Protocol Version 4 population does include a mixture of individuals, those who never received 10 milligrams and went to 6 milligrams, that's the green bar; those who were ApoE4 noncarriers and went to 10 milligrams; and those who did not consent to Protocol Version 4 early enough.

If we look at those 2 populations using the heat map I showed you before, here is the pre-Protocol Version for population. And again, you see this great heterogeneity and very little solid blue in the heat map. And indeed, only 21% of patients in EMERGE and 15% of patients in ENGAGE in that population received the full possible 14 doses of 10 milligrams. Looking at those in the post Protocol Version 4 population and this is smaller because it's less patients who went all the way out to week 78, you see quite a change. There's much more solid blue, much less heterogeneity. And, indeed, an increase to 51% of patients in EMERGE and 47% of patients in ENGAGE in that population had the full possible 14 doses of 10 milligrams, and that's why they had that higher median cumulative dose.

Okay. I want then to show the efficacy in that subpopulation that we have formed. First of all, on the table here, this is results I've already shown you. This is the overall ITT population of the larger dataset, and we're looking at the primary analysis on the primary endpoint, CDR sum of boxes. If you recall, we had a minus 0.40 in EMERGE and we had a 2% in the wrong direction in ENGAGE. Now in the post-PV4 population at week 78, you have a minus 0.53, which is a 30% change from baseline in CDR sum of boxes in EMERGE; and a 27% change from baseline in ENGAGE. Now this is a subgroup. So we're showing here the 95% confidence intervals rather than p-values. I'm also not showing you the secondaries; however, for the sake of time, because this has been a lot of data, but the secondaries are each consistent with this outcome, that if you select the population in this manner, you do see an effect in ENGAGE, which is equivalent to that in EMERGE. Here is the longitudinal change from baseline in the post-Protocol Version 4 population in both EMERGE and ENGAGE, and you can see the low and high doses diverging over time from placebo.

Finally then. To summarize, the aducanumab Phase III top line results. Following steady termination based on futility, we analyzed a larger dataset. And this showed that in EMERGE, the high dose reduced clinical decline as measured by the primary and secondary endpoints. In ENGAGE, aducanumab did not reduce the clinical decline. In a post-hoc analysis, data from a subset of patients exposed to the high dose of aducanumab support the positive findings of EMERGE. I'm [ going to ] read this. In sub studies of biomarkers, aducanumab showed an effect on those disease-related biomarkers. The most common AEs were ARIA-E and headache. We are currently finalizing the details of a re-dosing study such that patients who were in our previously enrolled trials will have access to aducanumab, all eligible patients previously enrolled in those studies.

Last, but not least, I really must thank an enormous team of individuals and collaborators, but most importantly, the patients and families who dedicated their time and effort to help us with this undertaking. And listed here are the many groups who supported us in this analysis. Thank you.

**Ron Petersen**

Thank you very much, Samantha for a complete -- this is Ron, can you hear me all right? Thanks. Thanks, Samantha, for a very complete recapitulation of the data that were acquired and I think an exposition of what the challenges were and how you've dealt with those questions. So please continue to ask questions for the panel. At this point, I'd like to ask our panelists for their initial impression of the data and it's meaningfulness. Let me start with Paul.

**Paul Aisen**

Thanks, Ron. The data is complex. I think that the futility decision was highly unfortunate and puts us in the situation of interpreting complex data. But clearly, the EMERGE final analysis is positive. The primary analysis of EMERGE is positive, and the analysis of all the key secondaries was consistent and positive. And as important, the biomarker evidence supports the mechanism with significant amyloid reduction leading to tauopathy -- reduction in tauopathy as indicated by both tau PET and CSF phospho tau. I think that is a hugely important result and it represents a major advance for the field.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Now the ENGAGE dataset, the results of the final analysis of ENGAGE are negative. Is this truly discordant? Can we understand this? I think it's challenging, but I believe that as Samantha has presented, when we consider the difference in the timing of enrollment into ENGAGE, relative to the protocol version change and the resulting reduced exposure to the effective high dose of aducanumab, I think the data from ENGAGE and EMERGE can be considered consistent. And so I think we are left with an overall positive interpretation of the data from the aducanumab studies that, therefore, represents a truly major advance for the field.

**Ron Petersen**

Thanks very much, Paul. Let me turn to Sharon. As a clinician, as a PI in this study, what's your impression?

**Sharon Cohen**

Yes. I share with Paul, the fact that the positive results, first time for Alzheimer's disease-modifying agent being positive for primary, all secondary and biomarker endpoints is exhilarating, not just to the scientific community but to our patients as well. And in terms of clinical meaningfulness, I speak to you as a clinician, always patient-facing and forever thinking of myself as in the trenches, the ability to hold on to activities of daily living, if you think about a 40% reduction in decline on the ADCS-MCI-ADL, you're talking about people at a mild stage of disease, still being able to work, bank, shop, travel, enjoy leisure activities for longer, and I submit to you that this matters a lot more to our patients than what score they get on a memory test. And I also believe that results on this functional scale of daily activity translates better to our nonspecialist colleagues in medicine, our family physicians who bear the brunt of Alzheimer's care as well as to the nonmedical community who struggle to understand clinical meaningfulness. And I should add, and who -- sorry, Steve, one more phrase, the community at large feels -- fears Alzheimer's disease and rightly so, largely because of the loss of autonomy that comes with this disease. So slowing loss of autonomy, for me as a clinician, is key.

**Ron Petersen**

Thanks very much, Sharon. I appreciate those comments from the front line. Steve?

**Stephen Salloway**

Yes. Thanks, Ron. I'm excited to be here discussing the aducanumab results at a pivotal turning point in Alzheimer's research. I followed 60 patients on aducanumab, with many on high dose, open-label treatment for up to 5 years. We also follow the patients clinically, so we know the families and how they're doing day-to-day. And I also know a lot about ARIA and how to manage it. The PRIME and ENGAGE studies were very positive experiences at our site for our patients, families and staff, with very low dropout over 5 years. And we salute the valiant patients and their study partners, and I ask you to join me in a round of applause for their important contribution.

Now to the hard question, how do we -- that's easy. Thank you so much to them. How do we make sense of this rich and complicated dataset? And as you heard, 2 important things happened during the trial that makes interpretation difficult. The study was terminated early, and the dose was increased for a large number of participants. We know that dose matters with this drug and probably with this class, and there was substantial dose-related lowering of plaque with positive results across all of the outcomes for one study and not the other, but continued exposure to high dose benefited patients with early Alzheimer's disease. And this fits with our experience. As a group, our staff and I -- my staff and I felt that our patients on open-label treatment were doing better than expected over an extended period of time. And we need to drill down and understand who is most likely to respond. So my feeling is, if sufficiently positive after careful review of the full aducanumab program, this could represent the first treatment that targets a core pathology and open an era of precision medicine for Alzheimer's disease. And since use of the drug will require amyloid testing to determine who's likely to benefit, it could also have the positive effect of leading to approval for amyloid PET, which would definitely benefit our patients. So overall, I think this is a -- Samantha presented a very complicated dataset beautifully and I think this is a milestone achievement for our field.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Ron Petersen**

Thanks very much, Steve. And I appreciate everybody submitting questions.

We've been sort of going through them now and trying to sort them out for groups that seem to coalesce with regards to a particular issue. And a couple are for Samantha with regard to the conduct of the study. Several have asked about protocol version for that amendment seems to be critical in the overall interpretation of these data. What motivated that? Why was that instituted at that point in time?

**Samantha Budd Haeberlein**
*Vice President of Clinical Development*

Thanks, Ron. As I mentioned, when we started the studies, we had stratified the dose such that ApoE4 carriers had the lower dose of 6-milligram per kilogram. But from our PRIME study, we had shown that the greatest benefit was at 10-milligram per kilogram. So going into these studies, we did believe that achieving that higher dose would be important for efficacy, but we did not have sufficient information on ARIA to be confident that we could take ApoE4 carriers up to 10-milligram per kilogram. And it was when we received that data in August of 2016 from the titration cohort in PRIME that, that titration itself did lower the incidence of ARIA in exactly ApoE4 carriers. That gave us the confidence. We discussed that with our DSMB, and they agreed that we could safely take ApoE4 carriers up to 10-milligram per kilogram. And I would not recommend changing dose in the middle of a Phase III trial. But it did turn out to be important for this particular study. And if we had not done so, we would not have the results that we have today. So I do believe that we knew dose was important and we made those changes to get to that dose.

**Ron Petersen**

A question about the international nature of the study and where there regional differences, country differences, et cetera? Can you comment at all on that with regard to the pattern of the results?

**Samantha Budd Haeberlein**
*Vice President of Clinical Development*

We're not commenting on how anything at that level may play out. What's important is that, in totality, as we've been discussing in EMERGE, irrespective of region or other slices of the data, the study is overall a positive study.

**Ron Petersen**

Several questions have come in regarding the clinical responses in biomarker subgroups and I think those are reasonable questions, important questions. But I think the subgroup was sufficiently small for both the CSF and clearly the tau PET to not draw any meaningful conclusions from those. I think the biomarkers were in the expected direction and suggestive but, again, the size of the samples were probably insufficient to really be definitive. A couple of comments have come in. Sharon, you, and Steve have commented on the clinical meaningfulness. Is this a big deal? I mean are these short term, 18-month, but I guess the question would be, if we drop the CDR sum of the boxes by 23% or 22% over 18 months, is that a big deal?

**Sharon Cohen**

It is a big deal. Sorry, Steve. I think you'd agree. Sorry, I was so excited to jump in. I think it is a big deal. Those of us who know this disease well, know what it means to lose yourself slice by slice. And anything you can hang on to and do well is a triumph. And if we're talking about 25% slowing, again, on cognitive tests that's not the measure I love, although I'm pleased that the CDR sum of boxes which includes some functional report as well, the caregiver input. But I really go to the functional scale where we're looking at what people can do. And if I don't have to give up driving and I have an extra year or 2, absolutely, that is meaningful. There's absolutely no doubt. If I can continue to work and support my family, is that

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

meaningful? I think we all know it is. You have to think about this disease as a long slow disease. And if you can slow it, you are winning out. And we started with 80% of people in a prodromal phase of Alzheimer's, meaning, by definition, they were independent in our ADL, maybe a little less efficient in doing everything they used to do, but still independent.

**Stephen Salloway**

Yes, so this is a -- we're looking for a biological foothold against Alzheimer's that we can build on. And so these effects are small, but I think they are meaningful, and I hope they are the beginning of a process where we can -- that we can add to.

**Ron Petersen**

Paul, as a trialist?

**Paul Aisen**

Yes. So I think there are 2 points I would make about the magnitude of the effect. One is that, as Samantha showed, the exposure was highly variable across the population. We're looking at an overall effect size on the outcome measures of 20% to 40% slowing. But I think that we can expect that with more consistent exposure to an effective dose, the response would have been even more favorable. I would also say that all the data including the biomarker data and, I agree, it's small numbers, but I think highly supportive of the hypothesis. All of the data suggests that this is a disease modification, the effect of this drug. And that means that the impact of treatment will continue to accrue with time. The separation from untreated individuals will continue to get larger with length of exposure, that would be the expectation.

**Ron Petersen**

Samantha, with regard to those comments, going back to the PRIME data, again, subsets of subsets of subsets in the PRIME data who remained in the study, but there was divergence, right, of the curves over time, so the longer -- so what Paul is suggesting is that while there may be a -- perhaps a clinically meaningful difference at 18 months, the curves may be diverging such that if we were to follow those people 24, 36 months, it would be more impressive.

**Samantha Budd Haeberlein**
*Vice President of Clinical Development*

Yes, what we saw in the PRIME study, the placebo-controlled period was only 12 months. So we only have the placebo really to look out for the 12-month period; however, those individuals who were in the high dose group of prime, so the 10-milligram per kilogram, they set off on a trajectory of improvement versus placebo. And they maintained that trajectory through the 36- and 48-month time point. So we would hope that the same mechanism of action and trajectory would be apparent in this study too.

**Ron Petersen**

Several questions have come in with, I think, the last comment on your summary slide of where are you going forward now with these participants trying to get them back? What's the plan there? And what kind of data will you be looking for?

**Samantha Budd Haeberlein**
*Vice President of Clinical Development*

It's unfortunate that we terminated the studies, right, so that the patients have -- will have a period of being off of drugs, so that we won't have this continuous period of exposure to aducanumab to assess just the question we were talking about, which is the longer-term benefit of aducanumab over time. But we do want to bring back patients such that we are able to look at, despite that period off drug, what are the longer-term benefits on efficacy and biomarker endpoints. Plus, there are still a number of individuals who were on placebo at the time that we terminated the studies. And so that's about 400 patients. Those

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

individuals will now have the opportunity to have the 10-milligram per kilogram dose and represents a new population exposed to aducanumab, for us to assess those same efficacy and biomarker endpoints.

**Stephen Salloway**

Ron, can I comment on that?

**Ron Petersen**

Sure. Please do, Steve.

**Stephen Salloway**

Well, no -- just a -- to take the temperature of the participants, which is pretty important given their contribution. When we informed them about the re-dosing study, almost to a person, every patient and family is very enthusiastic about returning and being part of that, so they were delighted. So that has not -- we've had many studies that have terminated early recently and we haven't had that response with any other treatment.

**Sharon Cohen**

And this is exactly the case in Toronto at our site as well. People are more than eager to go back on a drug to come for once a month dosing and, inconvenience aside, there's an overwhelming desire to go back on the drug.

**Ron Petersen**

Well, I think we're about out of time here. And again, I want appreciate everybody's schedule for the rest of the meeting, and I want to thank the panel. I want to thank Samantha for a superb presentation of the data. I'm sure it's going to be discussed extensively over the next few days as it should. I want to thank Paul, Sharon, and Steve for their opinions and, again, CTAD for allowing us. I think this, as I was saying earlier, is a pivotal time for the field. And I think it will remain with you to interpret these data and draw conclusions from them as you think appropriate.
So again, thanks to CTAD and thank you very much for coming this morning.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.