**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

NADIA SHASH and AMJAD KHAN,
individually and on behalf of all others
similarly situated,

     Plaintiffs,

     v.

BIOGEN INC., MICHEL VOUNATSOS, and
ALFRED W. SANDROCK, JR.,

     Defendants.

Civil Action No.: 1:21-cv-10479-IT

**Leave to File 30-Page Memorandum**
**Granted on 2/10/2026**

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................3

I.    Plaintiffs Have Not Met Their Heavy Burden of Establishing "Good Cause" to Amend Under Rule 16. ........................................................................................................3

    A.    Plaintiffs Were Not Diligent in Seeking Leave to Amend the SAC.........................4

        1.    Plaintiffs Unduly Delayed in Seeking to Add the AdCom Allegations. ................................................................................................4

        2.    Plaintiffs Unduly Delayed in Seeking to Add the Scienter Allegations. ................................................................................................6

    B.    The PTAC Would Severely Prejudice Defendants and Delay This Proceeding..............................................................................................................9

II.    Plaintiffs' Proposed Amendment Is Futile.................................................................13

    A.    The PTAC Is Subject to the Heightened Pleading Standards of Rule 9(b) and the PSLRA. ...............................................................................................14

    B.    Defendants' Statements About Aducanumab's Efficacy Are Statements of Opinion That This Court Dismissed, Which Was Affirmed on Appeal. ...............14

    C.    The PTAC, Which Largely Seeks to Resuscitate Previously-Dismissed Statements, Does Not Allege That Defendants' Opinions About High-Dose Efficacy Were False or Misleading. ...........................................................18

        1.    The PTAC Does Not Plead Objective Falsity...........................................19

        2.    The PTAC Does Not Plead Subjective Falsity. ........................................20

    D.    The PTAC Does Not Plead a Strong Inference of Scienter. ................................25

    E.    The PTAC Does Not Plead That the AdCom Meeting Satisfies Loss Causation.................................................................................................................27

III.    Plaintiffs Violated Local Rule 15.1(b) and Cannot Amend to Add Dr. Budd Haeberlein. ...............................................................................................................29

IV.    Plaintiffs Cannot Add PolyCon as "Lead Plaintiff." .........................................................30

CONCLUSION..............................................................................................................30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp.* v. *Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)......................................................................................13, 14, 26

*Acosta-Mestre* v. *Hilton Int'l of Puerto Rico, Inc.*,
  156 F.3d 49 (1st Cir. 1998)................................................................................................12

*In re Alkermes Sec. Litig.*,
  2005 WL 2848341 (D. Mass. Oct. 6, 2005)......................................................................27

*Allen* v. *Brown Advisory, LLC*,
  41 F.4th 843 (7th Cir. 2022) ...............................................................................................7

*In re Biogen Inc. Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016) ...................................................................................26

*In re Bisys Sec. Litig.*,
  496 F. Supp. 2d 384 (S.D.N.Y. 2007)..................................................................................4

*United States* v. *Black*,
  625 F.3d 386 (7th Cir. 2010) .............................................................................................18

*In re Boston Sci. Corp. Sec. Litig.*,
  686 F.3d 21 (1st Cir. 2012)................................................................................................14

*In re Boston Sci. Corp. Sec. Litig.*,
  708 F. Supp. 2d 110 (D. Mass. 2010) ...............................................................................28

*CardioNet, LLC* v. *InfoBionic, Inc.*,
  2017 WL 8222366 (D. Mass. Mar. 3, 2017)........................................................................9

*Carreiro* v. *Toter, LLC*,
  2021 WL 3726939 (D. Mass. Aug. 23, 2021) .................................................................8, 13

*In re Cerence S'holder Deriv. Action*,
  2025 WL 1707230 (D. Mass. June 18, 2025)......................................................................13

*Chieftain Royalty Co.* v. *SM Energy Co.*,
  2020 WL 13582565 (W.D. Okla. Aug. 31, 2020) ...............................................................11

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
  519 F. Supp. 3d 99 (E.D.N.Y. 2021) ................................................................................29

*Davis* v. *Lenox Hill Hosp.*,
   2004 WL 1926086 (S.D.N.Y. Aug. 31, 2004) ........................................................................12

*F.L. Roberts & Co., Inc.* v. *Land-Air Express of New England, Ltd*,
   2019 WL 11624581 (D. Mass. Feb. 4, 2019) ..........................................................................8

*Fire & Police Pension Ass'n of Col.* v. *Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015)....................................................................................................4

*Ford* v. *Townsends of Arkansas, Inc.*,
   2009 WL 10676832 (E.D. Ark. Oct. 21, 2009) .....................................................................11

*Galenski Farm* v. *Nutrien Ag Sols., Inc.*,
   2022 WL 19977087 (D. Mass. Nov. 21, 2022) ........................................................................6

*Gonzalez* v. *Diamond Resorts Int'l Mktg., Inc.*,
   2020 WL 4925702 (D. Nev. Aug. 21, 2020) ..........................................................................11

*Great Lakes Ins. SE* v. *Andersson*,
   338 F.R.D. 424 (D. Mass. 2021)..............................................................................................3

*Hagerty* v. *Cyberonics, Inc.*,
   146 F. Supp. 3d 337 (D. Mass. 2015) ......................................................................................4

*Harrison* v. *Forde*,
   2022 WL 1572247 (S.D. Ala. May 18, 2022) ..........................................................................8

*Kay* v. *N.H. Democratic Party*,
   821 F.2d 31 (1st Cir. 1987).................................................................................................5, 6

*United States* v. *Kayser-Roth Corp.*,
   103 F. Supp. 2d 74 (D.R.I. 2000) ..........................................................................................18

*Klunder* v. *Brown Univ.*,
   778 F.3d 24 (1st Cir. 2015)....................................................................................................13

*LaFlamme* v. *Carpenters Loc. No. 370 Pension Plan*,
   220 F.R.D. 181 (N.D.N.Y. 2003) ............................................................................................7

*Lennar Ne. Props., Inc.* v. *Barton Partners Architects Planners Inc.*,
   2021 WL 1195629 (D. Mass. Mar. 30, 2021).........................................................................13

*Mark Breiner DDS, LLC* v. *BTL Indus. Inc.*,
   2026 WL 114405 (D. Mass. Jan. 15, 2026) ...........................................................................29

*Martins* v. *3PD, Inc.*,
   2013 WL 1320454 (D. Mass. Mar. 28, 2013)..........................................................................29

*Metzler Asset Mgmt. GmbH* v. *Kingsley*,
    928 F.3d 151 (1st Cir. 2019) ................................................................14, 25

*Miceli* v. *JetBlue Airways Corp.*,
    914 F.3d 73 (1st Cir. 2019) ............................................................................3

*In re Milk Prods. Antitrust Litig.*,
    195 F.3d 430 (8th Cir. 1999) .......................................................................10

*Miller Inv. Tr.* v. *Morgan Stanley & Co., LLC*,
    308 F. Supp. 3d 411 (D. Mass. 2018) ....................................................27, 29

*Mulder* v. *Kohl's Dep't Stores, Inc.*,
    2016 WL 393215 (D. Mass. Feb. 1, 2016) .....................................................4

*MW Gestion* v. *1Globe Cap. LLC*,
    349 F.R.D. 41 (D. Mass. 2025) ....................................................................12

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .....................................................................................18

*Parker Waichman LLP* v. *Salas LC*,
    332 F.R.D. 11 (D.P.R. 2019) ..........................................................................8

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) .........................................................................18

*In re Petrobras Sec. Litig.*,
    2016 WL 3144395 (S.D.N.Y. May 5, 2016) .............................................4, 12

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) ..........................................................................19

*S. Grouts & Mortars, Inc.* v. *3M Co.*,
    575 F.3d 1235 (11th Cir. 2009) ......................................................................7

*Sargent* v. *NorDx*,
    2022 WL 17738711 (D. Me. Dec. 16, 2022) ..................................................8

*Scognamillo* v. *Credit Suisse First Bos., LLC*,
    587 F. Supp. 2d 1149 (N.D. Cal. 2008) ........................................................13

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund* v. *CVS Pharm., Inc.*,
    305 F. Supp. 3d 337 (D.R.I. 2018)..................................................................8

*Sosa* v. *Mass. Dep't of Correction*,
    654 F. Supp. 3d 33 (D. Mass. 2023) .............................................................29

*Steir* v. *Girl Scouts of the USA*,
   383 F.3d 7 (1st Cir. 2004) ............................................................................5, 9

*Stepanischen* v. *Merchs. Despatch Transp. Corp.*,
   722 F.2d 922 (1st Cir. 1983) ...........................................................................12

*Sustainable Forest, L.L.C.* v. *Qwest Commc'ns Int'l, Inc.*,
   2006 WL 8422988 (D.S.C. Feb. 23, 2006) ......................................................11

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .........................................................................................25

*In re The First Marblehead Corp. Sec. Litig.*,
   639 F. Supp. 2d 145 (D. Mass. 2009) ..............................................................29

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .............................................................................19

*Town of Lexington* v. *Pharmacia Corp.*,
   2015 WL 1321448 (D. Mass. Mar. 24, 2015) ..............................................10, 11

*Tracey* v. *Mass. Inst. of Tech.*,
   332 F.R.D. 50 (D. Mass. 2019) .......................................................................7, 8

*Trans-Spec Truck Serv., Inc.* v. *Caterpillar Inc.*,
   524 F.3d 315 (1st Cir. 2008) .............................................................................6

*Turner* v. *Liberty Mut. Ret. Benefit Plan*,
   350 F.R.D. 1 (D. Mass. 2025) ..........................................................................11

*Unicomp, Inc.* v. *Elementis Pigments, Inc.*,
   1999 WL 1995401 (D. Me. Feb. 16, 1999) ........................................................5

*In re Urethane Antitrust Litig.*,
   2007 WL 1424327 (D. Kan. May 14, 2007) ......................................................11

*Westfall* v. *Kendle Int'l, CPU, LLC*,
   2007 WL 486606 (N.D. W. Va. Feb. 15, 2007) .................................................11

*Young* v. *Lepone*,
   305 F.3d 1 (1st Cir. 2002) ................................................................................13

## Statutes and Rules

15 U.S.C. § 78u-4 ...................................................................................... *passim*

Fed. R. Civ. P. 9 .................................................................................13, 14, 27

Fed. R. Civ. P. 16 ...................................................................................... *passim*

Defendants Biogen Inc. ("Biogen"), Michel Vounatsos and Alfred W. Sandrock, Jr., M.D., Ph.D. (together, "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Motion for Leave to File Third Amended Complaint (Doc. No. 230, the "Motion").

## PRELIMINARY STATEMENT

The Court should deny Plaintiffs' Motion because it fails to establish "good cause" to amend and because the proposed amendment would be futile.  After more than five years of litigation, and four months before the scheduled close of fact discovery, Plaintiffs have moved to file a Proposed Third Amended Complaint ("PTAC").  The PTAC seeks to reinstate numerous alleged misstatements that this Court and the First Circuit rejected years ago, as well as a second alleged corrective disclosure that this Court rejected nine months ago—the November 6, 2020 Advisory Committee ("AdCom") meeting.  Plaintiffs argue that amendment is justified because they purportedly only recently obtained an "accretion of facts" through document discovery that plugs the gaps in the Second Amended Complaint ("SAC").  But Plaintiffs' Motion comes nowhere near establishing good cause to amend under Rule 16—which requires Plaintiffs to show that they acted diligently and that amendment would not prejudice Defendants.  Further,  even if Plaintiffs could establish good cause, amendment would be futile because the proposed allegations—based on cherry-picked snippets cited from 101 discovery documents, many of which are mischaracterized on their face—do not plead that any Defendant disbelieved their public statements about the efficacy of high-dose aducanumab.

Plaintiffs' Motion should be denied for three independent reasons:

*First*, as Plaintiffs concede, they filed their Motion *one year* after the deadline in the Scheduling Order, and thus must satisfy the "heavy burden" of showing that they acted diligently and that their amendment will not prejudice Defendants.  But Plaintiffs plainly were not diligent:

(1) <u>AdCom Amendment</u>.  The PTAC seeks to supplement Plaintiffs' loss causation theory

1

by reinstating the November 6, 2020 AdCom meeting as a second corrective disclosure. Defendants first moved to dismiss for failure to plead loss causation for the AdCom more than four years ago—putting Plaintiffs on notice of the SAC's deficiency. And this Court addressed that precise issue more than nine months ago when it held, in its Rule 12(c) ruling, that the AdCom was *not* a loss-causing corrective disclosure because it did not present new corrective information. Plaintiffs do not even attempt to justify their delay. Nor can they: the AdCom was public, occurred five years ago, and Plaintiffs had no basis to wait.

(2) <u>Previously Dismissed Statements</u>. The other significant proposed amendment is the reassertion of fraud claims for alleged misstatements made between October 2019 and April 2020, all but two of which were previously dismissed. Plaintiffs were not diligent in seeking this amendment either. The majority of the PTAC's cited documents were produced in September 2025, and Plaintiffs admit that they began drafting the PTAC that month. But Plaintiffs did not file this Motion until January 2026, on the express basis that they waited to accumulate more facts before seeking leave. Courts do not allow such a wait-and-see approach. Plaintiffs' Motion identifies only two newly obtained documents produced in December 2025—but Plaintiffs had already told the Court of their intent to amend by then, so plainly they did not need those documents. Diligence requires more.

*Second*, amendment will prejudice Defendants. The proposed amendment would extend the class period by nine months, add 10 alleged misstatements, and add a second alleged corrective disclosure, thus fundamentally changing Plaintiffs' theories of reliance and price impact. As Plaintiffs previously admitted, at minimum, class certification would have to be completely redone, including briefing, expert reports, and at least five full-day depositions, all at enormous expense. This is the definition of prejudice, and courts deny amendment in such circumstances.

*Third*, even if Plaintiffs could show good cause to amend one year after the deadline, the Motion should be denied because amendment would be futile. This Court previously held that Defendants' opinions about aducanumab's efficacy were not actionable both because they were not adequately pleaded as *objectively false*—meaning not reasonably supported by data—or *subjectively false*—meaning disbelieved. Here, as both this Court and the First Circuit recognized, the FDA endorsed Biogen's interpretation of the clinical trial data. *See* Sept. 12, 2022 Mem. & Order, Doc. No. 76 at 25; First Cir. Op., Doc. No. 83 at 28. That alone renders the PTAC futile.

With respect to subjective falsity, Plaintiffs admit that they received over 250,000 documents but cannot identify a "single smoking gun document." And none of the documents cited in the PTAC show that Defendants did not subjectively believe that high-dose aducanumab slowed decline in Alzheimer's disease patients. Plaintiffs' failure to plead subjective falsity—as well as scienter and loss causation—renders amendment futile.

In sum, as set out more fully below, this Court and the First Circuit settled the proper scope of this litigation years ago. The PTAC comes too late, requires too many do-overs to Defendants' detriment, and does not fix the defects in the SAC. The Motion should be denied.

### ARGUMENT

I.    **PLAINTIFFS HAVE NOT MET THEIR HEAVY BURDEN OF ESTABLISHING "GOOD CAUSE" TO AMEND UNDER RULE 16.**

As Plaintiffs concede, Doc. No. 230 at 7, the January 9, 2025 deadline to move to amend has passed, Scheduling Order, Doc. No. 166, and their Motion is governed by the "good cause" standard of Federal Rule 16(b)(4). *Miceli* v. *JetBlue Airways Corp.*, 914 F.3d 73, 86 (1st Cir. 2019).[1] This standard places a "heavy burden" on the movant. *Great Lakes Ins. SE* v. *Andersson*,

---

[1] Unless otherwise noted, emphases are added and internal citations and quotation marks omitted.

338 F.R.D. 424, 427 (D. Mass. 2021).  In assessing "good cause," the First Circuit "focuses on both" (i) "the diligence (or lack thereof) of the moving party" and (ii) the "prejudice, if any, to the nonmovant."  *Id*.  Plaintiffs' undue delay in bringing this Motion, and the severe prejudice Defendants will face if it is granted, both require that the Motion be denied.[2]

### A.    Plaintiffs Were Not Diligent in Seeking Leave to Amend the SAC.

Plaintiffs' proposed amendments focus on two significant changes, allegations: (1) purportedly supporting the pleading of loss causation for a second alleged corrective disclosure, the November 6, 2020 AdCom meeting (the "AdCom Allegations") (*see* PTAC Redline, Doc. No. 229-3 ¶¶ 2, 291-371); and (2) seeking to supplement the SAC's scienter allegations to reinstate or add 10 alleged misstatements, and lengthen the putative class period by nine months (the "Scienter Allegations") (*id.* ¶¶ 130-290).  Doc. No. 230 at 5.  Both proposed changes are inexcusably late.

### 1.    Plaintiffs Unduly Delayed in Seeking to Add the AdCom Allegations.

Plaintiffs' diligence is measured from the time a pleading deficiency is flagged in a motion to dismiss.  *See Fire & Police Pension Ass'n of Col.* v. *Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015) (affirming denial because "plaintiffs were put on notice of the deficiencies in the complaint by the motion to dismiss" and "[i]f they had something relevant to add, they should have moved to add it then"); *Mulder* v. *Kohl's Dep't Stores, Inc.*, 2016 WL 393215, at *9 (D. Mass. Feb. 1, 2016), *aff'd*, 865 F.3d 17 (1st Cir. 2017) (same); *Hagerty* v. *Cyberonics, Inc.*, 146 F. Supp. 3d 337, 344 (D. Mass. 2015), *aff'd*, 844 F.3d 26 (1st Cir. 2016) (same).  Here, more than ***four years*** have

---

[2] Plaintiffs cite various cases for the uncontroversial proposition that the PSLRA does not categorically prohibit moving to amend based on new evidence.  Doc. No. 230 at 5-6.  As several courts have observed, however, the PSLRA shifted the burden to plaintiffs to acquire particularized knowledge of a party's scienter *prior* to obtaining discovery."  *In re Bisys Sec. Litig.*, 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007); *see also In re Petrobras Sec. Litig.*, 2016 WL 3144395, at *3 (S.D.N.Y. May 5, 2016) (denying leave to amend where "granting plaintiffs' request would amount to an end run around the PSLRA [as] Plaintiffs would receive the benefits of discovery without adequately pleading scienter before discovery began").

passed since Defendants argued in their motion to dismiss in September 2021 that allegations about the AdCom meeting and vote (and the subsequent stock drop) do not plead loss causation because they did not reveal new, corrective information or represent the materialization of an undisclosed risk. Defs.' MTD Br., Doc. No. 61 at 33-34. Then, in March 2024, Defendants again argued in their 12(c) briefing that the AdCom was not a corrective disclosure. Defs.' 12(c) Reply, Doc. No. 136 at 6, 14-18. On March 27, 2025, this Court held that Plaintiffs had not "alleged that the Advisory Committee vote was a corrective disclosure providing new information to the market." Mar. 27, 2025 Mem. & Order, Doc. No. 163 at 16-18.

This delay—more than ***four years*** since Defendants raised the AdCom loss causation issue, and ***nine months*** since the Court addressed the issue—is categorically too long to constitute diligence under Rule 16. *See Kay* v. *N.H. Democratic Party*, 821 F.2d 31, 34 (1st Cir. 1987) (undue delay where plaintiff moved to amend three months after claims were dismissed); *Unicomp, Inc.* v. *Elementis Pigments, Inc.*, 1999 WL 1995401, at *2 (D. Me. Feb. 16, 1999) (undue delay where plaintiff "delayed filing its motion for . . . two and a half months" after it "possessed the majority of the relevant information"); *infra* 6-7. Such delay is "sufficient reason for the court to withhold permission to amend." *Steir* v. *Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).

Undue delay is also established because Plaintiffs have had access to the AdCom Allegations since 2020. The AdCom Allegations are drawn from public disclosures made at the November 6 AdCom meeting. *See* Doc. No. 229-3 ¶¶ 360-64. This information was public before Plaintiffs filed the SAC on August 4, 2021; in fact, the SAC contains numerous references to materials and discussions shared during the November 6 AdCom meeting. *E.g.*, SAC ¶¶ 16, 282-93, 305-07. "[M]any courts have recognized" that where, as here, a "party knows or is in possession of the information that forms the basis of the later motion to amend at the outset of the

5

litigation, the party is *presumptively not diligent*." *Galenski Farm* v. *Nutrien Ag Sols., Inc.*, 2022 WL 19977087, at *3 (D. Mass. Nov. 21, 2022) (cleaned up) (collecting cases); *accord Trans-Spec Truck Serv., Inc.* v. *Caterpillar Inc.*, 524 F.3d 315, 327 n.12 (1st Cir. 2008). This is an alternative ground to deny Plaintiffs' request to add the AdCom Allegations.

Plaintiffs provide no justification for their four-plus-year delay. They merely offer the conclusory statement that "[t]he relevance of the additional information was not clear until Defendants' production." Doc. No. 230 at 5. But they fail to specify what "additional information" or "production" they are referring to, or how either demonstrated the "relevance" of the new AdCom Allegations. This argument should be rejected. *See Kay*, 821 F.2d at 34 (rejecting plaintiffs' explanation "that facts had been elicited during discovery that threw new light on matters"). In any event, since the loss causation inquiry focuses on the release of *public* information that is allegedly corrective of false statements, and not on internal communications produced in discovery, Plaintiffs' argument makes no sense.

2.    Plaintiffs Unduly Delayed in Seeking to Add the Scienter Allegations.

Plaintiffs separately seek to amend to add "a new section" on scienter and 10 additional alleged misstatements—eight of which were previously dismissed by this Court and affirmed. Doc. No. 230 at 5, 9-10, 15-17; Doc. No. 229-3 ¶¶ 130-290. Plaintiffs argue that there is good cause for their delay because the Scienter Allegations are "based on the documents Defendants produced in discovery." Doc. No. 230 at 5. Here too, Plaintiffs have not acted with diligence.

As a threshold point, Plaintiffs justify their failure to move before the Scheduling Order deadline by arguing they "took discovery expeditiously once they were allowed to." *Id.* at 15. But as the Court recognized during the December 17, 2025 discovery conference, "[i]f [Plaintiffs] wanted to amend based on what [they] were going to get on discovery, maybe [they] should have pushed hard to get it earlier; and if [they] didn't like [Defendants'] pace, [Plaintiffs] should have

come to [the Court] earlier." Soloway Decl., Ex. 1, Doc. No. 238-1 at 16:6-10. Plaintiffs, however, raised no issues with Defendants' productions with the Court. This counsels against a finding of good cause. *See Allen* v. *Brown Advisory, LLC,* 41 F.4th 843, 853 (7th Cir. 2022) ("[A] plaintiff is not diligent when he in silence watches a deadline pass even though he has good reason to act or seek an extension of the deadline."); *LaFlamme* v. *Carpenters Loc. No. 370 Pension Plan*, 220 F.R.D. 181, 186 (N.D.N.Y. 2003), *aff'd*, 127 F. App'x 3 (2d Cir. 2005) (rejecting similar excuse where plaintiff never "asked for an extension of the amending deadline").

Furthermore, Plaintiffs have not acted diligently since receiving document discovery. Defendants substantially completed their document productions by the Court-ordered deadline, September 26, 2025. Soloway Decl., Doc. No. 238 ¶ 2.[3] Of the 101 produced documents referenced in the PTAC, 61 were produced by the September 26 deadline, and another 22 were produced by the end of October. *Id.* ¶ 3. Plaintiffs concede that in September, "Plaintiffs promptly evaluated whether to amend . . . ***and drafted the PTAC***." Doc. No. 230 at 15. On October 21, 2025, Plaintiffs suggested an intent to amend in an email to Defendants. Soloway Decl., Ex. 2, Doc. No. 238-2 at 1. Defendants promptly asked Plaintiffs to share a copy of any proposed amended pleading. *Id.* But Plaintiffs then waited *several months*—until January 2026—to seek leave to amend. That is too long. *See supra* 5; *Tracey* v. *Mass. Inst. of Tech.*, 332 F.R.D. 50, 52 (D. Mass. 2019) (no good cause where plaintiffs "possess[ed] [] most of the documents and deposition testimony needed" but waited four more months to file a motion to amend); *Allen*, 41 F.4th at 853 (affirming denial of leave to amend despite plaintiff arguing "he needed [three months] to review and understand the documents before moving"); *S. Grouts & Mortars, Inc.* v. *3M Co.*,

---

[3] Plaintiffs note that Defendants productions are "not complete," Doc. No. 230 at 4, but the additional productions, following substantial completion, were precipitated by Plaintiffs' additional requests for search terms and custodians. *See* Soloway Decl. ¶ 4.

575 F.3d 1235, 1242 (11th Cir. 2009) ("over a month" too long); *Harrison* v. *Forde*, 2022 WL 1572247, at *3 (S.D. Ala. May 18, 2022) (three months too long).

Plaintiffs defend their delay by arguing that "[c]ourts do not want plaintiffs to run to court the minute they have some probative evidence for a claim." Doc. No. 230 at 16-17. But the law is clear that when plaintiffs are "aware of *enough colorable evidence* to assert their purported claim," they are not diligent under Rule 16 if they "wait[] several more months before filing their motion to amend." *Tracey*, 332 F.R.D. at 52. Plaintiffs' cases involved a shorter delay—and correspondingly more diligence—than Plaintiffs exhibited here.[4]

Plaintiffs also attempt to justify their delay by citing "the accretion of facts from documents drawn throughout Defendants' production[s]." Doc. No. 230 at 16-17. But, tellingly, Plaintiffs do not identify a single document produced after September 2025 that they needed to seek leave to amend. They cite two documents produced on December 5, Doc. No. 230 at 17, but they announced their intent to seek leave to amend in a Court filing earlier that same day—*before these documents were even produced*. *See* Response to Court Order, Doc. No. 219 at 1; Soloway Decl., Ex. 3, Doc. No. 238-3 (showing document filed at 6:30 p.m. ET); Soloway Decl., Ex. 4, Doc. No. 238-4 (showing documents produced at 8:01 p.m. ET).

---

[4] *See Carreiro* v. *Toter, LLC*, 2021 WL 3726939, at *3 (D. Mass. Aug. 23, 2021) ("month-and-a-half" delay after learning identity of proper party); *Sargent* v. *NorDx*, 2022 WL 17738711, at *6-7 (D. Me. Dec. 16, 2022) (one-month delay after learning new evidence, discounting six months that matter was stayed); *Parker Waichman LLP* v. *Salas LC*, 332 F.R.D. 11, 13 (D.P.R. 2019) (motion to amend crossclaim filed "twelve days" after receiving relevant agreements); *F.L. Roberts & Co., Inc.* v. *Land-Air Express of New England, Ltd*, 2019 WL 11624581, at *1-4 (D. Mass. Feb. 4, 2019) (permitting "modest" amendment that would not cause substantial delay, sought two months after learning new information in deposition). Plaintiffs' one case with a comparable delay, *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund* v. *CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 344 (D.R.I. 2018), is distinguishable because there, unlike here, the proposed amendment would not prejudice defendants. *See infra* 9-12.

### B. The PTAC Would Severely Prejudice Defendants and Delay This Proceeding.

Plaintiffs' Motion should be denied for the independent reason that allowing Plaintiffs' amendments at this stage would severely prejudice Defendants. A proposed amendment is prejudicial "where it injects a new theory or relief into the litigation." *Steir*, 383 F.3d at 12. As this Court explained, "motions to amend whose timing prejudices the opposing party by requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy" are "particularly disfavored." *CardioNet, LLC* v. *InfoBionic, Inc.*, 2017 WL 8222366, at *1 (D. Mass. Mar. 3, 2017) (Talwani, J.). Here, permitting amendment would prejudice Defendants and delay this litigation.

*First*, and most egregiously, permitting the PTAC would require the parties to redo class certification—including fact development and briefing—for a third time. Plaintiffs moved for class certification in June 2025, on behalf of a proposed class of investors who purchased stock from July 22, 2020 to November 6, 2020. The briefing spanned five months and involved the exchange of approximately 4,000 pages of documents, including four briefs, four expert reports, and 48 additional exhibits. *See* Doc. Nos. 171-73, 179-210, 216-17. The parties also took five full-day depositions—two experts and three proposed class representatives. The parties' briefing, expert reports, and depositions focused on the sole remaining alleged misstatement on July 22, 2020—including its price impact (or lack thereof)—and the sole remaining alleged corrective disclosure on November 4, 2020. *See, e.g.*, Class Cert. Br., Doc. No. 228 at 10-33; Opp. to Class Cert., Doc. No. 235 at 10-33. In December 2025, the Court ordered the parties to submit reorganized class certification briefing, which is nearly completed. Dec. 8, 2025 Order, Doc. No. 220. The expert costs and attorneys' fees have been substantial. Soloway Decl. ¶ 5.

The PTAC proposes to extend the start date of the class period by nine months and to add

9

10 alleged misstatements and an additional corrective disclosure. Doc. No. 229-3 ¶¶ 2, 269-371. This would require the parties and their experts to evaluate the price impact of the new alleged misstatements and corrective disclosure. The price impact analyses would completely change: whereas Plaintiffs currently pursue an inflation maintenance theory because the price of Biogen stock did not rise on July 22 (the start of the proposed class period), the PTAC pursues a front-end price impact theory (alleging that Biogen's share price *rose* following the first alleged misstatement). The parties' experts would have to issue entirely new reports and be re-deposed. Defendants would have to retake each named plaintiff's deposition to assess their understanding of, and reactions to, the new challenged statements and the impacts on their investment decisions. And class certification briefs would have to be re-written. The time and costs would be substantial.

Plaintiffs argue that the impact of amendment on class certification would be "limited" and "not require any additional deposition discovery." Doc. No. 230 at 18. They are wrong. They are also disingenuous, as they previously told the Court that, if their amendment were allowed, "the existing expert reports and evidentiary record will no longer be sufficient or complete because (i) the class period will begin nine months earlier, and (ii) the price impact of the new misstatements must be analyzed." Doc. No. 219 at 2.[5]

Courts recognize that forcing defendants to redo class certification is prejudicial and thus routinely deny leave to amend where class certification briefing and attendant discovery are well underway or completed. *See, e.g.*, *Town of Lexington* v. *Pharmacia Corp.*, 2015 WL 1321448, at *5 (D. Mass. Mar. 24, 2015) (denying leave under Rule 16 where class certification briefing was

---

[5] Plaintiffs argue that Defendants tried to "expand discovery to affect class certification" by serving recent discovery requests that "are only relevant to typicality and adequacy." Doc. No. 230 at 20. But the cited requests bear on merits issues and the pending motion to substitute a new plaintiff, not only "typicality and adequacy," and Defendants have not sought to reopen class certification.

10

complete and "[plaintiff's] substantial change to the class definition and its proposed class issues would likely require additional discovery and a postponement."); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 438 (8th Cir. 1999) (no good cause to amend because "requir[ing] reopening class discovery" is "precisely the sort of prejudice that justifies denial of a motion to amend"); *Gonzalez* v. *Diamond Resorts Int'l Mktg., Inc.*, 2020 WL 4925702, at *7 (D. Nev. Aug. 21, 2020) (finding "prejudice warrants denial of leave to amend" where "class-related discovery and class-certification motion practice [were] finished") (collecting cases).[6]

Defendants would be prejudiced not only by the additional costs of redoing class certification, but also because the proposed amendment fundamentally alters Plaintiffs' theory of reliance. Plaintiffs invoke the presumption of reliance supported by the efficient market theory. Doc. No. 58 ¶ 355; Doc. No. 228 at 10-11. Defendants have developed an extensive record rebutting Plaintiffs' inflation maintenance theory of price impact and would be forced to develop an entirely new price impact argument and class certification defense if the PTAC is permitted. That is prejudicial. *See Town of Lexington*, 2015 WL 1321448, at *4 ("Requiring [] Defendants to adapt their defensive posture" to plaintiffs' new facts and theories "this far into the proceedings unduly prejudices [] Defendants"); *Turner* v. *Liberty Mut. Ret. Benefit Plan*, 350 F.R.D. 1, 8 (D.

---

[6] *Accord Ford* v. *Townsends of Arkansas, Inc.*, 2009 WL 10676832, at *3 (E.D. Ark. Oct. 21, 2009) (denying amendment under Rule 16 that would "result in necessarily reopening class discovery and further delay"); *Chieftain Royalty Co.* v. *SM Energy Co.*, 2020 WL 13582565, at *3 (W.D. Okla. Aug. 31, 2020) (amendment "would be unduly prejudicial to Defendant because certification discovery and briefing on Plaintiff's motion for class certification have been completed"); *Westfall* v. *Kendle Int'l, CPU, LLC*, 2007 WL 486606, at *5 (N.D. W. Va. Feb. 15, 2007) ("[T]he expense and burden of briefing a response to class certification again[] is unduly prejudicial to the defendants."); *Sustainable Forest, L.L.C.* v. *Qwest Commc'ns Int'l, Inc.*, 2006 WL 8422988, at *5 (D.S.C. Feb. 23, 2006) (denying leave to amend because defendant "would be prejudiced by having to brief the class certification issues for a third time"); *In re Urethane Antitrust Litig.*, 2007 WL 1424327, at *4 (D. Kan. May 14, 2007) (finding prejudice under Rule 16 where "[g]ranting the motion would require the court to reopen class discovery and revisit class certification issues, a process which lasted more than a year the first time around").

Mass. 2025) ("Even if plaintiff is correct that the incremental discovery would not be extensive, amendment would nevertheless be unfairly prejudicial, as it would likely meaningfully affect defendants' litigation strategy."); *Davis* v. *Lenox Hill Hosp.*, 2004 WL 1926086, at \*4 (S.D.N.Y. Aug. 31, 2004) (denying leave where plaintiff moved after close of class discovery and "proposed amendments would change the nature of the claims . . . and would require the defendants to expend significant additional resources"); *Petrobras*, 2016 WL 3144395, at \*1 (denying amendment to revive securities fraud claims that would change the "calculation of damages," even where plaintiffs said they "would not seek any further fact discovery").[7]

*Second*, the PTAC is prejudicial because it would cause—and has caused—delay. Although document discovery is nearly complete, depositions of fact witnesses and experts cannot move forward until the scope of the case is clear. For that reason, the Court has already stayed depositions "until the issue of the proposed amended complaint is resolved." Doc. No. 222. If Plaintiffs' Motion is granted, the case management schedule will need to be amended, including additional time for class certification, which may cause substantial *additional* delay.

Courts regularly reject amendments that are likely to delay discovery, postpone deadlines, or require additional motion practice. *See Acosta-Mestre* v. *Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49, 52 (1st Cir. 1998) (affirming denial of amendment sought "near the close of discovery" that "would have resulted in at least an additional four months of discovery"); *Stepanischen* v. *Merchs. Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983) (affirming denial of

---

[7] Plaintiffs claim that their proposed "amendment does not introduce new legal theories," Doc. No. 230 at 18, but most of the alleged misstatements were dismissed and affirmed on appeal because the First Circuit found that the July 22 Statement was different and "stands out from the rest." Doc. No. 83 at 16-20. Likewise, the new corrective disclosure appears to add a new "materialization of an undisclosed risk" theory of loss causation. Doc. No. 229-3 ¶ 364. The proposed expansion of the putative class period, and resultant inclusion of new class members and stock price movement, is designed to increase and alter Plaintiffs' theory of damages.

amendment where "the addition of new claims would likely have required additional discovery and caused further delay."); *MW Gestion* v. *1Globe Cap. LLC*, 349 F.R.D. 41, 45 (D. Mass. 2025) (denying leave to amend because "delays, inefficiencies, and wasted work . . . impose unnecessary costs and inefficiencies and place a burden on both the courts and party opponents"); *Scognamillo* v. *Credit Suisse First Bos., LLC*, 587 F. Supp. 2d 1149, 1156 (N.D. Cal. 2008) (finding that "Defendants will suffer severe prejudice if Plaintiffs are allowed to shift the focus of the case five years after the suit was first filed and three months before the current discovery cutoff").[8]

## II.    PLAINTIFFS' PROPOSED AMENDMENT IS FUTILE.

Leave to amend must be denied when the proposed amendment would be futile because it fails to state a claim. *ACA Fin. Guar. Corp.* v. *Advest, Inc.*, 512 F.3d 46, 56 (1st Cir. 2008). The PTAC seeks to "add misstatements" that "were previously dismissed" in the SAC, Doc. No. 219 at 1, but fails to cure fundamental pleading failures identified by this Court and affirmed by the First Circuit. The PTAC also attempts to resuscitate the November 6, 2020 AdCom as a second corrective disclosure, but, again, offers no basis to reverse the Court's prior holding on this issue.[9]

---

[8] Plaintiffs' cases on prejudice involve different facts. *Klunder* v. *Brown University* concerned a defendant who added a single additional defense to its answer. 778 F.3d 24, 35 (1st Cir. 2015). In *Carreiro* v. *Toter, LLC*, plaintiffs sought to swap out a party "promptly" after realizing they had sued the wrong party and did "not seek to argue a different set of facts." 2021 WL 3726939, at *4 (D. Mass. Aug. 23, 2021). And in *Lennar Northeast Properties, Inc.* v. *Barton Partners Architects Planners Inc.*, plaintiffs moved to add a contractual indemnification claim *just 10 days* after the court declared their complaint did not properly allege one. 2021 WL 1195629, at *3 (D. Mass. Mar. 30, 2021). Further, there was "no risk of significant delay" in the schedule in that case, nor was any additional discovery going to be needed. *Id.* at 4. Not so here. *Supra* 9-12.

[9] Defendants rely on documents cited and quoted in the PTAC, which are incorporated by reference or subject to judicial notice. Doc. No. 83 at 4 n.2; *accord Young* v. *Lepone*, 305 F.3d 1, 11 (1st Cir. 2002) ("When the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss[.]"); *In re Cerence S'holder Deriv. Action*, 2025 WL 1707230, at *2 (D. Mass. June 18, 2025) (documents produced by defendants deemed incorporated by reference into complaint).

A.      **The PTAC Is Subject to the Heightened Pleading Standards of Rule 9(b) and the PSLRA.**

Under Section 10(b), Plaintiffs must plead: (1) a material misrepresentation or omission; (2) made with scienter; and (3) loss causation. *Advest*, 512 F.3d at 58. Such claims are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27-30 (1st Cir. 2012). The PTAC thus must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The PTAC must also "state with particularity facts giving rise to a strong inference that the defendant acted" with "intentional or willful conduct designed to deceive or defraud" or "a high degree of recklessness." *Metzler Asset Mgmt. GmbH* v. *Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019).

B.      **Defendants' Statements About Aducanumab's Efficacy Are Statements of Opinion That This Court Dismissed, Which Was Affirmed on Appeal.**

The SAC challenged Defendants' publicly expressed opinions about the efficacy of aducanumab in patients who received the high dose (10mg/kg) over a sustained time period. Doc. No. 58 ¶ 150. Those statements were made following three key clinical trials:

- In 2012, Biogen conducted the PRIME Phase 1b study (Study 103). PRIME, primarily a safety study, *id.* ¶ 68, met its safety endpoint and also revealed that patients who received a high dose of aducanumab (10 mg/kg) saw a statistically significant reduction in both amyloid beta aggregates in the brain and clinical decline. Trach Decl., Ex. A, Doc. No. 62-1 at 88-90.

- In 2015, Biogen commenced two Phase 3 clinical trials to evaluate efficacy and safety: ENGAGE (Study 301) and EMERGE (Study 302). Doc. No. 58 ¶¶ 4, 76-77; Doc. No. 62-1 at 11, 29.[10] These studies were prematurely terminated.[11] After further analysis, Biogen and the

---

[10] Approximately two-thirds of the study patients carried the gene ApoE4 ("carriers"). Doc. No. 58 ¶ 79. The trial protocol initially restricted the dose that carriers could receive to 3 or 6 mg/kg, rather than the 10 mg/kg dose that non-carriers could receive, but protocol amendments eventually permitted the 10 mg/kg dosage to be tested in carriers. *Id.* ¶¶ 94-100. Because Study 302 started after Study 301, these amendments resulted in more patients in Study 302 receiving the 10 mg/kg dose for a longer period. *Id.* ¶ 11; Doc. No. 62-1 at 64.

[11] An independent committee determined from pooled data that continuing the trials would be futile, Doc. No. 58 ¶¶ 103, 105, 107, and Biogen announced their termination on March 21, 2019,

14

FDA determined that Study 302 met its primary and secondary endpoints, and that a high dose of aducanumab (10 mg/kg) reduced clinical decline. *Id.* ¶¶ 177, 181. Study 301, a negative study, failed to reach its endpoints, but in *post hoc* analysis, a subset of patients in Study 301 who received sufficient high-dose exposure showed results similar to those found in Study 302. *Id.*

The SAC challenged Biogen's opinions about the efficacy of high-dose aducanumab, beginning on October 22, 2019, when Biogen announced that it would seek FDA approval. For example, Biogen opined that "sufficient exposure to high dose aducanumab reduced clinical decline"—a finding that "was statistically significant in EMERGE" and supported by the data from a subset of patients who achieved "sufficient exposure to high dose aducanumab in ENGAGE," as well as data from the earlier PRIME study. Trach Decl., Ex. D, Doc. No. 62-4 at 5-6.

The FDA concurred with Biogen. On November 4, 2020, the FDA and Biogen issued a briefing document (the "Briefing Book"), which reflected the FDA's positive views about high-dose efficacy. Doc. No. 58 ¶¶ 262, 266, 268-69; Doc. No. 62-1. The FDA concluded that "the effect of aducanumab in Study 302 is ***robust and exceptionally persuasive*** on ***several*** of the instruments used to evaluate efficacy" and "characterized [Study 302] as 'highly persuasive' evidence of aducanumab's efficacy." Doc. No. 58 ¶¶ 298, 301. The FDA agreed that Study 103 could serve "as a supporting study to approve aducanumab." *Id.* ¶¶ 298, 300. And the FDA found that Study 301 "do[es] not meaningfully detract from the persuasiveness of Study 302" because "patients with higher exposure to the 10 mg/kg dose in Study 301 had similar responses to patients in Study 302." Doc. No. 62-1 at 94. Later, on June 7, 2021, the FDA approved aducanumab through its accelerated approval pathway. Doc. No. 229-2 ¶ 398; Trach Decl., Ex. B, Doc. No. 62-2 at 2, 3.

---

*id.* ¶ 108. Biogen then analyzed the data, including three additional months of data generated between the futility analysis cutoff and the trials' termination. *Id.* ¶¶ 102, 108, 118.

15

After Defendants moved to dismiss the SAC, this Court ruled that the SAC failed to plead that Defendants' statements about high-dose efficacy were false. Doc. No. 76 at 19-27. At the outset, the Court determined that Defendants' alleged misstatements were "interpretations of clinical trial data" and properly analyzed as "opinions," which are actionable only if they are both objectively and subjectively false. *Id.* at 17-18. The Court also explained that Biogen had been "transparent" that its conclusions were drawn from a post hoc analysis that used "alternative statistical analyses" to "look for evidence of efficacy to support FDA approval." *Id.* at 24.

Plaintiffs argued that Biogen's topline interpretations were objectively false based on an appendix to the Briefing Book prepared by FDA statistician Tristan Massie that offered alternative post hoc analyses to Biogen's and the FDA's (the "Massie Appendix"), focusing on patient subgroups. Doc. No. 58 ¶ 275; Doc. No. 58-3. The Court rejected that argument because "nothing in the [SAC] establishes the primacy of the sub-group level analysis," and the facts alleged in the SAC—including the FDA's endorsement of Biogen's conclusions over Plaintiffs'—"demonstrate[] that the proper statistical method for analyzing the topline results is one of genuine scientific debate and therefore not actionable under the PSLRA." Doc. No. 76 at 24-25. The Court further held that Biogen had "no affirmative duty to disclose all information" about the clinical trials. *Id.* at 26. Thus, omission of Plaintiffs' preferred subgroup analysis "was not misleading given that Biogen expressed its conclusions as reasonable opinions" and "consistently framed the support [from Study 301] as qualified and applying to just a portion of the patient data." *Id.* at 26-27. With respect to subjective falsity, Plaintiffs' claims failed because the SAC lacked facts showing that Defendants subjectively disbelieved their opinions about aducanumab's efficacy. *Id.* at 18.

The Court also held that Plaintiffs failed to plead a strong inference of scienter. *Id.* at 34-

16

38. Even assuming that Biogen was aware of Massie's countervailing subgroup analyses, that fact does not "support the conclusion that Biogen believed its own conclusions were wrong." *Id.* at 34. The Court also emphasized that "the FDA ha[d] endorsed the post hoc analysis and conclusions . . . with full visibility into the underlying data," which was "strong evidence against finding scienter." *Id.* at 35, 38. Additionally, the Court found that Biogen had "a plausible explanation" for withholding subgroup data: it "was under review by the FDA." *Id.* at 36.

On appeal, the First Circuit reinstated a single alleged misstatement—the July 22 Statement—but affirmed dismissal of every other statement about high-dose efficacy for failure to plead scienter. Doc. No. 83. The First Circuit reasoned that "even if the Defendants were on notice of Massie's analyses," the SAC "lacks any allegation that the Defendants honestly believed Massie's interpretation of the data over their own." *Id.* at 27; *see also id.* at 24-25. Moreover, the FDA's agreement with Biogen's interpretation "supports the inference that Biogen sincerely disbelieved Massie's interpretation of the subgroup data," and "the failure to disclose said data in this context was not made with [scienter]." *Id.* at 28. At bottom, "a legitimate disagreement over scientific data does not give rise to a securities fraud claim." *Id.* at 30.

The First Circuit likewise rejected Plaintiffs' contention that Defendants engaged in misleading "data manipulation," given that "Biogen disclosed its use of post hoc analyses, which the FDA assisted with and endorsed." *Id.* at 31. The First Circuit agreed that there was "merit to Defendants' justification for withholding" the clinical trial data in light of the impending regulatory filing with the FDA. *Id.* at 32-33. And the First Circuit concluded that the SAC's allegations of "irregularities" in aducanumab's approval "focus more on the FDA's conduct" than Biogen's, and thus "offer little meaningful insight." *Id.* at 33-34.

17

**C.      The PTAC, Which Largely Seeks to Resuscitate Previously-Dismissed Statements, Does Not Allege That Defendants' Opinions About High-Dose Efficacy Were False or Misleading.**

The PTAC seeks to revive eight previously dismissed opinions about high-dose efficacy, and add two new, similar statements, in which Defendants opined that aducanumab was effective for patients who received sufficient exposure to a 10mg/kg dose.  Doc. No. 229-2 ¶¶ 269-73, 279, 281-82, 284, 287.  For instance, Dr. Sandrock opined that "sufficient exposure to high dose aducanumab reduced clinical decline" and that the "reduction in clinical decline was statistically significant in [Study 302], and we believe that patients . . . who achieved sufficient exposure to high dose aducanumab in [Study 301] support the findings of [Study 302]."  *Id.* ¶ 269.  Dr. Budd Haeberlein similarly opined, "[i]n a post-hoc analysis, data from a subset of patients exposed to the high dose of aducanumab [in Study 301] support the positive findings of [Study 302]."  *Id.* ¶ 281.  Like the SAC, the PTAC asserts that these statements are misleading because they purportedly concealed alternative, subgroup-level analyses—later published in the Massie Appendix—that supposedly supported a different conclusion about aducanumab's efficacy.  *Id.* ¶ 274.

Plaintiffs' Motion does not address how the PTAC purportedly cures the Court's prior holding on falsity, which was not disturbed on appeal, Doc. No. 230 at 9-10, and thus remains the law of the case.  *See United States* v. *Kayser-Roth Corp.*, 103 F. Supp. 2d 74, 83 (D.R.I. 2000) ("[W]hen a higher court reverses [on] one ground and remands a case without disturbing other determinations made by a lower court, the determinations not reversed continue to be the law of the case."), *aff'd*, 272 F.3d 89 (1st Cir. 2001).[12]  As this Court held, under *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the

---

[12] *Accord United States* v. *Black*, 625 F.3d 386, 389 (7th Cir. 2010); *In re PCH Assocs.*, 949 F.2d 585, 592-93 (2d Cir. 1991).

challenged opinions are not actionable unless they are both objectively and subjectively false or omit material facts about "the type of inquiry" into or knowledge concerning a statement of opinion. Doc. No. 76 at 18.[13] The PTAC pleads neither objective nor subjective falsity.

### 1. The PTAC Does Not Plead Objective Falsity.

Plaintiffs' Motion fails entirely to address objective falsity. And, like the SAC, the PTAC does not allege that the challenged statements are objectively false. In other words, it is objectively true that: (1) a high dose of aducanumab in Study 302 "resulted in a statistically significant reduction in clinical decline compared with placebo," Doc. No. 62-1 at 41, 56; (2) even though Study 301 failed to meet its endpoints, participants "with sufficient exposure to 10 mg/kg [dosing] ha[d] clinical outcomes similar to those in Study 302," *id.* at 84; and (3) patients in Study 103 who received 10 mg/kg doses of aducanumab achieved "statistically significant amyloid plaque reduction and reduction in clinical decline," *id.* at 89. The PTAC does not challenge the accuracy of these objectively accurate observations in Defendants' statements.

Moreover, because the FDA endorsed Defendants' interpretation that high-dose aducanumab is efficacious, *supra* 15-17, "that interpretation is *per se* reasonable as a matter of law." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 421 (2d Cir. 2023); *Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (allegations that "Defendants' interpretations of the data was irrational or unreasonable . . . have little merit" following FDA acceptance).

As with the SAC, the PTAC *does not dispute* the accuracy of the statistical analyses relied on by Biogen.[14] And because the FDA endorsed Biogen's interpretation of the trial data,

---

[13] The two new alleged misstatements in the PTAC, Doc. No. 229-2 ¶¶ 279, 284, are also opinions because they "express a view" about "the phase III data." Doc. No. 76 at 18.

[14] This Court previously recognized that "Plaintiffs do not dispute that the challenged statements accurately reported the results of Biogen's post hoc analyses and that the post hoc results support the inference that aducanumab showed signs of effectiveness at higher doses." Doc. No. 76 at 23.

Defendants' interpretations are "per se reasonable." None of the new evidence cited in the PTAC disputes the accuracy of the trial data itself or these analyses. Instead, the PTAC principally points to internal correspondence that purportedly shows Defendants were aware of different subgroup analyses that Plaintiffs believe are more persuasive and support a different conclusion. But none of this evidence changes this Court's prior holding that Plaintiffs fail to plead that "Biogen's interpretation of the data was objectively false," especially given that the PTAC, like the SAC, concedes "that the FDA had endorsed Biogen's statistical model over the one Plaintiffs contend should supersede it here." Doc. No. 76 at 24-25. As the First Circuit held, "a legitimate disagreement over scientific data does not give rise to a securities fraud claim." Doc. No. 83 at 30. The PTAC may reflect a "legitimate disagreement" over how to interpret the voluminous, complex clinical trial data, but it does not and cannot show that the interpretations by Defendants and the FDA were unreasonable and objectively false. This alone renders amendment futile.

2.    The PTAC Does Not Plead Subjective Falsity.

The Court need not analyze subjective falsity because the PTAC fails to plead objective falsity. But even if the Court reaches this issue, the PTAC does not cure the SAC's failure to plead that Defendants disbelieved their public statements. None of the documents cited in the PTAC show that Defendants credited Plaintiffs' preferred interpretation of the data over their own.

*First*, Plaintiffs purport to have identified a statistical analysis by Biogen "just after [Biogen] declar[ed] futility" in March 2019 showing that "Defendants did not believe that sufficient exposure [to high-dose aducanumab] was sufficient." Doc. No. 229-2 ¶ 130; Doc. No. 230 at 11. They heavily rely on a bullet in an April 2019 slide deck, stating that, in Study 301, there was "no clear dose response to show that 14 doses of 10mg/kg works better" than placebo. Soloway Decl., Ex. 5, Doc. No. 238-5 at 5. But that bullet concerns Study 301—the negative study. And Plaintiffs concede that these analyses were based on *preliminary data* that became

20

available on March 21, 2019. Doc. No. 229-2 ¶¶ 130-32. The preliminary data was limited to the "Intent to Treat" population, meaning it included *all* randomized patients regardless of whether they actually received treatment or adhered to the protocol. This did not include the "vast set of clinical imaging and biomarker data that [Study 301 and Study 302] ha[d] generated," which Biogen "continued to analyze" over the next several months, Doc. No. 62-4 at 3, or the "final data" that Plaintiffs admit was not available until November 2019. Doc. No. 230 at 13. Biogen's extensive analysis of that additional data revealed that, in fact, participants in Study 301 with sufficient high-dose exposure achieved results similar to the comparable population in Study 302—a finding the FDA accepted and Plaintiffs *do not dispute*. *See* Doc. No. 62-4 at 8-9. This document thus says nothing about what Defendants believed six months later, in October 2019, when they first spoke publicly about aducanumab's efficacy after substantial additional analyses.

And none of the other cited documents—which Plaintiffs frequently mischaracterize— show that any Individual Defendant did not believe their opinions that aducanumab trial data supported high-dose efficacy. For example:

- Plaintiffs say Biogen ██████████████████████████████████████████ ████████████████████████████████████████ Doc. No. 230 at 11 (citing Doc. No. 229-2 ¶¶ 223-25). ████████████████████ ██████████████ *See* Soloway Decl., Ex. 6, Doc. No. 238-6. ██████████ ████████████████████████████████████████ *Id.* at 1, 2.

- Plaintiffs say that Defendants "concluded" that "no one factor, including timing of pv3 and pv4 and the resultant dose changes, would explain why 301 and 302 had different outcomes." Doc. No. 230 at 11. They doubly misrepresent the cited document. *First*, they omit that the quoted language in the cited September 2019 email reflected Biogen's "*initial hypothesis*"— from months earlier, based on preliminary data—and not a "conclusion." *See* Soloway Decl., Ex. 7, Doc. No. 238-7 at 2. *Second*, they omit that the same document goes on to offer the "Conclusion" that, at sufficient doses, "the difference between 301 high dose and matched placebo patients *were approximately = to the aggregate 302 study outcomes*"—precisely the interpretation that Defendants relied on when speaking publicly. *Id.*

- Plaintiffs say that Biogen chose not to present carrier/noncarrier subgroup analyses at CTAD

21

in December 2019 because "it would show" Defendants were "data mining." Doc. No. 230 at 13. The cited document says the opposite. It lists "pros" and "cons" of presenting various data. *See* Soloway Decl., Ex. 8, Doc. No. 238-8 at 8. One "con" of presenting carrier/noncarrier subgroup data is: "may detract focus from core topline data and could imply data mining." *Id.* In other words, the author was concerned that *presenting* the subgroup analysis could "imply data mining" (i.e., that Biogen was selectively presenting some subgroups and not others)—not that the topline results that Biogen did present were "data mining."

- Plaintiffs say that pre- and post-PV4 data was "repeatedly raised at Biogen's Board of Directors level," Doc. No. 230 at 12 (citing Doc. No. 229-2 ¶¶ 218-22), but the document they cite actually says that the Board asked repeatedly about a potential manufacturing issue, called "batch effect," and *not* the PV4 subgroup data. *See* Soloway Decl., Ex. 9, Doc. No. 238-9 at 1.

- Plaintiffs say that Dr. Budd Haeberlein admitted that the difference between Studies 301 and 302 is "not a 'home run,'" undermining Biogen's "simple" dose explanation. Doc. No. 230 at 14 (citing Doc. No. 229-2 ¶¶ 226-36). This document is from May 2020, after all of the PTAC's newly added statements, and is thus irrelevant. *See* Soloway Decl., Ex. 10, Doc. No. 238-10. In any event, what Dr. Budd Haeberlein actually says is that a "simple" dose explanation cannot account for all differences between Studies 301 and 302, citing, for example, the subgroup of patients "in Japan." *Id.* at 1. That certain analyses that hold true broadly may not apply to smaller subgroups, who may have different disease characteristics, is unremarkable. The document certainly does not convey disbelief by Dr. Budd Haeberlein in the topline conclusions she publicly stated months earlier.

- Plaintiffs cite feedback from a third party, Dr. Fleming, hired by Biogen to review the trial data. *See* Soloway Decl., Ex. 11, Doc. No. 238-11. This document postdates *every* new alleged misstatement and is irrelevant. It also does not show Defendants' subjective disbelief: Dr. Fleming's takeaway was that he "agreed" with Biogen's findings but found the evidence relatively "weak" and recommended an additional study. *Id.* at 2. This document shows nothing about Defendants' beliefs when they made the challenged statements months earlier.

In short, none of the newly added allegations demonstrate that Defendants did not subjectively believe their publicly expressed opinions.

*Second*, Plaintiffs argue that Massie shared subgroup analyses with Biogen in August 2019. Doc. No. 230 at 11 (citing Doc. No. 229-2 ¶¶ 151-78). The PTAC provides examples of Biogen employees discussing opinions that later appeared in the Massie Appendix, including that (i) pre-PV4 patients outperformed post-PV4 patients in Study 302 (Doc. No. 229-2 ¶¶ 218-22) and (ii) "the overall benefit to Non-Carriers was almost non-existent" (*id.* ¶¶ 193-217). Doc. No. 230 at

22

12-14. Again, this says *nothing* about whether Defendants subjectively disbelieved their public statements. And this Court and the First Circuit both held that the challenged statements were not actionable "even if the Defendants were on notice of Massie's analyses" because the complaint "lacks any allegation that the Defendants honestly believed Massie's interpretation of the data over their own." Doc. No. 83 at 27; Doc. No. 76 at 34.

*Third*, Plaintiffs complain that Defendants "split data post hoc any number of ways" until they found a "population that did well," "running thousands of permutations." Doc. No. 230 at 11-13. But the Court already settled this issue, explaining that "post hoc analyses are exploratory by nature," so where "it is clear that a post-hoc analysis is being used, it is understood that those results are less significant and should therefore have less impact on investors." Doc. No. 76 at 23. Here, "Biogen was transparent that the goal of the post hoc analyses was to look for evidence of efficacy to support FDA approval and Biogen further disclosed that its post hoc analyses were aimed at using alternative statistical analyses to identify different, non-specified, indicators of effectiveness." *Id.* at 24. Nothing in the PTAC disturbs the Court's prior rejection of this theory.[15]

*Fourth*, Plaintiffs argue that the FDA's statisticians were "excluded" from a "working group" analyzing the clinical trial results. Doc. No. 230 at 11 (citing Doc. No. 229-2 ¶¶ 151-78). This allegation has no bearing on any Individual Defendant's subjective beliefs and it is irrelevant to any claim in this case. It is also not supported by *any* particularized factual allegations. The PTAC includes the conclusory allegation that Massie's input was "difficult" and so "Biogen and

---

[15] Relatedly, Plaintiffs say that Biogen's post hoc analyses "violated" internal "guidelines." Doc. No. 230 at 12. But they cite a "backup" slide from an internal presentation that lists questions to help "establish the likely validity of a subgroup as a guide to additional trials." Doc. No. 229-2 ¶ 180; Soloway Decl., Ex. 12, Doc. No. 238-12 at 116. Plaintiffs do not explain what aspect of these "guidelines" Biogen supposedly "violated," nor that any Individual Defendant was aware of these "guidelines" or any supposed "violation." This allegation is completely disconnected from Plaintiffs' fraud claim.

Dunn . . . excluded Massie and all other FDA statisticians," but cites no facts describing *who* made this decision, *why* they made it, *what* was communicated to whom, or *when* or *how* it was communicated. Doc. No. 229-2 ¶ 177.

*Fifth*, and relatedly, Plaintiffs rehash allegations that Biogen worked with a "pliable FDA official" who coordinated with Biogen in "one-on-one phone calls and meetings." Doc. No. 230 at 14. The First Circuit already rejected these allegations because they "focus more on the FDA's conduct throughout the approval process than Biogen's and thus offer little meaningful insight into whether Defendants knew" their statements were misleading. Doc. No. 83 at 33-34; *id.* ("It is not clear . . . what rule investors allege Biogen violated."). And Plaintiffs ignore that *numerous* FDA personnel—not just a single "official"—agreed with Biogen's interpretation and granted accelerated approval. Trach. Decl., Exs. A, K-N, P, Doc. Nos. 62-1, 11-14, 16; Doc. No. 229-2 ¶¶ 395-99.[16]

*Sixth*, Plaintiffs allege that in May 2020 Defendants "developed a strategic plan" to seek Japanese approval after FDA approval because the Japanese regulators asked "tough" questions. Doc. No. 230 at 13; Doc. No. 229-2 ¶¶ 249-68. These allegations are irrelevant: the PTAC does not allege *any* misstatement concerning Biogen's interactions with foreign regulators, all of which are alleged to have occurred *after* every new alleged misstatement was made. *Id.*[17] And these

---

[16] Plaintiffs cite a message from *November 30, 2020*—weeks after the putative class period—in which one Biogen employee told another that ███████████████████████ ███████████████████████ Doc. No. 230 at 14; Doc. No. 229-2 ¶¶ 10; 390-91; Soloway Decl., Ex. 13, Doc. No. 238-13 at 7. The PTAC provides no allegation as to how this message supports scienter, let alone a strong inference of scienter.

[17] The PTAC also implies that Biogen's selection of which data "outliers" to exclude was somehow inappropriate because Biogen evaluated "210 different permutations" before picking one. Doc. No. 229-2 ¶¶ 256-68. But Plaintiffs do not allege what, in their view, was the *proper* choice of "outliers," and they acknowledge, as Biogen and the FDA stated in the Briefing Book, that "there is no precedent" for such a selection. Doc. No. 229-2 ¶ 268. In any event, these allegations do not bear on any alleged misstatement or what any Individual Defendant believed about aducanumab.

24

allegations are untethered from the Individual Defendants, and certainly do not plead their subjective disbelief in high-dose efficacy.

*Finally*, Plaintiffs insist that a challenged statement was "outright false," Doc. No. 230 at 13, but they badly misconstrue the statement. Plaintiffs say that Biogen "presented outright false data" at CTAD by deliberately omitting newly received PV4 data from the presentation and falsely telling investors that the new data is "consistent with April data." Doc. No. 230 at 13; Doc. No. 229-2 ¶¶ 240-48. But, contrary to Plaintiffs' argument, the CTAD presentation itself *does* present the PV4 data (and the earlier email Plaintiffs cite simply considers whether or not to present the newly obtained PV4 data). Trach Decl., Ex. R, Doc. No. 62-18 at 53-58. Plaintiffs also wrongly assert that, at CTAD, Dr. Budd Haeberlein said there were only "very small changes" between the preliminary and final data (¶ 246) while presenting a slide about the "post-PV4 population" (¶ 247). But Dr. Budd Haeberlein made that statement while presenting a *different slide about different data*, as the transcript of CTAD and Biogen's slides make clear. *See* Soloway Decl., Ex. 14, Doc. No. 238-14 at 7; Doc. No. 62-18 at 22-23.[18]

### D.    The PTAC Does Not Plead a Strong Inference of Scienter.

The PSLRA requires a securities fraud complaint to "state with *particularity* facts giving

---

[18] Plaintiffs also argue that Dr. Budd Haeberlein's statement on October 22, 2019, that "the analysis that we've conducted to date has been on the entire studies," was "false" because it ignored Biogen's subgroup analyses. Doc. No. 230 at 13 (citing Doc. No. 229-2 ¶¶ 208-09). But the PTAC does not even list this as one of "Defendants' False Statements." *See* Doc. No. 229-2 § VI. In any event, that is not what Dr. Budd Haeberlein said. An analyst asked if Biogen's analysis included "the patients who completed after the futility cohort," i.e., the three additional months of data generated after the futility analysis cutoff. *Supra* 14 n.11. Dr. Budd Haeberlein confirmed that it did include the entire period, and explained that subgroups "will come later." Doc. No. 229-2 ¶¶ 209-10. As the First Circuit held, investors fully understood in October 2019 that Biogen was not presenting subgroup analyses at that time, Doc. No. 83 at 29, and no reasonable investor would have understood Dr. Budd Haeberlein to say that Biogen had performed *no* subgroup analyses. *See* Doc. No. 229-2 ¶ 210. Plaintiffs also cannot plead loss causation for this statement because the PTAC does not plead that the "truth" about this statement was ever "revealed." *Infra* 27-29.

rise to a *strong inference* that the defendant acted with" scienter, that is "intentional or willful conduct designed to deceive or defraud investors." *Kingsley*, 928 F.3d at 158 (emphasis in original). To determine whether the requisite inference is "strong," courts must undertake "a comparative evaluation" to determine whether the "inferences urged by the plaintiff" are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The First Circuit's application of this rule "is notably strict and rigorous." *Advest*, 512 F.3d at 58 n.7.

As discussed *supra* 20-25, the PTAC fails to plead facts establishing that Defendants subjectively disbelieved their opinions about the clinical trial results and high-dose efficacy. This means the PTAC fails to raise a strong inference that Defendants acted with fraudulent intent. But, under *Tellabs*' comparative evaluation, the PTAC fails to plead scienter for the additional reason that Plaintiffs' fraud theory is implausible and less compelling than a non-fraudulent inference.

Even with the benefit of *months* of document discovery, and—by Plaintiffs' count—over 250,000 documents totaling *four million pages*, Plaintiffs have not fixed the SAC's failure to plead motive to deceive shareholders. The PTAC offers no cogent theory for *why* Defendants would pursue approval of a therapy in which they lacked confidence. As this Court previously explained, "courts have repeatedly rejected the inference that a company would continue to invest in a therapy when it supposedly knows it does not work." Doc. No. 76 at 37 (collecting cases).

Moreover, the PTAC lacks *any* allegations that Defendants benefited financially from the purported fraud. There are no allegations that any Individual Defendant sold stock at inflated prices, which weighs against scienter. *See Advest*, 512 F.3d at 66-67 (no scienter absent allegations defendants would be "personally enrich[ed]"). To the contrary, Biogen spent nearly *$10 billion* repurchasing millions of shares during the proposed class period at prices it allegedly inflated. *See*

Trach Decl., Ex. T, Doc. No. 62-20 at 49.  This negates any inference of scienter because "[i]t would make little sense for defendants to initiate a repurchase program if they knew Biogen's stock price was artificially inflated by their fraudulent misrepresentations."  *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 50 n.22 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017).

The far more compelling inference is that Defendants' statements reflected their honestly held interpretations of clinical trial data—interpretations shared by the majority of FDA personnel who reviewed the same data.  As this Court explained in dismissing the SAC: "the fact that Biogen had been working closely with the FDA and that the FDA has endorsed" Biogen's interpretation of the data "is strong evidence against finding scienter."  Doc. No. 76 at 38.  The First Circuit agreed that the FDA's endorsement supports an inference that "Biogen sincerely *disbelieved* Massie's interpretation of the subgroup data as undermining aducanumab's efficacy," Doc. No. 83 at 28, and concluded that "Plaintiffs' theory . . . defies common sense," *id.* at 33.  Nothing in the PTAC changes this analysis or makes Plaintiffs' fraudulent inference more compelling, and the amendment should be rejected for failure to plead a strong inference of scienter.[19]

### E.    The PTAC Does Not Plead That the AdCom Meeting Satisfies Loss Causation.

Loss causation requires a "causal link between the alleged misconduct and the economic harm ultimately suffered."  *In re Alkermes Sec. Litig.*, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005).  Plaintiffs must plead loss causation with specificity under Rule 9(b).  *See, e.g.*, *Miller Inv. Tr.* v. *Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 444-45 (D. Mass. 2018).

---

[19] The PTAC's remaining scienter allegations were previously pleaded in the SAC and rejected. Plaintiffs suggest that Biogen's decision not to release all the clinical trial data gives rise to an inference of scienter.  Doc. No. 230 at 14.  But this Court and the First Circuit already rejected that allegation.  *Supra* 16, 17.  The PTAC also recycles allegations from the SAC attributed to former Biogen employees that do not bear on any Defendant's state of mind.  Doc. No. 229-2 ¶¶ 382, 400(e).  These allegations have not changed from the SAC and should be rejected.

Plaintiffs allege that the "truth" concealed by Defendants' alleged misstatements was revealed by the Massie Appendix, which contained alternative subgroup analyses that Massie believed were inconsistent with high-dose efficacy. Doc. No. 229-2 ¶¶ 294-317. Plaintiffs previously argued that the November 6 AdCom meeting and vote were an *additional* loss-causing corrective disclosure. Doc. No. 163 at 17-18. But this Court rejected that argument because "it was the Massie Report [that] revealed the data Defendants had concealed." *Id.*

Plaintiffs now insist that the PTAC "alleges that new information was disclosed" at the AdCom meeting, Doc. No. 230 at 5, although their Motion provides no additional detail on *what* supposedly "new information" was disclosed. In any event, Plaintiffs are wrong. The only "new" information alleged in the PTAC appears to be that Biogen supposedly disclosed data showing that "non-carriers [in Study 302] had better outcomes after PV4" during the November 6 AdCom meeting. Doc. No. 229-2 ¶¶ 362-63. But this information was not "new." The Massie Appendix disclosed precisely the same subgroup data—comparing the performance of non-carriers in Study 302 before and after PV4—*two days earlier*. Doc. No. 58-3 at ECF page no. 35 & Fig. 6. And the SAC admitted that the Massie Appendix "reveal[ed]" that PV4 results were inconsistent with high-dose efficacy and could not reconcile the results of Studies 301 and 302. Doc. No. 58 ¶ 275. Plaintiffs' citation to already-disclosed information cannot satisfy loss causation. *In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128-29 (D. Mass. 2010), *aff'd*, 649 F.3d 5 (1st Cir. 2011). Moreover, Plaintiffs do not allege that any analyst seized on this information or that it drove the 28.2% stock drop on November 9, which was plainly attributable to the negative AdCom vote itself, as Plaintiffs previously argued. *E.g.*, Doc. No. 122 at 16-18; Doc. No. 63 at 33.

Plaintiffs are also wrong that the negative AdCom vote "was the materialization of the risk concealed by Defendants' false statements." Doc. No. 229-2 ¶ 364. Defendants did not conceal

28

such a risk—indeed, they never predicted how the AdCom would vote and expressly declined "to speculate on how the regulators would look at this kind of data" or "comment on FDA's internal processes."  Trach Decl., Ex. O, Doc. No. 62-15 at 14; Trach Decl., Ex. Q, Doc. No. 62-17 at 15.[20] *See In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 110 (E.D.N.Y. 2021) (FDA letter identifying violations was "materialization of the risk that was disclosed"); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164-65 (D. Mass. 2009) ("loss causation allegations fail because [issuer] provided adequate disclosures").

Separately, the PTAC fails to plead loss causation for Dr. Budd Haeberlein's newly-alleged misstatement that there were "very small changes" between preliminary and final datasets, Doc. No. 229-2 ¶ 284, because the PTAC does not allege that the "truth" was ever "revealed."  *Miller Inv. Tr.* v. *Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 447 (D. Mass. 2018).

## III.    PLAINTIFFS VIOLATED LOCAL RULE 15.1(B) AND CANNOT AMEND TO ADD DR. BUDD HAEBERLEIN.

Local Rule 15.1(b) requires that "[a] party moving to amend a pleading to add a new party shall serve . . . the motion to amend upon the proposed new party *at least 14 days* in advance of filing the motion."  This rule applies to amendments seeking to reinstate previously dismissed defendants, like Dr. Budd Haeberlein.  *See Sosa* v. *Mass. Dep't of Correction*, 654 F. Supp. 3d 33, 37 (D. Mass. 2023).  Dr. Budd Haeberlein was dismissed from the case in March 2025—a dismissal Plaintiffs did not oppose.  Doc. No. 163 at 21.  Plaintiffs did not serve their Motion or proposed PTAC on Dr. Budd Haeberlein or ask counsel to accept on her behalf—much less 14 days in advance as required.  This is an alternative ground to deny the Motion as to Dr. Budd

---

[20] *See also* Doc. No. 62-4 at 23 ("[T]here are circumstances where [] FDA can approve a drug based on a single study, it's up to them to determine what those circumstances are."); Doc. No. 62-18 at 6 ("[R]egulatory authorities may . . . fail or refuse to approve or may delay approval of Biogen's drug candidates, including aducanumab.").

Haeberlein.  *See Mark Breiner DDS, LLC* v. *BTL Indus. Inc.*, 2026 WL 114405, at \*13 (D. Mass. Jan. 15, 2026) (denying amendment as to five new defendants because "[t]here is no evidence in the record that plaintiffs have complied with" 15.1(b)); *Martins* v. *3PD, Inc.*, 2013 WL 1320454, at \*4-5 (D. Mass. Mar. 28, 2013) (denying motion to add new individual defendants for violation of Rule 15.1(a) and (b)).

## IV.    PLAINTIFFS CANNOT ADD POLYCON AS "LEAD PLAINTIFF."

The PTAC seeks to add a new plaintiff to this litigation: PolyCon Solutions LLC ("PolyCon"), which is falsely described as a "Lead Plaintiff" despite never having been a party to this lawsuit or appointed as lead plaintiff.  Doc. No. 229-2 ¶ 45.  PolyCon cannot join this case now—as "Lead Plaintiff" or as a substitute for Nadia Shash—for the reasons discussed in Defendants' opposition to Plaintiffs' substitution motion.  *See* Doc. No. 195.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Defendants respectfully request to be heard at oral argument.

Dated:  February 13, 2026

Respectfully submitted,

 */s/ Audra J. Soloway*
Audra J. Soloway (*pro hac vice*)
Richard C. Tarlowe (*pro hac vice*)
Daniel Sinnreich (*pro hac vice*)
Samantha A. Bui (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
asoloway@paulweiss.com
rtarlowe@paulweiss.com
dsinnreich@paulweiss.com
sbui@paulweiss.com

William J. Trach (BBO #661401)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
william.trach@lw.com

*Counsel for Defendants*
*Biogen Inc., Michel Vounatsos,*
*and Alfred W. Sandrock, Jr.,*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 13, 2026, I caused a copy of the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

<u>/s/ Audra J. Soloway</u>
Audra J. Soloway
