# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DAVID B. TRACEY, DANIEL
GUENTHER, MARIA T. NICHOLSON,
CORRINNE R. FOGG, individually and as
representatives of a class of participants and
beneficiaries on behalf of the MIT
Supplemental 401(k) Plan,

         *Plaintiffs*,

v.

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, THE MIT
SUPPLEMENTAL 401(K) PLAN
OVERSIGHT COMMITTEE, THE
ADMINISTRATIVE COMMITTEE,
ISRAEL RUIZ, ALISON ALDEN, MARC
BERNSTEIN, LAWRENCE CANDELL,
GLENN DAVID ELLISON, MICHAEL
HOWARD, MARTIN KELLY, S.P.
KOTHARI, ROBERT C. MERTON,
GUNTHER ROLAND, LORRAINE A.
GOFFE-RUSH, GLEN SHOR, PAMELA
WELDON, THOMAS M. WIEAND, and
BARTON ZWIEBACH,

         *Defendants*.

Civ. No. 1:16-cv-11620-NMG

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT

**INTRODUCTION**

When Plaintiffs originally filed this case, they sought to challenge not only Defendants' prudence in administering the Massachusetts Institute of Technology's ("MIT") Supplemental 401(k) Plan (the "Plan"), but also Defendants' character, accusing the Plan's fiduciaries of improperly favoring the interests of Fidelity and its CEO, Abigail Johnson, over those of their fellow MIT employees when making decisions about the Plan. Plaintiffs' accusations—which were based on little more than Fidelity's status as one of MIT's countless donors and Ms. Johnson's service as one of many community members of the MIT Corporation—were wholly conjectural. They were also illogical, given the substantial measures that the MIT professors and employees serving as Plan fiduciaries took *against* Fidelity's financial interests, both before and during the period at issue in the lawsuit. This Court dismissed Plaintiffs' duty of loyalty claims accordingly.

Plaintiffs now seek to revive their dismissed disloyalty claim, contending that through discovery they have learned details that were missing from their original pleadings. But even accepting Plaintiffs' purported revelations as genuine, they are far too late: The deadline for amending the pleadings passed over a year ago, and though they claim to rely for their revamped narrative primarily on documents and testimony provided last fall, they cannot justify delaying their motion for leave until half a year later—after fact discovery has closed and expert reports have been exchanged. True, as Plaintiffs observe, MIT produced a small number of documents in a clean-up disclosure this spring. But that observation is just an attempt at distraction, as Plaintiffs cite *not one* of these documents in support of their recycled disloyalty theories. Plaintiffs cannot show good cause to excuse their extreme delay in attempting to resurface their disloyalty claims beyond the amendment deadline, and that alone is sufficient to deny their Motion.

Moreover, Plaintiffs' efforts at character assassination remain as hollow today as they were in the beginning, establishing that the amendment would be futile even if Plaintiffs could muster good cause for their delay. Stripped of Plaintiffs' significant mischaracterizations, the evidence on which Plaintiffs rely shows nothing more than that, in making decision after decision for the Plan in a manner that *disfavored* Fidelity, the Plan's fiduciaries sought only to provide senior officials at Fidelity the courtesy of a heads up. Such professionalism is not disloyalty, and Plaintiffs cannot point to any evidence that the Plan's fiduciaries ever allowed Fidelity's interests to divert them from making decisions solely in Plan participants' interests. As before, Plaintiffs rely on speculation and innuendo.

Plaintiffs' Motion for leave to amend their complaint for a third time should be denied.

**<u>PROCEDURAL BACKGROUND</u>**

Plaintiffs filed their original complaint in this action on August 9, 2016, alleging that Defendants breached ERISA fiduciary duties of prudence and loyalty owed to the Plan and its participants. After Defendants initially moved to dismiss, Plaintiffs filed an amended complaint on November 16, 2016. Both complaints alleged that Defendants, including MIT professors and other MIT employees, breached their duty of loyalty by favoring Fidelity when making decisions regarding the Plan's investment options and recordkeeping arrangement. Plaintiffs based their disloyalty claim in significant part on the fact that Fidelity and its charitable foundation have been among MIT's tens of thousands of donors, and that Fidelity's CEO, Abigail Johnson, has served as a member of MIT's Board of Trustees, the "MIT Corporation." ECF No. 32 ¶¶ 82-83.

Defendants moved to dismiss the amended complaint on December 16, 2016, arguing, among other things, that Plaintiffs failed to plausibly allege any disloyalty. As Defendants explained, Plaintiffs' attempt to impugn the motives of the individual fiduciaries was not only speculative, but also inconsistent with the multiple significant actions that Defendants took

-2-

against Fidelity's financial interests. Those measures included removing all but one Fidelity investment option from the Plan's investment lineup and—contrary to Plaintiffs' assertion that Defendants allowed Fidelity's asset-based compensation for recordkeeping services to increase unchecked—terminating Fidelity's asset-based compensation altogether by limiting Fidelity to an annual per-participant fee. ECF No. 39 at 8-9, 18-19. On August 31, 2017, Magistrate Judge Bowler issued a Report and Recommendation recommending dismissal of Plaintiffs' duty of loyalty claims. ECF No. 70 at 40. On October 4, 2017, the Court adopted Magistrate Judge Bowler's recommendation in relevant part, agreeing that Plaintiffs' theories of disloyalty did not rise above speculation.[1] ECF No. 79 at 4, 6. On March 1, 2018, Plaintiffs filed a Second Amended Complaint, adding additional Defendants and eliminating disloyalty allegations per the Court's dismissal order.

Fact discovery in this matter concluded on November 30, 2018. ECF No. 136. On Plaintiffs' motion, however, the Court allowed Plaintiffs to take additional depositions in early 2019 and pushed back the deadlines for initial and rebuttal expert reports to January 31, 2019 and February 28, 2019. ECF No. 184. On March 11, 2019, the parties jointly moved to stay the litigation pending completion of a private mediation. ECF No. 188. In response, the Court extended the deadlines for completion of expert depositions and filing of summary judgment motions to June 30, 2019 and July 15, 2019, respectively. ECF. No. 190. The Court left the September 9, 2019 trial date unchanged. *Id.*

---

[1] Contrary to Plaintiffs' representation, this Court did not dismiss their loyalty claim as speculative because it lacked "the benefit of discovery." Mot. 2. Nor did the Court invite Plaintiffs to offer an amended pleading after the close of fact discovery. In fact, the Court ordered all amended pleadings to be filed by February 28, 2018—long before the close of fact discovery.

-3-

## ARGUMENT

**I.    Plaintiffs Have Not Shown Good Cause For Seeking Leave To Amend Their Complaint So Long After The Amendment Deadline**

Plaintiffs' Motion should be denied because Plaintiffs cannot meet the Rule 16(b) "good cause" standard that applies where, as here, a party seeks to amend the pleadings after a scheduling order deadline for amendment has expired. *See Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.*, 714 F.3d 62, 64 (1st Cir. 2013); *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). Rule 16(b) states that "[a] schedule may be modified only for good cause." Fed. R. Civ. P. 16(b). "Good cause" requires, at a minimum, a demonstration of "diligence of the party seeking the amendment[.]" *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004). The "good cause" standard, in other words, does not merely require Plaintiffs to explain why they did not seek to amend their complaint before the court-established deadline; it also requires them to demonstrate that they acted diligently and promptly to seek an amendment once they believed they had the basis to do so. Plaintiffs have not even attempted to meet that requirement, and indeed cannot do so. Even a cursory review of the record confirms that Plaintiffs lack any conceivable justification for delaying their speculative amendment until after the close of fact discovery and the exchange of expert reports and a mere 45 days before the deadline for dispositive motions.[2]

In an attempt to create the impression that they acted diligently, Plaintiffs suggest that the completion of Defendants' document production was necessary to enable them to frame their disloyalty claim. But the bulk of Defendants' documents (8,040 out of 8,144)—and ***every single***

---

[2] *See* ECF Nos. 136, 184, 190. As Plaintiffs note, in light of the parties' request that the Court stay pretrial deadlines pending mediation, Defendants did agree to treat Plaintiffs' Motion as having been filed on March 11, 2019. Even if Plaintiffs had filed their Motion on March 11, 2019, however, Plaintiffs' "good cause" story would not have been any different. As of March 11, 2019, the deadlines for fact discovery and the exchange of expert reports had passed, and dispositive motions were due April 24, 2019. *See* ECF Nos. 136, 184.

*one* of the documents on which Plaintiffs purport to rely for their story—were produced by the end of October 2018. Rice Decl. ¶¶ 3-4. Only 104 documents were produced after October 2018, just 74 in 2019, and Plaintiffs do not rely on *any* of those materials as a basis for their proposed amendment. *Id.*; *see* Mot. 5. Plaintiffs likewise acknowledge that they received Fidelity's third-party production by the end of October 2018. Mot. 5. That a clean-up production of a few documents with no relevance to Plaintiffs' proposed loyalty claim occurred "as late as March 22, 2019," *id.*, therefore cannot justify Plaintiffs' delay to the twelfth hour in moving to amend.

Plaintiffs also suggest that their Motion is timely because they did not arrange to take the deposition of one fact witness (Michael Howard) until March 15, 2019.[3] *See id.* But, here again, the majority of the fact depositions taken by Plaintiffs, including most of those cited in Plaintiffs' proposed amendment, had been completed by the end of November 2018. Rice Decl. ¶ 5. Plaintiffs offer no explanation as to why they could not have sought leave to amend then based on the parties' substantial completion of discovery by that time—particularly given their insistence that they "did not derive the new claim from a single document or deposition." Mot. 5.

Of course, Plaintiffs predictably claim that Mr. Howard's deposition is a basis for some of their new allegations. Yet Plaintiffs do not assert that his testimony (which simply parroted passages in previously produced documents) was so critical to their claim that they could not have sought leave to amend earlier without it, much less explain why. In fact, Plaintiffs rely on Mr. Howard's deposition principally to establish that, as a former Fidelity employee, he had confidential information regarding Fidelity's financial and pricing practices that MIT did not

---

[3] Mr. Howard's deposition was originally scheduled for November 28, 2018, but Plaintiffs elected to cancel that deposition in order to prioritize the depositions of other witnesses. *See* Rice Decl. ¶ 6 & Exs. A (Howard Dep. Notice), B (Nov. 5, 2018 Email from S. Apking cancelling deposition).

seek to exploit when negotiating Fidelity's recordkeeping compensation. *See* Mot. 11-12. Plaintiffs, however, do not contend that before Mr. Howard's deposition they were unaware of his prior employment with Fidelity, which can be readily ascertained through a simple internet search.[4]  Moreover, by the end of November 2018, Plaintiffs had deposed the key individuals who led MIT's negotiations with Fidelity, including Israel Ruiz, and those witnesses could have told Plaintiffs precisely who did and did not participate in that process.[5]

This likely explains why Plaintiffs try to hang their recycled loyalty claim not on any specific subset of documents or testimonial passages, but rather on "the totality of the facts and circumstances." Mot. 5.  The problem they face, however, is that the individual "circumstances" constituting the "totality" were by and large disclosed long before they sought leave to amend. Plaintiffs' fuzzy assertions that "facts were disclosed in discovery" and "[t]he nature of the facts constituting a breach are cumulative" (Mot. 5-6) fall far short of the "exacting" "good cause" standard that governs a late-filed motion for leave to amend. *See Steir*, 383 F.3d at 12 ("As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting [under the Rule 16(b) standard].").  Because Plaintiffs cannot meet that rigorous good cause standard, their Motion must be denied.

## II.      Plaintiffs' Proposed Amendment Would Be Improper Even Under The Less Exacting Rule 15 Standard

Even if Plaintiffs could show good cause to excuse their noncompliance with the Court's scheduling order, their Motion could not be accepted unless the Court also found the proposed amendment proper under the standards of Rule 15(a)*. See Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 342 (D.R.I. 2018).  There

---

[4] *See* Mike Howard, *LinkedIn* Profile Page, https://www.linkedin.com/in/mike-howard-924a986/ (last visited June 14, 2019).

[5] *See* Rice Decl., Ex. C (Ruiz Dep.) at 170-71.

are ample grounds to deny Plaintiffs leave to amend under those standards. "[A] request to amend—especially a belated request—requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations." *Palmer v. Champion Mortg.*, 465 F.3d 24, 30-31 (1st Cir. 2006). Especially pertinent in this case, "reasons for denying leave include undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility of amendment." *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 48 (1st Cir. 2009) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, not only have Plaintiffs unduly delayed in seeking leave to amend, as already explained, *see supra* at 4-6, but also their proposed amendment would be futile and unduly prejudicial to Defendants.

A.      **Plaintiffs' Proposed Amendment Is Futile**

The futility of a proposed amendment alone "is fully sufficient to justify the denial of a motion to amend." *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001); *see Correa–Martinez v. Arrillaga Belendez*, 903 F.2d 49, 59 (1st Cir. 1990) ("Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters."), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004). Plaintiffs' amendment here does not clear the futility threshold. Like the claim the Court has already dismissed, Plaintiffs' proposed amendment alleges that Defendants sought to favor the interests of Fidelity and the Johnson family over those of Plan participants and attempts to attribute any conduct that Plaintiffs have deemed imprudent to that supposed improper purpose. At the end of the day, however, Plaintiffs offer no facts capable of raising their theory above the mere speculation that doomed their original claim. Even with the benefit of full fact discovery, they cite no evidence linking any purportedly improper action or inaction by any Plan fiduciary to an effort to benefit or curry

-7-

favor with Fidelity.  Instead, Plaintiffs cite evidence that, at best, shows only that when Defendants made decision after decision ***against*** Fidelity's interests, such as curtailing Fidelity's investment management responsibilities and ultimately removing all but one Fidelity investment option from the Plan's menu, MIT's officials sought to be professional and courteous in informing Fidelity's managers of those decisions.  ERISA does not prohibit fiduciaries from operating with professional courtesy, and nothing Plaintiffs cite in support of their Motion provides a basis to resuscitate their previously dismissed disloyalty claim.

For instance, Plaintiffs' allegation that former MIT Executive Vice President and Treasurer Teresa Stone disloyally put Fidelity's interests ahead of the Plan's is based almost entirely on a single comment at a June 2009 Oversight Committee meeting—prior to the relevant period.  Ms. Stone then reportedly noted that MIT must be "sensitive" to its "decades long plus relationship with Fidelity" and to the fact that Fidelity's Ms. Johnson was a member of the MIT Corporation and MIT Investment Management Company ("MITIMCo")'s Board of Trustees. Mot. 7.[6]  Plaintiffs imply that this comment was connected to MIT's analysis of the pricing of Fidelity's ongoing recordkeeping arrangement.  In fact, Ms. Stone made this observation in the context of MIT's decision to transfer ***hundreds of millions of dollars*** in Plan assets out of Fidelity-managed funds and into funds managed by Fidelity competitors Vanguard and PIMCO—and solely for the purpose of ensuring that communication of this adverse decision was handled professionally.[7]  Read in context, Ms. Stone's comment does not remotely suggest that any decision regarding the Plan was made to advance Fidelity's interests rather than those of Plan participants; it merely reflects a reasonable—and legally permissible—desire to be

---

[6] Plaintiffs' Motion cites paragraph 11(d) of their Exhibit C to the Declaration of Joel D. Rohlf.  Paragraph 11(d) in turn cites MIT-0118924 in support.  For ease of reference, Defendants have attached MIT-0118924 as Exhibit D to the accompanying Rice Declaration.

[7] *See* Rice Decl., Ex. D at MIT-0118927-28, 930-31.

-8-

professional in communicating with Fidelity about changes to the Plan that were **unfavorable** for Fidelity.

The same is true of Ms. Stone's deposition testimony that she wanted to communicate adverse decisions to Fidelity "gracefully." Mot. 8. There is not a hint in the evidentiary record that MIT's many decisions (both before the class period and continuously thereafter) to reduce Fidelity's responsibilities and revenues in connection with the Plan were changed or delayed as a result of Ms. Stone's endeavor to provide courtesy notifications of these adverse decisions to Fidelity managers given the longstanding service relationship between the Plan and Fidelity. And Plaintiffs' suggestion that there is something nefarious about Ms. Stone's non-Plan interaction with Ms. Johnson on MITIMCo's Board of Trustees, and her acknowledgement of Fidelity's charitable contributions to Boston's Museum of Fine Arts (of which Ms. Stone was a trustee), *see* Mot. 8, is plainly scurrilous. These interactions outside the context of Ms. Stone's service to the Plan do not in any way indicate that Ms. Stone made any decision regarding the Plan for the purpose of benefitting Ms. Johnson or Fidelity. Again, all of the evidence is to the contrary—beginning before the class period and continuing thereafter, Ms. Stone and the Committee repeatedly acted **against** Fidelity's interests during the class period, moving Plan assets away from Fidelity funds to funds managed by other companies.

Plaintiffs' attempt to cast the statements of Ms. Stone's successor, Israel Ruiz, in the same light is similarly empty. As they did with Defendants generally in the loyalty claim the Court dismissed, Plaintiffs speculate that Mr. Ruiz's Plan decision-making must have been guided by an illicit motive to favor Fidelity due to Ms. Johnson's participation along with other

-9-

members of the community on a visiting committee for MIT's Sloan School of Management.[8]

But, here again, Plaintiffs ignore that, just as Ms. Stone did, Mr. Ruiz presided over a steady

withdrawal of Plan-related responsibilities and revenue from Fidelity, and the evidence they cite

reflects nothing more than Mr. Ruiz's efforts to communicate these adverse decisions to Fidelity

officials in a polite and professional manner. For example, Plaintiffs highlight an email

exchange between Mr. Ruiz and Michael Howard, then chair of the Oversight Committee's fund

selection subcommittee, that occurred after the Committee reached the "consensus view" that

Fidelity should be removed from the list of candidates to provide asset-management services for

the Plan's lineup of passive investment options in the major Plan re-design that came to fruition

in 2015.[9] Mr. Ruiz indicated that he wanted to advise MIT's president and chairman of that

news after a meeting of the Sloan Visiting Committee, and Mr. Howard agreed to temporarily

pause work on the "index provider work stream" until Mr. Ruiz had that conversation.[10]

Plaintiffs seize on this communication as signaling disloyal decision-making, but they fail to

acknowledge that Mr. Howard specifically testified that pausing that one aspect of the

subcommittee's work (after deciding to exclude Fidelity from further consideration) did not in

any way delay the overall effort to consolidate the Plan's lineup.[11] More fundamentally,

Plaintiffs breeze past the conceded fact that the subcommittee's decision to opt for a provider

other than Fidelity became the final fiduciary judgment—Mr. Ruiz never intimated that

Fidelity's products should continue to be considered by the subcommittee, and Defendants

---

[8] *See* The MIT Corporation, Visiting Committees, https://corporation.mit.edu/committees/visiting-committees (last visited June 14, 2019) (visiting committees marshal input from the community on MIT's core educational mission).

[9] Mot. 10; Rice Decl., Ex. E at MIT-0122074; *see id.*, Ex. F (Howard Dep.) at 133:9-13.

[10] Rice Decl., Ex. E at MIT-0122074-75; *id.*, Ex. F (Howard Dep.) at 137:14-139:17.

[11] Rice Decl., Ex. F (Howard Dep.) at 134:24-135:20.

ultimately selected non-Fidelity providers for the Plan's passive options.[12]  Plaintiffs' reckless

insinuations, in short, are contrary to the facts established long ago in discovery.

Plaintiffs' other efforts to suggest that MIT's fiduciaries made Plan decisions with

Fidelity's interests in mind are weaker still.  For instance, Plaintiffs seize on an email in which

David Schmittlein, Dean of MIT's Sloan School of Management, joked about the Johnson family

donating to MIT, *see* Mot. 11, but Plaintiffs know that Mr. Schmittlein has never had any

fiduciary responsibility for the Plan.  Plaintiffs also suggest that Defendants acted disloyally by

not seeking to exploit confidential, inside information Mr. Howard gained from his prior

employment with Fidelity, and by not giving him an "active role in negotiating or assessing

recordkeeping fees."  Mot. 12.  But setting aside the serious ethical questions that could have

arisen had MIT sought to capitalize on Mr. Howard's recollections of Fidelity's confidential

financial information in attempting to negotiate with Fidelity, Plaintiffs point to no decision

about Mr. Howard's role with respect to the Plan that was made to favor Fidelity.  Indeed, if Mr.

Howard—a former senior Fidelity official—*had* been given responsibility to negotiate MIT's

recordkeeping relationship with his former employer, Plaintiffs surely would be attempting to

cast that decision as disloyal and conflicted as well given his prior affiliation.

Finally, in addition to their assertions of disloyalty, Plaintiffs also attempt to shoehorn

into their amendment an entirely new theory that Defendants improperly allowed Fidelity to use

its role as Plan recordkeeper to market non-Plan products to participants.  *See* Mot. 12-13.  Yet

far from supporting this new theory, the evidence flatly contradicts it.  For example, Plaintiffs

assert that "Fidelity offered Plan participants a retirement planning tool on the Plan's website

that solicits non-Plan products when utilized."  *Id.*  The cited evidence, however, has nothing to

do with the Plan website.  Instead, the evidence on which plaintiffs rely indicates only that one

---

[12] *See* Rice Decl., Ex. G at MIT-0008975-79.

witness received an email from Fidelity describing annuity products after she accessed a

retirement planning tool on the general Fidelity.com website—not the Plan website—in

connection with an entirely separate individual retirement account she opened with Fidelity

*before* joining MIT.[13]  Plaintiffs identify no evidence that the Plan's website offered the

retirement planning tool in question, and the only record evidence on the point suggests that it

did not.[14]

Similarly, while Plaintiffs assert that "Fidelity's on-site representative could assist Plan

participants in purchasing nonplan Fidelity products" (Mot. 13), the cited testimony concerns

only Fidelity's *general* practice a decade ago—not its practice *at MIT* during the class period.[15]

Additionally, Mr. Howard's testimony does not suggest that, even under Fidelity's general

practice, Fidelity's on-site representatives could *initiate* discussions with plan participants about

non-plan products—only that, upon the request of a plan participant, they "could assist" plan

participants seeking to purchase such products.[16]  Again, that testimony addresses Fidelity's

*general* practices, and Plaintiffs have not shown any evidence of such practices *at MIT*.

Similarly, the testimony Plaintiffs cite to supposedly show that "Fidelity affirmatively reached

out to the Plan's high net worth clients … to provide 'retirement planning,' i.e., sales pitches"

(Mot. 13) does not in fact indicate that such communications ever occurred.  Indeed, the very

document the deponent was addressing shows that MIT objected when it mistakenly believed

that Fidelity may have intended to move forward with such a project.[17]  In sum, stripped of their

---

[13] Rice Decl., Ex. H at FIDELITY002759; *see id.*, Ex. I (Samuelson Dep.) at 70:7-14 ("Q.  Do you recall how you got to that income evaluator tool? A. I got it through the Fidelity.com platform because I had a rollover IRA.").

[14] *Compare* Rice Decl., Ex. I (Samuelson Dep.) at 70:7-14 *with id.*, Ex. J (Davies Dep.) at 208:1-209:9.

[15] Rice Decl., Ex. F (Howard Dep.) at 54:7-55:18.

[16] *See id.*

[17] *See* Rice Decl., Ex. I (Samuelson Dep.) at 79-80; *id.*, Ex. K at FIDELITY003238-41.

blatant mischaracterizations of the evidence, Plaintiffs offer no factual basis for this newly-minted theory.

**B.** **Defendants Would Plainly Be Prejudiced By The Addition Of A New Claim On The Eve Of Summary Judgment Briefing And Trial**

Finally, Plaintiffs' bare assertion that granting their Motion for leave to amend will have no impact on the timing or substance of further proceedings in this case defies credulity. *See* Mot. 14-15. Fact discovery is closed, expert reports have been exchanged, and Defendants have begun preparing both for summary judgment proceedings (with opening briefs due in a month), and for a trial on Plaintiffs' existing claims in September. Introduction of a new theory of liability at this late stage plainly would prejudice Defendants and place the existing schedule in jeopardy.

Plaintiffs attempt to deflect any claim of prejudice by contending that the proposed amendment, if permitted, would "not require additional discovery." Mot. 1; *see id.* at 14-15. But even if ***Plaintiffs*** do not intend to take additional discovery to support their claim, by waiting until this late stage to seek leave to amend, they have denied ***Defendants*** the opportunity to develop a factual record on Plaintiffs' new theories. *See Bacchi v. Mass. Mut. Life Ins. Co.*, 2016 WL 8710427, at *1, 4 (D. Mass. May 20, 2016) (adopting recommendation that motion for leave to amend filed "after fact discovery was closed, and after the defendant's expert reports had been served" be denied, as "the defendant ha[d] been foreclosed from exploring the[] new allegations in discovery").[18] The prejudice to Defendants would be particularly acute in the circumstances

---

[18] Plaintiffs assert that the proposed amendment would not seriously alter the proceedings because the facts underlying their proposed loyalty claim are also purportedly relevant to Plaintiffs' prudence claim and Plaintiffs are not seeking any additional damages through their new claim. Mot. 15. But even if Plaintiffs were correct that the facts that ***they*** intend to rely on for the proposed claim are also relevant to their existing ones (which they have not shown), Defendants should not be artificially constrained to rely on the same facts in developing their defense, and the legal standards applicable to the two claims are unquestionably different. Moreover, if Plaintiffs were correct that the proposed amendment would change nothing, that would itself be a sufficient reason to deny Plaintiffs'

here because Plaintiffs' proposed amendment rests in part on assertions about the conduct and practices of a third party, Fidelity, *see* Mot. 13, about which Defendants may not possess full information. If Plaintiffs' motion were allowed at this stage, Defendants would have less than a month to develop their defense to Plaintiffs' new claim before summary judgment briefing is due, with a trial scheduled to begin shortly thereafter. The First Circuit has repeatedly recognized that permitting an amendment in similar circumstances would unfairly prejudice the defendant. *See, e.g.*, *Grant v. News Grp. Boston, Inc.*, 55 F.3d 1, 5 (1st Cir. 1995) (affirming denial of motion to amend where "discovery was already complete" and defendant "had nearly completed its motion for summary judgment and undoubtedly was well into its trial preparation"); *Tiernan v. Blyth, Eastman, Dillon & Co.,* 719 F.2d 1, 4-5 (1st Cir. 1983) (finding prejudice even where additional discovery was not necessary, as additional claims "may well have affected defendants' planned trial strategy and tactics" and would likely have "required additional time to prepare for trial"); *see also McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger*, 1999 WL 813952, at *4 (D.N.H. Apr. 29, 1999) ("Undue prejudice is likely if an amendment is proposed after the close of discovery." (citing *Grant*, 55 F.3d at 5-6)).

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for leave to file the proposed Third Amended Complaint should be denied.

Dated: June 14, 2019

Respectfully Submitted,

*/s/Shannon M. Barrett*
Brian D. Boyle (*pro hac vice*)
Gregory F. Jacob (*pro hac vice*)
Shannon M. Barrett (*pro hac vice*)

---

amendment as futile. *Todisco v. Verizon Commc'ns, Inc.*, 497 F.3d 95, 98 (1st Cir. 2007) ("The motion may also be denied if a proffered amendment . . . would serve no useful purpose." (quotations omitted)).

Meaghan VerGow (*pro hac vice*)
Deanna M. Rice (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
T: (202) 383-5300
F: (202) 383-5414
bboyle@omm.com
gjacob@omm.com
sbarrett@omm.com
mvergow@omm.com
derice@omm.com

Alison V. Douglass (BBO #646861)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
T: (617) 570-1676
F: (617) 523-1231
adouglass@goodwinlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Shannon M. Barrett, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 14, 2019.

/s/ Shannon M. Barrett
Shannon M. Barrett
*Attorney for Defendants*